# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### NORTHERN DIVISION (KNOXVILLE)

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br><br>*Plaintiff*,<br><br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHE-RINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County Board of Education,<br><br>*Defendants*. | Case No. 3:25-cv-584-CEA-DCP<br><br>District Judge Charles E. Atchley<br><br>Magistrate Judge Debra C. Poplin |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND DECLARATORY AND INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

Introduction ........................................................................................................................1

Background...........................................................................................................................2

    A.    The First Amendment guarantees equal treatment based on religion. .........................2

    B.    The charter-school program discriminates based on religion. ....................................3

    C.    The Knox County Board of Education enforces the discriminatory charter-school requirements against Wilberforce. ....................................................................6

Legal Standard....................................................................................................................10

Argument ...........................................................................................................................10

I.    Banning religious charter schools violates the Free Exercise Clause. .........................11

II.    The Establishment Clause does not justify enforcing the ban. ..................................12

    A.    The Establishment Clause does not apply. ..............................................................12

    B.    Even if the Establishment Clause applied, it could not defeat Wilberforce's free-exercise right. ...............................................................................................18

    C.    At minimum, the ban on religious sponsors is unconstitutional. ...............................20

III.    Wilberforce is entitled to a permanent injunction and declaratory judgment.........................21

Conclusion..........................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Ky. v. Grayson County,*
591 F.3d 837 (6th Cir. 2010) ................................................................................. 5

*Adickes v. S. H. Kress & Co.,*
398 U.S. 144 (1970) ................................................................................................ 16

*Barton v. Neeley,*
114 F.4th 581 (6th Cir. 2024) ................................................................................. 14

*Bays v. City of Fairborn,*
668 F.3d 814 (6th Cir. 2012) .................................................................................. 22

*Biden v. Nebraska,*
600 U.S. 477 (2023) ................................................................................................ 13

*Carson v. Makin,*
596 U.S. 767 (2022) ......................................................................................... *passim*

*Cath. Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n,*
605 U.S. 238 (2025) ................................................................................................ 19

*Caviness v. Horizon Cmty. Learning Ctr.,*
590 F.3d 806 (9th Cir. 2010) ........................................................................... 16, 17

*Church of Lukumi Babalu Aye v. City of Hialeah,*
508 U.S. 520 (1993) ................................................................................................ 11

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ................................................................................................ 12

*Commodities Exp. Co. v. Detroit Int'l Bridge Co.,*
695 F.3d 518 (6th Cir. 2012) .................................................................................. 13

*Cont'l Airlines, Inc. v. Intra Brokers, Inc.,*
24 F.3d 1099 (9th Cir. 1994) .................................................................................. 10

*DaimlerChrysler Servs. N.A. v. Summit Nat., Inc.,*
144 F. App'x 542 (6th Cir. 2005) ............................................................................ 10

*Dep't of Transp. v. Ass'n of Am. R.Rs.,*
575 U.S. 43 (2015) ........................................................................................ 13, 14, 15

*Doe v. Lee,*
102 F.4th 330 (6th Cir. 2024) ................................................................................. 22

ii

*Drummond v. Okla. Statewide Virtual Charter Sch. Bd.*,
  558 P.3d 1 (Okla. 2024) ............................................................................... 17, 20

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ...................................................................................... 21

*Engel v. Vitale*,
  370 U.S. 421 (1962) ...................................................................................... 20

*Espinoza v. Mont. Dep't of Rev.*,
  591 U.S. 464 (2020) ................................................................................ *passim*

*Everson v. Bd. of Educ.*,
  330 U.S. 1 (1947) ....................................................................................... 1, 2

*Free Speech Coal. v. Paxton*,
  606 U.S. 461 (2025) ...................................................................................... 12

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ...................................................................................... 11

*Garner v. Memphis Police Dep't*,
  8 F.3d 358 (6th Cir. 1993) ............................................................................. 10

*Howell v. Father Maloney's Boys' Haven, Inc.*,
  976 F.3d 750 (6th Cir. 2020) ......................................................................... 17

*Ill. ex rel. McCollum v. Bd. of Ed.*,
  333 U.S. 203 (1948) ...................................................................................... 20

*Jefferson v. Chattanooga Pub. Co.*,
  375 F.3d 461 (6th Cir. 2004) ......................................................................... 10

*Joelner v. Vill. of Wash. Park*,
  378 F.3d 613 (7th Cir. 2004) ......................................................................... 22

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ................................................................................ 18, 19

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ......................................................................... 14

*Lebron v. Nat'l R.R. Passenger Corp.*,
  513 U.S. 374 (1995) ............................................................................ 12, 13, 15

*Lee v. Weisman*,
  505 U.S. 577 (1992) ...................................................................................... 20

*Legend Night Club v. Miller,*
    637 F.3d 291 (4th Cir. 2011); ...........................................................21

*Lindke v. Freed,*
    601 U.S. 187 (2024)..........................................................................12

*Logiodice v. Trs. of Me. Cent. Inst.,*
    296 F.3d 22 (1st Cir. 2002) .....................................................16, 17, 18

*Manhattan Cmty. Access Corp. v. Halleck,*
    587 U.S. 802 (2019).........................................................15, 16, 17

*McDaniel v. Paty,*
    435 U.S. 618 (1978)..........................................................................21

*Mik v. Fed. Home Loan Mortg. Corp.,*
    743 F.3d 149 (6th Cir. 2014) ...........................................................13, 15

*Mitchell v. Helms,*
    530 U.S. 793 (2000)..........................................................................11

*Nken v. Holder,*
    556 U.S. 418 (2009)..........................................................................21

*Oklahoma Statewide Charter Sch. Bd. v. Drummond,*
    605 U.S. 165 (2025)...................................................................1, 3, 20

*Peltier v. Charter Day Sch.,*
    37 F.4th 104 (4th Cir. 2022) ...........................................................17

*Phillips v. Tangilag,*
    14 F.4th 524 (6th Cir. 2021) ...........................................................16

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925)..........................................................................16

*Rendell-Baker v. Kohn,*
    457 U.S. 830 (1982).........................................................16, 17, 18

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020)............................................................................21

*Rutledge v. United States,*
    517 U.S. 292 (1996)............................................................................3

*Sherbert v. Verner,*
    374 U.S. 398 (1963)............................................................................2

*Shurtleff v. City of Boston*,

    596 U.S. 243 (2022) ...................................................................................................... 19

*Thomas v. Rev. Bd.*,

    450 U.S. 707 (1981) ................................................................................................. 2, 11

