**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION (KNOXVILLE)**

-------------------------------------------------------

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE | ) |
| | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as Members of the Knox County Board of Education, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

Case No. 3:25-cv-00584 (CEA) (DCP)

-------------------------------------------------------

| | |
|---|---|
| REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP, | ) |
| | ) |
| | ) |
| | ) |
| *Intervenors*. | ) |

-------------------------------------------------------

---

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE BY ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, AND HOLLY SLATER**

---

David D. Ayliffe, Esq.
Thomas H. Jarvis, Esq.
Erika L. Hughes, Esq.
Baker, Donelson, Bearman,
Caldwell & Berkowitz, P.C.
265 Brookview Centre Way
Suite 600
Knoxville, Tennessee 37919

*Attorneys for Proposed Intervenors*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................3

I.     Tennessee Families Are Entitled to Intervene as a Matter of Right Because They
       Have Substantial Unrepresented Interests in the Issues Presented by This Case That
       Will Be Materially Affected by the Outcome. ...................................................................3

       A.     Tennessee Families' motion to intervene is timely .................................................3

              i.     The point to which the suit has progressed. ..................................................4

              ii.    The purpose for which intervention is sought ..............................................5

              iii.   The length of time preceding the application during which the
                     proposed intervenors knew or reasonably should have known of
                     their interest in the case ..............................................................................6

              iv.    The prejudice to the original parties due to the proposed intervenor's
                     failure, after he or she knew or reasonably should have known of his
                     or her interest in the case, to apply promptly for intervention. ...................7

              v.     The existence of unusual circumstances militating against or in favor
                     of intervention. ...........................................................................................7

       B.     Tennessee Families have substantial interests in this case. .....................................8

              i.     Private schools are not required to provide the same scope of
                     accommodations under Section 504 of the Rehabilitation Act ...................9

              ii.    Charter schools would lose access to and control over certain Title I
                     funds ..........................................................................................................13

              iii.   A ruling in Plaintiff's favor could jeopardize public charter schools'
                     access to TISA funding from the state. .....................................................17

       C.     Tennessee Families' substantial interests would be impaired by an adverse
              ruling deeming charter schools private. ...............................................................19

       D.     Proposed Intervenors' substantial interests will not be adequately
              represented by the existing parties, as no parties plan to defend the public
              nature of charter schools. ....................................................................................20

II.    Alternatively, Proposed Intervenors Should Be Granted Permissive Intervention ...........22

       A.     Tennessee Families' proposed defense of Tennessee's charter school law
              shares common questions of law and fact with the main action ...........................23

i

B.  Permissive intervention will not unduly delay or prejudice adjudication..............23

C.  Permissive intervention is warranted to streamline adjudication and to ensure Tennessee Families' distinct interests are heard. .......................................24

CONCLUSION.........................................................................................................................25

ii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Berger v. N.C. State Conf. of the NAACP,*
  597 U.S. 179 (2022) ................................................................................ 21

*Blount-Hill v. Zelman,*
  636 F.3d 278 (6th Cir. 2011) ................................................................ 3, 6

*Brewer v. Republic Steel Corp.,*
  513 F.2d 1222 (6th Cir. 1975) ................................................................ 22

*Buck v. Gordon,*
  959 F.3d 219 (6th Cir. 2020) ................................................................. 24

*In re Auto. Parts Antitrust Litig., End-Payor Actions,*
  33 F.4th 894 (6th Cir. 2022) ............................................................... 4, 5

*Ireland v. Kansas Dist. of Wesleyan Church,* No. CIV. A.,
  94-4077-DES, 1994 WL 413807 (D. Kan. July 1, 1994) ......................... 12

*Jenkins v. La-Z-Boy Inc.,*
  No. 3:09-CV-101, 2009 WL 10710296 (E.D. Tenn. Sept. 24, 2009) ......................... 4

*Kirsch v. Dean,*
  733 F. App'x 268 (6th Cir. 2018) ............................................................. 4

*League of Women Voters of Michigan v. Johnson,*
  902 F.3d 572 (6th Cir. 2018) ............................................................ 23, 24

*Linton by Arnold v. Comm'r of Health & Env't, State of Tenn.,*
  973 F.2d 1311 (6th Cir. 1992) .................................................................. 5

*Michigan State AFL-CIO v. Miller,*
  103 F.3d 1240 (6th Cir. 1997) ....................................................... 8, 19, 20

*Mountain Top Condo. Assoc. v. Dave Stabbert Master Builder, Inc.,*
  72 F.3d 361 (3rd Cir.1995) ...................................................................... 4

*Purnell v. City of Akron,*
  925 F.2d 941 (6th Cir. 1991) ......................................................... 8, 19, 24

*Salem Pointe Cap., LLC v. BEP Rarity Bay, LLC,*
  854 F. App'x 688 (6th Cir. 2021) ..................................................... 3, 4, 7

*Stotts v. Memphis Fire Dep't,*
  679 F.2d 579 (6th Cir. 1982) ............................................................. 6, 8

*Stupak-Thrall v. Glickman,*
  226 F.3d 467 (6th Cir. 2000) ............................................................. 4, 22

*United States v. City of Detroit,*
  712 F.3d 925 (6th Cir. 2013) ............................................................. 5, 6

*United States v. Michigan,*
  424 F.3d 438 (6th Cir. 2005) ............................................................. 22

*Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula,*
  41 F.4th 767 (6th Cir. 2022) ............................................................. 8, 19, 20

**Statutes**

20 U.S.C. § 6301 ............................................................................... 9

29 U.S.C. § 794(a) ............................................................................ 9

Tenn. Code Ann. § 49-13-104(4) ..................................................... 9

Tenn. Code Ann. § 49-13-112 ........................................................... 9, 19

Tenn. Const. art. XI, § 12 ................................................................. 18

