# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

THE WILBERFORCE ACADEMY OF KNOXVILLE, )
)
)
*Plaintiff*, )
)
v. )
)
KNOX COUNTY BOARD OF EDUCATION, *et al.*, )
)
)
*Defendants*. )

Case No. 3:25-cv-584

Judge Atchley

Magistrate Judge Poplin

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendants Knox County Board of Education, John Butler, Anne Templeton, Patricia Fontenot-Ridley, Katherine Bike, Lauren Morgan, Betsy Henderson, Steve Triplett, Travis Wright, and Kristi Kristy's (collectively "KCBOE") Motion to Dismiss [Doc. 57]. For the reasons explained below, KCBOE's Motion [Doc. 57] is **GRANTED IN PART** and **DENIED IN PART.**

## I.     BACKGROUND

Plaintiff, The Wilberforce Academy of Knoxville ("Wilberforce"), is a religious organization seeking to establish a charter school in Knox County, Tennessee. [Doc. 10]. Wilberforce's mission is unmistakable: to provide "Christian educational services" by operating a "Christian charter school." [*Id.* at ¶ 31].  But Tennessee law currently provides that charter schools are required to operate as "nonsectarian" and "nonreligious." [*Id.* at ¶ 23]; *see also* Tenn. Code Ann. § 49-13-111(a)(2). For this reason, Wilberforce contends that KCBOE, which is responsible for approving or denying charter school applications, will ultimately deny Wilberforce's application solely on the basis of its religious status. [Doc. 10 at ¶¶ 25–26].

### A. Tennessee's Charter School Application Process

Of particular importance to the disposition of the instant motion is Tennessee's charter-school application process, which warrants a brief discussion.

The Tennessee Public Charter Schools Act of 2002 (the "Act") establishes a framework for the creation and operation of charter schools within Tennessee's public school system. *See* Tenn. Code. Ann. § 49-13-101. Under the Act, a proposed charter school must be operated by a nonprofit governing body, referred to as a "sponsor," which cannot be a religious or sectarian entity and may not promote the agenda of a religious denomination. *Id.* §§ 49-13-104(a)(10), 49-13-104(16), 49-13-106(c). Charter schools themselves must "[o]perate as public, nonsectarian, [and] nonreligious" schools and are funded through state, federal, and local public funds. *Id.* § 49-13-111. Though public in nature, the private, operational structure of schools created under the Act is designed to promote "greater decision making authority to schools," improve student learning, and expand educational options for parents. *Id.* § 49-13-102.

To establish a charter school, a sponsor must first submit a letter of intent to both the Tennessee Public Charter School Commission (the "Commission") and the relevant "authorizer"[1] sixty days before the application process begins. *Id.* § 49-13-107(a). The sponsor must then complete and submit a detailed application using a template developed by the State Board of Education "on or before February 1 of the year preceding the year in which the proposed public charter school plans to begin operation." *Id.* § 49-13-107(b). The application requires extensive information regarding the proposed charter school's academic plan, student-performance measures, operating budget, transportation, and compliance with applicable health and safety laws,

---

[1] "Authorizer" is defined as "the local board of education or the Tennessee public charter school commission that makes decisions regarding the approval, renewal, or revocation of a public charter school application or agreement." Tenn. Code Ann. § 49-13-104(4).

among other things. *Id.*

Once submitted, the authorizer reviews the application using standards and scoring criteria adopted by the State Board of Education. *Id.* § 49-13-108. The local board must vote to approve or deny the application within ninety days. *Id.* If the application is denied, the sponsor may amend the application to address any deficiencies within 30 days, after which the local board conducts another review. *Id.* If the application is again denied, the sponsor may appeal to the Commission, which conducts a de novo review and may approve the charter school notwithstanding the local board's denial. *Id.*

Approved charter schools remain subject to government oversight and regulation. They must comply with state academic standards, federal and state anti-discrimination laws, and other statutory and regulatory requirements governing public schools. *See id.* § 49-13-111. Charter schools must also apply to renew their charter agreement every 10 years to ensure compliance with regulatory and statutory requirements. *Id.* §§ 49-13-108(a), 49-13-110. If a public charter school cannot meet a State Board of Education rule or statute, the sponsor may apply for a "waiver" from such statute or rule. *Id.* § 49-13-111(p). But waivers may not be granted for regulatory or statutory requirements related to "federal and state civil rights." *Id.* The only person with authority to waive the State Board of Education rules for a charter school under Tennessee law is the Commissioner of Education. *Id.* § 49-1-203. In addition, pursuant to Tenn. Code. Ann. § 49-13-108(b)–(f), the State Board of Education has adopted application requirements that all authorizers must follow. Every two years, the State Board of Education must evaluate authorizer quality, including "determin[ing] authorizer compliance with the requirements of the [Act] and the rules and regulations of the state board of education." *Id.* § 49-13-145. An authorizer who fails to comply, such as by allowing a religious charter school, is subject to a loss of funding as determined by the

