**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION (KNOXVILLE)**

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br>*Plaintiff*,<br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION,<br>*Defendant*,<br><br>RICHARD COBLE, et al.,<br>*Intervenor-Defendants*,<br><br>ADRIENNE CARROLL, et al.,<br>*Intervenor-Defendants*. | Case No. 3:25-cv-584-CEA-DCP<br><br>District Judge Charles E. Atchley<br><br>Magistrate Judge Debra C. Poplin |

**PLAINTIFF'S POST-DISCOVERY MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


Introduction ........ 1

Background ........ 2

- I. Legal background ........ 2
- II. Factual background ........ 4
- III. Procedural history ........ 6

Legal Standard ........ 8

Argument ........ 9

- I. Wilberforce is entitled to summary judgment on standing. ........ 9
- II. Wilberforce is entitled to summary judgment on the merits. ........ 15
  - A. Banning religious charter schools violates the Free Exercise Clause. ........ 15
  - B. The Establishment Clause does not justify banning religious charter schools. ........ 17
- III. This Court should award all appropriate relief. ........ 24

Conclusion ........ 25

## TABLE OF AUTHORITIES

### Cases

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) .......... 21

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) .......... 9

*Bays v. Fairborn*,
668 F.3d 814 (6th Cir. 2012) .......... 25

*Bd. of Park Comm'rs v. Nashville*,
185 S.W. 694 (Tenn. 1916) .......... 19

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 17

*Boerne v. Flores*,
521 U.S. 507 (1997) .......... 15

*Brooks v. Oak Ridge*,
222 F.3d 259 (6th Cir. 2000) .......... 15

*Brown v. Bd. of Ed.*,
347 U.S. 483 (1954) .......... 16, 17

*Carson v. Makin*,
596 U.S. 767 (2022) .......... 1, 15, 16, 22

*Carter v. Broadlawns Med. Ctr.*,
857 F.2d 448 (8th Cir. 1988) .......... 23

*Cath. Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025) .......... 23

*Caviness v. Horizon Cmty. Learning Ctr.*,
590 F.3d 806 (9th Cir. 2010) .......... 20

*Commodities Exp. Co. v. Detroit Int'l Bridge Co.*,
695 F.3d 518 (6th Cir. 2012) .......... 17

*Dep't of Transp. v. AAR*,
575 U.S. 43 (2015) .......... 17, 18, 20

*Doe v. Lee*,
102 F.4th 330 (6th Cir. 2024) .......... 25

*Drummond v. Okla. Statewide Virtual Charter Sch. Bd.*,
558 P.3d 1 (Okla. 2024) .......... 21

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .......... 25

*Engel v. Vitale*,
370 U.S. 421 (1962) .......... 24

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) .......... *passim*

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .......... 11

*Howell v. Father Maloney's Boys' Haven*,
976 F.3d 750 (6th Cir. 2020) .......... 21

*Hughes v. Region VII Area Agency on Aging*,
542 F.3d 169 (6th Cir. 2008) .......... 15

*Ill. ex rel. McCollum v. Bd. of Ed.*,
333 U.S. 203 (1948) .......... 24

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) .......... 12

*Johnson-Bey v. Lane*,
863 F.2d 1308 (7th Cir. 1988) .......... 23

*Katcoff v. Marsh*,
755 F.2d 223 (2d Cir. 1985) .......... 23

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .......... 22, 23

*Kyllo v. United States*,
533 U.S. 27 (2001) .......... 17

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*,
172 F.3d 397 (6th Cir. 1999) .......... 10, 11

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) .......... 17, 18, 19, 20

*Lee v. Weisman*,
505 U.S. 577 (1992) .......... 24

*Lindke v. Freed*,
601 U.S. 187 (2024) .......... 17

*Logiodice v. Me. Cent. Inst.*,
296 F.3d 22 (1st Cir. 2002) .......... 20, 21, 22

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 24

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) .......... 20, 21, 22

*Martin v. Kelley*,
803 F.2d 236 (6th Cir. 1986) .......... 25

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) .......... 11

*Mik v. Fed. Home Loan Mortg. Corp.*,
743 F.3d 149 (6th Cir. 2014) .......... 15, 17, 20

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*,
984 F.3d 477 (6th Cir. 2020) .......... 15

*Ne. Fla. Ch., AGCA v. Jacksonville*,
508 U.S. 656 (1993) .......... 10, 14

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 25

*Oklahoma Statewide Charter Sch. Bd. v. Drummond ex rel. Oklahoma*,
605 U.S. 165 (2025) .......... 1, 21

*Pagan v. Glendale*,
559 F.3d 477 (6th Cir. 2009) .......... 25

*Peltier v. Charter Day Sch.*,
37 F.4th 104 (4th Cir. 2022) (en banc) .......... 21

*Phillips v. Tangilag*,
14 F.4th 524 (6th Cir. 2021) .......... 20

*Pierce v. Soc'y of Sisters*,
268 U.S. 510 (1925) .......... 21

*Rd.-Con v. Philadelphia*,
120 F.4th 346 (3d Cir. 2024) .......... 9, 25

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982) .......... 20, 21, 22

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) .......... 25

*SFFA v. U.S. Naval Acad.*,
2024 WL 4057002 (D. Md. Sept. 5) .......... 9, 10

*Sporhase v. Nebraska*,
458 U.S. 941 (1982) .......... 12

*Thomas v. Review Bd.*,
450 U.S. 707 (1981) .......... 16

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) .......... 23, 24

*Trinity Lutheran Church v. Comer*,
582 U.S. 449 (2017) .......... 9, 10, 15

*United Specialty Ins. Co. v. Cole's Place, Inc.*,
936 F.3d 386 (6th Cir. 2019) .......... 25

*USAID v. AOSI*,
591 U.S. 430 (2020) .......... 18

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) .......... 9

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021) .......... 10, 11

*Wieman v. Updegraff*,
344 U.S. 183 (1952) .......... 23

**Statutes**

Fed. R. Civ. P. 36 .......... 11

Fed. R. Civ. P. 56 .......... 8

Fed. R. Civ. P. 57 .......... 25

Tenn. Code Ann. §48-52-102 .......... 18

Tenn. Code Ann. §49-2-101 .......... 2

Tenn. Code Ann. §49-2-203 .......... 2

Tenn. Code Ann. §49-5-601 .......... 2

Tenn. Code Ann. §49-5-609 .......... 2

Tenn. Code Ann. §49-6-3505 .......... 4, 16

Tenn. Code Ann. §49-6-3510 .......... 4

Tenn. Code Ann. §49-13-101 .......... 2

Tenn. Code Ann. §49-13-104 .......... *passim*

Tenn. Code Ann. §49-13-106 .......... 2, 19, 20

Tenn. Code Ann. §49-13-107 .......... *passim*

Tenn. Code Ann. §49-13-108 .......... 3, 11, 14

Tenn. Code Ann. §49-13-110 .......... 3, 18, 19

Tenn. Code Ann. §49-13-111 .......... *passim*

Tenn. Code Ann. §49-13-112 .......... 15

Tenn. Code Ann. §49-13-113 .......... 2, 24

Tenn. Code Ann. §49-13-114 .......... 2

Tenn. Code Ann. §49-13-124 .......... 19

Tenn. Code Ann. §49-13-143 .......... 5

Tenn. Pub. Ch. 963, 114th Gen. Assembly (2026) .......... 4

Tenn. Pub. Ch. 1128, 114th Gen. Assembly (2026) .......... 3, 16

**Regulations**

Tenn. Comp. R. & Regs. 0520-14-01-.01 .......... 3, 12

Tenn. Comp. R. & Regs. 0520-14-02-.01 .......... 2, 13

**Other Authorities**

Chapman & McConnell, *Agreeing to Disagree* (2023) .......... 20, 21

1 *Complete Works of the Most Rev. John Hughes* (Kehoe ed., 1866) .......... 16

Gabel, *Public Funds for Church and Private Schools* (1937) .......... 17, 22

Jorgenson, *The State and the Non-Public School, 1825-1925* (1987) ........................................................ 17, 22