*Torcaso v. Watkins*,

    367 U.S. 488 (1961) ...................................................................................................... 21

*Town of Greece v. Galloway*,

    572 U.S. 565 (2014) ...................................................................................................... 19

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,

    582 U.S. 449 (2017) ............................................................................................... 1, 3, 11

*United Specialty Ins. Co. v. Cole's Place, Inc.*,

    936 F.3d 386 (6th Cir. 2019) ........................................................................................ 22

*United States v. Miami Univ.*,

    294 F.3d 797 (6th Cir. 2002) ........................................................................................ 10

*Vette v. K-9 Unit Deputy Sanders*,

    989 F.3d 1154 (10th Cir. 2021) ...................................................................................... 5

*Wash. Cnty. Bd. of Educ. v. MarketAmerica, Inc.*,

    693 S.W.2d 344 (Tenn. 1985) ........................................................................................ 8

*Wieman v. Updegraff*,

    344 U.S. 183 (1952) ...................................................................................................... 19

**Statutes**

*Education Freedom Act of 2025*, Pub. Ch. 7, 114th Tenn. General Assembly, 1st Extraordinary Sess. ..... 3

Fed. R. Civ. P. 56 ................................................................................................................ 11, 12

Fed. R. Civ. P. 57 ...................................................................................................................... 27

Tenn. Code §48-52-102 ............................................................................................................. 13

Tenn. Code §49-13-101 ......................................................................................................... 8, 14

Tenn. Code §49-13-102 ...................................................................................................... 1, 4, 5

Tenn. Code §49-13-104 ...................................................................................................... *passim*

Tenn. Code §49-13-106 ......................................................................................................... 4, 15

Tenn. Code §49-13-107 ...................................................................................................... *passim*

Tenn. Code §49-13-108 ............................................................................................................... 4

Tenn. Code §49-13-110 ......................................................................................................... 4, 14

Tenn. Code §49-13-111 ..............................................................................................................*passim*

Tenn. Code §49-13-112 ........................................................................................................... 4, 11

Tenn. Code §49-13-113 ........................................................................................................... 4, 19

Tenn. Code §49-13-124 ..................................................................................................................14

Tenn. Code §49-13-143 ....................................................................................................................8

Tenn. Code §49-13-145 ....................................................................................................................8

Tenn. Code §49-6-3504 .....................................................................................................................5

Tenn. Code §49-6-3505 ..................................................................................................................18

**Regulations**

Tenn. Comp. R. & Regs. §520-14-01-.01 ....................................................................................8, 9

**Other Authorities**

*2025 Charter Agreement: Cornerstone Prep Denver* (Jan. 24, 2025), bit.ly/4p5IPMa.....................14

*A Charter School Application Submitted to Knox County Schools* (2014), perma.cc/8NG7-KCWK.............15

Chapman & McConnell, *Agreeing How to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* (2023)........................................................................................16

*Charter Agreement: Encompass Community School* (Jan. 24, 2025), bit.ly/3L6Axpc.......................14

*Encompass Community School, Application for a Public Charter School* (amended May 24, 2024), bit.ly/4pLOsjz ...........................................................................................................................14

*Knox County Schools Charter Performance Framework*, Knox County Sch. Bd. (2022), perma.cc/5YQH-NHMW........................................................................................................................ 8, 12

*Knox County Schools: Charter School Handbook* (2025), perma.cc/HK3S-2Y9T ............................. 8, 9, 11

McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ......................................................................................................................................20

Petrs' Br., *Oklahoma Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025) (No. 24-394) ..........20

Petr's Br., *St. Isidore of Seville Cath. Virtual Sch. v. Drummond*, 605 U.S. 165 (2025) (No. 24-396)..........20

Tenn. Op. Att'y Gen. No. 03-46, 2003 WL 21030186 (Apr. 17).....................................................5, 20

Tenn. Op. Att'y Gen. 25-19 (2025) .......................................................................................6, 8, 11, 15

Tenn. State Bd. of Educ., *Charter School Application* (2025), perma.cc/6RPW-ZT4Q......................9, 14

# INTRODUCTION

The Free Exercise Clause prohibits governments from excluding their citizens from public benefits "because of their faith." *Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947). Unfortunately, Knox County does just that in its administration of Tennessee's charter-school program. While state law and county policy let private organizations operate charter schools with "maximum flexibility," they outright ban charter schools from being religious. Tenn. Code §49-13-102(b). All "religious" and "sectarian" schools are categorically ineligible for the charter program. Tenn. Code §§49-13-104(16)(B), -111(a)(2). The First Amendment forbids this discrimination. *See Carson v. Makin*, 596 U.S. 767, 785 (2022).

Though the Supreme Court split 4-4 on the constitutionality of religious charter schools in *Oklahoma Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025), the question remains open in this circuit, and it turns on pure questions of law. Bans on religious charter schools discriminate against religion on their face, triggering strict scrutiny. To satisfy that standard, Defendants need the Establishment Clause to *require* them to ban religious charter schools. It does not. And like the merits of those constitutional questions, no other facts here are in genuine dispute. Plaintiff wants to open a charter school, is ready to do so, but is flatly barred because it is Christian. Whether its application would be approved is irrelevant to its right to seek forward-looking relief, which turns instead on its mere inability to compete. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017).

Accelerated summary judgment is not only appropriate, but necessary. It takes immense time, effort, and money to apply for, open, staff, and run a charter school. Because applications are accepted only once per year, every February that passes means the sponsor must wait another year to apply (and another two years to open the school). And Plaintiff could not safely operate until it wins relief here and that judicial victory is affirmed by the Sixth Circuit and, most likely, the U.S. Supreme Court. Plaintiff thus needs summary judgment as soon as possible. It respectfully asks this Court to enter

1

summary judgment on liability and to enter declaratory and injunctive relief. Though Plaintiff's complaint also seeks damages, it does not seek summary judgment on that theory at this time.

## BACKGROUND

### A. The First Amendment guarantees equal treatment based on religion.

The Free Exercise Clause protects religious believers not just from outright coercion, but also from discrimination. *Carson*, 596 U.S. at 778. A State "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.* If a State chooses to "subsidize private education," it cannot exclude any recipients "solely because they are religious." *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 487 (2020).