**Regulations**

28 C.F.R. § 41.53 .............................................................................. 10

34 C.F.R. § 104.31 (2023) ................................................................. 9

34 C.F.R. § 104.33(a) ....................................................................... 10, 13

34 C.F.R. § 104.33(c)(1) ................................................................... 13

34 C.F.R. § 104.39 ............................................................................ 10

34 C.F.R. § 104.39(b) ....................................................................... 13

34 C.F.R. § 200.64(b)(4) ................................................................... 16

34 C.F.R. § 200.66(b)(2) ................................................................... 15

34 C.F.R. § 303.23 ............................................................................ 14

iv

**INTRODUCTION**

Proposed Intervenors, Adrienne Carroll, Ciara Crutcher, Tiffany Nash, Evelyn Henderson, Shakeithia Rice, and Holly Slater, have moved to intervene in this action under Rules 24(a) and (b) of the Federal Rules of Civil Procedure. Individually, Proposed Intervenors are parents of children who attend public charter schools in Memphis, Nashville, and Chattanooga, Tennessee (collectively "Tennessee Families"). Many of these children have disabilities and receive special accommodations pursuant to federal law to ensure that they receive an equal education. Others attend schools that receive specialized federal funding targeted to support schools with a large number of children from low-income families. And all of the Tennessee Families benefit from the public nature of their respective public charter schools, a public education made possible because Tennessee public charter schools are funded in the same way as all traditional public schools in the state.

The children of the Tennessee Families are thriving because of these programs and their access to public charter schools as an alternative to traditional public schools. Thanks to anti-discrimination laws and federal funding programs available to public schools, along with public charter school options best suited to serve children with differing needs, the children of the Tennessee Families receive individualized and targeted accommodations in both the classroom and elsewhere throughout the school to ensure that neither their disabilities nor their economic status hinder their education. Their public charter schools depend on both state and federal funding and the freedom to allocate it as needed to provide this education. The availability and scope of these accommodations and programs—and the very existence of these public charter schools—depend on public charter schools remaining just that: public.

Plaintiff, Wilberforce Academy of Knoxville, was created to operate a Christian charter school in Knox County, Tennessee, and intends to make biblical teaching and Christian principles

1

the central feature of its educational curriculum. In support of its arguments that its freedom of expression is violated by Tennessee laws preventing it from opening such a school, Plaintiff argues that it is a private entity rather than a governmental entity. In response, Defendants have stated they do not intend to take a substantive position as to any of Plaintiff's arguments. This Court has granted a motion to intervene by Amanda Collins, Rev. Dr. Richard Coble, Kerry Dooley, Elizabeth Porter, and Rev. Dr. Katina Sharp ("Existing Intervenors"), who are solely concerned with preventing Plaintiff from using their public education tax dollars to teach religion.

But the existing parties to this litigation have failed to consider a fundamental question: *What will Plaintiff's claims mean for the almost 50,000 students[1] who currently attend public charter schools in Tennessee?* That is what matters most to the Tennessee Families who seek to intervene in this lawsuit. Although Tennessee Families do not oppose Plaintiff's religious convictions, Tennessee Families do object to Plaintiff's use of this litigation to accomplish their goals because of the substantial harm it will cause Tennessee Families and their children, which perhaps is unintended but is harm nevertheless. Specifically, if Plaintiff succeeds in this lawsuit, public charter schools in Tennessee risk losing their primary source of funding and likely would cease to exist. If that were to happen, the children of Tennessee Families—and presumably tens of thousands more throughout the state—would find themselves without access to the same quality public education and disability accommodations they currently receive at their respective public charter schools.

Thus, Tennessee Families have direct and substantial interests in ensuring that public charter schools in Tennessee remain public. These important interests are entirely unrepresented

---

[1] As of the 2023-2024 academic year, 44,361 students were enrolled in charter schools in Tennessee. *2023-24 Public Charter Schools Annual Report*, p. 4, TENNESSEE DEPARTMENT OF EDUCATION, https://www.tn.gov/content/dam/tn/education/documents/Annual_Charter_Report_for_SY2023-24.pdf.

and unprotected in this litigation. The existing parties' interests would *all* be served by a decision of this Court deeming charter schools private. But such a momentous change should not be considered without understanding the consequences to the families who rely upon public charter schools for the education of their children. Therefore, this Court should allow Tennessee Families to intervene so they can articulate and protect their important and deeply personal interests regarding their children's access to equal education at public charter schools, their children's access to targeted support and services provided to low-income students, and their children's opportunity to choose a public charter school that serves their unique needs.

## ARGUMENT

I. **Tennessee Families Are Entitled to Intervene as a Matter of Right Because They Have Substantial Unrepresented Interests in the Issues Presented by This Case That Will Be Materially Affected by the Outcome.**

Under Rule 24(a)(2), "the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). A party moving to intervene as of right must show "(1) timeliness of the application to intervene, (2) the applicant's substantial legal interest in the case, (3) impairment of the applicant's ability to protect that interest in the absence of intervention, and (4) inadequate representation of that interest by parties already before the court." *Salem Pointe Cap., LLC v. BEP Rarity Bay, LLC*, 854 F. App'x 688, 694 (6th Cir. 2021) (internal quotation marks omitted).

A. **Tennessee Families' motion to intervene is timely.**

The timeliness of a Rule 24 motion is a threshold issue that must be addressed first. *Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011). In determining whether a motion to intervene is timely, courts in the Sixth Circuit consider various factors based on the totality of the

3

circumstances with no one factor being dispositive. *Salem Pointe Cap.,* 854 F. App'x at 695. These factors include:

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his or her interest in the case, to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Id.* Here, all factors weigh favor of granting Tennessee Families' motion.

### i. The point to which the suit has progressed.

Under the first factor, courts look to "what steps occurred along the litigation continuum during this period of time." *Stupak-Thrall v. Glickman*, 226 F.3d 467, 475 (6th Cir. 2000) (emphasis omitted). Courts evaluating this factor consider whether the litigation has reached certain "benchmarks." *In re Auto. Parts Antitrust Litig., End-Payor Actions*, 33 F.4th 894, 901 (6th Cir. 2022). A case "is in its final stages" and has therefore generally progressed too far for intervention "when the district court has already ruled on dispositive motions, closed discovery, certified classes, or held fairness hearings that lead to settlement approval." *Id.* (denying intervention where the district court's previously-identified "finish line" for final disposition of the case was "fast approaching") (internal citations omitted); *see also Kirsch v. Dean*, 733 F. App'x 268, 275 (6th Cir. 2018) (affirming denial of intervention where district court had resolved numerous dispositive and non-dispositive motions); *Mountain Top Condo. Assoc. v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 370 (3rd Cir.1995) (affirming granting of intervention four years after the compliant was filed where little discovery had been completed); *Jenkins v. La-Z-Boy Inc.*, No. 3:09-CV-101, 2009 WL 10710296, at *3 (E.D. Tenn. Sept. 24, 2009) (denying intervention where a court's scheduling order would be disrupted). And even where significant progress has

been made, this factor weighs in favor of intervention where the suit "cannot be expected to end any time soon." *United States v. City of Detroit*, 712 F.3d 925, 931 (6th Cir. 2013).