3

State Board of Education. *Id.*

   B.  *Wilberforce*

Enter Wilberforce. On November 25, 2025, Wilberforce submitted a letter of intent to KCBOE indicating its intent to open a faith-based Christian charter school in the 2027-2028 school year. [Doc. 10 at ¶ 43; Doc. 10-2]. Importantly, the "Sponsor Eligibility" section of the letter of intent form requires the sponsor to affirm that it satisfies the statutory eligibility requirements, including that it is not a "religious or church school"—a representation Wilberforce could not make. [Doc. 10 at ¶ 44; Doc. 10-2 at 5[2]]. Wilberforce did affirm, however, that it is a not-for-profit organization and has applied for 501(c)(3) status. [Doc. 10-2 at 5]. On December 2, 2025, KCBOE responded to Wilberforce by email indicating that its letter of intent was "considered incomplete" based on Wilberforce's failure to affirm the statutory eligibility requirements. [Doc. 10 at ¶ 45; Doc. 10-4]. Additionally, Wilberforce spent substantial resources in preparing a completed, 279-page application that was ready to be submitted on January 29, 2026; however, it too requires a sponsor to "affirm" that it will operate as a "nonsectarian, non-religious school." [Doc. 10 at ¶ 46; Doc. 70-4 at 14–15]. Because Wilberforce cannot make such a representation in the application, it did not submit it by the February 1, 2026, deadline. [Doc. 70 at 3].

Notwithstanding its failure to submit an application, Wilberforce alleges that it is "able and ready" to apply for charter status and will do so once a court orders KCBOE to stop discriminating against religious sponsors. [Doc. 10 at ¶ 48].

On November 30, 2025, Wilberforce filed this action against KCBOE seeking declaratory

---

[2] For consistency and ease of reference, record citations are to the internal pagination of any filed document, not to the CM/ECF-stamped document and page number. Where possible, further citation is made to more specific subdivisions within a document, such as the paragraph number of an affidavit or complaint.

and injunctive relief, challenging the nonsectarian requirement of Tennessee's charter-school program, which it believes unlawfully discriminates against religious organizations in violation of the Free Exercise Clause of the First Amendment. [Docs. 1, 10]. Since the filing of the Amended Complaint, two separate groups have been permitted to intervene in this matter. [Docs. 41, 80]. Now, KCBOE moves to dismiss the claims against it, raising jurisdictional arguments under Fed. R. Civ. P. 12(b)(1) and a failure to join a necessary party argument under Fed. R. Civ. P. 19(a). [Doc. 57]. Wilberforce has filed a response in opposition [Doc. 70], and KCBOE filed a reply [Doc. 71]. In addition, Wilberforce, after receiving leave from the Court, filed a sur-reply. [Doc. 75]. The Motion is now ripe for review.

## II.      STANDARD OF REVIEW

Rule 12(b)(1) motions fall into two categories: "facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "A facial attack is a challenge to the sufficiency of the pleading itself." *Id.* In considering whether jurisdiction has been established on the face of the pleading, "the court must take the material allegations of the [pleading] as true and construed in the light most favorable to the nonmoving party." *Id*. (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235-37 (1974)). "A factual attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *Id*. When resolving a factual attack, a court is not limited to merely the pleadings but instead retains broad discretion to consider and weigh extrinsic evidence. *Cartwright v. Garner*, 751 F.3d 752, 759–60 (6th Cir. 2014). The burden to prove jurisdiction is on the plaintiff. *Cob Clearinghouse Corp. v. Aetna U.S. Healthcare, Inc.*, 362 F.3d 877, 881 (6th Cir. 2004) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

## III. ANALYSIS

KCBOE asserts two primary arguments in its motion to dismiss [Doc. 57]. First, it argues that Wilberforce's claims should be dismissed for lack of subject matter jurisdiction, lodging both a facial and factual attack. [*Id.* at 7–17, 25]. Specifically, it asserts Wilberforce lacks standing and that this matter is moot. Second, it contends Wilberforce's failure to include the Commissioner of Education as a defendant in this action is detrimental to its claims because she is a proper and necessary party that the Court cannot accord compete relief without under Fed. R. Civ. P. 19(a). [*Id.* at 17–24]. The Court will analyze each issue in turn.