Storslee, *Church Taxes and the Original Understanding of the Establishment Clause*,
169 U. Pa. L. Rev. 111 (2020) ........................................................................................................ 16

Tenn. Op. Att'y Gen. 2025-19 ........................................................................................................ 19

## INTRODUCTION

Under the Free Exercise Clause, States cannot bar "religious schools from public benefits solely because of the religious character of the schools." *Carson v. Makin*, 596 U.S. 767, 779 (2022). But "[w]hat about charter schools?" *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 537 (2020) (Breyer, J., dissenting). After the Supreme Court's 4-4 nondecision in *Oklahoma Statewide Charter Sch. Bd. v. Drummond ex rel. Oklahoma*, 605 U.S. 165 (2025), it remains an open question whether the Free Exercise Clause lets States bar religious charter schools.

Though the question presented here might be legally close, it is legal—a question that can and should be decided at summary judgment. This Court already found that Wilberforce had standing. Five months of discovery did nothing but strengthen that prior finding. KCBOE doubled down on its commitment to enforcing the laws and policies that ban religious charter schools in Tennessee. Wilberforce's application to open a Christian charter school thus remains futile, and Wilberforce could not be more ready and able to submit that application once the discriminatory barriers are removed. As for the merits, the challenged policies discriminate against religion on their face. Whether that discrimination satisfies strict scrutiny is a question of law that turns on undisputed, legislative facts. As in *Carson*, summary judgment is the vehicle to decide these constitutional questions.

Time is of the essence. Wilberforce wants to open a charter school in Knox County. Given the way the approval process works, each February that passes is another *two* years before Wilberforce can open, serve families, and spread the Gospel. And though this Court's decision will be highly influential, it will likely not be final. Among the plaintiff, defendant, and two sets of intervenors, an appeal from this Court's decision is guaranteed, perhaps all the way to the U.S. Supreme Court. Wilberforce thus greatly appreciates that this Court granted "expedited" discovery and summary-judgment briefing. Doc.64 at 4-5. Consistent with that approach, and respectful of this Court's many competing obligations, Wilberforce asks the Court to grant this motion as soon as practicable.

# BACKGROUND

## I. Legal background

Tennessee created its charter-school program in 2002. Tenn. Code Ann. §49-13-101. Charter schools are labeled "public" schools in many statutes and regulations because they, for example, are open to all students in the area, §49-13-113(b), and are free of charge, §49-13-106(e)(1).

Charter schools differ from traditional public schools in crucial respects. The county school board directly manages and controls Tennessee's traditional public schools, including hiring teachers and purchasing supplies, §49-2-203, using a budget set by the county commission, §49-2-101. But a charter school is "operated" by a private 501(c)(3) non-profit, §49-13-111(a)(1), which serves as the school's "governing body," §49-13-104(10). The private nonprofit is vested "with control of instruction," §49-13-111(a)(1), and is responsible for the school's "budgeting, curriculum and other operating procedures," as well as "overseeing management and administration of" the school, §49-13-104(10); App.1552. Charter schools also are not subject to public schools' collective-bargaining requirements for teachers. *See* Tenn. Code Ann. §§49-5-601 to -609. And they can set up their own system of student transportation (or forgo it altogether). §49-13-114(a).

Even the limits imposed on charter schools are negotiable. Charters can seek "a waiver of any state board rule or statute that inhibits or hinders" their "ability to meet [their] goals or comply with the school's mission statement." §49-13-111(p). Charters "commonly" obtain waivers permitting them to, for example, fire teachers at will and depart from state textbook requirements. App.1699; *see* App.1610-15. But they cannot obtain waivers from "requirements related to" "[f]ederal and state civil rights," §49-13-111(p)(1), or from the "requirements in the charter school statute," Tenn. Comp. R. & Regs. 0520-14-02-.01(3).

If a nonprofit wants to open a new charter school, it "appl[ies] to the local board of education"—as relevant here, KCBOE. Tenn. Code Ann. §49-13-106(i). The nonprofit, known as the school's "sponsor," first submits a "letter of intent." §49-13-107(a). The nonprofit then files an

application. §49-13-107(b). Once the school board receives a charter application, it has 90 days to approve or deny it. Tenn. Code Ann. §49-13-108(b)(2). During that period, the board can meet with the sponsor and request further information, and the sponsor can supplement its application. *See, e.g.*, App.14, 493-94, 1508-09. If the board votes to deny the application, it "must specify objective reasons for the denial" in writing. §49-13-108(b)(3). The sponsor then has 30 days "to submit an amended application," which the board must approve or deny within 60 days. *Id.* If the board denies the application, the sponsor can appeal the denial to the Tennessee Public Charter School Commission, an independent state agency. §49-13-108(b)(5)(A). The state charter commission must then approve or deny the sponsor's application within 75 days. §49-13-108(b)(5)(C).

If the school board approves the application, it will sign a charter agreement with the sponsor that "outlines the rights, responsibilities, and performance expectations of each party." §§49-13-104(5), -110(a). Once established, charter schools must apply to renew their charter agreement every 10 years, meet the authorizer's performance standards, and satisfy other requirements. §§49-13-108(a), -110(b)(1), (c).

Tennessee bans certain kinds of charter schools—including, as relevant here, religious ones. Under Tennessee Code §49-13-111(a)(2), every charter school "shall … [o]perate" as "nonsectarian" and "nonreligious." And to submit a charter application, a sponsor must use a state-created form, Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(a), which "require[s]" the sponsor to "affirm" that its charter school will operate as a "nonsectarian, non-religious" school, App.1693, 1697.

Until very recently, Tennessee also banned religious nonprofits from sponsoring *secular* charter schools. The definition of "sponsor" said the school's governing body could "not promote the agenda of any religious denomination or religiously affiliated entity." Tenn. Code Ann. §49-13-104(15)(B) (2024). The legislature amended that definition in 2026 to delete the quoted language. Pub. Ch. 1128, §1, 114th Gen. Assembly. In the same session, the legislature expanded Tennessee's Education

Freedom Scholarships, Pub. Ch. 963, a voucher program that gives selected students over $7,000 per year to attend a private school of their choice, including religious schools, Tenn. Code Ann. §49-6-3505; App.1776. These funds "are not directly paid to the parent … or student"; the State holds them and "facilitates payments to schools" themselves. App.1768; *see* Tenn. Code Ann. §49-6-3510(a)(1). But while Tennessee now funds religious schools and lets religious entities run charter schools, it continues to ban charter schools from *being* religious. *E.g.*, Tenn. Code Ann. §49-13-111(a)(2).