In line with these principles, American governments have long provided financial and other support to religious schools. In the founding era and early 19th century, "governments" at the federal, state, and local levels "provided financial support to private schools, including denominational ones." *Id.* at 480. "Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy." *Id.* "After the Civil War, Congress spent large sums on education for emancipated freedmen, often by supporting denominational schools in the South through the Freedmen's Bureau." *Id.* at 481. And "Congress paid churches to run schools for American Indians through the end of the 19th century." *Id.*

In the 20th century, the Supreme Court consistently recognized the right of religious believers to receive public benefits without discrimination. In its first case applying the Establishment Clause, the Court upheld a state program to aid religious schools, affirming that the right to "free exercise" prohibited States from preventing any individuals "from receiving the benefits of public welfare legislation" "because of their faith." *Everson*, 330 U.S. at 16. The Court reaffirmed that principle many times. *E.g.*, *Thomas v. Rev. Bd.*, 450 U.S. 707, 716 (1981); *Sherbert v. Verner*, 374 U.S. 398, 410 (1963).

In a recent trio of cases, the Supreme Court made clear that government efforts to fund private schools cannot exclude religious schools. In *Trinity Lutheran*, Missouri offered grants to private schools

2

to improve their playgrounds, unless the school was religious. 582 U.S. at 453-54. The Court held that "the exclusion of [a church school] from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution." *Id.* at 467. In *Espinoza*, Montana's constitution prohibited religious schools from participating in a scholarship program that used "tax credits to 'subsidize tuition payments' at private schools." 591 U.S. at 472. The Court held that this limitation, too, unconstitutionally "bar[red] religious schools from public benefits solely because of the religious character of the schools." *Id.* at 476. And in *Carson*, the Court held that Maine could not exclude religious schools from its program to pay tuition at the "approved private school of the parent's choice." 596 U.S. at 773-74, 795. Maine objected that its exclusion was based on the schools' "anticipated religious *use* of the benefits," not on their *status* as religious schools. *Id.* at 789 (emphasis added). But the Court held that "use-based discrimination" is just as "offensive to the Free Exercise Clause" as "discrimination on the basis of religious status." *Id.* at 787.

Last Term, the Supreme Court took up whether excluding privately run religious schools from a state charter-school program violates the Free Exercise Clause. With Justice Barrett recused, the Court divided evenly on that question. *Oklahoma*, 605 U.S. 165. No opinion from the Court issued. So the question remains open in Tennessee and the Sixth Circuit. *Rutledge v. United States*, 517 U.S. 292, 304 (1996).

### B. The charter-school program discriminates based on religion.

Tennessee prides itself on its "long history" of "publicly supported educational freedom." *Education Freedom Act of 2025*, Pub. Ch. 7, 114th Tenn. General Assembly, 1st Extraordinary Sess., p. 1. The state legislature declares that "parents should be free to choose the school that best fits the educational needs of their specific child." *Id.* In line with this principle, Tennessee has established a charter-school program to serve as a more flexible "alternative" to traditional public schools. Tenn.

3

Code §49-13-102(b). Under the program, nearly any non-profit organization can propose and operate its own charter school with its own unique "mission and goals." §49-13-107(b)(1).

Tennessee charter schools achieve flexibility by marrying private management with public funding. Charter schools are operated by a "governing body," which must be a non-profit 501(c)(3) organization. §§49-13-104(10), -111(a)(1). The schools receive public funding from their local county board of education. §§49-13-111 (a)(4), -112. In exchange, they are generally prohibited from charging tuition and are required to be open to all students in the district where they operate. §§49-13-106(e), -113(a)-(b). But students attend only if their parents want them to; no one is required to attend a charter school. §49-13-113(a).

To establish a charter school, the prospective governing board of the school, known as the "sponsor," must sign a "charter agreement" with the local board of education. §§49-13-104(5), -110(a). To obtain such an agreement, the sponsor usually must first submit a "letter of intent" to the local school board. §49-13-107(a). After at least 60 days have passed, the sponsor must then file an application with the board. §43-13-107(b). By statute, the sponsor's application must include 22 categories of information, including the school's mission and academic focus, its budget and operational plans, and its compliance with various state and federal requirements. §49-13-107(b). If the board approves the application, it will sign a charter agreement with the sponsor based on the representations in the application. §49-13-110(a). Once established, charter schools remain subject to oversight by the local school board. They must apply to renew their charter agreement every 10 years, meet state performance standards, and satisfy other requirements. §§49-13-108(a), -110(b)(1), (c).

Though they are denominated "part of the state program of public education," §49-13-106(a), charter schools exercise far greater autonomy than a traditional public school. The school's private governing board is vested with "control of instruction." §§49-13-111(a)(2). Each charter defines its own "academic focus," "mission," and "goals," allowing for a wide variety of schools. §49-13-

107(b)(1)-(2). A charter school can specialize in a particular subject, like "math," "science," or the "arts," or it can devote itself to "an instructional program such as Montessori or Paideia." §49-13-104(1). The ChattAcademy Community School, for instance, is a bilingual English-Spanish immersion school, while Nashville Classical Charter School centers its curriculum on the great books of Western Civilization. Verif.-Am.-Compl., Doc.10, 21.[1] An "opportunity" charter school can cater specifically to "at risk" students. §§49-13-104(13), -133. A charter school can even choose to be single sex, §49-13-107(b)(9), or, in some cases, a boarding school, §§49-13-104(13)(B), -107(b)(22). State law consciously gives charter schools "greater decision making authority" and "responsibility" than traditional public schools so they can "[i]mprove learning," expand "options for parents," and adopt "different and innovative teaching methods." §49-13-102(a)(1)-(3).

But despite Tennessee's general commitment to charter-school autonomy, state law makes clear that religious groups cannot participate in the charter-school program. State law requires charter schools to be "nonsectarian" and "nonreligious." §49-13-111 (a)(2). And an organization cannot sponsor a charter school if it "promote[s] the agenda of any religious denomination or religiously affiliated entity." §49-13-104(16)(B). This latter requirement prohibits religious organizations from operating a charter school even if the organization is willing to operate the school as a "nonsectarian, non-religious school." Tenn. Op. Att'y Gen. No. 03-46, 2003 WL 21030186, *3 (Apr. 17).

This overt religious discrimination stands in marked contrast to Tennessee's support of religious schools in other contexts. In the 2025-2026 school year, for instance, the State's Education Freedom Scholarship Program provided 20,000 students with tuition assistance at the private school of their choice. §49-6-3504(a). Many religious schools benefited tremendously from this program.

---

[1] "A verified complaint 'carries the same weight as would an affidavit for the purposes of summary judgment.'" *ACLU of Ky. v. Grayson County*, 591 F.3d 837, 844 n.2 (6th Cir. 2010); *accord Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021) (same weight as a declaration).