None of these timeliness benchmarks have been reached in this case. Discovery has not begun. No scheduling order is in place. Defendants did not respond to the operative complaint until mere days ago. (Def. Mot. to Dismiss, Doc. 57.) And no dispositive motions have been ruled upon (or even fully briefed). In short, this case is in its infancy, and no substantive benchmarks have been reached. Thus, all timeliness factors weigh in favor of granting Tennessee Families' motion to intervene.[2]

### ii. The purpose for which intervention is sought.

This factor has been applied "somewhat inconsistent[ly]" by courts in the Sixth Circuit, with courts sometimes focused on the "legitimacy of the intervenors' purported interest," and, at other times, on "whether the would-be intervenors acted promptly in light of their stated purposes." *In re Auto. Parts Antitrust Litig.*, 33 F.4th at 902. An intervenor's purpose is legitimate, however, where its interests would be materially affected by an adverse ruling. *Cf. Linton by Arnold v. Comm'r of Health & Env't, State of Tenn.*, 973 F.2d 1311, 1318 (6th Cir. 1992) (finding that an intervenor's purpose was legitimate where it was based on a challenge to a decision which affected their contractual rights).

Tennessee Families each have children who benefit directly from the existence of public charter schools and the availability of certain federal anti-discrimination protections, as well as federal and state programs and funding that are available because of the public nature of charter schools in Tennessee. Plaintiff's action threatens the availability of these protections and

---

[2]    As stated in the motion, Tennessee Families are aware that this Court has scheduled a telephonic scheduling conference for February 18th. Counsel for Tennessee Families are available at that time and ready to participate in this conference. Alternatively, their counsel are prepared to make every conceivable effort to comply with any scheduling order put down in this matter prior to an order on this motion so as to not disrupt the proceedings.

programs, as it seeks to have public charter schools deemed private entities to advance its own narrow interests. But if that were to happen, the children in each of these Tennessee Families would be left unprotected by laws upon which they rely for their public education. Even more concerning, the constitutionality of the state's funding mechanism for public charter schools would immediately be in doubt if Plaintiff were to prevail, a development that would threaten the very existence of the public schools attended by the children in each of these Tennessee Families. It is hard to fathom a more legitimate interest in the context of this litigation. Thus, this factor also weighs in favor of granting the motion to intervene.

### iii. The length of time preceding the application during which the proposed intervenors knew or reasonably should have known of their interest in the case.

Potential intervenors must move to intervene in a timely fashion after they knew or should have known of their interest in the litigation and that such an interest would not be fully protected. *Stotts v. Memphis Fire Dep't*, 679 F.2d 579, 582–83 (6th Cir. 1982). Where a potential intervenor waits for several months or even years after discovering interest in the litigation, and/or when that delay is for strategic purposes, this factor weighs against intervention. *See Blount-Hill*, 636 F.3d at 285–86 (holding that the potential intervenors waited either months or years and did so to await the results of an election which could have affected their interests). But where a potential intervenor moves promptly after learning of its interest and before any issues have been litigated, this is generally deemed timely. *See City of Detroit*, 712 F.3d at 931.

The minimal amount of time that passed between when Tennessee Families knew of their interest in this litigation ***and*** that no existing party or the State of Tennessee would step into defend it also favors intervention here. Tennessee Families only became aware of this lawsuit recently, as the case was just filed in December 2025, and it has received only limited media coverage in the

Knoxville market and almost none outside of Knoxville.**3** After becoming aware of this situation, Tennessee Families promptly moved to intervene. As such, this factor further supports intervention here.

> **iv.    The prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his or her interest in the case, to apply promptly for intervention.**

This factor focuses on prejudice to the existing parties due to a potential intervenor's failure to intervene at an earlier point. *Salem Pointe Cap.*, 854 F. App'x at 699. Importantly, the analysis for this factor is based on alleged prejudice caused by the *delay* rather than alleged prejudice caused by the intervention itself. *Id.* The timing of intervention is the relevant consideration. *Id.*

As discussed above, Tennessee Families did not delay at all in moving to intervene. Rather, Tennessee Families moved to intervene within weeks of learning of the existence of the lawsuit and that none of the existing parties would protect (or are even aware of) their interests. Additionally, the case has not progressed past its initial stage, and the Court has made no substantive rulings. Clearly, the timing of this intervention would cause no prejudice to the existing parties.

> **v.    The existence of unusual circumstances militating against or in favor of intervention.**

The final timeliness factor is whether any unusual circumstances militate against or in favor of intervention. Courts in the Sixth Circuit "do[] not have an established list of additional factors that it considers in every timeliness analysis under this fifth factor." *Id.* at 700 (internal quotation marks omitted). Examples of "unusual circumstances" militating against intervention include "subterfuge" by the potential intervenor in moving to intervene, *id.*, and a court's retention of

---

**3**      *See* Jack Ziskin, *Knox County parent pushes back on newly created religious charter school seeking public funds*, WATE, https://www.wate.com/news/top-stories/knox-county-parent-pushes-back-on-newly-created-religious-charter-school-seeking-public-funds/ (last updated Feb. 3, 2026).

continuing jurisdiction to modify a decree that served as the basis for the potential intervenor's claims, as well as lengthy settlement negotiations, *Stotts*, 679 F.2d at 585.

Certainly, no unusual circumstances exist in this case that militate *against* intervention. On the other hand, the fact that neither the Defendants nor the State of Tennessee intend to defend the state laws at issue in this matter does present an unusual circumstance that has left Tennessee Families' interests wholly unprotected and, thus, militates in favor of intervention.