### A. Standing

Article III of the Constitution limits the jurisdiction of federal courts to hear only actual cases and controversies. U.S. Const. art. 3, § 2. Courts have long understood Article III, Section 2 to require that a "case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (citation omitted). To ensure that a live controversy exists between the parties, "constitutional standing has three elements that serve as its irreducible minimum in all cases." *Miller v. City of Wickliffe*, 852 F.3d 497, 502 (6th Cir. 2017) (citing *Lujan*, 504 U.S. at 560). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual and imminent, not conjectural or hypothetical." *Id.* (internal citation and quotations omitted). The second element requires the plaintiff to prove causation—"i.e., that her injury is 'fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court." *Id.* (citation and quotations omitted). For the third and final element, the plaintiff must "prove that it is likely, rather than merely speculative, that a favorable decision could redress the injury." *Id.* (citation omitted).

i. Injury In Fact

KCBOE's argument, in essence, is that Wilberforce cannot establish an injury in fact because it never submitted a charter-school application and therefore never received a final rejection decision capable of causing a cognizable injury. [Doc. 57 at 10–15]. Relatedly, KCBOE argues that Wilberforce is "ultimately the cause of its alleged injury." [Doc. 71 at 3]. And to the extent that Wilberforce invokes the futility doctrine, KCBOE contends that the doctrine is inapplicable because Wilberforce has not adequately alleged or demonstrated that it is "able and ready" to apply for charter status. [Doc. 57 at 12]. In KCBOE's view, Wilberforce failed to show "that it would otherwise be entitled to form a charter school under the rigorous requirements of Tennessee law." [*Id.*]. But the relevant inquiry is not whether Wilberforce could prove it ultimately would have been approved, only whether it had a concrete intent to apply but was deterred from doing so by an allegedly unconstitutional barrier.

To understand why KCBOE's position is misguided, a careful review of the Supreme Court's development of the "able and ready" doctrine is warranted. The Supreme Court first articulated the "able and ready" doctrine in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). In *Northeastern Florida*, the court considered whether an association had to demonstrate, for standing purposes, that one of its members would have received a city contract in the absence of an ordinance favoring certain minority-owned businesses. 508 U.S. at 658–59. Importantly, the petitioners alleged that they had regularly bid on and performed construction work in the City of Jacksonville and that they "would have . . . bid on . . . designated set aside contracts but for the restrictions imposed" by the ordinance. *Id.* at 659. Justice Thomas, writing for the court, surveyed the Court's prior standing decisions and concluded:

> Singly and collectively, these cases stand for the following proposition: When the
> government erects a barrier that makes it more difficult for members of one group

7

to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. *See, e.g., Turner* v. *Fouche, supra*, at 362 ("We may assume that the [plaintiffs] have no right to be appointed to the . . . board of education. But [they] do have a federal constitutional right to be *considered* for public service without the burden of invidiously discriminatory disqualifications") (footnote omitted) (emphasis added). And in the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract. *See Croson*, 488 U.S. at 493 (principal opinion of O'CONNOR, J.) ("The [set-aside program] denies certain citizens the *opportunity to compete* for a fixed percentage of public contracts based solely upon their race") (emphasis added). To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.

*Northeastern Florida*, 508 U.S. at 666 (emphasis in original). Even though the petitioners had not actually applied for the city contracts, the court determined that the barrier to entry was the harm, not the ultimate denial of the benefit. *Id. Northeastern Florida* established that, at least in the context of an equal protection case involving a set-aside program, the plaintiff need not prove that he would be entitled to the benefit absent the discriminatory barrier.

The Supreme Court revisited the "able and ready" doctrine, again in the equal protection context, in *Gratz v. Bollinger*, 539 U.S. 244 (2003). In *Gratz*, one of the petitioners, Hamacher, brought an equal protection challenge against the University of Michigan for its use of race in undergraduate admissions. 539 U.S. at 262. Hamacher alleged that his freshman application was denied based on race but that he was "'able and ready' to apply as a transfer student should the university cease to use race in undergraduate admissions." *Id.* The Court again, relying on its reasoning in *Northeastern Florida*, found that Hamacher had standing because he demonstrated that he was "able and ready" to apply. Importantly, the court did not inquire as to whether Hamacher's application would ultimately be accepted.