## II. Factual background

Knox County has charter schools and religious schools, but no religious charter school. KCBOE approved a secular charter school called Knoxville Prep in 2024, but Knoxville Prep just closed. App.1549-50, 1610. Now the only charter school in the county is Emerald Academy, a secular school that was first approved in 2014 and operates near Downtown Knoxville. App.1527, 1610.

Wilberforce Academy wants to be the first religious charter school in Knox County, uniting high-quality academics with Christian faith and teaching. App.7-8. Students will begin to develop biblical literacy in kindergarten and begin taking catechism lessons by third grade. App.8. And they will pray and hear Scripture together in a school assembly every morning. App.8. The school will also place a strong emphasis on civics education and public service, and it will help students develop financial literacy and business acumen through a hands-on entrepreneurial program. App.8-9.

Wilberforce's leaders—its executive director and four board members—are remarkably qualified to open a successful charter school in Knox County. Its executive director, Zachary Wishart, is the principal of a Christian private school in Knox County and was on the advisory board of Knoxville Prep. App.4. Doug Harris is a former chair of KCBOE and has started several successful nonprofits. App.20-21. David Colquitt serves on the boards of Emerald Academy and a Knoxville private school, and he has pledged $2.2 million from his charitable foundation to support Wilberforce in its opening years. App.28-29. Laura Beaman serves on the board of a Christian private school. App.6. And Parker Bartholomew is a real-estate developer with experience acquiring properties for schools. App.6.

Wilberforce is able and ready to apply to open a Christian charter school in Knox County, once courts hold that it has a First Amendment right to do so. Wilberforce originally sought to open in the 2027-2028 school year. App.10. A new charter could open that year if it submitted its letter of intent to the county board of education by December 3, 2025, and its application by February 2, 2026. *See* Tenn. Code Ann. §49-13-107(a)-(b). Wilberforce submitted a letter of intent on November 25, 2025. App.485. Wilberforce then completed a 279-page, ready-to-submit draft application, and an accompanying budget, on January 29, 2026. App.112-397. Wilberforce's executive director personally spent around 80 hours working on the application. App.10; *see also* App.446-47. Wilberforce also spent $140,000 hiring an outside consultant group to help draft the application, App.10, which itself devoted 1,200 man hours to the project, App.446; *see also* App.450-56. The consultant compared the immense work that went into Wilberforce's application to the "labors of Hercules." App.451.

Although it was able and ready to apply by the February 2 deadline, Wilberforce did not do so because submitting an application is futile. App.11. Wilberforce cannot sign the statement of assurances necessary for its application to be deemed complete. *See* App.1697. And state law prohibits Wilberforce from opening a Christian charter school. Tenn. Code Ann. §49-13-111(a)(2). KCBOE enforces these requirements. Its Policy I-450 makes charter schools meet "the requirements of state law," including §49-13-111's ban on religious charters. App.1552 & n.2. Its charter-school handbook repeats that charter schools must be "nonsectarian" and "non-religious," and that charter applications must comply with the State's official form. App.1563, 1567. KCBOE's charter performance framework, which legally binds charter schools in Knox County, Tenn. Code Ann. §49-13-143, even takes the position that "the Establishment Clause" prohibits charter schools "from engaging in religious instruction." App.1600; *see* App.1641, 1668, 1675 (KCBOE applying this performance framework after the filing of this suit). And in this litigation, KCBOE has repeatedly stressed that it complies "with all Tennessee state laws and regulations," and that, in its view, "established case law prevent[s] religious

organizations from sponsoring explicitly religious charter schools under the Establishment Clause," App.464, 475; *see also* Doc.57 at 16; Doc.98 at 5; App.11-12, 416, 460, 469, 496, 1534.

Though the 2025-26 cycle has passed, Wilberforce's intent to apply to open a religious charter school remains unchanged. App.13-14, 23, 31-32. Once it obtains adequate judicial relief, Wilberforce will submit its application by the next deadline, App.13-14, 23, 31-32, currently February 1, 2027, Tenn. Code Ann. §49-13-107(b).

**III. Procedural history**

Wilberforce filed this federal lawsuit in November 2025. Doc.1. After Wilberforce amended its complaint, Verif.-Am.-Compl. (Doc.10), KCBOE moved to dismiss, Doc.57. Meanwhile, two groups of parents intervened as defendants: the Coble intervenors, Doc.41, and the Carroll intervenors, Doc.80. The Coble intervenors are represented by the American Civil Liberties Union, the Southern Poverty Law Center, the Freedom from Religion Foundation, and Americans United for Separation of Church and State, as well as by private counsel. The Carroll intervenors are represented by private counsel, though they were recruited to join this suit by the Tennessee Charter School Center. App.1935.

The Coble intervenors have children who attend traditional public schools in Knox County. Doc.22 at 6. They fear that opening Wilberforce will decrease funding for their schools; but they do not know whether their schools' budgets will net decrease if Wilberforce opens, how much any decrease would be, and whether any decrease would affect their child. App.1953-54, 1962, 1970-71, 1979-81, 1989-90, 2000-04. The Coble intervenors also pay taxes to Knox County and think that, if those taxes go to fund Wilberforce's Christian charter school, it will violate the Establishment Clause. Doc.22 at 13. Of the Knox County taxes that fund charter schools, the Coble intervenors say they pay some property tax each year (except Dooley), but refused to calculate how much sales tax. App.470, 1948, 1957, 1965-66, 1974-75, 1985. The amount doesn't matter, they say, because they object to even

"a fraction of a penny" of their taxes going to Wilberforce. *E.g.*, App.1959, 1969, 1987. As Coble put it, the objection "is more about principle than it is about money amounts." App.1950.

The Carroll intervenors have children who attend charter schools elsewhere in Tennessee. App.1920-21. They do not live in Knox County or pay taxes there. App.1919. The Carroll intervenors instead fear that, if Wilberforce wins relief under the First Amendment, their charter schools will somehow become "private" schools under various statutes, like the federal Rehabilitation Act and the Tennessee Investment in Student Achievement funding formula. *E.g.*, Doc.60-6 ¶19, ¶25. But they do not know how a decision from this Court about the federal *Constitution* would affect whether charter schools are covered by these various *statutes*. App.1941, 1943. And they do not know how a decision by this Court in favor of Wilberforce could affect other charter schools that aren't parties to this case. App.1939.

Because Wilberforce wants to open its charter school as soon as possible, it filed a motion for summary judgment soon after its complaint. Doc.14. This Court denied that early motion "without prejudice to refiling after discovery is completed." Doc.64 at 1. Relying solely on Rule 56(d), this Court ruled that KCBOE should get discovery into Wilberforce's "standing." Doc.64 at 4. But to balance fairness to Wilberforce, this Court granted "expedited" discovery of five months. Doc.64 at 4-5.

Over the last five months, discovery into Wilberforce's standing was extensive. Wilberforce responded to 117 written discovery requests. Norris-Dec. ¶67. It produced over 2,850 pages of documents. ¶69. Its witnesses gave 23 hours of live testimony over four depositions. ¶68. Even Wilberforce's charter consultant—a nonparty—sat for a deposition and produced thousands more pages of documents. Discovery closed on July 7, 2026. No party moved to extend the discovery period, raised any discovery dispute with this Court, or otherwise complained that discovery was insufficient.