Verif.-Am.-Compl. ¶27. At one Knox County Christian school, for instance, around 300 of the school's 675 students were scholarship recipients. Wishart-Decl. ¶4.

Some state officials have begun to acknowledge the inconsistency. On November 25, 2025, Tennessee Attorney General Skrmetti issued an opinion concluding that the State's statutory bar on religious charter schools "likely violates the Free Exercise Clause." Tenn. Op. Att'y Gen. 25-19 at 13.

### C. The Knox County Board of Education enforces the discriminatory charter-school requirements against Wilberforce.

Wilberforce Academy intends to open a charter school to help meet the pressing demand for more school choice in Knox County. But because Wilberforce is Christian and the Knox County Board of Education enforces the ban on religious charter schools, Wilberforce has no fair opportunity to establish a charter school.

Knox County is one of the fastest-growing regions in the country. Many of its schools are operating near or at capacity. Verif.-Am.-Compl. ¶29. This problem will only worsen as the county's population continues to rise. ¶29. Wilberforce Academy, a private, non-profit organization, aims to help alleviate that pressure by establishing a K-8 charter school to serve as an additional, high-quality educational choice for families in the county. ¶30. Wilberforce is well positioned to establish a thriving charter school in Knox County. Its executive director is a principal at an existing Christian school in Knox County. ¶32; Wishart-Decl. ¶¶2-3. Other board members include a former chair of the Knox County Board of Education, a board member of an existing charter school in Knox County, and local business and civic leaders. Verif.-Am.-Compl. ¶32; Wishart-Decl. ¶6.

Christianity lies at the center of Wilberforce's mission. Verif.-Am.-Compl. ¶31. Wilberforce's corporate charter defines its purpose as providing "Christian educational services" and operating a "Christian charter school." Doc. 10-1, §8(b). And it "affirms the truth of the Apostles' Creed and the inerrancy and infallibility of the Holy Bible." §8(b). In all its activities, Wilberforce aims to lead

students to a saving faith in Jesus Christ and a closer personal relationship with Him. Verif.-Am.-Compl. ¶34.

Wilberforce's proposed school will unite high-quality academics with a strong biblical foundation. ¶34. Students will begin to develop biblical literacy in kindergarten and begin taking catechism lessons by third grade. ¶35(a). And they will pray and hear Scripture together in a school assembly every morning. ¶35(a). The school will also place a strong emphasis on civics education and public service, and it will help students develop financial literacy through a hands-on entrepreneurial program. ¶35(b)-(c).

Wilberforce believes strongly in opening its doors to all. ¶37. Wilberforce intends to make its school open to all students eligible to attend charter schools, regardless of faith background. ¶37. No student will be required to affirm Christian doctrine or engage in Christian worship, or be penalized for failing to do so. ¶37.

To best promote school choice in Knox County, Wilberforce intends to open its charter school as soon as possible. Under state law, a new charter school must submit its application to the relevant county board of education. Tenn. Code §49-13-107(b). A new charter can open as early as the 2027-2028 school year if the sponsor submits its letter of intent to the county by December 3, 2025, and its application by February 1, 2026. *See* §49-13-107(a)-(b). To that end, Wilberforce submitted a letter of intent on November 25, 2025. Verif.-Am.-Compl. ¶43; Doc.10-2. Wilberforce also hired an outside consultant group to assist it in preparing the application, spending tens of thousands of dollars to have its application ready to submit. Verif.-Am.-Compl. ¶46; Wishart-Decl. ¶¶9-10. If it had the right to do so, Wilberforce would timely submit its completed application by the deadline of February 1, 2026. Verif.-Am.-Compl. ¶¶46, 67; Wishart-Decl. ¶¶9, 12.

At present, though, submitting Wilberforce's application to the Knox County Board of Education would be futile. As explained, state law prohibits Wilberforce from serving as the sponsor for

a charter school, §49-13-104(16)(B), and from operating a Christian charter school, §49-13-111 (a)(2). Though Attorney General Skrmetti opined that those state laws are "likely" unconstitutional, Tenn. Op. Att'y Gen. 25-19 at 13, his opinion is tentative and not "binding" on Knox County anyway, *Wash. Cnty. Bd. of Educ. v. MarketAmerica, Inc.*, 693 S.W.2d 344, 348 (Tenn. 1985). And the Knox County Board of Education is committed to banning religious charters. As recently as July 2025, the board's current guidance reiterates that every charter school under its authority must operate as a "nonsectarian, nonreligious school." *Knox County Schools: Charter School Handbook* 8-9 (2025), perma.cc/HK3S-2Y9T (*Handbook*). The board even takes the position that the First Amendment *prohibits* the creation of religious charter schools. According to Knox County's performance framework for charter schools, which binds charter schools within its jurisdiction, *see* Tenn. Code §49-13-143, a charter does not meet required performance standards if it does not follow "the Establishment Clause restrictions prohibiting public schools from engaging in religious instruction." *Knox County Schools Charter Performance Framework* 19, Knox County Sch. Bd. (2022), perma.cc/5YQH-NHMW (*Performance Framework*).

The application process proves the futility. When submitting the required letter of intent, a proposed charter must use the State's form, Tenn. Comp. R. & Regs. §520-14-01-.01(1)(b), and the State's form requires a sponsor to meet the eligibility requirements established by the Tennessee Public Charter Schools Act, *see* Doc. 10-2 at 5 & n.3 (citing Tenn. Code §§49-13-101 to -145). Wilberforce had to admit in its letter that it does not satisfy those requirements because it "does 'promote the agenda of any religious denomination or religiously affiliated entity.'" Doc.10-2 at 5 (quoting Tenn Code §49-13-104(16)). In other words, it had to leave one of the required check boxes unchecked. *See* Doc.10-2 at 5. In response, the Knox County board told Wilberforce that "your Letter of Intent is considered incomplete" because Wilberforce left one of the sponsor-eligibility boxes "unchecked." Doc.10-4. The board indicated it "can accept a completed letter until December 3." Doc. 10-4. On December 5, the board sent a second email to Wilberforce, reiterating that Wilberforce's original letter

was "incomplete" and that Wilberforce had failed to "correct this error" by "the state deadline of December 3." Ex.2. Though the board confusingly suggested that Wilberforce was "proceeding with the process … based upon your original Letter of Intent," it specified that "[a] charter sponsor should comply with T.C.A. §49-13-104(16)." Ex.2. That statute is the very one that forbids religious charter schools. Indeed, to apply, Wilberforce must use another state-mandated form, *see Handbook* 13; Tenn. Comp. R. & Regs. §520-14-01-.01(1)(a), and that form again "require[s]" the sponsor to "affirm" that its charter school will operate as a "nonsectarian, non-religious" school, Tenn. State Bd. of Educ., *Charter School Application* 10, 14 (2025), perma.cc/6RPW-ZT4Q. Wilberforce cannot affirm that, so the board cannot and would not accept, approve, or equally consider Wilberforce's application.