In sum, Tennessee Families' motion is timely because all five timeliness factors weigh in favor of intervention.

**B.     Tennessee Families have substantial interests in this case.**

The Sixth Circuit has established a "rather expansive notion" of what constitutes a substantial interest under Rule 24(a)(2), *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997), requiring only that the lawsuit's impact on potential intervenors be concrete and that the intervenors have more than a "general ideological interest" in the lawsuit's outcome, *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*, 41 F.4th 767, 773 (6th Cir. 2022). Article III standing is not required to demonstrate a substantial interest. *See Purnell v. City of Akron*, 925 F.2d 941, 948 (6th Cir. 1991). And any close question regarding the sufficiency of an intervenor's interest should "be resolved in favor of recognizing an interest under Rule 24(a)." *Miller*, 103 F.3d at 1247.

Tennessee Families assert three similar, but distinct, interests in this litigation, all of which would be threatened by a ruling in Plaintiff's favor: protecting the availability and scope of critical disability accommodations under Section 504 of the Rehabilitation Act, preserving access to and control over federal funds through Title I, and protecting against the loss of per-pupil state funding. All three are clearly sufficient interests for Rule 24(a) intervention.

The stakes of this case will have a much broader impact than on one particular school in one particular county in Tennessee. A decision in Plaintiff's favor on any ground could have far-reaching and significant consequences for tens of thousands of students attending public charter schools across the state. Public charter schools in Tennessee are authorized by a local board of education or by the Tennessee Public Charter School Commission,[4] and, because they are tuition-free public schools, they are entitled to receive state and federal funding appropriated and distributed to all public elementary and secondary schools in the state, including Tennessee Investment in Student Achievement (TISA) funds[5] and funds for programming under Title I of the Every School Succeeds Act (ESSA).[6] Additionally, charter schools—like all public schools—are required to comply with the strict requirements of Section 504 of the Rehabilitation Act. Tennessee Families interests include the protections and benefits their children currently receive through these programs that are exclusively available at public schools. Additionally, their interests are based on the unique value their public charter schools offer to their children that traditional public schools cannot provide. These interests, as explained in more detail below, are dependent upon charter schools remaining public schools.

> i. **Private schools are not required to provide the same scope of accommodations under Section 504 of the Rehabilitation Act.**

Section 504 of the Rehabilitation Act prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); 34 C.F.R. § 104.31 (2023). Tennessee Families have children who attend public charter schools which receive federal funding through the Individuals with Disabilities in Education Act ("IDEA"), the Elementary and

---

[4] Tenn. Code Ann. § 49-13-104(4).

[5] Tenn. Code Ann. § 49-13-112.

[6] The 'Elementary and Secondary Education Act of 1965' (ESEA) was reauthorized by the 'Every Student Succeeds Act of 2015' (ESSA). The ESSA also governs Title II, III, IV, V. *See* 20 U.S.C. § 6301 *et seq*.

Secondary Education Act ("ESSA"), and the Charter School Program and are therefore subject to Section 504.[7]

If public charter schools were deemed private, the children of the Tennessee Families who currently receive support pursuant to a Section 504 plan will have significantly reduced anti-discrimination and equal access protections. Private schools can deny admission to students that require more than "minor adjustments" to the school's program to receive an appropriate education.[8] Public schools, on the other hand, must serve all students "regardless of the nature or severity of the person's handicap"[9] and must provide accommodations that do not impose an "undue hardship."[10] The Office of Civil Rights notes that the "minor adjustments" standard applicable to private schools "differs radically from the obligations of similar public programs."[11]

This radical difference is best understood by its impact on some of the children of the Tennessee Families. Tiffany Nash, for example, has an elementary-aged child who attends a public charter school, Vision Prep, in Memphis. (Nash Dec. ¶ 2.) Her child developed a brain tumor and now suffers from short-term memory loss and other ongoing medical issues that require constant access to a nurse and regular breaks. (*Id.* ¶¶ 3–4.) These medical conditions significantly affect her

---

[7]     U.S. Dept. of Educ., Office of Civil Rights, *Frequently Asked Questions about the Rights of Students with Disabilities in Public Charter Schools under Section 504 of the Rehabilitation Act of 1973* (Dec. 28, 2016) at 1, fn. 3, https://www.ed.gov/media/document/frequently-asked-questions-about-rights-of-students-disabilities-public-charter-schools-under-section-504-of-rehabilitation-act-of-1973-2016-89985.pdf (identifying IDEA funding, Title I of ESSA and the Charter School Program as "federal financial assistance.").

[8]     34 C.F.R. § 104.39 ("A recipient that provides private elementary or secondary education may not, on the basis of handicap, exclude a qualified handicapped person if the person can, with minor adjustments, be provided an appropriate education . . . within that recipient's program or activity."). *See also*, Lynn M. Daggett, *"Minor Adjustments" and Other Not-So-Minor Obligations: Section 504, Private Religious K-12 Schools, and Students with Disabilities*, 52 U. LOUISVILLE L. REV. 301 (2014) (detailed discussion of private school obligations to students eligible under Section 504 including how the "minor adjustment" standard should be interpreted).

[9]     34 C.F.R. § 104.33(a).

[10]     28 C.F.R. § 41.53 (Recipients must make reasonable accommodations for people with disabilities "unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.")

[11]     Memorandum from Richard D. Komer, Deputy Assistant Secretary for Policy, to OCR Staff, 22 IDELR 669, at 672-73 (July 27, 1990).

child's ability to function within a typical classroom. (*Id.* ¶ 4.) As a public charter school subject to Section 504, Vision Prep has worked tirelessly with Ms. Nash and her child to develop (and regularly amend) a Section 504 plan that allows her child to receive the *same* education that children without such disabilities receive. (*Id.* ¶¶ 6–8.) Without that complex and evolving 504 plan in place—required by law for public schools like Vision Prep—her child would not be able to thrive at school. (*Id.* ¶¶ 5–6, 8.)