8

In 2017, the Supreme Court decided *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), and although standing was not at issue, the Supreme Court's description of the petitioner's injury is nonetheless instructive. In *Trinity Lutheran*, the petitioner, a religious preschool and daycare, sought to replace the surface of its playground by participating in Missouri's Scrap Tire Program, which offered reimbursement grants to qualifying nonprofit organizations that purchased playground surfaces made from recycled tires. 582 U.S. at 454. Petitioner's application was denied due to the state's "strict and express policy of denying grants to any applicant owned or controlled by a church, sect, or other religious entity." *Id.* at 455. The court ultimately held that the state's policy violated the petitioner's rights under the Free Exercise Clause of the First Amendment. *Id.* at 467. In reaching that decision, the Court rejected the state's arguments that it simply declined to award the petitioner a subsidy the state had no obligation to provide. In response, the court held:

> Trinity Lutheran is not claiming any entitlement to a subsidy. It instead asserts a right to participate in a government benefit program without having to disavow its religious character. The "imposition of such a condition upon even a gratuitous benefit inevitably deter[s] or discourage[s] the exercise of First Amendment rights." *Sherbert*, 374 U. S., at 405, 83 S. Ct. 1790, 10 L. Ed. 2d 965. *The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant.* Cf. Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U. S. 656, 666, 113 S. Ct. 2297, 124 L. Ed. 2d 586 (1993) ("[T]he 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract"). Trinity Lutheran is a member of the community too, and the State's decision to exclude it for purposes of this public program must withstand the strictest scrutiny.

*Id.* at 463 (emphasis added). The Court's reliance on its holding in *Northeastern Florida* in defining the injury provides guidance on how to apply the "able and ready" doctrine in a First Amendment context.

Finally, the Supreme Court's decision in *Carney v. Adams* clarifies what a plaintiff must demonstrate to show that he is "able and ready." In *Carney*, the respondent, Adams, filed suit

against Delaware's Governor, claiming that Delaware's political balance requirements violated his First Amendment right to freedom of association by making him ineligible to become a judge unless he rejoined a major political party. 592 U.S. at 56. The Court, after carefully reviewing all the evidence in the record, found that Adams was not "able and ready" to apply for a judicial position. *Id.* at 61. Although Adams testified in his deposition that he would apply for any judicial position that he thought he was qualified for, his "few words of general intent" did not demonstrate that that he was going to apply in the imminent future. *Id.* at 66. Adams did not reference any anticipated timeframe, prior judgeship applications, prior relevant conversations, or any other preparation or investigations into potential judicial positions. *Id.* at 63–64. Based on the evidence in the record, the court concluded that Adams's claim suggested an "abstract, generalized grievance, not an actual desire to become a judge." *Id.* The court concluded by noting that its holding in *Carney* did not disrupt its prior precedents holding that "plaintiff need not translat[e ] his or her desire for a job . . . into a formal application where that application would be merely a futile gesture." *Id.* at 66 (internal citations and quotations omitted).

The Supreme Court's "able and ready" precedents make two principles clear as applied to the present dispute. First, Wilberforce need not demonstrate that it ultimately would have received charter approval. Rather, the relevant injury is whether it had an intent to apply but for the existence of a discriminatory barrier that prevented it from competing on equal footing with secular organizations. *See Northeastern Florida*, 508 U.S. at 666 ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."); *Trinity Lutheran*, 582 U.S. at 463 ("The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant."). Second, although *Carney* does not precisely define the quantum of proof necessary

10

to establish that a plaintiff was "able and ready," Wilberforce must at least present sufficient evidence showing an intent to apply that is concrete. *See Carney,* 592 U.S. at 64 ("Precedent supports the conclusion that an injury in fact requires an intent that is concrete."); *Lujan*, 504 U.S. at 561 ("First, the plaintiff must have suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical." (internal citations and quotations omitted)).

A careful review of the record demonstrates that Wilberforce has met its burden. To begin, the facts in this case stand in marked contrast to those in *Carney*. Unlike the petitioner in *Carney*, Wilberforce has undertaken extensive "preparations" to apply on a clear "anticipated timeframe." *Carney*, 592 U.S. at 63. The allegations in the Amended Complaint and evidence in the record demonstrate that Wilberforce set out on a mission to begin operating as a charter school in the 2027-2028 school year. [*See* Doc. 10 at ¶¶ 20, 43, 46, 67; Doc. 10-2; Doc. 10-3]. First, Wilberforce took the initial step in the application process of becoming a charter school by submitting a letter of intent as required by state law. [Doc. 10 at ¶ 43; Doc. 10-2]. Second, it spent considerable time and resources, including engaging an outside consulting group, completing a 279-page application that was ready to submit before the February 1st deadline. [*See* Doc. 10 at ¶ 46; Doc. 70-1 at ¶ 3]. The Court cannot say that the allegations and evidence here is anything like the "words of general intent" that evidenced an "abstract, generalized grievance" present in *Carney*. 592 U.S. at 63–64. Furthermore, Wilberforce has made abundantly clear that it intends to apply again if the Court rules in its favor. [Doc. 10 at ¶ 48]. The evidence in the record compels the Court to reach the conclusion that Wilberforce—based on its "able and ready" status—has demonstrated a concrete intent to apply to become a charter school in the reasonably foreseeable future. *Cf. id.* at 60 ("Adams must at least show that he is likely to apply to become a judge in the reasonably foreseeable future if Delaware did not bar him because of political affiliation."); *Lujan* 504 U.S.