While discovery was open, this Court largely denied KCBOE's motion to dismiss the amended complaint. MTD-Op. (Doc.88). Because both sides submitted outside evidence, this Court treated

KCBOE's motion as both a "facial and factual attack" on Wilberforce's standing. MTD-Op.6, 17. It rejected both attacks. This Court had "little difficulty" finding that Wilberforce's application would have been "futile." MTD-Op.13. Based on many laws, policies, and documents, Wilberforce "made a clear showing that KCBOE would have denied its application" because its school is religious. MTD-Op.13 (citing, *e.g.*, Tenn. Code Ann. §49-13-111(a)(2)). What matters, then, is whether Wilberforce intends to apply after that discriminatory barrier is removed. MTD-Op.10, 18. After reviewing the "evidence in the record," this Court found that Wilberforce had "a concrete intent to apply to become a charter school in the reasonably foreseeable future." MTD-Op.11-12 & n.3. So all the requirements for Article III standing were met. MTD-Op.17. After finding standing, this Court also rejected KCBOE's arguments that the case was moot and that the State was a necessary party. MTD-Op.17-20. And it dismissed the individual KCBOE defendants as "redundant" with KCBOE. MTD-Op.20-21.

For purposes of this motion, two more developments matter. First, Wilberforce no longer seeks compensatory damages. *Cf.* Verif.-Am.-Compl. (Doc.10) 16. It seeks a declaration and a permanent injunction with respect to future application cycles and nominal damages with respect to the 2025-26 cycle. Verif.-Am.-Compl.16. Second, Wilberforce no longer seeks relief with respect to its backup preference that, if it cannot pursue a Christian charter school, it would pursue a secular charter school. *Cf.* Verif.-Am.-Compl. ¶39, ¶48; App.15. Wilberforce seeks relief with respect to all laws and policies that continue to block its strong, first preference: applying to open an explicitly Christian charter school in Knox County. *See* Verif.-Am.-Compl. ¶28, ¶47. Wilberforce hopes to get relief in time to apply for the next cycle, ending on February 1, 2027. Tenn. Code Ann. §49-13-107(b).

## LEGAL STANDARD

Summary judgment "shall" be granted if there is "no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient" to defeat

summary judgment; "there must be evidence on which the [finder of fact] could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

## ARGUMENT

Wilberforce is entitled to summary judgment. The undisputed facts show that Wilberforce has standing and that Tennessee's prohibition on religious charter schools violates its First Amendment right to be free from religious discrimination. The Court should grant Wilberforce a permanent injunction, a declaratory judgment, and nominal damages.

### I. Wilberforce is entitled to summary judgment on standing.

In resolving KCBOE's factual challenge at the motion-to-dismiss stage, this Court had "little difficulty" finding that Wilberforce proved standing. MTD-Op.13, 17. Discovery only bolstered this Court's findings. Because the material facts surrounding Wilberforce's ability and readiness to apply are not in genuine dispute, this Court should enter summary judgment on standing. *E.g.*, *SFFA v. U.S. Naval Acad.*, 2024 WL 4057002, at *1 (D. Md. Sept. 5) (granting plaintiff summary judgment on standing because defendants' arguments failed to raise a genuine dispute on ability and readiness to apply).

This Court's opinion contains the governing law. The "inability to compete on an equal footing" because of a ban on religious charter schools is an '"injury in fact."' MTD-Op.9 (quoting *Trinity Lutheran Church v. Comer*, 582 U.S. 449, 463 (2017)). Wilberforce suffers that injury if, absent the discriminatory barrier, it has "a concrete intent to apply to become a charter school in the reasonably foreseeable future." MTD-Op.11. The barrier causes that injury, and that injury is redressed by declaring the barrier unconstitutional or enjoining its enforcement. MTD-Op.15-17. Wilberforce also suffered a past injury when this discriminatory barrier stopped it from equally competing in 2025-26, *see Rd.-Con v. Philadelphia*, 120 F.4th 346, 358 (3d Cir. 2024); and that injury is sufficiently redressed by ordering KCBOE to pay nominal damages, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021).

As this Court already found, Wilberforce has "a concrete intent to apply to become a charter school in the reasonably foreseeable future." MTD-Op.11. It "has undertaken extensive 'preparations'

to apply on a clear 'anticipated timeframe.'" MTD-Op.11. When this lawsuit was filed, Wilberforce was already incorporated under Tennessee law and had "appl[ied] for 501(c)(3) status." MTD-Op.12 (crediting this fact as proof of Wilberforce's "concrete intent"). Wilberforce then "took the initial step in the application process … by submitting a letter of intent" before the November 2025 deadline. MTD-Op.11. It stopped after KCBOE told Wilberforce that charter schools and sponsors cannot be religious, MTD-Op.12—both on the mandatory form for letters of intent, *see* App.11-12, 482 n.1, 484 & n.3, and in KCBOE's post-submission communications with Wilberforce, *see* App.11-12, 402-04, 1534. Even still, Wilberforce went on to "spen[d] considerable time and resources, including engaging an outside consulting group, completing a 279-page application that was ready to submit before the February [2026] deadline." MTD-Op.11. Wilberforce still has that application, and the IRS has now approved its 501(c)(3) status. App.112-397, 411. Per the undisputed testimony and evidence in the record, Wilberforce sincerely intends to submit its application as quickly as possible once the bans on religious charter schools are removed, including in the upcoming 2026-27 cycle. MTD-Op.18; *see* App.13-14, 23, 31-32, 72-73, 86-87, 446-47.

Wilberforce's concrete intent cannot be undermined by predictions that its application would be denied on some non-religious ground. Because Wilberforce is injured by the mere inability to compete, it "need not demonstrate that it ultimately would have received charter approval." MTD-Op.10 (citing *Ne. Fla. Ch., AGCA v. Jacksonville*, 508 U.S. 656, 666 (1993); *Trinity Lutheran*, 582 U.S. at 463). The "relevant inquiry is not whether Wilberforce could prove it ultimately would have been approved, only whether it had a concrete intent to apply but was deterred from doing so by an allegedly unconstitutional barrier." MTD-Op.7. Any supposed deficiencies in Wilberforce's draft charter application are "neither here nor there." *Naval Acad.*, 2024 WL 4057002, at *5; *accord Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021). Wilberforce did not need to prepare an application at all, given the futility of opening a religious charter school under the existing law. *Lac Vieux Desert Band of Lake Superior*

*Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999). Even if KCBOE would *certainly* reject Wilberforce's application on non-religious grounds, Wilberforce still has standing to try—to get relief that lets it apply and compete on equal footing without being discriminated against based on religion. *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023); *Vitolo*, 999 F.3d at 359.