Wilberforce thus needs a judicial remedy before it can apply to open a Christian charter school in Knox County. If a court ordered the board and its members (Defendants here) to stop discriminating against religious schools and sponsors, Wilberforce would immediately apply to sponsor a Christian charter school for the earliest school year it could open. Verified-Am.-Compl. ¶48. If a court ruled that the ban on religious charter *schools* is constitutional but the ban on religious charter *sponsors* is not, Wilberforce would immediately apply to sponsor a secular charter school for the earliest year it could open. ¶48. Wilberforce Academy believes that explicit Christian instruction and practice are critical to a good education, and that a purely secular education is necessarily an inferior one. ¶39. But in Wilberforce's view, providing a good nonreligious education is still a way of glorifying God by preparing students' hearts and minds to serve Him, though in a lesser way that falls short of a proper, explicitly Christian education. ¶39. Wilberforce would prefer operating a secular charter school to being shut out of the charter program entirely.

Accordingly, Wilberforce seeks a declaration that Tennessee's statutes and the board's policies discriminating against religious charter schools and sponsors violate the First Amendment, and a

permanent injunction preventing Defendants from enforcing them. Verif.-Am.-Compl. 16. Though its complaint also seeks damages, Wilberforce does not seek summary judgment on that theory now.

## LEGAL STANDARD

Summary judgment "shall" be granted if there is "no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party can file a motion for summary judgment "at any time," Fed. R. Civ. P. 56(b), including "prior to discovery," *Jefferson v. Chattanooga Pub. Co.*, 375 F.3d 461, 463 (6th Cir. 2004). Summary judgment is appropriate before discovery when the motion turns on "questions of law" and "discovery would not aid in the resolution of those questions." *United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002).

A party can likewise seek partial summary judgment on any "claim" or "part" of a "claim" at the outset of the case. Fed. R. Civ. P. 56(a); *accord id.*, advisory committee's note to 2010 amendment. Courts can grant summary judgment for "the plaintiff on the issue of liability," for example, while reserving the issue of "damages." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 366 (6th Cir. 1993). And courts can grant prospective relief without addressing damages. *See DaimlerChrysler Servs. N.A. v. Summit Nat., Inc.*, 144 F. App'x 542, 549-50 (6th Cir. 2005) (affirming issuance of "permanent injunction" in "partial summary judgment" order because "the district court was not required to determine damages prior to issuing an injunction"); *Cont'l Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1102 (9th Cir. 1994) (holding that a district court can issue a "permanent injunction" by "summary judgment" "early in the proceedings" and "separately from [the plaintiff's] claims for past damages").

## ARGUMENT

This case raises the purely legal question of whether the state and county restrictions on religious charter schools, which Defendants enforce, violate the Free Exercise Clause. They do. These restrictions expressly discriminate against private religious organizations wishing to participate in the charter program because those organizations are religious. This discrimination is not narrowly tailored

to serve any compelling interest, like preventing a violation of the Establishment Clause. So Wilberforce is entitled to judgment on liability, as well as declaratory and injunctive relief.

## I. Banning religious charter schools violates the Free Exercise Clause.

The state and county ban on religious charter schools violates the Free Exercise Clause. The ban expressly discriminates based on religion, and it cannot pass strict scrutiny.

The religious charter school ban discriminates on its face against religious schools and sponsors. A government "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. A "state benefit program" that "specifically carve[s] out private religious schools from those eligible" to participate "must be subjected to 'the strictest scrutiny.'" *Id.* at 780; *accord Espinoza*, 591 U.S. at 487; *Trinity Lutheran*, 582 U.S. at 463. Tennessee's charter program, as implemented by Knox County, falls squarely within this rule. The program establishes a benefit for qualifying nonprofits: charter agreements with the local school board, which come with guaranteed access to "public funds." *Carson*, 596 U.S. at 780; *see* Tenn. Code §49-13-112. Yet the program expressly excludes "religious" and "sectarian" schools and sponsors. §§49-13-104(16)(B), -111(a)(2); *Handbook* 8-9; Ex.2. It therefore triggers strict scrutiny. *Carson*, 596 U.S. at 780; *accord* Tenn. Op. Att'y Gen. No. 25-19 at 6-7. [2]

Because the ban on religious charter schools facially discriminates against religion, it must satisfy strict scrutiny. *Carson*, 596 U.S. at 780. To satisfy that daunting test, Defendants must show that the ban "is the least restrictive means of achieving some compelling state interest." *Thomas*, 450 U.S.

---

[2] Strict scrutiny applies for other reasons as well. The board categorically refuses to authorize religious charter schools even though Tennessee's charter-school laws establish "a system of individual exemptions." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021); *see* Tenn. Code §49-13-111(p); Verif.-Am.-Compl. ¶¶59-63. And the use of the pejorative term "sectarian" to describe religious schools, §49-13-111(a)(2), evinces an impermissible "hostility" toward religion, *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993); *see Mitchell v. Helms*, 530 U.S. 793, 828-29 (2000) (plurality op.); Verif.-Am.-Compl. ¶¶64-68. But Wilberforce saves these points for another day, if necessary, because the ban's facial discrimination against religious schools on its own straightforwardly requires strict scrutiny.

at 718. As "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), this standard is satisfied only in "truly extraordinary circumstances," *Free Speech Coal. v. Paxton*, 606 U.S. 461, 485 (2025).

Defendants cannot possibly meet strict scrutiny here. The ban on religious charter schools is not necessary to comply with the Establishment Clause. Charter-school operators are private non-profits that receive government funding when families voluntarily choose to send their children there. *See* §§49-13-111 (a)(1), -113(a). "[A] neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Carson*, 596 U.S. at 781; *see also infra* Part II. Nor can any "interest in separating church and state more fiercely than the Federal Constitution … qualify as compelling in the face of the infringement of free exercise." *Carson*, 596 U.S. at 781 (cleaned up).