Shakeithia Rice has a similar story of the benefits of public charter school education. Her middle school-aged child suffers from sickle cell anemia, a rare inherited blood disorder that can cause serious medical complications and causes chronic, severe, and unpredictable pain. (Rice Dec. ¶ 4.) Ms. Rice's child attends East End Prep, a public charter school in Nashville. (*Id.* ¶ 2.) Her child's medical conditions are often unpredictable, sometimes requiring the use of a wheelchair and alternative seating within the classroom and often force her child to miss school. (*Id.* ¶¶ 4–5, 8.) East End Prep has provided significant accommodations as part of a 504 plan, including academic accommodations to account for medical absences, to ensure that her child receives the same education as other students regardless of what challenges her child may face. (*Id.* ¶¶ 8–9.)

Evelyn Henderson is the mother of two children who attend Ivy Academy's Skillern Elementary ("Skillern") in Soddy Daisy, both of whom have benefited from 504 plans. (Henderson Dec. ¶¶ 3, 7.) Her eldest child suffers from both academic and social anxiety, while her youngest has been diagnosed with attention deficit hyperactivity disorder. (*Id.* ¶¶ 8, 10.) Skillern has worked with Ms. Henderson to develop specifically-tailored 504 plans that have allowed her children to thrive academically and even enjoy attending school—an activity that used to cause fear. (*Id.* ¶¶ 7, 9, 12.)

Holly Slater is the Chief Executive Officer of Ivy Academy in Soddy Daisy, and the parent of two children who attend Skillern. (Slater Dec. ¶¶ 2, 9.) Her eldest child suffers from a birth defect that required the child to undergo double knee surgery, while her youngest child struggles with neurodivergence that significantly impairs the child's ability to tolerate various sensory experiences. (*Id.* ¶¶ 12, 13.) Skillern established 504 plans for both children. (*Id.*) In particular, Skillern has put in place a comprehensive plan to alleviate stressful sensory triggers from her youngest child's day. (*Id.* ¶ 15.) Skillern's efforts in this regard have been life-changing for Ms. Slater and her child, giving her child the opportunity to be comfortable at school and learn like other children. (*Id.* ¶ 16.)

Without these 504 plans in place, many of these children would not even be able to attend school, much less thrive in the manner they are now. These Tennessee Families rely upon these 504 plans to ensure equal access to education for their children.

A decision deeming charter schools private could destroy these accommodations. Despite the fact that Ms. Nash's child, for example, was already enrolled at Vision Prep when her child's disabilities began, if Vision Prep were deemed to be a private school, it could (lawfully) remove her child as a student due to the fact that her accommodations are well beyond "minor adjustments." *See Ireland v. Kansas Dist. of Wesleyan Church*, No. CIV. A. 94-4077-DES, 1994 WL 413807, at *6 (D. Kan. July 1, 1994) (student was not otherwise qualified to remain in pre-K or be promoted to Kindergarten because he required more than minor adjustments to the program). In contrast, as long as Vision Prep remains a public school, it is subject to the stricter requirements of Section 504 and must provide an equal education for Ms. Nash's child. But a private school could simply wash its hands of any obligations to her.

Even if the Tennessee Families' children were able to remain enrolled at their schools with the requisite accommodations in place, a private school could charge these families for services that involve substantial cost.[12] Public schools, however, must provide a "free"[13] education "without cost to the handicapped person or to his or her parents or guardian."[14]

The Tennessee Families therefore have substantial interests in this litigation regarding Section 504 accommodations.

### ii. Charter schools would lose access to and control over certain Title I funds.

Title I is the largest federal program benefiting elementary and secondary public schools and students, including several of the Tennessee Families.[15] The program provides financial support to schools serving students from low-income families.[16] Depending on a school's concentration of students in poverty, Title I funding can either be used to deliver targeted programming to low-income students or to provide activities that benefit all students in a particular public school with a high concentration of low-income students.

The funding is typically used for programming that supplements instruction or provides tutoring, upgrades instructional materials, coordinates social services, addresses school safety issues, and increases family engagement. Title I funds can also be dedicated to support specific

---

[12] 34 C.F.R. § 104.39(b) ("A recipient to which this section applies may not charge more for the provision of an appropriate education to handicapped persons than to nonhandicapped persons except to the extent that any additional charge is justified by a substantial increase in cost to the recipient.").

[13] 34 C.F.R. § 104.33(a).

[14] 34 C.F.R. § 104.33(c)(1).

[15] National Center for Education Statistics, *Revenues and Expenditures for Public Elementary and Secondary Education: School Year 2021–22 (Fiscal Year 2022)*, U.S. Dep't of Ed., Inst. of Ed. Scis., (last updated May 30, 2024), https://nces.ed.gov/pubs2024/2024301.pdf.

[16] *See generally Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families – Updated Non-Regulatory Guidance*, U.S. DEP'T OF ED., [hereinafter *Title 1, Part A of ESEA Uniform Guidance*] https://www.ed.gov/sites/ed/files/2023/05/Title-I-ES-guidance-revised-5-2023.pdf

academic assessments and school improvement activities. These funds are essential for the eighty-seven percent of Tennessee public charter schools that receive and depend on Title I funds to provide services and programming for their Title I eligible students, including several of the Tennessee Families. States receive Title I funding from the federal government pursuant to a specific funding formula that considers the number of students eligible for Title I programs and services in the state.[17] That Title I funding is distributed to the states via State Education Agencies ("SEAs"), which then distribute the Title I funds to Local Education Agencies ("LEAs")— typically school districts. LEAs then allocate Title I funds to individual schools within their districts and attendance areas. For Title I eligible students enrolled in public schools, LEAs must allocate Title I funding to the public elementary and secondary schools according to a formula that either (1) provides a set amount of Title I funding to the entire school based on the concentration of Title I eligible students; or (2) allocates specific dollar amounts to each school based on the cost of services provided to eligible students in each grade.[18]

The federal law and regulations that govern Title I grant programs treat private schools differently than public schools. Because LEAs operate for the benefit of public elementary and secondary schools, LEAs are not required to fund private schools or their students in the same manner as they funds public schools and their students.[19] Most notably, instead of requiring an

---

[17]    *See generally id.*

[18]    *See* ESEA Section 1113(a) and Section 1113(a)(5)(A) (Federal statute requires an LEA to allocate Title 1 funds to individual public schools, identified as eligible to participate, in rank order of poverty percentage based on the number of public school children from low-income families residing in each school. An LEA must first annually rank schools by poverty percentage and then selects, in rank order, those schools the LEA will serve. For schools that exceed 75 percent poverty, the LEA must serve those schools in rank order without regard to grade-span before serving any school with a poverty percentage of 75 percent or below. If an LEA has sufficient funds to serve all schools above 75 percent poverty and has Title I funds remaining, the law allows the LEA to serve its other schools in rank order of poverty by the LEA as a whole or by grade-span groupings. Among schools with less than 75 percent poverty, the LEA has flexibility to focus resources on certain grades.).