11

at 564 ("Such 'some day' intentions -- without any description of concrete plans, or indeed even any specification of when the some day will be -- do not support a finding of the 'actual or imminent' injury that our cases require.").

Still, KCBOE argues that Wilberforce cannot show an injury in fact because there has been no final decision based on Wilberforce's failure to submit the application. [Doc. 57 at 13–15]. KCBOE further rejects Wilberforce's futility argument on the basis that it never expressly told Wilberforce that it was prohibited from applying. [*Id.*]. The Court is unpersuaded.

Wilberforce began the charter-school application process in the manner required by state law by submitting a letter of intent to KCBOE. [Doc. 10-2]. KCBOE responded by informing Wilberforce that its submission would be considered "incomplete" unless it affirmed that it satisfied the statutory eligibility requirements, including that it was not a religious organization. [Doc. 10-4]. The charter-school application itself likewise requires the same affirmation. [Doc. 70-4 at 14–15]. Thus, Wilberforce was effectively presented with only two options: either falsely disclaim its religious status or continue submitting materials that KCBOE had already indicated would be deemed incomplete. Under these circumstances, requiring Wilberforce to proceed further in the application process would elevate form over substance. And, to the extent KCBOE contends that Wilberforce should have sought a waiver, requiring a religious organization to navigate additional procedural hurdles solely because of its religious status only further underscores that Wilberforce was not permitted to compete on equal footing with secular organizations.[3] *See*

---

[3] KCBOE also takes issue with the fact that Wilberforce was not operating as a registered 501(c)(3) organization at the time the Complaint was filed. [Doc. 57 at 13]. However, Wilberforce did not need to be. At the letter-of-intent stage, all that is required is that a sponsor must have "applied for 501(c)(3) status," which Wilberforce had done. [*See* Doc. 10-2 at 5; Doc. 48-2 at ¶ 4]. While it is true that post-complaint events cannot retroactively generate standing, Wilberforce's decision to apply for 501(c)(3) status combines with the other evidence in the record to demonstrate that it had a concrete intent to apply to operate a charter school, even though it had yet to complete all the necessary steps to become one before filing suit.

12

*Northeastern Florida*, 508 U.S. at 666. The Court has little difficulty concluding that any additional effort to apply would have been futile. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977) (a plaintiff need not submit a "formal application" where the defendant's "discrimination" makes it "a futile gesture"); *Doster v. Kendall*, 54 F.4th 398, 417 (6th Cir. 2022) ("Just as someone may challenge a racially discriminatory policy for awarding contracts without receiving a formal denial, *Ne. Fla. Chapter*, 508 U.S. at 666, so too the Plaintiffs likely can challenge a religiously discriminatory policy without receiving a formal denial.").

Finally, the Court's decision here is consistent with the Sixth Circuit authority cited by KCBOE. *See Miller v. City of Wickliffe*, 852 F.3d 497 (2017); *Roberts v. Progressive Preferred Ins. Co.*, No. 24-3454, 2026 U.S. App. LEXIS 5460 (6th Cir. Feb. 24, 2026).

First, in *Miller*, the plaintiffs, a group of business owners, filed suit in federal court challenging a city's nightclub ordinance. 852 F.3d at 501. The district court dismissed their claims, finding that they lacked an injury in fact because none of them had actually applied for a permit under the ordinance. *Id.* On appeal, the plaintiffs invoked the futility doctrine, arguing that the history and language of the ordinance made it clear that they would have been denied a permit. *Id.* at 504. The Sixth Circuit rejected that argument, reasoning that although the plaintiffs made some showing that the city would have denied their application, "they did not make a strong showing." *Id.* Indeed, the court emphasized that the city "never indicated that it would not permit plaintiffs to open their nightclub." *Id.* at 505. Conversely, in this case, Wilberforce has made such a showing. Not only did KCBOE practically reject Wilberforce's letter of intent, but the chairwoman of KCBOE, in a press inquiry about Wilberforce's application, stated that KCBOE "adheres to all applicable state and federal laws," which explicitly prevents religious organizations from operating a charter school. [*See* Doc. 10 at ¶ 47]; *see also* Tenn. Code Ann. § 49-13-111(a)(2). The Court

13

concludes that, unlike the plaintiffs in *Miller*, Wilberforce has made a clear showing that KCBOE would have denied its application.