For what it's worth, any argument that Wilberforce's application would be rejected on non-religious grounds would be unsupported speculation. Wilberforce's lengthy application, extensive fundraising, and impressive leadership compare favorably to the two other charter schools that KCBOE has approved. *Compare* App.112-397, *with* App.499-1445. If the intervenors disagree, their opinion doesn't matter because they have no authority over charter applications in Knox County. KCBOE does, but it cannot argue that it would deny Wilberforce's application on non-religious grounds. It admitted in discovery that "KCBOE has never reviewed" or "evaluated" Wilberforce's application, and so KCBOE "cannot … deny that Wilberforce's proposed charter school plan would … be approved." App.466. Even without this binding concession, *see* Fed. R. Civ. P. 36(b), no supposed defect in Wilberforce's draft application could be fatal to its standing to seek forward-looking relief. Any defect could be fixed either before the application is due in February 2027, Tenn. Code Ann. §49-13-107(b), or in post-application negotiations and amendments with KCBOE, *see* App.14, 493-94, 1508-09, 1533, 1538. And absent the illegal bans on religious charter schools, the state Charter School Commission could overrule any adverse decision that KCBOE might make. Tenn. Code Ann. §49-13-108(b)(5).

Nor can Wilberforce's concrete intent be undermined by the fact that it has not yet formally submitted an application. Article III does not require plaintiffs to take "futile" actions. *Lac Vieux*, 172 F.3d at 406. For the same reason, a plaintiff's failure "to engage in a futile act" cannot be used to undermine "the sincerity of [its] injury." *Mendoza v. Perez*, 754 F.3d 1002, 1014 n.6 (D.C. Cir. 2014). There is nothing suspicious about wanting to avoid a discriminatory denial. App.12. If Wilberforce's

application were denied on discriminatory grounds, many members of the public would wrongly assume there is something wrong with the school. App.12. That in turn would make it harder for Wilberforce to attract students and public support in the future. App.12. The law does not make Wilberforce suffer all the consequences of inevitable discrimination before it can challenge that discrimination, any more than it makes a black job applicant ignore the "'Whites Only' sign on the hiring-office door." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977).

Wilberforce's application is futile without judicial relief. The question for futility is not whether the applicant could physically submit the application, but whether the benefit in question (here, opening a religious charter school) could be "granted" without judicial relief. *Sporhase v. Nebraska*, 458 U.S. 941, 945 n.2 (1982). As this Court found, it is "clear" that Wilberforce's application "would" be denied because charter schools in Tennessee cannot be religious. MTD-Op.13-14 (citing Tenn. Code Ann. §49-13-111(a)(2)). Under Tennessee law, charter schools "shall" operate as "nonsectarian" and "nonreligious." Tenn. Code Ann. §49-13-111(a)(2). Hence why, in its charter agreements with Emerald Academy and Knoxville Prep, KCBOE made both schools agree to operate as "nonreligious" schools "pursuant to T.C.A. §49-13-111(a)(2)." App.1447, 1465, 1491. The mandatory application form for charter schools also "requires a sponsor to 'affirm' that it will operate as a 'nonsectarian, non-religious school,'" which "Wilberforce cannot" do. MTD-Op.4; *see* Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(a); App.12, 492, 1534, 1567, 1697. KCBOE maintained in discovery that it follows all state laws, including the ban on religious charter schools. *E.g.*, App.460, 465, 475; *see also* Doc.57 at 16; Doc.98 at 5; App.12, 416, 469, 496, 1552 & n.2. KCBOE will not, absent an order from this Court, ignore that ban as unconstitutional. App.460, 465, 475; MTD-Op.18. KCBOE even maintains that religious charter schools are forbidden under the Establishment Clause, a position that would bar Wilberforce's Christian charter school even if state law did not. App.475, 1600, 1641, 1668.

Even if KCBOE approved Wilberforce's application, the futility problem would remain. Once Wilberforce was approved, the intervenors and related groups would sue Wilberforce, KCBOE, the State, or all three. Per the intervenors, funding or operating this Christian charter school would violate the Establishment Clause. App.1995-98; Doc.22 at 13. When a Catholic charter school was briefly approved in Oklahoma, the same groups backing these intervenors sued the school and the approving authority. App.422-24; Verif.-Am.-Compl. ¶49; Doc.28 ¶49. And suing Wilberforce would be easy, according to the intervenors, because anyone who pays sales tax in Knox County has standing. Doc.22 at 13. No school could meaningfully enroll families, hire staff, secure loans, erect facilities, or responsibly open a charter school with that threat of enterprise-ending litigation hanging over its head. App.13. Wilberforce needs judicial relief whether or not its application is approved.

It is no answer to say that Wilberforce could seek a "waiver" from the statutory ban on religious charter schools. *Cf.* Tenn. Code Ann. §49-13-111(p). As this Court ruled before, imposing an extra "waiver" requirement on religious entities because they are religious remains discriminatory. MTD-Op.12. And besides, a waiver would not stop KCBOE from denying Wilberforce's application (or the intervenors from suing Wilberforce) on Establishment Clause grounds. *See* App.475, 1600, 1995-98. KCBOE also admits it would deny any such waiver. App.465, 468-69; Doc.19 at 9; Doc.57 at 6, 16; *see also* App.1681 (rejecting resolution to submit waiver request on Wilberforce's behalf). KCBOE would have no choice: Under the charter-school statute, no official can "waive regulatory or statutory requirements related to … [f]ederal and state civil rights," Tenn. Code Ann. §49-13-111(p)(1), including the ban on religious charter schools, *see* Tenn. Code Ann. §49-6-8002(a)(3); App.1600, 1680; Ex.45 at 31:17-31. And no official can waive the "requirements in the charter school statute," Tenn. Comp. R. & Regs. 0520-14-02-.01(3), including the ban on religious charter schools, Tenn. Code Ann. §49-13-111(a)(2).

Nor is it an answer to say that, even though KCBOE would deny Wilberforce's application, the state charter commission might approve it on appeal. *See generally* Tenn. Code Ann. §49-13-108(b)(5). Under Tennessee law, Wilberforce must submit its application to KCBOE. §49-13-107(b). The religious-discrimination injury to Wilberforce is complete because KCBOE will deny its application, *Ne. Fla.*, 508 U.S. at 666; and forcing only a *religious* charter school to appeal proves that Wilberforce cannot compete on equal terms now, MTD-Op.12. In all events, Wilberforce's application would be no less futile on appeal. The state commission is equally subject to the statute banning religious charter schools, Tenn. Code Ann. §49-13-111(a)(2), and the statute disallowing waivers of that ban, §49-13-111(p)(1). In fact, the commission has its own policies banning religious charter schools. Its Policy 4804, for example, "prohibit[s]" charter schools from "using religion to proselytize, promote, or show bias toward one particular religion or attempt to indoctrinate or establish any religion or religious belief over another." App.1857. And its performance framework maintains that "the Establishment Clause" prohibits "religious instruction" in charter schools. App.1896. None of these policies have been disavowed or materially revised—not after General Skrmetti opined that the ban on religious charter schools was "likely unconstitutional" in November 2025, not after Wilberforce filed this suit, and not after the state legislature amended the charter-school statute in May 2026.

In short, charter schools are currently banned from being religious. Because Wilberforce is able and ready to apply to open a religious charter school once those bans are removed, it has standing to challenge them. It did not have to submit a futile application first, and the likelihood that its application would be approved or denied on non-religious grounds is irrelevant to standing. The basic facts about Wilberforce's subjective intent, which this Court already found in Wilberforce's favor, are not in genuine or material dispute.

## II. Wilberforce is entitled to summary judgment on the merits.

The bans on religious charter schools are unconstitutional. The Free Exercise Clause forbids excluding religious schools from the charter program. And the Establishment Clause provides no justification.