## II. The Establishment Clause does not justify enforcing the ban.

To date, the sole justification that the Knox County board has offered for discriminating against religious charter schools and sponsors has been that "the Establishment Clause" prohibits "public schools from engaging in religious instruction." *Performance Framework* 19. This assertion is wrong twice over. Charter-school operators are private entities to which the Establishment Clause does not apply. And even if it applied, the Establishment Clause could not defeat Wilberforce's free-exercise right. At minimum, the Establishment Clause cannot justify blocking Wilberforce from operating a *secular* school—its second-order preference, if this Court rejects its first-order preference of operating an openly Christian school.

### A. The Establishment Clause does not apply.

The First and Fourteenth Amendments apply only to "governmental action." *Lindke v. Freed*, 601 U.S. 187, 195 (2024). For the Establishment Clause to apply to Wilberforce, a private actor, Wilberforce must be part of the State, or its actions must be "regarded as [state] action for constitutional purposes." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378 (1995). Neither condition is true.

### 1. Wilberforce is not a government entity.

Wilberforce is not a government entity, nor will it become one if its charter application is approved. For "purposes of the First Amendment," a "corporation is part of the Government" when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation." *Id.* at 400; *see also Biden v. Nebraska*, 600 U.S. 477, 491 (2023) (reiterating the elements of creation by the government, control by the government, and public purpose); *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 53 (2015) (same). Where these features are absent, a corporation is a private entity. *Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 168 (6th Cir. 2014); *Commodities Exp. Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 529 (6th Cir. 2012). They are absent here.

Wilberforce is as far from a government entity as a corporation can get. The Tennessee legislature did not incorporate Wilberforce "by a special statute." *Lebron*, 513 U.S. at 397. Wilberforce incorporated "under the Tennessee Nonprofit Incorporation Act," Tennessee's general incorporation statute for nonprofit organizations. Doc.10-1 at 2 (citing Tenn. Code §48-52-102). Wilberforce formed to pursue "charitable, and in particular religious and educational," "purposes," Doc.10-1 ¶8(a), not to pursue "governmental objectives," *Lebron*, 513 U.S. at 399. And the State has no authority to appoint Wilberforce's directors. Wilberforce's private incorporator selected its initial board members, and the board is responsible for selecting members going forward. Doc.10-1 ¶¶4, 10. Wilberforce is a purely private entity.

None of these features will change if Wilberforce becomes the operator of a charter school. When a state or county board approves a charter application, it does not issue new articles of incorporation to the sponsor, amend the articles of incorporation to have different purposes, or assert the power to name the sponsor's board of directors. It simply enters a contract with the sponsor authorizing the establishment of a charter school. Tenn. Code §49-13-110(a). The sponsor's corporate

structure changes in only one small respect: It must name one "parent representative" to serve on its board of directors. §49-13-101(a)(1). And even here, the sponsor, not the government, gets to choose the parent representative. *Id.*

Far from radically altering a sponsor's corporate structure, a charter agreement *enshrines* it in its existing form. Sponsors are required to include their "Articles of Incorporation" in their application. *Charter School Application* 10; *see also* Tenn. Code §49-13-107(b)(7). Charter agreements must incorporate the required materials in the sponsor's application. §49-13-110(a). The sponsor's existing corporate structure thus becomes part of the charter agreement.[3] The sponsor must notify the board of education if it wants to alter its "corporate legal status." *See, e.g.*, *2025 Charter Agreement: Cornerstone Prep Denver* 11 (Jan. 24, 2025), bit.ly/4p5IPMa.

It is no response to say that *the charter school* is a state entity even if *the sponsor* is not. When assessing an entity's status under the First Amendment, "corporate law" defines the entity's identity and structure. *USAID v. AOSI*, 591 U.S. 430, 435 (2020); *see Dep't of Transp.*, 575 U.S. at 51 ("It is appropriate to begin the analysis with Amtrak's ownership and corporate structure."). In Tennessee, a charter school has no separate corporate existence from its operator. Tennessee's charter-school laws do not provide for the incorporation of a charter school or confer powers on the school as a distinct entity; they instead confer powers on "the governing board," *i.e.*, the preexisting nonprofit that operates the school. Tenn. Code §49-13-124(a). Concrete examples make this plain. In the "Governance" section of its application, Emerald Academy, an existing Knox County charter school, described the board of the operator and the board of the school as one and the same, with no distinct,

---

[3] *See, e.g.*, *Charter Agreement: Encompass Community School* 1 (Jan. 24, 2025), bit.ly/3L6Axpc (noting the agreement includes the "Approved Charter School's Application"); *Encompass Community School, Application for a Public Charter School* 349-55 (amended May 24, 2024), bit.ly/4pLOsjz (including the sponsor's articles of incorporation as part of the application). The Court can and should take judicial notice of the charter-school applications and agreements cited in this motion. *See Kentucky v. Biden*, 23 F.4th 585, 599 n.8 (6th Cir. 2022) (courts can "take judicial notice of … government websites"); *Barton v. Neeley*, 114 F.4th 581, 589 n.2 (6th Cir. 2024) (courts can "take judicial notice" of "public records").

second corporate entity constituting the school. Emerald Academy, *A Charter School Application Submitted to Knox County Schools* 85-93 (2014), perma.cc/8NG7-KCWK. And "[c]harter agreements typically refer to the charter school and the sponsor or governing body 'interchangeably.'" Tenn. Op. Att'y Gen. 2025-19 at 11 (collecting examples). The entity at issue is Wilberforce, not the school it intends to form, and Wilberforce is plainly private.

Even if the charter school were the relevant entity, it still would be private. *See id.* at 10-12. Although a charter school cannot exist without government approval, it is the private "sponsor" that "establish[es]" the school." Tenn. Code §49-13-106 (i). The private sponsor, and not the government, defines the school's "mission and goals." §49-13-107(b)(1), (2). And the private sponsor, which continues to choose its own directors, operates the school. §49-13-104 (10), (16). This last point is dispositive on its own. *See Mik*, 743 F.3d at 168 & n.13 (Freddie Mac is not a government entity, despite being created by special statute, because the government does not appoint its directors).

It is likewise no response to say that charter schools are designated "public" by statute. §49-13-106 (a). As noted, the relevant entity is the operator, not the school, and no statute provides that the 501(c)(3) organizations that operate charter schools are somehow "public." In all events, legislative "pronouncements … are not dispositive of [an entity]'s status as a governmental entity … under the Constitution." *Dep't of Transp.*, 575 U.S. at 51. Courts must instead perform "an independent inquiry into" that "status." *Id.*; *accord Lebron*, 513 U.S. at 392. The First Amendment constrains state statutes, not the other way around.