[19]    *See* 34 C.F.R. § 303.23 (defining an LEA as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public

LEA to make a direct Title I allocation to schools (as is required for public schools), federal law establishes materially different allocation requirements for private schools and their students.

Specifically, for students enrolled in private schools, federal law only requires an LEA to determine the proportional share of Title I funds needed to provide *equitable* services—not the funds required to provide *identical* services to those provided to Title I eligible students enrolled in public schools.[20] Further narrowing the ways a private school may use its Title I funds, federal law specifically prohibits the provision of equitable services in a manner that benefits "the needs of [a] private school or the general needs of children in the private school."[21] In addition, the LEA decides for the private school how its Title I funds will be spent. "Private school officials have no authority to obligate or receive Title I funds" and the LEA must "maintain control of Title I funds, materials, equipment, and property."[22] Title I funds cannot be paid to a private school, "even as reimbursement."[23] And unlike a public school that enrolls Title I eligible students, there is no guarantee a private school will receive funding to serve all of its Title I eligible students.[24]

In contrast to public schools, responsibility and final say in the planning, designing, and implementing of Title I equitable services for private school children lie with the LEA and not the

---

elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools").

[20]    ESEA Section 1117(b)(1)(J)(ii) (general rule is to provide equitable services to eligible low-achieving students in each school commensurate with the funds generated by students from low-income families in that school).

[21]    ESEA Section 1117(d); 34 C.F.R. § 200.66(b)(2); *Title 1, Part A of ESEA Uniform Guidance*, at 36, https://www.ed.gov/sites/ed/files/2023/05/Title-I-ES-guidance-revised-5-2023.pdf.

[22]    ESEA Section 1117(d)(1); *Title 1, Part A of ESEA Uniform Guidance,* at 38, https://www.ed.gov/sites/ed/files/2023/05/Title-I-ES-guidance-revised-5-2023.pdf.

[23]    ESEA Section 1117(d)(1); *Title 1, Part A of ESEA Uniform Guidance,* at 38; *see also Non-Public School Intent to Participate Form*, at 2, 2026-27 IntentToParticipateForm.pdf (non-public schools cannot receive direct funding from Title I federal grant programs. Instead, the program enables private school students and teachers to receive benefits, services, and materials offered by the LEA).

[24]    *See Title 1, Part A of ESEA Uniform Guidance*, at 33, https://www.ed.gov/sites/ed/files/2023/05/Title-I-ES-guidance-revised-5-2023.pdf. (listing Title I eligibility requirements for private school students).

private schools.[25]  In other words, while public schools receive Title I monies and are given control over how to spend those monies to provide critical services and supports for all their low-income students, private schools receive services (not monies) at the direction and control of the LEA (not at the school's direction and control) to serve (some, but not necessarily all of) their low-income students.  The scope and impact of the Title I services and supports provided to low-income students changes substantially when a school cannot decide how it spends Title I monies and cannot determine who provides those services. And private schools may not even receive sufficient Title I funding to support all their Title I eligible students.[26]

During the 2024–25 school year, 104 of the 119 public charter schools in Tennessee—87 percent—received Title I funding.[27] If charter schools in Tennessee are suddenly deemed private, these schools and all of their Title I eligible students will have less access to currently available funding, programs, and services provided under Title I. Tennessee Families, and similarly situated families across the state, face the risk of losing the very support and services they rely and depend upon for their children's continued academic progress and success in public school.

Ciera Crutcher and Adrienne Carroll, for example, both have children who greatly benefit from attending public charter schools that currently receive Title I funding. (Crutcher Dec. ¶ 11; Carroll Dec. ¶ 11.) Ms. Crutcher has two children who attend East End Preparatory School and RePublic High School in Nashville, (Crutcher Dec. ¶ 2.), while Ms. Carroll's child attends

---

[25]     ESEA Sections 1117(a)(1)(A), (b)(1), and (d); 34 C.F.R. § 200.64(b)(4); *Title 1, Part A of ESEA Uniform Guidance,* at 35, https://www.ed.gov/sites/ed/files/2023/05/Title-I-ES-guidance-revised-5-2023.pdf.
[26]     *Id.* at 13.
[27]     *2024-25 Title I K-12 And Concentrated Poverty Schools*, TENNESSEE DEPARTMENT OF EDUCATION, https://eplan.tn.gov/DocumentLibrary/Default.aspx?ccipSessionKey=639069786002828690 (last visited Feb. 17, 2026).

Grizzlies Prep in Memphis, (Carroll Dec. ¶ 2.) All three of these schools receive Title I funding.[28] Both Ms. Crutcher and Ms. Carroll rely upon these respective schools' access to Title I funding to provide high quality educational opportunities for their children. (Crutcher Dec. ¶ 11; Carroll Dec. ¶ 11.) And both are concerned that a decision deeming charter schools private in Tennessee could lead to a loss of this funding or in a change in how it is used. (Crutcher Dec. ¶¶ 11–13; Carroll Dec. ¶¶ 11–13.)

Clearly, Tennessee Families have a substantial interest in litigation that threatens charter schools' status as public schools and consequently threatens their children's access to the Title I funds, programming, and services provided to eligible public school students.

### iii. A ruling in Plaintiff's favor could jeopardize public charter schools' access to TISA funding from the state.

The central premise of Plaintiff's argument is public charter schools are private entities rather than governmental entities. Beyond its parochial interests, Plaintiff appears to ignore the consequences of its argument and the harm it will cause to children like those of the Tennessee Families. If Plaintiff prevails, the very existence of public charter schools will be threatened because public charter schools' primary source of funding—TISA—depends on their status as public schools.