Second, KCBOE devotes a substantial portion of its reply brief to the Sixth Circuit's decision in *Roberts*, though it is distinguishable from this case. In *Roberts*, the plaintiff began completing an online application for a grant program but voluntarily abandoned the process after learning the program was limited to Black-owned businesses. 2026 U.S. App. LEXIS 5460, at *3–4. The Sixth Circuit concluded that the Plaintiff manufactured his own injury because the alleged discrimination did not arise at the application stage he had initiated. *Id.* at 11–12. Rather, the program involved two sequential contractual stages—an application-stage contract formed upon submission of the application and a later grant-stage contract for applicants. *Id.* at 9. Had the plaintiff simply submitted the application, he would have entered the initial contractual stage and then encountered the allegedly discriminatory barrier. *Id.* at 11–12.

This case is materially different. Unlike *Roberts,* this matter does not involve separate sequential stages at which discrimination arose only later in the process. And to the extent the letter of intent can be characterized as an initial contractual stage, which it is not alleged to be, Wilberforce submitted it and immediately encountered the challenged eligibility restriction. [*See* Docs. 10-2, 10-4]. At the very outset of the process, Wilberforce was required to affirm that it was not a religious organization for its submission to be considered complete. *See Trinity Lutheran*, 582 U.S. at 465 ("In this case, there is no dispute that Trinity Lutheran *is* put to the choice between being a church and receiving a government benefit. The rule is simple: No churches need apply." (emphasis in original)). In contrast to *Roberts*, Wilberforce did not voluntarily abandon a process before encountering the alleged barrier—the barrier confronted it at the threshold.

Accordingly, the Court finds that Wilberforce has demonstrated a concrete injury in fact sufficient to confer Article III standing.

14

Next, KCBOE contends that, even if Wilberforce demonstrates that it suffered a concrete injury, it cannot show that its alleged injury "is fairly traceable to the defendant's allegedly unlawful conduct." [Doc. 57 at 16–17]. Essentially, KCBOE points the finger at someone else by arguing that Wilberforce's alleged injury derives from a Tennessee law passed by the Tennessee General Assembly and that State Board of Education rules applicable to charter schools, not the actions of KCBOE. [*Id.* at 17]. KCBOE asserts that its hands are tied, as Tennessee law gives it no authority to approve a charter school that is religious in nature. [*Id.*].

Although it is true that KCBOE may lack discretion to approve a religious charter school, it still may be held responsible for an alleged unconstitutional law it enforces. "The law of this circuit is clear that . . . the defendant may sue an official who was not himself initially responsible for the unlawful policy and who is, instead, merely enforcing the illegal mandates that he has been charged with enforcing." *Santini v. Rausch*, No. 3:21-cv-00661, 2021 U.S. Dist. LEXIS 96909, at *29 (M.D. Tenn. May 21, 2021). An analogous example can be found in *Durham v. Martin*, 905 F.3d 432 (6th Cir. 2018). In *Durham*, the Tennessee General Assembly voted to expel the plaintiff from the House of Representatives, and as a result, government administrators denied him lifetime health insurance that state representatives who retired from service would ordinarily receive. 905 F.3d at 433. The plaintiff sued the administrators for "enforc[ing] the denial of [his] benefits" based on his unconstitutional expulsion. *Id.* The district court dismissed the action for lack of standing; however, the Sixth Circuit reversed, holding:

> Even if the administrators were only implementing the consequences of others' actions—that is, Durham's expulsion by the legislature—Durham still has standing to sue the administrators for their actions in carrying out those consequences. "Plaintiffs suing public officials can satisfy the causation and redressability requirements of standing by demonstrating 'a meaningful nexus' between the defendant and the asserted injury." *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1111-12 (10th Cir. 2007)). An official's enforcement of another's policy falls into this category.

15

. . .

> Here, the administrators were not responsible for Durham's expulsion from the legislature. But they do possess authority to enforce one set of consequences of that expulsion: whether Durham receives retirement and healthcare benefits. Their deciding not to pay these benefits created the injury that Durham seeks to remedy. Durham's alleged injury also could be remedied by ordering the administrators to pay those benefits to him. So Durham's suit meets all three elements of standing: he had an injury, the administrators caused that injury, and they could redress that injury if ordered to do so.

*Id.* at 434. Similarly, KCBOE possesses the authority to enforce the Tennessee charter school eligibility requirements, which results in the alleged injury for which Wilberforce seeks a remedy.