The material facts are not in dispute on the merits either. No party doubts that Wilberforce is religious. The scope of the Religion Clauses, and the application of strict scrutiny, turn on questions of law. *E.g.*, *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 479, 482 (6th Cir. 2020); *Brooks v. Oak Ridge*, 222 F.3d 259, 264 (6th Cir. 2000). Whether Wilberforce is a government entity or a state actor also turns on questions of law. *E.g.*, *Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 156, 168 (6th Cir. 2014); *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 176 (6th Cir. 2008). Hence why, in *Carson*, the Supreme Court resolved similar questions on a summary-judgment record. 596 U.S. at 776-77, 780-81, 785. This Court should too.

### A. Banning religious charter schools violates the Free Exercise Clause.

Tennessee's ban on religious charter schools triggers strict scrutiny under the Free Exercise Clause. The government "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.* at 778. Any government program that "bar[s] religious schools from public benefits solely because of [their] religious character" is subject to "strict scrutiny," *id.* at 779; *accord Espinoza*, 591 U.S. at 487; *Trinity Lutheran*, 582 U.S. at 463, "the most demanding test known to constitutional law," *Boerne v. Flores*, 521 U.S. 507, 534 (1997). Tennessee's charter program expressly discriminates against religious schools. The program creates a benefit for qualifying nonprofits: charter agreements with the local school board, which come with guaranteed access to "public funds." *Carson*, 596 U.S. at 780; *see* Tenn. Code Ann. §49-13-112. Yet the program excludes "religious" and "sectarian" schools. Tenn. Code Ann. §49-13-111(a)(2). It thus facially discriminates against religion and triggers strict scrutiny. *See Carson*, 596 U.S. at 775, 780 (prohibition on aid to "sectarian" schools triggers strict scrutiny).

KCBOE cannot satisfy strict scrutiny. To meet that daunting standard, KCBOE must show that the ban "is the least restrictive means of achieving some compelling state interest." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981). No compelling interest supports the ban, as the ban is not necessary to comply with the Establishment Clause. Charter-school operators are private nonprofits that receive government funding only if families voluntarily choose to send their children there. *See* Tenn. Code Ann. §§49-13-111(a)(1), -113(a). "[A] neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Carson*, 596 U.S. at 781. Nor can any "interest in separating church and state more fiercely than the Federal Constitution … qualify as compelling." *Id.* (cleaned up). Even if the ban furthered a compelling antiestablishment interest, it is "fatally underinclusive," including because Tennessee's voucher program subsidizes religious education for thousands of students every year, *Espinoza*, 591 U.S. at 486; *see* Tenn. Code Ann. §49-6-3505, and Tennessee now lets religious nonprofits sponsor and operate charter schools, Tenn. Pub. Ch. 1128, §1, 114th Gen. Assembly.

Wilberforce's position is grounded not just in binding precedent, but also in the First and Fourteenth Amendments' original meaning. Federal, state, and local "governments provided financial support to private schools, including denominational ones," from "the founding era" through "the end of the 19th century." *Espinoza*, 591 U.S. at 481. The early Republic recognized that free-exercise principles required granting religious minorities equal access to funding for private schools. *See* Storslee, *Church Taxes and the Original Understanding of the Establishment Clause*, 169 U. Pa. L. Rev. 111, 159-60, 165-68 (2020) (discussing funding for Shearith Israel, Trinity Church in Georgetown, and Ursuline nuns in New Orleans); 1 *Complete Works of the Most Rev. John Hughes* 63 (Kehoe ed., 1866) (arguing that funding Protestant but not Catholic schools was unconstitutional). Nor was there some special exception that let States deny funding to certain religious schools that the State labeled "public schools." Modern public schooling did not exist in 1791 or 1868. *Brown v. Bd. of Ed.*, 347 U.S. 483,

489-90 (1954). From the founding through the late 19th century, States regularly deemed private, denominational schools to be "public schools" entitled to government support. *See* Gabel, *Public Funds for Church and Private Schools* 8-13 (1937); Jorgenson, *The State and the Non-Public School, 1825-1925*, at 5-7 (1987) (both works cited in *Espinoza*, 591 U.S. at 480-81). States cannot now use the "public" label, in circular fashion, to diminish the scope of the Free Exercise Clause "when [it] was adopted." *Cf. Kyllo v. United States*, 533 U.S. 27, 34 (2001).

### B. The Establishment Clause does not justify banning religious charter schools.

KCBOE nevertheless claims that the Establishment Clause bars religious charter schools, and that Wilberforce has no free-exercise rights, because charter schools are the government. This assertion is wrong twice over. Charter-school operators are private entities to which the Establishment Clause does not apply. And even if the Establishment Clause applied, it could not defeat Wilberforce's free-exercise right.

#### 1. The Establishment Clause does not apply.

The First and Fourteenth Amendments apply only to "governmental action." *Lindke v. Freed*, 601 U.S. 187, 195 (2024). For the Establishment Clause to apply to Wilberforce, it must be a government entity, or its actions must be "regarded as [state] action for constitutional purposes." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378 (1995). Neither is true.

***Government Entity.*** Wilberforce is not a government entity, nor will it become one if its charter application is approved. For "purposes of the First Amendment," a "corporation is part of the Government" when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation." *Id.* at 400; *see also Biden v. Nebraska*, 600 U.S. 477, 491 (2023); *Dep't of Transp. v. AAR*, 575 U.S. 43, 53 (2015). Where these features are absent, a corporation is a private entity. *Mik*, 743 F.3d at 168; *Commodities Exp. Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 529 (6th Cir. 2012). They are absent here.

Wilberforce is as far from a government entity as a corporation can get. The Tennessee legislature did not incorporate Wilberforce "by a special statute." *Lebron*, 513 U.S. at 397. Wilberforce incorporated under Tennessee's general incorporation statute for nonprofit organizations, App.373 (citing Tenn. Code Ann. §48-52-102), no different from the ACLU of Tennessee, App.1911. Wilberforce was formed to pursue "charitable, and in particular religious and educational," "purposes," App.373, not to pursue "governmental objectives," *Lebron*, 513 U.S. at 399. And the State has no authority to appoint Wilberforce's directors. Wilberforce's private incorporator selected its initial board members, and the board is responsible for selecting members going forward, App.373-74, including the future fifth board member (a parent who chooses for their child to attend Wilberforce), *see* Tenn. Code Ann. §49-13-109(a)(1). Wilberforce is a purely private entity.

None of these features will change if Wilberforce becomes the operator of a charter school. When a state or county board approves a charter application, it does not issue new articles of incorporation to the sponsor, amend the articles of incorporation to have different purposes, or assert the power to name the sponsor's board of directors. It simply enters a contract with the sponsor authorizing the establishment of a charter school. Tenn. Code Ann. §49-13-110(a). Far from radically altering a sponsor's corporate structure, a charter agreement *enshrines* it in its existing form. Sponsors are required to include their "Articles of Incorporation" in their application. App.1693; *see also* Tenn. Code Ann. §49-13-107(b)(7). Charter agreements must incorporate the required materials in the sponsor's application. §49-13-110(a). And so the sponsor's existing corporate structure becomes part of the charter agreement. *See, e.g.*, App.622-24, 627-28, 1455; App.897-98, 1314-15, 1319, 1500.