### 2. Wilberforce is not a state actor.

Operating a charter school is not one of the "few limited circumstances" where a "private entity can qualify as a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). A private entity acts as a state actor when it "performs a traditional, exclusive public function"; "when

the government compels [it] to take a particular action"; or "when the government acts jointly with" it. *Id.* None of these tests are met here.

"Obviously, education is not and never has been a function reserved to the state." *Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 26 (1st Cir. 2002); *accord Caviness v. Horizon Cmty. Learning Ctr.*, 590 F.3d 806, 816 (9th Cir. 2010). "[S]tates can privatize … education[] without turning the parties who take on these tasks into 'government' agents." *Phillips v. Tangilag*, 14 F.4th 524, 532 (6th Cir. 2021). "To qualify as a traditional, exclusive public function …, the government must have traditionally *and* exclusively performed the function." *Halleck*, 587 U.S. at 809. Neither condition holds for education. "There were no public schools as we understand them at the founding." Chapman & McConnell, *Agreeing How to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* 146 (2023). "Public schools in anything remotely resembling the current system first came into being in the early 1830s." *Id.* Private schools, moreover, have always existed alongside public ones; it is even unconstitutional to ban private schools. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925).

Tennessee also does not "compe[ll]" Wilberforce to engage in the "particular action" at issue— religious instruction. *Halleck*, 587 U.S. at 809; *see Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) (finding this test for state action unmet where the challenged "decisions to discharge the petitioners were not compelled … by any state regulation").

Nor would Wilberforce and the State "jointly" operate a school. *Halleck*, 587 U.S. at 809. This test is met when a private individual and the government both directly participate in a common course of action—as when a restaurant owner and a police officer "conspir[e]" to have a patron arrested. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). Here, Wilberforce alone "will operate" the school and "overse[e]" its "management and administration." §49-13-104 (10). The board of education will not send representatives to lead prayers or teach catechism lessons. To be sure, the board may "contrac[t] with" Wilberforce, "licens[e]" the school, engage in "extensive regulation" of its

activities, and "fun[d]" it; but these factors, even in combination, do "not convert [a] private entity into a state actor." *Halleck*, 587 U.S. at 814-15; *see also Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 754 (6th Cir. 2020) (a government "license" and "contract for services" do not amount to joint action).

*Rendell-Baker* confirms that operating a charter school will not make Wilberforce a state actor. The entity there was a private school whose funding came almost entirely from the State; was subject to "extensive regulation"; and performed the "public function" of educating "maladjusted high school students," which the State was obliged by law to provide for "at public expense." 457 U.S. at 840-42. But these features were not enough to make it a state actor. *Id.* at 843.

Two circuits have reached the same conclusion. The Ninth Circuit holds that "a private non-profit corporation that runs a charter school" is not "a state actor." *Caviness*, 590 F.3d at 808. And the First Circuit has likewise held that a private school that contracts with a local school board to provide public education, in lieu of the board running its own school, is not a state actor. *Logiodice*, 296 F.3d at 24, 27-28.

Though two courts have held that charter schools are state actors because operating "free public schools" is exclusively a state function, *Peltier v. Charter Day Sch.*, 37 F.4th 104, 117 (4th Cir. 2022) (en banc); *Drummond v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, 12 (Okla. 2024), *aff'd by an equally divided court*, 605 U.S. 165, that framing "is circular," *Peltier*, 37 F.4th at 147 (Quattlebaum, J., dissenting in relevant part); *accord Logiodice*, 296 F.3d at 27. *Halleck* rules out this kind of semantic move. The respondent there argued that a cable operator was a state actor because "operation of a public forum for speech is a traditional, exclusive public function." 587 U.S. at 811. But by defining "the relevant function" as operating a *public* forum, the respondent had "mistakenly ignore[d] the threshold state-action question"; the proper framing was whether "[p]roviding some kind of forum for speech" is an exclusive public function, which it was not. *Id.* at 811-12. So too here, the question

is whether providing "some kind of" education—whether free and open to all, or with tuition and selective admissions—is an exclusive public function. *Id.* at 812. Again, no.

Even under these courts' rigged framing, charter-school operators would not be state actors. The school in *Rendell-Baker* was not a state actor even though it was free to attend and performed a "public function." 457 U.S. at 841-42. And as a historical matter, compulsory public schooling did not arise until the late 19th century. Chapman & McConnell 146. Before then, when the government sought to provide public access to education, it "provided financial support to private schools." *Espinoza*, 591 U.S. at 480; *accord Logiodice*, 296 F.3d at 27. Some States to this day fulfill their constitutional obligations to provide public education by offering scholarships to attend private schools. *See Carson*, 596 U.S. at 773. Tennessee's voucher program reflects that tradition. Tenn. Code §49-6-3505(c)(1).

**B. Even if the Establishment Clause applied, it could not defeat Wilberforce's free-exercise right.**

The Free Exercise and Establishment Clauses "have 'complementary' purposes, not warring ones." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 533 (2022). Even if the Establishment Clause applied to charter schools, Wilberforce still has the right not to be discriminated against. And because accommodating Wilberforce would not require any religious coercion or discrimination against other religious groups, nothing in the Establishment Clause requires discriminating against Wilberforce.

Wilberforce has free-exercise rights even if charter schools are state entities. Wilberforce does not operate a charter school yet, so *right now* it is indisputably a private entity with First Amendment rights. And even supposing that charter schools are government schools, Tennessee's charter program holds out a valuable "public benefit"—the opportunity to design, create, and run a government school. *Carson*, 596 U.S. at 785. The government may not "den[y]" Wilberforce that "benefit based on [its] religious exercise." *Id.* A traditional public-school teacher, for instance, is an agent of the State while at work and so may not exercise her Jewish faith in the classroom with the same freedom that she can outside of school. *See Kennedy*, 597 U.S. at 527. But a law prohibiting Jews from being public-school

teachers would clearly violate the Free Exercise Clause. *Wieman v. Updegraff*, 344 U.S. 183, 191-92 (1952). In the same way, the Knox County board cannot deny Wilberforce the opportunity to work within the public-school system simply because it is a religious institution.