Private schools in Tennessee do not receive TISA funding directly from the state.[29] By contrast, public charter schools are funded directly from the state through TISA—funds specifically collected for and spent on the state's public education system.[30] Public charter school

---

[28]    *East End Prep Family Handbook*, https://www.eastendprep.org/resources/family-handbook/ (last visited Feb. 17, 2026); *RePublic High State and Federal Programs*, https://republiccharterschools.org/about/stateandfederalprograms/ (last visited Feb. 17, 2026); *Grizzlies Prep Title I Resources*, https://www.grizzliesprep.org/title-1 (last visited Feb. 17, 2026).

[29]    Tenn. Code Ann. § 49-10-1405 (a)(2)(B); Tenn. Code Ann. § 49-6-2605.

[30]    Tenn. Code Ann. § 49-6-2605.

students are eligible for the same funding levels as all public school students in the state. This is not by happenstance; it is by design. If charter schools were deemed private, then TISA funding directly from the state likely would be cut off. Public charter schools could disappear from Tennessee. And without public charter schools, Tennessee Families would lose access to life-changing educational opportunities for their children.

In Tennessee, the Education Article of the state constitution is Article XI, Section 12, which states in relevant part:

> The State of Tennessee recognizes the inherent value of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools. The General Assembly may establish and support such postsecondary educational institutions, including public institutions of higher learning, as it determines.

Tenn. Const. art. XI, § 12. The plain language of the Tennessee Education Article expressly recognizes the state legislature's responsibility to establish, maintain and support "a system of free public schools." *Id.* If this Court rules that a charter school established under Tennessee law is "private" for constitutional purposes, then under a plain reading of Article XI, a court could determine that charter schools should not be considered part of the "system of free public schools" that the legislature maintains and supports.

Tennessee's charter school law unambiguously states that public charter schools are part of the state program of public education.[31] This—coupled with Article XI, Section 12's mandate to fund public education—requires the Tennessee General Assembly to provide state education dollars to support the "system of free public schools," including Tennessee public charter schools,

---

[31] Tenn. Code Ann. § 49-13-106.

and enables Tennessee's public charter schools to receive TISA funds in the same manner as all public schools.[32]

There is a clear risk, then, that public charter schools could lose direct TISA funding from the state overnight should Plaintiff's arguments be accepted. If Tennessee public charter schools are deemed private entities for federal constitutional purposes, they risk being classified and treated as private schools for Tennessee constitutional purposes and, thus, not part of the public school system. All Tennessee charter schools would be prevented from receiving TISA funding directly from the state. Without continued access to direct TISA funding, charter schools across the state would shutter, and Tennessee Families would lose access to the public charter schools in which their children are currently thriving. Accordingly, Tennessee Families have a substantial interest in litigation that threatens charter schools' status as public schools, their funding as public schools, and therefore their continued existence.

### C. Tennessee Families' substantial interests would be impaired by an adverse ruling deeming charter schools private.

To satisfy the impairment factor, "a would-be intervenor must show *only* that impairment of its substantial legal interest is *possible* if intervention is denied. This burden is minimal." *Miller*, 103 F.3d at 1247 (emphasis added) (citation omitted). A potential intervenor does not need to establish an injury in fact. *Purnell v. City of Akron*, 925 F.2d at 948. Rather, "the [impairment factor] is satisfied whenever disposition of the present action would put the movant at a practical disadvantage in protecting its interest." *Wineries*, 41 F.4th at 774. (internal quotation marks omitted).

Plaintiff urges the Court to treat Tennessee charter schools and potential charter schools, like Plaintiff, as "private entities that receive public funding" and not "government entities." (Am.

---

[32]     Tenn. Code Ann. § 49-13-112.

Compl., Doc. 10 ¶ 56.) However, to treat Tennessee's public charter schools as private schools and not as public schools threatens to deprive students of both significant protections against discrimination as well as access to certain Title I-funded programs and benefits. Additionally, it could very well cause all charter schools in the state to cease operation until and unless significant legislative action is undertaken to determine a constitutional funding mechanism for such schools. This threatens the education of students, like the Tennessee Families' children, most in need of supplemental services and accommodations, many of whom were compelled to leave their traditional public schools due to an inability of those schools to address their specific needs.

Characterizing public charter schools as non-governmental entities for Plaintiff's narrow purpose could result in all Tennessee charter schools being treated as private entities for *all* purposes, including the allocation of and control over federal Title I funding and programing, the scope and applicability of federal laws protecting students against discrimination, and (lack of) direct access to state public education monies. Therefore, Plaintiff's potential success in obtaining approval from the state and local government to operate its private, religious charter school presents potential significant harm to all charter school students in Tennessee, including the children of the Tennessee Families, currently benefiting from Title I-funded services, certain Section 504 plans, and the existence of public charter schools in general in Tennessee.

**D.** **Proposed Intervenors' substantial interests will not be adequately represented by the existing parties, as no parties plan to defend the public nature of charter schools.**

The burden to show inadequate representation is "minimal." *Wineries*, 41 F.4th at 774. (internal quotation marks omitted). It is not necessary to prove with certainty that existing parties' interests are wholly adverse to proposed intervenors' interests, but only that an existing party who seeks the same outcome "will not make all of the prospective intervenor's arguments." *Miller*, 103 F.3d at 1247. While a presumption of adequate representation may apply where the intervenor's

interest is identical to that of an existing party, that presumption is destroyed where the interests are similar but not identical. *See Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 196–97 (2022).

Defendants made clear that they do not intend to defend the constitutionality of Tennessee's charter school program, and the Tennessee Attorney General has now declined to intervene. That leaves only the Existing Intervenors to defend the constitutionality of the program, yet they are only concerned with a narrow issue: preventing religious education in public schools funded by public-education tax money. (Doc. 22.) Were this Court to hold that charter schools are private schools and/or private entities, as argued by Plaintiff, then public charter schools would cease to exist, and the Existing Intervenors' concerns in the litigation likely would be alleviated.