KCBOE's reliance on *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022) is misplaced. In *Nabors*, the Sixth Circuit addressed a challenge to a Tennessee law prohibiting ministers ordained through the Universal Life Church from solemnizing marriages. 35 F.4th at 1028. The plaintiff, seeking injunctive and declaratory relief, sued various state officials, local district attorneys, and county clerks. *Id.* The court concluded that the plaintiff did not have standing to pursue its claims against the county clerks because they had "*no* discretion and *no* authority under state law to deny a couple a marriage license just because a ULD minister solemnized the proceeding." *Id.* at 1037 (emphasis in original). Indeed, the clerks represented that they had never denied—and would never deny—a marriage license on that basis. *Id.* In short, the clerks in *Nabors* lacked any power to inflict the alleged injury—namely, the denial of a marriage license.

KCBOE stands in a fundamentally different position. Unlike the clerks in *Nabors*, KCBOE plays a direct role in the charter-school approval process and possesses the authority to approve applications. *See* Tenn. Code Ann. § 49-13-108(a). That authority necessarily includes the ability to reject or refuse to process an application based on the very religious-status restriction challenged

16

here. KCBOE *does* have the authority to injure Wilberforce, which the clerks in *Nabors* did not have. Moreover, the language, and holding, that KCBOE cites in *Nabors* rested on a distinct theory of injury not present here. [Doc. 57 at 16–17]. The plaintiff in *Nabors* also argued that even if the clerks issued the marriage licenses, the licenses themselves were still tainted by the underlying statute. *Nabors*, 35 F.4th at 1038. The Sixth Circuit rejected that theory because that specific asserted injury stemmed from the statute's effect on the validity of the marriage—not from any action taken by the clerks themselves. *Id.* at 1038–39. By contrast, Wilberforce does not assert a "potentially-invalid-license" theory. It simply seeks to prevent KCBOE from treating it differently from secular organizations during the charter-school application process, which is a power it inherently possesses. Because KCBOE is tasked with enforcing an alleged unconstitutional law against Wilberforce, it has shown that its asserted injury "is fairly traceable to [KCBOE's] allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 751, 757–58 (1984).

Accordingly, based on the allegations in the Amended Complaint and the evidence before the Court, the Court finds that KCBOE's facial and factual attacks fail, and, therefore, Wilberforce has standing to challenge, as applied and facially, Tennessee's charter-school framework.

### B. Mootness

Continuing with its jurisdictional arguments, KCBOE briefly argues that this matter is moot because even if the Court granted Wilberforce's requested relief, it can no longer file an application to open its proposed charter school for the 2027-2028 school year, as the application deadline has already passed. [Doc. 57 at 25]. In response, Wilberforce contends that it "remains able and ready to apply for the next open opportunity and continues to suffer discrimination from being unable to sponsor or run a school in 2028 and beyond." [Doc. 70 at 11].

A case becomes moot "when the issues presented are no longer 'live' or the parties lack a

legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted). This happens only when "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* (internal citations and quotations omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (internal citations and quotations omitted).

As the Court has already explained, Wilberforce has demonstrated a concrete interest in being able to apply and to compete on equal footing with secular organizations to become a charter school in Tennessee. Although it is true that it may not be able to open a charter school during the 2027-2028 school year, Wilberforce has alleged and shown that it is "able and ready" to apply to for charter-school status "for the earliest school year it could open." [*See* Doc. 10 at ¶ 48]. Moreover, no post-filing developments have indicated that KCBOE plans to consider Wilberforce's application as it would any other organizations.

Accordingly, Wilberforce's claim presents a live case or controversy that is not moot.

### C. *Proper and Necessary Party*

KCBOE also seeks dismissal on the grounds that Wilberforce has failed to join the Commissioner of Education (the "State") as a proper and necessary party to this action under Fed. R. Civ. P. 19(a). [Doc. 57 at 18–24]. It contends that the State has a legal interest in this matter because, if Wilberforce were to prevail, the State would be required to allocate funds directly to Wilberforce. [*Id.*]. In addition, KCBOE further argues that because the State is the entity tasked with creating the charter school application forms and authorizing standards, any judgment in Wilberforce's favor will be altering its laws and policies, not KCBOE's.

Rule 19 allows dismissal for failure to join an indispensable party. "A party is indispensable if: (1) it is necessary, (2) its joinder cannot be effected, and (3) the court determines that it will

18

dismiss the pending case rather than proceed in the case without the absentee." *PNC Equip. Fin., LLC v. Mariani*, No. 1:14-cv-663, 2015 U.S. Dist. LEXIS 94833, at *8 (S.D. Ohio Mar. 16, 2015) (quoting *Glancy v. Taubman Centers, Inc.*, 373 F.3d 656, 666 (6th Cir. 2004)). "Under Rule 19, a person is 'necessary' if: (1) the absence of the person to be joined impairs the court's ability to grant relief; (2) the person to be joined claims an interest in the subject matter of the action and not joining the person would impede the person's ability to protect that interest; or (3) the person to be joined claims an interest in the subject matter of the action and not joining the person would leave one or more of the parties vulnerable to incurring multiple or inconsistent obligations regarding the claimed interest. *Id.* (citing Fed. R. Civ. P. 19(a)).