It is no response to say that *the charter school* is a state entity even if *the sponsor* is not. When assessing an entity's status under the First Amendment, "corporate law" helps define the entity's identity and structure. *USAID v. AOSI*, 591 U.S. 430, 435 (2020); *see Dep't of Transp.*, 575 U.S. at 51 ("It is appropriate to begin the analysis with Amtrak's ownership and corporate structure."). In Tennessee,

a charter "school has no existence apart from the sponsor." Tenn. Op. Att'y Gen. 2025-19 at 10. Tennessee's charter-school laws do not provide for the incorporation of a charter school as a distinct entity. They instead name the school's preexisting sponsor as its "governing body." Tenn. Code Ann. §49-13-104(10), (16). For example, "[t]he power to sue," which is one of the essential "rights of a corporation," *Bd. of Park Comm'rs v. Nashville*, 185 S.W. 694, 700 (Tenn. 1916), is vested in the "governing body," not the school, Tenn. Code Ann. §49-13-124(a).

Concrete examples make plain that a charter school does not exist separately from its sponsor. "Charter agreements typically refer to the charter school and the sponsor or governing body 'interchangeably.'" Tenn. Op. Att'y Gen. 2025-19 at 11 (collecting examples); *see, e.g.*, App.1447, 1464 (Emerald Academy); App.1491 (Knoxville Prep); App.1778, 1823 (other examples). Charter agreements also refer to the *sponsor's* corporate documents as "[t]he Charter School's Articles of Incorporation." App.622-24, 1455 (Emerald Academy); App.1314-15, 1500 (Knoxville Prep); *see also* App.1832, 1854-55 (referring to "[t]he Charter School" as a registered §501(c)(3) non-profit when the sponsor is so registered); App.1788, 1803, 1820 (same). Here, too, the relevant entity is Wilberforce, not the school it intends to form, and Wilberforce is plainly private.

Even if the charter school were the relevant entity, it still would be private. *See* Tenn. Op. Att'y Gen. 2025-19 at 10-12. The government does not unilaterally "creat[e]" charter schools. *Lebron*, 513 U.S. at 384. A charter school is authorized only when the private "sponsor" and a government body *together* sign a "charter agreement." Tenn. Code Ann. §49-13-110(a). After the authorization, the private "sponsor," not the government, "establish[es]" the school, Tenn. Code Ann. §49-13-106(i), and is responsible for taking the concrete steps necessary to get the school up and running, including obtaining a facility, establishing an admissions procedure, and hiring staff, App.1730; *see* App.1732-53. The private sponsor, and not the government, defines the school's "mission and goals." §49-13-107(b)(1), (2). And the private sponsor, which continues to choose its own directors, operates the

school, §49-13-104(10), (16); App.1552. This last point is dispositive on its own. *See Mik*, 743 F.3d at 168 & n.13 (Freddie Mac, though created by statute, is not a government entity because the government does not appoint its directors).

It is likewise no response to say that charter schools are designated "public" by statute. Tenn. Code Ann. §49-13-106(a). As noted, the relevant entity is the operator, not the school, and no statute provides that the 501(c)(3) organizations that operate charter schools are somehow "public." In all events, legislative "pronouncements … are not dispositive of [an entity]'s status as a governmental entity … under the Constitution." *Dep't of Transp.*, 575 U.S. at 51. Courts must instead perform "an independent inquiry into" that "status." *Id.*; *accord Lebron*, 513 U.S. at 392. The First Amendment constrains state statutes, not the other way around.

***State Action.*** Operating a charter school is not one of the "few limited circumstances" where a "private entity can qualify as a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). A private entity acts as a state actor when it "performs a traditional, exclusive public function"; "when the government compels [it] to take a particular action"; or "when the government acts jointly with" it. *Id.* None of these tests are met here. A "private school," even when funded "primarily from public sources" and "regulated by public authorities," is not a state actor. *Rendell-Baker v. Kohn*, 457 U.S. 830, 831 (1982). Thus, "a private non-profit corporation that runs a charter school" is not "a state actor." *Caviness v. Horizon Cmty. Learning Ctr.*, 590 F.3d 806, 808 (9th Cir. 2010).

"Obviously, education is not and never has been a function reserved to the state." *Logiodice v. Me. Cent. Inst.*, 296 F.3d 22, 26 (1st Cir. 2002); *accord Rendell-Baker*, 457 U.S. at 842; *Phillips v. Tangilag*, 14 F.4th 524, 532 (6th Cir. 2021); *Caviness*, 590 F.3d at 816. "To qualify as a traditional, exclusive public function …, the government must have traditionally *and* exclusively performed the function." *Halleck*, 587 U.S. at 809. Neither condition holds for education. "There were no public schools as we understand them at the founding." Chapman & McConnell, *Agreeing to Disagree* 146 (2023). "Public schools

in anything remotely resembling the current system first came into being in the early 1830s." *Id.* Private schools, moreover, have always existed alongside public ones. It is even unconstitutional to ban private schools. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925).

Tennessee also does not "compe[l]" Wilberforce to engage in the "particular action" at issue: religious instruction. *Halleck*, 587 U.S. at 809; *see Rendell-Baker*, 457 U.S. at 841 (finding this test for state action unmet where the challenged "decisions to discharge the petitioners were not compelled … by any state regulation"). Nor would Wilberforce and the State "jointly" operate a school. *Halleck*, 587 U.S. at 809. This test is met when a private individual and the government both directly participate in a common course of action—as when a restaurant owner and a police officer "conspir[e]" to have a patron arrested. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). Here, Wilberforce alone "will operate" the school and "overse[e]" its "management and administration." Tenn. Code Ann. §49-13-104(10). KCBOE will not send representatives to lead prayers or teach catechism lessons. While KCBOE may "contrac[t] with" Wilberforce, "licens[e]" the school, engage in "extensive regulation" of its activities, and "fun[d]" it, these factors, even in combination, do "not convert [a] private entity into a state actor." *Halleck*, 587 U.S. at 814-15; *see also Howell v. Father Maloney's Boys' Haven*, 976 F.3d 750, 754 (6th Cir. 2020) (a government "license" and "contract for services" do not amount to joint action).

Though two courts have held that charter schools are state actors because operating "free public schools" is exclusively a state function, *Peltier v. Charter Day Sch.*, 37 F.4th 104, 117 (4th Cir. 2022) (en banc); *Drummond v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, 12 (Okla. 2024), *aff'd by an equally divided court*, 605 U.S. 165 (2025), that framing "is circular," *Peltier*, 37 F.4th at 147 (Quattlebaum, J., dissenting in relevant part); *accord Logiodice*, 296 F.3d at 27. *Halleck* rules out this kind of semantic move. The respondent there argued that a cable operator was a state actor because "operation of a public forum for speech is a traditional, exclusive public function." 587 U.S. at 811. But by

defining "the relevant function" as operating a *public* forum, the respondent had "mistakenly ignore[d] the threshold state-action question"; the proper framing was whether "[p]roviding some kind of forum for speech" is an exclusive public function, which it was not. *Id.* at 811-12. So too here, the question is whether providing "some kind of" education—whether free and open to all, or with tuition and selective admissions—is an exclusive public function. *Id.* at 812. "Obviously," no. *Logiodice*, 296 F.3d at 27.