Charter schools being government entities could alter the constitutional analysis only if the Establishment Clause *forbids* respecting Wilberforce's free-exercise rights. It does not. The Establishment Clause prohibits making "a religious observance compulsory," *Kennedy*, 597 U.S. at 537, as well as the government "'officially prefe[rring]' one religious denomination over another," *Cath. Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025). So long as the government respects those limits, it is not prohibited from "sponsor[ing] prayers" and religious activity, even activity that can be disparaged as "sectarian." *Town of Greece v. Galloway*, 572 U.S. 565, 579-80 (2014); *see also Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring) (distilling six "traditional hallmarks" of a religious establishment, all of which involve either coercion or denominational preference). A religious charter school can exist comfortably within these limits. Attendance is purely voluntary, §49-13-113 (a), so there is nothing coercive about prayer or religious instruction there. And so long as all religious groups can apply to establish charter schools on equal terms, authorizing a charter that's associated with a particular religious tradition does not create any denominational preference. *Cf. Town of Greece*, 572 U.S. at 579 (noting with approval that Congress "acknowledges our growing diversity" in its appointment of chaplains "not by proscribing sectarian content but by welcoming ministers of many creeds").

History supports this conclusion. As noted, in "the founding era and the early 19th century," governments financially supported "denominational" schools. *Espinoza*, 591 U.S. at 480. Tellingly, over this same period "the tradition of separation between church and state" became "an ingrained and vital part of our constitutional system," with "no State" retaining "an established church" by 1834. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409,

1437 (1990). Yet States saw no conflict between disestablishment and support for denominational schools. "Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy." *Espinoza*, 591 U.S. at 480.

This conclusion is also consistent with prohibiting prayer and religious instruction at traditional public schools. The Supreme Court has found such prayer objectionable because it establishes a "state-created orthodoxy" and exerts "coercive pressure" on students. *Lee v. Weisman*, 505 U.S. 577, 592 (1992); *see also Engel v. Vitale*, 370 U.S. 421, 431 (1962) (prayer in a traditional public school creates an "officially approved religion" and exerts "coercive pressure"). This follows from the fact that attendance at a traditional public school is "compulsory." *Ill. ex rel. McCollum v. Bd. of Ed.*, 333 U.S. 203, 212 (1948). Where "children" must "remain in attendance" during religious observance, the prayers expressed bear the State's stamp of approval, and the pressure to participate is coercive. *Id.* at 205. But a Christian charter school with *voluntary* enrollment no more mandates Christianity as the State's official religion than a Spanish immersion charter school mandates Spanish as the State's official language. *See* Verified-Am.-Compl. ¶21.

### C. At minimum, the ban on religious sponsors is unconstitutional.

If the Establishment Clause applied and absolutely prohibited religious instruction at any charter school, then the state and county ban on religious charter *schools* might be constitutional. *See* §49-13-111 (a)(2). But the ban on religious *sponsors*, which prohibits religious institutions from operating charter schools even if the school is totally secular, is not. *See* §49-13-104 (16)(B); Tenn. Op. Att'y Gen. No. 03-46, 2003 WL 21030186, *3; Ex.2. This question was not presented in *Oklahoma*, since that case involved a school that was approved to operate as explicitly Catholic. 558 P.3d at 6-7; *see* Petrs' Br. at i, *Oklahoma*, 605 U.S. 165 (No. 24-394) (presenting only the question of whether "religious schools" have a Free Exercise right to participate in a state charter program); Petr's Br. at i, *St. Isidore of Seville Cath. Virtual Sch. v. Drummond*, 605 U.S. 165 (2025) (No. 24-396) (same). But that question is

presented here. Though Wilberforce's strong preference is to open a Christian charter school, it at least wants the chance to apply—as a Christian organization—to open a secular charter school. Verif.-Am.-Compl. ¶¶39, 48.

The ban on religious sponsors is, if anything, even more unconstitutional under the First Amendment than the ban on religious schools. The government cannot make "professing" certain "religious beliefs or disbeliefs" a condition of partnering with it. *Torcaso v. Watkins*, 367 U.S. 488, 493 (1961). And it has no valid antiestablishment interest in preventing religious groups from running secular schools. It is repugnant to the First Amendment to presume that organizations with a religious mission will "support measures antithetical to the separation of church and state" or be "less faithful" to its civil duties if allowed to partner with the government. *McDaniel v. Paty*, 435 U.S. 618, 629 & n.9 (1978) (plurality op.) (invalidating ban on ministers serving in public office).

### III. Wilberforce is entitled to a permanent injunction and declaratory judgment.

Wilberforce is entitled to a permanent injunction prohibiting Defendants from enforcing any law or policy that forbids religious charter schools and charter-school sponsors. A permanent injunction is appropriate if the plaintiff "has suffered an irreparable injury," the "remedies available at law … are inadequate to compensate for that injury," "the balance of hardships" favors an injunction, and "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Because "the opposing party" here is a government body and its officers, the last two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Wilberforce satisfies these criteria. Absent an injunction, Defendants will continue to violate Wilberforce's First Amendment right to a fair opportunity to apply to establish a charter school. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). Likewise, "monetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011); *accord Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th

Cir. 2004). And "it is always in the public interest to prevent violation of a party's constitutional rights." *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012).

Wilberforce is also entitled to a declaratory judgment. Whether to issue a declaratory judgment turns on "five factors": "[w]hether the declaratory action would settle the controversy," "whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue," "whether the declaratory remedy is being used merely for the purpose of 'procedural fencing,'" "whether the use of a declaratory action would … improperly encroach upon state jurisdiction," and "whether there is an alternative remedy which is better or more effective." *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019).

These factors all support declaratory relief. A declaration would settle the controversy and clarify the legal relations between the parties by making clear that Defendants must give Wilberforce a fair opportunity to apply to start a charter school. There is no "evidence of 'procedural fencing'" because Wilberforce did not file suit "in apparent anticipation of litigation in state court." *Id.* at 399. A declaration would not encroach on state jurisdiction because it would address "federal-law questions." *Id.* at 401. And no other remedy is better. True, an injunction can give Wilberforce relief. But "a declaratory judgment may complement an injunction." *Doe v. Lee*, 102 F.4th 330, 342 (6th Cir. 2024); *see* Fed. R. Civ. P. 57. And an injunction accompanied by a declaration making clear what statutes and policies violate the First Amendment is superior to an injunction on its own.

## CONCLUSION

This Court should grant summary judgment to Wilberforce by ruling that Defendants are violating Wilberforce's First Amendment rights and entering declaratory and injunctive relief.

Dated: January 2, 2026

Respectfully submitted,

_/s/ Cameron T. Norris_
Cameron T. Norris (TN Bar No. 33467)
Ryan M. Proctor*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*admitted pro hac vice*

*Counsel for Wilberforce Academy*

23