In stark contrast, the Tennessee Families' interests—protecting access to anti-discrimination protections as well as funding and programs crucial to the public education of their children—are dependent on public charter schools remaining just that: public. The Tennessee Families have a substantial interest in protecting the availability of services, programs and/or protections for students at—and the very existence of—their public charter schools. Were this Court to hold that charter schools in Tennessee are private, as Plaintiff urges, then Plaintiff would get to open a school and teach its desired curriculum (at least until the state funding stopped), Defendants would be able to wash their hands of the matter entirely, and the Existing Intervenors' desire to prevent public education dollars going to religious education would be vindicated, as there would likely no longer be any public charter schools.

But Tennessee Families and their children would lose. Their ability to choose the public school that best meets the needs of their children would be destroyed, which would result in significant hardship to each of these families (Carroll Dec. ¶ 18; Crutcher Dec. ¶ 17; Henderson

Dec. ¶ 23; Nash Dec. ¶ 18; Rice Dec. ¶ 20; Slater Dec. ¶ 26.), and will deny their children the educational opportunities their parents have determined are best suited for their education. No existing party to this case appears to be aware of these interests, much less be inclined to protect them. Tennessee Families are the only parties capable of articulating and protecting their interests, and this Court needs to hear these voices. Therefore, Tennessee Families have a right to intervene under Rule 24(a), and their motion should be granted.

## II.     Alternatively, Proposed Intervenors Should Be Granted Permissive Intervention

If the Court determines that intervention as of right is unwarranted, permissive intervention under Rule 24(b) should be granted. Permissive intervention is appropriate where "intervention is timely and alleges at least one common question of law or fact." *United States v. Michigan*, 424 F.3d 438, 445 (6th Cir. 2005). "Once these two requirements are established, the district court must then balance undue delay and prejudice to the original parties, if any, and any other relevant factors to determine whether, in the court's discretion, intervention should be allowed." *Id.* "A under Rule 24(b) is addressed to the sound discretion of the District Court." *Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1225 (6th Cir. 1975). Just like intervention as of right, permissive intervention "should be broadly construed in favor of potential intervenors." *See Stupak-Thrall*, 226 F.3d at 472.

Here, the Court should grant permissive intervention because defenses regarding the Tennessee Families' public nature of charter schools present common questions of law with the main action, namely whether public charter schools are private entities. Moreover, intervention will not unduly delay or prejudice any party, as this case is in its earliest stages.

### A. Tennessee Families' proposed defense of Tennessee's charter school law shares common questions of law and fact with the main action.

The Proposed Intervenors assert defenses and arguments that "share[] with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). This factor can be satisfied by the potential intervenor showing that it will raise similar arguments in defense of a claim. *See League of Women Voters of Michigan v. Johnson*, 902 F.3d 572, 577 (6th Cir. 2018) (holding that potential intervenor's proposed argument regarding lack of standing was the same as the existing defendant and therefore satisfied the common question requirement).

Plaintiff asserts that Tennessee's prohibitions on religious charter schools violate the Free Exercise Clause, as it is a private entity operating a private school. If permitted to intervene, the Tennessee Families will counter this claim by arguing that charter schools in Tennessee are public schools and governmental entities. Thus, the public versus private nature of charter schools share common questions of law and fact. Additionally, the Tennessee Families intend to challenge Plaintiff's standing to bring its claims, as it has never even applied to operate a charter school.

### B. Permissive intervention will not unduly delay or prejudice adjudication.

As explained above, intervention does not prejudice the existing parties where a case is "in its infancy," with no scheduling order in place and discovery having not yet begun. *Johnson*, 902 F.3d at 578–79. Tennessee Families have moved to intervene at the very outset of this case, before any scheduling order has been entered or any discovery has begun. Nor would intervention prejudice the adjudication of the issues already before the Court. Where a potential intervenor's defenses overlap with claims and defenses presented by existing parties, there is "little risk that allowing [intervention] would . . . interfere[] with the court's ability to reach an expeditious resolution." *Johnson*, 902 F.3d at 578. The arguments and defenses that the Tennessee Families will make in support of their interests share significant overlap with existing claims and defenses

already advanced in this matter. In recognition of the Sixth Circuit's policy that Rule 24 be "broadly construed in favor of potential intervenors," this Court should permit intervention here. *Purnell*, 925 F.2d at 950.

**C. Permissive intervention is warranted to streamline adjudication and to ensure Tennessee Families' distinct interests are heard.**

In evaluating a Rule 24(b) motion, courts seek to promote "judicial economy" and "avoid multiplicity of litigation." *Buck v. Gordon*, 959 F.3d 219, 225 (6th Cir. 2020). As part of this analysis, courts in the Sixth Circuit consider whether the proposed intervenors' interest in the litigation is different than that of the existing parties. *See, e.g.*, *Johnson*, 902 F.3d at 579. Where the interests of proposed intervenors are unrepresented by the existing parties, intervention ensures that all relevant considerations and arguments are before the Court. *See generally id.*

Here, allowing the Tennessee Families to intervene will promote efficient adjudication and consideration of their distinct interests, and it will ensure that the Court has the benefit of the Tennessee Families' perspective on the ramifications of its ultimate decision in the case. Denying intervention also risks piecemeal litigation, as denial of intervention may force the Tennessee Families to challenge the designation of charter schools as private in one or more separate, future actions. Permitting intervention will ensure that all relevant issues are resolved in a single proceeding. *See Buck*, 959 F.3d at 225.

For the foregoing reasons, and if this Court declines Tennessee Families' motion for intervention as of right, this Court should exercise its discretion to allow permissive intervention here. *See Purnell*, 925 F.2d at 950.

## CONCLUSION

For the reasons and upon the authorities cited above, this Court should grant the Motion to Intervene. The very existence of public charter schools in Tennessee is at stake in this litigation, and no existing party seems to notice.

Respectfully submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

*s/ Thomas H. Jarvis*
David D. Ayliffe (BPR #024297)
Thomas H. Jarvis (BPR #036835)
Erika L. Hughes (BPR #035755)
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
(865) 549-7000
dayliffe@bakerdonelson.com
tjarvis@bakerdonelson.com
ehughes@bakerdonelson.com
*Attorneys for Adrienne Carroll, Ciara Crutcher, Tiffany Nash, Evelyn Henderson, Shakeithia Rice, and Holly Slater*

25

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

 

                                    *s/ Thomas H. Jarvis*
                                    Thomas H. Jarvis