The State is not a necessary party to this action. To begin, although a state certainly has an interest in defending the constitutionality of its laws, no authority suggests that it automatically becomes a necessary party in every lawsuit challenging a state statute. *See Am. Trucking Ass'ns v. New York State Thruway Auth.*, 795 F.3d 351, 359 (2nd Cir. 2015). "State (and federal) statutes are frequently challenged as unconstitutional without the state (or federal) government as a named party." *Id.* Indeed, that principle is reflected in 28 U.S.C. § 2403(b), which provides a notice mechanism and relaxed intervention procedures when the validity of a state statute is at issue in an action where the state is not present. *Id.* If the state were always a necessary party in such cases, § 2403(b) would serve little purpose. *Id.*

Moreover, for many of the same reasons discussed above regarding the causation and redressability elements of standing, complete relief may be afforded to Wilberforce in the State's absence. Wilberforce's alleged injury arises from being subject to unequal treatment in the charter-school application process, and the Court can fully redress that injury by ordering KCBOE to cease the challenged conduct. The nature of the requested relief is critical here. Even assuming

19

Wilberforce ultimately prevails on the merits, the Court could not—and is not asked to—order that Wilberforce be granted charter-school status. Rather, the requested relief is far narrower: Wilberforce seeks only the opportunity to participate in the application process on the same footing as secular organizations. [*See* Doc. 70 at 21–22]. That distinction matters because the challenged restriction concerns only one aspect of a broader and multi-layered charter-school approval process. KCBOE could still deny Wilberforce's application for any number of permissible, nonreligious reasons unrelated to the challenged eligibility requirement. Thus, although the state may play a role in funding approved charter schools, no ruling contemplated here would require the state itself to take any action beyond the ordinary consequences of who KCBOE decides to grant charter-school status to.

Finally, the State's own conduct undermines KCBOE's notion that the State's interest cannot adequately be protected in its absence. The Tennessee Attorney General has already issued an opinion questioning the constitutionality of the law at issue and has expressly declined to intervene in this action. [*See* Doc. 58; Doc. 70 at 21 (citing Tenn. Op. Att'y Gen. No. 25-19)]. And to the extent KCBOE argues that it could face consequences for approving a religious charter school, that concern carries less force where the State's chief legal officer has expressed the view that the restriction itself is unconstitutional. Additionally, two separate groups have since intervened and will undoubtedly zealously defend Tennessee's charter-school framework and the challenged provisions. [*See* Docs. 41, 80]. Under these circumstances, the Court concludes that the Rule 19(a) factors do not support finding the State to be a necessary party.

### D. Claims Against Individual Board Members

Lastly, KCBOE argues that Wilberforce's claims brought against Defendants John Butler, Anne Templeton, Patricia Fontenot-Ridley, Katherine Bike, Lauren Morgan, Betsy Henderson, Steve Triplett, Travis Wright, and Kristi Kristy (collectively the "Individual KCBOE Members")

should be dismissed because they are redundant to the claims against the Knox County Board of Education. [Doc. 57 at 25]. Wilberforce does not object to the dismissal of the individual members of the Knox County Board of Education so long as KCBOE agrees that their presence is genuinely redundant. [Doc. 70 at 23]. It is unclear whether KCBOE has voiced such an agreement; however, Wilberforce does not raise any substantial arguments in opposition to dismissal of the individual members. *See Sagan v. Sumner County Bd. of Educ.*, 726 F. Supp. 2d 868, 875–76 (M.D. Tenn. July 6, 2010) (dismissing the plaintiff's claims against a special education teacher as redundant because the plaintiff did not raise any arguments in defense).

Therefore, based on the lack of opposition, the Court finds that Wilberforce's claims against the Individual KCBOE Members are tantamount to claims brought against the Knox County Board of Education. *See Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000) ("An official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents." (internal citation omitted)). Therefore, the motion to dismiss the claims against the Individual KCBOE Members is **GRANTED**.

## IV. CONCLUSION

For the foregoing reasons, KCBOE's Motion to Dismiss [Doc. 57] is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED IN PART** only to the extent that the claims against the Individual KCBOE Members are **DISMISSED WITHOUT PREJUDICE**. The Motion [Doc. 57] is **DENIED** in all other respects, and Wilberforce's claims may proceed.

SO ORDERED.

/s/ Charles E. Atchley, Jr.
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**

21