Even under these courts' rigged framing, charter-school operators would not be state actors. Historically, the term "public school" did not necessarily mean "government-run school." From colonial times to at least the 1870s, American governments deemed schools "under complete private control" to be "'public' schools" entitled to public support. Gabel, *supra*, at 8-13; *accord* Jorgenson, *supra*, at 5-7. Even in the modern era of compulsory public schooling, "publicly funded education of last resort" has not been "provided exclusively by government." *Logiodice*, 296 F.3d at 27; *see also Carson*, 596 U.S. at 773. And the school in *Rendell-Baker* was not a state actor even though it was free to attend and it performed a "public function." 457 U.S. at 841-42. No historically honest definition of "education" can turn it into an exclusive government function.

**2. Even if the Establishment Clause applied, it could not defeat Wilberforce's free-exercise right.**

The Free Exercise and Establishment Clauses "have 'complementary' purposes, not warring ones." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 533 (2022). Even if the Establishment Clause applied to charter schools, Wilberforce still has the right not to be discriminated against. And because accommodating Wilberforce would not require any religious coercion or discrimination against other religious groups, nothing in the Establishment Clause requires discriminating against Wilberforce.

Wilberforce has free-exercise rights even if charter schools are state entities. Wilberforce does not operate a charter school yet, so *right now* it is indisputably a private entity with First Amendment rights. And even supposing that charter schools are government schools, Tennessee's charter program

holds out a valuable "public benefit"—the opportunity to design, create, and run a government school. *Carson*, 596 U.S. at 785. The government may not "den[y]" Wilberforce that "benefit based on [its] religious exercise." *Id.* A traditional public-school teacher, for instance, is an agent of the State while at work and so may not exercise her Jewish faith in the classroom with the same freedom that she can outside of school. *See Kennedy*, 597 U.S. at 527. But a law prohibiting Jews from being public-school teachers would clearly violate the Free Exercise Clause. *Wieman v. Updegraff*, 344 U.S. 183, 191-92 (1952). In the same way, KCBOE cannot deny Wilberforce the opportunity to work within the public-school system simply because it is religious.

Charter schools being government entities could alter the constitutional analysis only if the Establishment Clause *forbids* respecting Wilberforce's free-exercise rights. It does not. The Establishment Clause prohibits making "a religious observance compulsory," *Kennedy*, 597 U.S. at 537, as well as the government "'officially prefe[rring]' one religious denomination over another," *Cath. Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025). So long as the government respects those limits, it is not prohibited from "sponsor[ing] prayers" and religious activity, even activity that can be disparaged as "sectarian." *Town of Greece v. Galloway*, 572 U.S. 565, 579-80 (2014); *see also Shurtleff v. Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring). In a variety of contexts, the government regularly employs ministers and chaplains to perform religious functions without any constitutional issue—including in legislatures, *Galloway*, 572 U.S. 565; the military, *Katcoff v. Marsh*, 755 F.2d 223 (2d Cir. 1985); prisons, *Johnson-Bey v. Lane*, 863 F.2d 1308, 1312 (7th Cir. 1988); and public hospitals, *Carter v. Broadlawns Med. Ctr.*, 857 F.2d 448, 458 (8th Cir. 1988).

A religious charter school can exist comfortably within the Establishment Clause's limits. Apart from discrimination and coercion, there is no free-floating rule under the Establishment Clause against government support for religious education. Public funding for religious schools has long co-existed with disestablishment. *Espinoza*, 591 U.S. at 480-81. Religious charter schools involve no

discrimination so long as all religious groups can apply on equal terms; if so, authorizing a charter that's associated with a particular religious tradition does not create any denominational preference. *Cf. Galloway*, 572 U.S. at 579 (noting with approval that Congress "acknowledges our growing diversity" in its appointment of chaplains "not by proscribing sectarian content but by welcoming ministers of many creeds"). And religious charter schools do not involve coercion because attendance is purely voluntary. Tenn. Code Ann. §49-13-113(a). The Supreme Court has found prayer and religious instruction in school objectionable when they establish a "state-created orthodoxy" and exert "coercive pressure" on students. *Lee v. Weisman*, 505 U.S. 577, 592 (1992); *Engel v. Vitale*, 370 U.S. 421, 431 (1962). Those issues arise because attendance at a traditional public school is "compulsory." *Ill. ex rel. McCollum v. Bd. of Ed.*, 333 U.S. 203, 212 (1948). Where "children" must "remain in attendance" during religious observance, the prayers expressed bear the State's stamp of approval, and the pressure to participate is coercive. *Id.* at 205. But a Christian charter school with *voluntary* enrollment no more mandates Christianity as the State's official religion than a Spanish immersion charter school mandates Spanish as the State's official language.

Religious charter schools also fit within the government's interest and longstanding practice of accommodation. "[F]or many people of faith across the country, there are few religious acts more important than the religious education of their children." *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025). But parents are legally compelled "to send their children to public school unless they find an adequate substitute." *Id.* at 561. "And many parents cannot afford such a substitute." *Id.* Absent publicly supported access to religious education, many parents will be forced to send their children to a school where their religious needs are not met. The government can legitimately accommodate the religious needs that arise from compulsory attendance, as it does for soldiers, prisoners, and hospital patients.

**III. This Court should award all appropriate relief.**

This Court should award Wilberforce a permanent injunction. A permanent injunction is appropriate if the plaintiff "has suffered an irreparable injury," the "remedies available at law … are

inadequate to compensate for that injury," "the balance of hardships" favors an injunction, and "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Because "the opposing party" here is the government, the last two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Wilberforce satisfies these criteria. Absent an injunction prohibiting KCBOE from engaging in religious discrimination, KCBOE will continue to violate Wilberforce's First Amendment right to apply to establish a charter school on religiously equal terms. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). And "it is always in the public interest to prevent violation of a party's constitutional rights." *Bays v. Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012).

Wilberforce is also entitled to a declaratory judgment. A declaratory judgment "would settle the controversy" and "clarif[y] the legal relations" between the parties by making clear that Wilberforce has a First Amendment right to apply on equal terms. *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019). It would thereby "complement an injunction." *Doe v. Lee*, 102 F.4th 330, 342 (6th Cir. 2024); *see* Fed. R. Civ. P. 57.

Finally, Wilberforce is entitled to nominal damages. A "plaintiff" is "entitled to at least nominal damages for violation of his constitutional rights" even in the absence of "actual damages." *Martin v. Kelley*, 803 F.2d 236, 239 n.3 (6th Cir. 1986); *accord Pagan v. Glendale*, 559 F.3d 477, 478 n.1 (6th Cir. 2009). Here, KCBOE violated Wilberforce's First Amendment rights when it denied Wilberforce a fair opportunity to apply for charter status in the 2026 application cycle, despite Wilberforce being able and ready to apply by the February 2 deadline. It owes Wilberforce a dollar for that past completed injury. *See Rd.-Con*, 120 F.4th at 358.

**CONCLUSION**

This Court should grant summary judgment to Wilberforce and award all appropriate relief.

Dated: August 2, 2026

Respectfully submitted,


/s/ *Cameron T. Norris*

Cameron T. Norris (TN Bar No. 33467)
Ryan M. Proctor*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

**admitted pro hac vice*

*Counsel for Wilberforce Academy*