**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION (KNOXVILLE)**

THE WILBERFORCE ACADEMY OF KNOXVILLE,
*Plaintiff*,

v.

KNOX COUNTY BOARD OF EDUCATION,
*Defendant*,

RICHARD COBLE, et al.,
*Intervenor-Defendants*,

ADRIENNE CARROLL, et al.,
*Intervenor-Defendants*.

Case No. 3:25-cv-584-CEA-DCP

District Judge Charles E. Atchley

Magistrate Judge Debra C. Poplin

**APPENDIX TO PLAINTIFF'S POST-DISCOVERY MOTION FOR SUMMARY JUDGMENT, VOLUME 1 (APP.1-497)**

**TABLE OF CONTENTS**

Exhibit 1: Declaration of Zachary Wishart ........ App.1

Exhibit 2: Declaration of Douglas Harris ........ App.19

Exhibit 3: Declaration of David Colquitt ........ App.26

Exhibit 4: Deposition of Zachary Wishart ........ App.34

Exhibit 5: Deposition of Douglas Harris ........ App.75

Exhibit 6: Deposition of David Colquitt ........ App.91

Exhibit 7: Email from Zachary Wishart (Jan. 29, 2026) ........ App.109

Exhibit 8: Wilberforce Charter Application ........ App.111

Exhibit 9: Wilberforce Budget ........ App.391

Exhibit 10: Wilberforce Actions of Directors ........ App.398

Exhibit 11: Email from KCBOE (Dec. 2, 2025) ........ App.401

Exhibit 12: Email from KCBOE (Dec. 5, 2025) ........ App.403

Exhibit 13: Email from KCBOE (Feb. 4, 2026) ........ App.406

Exhibit 14: Wilberforce 501(c)(3) Letter ........ App.409

Exhibit 15: *Christian Group Sues KCBOE* ........ App.413

Exhibit 16: ACLU Oklahoma Press Release ........ App.421

Exhibit 17: Wilberforce Board Meeting Minutes (Apr. 3, 2026) ........ App.434

Exhibit 18: Wilberforce Board Meeting Minutes (June 23, 2026) ........ App.437

Exhibit 19: Wilberforce Board Ratification Resolution ........ App.440

Exhibit 20: Deposition of David Denton ........ App.443

Exhibit 21: Email from Joy Lambrecht (Jan. 29, 2026, 5:20 p.m.) ........ App.450

Exhibit 22: Email from Ben Lindquist (Jan. 30, 2026) ........ App.452

Exhibit 23: Email from Joy Lambrecht (Jan. 29, 2026, 1:50 p.m.) ........ App.454

Exhibit 24: KCBOE's Amended R&Os to Wilberforce's RFPs ........ App.457

Exhibit 25: KCBOE's Amended R&Os to Wilberforce's RFAs ........ App.462

Exhibit 26: KCBOE's Amended R&Os to Wilberforce's Second Interrogatories....................App.473

Exhibit 27: Wilberforce Letter of Intent....................App.479

Exhibit 28: Wilberforce Letter of Intent Executive Summary....................App.486

Exhibit 29: KCBOE Charter Application Guidance....................App.491

Exhibit 30: Email from Kristi Kristy (Dec. 2, 2025)....................App.495

Exhibit 31: Emerald Application....................App.498

Exhibit 32: Knoxville Prep Application....................App.789

Exhibit 33: Emerald Original Charter Agreement....................App.1446

Exhibit 34: Emerald Renewal Charter Agreement....................App.1463

Exhibit 35: KCBOE Board Meeting Minutes (June 5, 2025)....................App.1481

Exhibit 36: Knoxville Prep Charter Agreement....................App.1490

Exhibit 37: Memorandum from Jon Rysewyk (May 29, 2014)....................App.1507

Exhibit 38: KCBOE Technical Assistance Workshop Video....................App.1512

Exhibit 39: KCBOE Technical Assistance Workshop Slides....................App.1514

Exhibit 40: KCBOE Board Meeting Minutes (Apr. 9, 2026)....................App.1543

Exhibit 41: KCBOE Policy I-450....................App.1551

Exhibit 42: KCBOE Charter School Handbook....................App.1554

Exhibit 43: KCBOE Charter Performance Framework....................App.1580

Exhibit 44: KCBOE Annual Authorizer Report (2024-25)....................App.1608

Exhibit 45: KCBOE Called Board Meeting Video (Feb. 5, 2026)....................App.1676

Exhibit 46: KCBOE Called Board Meeting Minutes (Feb. 5, 2026)....................App.1678

Exhibit 47: Tennessee Charter Application Form....................App.1683

Exhibit 48: Tennessee Charter School Pre-Opening Checklist....................App.1728

Exhibit 49: *Education Freedom Scholarship FAQs*....................App.1754

Exhibit 50: *Tennessee Education Freedom Scholarship Program*....................App.1774

Exhibit 51: Wooddale Middle School Charter Agreement ....................................................... App.1777

Exhibit 52: Wooddale Middle School Charter Application ..................................................... App.1801

Exhibit 53: LEAD Neely's Bend Charter Agreement .............................................................. App.1822

Exhibit 54: LEAD Neely's Bend Charter Application ............................................................. App.1846

Exhibit 55: Tennessee Public Charter School Commission Policy 4804 ................................. App.1856

Exhibit 56: Tennessee Public Charter School Commission Charter Performance Framework .... App.1858

Exhibit 57: ACLU of Tennessee Amended and Restated Charter ........................................... App.1910

Exhibit 58: Carroll Intervenors' Amended R&Os to Wilberforce's First Interrogatories ....... App.1916

Exhibit 59: Deposition of Holly Slater ..................................................................................... App.1931

Exhibit 60: Deposition of Richard Coble .................................................................................. App.1946

Exhibit 61: Deposition of Kerry Dooley ................................................................................... App.1955

Exhibit 62: Deposition of Amanda Collins ............................................................................... App.1963

Exhibit 63: Deposition of Elizabeth Porter ............................................................................... App.1972

Exhibit 64: Deposition of Katina Sharp .................................................................................... App.1983

Exhibit 65: Coble Intervenors' Amended R&Os to Wilberforce's RFAs ................................ App.1992

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br>*Plaintiff*,<br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION, et al.,<br>*Defendants*,<br><br>RICHARD COBLE, et al.,<br>*Intervenor-Defendants*,<br><br>ADRIENNE CARROLL, et al.,<br>*Intervenor-Defendants*. | Case No. 3:25-cv-584-CEA-DCP<br><br>District Judge Charles E. Atchley<br><br>Magistrate Judge Debra C. Poplin |

**DECLARATION OF ZACHARY WISHART**

I, Zachary Wishart, declare as follows:

1. I make this declaration in my individual capacity based on my personal knowledge and in my capacity as a corporate representative based on information known and reasonably available to the Wilberforce Academy of Knoxville. I am over the age of 18, of sound mind, and otherwise competent to sign this declaration. If called to testify about these matters at trial, I would do so.

2. I am the executive director of the Wilberforce Academy of Knoxville, the plaintiff in this litigation.

3. I have a bachelor's degree from Liberty University. I have a Master's of Education from Bryan College in education administration with a focus on Christian school administration. I have an Education Specialist degree from Columbia International University.

4. I have an all-levels school principal certification from the Association of Christian Schools International. I previously had a school counselor certification from the Association of Christian Schools International.

5. I hold a Tennessee teacher license with endorsement 145, special education. I am also currently completing a special education certification through the University of Tennessee. I expect to complete the certification by Spring 2027. As part of that course of study, I took and passed the Praxis Special Education: Foundational Knowledge exam in May 2026. A main reason I decided to get this certification is to broaden my knowledge so I could better help Wilberforce navigate special-education issues, should it be allowed to apply and open a charter school.

6. I have deep experience serving children and families in Knoxville in all facets of education—in public and private schools, in Christian and secular schools, and as a school counselor, administrator, and many other roles.

a. While in college, I worked in the Knox County public-school system. I served as a special education educational assistant for one semester. I also worked at the Knoxville Adaptive Education Center, which serves students from across Knox County who require a structured and supportive school environment with a strong mental-health component. And I worked as a substitute teacher.

b. From 2017 to 2019, I worked in a behavior intervention and mental health role at Mooreland Heights Elementary, a public school in Knox County.

c. From 2019 to 2020, I worked as a foster-care case manager at Tennessee Baptist Children's Homes.

d. From 2021 to 2022, I worked as a school counselor at Grace Christian Academy, a private religious school in Knoxville. I developed and implemented a comprehensive school counseling program for K-8 students, and I conducted 19 classroom guidance lessons per week.

e. In 2022, I was an Education Policy Fellow at the American Federation for Children. In that capacity, I researched the effects of school choice on student outcomes.

f. In 2022, I also performed contract work for Tennesseans for Student Success, an education policy organization. In that capacity, I organized an event to promote their annual student summer-reading competition, and I provided workshops and information for school-board candidates.

g. When Knoxville Preparatory School was approved to operate as Knoxville's second charter school in 2024, its sponsor asked me if I wanted to apply to work as its principal. I instead agreed to serve on Knoxville Prep's local advisory board. In that role, I advised the school on community engagement and the process of opening the charter school.

h. From 2024 to 2025, I was a School Leaders Fellow for the American Federation for Children, a nonprofit that promotes school choice for low-income families. In that capacity, I advocated for school choice.

i. I am a board member of the Metro Drug Coalition, a Knoxville-based non-profit organization that helps individuals resist and recover from substance misuse.

j. I formerly volunteered with the Foster Care Review Board for Knox County, which reviews foster-care placements to ensure they are serving the best interests of the children in the foster care system.

7. Since 2022, I have been the middle-school principal at River's Edge Christian Academy, a private religious school in Knoxville. Since 2024, I have also been the high-school principal. In that role, I supervise the school's 50 teachers and staff, select the curriculum, interface with the board of directors, and oversee parent engagement. I also personally oversee River's Edge's special-ed programming for sixth through twelfth grade.

8. I have been interested in and researching the possibility of starting a Christian school in Knoxville since before 2020. In 2023, I engaged in discussions with the Spreading Hope Network, a Christian school organization, about starting a Christian school with their assistance.

9. I believe strongly in the value of Christian education and the need to expand access to it. When I worked in the Knox County public-school system, I saw many children who came from unstable and low-income homes. I wanted to share with them the hope that I have—that there is a God who loves them and sent His son Jesus to die on the cross for them. But I was legally barred from sharing that hope in the public-school system. I can share the joy of my Christian faith in my current job at River's Edge. But there are still many children who are unable to access Christian education because they do not have the financial means to attend a traditional private Christian school. I want to help open a Christian charter school that is free to attend.

10. To make my vision a reality, I decided in August 2025 to form a new nonprofit, called the Wilberforce Academy of Knoxville, to serve as the sponsor for a Christian K-8 charter school in Knox County.

11. I recruited four individuals to serve as the board of directors for Wilberforce: Doug Harris, David Colquitt, Parker Bartholomew, and Laura Beaman. I know all four individuals well and chose them because I trust them and their ability to help me run a successful charter school.

a. Doug Harris is an entrepreneur and the former Chair of the Knox County Board of Education. He brings invaluable charter-school experience because he sat on the Knox County Board of Education when it approved Emerald Academy, the county's first and currently only charter school. He and I have regularly met for years to discuss ways to improve education in Knox County, including Christian education. Mr. Harris is also a highly successful entrepreneur, aligning with Wilberforce's focus on entrepreneurship. And he serves and supports many nonprofits in Knoxville, giving him invaluable experience and connections to potential donors for Wilberforce. One of the boards he serves on is the Emerald Youth Foundation, the Christian nonprofit connected to Emerald Charter Schools and Emerald Academy.

b. David Colquitt is an entrepreneur, philanthropist, and a member of the board of Emerald Academy. For years he and I have discussed the possibility of opening a charter school and Christian school in Knox County.

c. Parker Bartholomew is an entrepreneur, real-estate developer, and highly involved parent at River's Edge. Whenever River's Edge has needed to acquire new property or instructional space, he has taken the lead in those projects.

d. Laura Beaman is a real-estate developer, a highly involved parent at River's Edge, and a member of River Edge's board.

12. Once Wilberforce is approved, it will select a fifth board member. That board member must be a parent whose child attends Wilberforce.

13. On November 21, 2025, Wilberforce was officially formed as a nonprofit corporation under Tennessee state law.

14. Wilberforce is a Christian nonprofit. As an organization, it affirms the truth of the Holy Bible and the Apostles' and Nicene Creeds. Wilberforce is not affiliated with any particular denomination within Christianity.

15. Wilberforce was formed for charitable, religious, and educational purposes—and in particular, to provide Christian educational services and to operate a Christian charter school.

16. On November 24, 2025, Wilberforce's board approved bylaws and a conflict-of-interest policy.

17. Also on November 24, 2025, Wilberforce submitted an application to the IRS to register as a §501(c)(3) non-profit organization. The IRS approved Wilberforce's application on April 1, 2026, deeming Wilberforce's exemption effective as of November 21, 2025, the date that Wilberforce was incorporated.

18. Also on November 24, 2025, the board appointed me executive director of Wilberforce. As executive director, I have the authority and duty to take all appropriate steps necessary to open a charter school on behalf of Wilberforce, including filing a lawsuit so that Wilberforce can lawfully operate, hiring litigation counsel, preparing a letter of intent to submit a charter application to Knox County, preparing a charter application, submitting a charter application, and determining whether submitting a charter application would be futile in the current application cycle. The board was aware that I took these actions and approved all my decisions.

19. Charter-school options in Knox County are currently limited. As of last year, the county had only two charter schools: Emerald Academy and Knoxville Prep. Knoxville Prep closed at the end of the 2025-2026 school year, leaving just Emerald Academy. Emerald Academy is (and Knoxville Prep was) secular.

20. Traditional private-school options in Knox County, and in particular Christian schools, are also limited. The private Christian schools nearest to the Cedar Bluff area—River's Edge, the Episcopal School of Knoxville, and the Christian Academy of Knoxville—all report full enrollment and waitlists for several grades. And cost is prohibitive for many families, even after the Tennessee Education Freedom Scholarships.

21. To meet this unmet demand for Christian education and school choice, Wilberforce intends to open a school in Cedar Bluff, a centrally located community in Knox County easily accessible by both I-40 and U.S. Route 221.

22. Wilberforce aims to open as a K-3 school in its first year with 318 students. By its fifth year, it aims to be a K-7 school with 618 students. At capacity, Wilberforce Academy aims to be a K-8 school with 693 students.

23. Wilberforce will unite high-quality academics with a strong biblical foundation. In particular, it will restore the proven principles that shaped America's earliest and most successful schools:

teacher-led, direct instruction; a culture of disciplined learning; and high expectations for every student. Above all, Christ serves as the cornerstone of Wilberforce Academy's mission, guiding the formation of students who are academically prepared, spiritually grounded, and equipped to lead lives of purpose. Wilberforce exists so that students can come to a saving faith in Jesus Christ, grow in a personal relationship with Him, and be equipped to make Him known wherever God leads them.

24. Wilberforce Academy plans to imbue its school with three major characteristics.

a. **Biblical foundation**: Inspired by *The New England Primer*, the primary textbook of the American colonies, students will develop early biblical literacy in grades K-2, primarily walking through *The Biggest Story Bible* and curriculum. Building on that early foundation, students will continue in grades 3, 4 and 5 with catechisms, another key element found in *The New England Primer*. Students will walk through *The New City Catechism*, memorizing key biblical truths. Each morning, all grades will begin their day with a morning assembly where students will hear Scripture read, participate in prayers, recite creeds and confessions and sing. But no student will be required to affirm Christian doctrine or actively participate, or be penalized for failing to do so.

b. **Civics education**: Wilberforce Academy is named in honor of William Wilberforce, the Christian leader and slavery abolitionist whose faith inspired his commitment to public service. Following his example, Wilberforce will emphasize strong civic engagement and social responsibility. Students will receive lessons on Tennessee history and government, hold mock elections, and participate in a school-wide monthly town hall featuring celebrations, speakers, and community-building activities. Wilberforce will aim to qualify for the Governor's Civics Seal, an award given to schools that "implement high-quality civic education programs." Tenn. Code §49-6-1018(a).

c. **Entrepreneurial program**: Wilberforce Academy aims to inspire the next generation of thoughtful, purpose-driven innovators through a dynamic, hands-on entrepreneurial program. Grounded in Christian values such as integrity, stewardship, and service, students will explore early financial literacy, gain awareness of meaningful career pathways, and develop an entrepreneurial mindset shaped by character and responsibility. By middle school, learners won't just study business; they will build it. By engaging instruction in key entrepreneurial concepts, students will design, launch, and operate their own in-school, student-led ventures. Along the way, they will practice sound decisionmaking, responsible resource management, and leadership that puts people first. This experience will empower students to create value, contribute positively to their communities, and pursue their future callings with confidence and purpose.

25. Wilberforce intends to teach Christianity as truth in its classes. In particular, Wilberforce will affirm the truth of the Holy Bible, the Nicene Creed, and the Apostles' Creed.

26. Although Wilberforce Academy believes strongly in the importance of providing an explicitly biblical and Christian education, it also believes strongly in opening its doors to all. Wilberforce intends to make its school open to all students eligible to attend charter schools, regardless of faith background. No student will be required to affirm Christian doctrine or engage in Christian worship, or be penalized for failing to do so.

27. To ensure that biblical Christian faith is truly integrated into the curriculum and life of the school, Wilberforce plans to hire faculty who share its belief in the Apostles' and Nicene Creeds and the inerrancy of the Bible. But if it were truly impossible to hire only mission-aligned faculty, Wilberforce Academy would still establish a religious charter school in Knox County.

28. In line with the legacy of its namesake, the great Christian abolitionist William Wilberforce, Wilberforce Academy fiercely opposes racial discrimination. As part of its first official acts, the

Wilberforce Board affirmed that Wilberforce will admit students of any race, color, national and ethnic origin and will not discriminate on the basis of race, color, national and ethnic origin in anything it does. Ex.10 ¶8.

29. Wilberforce originally sought to apply for charter status in the 2026 application cycle, the first cycle in which Wilberforce could have applied after it was formed. Had Wilberforce been approved in that cycle, it would have been eligible to open in the 2027-2028 school year.

30. The deadline to submit a letter of intent in the 2026 application cycle was December 3, 2025. The deadline to submit a final charter application in the 2026 application cycle was February 2, 2026.

31. I submitted a letter of intent on behalf of Wilberforce on November 25, 2025.

32. Wilberforce drafted a complete, 279-page, ready-to-submit charter application by January 29, 2026. That application includes a five-year operating budget in the format required by state law. I personally spent about 80 hours working on the application. I have also personally spent over $1,000 of my own money without reimbursement to prepare the application.

33. To assist in drafting the application, I enlisted the aid of Arcadia Education, an outside consulting group with substantial experience working with charter schools and helping them prepare successful applications. Wilberforce paid Arcadia $140,000 for its services. Arcadia devoted about 1,200 man hours to preparing the application.

34. I worked closely with Arcadia to translate Wilberforce's vision into a complete application. I participated in hours of video calls with Arcadia staff. We exchanged at least 128 emails. See, for example, WILB-ACAD-745-50, 753, 762-72, 774, 777-78, 795, 816-25, 828-31, 835-37, 840-46, 850-55, 863-64, 2250, 2258-67. And I provided close feedback on drafts.

35. Part of preparing a charter application involves identifying potential locations for the school to operate. Parker Bartholomew and I devoted substantial time and effort to identifying

locations, some which are discussed in Wilberforce's charter application. Ex.8 at 190-91. I personally visited several of the potential locations to evaluate them. I also identified underutilized Knox County public-school facilities that Wilberforce can potentially use, such as Cedar Bluff Middle School and Cedar Bluff Preschool.

36. Although Wilberforce was able and ready to apply to open in the 2027-2028 school year by the deadline of February 2, 2026, Wilberforce did not apply because its application would have been futile. Tennessee law forbids religious charter schools, and the Knox County Board of Education (KCBOE) has consistently made clear that it follows Tennessee law. For example:

a. For example, Wilberforce had to submit an incomplete letter of intent in 2025-26. Tennessee's mandatory letter-of-intent form for 2026 warned that "Tennessee law limits who may sponsor a charter school and prescribes the type of entity that may operate a charter school," instructing would-be sponsors to consult "[t]he complete Tennessee Public Charter Schools Act …in T.C.A. §§ 49-13-101 through 145." Ex.27 at 5 & n.3. Section 111 of that Act bars religious charter schools. Tenn. Code §49-13-111(a)(2). The form also required Wilberforce to "check" a box "to confirm eligibility" as a "sponsor," stressing that under Tennessee law a "sponsor" cannot "promote the agenda of any religious denomination or religiously affiliated entity." Ex.27 at 3 n.1. Though Wilberforce submitted its letter of intent before the deadline, it had to leave that mandatory box unchecked.

b. On January 16, 2026, I attended KCBOE's Charter Application Technical Assistance Workshop for sponsors applying to open in the 2027-28 school year. During that workshop, Theresa Nixon, KCBOE's Executive Director for Academic Supports, stated that a charter school "can't be run by a church or other religious organization." Ex.38 at 17:09-14. Ms. Nixon has the knowledge and authority to speak for KCBOE, including at the workshop. *See* Doc.19-1; Ex.26 at 3.

c. At the same workshop, Ms. Nixon told me, "obviously, you use the State Board of Education application." Ex.38 at 23:34-40. While she made that statement, her PowerPoint slide said, "Please use the SBE Initial Application." Ex.39 at KCBOE03831. As explained, Wilberforce cannot comply with the state application's instructions because it intends to open a religious charter school.

d. At a February 2, 2026, meeting, the Chair of the Knox County Board of Education affirmed, without opposition from any other member, that "we do follow" the "state law" prohibiting religious charter schools. Ex.45 at 38:36-56; Ex.25 at 7. At the same meeting, the Board voted down a resolution to ask the state Commissioner of Education to consider waiving that state-law requirement for Wilberforce.

e. In addition, the state-mandated form for submitting a charter application includes a "Statement of Assurances" that requires the sponsor to "affirm" that it will operate as a "nonsectarian, non-religious" school. Ex.47 at 14. Wilberforce cannot affirm this statement while applying to open a religious charter school.

37. Wilberforce does not want to submit a futile application. KCBOE would inevitably deny that application because Wilberforce is religious. Even if a charter application is rejected based on illegal religious discrimination, it is natural for members of the public to assume that there was something wrong with the proposed school as a school. Subjecting Wilberforce to an inevitable rejection risks unfairly compromising its reputation and its ability to obtain community support and interest from families in the future.

38. Wilberforce also needs the certainty of judicial relief to open. Without a final decision vindicating Wilberforce's First Amendment right to apply and open, Wilberforce remains vulnerable to a lawsuit trying to end its operations or revoke its funding on the ground that a religious charter school violates the Establishment Clause. The intervenor families in this litigation believe that. When

a Catholic charter school was briefly approved in Oklahoma, the very groups backing those intervenors—including the Freedom from Religion Foundation, Americans United for the Separation of Church and State, and the American Civil Liberties Union—sued the school and the approving authority. *Oklahomans File Lawsuit to Stop State from Sponsoring Nation's First Religious Public Charter School*, ACLU (July 31, 2023), perma.cc/M9T9-BXG2. No school could meaningfully enroll families, hire staff, secure loans, erect facilities, or responsibly begin instruction with the threat of enterprise-ending litigation hanging over its head.

39. Wilberforce also does not seek a waiver under Tenn. Code §49-13-111(p) of the requirement that charter schools be nonreligious because doing so would be futile. KCBOE has consistently taken the position that it has no authority to grant such a waiver; and on February 2, 2026, KCBOE voted down a resolution to ask the state commissioner of education to consider granting a waiver to Wilberforce. State law also prohibits the Commissioner from granting a waiver of the requirement that charter schools be nonreligious. See, for example, Tenn. Code §49-13-111(p)(1); Tenn. Comp. R. & Regs. 0520-14-02-.01(1).

40. Wilberforce also does not seek a waiver because it does not want to be approved through the waiver process. Under state law, waivers can be issued only for a limited time. If Wilberforce proceeded under a waiver, it would periodically have to seek renewal of the waiver. At the point of renewal, state or county officials would have complete discretion to end Wilberforce's continued existence. Wilberforce would struggle to persuade donors, families, and teachers to invest long-term in its school under this regime. And Wilberforce objects to the intrusive process of government officials making a value judgment of whether its religious mission is worth accommodating.

41. Wilberforce continues to sincerely intend to apply to open a Christian charter school in Knox County. Adapting Wilberforce's current draft charter application to a future application cycle is not difficult and would take only a few hours of work on my part. If a court ordered adequate relief,

I would immediately adapt Wilberforce's completed application and submit it before the next applicable deadline—currently February 1, 2027.

42. After submitting Wilberforce's application, I will work with Knox County to ensure Wilberforce has filled out all forms, submitted all documents, met all requirements, resolved any concerns, and taken any other steps needed to timely open a charter school.

43. During KCBOE's Charter Application Technical Assistance Workshop on January 16, 2026, Theresa Nixon, KCBOE's Executive Director for Academic Supports, explained that after a sponsor submits an application, KCBOE staff hold an in-person "capacity interview" with representatives from the sponsor. Ex.38 at 29:00-58. The purpose of the interview is to allow KCBOE to "[g]ain clarity on any remaining questions related to the proposed school" and "[a]ssess the sponsor's capacity to implement the plans" in its application. Ex.39 at KCBOE03835. Ms. Nixon further informed me that KCBOE takes the capacity interview into account when voting on whether to approve a charter application. Ex.38 at 21:23-22:42; Ex.39 at KCBOE03830.

44. In preparing Wilberforce's application, I ensured that Wilberforce complied with all applicable provisions of Tennessee law, other than those that discriminate against its religious beliefs. If any feature of Wilberforce's application is not in conformity with Tennessee law, I will promptly revise Wilberforce's application to get in conformity.

45. If Wilberforce's charter application is approved, I plan to leave my current job and devote myself full time to serving as executive director of Wilberforce.

46. Wilberforce Academy believes that explicit Christian instruction and practice are critical to a good education, and that a purely secular education is necessarily an inferior one. But if it lacks the right to operate a religious charter school, Wilberforce intends to establish a nonreligious, nonsectarian charter school instead. Wilberforce believes that helping students succeed academically and learn good habits is an important act of Christian charity, even if accomplished through a secular

education. Wilberforce further believes that a strong character-forming nonreligious education can prepare students to receive the gospel at a later time or outside of school. In Wilberforce's view, providing a good nonreligious education would still glorify God by preparing students' hearts and minds to serve God, though in a lesser way that falls short of a proper, explicitly Christian education.

47. To be prepared for the alternative possibility of establishing a secular school, Wilberforce also prepared a complete 279-page application for a secular charter school. Much of the content of Wilberforce's secular application is similar to its religious application. But the secular school would not engage in prayer or religious instruction or teach Christianity as true and would otherwise comply with all laws and policies governing religion in charter schools.

48. Wilberforce's intentions concerning its second preference of applying to open a secular charter school have not changed since this lawsuit was first filed. If it became clear that Wilberforce does not have the right to apply to operate a religious charter school, I would immediately adapt and submit Wilberforce's completed application to open a secular school. I would do so before the next applicable deadline—currently February 1, 2027. But given recent changes to Tennessee law and positions taken by KCBOE and the Knoxville-based intervenors in this case, Wilberforce no longer seeks judicial relief confirming its right to apply to open a secular school. It seeks judicial relief confirming its right to apply to open a Christian charter school—its overwhelmingly strong, first preference.

49. Throughout the application process and this lawsuit, I have given regular updates to every member of Wilberforce's board. Every member of the board has supported and approved the actions I have taken on behalf of Wilberforce—including bringing this lawsuit, hiring litigation counsel, submitting a letter of intent, preparing a charter application, and choosing not to apply in the 2026 application cycle. At no point has any member of the board expressed disapproval of any action I have taken or questioned whether I acted within the bounds of my authority as executive director.

50. Exhibit 36 to Wilberforce's motion for summary judgment is a true and correct copy of Knoxville Prep's charter agreement. The document is a public record filed with Knox County as authorized by law, and I have personal knowledge of it from my time consulting Knoxville Prep.

51. Exhibit 10 to Wilberforce's motion for summary judgment is a true and correct copy of Wilberforce's actions of directors, taken on November 24, 2025. The document is a public record filed with the State of Tennessee as authorized by law, and I have personal knowledge of it as Wilberforce's executive director.

52. Exhibit 27 to Wilberforce's motion for summary judgment is a true and correct copy of Wilberforce's letter of intent. The document is a public record filed with Knox County as authorized by law; it was produced by the Knox County Board of Education in this litigation; and I have personal knowledge of it as Wilberforce's executive director.

53. Exhibit 28 to Wilberforce's motion for summary judgment is a true and correct copy of the executive summary I submitted with Wilberforce's letter of intent. The document is a public record filed with Knox County as authorized by law; it was produced by the Knox County Board of Education in this litigation; and I have personal knowledge of it as Wilberforce's executive director.

54. Exhibit 11 to Wilberforce's motion for summary judgment is a true and correct copy of an email I received from KCBOE on December 2, 2025.

55. Exhibit 12 to Wilberforce's motion for summary judgment is a true and correct copy of an email I received from KCBOE on December 5, 2025.

56. Exhibit 7 to Wilberforce's motion for summary judgment is a true and correct copy of an email I sent on January 29, 2026, attaching Wilberforce's completed application and budget.

57. Exhibit 8 to Wilberforce's motion for summary judgment is a true and correct copy of Wilberforce's application to open a religious charter school, as completed on January 29, 2026. It includes true and correct copies of Wilberforce's charter of incorporation and bylaws. The latter

documents are public records filed with the State of Tennessee as authorized by law. And I have personal knowledge of all the documents as Wilberforce's executive director.

58. Exhibit 9 to Wilberforce's motion for summary judgment is a true and correct copy of Wilberforce's budget to accompany its charter application, as completed on January 29, 2026. I have personal knowledge of it as Wilberforce's executive director.

59. Exhibit 13 to Wilberforce's motion for summary judgment is a true and correct copy of an email I received from KCBOE on February 4, 2026.

60. Exhibit 14 to Wilberforce's motion for summary judgment is a true and correct copy of the IRS's decision letter of April 1, 2026 on Wilberforce's §501(c)(3) application. Wilberforce received it from the Internal Revenue Service, and I have personal knowledge of it as Wilberforce's executive director.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 1, 2026.

Zach Wishart

Zachary Wishart

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION (KNOXVILLE)**

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE, *Plaintiff*, v. KNOX COUNTY BOARD OF EDUCATION, et al., *Defendants*, RICHARD COBLE, et al., *Intervenor-Defendants*, ADRIENNE CARROLL, et al., *Intervenor-Defendants*. | Case No. 3:25-cv-584-CEA-DCP<br>District Judge Charles E. Atchley<br>Magistrate Judge Debra C. Poplin |

**DECLARATION OF DOUGLAS HARRIS**

I, Douglas Harris, declare as follows:

1. This declaration is based on my personal knowledge and belief. I am over the age of 18, of sound mind, and otherwise competent to sign this declaration. If called to testify about these matters at trial, I would do so.

2. I am the president and chair of the board of directors of the Wilberforce Academy of Knoxville.

3. I have a bachelor's degree in business administration and marketing from the University of Tennessee at Knoxville.

4. I am a lifelong entrepreneur. Since 1992, I have been the president of Harris Enterprise Group, which helps operate over 30 franchise businesses. In that capacity, I also co-founded and operate a restaurant software business with over 26,000 locations. And I consult and advise businesses in construction, HR, strategic growth, operations, and more.

5. I have long had a passion for education. I served on the Knox County Board of Education from 2012 to 2016. I was Chair of the Board in 2016. As a board member, my duties including

managing the superintendent, making policies for Knox County Schools and overseeing their implementation, and determining the yearly budget. I also gained familiarity with the charter-school application process. During my time on KCBOE, Emerald Academy, Knox County's first and currently only charter school, applied and was approved to open.

6. I also serve and lead many nonprofits. As a Christian, my nonprofit service is an important way for me to give back to my community, serve the world, and promote Christian education.

a. I am the co-founder and board chair of TivaWater. In that role, I have traveled to Africa 40 times to promote clean water, orphan care, indigenous business start-ups, medical clinics, and Christian discipleship ministry.

b. I am a board member of the Emerald Youth Foundation and its finance chair. The foundation has a $10 million budget and provides services to over 2,000 youths in the urban core. It is a Christian ministry that works to develop urban leaders who can one day give back to their communities. The foundation is affiliated with Emerald Academy.

c. I am the co-founder and treasurer of the Bearden Learning Center. The center organizes offsite Christian Bible classes for public-school students in Knox County. The classes involve prayer, study, and exploration of the Christian faith. Participating students can get course credit at their public schools.

d. I am the co-founder and a former board member of the Compassion Coalition. The coalition is a faith-based network of churches, organizations, and businesses that address poverty and other social needs in Knox County. The coalition helps ensure that these groups act in a coordinated and organized way when they assist the needy in Knoxville.

e. I am the board chair of the National Christian Foundation of East Tennessee, a Christian nonprofit that counsels high net-worth individuals on how to engage in effective charitable giving.

7. Zachary Wishart asked me to serve on the board of Wilberforce in August 2025. Three main reasons led me to agree.

a. We need more competition in education. The United States spends about $1 trillion on public education, but only about 30% of public-school students are proficient in math, reading, and language. Charter schools like Wilberforce present an opportunity to do things differently.

b. Mr. Wishart proposed locating the school in the Cedar Bluff area, near where I live. I know a lot about the schools in that area. In my view, the area could use expanded school choice because the public schools do not score well in math and reading proficiency. But because Cedar Bluff is not urban, it is an area that organizations looking to open a charter school would normally overlook.

c. As a Christian, I recognize that there's a spiritual component to education that students in traditional public schools are missing. Wilberforce Academy would be able to provide that spiritual component, and to do so for families that lack the money to send their children to a traditional Christian private school.

8. On November 24, 2025, the board of directors appointed Zachary Wishart to be the executive director of Wilberforce. With that action, the board empowered him to take all appropriate steps necessary to open a charter school on behalf of Wilberforce, including filing a lawsuit so that Wilberforce can lawfully operate, hiring litigation counsel, preparing a letter of intent, preparing a charter application, and determining whether to submit a charter application immediately or after the litigation ended.

9. I know Zachary Wishart well and have met with him regularly for years to discuss how to improve school policy in Knox County. Given his role as principal of River's Edge Christian Academy and his extensive background in education policy, I believe he is well qualified to act as executive

director and to make the decisions necessary to prepare an application for Wilberforce Academy and open its school. I have been confident in his vision for Wilberforce from the beginning.

10. I have approved all the actions Mr. Wishart has taken on behalf of Wilberforce. No other Wilberforce board member has expressed disapproval of Mr. Wishart's actions as executive director or called into question his authority to take them.

11. On April 3, 2026, the Wilberforce board of directors held a meeting, which I attended. At the meeting, the board voted to reaffirm its continued intent to open a religious charter school and to continue with this lawsuit. The votes were unanimous.

12. On June 23, 2026, the Wilberforce board of directors held a meeting, which I attended. At the meeting the board approved a resolution reaffirming its view that Mr. Wishart, as executive director, had authority to bring this lawsuit, hire litigation counsel, submit a letter of intent, prepare a charter application, and choose not to submit the charter application in the 2026 application cycle. Out of an abundance of caution, and because the intervenors in this case have questioned Mr. Wishart's authority, the board ratified his decisions effective as of the date they were made. But the board also thought those ratifications were unnecessary, as Mr. Wishart had the authority and acted with the board's approval all along. The votes were unanimous.

13. From my time on the KCBOE board, I predicted correctly that KCBOE would not feel authorized to—and would not—approve Wilberforce's application to open a Christian charter school. But once Wilberforce wins the right to apply in court, Wilberforce intends to apply to open a Christian charter school at the earliest opportunity. If a court ordered adequate relief, Wilberforce would apply to open a Christian charter school before the next applicable deadline, including in the next application window that closes on February 1, 2027. That is always been Wilberforce's, the board's, and Mr. Wishart's sincere and earnest intent.

14. Exhibit 17 to Wilberforce's motion for summary judgment is a true and correct copy of the minutes of the Wilberforce board meeting on April 3, 2026. I have personal knowledge of them as president and board chair of Wilberforce Academy and an attendee of the meeting.

15. Exhibit 18 to Wilberforce's motion for summary judgment is a true and correct copy of the minutes of the Wilberforce board meeting on June 23, 2026. I have personal knowledge of them as president and board chair of Wilberforce Academy and an attendee of the meeting.

16. Exhibit 19 to Wilberforce's motion for summary judgment is a true and correct copy of the resolution adopted by the Wilberforce board at its June 23, 2026 meeting. I have personal knowledge of it as president and board chair of Wilberforce Academy and an attendee of the meeting where it was approved.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 1, 2026.

Doug Harris
Douglas Harris

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION (KNOXVILLE)**

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE, *Plaintiff*,<br>v.<br>KNOX COUNTY BOARD OF EDUCATION, et al., *Defendants*,<br>RICHARD COBLE, et al., *Intervenor-Defendants*,<br>ADRIENNE CARROLL, et al., *Intervenor-Defendants*. | Case No. 3:25-cv-584-CEA-DCP<br>District Judge Charles E. Atchley<br>Magistrate Judge Debra C. Poplin |

**DECLARATION OF DAVID COLQUITT**

I, David Colquitt, declare as follows:

1. This declaration is based on my personal knowledge and belief. I am over the age of 18, of sound mind, and otherwise competent to sign this declaration. If called to testify about these matters at trial, I would do so.

2. I serve on the board of directors of the Wilberforce Academy of Knoxville. I am also Wilberforce's treasurer.

3. I have an A.B. in politics from Princeton University and a J.D. from the University of Virginia. Following law school, I worked as a litigation associate for Bracewell & Giuliani LLP for one year.

4. My wife, Annie Haslam Colquitt, and I have been married for 14 years. We live in Knoxville, Tennessee and have three school-aged children.

5. Annie's father, Bill Haslam, is the former governor of Tennessee; and his father, Jim Haslam, is the founder of Pilot. Headquartered in Knoxville, Pilot was owned and operated for many years by our family. Headquartered in Knoxville, Pilot grew from a single gas station to one of the ten

largest privately held companies in the United States—making it the most profitable company to come out of Knoxville. My family and I remain deeply rooted in Knoxville and do what we can to serve and give back to our community.

6. I left the private practice of law in 2014 to join our family's business. I worked at Pilot Travel Centers, which operates a network of truck stops. I worked as a station manager, then a regional manager, then in the corporate office, including as chief of staff to the company president.

7. I now own and operate several hospitality projects with my wife, including RT Lodge in Maryville, Tennessee, and The Swag and Cataloochee Ranch in Western North Carolina.

8. I serve on the boards of several nonprofits in Knoxville:

a. I serve on the board of Emerald Academy, the only charter school currently operating in Knox County.

b. I serve on the board of the Webb School of Knoxville, a private K-12 school.

c. I serve on the board of Safe Families for Children East Tennessee, a Christian nonprofit dedicated to helping children who are on the edge of entering foster care and susceptible to abuse. The nonprofit provides volunteers who offer a short-term home for children in need to protect them from neglect and abuse and to give vulnerable families in crisis a lifeline without having to go to the foster care system.

d. I serve on the boards of the Knoxville Symphony Orchestra, the Friends of the Smokies, Wears Valley Ranch, and The Baker School of Public Policy at The University of Tennessee, Knoxville.

e. As a Christian, I am an active member of Cedar Springs Presbyterian Church, where I serve as an elder.

9. My wife and I established and operate the Colquitt Foundation, a charitable nonprofit. We are the foundation's sole funders, and we decide which causes the foundation supports.

10. The Colquitt Foundation focuses much of its charitable giving on Knoxville and the surrounding area. For example, after Hurricane Helene devastated the Smoky Mountain region in 2024, the Colquitt Foundation devoted over $2 million to recovery efforts. The Colquitt Foundation also recently pledged $3 million to the Webb School of Knoxville ($1 million of which is already paid) and $1 million to River & Rail, a theater in Knoxville ($300,000 of which is already paid).

11. My wife and I established The Colquitt Foundation with the belief that every person is made in the image of God and that our community is best served when there are vibrant Gospel-centered churches; strong, loving, and stable families; and opportunities for every child to receive a high-quality education. We believe that no single system, or school, is the best fit for every child. Every family, regardless of wealth or zip code, deserves to be able to choose from several high-quality options as to how to best educate their children. That is why my wife and I, both as individuals and through the Colquitt Foundation, have supported traditional public schools, traditional private schools (secular and religious), and charter schools.

12. For the same reasons, the Colquitt Foundation—and Annie and I personally—are excited to support Wilberforce Academy. We believe there is a strong need and a strong demand for a tuition-free Christian charter school in Knox County.

13. The Colquitt Foundation has pledged $2.2 million in support to Wilberforce Academy. That commitment is firm. Nothing would cause the foundation to withdraw from its commitment.

14. The Colquitt Foundation's $2.2. million pledge is designed to cover any gaps in Wilberforce's funding after its approval in its pre-opening year and its first two years of instruction. We reached the $2.2 million figure based on Wilberforce's projections of how large of a funding gap could reasonably be expected. As I noted in my commitment letter, that $2.2 million is not a ceiling: My wife and I look forward to donating additional funds to Wilberforce in the future, both through the

Foundation and personally. And as treasurer, I would draw on my connections in Knoxville to raise money for Wilberforce from other sources to help meet any needs that arise.

15. On top of the $2.2 million pledged, my wife and I personally donated $145,000 to Wilberforce to cover its initial costs, including the cost of engaging Arcadia Education, the consultant that helped Wilberforce prepare its draft charter application.

16. The Colquitt Foundation is financially healthy. The Foundation currently has over $38 million in assets. This marks a substantial increase from the initial $20-25 million Annie and I initially gave to it. The Foundation's money is invested well. Other than our commitment to Wilberforce, the Foundation currently has less than $3 million in outstanding commitments. And the Foundation has never withdrawn from or reduced a commitment after making it.

17. Zachary Wishart and I share a deep commitment to improving education in Knoxville, working together to recruit and support strong school-board members, to further school choice, and to advance Christian education. We have discussed the possibility of opening a charter school for years. In the fall of 2025, he first raised the prospect of opening a Christian charter school with me, and he invited me to serve on the board of Wilberforce Academy.

18. I agreed to serve on Wilberforce's board because I believe in Wilberforce's mission of opening a tuition-free Christian charter school in Knox County and because I trust Zachary Wishart's ability to open and run a successful school. His experience as a Christian school principal and his extensive background in education policy make him highly qualified to lead Wilberforce. The extensive efforts he has undertaken on behalf of Wilberforce—all without compensation—demonstrate his passion for making Wilberforce a reality and expanding access to Christian education.

19. I agreed to join and support Wilberforce because I believe in this school, its leadership, and the impact it will have for families and children in Knoxville. As a former lawyer, I understand that the school cannot safely open or operate unless it first wins this litigation on religious-liberty

grounds. And winning this litigation could advance religious liberty more broadly, if others choose to follow Wilberforce's example. But opening and operating Wilberforce is the immediate and overarching goal, one that I would support and pursue even if it had no effect other than letting this one nonprofit apply to open one charter school in Knoxville.

20. On November 24, 2025, the board of directors appointed Zachary Wishart executive director of Wilberforce. The board empowered him to take all appropriate steps necessary to open a charter school on behalf of Wilberforce, including filing a lawsuit so that Wilberforce can lawfully operate, hiring litigation counsel, preparing a letter of intent to submit a charter application to Knox County, preparing a charter application, submitting a charter application, and determining whether submitting a charter application would be futile in the current application cycle.

21. To my knowledge, no Wilberforce board member has ever expressed any disapproval of Mr. Wishart's actions as executive director or questioned his authority to take any of them.

22. On April 3, 2026, Wilberforce's board held a meeting, which I attended. At the meeting, the board voted to reaffirm its intent to open a religious charter school and to continue with this lawsuit.

23. On June 23, 2026, Wilberforce's board held a meeting, which I attended. At the meeting, the board approved a resolution reaffirming its view that Mr. Wishart, as executive director, had authority to bring this lawsuit, hire litigation counsel, submit a letter of intent, prepare a charter application, and choose not to submit the charter application in the 2026 application cycle. Out of an abundance of caution, and because the intervenors in this case have questioned Mr. Wishart's authority to act, the board ratified his decisions, effective retroactively to the date the decisions were made.

24. Wilberforce sincerely intends to apply to open a Christian charter school. If the current barriers to opening and operating a religious charter school in Tennessee are fully and finally

eliminated, Wilberforce will apply at the earliest opportunity, including the next application cycle that ends in February 2027.

25. Exhibit 34 to Wilberforce's motion for summary judgment is a true and correct copy of Emerald Academy's current charter agreement. It is a public record filed with Knox County as authorized by law, and I have personal knowledge of it as a member of Emerald's board.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 1, 2026.

David Colquitt

# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

Case No. 3:25-cv-584 (CEA)(DCP)

THE WILBERFORCE ACADEMY OF KNOXVILLE, )
Plaintiff, )
v. )
KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County School Board of Education, )
Defendants, )
REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. KATINA SHARP, )
Intervenor-Defendants, )

ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER, )
Intervenor-Defendants. )

VIDEOGRAPHED DEPOSITION OF ZACHARY WISHART

JUNE 4, 2026

Page 2

APPEARANCES:

FOR WILBERFORCE ACADEMY OF KNOXVILLE:

Cameron T. Norris
Ryan M. Proctor
CONSOVOY McCARTHY, PLLC
1600 Wilson Road, Suite 700
Arlington, Virginia 22209
(703)243-9423

FOR INTERVENOR-DEFENDANTS REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP:

Mitchell E. Feldman
Wanqian Zhang
MORRISON FOERSTER, LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
(617)648-4759

FOR DEFENDANTS KNOX COUNTY:

Jessica Jernigan-Johnson
DEPUTY LAW DIRECTOR
400 Main Street, Suite 612
Knoxville, Tennessee 37902
(865)215-2327

FOR INTERVENOR-DEFENDANTS ADRIENNE CARROLL, et al:

David D. Ayliffe
Thomas H. Jarvis
BAKER DONELSON, P.C.
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
(865)549-7132

Page 3

APPEARANCES CONTINUED:

Luke Anderson
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202)466-3234

Sophia Mire Hill
Southern Poverty Law Center
150 E. Ponce de Leon, Suite 340
Decatur, Georgia 30030
(504)457-1553

ALSO PRESENT:

David Jenkins, Videographer

Page 4

INDEX OF EXAMINATIONS


| | Page No. |
|---|---|
| By Mr. Feldman | 8 |
| By Mr. Ayliffe | 323 |
| By Ms. Jernigan-Johnson | 339 |
| By Mr. Norris | 346 |
| By Mr. Feldman | 366 |


INDEX OF EXHIBITS


| Exhibit | | Page No. |
|---|---|---|
| CID-1 | Notice of Deposition | 12 |
| CID-2 | Application Documents; WILB-ACAD-0280 - WILB-ACAD-0347 | 39 |
| CID-3 | Letter of Intent to Apply to Open a Tennessee Public Charter School (Exhibit B) | 64 |
| CID-4 | Emails regarding Wilberforce Academy Letter of Intent (Exhibit 2) | 83 |
| CID-5 | Supplemental Declaration of Zachary Wishart | 99 |
| CID-6 | Knox County Schools Organizational Chart | 108 |
| CID-7 | Resolution (Exhibit 3) | 115 |

INDEX OF EXHIBITS (continued)


| Exhibit | | Page No. |
|---|---|---|
| CID-8 | Letter of Intent to Apply to Open a Tennessee Public Charter School | 119 |
| CID-9 | 2/4/2026 Email from Knox County Schools; WILB-ACAD-0865 - 0866 | 123 |
| CID-10 | 1/3/2026 Email to Zachary Wishart from Parker Bartholomew; WILB-ACAD-0791 - 0794 | 164 |
| CID-11 | 4/7/2026 Email from Zachary Wishart; WILB-ACAD-0878 - 0880 | 174 |
| CID-12 | 1/29/2026 Email from Zachary Wishart to Cam Norris and Ryan Proctor regarding the proposed school budget; WILB-ACAD-0859 - 0861 | 183 |
| CID-13 | Application for a Charter School To Open 2027-2028 School Year; WILB-ACAD-0001 - 0279 | 185 |
| CID-14 | 1/7/2026 Email from Zachary Wishart to the Arcadia Team; WILB-ACAD-0795 - 0796 | 216 |
| CID-15 | Application for a Charter School To Open 2027-2028 School Year; WILB-ACAD-1955 - 2233 | 255 |
| CID-16 | January 2026 Emails; WILB-ACAD-0797 - 0815 | 278 |
| CID-17 | 6/21/2024 X.com Post | 309 |
| CID-18 | 10/25/2025 Twitter Post | 311 |
| CID-19 | Curriculum Vitae of Zachary Wishart; WILB-ACAD-0251 - 0253 | 322 |
| CID-20 | 1/1/2026 Declaration of Zachary Wishart | 322 |




S T I P U L A T I O N S

The videographed deposition of Zachary Wishart, herein, called at the instance of the Intervenor-Defendants, taken pursuant to all rules applicable to the Tennessee Rules of Civil Procedure, and taken by notice on the 4th day of June, 2026, beginning at approximately 8:34 a.m., at the law offices of Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., 265 Brookview Way, Suite 600, Knoxville, Tennessee, before LORA R. BOATMAN, Licensed Court Reporter, pursuant to stipulation of counsel.

It being agreed that LORA R. BOATMAN, Licensed Court Reporter, may report the deposition in machine shorthand, afterwards reducing the same to typewritten form.

All objections except as to the form of the questions are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, et cetera, excluding the reading of the completed deposition by the witness and the signature of the witness, are expressly waived.



VIDEOGRAPHER: We are on record. The time is 8:34 a.m. on June 24, 2026. This is the video deposition of Zach Wishart, both in his personal capacity and as corporate representative of Wilberforce Academy of Knoxville, taken by the defendants in the matter of Wilberforce Academy of Knoxville versus Knoxville County Board of Education, John Butler, et al., Case No. 325-CV-584, filed in the U.S. District Court Eastern District of Tennessee. The deposition is being held at 265 Brookview Centre Way, Knoxville, Tennessee.

Counsel will state their appearances and affiliations for the record, and the court reporter will swear in the witness.

MR. FELDMAN: Morning. Mitch Feldman for the intervenor-defendants. And with me today, I have my colleagues, Wanqian Zhang and Sophia Hill and Luke Anderson.

MS. JERNIGAN-JOHNSON: Jessica Jernigan-Johnson for the Knox County Board of Education.

MR. AYLIFFE: David Ayliffe for the Carroll intervenors.



MR. JARVIS: Tom Jarvis for the Carroll intervenors.

MR. PROCTOR: Ryan Proctor for the plaintiff.

MR. NORRIS: And Cam Norris for the plaintiff.

ZACHARY WISHART,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. FELDMAN:

Q. Morning, Mr. Wishart.
A. Good morning.
Q. Is Wishart -- am I pronouncing that right?
A. That's correct.
Q. All right. A moment ago you just heard my name is Mitch Feldman. I am counsel for the intervenor-defendants in this matter.
Could I just ask you to spell your name for the record, please?
A. Yeah. Zachary, Z-A-C-H-A-R-Y, Wishart, W-I-S-H-A-R-T.
Q. And do you understand that you're under oath today?
A. Yes.

Q. And that's the same oath that you would take in court, right?
A. Yes.
Q. And you understand that your testimony today could be used at a trial or proceeding in this matter, right?
A. Yes.
Q. Okay.
I want to talk a little bit about kind of the ground rules of deposition. I'm sure you and your counsel went over this a little bit. But I'm going to ask that you please listen to my questions carefully and answer them to the best of your ability. If you answer the question, I'm going to assume you understood it. You can always ask me to clarify it if you don't understand a question. Does that make sense?
A. Yes.
Q. Okay. Great.
And you see we have a videographer, but we also have a court reporter taking things down today. So what that means is that no uh-huhs or huh-uhs or head nods. That's not going to reflect in the transcript. So I ask that you state your answers in full words.



A. Okay.
Q. And I'll also ask that you wait until I finish my question. I'll try and speak slowly and clearly. And I will do the same for you when you're speaking. I'll try not to interrupt you. Does that make sense?
A. Yes.
Q. Is there any reason you can't testify truthfully today?
A. No.
Q. And do you understand that you have been noticed today in this deposition as a corporate representative for Wilberforce?
A. Yes.
Q. And do you understand that you have also been noticed in your personal capacity?
A. Yes.
Q. Okay. A moment ago, I spoke to your counsel, and the default is, when I'm asking questions, it's going to be in your capacity as a corporate representative for Wilberforce. Okay?
A. Okay.
Q. And if it's not, I'm going to make clear that it's not and I'm asking a question in your individual capacity. Okay?



A. Okay.
Q. Have you ever had your deposition taken?
A. No.
Q. Have you ever been involved in a lawsuit other than this one?
A. No.
Q. And what did you do to prepare for your deposition today?
A. I met with my attorneys.
Q. Okay. About how long?
A. About five hours over two days.
Q. And how many attorneys did you meet with?
A. Two.
Q. Two. Is that Mr. Norris and Mr. Proctor here?
A. Yes.
Q. And did you review any documents?
A. Yes.
Q. Which documents did you review?
MR. NORRIS: Objection. Work product.
Don't answer that question.
///



BY MR. FELDMAN:
Q. About how many documents did you review?
A. Well, my application was 287 pages. So the application as well as email correspondence. So I'm not sure how many more pages that was.
Q. And all those documents have been produced in this matter?
A. Yes.
Q. I'm going to show you a document right now.
MR. FELDMAN: We're going to mark the exhibits CID for Intervenor-Defendant Exhibit 1.
(Exhibit CID-1, Notice of Deposition, marked for identification.)
BY MR. FELDMAN:
Q. Take your time.
You can look up when you're ready.
A. Okay.
Q. Have you seen this document before?
A. Yes.
Q. And on page 7, there's a list of ten topics. Do you see that?

Page 13

A. Yes.
Q. Have you reviewed each of the topics identified in this 30(b)(6) notice?
A. Yes.
Q. Had you reviewed those topics before today?
A. Yes.
Q. Do you believe you're prepared to testify on behalf of Wilberforce for each of these topics?
A. Yes.
Q. Did you do anything specific to prepare for any of these topics specifically?
A. I'm not sure I completely understand your question.
Q. Outside of reviewing with your lawyers like we just talked about a moment ago, on your own time did you do anything to prepare to testify on these topics?
A. Yes.
Q. What did you do?
A. I just reviewed -- after looking at this, I looked at, you know, emails and communications that I've had with our board as well as reviewing our application.

Page 14

Q. Those emails, have you produced those in this litigation?
A. Yes.
Q. Do you recall specifically which emails you looked at?
A. Yes. I reviewed emails where I was asking for board members for their bios as well as correspondence with Knox County Schools.
Q. Okay.
And is there any topic on this list that you don't feel prepared to testify about today?
A. No.
Q. Okay. I want to talk a little bit about you. We'll go in your personal capacity for these questions. Would you tell me a little about your educational background?
A. Sure. I have a bachelor's degree from Liberty University. A master's degree in education administration from Bryan College, and an education specialist degree from Columbia International University.
Q. Do you have any licenses?
A. Yes. I have a certification from the Association of Christian Schools International as a school principal and a now expired school

Page 15

counselor certification from the same organization.
Q. Okay.
Any other types of certifications?
A. Not -- not active and current.
Q. Okay.
What were those certifications?
A. Were?
Q. Meaning a moment ago you just said not active and current. What were they?
A. Sure. I'm actually in the process of pursuing a special education certification for the state of Tennessee.
Q. And when do you expect that to be completed?
A. This summer.
Q. What does that entail?
A. So in my current role as principal at River's Edge Christian Academy, I also oversee our special-ed services. So for -- in order to kind of enhance my knowledge there and to better serve our students, I began to seek out special education certifications because it's a big part of my job now. So...
Q. Sorry, are you finished?
A. Yes, sir.

Page 16

Q. When did you start that certification?
A. I started the certification maybe in March or April is whenever I was accepted into the program. It's a self-paced program. So there's not a specific entry date. That's through the University of Tennessee, but, you know, I've considered doing it for a few years now. I was going to do it through Liberty University, and UT had a more affordable option.
Q. Did anybody ask you to start that certification?
A. No.
Q. And you said you're currently employed at River's Edge. What's your role there?
A. I'm the middle and high school principal there.
Q. And what does that entail?
A. It's a wide range of responsibilities including supervision of staff, selection of curriculum, providing professional development for our teachers, interfacing with our board of directors and community stakeholders, parent engagement, and I also oversee our special-ed programming sixth through twelfth grade.

Page 17

Q. Before we get into some of those, could you tell me what River's Edge is?
A. Yes. It is a K-to-12 Christian school.
Q. And when you say it's a Christian school, could you elaborate a bit more on what you mean by that?
A. It is a school that teaches the Christian faith as part of its core curriculum.
Q. It's a private school, right?
A. Yes.
Q. Okay.
And what specific doctrine does it teach of Christianity?
A. So the school has a statement of faith that we abide by, but it's nondenominational.
Q. It's a nondenominational statement of faith?
A. Yes.
Q. Does it teach the inerrancy and infallibility of the Bible?
A. Yes.
Q. Which Bible?
A. The school has not adopted a specific translation.

Page 18

Q. Not like the English Standard Version, something like that?
A. No.
Q. And a moment ago you said that -- we talked about it a bit, but you said that you oversee the school's special education program. Could you explain what that program is?
A. Yeah. So it's newer for us. We're excited about it. And we will be -- we have accommodation plans for students that come to us with IEPs, and we will -- our goal is to be able to serve as many students with as many different learning ability levels as possible. So part of that looks like intervention services in classrooms. And then also, pull-out tutoring services as needed.
Q. And does the school currently accept students with IEPs?
A. Yes. We have an admissions process, but yes.
Q. Okay.
And the school follows those IEPs currently?
A. Not exactly always, because the way that state law works with private schools, we don't -- we don't follow -- we develop our own

Page 19

internal plans.
Q. So it's a -- it's a process outside of state law, right?
A. It's in compliance with state law.
Q. Okay.
And how many students with disabilities attend River's Edge?
A. I would have to look at the number. I don't know for sure.
Q. More than ten?
A. Yes.
Q. More than 20?
A. It would be speculative. I'm not a hundred percent sure. I would guess, so in 20 something.
Q. Twenty something?
A. (Witness moves head up and down.)
Q. Okay.
You listed a number of items that you oversee at River's Edge; staff, curriculum. Do you -- as principal, do you have input on the policies and practices at River's Edge?
A. I can -- yes.
Q. Okay.
A. But not always. So our head of

Page 20

school owns the policies as well as our board of directors. So I can make recommendations but changing policies is not up to me.
Q. And who is the head of school?
A. Brian Beemer.
Q. But if you -- if you thought a policy or practice at the school was inappropriate, you would -- you would raise that with Mr. Beemer, right?
MR. NORRIS: Objection. Form.
THE WITNESS: Likely so, yes.
BY MR. FELDMAN:
Q. And what is your current salary at River's Edge?
A. My current salary for the '26-'27 school year base I believe is 75,193. It's a random number.
Q. 75,193.
Do you have any other sources of income?
A. No.
Q. Besides Wilberforce, have you ever been involved in opening a school?
A. Yes.
Q. What school?

Page 21

A. I was on the advisory board for Knoxville Preparatory School.
Q. Is that a religious school?
A. No.
Q. That's a charter school?
A. Yes.
Q. When did that school open?
A. Fall of '24, I believe. So August 2024.
Q. Okay.
Is it true that Knoxville Preparatory School is closing?
A. Yes.
Q. What was your specific role in opening that school?
A. I was on the local advisory board.
Q. What did that entail?
A. So I met with other community stakeholders on the advisory board, and we advised on community engagement and the launch of the school.
Q. Were you involved in any government licensing for the school?
A. No.
Q. Okay.

Page 22

Let's talk about your proposed role at Wilberforce. Wilberforce was created in November of 2025, right?
A. Correct.
Q. And you have been involved since its inception?
A. Yes.
Q. You have been involved since before its inception?
A. Yes.
Q. When did you start your involvement in Wilberforce?
A. Over the summer. Last summer.
Q. Do you have a month in mind?
A. In Wilberforce, late -- mid to late August.
Q. Okay. We can return to that in a second. But I want to get a sense of your role at Wilberforce. Your role is school director, right?
A. Yes.
Q. And you don't currently receive a salary from Wilberforce, right?
A. Correct.
Q. And your current role is the same as the planned role in the school, also school director

Page 23

if and when it may open.
MR. NORRIS: Objection. Form.
THE WITNESS: (Witness moves head up and down.)
BY MR. FELDMAN:
Q. And what's your anticipated salary?
A. There is a budget document in the application. I believe 115.
Q. And as school director, you would be responsible for the day-to-day operations of the school?
A. Correct.
Q. Direct interactions with students, right?
A. Yes.
Q. You would be responsible for ensuring that the school is compliant with the applicable laws and regulations, right?
A. Correct.
Q. You don't report to anyone except for the board, right?
A. At Wilberforce?
Q. Correct.
A. Correct.
Q. And all director and dean-level

Page 24

positions report to you, right?
A. Correct.
Q. How many people would report to you?
A. So charter schools have a staffing model where they scale up, and so year one to five looks different. I don't recall what year one is, but probably around a dozen or so plus, year one.
Q. You can propose curriculum?
A. Yes.
Q. You can reject curriculum?
A. Yes.
Q. There are really no operational decisions that don't end with you, right?
MR. NORRIS: Objection. Vague as to scope of operational decisions.
THE WITNESS: Some things are already set in state law, but for the most part, yes.
BY MR. FELDMAN:
Q. When you say "state law," you mean the government has some say over operational decisions, right?
A. Yes. Just like they do in private schools.
Q. Any other responsibilities as school

Page 25

director?

A. Likely so. School director and principal wear quite a few different hats.

Q. You have authority over Wilberforce's bank accounts?

A. As the primary signer, yes, but those things are governed by the board of directors as well.

Q. You were the primary point of contact between Wilberforce and the Knox County School Board during the letter of intent process, right?

MR. NORRIS: Make an objection that Wilberforce is a little vague as to whether it refers to the nonprofit or the school.

BY MR. FELDMAN:

Q. Okay.

You were the primary point of contact between Wilberforce, the sponsor, and the Knox County Board during the letter of intent process?

A. Yes.

Q. And does that answer change depending on whether I'm talking about the school or the nonprofit?

Page 26

A. No.

Q. Okay.

Were there any communications sent to the Knox County Schools without your review or approval?

A. No.

Q. Any documents produced in this litigation that you haven't had the opportunity to review?

A. No.

Q. Do any of the background questions that I just asked change depending whether I ask those in your capacity as Wilberforce's corporate representative?

MR. NORRIS: Objection. Calls for a legal conclusion.

THE WITNESS: I'm not sure.

BY MR. FELDMAN:

Q. You're not sure whether those would change?

A. I don't know that I understand the question.

Q. Okay.

Had I asked you those questions in your capacity sitting here today as Wilberforce's

Page 27

corporate representative, would your answers have changed?

A. No.

Q. Now we're going to go back to I'm asking you questions in your corporate representative capacity, and I'll specify otherwise. Okay?

A. Okay.

Q. Tell me about Wilberforce. What is it?

A. A Christian -- proposed Christian charter school.

Q. And are there multiple entities that comprise of Wilberforce?

A. Well, right now, the charter school hasn't been approved. So we're just a Christian nonprofit, but then we will become a school. So other than that, no.

Q. So right now there's only one entity, and that's the Christian nonprofit, right?

A. Correct.

Q. Was Wilberforce your idea?

A. Yes.

Q. When did you first come up with the idea that became Wilberforce?

Page 28

A. Yeah, that's a great question. I have explored expanding access to Christian education for quite a while. So going back a couple of years. I have been -- I've just had this burden to be able to start a new Christian school.

Q. And when you say "a couple of years," we're talking like 2024?

A. I would actually say it predates that.

Q. Predates that. Twenty -- can you give me a general time frame you came up with this?

MR. NORRIS: Objection. Vague as to "this."

BY MR. FELDMAN:

Q. When you came up with Wilberforce.

A. I think there's a different -- my desire to expand access to Christian education has predated the specific desire for the entity Wilberforce.

Q. Okay.

And when did you have the idea to specifically create Wilberforce?

A. Specifically Wilberforce, July, August 2025.

Q. In July of 2025, did you have any

conversations with anyone about Wilberforce?

MR. NORRIS: Objection to the extent that calls for you to reveal confidential communications with attorneys. I would instruct you not to answer. But to the extent it does not, go ahead and answer.

THE WITNESS: My fiancée at the time and I had talked a lot about what it would look like to start a school one day.

BY MR. FELDMAN:

Q. Anyone else?

MR. NORRIS: Same objection, instruction.

THE WITNESS: I think some people know that I've had a long-term desire about it. July, August. I had a conversation with a friend of mine, David, about it as one of my more specific conversations about the concept of Wilberforce.

BY MR. FELDMAN:

Q. Who is David?

A. David Colquitt is a close friend of mine.

Q. How do you know David Colquitt?

A. We have been friends for probably



four or five years.

Q. Where did you first meet?

A. I actually don't recall.

Q. Okay.

In that first conversation with David Colquitt in -- in July of 2025, do you remember specifically what you talked about?

A. I don't. I, a couple of years ago, had asked David to -- well, no.

Q. Do you generally remember what you talked about?

A. I would say it surrounded expanding Christian education.

Q. And between July and November of 2025, did you have conversations with anyone else about Wilberforce?

MR. NORRIS: To the extent you're going to reveal the substance of conversations that are confidential with your attorneys, I would instruct you to limit your answer to yes or no. To the extent you're not talking about confidential communications with attorneys, you can answer.

BY MR. FELDMAN:

Q. I'm just going to be -- excuse me.



I'm just going to be clear. I'm not asking for privileged information. So any of my questions that are asked about your conversations, I'm not asking for that.

MR. NORRIS: Thank you.

THE WITNESS: Yes.

BY MR. FELDMAN:

Q. And who did you talk with?

A. Individuals that I felt like would be great board members to help get the school on strong footing.

Q. Did you send emails about that?

MR. NORRIS: Objection. Vague as to "that."

BY MR. FELDMAN:

Q. Did you send emails when you're talking to individuals that you felt like would be good board members?

A. I don't believe so, no.

Q. Text messages?

A. No.

Q. You didn't send a single email between July and November of 2025 about Wilberforce?

MR. NORRIS: Objection. Vague as to "you," and also mischaracterizes prior



testimony.

THE WITNESS: I have very regular contact on the phone calls with our board members. And two of those board members are parents at the school that I currently work at that are very involved, so all of those conversations were either on the phone or in person.

BY MR. FELDMAN:

Q. Did you review your email in-box to confirm whether or not you had emails with these individuals?

A. Yes.

Q. Okay.

And could you tell me who exactly was involved in those initial discussions?

A. Initial discussions about formation of the school?

Q. Correct.

A. So Wilberforce was my idea, and then I sought out those board members, and then we -- then we talked about it from there.

Q. And could you name those individuals you talked to?

A. Yes. Parker Bartholomew, Doug

Page 33

Harris, Laura Beaman, and David Colquitt.
Q. You also retained attorneys, right?
A. Yes.
Q. You retained Long, Ragsdale & Waters, PC, correct?
A. Yes.
Q. When did you retain that firm?
A. Shortly after the decision was made to start the school.
Q. July of 2025?
A. No. Probably September.
Q. September.
And you also engaged Consovoy McCarthy, PLLC.
A. Yes.
Q. When did you engage that firm?
A. I don't recall the specific day.
Q. Was it before September of 2025?
A. It might have been in August.
Q. August of 2025?
A. I would have to look back. I'm not sure.
Q. And is that the attorneys sitting here today with you?
A. Yes.

Page 34

Q. Anyone else at Consovoy McCarthy?
A. No.
Q. From the outset, was the plan to create a charter school?
MR. NORRIS: Objection. Form.
THE WITNESS: Yes.
BY MR. FELDMAN:
Q. Did Wilberforce ever consider creating a private school instead?
A. Wilberforce did not, no.
Q. Did you consider creating a private school instead?
A. A couple of years ago, I did consider that.
Q. Why did you change your mind?
A. My desire is that high quality education be most accessible to all families regardless of income, and charter schools provide that opportunity.
Q. And we haven't done this yet, but in your own words, can you tell me what Wilberforce is?
A. A kindergarten-to-eighth-grade Christian charter school.
Q. Particular denomination of Christianity?

Page 35

A. No.
Q. Will it teach a particular version of the Bible?
MR. NORRIS: Objection. Vague.
THE WITNESS: No.
BY MR. FELDMAN:
Q. Will Wilberforce ever serve any other grades besides K through eight?
A. Possibly, yes.
Q. What do you mean by possibly?
A. If -- if by success of the school and demand is there and the families of the school want to see a high school, then I think that's a -- I don't think we would preclude that from ever being on the table.
Q. Does Wilberforce have a current goal to expand it to high school?
A. No.
Q. Let's talk a little bit about the incorporation and formation of Wilberforce. A moment ago we talked about November of 2025. But Wilberforce was incorporated on November 21, 2025, right?
A. That sounds correct.
Q. You were involved in that

Page 36

incorporation process, right?
A. Yes.
Q. What was your involvement?
A. Initial research into the requirements as well as consultation with Will Edwards.
Q. And who is Will Edwards?
A. Our incorporating attorney.
Q. Okay.
Is he at one of the firms I just mentioned?
A. Long, Ragsdale & Waters.
Q. Is that the only attorney you consulted with for the incorporation?
A. Yes.
Q. You reviewed the formation materials before they were filed with the secretary of state, right?
A. Yes.
Q. The charter of incorporation, right?
A. Yes.
Q. Bylaws?
A. Yes.
Q. Anything else?
A. I don't recall.

Page 61

of our friendship.
Q. What did you understand that to mean, that he would recuse himself?
A. That when the charter school comes to a vote, that he won't be able to vote.
Q. Would he be able to advocate during board sessions for Wilberforce?
MR. NORRIS: Objection, form. Objection, calls for speculation.
THE WITNESS: A board member can say whatever they would like to say, but...
BY MR. FELDMAN:
Q. So he could advocate?
MR. NORRIS: The same objections.
THE WITNESS: Sure.
BY MR. FELDMAN:
Q. And you also asked Mr. Triplett to design a logo for the school, right?
A. Yes.
His company, High Resolutions, services River's Edge Christian Academy, and so there was an established contact there, and they have designers in-house.
Q. Did you pay High Resolutions to design that logo?

Page 62

A. Yes.
Q. Rather, did Wilberforce pay High Resolutions to design that logo?
A. I actually paid for that personally.
Q. How much did you pay to design that logo?
A. I don't recall the exact number, but over $1,000 because they gave multiple versions.
Q. Over $5,000?
A. No.
Q. Somewhere between one and two thousand dollars?
A. I believe so.
Q. You also said Betsy Henderson. What did you communicate about Wilberforce to Betsy Henderson?
MR. NORRIS: Objection. It's become vague whether "you" is talking about Wilberforce now or him personally.
BY MR. FELDMAN:
Q. What did Wilberforce communicate with Betsy Henderson?
A. That their -- that Wilberforce was submitting a letter of intent.
Q. Anything else?

Page 63

A. I don't recall specifics.
Q. Do you recall anything more general than just we are submitting a letter of intent?
A. Probably the context of being a Christian charter school.
Q. And did Mr. -- excuse me. Did Ms. Henderson also recuse herself?
A. She did.
Q. Okay.
And the same with Mr. Triplett. You understand that she can still advocate for Wilberforce during board sessions, correct?
MR. NORRIS: Same objection as to that similar question about Mr. Triplett.
THE WITNESS: Yes.
BY MR. FELDMAN:
Q. What was her reaction to Wilberforce?
A. Positive.
Q. Do you remember anything specific she said?
A. No.
Q. And you serve as Ms. Henderson's campaign manager, correct?
A. Yes.

Page 64

Q. Have you financially contributed to her campaign at all?
A. Yes.
Q. How much?
A. Probably over $1,000.
Q. Between 1,000 and 2,000?
A. The contribution cap is $1,900, so less than that.
Q. Okay.
Turning back to the submission of the letter of intent. I'd like to show you a document.
MR. FELDMAN: Wan, can you pull Tab 13, please? Actually before that, Tab 11.
MR. NORRIS: Mitchell, do you want to aim to go for about ten, take a break in ten?
MR. FELDMAN: Sounds good.
(Exhibit CID-3, Letter of Intent to Apply to Open a Tennessee Public Charter School (Exhibit B), marked for identification.)
BY MR. FELDMAN:
Q. If you need to take -- we can take a break. I just ask that it's not in the middle of a

Page 93

conversation.

Q. And was there any discussion about whether to continue pursuing litigation instead of the application process during those conversations with the board of directors?

A. Can you repeat the question?

Q. When you had your conversation with the board of directors, you told them that the Knox County Schools were allowing you to proceed with your application, right?

MR. NORRIS: Objection. That's not the testimony.

THE WITNESS: Yeah, I didn't say that we were able to proceed.

BY MR. FELDMAN:

Q. You didn't tell the board of directors at Wilberforce that Wilberforce was able to proceed with its application. Is that your testimony?

A. No.

Q. Why not?

A. No, as in I didn't tell them that -- I told them that we were notified that -- I don't recall the exact conversation, that our letter of intent was considered incomplete because we didn't

Page 94

check all of the boxes. To -- I don't know -- I don't recall on the contents of this second email what else I shared.

Q. My question is why didn't you tell the board of directors that Wilberforce was allowed to proceed with its application?

MR. NORRIS: Objection to form.

THE WITNESS: I'm not sure.

BY MR. FELDMAN:

Q. That would have been a material piece of information in considering whether to pursue litigation, right?

MR. NORRIS: Object to form. Objection to vague as to what "that" means.

THE WITNESS: I don't think so, no.

BY MR. FELDMAN:

Q. One of Wilberforce's arguments in this litigation has been that any application would have been futile. Right?

A. Yes.

Q. And you don't think it would have been important to Wilberforce's decision to pursue litigation on that theory that the Knox County Schools was allowing Wilberforce to proceed on its letter of intent?

Page 95

MR. NORRIS: Object to form. Also objection, foundation, to where we're talking about in terms that the application could proceed.

MR. FELDMAN: I appreciate the objection, Cam, but if you could limit your speaking objections.

MR. NORRIS: I tried to. I'm sorry, that was inefficient. Objection, foundation.

THE WITNESS: The board would have still had to have denied Ms. Nixon and her testimony or her presentation later on in a charter school workshop that I attended, she said explicitly that charter schools cannot be religious. And, you know, I knew that that was the factor going -- you know, wanting -- having the desire to open the school to begin with, later affirmed by Ms. Nixon's presentation.

BY MR. FELDMAN:

Q. We'll get that -- we'll get to that in a moment. And I'll ask you now, do you remember when that presentation was?

A. Before the application deadline.

Q. But it was after you received this

Page 96

email, right?

A. Yes.

Q. So you hadn't heard Ms. Nixon's presentation yet, right?

A. Correct.

Q. And you don't think that this was a material piece of information for the board to know when considering to pursue its lawsuit against the board of education?

MR. NORRIS: Object to form.

THE WITNESS: I informed the board individually, just not in a board meeting setting, nor did they have the copy of the letter, but they were notified about it.

BY MR. FELDMAN:

Q. Oh, so now you're -- I'm just trying to get it straight. Are you changing your testimony? You didn't inform the board that the Knox County Schools was allowing Wilberforce to proceed with its application process?

MR. NORRIS: Objection. That mischaracterizes his testimony.

THE WITNESS: I don't recall the specifics of the conversations, but we knew that we couldn't actually apply and be

Page 97

approved despite what Knox County's response was.

BY MR. FELDMAN:

Q. And but before this, the only specific statement you had received is -- excuse me. Let me rephrase that.

Before this, you had only received two statements about whether your application would be approved, right?

MR. NORRIS: Objection. Vague as to "statements."

THE WITNESS: Probably, yes.

BY MR. FELDMAN:

Q. And those statements are the one email about the check box left unchecked, right?

MR. NORRIS: Same objection.

THE WITNESS: Yes.

BY MR. FELDMAN:

Q. And the other statement is the one passing comment from Steve Triplett, right?

MR. NORRIS: Same objection. Also objection, mischaracterizes his testimony.

THE WITNESS: Yes.

BY MR. FELDMAN:

Q. I can't remember if I asked this.

Page 98

Did you share this email correspondence with anyone else?

A. No. I don't believe so.

Q. In conversation?

A. Yes, probably in conversation.

Q. Who else?

A. I don't recall who, but I likely shared it with others.

Q. Can you think of anyone specific you're talking about?

A. Probably my fiancée at the time.

Q. That's it?

A. I wouldn't swear that was it. I mean, I don't recall.

Q. Can you think of anyone else?

A. I'm not sure.

Q. Anyone at River's Edge?

A. Potentially.

Q. And who would you have shared that with at River's Edge?

A. I'm not sure. I mean, I have a lot of close colleagues.

MR. FELDMAN: Wan, can you pass Tab 14, please?

This is CID Exhibit 5.

Page 99

(Exhibit CID-5, Supplemental Declaration of Zachary Wishart, marked for identification.)

BY MR. FELDMAN:

Q. Take your time to review. You can let me know when you're ready.

(Witness reviewing document.)

BY MR. FELDMAN:

Q. What is this document?

A. This is a declaration from me.

Q. How do you know that?

A. It says "supplemental declaration."

Q. And then on the last page here, "I declare under the penalty of perjury the foregoing is true and correct." There's an electronic signature. Do you see that?

A. Yes.

Q. Is that your signature?

A. Yes.

Q. You agree that this is your declaration by pains and penalty of perjury --

A. It's an electronic signature, but yes.

Q. And if I could direct your attention to paragraph 5, please.

Page 100

You say, "Although Wilberforce is ready and able to open in the 2027-2028 school year, it will not do so because applying would be futile."

Right?

A. Yes.

MR. NORRIS: Object to form.

BY MR. FELDMAN:

Q. You go on to say later in that paragraph on the next page that, quote, "The Knox County Board of Education has repeatedly communicated that it will not approve a religious charter school."

Do you see that?

A. What number?

Q. We're still in paragraph 5. It's the last sentence.

A. Yes.

Q. Do you see that?

A. Yes.

Q. And then in paragraphs 6, 7, and 8, you give a list of those communications from the Knox County Board of Education, right?

A. Yes.

Q. Let's talk about paragraph 6. And you say that on January 16, 2026, you attended a

Page 101

charter application technical assistance workshop. Work ship. I assume that's workshop. For sponsors applying to open in the 2027-'28 workshop. During that workshop, Teresa Nixon, the representative of Knox County Schools reiterated that charter schools cannot be religious.

Did I read that correctly?

A. Yes.

Q. Let's talk about that workshop. What -- what was the format of that workshop?

A. It was virtual.

Q. It was virtual?

A. Uh-huh.

Q. Over Zoom?

A. I don't know if it was definitely Zoom. But over a format like that.

Q. Do you know if that workshop was recorded?

A. It was.

Q. It was recorded. Okay.

Do you know who has that recording?

A. I would imagine the district.

Q. Okay. Did you take notes during that workshop?

A. No.

Page 102

Q. Any handwritten notes?

A. No.

Q. Did you tell anyone about that workshop?

A. Yes. At least a couple of board members knew that I was attending.

Q. How did you tell those board members?

A. Probably by phone.

Q. Did you send them a recap of the workshop at all?

A. No.

Q. No.

And did anyone else attend that workshop?

A. Not on behalf of Wilberforce.

Q. Anyone else besides Wilberforce?

A. No.

Q. No.

So like on the whatever virtual screen you saw, could you see other names of attendees?

A. I was the only one that attended outside of Ms. Nixon and someone in her office. I don't recall her name.

Page 103

Q. Okay.

How did you hear about the workshop?

A. I believe it was in the technical -- the invitation to the -- I don't recall. Maybe it was under additional information, and there was a -- I signed up for it somehow to indicate I would be participating.

Q. Why did you attend the workshop?

A. Because I thought it would be beneficial.

Q. Beneficial in what way?

A. Beneficial to see, you know, any further context for charter operations.

Q. At this point, did you intend to submit a charter application on February 26, 2026?

A. I believe there was some conversation still around it of potential of submitting it, whether that be -- yes, there was conversations around it.

Q. So you still potentially intended on submitting a charter application, right?

MR. NORRIS: Objection. Vague as to "potentially intended."

THE WITNESS: The concern was that if we submit the application and the board is

Page 104

forced to turn it down, then it could do us harm with potential families in the future. And so there were just some conversations around that.

BY MR. FELDMAN:

Q. What potential harm?

A. Well, if the news reports that a charter school had been rejected, then families may think, oh, well, I don't want to enroll in that school. What was wrong with it in order for it to be rejected?

Q. Had you talked to any families about that?

A. Not in any specific families, no.

Q. So this is just your thinking was that it could be harmful?

A. Yeah.

Q. Okay.

Besides Ms. Nixon, did anyone else present at the January 16 technical assistance workshop?

A. Her name was Becky. I forgot her last name. But she was there, very kind. I don't recall -- she was there as support, but I don't know that she presented any material. It was mostly

Ms. Nixon.

Q. What did Becky talk about?

A. I don't recall outside of just, "Hi, my name is Becky." I don't know that she said much.

Q. Sure.
And about how long was the workshop?

A. Under an hour.

Q. Did you receive a handout for the workshop or anything like that?

A. She had slides that she went through.

Q. Did you, like, print out a copy of those slides or anything?

A. No. At that point in time, I almost had my application completely finished and a lot of my own research. There wasn't any new material that I wasn't aware of. So...

Q. You said that we talked about Ms. Nixon reiterated that charter schools cannot be religious. What did she say about that?

A. If I recall correctly, there was a slide in which I believe it referenced, you know, T.C.A. some number about the non -- that schools cannot be religious.

Q. Did it -- it just like quoted the



statute; is that right?

A. Yes, but she also verbally mentioned it as well.

Q. What did she say? Did she just read the statute?

A. I don't recall with certainty, but that sounds right.

Q. So you think that she just read the statute. Do you remember anything else that she said during that workshop?

A. Yeah. Just general, you know, that she's the charter school contact, the charter school liaison, and just basic charter material.

Q. Okay.
Did she explain -- and you just said she's like the charter school contact. Did she explain what that meant in terms of the Knox County school education system, where she fits in?

A. Just that she is the liaison of the authorizer, so -- and that kind of her role is in supporting charter schools and what they need from the district.

Q. When you say the "authorizer," do you mean the Knox County Board of Education?

A. Yes.



Q. Okay.
So you understand that the Knox County Board of Education is the entity that would approve or deny a charter application?

A. Yes.

Q. Not Ms. Nixon, right?

A. Yes.

Q. So from her words, you understand that she was the liaison, but that wasn't a statement that she was part of the Knox County Board of Education, right?

MR. NORRIS: Objection. Form.

THE WITNESS: She's an employee and representative of the district.

BY MR. FELDMAN:

Q. But not the Knox County Board of Education?

A. A board of education supervises the superintendent, which in return supervises the staff.

Q. So you think that Ms. Nixon is below the superintendent?

A. Yes.

Q. That Ms. Nixon reports in any way to the Knox County Board of Education?



A. Not in her individual capacity.

Q. I'm sorry, what do you mean by that?

A. Well, the board supervises the superintendent, and the superintendent has the employees. So while she does not report to the board, she executes policy of the board in her role.

Q. Okay.
So it's your testimony that Ms. Nixon reports to the superintendent, right?

A. There are likely layers between her and the superintendent, but...

MR. FELDMAN: Wan, can you please pass out Tab 15?

(Exhibit CID-6, Knox County Schools Organizational Chart, marked for identification.)

BY MR. FELDMAN:

Q. Let me know when you're ready.
What is this document, Mr. Wishart?

A. The organizational chart of Knox County Schools.

Q. How do you know that?

A. It says that at the top.

Q. I'll represent to you that this is the district's organization chart pulled from

Page 129

Q. No.
The Knox County Board of Education?
A. Yeah, at times.
Q. Okay. And I'm asking you to think really hard whether you had a specific conversation with Steve Triplett about the decision not to submit a charter application.
A. I can't say with certainty. I know that we had conversations that -- about my concern with submitting it, and the board having to turn it down based on its religious status and affecting the long-term prospects of the school then. But I don't know that I told him conclusively that we were not submitting the application.
Q. So you're not sure either way?
A. Correct.
Q. You're not aware of any religious public charter application in Tennessee that has been denied solely because it is a religious organization, right?
MR. NORRIS: Objection. Form.
THE WITNESS: Well, the opportunity to apply has just not been there.
BY MR. FELDMAN:
Q. Well, a moment ago we just looked at

Page 130

one, right? So you're aware of at least one that has been approved, right?
A. But I was not aware that that was even going through the application process at the same time we were.
Q. But you are aware now, right?
A. Yes.
Q. Okay.
And so now that you're aware that an application has been approved, is Wilberforce asking a court to assume what the Knox County Board of Education would have done with Wilberforce's application?
MR. NORRIS: Objection, vague. Objection, argumentative.
THE WITNESS: No.
BY MR. FELDMAN:
Q. You're not.
Is it not Wilberforce's legal position in this matter that the Knox County Board of Education would have denied Wilberforce's application?
MR. NORRIS: Objection, form. Objection, calls for a legal conclusion.
THE WITNESS: The -- can you repeat

Page 131

your question? Sorry.
BY MR. FELDMAN:
Q. It's Wilberforce's legal position in this matter that the Knox County Board of Education would have denied its application solely because it's religious, right?
MR. NORRIS: Same objections.
THE WITNESS: Yes.
BY MR. FELDMAN:
Q. Has that position changed now that you know that at least one Tennessee application has been approved for a religious public charter school in Tennessee?
A. No.
Q. When did Wilberforce first decide to file this lawsuit?
A. Perhaps late August, early September.
Q. Of 2025?
A. No, I'm sorry. That's incorrect. That's when the -- that's incorrect.
That would have been in I believe November. Late October or early November.
Q. When did you first start having conversations about whether to file this lawsuit?

Page 132

MR. NORRIS: Objection as to privilege.
You can reveal dates, but not the substance of the communications.
THE WITNESS: Can you repeat the question?
BY MR. FELDMAN:
Q. When did you first start having conversations about whether to file this lawsuit?
MR. NORRIS: Same instruction.
THE WITNESS: Probably late August.
BY MR. FELDMAN:
Q. Late August of 2025?
A. Yes.
Q. Okay.
And then you engaged Consovoy McCarthy I believe you said in September of 2025, correct?
MR. NORRIS: Objection. Mischaracterizes his testimony.
THE WITNESS: Sorry, say that again.
BY MR. FELDMAN:
Q. You engaged Consovoy McCarthy in September of 2025, correct?
A. Yes.

Page 141

Q. Okay. He's a charter application consultant, right?
A. Yes.
Q. And that's who you primarily communicated with at Breakthrough is Mr. Denson, right?
A. Yes.
Q. Do you recall Mr. Denson sending you an application framework?
A. Yes.
Q. Okay. And that application framework advised Wilberforce about designing a legally compliant public charter school application, right?
A. Yes.
Q. And the application framework advised Wilberforce that it needed to uphold full compliance with federal and state constitutional law, right?
A. Yes.
Q. And Breakthrough Education Consulting advised Wilberforce that a religious public charter school is not consistent with Supreme Court precedent, right?
MR. NORRIS: Objection. Foundation.

Page 142

THE WITNESS: Yes.
BY MR. FELDMAN:
Q. Because it violated the establishment clause, right?
A. I don't recall what reference he made specifically as to why.
Q. Okay.
Regardless, Breakthrough Education Consulting Group advised you that a religious public charter school is unconstitutional, right?
A. Yes.
Q. You decided not to use Breakthrough Education Consulting Group?
A. Yes. Correct.
Q. And you wanted to proceed with drafting the charter application anyways, right?
A. Yes.
Q. Because Wilberforce's view is that religious public schools are constitutional under the free exercise clause, right?
MR. NORRIS: Objection. Calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. FELDMAN:
Q. So you engaged Arcadia Education,

Page 143

right?
A. Yes.
Q. After deciding not to proceed with Breakthrough, right?
A. Yes.
Q. And Arcadia Education is a charter school consulting firm, right?
A. Yes.
Q. And who specifically at Arcadia Education helped with Wilberforce's draft public charter school application?
A. There were a couple of people or a few people on that team.
Q. Was it David Denton?
A. Yes.
Q. Joy Lambrecht?
A. Yes.
Q. Amy Frank?
A. Yes.
Q. Do you recall any others?
A. Yes. There was a Mary Katherine or -- Mary Katherine, I believe.
Q. How about Ben Lindquist?
A. Yes. Ben wasn't -- yes.
Q. Anyone else?

Page 144

A. I think that was it.
Q. Was there anyone besides Arcadia Education that helped Wilberforce draft its charter application?
A. I -- can you repeat the question?
Q. Was there anyone else besides Arcadia Consulting who helped Wilberforce draft its charter application?
A. No.
Q. And how did you find out about Arcadia Education?
A. I found out about Arcadia a while back, through the Spreading Hope Network, which is a Christian school organization.
Q. What's your affiliation with the Spreading Hope Network?
A. I don't have a direct affiliation.
Q. Where did you find the Spreading Hope Network?
A. I came across them in probably pre-COVID as I began to, you know, research and wonder what it might be like to expand access to education in Knoxville.
Q. And who -- was there anyone specifically at Spreading Hope Network that

connected you with Arcadia Education?
A. No one connected me with them. I reached out and introduced myself.
Q. Okay. How did you reach out?
A. Via email.
Q. And Arcadia Education has never drafted an application for a religious public charter school, right?
MR. NORRIS: Objection, foundation. Objection, calls for speculation.
THE WITNESS: As far as I know, right.
BY MR. FELDMAN:
Q. And when you first reached out to Arcadia Education, did you share any other draft charter applications?
A. I believe maybe. I don't know if I shared the applications or if that -- but I do recall referencing specific schools that had been approved in the state. I may have -- I may have shared those applications or I may have told them where they could see those applications. I don't recall which one.
Q. None of those applications were religious public charter schools, correct?



A. Correct.
Q. Did you look for any religious public charter school applications?
A. No.
Q. Did you sign an engagement letter with Arcadia Education?
A. Yes.
Q. Have you produced that engagement letter in this litigation?
MR. NORRIS: Objection. He's not the lawyer.
THE STENOGRAPHER: I'm sorry?
MR. NORRIS: He's not the lawyer.
THE WITNESS: I would imagine so, yes.
BY MR. FELDMAN:
Q. But you provided that to your counsel, right?
MR. NORRIS: Same objection.
THE WITNESS: Yes. Well, I -- I believe so.
BY MR. FELDMAN:
Q. Wilberforce formally engaged Arcadia to draft its charter application on December 3, 2025, right?



A. That sounds right.
Q. And Mr. Colquitt paid Arcadia $140,000 to do that work, right?
MR. NORRIS: Objection. Foundation.
THE WITNESS: Yes.
BY MR. FELDMAN:
Q. How did you make an assessment on whether $140,000 was reasonable to complete a draft charter application?
A. I -- at that point, I called the former CEO of Prep Public Schools and asked him if that was a reasonable ballpark price.
Q. What is that individual's name?
A. Brad Scott.
Q. How do you know Mr. Scott?
A. At the time he was -- not at the time of the application, but I met him whenever he was the CEO of Prep Public Schools and I was on the advisory board.
Q. Where did you meet -- rather, where did you have this conversation with Mr. Scott?
A. I called him.
Q. Oh, you called him. Excuse me.
About how long was that conversation?



A. I don't recall it being long. So probably less than ten minutes.
Q. Did Mr. Scott provide any other guidance on charter application drafting?
A. No. I believe he offered, you know, support and help, but I just didn't engage with it.
Q. Did you exchange any emails with Mr. Scott?
A. No, not about Wilberforce.
Q. Did you have any other conversations with Mr. Scott about Wilberforce besides the ballpark figure for a consulting group?
A. Not that I recall.
Q. You engaged Arcadia on December 3rd, and that was after you had already submitted the letter of intent, right?
A. Yes.
Q. After you had already filed your lawsuit, right?
A. Yes.
Q. And Mr. Colquitt paid the $140,000 Arcadia invoices personally, right?
MR. NORRIS: Objection. Vague as to "personally."
THE WITNESS: I don't recall if it

was personally or if he gave money to Wilberforce, and then from there I -- I don't recall.
BY MR. FELDMAN:
Q. "Or if he gave money to Wilberforce," meaning he added money to the Wilberforce bank account?
A. Yes. I don't recall. He's the treasurer of the organization, so I don't recall if he -- if the transaction came from his personal account or if it came from a donation he made to the Wilberforce account.
Q. Okay. Would you have known if Wilberforce's bank account was drained by $140,000?
A. Well, there is not money in the Wilberforce account with the exception of the expenses that were concurred through the application.
Q. Okay. Mr. Colquitt has a foundation, right?
A. Yes.
Q. And Mr. Colquitt's foundation has committed $2.2 million to Wilberforce, right?
A. Yes.
Q. Is the $140,000 subtracted from that



$2.2 million?
A. No.
Q. It's not.
A. (Witness moves head side to side.)
Q. Is there a document saying that?
A. No.
Q. An email saying that?
A. No.
Q. Any kind of agreement?
MR. NORRIS: Objection. Vague as to "agreement."
THE WITNESS: So the $2.2 million commitment was based on -- it's up to 2.2 million. So it's not a blank check for 2.2 million. And it is for the deficits that we may incur in the early years of charter operation, which is very -- almost a universal practice among charter schools to have gap funding in the early years, to keep things up until the school's at capacity.
BY MR. FELDMAN:
Q. But this is an early years expense, right?
A. This is a pre-operating expense.
Q. Right.



And you said it's common for charter schools to have gap funding before operations, right?
A. Yes. In the early years of the school from opening the school, yeah.
Q. But you don't have a document one way or another saying whether this $140,000 is subtracted from the $2.2 million commitment, right?
A. No.
Q. How long did Arcadia work on the draft application?
MR. NORRIS: Objection. Form.
THE WITNESS: Soon after we engaged with them, we got to work pretty quickly. So, you know, in December. And the first -- the first draft was before Christmas.
BY MR. FELDMAN:
Q. And what specifically was Arcadia's role in drafting the application?
A. So the early sessions were basically their team that you mentioned before, Joy and David and Ben, and they were just trying to get my vision for the school. What did I want the academic program to look like. What kind of curriculum. Just all the unique facets of the educational



program. And so they were asking me a lot of questions, and then formulate things from that. So their role was essentially taking all of my ideas and putting them to paper. So...
Q. But Arcadia never had any interaction with the board of directors at Wilberforce, right?
A. No.
Q. It was just you?
A. Yes.
Q. And you spent quite a significant amount of time on that application personally, right?
A. Yes.
Q. Eighty hours?
A. At least, yeah.
Q. At least 80 hours.
And Arcadia finished that application on January 29, 2026, right?
A. That sounds correct.
Q. Just a few days before the submission deadline?
A. Yes.
Q. Arcadia was under the impression that you would be submitting the draft charter

application, right?
A. Yes.
Q. You told them that you would be submitting the draft charter application, right?
A. Yes.
Q. Okay.
By January 29, 2026, had you decided whether or not to submit the draft charter application?
A. I would say that not with 100 percent certainty.
Q. When did you make the final decision not to submit the draft charter application?
A. I don't recall specifically. Probably definitively, you know, a couple of days before.
Q. What changed between January 29th and February 1st?
MR. NORRIS: Objection. Mischaracterizes his testimony.
THE WITNESS: Nothing changed.
BY MR. FELDMAN:
Q. Nothing changed.
Did you share the draft charter application with them?



A. Yes.
Q. Who?
A. I shared the draft with Brian Beemer, who is my boss at River's Edge. I shared it with Patrick Carter. Patrick is the athletic director at River's Edge. I believe I shared it with my wife, Katherine, and a friend of mine, Taylor Hall.
Q. Let's start with Mr. Beemer. What role does Mr. Beemer have in Wilberforce?
A. He doesn't have a role in Wilberforce.
Q. Why did you share the draft charter application with Mr. Beemer?
A. Because, you know, when I shared -- as my employer, I wanted him to know about this idea that I was moving forward with. And he was excited about it, and so he wanted to see what it looked like. He runs the school.
Q. Did you have a conversation with Mr. Beemer about the draft charter application?
A. Probably so.
Q. What did you talk about?
A. Just some unique elements and how that even what is in there, some of the academic



programming could be interesting for us to think about some things that I even learned with Arcadia for us to implement at River's Edge.
Q. Has Mr. Beemer expressed any interest to work at Wilberforce?
A. No. He's very committed to where he is.
Q. Okay.
And how about Mr. Carter? Why did you share the draft application with Mr. Carter?
A. You know, Patrick is a friend. And so, you know, I've shared about the excitement of the school with him as well. He lives in the Cedar Bluff community, so he's particularly interested because it would be located in his community.
Q. And so Mr. Carter has expressed interest of sending his children to that school?
A. No, not necessarily. His students -- or his kids are currently at River's Edge.
Q. Okay.
Does Mr. Carter have any role in the proposed Wilberforce school?
A. No. I mean not officially. I'd love to hire him, but...



Q. Has he expressed an interest?
A. Perhaps reading between the lines a little bit. I haven't been overly direct with him about it because I'm his boss at a different school right now. So...
Q. And Mr. Hall. Why did you share the draft application with Mr. Hall?
A. Taylor and I have been friends a long time. His kids go to a school similar to mine in a different state. And I know that he's excited about this project as well. We've exchanged resources over time. He started a school in South Carolina, and I connected him with some people that I knew that would be able to help him with the type of school that he was forming. And so just exchange of ideas and resources.
Q. And you said Mr. Hall operates a school in South Carolina.
A. He's the board chair of a school in South Carolina.
Q. Okay. Has Mr. Hall expressed an interest to work at Wilberforce?
A. No.
Q. Okay. And then you also mentioned you shared with your wife.

Page 209

their tier and their individual needs.
BY MR. FELDMAN:
Q. For at least some students, it would be required to have ESL services for all core content areas, right?
MR. NORRIS: Same objections.
THE WITNESS: The same with special-ed in that students are in the -- in the central classroom throughout the day and will receive pull-out services, so they're not excluded from the rest of their peers for the entirety of the day.
BY MR. FELDMAN:
Q. So there's no scenario where you would have a student who would require ESL instruction for all core content areas?
A. So under inclusion practices, no, I don't believe so. We would have students that participate with their peers in the traditional classroom as well and will receive pull-out services for ELL instruction.
Q. Do you specifically know whether that complies with state and federal law about providing ESL services to English Language Learners?
MR. NORRIS: Objection, form.

Page 210

Objection, calls for legal conclusions.
THE WITNESS: I -- I believe that it is compliant.
BY MR. FELDMAN:
Q. What is that belief based off of?
A. My belief is based on the fact that practices of even Knox County Schools did not have comprehensive ELL classrooms. Students even in Knox County are part of the traditional classroom, and then receive pull-out services as their individual plans state that they need to.
Q. If there's an individual plan that requires ESL education for all core content areas, would Wilberforce have the capability to administer that individual plan?
A. If we were given a plan that was required to do that, then we would -- we would make that happen. However, I don't think that an educator is going to tell you that there are scenarios that even students who don't have a base knowledge of the English language still are part of their, you know, standard classroom as well throughout the day. So there are not -- yeah.
Q. But -- yeah, so but if you were given an individual plan that required that, you

Page 211

would comply with that individual plan, right?
A. Yes, just as we would comply with special-ed. You know, we'll be compliant with special-ed, but -- not "but." We will be compliant with special-ed. I don't think that -- in my experience also working in public schools with a school that had a high ELL population, that students are in an exclusive environment to only ELL students for the majority or even half of the day.
Q. Remind me, what school was that?
A. Mooreland Heights Elementary.
Q. When was that?
A. 2017 to 2019.
Q. Okay. Were you responsible for the ELL program?
A. No.
Q. Were you responsible for the special-ed services program?
A. No.
Q. And again my question is, it's at least possible that you would encounter a student with an individualized plan that would require them to have ESL services for all core academic areas, right?
A. Sure.

Page 212

Q. And Wilberforce would comply with that, right?
A. We would most definitely comply.
Q. But Wilberforce would likely need to allocate additional budgeting towards English Language teachers, right?
A. If that there was a need where the student had to have a full-day service, then yes.
Q. Wilberforce hasn't signed a -- scratch that.
Switching topics, just so that I can flag for you to Wilberforce's proposed facilities. Wilberforce hasn't signed a binding written contract securing a facility, right?
MR. NORRIS: Objection to the extent that calls for a legal conclusion.
THE WITNESS: Correct.
BY MR. FELDMAN:
Q. Wilberforce hasn't obtained any form of right to occupy any building for the school, right?
MR. NORRIS: Objection, vague, and a legal objection.
THE WITNESS: Correct. But we -- no charter school is going to engage in a

Page 213

contract without already an approved charter application.

BY MR. FELDMAN:

Q. Okay. But you -- Wilberforce has made an effort to identify potential locations, right?

A. Yes.

Q. And Wilberforce believes that those locations are actual viable locations for the school?

A. So, yes, there are a couple of options. Yes, the State of Tennessee actually passed legislation that would require for underutilized spaces to -- underutilized school buildings to also be permitted to use -- for charter schools to use underutilized public school buildings as well. And so had we had an approval, one additional temporary plan would have been to -- if the opportunity arose, to share space with a current Knox County school.

Q. Have you identified any of those underutilized spaces?

A. Knox County was not -- in their report about the underutilized facilities, they were not -- they didn't include all facilities in their

Page 214

report that they have to give to the State. But they did identify that Cedar Bluff Middle School was underutilized. But to the extent of how many classrooms and what kind of the day-to-day operation of that would look like was unfounded. We weren't sure yet. So that was also on the table as a possibility.

Q. It was a possibility, but you didn't include it in your charter application because you didn't have enough information, right?

A. Correct.

MR. NORRIS: Objection. Form.

Sorry. Objection to form.

Sorry, I interrupted the witness.

THE WITNESS: No, you're good.

Correct. It would have been a bit premature and something that we could have negotiated with the district or discussed with the district upon approval of the application before we were to settle on another space.

BY MR. FELDMAN:

Q. Okay. And sitting here today, the only potential space under that program is Cedar Bluff Middle School, right?

A. No. In our -- there are a number

Page 215

spaces on that report that showed that there are a number of buildings in Knox County Schools that are underutilized, including some that only used, you know, 25 to 30 percent of the space.

One of our commitments, and the reason Cedar Bluff is identified, is proximity to a large portion of Knox County and transportation to where a lot of people could get to the Cedar Bluff location from across town, downtown, and north and west Knoxville, all around. And so had the application been approved, we would have engaged in those conversations with the district to see what might be underutilized that we could use.

The district left off on their report Cedar Bluff Preschool, which is a former elementary school, which sits in front of Cedar Bluff Middle School and High School.

Interestingly, they left it off despite the fact that the entire top floor of that building is not utilized for education space, which is required by state law. And so that building would probably be a prospect for us to look at, at least for temporary space as well.

Q. But none of those spaces are included in your charter application, right?

Page 216

A. Correct.

Q. The one that you intended to submit to the Knox County Board of Education, right?

A. Correct.

Q. Okay. And during the drafting process you identified a handful of proposed locations, right?

A. Yes.

MR. FELDMAN: Wan, can you hand up Tab 32, please?

(Exhibit CID-14, 1/7/2026 Email from Zachary Wishart to the Arcadia Team; WILB-ACAD-0795 - 0796, marked for identification.)

BY MR. FELDMAN:

Q. What is this document, Mr. Wishart?

A. This is an email to the Arcadia Consulting Group.

Q. And this is dated January 7, 2026, right?

A. Yes.

Q. And this email concerns potential locations for Wilberforce Academy, correct?

A. Yes.

Q. You identified a few locations in

Page 217

this email; is that right?
A. Yes.
Q. And that's under Bullet 1.
Do you see that?
A. Yes.
Q. And for this location, you said it was a potential rentable space for the first couple of years, right?
A. Yes.
Q. How many square feet is that listing?
A. 30,000.
Q. That's about half the space that we talked about earlier in your emails with Mr. Bartholomew, right?
A. Yeah.
But it says it would probably need to be a minimum of 30,000 square feet to allow for full enrollment through year two. So we wouldn't be at capacity at that point. And so that would have been -- some of these things would have been -- yeah, so it's not like I was saying get a property of just 30,000.
Q. You were saying that let's get a property of 30,000; and then after year two, we'll

Page 218

move to another property, right?
A. Well, that was -- in that scenario, that's what would be needed.
Q. Okay. And that would be additional expense to move to another property, right?
A. Correct.
Q. So that location wouldn't be viable for the first five years of operation, right?
A. Correct.
Q. And the first property that's 28,000 square feet, that's 2010 Castaic Lane, Knoxville, right?
A. Yes.
Q. And that property is for sale, right?
A. Yes.
Q. Do you recall how much that property -- what the listing price was for that property?
A. We looked at several. That one might have been...
I don't recall if that one was one of the ones that was 2.8 million or 4 million. That particular property was interesting because Parker and I looked at the map trying to figure out if there was buildable space on the property because

Page 219

it's secluded and fenced in.
Q. Sorry, can you repeat that? The property doesn't have buildable space?
A. We were trying to determine if that -- it could be expanded where that if we were to buy that, is that something that we could, you know, build and expand on or not.
Q. But you saw that it was fenced in, right?
A. It is fenced in, but it is on kind of a larger piece of property. The challenge that we were facing there, a lot of it would be parking if you were to build on. And then there was like a funny kind of garage unit onto the side of it and kind of like a quasi warehouse space that would -- we just talked, okay, what could we do with this space? Could we close that in? What would that look like? So...
Q. But there were several challenges with that property, right?
A. Correct.
Q. Okay. The next property you identify is a shopping center, right?
A. Yes.
Q. And you say that this isn't ideal

Page 220

because it would require big investment in renovations and still likely only be a temporary space, right?
A. Yes.
Q. You said you would have a hard time imagining how this would work, right?
A. Yes, with pickup and dismissal.
Q. Right.
Excuse me, right, you would have a hard time imagining how this would work with things like pickup and dismissal.
And then the next property is what you characterize as, quote, would be seen as a little outside of our service region, right?
A. Yes. I don't actually recall what that specific property was.
Q. Okay.
The last one is you call it a property where you say you would prefer to be on the other side of the interstate, right?
A. Correct.
Q. And that is a former American Freight, right?
A. Yes. I don't remember that property as well either.

Page 221

Q. Do you know whether that property is currently occupied?
A. I don't know.
Q. You don't know whether that's currently an AutoZone?
A. Well, I don't believe that it was an AutoZone on January 7th.
Q. Okay. Have you driven past that property?
A. I don't believe so.
Q. Have you visited any of these properties?
A. Yes. The 28 -- I drove to the one at the top, the 28,000 square feet, but only on the outside. I haven't been on the inside.
Q. Okay. But none of the other properties you drove to?
A. Yes, and I've drove to the Seven Oaks location.
Q. The Seven Oaks location. The shopping center?
A. The shopping center, yes.
Q. That's the one you said they would have a big investment in renovation, right?
A. Correct.

Page 222

Q. Do you know how much that would cost in renovations?
A. Parker and I discussed that the easiest buildings to renovate would be ones that had -- that were formally grocery stores, because those locations have some fire requirements that are more similar to educational occupancy requirements. And so he -- I don't recall how much, but I remember that he said that some of this would depend on, you know, the fire system as well because that is a substantial cost. So...
Q. Do you have an amount in mind?
A. Three or 4 million maybe.
Q. Okay.
So you visited the first two. You haven't seen the second two.
A. Correct.
Q. And if we could turn to Tab 2 again. Excuse me, Exhibit -- the charter application, 13, please. If you don't mind flipping over to page 190.
At the bottom of page 190 is a section for "Progress in Identifying and Securing a Facility." Do you see that?
A. Yes.

Page 223

Q. And then at the top of 191, you identify three potential properties, right?
A. Yes.
Q. Okay. Three of those properties we just talked about in your January 7th email, right?
A. Yes.
Q. The first one that you visited, 210 Cadic Lane [sic], that was eliminated as an option, right?
A. Yes.
Q. Okay. And then you also listed the 9305 Kingston Place. It's a new retail place, I believe. We didn't see that in the last email.
MR. NORRIS: Objection. Form.
BY MR. FELDMAN:
Q. Excuse me. I'm sorry. That is the -- that's the former American Freight, is it not? Isn't that true?
A. Yes. So Castaic Lane is the one that's not listed.
And these two are probably that other -- I don't have the links, but I assume that these other two, Site 2 and 3, are the other two properties that I didn't visit.
Q. Okay.

Page 224

The first one is the shopping center, right? That's the one where you said you had a hard time imagining how this would work with pickup and drop off, right?
A. Yes.
Q. And the second one is 11130 Kingston Pike. That's the one that you said would be outside of the service region, right?
A. Probably so, yes.
Q. Okay. And that's the large commercial space that would require a significant amount of renovation?
A. No, the -- the shopping center, 297 North Seven Oaks Drive is the one -- the first one is where I said that it would probably take a lot of renovation.
Q. Okay.
A. A big investment renovations.
Q. Okay. The second one is the one that would be outside of the service region.
A. Correct.
Q. Okay. And then the third one is the former American Freight space, right?
A. I believe so.
Q. Okay. And that's the one -- you

App.0958


A. No.
Q. We talked about a couple of administrators you have potentially identified at River's Edge. Have you identified others at River's Edge who you would consider recruiting?
A. In my capacity at River's Edge, I have over 40 employees that report to me. A lot of them are great teachers. And so, you know, if -- when the time comes and they express interest, I would love to see that. But I haven't identified specific ones that I plan to seek out.
Q. Have you had any discussions with anybody at River's Edge about moving to Wilberforce if it were to open?
A. Not other than kind of the more broad discussions with Ms. Auxier and Mr. Carter.
Q. If Wilberforce were to open, would you actively recruit from River's Edge Academy?
A. I don't know that I would actively recruit. I would want Wilberforce to be the very best that it can be, and so I want the best applicants wherever those may come from.
Q. Okay.
Your charter application identifies several leadership gaps. Do you recall that?


A. Yes.
Q. And specifically, there was a portion that identified three essential functions that must be filled before opening. Do you recall that?
A. I do recall.
Q. And those are teaching and learning leadership, student services leadership, and operations and finance leadership. Do you recall that?
A. Yes.
Q. Have you filled any of those gaps?
A. No. That traditionally would be filled during the pre-operating planning year once the application has been approved.
Q. Have you identified any candidates to fill those gaps?
A. I wouldn't say specifically, no.
Q. Generally?
A. No.
Q. Okay. Let's talk about the demand for Wilberforce. And -- apologies. Just a moment.
So to assess the need for opening the school, Wilberforce conducted a needs assessment, right?


A. Yes.
Q. And a significant portion of that is evaluating the needs based on community outreach and engagement activities, right?
A. Yes.
Q. Could you turn to page 56, please, of the charter application?
This page provides a summary of Wilberforce's community outreach and engagement activities, right?
A. Yes.
Q. The first item on this list is a public-facing website, right?
A. Yes.
Q. And in the first bullet of this, it says, within -- evidence based on the public-facing websites is that, quote, "Within the first week of the website being live, there were 553 unique visitors and over 80 parents registered to receive more information."
Do you see that?
A. Yes.
Q. I suppose first, how do you know that 80 parents registered to receive more information?


A. I guess we concretely don't know that they were all parents. The assumption is, why would they be signing up for school updates if they weren't parents? So...
Q. Can you imagine why anyone at this table might sign up for an update?
A. You all might have gotten an email from me in the past, I don't know.
Q. So folks who aren't parents -- there's a reason why people who aren't parents would sign up for an update, right?
A. Opposing attorneys, I mean, I don't think that the population is probably that large that are wanting to sign up for that reason.
Q. But you don't have any concrete basis to assert that these are 80 parents, right?
A. Sure.
Q. Okay. And you also say there are 553 unique visitors, right?
A. Yes.
Q. Do you have any basis to believe that any of those unique visitors are interested in sending their children to Wilberforce?
A. I would imagine statistically that a portion of them would. Right? I mean, if you're

searching out Christian education opportunities in Knoxville. I don't think all 553 were attorneys.

Q. They might not be attorneys, but can you imagine there might be individuals who are interested in seeing what might happen to a religious public school?

A. Perhaps.

Q. Okay. So you don't really have a basis to know whether any of the 553 visitors would be interested in sending their children to Wilberforce, right?

MR. NORRIS: Objection. Asked and answered.

THE WITNESS: Yeah.

BY MR. FELDMAN:

Q. Sorry. Could you just repeat that, please?

A. Yes.

Q. Thank you.

The second item is social media outreach. What did you mean by targeted social media?

A. I believe that whenever you set up a social media page, you include the geographic location that your organization is in. And so I



would say that that was probably the descriptor of "targeted," for the reason we started it.

Q. Was it targeted towards Christian families?

A. Well, if the geographic location is Knoxville, then it wouldn't be just targeted to Christian families.

Q. My question is, was any of the social media targeted towards Christian families?

MR. NORRIS: Objection. Vague as to "targeted."

THE WITNESS: Well, I think that in the advertisement as a Christian school, it would probably naturally attract some Christian families.

BY MR. FELDMAN:

Q. Was it posted on maybe Christian forums?

A. No.

Q. On Christian Facebook pages, for example?

A. No, I don't recall sharing any of our posts into community groups.

Q. Okay. So no posts were shared into community groups?



A. I don't recall that, no.

Q. Okay. About how many posts did Wilberforce make?

A. I would have to look back. Maybe three or four.

Q. Okay. And under here, there's the first bullet, and it says again, "Wilberforce's Facebook page received 7,702 unique viewers." Right?

A. Yes.

Q. You have no way of knowing whether any of those viewers are interested in sending their children to Wilberforce, right?

MR. NORRIS: Objection. Form.

THE WITNESS: I mean, I would imagine out of 7,000 people, that there were a number in Knoxville that would be interested.

BY MR. FELDMAN:

Q. But you don't know what that number is?

A. No.

Q. And you said 334 families followed the page, right?

A. Yes.

Q. How do you know those were families?



A. I don't.

Q. And you distinguished between families and 409 individuals. How do you know that they were individuals?

A. I don't recall why that that's the language that we used.

Q. Do you have any specific reason to believe that any of those identified families or individuals have interests in sending their children to Wilberforce?

MR. NORRIS: Objection. Form.

THE WITNESS: No.

BY MR. FELDMAN:

Q. Below that bullet, you said many individuals have messaged Wilberforce on its social media account. How many individuals messaged Wilberforce?

A. I don't recall how many specifically.

Q. Twenty?

A. Probably less than 20.

Q. Less than 20?

A. (Witness moves head up and down.)

Q. Okay. Less than ten?

A. I don't recall.

Page 241

Q. Okay. Somewhere between zero and 20 individuals?
A. Yes.
Q. Okay. And you said that they've expressed interest, inquired about enrollment, and offered assistance in volunteering to the school, right?
A. Yes.
Q. Has anyone messaged Wilberforce's account to express disinterest?
A. It's possible, but I don't recall specifically.
Q. How many individuals?
A. Maybe one or two.
Q. Have you produced those communications in this litigation?
A. I don't believe that I've produced the Facebook messages to the Wilberforce account.
Q. Have you retained those messages in any way?
A. Yeah, they would just be on the account.
Q. Okay. They haven't deleted?
A. I can check. I don't think that Facebook automatically deletes.

Page 242

Q. Okay.
In the next bullet, you identify relationship-based community engagement. You say that the school director and founding board members have engaged in direct conversations with families.
Do you see that?
A. Yes.
Q. How many families?
A. I'm not sure.
Q. Is it less than ten?
A. Maybe ten to twelve.
Q. Ten to twelve?
A. (Witness moves head up and down.)
Q. Okay. And those families -- all of those families stated that they will send their children to Wilberforce if it opens?
A. I think that -- yeah, some of it depends on, you know, the timing. If they are able to get their kindergartener started there, things like that.
Q. This is assuming the 2027 open, right?
A. Correct.
Q. So did those twelve families state that they would send their children to Wilberforce

Page 243

for a 2027 open?
A. I wouldn't say conclusively that all of them would, but certainly some.
Q. Some. How many?
A. I'm not sure. At least probably -- I don't even want to guess because I'm really not sure.
Q. Is it less than half?
A. Perhaps around -- perhaps around that number.
Q. Are any of those families not Christian?
MR. NORRIS: Objection. Calls for speculation.
THE WITNESS: Not that I -- not that I know of.
BY MR. FELDMAN:
Q. And the bullet below that is "Prospective Family Interest Registry."
A. Yes.
Q. Is that the same 80 parents that we talked about earlier?
A. It is.
Q. Have you received -- besides the social media messages, have you received any

Page 244

communications from individuals or families expressing that they do not support Wilberforce opening?
A. Not that have reached out to me. Perhaps social media comments on a news story or something like that.
Q. Okay. You haven't received any emails?
MR. NORRIS: Objection to the form of the question.
THE WITNESS: I don't recall. I don't recall. It's possible. I've produced all the Wilberforce emails. So if there was one, I sent it. So...
BY MR. FELDMAN:
Q. Okay.
And then on page 57, No. 12, it asks you to provide as an attachment evidence of community engagement and support for the school, right?
A. Yes.
Q. And we can turn to Attachment 1, which I'll get you the page number. Page 249.
These are the same items we just discussed, right? This is the --

Page 245

A. Yes.
Q. -- website?
A. Yes.
Q. And this is the interests sign-up form on the bottom, right?
A. Yes.
Q. And then behind this there's a letter from Clayton Wood, Executive Director of Thrive, right?
A. Yes.
Q. Has Mr. Wood told you that he would send his children to Wilberforce?
A. No.
Q. Okay.
In the second paragraph, he says, "Academically, we would be encouraged to see a program that recognizes and supports gifted students through appropriate IEP services."
Do you see that?
A. Yes.
Q. Has Mr. Wood seen Wilberforce's draft charter application?
A. No.
Q. Has Mr. Wood seen Wilberforce's budget?

Page 246

A. No.
Q. Does Mr. Wood know that there are -- under the minimum enrollment scenario, there are zero special education teachers planned to be hired at Wilberforce?
MR. NORRIS: Objection. That mischaracterizes the testimony.
THE WITNESS: No.
BY MR. FELDMAN:
Q. Has Wilberforce commissioned a survey of Knox County families asking whether they would enroll their students in a religious public charter school?
A. No.
Q. Has Wilberforce conducted any focus groups with families about whether they would enroll their students in a public religious charter school?
A. No.
Q. Has Wilberforce held any open meetings where families could express an interest in a religious public charter school?
A. No.
Q. Has Wilberforce done any analysis of how many families in the Cedar Bluff area would specifically seek out a Christian public charter

Page 247

school?
MR. NORRIS: Objection to form.
THE WITNESS: No.
BY MR. FELDMAN:
Q. Do you recall in the charter application that you referenced -- Wilberforce referenced the wait lists at private religious schools as a basis for asserting that there would be demand for a religious public charter school?
A. Yes.
Q. Has Wilberforce done any assessment on whether families on those wait lists would choose to send their children to a religious public charter school?
A. Not specifically to a religious public charter school.
Q. And sitting here today, what is the number of families who have expressed a concrete, documented interest in enrolling their children in Wilberforce Academy if it were to open?
MR. NORRIS: Objection. Form.
THE WITNESS: I'm not sure.
BY MR. FELDMAN:
Q. Let's talk a bit -- we covered it earlier, but let's talk about the secular

Page 248

application. Do you recall talking about that?
A. Yes.
Q. And if Wilberforce is not able to open up a religious public charter school, it wants to open a secular school, right?
A. Yes.
Q. That -- that secular school would be sponsored by Wilberforce, right?
A. Yes.
Q. Wilberforce is a religious entity, right?
A. Yes.
Q. Wilberforce drafted a secular school application, right?
A. Yes.
Q. When did Wilberforce draft that application?
MR. NORRIS: Objection. Vague as to "application."
THE WITNESS: The educational program of the application was completely developed by the application deadline. That's our first and primary desire, is to start an explicitly Christian charter school.
If, through this process we are

App.0062



unable to do that, then we would will apply for a secular charter school. So that application was -- adjustments were completed in that -- in the spring semester. And -- yeah, so that was completed sometime in the spring semester. I don't recall the specific date. But the adjustments to that were not substantial because the base of the charter application and the academic program is pretty consistent. So in the Christian education world, we use the term "biblical integration," which means we teach in a Christian school that God is the king of every subject. That he is sovereign over all things.

So we will -- the secular -- those levels of integration would just look different in a secular school because we wouldn't be expressing those, uh, those beliefs. But the core tenets of the academic program are consistent between the Christian and the secular application.

BY MR. FELDMAN:

Q. So the biblical -- sorry. Let me just take this one at a time. I'll start with -- you used the word "adjustments." Could you explain



to me what adjustments mean?

A. Sure. Adjustments mean anything that is explicitly religious in our instruction. So for an example, students would attend at Wilberforce, the Christian charter school, they will attend Bible class weekly, and in a secular -- multiple times a week. But in the secular charter school, that would look different because we wouldn't be able to do that.

Q. You said explicit -- I'm sorry, I'm forgetting the words that you used. I think you said explicitly religious. Correct me if I'm wrong. Does that mean that the secular application has items that are implicitly religious?

MR. NORRIS: Objection, vague as to "implicitly," and objection to the form.

THE WITNESS: I would say that as Christian individuals, myself and the board members included, there are biblical truths that would carryover to the secular application, including that we believe that every student is made in the image of God. So we want our students to receive the best education that we can possibly provide for them because they're worthy of that because



they are image bearers of God.

BY MR. FELDMAN:

Q. And you said that this was completed in the spring semester. Do you have a month for me?

A. I don't. I got married in March, so I think it was before March.

Q. Congratulations.

A. Thank you.

But I don't specifically recall. I believe it was before the wedding, but I'm not for certain.

Q. Was it after -- excuse me, I didn't mean to interrupt you.

A. That's okay.

Maybe it wasn't, though. I don't want to say definitively.

Q. It sounds like it was after the application deadline, though, right?

A. Yes.

Q. Okay.

A. We -- as I stated, our primary desire is to start the Christian charter school. And so that was in preparation to say, okay, if we're unable to proceed with this, then we want to make sure that we're -- we're able and ready to



apply for a secular school should that time come.

Q. Okay.

And if you can remember earlier, we looked at a board resolution where the board approved proceeding with drafting a secular school application, right?

A. Correct.

Q. And that email where you sent the board minutes was April 7th of 2026. Do you remember that?

A. Yes.

Q. Okay. Does that refresh your recollection around when you proceeded with drafting the secular school application?

A. I think that I still began working on it before that board meeting. I don't know that it was necessarily completed. But I believe that -- I believe I began working on it before that.

Q. Before the board approved the application, right?

A. Before the board approved the intent to apply should this door be closed.

Q. Okay. Did anyone help you with drafting the application?

A. The secular application?

Page 253

Q. That's right.
A. No.
Q. Arcadia didn't help you?
A. No.
Q. Okay. It was just you that made those edits?
A. Yes. Yeah, Arcadia did not help me with that. So -- yeah, as I recall, yes.
Q. And how did you go about making those edits? In other words, did you control-find and just try and replace certain words in the application?
A. Obviously, there are -- yes, yes. But that was not the complete edit. It wasn't merely words adjustments. But, yes, that was definitely a tool that was used.
Q. I mean, it sounds like you did a full readthrough to make sure that that -- in terms of your view of secular, this was a secular application, right?
A. Yes.
Q. Have you shared the secular application with the board of directors?
A. Not -- not yet. Not yet.
Q. Have you shared the secular

Page 254

application with anyone?
MR. NORRIS: Objection. Vague as to "anyone."
Also, to the extent you're going to talk about communications with your attorneys, just don't reveal the communications. The content of those communications.
THE WITNESS: Okay.
I did share it with my attorneys.
BY MR. FELDMAN:
Q. Okay.
Anyone else besides your attorneys?
A. I don't believe so.
Q. Did you prepare a separate budget for the secular application?
A. No.
Q. Okay. So if you were to apply, you would apply based on the same budget we looked at earlier, right?
A. Correct.
Q. Did you do any analysis on whether Wilberforce could lawfully operate a secular school?
A. Could -- I'm sorry, say that...
Q. Did you do any analysis on whether Wilberforce could lawfully operate a secular public

Page 255

charter school?
A. No.
Q. And so if you were to submit this -- excuse me. Is it your position that the secular application is -- you're ready and able to submit that application?
A. Yes.
Q. Okay.
So the application that you've shared in connection with this litigation, that's the one that you would submit to the Knox County Board, right?
A. Yes.
Q. Okay.
MR. FELDMAN: Wan, can we pass out Tab 33, please?
(Exhibit CID-15, Application for a Charter School To Open 2027-2028 School Year; WILB-ACAD-1955 - 2233, marked for identification.)
BY MR. FELDMAN:
Q. And I'm sorry, Mr. Wishart, were you just communicating with someone right now?
A. No. No.
Q. Okay. I'll just ask that you keep

Page 256

your phone tucked away, if you don't mind.
A. Okay.
Q. I just want to make sure you're not talking with anyone in the middle of the deposition.
A. Sure.
Q. Thank you.
Take your time, and I'm happy to ask when you're ready.
A. Oh, yeah, just whenever.
Q. Nothing specific to look at yet.
MR. NORRIS: What number is this?
MR. FELDMAN: This is Exhibit 15, CID-15.
BY MR. FELDMAN:
Q. What is this document?
A. This is the charter application.
Q. Is this the -- and if you turn page, I guess, 1958.
A. Yes.
Q. On the left side, do you see Academic Focus, and "Classical with an emphasis on civics and entrepreneurship"?
A. Yes.
Q. Is this Wilberforce's secular charter application?

public charter schools are part of the state program of education, right?

MR. NORRIS: Objection. Calls for a legal conclusion.

THE WITNESS: Yes.

BY MR. FELDMAN:

Q. Okay. And you understand that charter schools are public schools according to Tennessee law, right?

MR. NORRIS: Same objection.

THE WITNESS: They are open enrollment and privately ran schools.

BY MR. FELDMAN:

Q. You would characterize them as public schools, right?

MR. NORRIS: Objection to the extent it's asking him for a legal conclusion.

THE WITNESS: They are described oftentimes in state law as public schools.

BY MR. FELDMAN:

Q. Okay. You understand that they are considered as public schools, right?

MR. NORRIS: Objection, vague as to "they." And objection, calls for a legal conclusion.



THE WITNESS: They are a unique hybrid of private and public. But in general, yes.

BY MR. FELDMAN:

Q. I'll just show you one document. Tab 34.

Please take your time.

MR. NORRIS: Sixteen?

MR. FELDMAN: Yes, that's right. This is CID Exhibit 16.

(Exhibit CID-16, January 2026 Emails; WILB-ACAD-0797 - 0815, marked for identification.)

THE WITNESS: Yes.

BY MR. FELDMAN:

Q. You'll have to excuse me, I lost my place.

What is this document, Mr. Wishart?

A. This is my correspondence with Bob Johnson Insurance Agency about insurance company for Wilberforce. Insurance coverage for Wilberforce.

Q. Okay. I know I said this would be quick, but I accidentally closed and lost my spot.

If you don't mind turning to 801, please. And on 801, do you see Nate Bergey? Who is



Nate Bergey?

A. An insurance agent with Bob Johnson Insurance.

Q. And you were talking to Nate Bergey in connection with receiving insurance for Wilberforce, right?

A. Yes.

Q. Okay. Nate Bergey on January 9th asked you, "Is it considered a private school?"

Do you see that?

A. Yes.

Q. On the next page, 802, you respond, "Charter schools are a unique hybrid setup where they are privately operated by a nonpublic but publicly funded and considered public schools."

Do you see that?

A. Yes.

Q. Okay. That's all. We can put that away.

Returning back now to your religious charter application and religious charter school. So we'll set aside the secular application for the time being.

Your religious -- your charter application discusses student discipline, right?



A. Yes.

Q. Okay. And it describes student discipline as part of student formation and development of character, right?

A. Yes.

Q. And as part of formation in character, will Wilberforce encourage character development by accepting Christian faith?

MR. NORRIS: Objection. Vague as to "accepting."

THE WITNESS: There are teachings of the Christian faith that, you know, we see in scripture. The fruits of the spirit: Love, joy, peace, patience, kindness, goodness, faithfulness, gentleness, and self control. Those are the attributes that we would strive for our students to display. But -- sorry, can you repeat the question again?

BY MR. FELDMAN:

Q. Well, my question is, is what is it -- I'm trying to understand what you mean by character development, and whether that includes, for example, accepting God.

A. No, it would not. Obviously, as a Christian, I would say that the Lord can do a

App.0065



transformation on a hardened heart that, you know, doesn't know him, but that there would certainly be no coercion for students to make a profession of faith that was not genuine or authentic out of mere compliance for something.

Q. Would students be encouraged to accept Christian faith?

A. Our desire is that students would see the truth of scripture and that it would be something that they would make as their own faith, yes. But there wouldn't be a point where that students are disciplined for not following that faith.

As -- as a believer, I would say that someone who makes a false testimony of faith wouldn't actually enter into the kingdom of God eternally, and I wouldn't want for a student to make a false profession that wasn't genuine for them. So...

Q. And students would be required to attend religious assemblies, right?

A. Attend, but not necessarily participate.

Q. But they would have to be present for those assemblies, right?



A. Yeah. In the same way that they would have to be present for math class, yes.

Q. Is there an opt-out mechanism for students who do not wish to attend?

A. No.

Q. What about for students who hold different religious beliefs? Is there an opt-out mechanism for those students?

MR. NORRIS: Objection. Vague as to "mechanism."

THE WITNESS: No, not currently.

BY MR. FELDMAN:

Q. Let's talk a little bit about hiring at Wilberforce. Faculty members' personal beliefs are important, right?

A. Yes.

Q. And faculty would be required to exemplify Christian character, right?

A. Yes.

Q. What does that mean, for an administrator to exemplify Christian character?

A. I would say that that means, you know, slow to anger, and patience, supporting of faculty and students and families.

Q. And that includes in, like, their



personal beliefs, right?

MR. NORRIS: Objection. Vague.

THE WITNESS: Sorry. Can you...

BY MR. FELDMAN:

Q. Meaning it's important that faculty are accepting, right?

MR. NORRIS: Objection. Vague.

THE WITNESS: Accepting of the Christian faith? Accepting...

BY MR. FELDMAN:

Q. Accepting of -- sure, accepting of the Christian faith. That's important?

A. Yes.

Q. Accepting of other cultures. That's important?

A. Yes.

Q. Accepting of other races. That's important?

A. Certainly.

Q. Accepting of other religions. That's important too?

A. Yes.

Q. And you would expect that faculty would exemplify those characters in how they interact with the community, right?



A. Yes.

Q. That includes like any public statements, right?

A. Yes.

Q. Okay.

What kind of conduct by faculty would undermine the type of culture that Wilberforce wants to build?

A. Conduct would be getting arrested. Like, yeah, public -- things that could just negatively affect the school.

Q. Right. That would include like discriminatory statements, things like that, right?

MR. NORRIS: Objection.

THE WITNESS: Yes.

BY MR. FELDMAN:

Q. The faculty will be trained to see themselves as, like, the chief culture bearers at Wilberforce, right?

MR. NORRIS: Objection. Vague.

THE WITNESS: Yes.

BY MR. FELDMAN:

Q. That's stated in the application, right?

A. Yes.

Page 285

Q. And in terms of hiring, teachers are expected to align with the school's mission, right?

A. Yes.

Q. That means their religious mission?

A. Yes.

Q. And that means with Christian beliefs, right?

A. Yes.

Q. Their particular denomination of Christian beliefs?

A. No.

Q. And what beliefs are relevant to mission alignment?

A. We would say the inerrancy and inspiration of the word of God. We would say that the -- we believe in the literal death, burial, and resurrection of Jesus. And that Jesus is both fully God and fully man, and was able to come to earth to take on our sin, was crucified, and then rose from the grave three days later.

Q. And how does that play out in terms of faculty conduct?

A. I'm not sure what you mean by that.

Q. My question is, how does mission alignment play out in terms of what you're looking

Page 286

for in faculty conduct?

A. That's a good question. I would say that during the interview process is we're getting to know them and their heart. You know, just if they display excitement for the mission of the school, and we feel like that they bring both joy and structure to the role.

Q. And kindness, for example?

A. Yes.

Q. Wilberforce would evaluate its applicants primarily based on their religious beliefs, right?

MR. NORRIS: Objection. Form.

THE WITNESS: No. I would say that that's -- that is a prerequisite, but effective instruction and ability to do the job well would also be a prerequisite.

BY MR. FELDMAN:

Q. Well, there are -- let me rephrase.

The faculty would be hired primarily based on their mission alignment. Is that fair to say?

A. Yes, as long as you're including broader mission alignment as both the faith as well as providing a great education.

Page 287

Q. I just want to understand something. Can we turn to -- if you still have the religious charter application with you. If you could turn to page 67, please?

It says at the top here, "Faculty Selection for Mission Alignment: Wilberforce teachers will be selected first and foremost for mission alignment, not merely technical competence."

Do you see that?

A. Yes.

Q. So the primary -- the primary characteristic you're looking for is mission alignment, not technical compliance, right?

MR. NORRIS: Objection. Mischaracterizes the document.

MR. FELDMAN: Competence, excuse me.

MR. NORRIS: Same objection.

THE WITNESS: I would say that that is the prerequisite. There may be great teachers that come from a different worldview. And we want both mission alignment first, and then also the ability to do the job well.

BY MR. FELDMAN:

Q. Okay. And so during the application process, teachers will be asked about their

Page 288

religious beliefs, right?

A. Not as much religious beliefs, but perhaps, you know, how that they might be active in their church. How that they -- sharing a little bit about their faith and how they came to know the Lord. But it won't be as know what theological nuances. It will be -- so no like splitting hairs over denominational differences.

Q. So I think you had characterized it before, but it's a prerequisite, right, mission alignment?

A. Yes.

Q. And so Wilberforce will not hire any teachers of any other faith besides Christian; is that right?

A. Yes.

Q. And teachers will be required to affirm the centuries-old statement of Christian faith articulated in the Nicene Creed, right?

A. Yes.

Q. And what specifically does affirming the Nicene Creed entail?

A. It would look like perhaps saying, you know, this is our -- in lieu of a broader statement of faith, this would be, you know, do you

App.0067



Q. Okay. I just wanted to fill in just some gaps for my knowledge.
A. Sure.
Q. So the first one there is education specialist, Columbia International University.
Do you see that?
A. Yes.
Q. What year was that?
A. Since I've been at River's Edge. Maybe 2023. I'd have to look on my diploma.
Q. And was that an in-person course of study, or how did that work?
A. It was online.
Q. Online.
A. Uh-huh.
Q. And is that the degree that was granted, education specialist?
A. Yes, sir.
Q. And then if you will flip to the last page. The next one is a master of education, education administration, Bryan College?
A. Yes.
Q. What year was that?
MR. NORRIS: Objection. Vague as to "that."



BY MR. AYLIFFE:
Q. What year was the Bryan College master's degree?
A. Actually I know, that was 2022.
Q. And what kind of course of study was that?
A. Education administration. It had a focus in Christian school administration.
Q. Was it in person or online?
A. I'm sorry, it was online.
Q. And the last one was the bachelor of science at Liberty?
A. Yes.
Q. And what year did you graduate from Liberty?
A. I believe 2018.
Q. And so you see that the first two pages of Exhibit 19 detail your work history?
A. Yes.
Q. Is that your complete work history detailed on Exhibit 19 since you graduated from Liberty in 2018?
A. I was on staff at my church part-time for a number of years. I would have to look back on the dates of that.



Q. Do you have an approximate date range?
A. Twenty -- it was while I was still at Liberty as well. And so...
Q. I'm just looking for after you graduated from Liberty.
A. After I graduated from Liberty, um, no. Well, yes and no. I've engaged in, like, campaign work as well. Mostly on a volunteer basis though. But that's part of my work history as well.
Q. Any paid positions that are not reflected here on Exhibit 19 since you graduated from Liberty in 2018?
A. I did some contract work for Tennesseans for Student Success.
Q. Can you tell me about that?
A. Yes. They are an organization that works for, like, education accountability, policy and legislation in Tennessee.
Q. And how long did you do that contract work?
A. I believe it was, like, six months. That would have been in, like, January to May 2022.
Q. And could you be a little more precise in the details about what that work



involved?
A. Sure. It was kind of broad. So they have a reading program, like a scholarship reading program called TriStar Reads. So I organized one of their events here in Knoxville to kind of get out the word about TriStar Reads. I did some policy, like, workshops and information for candidates that were running for school board at the time as well.
Q. Did any of that work for that organization involve Tennessee's public charter school system?
A. Not -- Tennesseans for Student Success works in the charter space, but my involvement was not -- my work didn't include any charter work.
Q. So -- were you finished?
A. I'll just preface that with saying during that time period, I believe it was in a volunteer capacity that I helped do an informational event for Knoxville Prep School in conjunction with TSS. I don't remember the time period on that though. So that may have fell out of that six-month period.
Q. Okay. And Knoxville Prep School is

where you served on the advisory board. Is that what I recall your testimony having been?

A. Correct. Yes.

Q. So other than the six months or so of contract work for Tennesseans for Student Success, is there any other paid work that you did since graduating from Liberty in 2018 that's not reflected on Exhibit 19?

A. No.

Q. All right.

A. Not that I recall.

Q. Thank you.

So in your conversation with Mr. Feldman earlier, you were talking a little bit, I think, about your work at Mooreland Heights Elementary.

A. Yes.

Q. And what were your duties at Mooreland Heights Elementary?

A. So it shifted between year one and year two. Year one, I worked with a teacher who -- she was a certified special education teacher. And she was developing the kind of -- we called it the PBIS, Positive Behavior -- my "I" is blanking on me. Supports is the last letter. And it was all about,



you know, reinforcing positive behavior in the school. And so my job was to, year one, was really to assist her in that capacity as she developed things. And then in year two, the position was restructured a little bit because she left to take a different position. And so then I was kind of team lead for that, and then we hired somebody else to work with me. And so we -- you know, I would do deescalation of students whenever things would be tense, or I would provide some, like, social skills lessons. It really depended on the needs of the individual students that we had.

Q. And so am I correct in understanding that you were a Knox County employee during your time at Mooreland Heights?

A. Yes.

Q. And other than your time at Mooreland Heights that's reflected here on Exhibit 19, have you ever been an employee of Knox County Schools at any other point in time?

A. Yes. So I went to church with the principal, and she was like, hey, I need somebody for a semester to help me out here. And so I helped out in a special education classroom for a semester in maybe like 2015 while I was still in college.



Q. Was that a paid position?

A. Yes.

Q. So other than when you helped out as a special education coordinator and then your time at Mooreland Heights, any other employment as an employee of Knox County Schools?

A. Yeah, I was a substitute teacher, you know, during college as well. And then during college, there was like a nine week -- it was after spring break until the summer break. And actually, I can tell you when that was because it was just an eight-week period. Spring 2017 I worked at Knoxville Adaptive Education Center from like the last nine weeks of school.

Q. Any other employment at Knox County Schools besides those two you just mentioned?

A. No.

Q. And you mentioned substitute teacher. I didn't see it on your bio, but do you hold a teacher's license in Tennessee?

A. Not a state teacher license.

Q. So just take me back to after you graduated in 2018. Other than Mooreland Heights, no other employment for Knox County Schools I think you said. Any other employment in Tennessee what I'll



call traditional public schools?

Do you understand what I mean when I say "traditional public schools"?

A. Yes. No.

Q. And since 2018, when you graduated from Liberty, other than Mooreland Heights, any other employment at a traditional public school anywhere in the USA?

A. No.

Q. Also on your bio -- we can move up from there. Administrative services manager at a private company. Do you see that?

A. Yes.

Q. Any duties in that capacity related to schools?

A. No.

Q. And then if you go to the first page of Exhibit 19, it lists education policy fellow from January of '22 to December of '22.

A. Yes.

Q. Can you tell me about that?

A. Yes. So that was something I had applied for. There were, I believe, three other fellows. It was all remote. So we did some like research projects, and we would have sessions where

App.0069



that we would hear from different education leaders. Some were sitting principals. Some were people who worked in policy. And so it was really more of a learning experience. You only got paid $5,000 for the whole time. So...

Q. Did any of your fellowship work as an education policy fellow, did that have anything to do with Tennessee's public charter school system?

A. No. It was a nationwide -- it was a nationwide fellowship. I was the only one in Tennessee.

Q. And I think I know the answer to this next question, but I'm going to ask it just to be sure. Have you ever been employed at any level of Tennessee State Government?

A. No.

Q. So have you ever been an employee of a charter school in Tennessee?

A. No.

Q. Have you ever worked -- strike that.

Have you ever worked at the Tennessee Board of Education?

A. No.

Q. And other than what we talked about earlier, your time at Mooreland Heights and the



other ones that you've mentioned, you've never worked with Knox County Schools other than those things?

A. Yeah, not since 2019.

Q. Tell me about how you became a member of the advisory board for Knoxville Prep.

A. I was being considered -- or I was asked that I was interested in applying for the principal position, and I declined. I appreciated the mission of the school and what they were doing, and so I was just asked if I wanted to be on the advisory board.

Q. You mentioned earlier in your conversation with Mr. Feldman, I think you referenced the organization period for both Emerald and Knoxville Prep. Do you recall that line of conversation?

A. Yes.

Q. Had Knoxville Prep already been organized and established as a charter school when you became a member of the advisory board?

A. I don't believe so, no.

Q. What do you mean by that?

A. I -- I think I was on the advisory board once the application was complete but



before -- I think it was before that it was approved.

Q. Did you have a role in preparing Knoxville Prep's application?

A. No.

Q. So other than with Wilberforce that we've been talking about here today, have you ever been involved with an attempt to form or apply for a charter school in Tennessee?

A. Yes.

Q. Can you tell me about that?

A. I was contacted by someone from South Carolina, and they asked if that I would be interested in being a part of a new charter school here in town that submitted a letter of intent but never submitted an application.

Q. And what time period was that?

A. Hmm. Between -- I'm not trying to be vague. I truly don't remember.

It was after 2020 and before 2025.

Q. Okay.

A. Sorry.

Q. That's all right.

Did you have -- with the South Carolina charter school letter of intent, did



you have any role in the preparation of the letter of intent for that?

A. No, I did not.

Q. So just to make sure I'm clear. Other than the South Carolina entity that was interested or that submitted a letter of intent and Wilberforce, is it correct that you have not been involved with an attempt to form or apply for a charter school in Tennessee?

MR. NORRIS: Objection. That mischaracterizes the prior testimony.

BY MR. AYLIFFE:

Q. You can answer.

A. Yes.

Q. I wanted to ask you, turning back to Exhibit 19, Mr. Wishart, just about the certifications. I saw you have an all-level school principal certification. And I just wanted to ask, I think I know the answer, but do you have the Tennessee institutional leader license by chance?

A. Instructional leadership license?

Q. Yes.

A. No, I do not.

Q. Thank you.

Let me direct your attention to what

Page 337

has been marked for identification as Exhibit No. 20. And I'll represent to you that it's a copy of your declaration that has been submitted in this case. It's Document 14-1. And it looks like you signed it on New Year's Day of this year.

Do you recognize that document?

A. Yes.

Q. I just wanted to ask you a question or two about Exhibit 20. Do you see paragraph 4 on the first page of Exhibit 20?

A. Yes.

Q. And I'm not going to read it to you but will let you take a look at it.

Can you tell me why you included that paragraph? What the significance of it is to you?

MR. AYLIFFE: And I'm asking him this question in his 30(b)(6) capacity.

MR. NORRIS: Thank you.

I'm just going to object that you shouldn't in your answer -- don't reveal the contents of any communications with your attorneys.

BY MR. AYLIFFE:

Q. Yeah, the same as the instruction

Page 338

earlier: I'm not asking you about any conversations with your attorneys.

A. It's twofold in that many families would like to attend or have access to a Christian education, but financial barriers may limit them from doing so. And so the Education Freedom Scholarships going to Christian schools, you know, suggests that there is demand there.

Q. And is it your view that the Education Freedom Scholarships help with providing that access?

A. Yes.

Q. I wanted to ask you, Mr. Wishart -- and I think I have this down right. You may remember. It was the start of the day. I think your testimony was something to the effect that right now Wilberforce is a Christian nonprofit, but it will become a charter school.

Do you recall giving that answer earlier, or something to that effect?

A. Yes.

Q. Okay.

And so I wanted to ask you what your understanding is of how Wilberforce goes from a nonprofit to a charter school.

Page 339

A. Well --

MR. NORRIS: Objection. Calls for a legal conclusion.

THE WITNESS: The -- the Wilberforce Academy of Knoxville is the nonprofit that is seeking to be approved to operate a school by the same name.

BY MR. AYLIFFE:

Q. Okay. And so what's the difference, in your mind, if the application were accepted?

A. I think they are largely one in the same, or that the Academy is a subsidiary to the nonprofit in the same way that Emerald Charter Schools operates Emerald Academy.

MR. AYLIFFE: No further questions.

EXAMINATION

BY MS. JERNIGAN-JOHNSON:

Q. I will try to make this easy. My name is Jessica Jernigan-Johnson, and I represent the Knox County Board of Education in this case. I'm going to ask you follow-up questions about students with disabilities.

A. Okay.

Q. The only thing that I will ask you to look at is what's been marked as CID-13. If you

Page 340

want to go ahead and pull that out. And I will be asking all of these questions in your official capacity as a 30(b)(6) witness.

A. Okay.

Q. Actually, I'm going to ask one question in your personal capacity.

A. Yeah.

Q. As a member of the Knox Prep Advisory Board, were you aware that they received a notice of deficiency regarding their provision of services under the IDEA?

MR. NORRIS: Objection. Foundation.

THE WITNESS: So I was no longer a member of the advisory council at that point. So I left the advisory board I want to say maybe December of their first operating year.

BY MS. JERNIGAN-JOHNSON:

Q. You anticipated my next question. Eight hours in, you're getting good at this.

So now I'm going to ask you in your official capacity. Do you plan to offer crisis intervention training to your staff?

A. Yes.

Q. And what is Wilberforce's plan for students who might need assistance with toileting

App.0071


far?

A. No.

Q. We can turn to a document. I'm just going to ask you if you remember. Do you recall how often it is that the board is required to meet under the corporate documents for Wilberforce?

A. Under the corporate documents, I believe once a year.

Q. Okay.

If Wilberforce had an application for a charter school approved by Knox County, would the board meet at different intervals than -- sorry. Scratch the question.

If Wilberforce has a charter school application approved by Knox County, how often then would the board meet?

A. With an approved charter school, during the planning year and in the early years of the school, I would say perhaps as frequently as once a month. And then as the school kind of gets its bearings, it may be more infrequently. Perhaps even quarterly.

Q. Okay.

If Wilberforce is able to open a charter school, what would your anticipated role at


the school be?

A. Executive director/school director. The titles are kind of interchangeable. So the early years, you know, kind of wearing the hat of executive director and the day-to-day -- overseeing the day-to-day operations as the principal as well.

Q. Okay. At least in part, then, will you be considered -- would you be considered an administrator at Wilberforce?

A. Yes.

Q. Will you be considered an administrator in full with all of those job responsibilities?

A. Yes.

Q. So earlier, is it fair to say -- when you testified that Wilberforce had not yet hired any administrators, is it fair to say you were leaving yourself out?

A. Yes.

Q. So let's talk about Wilberforce's legal position in this case for a minute.

Under Wilberforce's legal position, as best you understand it, is it constitutional for Knox County to deny a charter application solely because the sponsor identifies as Unitarian


Universalist?

A. No.

Q. Under Wilberforce's legal position in this case, would that also be considered religious discrimination?

A. Yes.

Q. So I believe there was testimony very early on with my friend across from the table about when you first started thinking about Wilberforce as an idea. But I want to separate the idea of establishing a religious charter school from the concrete idea of Wilberforce as a nonprofit.

Do you know approximately when you first were interested in the idea of establishing a religious charter school?

A. Sorry. Differentiate between in general versus Wilberforce just broadly, whenever I was interested in starting a religious charter school?

Q. Right. I'm not asking about Wilberforce specifically. As a general idea, when were you first interested in the idea of establishing a religious charter school?

A. I followed the Oklahoma case and was interested in -- if that case would have opened that


door, I was interested in beginning a Christian charter school at that point.

And so predating that even case, you know, it's something that I -- I testified earlier that I've engaged in conversations with the Spreading Hope Network about starting a school with their assistance and their program at one point in time. And so, you know, I remember even in those discussions thinking, gosh, I wish that, you know, charter schools could be Christian, because it would -- the resources and funding model makes it sustainable for all families to be able to come to the school.

So well over -- sorry. I would say at least a year before this specific idea of Wilberforce came into existence.

Q. So is it fair to say, then, that your interest in opening a religious charter school generally preceded your plan to start Wilberforce specifically?

A. For sure.

Q. Okay. When specifically did that general interest in establishing a religious charter school turn into the plan to open a nonprofit called Wilberforce?

Page 353

A. I believe that was in later August.

Q. Can you pinpoint the month and year when you specifically decided to create a nonprofit called Wilberforce?

A. Well, the nonprofit was, I believe, formed in October. But my desire and pondering of that, if I was going to actually move forward with it, even without a name, was probably mid to late August.

Q. Okay.

So to the best of Wilberforce's understanding, under Tennessee law, can Wilberforce open a Christian charter school in Knox County?

A. No.

Q. Was that Wilberforce's understanding when it submitted the letter of intent in November of 2025?

A. Yes.

Q. Was that Wilberforce's understanding after it received the email about its letter of intent from Knox County in December of 2025?

A. Yes.

Q. Is that Wilberforce's understanding today?

A. Yes.

Page 354

Q. Wilberforce had a draft charter application completed before the February 2026 deadline; is that correct?

A. Yes.

Q. If Wilberforce had submitted that application before the February 2026 deadline, do you think Knox County would have approved that application?

A. No.

Q. Is that belief in part because of your understanding of Tennessee law?

A. Yes.

Q. You earlier mentioned the Oklahoma case. Is that --

A. Yes.

Q. That's the case that made it to the U.S. Supreme Court; is that correct?

A. Yes.

Q. Are you familiar with the fact that there was a religious charter school in that case that was approved by the charter authority?

A. Yes.

Q. Do you know what happened to that religious charter school after it was approved by the charter authority?

Page 355

A. They were sued and stopped in court.

Q. I'm sorry, can you repeat that?

A. They were sued and then stopped from actually opening in court after they were approved.

Q. Are you concerned that if Wilberforce opened a religious charter school in Knox County, that it would likewise get sued?

A. Certainly.

Q. Would Wilberforce have that concern about getting sued even if Knox County approved its charter application?

A. Yes. Yes.

Q. In the view of Wilberforce, would the threat of that lawsuit make it hard to raise money for the school?

A. Not only raise money, but also in good conscious tell families that it was going to open and them to make their plans on that.

Q. Would that threat make it harder to recruit people to work at Wilberforce?

A. Yes.

Q. Would that threat make it, in your view, difficult for Wilberforce to get a $15 million bank loan to open a facility?

A. Yes.

Page 356

Q. So to the best of your understanding, can Wilberforce open a Christian charter school in Knox County without prevailing in this lawsuit?

A. No.

Q. Sitting here today, does Wilberforce sincerely want to apply to open a Christian charter school in Knox County?

A. Yeah. Absolutely.

Q. Does it sincerely want to apply for the application cycle that will begin at the end of '26 into early 2027?

A. Yes.

Q. Okay. Does it sincerely want to apply in future years beyond -- after 2027?

A. Yes, until I get approved.

Q. Did it sincerely want to apply in the 2025-26 cycle?

A. Yes.

Q. And why does it want to apply to open a Christian charter school in Knox County?

A. So, you know, I worked at a -- to give a little bit of context here if I can. I had a good experience working at Mooreland Heights Elementary. There were a lot of educators that I

Page 357

really respected there. A principal, who has since passed away, that I still count as one of the best bosses I've ever had. She was phenomenal.

At that school, you know, I saw kids who -- many kids who lived in government housing who lacked opportunities. They came from low-income homes, and sometimes lacked some stability in those homes. And my desire at that time, which I was legally barred from, was that I wanted them to know about the hope that I have. That hope that is not based on our economic circumstances, but based on an eternal hope that I have in Jesus. I want kids to experience that same hope. Kids, just like the ones I got to serve at Mooreland Heights, to know that there's a God that loves them, who sent his son Jesus to die on the cross for them. And that's my desire, is that those kids get to experience what I get to experience now at a Christian school.

Unfortunately, a lot of families are prohibited from being able to have that opportunity because they don't have the financial means and resources to be able to attend that school like the one that I currently serve, even though -- I'm thankful that Education Freedom Scholarships have helped make a way for more kids. It's still not

Page 358

enough. And we need -- we need more schools that can serve these kids well.

And so my desires for the students that I encountered at Mooreland Heights, kids that grew up as even as a public school graduate and as peers of mine, getting to experience the joy of seeing how that -- how that -- who God is, both inside the school setting and just how we seek his hand through every subject.

Q. If Wilberforce cannot apply or open a Christian charter school, does Wilberforce sincerely want to apply to open a secular charter school in Knox County?

A. Yes.

Q. Does it sincerely want to do that should it not be able to open a Christian charter school in the upcoming 2026-27 application cycle?

A. Yes.

Q. And what about beyond that in future years?

A. Yes. Certainly.

Q. And did Wilberforce sincerely want to apply for the previous cycle, 2025-2026, to open a secular charter school had it known it couldn't apply to open a Christian charter school at that

Page 359

time?

A. Yes.

Q. Are you a lawyer?

A. No.

Q. Are you a nonprofit lawyer?

A. No.

Q. Do you know how to parse the meaning of corporate documents?

A. I've tried, but no.

Q. Could we look at CID-2 now? Specifically, page 330, using the red numbers at the bottom.

A. All right.

Q. I'll represent to you that this is a page from Wilberforce's charter of incorporation.

Do you see that at the top?

A. On page 330, yes.

Q. Do you remember reading paragraph 14, I believe, with my friend Mitchell?

A. Yes.

Q. I know you just testified you're not a lawyer. But to the best of Wilberforce's understanding, can this document be amended?

A. Yes.

Q. Can you turn to page 339 of the same

Page 360

document? Can you read for me Section 2(a) of this page?

A. "Action of the board of directors."

Q. Can you read the lead-in to that as well? I'm sorry.

A. "Initiation of action to amend these bylaws may be by action of the board of directors or recommendation of an ad hoc committee appointed by the President."

Q. If you look at the top left corner of this page, do you understand this to be the bylaws of Wilberforce Academy?

A. Yes.

Q. Okay.

To the best of Wilberforce's understanding, can this document be amended?

A. Yes.

Q. If you became convinced that Wilberforce needed to amend its corporate documents in order to apply to open a secular school, would Wilberforce make the necessary amendments?

A. Yes.

Q. Would those amendments include any necessary amendments to ensure the school is completely secular?

Page 373

MR. FELDMAN: Okay. No further questions.

MR. NORRIS: Okay. Great.

MR. FELDMAN: We're going to leave it open. You objected and instructed the witness not to answer on a few items, so we're going to leave the record open.

MR. NORRIS: Okay, we object to it being held open or this deposition occurring on any other day or time.

VIDEOGRAPHER: We are off record. The time is 7:29 p.m.

(Whereupon, the deposition suspended at 7:29 p.m.)

Page 374

C E R T I F I C A T E

STATE OF TENNESSEE:

COUNTY OF KNOX:

I, LORA R. BOATMAN, Licensed Court Reporter, in and for the State of Tennessee, do hereby certify that the above videographed deposition was reported by me and that the foregoing pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am licensed by the State of Tennessee as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand this the 9th day of June, 2026.

Lora R. Boatman

______________________________

LORA R. BOATMAN, LCR No. 106.
Expiration Date: 6/30/2028.

Page 375

ERRATA SHEET

Deposition of: ______________________

Date Taken: ______________________

Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change: _______________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change: _______________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change: _______________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change: _______________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________

SIGNATURE:_________________________ Date:_________

PRINT WITNESS NAME:_______________________________

Page 376

ERRATA SHEET

Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change: _______________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change: _______________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change: _______________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change: _______________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change:________________________________
Page No.____ Line No. ____ Change to:_____________
Reason for change: _______________________________

SIGNATURE:_________________________ Date:_________

PRINT WITNESS NAME:_______________________________

# EXHIBIT 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

- - - - - - - - - - - - - - x

THE WILBERFORCE ACADEMY OF KNOXVILLE,
Plaintiffs

VS

CASE NO. 3:25-cv-584(CEA)(DCP)
JUNE 16, 2026

KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County Board of Education,
Defendants,

- - - - - - - - - - - - - -

REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP,
Intervenor-Defendants,

- - - - - - - - - - - - - -

ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER,
Intervenor-Defendants.

- - - - - - - - - - - - - -



(VIA ZOOM) Deposition of DOUGLAS ALAN HARRIS, taken pursuant Rule 26 of the Federal Rules of Civil Procedure, on Tuesday, June 16, 2026 at 10:00 AM (EST) before LOUISE E. BOUTEILLER, CSR, a Connecticut Shorthand Reporter and a Notary Public in the State of Connecticut.



A P P E A R A N C E S:

CONSOVOY McCARTHY PLLC
BY: RYAN M. PROCTOR, ESQ.
CAMERON T. NORRIS, ESQ.
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
ryan@consovoymccarthy.com
cam@consovoymccarthy.com
Representing the Plaintiff

MORRISON FOERSTER, LLP
BY: JON MCNEAL, ESQ.
12531 High Bluff Drive, Suite 200
San Diego, California 92130-3588
jmcneal@mofo.com

Representing the Coble Intervenor-Defendants

MORRISON FOERSTER LLP
BY: ADAM J. HUNT, ESQ.
250 West 55th Street
New York, New York 10019-9601
adamhunt@mofo.com

Representing the Coble Intervenor-Defendants

KNOX COUNTY LAW DIRECTOR'S OFFICE
BY: DAVID M. SANDERS, ESQ.
Senior Deputy Law Director
400 Main Street, Suite 612
Knoxville, Tennessee 37902
david.sanders@knoxcounty.org

Representing the Defendants



A P P E A R A N C E S (continued):

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
BY: THOMAS H. JARVIS, ESQ.
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
tjarvis@bakerdonelson.com

Representing the Intervenor-Defendants (Adrienne Carroll, Ciara Crutcher, Tiffany Nash, Evelyn Henderson, Shakeithia Rice, and Holly Slater)

Page 5

INDEX


| | PAGE |
|---|---|
| Direct Examination by Attorney McNeal | 12 |
| Cross Examination by Attorney Proctor | 239 |
| Redirect Examination by Attorney McNeal | 256 |


Page 6

EXHIBIT INDEX


| PLAINTIFF'S EXHIBITS FOR IDENTIFICATION ID# | PAGE |
|---|---|
| (None.) | |

| INTERVENOR-DEFENDANTS' EXHIBITS FOR IDENTIFICATION ID# | PAGE |
|---|---|
| 1 - Resume of Douglas A. Harris | 17 |
| 2 - Application for a Christian charter school | 44 |
| 3 - E-mail | 47 |
| 4 - Bylaws of The Wilberforce Academy | 102 |
| 5 - Actions of Directors | 108 |
| 6 - Letter of Intent by Wilberforce | 141 |
| 7 - Document re: Arcadia Education | 145 |
| 8 - Complaint | 147 |
| 9 - E-mail from Mr. Wishart | 151 |
| 10 - IRS Form 1023 | 157 |
| 11 - E-mail - Board minutes | 174 |
| 12 - E-mail sent 12/2/2025 | 191 |
| 13 - Document | 196 |
| 14 - Resolution | 211 |
| 15 - State's acknowledgement of Wilberforce's Letter of Intent | 217 |
| 16 - Plaintiff's Motion for Summary Judgment | 220 |


Page 7


| (Exhibits - continued) | PAGE |
|---|---|
| 17 - E-mail | 221 |


* * * * *

(The Exhibits were retained by counsel.)

Page 8

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and among counsel for the respective parties hereto, that all technicalities as to the proof of the official character of the authority before whom the deposition is to be taken are waived.

IT IS FURTHER STIPULATED AND AGREED by and among counsel for the respective parties hereto, that the deposition transcript may be signed before a Notary Public or Commissioner of the Superior Court.

IT IS FURTHER STIPULATED AND AGREED by and among counsel for the respective parties hereto, that all objections, except as to form, are reserved to the time of trial.

oOo

Page 9

(On the record at 10:07 AM.)
THE COURT REPORTER: My name is Louise Bouteiller. I am the Court Reporter stenographically taking today's proceedings.
Today's date is May 16, 2026.
The time is now approximately 10:07 AM.
The attorneys participating in this proceeding acknowledge that I am not physically present in the proceeding room and that I will be reporting this proceeding remotely. They further acknowledge that in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.
Please indicate your consent by stating your name and your agreement on the record.
THE WITNESS: Douglas Harris.
MR. SANDERS: This is David

Page 10

Sanders. I consent on behalf of Knox County Board of Ed.
MR. McNEAL: Jon McNeal consents on behalf of Coble Intervenor-Defendants.
MR. PROCTOR: Ryan Proctor, I consent on behalf of Plaintiff, Wilberforce Academy.
MR. JARVIS: And Tom Jarvis, consents on behalf of the Carolina Intervenors.
THE COURT REPORTER: Are all counsel going to be ordering a copy of the deposition transcript?
MR. SANDERS: Yes.
MR. McNEAL: Yes.
MR. PROCTOR: Yes for Plaintiff.
MR. JARVIS: Yes for Carolina Intervenors.
THE COURT REPORTER: Usual stipulations or is the deponent going to read and sign a copy of the deposition transcript?
MR. PROCTOR: Yes, he'll review and sign, yes.

Page 11

MR. McNEAL: Yes.
THE COURT REPORTER: Okay. Will the witness please state your full legal name and address.
THE WITNESS: Douglas Alan Harris, 1212 Great Oaks Way, Knoxville, Tennessee 37919.
THE COURT REPORTER: Please spell your last name.
THE WITNESS: H-a-r-r-i-s.
THE COURT REPORTER: Please state where you are physically located for this proceeding.
THE WITNESS: Knoxville, Tennessee.
THE COURT REPORTER: Please state the name of anyone who is present in the room with you.
THE WITNESS: No one.
THE COURT REPORTER: Okay. Can counsel verify that before me is Doug Harris?
MR. PROCTOR: Yes.
DOUGLAS HARRIS,
of 1212 Great Oaks Way, Knoxville, Tennessee,

Page 12

37919, having been duly sworn by LOUISE E. BOUTEILLER, CSR, a Connecticut Shorthand Reporter and a Notary Public in and for the State of Connecticut, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. McNEAL:
Q All right. Welcome, Mr. Harris.
A Thank you.
Q Can you just state your name for the record one more time?
A Douglas Harris.
Q And do you understand you're under oath today?
A I do.
Q Do you understand that it's the same oath that you would take in court?
A Yes.
Q Do you understand your testimony can be used at a trial in this matter?
A Yes.
Q So please just listen to my questions. Answer them to the best of your ability. If you don't understand, ask. I'll clarify.
A Okay.

live with me in Knoxville to train him to do basically all of -- a lot of the stuff that I was doing, and so he was taking on some of these duties and then I was putting a lot more of my time into volunteering in non-profits.

I actually launched a non-profit in the year 2000 called The Compassion Coalition, and there was one key employee and then there was one key volunteer and they were in my office and they actually -- that ministry stayed in my office for I think 15 years, but I was spending probably 20 -- at least 20 hours a week just in a volunteer capacity.

Q So it sounds like part of it was that you were -- you had other things going on that were --

A Yes, yes. I was not retired, for sure. I was still very active.

Q And by the time that you decided to take a step back, you had been in operation for around eight years?

A Yes.

Q And would you say it was -- strike that.

Were your operations in a state where everyone kind of knew what their role and



responsibility was?

A I think so, yes. We have a really good team, and my management philosophy has always been to take care of people, that's one of our core values, and so our turnover is very low and, like I mentioned before, a lot our managers have been around for years and so that obviously helped with operations.

Q And you had systems in place?

A Yes.

Q And every -- because you had been working together for eight years, everybody knew what they were doing, correct?

A Yes. And also there's a benefit when you're at most -- this was a franchise, and so you also have the franchisor will make periodic visits to make sure that you're running the system as -- as you're instructed to, so that's another set of eyes that's watching to make sure we're doing what we're supposed to do.

Q Okay. So the team had been together for eight years?

A Yes.

Q Everyone knew their duties and responsibilities. You had systems in place?



A Yes.

Q And that allowed you the room to take a step back from the business?

A Yes.

Q Okay. Do you have any other present professional responsibilities besides Harris Entertainment Group (sic)?

A Currently?

Q Correct.

A I'm an active partner in SafeSplash Swim Schools. We've got four locations. I'm not -- I don't have a title, but I'm an active partner with the young man that runs that business.

Also am a part owner in some Huey Magoo's chicken tender restaurants in Montgomery, Alabama. So I'm fairly active in that, talking to the owner, the other owner -- I'm a part owner -- the operator run those.

And then 8 years ago with my sons, we started a software business. It's grown quite large and so I've been, over the last eight years, been pretty active in that. I would go to meetings and help with sales. I've obviously helped with strategy, hiring decisions, but I'm not paid. I'm on the board, but I'm not paid.



Q So it sounds like you have an immense amount of professional experience.

A I would consider that a compliment. Thank you, I guess.

I've been -- I've been running businesses for 33 years, and I've also started businesses in Africa. I've been going there for almost 18 years on a yearly basis. More than yearly. I've been 40 times.

I helped young indigenous African-American men and women start businesses there. I don't own them. We just help with capital, and then I would be like a consultant to them over the years, and some of them have grown to be quite large and successful.

Q Where in Africa?

A Uganda.

Q Your resume also lists service with Emerald Youth Foundation --

A Yes.

Q -- correct?

A Yes.

Q What is that?

A That's an urban ministry in Knoxville, Tennessee that's budgets about $10 million. It's a

Page 29

large organization that services over 2,000 youths in the urban core, and I've been on that board for 13 years. I was on an advisory board probably another 10 years before that, and now I'm on the board of trustees, and I'm also the chair of the finance committee.

Q What is the mission of Emerald Youth Foundation?

A It's to develop leaders in this urban core so that they can give back to our community.

Q So you are both, you said, board chair or --

A I'm a chair of the finance committee, yes.

Q Got it. Okay.

So you're on the finance chair committee and then you also sit on the board?

A Yes.

Q Okay. Your resume also lists the National Christian Foundation of East Tennessee.

A Yes.

Q What is that organization?

A The National Christian Foundation, I believe it's the largest Christian foundation in the world. It's got billions of dollars under

Page 30

management, and so we help basically Christian donors through their resources and help them increase their generosity. We use some strategies of complex plans where people can sell part of their businesses and give it to charity, and then we also help people with just making a plan on how they want to give their money away.

Q I'm sorry, I'm not sure I'm understanding.

So is this like a fundraising organization?

A No, it's people -- it's typically people with high net wealth that are Christians and they have -- they need some wisdom and some guidance on how to give their money away because a lot of them are generous and they want to give their money away because they've usually owned business for years and so they've got a lot more to give, and so we provide expertise, and we have retreats and seminars in helping people develop a plan to give their -- their wealth away.

Q And you said it's for Christians, correct?

A Yes. I mean, I think anybody would be welcome to -- to join, but it primarily serves the

Page 31

Christian community.

We use a vehicle called a donor advise fund, that's what most people would put their assets into a donor advice fund, and then we have tools online that makes it easy for them to give their money away.

Q When you say Christians, is that all denominations of Christianity?

A Yes.

Q Do you target specific denominations?

A No, and I don't work in the home office, but in -- this is -- we're like a satellite office in Knoxville. We don't target, you know, any particular denomination.

Q So the target audience is broadly high net worth individual --

A Yes.

Q -- who are any brand of Christianity?

A Yes.

Q Christian?

A Yes.

Q Okay. And remind me of your role there?

A I'm the chair.

I think I've been the chair for probably 10 years.

Page 32

Q Okay. And what is -- what are your duties and responsibilities as the chair?

A Well, I oversee the meetings. We have three meeting per year, but I meet probably monthly with the president. So my job as the chairman obviously is to work closer with the chairman, but he's been doing this for 30 years. He doesn't need a whole lot of help with what he's doing.

So we make sure that the financials are audited and that everything is -- the i's are dotted and the t's are crossed, and we help with some strategy and help with referrals in our network, too, with other members of the board.

Q How much money are you advising on, do you know, as a total?

A I think we are -- I think our corpus is around -- I think it's around 130,000,000.

Q Okay. So this is a very cash intense --

A Yes.

Q -- organization?

A Yes.

Q And you said that there's a president as well?

A Yes.

Q And who's that?

Page 33

A His name is David Ragland.
Q Okay. And David's been doing this for 30 years?
A I believe it's been 30 years.
Q Okay. And because of his wealth of experience, you tend to delegate some responsibility to him? Did I get that correct?
A Yes, but, I mean, typically in most boards, the major job of the board is to oversee the president and to make sure what he's doing is fulfilling the mission.
So in that context, yes, that's -- I would be -- all of the board members were overseeing what he's doing and making sure we're being faithful to the mission.
Q Are there any other responsibilities of the board chair or NCF East Tennessee?
A I've gotta make sure, like, the tax return is filed and -- I'm trying to think -- the minutes -- we had minutes for the meetings -- so some of the typical administrative duties on typical boards, so I would say I would -- I'm responsible for that.
Q Isn't it referred to as NCF? Is that a --

Page 34

A Yes, that's an acronym for National Christian Foundation.
Q Great.
I just don't want to have to say "National Christian Foundation" --
A Yes.
And the actual board that I'm on is National Christian Foundation of East Tennessee, because there's a national organization. We're almost like a franchisee, for lack of a better word. Affiliate. That's the word they use is affiliate.
Q So it sounds like what you're telling me as the board chair, your job is to ensure that the mission is structurally adhered to?
A Yes.
Q And that the reporting and filing requirements that are necessary to keep the organization running are strictly adhered to?
A Yes.
Q Are there any other responsibilities that you have?
A I can't think of anything off the top of my head.
Q And would you say that -- so

Page 35

Mr. Ragland's been there for 30 years, correct?
A Yes.
Q And so you don't feel like you need to supervise him closely, is that correct?
A I don't know if -- I wouldn't characterize it that way.
Q How would you characterize it?
A I would say that we supervise him to the extent that we're going to make sure that there's no major fraud, and that he's not -- following the mission of the organization, and that he's living a life of integrity that we would want him to live, so that's how I would characterize it, and that he's, you know, doing all the administrative duties, banking duties and all of that, that needs to run the organization.
Q How long have you known David?
A Probably 35 years.
Q Was the --
A 30, 35 years.
Q Go ahead. Sorry.
A Yes, 30 to 35 years.
Q Was the amount that you supervise David if he had, let's say, five years of experience and you'd only known him for five years, would that

Page 36

change?
A If he was asking me questions, yes, but I wouldn't be going over to his office more often.
I mean, I would be looking at the board meetings, and I would be looking at the activity.
You know, we've got measurements. We've got benchmarks that we're looking at to see if we're accomplishing our goals. So I would be looking at that and if I didn't see the activity and the accomplishments, I'm sure the entire board would want to intervene; but, just to say that if he had less experience would I be going over there more often, I don't think I would characterize it like that.
Q So it sounds like, as the board chair, you get reports sent to you?
A Yes.
Q And what do those reports consist of?
A We have KPI indicators of how many people have opened donor advice funds, how many new contacts they've made, and then the financial information, and then also there'd be some activity maybe in some marketing information that would be coming from the national organization that's based out of Atlanta.

Page 37

Q So you routinely receive reports that allow you to monitor and supervise the progress of the organization?
A Yes.
Q And then, based off of those reports, you make decisions and direct the organization?
A Yes.
Q Okay.
A And I would say I get those reports about every four -- about every four months.
Q Okay. And if there were events that were happening, let's say, monthly for NCF, would you need more reports? Would you --
A Probably not. I mean, we're paying him to run that organization and, you know, we expect him to do the work. We're board members and we've got other duties and responsibilities in our lives.
I mean, if it fell apart and we thought that he was doing something that was illegal or something like that, I'm sure we would come in and spend more time to clean it up and to find a new executive director.
But just on a day-to-day basis, we've got a high level of trust, and the people that we hired, we hire good people and let them do their

Page 38

job.
Q And if David was moving the organization in a direction that was against the organization's purpose, would you step in?
A Yes.
Q Let's turn to the KCS board.
It says here on your resume that you're a school board member from 2012 to 2016?
A Yes, sir.
Q And it says that you were chair in 2016?
A Yes.
Q And what were your major responsibilities as a board member?
A Our main duty as a board member is to manage the superintendent and then to make policy, and oversee the policies.
Q When you were --
A And I would say also is to help with -- determine the yearly budget.
Q When you were on the board, did you gain familiarity with the charter school application process?
A Yes.
Q And while you were on the board was the first Knoxville charter, correct?

Page 39

A Yes, I believe it was while I was on the board.
Q And you understood that the Knox County Board serves as the authorizer for charter school applications in Knox County?
A Yes, I do.
Q In your words, what does an authorizer do?
A We basically determine if the application -- if the people that are putting the application in if they're going to be able to get the job done, is the way I would characterize it.
Q What type of things would you look at?
A We would look at who's -- who's going to run it, Number 1, I would think, and their experience. He would look at some of their financial capacity, and then we would get advice from the staff in the school on the application itself on details maybe of the curriculum and things like that because I wouldn't say that most of the board members would say that they're experts in that subject matter, even though they're on the school board.
Q And the board has the authority to approve or deny a charter school application?

Page 40

A Yes.
Q And to summarize what you said, the -- while exercising that authority, the board would evaluate applications based on personnel, the funding, correct?
A Yes.
Q Anything else?
A I'm trying to think if there's any other legal caveats.
You know, we did have a legal counsel that would be there helping if there was legalities that they were missing, we would be advised by our counsel on the school board on things like that.
Q Would the board review the application and make sure it complies with state law?
A Yes, and I would say that we were given advice from our attorneys on that because we -- I wouldn't say any of us would say we were -- had the capacity to -- to make that judgment call.
Q Who was the counsel at the time you were on the board?
THE WITNESS: David, could you help me with this?
I'm drawing a blank.
It wasn't Mr. Dupler.

It was -- I can't recall his name.
BY MR. McNEAL:
Q Okay.
A He's a -- he's a judge now in Knox County. I'll think of it in just a second.
Q Okay. If you think about it later, feel free to come back around on that.
A Okay.
And David Sanders was also on the staff of the -- so he would serve at some of the meetings as well.
I can't recall at this meeting who was -- who was there.
Q Was the attorney that would help you on determining the legality of the application, were they employed by the County?
A Yes.
Q So what did you -- when a charter application came before you, what did you think your job was as a board member?
A Was to make a commonsense decision of if this organization had met with proposing it -- had personnel, the funding, and from the advice of our staff at the school if the curriculum was enough to say, yes, this is a valid charter school



application and we should approve it.
Q And the board had authority to make that decision?
A Yes.
Q What did you look for in the curriculum?
A Frankly, I don't recall really looking that deeply into curriculum because, again, I'm a businessperson.
So I brought a lot of things to the school board, I feel, like, that didn't involve curriculum. That's not my area of expertise.
I usually would rely on the staff and people, administrators, that knew about curriculum, so I -- I don't recall really looking and diving deeply into the curriculum.
Q Were there other members of the board that were more familiar with helping schools or --
A There was -- in my first two years, I think when we were looking at this, there was -- there was a couple of ex teachers, I believe.
Q Would you lean on their expertise in that area when it would come to making a decision on a -- on a school?
A Frankly, I don't recall them ever even bringing up the curriculum either.



Q Okay.
A So, again, I think we were relying on the staff.
We've got, you know -- at that time a $400 million budget and lot of capable people of look at the details of an application like that.
Q And when you say you would rely on the staff, would they produce a report for you?
A No, I think that they actually -- yes, I don't know if it was probably a report form, but I'm pretty sure that they actually said that this application could be approved as it was presented. I could be wrong on that. I'm not going to bet on it, but I'm pretty sure they make a recommendation one way or the other.
Q So it sounds to me, and correct me if I'm wrong, the staff brings a recommendation. The board has ultimate authority to --
A Right.
Q -- authorize the application, so --
A Let me just say the recommendation is not whether we should approve it or not.
I think the recommendation would be that this is an application that's checked, you know -- that's done everything that needs to be done and



it's -- it looks like a valid application.
Q Okay. So --
A I don't really know how to explain it.
I mean, if they didn't think it was going to work, I think they would just flat out say, we don't approve this application.
Q And if they said, you know, this -- this application probably won't work, the board could still turn around and say we're going to approve it?
A We could.
Q And the offset if the board -- if the staff comes and says this is a great charter school, you can still turn around and say we're still not going to approve this?
A Yes.
Q Okay. So I'm going to bring another Exhibit onto the screen. I'm going to be marking this at Coble Intervenor Exhibit 2.
A Okay.
(The document referred to was marked as CID Exhibit 2.)
BY MR. McNeal:
Q (Indicating.)
It should be on your screen now.

Page 65

had with him before then?
A I don't know that I said I didn't know him we well.
It was the other people on the board, the other people that he was asking.
Q Okay.
A Sorry about that.
Q It's okay.
So what you're saying is that during that conversation, he talked about other people that were going to be on the board?
A Yes.
Q And you did not know those people very well?
A No.
Q The only person that you knew was Mr. Colquitt?
A Yes, and -- and Zach Wishart, yes.
Q And Mr. Wishart.
And your -- during that meeting, he talked about other people that were going to be on the board?
A My guess is that he did; but I don't recall it, to be honest with you.
Q Okay. Let's talk about finances.

Page 66

In as close to his exact words as you recall, what did he say about the financing of Wilberforce?
A Well, I mean, I know we had a conversation about this -- the scope and the -- you know, the heavy lift that that would be, but I don't think either one of us were afraid that we couldn't do that.
I've been involved in some large projects, and I know David Colquitt has been involved in large projects, and both of us had resources. So even if we didn't have anybody else on the board, we had a good start right there; but, we didn't -- I mean, we just had -- we talked about it, you know, it's going to be work.
Q Did you talk about the general amount that you would need to get the application?
A I don't think we got into the details on that specifically because a lot of it, too, would depend on what location you've got, so it would be just speculating how much the budget would be in a conversation like that.
Q Do you remember if there were any specific numbers talked about?
A No, I don't remember.

Page 67

Q And your position in that meeting was that Mr. Colquitt and yourself would be able to cover the costs of the application, is that correct?
MR. PROCTOR: Objection -- actually, strike that.
THE WITNESS: No, I -- I didn't say we both would cover the costs, but I knew that we both had financial resources to get a good start, and we both could raise the money, I feel, confident to get -- to get that school opened.
BY MR. McNEAL:
Q Okay. Let's talk about the site.
What did Mr. Wishart, in as close to his exact words as you can recall, say about the site?
A Well, that was one of the things that made me excited about the project because he told me he wanted to put it in the Cedar Bluff area and that's not too far from where I live, and I know a lot about that school and those schools there, and specifically Cedar Bluff, the -- the test scores for proficiency for math and reading are not very good. They're less than 50 percent. I think

Page 68

they're less than 40. But I know they're less than 50 percent, and people wouldn't think necessarily that that's a good location to put a charter school, I think, because it's not in an urban area; but, there's definitely some deficiencies, and there's needs to be some more competition and some more choice and so when he told me about Cedar Bluff, I perked up and that definitely made me more interested in the project.
Q Is the correct plan still to put it in Cedar Bluff?
A I believe so, yes, yes.
Q Your testimony is yes?
A Yes.
Q When he said that the plan was for it to be in Cedar Bluff, what was your response?
A I think basically what I just told you, is that there's a gap in the education outcome there in Knox County, and there needs to be some more competition and some more choices for parents and students to hopefully close that gap.
Q Let's talk about the legality, and I'm asking the same question I just asked many times.
What -- in as close to his words as possible, what did Mr. Wishart tell you about the

Page 93

of the reasons he wanted to start this. It's his -- it's his passion.
Q Got it.
And you -- but you did not tell him that he could be the administrator at that point, correct?
A No, I did not.
Q You didn't give him any assurances on behalf of the board?
A No.
Q Okay. And you discussed the possible site of Wilberforce?
A We discussed the general area, which is the Cedar Bluff area, but I don't think we talked about any sites. I don't recall that at all.
It was just a general area and the need for some kind of -- you know, a different choice for -- for children and parents in that area.
Q And you told him that Cedar Bluff was an area that was in need of more school choice?
A Yes.
Q And you told him that you lived in Cedar Bluff, I assume?
A I lived in that area, yes, just down the road from it.

Page 94

Q And you told him you thought it was a good idea to open Wilberforce?
A Yes, in that area, yes.
Q And you also discussed the legality of Wilberforce?
A Yes.
Q And you discussed that litigation was contemplated at that time, correct?
MR. PROCTOR: Objection, mischaracterizes his prior testimony.
BY MR. McNEAL:
Q Okay. Well, was there anything else discussed at that meeting?
A I would say on the location.
I -- I think when we talked about the location, that really got me excited because if he had potentially wanted to put it somewhere else, I might not have been interested frankly, because I'm so busy and I'm on -- I've got other things going on.
So I think -- I do recall that I was kind of surprised that he picked that area 'cause I was thinking out of the box, but I guess I'm not surprised because I know that Zach knows a lot about education in our community; but, I do

Page 95

remember thinking that.
Q You said "I do remember thinking that."
What do you mean by that?
A That that was a great location, and I was glad that he picked that and if he picked another location potentially, I wouldn't have been interested even being on the board.
Q Understood.
Other than Mr. Wishart, in August did you communicate with anyone else about Wilberforce?
A I'm sure I talked to my wife.
MR. PROCTOR: Jon, we've been going about an hour and 40 minutes.
Do you think that now would be around a good time for a break or --
MR. McNEAL: Yes, sure.
MR. PROCTOR: Okay.
MR. McNEAL: 10 minutes. Call it 8:50 or what's that for y'all, it's 11:50.
MR. PROCTOR: Yes, 11:50. Great. Thank you.
THE WITNESS: All right.
(Whereupon a recess was taken.)
BY MR. McNEAL:

Page 96

Q So the last question I asked you was in the month of August, other than Mr. Wishart, have you -- did you communicate with anyone else about Wilberforce?
A The only person I can recall would be my wife.
Q Okay. How about in the month of September?
A No, I don't recall talking to other people about it.
Q How about in the month of October?
A I don't recall talking to other people.
Q Then, how about November?
A In November, I bet I talked with some people because that's when some things were starting to happen, like when I talked to Mr. Wishart about the box being checked, I couldn't tell you for sure who it was but, I mean, I've got a lot of good close friends, and I'm sure I probably mentioned it to some of 'em, but it wasn't like I posted it on Facebook or something.
Q Yes, of course.
So other than Mr. Wishart, can you name any person that you talked to in the month of November about Wilberforce?

A Yes, I think it's highly likely.
Q Okay. Pivoting now, does Wilberforce Academy sincerely want to apply to open a Christian charter school in Knox County?
A Definitely.
MR. McNEAL: Objection, misleading.
THE WITNESS: Okay.
BY MR. PROCTOR:
Q You can answer.
A Okay. Yes, we definitely want to open a Christian charter school.
Q Why?
A Well, there's several reasons. First of all, speaking for myself, and I think I probably speak for everybody on the Board, you know, public education spends a trillion dollars a year, and only about 30 percent of the students are proficient in math and reading, language. So there's certainly a need for more competition, people to do things differently, so that's Number 1.
Number 2, as I referenced earlier, and just referring to this school, there's a big need in Cedar Bluff, in my opinion, because of the



academic achievement -- lack of academic achievement in that area, and I might add that school is probably a little bit overcrowded, so there's even room for another school because we need more classrooms.
But finally, I mean, I believe, and I know everybody on the Board believes, that education is just not reading and math. There's a spiritual component for many of us that are Christians that kids are missing, that people are missing in general, and that starting The Wilberforce Academy would close that gap, and it would give parents the opportunity that don't have the money to send their kid to a Christian private school to have a different option.
And so for those three reasons, I would say that's definitely why we want to open.
Q Other than Wilberforce, do you have any experience expanding access to Christian education in Knox County?
A Well, in -- in Emerald Youth Academy, I know they do Bible studies, and they have small groups, and they do Bible lessons in their after-school activities. So that to that extent when I'm on that Board, we've been doing that for a



long time.
Then recently, in the last year, I've been the co-founder and I'm the treasurer of an entity called the Bearden Learning Center, and what we do is we facilitate offsite Christian Bible classes for high school students, and these students receive high school credits toward graduation.
We're starting in Bearden High School, which is actually the school I went to; graduated from. This Fall, we've already got 200 students signed up for the curriculum. We're going to be teaching Old Testament and New Testament, and basically what this is, the Supreme Court, I think in 1950-something, made a law to where parents could take their kids offsite for religious instruction.
But more importantly the State of Tennessee about five years ago passed a law that you could actually get high school credit, and so we're -- it started this, and we're planning on expanding in all of Knox County.
There's another school that did it. It started years ago, Feradon High School, that has a separate 501(c)(3).



We got our own separate 501(c)(3) established in the last few months, and so that's another avenue that I've been able to advance the Kingdom in the Gospel.
Q Is Bearden High school a public school?
A Yes, it's one of the largest public schools in Knox County.
Q And are these Bible study classes explicitly religious?
A Yes.
Q How so?
A Well, I mean, we can pray. We can -- basically, there's no restrictions on how these are taught, as opposed to there is a Bible class at Bearden High School that has to be totally secular and historical in nature, as opposed to this would be a class that you might get in a Sunday school class.
Q If Wilberforce can't open a Christian charter school, does it want to apply to open a secular school in Knox County?
A You know, personally, I'll be disappointed if we can't, but, yes, because of the first two reasons that I talked about for the lack of choice.

I mean, I've been a big proponent of vouchers and charter schools for a long time.

I think I was probably the first Board member in Knox County who's publicly come out, and also campaigned on the -- that I was going to promote charter schools.

So to answer your question, yes, we plan on opening another charter school that would be secular.

Q If Wilberforce gets the legal -- excuse me, let me restart.

If Wilberforce gets the legal obstacles removed and its charter applications removed, will it do everything possible to open that charter school?

A Yes.

Q Did they --

A I mean --

Q Oh, go ahead.

A I mean, we've definitely got the capabilities, the Board that we have assembled and the track record that we have.

I mean, I know for myself, I started I think four non-profits myself and they're all successful.



One of 'em has been going for over 20 years, it's called The Compassion Coalition. I think maybe I mentioned that earlier.

I started a non-profit in Africa that's probably served hundreds of thousands of people, giving them clean water, food, medical care, started jobs.

So this is not out of our reach to be able to open up a school like this.

Q To date, has Mr. Wishart done anything as an executive director of Wilberforce that you consider outside of his authority as the Executive Director of Wilberforce?

MR. McNEAL: Objection, leading.

THE WITNESS: No.

BY MR. PROCTOR:

Q Has any Board member raised a concern that -- excuse me.

Has any other Board member raised a concern that Mr. Wishart is -- has acted outside hit authority?

MR. McNEAL: Same objection.

THE WITNESS: No.

BY MR. PROCTOR:

Q To date, has Mr. Wishart done anything



as Executive Director of Wilberforce that you disprove of?

MR. McNEAL: Same objection.

THE WITNESS: No.

BY MR. PROCTOR:

Q Has any other board member voiced any disapproval of anything that Mr. Wishart has done as Executive Director?

A No.

MR. McNEAL: Same objection.

THE WITNESS: No.

BY MR. PROCTOR:

Q In your view, does the Wilberforce Board approve of the lawsuit?

MR. McNEAL: Same objection.

THE WITNESS: Yes, I mean, unfortunately, I guess it was our only option, so, yes, they approve of the lawsuit.

BY MR. PROCTOR:

Q In your view, has the Board authorized the lawsuit?

A Yes.

Q If the Board wanted to end the lawsuit, could it do so?



A Easily.

Q Could the Board end the lawsuit over Mr. Wishart's objection if it wanted to do so?

A Yes, he has no technical authority. He's not on the Board.

Q Are you aware of any Board member expressing any concerns or complaints about how Mr. Wishart handled the Letter of Intent?

MR. McNEAL: Objection, leading.

THE WITNESS: No.

BY MR. PROCTOR:

Q Did you have any concerns or complaints about how he handled the Letter of Intent?

MR. McNEAL: Same objection.

THE WITNESS: No.

BY MR. PROCTOR:

Q Did you have any objections or concerns about how Mr. Wishart has handled the charter application?

MR. McNEAL: Same objection.

THE WITNESS: No, I think he's done a good job.

It appears that he hired a firm that was able to help him create a really nice document.

Page 249

BY MR. PROCTOR:
Q Have you heard any complaints from any other board members about how Mr. Wishart handled the charter application?
MR. McNEAL: Objection.
THE WITNESS: No.
BY MR. PROCTOR:
Q Have you had any concerns or complaints about how Mr. Wishart has handled this litigation?
A No.
Q Have you heard any -- are you aware of any other board members expressing concerns or complaints about how Mr. Wishart has handled this litigation?
A No.
Q Okay.
MR. PROCTOR: Jon, I'm sorry. I don't remember what the Exhibit number is, but would we be able to go to the Board actions document on Page 344?
MR. McNEAL: I just need to know the Exhibit number.
MR. PROCTOR: Okay.
MR. McNEAL: I retitled all of them, too, so I could produce them.

Page 250

So you need to give me the Exhibit number or else I can't do it.
MR. PROCTOR: All right. Just give me a moment.
MR. McNEAL: No problems.
MR. NORRIS: A question for the Reporter: Is it possible for one of us to share our screens and do it that way, use the screen share function on Zoom?
THE COURT REPORTER: Hold on, let me just double-check something.
(Discussion off the record.)
MR. McNEAL: All right. It looks like it's 5. I'm pulling it up. (Indicating.)
Is this what you want?
MR. PROCTOR: Yes, thank you.
And could you scroll down a little bit, please?
MR. McNEAL: (Indicating.)
BY MR. PROCTOR:
Q All right, Mr. Harris. We're ready to resume.
A Okay.
Q Okay. Do you remember looking at this

Page 251

document, this is --
A Yes.
Q -- Exhibit -- okay, great, this is Exhibit 5, the Actions of the Directors.
Could you take a look at paragraph 4 and tell me in your words what paragraph 4, the Board, did?
A Yes, we basically approved the Bylaws of the corporation and --
Q Okay.
A -- tell the secretary to codify them, I guess, in the State.
Q Great.
And then could we -- can we look at Exhibit 4, please?
MR. McNEAL: Yup. (Indicating.)
MR. PROCTOR: All right.
BY MR. PROCTOR:
Q Do you recognize this document, Mr. Harris?
A Yes.
Q What is it?
A This is the Bylaws of The Wilberforce Academy.
Q Okay. And are these the Bylaws that the

Page 252

Board approved?
A Yes.
Q Okay.
MR. PROCTOR: And, Jon, could you just scroll down just a little bit, please?
MR. McNEAL: (Indicating.)
MR. PROCTOR: Perfect.
BY MR. PROCTOR:
Q And then, can you look at -- do you see section 2 that says "purposes"?
A Yes.
Q And do you see Subsection (b) that says "specific purposes"?
A Yes.
Q And could you just take a look at that first sentence?
A Okay.
Q You can let me know when you're ready.
A Yes.
Q Okay. And what would you say -- how would you characterize -- or sorry, strike that.
Based on that section of the document, what would you say Wilberforce's specific purposes are?

Page 253

A Is to provide Christian educational services and operate a Christian charter school.
Q All right. So do these documents refresh your recollection on whether the Board approved the decision to create a Christian charter school?
MR. McNEAL: Objection, leading.
THE WITNESS: Yes, it does. Yup.
BY MR. PROCTOR:
Q And what is your recollection?
A Well, I think these were done in -- in November, the end of November. So, yes, this is what we all agreed that we wanted to do, was to start a Christian charter school.
Q Okay. And do you see that last part of the sentence, conduct activities ancillary thereto?
A Yes.
Q What could you consider to be activities ancillary to operating a Christian charter school?
MR. McNEAL: Objection, leading.
THE WITNESS: I mean, I guess it's pretty open-ended, but I would think they would be Christian-oriented programs, or anything that you wanted to do that were in that Christian mission.

Page 254

BY MR. PROCTOR:
Q Would submitting a Letter of Intent be an activity ancillary to operating a Christian charter school?
MR. McNEAL: Objection, leading.
THE WITNESS: Yes, definitely.
BY MR. PROCTOR:
Q What about sending an application?
A Yes.
Q What about filing a lawsuit to make it possible to open?
A Yes.
MR. McNEAL: Objection, leading.
BY MR. PROCTOR:
Q In your view, is it necessary for Wilberforce to prevail in this lawsuit to be able to open a Christian charter school?
MR. McNEAL: Objection, leading.
THE WITNESS: Yes.
BY MR. PROCTOR:
Q What do --
A If we don't win the lawsuit and we still open, like if the Board of Education had said they would let us open, even still there would have been a risk. I'm afraid that we could have been shut

Page 255

down by another lawsuit later on after, you know, raising $10 million and hiring staff and getting a school open, there would have been a risk.
Q Sitting here today, what do you think would have happened if Wilberforce had submitted an application by February 2nd?
MR. McNEAL: Objection, leading. Objection, calls for speculation.
THE WITNESS: From my experience of being on the board four years, they would -- you know, the attorneys are going by the letter of law and they would have denied that.
They would have told the Board not to vote for it, and even if the Board members supported the idea in general, I believe they would have voted against it and denied the application.
BY MR. PROCTOR:
Q On what basis would they have voted against and denied the application?
A Because it was --
MR. McNEAL: Objection, speculation.
THE WITNESS: Because it was going

Page 256

to be a religious charter school. They were going to discriminate on religion.
MR. PROCTOR: All right. Nothing further from us.
REDIRECT EXAMINATION
BY MR. McNEAL:
Q Okay. All right. Mr. Harris, you've just said you believe that education should include a spiritual component, is that right?
A Yes.
Q Do you equate spirituality with Christianity?
A I mean, I do, personally.
I know from the broader scope of other people, they consider many ways to spirituality; but for me and my family, we consider Jesus Christ as the -- as the only way. It's to seek the truth.
Q Okay. So, when you said that education should include a spiritual component, you're saying that it should be Christian, is that correct?
A I think in America that people should be able to have the right to choose whatever religion they want, and if you happen to be Christian, then you should be able to send your kids to a school that are going to support those -- that value

Page 261

How is the secular charter school application different from the religious charter school application that you saw?
A Well, from the beginning, from what I recall, it -- it stipulates that we're not a Christian school, as opposed to the original document. Other than that, I don't really know because I didn't read it thoroughly because I'm hoping we're not going to have to use it; but, I assume that the curriculum standards and the curriculum would be different, but I'm just making assumptions.
Q What would be different about the curriculum?
A Well, I assume that the Christian school is going to have reference to the Scripture, the Bible. They're going to -- the whole essence of the education is going to revolve around Christianity and the Scripture, whereas in a secular school you're not going to be able to do that.
Q Okay.
MR. McNEAL: No further questions.
MR. NORRIS: All right. Thanks, everybody.

Page 262

Thank you, Court Reporter.
(Whereupon the witness was excused and the deposition adjourned at 4:02 PM on Tuesday, June 16, 2026.)

Page 263

C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn (via Zoom), and thereupon testified as appears in the foregoing deposition (via Zoom); that said deposition was taken by me stenographically in the presence of counsel (via Zoom) and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 23rd day of June 2026.

*Louise E. Bouteiller*
LOUISE E. BOUTEILLER, Notary Public

My commission expires:
1/31/2029

Page 264

CERTIFICATE OF DEPONENT

I, DOUGLAS ALAN HARRIS, have read the foregoing transcript of the testimony given at the deposition on June 16, 2026, and it is true and accurate to the best of my knowledge and/or with the changes as noted in the attached errata sheet.

______________________________
DOUGLAS ALAN HARRIS

Subscribed and sworn to before me on this the

______________________ day of ___________________,

20________.

_______________________
Notary Public

My commission expires:

_________________________

# EXHIBIT 6

U.S. DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

The Wilberforce Academy
of Knoxville
v. Case No. 3:25-cv-00584
Knox County Board of Education

WEB CONFERENCE DEPOSITION OF
DAVID MATTHEW COLQUITT

JUNE 24, 2026
9:03 A.M.
TENNESSEE

NICOLE REIS, CSR, RPR NO. 852392



APPEARANCES OF COUNSEL

On Behalf of the Plaintiff (Wilberforce Academy):
CAMERON T. NORRIS, ESQUIRE
CONSOVOY McCARTHY, PLLC
265 Franklin Street, Suite 1702
PMB A189
Boston, MA 02110
cam@consovoymccarthy.com

On Behalf of the Defendants (Knox County Board of Ed.):
DAVID D. AYLIFFE, ESQUIRE
BAKER DONELSON
265 Brookview Centre Way, Suite 600
Knoxville, TN 37919
865.549.7231
dayliffe@bakerdonelson.com

On Behalf of the Coble Intervenors:
JON J. McNEAL, ESQUIRE
MORRISON FOERSTER
12531 High Bluff Drive, Suite 200
San Diego, CA 92130
858.720.5100
jmcneal@mofo.com

On Behalf of Knox County:
DAVID M. SANDERS, ESQUIRE
KNOX COUNTY, DEPUTY LAW DIRECTOR
400 Main Street, Suite 612
Knoxville, TN 37902
865.215.2327
david.sanders@knoxcounty.org

ALSO PRESENT:
Ryan Proctor, Esq., Consovoy McCarthy
Brooke Galloway, Esq., Morrison Foerster
Mitchell E. Feldman, Esq., Morrison Foerster
Rachel K. Harrison, Knox County



INDEX OF EXAMINATION

WITNESS: DAVID MATTHEW COLQUITT

EXAMINATION PAGE
BY MR. McNEAL...................................... 6

INSTRUCTIONS TO WITNESS:
Page 85, Line 10
Page 85, Line 20
Page 86, Line 23
Page 99, Line 2
Page 101, Line 9
Page 104, Line 2
Page 104, Line 8
Page 105, Line 21
Page 106, Line 11
Page 109, Line 1
Page 109, Line 7
Page 109, Line 12
Page 111, Line 17
Page 112, Line 2
Page 112, Line 7
Page 112, Line 15
Page 113, Line 17
Page 114, Line 22
Page 115, Line 11
Page 115, Line 17
Page 116, Line 8
Page 117, Line 13
Page 117, Line 20
Page 118, Line 4
Page 140, Line 4
Page 148, Line 2
Page 148, Line 8
Page 149, Line 18
Page 159, Line 15
Page 169, Line 2



INDEX OF EXHIBITS


| INTERVENOR | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Bylaws | 53 |
| EXHIBIT 2 | Actions of Directors | 56 |
| EXHIBIT 3 | Application for Charter School | 60 |
| EXHIBIT 4 | Colquitt Foundation; Donation Article. | 76 |
| EXHIBIT 5 | Form 990-PF (2024) | 95 |
| EXHIBIT 6 | Charter Application Support Proposal; email chain | 125 |
| EXHIBIT 7 | Arcadia Education Correspondence dated November 20, 2025; Attachments | 130 |
| EXHIBIT 8 | The Wilberforce Academy of Knoxville bank statements | 142 |
| EXHIBIT 9 | Wilberforce Academy Board Meeting; email | 150 |
| EXHIBIT 10 | Resolution of the Board of Directors | 152 |


(Exhibits 1-10 were attached to the original transcript.)

(DEPOSITION COMMENCED AT 9:03 A.M.)

THE REPORTER: It is hereby stipulated and agreed by all counsel that this web-based remote proceeding is being conducted by parties in separate locations.

The oath shall be administered upon the witness providing a valid form of identification.

This proceeding will not be recorded by video or audio means without prior consent of all parties.

Exhibits may be marked by counsel and provided to all parties.

All parties shall bear their own costs for this proceeding unless otherwise agreed upon in advance.

For the record, I am a Massachusetts notary, and my RPR number is 852392; to ensure a valid notary and certified court reporter is present at this proceeding.

Do all parties agree?

(All parties in agreement.)



DEPOSITION OF DAVID MATTHEW COLQUITT
JUNE 24, 2026

DAVID MATTHEW COLQUITT
Having been first duly sworn, testified as follows:

THE REPORTER: Please state and spell your full name for the record.

THE WITNESS: David Matthew Colquitt. Spell it all?

THE REPORTER: Yes, please.

THE WITNESS: D-A-V-I-D, M-A-T-T-H-E-W, C-O-L-Q-U-I-T-T.

EXAMINATION

BY MR. McNEAL:

Q. Mr. Colquitt, how are you this morning?
A. I'm good.
Q. Can you state your name for the record one more time?
A. David Matthew Colquitt.
Q. Do you understand you're under oath today?
A. I do.
Q. Do you understand that this is the same oath you would take in court?
A. I do.



Q. Do you understand your testimony could be used at a trial in this matter?
A. I do.
Q. So I just want to cover some housekeeping real quick.

So, just please listen to my questions, and answer them to the best of your ability.

If you don't understand, just ask me to clarify.

If you answer, I'll assume that you've understood; is that fair?
A. That's fair.
Q. The court reporter, Nicole, she's taking things down.

I'm going to try to speak as slowly as reasonable.

Please wait until I finish, I'll wait until you finish.

Give verbal answers; otherwise, it may not be reflected in the transcript.

Your lawyer may object, and unless he directs you not to answer, please answer; do you understand?
A. I do.
Q. Is there any reason you cannot testify truthfully today?
A. No reason.



Q. Have you ever had your deposition taken before?
A. I don't believe so.
Q. What did you do to prepare for your deposition today?
A. I spoke with Cam and Ryan yesterday for about three hours, and reviewed some documents.
Q. Which documents did you review?
A. Several. The LOI, the application, emails on which I was copied, the depositions of Zach and Doug.

I'm sure I'm missing others, but those were the, I'd say, the main ones.
Q. Is there anything else that you can remember that you looked at?
A. Emails from KCS to Wilberforce about the LOI. The bylaws. I think I already said that.

I think that's the thrust of it. I think that's -- no, I cannot recall others, to answer your question.
Q. So, besides the -- you said two to three hours yesterday?
A. About three hours. A little under three.
Q. About three hours; was that in person?
A. Zoom.
Q. So besides the three hours you spent preparing yesterday, is there anything else that you did to

Page 81

A. Um, up until, actually, last week, the River & Rail was informal.
Q. Is that the local theater group?
A. Correct.
Q. Okay. But now that's formal?
A. They're getting a bank loan, and he needed a commitment letter for the bank, so I provided that letter.
Q. Okay. Has the foundation made any other pledges, either written or oral, to any organizations that have not been fully paid yet?
A. Not -- not that I'm aware of, or not that I can think of sitting here today.
Q. Has the foundation guaranteed or cosigned any debt, loan, line of credit for any person or organization?
A. Ever?
Q. Yes.
A. Yes.
Q. Okay. What were the circumstances, and who was it?
A. River & Rail, when they were -- they're moving properties now, but for their previous property, we -- excuse me -- we guaranteed, um, their loan to purchase that property.

Page 82

Q. How much collateral --
A. And -- and -- sorry, I want to go back. I actually think we guaranteed that personally, not through the foundation.
Q. Okay. So you personally guaranteed a loan to River & Rail?
A. I believe so. I believe it was personally, yes.
Q. And how much did you guarantee?
A. I think it was a $750,000 loan.
Q. Okay.
A. It was less than a million and more than 500.
Q. Any other guarantees or co-signing of debts, loans, or lines of credit?
A. Not that I can think of.
Q. So, if you add up every outstanding commitment the foundation has, Wilberforce, everything, what is the total dollar figure of obligations the foundation expects to pay in 2026?
THE WITNESS: Repeat that last part of the question.
Q. If you add up every outstanding commitment that the foundation has, what is the total dollar figure of obligations the foundation must pay in 2026?
A. In '26, we have one million to Webb.
In 2026, it's either 400 or 300 to River & Rail,

Page 83

I can't remember which, so that's 1.3 or 1.4.
Plus, depending on when Wilberforce hears what they're up against -- I would have to reference the letter to Zach.
Q. How about in 2027?
A. Again, Wilberforce is kind of the year zero. It's hard to answer because of the current litigation, but it would be one million to Webb, 300 to 400 to River & Rail, whichever is which, and then the Wilberforce figure.
Q. Okay. So, against those obligations, how much liquid cash does the foundation have available today?
A. You say "liquid cash," how much of the money is in cash?
Q. How much is not tied up in some sort of investment or long-term holding?
A. When you say "tied up in investment," you mean any investment other than cash?
Q. Yes.
A. Well, I imagine the vast majority is not in cash because that would, in my mind, be imprudent for a charitable foundation to do.
Ah, I -- I can't answer how much is purely in cash.
Q. Do you know how much is in the HF foundation

Page 84

pool?
A. Ah, so the short answer is no. I can tell you the total amount of foundation assets, roughly, but I can't tell you -- some of it's at the trust company, Knoxville, some of it's in the HF foundation pool.
So, it may be in -- I don't know of all the specific entities, but in the overall foundation, as of the end of last month, we have 38, over $38 million.
Q. You said you can't speak to the, essentially, the breakdown of the money within the foundation to that level of granularity; is that correct?
A. Not off the top of my head.
Q. Who would know?
A. Well, I have it on the computer somewhere, and then HF Capital, our accountants.
But I have it -- I have it on my email, because I thought you might ask about the foundation, and I wanted to get the latest asset total.
Q. That makes sense.
A. Based on the spreadsheet, and on the spreadsheet's the answer, but...
Q. So, was that part of preparing for this deposition today?
A. I guess in retrospect it was.
I apologize for not -- not including that

earlier.
Q. Is there any commitment or obligation of the foundation we've not discussed today?
MR. NORRIS: Objection. David, there's a -- there could be a First Amendment associational privileges issue, to the extent that you've got confidential donations and things like that.
So, I'd instruct you not to answer with respect to things that confidential.
(So noted.)
MR. McNEAL: What's -- Cam, what's the exact basis here on the First Amendment privilege stuff?
MR. NORRIS: Yeah, it's a charitable foundation, and it could have, you know, confidential associational activities or donations or plans that have not been revealed that are being kept confidential; those would be protected by the First Amendment.
I'm instructing him not the answer to the extent his plans and activities are confidential.
(So noted.)
MR. McNEAL: Okay. So, you're instructing the witness not to answer to the extent it intrudes on First Amendment associational privilege grounds; is that correct?
MR. NORRIS: I'm not giving the lay witness that



legal instruction. I would instruct him not to reveal confidential activities. I think that's the one line I would ask him to draw.
But there is plenty that is not confidential, and that it could be reported on a Form 990 someday, and I don't -- I think that that is all fair game, and I think that he should answer to the extent that things are not confidential.
MR. McNEAL: Would it help if we took this as "Confidential" under the protective order?
MR. NORRIS: I would give the same instruction.
MR. McNEAL: Despite whether or not it's "Confidential" under the protective order entered in this case?
MR. NORRIS: Correct. Yeah. Same instruction.
THE WITNESS: I've lost the question; do you mind repeating it?
Q. Is there any other commitment or obligation of the foundation that we've not discussed today?
MR. NORRIS: I will object on the First Amendment grounds, and instruct you not to answer to the extent any of that is confidential.
(So noted.)
A. No. As I'm sitting here today, off the top of my head, those are the only commitments of the



foundation.
Q. "No," that those are the only -- that you can speak of that don't break the alleged First Amendment privilege grounds, or "no," those are all the ones that we have not discussed today?
A. I'm answering the question the same either way.
MR. McNEAL: All right. Let's go back to the Commitment Letter.
(DOCUMENT DISPLAYED VIA SCREEN SHARE)
Q. Can you see that on my screen right now?
A. I can.
Q. How much of the foundation's current assets on-hand are illiquid?
A. How do you define "illiquid"?
Q. "Illiquid" in the sense that you cannot -- let's put it this way: You cannot get the funds within a month?
A. Oh. I can't give you the exact amount, but having looked at materials, and I can't give you a number, I would be shocked if anything greater ten percent isn't "illiquid," as you define it.
Q. Okay. How about if you could not access the funds within a week?
A. Ah, my level of confidence probably shrinks a little bit on the exact amount, but there's no, to my



knowledge, there are no private investments, business investments that would acquire liquidating private company holding as part of the foundation.
Q. All right. Let's go to the Commitment Letter.
This is your signature; is that correct?
A. That's correct.
Q. And what is this document commit the foundation to do?
THE WITNESS: Can I read the letter you have in front of me?
MR. McNEAL: Yup. Go ahead.
THE WITNESS: Do you mind scrolling up and getting rid of that -- if you can center it -- sorry. If I can control it, I'll control it, but if not...
(Scrolling.)
MR. McNEAL: How's that?
THE WITNESS: That's perfect.
(WITNESS PERUSING SCREEN SHARED DOCUMENT)
A. This is, essentially -- well, I read this as: Committing funds in year zero, five -- up to $500 thousand, $1.2 million, and $500 thousand -- sorry.
"$500 thousand in year zero; $1.2 million in year one; and, $500 thousand in year two, to ensure the financial stability and success of Wilberforce Academy."
Q. Is there anything in this document that

Page 89

obligates the foundation to pay a fixed amount?
A. I would --
MR. NORRIS: Objection.
A. I would have to ask a lawyer.
Are you asking me: Does it legally commit us to do that?
Q. I'm asking you, in your personal capacity, whether you read this to say that you are obligated, or the foundation is obligated, to pay any fixed amount towards Wilberforce?
A. Yeah. Yes. As we -- in my understanding, this is a commitment, and our standard way we handle gifts, I would, we would say this is -- we've committed to this.
Q. Can you point me to language within the Commitment Letter that obligates you to pay a fixed amount to the foundation?
MR. NORRIS: Objection as to "obligate."
A. I misheard "fixed amount."
Q. Okay. So, I'll just -- I'll restate it.
So, this is, this Commitment Letter is stated as: Up to 500 thousand; 1.2; 500 thousand, that's year zero, one, two; is that correct?
A. Sorry, I'm not trying to be difficult. Say it again.
Q. Okay. So, the Commitment Letter says that you

Page 90

are, you can pay up to 500 thousand in year zero, 1.2 million in year one, and 500 thousand year two; is that correct?
MR. NORRIS: Objection; mischaracterizes the document.
A. I would say it stands. It's $500 thousand in year zero; 1.2 in year one; 500 thousand in year two.
Q. So, when it says "up to," that means the foundation could pay less; is that correct?
A. My intention in writing it that way, we arrived at these numbers in part by having conversations with Zach, who obviously was working with Arcadia on the application.
And my understanding from those conversations was essentially that there could be a potential gap as they were modeling out the future school, and that these amounts corresponded to those potential gaps.
And, so, I'm making up the numbers just for conversation, for illustration purposes, but I think if, and I can't recall without looking at the application what exactly the enrollment was in year one, but let's say if the school was a hundred percent enrolled in year one, which is not what the plan says, but if it were to be a hundred percent year one, they would not need to rely as much on contributions to help close the gap.

Page 91

So, these numbers were not finger-in-the-wind numbers as I referred to earlier, but were meant to be commitments to, ah, correspond with the perceived means of Wilberforce.
Q. I don't really think you answered my question.
My question was that when the Commitment Letter says that you stand ready to commit up to an amount, that also means that you can pay less than that amount; is that correct?
A. Are you asking me as a lawyer, or what I meant when I wrote that?
Q. I'm asking you what the -- what the letter says.
A. Well, I'd read you what the letter says, but I told you what I meant by those words.
Q. Okay. So, your position is that it says that you can pay less than, "up to," but when you wrote it, you meant to say that it, you would pay 500 thousand in year zero?
MR. NORRIS: Objection; form.
And objection; argumentative.
A. I said what I said. I'm telling you what I meant by what I said.
So, if you repeat the question again.
Q. Let me rephrase. Is there anywhere -- is there anything in this document that you can point me to that

Page 92

says that The Colquitt Foundation is obligated to pay any money at all to Wilberforce?
A. Is there language in this document that says we are obligated to pay?
Q. Yes.
A. Those words do not appear on this letter, but -- but the spirit of the letter, and as I read the letter in combination with the way we normally handle gifts, I view it as an obligation, and my wife views it as an obligation.
Q. As of today, is there money escrowed for Wilberforce under this document?
A. No.
Q. Other than The Colquitt Foundation, has any other person, entity, or organization committed any money to Wilberforce?
A. Not that I'm aware of in terms of commitment, no. Not similar to this letter.
Q. I don't -- I don't think you're really answering my question. It wasn't in terms of similar to this commitment.
The question I asked is: Has anyone else, any individual, foundation, or company, pledged funds, donated money, or promised financial support to Wilberforce?

MR. NORRIS: Objection; calls to a narrative.
Objection; foundation, calls for speculation.
A. No promise of specific amounts have -- no. No, is the answer.
Q. Has Wilberforce conducted any fund-raising to raise money from sources other than the foundation?
A. Not that I'm aware of.
Q. Has anyone provided Wilberforce with any kind of support, other than what The Colquitt Foundation has already provided?
A. In-kind support?
Q. Yes.
A. Zach Wishart is not being paid. He is donating considerable amounts of time in his capacity as executive director. Um, he is the person that jumps into my mind immediately.
Q. Has anyone provided Wilberforce with office space, services, anything like that?
MR. NORRIS: Objection; form.
A. No. I would say -- sorry. No, I think -- well, I'm not sure where we are in the billing cycle. I think there's a chance on in-kind support that Will Edwards legal -- legal services, as it relates to his time, could be classified as in-kind support.
Q. So, did Will Edwards take on representation of



Wilberforce pro bono?
A. He -- Wilberforce is -- has paid some of the filing fees via Will Edwards.
Up until this point, we have not received a bill for his time.
Q. Okay. Is there any circumstance that would cause The Colquitt Foundation to withdraw or reduce any commitment it makes to Wilberforce?
THE WITNESS: Repeat the question one more time.
Q. Is there any circumstance that would cause ? The Colquitt Foundation to withdraw or reduce its financial commitments, to the extent they exist, to Wilberforce?
MR. NORRIS: Objection; form. Objection; calls for a narrative.
A. Nothing would cause us to withdraw. The answer to that portion is no.
Reduce, as I said earlier, what we were trying to communicate with this "up-to" language was that if we have a hundred -- as an example: If we have a hundred percent enrollment in year one, and there's less of a need for outside contributions to help subsidize the school, that might lead to a reduction, but to withdraw, no.
Q. If Wilberforce lost 501(c)(3) status, would



The Colquitt Foundation reduce or withdraw any financial commitments to Wilberforce?
MR. NORRIS: Objection; calls for speculation.
A. I would say no.
And I would have to talk to lawyers about impact of -- of what you just described.
Q. Has The Colquitt Foundation ever withdrawn, reduced, or withdrew -- reduced a financial commitment made to any organization?
A. Never.
Q. If Wilberforce became the subject of negative press coverage, would that cause the foundation to pull its funding?
A. Never.
MR. McNEAL: I'm going to show you another document.
(DOCUMENT DISPLAYED VIA SCREEN SHARE)
MR. McNEAL: Not that one.
I'm going to stamp this as Coble Intervenors Exhibit 5.
Exhibit 5 (Coble Intervenors) Marked for ID
Q. Do you know what this document is, Mr. Colquitt?
A. It appears to be the 990 from The Colquitt Foundation, I guess in tax year '24, for calendar year '24.



Q. When was the first time you saw this document?
A. Whenever it was filed, or prepared to be filed, I would have to imagine, but I don't have detailed memory of looking at this.
Q. And it says here the books are "In Care of HF Capital," correct?
A. That's what it says, correct.
Q. What is HF Capital?
A. HF Capital is our family investment office, and so like a lot -- sorry, was reading that text from David Ayliffe that popped up on my screen.
It's a family investment office that provides lots of services to the family, so wanting to invest our assets to, they provide accounting services, and related functions. They help manage investments, they help manage personal finances, help keep track of all these kinds of reports, et cetera.
Q. So, earlier you identified this as the foundation's tax return for 2024; is that correct?
A. I think I identified it as the 990.
Q. The 990, okay. And as president, you'd be the one who signs this, correct?
A. I would need to look at the bottom of the document.
Q. Okay. Has anyone, you, your wife, or anyone at

HF Capital, ever discussed the possibility of the foundation not funding Wilberforce?
A. Never.
Q. Anyone else?
THE WITNESS: Repeat the first question prior to, "Anyone else?"
Q. Has anyone else ever discussed the possibility of the foundation not supporting Wilberforce?
A. No.
Q. If the foundation's commitment is exhausted, runs out of money, what's the plan to fund Wilberforce going forward?
A. To understand the question, if we spend our $38 million prior to year two?
Q. Correct.
A. We would rely on personal -- let me back up.
Each year we've added additional funds to the charitable foundation, and I anticipate we'll continue to do that.
Um, that said, if -- if all of those funds were exhausted, which I find highly unlikely, but if they were, we would rely on our personal assets and net worth to fill any obligations we had, including to Wilberforce.
Q. And The Colquitt Foundation is the only source of funding Wilberforce has ever had; is that correct?



MR. NORRIS: Objection; form.
A. To my knowledge, yes.
Other -- actually, I want to retract that.
I believe that some of the funds from that have been received by Wilberforce were actually contributed in our personal names.
So, to be clear: I think, I'm fairly confident that funds that Wilberforce received did not come through the foundation.
Q. Who was the first person to raise Wilberforce with you?
A. Zach Wishart.
Q. When was that?
A. Would have been fall of '25, so I'm guessing September/October.
Q. Okay. Was this an in-person conversation?
A. Yes.
Q. What did you guys talk about?
MR. NORRIS: Objection; calls for a narrative.
A. Well, I can't recall the specific conversation.
Q. Okay. Let's go by topics. What was the first topic you talked about?
MR. NORRIS: And for this line of questioning, I object to the basis of privilege and instruct you not to answer to the extent you and Zach were discussing any



communications with attorneys.
(So noted.)
THE WITNESS: Repeat the question one more time.
Q. I said, "Let's go by topics."
A. Yes.
Q. What was the first topic you and Zach discussed the first time you talked about Wilberforce?
A. I can't recall with specificity, but I imagine it was something to the effect of: "I'm thinking about -- what would you think about starting a school," or something about Zach's desire to start a charter school.
Q. Were attorneys present?
A. I can't recall.
Q. Was the conversation, you said it was in person?
A. In person.
Q. Was anyone else there?
A. With the exception of, for the first time when Zach, when he may have floated the idea of, "What about this?"
Q. That's the conversation I'm asking you about; yes.
A. I'll repeat what I said: I don't recall anything with exact specificity as far as he said this, I said that, but I imagine that was in person in my office.



Q. Was anyone else there?
A. I don't think anybody else was there.
Q. Okay. How long did you and Zach discuss Wilberforce for?
A. I can't recall.
Q. More than a half hour?
A. I can't recall the specifics of this initial time that was raised, so I cannot answer your question.
Q. Let's pin the conversation to a date. Was it in August?
A. I don't know.
Q. Was it in --
A. August? I think it would have been September or October. I mean, sorry, yeah, September/October.
Q. Okay. So, maybe late, sometime mid-September to mid-October?
MR. NORRIS: Objection; mischaracterizes his testimony.
A. "No," was the answer. I would not limit it to that, those dates.
Q. Okay. So sometime in either September or October?
A. Yeah, I think that's correct.
Q. Did you discuss challenging the statute that says that a public school must be nonreligious and

Page 125

periodically.
I recall sharing with Zach, um, my thoughts as it related to my time on Emerald, and having conversations around that.
But, I would say the vast bulk of the work, the actual work of Arcadia was -- was Zach. And not even, not even a close second.
Q. Was there a negotiation on price with Arcadia?
A. Ah, I don't believe so. I don't believe so.
MR. McNEAL: I'm going to show you another exhibit here. All right. I'm going to share my screen.
(DOCUMENT DISPLAYED VIA SCREEN SHARE)
Q. Can you see the document, Mr. Colquitt?
A. Yes.
MR. McNEAL: Going to be marking this document Coble Exhibit 5[sic], and represent to you that this document was produced in the course of this litigation by Wilberforce.
Exhibit 6 (Coble Intervenors) Marked for ID
Q. Have you seen this document before, Mr. Colquitt?
A. I don't believe I have.
MR. PROCTOR: Jon, should that be -- I think the form 990 was already 5.
MR. McNEAL: Oh, thank you. Correction. I'll

Page 126

mark this as Exhibit 6.
(Exhibit stands.)
THE REPORTER: May we go off the record for a moment, please?
(OFF THE RECORD)
MR. McNEAL: Back on the record. Mr. Colquitt, can you just read this part quickly, and then let me know when you are complete.
THE WITNESS: So, not out loud?
MR. McLEAN: No, you don't need to read it out loud.
(WITNESS PERUSING DOCUMENT)
THE WITNESS: I'm finished.
Q. So, was there a negotiation on price between Arcadia and Wilberforce?
A. I stand corrected. My memory is faulty, it appears there was.
Q. And what was, how -- strike that.
Were you involved in the fee negotiation?
A. I don't recall ever speaking to Arcadia about the fee.
Zach and I, as I said, communicated around contracting and that sort of thing.
Q. I don't really think you -- that was the, really got to what I was asking.

Page 127

My question was: Were you involved with the fee negotiation with Arcadia?
A. With Arcadia?
Q. Yes.
A. No.
Q. Did you -- strike that.
How did the amount contracted for with Arcadia, how did Wilberforce and Arcadia arrive at that number?
MR. NORRIS: Objection; foundation.
A. Well, looking at this email, I would say they proposed a price, and we -- Zach was able to shave the price down.
Q. Did you tell Zach that The Colquitt Foundation could not fund 194,000?
A. (No verbal response.)
MR. McNEAL: Your answer cut out again.
A. No.
Q. Did you have any conversations with Zach around the affordability of Arcadia?
A. I don't know if I would phrase it as "affordability."
We definitely had conversations, I think, around price.
Q. When was that conversation?
A. I'm partially relying on the document you have,

Page 128

you're showing me now, but I would say mid to late November.
Q. Were there any discussions between you and Zach as to whether or not Wilberforce could cover the full amount requested by Arcadia?
A. I don't know if I would phrase it that way, but we definitely talked about cost, and we've had conversations about how you pay for things, including Arcadia.
Q. I'll rephrase it: Could Wilberforce not afford to pay Arcadia the 194,000 as they requested?
A. No. We -- we -- what I would say is, I was -- I take it, on this amount, and with, I think, the 150 or 140 total amount, I was confident we would find the funds to cover it.
Q. Who made the decision that Wilberforce could not pay the full amount?
MR. NORRIS: Objection; argumentative and mischaracterizes the testimony and foundation.
A. I think -- nobody -- nobody said we could not cover the full amount.
I do think that -- and this is, I'm sitting here trying to reflect on this time period you're asking me about.
I imagine they came with a price, and usually,

in my experience, a prudent thing to do is try to lower the price, and I imagine that's what Zach -- Zach did.

But it wasn't rooted in fears around dollar figures, it was probably more rooted in fears of having the dollar figures being as low as it could be, which I think is general commonsense practice.

Q. Can you read this highlighted part for me?
A. "We, unfortunately, can't get to 194 -- 194k."
Q. So, no one -- scratch that.
So, your position is that Wilberforce could get to 194,000, but this was a negotiation tactic, correct?
MR. NORRIS: Objection; foundation, and mischaracterizes prior testimony.
THE WITNESS: Repeat the question one more time.
Q. Your position is that Wilberforce could get to 194,000, but that this was a negotiation tactic?
MR. NORRIS: Same objection.
A. Yes, that's my belief. Based on reading this and thinking about it, yes.
MR. McNEAL: I'm going to show you another document.
(DOCUMENT DISPLAYED VIA SCREEN SHARE)
MR. McNEAL: I'm going to represent to you that this document was produced in the course of this litigation by Wilberforce. I'm going to be stamping



this --
THE WITNESS: Can I -- I apologize. I just spilled something. Can you give me one minute to go grab a paper towel?
MR. McNEAL: Yup. Go ahead.
(Witness exits deposition.)
That will be, I'll be marking this Exhibit 7.
MR. NORRIS: Jon, why don't we wait? Do you mind scrolling down just so I can scan the whole document?
MR. McNEAL: Yup.
(Scrolling.)
(Witness reenters deposition.)
Exhibit 7 (Coble Intervenors) Marked for ID
THE WITNESS: Sorry about that.
MR. NORRIS: Thank you. I don't think this is going to matter, Jon.
Is this the document, by chance, that we asked the other parties to delete because it was not classified correctly?
MR. McNEAL: I believe so, yes.
Would you like us to classify this portion of the transcript "Confidential"?
MR. NORRIS: I don't think we -- as long as we agree that this document shouldn't go on the public



record, or this part of the transcript go on the public record and be deemed confidential at that time, we're good.
MR. McNEAL: Okay.
Q. Have you ever seen this document before, Mr. Colquitt?
THE WITNESS: Can you scroll through it for me?
MR. McNEAL: I can.
(Scrolling.)
A. The answer to the question is yes, I believe I have.
You can keep scrolling if you want, but yes, I believe I have.
Q. When's the first time you saw this document?
A. I can't specifically recall the first time I saw this document.
Q. Okay. Was it this year?
A. I would -- no, I imagine I would have seen it in 2025.
As I said earlier, Zach and I talked about Arcadia, et cetera, getting the bid.
Q. It states a fixed fee of 140,000; is that correct?
A. That's what it says.
Q. With 50 percent due at signing, and 50 percent



due upon completion; is that correct?
A. That's correct.
Q. How many versions of the Wilberforce charter application are there?
A. Well, there's, in sort of the "final" form? "Final," in air quotes, form.
Q. Yeah, let's say "final," in air quotes, form.
A. Two.
Q. Okay. What are the two versions?
A. One is the version we would like, of the school we would most like to open, Christian Charter School, and the second is if we're not permitted to do so, having Wilberforce open up a secular charter school.
Q. What is the difference between the two applications? In your understanding.
A. My understanding is in the initial, the preferred application, we will actually engage in religious instruction.
Q. And the charter applications had a submission deadline, correct?
MR. NORRIS: Objection; form.
A. Sure. Yes.
Q. When did you first see the secular version of the application?
A. I can't recall. I think -- I think -- I think

Page 141

workbooks?
Q. Yes. Budget workbooks? Excel sheets?
A. I've seen lots of Excel worksheets.
Q. Good.
A. Totally tracking.
Q. So, let me rephrase.
You said that you saw budget -- you said that you -- let me rephrase one more time.
You said that you saw budget workbooks within the draft application after the draft application was completed; is that correct?
MR. NORRIS: Objection; that mischaracterizes his testimony.
A. Yeah, I've seen, I believe -- I believe when the draft was ready, and again, air quotes on "final," I believe the workbooks and application were all emailed out. I believe.
Q. And what I'm asking is: Have you seen any other versions of those workbooks, besides the ones emailed to you when the application was complete?
A. I do not believe I have seen any digital versions of those.
I can't recall specifics with Zach, if -- if -- I don't think I saw, sort of, draft workbooks, necessarily, but again, Zach and I are with each other a

Page 142

lot. I don't think he did. I don't think I saw any.
MR. McNEAL: I'm going to show you another document.
(DOCUMENT DISPLAYED VIA SCREEN SHARE)
MR. McNEAL: I'm going to represent to you that this document was presented in the course of this litigation by Wilberforce.
I'm going to mark this as Coble Exhibit 8.
Exhibit 8 (Coble Intervenors) Marked for ID
Q. Have you ever seen this document before, Mr. Colquitt?
A. I have.
Q. What is this document?
A. These are bank statements. Well, I'm saying it's bank statements. If you scroll down.
Well, sort of monthly bank statements for Wilberforce Academy Knoxville account.
Q. So, it says, "To: Wilberforce Academy," some numbers, "From: David Colquitt," some numbers; is that correct?
A. Correct.
Q. When is says, "From: David Colquitt," is that you, in your personal capacity?
A. Correct.
Earlier when you were asking me about foundation

Page 143

giving, I think I mentioned this then, that I think we gave in our personal capacity. Yes.
Q. Okay. So, this deposit on December 3rd was from you, in your personal capacity, in the amount of 75,000 to Wilberforce; is that correct?
A. Correct. Yes.
Q. Okay. I'm now showing you the account balance in January.
The account balance is $40 -- or $4,282.25; is that correct?
A. That's what it says; yes.
Q. But, and you're the treasurer, is that --
A. Yeah.
Q. -- you know, to the best of your knowledge, is that what the account balance was?
A. Yes.
Q. And I'm going to scroll to the end here.
This is dated May 29th, 2026, and that's the same balance; is that correct?
A. That is correct.
Q. You attended a board meeting in early April; is that correct?
MR. NORRIS: Objection; foundation.
A. I -- I -- I trust that you did -- if you have the minutes and can refresh my memory, I'm happy to say

Page 144

yes, but I -- that sounds right.
Q. Do you remember -- strike that.
Did you provide any financial update at that February, or at that April board meeting?
MR. NORRIS: Objection; foundation.
A. I believe that I did share the account balance with the group.
Um, I believe that's reflected in the minutes, but if you -- I'm happy to have my memory refreshed.
Q. And you reported that the Wilberforce account had $4,282.25, with no outstanding obligations; is that correct?
MR. NORRIS: Objection; foundation.
A. I believe that it is correct; yes.
Q. And that was the entirety of the organization's money; is that correct?
MR. NORRIS: Objection; argumentative and foundation.
A. Yes. There are no assets outside of this, no cash assets outside of this account.
Q. Did any board member ask you a question about the balance?
A. I can't recall.
Q. Did anyone express any concerns at all about the balance?

Page 145

A. Not that I remember.
Q. Is that including yourself?
A. I'm -- I know I did not express concerns about the balance.
Q. And at the time of that meeting in April 2026, Wilberforce had been in existence for about four, well, five months; is that correct?
A. I trust, I believe we came into existence at the end of November. Then again, I can have my memory refreshed, but I believe that's correct.
So the math on that would be: December, January, February, March, April. Sure, about five months.
Q. Wilberforce held a board meeting yesterday; is that correct?
A. That is correct.
Q. Who called that meeting?
A. Doug Harris.
Q. Were you there?
A. I was on the Zoom, or I can't remember if it was Zoom, but I was on the...
Q. So it was --
A. I was online.
Q. It was a teleconference of some sort?
A. Correct.

Page 146

Q. Who attended the board meeting?
A. All of the board members, and Zach Wishart.
Q. What did the board do at that meeting?
A. Several things. Ah, one, we approved a resolution brought forward by Doug that essentially just ratified and confirmed all the actions taken by Zach Wishart, to date, and in the future, as reflecting the will of the board.
It's along the resolution that -- if I could have my memory refreshed on the exact things we did, but big picture, we ratified and confirmed all of these actions.
And then I shared a financial update, and shared the same number that you and I've been discussing that's on the screen.
Um, prayed.
Um, and then we kind of walked through, in that resolution, there were five elements in particular that I know on the resolution are sort of separated out.
And Zach kind of gave an overview to the board, and opened it up for any questions or comments on each of those items.
Q. Did you discuss this litigation?
A. I'm sure we did to some degree, but it was not a focus of the -- the call. I think it was mentioned

Page 147

that -- that, ah, Doug and Zach had been deposed, and that I was being deposed tomorrow.
Q. Were there attorneys present at the board meeting?
A. There were not.
Q. When did you first learn this meeting was happening?
A. And let me go back to my earlier comment about the litigation being discussed.
Yes, the litigation was discussed in the context of those five prongs, but if you mean beyond -- beyond what's in that resolution, there wasn't a separate -- there wasn't a separate litigation conversation, apart from ratifying the commencement of suit, et cetera.
Q. Is it safe to say that the board meeting was focused on actions that had already happened, and not necessarily the future litigation?
MR. NORRIS: Objection to form.
A. No, I would not think that's fair.
Q. What was discussed about the future of this litigation at the board meeting?
MR. NORRIS: Objection, on the grounds of privilege, and instruct you not to reveal the contents of confidential communications with attorneys.
But to the extent you can answer without

Page 148

revealing those types of communications you can answer.
(So noted.)
THE WITNESS: Sorry. Repeat the question one more time.
Q. What was discussed at the board meeting yesterday about the future of this litigation?
MR. NORRIS: Same objection and instruction.
(So noted.)
A. I think, broadly speaking, and I can't recall specifics, and if you have the resolution, I'm happy to have that refreshed, but essentially, that folks are on board, keep going, and, ah, you know, proceed.
Q. Did anyone express any reservations about the litigation going forward?
A. No.
Q. Did anyone express any reservations about the litigation at all?
A. No.
Q. Did anyone express any reservations about the direction that Wilberforce is going?
A. No.
Q. When did you first receive the document the board voted on yesterday?
A. Ah, Doug -- I can't recall the date. Doug emailed it out to the board in advance. I can't recall.

Page 149

Q. Was it less than a week ago?
A. It's Wednesday? I believe it was less than a week ago.
Q. Was there a written agenda for the meeting?
A. I believe so. Unless there was some included in that where Doug attached a document, but I -- I don't remember a written agenda.
Q. Other than the email attaching the resolution, did you receive any communications about this meeting before it happened?
MR. NORRIS: Objection on the ground of privilege.
To the extent that you would reveal confidential communications with attorneys, I would instruct you not to answer.
But to the extent you can answer without revealing those types of communications, you can answer.
(So noted.)
A. Zach Wishart was at a lunch with me yesterday with other people, and I think I said something to the effect: "Are we still on for this afternoon?" There was some acknowledgment the meeting was happening later that day.
MR. McNEAL: I'm going to show you another document.

Page 150

THE WITNESS: Sure.
Q. But that was the only communication; is that correct?
A. I believe -- I believe so.
(DOCUMENT DISPLAYED VIA SCREEN SHARE)
MR. McNEAL: All right. I'm going to be marking this as Coble Exhibit, I guess we're on 9.
MR. PROCTOR: That's what I have.
Exhibit 9 (Coble Intervenors) Marked for ID
(DOCUMENT DISPLAYED VIA SCREEN SHARE)
MR. McNEAL: Thank you. I'm going to represent to you that this document was produced in the course of this litigation by Wilberforce.
Have you ever seen this document before, Mr. Colquitt?
A. I have not seen the email from Doug to Zach, no, but I've seen the body of that email from where I'm copied.
Q. Okay. So this was sent on Monday, that's two days ago; is that correct?
A. Correct.
Q. This was sent to you, Zach, Ms. Laura Beaman, Mr. Parker Bartholomew, is that correct, from Mr. Doug Harris?
A. That's correct.

Page 151

Q. It says (as read): "Friends, I'm looking forward to our board meeting at 3 p.m. tomorrow"; is that correct?
A. That is correct.
Q. Did you know about this board meeting before Monday, June 22nd?
A. At some point, there was just a calendar invite sent. I don't know if it's attached to this email or was sent separately.
Q. Do you know if that invite has been produced in this litigation?
A. I have no idea.
MR. McNEAL: Cam, if it hasn't, we'd like to see that invite, as well.
MR. NORRIS: Okay. I also don't know the answer off the top of my head, so we'll investigate that.
MR. McNEAL: Okay. Thanks.
Q. So, you received -- back to Mr. Colquitt -- you received this resolution on the 22nd, the board voted on it on the 23rd; is that correct?
A. Yes. We voted on -- yes. Yes to both.
Q. And you voted to ratify the resolution; is that correct?
A. We did.
MR. McNEAL: I'm going to show you another document.

Page 152

(DOCUMENT DISPLAYED VIA SCREEN SHARE)
MR. McNEAL: I'm going to mark this as Coble Exhibit 10.
Exhibit 10 (Coble Intervenors) Marked for ID
Q. I'm going to represent to you that this was produced in this litigation by Wilberforce.
MR. McNEAL: Actually, Cam, do you want to take like a ten-minute break?
MR. NORRIS: Works for me. Does that sound good, David?
THE WITNESS: Works for me.
(RECESS FROM 2:20 TO 2:31 P.M.)
MR. McNEAL: We're going back on the record.
Q. So, Mr. Colquitt, we were talking earlier about the board meeting you had yesterday; is that correct?
A. Yes; we were talking about that.
Q. The board ratified certain actions; is that correct?
A. Ah, that is correct. That we -- we ratified actions.
I would only -- my only hesitation there is, I believe there's the clause in there, in the document, as well, not that we needed to ratify, but -- but we did.
Q. It says, "Out of an abundance of caution"; is

Page 153

that correct?
A. If you show me the document I can confirm, but I...
Q. To the best of your memory.
A. I will take your word for it.
Q. Okay. What were the actions that the board ratified yesterday?
MR. NORRIS: Objection; foundation.
A. Lots. I mean, the big picture what we ratified was everything Zach Wishart has done thus far in his role as executive director.
But everything, I can't remember the exact text, but, basically, everything he does in the future, as well.
We specifically called out commencement of the litigation, ah, filing -- well, that's filing the lawsuit, I suppose, the decision not to file the application in February.
Hiring of Cam and Ryan.
Oh, goodness. What else was there?
Um, continuing the lawsuit.
I believe the secular application, or desire to proceed with the secular application in the event that we're unsuccessful with Christian, explicitly, Christian Charter School.

Page 154

Um, and I know I'm missing something, but I have a lot in my head, so those are specific items, thus far.
But, ratified his ability to do things in the future.
Q. Let's just go one at a time. You said ratifying the filing of this lawsuit; is that correct?
MR. NORRIS: I just want to note for the record, this may be an accident, the document was up, and it is no longer up on the screen.
MR. McNEAL: I think we'll just take this from Mr. Colquitt's personal knowledge from here, and use the document as needed.
Go ahead, Mr. Colquitt.
THE WITNESS: Sorry. What was the question?
Q. The resolution ratified the filing of this lawsuit; is that correct?
A. I believe so.
Q. This lawsuit was filed in early December 2025; is that correct?
A. I believe so.
Q. It filed preparation of the religious charter of the application; is that correct?
A. Say that again.
Q. It ratified the preparation of the religious charter application; is that correct?

Page 155

A. I believe so.
Q. And that was completed late January of this year; is that correct?
A. I believe so.
Q. It ratified the preparation of the secular charter application; is that correct?
A. I believe so.
Q. And you previously testified that that was completed shortly thereafter, the charter app -- the -- or the religious charter application; is that correct?
A. I don't think I said shortly thereafter, I said sometime between charter -- the religious charter application being completed and end of the first quarter.
Q. Okay. And then it ratified the decision not to submit any application by the deadline; is that correct?
A. I believe so.
Q. So, all -- so, engaging counsel, filing the suit, preparing the applications, deciding not to submit, those all happened either in late 2025 or early '26; is that correct?
MR. NORRIS: Objection; vague as to "those all happened."
And objection; foundation.
THE WITNESS: Sorry. Repeat it one more time.
Q. So, engaging counsel, filing this suit,

Page 156

preparing these applications, and deciding not to submit the applications, those four actions all occurred back in late 2025 or early '26; is that correct?
A. I believe that is correct.
Q. And this resolution was adopted yesterday, and that's June 23rd; is that correct?
A. That is correct.
Q. So, to ratify something is approving after the fact action's already taken; is that correct?
MR. NORRIS: Objection; that all calls for a legal conclusion.
A. I believe, essentially, that's what it is. I would want to ask a lawyer before I say that's a matter of law, but I believe that's the right answer.
Q. Before this, there was one other board meeting that was in April; is that correct?
MR. NORRIS: Objection; foundation.
A. I'm hesitating, because I'm trying to go through -- I know we had the written actions of the directors, initially, I know we had the board meeting, and I know we had the board meeting yesterday.
It may be the glare of the lights. I can't recall if there was an additional board meeting, ah, as I'm sitting here right now at this moment.
Q. Just to clarify: Your position is that you do

Page 157

not know if there were other board meetings besides the April meeting and the meeting yesterday; is that correct?
MR. NORRIS: Objection; form.
And objection; mischaracterizes his testimony.
A. I'm saying we had the -- repeat what you said. Sorry.
Q. Is your position that you cannot remember any other board meetings besides the April meeting and the board meeting yesterday?
MR. NORRIS: Objection; form.
Objection; mischaracterizes his testimony.
A. I cannot recall if we had an additional board meeting.
Q. But as of today, there are two board meetings that you can recall; is that correct?
MR. NORRIS: Objection; mischaracterizes his testimony.
A. Well, I think we -- I suppose it depends on what the meeting is, we took official action as a board.
MR. SANDERS: "Should be around here."
MR. McNEAL: David Sanders, you're unmuted.
MR. SANDERS: Sorry.
MR. McNEAL: All good.
A. Yeah, my testimony is, right now I can't recall; although, as I sit here I'm worried that, I'm sure, I'm

Page 158

not sure, you know, it's -- it's -- I'm trying to keep a lot of things straight in my head right now based on memory.
I think that is accurate; yes.
MR. McNEAL: I'd just like to note, Cam, if there are other board meetings, we'd like to see the minutes of those.
MR. NORRIS: If there are other board meetings, you will have the minutes if you don't already, but there aren't and you don't, that's why you don't.
Q. One of the decisions that you ratified was not to submit an application to the charter school by the deadline; is that correct?
A. I believe so.
Q. And the resolution said that the board determined that submission would be futile; is that correct?
THE WITNESS: I would have to see the document.
MR. McNEAL: I'm going to go ahead and share my screen again.
(DOCUMENT DISPLAYED VIA SCREEN SHARE)
MR. McNEAL: This is already marked as Coble Intervenors Exhibit 10; can you read that, Mr. Colquitt?
THE WITNESS: Want me to read it out loud, or?
MR. McNEAL: Oh, no, just read it, and let me

Page 159

know when you're done.
THE WITNESS: Okay. Just ".5"?
MR. McNEAL: Yup.
(WITNESS PERUSING DOCUMENT)
THE WITNESS: I'm done.
Q. How did the board make the determination that submission would be futile under Tennessee Law, Knox County Policy?
MR. NORRIS: I'm going to object, calls for a legal conclusion.
But I also want to object on the grounds of privilege and instruct you not to reveal confidential communications with attorneys; but, otherwise, you can answer.
(So noted.)
A. I would say in conver -- computation with Cam and Ryan.
Q. How long was it discussed at the meeting?
MR. NORRIS: Objection.
Q. Actually, strike that.
How long was the .5, the ratification of the decision to not submit an application discussed at the board meeting yesterday?
A. Maybe five -- five to ten minutes.
Q. Did you discuss Union Academy?

Page 160

MR. NORRIS: Objection; foundation.
A. At the board meeting?
Q. Yes.
A. No.
Q. So, at the board meeting yesterday, the board concluded that to ratify the decision not to submit an application on the grounds that it was futile in Tennessee Law in Knox County; is that correct?
MR. NORRIS: Objection; form.
THE WITNESS: Either way, rephrase that one more time.
Q. At the board meeting yesterday, the board decided not to, or decided to ratify the decision not to submit an application on the basis that submission would have been futile under Tennessee Law and Knox County Policy; is that correct?
A. Yes, I believe that's accurate, and is a reflection of what's an the page.
Q. And the discussion on this section of the resolution was five minutes or less; is that correct?
A. I did not say that. I think I said maybe five to ten.
Q. Okay. So, about five to ten minutes of discussion on this; is that correct?
A. I think so, yeah. I was not timing each, but I

Page 161

believe that's approximate.
Q. Before yesterday's vote, had you read the entire resolution?
A. Yes.
Q. Who prepared the resolution?
A. I received it from Doug, so my assumption is Doug, but I don't know.
Q. Did Doug draft the resolution?
A. I don't know.
Q. So you don't know who drafted the resolution?
MR. NORRIS: Objection; asked and answered.
A. Well, he put forward the resolution, so I imagine that he is the -- he is the one bringing forth the resolution.
Who typed it all, who typed it, I have no idea.
Q. Do you know Betsy Henderson, personally?
A. I do.
Q. Did you meet with her in 2025 in your office?
MR. NORRIS: Objection; foundation.
A. I've probably met with her several times in my office in 2025.
Q. In any of those meetings with her, did you discuss Wilberforce?
A. No. Not to my memory, no.
Q. Have you ever discussed Wilberforce with her?

Page 162

A. I think the only time I've ever mentioned Wilberforce to her was sometime after the individual board members were dropped from the lawsuit, and I probably cracked some joke about, "It's a good thing your campaign manager isn't suing you anymore." I think that's the only time I've ever mentioned Wilberforce to Betsy.
Q. Have you ever had any conversations about Wilberforce with any of the other KCS members?
MR. NORRIS: Objection; foundation, calls for a narrative.
A. No.
Q. Do you know Steve Triplett?
A. I do.
Q. And you've never spoken to him about Wilberforce; is that correct?
A. That is correct.
Q. How about people that work for KCS, have you ever discussed Wilberforce with anyone, people who've -- who work for KCS?
MR. NORRIS: Objection; foundation, and calls for speculation.
A. No. Not -- no, I don't believe so.
MR. McNEAL: We're about to wrap up, Cam. You want to take five minutes, let me get all my notes

Page 163

together, and then we'll finish this thing up?
MR. NORRIS: Works for me. Good, David?
THE WITNESS: Great.
(RECESS FROM 2:46 TO 2:54 P.M.)
MR. McNEAL: Let's go back on the record.
(DOCUMENT DISPLAYED VIA SCREEN SHARE)
MR. McNEAL: All right. Mr. Colquitt, can you see my screen?
THE WITNESS: I can.
Q. Consovoy McCarthy was engaged in, between August and October of 2025; is that correct?
MR. NORRIS: Objection; foundation.
And objection; calls for a legal conclusion about what counsel's engaged.
A. I believe that's correct.
Q. And there was no board meeting before that engagement; is that correct?
MR. NORRIS: Objection; foundation.
A. I can't recall the exact sequence of those things.
Q. Was there any board meeting in 2025?
A. Well, I'm sorry, I'm including the action of the directors. The written action of the directors.
Q. Let's just keep it to the board meeting.
So, was there a board meeting before Consovoy

Page 164

McCarthy was engaged?
A. Not that I recall.
Q. At the board meeting yesterday; how long did you discuss: ".1: Engagement of Consovoy McCarthy"?
A. Probably, I would say, shorter than we did on the rest -- the rest of the topics.
I think, I think everybody's familiar with Cam and Ryan, and there were no -- no serious questions.
And I guess I will also say that, you know, I spoke, and I did say this at the outset of the meeting yesterday, from our vantage point, none of this was necessary action. We believe we'd already empowered Zach to make all of these decisions.
But, yes, I would say that this -- this point was -- was short.
Q. So, to be clear: You discussed the engagement of Consovoy McCarthy for less than five minutes?
A. I believe that is correct.
Q. Less than three minutes?
A. I don't know.
Q. "4.2: Commencement of Litigation," this litigation was filed in, on, I think December 3rd, 2025; is that correct?
A. That sounds about right.
Q. And there was no board meeting before the

Page 165

commencement of this litigation; is that correct?
MR. NORRIS: Objection; form.
A. Ah, I don't -- I don't believe so, no.
Q. And at yesterday's June 23rd board meeting, how long did you discuss ratification of commencement of litigation?
A. I'd say in a similarly -- about, probably five minutes on that piece.
But, again, this is all sort of ballpark.
My sense is, ah, yeah, very quickly.
Everybody's comfortable and on board. We were all already on board with all of these things.
Q. For ".3: Religious Charter Application," the religious charter application was produced in late January of 2026; is that correct?
MR. NORRIS: Objection; vague as to "produced."
A. I believe so, yes. Yes.
Q. And there was no board meeting before the application was produced?
MR. NORRIS: Objection; foundation.
A. Before it was just created? The short answer is no. I don't -- no.
Q. How long did the board deliberate on whether or not to ratify the religious charter application at yesterday's board meeting?

Page 166

A. To repeat what I said, we believe this has already been, you know, approved, and very short time on -- on that.
Q. Less than three minutes?
A. I don't know. Ah, I would say less than five on that piece.
Q. The preparation and production of the secular charter application you previously said was done sometime in the first quarter of 2026; is that correct?
A. Yes. That's -- I believe that's what I said, yes.
Q. Was there any board meeting before the production of the secular charter application?
MR. NORRIS: Objection; vague as to "production."
A. I don't believe so.
Q. Yesterday, how long did the board deliberate on the ratification of the decision to, in the alternative, pursue a secular charter?
A. It's actually, probably -- the ratification was pretty quick. These were --
THE REPORTER: Excuse me. I'm sorry, I didn't hear the end of your answer.
MR. McNEAL: You broke up at the end.
THE WITNESS: Sorry. Sorry. This is -- my

Page 167

internet connection.
MR. NORRIS: You broke up for me at the beginning, too. I didn't hear any of it.
MR. McNEAL: All right.
THE WITNESS: Repeat the question one more time.
MR. McNEAL: I'll just repeat my question again, yeah.
Q. How long did you deliberate, how long did the board deliberate yesterday on the, to ratify the decision to not, or to ratify the decision to pursue a secular charter in the alternative?
A. My guess is that was five to ten minutes.
I know we had already taken some prior board action, I believe in April, to that effect.
Zach did provide a, sort of, general update on -- on, you know, how it was created.
Five to ten minutes, I would say.
Q. The decision to not submit an application was complete by the, as it says here, the February 1st, 2026 deadline; is that correct?
MR. NORRIS: Objection; form.
A. Are you asking me is that what it says?
Q. Is that your understanding of when the deadline was?
MR. NORRIS: Objection; form.

Page 168

A. Ah, I actually think that actually might not be correct. That might be the 2nd.
Q. Either way, it was either the 1st or the 2nd; is that correct?
A. I believe so. Early February.
Q. Was there a board -- and there was no board meeting before the decision not to submit an application; is that correct?
A. Yeah, but that provides, apart from the initial action of the directors, which we believe empowered Zach to make all these decisions.
Q. And how long did the board deliberate on the ratification of the decision to not submit an application yesterday?
A. I think I've already answered that. I think about five to ten minutes.
With all these things, I was not -- I did not have a stopwatch, so this is ballpark.
Q. What was the basis for the board's determination that submission would be futile under Tennessee Law and Knox County Policy?
MR. NORRIS: Objection; asked and answered.
And objection to the extent, on privileged grounds, I'd instruct you not to answer by revealing confidential communications with attorneys.

MR. NORRIS: Objection; calls for a narrative.
A. We discussed -- well, I think I told you, they discussed -- I made a motion regarding notice of the meeting. It was -- it was approved, adopted. Um, document was discussed and adopted. Shared financial, you know, what I already talked about, the balance of the account, information related to that. And that was it.
Q. Nothing else?
MR. NORRIS: Objection; calls for a narrative.
A. I don't believe so. Those were the -- those were the big topics discussed.
Q. Have you given me every factual basis of your testimony about what the board did at the meeting yesterday?
MR. NORRIS: Objection; form.
A. I believe so.
Q. Is there any answer you gave today that you want to change, correct, or add to before we adjourn?
MR. NORRIS: Objection; calls for a narrative.
A. Ah, not that I recall, but sort of like at the first break, I'm sure I'll replay something and wish I said something differently, but nothing as I sit here today, that I think.
MR. McNEAL: Okay. I have no further questions.
MR. NORRIS: Okay. I'd like to note for the



record, because I believe we were previously off the record, that we produced via email at 2:52 Eastern today, the aforementioned calendar invite that's been produced to opposing counsel, and that's Bates number 2851.
I just want to make sure, Jon, that you and your team would like time to review it, and then ask the witness questions about it while he's here.
MR. McNEAL: I have not had a chance to look at it.
MR. NORRIS: We could take a break.
MR. McNEAL: Yeah, let's take five. We'll take a look at it and come back.
(RECESS FROM 3:11 to 3:15 P.M.)
(Mr. Sanders exits deposition.)
(Ms. Harrison enters deposition.)
MR. McNEAL: We've looked at your recent production, and we have no further questions.
MR. NORRIS: Plaintiff also has no further questions, so I believe that concludes us.
(DEPOSITION CONCLUDED AT 3:16 P.M.)



C-E-R-T-I-F-I-C-A-T-E

I, NICOLE REIS, RPR, a Notary Public with and for the Commonwealth of Massachusetts, duly commissioned, qualified, and authorized to administer oaths and to take and certify that heretofore, to wit, on the 24th day of June, 2026, appeared before me via web conference, David Matthew Colquitt, in the afore-captioned cause pending in the U.S. District Court, Eastern District of TN; that the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth; and that thereupon and while said witness was under oath, the within deposition was taken down by me in shorthand at the time and place herein named, and was thereafter reduced to typewriting under my supervision.

I further certify that I am not interested in the event of the action.

Reading and signing of the transcript was not requested by the deponent or any parties involved upon completion of the deposition.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my seal of office this 5th day of July, 2026, and certify that the preceding document is a true, exact, complete, and unaltered copy made by me of stenographic means, and presented by me, Nicole Reis, Notary Public.




NICOLE REIS, RPR/NOTARY PUBLIC
MY COMMISSION EXPIRES: AUGUST 5, 2027
RPR NO.: 852392
IN RE: WILBERFORCE ACADEMY OF KNOXVILLE V. KNOX COUNTY BOARD OF EDUCATION
DATE: JUNE 24, 2026

# EXHIBIT 7

Gmail

Ryan Proctor <ryan@consovoymccarthy.com>

# Wilberforce Application

1 message

**Zach Wishart** <zachwishart@gmail.com> Thu, Jan 29, 2026 at 3:12 PM
To: Cam <cam@consovoymccarthy.com>, Ryan Proctor <ryan@consovoymccarthy.com>

Cam and Ryan,

I have attached the Wilberforce application, including the budget. It is complete and submission ready.

Thank you!

**2 attachments**

**Wilberforce Academy of Knoxville -- Attachment 9_ Operating Budget.xlsx**
210K

**Charter School Application -- Wilberforce Academy of Knoxville.pdf**
8578K

# EXHIBIT 8

Application for a Charter School
To Open 2027-2028 School Year

WILBERFORCE ACADEMY

**Table of Contents**


Application Cover Sheet ... 4

Statement of Assurances ... 5

Waivers ... 7

Section One: Educational Program Design and Capacity ... 10

1.1 School Overview ... 10

1.2 School Mission and Model ... 10

1.3 Anticipated Student Population ... 33

1.4 Family and Community Engagement and Support ... 55

1.5 School Culture and Discipline ... 61

1.6 Curriculum and Instruction ... 82

1.7 Special Populations ... 127

1.8 Student Assessment and Evaluation ... 135

1.9 Educational Program and Capacity ... 143

Section Two: Operations Plan and Capacity ... 162

2.1 Governance ... 162

2.2 Staffing ... 179

2.3 Facilities ... 189

2.4 Transportation ... 192

2.5 Health and Safety ... 196

2.6 Insurance ... 201

2.7 Food Service ... 201

2.8 Start-up Plan ... 204

2.9 Operations Capacity ... 208

Section Three: Budget and Finance ... 215

3.1 Operating Budget ... 215

3.2 Budget and Finance Capacity ... 233

Attachment 1: Evidence of Community Engagement ... 249

Attachment 2: School-Based Team Resume ........ 251
Attachment 3: Board Member Resumes/Bios ........ 254
Attachment 4: Organizational Chart ........ 258
Attachment 5: Articles of Incorporation ........ 259
Attachment 6: Proof of Nonprofit and Tax-Exempt Status ........ 266
Attachment 7: Governing Board Bylaws ........ 270
Attachment 8: Proof of Insurance ........ 278
Appendix: Donor Commitment Letter ........ 279

WILBERFORCE ACADEMY

**Application Cover Sheet**

General Information

| | | | |
|---|---|---|---|
| Name of Proposed School | The Wilberforce Academy of Knoxville | | |
| Sponsor/Sponsoring Entity | The Wilberforce Academy of Knoxville | | |
| Academic Focus | Classical Christian with an emphasis on civics and entrepreneurship | | |
| Grade Structure | Year 1 | Year 5 | At Capacity |
| | K-3 | K-7 | K-8 |
| Projected Enrollment | Year 1 | Year 5 | At Capacity |
| | 318 | 618 | 693 |
| Neighborhood and/or Community in which the school plans to locate | Cedar Bluff | | |
| Projected Opening School Year | Fall 2027 | | |

Primary Point of Contact

| | |
|---|---|
| Name | Zach Wishart |
| Role in Proposed School | School Director |
| Mailing Address | 8840 Keenberg Lane |
| Mailing Address Line 2 | |
| City, State, Zip Code | Knoxville, TN 37931 |
| Primary Telephone | (865) 257-6105 |
| Alternate Telephone | |
| Email Address | zachwishart@gmail.com |

Applicant Team

| Name | Current Job Title & Employer | Role in Drafting Charter School Application |
|---|---|---|
| Zach Wishart | Middle & High School Principal, River's Edge Christian Academy | Lead Author |

WILBERFORCE ACADEMY

**Statement of Assurances**

As the authorized representative of the sponsor applying to open a charter school in Tennessee, I hereby certify that the information submitted in this application is true to the best of my knowledge and belief, realizing that any misrepresentation could result in disqualification from the application process or revocation after award; and if awarded a charter, the school must comply with all assurances within this section, and all applicable state and federal laws and regulations related to public charter schools. Furthermore, the governing body of the proposed charter school hereby assures that it accepts full legal and financial responsibility for the operation of the school.

I affirm that the public charter school will:

1. Be operated by a not-for-profit organization that is exempt from federal taxation under §501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3));
2. Operate as a public, nonsectarian, non-religious public school, with control of instruction vested in the governing body of the school under the general supervision of the authorizer and in compliance with the charter agreement and the Tennessee Public Charter Schools Act;
3. Follow all federal, state, and local laws and regulations pertaining to the operation of a public charter school, unless waived according to T.C.A. § 49-13-111(p);
4. Provide special education services for students with disabilities as provided in T.C.A. Title 49, Chapter 10, Part B of the Individuals with Disabilities Education Act, Title II of the Americans with Disabilities Act of 1990, and Section 504 of the Rehabilitation Act of 1973;
5. Adhere to applicable state and federal law relating to students who are limited English proficient, including Title VI of the Civil Rights Act of 1964, and the Equal Educational Opportunities Act of 1974;
6. Offer curriculum, textbook, and instructional materials that meet state and federal requirements, including that they are aligned to state academic standards (T.C.A. § 49-6-2202), do not include or promote prohibited concepts (T.C.A. § 49-6-1019), were not created to align exclusively to the Common Core State Standards, and are not marketed as Common Core textbooks or materials (T.C.A. § 49-6-2202);
7. Follow all federal and state laws and constitutional provisions prohibiting discrimination on the basis of disability, race, creed, color, national origin, religion, ancestry, or need for special education services;
8. Follow non-discriminatory admission policies pursuant to T.C.A. § 49-13-107, and processes for conducting an enrollment lottery, if applicable, in alignment with T.C.A. § 49-13-106 & 113 and State Board Rule 0520-14-01-.04;
9. Maintain a school term of no less than two hundred (200) days, including one hundred eighty (180) days for classroom instruction, pursuant to T.C.A. § 49-6-3004;
10. Ensure each instructional day consists of the minimum requirements, pursuant to T.C.A. § 49-6-3004, T.C.A. § 49-6-201, and State Board Rule 0520-01-02-.31(1);
11. Utilize this application as a contract with the authorizer, if no other agreement is signed, pursuant to Tennessee Attorney General Opinion No. 10-45;
12. Exclusively employ teachers who hold an active teaching license and any appropriate endorsement(s) to teach in a public school in Tennessee;
13. Comply with Open Meetings and Open Records laws (T.C.A. §§ 8-44-101 et seq.; 10-7-503, 504);

WILBERFORCE ACADEMY

14. Not charge tuition, except for students transferring from another district to the school pursuant to the local board's out-of-district enrollment policy and T.C.A. § 49-6-3003;
15. Not charge registration fees or enrollment fees, except as authorized by T.C.A. § 49-13-106;
16. Follow state financial (budgeting and audit) procedures and reporting requirements according to T.C.A. §§ 49-13-111, 120, and 127;
17. Require governing body members, employees, officers, and other authorized persons who receives funds for the charter school, has access to the charter schools' funds, or has authority to make expenditures from the charter schools' funds, to give a surety bond in the form prescribed by T.C.A. § 8-19-101; and
18. Maintain all necessary and appropriate insurance coverage;
19. Notify its authorizer immediately of any change in circumstances that may have a significant impact on the school's ability to fulfill its goals as stated in its charter agreement; and
20. Submit to its authorizer a request to amend its charter agreement for any material modifications as defined by the charter agreement and TN Public Charter Commission rules.

_______________________________________ ____________________

Signature of Authorized Representative Date

_______________________________________

Printed Name of Authorized Representative

_______________________________________

Title of Authorized Representative

WILBERFORCE ACADEMY

**Waivers**

| Statute or State Board Rule | Description of Statute or Rule | Explain how the statute or rule inhibits or hinders the sponsor's ability to meet its goals or comply with its mission |
|---|---|---|
| 49-3-306(a) | Licensed Personnel Salaries | This statute requires adherence to district-wide licensed personnel salary structures that may not align with WAK's instructional model or staffing priorities. Compliance would limit the school's ability to design a compensation system that supports differentiated roles, performance expectations, and mission-critical positions. |
| 8-23-206(a) | Longevity Pay | Mandatory longevity pay requirements may restrict WAK's ability to allocate resources strategically based on instructional impact, role responsibility, and school growth stage. The statute would impede the school's capacity to design a compensation structure aligned to performance, contribution to mission, and financial sustainability, particularly during initial years of operation. |
| 49-6-2206 | Use of Unapproved Textbooks | This statute limits instructional autonomy by requiring exclusive use of state-approved instructional materials. WAK's classical and knowledge-rich curriculum depends on carefully curated texts that may not appear on state-approved lists. Compliance would restrict the school's ability to deliver its intended instructional program with fidelity and coherence. |
| 49-5-408 | Contracts | WAK desires the flexibility needed to properly staff the school with the most qualified candidates to provide an effective education aligned to the school's mission. |
| 49-5-409 | Termination of Contracts | WAK desires the flexibility needed to properly staff the school with the most qualified candidates to provide an effective education aligned to the school's mission. |
| 49-5-510-513 | Tenure | Tenure requirements may limit WAK's ability to ensure ongoing instructional effectiveness and mission alignment among |

WILBERFORCE ACADEMY

| | | |
|---|---|---|
| | | staff. The school's model emphasizes continuous professional growth, accountability, and alignment with its educational philosophy. |
| 49-5-701-713 | Leave | Statutorily prescribed leave structures may limit WAK's ability to design personnel policies aligned to its staffing model, operational capacity, and instructional priorities. Custom leave policies would allow the school to balance employee support with continuity of instruction and fiscal responsibility, particularly during the early growth years. |
| SBE Rule 0520-1-2-.02 | Salary Schedules | Required salary schedules may constrain WAK's ability to design compensation structures that reflect differentiated roles, responsibilities, and performance expectations. Flexibility in compensation is essential to support the school's instructional model, recruit mission-aligned educators, and ensure long-term financial viability. |
| SBE Rule 0520-01-03-.07(2) | Library Information Center Personnel | WAK's classical and content-rich curriculum relies on curated classroom texts, and our students are better served by classroom-level libraries. As the school grows in grades and enrollment, WAK will begin to build a more centralized library. |
| SBE Rule 0520-01-03-.07(3) | Library Information Center Collections | WAK's classical and content-rich curriculum relies on curated classroom texts, and our students are better served by classroom-level libraries. As the school grows in grades and enrollment, WAK will begin to build a more centralized library. |
| SBE Rule 520-1-2-.04 | Leave for Teachers | Prescriptive leave requirements may limit WAK's ability to develop personnel policies aligned with its staffing structure, instructional continuity goals, and operational needs. Flexible leave policies support both employee well-being and consistent classroom instruction, particularly in a small-school environment. |

| | | |
|---|---|---|
| 49-5-101(a); SBE Rule 0520-01-02-.03-6 | Licensed Principals | WAK will recruit the most qualified principals and instructional leaders regardless of administrative status in order to fulfill its mission. |
| SBE Rule 0520-01-02-.03 | Employment Standards | WAK desires the flexibility needed to properly staff the school with the most qualified candidates to provide an effective education aligned to the school's mission. |

WILBERFORCE ACADEMY

**Section One: Educational Program Design and Capacity**

1.1 School Overview

1. *In 2-3 paragraphs, describe the overall vision for the proposed school. Include relevant details such as the academic focus, the students it will serve, and what success looks like.*

The Wilberforce Academy of Knoxville (referred to in this application as Wilberforce, WAK, or the school) proposes to open a K-8 charter school that provides families across Knox County a high-quality, tuition-free Christian education, integrating rigorous academics, biblical formation, and purposeful character development. The classical academic program and joyful, orderly culture of the school will be rooted in the Christian faith and shaped by the intellectual tradition of liberal arts spanning from the ancient Greeks and Hebrews through the American founding up to the present day. At the same time, our curriculum will proudly be fully aligned to Tennessee Academic Standards and accessible to all students. Wilberforce will cultivate in students a sense of wonder and the habits of reflection, disciplined study, and personal responsibility through an intentional academic model that includes robust literacy and numeracy foundations; deep engagement with stories, primary sources, and historical ideas; and consistent development of the virtues of perseverance, attentiveness, and respect.

Wilberforce seeks to serve families from across all Knox County neighborhoods, income levels, religious beliefs, and backgrounds. The school will provide a welcoming, supportive, and joyful learning environment in which all students can grow in knowledge, understanding, self-mastery, and confidence. Through clear routines, thoughtful instruction, and meaningful exposure to the ideas that have shaped our civic and cultural inheritance, Wilberforce will help students build the skills, awareness, and self-understanding required for lifelong learning and responsible citizenship.

Success for Wilberforce will be visible both in student outcomes and in community impact. Academically, students will meet or exceed state expectations in literacy, math, science, and social studies at rates that meet and exceed our peer institutions while demonstrating growth across all subgroups. Students will leave 8th grade equipped to think critically, communicate clearly, engage respectfully with differing viewpoints, and contribute positively to their families, schools, and neighborhoods. At the community level, success will be evidenced by a diverse and thriving school culture, strong partnerships with families, and a reputation for preparing young people to enter high school with purpose, resilience, and a commitment to serving God and neighbor.

1.2 School Mission and Model

2. *Provide the mission statement for the proposed charter school.*

**The mission of the Wilberforce Academy of Knoxville is to prepare the hearts and minds of students through the patient and rigorous pursuit of truth, a nurturing culture of joy and structure, and the steadfast cultivation of Christian virtue so that they may live free and purposeful lives as responsible citizens and steward leaders.**

To realize our mission, WAK will provide a robust, content-rich curriculum in the liberal arts that is accessible and edifying to all students. A time-tested and rigorous course of study, the liberal arts train students in verbal and quantitative reasoning so that they may understand the truth. From kindergarten through eighth grade, Wilberforce students will develop foundational skills, habits, and background knowledge in mathematics, science, reading and spelling, grammar and composition, literature, history, fine arts, physical wellness, and biblical literacy. At Wilberforce, our aim is to support all learners in achieving a high standard of academic excellence, as evidenced by student performance data, TVAAS Level 5 growth rankings, a target of at least 90% of students meeting or exceeding grade-level expectations in reading, and consistently outperforming local district schools.

A Wilberforce education will be both rigorous and patient. Appropriate rigor for the K-8 level means that all students will master the fundamental skills and habits of learning while growing in their understanding of biblical truth and their national heritage. Using developmentally appropriate pedagogy, teachers will devote the necessary time and effort to train students in phonics-based literacy, conceptual and procedural mathematics, and the order of the natural world expressed in science. At the same time, students' imaginations will be formed by beautiful stories, poetry, history, art, music, and Scripture. Thus, Wilberforce will patiently and deliberately equip students with the skills, habits, and background knowledge essential to lifelong learning, such as reading comprehension, strong memory, logical reasoning, confident speech and writing, and attentive observation. Through the curriculum, students will master the fundamentals of each core subject while developing a sense of pride and belonging in their cultural inheritance as Americans. Wilberforce will stand as an exemplary institution for teaching American history, government, and citizenship, and we will measure success in this area by pursuing the Governor's Tennessee Excellence in Civics Education Seal.

All learning at WAK will take place in an orderly and safe environment characterized by joy and structure. Students will wear uniforms and convene daily for morning assembly, during which the entire school gathers to raise the flag, recite the Pledge of Allegiance, sing, orient the day, and pray as their conscience allows. The school environment will be clean, welcoming, and thoughtfully adorned with beautiful art from the Western tradition, carefully selected pieces of student artwork, and displays of school and civic pride. Each classroom will be teacher-led and characterized by clear and consistent routines. Teachers will employ evidence-based methods of instruction designed to engage and support all students while making learning both thorough and enjoyable. School culture will be reinforced through monthly all-school assemblies, called Town Halls, that celebrate student achievements and virtuous conduct. Additionally,

Wilberforce's offering of extracurricular sports, clubs, and other activities, such as student council and community service projects, will provide regular opportunities for students to practice responsible civic participation and servant leadership in the school and local communities. To evaluate the strength of Wilberforce's school culture, we will seek to maintain annual teacher and student retention rates above 85% and to demonstrate high rates of parent satisfaction through strong family-school relationships and regular family survey feedback.

In addition to academic excellence and a nurturing school culture, WAK seeks to cultivate Christian virtue in our students. At Wilberforce, we believe that knowing and understanding Scripture promotes spiritual growth and maturity. To this end, Wilberforce will explicitly teach biblical literacy through Bible stories in the earliest grades, catechism in the intermediate grades, and theological study in the later grades. All students will memorize passages of Scripture and the ancient creeds. Christian formation will extend beyond instruction to daily practice. Administrators and faculty will model Christian character through the consistent demonstration of virtues such as faith, hope, love, gratitude, kindness, and service. Through biblical teaching and faithful role models, Wilberforce seeks to foster spiritual growth and moral formation in every student.

As a result of their Wilberforce education, we hope for our students to live purposeful lives of responsible citizenship and servant leadership. Wilberforce will equip students with the skills, habits, knowledge, and foundations for Christian virtue that will enable them to be lifelong learners and grow in faith. We will consider the school successful in these long-term aims if our graduates go on to complete high school, pursue gainful employment or higher education, establish families, build businesses, serve and lead in their churches and communities, and participate actively in civic life.

3. *Describe any mission-specific short- and/or long-term educational goals and targets that the school will have and how internal and external stakeholders, including the public, will know the extent to which the school is achieving its mission.*

The rigorous pursuit of truth is greatly advanced by accountability structures that yield objective measures of both student growth and performance. Wilberforce welcomes the accountability system and will work diligently to ensure all students receive not only the instruction, but the support and preparation they need to grow and perform at their full potential.

WAK anticipates that our students may come to us with gaps, and that the school will have to invest time in developing the nurturing culture of joy and structure that will be a hallmark of the student experience. For that reason, WAK is intentionally setting strong academic goals for our student body, especially our disadvantaged student groups, that will support the transformative student growth and achievement for all our students.

Toward that end, WAK's highest goal is to provide an exceptional academic foundation through the patient and rigorous pursuit of truth. In support of this unifying goal, we have laid out a series of short, intermediate, and long-term goals that are measurable.

| Wilberforce Academic Goals | | |
|---|---|---|
| **Goal: Wilberforce will provide an exceptional academic formation through the patient and rigorous pursuit of truth.** | | |
| **A) As evidenced by TCAP and TVAAS scores** | | |
| **Short-Term Goals (by year 3)** | **Intermediate Goals (by year 5)** | **Long-Term Goals (by year 9)** |
| WAK will earn a Level 3 TVAAS designation and a C rating by TDOE in our first year of operation. | WAK will earn a Level 4 TVAAS designation and a B rating by TDOE. | WAK will earn a Level 5 TVAAS designation and an A rating by TDOE. |
| WAK will perform in the top 35% statewide on TCAP math and ELA in our first year and improve by 5% each year until we reach the top 15%. | WAK will perform in the top 15% statewide on TCAP math and ELA. | WAK will annually perform in the top 15% statewide on TCAP math and ELA. |
| Our historically underserved student groups will annually earn growth scores in the top 30% statewide on TCAP math and ELA. | Our historically underserved student groups will perform in the top 40% statewide on TCAP math and ELA. | Our historically underserved student groups will annually perform in the top 40% statewide on TCAP math and ELA. |
| **B) As evidenced by state and federal recognition** | | |
| **Short-Term Goals** | **Intermediate Goals** | **Long-Term Goals** |
| WAK will earn the Tennessee Governor's Civics Seal in our second year of operation. | WAK will earn the National Blue Ribbon School designation in our sixth year of operation. | WAK will earn the Reward School designation by our ninth year of operation. |
| **C) As evidenced by nationally normed assessment** | | |
| **Short-Term Goals** | **Intermediate Goals** | **Long-Term Goals** |
| WAK will begin collecting and implementing NWEA MAP data in year 1. | WAK will perform at or above the national average on the NWEA MAP assessment. | WAK will consistently perform above the national average on the NWEA MAP assessment. |

Of these short, intermediate, and long-term goals, all but the NWEA MAP scores are public and will be made available to families and the community through the school's website. The MAP scores will be shared for internal use only with faculty and individually with families. These

academic goals will not be achievable without the supporting structure of school culture and operations. For this reason, we are including these sets of goals as well.

| Wilberforce Cultural and Operational Goals | | |
|---|---|---|
| **Domain** | **Short-Term Goals** | **Long-Term Goals** |
| Faculty and Employee Satisfaction and Overall Cultural Health | Faculty satisfaction rate of 80% or greater on spring survey | Designation as a "Flourishing School" by Christian Workplace. This requires an excellent rating on faculty surveys |
| Faculty and Employee Satisfaction and Overall Cultural Health | Faculty retention rate over 75% in year 1 | Faculty retention rate at or above 85% on average annually |
| Family Satisfaction | Family satisfaction rate of 70% or more on spring survey | Family satisfaction rate consistently at or above 85% on spring survey |
| Family Satisfaction | Net Promoter Score (NPS) of 30 in our first year, growing 5 points per year until we reach 70 (which is considered world-class). | NPS at or above 60 annually |
| Family Satisfaction | Student retention rate over 75% in year 1 | Annual student retention rate at or above 90% |
| School Health | Average daily attendance at or above 95% | Average daily attendance at or above 95% |
| School Health | Enrollment meeting or exceeding 100% of budgeted enrollment | Enrollment meeting or exceeding 100% of budgeted enrollment as the school grows each year |
| School Health | 1.5 applications for every available seat by year 3 | 2 applications for every available seat annually |
| Student Formation | Over 90% of families report positive character development in students attending for 3 years consecutively | Alumni surveys reveal healthy life choices (college, career, marriage, etc.) well in excess of statistical norms |

4. *Describe how the sponsor assessed the need for the proposed school, including considerations around availability of school choice options in the community, capacity, and number and quality of available seats.*

To assess the need for the proposed school, we have conducted a comprehensive needs assessment that included (1) analysis of population growth, (2) review of district capacity and seat availability, and (3) evaluation of the quality and accessibility of existing school choice options. To do these analyses, we collected data from the U.S. Census website, from the Tennessee TVAAS system site, from the Knox County Public Schools site, from individual schools, and from local news outlets.




The findings show that the Western Knox County region is experiencing rapid growth and limited availability of elementary and middle school seats. Knox County is one of the fastest-growing regions in the country; the county's population is expected to increase by more than 70,000 residents by 2040. Many schools in the county are operating near, at, or above capacity, and pressure on existing schools will only continue to rise as the county's population grows.[1] Academic performance among the public schools is inconsistent, with almost half of the schools performing at a "C" level or below, according to the state.[2] In addition, values-aligned alternatives are scarce. Existing traditional private options are oversubscribed and unaffordable, particularly for families without access to Education Freedom Scholarships; even with Education Freedom Scholarships, private school tuition remains a financial barrier for many families. These factors collectively demonstrate a clear need for a high-quality K-8 charter school.

[1] https://haslam.utk.edu/news/tennessee-population-projected-to-hit-nearly-8-million-by-2040/
[2] https://www.knoxschools.org/news/public-notices/~board/publicnotices/post/policy-review-committee-26-003

WILBERFORCE ACADEMY




**Population Growth and School Location**

Boasting a low cost of living, strong economic growth, and abundant natural beauty, Knoxville, the largest city in East Tennessee, has consistently been recognized as one of the most livable cities in the United States.[3] [4] [5] Kim Bumpas, president of Visit Knoxville, describes the city as a "nature-loving, adventure-seeking, artsy kind of town," and the area is attracting new residents with its 90 parks, more than 100 miles of greenway, historic Market Square, and a brand-new multi-use stadium, among many other amenities.[6] Knox County has experienced steady growth over the past decade, with its population increasing by 12% between 2014 and 2024.[7] According to the moving and storage company PODS, Knoxville ranked 8th in the U.S. for "move-ins" this year.[8]

The western part of the county, in particular, has seen a large share of the recent economic development, and many families are moving to the area.[9] WAK (represented by the star on Maps 1 and 2) will be strategically located in the general Cedar Bluff area of Knox County, at the epicenter of the region's growth. Between 2018 and 2023, the total population in the zip codes within 10 miles of Cedar Bluff grew by 7% (from 532,281 to 568,138). More importantly, the number of children in this region ages 0 to 14—the region's current and future student population—increased by 4,350 over the last five years.[10] As Map 1 illustrates, many of the highest-growth areas are concentrated around the planned school location.

While many regions across the United States are facing declines in their school-age populations, the zip codes surrounding Cedar Bluff are experiencing notable increases. During the same five-year period, median home values rose by an impressive 62%, underscoring the strong demand for housing in the region.[11]

---

[3] https://liferedefined.com/live/
[4] https://www.knoxvillechamber.com/wp-content/uploads/2024/11/2025-Facts-and-Figures.pdf
[5] https://livability.com/tn/knoxville/where-to-live-now/8-reasons-to-move-to-knoxville-tennessee/
[6] https://www.visitknoxville.com/plan-your-visit/visitors-guide/
[7] https://alfred.stlouisfed.org/series?seid=TNKNOX5POP&
[8] https://www.knoxvillechamber.com/wp-content/uploads/2024/11/2025-Facts-and-Figures.pdf
[9] https://www.wate.com/news/knox-county-news/new-businesses-booming-in-farragut-as-population-grows/
[10] https://www.census.gov/programs-surveys/acs.html
[11] https://www.census.gov/programs-surveys/acs.html

In addition to being positioned amid substantial development and population growth, WAK will be closely located to two major thoroughfares, I-40 and I-75, providing convenient access for families across the county. The school is well situated to serve as a central hub, supporting nearby neighborhoods while also attracting students from diverse communities throughout Knox County. Further supporting details on the need presented by the anticipated population growth and reasoning for the school's location can be found in question 6.




**District Capacity and Seat Availability**

The increasing population in Knox County has resulted in schools operating at capacity and pressure has mounted for the construction of new schools as parents become more and more displeased with portable classrooms and traffic issues.[12] [13] Knox County Schools have seen an increase of about 7,000 students between 2007[14] and 2025.[15] A recent report by the Knoxville News Sentinel reported that the public schools are crowded, and new construction will be needed in the future.[16] A couple of new K-8 schools have recently been approved, however, it will be several years before they are ready to open,[17] [18] and they still will not be sufficient for the demand for new seats. The new K-8 school to serve Beaumont, Lonsdale and Mechanicsville is projected to house up to about 1,600 new students,[19] and the new school in West Farragut will serve about 1,400 students.[20] However, as U.S. Census data has shown, there has been an increase in over 4,000 children between the ages of 0 and 14 just in the 10-mile region around Cedar Bluff between 2018-2023,[21] and all indications show that Knoxville is continuing to grow. Additional new seats are still needed.

[12] https://www.knoxnews.com/story/news/education/2024/08/29/powell-elementary-school-community-is-unhappy-with-portable-classrooms/74925797007/
[13] https://www.wate.com/news/knox-county-news/43-7m-contract-for-new-farragut-elementary-school-approved-by-board-of-education/
[14] https://archive.knoxplanning.org/pefa/presentation.pdf
[15] https://nces.ed.gov/ccd/districtsearch/district_detail.asp?details=1&ID2=4702220
[16] https://www.knoxnews.com/story/money/business/2025/07/07/knoxville-merit-construction-company-builds-east-tennessee-knox-county-schools/83456777007/
[17] https://www.knoxnews.com/story/news/education/2026/01/09/knox-county-school-board-approves-k8-school-design-beaumont-lonsdale-mechanicsville/88069540007/
[18] https://www.wate.com/news/knox-county-news/construction-of-new-k-8-school-in-knoxville-set-to-begin-this-year/
[19] https://www.msn.com/en-us/news/us/knox-county-school-board-approves-innovative-k-8-school-design/ar-AA1TSBsd
[20] https://www.knoxfocus.com/archives/this-weeks-focus/kcs-breaks-ground-for-new-school-in-farragut/#:~:text=The%20new%20campus%2C%20which%20is,Jon%20Ryeswyk.
[21] https://www.census.gov/programs-surveys/acs.html

In addition, the public has expressed a desire for more innovation, but there is not clear direction on what kinds of innovation are most important.[22] Many different educational models have been debated, and the only consensus is that *more models* are needed.[23] WAK stands ready to bring a new type of school to a market that needs greater capacity and desires more options.

**Quality and Accessibility of Existing School Choice Options**

1.Knox County Schools: Public Schools

The Knox County School System, the third-largest public school system in Tennessee, employs 9,000 teachers and staff and enrolls about 59,000 students. The 94 public schools in the area are comprised of:

- 52 elementary schools (1 virtual)
- 17 middle schools (1 virtual)
- 17 high schools (1 virtual)
- 2 charter schools (Emerald Academy and Knoxville Prep)

While the total number of students enrolled in Knox County schools has remained essentially flat over the last several years, the distribution of school quality is inconsistent, with nearly half of schools (48%) performing at or below a "C" level and fewer than one in five earning the state's "Reward" designation.[24] These gaps in access to consistently high-performing schools underscore a need for new tuition-free options that expand the availability of high-quality seats, particularly in growing areas of the county.

Mapping the elementary and middle schools in the area and illustrating their Math Achievement scores show performance patterns across the district:

[22] https://youtu.be/KrT3RDyA0DM

[23] https://citizenportal.ai/articles/6348262/Tennessee/Knox-County-board-approves-MechanicsvilleLonsdaleBeaumont-facilities-plan-after-heated-debate-amendment-to-preserve-Beaumont-style-magnet-programming-fails

[24] https://www.knoxschools.org/news/public-notices/~board/publicnotices/post/policy-review-committee-26-003

WILBERFORCE ACADEMY




Map 3: Relative Math Achievement Scores (2024)

In Map 3, **green** circles represent schools with math achievement scores above the district average; the darker the green, the higher the scores. **Red** circles represent schools with math achievement scores below the district average; the darker the red, the lower the scores. The **stars** indicate the schools that received the "Reward" distinction. In the service region chosen by WAK **(circled),** there is a mixture of school achievement scores.

A full list of district elementary and middle schools and their 2024 ELA, Math, and Science assessment scores is given below.[25] A review of this data reveals significant variability in academic performance across district elementary and middle schools. This uneven achievement indicates that many students lack consistent access to high-quality instruction and require stronger, more systematic support in these core subject areas.

**Elementary Schools**

| 4th Grade Scores (2024) | ELA | | Math | |
|---|---|---|---|---|
| | Growth Index | Achievement | Growth Index | Achievement |
| A L Lotts Elementary | -1.63 | 58.0 | 2.34 | 57.9 |
| Adrian Burnett Elementary | 0.84 | 45.1 | 1.8 | 43.5 |
| Amherst Elementary School | -0.03 | 53.4 | -2.58 | 51.9 |
| Ball Camp Elementary | -0.29 | 59.1 | 1.36 | 57.6 |
| Bearden Elementary | -0.83 | 66.6 | -0.48 | 64.9 |
| Beaumont Elementary/Magnet | -2.44 | 50.3 | -2.2 | 43.1 |
| Belle Morris Elementary | 1.83 | 37.1 | 1.12 | 36.5 |
| Blue Grass Elementary | -0.81 | 66.9 | 1.84 | 64.1 |
| Bonny Kate Elementary | 0.35 | 54.4 | 0.82 | 49.5 |
| Brickey McCloud Elementary | -1.89 | 55.8 | -1.25 | 53.2 |
| Carter Elementary | 2.59 | 47.7 | 3.12 | 41.8 |
| Cedar Bluff Elementary | 3.31 | 48.6 | 2.33 | 45.0 |

[25] https://tvaas.sas.com/e/scatterplot.html?as=a&aj=a&w4=84

WILBERFORCE ACADEMY

| | | | | |
|---|---|---|---|---|
| Chilhowee Intermediate | 1.03 | 44.8 | 3.07 | 44.8 |
| Christenberry Elementary | 2.54 | 48.6 | -0.35 | 46.8 |
| Copper Ridge Elementary | -2.22 | 52.9 | -5.88 | 49.9 |
| Corryton Elementary | -0.32 | 61.2 | 0.16 | 59.3 |
| Dogwood Elementary | -0.53 | 45.4 | 0.75 | 43.6 |
| East Knox Elementary | -0.37 | 45.6 | 1.99 | 45.3 |
| Emerald Academy | 0.17 | 43.5 | -1.24 | 44.9 |
| Farragut Intermediate | 5.58 | 62.1 | 6.14 | 62.1 |
| Fountain City Elementary | 0.08 | 52.9 | 0.96 | 48.9 |
| Gap Creek Elementary | -1.98 | 59.1 | -1.64 | 54.6 |
| Gibbs Elementary | 1.36 | 52.5 | 4.88 | 51.5 |
| Green Magnet Math and Science Academy | -1.94 | 32.5 | -3.59 | 27.6 |
| Halls Elementary | 2.98 | 54.7 | 4.05 | 57.6 |
| Hardin Valley Elementary | 1.21 | 59.5 | 5.01 | 58.4 |
| Inskip Elementary | 1.59 | 36.0 | 2.15 | 33.9 |
| Karns Elementary | 0.29 | 49.0 | 3.45 | 46.2 |
| Knox Adaptive Education Center | -1.31 | 36.2 | 0.98 | 25.6 |
| Knox County Virtual School | 0.7 | 48.9 | -0.75 | 36.7 |
| Lonsdale Elementary | 4.54 | 35.9 | 4.13 | 34.5 |
| Maynard Elementary | 0.91 | 36.1 | -1 | 34.4 |
| Mooreland Heights Elementary | 0.71 | 38.9 | 0.08 | 34.9 |
| Mt Olive Elementary | 2.02 | 51.9 | 3.31 | 50.8 |
| New Hopewell Elementary | 1.72 | 50.7 | 3.39 | 49.6 |
| Northshore Elementary School | 1.08 | 65.3 | 5.91 | 62.5 |
| Norwood Elementary | 0.5 | 36.5 | -0.07 | 39.4 |
| Pleasant Ridge Elementary | -0.36 | 53.5 | 0.6 | 47.7 |
| Pond Gap Elementary | 1.15 | 38.8 | 5.54 | 38.5 |
| Powell Elementary | -4.57 | 51.1 | 5.8 | 48.8 |
| Ritta Elementary | -1.63 | 50.9 | 2.34 | 50.6 |
| Rocky Hill Elementary | 0.23 | 66.6 | 1.61 | 63.8 |
| Sarah Moore Greene Magnet Technology Academy | -0.71 | 38.4 | 0.02 | 35.6 |

WILBERFORCE ACADEMY

| | | | | |
|---|---|---|---|---|
| Sequoyah Elementary | 1.16 | 69.9 | 3.7 | 65.7 |
| Shannondale Elementary | 2.8 | 60.1 | 2.14 | 54.1 |
| South Knox Elementary | 0.7 | 65.5 | 0.35 | 59.7 |
| Spring Hill Elementary | 1.18 | 35.8 | 1.41 | 32.6 |
| Sterchi Elementary | 0.25 | 51.2 | 0.53 | 48.4 |
| West Haven Elementary | -0.53 | 46.2 | 3.27 | 46.1 |
| West Hills Elementary | -1.28 | 55.1 | -0.85 | 53.5 |
| West View Elementary | -1.54 | 47.6 | -0.17 | 42.4 |
| DISTRICT AVERAGE | 0.36 | 50.48 | 1.38 | 47.85 |

**Middle Schools**

| 8th Grade Scores (2024) | ELA | | Math | | Science | |
|---|---|---|---|---|---|---|
| | Growth Index | Achievement | Growth Index | Achievement | Growth Index | Achievement |
| Bearden Middle School | -1.38 | 55.5 | -0.15 | 50.6 | -3.58 | 322 |
| Carter Middle School | -1.41 | 52.1 | 3.82 | 50.6 | -1.33 | 314.2 |
| Cedar Bluff Middle School | -0.66 | 52.7 | -2.15 | 47.7 | 0.16 | 320.5 |
| Emerald Academy | 0.94 | 54.5 | -0.17 | 48 | -0.99 | 323.4 |
| Farragut Middle School | 0.37 | 66.6 | 4.12 | 67.8 | -3.35 | 338.6 |
| Gibbs Middle School | -1.97 | 51.9 | -4.39 | 50.9 | -4.73 | 319.9 |
| Gresham Middle School | 2.69 | 49.5 | -2.58 | 47.9 | -2.99 | 317.8 |
| Halls Middle School | 3.71 | 47.9 | -4.47 | 47.9 | -3.43 | 317.6 |
| Hardin Valley Middle School | -5.27 | 59.2 | 2.49 | 58.6 | -6.71 | 328.9 |
| Holston Middle School | 2.61 | 46.5 | -0.29 | 41.8 | 0.03 | 308.2 |
| Karns Middle School | -0.78 | 51.4 | -4.88 | 50.3 | -3.43 | 322.2 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Knox County Virtual School | 0.91 | 54.3 | -2.93 | 45 | 1.28 | 318.7 |
| Northwest Middle School | -2.75 | 37.2 | 1.69 | 35.6 | -0.51 | 306.9 |
| Powell Middle School | -0.19 | 53.6 | 0.84 | 52.2 | -2.15 | 322.4 |
| South Doyle Middle School | -3.94 | 45.5 | -0.67 | 45.4 | -5.64 | 316.2 |
| Vine Middle/Magnet | -1.27 | 32.4 | -0.49 | 31.7 | -1.68 | 300.1 |
| West Valley Middle School | 0.65 | 64.3 | -3.91 | 67.6 | 1.13 | 333.4 |
| Whittle Springs Middle School | -2.43 | 40.6 | -5.72 | 40.9 | -4.18 | 317 |
| **DISTRICT AVERAGE** | **-0.57** | **50.87** | **-1.10** | **48.92** | **-2.34** | **319.33** |

The wide variances from school to school in both achievement and growth markers indicate that there are many students who are falling behind and could benefit from other educational models or instructional methods. We believe many of them could thrive in an environment with a different pedagogical approach, and many could benefit from a smaller school setting that is nurturing and focused on developing virtue along with mastery in the core academic subjects.

2. Knox County Schools: Traditional Private

In 2023, students in the 10-mile region around Cedar Bluff attended private schools at the rate of 16%, compared to 12% nationally, indicating a greater desire for school choice than in other regions. Just five years earlier, only 13% of students were enrolled in traditional private schools.[26] While the public school enrollment has remained flat,[27]despite a growing population in the area, the increase in private school enrollment has been significant. Essentially all of the growth in population of school-aged kids over the last five years has been absorbed by the increased enrollment in private schools. A map of the private schools in the Cedar Bluff area by enrollment size and tuition rates shows who the key competitors are.

[26] https://www.census.gov/programs-surveys/acs.html
[27] https://www.census.gov/programs-surveys/acs.html




In Map 4, the size of the circle denotes the size of the school, and the darker the color, the higher the tuition rates. The schools closest to where WAK will be (Webb School of Knoxville, Christian Academy of Knoxville, and Tate's School of Discovery) have a relatively high tuition rate, while the less expensive options are located on the outskirts of the Cedar Bluff area.

Furthermore, many of these private school options report full enrollment or significant waitlists, particularly in key grade levels, suggesting that demand for high-quality, alternative educational options continues to exceed the available supply. For example, local private Christian schools around Wilberforce's location such as River's Edge Christian Academy (with its three campuses), the Episcopal School of Knoxville, and the Christian Academy of Knoxville, located most closely to the potential Wilberforce campus, all report full enrollment with waitlists in multiple grades and plans to open additional sections. There is potential for WAK to attract families who are looking for alternatives to the district public schools but would appreciate a tuition-free option.

Regarding the accessibility of school choice, opportunities exist at a greater level for high school students through magnet programs, academies, and specialized pathways. And while several private elementary and middle school opportunities are available, the number of seats is limited relative to the number of families seeking alternatives to traditional district schools. In addition, these private options can present financial barriers both when it comes to tuition and for families with students who have Individualized Education Programs (IEPs) or who require specialized supports and services.

Even with Tennessee's Education Freedom Scholarship Program, which provides scholarships for students to attend private schools (including religious ones), these financial barriers remain. For

example, the average tuition for Knoxville private schools is above $15,000 per year, and the Scholarship Program currently provides scholarships of $7,295. In the 2024-2025 year, there were 20,000 of these scholarships but close to 43,000 applications. With far fewer options for families seeking school choice at the elementary and middle school levels, many families are left without accessible, high-quality alternatives during the foundational years of a child's education, especially when those families are often seeking values-aligned educational environments that reflect their priorities regarding character, community, and academic expectations.

Additionally, because WAK aims to unite high-quality academics with a strong biblical foundation in the charter school context and thereby enhance those academics, the school would be one-of-a-kind in the area and thus, as the full waitlists for private Christian schools in the area suggest, fulfill a need and demand for a tuition-free Christian and biblically based academic education. As of 2026, 17% of students in Knoxville choose to attend private schools, with the large majority being at Christian schools, indicating the high regional demand for Christian education.[28]

Taken together, population growth, persistent overcrowding, limited charter presence, high demand for Christian education, and uneven academic performance in current schools demonstrate a clear need for additional high-quality elementary and middle school seats in western Knox County. Existing public options vary widely in quality, private options are financially inaccessible to many families, and demand for alternatives continues to exceed supply. Wilberforce directly addresses these gaps by expanding capacity and offering an inclusive, academically rigorous, and values-driven educational option during the foundational years. The proposed charter will help satisfy unmet demand by providing families with an additional tuition-free opportunity that combines academic excellence with individualized support for diverse learners from diverse backgrounds, including those with IEPs.

5. *Describe the structure of the school day and week for the typical student. Differentiate by grade bands (e.g., K-5, 6-8, 9-12) as needed.*

The structure of the school day and week is designed to provide students with an inclusive, academically rigorous, values-aligned, and mission-driven education. The schedule emphasizes both academic rigor and relationship formation, ensuring that students grow intellectually, spiritually, and personally within a supportive and consistent environment. Recognizing the importance of developing literacy and numeracy, the schedule devotes extensive time to these for all students in grades K-8, including by incorporating ELA and math skills across the curriculum such as in Bible, history, and science classes. In addition to every student in grades K-8 receiving weekly instruction in the arts, examples of musical and fine art historical achievements are woven into ELA and history instruction. In support of WAK's mission to cultivate Christian and civic virtue, time is devoted to civic instruction and spiritual engagement across all grade levels and in different settings. On a daily basis, the entire school will gather for a communal morning

[28] https://www.privateschoolreview.com/tennessee/knoxville

assembly. On a monthly basis, a guest speaker will offer enrichment, and awards will be given at the whole-school Town Hall gathering.

For all students, school hours will be 7:45am-3:00pm, Monday through Friday. WAK will follow the Knox County Schools calendar in an effort to accommodate and support families with students in multiple schools. To further support families, after-school care and tutoring will be offered through a partnership with Thrive Ministries.

Throughout the schedules outlined below, WAK will implement a homeroom teacher-led advisory model that is embedded within the daily classroom experience rather than scheduled as a standalone period. Advisory practices occur organically throughout the day—during morning routines, academic check-ins, transitions, and reflective classroom moments—and are integrated into core instruction and school culture. This approach strengthens teacher-student relationships and supports academic habits and character formation without reducing instructional time or requiring additional staffing.

**Grades K-4**

As is represented in the grades K-4 sample schedule below, WAK students will spend the earliest grades concentrating on mastering the foundational skills of literacy and numeracy in teacher-led classrooms. Students in grades K-4 will begin each day with a 10-to-15-minute teacher-led, whole-school assembly consisting of a brief morning devotional, prayer, hymn or praise song, and the Pledge of Allegiance, setting a positive and purposeful tone for the day and reinforcing the school's focus on moral and civic virtue. All students will attend the assembly respectfully, but active participation in prayer and singing will not be mandatory.

Following the morning assembly, students will engage in a full day of classroom-based instruction in core academic subjects, including reading, language arts, mathematics, science, and history, delivered by a single homeroom teacher in each section of grades K-3, facilitating strong teacher-student relationships and the opportunity for early, integrated intervention. Having a homeroom teacher that is responsible foremost of a student's daily instruction and classroom experience is developmentally appropriate for young learners because it provides consistency, predictable routines, and a secure environment that supports early academic, social, and emotional growth. By spending most of the day with the same teacher, students are able to form strong, trusting relationships, allowing teachers to understand individual learning needs and respond quickly with personalized support.[29] The model also promotes integrated learning, as homeroom teachers can connect reading, math, science, and history through thematic lessons and flexible pacing, helping students make meaningful connections across subjects while remaining engaged and supported throughout the school day.

To prepare for the transition to upper elementary, students in 4th grade will begin rotating between two teachers for English language arts (ELA) and mathematics. This model helps

[29] https://www.srcd.org/news/study-reveals-importance-student-teacher-relationships-early-childhood-education

students gradually build independence and organizational skills while benefiting from teachers with specialized content expertise. The natural conclusion of several key ELA curricula and beginning of others at the 3rd to 4th grade juncture further invites this development.

Each day for grades K-4 will also include a dedicated intervention period designed to provide targeted, data-driven academic support. During this time, homeroom teachers and special education instructors will deliver small-group or individualized instruction based on student performance data, benchmark assessments such as NWEA and DIBELS, and on-going progress monitoring. It should be noted that this dedicated intervention period functions as an extension of the Tier II and III intervention that take place during whole-group instruction through the use of a multi-sensory approach to literacy, differentiated question-asking during class conversation, affirmative checking,[30] and differentiated practice implicit in the Singapore Mathematics program. The data-informed intervention approach during the intervention period allows educators to provide consistently enriched whole-group instruction while also closing skill gaps and reinforcing foundational concepts. It also allows time for educators to further extend learning for students who have mastered grade-level content. Qualified parent volunteers will be sought to create a further edifying experience during this period by facilitating enrichment activities and reading groups for Tier I students.

Alongside the core academic subjects, students will receive daily instruction in alternating special area classes including physical education, art, music, Bible, and civics, which foster creativity, collaboration, entrepreneurialism, moral imagination, and physical wellness. These special area classes complement the rich, core-academic program by providing students with historically significant works of art and bolstering the school's commitment to cultivating the whole student to be a healthy, well-rounded community member. Each of these special area classes will be taught by a specialist teacher, giving core academic teachers time to collaborate in data analysis and grade-level planning.

K-4 daily schedules will include two recesses of 20 minutes each. This structure allows for movement and social engagement to punctuate shorter, more developmentally appropriate periods of classroom work. After school, in addition to after-school care being offered, a variety of extracurricular clubs and sports will be encouraged, including entrepreneurial-themed clubs guided by the Junior Achievement curricula for K-4 and several sports beginning in grade 3.

| **Grades K-4 Sample Schedule** | |
|---|---|
| **7:45-8:00** | **Morning Assembly**<br>*Devotional, Prayer, and Pledge of Allegiance* |
| **8:00-8:45** | **ELA**<br>*Literacy Essentials* (K-3) |

[30] Doug Lemov, *Teach Like a Champion 2.0: 62 Techniques that Put Students on the Path to College* (Jossey-Bass, 2015), Technique 6: "Affirmative Checking."

| | |
|---|---|
| | *English from the Roots Up and Well-Ordered Language* (4) |
| **8:45-9:45** | **Math**<br>*Primary Mathematics 2022 (Singapore Math)* |
| **9:45-10:10** | Recess |
| **10:10-10:55** | **ELA**<br>*Literacy Essentials* (K-3), *IEW Composition* (3-4) |
| **10:55-11:25** | Lunch |
| **11:25-11:50** | Recess |
| **11:50-12:35** | **Intervention Groups** and **ELA**<br>*Leveled Reading from Primary Phonics* (K-3)<br>*Partner Reading* (4) |
| **12:35-1:10** | **History/Science**<br>*Core Knowledge History and Science* |
| **1:10-1:45** | **Special Class**<br>*Music M/TH, Art T/W, Civics F* |
| **1:45-2:05** | **ELA**<br>*Classical Literature and Poetry* |
| **2:05-2:20** | **Math**<br>*Primary Mathematics 2022 (Singapore Math)* |
| **2:20-2:55** | **Special Class**<br>*Bible M/W/F, Physical Education T/TH* |
| **2:55-3:00** | Dismissal |

The K-4 schedule displays a strong alignment among the structure of the day, the chosen core curricula, and the State of Tennessee's recommended instructional minutes. This instructional minute alignment is displayed in the table below.[31]

**K-4th Grade Instructional Minute Alignment**

| Discipline | Curriculum | Publisher Recommended Minutes | State of Tennessee Recommended Instructional Minutes/Day (inclusive) | Wilberforce Scheduled Minutes |
|---|---|---|---|---|
| ELA | Literacy Essentials, Including Primary Phonics | 3 x 45-minute blocks | n/a | K-3: 3 x 45 minutes |

[31] The described minutes refer to Tier I instruction. While these minutes are understood to include small-group work with Tier II and III students as a best practice, an intervention block of 45 minutes daily *further* provides time for Tier II and III students to receive additional direct instructional minutes.

| | | | | |
|---|---|---|---|---|
| | English from the Roots Up | 15 minutes | n/a | 4: 15 minutes |
| | Well-Ordered Language | 20-30 minutes | n/a | 4: 30 minutes |
| | IEW Composition | 30-45 minutes | n/a | 4: 45 minutes |
| | Wilberforce Classical Reading and Poetry | 20 minutes | n/a | 20 minutes |
| Bible | The Biggest Story and The New City Catechism | 35 minutes (3x/week) | n/a | 35 minutes (3x/week) |
| | TOTAL | K-3: 155-190 minutes<br>4: 85-120 (min.) to 110-145 (max.) | K-2: 150 minutes<br>3-4: 120 minutes | K-3: 155- 190 minutes<br>4: 110-145 minutes |
| | | | | |
| Math | Primary Mathematics 2022 (Singapore Math) | 60-90 minutes | K-2: 60 minutes<br>3-4: 90 minutes | K-4: 90 minutes |
| | | | | |
| History | Core Knowledge History | 20-30 minutes | weekly instruction | 35 minutes, every other day (70-105 minutes weekly) |
| | | | | |
| Science | Core Knowledge Science | 20-30 minutes | regular instruction | 35 minutes, every other day (70-105 minutes weekly) |

**Grades 5-6**

As is represented in the schedule for grades 5-6 below, the day for students in grades 5-6 is intentionally designed to remove elementary-level scaffolding gradually while maintaining essential relational and behavioral supports. Students will continue to begin each day attending the morning assembly before transitioning to a more departmentalized schedule. They will rotate among teachers for core academic subjects, allowing for increased subject specialization while maintaining continuity through the teacher looping model: Each student will have the same set of core teachers for both years (5th and 6th grade), which helps strong relationships, consistent expectations, and a deep understanding of each student's learning needs and strengths. Students will continue to participate in special area classes: physical education, art, music, Bible, and civics. Civics will continue to be led by the guidance counselor, and lessons during grades 5-6 will build on earlier themes, emphasizing responsible citizenship, Biblical character development, leadership, entrepreneurism, and teamwork.

Each day will continue to include a dedicated intervention period designed to provide targeted, data-driven academic support. During this time, teachers will deliver small-group or individualized instruction based on student performance data. Tier II and Tier III students will

receive intensive intervention during this period. As in the lower grades, their Tier I peers will participate in focused reading. At the 5th and 6th grade levels, Tier I reading will be deeper and more independent, allowing this period to include "Literature Circles," teacher-guided reading accompanied by Socratic discussion. Further enrichment during this period for Tier I students includes advanced math problem-solving through the Singapore Math curriculum.

After-school, in addition to after-school care being offered, an expanded selection of extra-curricular clubs led by faculty and sports will be encouraged, including the next level of entrepreneurial-themed clubs guided by the Junior Achievement curricula for middle school, expanded project and service learning opportunities related to the Tennessee Governor's Civic Seal requirements, and several competitive sports.

| **Grades 5-6 Sample Schedule** | |
|---|---|
| **7:45-8:00** | **Morning Assembly**<br>*Devotional, Prayer, and Pledge of Allegiance* |
| **8:00-8:05** | *transition* |
| **8:05-9:00** | **ELA**<br>*English From the Roots Up, Well-Ordered Language, IEW Composition, and Poetry* |
| **9:00-9:05** | *transition* |
| **9:05-10:00** | **Math**<br>*Primary Mathematics 2022 (Singapore Math)* |
| **10:00-10:05** | *transition* |
| **10:05-10:50** | **Special Class**<br>*Music M/TH, Art T/W, Civics F* |
| **10:50-10:55** | *transition* |
| **10:55-11:15** | Recess |
| **11:15-11:35** | Lunch |
| **11:35-11:40** | *transition* |
| **11:40-12:25** | **Intervention Groups, Math Enrichment,** and **Literature Circles**<br>*Classical Literature List and Tier II and III Intervention Resources for ELA and Math* |
| **12:25-12:30** | *transition* |
| **12:30-1:15** | **Special Class**<br>*Bible M/W/F, Physical Education T/TH* |
| **1:15-1:20** | *transition* |
| **1:20-1:40** | Recess |
| **1:40-1:45** | *transition* |
| **1:45-2:20** | **History**<br>*Core Knowledge History* |

WILBERFORCE ACADEMY

| | |
|---|---|
| **2:20-2:25** | *transition* |
| **2:25-3:00** | **Science**<br>*Core Knowledge Science* |

The sample schedule for grades 5-6 displays a strong alignment among the structure of the day, the chosen core curricula, and the State of Tennessee's recommended instructional minutes. This instructional minute alignment is shown in the table below.[32]

**5th-6th Grade Instructional Minute Alignment**

| Discipline | Curriculum | Publisher Recommended Minutes | State of Tennessee Recommended Instructional Minutes/Day (inclusive) | Wilberforce Scheduled Minutes |
|---|---|---|---|---|
| ELA | English from the Roots Up | 15 minutes | n/a | 5-10 minutes |
| | Well-Ordered Language | 20-30 minutes | n/a | 20 minutes |
| | IEW Composition | 30-45 minutes | n/a | 30 minutes |
| | Wilberforce Classical Reading and Poetry | 30-45 minutes | n/a | 45 minutes |
| Bible | Foundations Worldview | 35 minutes (3x/week) | n/a | 35 minutes (3x/week) |
| | TOTAL | 95-130 (min.) to 135-170 (max.) minutes | 5: 90-120 minutes<br>6: 55 minutes | 100-135 minutes |
| | | | | |
| Mathematics | Primary Mathematics 2022 (Singapore Math) | 60-90 minutes | 5: 90 minutes<br>6: 55 minutes | 55-100 minutes |
| | | | | |
| History | Core Knowledge History | 20-30 minutes | weekly instruction | 35 minutes daily |
| | | | | |
| Science | Core Knowledge Science | 20-30 minutes | regular instruction | 35 minutes daily |

**Grades 7-8**

As is represented in the grades 7-8 sample schedule below, students in grades 7-8 will undertake increased autonomy and responsibility while continuing to be supported through intentionally

[32] The described minutes refer to Tier I instruction. While these minutes are understood to include small-group work with Tier II and III students as a best practice, an intervention block of 45 minutes daily *further* provides time for Tier II and III students to receive additional direct instructional minutes.

WILBERFORCE ACADEMY

placed character and academic scaffolds. Students in these upper grades will begin each day by attending the morning assembly. They will then rotate among subject area specialist teachers for their core academic subjects. Uniquely at this level, students will engage with a different teacher for each subject, allowing them to practice greater personal responsibility within a supportive community that knows and cares for them.

Students in grades 7-8 will also have a daily recess period of 20 minutes and will participate in special area classes including physical education, art, music, Bible, and civics. Notably, civics lessons during the 7th and 8th grade years will build toward a capstone civic service project.

Each day will continue to include a dedicated intervention period designed to provide targeted, data-driven academic support. During this time, teachers will deliver small-group or individualized instruction based on student performance data. Students will attend based on invitation or self-selection during this tutoring/study hall period.

After-school, a selection of extra-curricular clubs led by faculty and sports will be encouraged, including the next level of entrepreneurial-themed clubs guided by the Junior Achievement curricula for middle school, expanded project and service learning opportunities related to the Tennessee Governor's Civic Seal requirements, and several competitive sports.

| **Grades 7-8 Sample Schedule** | |
|---|---|
| **7:45-8:00** | **Morning Assembly**<br>*Devotional, Prayer, and Pledge of Allegiance* |
| **8:00-8:05** | *transition* |
| **8:05-9:00** | **ELA**<br>*Fix-It! Grammar, IEW Composition, and Classical Literature and Poetry* |
| **9:00-9:05** | *transition* |
| **9:05-10:00** | **Math**<br>*Carnegie Learning* |
| **10:00-10:05** | *transition* |
| **10:05-10:50** | **Special Class**<br>*Music M/TH, Art T/W, Civics F* |
| **10:50-10:55** | *transition* |
| **10:55-11:15** | Lunch |
| **11:15-11:35** | Recess |
| **11:35-11:40** | *transition* |
| **11:40-12:25** | **Special Class**<br>*Bible M/W/F, Physical Education T/TH* |
| **12:25-12:30** | *transition* |

WILBERFORCE ACADEMY

| | |
|---|---|
| **12:30-1:15** | **Intervention Groups** and **Study Hall**<br>*Tier II and III instruction by invitation* |
| **1:15-1:20** | *transition* |
| **1:20-2:05** | **History**<br>*Core Knowledge History* |
| **2:05-2:10** | *transition* |
| **2:10-2:55** | **Science**<br>*Core Knowledge Science* |
| **2:55-3:00** | Dismissal |

The grades 7-8 sample schedule displays a strong alignment among the structure of the day, the chosen core curricula, and the State of Tennessee's recommended instructional minutes. This instructional minute alignment is displayed in the table below.[33]

**7th-8th Grade Instructional Minute Alignment**

| Discipline | Curriculum | Publisher Recommended Minutes | State of Tennessee Recommended Instructional Minutes/ day (inclusive) | Wilberforce Scheduled Minutes |
|---|---|---|---|---|
| ELA | Fix-It! Grammar | 20-30 minutes | n/a | 20 minutes (2-3x/week) |
| | IEW Composition | 30-45 minutes | n/a | 35 minutes (2-3x/week) |
| | Wilberforce Classical Reading and Poetry | 30-45 minutes | n/a | 35 minutes (2-3x/week) |
| Bible | Foundations Worldview | 35 minutes (3x/week) | n/a | 35 minutes (3x/week) |
| | TOTAL | 60 minutes | 55 minutes | 55-90 minutes |
| | | | | |
| Mathematics | Carnegie Learning | 50-60 minutes | 55 minutes | 55 minutes |
| | | | | |
| History | Core Knowledge History | 45-60 minutes | 55 minutes | 55 minutes |
| | | | | |
| Science | Core Knowledge Science | 45-60 minutes | 55 minutes | 55 minutes |

[33] The described minutes refer to Tier I instruction. While these minutes are understood to include small-group work with Tier II and III students as a best practice, an intervention block of 45 minutes daily *further* provides time for Tier II and III students to receive additional direct instructional minutes.

**Summary**

The daily and weekly schedule at WAK intentionally embodies a classical approach to education while advancing the school's mission to prepare the hearts and minds of students for lives of virtue, freedom, and purposeful citizenship. By structuring the day to prioritize sustained engagement with literacy, numeracy, and content-rich instruction, the schedule reflects the classical emphasis on mastery of foundational skills and the integration of knowledge across disciplines. The weaving of history, literature, theology, and the arts cultivates wonder and moral imagination, while consistent routines and communal practices—such as daily morning assemblies and monthly Town Hall gatherings—form habits of reflection and civic responsibility. This orderly and age-appropriate rhythm supports students' intellectual development alongside their spiritual and moral formation, fostering a joyful culture rooted in structure and purpose. Through this carefully designed schedule, WAK ensures that academic rigor, Christian virtue, and community life work together to form steward leaders prepared to serve faithfully and wisely in the world.

1.3 Anticipated Student Population

6. *Describe the anticipated student population, including their anticipated academic and non-academic needs. Describe your methodology and identify your sources for determining these projections.*

To project the anticipated student population and associated academic and non-academic needs, the sponsor employed a multi-step methodology drawing on recent reliable data sources. This approach included the analysis of U.S. Census and regional demographic data to identify population growth trends and shifts in school-age cohorts, the review of county and district-level enrollment and demographic reports, and the analysis of student demographic data from the fifteen public elementary schools located closest to the proposed school site, which serve as the most likely feeder communities. These combined sources, along with statistics published by Knox County Schools and reports from the Tennessee Department of Health and the Tennessee Department of Education, were used to assess the probable academic and non-academic needs of our future students, as well as the probable composition of the student body in terms of race and ethnicity, economic disadvantage, English learner (EL) status, and students with disabilities.

WAK anticipates serving a diverse student population whose academic and nonacademic needs reflect both the demographic trends of western Knox County and the broader challenges facing Tennessee students.




Knox County has experienced steady growth over the past decade, and this growth is expected to continue well into the future. The University of Tennessee's Boyd Center for Business and Economic Research projects that Tennessee's statewide population will increase by approximately 15% between 2020 and 2040.[34]

A 2025 market report from Synergos Technologies, Inc. forecasts a 3.9% population increase in the Knoxville area over the next five years.[35]




Figure 72: 5 Year Percentage Change Thematic

These reports and multiple forecasting models anticipate sustained regional growth, with one report estimating that more than 70,000 new residents will relocate to Knox County between 2024 and 2044.[36] [37]

---

[34] https://haslam.utk.edu/news/tennessee-population-projected-to-hit-nearly-8-million-by-2040/
[35] https://www.synergos-tech.com/mkt_reports/STI_Market_Reports/M096/_book/population-forecast.html
[36] https://advanceknox.org/resources/comments/attachments/20240129152440.pdf
[37] https://www.wvlt.tv/2024/01/11/knox-county-growth-plan-passes-first-vote/

WILBERFORCE ACADEMY

Growth is expected to be especially strong in the western portion of the county, where WAK will be located. Hardin Valley—one of the county's fastest-growing communities and just six miles from Cedar Bluff—recently approved rezoning that allows for up to 506 new housing units. The full housing development pipeline provided to the Knoxville-Knox County Planning group is shown below.[38]




**Total Housing Pipeline: Up to 4,499 units in process (unbuilt or *very* recently completed)**

Karns, a community located only five miles from Cedar Bluff, is also experiencing rapid growth. The community has grown at an annual rate of more than 7%, resulting in a 33% population increase over the past five years.[39]

Given these trends, a significant number of new families are expected to relocate to the area. Ensuring that high-quality school options are available to them will be essential.

In addition to being positioned amid significant development and population growth, WAK will be closely located to two major thoroughfares, I-40 and I-75, providing convenient access for families across the county. The school is well situated to serve as a central hub—supporting nearby neighborhoods while also attracting students from diverse communities throughout Knox County.

**Student Demographics**

In addition to overall growth, the western side of Knox County has experienced notable demographic changes. Census data show that between 2018 and 2023, the 10-mile radius surrounding Cedar Bluff became increasingly diverse. The largest population increases occurred among individuals identifying as "two or more races" and those identifying as "Hispanic or Latino." In 2018, the area was 86% white; by 2023, that share had declined to 83%,[40] a trend that is expected to continue.

[38] https://www.kcpa.us/2022/01/growth-in-hardin-valley/
[39] https://worldpopulationreview.com/us-cities/tennessee/karns
[40] https://www.census.gov/programs-surveys/acs.html

| | Population | | |
|---|---|---|---|
| | **2018** | **2023** | **Change** |
| Two or More Races | 11,155 | 36,594 | 25,439 |
| Hispanic or Latino | 24,435 | 35,487 | 11,052 |
| White | 463,769 | 470,203 | 6,434 |
| Black or African American | 32,319 | 33,000 | 681 |
| Asian | 11,147 | 11,393 | 246 |

Across Knox County, racial diversity has steadily increased. In the zip codes located within 15 miles of Knoxville, the share of the white population declined from 85% in 2018 to 82% in 2023. Educational attainment has also risen. In 2018, 35% of adults aged 25 and older in the area held at least a bachelor's degree; by 2023, that figure had increased to 38%. Household incomes around the Cedar Bluff area have risen between 2018 and 2023 as well.[41] County-level data reflect similar demographic shifts.




By 2025, Knox County Schools reported the following student demographics,[42] which show us information about our anticipated student population:




[41] https://www.census.gov/programs-surveys/acs.html
[42] ttps://tdepublicschools.ondemand.sas.com/district/00470

While WAK will market to, and hope to attract students from, all areas of Knox County, statistics from other schools tell us it is likely that many of our students will come from the neighborhoods nearest to the school. To get a more granular look at the probable student body statistics, we gathered data from **the fifteen closest elementary schools** to the Cedar Bluff area.

| School Name | Size | Minority Percentage | Economically Disadvantaged Percentage | English Learners with Transition 1-4 Percentage | Students with Disabilities Percentage |
|---|---|---|---|---|---|
| Cedar Bluff Elementary | 1053 | 42% | 19% | 18% | 20% |
| Ball Camp Elementary | 559 | 29% | 12% | 10% | 25% |
| Karns Elementary | 1047 | 28% | 17% | 10% | 21% |
| Mill Creek Elementary School | 286 | 30% | 12% | 10% | 17% |
| Hardin Valley Elementary | 1206 | 20% | 6% | 8% | 14% |
| Farragut Primary | 997 | 25% | 5% | 10% | 12% |
| Blue Grass Elementary | 589 | 16% | 5% | 2% | 17% |
| Northshore Elementary School | 1065 | 15% | 5% | 5% | 15% |
| Amherst Elementary School | 659 | 37% | 19% | 9% | 23% |
| West Hills Elementary | 674 | 43% | 24% | 12% | 20% |
| Rocky Hill Elementary | 725 | 20% | 5% | 9% | 16% |
| Bearden Elementary | 374 | 32% | 11% | 13% | 16% |
| West Haven Elementary | 309 | 67% | 28% | 31% | 17% |
| Powell Elementary | 839 | 28% | 19% | 11% | 20% |
| Pleasant Ridge Elementary | 277 | 48% | 26% | 14% | 22% |
| **AVERAGE** | | **32%** | **14%** | **11%** | **18%** |

Averaging these numbers, we find the following student demographics for the area around Cedar Bluff:

- Average Minority Percentage: 32%
- Average Economically Disadvantaged Percentage: 14%
- Average English Learners with Transition 1-4 Percentage: 11%
- Average Students with Disabilities Percentage: 18%

These area statistics provide important context for understanding the student population the school is expected to serve. The anticipated student body will reflect the demographic and socioeconomic characteristics of the surrounding community. WAK will be prepared to serve students from all backgrounds and population groups.

**Academic Needs of the Students in the Community**

WAK recognizes that the students in Knox County have four primary academic needs: (1) More school options, (2) Strong teaching and learning in the core subjects, (3) Additional education in civics and entrepreneurship, and (4) Targeted intervention and acceleration.

1. More School Options

As mentioned previously, many families are moving to Knox County, especially in the western region, and more schools will be needed to serve them. When Knox County Schools Superintendent Dr. Jon Rysewyk took the helm a few years ago, he declared that "**A one-size-fits-all approach is no longer capable of providing the responsiveness and support our schools and students deserve.**"[43] We agree, and WAK is ready to offer an alternative approach for any student in the region.

Only 78% of Tennessee's school-age students attend public schools,[44] demonstrating the statewide appeal that families have found in other forms of education. Right in the Cedar Bluff region, some of the largest Christian schools can be found, but they are very expensive. Polling has shown that the community shows high approval of these private schools, but they are only available to the more affluent families due to their high tuition rates. School choice vouchers are available to some families through Educational Freedom Scholarships, but they remain out of reach for many others. In the 2024-2025 year, there were 20,000 of these scholarships but close to 43,000 applications. WAK will provide another highly needed school choice in the area that removes tuition barriers and is purposely located in a centralized, dense area of the county to be as accessible as possible to most students in the county.

2. Strong Direct and Content-Rich Instruction in Core Subjects

As mentioned in question 4, many of the schools in the area have reported low math and ELA scores. For example, 57% of the elementary schools in Knox County scored below state averages in 4th grade math scores, and eighteen of those low-performing schools are within 10 miles of the Cedar Bluff area.[45] The students in Knox County need stronger support in the basic subjects of math, reading, and writing to help them become proficient in all areas.

We seek to serve the underserved students in Knox County through targeted, specialized supports, inclusive curriculum, and strong teacher-led learning. The best service for underserved students is a high-quality education. WAK has carefully chosen curriculum and methodologies that have proven track records across the country, and that emphasize content-rich material and direct instruction (for example, explicit phonics and discovery-based mathematics). It is our goal to provide an excellent education in all of the core subjects. (Please refer to questions 18-22 for specific detail.)

[43] https://tn01917079.schoolwires.net/cms/lib/TN01917079/Centricity/Domain/1105/AnnualPlan23Finalv2Bleed.pdf
[44] https://myschoolchoice.com/state-roadmaps/tennessee-school-choice
[45] https://tvaas.sas.com/e/scatterplot.html?as=a&aj=a&w4=84

3. Additional Education in Civics and Entrepreneurship

Most schools substantially neglect the teaching of civics and entrepreneurship, and yet they are at the heart of what it means to be a contributor to the society students will inherit. Studying civics helps young people understand how government works, what rights and responsibilities they hold, and how public decisions affect their daily lives. Civics also builds critical thinking skills by teaching students to evaluate evidence, consider multiple viewpoints, and navigate misinformation. Just as importantly, it fosters a sense of community and shared responsibility, helping students see how they can contribute to positive change. In short, civics education equips students to be informed, responsible, and engaged members of society, capable of sustaining strong communities and democratic values for future generations.

Studying entrepreneurship equips students with practical skills and mindsets that are valuable regardless of whether they start a business. It teaches them to think creatively, identify opportunities, solve problems, and adapt to changing circumstances—abilities that are increasingly important in a rapidly evolving economy. Entrepreneurship education also builds resilience and confidence by encouraging students to take initiative, learn from setbacks, and develop workable solutions to real-world challenges. In addition, it helps students understand how businesses operate and how value is created, thus fostering financial literacy and economic awareness. Ultimately, studying entrepreneurship prepares young people to be innovative, resourceful contributors to their communities and to pursue their goals with initiative and purpose.

According to a 2024 survey report by the Institute of American Civics at the University of Tennessee, Knoxville's Baker School of Public Policy and Public Affairs, "[o]nly about half of respondents knew that Tennessee has a state constitution." In light of the general population's evident deficit in civic literacy, the report concluded that "[i]t is crucial that Tennesseans develop a higher level of civic knowledge, and the process will not be easy. Strong efforts will need to be made at the K-12 level, in universities, and in the general public across the state."[46] In response to this need, WAK will have special curricular emphasis in both of these areas, enriching the lives of the students who attend the school, and ultimately, the county at large.

4. Targeted Intervention and Acceleration

Recognizing that there are significant percentages of area students who are economically disadvantaged, English learners, or students with disabilities, we know that many students will need individualized attention. Our small class sizes and our school culture are specifically designed to let all children be seen and known, and they will give our students opportunities to grow. In addition, our Director of Specialized Services, one of our key hires from Year 1, will lead the initiatives to ensure that all of our students are well cared for and receiving the attention they need.

[46] https://news.utk.edu/2024/08/07/uts-institute-of-american-civics-survey-shows-urgent-need-for-civics-education-in-tennessee/

WILBERFORCE ACADEMY

**Non-Academic Needs of Students in the Community**

Our study of the students in Knox County have led us to realize there are several non-academic needs that they have, including:

- Basic needs and support to overcome barriers to access
- Mental health and emotional well-being
- Emotional and behavioral support
- Family support

As referenced earlier, Knox County's student population is marked by diversity in race, ethnicity, socioeconomic status, and lived experience. Non-academic needs intersect with these demographic realities, as students face challenges related to mental health, food and housing insecurity, and transportation. These needs are not distributed evenly; they are often concentrated in marginalized communities and among special populations, including students with disabilities and English learners. The COVID-19 pandemic and subsequent economic disruptions have exacerbated many of these challenges.

The child poverty rate in the county is 12.2%, and food insecurity affects approximately 10% of Knox County residents. In addition, 5.5% of Knox County residents do not have access to a car. These factors can have profound implications for student health, behavior, and academic performance.[47]

Mental health is a critical concern for Knox County students. According to the 2025 County Data Package, the suicide mortality rate stands at 18 per 100,000 residents. Both fatal and non-fatal drug overdose rates are higher than state averages.[48] A shocking percentage—almost 40%—of all Knox County high school students reported in 2022 that they felt so sad or hopeless that they stopped normal activities for two or more weeks in the previous year.[49]

Across the state, one in four children have been diagnosed with a mental, emotional, developmental, or behavioral disorder.[50] These figures are rising, and the rates of youth suicide are as well, as seen in this graphic from a Tennessee Department of Health publication.[51]

[47] https://www.tn.gov/content/dam/tn/health/documents/vitality-toolkit/data-packages-2025/Data%20Package_2025_Knox.pdf

[48] https://www.tn.gov/content/dam/tn/health/documents/vitality-toolkit/data-packages-2025/Data%20Package_2025_Knox.pdf

[49] https://www.tn.gov/content/dam/tn/mentalhealth/planning/FINAL%202024%20NA%20Summary.pdf

[50] https://www.tn.gov/health/health-program-areas/county-health-councils/tn-vitality-toolkit/caring-connected-communities/mental-well-being.html

[51] https://www.tn.gov/content/dam/tn/health/program-areas/2025%20Suicide%20Prevention%20Annual%20Report.pdf

WILBERFORCE ACADEMY




These sobering statistics not only underscore the urgent need for accessible, effective mental health support in schools, but also point to underlying trends and problems in our society.

As a school, we desire to come alongside students and families, meeting their needs to the best of our abilities. We will provide our students a strong system of supports, including tiered supports for non-academic needs and related services (speech, occupational therapy, physical therapy, etc.). In addition to these professional services, we will provide students with a school culture that is welcoming, nurturing, and edifying, which will clear away many of the distractions that children experience today so that they are best able to access the curriculum. Our Director of Specialized Services will oversee supports for any student identified with extra needs, and will work closely with our school counselor, who will provide individual and small-group counseling and family support. We will also utilize our community partnerships to help serve students. When student needs go beyond what our teachers and school counselor can provide, we will reach out to our partners at organizations like Thrive, as well as government agencies to access services and assistance.

WAK will use a multi-tiered, proactive system to identify students who require nonacademic supports. Identification of students with extra needs will occur through attendance, behavior, and engagement data. In addition, we will rely on teacher and staff referrals as they observe patterns of student behaviors, moods, and peer interactions. Family input will be gathered during enrollment, conferences, and ongoing communication, and we will use data review cycles, especially through Student Study Team (SST) meetings and quarterly reviews of attendance and discipline, to ensure that students with these needs are identified early and consistently.

We believe many students could be helped by pointing them to something that can give them true hope. Faith formation, at the core of WAK's offerings, has been shown to be transformative among students, giving them hope, peace, and security in the midst of tumultuous times. For example, far fewer students who attend Christian classical schools (by percentage) report feeling

"helpless dealing with life's problems" compared with students at other types of schools.[52] By giving the students an opportunity to learn about the Christian faith, we can give them an alternative perspective toward life that offers deep joy and purpose. WAK seeks to be a haven for students of all backgrounds and experiences, serving them in both curricular and extracurricular ways.

In summary, WAK is strategically located in one of Knox County's fastest growing and most demographically diverse regions. Our academic and non-academic programming is designed to meet the needs of this evolving student population, and our projections are grounded in reliable, recent data that reflect both current realities and future trends.

7. *Complete **Table 1** and describe your sources and methodology for determining initial enrollment projections.*

| Table 1. Projected Enrollment | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade Level | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Full Capacity |
| K | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 |
| 1 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 |
| 2 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 |
| 3 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 |
| 4 | | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| 5 | | | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| 6 | | | | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| 7 | | | | | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| 8 | | | | | | 75 | 75 | 75 | 75 | 75 | 75 |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | | | | | | | | | | | |
| 12 | | | | | | | | | | | |
| TOTAL | 318 | 393 | 468 | 543 | 618 | 693 | 693 | 693 | 693 | 693 | 693 |

[52] https://classicaldifference.com/good-soil/#more-detail1

WILBERFORCE ACADEMY

*Note: The numbers given in the above chart reflect enrollment at 100% and are the controlling enrollment numbers used for staffing and facility needs. Our projections used for budgeting purposes are less than this, due to expected attrition and other enrollment variability. The numbers in this chart remain our enrollment goals. (See question 57 for more detail.)*

Our enrollment projections were developed through a structured process that balanced three core priorities: (1) our mission to create an intimate and nurturing learning environment where every student is seen, heard, and known; (2) the demographic and market realities of Knoxville's growing population; and (3) the financial and regulatory requirements necessary to maintain a healthy, sustainable school model.

**1. Mission-Driven School Size and Culture**
A central design principle of our school is to maintain a scale that supports strong relationships, personalized attention, and a cohesive school culture. This commitment required us to avoid oversizing grade levels in ways that could dilute the closeknit environment we aim to cultivate. Our projections therefore begin with an intentional cap on class size and the number of sections per grade, ensuring that the school remains small enough for students to be known individually while still large enough to offer robust programming and operational stability.

**2. Market and Demographic Analysis**
As mentioned in question 6 above, with the recent increase of 4,350 children ages 0-14 in the Cedar Bluff region[53] and the rising demand for school choice,[54] we predict strong demand for a new charter option. In addition, the Knoxville area has been growing in the number of Christian adherents in the area. According to the Association of Religious Data Archives, the number of Christians in Knoxville increased by about 63,000 between 2010 and 2020.[55] Many of these families would likely appreciate and seek out a tuition-free Christian education for their children. Based on this combination of factors—the rising population numbers and our unique educational proposition—we constructed a demand forecast. Considering both the current student population plus the increase of 4,350 children in ages 0-14 in the Cedar Bluff region seen over the last several years, there is room for a sizeable new school. If our school can capture just 7% of the new students in Year 1, growing by an additional 75 students a year, we will meet our enrollment goals.

**3. Financial Sustainability and Regulatory Compliance**
To ensure compliance and financial defensibility, we designed our projections with the Tennessee State Department of Education's maximum class size rules in mind. These limits provided a regulatory framework for determining the number of students per classroom and the number of sections needed at each grade level. By designing within these boundaries, we ensured that our

[53] https://www.census.gov/programs-surveys/acs.html
[54] https://www.privateschoolreview.com/tennessee/knoxville
[55] Calculated based on profile of Knoxville created at https://www.thearda.com/us-religion/community-profiles/build-a-profile-of-your-community

staffing model, facility plan, and financial pro forma remain fully compliant and operationally realistic.

We modeled multiple enrollment scenarios to ensure that the school remains financially sound under both realistic and conservative assumptions to find the point at which mission, market demand, and financial sustainability intersect. This approach ensures that the school can operate with healthy margins, maintain appropriate staffing ratios, and invest in high-quality programming from the first year onward.

We have designed the following grade-level structure to maximize classroom experience for students and financial stability for the school. At 100% capacity, these would be our class sizes:

- **Grades K-2:** Four sections of 20 students each, totaling 80 students per grade
- **Grade 3:** Four sections of 19-20 students, totaling 78 students
- **Grades 5-8:** Three sections of 25 students each, totaling 75 students per grade

Because we want to move from smaller class sizes in the younger years to slightly larger class sizes in the middle school years, we are planning for the third-grade classes to be an intermediate size, allowing for a slow attrition rate over two years between second grade and fourth grade. This structure allows the school to grow to a size that meets community needs while preserving the intimate, relationship-centered culture that defines our mission.

8. *Complete **Table 2** and describe your methodology for determining initial demographic projections. If the sponsor is proposing to operate an Opportunity Public Charter School, detail the anticipated percent of the student population that will be at risk, as defined in T.C.A. 49-13-104.*

| Table 2. Anticipated Demographics | |
|---|---|
| **Student Population*** | **Estimated Percent of Total Enrollment at Capacity** |
| Economically Disadvantaged | 20% |
| Students with Disabilities | 18% |
| English Learners | 11% |
| At-Risk *(for opportunity public charter schools only)* | n/a |

To develop the demographic projections in Table 2, we used a multistep methodology using data from the Tennessee Department of Education (TDOE) Report Card, Knox County Schools (KCS)

demographic reports, and a geographic review of the 15 elementary schools closest to the proposed WAK location in the Cedar Bluff area. These schools provide the most accurate representation of the population the school is likely to serve.

We began by compiling demographic data at two levels:

- Districtwide averages for Knox County Schools, which provide a broad baseline for the county's student population
- Averages of the 15 closest elementary schools, which offer a more precise picture of the immediate enrollment catchment area

For each demographic category, we compared the district average with the local school average and selected the higher of the two values as the basis for our projection. The comparison is summarized below:

| | Averages of the 15 Closest Elementary Schools | District Averages |
|---|---|---|
| Minority Percentage | 32% | 35% |
| Economically Disadvantaged | 14% | 20% |
| English Learners with Transition 1-4 | 11% | 9% |
| Students with Disabilities | 18% | 16% |
| Per Pupil Spending | $12,357 | $12,471 |

Statewide data further support these assumptions. Across Tennessee, 15% of students are identified with disabilities and 9% are English Learners, reinforcing that our projections fall within expected statewide ranges.[56]

Although the long-term projection for Students with Disabilities (SWD) is 18%, consistent with the local school average, we anticipate a lower percentage in the school's initial years. This expectation is based on two factors:

- Age-based identification patterns: Disability identification rates are significantly lower among early elementary students (ages 5-7) than among older students.[57] As WAK opens with grades K-3 and adds one grade per year, identification rates will naturally rise over time.
- Enrollment patterns in new schools: Families of students with more complex needs often wait to enroll until a new school has established a track record of strong supports and services.

For these reasons, we project an initial SWD rate of approximately 10% in Year 1, increasing annually until stabilizing at 18% at full capacity.

[56] https://tdepublicschools.ondemand.sas.com/

[57] https://data.ed.gov/dataset/idea-section-618-data-products-static-tables-part-b-count-environ-table9/resources

The economically disadvantaged (ED) rate among the 15 closest elementary schools (14%) is notably lower than the districtwide average (20%). However, Tennessee charter schools—particularly those not using selective enrollment criteria—often enroll higher percentages of economically disadvantaged students than their immediate neighborhood averages. To ensure conservative planning aligned with statewide charter enrollment patterns, we adopted the districtwide rate of 20% for our projection.

The Cedar Bluff area has a higher concentration of English Learners than the district as a whole. The local school average (11%) exceeds the district average (9%), and therefore we used 11% as our projected EL rate. This approach aligns with the expectation that charter schools should plan for the more resource intensive scenario when local variation exists.

Our demographic projections reflect:

- A comparative analysis of districtwide and local school data
- A conservative planning approach, selecting the higher of the two values for each demographic category
- Adjustment for grade band effects and early year identification patterns for Students with Disabilities
- Alignment with enrollment trends observed in Tennessee charter schools, particularly regarding economically disadvantaged students

All data were sourced from the Tennessee Department of Education Report Card and Knox County Schools demographic reports, ensuring accuracy, transparency, and consistency with state approved methodologies.

*9. Describe the proposed school's plan to recruit students both before and after the school has opened.*

Under the supervision of the school director, WAK will implement a comprehensive, multi-phase student recruitment plan designed to build strong community awareness before opening and to sustain enrollment growth after the school has launched. Our approach emphasizes authentic community engagement, transparent communication, and strategic marketing to ensure that families understand the mission, vision, and benefits of our classical education model. We will welcome students from all backgrounds and will not discriminate in our student recruitment and admissions processes in any way, maintaining full compliance with T.C.A. § 49-13-113 and SBE Rule 0520-14-01-.04. The school will follow all federal and state laws as well as constitutional provisions prohibiting discrimination on the basis of disability, race, creed, color, nation origin, religion, ancestry, or need for special education services.

We are committed to ensuring that recruitment efforts reach the full diversity of Knox County. To do so, we will provide recruitment materials in Spanish as well as in English and attend cultural festivals and community events across the county. We will collaborate with churches, preschools, social service agencies, and community centers to reach economically disadvantaged families and those without reliable internet access. Recruitment events will be held in varied location, such as libraries, community centers, and parks, and at varied times to accommodate working families. We will also communicate with early intervention providers and disability serving organizations to ensure that families of students with disabilities are fully informed of their rights and welcomed into our school community.

**Pre-Opening Recruitment**

During the planning year, members of the board, the School Director, the Director of Operations, and founding ambassadors will actively engage with community partners, civic organizations, and local businesses to build relationships and raise awareness of the school. WAK representatives are already well networked in Knox County, and once the application is approved, we plan to start recruitment in earnest. Beginning in August of Year 0, monthly sessions ("Wilberforce 101" and "Wilberforce Admissions" meetings) will be promoted and open to the public for any interested families to attend. These times will be used to introduce families to the school's mission and curriculum. Our board members, future staff, and funders are all poised to spread the word and host interest meetings.

Other outreach will include participation in community events, meeting with area church leaders and local daycare providers, partnerships with organizations such as chambers of commerce, youth service clubs, and cultural institutions, and meetings with elected officials and community leaders. A strong digital presence will be established through a school website and social media platforms (Facebook, Instagram, LinkedIn), supported by targeted advertising campaigns, and earned media coverage. Traditional marketing strategies such as signage and brochures will complement digital efforts to ensure broad visibility. Recruitment benchmarks will be tracked through applications and waitlist management, with the goal of exceeding available seats prior to the lottery.

**Post-Opening Recruitment**

Once the school has opened, recruitment efforts will continue to ensure full enrollment and to backfill seats as needed. The School Director will lead ongoing recruitment activities. Monthly open houses, building tours, and information sessions will be held at the school and in community spaces to maintain visibility and provide opportunities for families to learn more. Social media campaigns will highlight student achievements, teacher expertise, and program successes, while newsletters and email updates will keep families and stakeholders informed. Partnerships with local preschools, summer camps, and community organizations will be leveraged to reach new families. Home visits and personalized outreach will be offered to families who may not be active in community events, ensuring equitable access to information.

WILBERFORCE ACADEMY

Two advantages will be leveraged after the school is open. First, once the strong reputation of WAK has been built, we will depend on word-of-mouth as a powerful recruiting strategy, asking our current families to put signs in their yard, bring their friends to informational sessions, and generally promote the school. Secondly, once there are students in attendance at WAK, we will begin to invite in media outlets and community leaders so they can witness the transformative power of our educational model. Getting video footage, either on TV or on our social media accounts, will be a powerful tool for introducing new families to our school.

**Sustainability and Accountability**

Recruitment responsibilities will be clearly assigned to school leadership and staff, with the School Director serving as the primary lead. Progress will be reported regularly to the board, which will monitor enrollment targets and adjust strategies as needed. By combining grassroots community engagement with professional marketing strategies, WAK will ensure that enrollment remains strong, diverse, and aligned with the school's mission to provide a rigorous, classical education to all students.

A detailed timeline of activities is given here:

| **Student Recruitment Timetable** | | | |
|---|---|---|---|
| **Months** | **Activities** | **Responsible Parties** | **Deliverables & Benchmarks** |
| August-September (Year 0) | - Launch website<br>- Design marketing materials; include QR codes directed to the website landing page<br>- Begin social media campaign<br>- Create a system for capturing family information and follow-up protocols<br>- Hold community forums<br>- Meet with key community leaders | Board, School Director, Dean of Curriculum and Instruction | Website live, materials printed, 2 forums held, family information system created |
| October-November (Year 0) | - Secure community partners<br>- Meet with local religious organizations; give them materials to distribute<br>- Hold monthly community info sessions<br>- Record a virtual info session video that can be put on website<br>- Set out yard signs in various school ambassador yards<br>- Ongoing social media and involvement in community events | Board, School Director, Ambassadors, Dean of Curriculum and Instruction | 2 forums held, 10 individual meetings with religious organizations or childcare centers |
| December-January | - Visit local childcare centers and preschools<br>- Monthly community sessions | School Director, Dean of | 2 forums held, outreach |

WILBERFORCE ACADEMY

| | | | |
|---|---|---|---|
| (Year 0) | - Continue speaking engagements<br>- Record a virtual Q&A session that could be put on website<br>- Evaluate outreach efforts | Curriculum and Instruction | evaluation report |
| February-March (Year 0) | - Neighborhood canvassing<br>- Monthly community forums<br>- First round of Facebook ads<br>- Second round of yard signs, include all families currently on list<br>- Outreach evaluation | School Director, Dean of Curriculum and Instruction | ≥100 applications collected, 2 forums held |
| April (Year 0) | - Social media campaign about upcoming Launch<br>- Use Facebook ads if needed<br>- Pitch media coverage<br>- Second round of neighborhood canvassing if necessary<br>- Admissions information session<br>- Evaluate outreach | Board, School Director | ≥250 applications received |
| May (Year 0) | - Facebook ads if needed<br>- Targeted mailings if needed | School Director, Dean of Curriculum and Instruction | ≥350 applications, waiting list established |
| June (Year 0) | - Host a school launch community picnic | Board, School Director, Director of Operations | ≥ 450 applications received |
| July (Year 0) | - Schedule school walk-throughs for enrolled students<br>- Conduct tours for interested families | School Director | |
| **SCHOOL OPENS** | | | |
| August-March (Year 1) | - Continue to hold monthly information sessions<br>- Schedule in-school tours for interested families<br>- Invite the media to school on multiple occasions to showcase the start of the new school in order to build stronger public relations<br>- Maintain a strong online presence, posting student activities and accomplishments regularly<br>- Print new yard signs as needed<br>- Run Facebook ads as needed<br>- Print direct mailing cards as needed<br>- Hold 2 "Shadow a Student" days to bring in new students | School Director, Dean of Curriculum and Instruction, Director of Operations | Filling and retaining >98% of seats |

| | | | |
|---|---|---|---|
| | - Conduct internal school survey to measure family satisfaction in January | | |
| | - Visit local daycare centers and preschools to recruit for Kindergarten | | |
| | - Send out "Intent to Return" forms to current families | | |
| | - Adjust marketing efforts as needed to fill any anticipated open seats | | |
| Ongoing (Years 2-5) | - Hold community sessions at least twice a year for new interested families | School Director, Dean of Curriculum and Instruction, Director of Operations | Filling and retaining >98% of seats |
| | - Continue to maintain strong relationships with local preschools and daycares | | |
| | - Conduct school tours for interested parties | | |
| | - Have annual "Shadow a Student" days | | |
| | - Continue to maintain a strong online presence via social media | | |
| | - Reassess enrollment goals and marketing efforts annually and adjust accordingly | | |

**Enrollment Pipeline Metrics**

WAK will use a comprehensive enrollment pipeline that tracks awareness, interest, applications, and confirmed enrollment. This multi-metric approach mirrors the practices of high performing Tennessee charter schools and demonstrates our readiness to open fully enrolled in Year 1.




At the top of the funnel, we will monitor website traffic, social media engagement, and the number of families captured in our interest database. These indicators show whether our outreach efforts are reaching a broad and diverse audience. Mid-funnel metrics—such as application counts, conversion rates, and grade level distribution—will allow us to assess whether interest is translating into actual demand and whether our messaging resonates with families across the county. At the bottom of the funnel, we will track seat confirmations, waitlist depth, and summer melt. These metrics are critical for ensuring that WAK opens with 318 students and maintains stable enrollment throughout the year. By monitoring these indicators monthly, we can adjust our recruitment strategies, intensify outreach where needed, and ensure that our enrollment pipeline remains strong and responsive.

This structured, data driven approach provides the board and school leadership with clear, actionable information and ensures that WAK is fully prepared to meet its enrollment targets by July of Year 0.

WILBERFORCE ACADEMY

**Top of Funnel: Awareness & Lead Generation**

| Metric | Target | Purpose |
|---|---|---|
| Website visits | 5,000 by March | Measures reach and visibility |
| Interested family leads | 600 by April | Ensures large, diverse prospect pool |
| Community partners distributing materials | 15+ | Expands reach through trusted institutions |
| Social media engagement | 10,000 impressions/month by March | Sustains awareness and recognition |

**Middle of Funnel: Applications & Conversion**

| Metric | Target |
|---|---|
| Applications submitted | 450+ by June |
| Offer acceptance rate | ≥ 75% |
| Applications by grade | ≥ 133% of open seats |
| Applications from target populations | Monitored, not quota based |

**Bottom of Funnel: Enrollment and Retention**

| Metric | Target |
|---|---|
| Seat confirmations | 318 by July |
| Waitlist size | 50-75 students |
| Summer melt rate | < 5% |
| Day 1 enrollment | ≥ 98% of seats filled |
| Mid-year retention | >95% |

**Contingency Plans**

We will monitor all enrollment pipeline metrics, leads, applications, confirmations, waitlist depth, and summer-melt indicators, on a monthly basis and report progress to the board. If any metric falls below target at any point in the year, school leadership will immediately intensify outreach efforts, including additional community events, targeted digital advertising, expanded canvassing, and renewed engagement with childcare centers, faith-based organizations, and neighborhood partners. This responsive approach ensures that recruitment efforts remain strong and adaptive throughout the pre-opening year. In addition, our financial model is intentionally conservative: the school remains fully viable at 75% enrollment, with staffing and non-instructional expenditures able to be phased in without compromising instructional quality or compliance. These contingency plans ensure that WAK will open fully prepared to serve students even under reduced-enrollment scenarios.

WILBERFORCE ACADEMY

**Community Organizations**
Community organizations that will be engaged upon approval (to ascertain and finalize support efforts) include:

- Street Hope Knoxville
- Thrive
- YMCA
- Boys and Girls Clubs
- Headstart programs
- Amachi Knoxville
- Hope Resource Center
- Knox County Church Network

*10. Describe the proposed school's policy for backfilling open seats, if applicable. If the proposed school does not plan to backfill open seats, explain why not.*

WAK will implement a clear, consistent, and legally compliant policy for backfilling open seats. Our approach mirrors practices used in approved Tennessee charter schools and is designed to balance equitable access for families with the academic and cultural stability of the school.

Our policy is grounded in four priorities:

- Equal Access: Ensuring that all families have fair access to available seats
- Stability: Maintaining cohesive classroom communities
- Academic Integrity: Protecting the continuity of instruction, especially in upper grades
- Nurturing Environment: Supporting students as they come into the school mid-year

**Backfilling Process and Use of the Waitlist**
WAK will maintain an active waitlist generated through our annual, publicly noticed lottery and backfilling will occur only through this waitlist. When a seat becomes available, we will offer it to the next student on the waitlist in the order established by the lottery, in full compliance with Tennessee law (T.C.A. § 49-13-113).

Operational sequence when a seat becomes available:

- Day 0: Seat becomes available; enrollment team contacts the next family on the waitlist by phone, email, and text.
- Families are given 48 hours to accept the seat (or 24 hours during the first 10 days of school when mobility is highest).
- If the family declines or does not respond, the next family is contacted immediately.
- All outreach attempts and responses are documented in the enrollment log.
- Once a family accepts, the onboarding process (described below) begins.

If the waitlist becomes short at any point, we will intensify our outreach, recruitment, and community engagement efforts to ensure families are aware of available opportunities. We will not admit students outside of the established lottery and waitlist process.

**Grade Band Backfilling Policy**

Grades K-5

We will backfill open seats in grades K-5 throughout the school year, from the first day of school until the end of the third quarter. This approach is consistent with practices used by high-performing Tennessee charter schools and reflects the developmental flexibility of early elementary grades. Backfilling in K-5 supports:

- Continued access for families seeking high-quality school options
- Enrollment stability and financial sustainability
- Classroom environments that can absorb new students with minimal disruption

All offers will be made strictly in waitlist order.

Grades 6-8

For grades 6-8, WAK will backfill seats from the first day of class until the end of the first semester. Like other Tennessee charter schools, WAK has chosen this cutoff policy because it reflects the following academic realities of middle school:

- Coursework becomes more cumulative and content specific
- Students enter with varying levels of preparation
- Mid-year entry can create challenges for both the incoming student and the receiving classroom

Limiting backfilling after the first semester protects instructional coherence while still providing access to families earlier in the year.

**Annual Lottery and Compliance**

All backfilling will occur exclusively through the waitlist generated by our annual lottery. We will:

- Conduct the lottery publicly and transparently
- Maintain the waitlist in accordance with T.C.A. § 49-13-113
- Notify families in order and document all offers
- Ensure no student is admitted outside the established process

This approach aligns with Tennessee's statutory requirements and with the operational practices of approved charter schools across the state.

**Student Onboarding Policy for Backfilled Enrollment**

We will implement a clear, supportive, and equitable onboarding process for all students admitted through backfilling. This process ensures that students who join midyear are welcomed

into the school community, provided with the academic and social supports necessary for success, and fully integrated into school routines and expectations. The onboarding approach is consistent across grade levels, with additional steps for middle school students due to the cumulative nature of coursework. The purpose of this process is to ensure smooth transitions for students entering after the start of the school year, provide families with clear information about expectations and supports, maintain continuity of learning and classroom culture, and comply fully with Tennessee enrollment and student records requirements. To ensure consistency and quality, the Dean of Curriculum and Instruction will oversee the onboarding process during Years 1-3 of the school, and the Dean of Culture will oversee it in Year 4 and beyond.

When a seat becomes available and is offered to a student from the waitlist, families will receive a written offer with a clear deadline for acceptance. Once the family accepts, the following process will occur:

<u>Within 1 business day:</u>
WAK will request all required records (IEPs, 504s, immunizations, transcripts, discipline records).

<u>Within 3-5 school days:</u>
WAK will schedule and conduct an intake meeting with the family and the Dean of Curriculum and Instruction or the Dean of Culture that introduces the new family to the school's mission, culture, and expectations; reviews the student and family handbook; explains academic programs, grading, and homework expectations; and outlines transportation, meals, arrival and dismissal procedures, and communication systems. Families will also meet key staff members such as the School Director, counselor, homeroom teacher, and Director of Specialized Services (if applicable), and complete any remaining enrollment documents.

<u>Before the student's first day:</u>
The School Director will verify class size compliance and determine classroom and teacher placement. The selected teacher will receive a summary of academic records and accommodations and will prepare classroom materials, seating, routines, and peer supports. Once everything is prepared, a second meeting with the family will be scheduled with the classroom teacher to explain essential classroom and homework routines and to field any parent questions.

<u>During the student's first week:</u>
The new student receives explicit instruction in routines and is supported by peer ambassadors. Peer ambassadors serve as a seat buddy, lunch buddy, and playground buddy during the new student's first week, where applicable. The student will complete brief reading and math diagnostics, and the teacher will review records to identify supports and interventions. Special education services will begin immediately if applicable.

During the first two weeks:
The teacher will explicitly teach school norms and routines to ensure a warm and nurturing welcome. The Dean of Curriculum and Instruction (in Years 1-3) or Dean of Culture (Year 4 and after) and key staff members will conduct a check-in to assess the student's well-being and to ensure the transition into WAK is going well. The family will receive materials for at-home literacy or mathematics support.

During the first 30 days:
Families will receive weekly communication from the teacher. The teacher will monitor academic progress and adjust supports as needed. By the end of the first month of enrollment, administrators and teachers will confirm successful cultural integration through classroom observation, review of the student's participation, and direct feedback from the student, family, and teacher.

This onboarding process applies consistently to all students admitted midyear, ensures the timely provision of all required services, and does not delay enrollment for any reason prohibited by law. It reflects WAK's commitment to equitable access, strong family communication, and the long-term success of every student who joins the school community.

WAK's backfilling policy is:

- Equitable, ensuring fair access to open seats
- Academically sound, with grade band distinctions aligned to student needs
- Operationally responsible, supporting stable enrollment and financial sustainability
- Consistent with our desire to maintain a nurturing environment
- Fully compliant with Tennessee charter school law and consistent with practices used in approved Tennessee charter applications

## 1.4 Family and Community Engagement and Support

*11. Explain how the sponsor has engaged with families and the community about the proposed school. Describe what the sponsor has learned through community engagement activities and how that engagement has informed the application and school design.*

**Family and Community Engagement**
The school's mission can only be accomplished through family and community engagement. Wilberforce cannot prepare the hearts and minds of students or form students who are prepared to live purposeful lives as responsible citizens and steward leaders without taking the time to engage intentionally and thoughtfully with families and the broader Knox County community to discern need, assess demand, and shape a school model that is responsive to local priorities.

**Community Outreach and Engagement Activities**
WAK's engagement efforts have been led by the School Director in partnership with the founding governing board, whose members bring strong professional and relational ties within the Knox County community. These existing relationships have allowed WAK to engage families and community stakeholders in a manner that is both relational and substantive, fostering trust and meaningful dialogue.

Key engagement strategies have included:

- Public-Facing Website: WAK launched a dedicated website to articulate the school's mission, educational philosophy, and commitment to academic rigor within a structured and joyful school culture. Families have been invited to submit interest forms and questions, allowing the school to gather input and better understand family priorities.
  - Within the first week of the website being live, there were 553 unique visitors and over 80 parents registered to receive more information.
- Social Media Outreach: Targeted social media engagement has been used to share information about the proposed school, communicate updates, and invite conversation. These platforms have functioned as two-way communication tools, providing insight into community hopes for a school that emphasizes character, academic excellence, and purposeful formation.
  - In under two weeks, WAK's Facebook page received 7,702 unique viewers. 334 families followed the page as a result of the targeted ad, and 409 individuals have followed the school's social media page in total.
  - Many individuals have messaged WAK's social media account to express interest, inquire about enrollment and offer assistance and volunteering to the school.
- Relationship-Based Community Engagement: The School Director and founding board members have engaged in direct conversations with families, faith-adjacent community organizations, educators, and civic leaders throughout Knox County. These conversations have helped clarify community needs and strengthen partnerships aligned with the school's vision for developing responsible and engaged citizens.
- Prospective Family Interest Registry: WAK has established a Prospective Family Interest Registry that allows parents and guardians to voluntarily share contact information to receive updates, attend information sessions, and learn more about the school's mission, program, and enrollment process.

**Key Community Needs Identified**
Through these engagement activities, the school identified several consistent themes:

- Desire for Formation of the Whole Child: Families expressed strong interest in an educational environment that attends not only to academic growth but also to character, responsibility, and purpose.
- Strong Demand for Values-Aligned Education: Many middle-income families in Knox County articulated a desire for a school that reinforces shared moral and civic values and

that supports the development of students as thoughtful, responsible members of their communities.
- Affordability and Access: Families consistently reported that while some private Christian school options exist, tuition costs, even when supplemented by Education Freedom Scholarships, remain out of reach for many. This has created a gap for families seeking a values-centered education that is financially accessible.
- Commitment to Academic Excellence: Parents emphasized that any new school option must be defined by rigorous academics, high expectations, and a disciplined, orderly learning environment that supports long-term student success.

**How Engagement Informed the School's Design**

Community engagement has directly informed both the charter application and the design of WAK:
- Mission and School Culture: Feedback reinforced the school's commitment to a culture that balances joy and structure, encourages the patient pursuit of truth, and supports the formation of students prepared to lead with integrity and purpose.
- Tuition-Free Charter Model: Community concerns about affordability and access solidified the decision to pursue a tuition-free charter model, ensuring families from a range of socioeconomic backgrounds can access a high-quality, mission-driven education.
- Family Partnership: Families expressed a desire for partnership rather than passive enrollment. As a result, WAK has embedded family communication, transparency, and collaboration as foundational elements of its school model.

**Ongoing Community Engagement**

The sponsor views community engagement as an ongoing responsibility essential to fulfilling the school's mission. The School Director and founding board members will continue to nurture the relationships established during the planning phase through information sessions, enrollment events, family forums, and consistent communication. These efforts will ensure Wilberforce remains responsive to the community it serves and faithful to its mission of preparing students to live free and purposeful lives as responsible citizens and steward leaders.

*12. Provide, as Attachment 1, evidence of community engagement and support for the school. Complete Table 3, adding rows as needed, to identify and describe each item submitted as part of the attachment. Sponsors have discretion over what types of community engagement activities they undertake and the supporting documents they submit; however, each piece of evidence should demonstrate authentic engagement with and investment in the community. For example, evidence could include letters of support from confirmed or potential partner organizations or photos and sign-in sheets from community meetings.*

| Table 3. Evidence of Community Engagement and Support | |
|---|---|
| **Briefly describe each piece of evidence included as part of Attachment 1.** | **Explain how and why the submitted item is evidence of the sponsor's engagement with the community and the community's support for the school.** |
| Website Analytics | The submitted website analytics demonstrate Wilberforce's active engagement with the community and growing community interest in the proposed school. The school's website serves as a primary outreach tool, providing families with information about the mission, academic model, and enrollment process. Consistent and recurring site traffic indicates sustained interest over time, suggesting that families are actively seeking information and returning as planning progresses. This engagement reflects both effective community outreach by the sponsor and early evidence of community support and demand for the school. |
| WAK Website: Parent Interest Sign Up | The submitted screenshot from the Wilberforce Academy of Knoxville (WAK) website demonstrates active engagement with the local community and early community support for the proposed school. The website invites families to register for email updates, providing a clear and accessible way for parents to express interest, stay informed, and provide input.<br><br>Within the first week of the website's launch, WAK received 553 unique visitors, and more than 80 parents registered to receive additional information. This early response reflects strong community interest and demand for a school aligned with WAK's mission. The volume of traffic and sign-ups indicates effective outreach and growing parent support for the establishment of the school. |
| Letter of Support from Thrive | The submitted letter of support provides direct evidence of both sponsor engagement and community support for WAK. The author, a local nonprofit executive director, |

| | |
|---|---|
| | demonstrates active familiarity with unmet academic and student support needs in the community and affirms that WAK would address gaps currently experienced by gifted and at-risk students. The letter further documents intent to partner with the school by offering service to enrolled students at no cost. This endorsement reflects authentic community demand, alignment of mission, and willingness to engage in ongoing partnership in support of the school's success. |

*13. Describe how the school will continue to engage parents and community members once it is open.*

**Ongoing Family and Community Engagement**
WAK understands that lasting student growth is cultivated through strong partnerships between the school, families, and the broader community. Once the school is open, WAK will intentionally foster ongoing relationships with parents and community members that support academic excellence, character development, and a structured yet joyful school culture. Through consistent engagement, clear communication, and shared responsibility, the school will invite families and community partners to play an active role in preparing students to grow into thoughtful, capable individuals who contribute meaningfully to their communities.

**Parent Education and Partnership**
WAK will provide regular opportunities for parents to deepen their understanding of the school's mission, academic program, and culture and give input on its progress. These efforts will include:

- Wilberforce 101 Meetings: The School Director will host Wilberforce 101 sessions for both enrolled and prospective families. These meetings will offer clear orientation to the school's philosophy, expectations, and approach to academic rigor, character formation, and family partnership.
- Admissions and Informational Meetings: Each spring, the school will host admissions information sessions to ensure transparency in enrollment processes and to help families understand how WAK's mission and program align with their educational goals.
- Parent Workshops: Semester-based parent workshops will be offered to support families in reinforcing habits of learning, responsibility, and character development at home. Topics may include academic support strategies, faith formation, child development, school culture expectations, and partnership in student formation.
- Parent and Community Surveys: Wilberforce will administer parent and community surveys twice each academic year to ensure meaningful stakeholder engagement and to inform continuous improvement. Surveys will be aligned to key performance indicators

including academic program quality, school culture and climate, communication effectiveness, family engagement, and student support services. The school will utilize data-collection tools such as climate and culture surveys, family engagement questionnaires, and targeted feedback forms following key events (e.g., Wilberforce 101 meetings, admissions sessions, and parent workshops). Survey data will be reviewed by the School Director and leadership team to evaluate program effectiveness and monitor progress toward stated goals. Findings will be used to guide instructional, operational, and organizational decision-making; inform professional development; and shape strategic planning. Aggregate survey results and responsive action steps will be communicated to families to promote transparency, accountability, and ongoing partnership with stakeholders.

**Volunteer Corps and Intergenerational Engagement**

WAK will establish a structured Volunteer Corps to invite parents, grandparents, and community members to contribute meaningfully to the life of the school. Volunteer opportunities will be clearly defined, supervised, and aligned with the school's culture of joy, order, and purpose.

- Grandparent Involvement: The school will intentionally welcome grandparents as volunteers and mentors, recognizing the value of intergenerational relationships in fostering wisdom, encouragement, and continuity within the school community.
- Reading Support Program: WAK plans to develop a volunteer-based reading support program in which volunteers regularly read with second-grade students. This initiative will strengthen literacy outcomes while reinforcing a culture that values patience, attentiveness, and the pursuit of truth through learning.

All volunteers will be subject to appropriate background checks and training to ensure student safety and program effectiveness.

**Community Partnerships and Service**

WAK will seek strategic partnerships with local organizations whose missions align with the school's commitment to service, stewardship, and care for others. One such potential partnership includes collaboration with Street Hope Knoxville, providing opportunities for age-appropriate service learning and community engagement that help students grow as responsible citizens and steward leaders.

These partnerships will be carefully structured to support student development, reinforce civic responsibility, and deepen students' understanding of their role within the broader community.

**Communication and Culture Building**

Ongoing engagement will be supported through clear, consistent communication between the school and families. WAK will maintain regular updates through web-based communication tools such as the website, social media and school newsletters, opportunities for feedback, and visible leadership presence to ensure families feel informed, heard, and valued.

Through these combined efforts, WAK will cultivate a school community marked by trust, shared purpose, and active partnership, ensuring that parents and community members play a meaningful role in supporting students as they grow in knowledge, character, and responsibility.

## 1.5 School Culture and Discipline

*14. Describe the culture or ethos of the proposed school and how it will promote a positive academic environment and reinforce the school's mission and goals.*

**School Culture and Ethos**

The culture of a school is composed of the relationships between the people within it. It is profoundly shaped by the curriculum, programs, and policies (i.e., all the decisions which the board, administration, and faculty make) and it is ultimately directed by the vision which informs each of these decisions. In order for the school's culture to be healthy, these relationships, especially the relationships between students, faculty, administration, must be healthy. When we say that the culture of WAK will be intentionally joyful, harmoniously ordered, and thoroughly purposeful, we are first and foremost saying that in each relationship and in each interaction Wilberforce team members have with a colleague, a student, a parent, or a lesson, we are striving to be joyful, orderly, and purposeful.

At the heart of the school's ethos is a shared commitment to truth and grace. By this we mean that the high expectations of academic rigor, Christian virtue, and civic responsibility will be paired with patient understanding and nurturing support when students fall short. This will create an environment in which students can apply themselves joyfully to deep thinking and orderly behavior while being encouraged and developed as whole persons of inherent dignity and purpose. Faculty will model intellectual curiosity and humility, moral clarity, and joyful self-discipline, reinforcing the school's mission to form students who are well prepared to be both thoughtful scholars and faithful civic leaders.

United by joyful, orderly, and purposeful relationships, and grounded in a shared commitment to truth and grace, WAK will establish and lead the culture so that it becomes common to all members of the school community. Regardless of background, each student and family will be warmly welcomed into the shared life of the school and invited to participate meaningfully in its academic, civic, and formative practices. Rather than cultivating parallel or fragmented cultures, WAK will intentionally sustain a single, coherent school culture to unite students, families, faculty, and leaders together through shared behavioral expectations, shared routines, and a unifying educational vision.

**Academic Environment**
The ennobling academic environment of WAK will be shaped by intentional encounters with beautiful material through consistent classroom routines, positive teacher-student and peer relationships, and elevated purpose. The academic environment will be designed to support sustained attention, disciplined thinking, and purposeful conduct by limiting environmental distractions and emphasizing order, clarity, and focus. Wilberforce faculty and staff will be understanding and embrace the perspective that school-wide routines, cultural traditions, and the physical adornment of the campus, hallways, classrooms, and people can either advance or distract from the mission of the school and its fulfillment. Consequently, Wilberforce's assemblies, daily routines like pick-up and dismissal, aesthetics, and faculty and student uniforms will be thoughtfully planned to reinforce the school's high academic and cultural expectations. At WAK, students will thus experience a purposefully shaped environment at every level of the school, signaling to students that their work and attention are meaningful, that they themselves are filled with dignity, and that excellence is both expected and attainable.

Instruction will be grounded in both classical pedagogy and enduring literature, emphasizing direct instruction, close reading, thoughtful discussion, logical reasoning, and articulate expression. Everyone in the academic environment will be oriented toward the same intellectual life: students will encounter great works of Western civilization, including Scripture, art, music, architecture, and literature, while teachers and administrators will model engagement with enduring ideas through shared study and leadership. This community-wide approach will surround students with adults who model intellectual curiosity, resilience, and a love of learning, shaping engaged students who have a healthy relationship with academic material while also meeting and exceeding standardized measures of achievement.

At every level, the culture and ethos of WAK aim to facilitate healthy and inclusive relationships—between students and their work, between students and their peers, between students and faculty, between faculty and administrators, between the school and families, and between the school and the larger community. To achieve this, the culture and ethos will be purposefully developed at each level of the school. Level-specific development includes:

**Faculty Culture**
The faculty culture of WAK will be characterized by a unified body of educators lovingly invested in intellectual excellence, moral integrity, professional growth, and the noble vocation of teaching children. Faculty will understand their work as shaping habits of mind and character, recognizing that their conduct, preparation, expertise, interests, and intellectual posture profoundly influence students. The means of developing this faculty culture will include shared commitments, clarity of expectations, sustained formation in pedagogy and academic content, vision-aligned accountability, and regular professional dialogue. Features of WAK's faculty culture will include:

- Shared instructional norms and pedagogical non-negotiables, aligned to the school's model and mission, providing faculty a common language and expectations for effective instruction across all classrooms
- Faculty discussions centered on the study of enduring, primary texts, including the Bible
- Peer observation paired with constructive conversations about pedagogy and classroom management
- Collaborative lesson planning that ensures coherence across disciplines and grade levels, and that emphasizes clarity, depth, and continuity of instruction
- Summer faculty training and ongoing professional development throughout the school year
- Transparent and formative performance feedback from administrators
- Mission-aligned hiring, onboarding, and retention practices that reinforce the school's instructional model and cultural expectations
- Structured orientation and ongoing mentoring for new faculty, led by experienced teachers and administrators

**Student Culture**

Wilberforce students will joyfully pursue truth and Christian virtue by ordering their actions toward the common good and seeking purposeful engagement in the wider community. Students will be taught to understand themselves as members of a learning community who are accountable for their actions and capable of contributing meaningfully to the common good. These relational habits will be practiced through clear behavioral expectations, supportive discipline, and intentional opportunities to practice leadership, service, and respectful dialogue. Students will encounter inspiring moral exemplars in literature, history, and art and will be explicitly taught to treat others with respect, fairness, and consideration, as consistently modeled by the school's faculty and staff. Key attributes of WAK's student culture will include:

- Learning and fulfilling classroom "jobs" or responsibilities such as passing out materials, watering plants, and line leader.
- Greeting adults and visitors respectfully, including standing and offering a handshake as an expression of courtesy when a visitor comes to the classroom
- Participating in school service roles and civic service projects, including those connected to the pursuit of the Tennessee Governor's Civic Seal
- Wearing student uniforms that promote unity, focus, and a sense of belonging, minimizing distractions and fostering mutual respect and dignity
- Moving through classrooms and common spaces calmly and orderly, demonstrating consideration for others and respect for learning time
- Participating enthusiastically and consistently in classroom instruction, driven by curiosity and a desire for understanding
- Listening attentively to others and speaking respectfully during discussions, supporting ideas with evidence, and responding charitably to others
- Taking responsibility for personal materials, workspaces, and shared school property, reflecting habits of stewardship and self-discipline

- Approaching academic work with persistence and care

**Classroom Culture**
Wilberforce classrooms will be places where truth is pursued with purpose and wonder, and where students are formed into attentive, observant, articulate, and thoughtful learners. Classrooms will be ordered toward inquiry, understanding, and mastery rather than unguided exploration, shallow exposure, or mere amusement. Teachers will lead Wilberforce classrooms and structure students' introduction to material. Students will be taught to engage material with genuine curiosity, and therefore careful attention will be given to how their attention is formed and directed. This culture of purpose and attention will be established through clear routines, direct instruction paired with thoughtful discussion, disciplined habits of listening and speaking, and an emphasis on mastery through guided practice. Teachers will cultivate an atmosphere where questions are joyfully welcomed, mistakes are treated as opportunities for growth, and purposeful effort is expected. WAK's classroom culture will be exhibited by:

- Clear and consistent classroom routines and transitions that establish predictability, maximize instructional time, and support student attentiveness and self-regulation
- Explicitly taught and consistently reinforced norms for attention, listening, speaking, and participation, fostering disciplined inquiry and respectful engagement with ideas and peers
- Frequent, direct, and concrete encounters with the stories, ideas, and phenomena being studied
- Regular guided practice and feedback oriented toward mastery, reinforcing effort, precision, and growth in understanding
- Daily recitation and memorization of edifying poetry and Bible verses to strengthen the love of beauty and attention
- Structured discussions in which students listen carefully, respond respectfully, and support their ideas with evidence from texts
- Walls adorned with intentionally placed classical art
- Minimal technology

**Campus-Wide Culture**
Wilberforce's campus-wide culture will foster joy in the shared life of the school, which will reflect unity of purpose and be ordered toward learning, Christian character development, and civic engagement. WAK seeks to be a place where students, families, and faculty experience excellent relationships with one another as they pursue an ennobling educational vision. The formation of this culture will include shared routines, common language around expectations and virtues, and visible symbols that reinforce the school's mission. Assemblies, gatherings, and communal practices will serve as anchors that orient the community toward gratitude for one another, purposeful reflection, high expectations, and mutual joy. Examples will include:

- A shared set of campus-wide behavioral expectations and common language for conduct, consistently taught and reinforced across classrooms, hallways, assemblies, and communal spaces

- Daily morning assemblies and monthly all-school Town Hall assemblies that highlight enduring ideas, student work, exemplary conduct, and achievements
- Classrooms and common spaces that reflect intentional care through student civic service
- Classrooms and common spaces with aesthetic consistency and palpable order, adorned with high-resolution reproductions of artistic works that reinforce the enduring ideals of heroism, humility, citizenship, and beauty while minimizing distraction
- Intentional adult presence during transitions, arrival, meals, and communal activities to reinforce the norms of respect, order, and care
- Regular presence of purposeful parent and grandparent volunteers participating in the academic work of the school
- Neat appearance of faculty and students in uniforms that foster and reflect school pride while minimizing distractions
- Communal recognition and celebration of American holidays and historical events, including Constitution Day

**Summary**

WAK's approach to school culture will welcome all families regardless of background and directly advance the school's mission, educational model, and desired student outcomes by aligning daily practices with our animating vision of academic, character, and civic formation through the patient pursuit of excellence. The culture will deliberately reinforce this formation by emphasizing the cornerstone of a healthy community: relationships rooted in joy and conducted with order and purpose. Through a rigorous, accessible, and content-rich classical curriculum, students will develop disciplined habits of inquiry, clear thinking, and articulate expression, while structured routines, consistent behavioral expectations, and intentional discipline practices will cultivate orderly classrooms grounded in mutual respect. Faculty Socratic discussions, common lesson planning, and ongoing professional development will ensure that teaching is both intellectually demanding and relationally attentive, strengthening the bond between students and faculty. Clear governance structures, instructional coaching, and shared accountability among faculty and administration will reinforce coherence and trust across the school community. Together, these strategies will establish a joyful and purposeful academic environment in which students are supported to persevere toward academic excellence and grow in virtue. As a result, WAK will consistently produce graduates who embody its mission: students who love learning the truth, engage meaningfully with ideas, serve others with humility, practice self-discipline, and are prepared to contribute thoughtfully and faithfully to their communities.

15. *Explain how this culture will be established for students, teachers, administrators, and parents from the first day of school, how it will be reinforced throughout the school year, and the plan for integrating students who enroll midyear.*

WILBERFORCE ACADEMY

WAK understands school culture to be rooted in the joyful, orderly, and purposeful relationships which make up the school. WAK will establish and sustain a unified school culture through a deliberate, multi-phase implementation plan that begins prior to student enrollment and continues throughout the academic year. Culture will be operationalized through aligned hiring and onboarding practices, explicit instruction in shared norms and expectations, consistent adult modeling, and school-wide routines and structures. These practices will be reinforced through ongoing professional development, leadership systems, family partnership structures, and a clearly defined process for integrating students who enroll midyear, ensuring continuity and coherence of culture across all stakeholder groups.

Culture will be treated as an operational priority, supported by concrete, aligned systems for adult formation, student routines, instructional practices, leadership structures, and family partnership. Each phase of implementation is designed to ensure that shared norms, expectations, and values are explicitly taught, consistently modeled, and reinforced over time. Before students arrive, WAK's teachers, administrators, and staff will participate in intentional onboarding and training aligned to the school's mission, shared norms, instructional routines, and behavioral expectations, ensuring adults are prepared to establish cultural norms consistently from the first day of school. During the opening weeks of school, cultural foundations will be laid through direct instruction in routines, expectations, and discussion norms for classrooms and common spaces, reinforced by visible administrative leadership and clear communication to families regarding schoolwide practices and expectations. Throughout the year, cultural norms and expectations will be reinforced through consistent adult modeling, aligned instructional and classroom management practices, ongoing professional development and coaching, schoolwide assemblies, and structured family partnership systems. Students who enroll midyear will be integrated through a defined onboarding process that includes explicit instruction in routines and expectations, academic and social supports as needed, peer mentorship, and proactive communication with families, ensuring continuity of culture and belonging for all students regardless of entry point.

Additional details and descriptions of how the culture will be established, including for midyear enrollees, are provided below.

The cultural implementation timeline at WAK will follow a clear timeline:

- Pre-opening phase: Adult formation and alignment before students arrive
- Opening phase (beginning day one, first two to three weeks depending on student age): Explicit introduction of routines, expectations, and shared language. Note: this is in addition to academic instruction, not in place of it.
- Ongoing reinforcement: Continuous modeling, feedback, and schoolwide assemblies throughout the year
- Midyear integration: Structured onboarding and culture induction for newly enrolled students

WILBERFORCE ACADEMY

**Establishing Faculty Culture**

Faculty Selection for Mission Alignment

Wilberforce teachers will be selected first and foremost for mission alignment, not merely technical competence. Teachers must demonstrate that they share Wilberforce's commitment to honoring the dignity of every student, and that they affirm the centuries-old statement of Christian faith articulated in the Nicene Creed. During the hiring process, candidates will encounter genuine warmth combined with careful and thoughtful judgment, signaling that care and standards coexist.

In addition to instructional excellence, teachers will be evaluated for soft skills and qualities such as their capacity for wonder, relational engagement with young students and with colleagues, desire to grow professionally, and intellectual humility and curiosity. Likewise, in addition to the necessary hard skills and institutional knowledge needed for school operations, administrators and non-teaching staff (office manager, registrar, nurse) will be intentionally selected for the following soft skills: their capacity to model patience, relational attentiveness, and care while maintaining appropriate legal boundaries.

What one would observe:

- Interview conversations attended by a panel of school leadership and faculty and centered on ideas, methods, scenarios, and students
- Assessment of candidate's "humble, hunger, smart" profile from Patrick Lencioni's Ideal Team Player.
- Candidates treated with hospitality and respect, given clear expectations about mission alignment
- Early conversations emphasizing growth, patience, and joy in teaching rather than perfection

Comprehensive Faculty Onboarding and Training

Once hired, teachers will enter a comprehensive onboarding process designed to inculcate the patient, joyful, and orderly manner with which they are expected to lead their classrooms. Before the school year begins, faculty and administrators will participate in mission-aligned training that includes the following topics and activities:

- Discipline, safety, and health protocols
- School mission, vision, and culture
- Classical pedagogy
- Research-based instructional practice workshops (e.g., *Teach Like a Champion* by Doug Lemov)
- Faculty seminars on enduring texts (e.g., Plato, Augustine, Shakespeare, Scripture)
- Practice labs where teachers rehearse classroom routines, discussion protocols, and behavioral corrections using shared language

- Peer observation norms, emphasizing humility and growth rather than evaluation

Faculty will be trained to see themselves as *chief culture-bearers*, recognizing that tone of voice, posture, preparation, and joy in the material are formative.

What one would observe:

- Administrators regularly entering classrooms to observe and encourage
- Teachers receiving specific, formative feedback rather than only evaluative comments
- Faculty speaking openly and frequently with administrators about challenges and growth areas
- A calm, supportive tone in professional interactions, even when addressing difficulties

<u>Ongoing Faculty Growth and Community Life</u>

Faculty onboarding will be followed by an aligned cycle of targeted resourcing, observation, and review, reinforcing the cultural expectation that teachers—like students—are expected to grow. Faculty formation continues throughout the year through structured intellectual, professional, and spiritual practices, which include:

- Annual growth goals, shaped collaboratively with colleagues, including personal and professional aims
- Faculty Socratic seminars on enduring texts (e.g., *"Pupils"* by Betsy K. Brown, Plato, Augustine, Shakespeare, Scripture)
- Mentor teachers outside a faculty member's immediate chain of command, providing counsel and coaching on pedagogy and vocation
- Faculty prayer partnerships and optional spiritual discipleship for junior teachers

Teachers will be expected to grow because growth is a sign of intellectual and moral life; a teacher who is not learning cannot model learning for students.

What one would observe:

- Faculty meetings beginning with prayer or a shared reading
- Teachers discussing texts, lessons, and student work with evident curiosity
- Veteran teachers informally coaching newer colleagues
- Faculty speaking of their work as a vocation, not merely a job

**Establishing Administrative Culture**

Administrators at WAK will be leaders and stewards of the school, its vision, and the faculty and student formation that takes place there. Culture at the leadership level impacts culture at the faculty level, which in turn impacts culture at the student and community-wide levels. Because their role carries unique responsibilities and pressures, serious attention will be given to building organizational health and leadership skills in the administrative team.

Concrete structures for establishing a strong administrative culture will include:

- Ongoing training in the leadership paradigms of Patrick Lencioni, especially training in his books: *The Five Dysfunctions of a Team, The 6 Types of Working Genius* and *The Advantage*
- Daily administrative check-ins to maintain trust, accountability, and clarity
- Weekly administrative tactical meetings
- Quarterly social events
- Annual administrative strategic sessions offsite.

The board will actively support administrators by providing or ensuring:

- Clear governance boundaries
- Strategic insight that is aligned with school mission and policy
- Regular board meetings in which there are consistent accountability conversations around KPIs.
- Research-supported organizational health practices

What one would observe:

- Administrators visible daily in classrooms, hallways, and common spaces
- Short, focused daily administrative meetings marked by trust and clarity
- Administrators naming and/or addressing areas of concern directly and calmly
- Leadership assisting teachers rather than operating at a distance

**Establishing Student Culture**

Teacher-Student Relationships

The central formative relationship at WAK is that between teacher and student, in which authority and care operate together for the good of the child. The setting of this relationship is the regular pursuit of truth together in the classroom. Through a rich classical curriculum that is animated both by direct instruction and Socratic inquiry and grounded in enduring literature, explicit phonics, discovery-based mathematics, and the Core Knowledge sequence (E.D. Hirsch), students will encounter a content-rich education designed to awaken wonder and a love of learning. Teachers will invite students to attend carefully to what is intrinsically beautiful, patterned, or curious, approaching material not because it is trendy or merely useful, but because it is worthy of sustained thought. In this setting, questions are welcomed, dialogue is encouraged, and curiosity is cultivated as teachers and students pursue understanding together.

What one would observe:

- Teachers warmly greeting students at the classroom threshold to invite them into the learning space
- Teachers knowing students well, addressing them personally, and engaging them in thoughtful conversation

- Teachers posing careful, open-ended questions, listening attentively to student responses, and guiding discussion with patience rather than haste
- Students responding to academic correction with trust rather than fear, confident that questions and mistakes are part of genuine learning
- Students speaking thoughtfully, referring back to texts or shared knowledge, and building on one another's ideas as they seek clearer understanding
- Classrooms marked by joy, orderliness, and mutual respect, where wonder and intellectual purpose shape the daily work of teaching and learning

Habituation through Structure and Care

Students are habituated into the culture through orderly, consistent structures and aesthetics paired with a patient, caring ethos. Concrete practices include:

- Uniforms that protect attention, reduce distraction, and signify dignity
- Hallways and classrooms painted in calm colors that do not distract attention
- High-quality reproductions of classical art displayed at student eye level
- Displays of real objects—plants, specimens, or artifacts—rather than excessive posters or charts
- Student artwork modeled after classical forms, carefully mounted and respectfully displayed
- Technology used sparingly and purposefully, never dominating the space
- Clear and consistent expectations for punctuality and classroom behaviors, aligned horizontally and vertically across grades, and teachers trained with management techniques such as "Make Compliance Visible" from *Teach Like a Champion* (Lemov)
- Lower grades using posture-reset chants ("Feet flat, hips back, eyes up!"), and upper grades receiving encouraging reminders ("Let's look like we're learning.")

What one would observe:

- Consistent, neat attire that recedes into the background
- Students entering classrooms calmly and purposefully
- Classroom procedures aligned horizontally (within grades) and vertically (across grades)
- Students listening attentively and responding in complete sentences
- Mistakes treated as opportunities for growth rather than embarrassment

Instructional Techniques that Reinforce Culture

Teachers will employ research-based management techniques, such as from *Teach Like a Champion* and *Love and Logic* by Cline and Fay, as well as multi-sensory, discovery-based, and story-focused curricula to reinforce joyful attentiveness and participation. These techniques remove obstacles to engaging in instruction and supply multiple modes for engaging in the community of learning.

Examples include:

- Use of **"**All Hands" (*Teach Like a Champion)* ensuring universal engagement
- Use of "Cold Call" (*Teach Like a Champion)* with warmth and dignity
- Explicit modeling of discussion norms and academic language
- Pervasive use of narration or "telling back" to develop habits of attention and to offer an oral mode of showing understanding during whole group instruction
- Extensive use of manipulatives and multi-sensory tools in mathematics, science, and phonics, expanding participation modes by emphasizing first-hand encounters with reality and guided discovery

What one would observe:

- Every student participating regularly in whole-group lessons, including students with Individualized Learning Plans (ILPs) or other needs
- Movement and concrete objects used regularly in lessons, including in the middle school years
- Teachers observing materials alongside their students and acting as a guide, asking questions and prompting thoughtful responses
- Students responding in complete sentences and citing texts and evidence during discussion
- Daily recitation and memorization of enduring passages from Scripture, poetry, and speeches
- Minimal technology, ensuring attention remains on materials, texts, ideas, and people

**Establishing Family Culture**

Holding school authority in trust, WAK affirms parents as the primary educators of their children. They will be regularly invited to inform, participate in, and further every level of the school's operation, from filling a family representative member seat on the board to engaging in academic support as reading volunteers or math group facilitators to beatifying the school through weekend opportunities. They will receive regular communication from multiple levels of the school, including a school-wide newsletter, classroom newsletters, individual communication via email or phone call from their student's teacher, and scheduled, in-person conference meetings.

Concrete practices will include:

- Personal communication via phone and email
- Proactive relationship practices, including first quarter phone calls from teachers and/or administration
- Invitations to monthly Town Halls featuring character awards, academic effort awards, and edifying speakers
- Admissions information sessions and tours
- "Wilberforce 101" orientation held by administration
- Workshops and seminars (e.g., nonprofit partnerships for internet safety)

- Frequent opportunities for visible volunteerism

What one would observe:
- Parents volunteering in classrooms and programs
- Families attending assemblies and workshops
- Early positive communication from teachers
- Siblings showing pride in monthly commendations

Care for Place and Community

Students will also participate in age-appropriate acts of stewardship, such as:
- Sweeping sidewalks
- Watering plant containers and planting seasonal flowers
- Straightening classrooms and common spaces
- Wiping tables after lunch
- Raising and lowering the flag on the flagpole each morning and afternoon

These practices reinforce the conviction that orderliness and joy require effort and responsibility, and that even small acts contribute to the common good.

Civic Formation and the TN Governor's Civic Seal

Pursuit of the Tennessee Governor's Civic Seal will be woven intentionally into school life. Students will engage in:
- Civic knowledge through history, government, and economics lessons
- Service projects aligned to pursuit of the TN Governor's Civic Seal, such as campus beautification projects, local food drives, or support for veterans or elderly neighbors
- Leadership roles, including assembly readers, student ambassadors for new families, peer buddies for new students, service project coordinators (as is age-appropriate)
- Use of Junior Achievement K-8 programming during the civics special area class which reinforces economic literacy, entrepreneurial thinking, and responsible citizenship

School-Wide Assemblies and Symbols

These, too, will be woven intentionally into school life, further implying that the rhythm of a community includes the following:
- Morning assemblies that orient the community toward gratitude, humility, and truth
- Monthly assemblies that celebrate exemplary scholarship, virtuous conduct, and civic service
- Student work, including essays, art, and recitations, that is publicly honored in elevated ways throughout the school, reflecting that excellence is attainable and joyful

What one would observe:

- Students taking pride in caring for their environment and assuming leadership roles in increasingly larger circles of the school
- Students discussing service as a joyfully embraced responsibility rather than a requirement
- Monthly school assemblies celebrating civic effort and leadership
- Daily school assemblies where students raise the flag and recite the Pledge of Allegiance

Plans for Integrating Midyear Students

As described in question 10, students enrolling midyear will be supported through a structured, relational onboarding process overseen by the Dean of Curriculum and Instruction in Years 1-3 of the school, and by the Dean of Culture beginning in Year 4. Every new student will be welcomed through a 5-step integration process:

1. Intake and Planning: After the seat is accepted, the school requests all required records (IEPs, 504s, immunizations, transcripts, discipline records) within 1 school day. Within 3-5 school days, a meeting is held with the family, the Dean of Curriculum and Instruction or Dean of Culture, and relevant staff to review records and assess needs. This meeting also introduces the new family to the school's mission, culture, and expectations; reviews the student and family handbook; explains academic programs, grading, and homework expectations; and outlines transportation, meals, arrival and dismissal procedures, and communication systems.
2. Classroom Preparation: The School Director confirms teacher placement, and the receiving teacher(s) prepares materials, seating, routines, and peer supports prior to the new student's arrival. A second meeting is held before the student attends between the receiving teacher and the parents to explain essential classroom and homework routines and to field any parent questions.
3. First-Week Orientation: The new student receives explicit instruction in routines and is supported by peer ambassadors. Peer ambassadors serve as a seat buddy, lunch buddy, and playground buddy during the new student's first week, where applicable. The new student completes reading and math diagnostics, which the teacher reviews to identify needed supports and interventions. Special education services begin immediately, if applicable.
4. Ongoing Academic and Cultural Support: in elementary grades, the family receives weekly communication from the homeroom teacher, as well as materials for at-home literacy or mathematics support. The teacher provides targeted scaffolding and explicitly teaches school norms and routines to ensure a warm and nurturing welcome. In middle school, teachers will connect with parents as needed throughout the year, and will as a matter of process connect with parents in the middle of each quarter as well as at the end of each quarter with progress updates.
5. Follow-Up and Monitoring: Check-ins between the family and the Dean of Curriculum and Instruction (in Years 1-3) or Dean of Culture (Year 4 and after) and key staff members occur at two weeks and one month to assess the student's integration. By the end of the

first month of enrollment, administrators and teachers confirm successful cultural integration through classroom observation, review of the student's participation, and direct feedback from the student, family, and teacher.

What one would observe:

- New students receiving explicit instruction in routines
- Parents of new students receiving explicit support and at-home materials for students transitioning to a new literacy or mathematics curriculum
- Teachers and administrators checking in with new students and families personally
- Peer ambassadors guiding new students through the school day
- New students adopting school norms with confidence and support

WAK's culture is not theoretical. It will be seen, practiced, and lived through actions that cultivate healthy relationships. Students will sweep sidewalks and recite poetry. Teachers will pray for students and study great texts together. Administrators will serve visibly, know students by name, and lead humbly. Parents will partner actively and respectfully. Through these concrete, intentional practices—rooted in organizational health and the school's mission—WAK will form students who participate in joyful, ordered, and purposeful relationships and serve the common good with humility and courage.

*16. Describe any goals related to student attendance and describe the structures the school will put in place, including collaboration with families and the community, to support student attendance and address chronic absenteeism.*

**Attendance Goals and Support Structures**

WAK believes that consistent attendance is fundamental to student success, both academically and in the development of habits of discipline, engagement, and responsibility. Regular attendance supports the students' ability to benefit from daily instruction, strengthens classroom community, and reinforces the culture of structure and purposeful learning that the school cultivates. With this in mind, WAK's attendance objectives include:

- Achieving attendance rates of 95%, meeting or exceeding local expectations for regular school participation
- Reducing the incidence of chronic absenteeism by implementing proactive, supportive strategies that address barriers to attendance early and collaboratively
- Fostering strong attendance as a shared responsibility among students, families, staff, and the broader school community

**Local Attendance Context**

Chronic absenteeism, defined by the Tennessee Department of Education as missing 10% or more of enrolled instructional days (approximately 18 days), is recognized statewide as a

significant challenge impacting academic progress and long-term outcomes. Chronic absenteeism is linked to lower achievement and reduced likelihood of on-time graduation.[58]

In Knox County, efforts to improve attendance have had measurable impacts: for example, community-wide initiatives documented that, prior to the COVID-19 pandemic, targeted interventions contributed to average daily attendance near 90% and a reduction in chronic absenteeism to approximately 13% among some student groups.[59]

At the district level, recent accountability reporting shows that Knox County Schools reported a chronic absenteeism rate of approximately 21% for the 2022-2023 school year, with ongoing goals to reduce that rate through enhanced supports and monitoring.[60] These figures underscore both the importance of intentional supports to bolster attendance and the opportunity WAK has to integrate evidence-informed practices from the outset.

**Multi-Tiered Attendance System of Support**

Wilberforce will address attendance and chronic absenteeism through a three-tiered system of support, ensuring that all students benefit from strong universal practices while those facing greater challenges receive increasingly targeted and individualized assistance.

Tier 1: Universal Prevention and Promotion (All Students)

Tier 1 strategies establish a strong schoolwide culture that promotes regular attendance for every student. These foundational practices to support attendance and prevent chronic absenteeism will include:

1. Clear Attendance Expectations: Attendance policies will be prominently communicated in student and family handbooks, at enrollment, and through regular school communications. These policies will emphasize the connection between daily participation and academic and social development, and they will outline how absences are classified (excused vs. unexcused) in accordance with Tennessee attendance definitions.
2. Positive School Climate and Recognition: WAK will focus on effective and engaging instruction that has students excited to come to school. The school will also implement positive incentives and recognition programs that celebrate strong attendance and meaningful improvement at both the individual and classroom levels. Reinforcing the value of being present supports an expectation around showing up for learning.
3. Health-Promoting Practices: Faculty and staff will actively promote age-appropriate hygiene routines, including regular handwashing and preventive health practices. My reducing the spread of illness, the school supports consistent attendance and minimizes preventable instructional loss.

---

[58] https://www.tn.gov/education/families/student-support/chronic-absenteeism.html?utm_source

[59] https://promiseneighborhoods.ed.gov/impactstories/knox?utm_source

[60]https://tn01917079.schoolwires.net/cms/lib/TN01917079/Centricity/Domain/1044/TISA%20Accountability%20Report%2024-25.pdf

Strong Tier 1 systems are designed to prevent attendance challenges before they emerge and to communicate that attendance matters for every student, every day.

Tier 2: Targeted Early Intervention (Students at Risk)

When early patterns of absenteeism emerge, WAK will implement Tier 2 supports aimed at addressing barriers before absences become chronic. These targeted strategies include:

1. Daily Monitoring and Early Outreach: Attendance will be reviewed daily by the front office staff to identify concerning trends early. Families will be contacted promptly when attendance irregularities arise, allowing the school to partner with families before patterns escalate.
2. Family Collaboration and Problem-Solving: Staff members will work closely with the families through personalized communication and outreach to identify and mitigate common barriers such as transportation challenges, health concerns, or emerging academic disengagement. Attendance newsletters and regular updates will reinforce shared responsibility and communication.

Tier 2 interventions are supportive rather than punitive and focus on strengthening relationships, increasing awareness and stabilizing attendance patterns through early action.

Tier 3: Intensive and Individual Support (Students with Chronic Absenteeism)

For students experiencing persistent or severe attendance challenges, WAK will provide Tier 3 interventions that are individualized and coordinated across school and community resources. These may include:

1. Intensive Family Engagement: School leadership and designated staff will work closely with families to understand complex or ongoing barriers to attendance and develop tailored support plans with interventions, such as assigning a trusted staff member as a daily point of contact for a student struggling with anxiety surrounding school arrival.
2. Community Partnerships: The school will pursue collaboration with local organizations, such as the Boys and Girls Clubs, health providers, and service agencies to connect families with external resources that address non-academic barriers impacting attendance, such as health, housing or social-emotional needs.

Tier 3 supports are layered on top of strong Tier 1 and Tier 2 practices and reflect the school's commitment to addressing root causes rather than symptoms of chronic absenteeism.

**Data-Informed Continuous Improvement**

Across all tiers, WAK will use attendance data as a tool for continuous improvement. Attendance trends will be reviewed regularly in administrative and leadership meetings to assess the effectiveness of strategies, determine appropriate tiered supports, and make timely adjustments. Progress toward attendance goals will be communicated transparently with staff and families to reinforce a shared commitment.

By implementing a coherent three-tiered system—combining universal expectations, early targeted supports, and intensive individualized intervention—Wilberforce will create an environment in which students are encouraged and equipped to attend school consistently. These efforts will help reduce chronic absenteeism, strengthen student engagement, and support the academic and character-forming goals of the school's educational program.

*17. Describe the proposed school's discipline approach. Discuss how this approach aligns with the school's mission and state law and will meet the needs of the anticipated student population.*

Through our integrated discipline approach, grounded in a growth mindset, respectful accountability, and strong instructional practice, discipline at Wilberforce is an expression of care. Students experience adults at all levels of the school who are consistent, fair, and invested in their formation. Over time, this steady guidance cultivates habits of self-discipline and joyful participation, preparing students not only for academic success but also for lives of virtuous civic engagement.

At WAK, discipline, or student correction, is understood as an essential aspect of a student's overall formation, which we understand as the purposeful process of learning and receiving wisdom within the context of nurturing relationships. Whereas academic instruction aims to shape the mind, discipline supports the ethical formation of character, helping students to understand how their conduct impacts their relationship with themselves, with others, and with their surroundings. The essential purpose of discipline, then, is to direct the transformation of the student into a more mature, confident, and capable version of themselves.

Grounded in strong relationships and intentionally managed classrooms, the Wilberforce approach to student discipline emphasizes guidance, modeling, instruction, and practice, helping students grow in habits, responsibility, and character over time. When infractions occur, teachers and staff will respond with calm correction and redemptive practices that focus on reflection, learning, and realignment, not shame or fear. Discipline will be experienced not as unstable or reactive, but as steady, predictable, and fair. Teachers and staff will ask not only what rule was broken, but what the student needs to learn next, who they are becoming, and what positive practice enables this. Through consistent expectations, patient mentoring, and adult role models who live out the Wilberforce culture of virtue, discipline will be a shared journey of growth, shaping habits and hearts while fostering a safe, supportive community for every learner.

This understanding of discipline as patiently leading students toward excellence in conduct will be translated into daily classroom practice through clear routines, shared language, and intentional teacher decisions that align formation with instruction. While teachers will have autonomy to develop classroom systems that establish habits and deepen relationships, they will operate within these broader cultural principles.

WILBERFORCE ACADEMY

**Discipline as Instruction**

Informed by the research in Carol Dweck's book *Mindset*, Wilberforce teachers will consistently set high expectations and establish clear classroom routines. Students will be taught that character, like intellect, is formed through practice, feedback, and perseverance. When a student disrupts a lesson or fails to meet an expectation, the response will not be "What's wrong with you?" but "What are you still learning?" Teachers will explicitly name behaviors such as self-control, attentiveness, perseverance as skills to be developed, reinforcing Dweck's emphasis that growth occurs when challenges are met with guided effort rather than labels or fixed judgments. For example, an elementary teacher might say, "You're still learning how to transition quietly. Let's practice that again," communicating both high expectations and confidence in the student's capacity to grow.[61]

The Wilberforce approach will employ calm, respectful consequences paired with student ownership—a research-based framework explained in Cline and Fay's book *Love and Logic*. In this framework, adults maintain empathy and use purposeful language while holding firm boundaries and avoiding power struggles or emotional escalation. When a middle school student forgets homework repeatedly, the teacher responds with empathy ("That's frustrating") and a logical consequence ("You'll need to complete it during study hall"), allowing the student to experience responsibility without humiliation. This reflects *Love and Logic*'s core principle that students learn best when they feel respected and when consequences are predictable, logically related, and delivered without anger.[62] Wilberforce teachers will consistently model emotional regulation, demonstrating that authority can be both kind, firm, and worthy of obedience.

Teachers will be trained to use concrete classroom management techniques that ensure discipline supports learning rather than interrupt it. Strong routines, such as orderly transitions, clear procedures for asking questions, and practiced entry and exit habits, reduce ambiguity and prevent misbehavior before it begins. Techniques like "Strong Voice" and "Least Invasive Intervention" from *Teach Like a Champion by* Doug Lemov allow teachers to correct behavior quickly and quietly, preserving both student dignity and instructional momentum.[63] For instance, a teacher may use a brief nonverbal cue or proximity to a misbehaving student rather than public correction, reinforcing expectations while maintaining a culture of respect and focus.

Across grade levels, discipline will be reinforced through proactive instruction. Teachers will instill a desire for virtue through ennobling examples across the curriculum and through rich classical literature. Further, they will explicitly teach what virtues such as respect, humility, and self-governance look like in concrete terms: how to listen attentively during a Socratic discussion, how to disagree charitably, how to recover from a mistake. Students will practice these behaviors

---

[61] Carol S. Dweck, *Mindset: The New Psychology of Success*, updated ed. (New York: Ballantine Books, 2016).

[62] Foster Cline and Jim Fay, *Love and Logic: The Foundation for Teaching Responsibility*, 2nd ed. (Golden, CO: Love and Logic Press, 2006).

[63] Doug, Lemov. *Teach Like a Champion 3.0: 63 Techniques That Put Students on the Path to College* (San Francisco: Jossey-Bass, 2021).

just as they practice academic skills, receiving feedback and opportunities to try again. In this way, discipline will not be episodic; it will be formative and woven into the rhythm of the school day.

Many student misbehaviors will be addressed through the teacher's classroom management rather than formal discipline. Such behaviors are typically not the result of student agency or intention but rather a lack of attention. Lack of attention is to be expected in children but is also patiently improved through habit formation in the classroom. Thus, teachers will address misbehaviors like being distracted or off-task, unintentionally disrupting a lesson by tapping one's pencil loudly, or missing the cue to take out the correct book for class by employing minimally invasive classroom management techniques to help the student return to what is expected. Example tactics include eye contact, standing close to the student's desk, asking a question, offering a word of praise to other students that are on task, verbal redirection, and repeating a task for practice. This form of discipline assumes teachability and reinforces habits before escalation. Classroom teachers and students will receive consistent and early support from the administration, preventing infractions from affecting instructional momentum while delivering focused, growth-oriented consequences.  Additionally, when patterns emerge, teachers and administrators will collaborate with families to reinforce shared expectations and provide consistent support across home and school contexts.

When students commit decidedly *willful or more substantial infractions*, teachers will address them using Wilberforce's three-level discipline framework described next.

**Framework for Infractions: Three-Levels of Support**

Behaviors that arise from distraction or a lack of student agency will first be addressed by the teacher through classroom management and habit formation. When decidedly *willful or more substantial infractions* occur, as opposed to common off-task behaviors, WAK will employ the following three-tiered discipline framework.

<u>First Level: Verbal, Individual Warning and Redirection</u>

The vast majority of student missteps will be addressed at this level through clear, direct, and individualized verbal correction. When a student's conduct reflects willful disregard for classroom rules or expectations, the teacher will respond promptly with a brief verbal warning or redirection that names the specific behavior and restates the expected action. These corrections will be delivered in a calm, respectful tone and are intended to correct behavior early, before it escalates or disrupts the learning environment. These corrections may be delivered during class or in private at the teacher's desk or in the hallway, as appropriate.

Verbal redirections at this level are formative rather than punitive. Teachers will avoid shaming, sarcasm, or public confrontation, instead speaking to students in a way that preserves dignity and communicates confidence in the student's capacity to correct course. Typical redirections may include reminders of classroom expectations, cues to refocus attention, or prompts to re-

engage appropriately with the task at hand. When appropriate, teachers may ask the student to briefly reflect or restate the expectation, reinforcing understanding and ownership.

Second Level: Classroom Consequence
If misbehavior continues or the infraction is clearly willful, the teacher will implement a classroom-level consequence. This may include loss of a privilege, reflective work, or another age-appropriate response tied to the behavior such as cleaning up misused crayons. Additional consequences at this level may include after-school detention, silent lunch, or a Helping Hands program, where students participate in service actions to improve the school such as sweeping a sidewalk or helping to plant flowers in planters. The goal will always be to provide meaningful consequences that allow students to practice a skill and reinforce responsibility.

Each classroom will have systems for tracking infractions internally to ensure clarity and appropriate escalation. The supervision of classroom-level consequences may be undertaken by a member of the administration. At this level, parents are notified any time the consequence alters the routine of the student's school day.

Third Level: Office Referral
A third infraction of the same nature in a single day, or a single infraction of an extenuating nature such as physical altercation or destruction of property, will result in an office referral. At this level, the student will not return to class before the lesson is complete, and a reflective conversation with an administrator will take place. In some cases, a student may remain in the office for an in-school suspension or may be sent home. With the goal of practicing correct participation, students will be given classwork to complete in the office as soon as possible, and before time away from class exceeds one day. All office-level consequences will follow state regulations regarding suspension, expulsion, and special education services, and the school will remain attentive to legal guidelines.[64] Parents will be notified by administration by phone as soon as possible on the same day for this level of infraction.

This three-level framework will be supervised by the school administration, who will regularly review discipline data to identify patterns, ensure equitable application of consequences, and refine supports for students and classrooms.

**Equity, Trauma-Informed Practice, and Legal Compliance**
WAK's discipline policies will comply with all applicable provisions of Tennessee law, including T.C.A. § 49-6-2801, et seq. (Teacher's Discipline Act); T.C.A. § 49-6-4001, et seq. (Student and Employee Safe Environment Act of 1996); T.C.A. § 49-6-4101, et seq. (School Discipline Act); and federal requirements under the Individuals with Disabilities Education Act (IDEA). Disciplinary actions involving students with disabilities will follow all required procedural safeguards, including manifestation determinations, continued access to instruction, and timely parent notification.

[64] https://tsba.net/wp-content/uploads/2025/10/2025-Student-Discipline-Guide.pdf

In keeping with the vision of discipline as patiently leading students toward excellence in conduct, Wilberforce will also integrate trauma-informed practices and accommodations for students with IEPs and 504 plans or who have been identified by the guidance counselor as benefitting from a revised discipline framework, recognizing that formation requires knowing the whole child. Teachers will be trained to interpret behavior through a lens of unmet needs or lagging skills rather than defiance, especially for students impacted by trauma, anxiety, or learning differences. Predictable routines, clear expectations, and calm adult responses create psychological safety, which research consistently identifies as essential for students whose stress responses may be heightened.[65] When a student becomes dysregulated, staff will prioritize de-escalation and regulation such as offering breaks, sensory supports, or structured check-ins as outlined in individualized plans, before addressing correction. Accommodations such as extended processing time, preferential seating, movement breaks, or alternative demonstrations of understanding will be implemented consistently so that expectations remain high while pathways to success are equitable. Importantly, these supports will be not framed as exceptions to discipline but as part of wise and just formation: teaching students how to recognize their needs, use appropriate tools, and grow in self-advocacy and responsibility over time. In this way, discipline remains fair and compassionate, honoring both the dignity of each learner and the school's commitment to helping every child flourish within a stable, nurturing community.

Further, in a K-8 school with a diverse student population, research supports using culturally relevant and responsive discipline practices that value students' community contexts rather than relying solely on exclusionary punishments; such asset-based approaches, rooted in culturally relevant pedagogy originally articulated by Ladson-Billing, connect discipline to students' cultural experiences, strengthen engagement and belonging, and help reduce disproportionate disciplinary outcomes by building relationships, incorporating student and family voices, and scaffolding expectations to be culturally informed and equitable even while seeking a common school culture.[66] Tennessee law (T.C.A § 49-6-4002) permits local boards and charter schools to adopt discipline policies that include holistic, positive behavior reinforcement and other prevention-focused systems tailored to the school's unique student population, community, and mission (e.g., PBIS with culturally responsive adaptations), encouraging parent involvement and reinforcing positive behavior across school and home contexts. Additionally, state law (T.C.A. § 49-6-2803) emphasizes appropriate discipline management techniques in alignment with locally adopted policies, which can be structured to support culturally responsive practices that avoid unnecessary exclusion and maintain inclusive learning environments.

The Wilberforce approach to discipline will fulfill Tennessee's state requirements by embedding legally compliant, evidence-based discipline practices within a coherent instructional and

[65] Substance Abuse and Mental Health Services Administration (SAMHSA), "SAMHSA's Concept of Trauma and Guidance for a Trauma-Informed Approach," HHS Publication No. (SMA) 14-4884 (Rockville, MD: SAMHSA, 2014).

[66] Briana A. Scott, Sarah M. Stilwell, Zaida V. Pearson, Marc A. Zimmerman, Hsing-Fang Hsieh, and Justin Heinz, "Interventions to Address Racism in Disciplinary Actions in K-12 Schools: A Systematic Review," *Prevention Science* (2025).

relational framework that prioritizes safety, equity, and positive behavior support as required under the Teacher's Discipline Act and the School Discipline Act. WAK's emphasis on clear expectations, predictable routines, calm correction, and graduated consequences aligns with state law's call for appropriate discipline management techniques that maintain order while minimizing unnecessary exclusion, while WAK's three-level framework ensures proportional responses, documentation, administrative oversight, and timely parent notification (see T.C.A. § 49-6-4101 et seq., T.C.A § 49-6-2801 et seq., and T.C.A. § 49-6-4002). By addressing most behaviors through classroom management, reflective practice, and logical consequences before escalation, WAK's discipline program will utilize proactive, evidence-based behavior supports rather than purely punitive measures. Drawing on growth mindset research, respectful accountability models, and minimally invasive classroom management techniques, the approach treats discipline as instruction that builds student responsibility and preserves dignity.[67] The explicit integration of trauma-informed practices, collaboration with families, and adherence to IDEA safeguards, including manifestation determinations, continued access to instruction, and individualized accommodations, demonstrate compliance with both state and federal mandates for students with disabilities. Regular administrative review of discipline data to monitor patterns and equity will further support fair and consistent application, aligning with research showing that relational, instructional discipline practices improve school climate while reducing exclusionary outcomes.[68] [69]

## 1.6 Curriculum and Instruction

*18. Provide an overview of the academic plan and program of the proposed school, including any non-negotiables of the school model (e.g., advisory model, instructional methods, length of school day). Explain how this plan supports the school's mission, anticipated student population, and planned outcomes.*

In order to achieve the mission of preparing the hearts and minds of students through the patient and rigorous pursuit of truth, a nurturing culture of joy and structure, and the steadfast cultivation of Christian virtue so that they may live free and purposeful lives as responsible citizens and steward leaders, the WAK academic program will be identified by the following daily student experience, core academic non-negotiables, instructional methods, curriculum, and supports for anticipated student populations.

---

[67] Carol S. Dweck, *Mindset: The New Psychology of Success* (New York: Random House, 2006). Dweck's research demonstrates that framing behavior and learning as developable through practice and feedback supports student resilience, responsibility, and long-term growth.

[68] Anne Gregory, Russell J. Skiba, and Pedro A. Noguera, "The Achievement Gap and the Discipline Gap: Two Sides of the Same Coin?" *Educational Researcher* 39, no. 1 (2010): 59-68. Their research demonstrates that proactive, instructional, and relational discipline approaches reduce exclusionary discipline and improve equity.

[69] Kristin Anderson Moore et al., "Creating Trauma-Informed Schools: A Review of Research," *Child Trends* (2017). Moore identifies predictable routines, calm adult responses, and relationship-based correction as essential for supporting students affected by trauma and stress.

WILBERFORCE ACADEMY

**Students' Daily Academic Experience**

Students at WAK will experience a structured, safe, inclusive, and nurturing school environment. The school day will begin at 7:45am with an all-school morning assembly and will end with dismissal at 3:00pm. The day is intentionally structured to meet all students' needs by providing predictable classroom routines, a unified and inclusive school culture, a low-tech learning environment, teacher-led classrooms, language-rich instruction, and targeted interventions and accommodations for students with special needs.

The daily schedule will ensure that all students receive high-quality instruction in all core and special content areas, as described in further detail in question 5. All grades will have dedicated times for the core subjects (ELA, mathematics, science, and history), special subjects (music, art, civics, Bible, and physical education), recess, lunch, and intervention groups. While literacy intervention will receive a dedicated daily block, additional targeted math and content-area supports will be provided through flexible grouping, small-group re-teaching, and intervention periods as needed based on data.

**Key Academic Model Non-Negotiables**

- Length of school day: 7 hours and 15 minutes
- Length of school year: aligned to Knox County Schools' schedule
- Classical education model
- Teacher-led instruction as the default model
- Minimal instructional technology
- Single-track curriculum
- Daily literacy and numeracy emphasis
- Whole-group instruction with targeted intervention
- Explicit instruction using Socratic and discovery-based techniques

WAK's academic program will be guided by a proven classical education model that cultivates not only excellence in learning but also excellence in character. The classical education model is a content-rich approach, characterized by a strong emphasis on language and a core curriculum focusing on the mathematical, historical, literary, and scientific traditions of the United States and of Western civilization. These foci are enriched with complementary studies of the American and Western tradition of art, music, and physical wellbeing. Dating back to ancient Greece, the classical education model has stood the test of time and prepares students to live examined lives of ongoing intellectual, moral, and civic engagement. The model's contemporary success is made evident through the high attendance and academic achievement at classical schools throughout the United States.[70] [71] [72] [73] The Good Soil Report, an aggregate of classical and classical Christian

[70] https://classicalcharterschools.org/results/
[71] https://www.cincyclassical.org/achievement-beyond-the-metrics/
[72]https://sandhillsccs.org/academics/achievement-outcomes/
[73]https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=01630505&orgtypecode=6&leftNavId=16817&&fycode=2023

school scoring data, indicates above-average outcomes for students in these schools, including higher average SAT/ACT scores and other strong academic and cultural indicators compared to national averages.[74]

At WAK, students will inherit the most beautiful stories, art, and mathematical and scientific explanations offered by the Western tradition. The academic plan is intentionally designed to ensure mastery of the Tennessee Academic Standards (TAS) while cultivating wisdom, virtue, and a love of truth. The program supports the school's mission to prepare children's hearts and minds for academic success, faithful citizenship, and lives of purpose.

**Instructional Methods & Pedagogical Approach**

Central to WAK's approach to academics is a dignified view of human purpose, which holds both teachers and students to high academic and moral expectations. This is evident in three key pedagogical characteristics of the WAK academic experience: Teacher-Led Classrooms, Relational Learning, and Recognizing the Dignity of Every Student. Through a balanced and patient pedagogical approach, students will develop content knowledge alongside a love of the enduring examples that are part of classical education, equipping them with the skills and courage to continue standing for the true, the good, and the beautiful.

Teacher-Led Instruction

Teachers will serve as content experts and moral exemplars, delivering structured, rigorous lessons aligned to Tennessee standards. WAK classrooms will be places where teachers shepherd students through first-hand encounters with mathematic and scientific phenomena, great literature, stories of the past, and the structure and function of the English language. As they do so, not only will the subject itself be on display, but so will the teacher's relationship with the subject and with the act of learning. Because teachers model intellectual curiosity and moral virtue for students, the WAK hiring team believes their task is critical in a way not often recognized: *who* is at the helm in every classroom matters most for virtue formation and the formation of engaged future citizens.

*Socratic Instruction*: First-hand encounters will be followed by lively conversation through the Socratic method. The Socratic method is a pedagogical technique centered on guided questioning. It will be adapted in early grades to be age-appropriate, supportive, and structured, helping students actively gain understanding through dialogue. The following outlines the model for such adaptation.

- Early elementary (K-2): The method will be simplified and concrete. Visuals, stories, and hands-on materials will support discussion. Teachers will ask open-ended questions such as:
    - "Why do you think that happened?"
    - "What do you notice?"

[74] https://classicaldifference.com/wp-content/uploads/2020/06/The-Classical-Difference-Good-Soil-7-outcomes-full-research-report-Draft-3-28-2020.pdf

  - "How could we check if that's true?"
- Upper elementary (3-6): Students will practice explaining their reasoning and listening respectfully to peers and instructors. Questions will become more analytical:
  - "What evidence supports your idea?"
  - "How is this similar to what we learned before?"
  - "What might happen if…?"
- Middle school (7-8): Dialogue will become more formal and reflective, supporting deeper critical thinking and preparing students for academic discussion:
  - "What assumptions are we making?"
  - "Do you agree or disagree, and why?"
  - "Can there be more than one valid answer?"

Mortimer Adler argues in *The Paideia Proposal* that the "Socratic method is essential for developing students' intellectual autonomy," particularly in disciplines that require reasoning, judgment, and interpretation rather than rote recall. He contends that education aimed at civic engagement must extend beyond the transmission of information to cultivate students' capacity to think critically, question ideas, and deliberate thoughtfully with others.[75] Through disciplined questioning, students move from passive reception of knowledge to active intellectual engagement.

Adler further emphasizes that Socratic teaching promotes long-term understanding rather than short-term performance. By grappling with ideas through guided dialogue, students internalize concepts more deeply and develop the habits of mind necessary for independent thinking. As Adler asserts, education succeeds not when students can repeat answers, but when they can "ask the right questions and pursue them intelligently."[76]

Importantly, the Socratic method does not replace explicit instruction; instead, it complements it. Classroom discussion is intentionally guided by the teacher, who provides clear explanations and direction as students encounter new content. In this way, Socratic dialogue cultivates intellectual humility, courage, and disciplined reasoning while motivating learning through curiosity and purposeful inquiry.

To ensure high-quality implementation of this instructional method, teachers will be trained to facilitate developmentally appropriate Socratic dialogue through ongoing professional development focused on purposeful questioning, discussion norms, and strategies for guiding student thinking while maintaining high expectations for evidence-based reasoning and respectful discourse.

*Direct Instruction*: WAK teachers will follow teacher-guided discovery with direct instruction through lecture and the Gradual Release of Responsibility model, often referred to as "I do, we

[75] Mortimer J. Adler, *The Paideia Proposal: An Educational Manifesto* (New York: Macmillan, 1982), Chapter 5.
[76] Adler, *Paideia Proposal*, Chapter 6.

do, you do." As author and researcher Zach Groshell describes in his book *Just Tell Them,* clear, explicit teaching is not the opposite of thinking, but the most reliable way to support it. Groshell urges educators to prioritize clarity and guidance, noting that when students are learning something new, teachers should simply "just tell them," so that working memory is not overloaded, and practice can be purposeful rather than confusing.[77]

Groshell grounds his argument for direct instruction in well-established cognitive science, especially the relationship between working memory and long-term memory. He explains that working memory is extremely limited and easily overloaded when students are asked to independently discover new ideas with minimal guidance. When too much novelty or ambiguity is introduced at once, students may appear busy, but little learning actually occurs because the information never stabilizes in long-term memory. As Groshell puts it, "If information does not make it into long-term memory, it has not been learned."[78]

Direct instruction protects working memory by making explanations clear, concise, and sequenced, allowing students to focus their mental effort on understanding rather than guessing. Once knowledge is securely stored in long-term memory, students can retrieve and apply it more flexibly, which is what enables higher-order thinking. Groshell emphasizes that explicit teaching is therefore not a shortcut, but a prerequisite for independence: "Telling students what they need to know is often the most efficient way to help them think, practice, and ultimately remember."[79]

WAK's pedagogy will be decidedly teacher-led, with an emphasis on seeking truth through guided encounters with motivating content in community with others and direct instruction, as opposed to focusing on project-based learning or unguided discovery.

**Relational Learning**

Relational learning is the conviction that education flourishes in rightly ordered relationships. It places relationships—between teacher and student, among students, and between the learner and truth—at the center of education. It assumes that students learn best when they are known, loved, and challenged within a stable, meaningful community oriented toward the good, the true, and the beautiful. Teachers guide students into wisdom through personal knowledge, shared practices, meaningful dialogue, and faithful engagement with enduring truths. The result is not only academic competence, but the formation of students who love what is good, recognize what is true, and delight in what is beautiful. Such students are well-prepared for Christian civic engagement, to be entrepreneurs that both recognize and seek to contribute to the greater good.

The structure of a student's day is designed to support deep student-teacher relationships. Students in kindergarten through grade 4 will remain with one core academic subject teacher for

[77] Zachary Groshell, *Just Tell Them: The Power of Explanations and Explicit Teaching* (London: John Catt Educational/Corwin, 2024), Chapter 1.
[78] Groshell, *Just Tell Them*, Chapter 1.
[79] Groshell, *Just Tell Them*, Chapter 2.

the majority of their day. In grades 5-8, students will build strong relationships with each of their core academic specialist teachers, whom they will have for the same subject for two years in a row. Simply put, WAK will give students and teachers time together so that teachers can truly know each student and formation can take place. Both the Socratic method described above and the school-wide emphasis on civic engagement support rightly ordered relationships among students. Within and without the classroom, students work in community to seek the common good.

In classical education, knowledge is not neutral or fragmented. Relational learning presents subjects as part of an ordered whole, not disconnected disciplines. Students encounter ideas through great books, primary sources, and beautiful works rather than textbooks alone. This approach enables students to experience learning as a dialogue with tradition; students enter a "great conversation" spanning centuries. Further, it invites wonder and contemplation, especially in the early grades. Students learn *from* knowledge, not merely about it. To support this style of instruction, direct encounters with concrete reality and guided discovery of the truth are essential, and therefore minimal technology will be used in WAK's classrooms.

**Recognizing the Dignity of Every Student**

As a pedagogical principle, respecting the dignity of every student requires teaching rich, meaningful content rather than diluting curriculum based on assumptions about student ability. It also requires using methods appropriate to students' developmental stages and providing intervention as needed.

Within WAK's classrooms, students will be allowed to struggle productively, because we recognize that effort and perseverance are dignifying. James Hiebert and Douglas Grouws argue that students learn best when they are required to grapple intellectually with important ideas, rather than being guided step-by-step to correct answers. They define productive struggle as sustained effort in reasoning through challenging problems where the solution method is not immediately obvious. Crucially, this struggle is productive because it is carefully designed and supported by the teacher, not left to chance or frustration. As they explain, learning is strengthened when "students expend effort to make sense of mathematics," because that effort leads to stronger connections and more durable understanding.[80]

From a cognitive perspective, productive struggle promotes conceptual understanding rather than surface-level performance. When students wrestle with ideas, test hypotheses, and confront misconceptions, they are more likely to reorganize their thinking and retain what they learn. Hiebert and Grouws emphasize that this kind of struggle helps students develop not only content knowledge but also habits of persistence and reasoning.[81]

[80] James Hiebert and Douglas A. Grouws, "The Effects of Classroom Mathematics Teaching on Students' Learning," in *Second Handbook of Research on Mathematics Teaching and Learning*, ed. Frank K. Lester Jr. (Charlotte, NC: Information Age Publishing, 2007), 387-404.

[81] Hiebert and Grouws, "Classroom Mathematics Teaching," 387-404.

Importantly, productive struggle does not preclude explicit instruction. Instead, timing matters. Teachers allow students to struggle with meaningful problems before or alongside explanation, intervening strategically to keep the struggle focused and fruitful. When teachers prematurely remove difficulty, students may succeed in the moment but fail to develop the understanding needed for transfer. As Hiebert and Grouws note, instruction that supports productive struggle leads to "greater learning because students are engaged in making sense of ideas for themselves."[82]

In this way, productive struggle is best understood as intentionally designing challenge, paired with teacher guidance, so that effort results in insight. It is a disciplined, research-supported approach to helping students become independent thinkers rather than passive recipients of information. Student voices will be frequently invited through discussion as well as recitation and narration, while guiding them toward clarity and truth. Students are treated as participants in learning, not passive recipients.

Further, learning will be understood to impact the whole student. As such, literature and other texts are chosen and employed to cultivate the moral imagination, even as they teach comprehension or vocabulary. By respecting the dignity of the student throughout the curricular and pedagogical choices made, classrooms will avoid other popular, ephemeral systems for behavior problem-solving. WAK aims at excellence in student action that will long endure because it springs from a rightly prepared and inspired heart and mind.

In the classical tradition, human dignity is grounded in the belief that every child is:

- Rational: made to know and love truth
- Moral: capable of virtue and responsibility
- Relational: formed within community

Recognizing dignity affirms that students are not problems to be managed or data points to be optimized, but persons to be formed. This conviction informs both how teachers teach and how they treat students.

In accordance with this philosophy of human dignity, WAK's direct instruction and tiered intervention model operates within a schoolwide Multi-Tiered System of Supports (MTSS), integrating RTI², special education services, and English learner (EL) supports to ensure that all students receive coordinated, data-driven instruction and interventions aligned to their individual learning needs.

[82] Hiebert and Grouws, "Classroom Mathematics Teaching," 387-404.

**Advisory Model**
As part of Wilberforce's commitment to relational learning, WAK will implement a homeroom-based advisory model embedded within the regular classroom structure to support student formation, academic habits, and school culture without requiring additional staffing or extended instructional blocks. Each classroom teacher will serve as the advisor for their homeroom, meeting briefly with students on a regular basis (e.g., weekly check-ins) to reinforce habits of scholarship, character development, and organizational skills consistent with the school's classical mission. Advisory activities will include guided reflection, goal-setting, discussion of school virtues, and monitoring of academic and behavioral expectations. This model ensures continuity of care, strengthens teacher-student relationships, and integrates student mentoring seamlessly into the daily life of the classroom while preserving maximal time for core academic instruction.

**Academic Program and Alignment to Tennessee Academic Standards**
WAK's curriculum is fully aligned to the Tennessee Academic Standards (TAS) in English Language Arts, Mathematics, Science, and Social Studies. The classical model provides a coherent, content-rich structure through which state standards are met and exceeded, while instruction is framed by the belief that truth is objective, knowable, and worthy of disciplined study for its own sake as opposed to merely application. WAK will ensure alignment to Tennessee State Standards through ongoing curriculum review, curriculum mapping, scope-and-sequence review, and internal audits annually.

<u>English Language Arts (ELA)</u>
The ELA program aligns directly with Tennessee ELA standards in reading, writing, speaking and listening, and language. Key alignment features include:

- Explicit phonics and reading instruction in grades K-3, aligned to foundational literacy standards
- Systematic instruction in grammar, vocabulary, and composition, aligned to writing and language standards
- Classical approach to writing that uniquely also targets speaking standards by having students narrate texts, take dictation, compose orally before writing, and present their written work
- Study of classic literature, nonfiction works, historical primary texts, and age-appropriate works reflecting the classical intellectual tradition, supporting comprehension, analysis, and knowledge-building required by TAS
- Frequent oral discussion and formal presentation across subjects, aligned to speaking and listening standards
- Socratic dialogue, through which students are taught to reason carefully, articulate ideas clearly, and support claims with textual evidence, directly supporting Tennessee's analytical and communication standards

ELA instruction will occur in interleaved sections throughout the school day to aid long-term retention of content and continuous practice of skills. ELA intervention groups will meet daily during a 45-minute block in the afternoon for all grades K-8. This block will provide Tier II and III support, high-dose tutoring, and small-group literacy reteaching and practice.

Mathematics

WAK's mathematics program aligns to the Tennessee Academic Standards for Mathematics, emphasizing mastery, logical reasoning, and precision. Instruction includes:

- Teacher-led exploration and guided discovery followed by discussion and documentation focused on conceptual understanding, clear explanation, and worked examples
- Multiple daily practice and cumulative review opportunities to ensure procedural fluency and retention
- Emphasis on reasoned problem-solving, mathematical discourse, and presentation, supporting TAS mathematical practices and reinforcing ELA standards within mathematics instruction
- Understanding of mathematics as an orderly, intrinsically worthy, and intelligible discipline that reflects consistency and truth

Math differentiation and remediation will be embedded within daily whole-group instruction through intentional lesson design, strategic questioning, and the use of scaffolded problem sets that allow all students to engage with core content at varying levels of complexity. Teachers will use formative checks and in-lesson adjustments—such as targeted modeling, guided practice, and flexible pacing—to address misconceptions and provide timely support without relying on additional instructional staff.

Science

Science instruction aligns with the Tennessee Academic Standards for Science and emphasizes careful observation, reasoning, and evidence. Features include:

- Sequential instruction in life, physical, and earth sciences, building cumulative understanding
- Emphasis on first-hand observation, scientific inquiry, classification, and analysis
- Integration of reading, writing, and discussion, especially through the Socratic method, reinforcing ELA standards within science instruction
- Presentation of science as the study of the natural world, approached with curiosity, humility, and respect for truth

Hands-on, experiential learning through scientific experiments, demonstrations, and observations will provide a multimodal experience to learning science that is accessible to diverse learners.

History

The History program aligns with Tennessee Academic Standards for Social Studies, emphasizing geography, civics, and economics while insisting that they be placed within their context of human history and the history of the United States. Instruction includes:

- Chronological study of history, which supports a first-hand experience of narrative, contextual understanding, and historical thinking
- Engagement with primary source documents, including foundational civic texts
- Explicit instruction in civic virtue, constitutional principles, and moral responsibility, aligned to state standards for civics and government
- Presentation of history as the study of the human story, complete with dramatic narrative, complex heroic figures, and influential geographic settings

Differentiation and remediation in history instruction will be integrated into whole-group lessons through deliberate text selection, structured discussion, and tiered questioning that support students with varying levels of background knowledge and reading proficiency. Teachers will provide scaffolded access to primary and secondary sources, explicit vocabulary instruction, and guided analysis to address gaps in understanding while maintaining a shared, content-rich learning experience for the entire class.

**Planned Student Outcomes and Assessment**

Students of WAK will:

- Meet or exceed Tennessee Academic Standards in all core subjects
- Achieve TVAAS Level 5 growth rankings
- Maintain a rate of 90% of students reading at or above grade level
- Consistently outperform local district schools on student benchmarks and cultural outcomes
- Demonstrate strong literacy, numeracy, and critical thinking skills
- Communicate clearly and persuasively in speech and writing
- Possess a well-formed moral compass rooted in Christian virtue and civic responsibility
- Positively impact their immediate community through entrepreneurial endeavors
- Exhibit courage and other habits necessary for lifelong learning, leadership, and service

Academic progress toward these outcomes will be monitored through continuous observation, daily and weekly formative assessments, regular teacher-created summative assessments (e.g., chapter and unit tests), nationally normed assessment results, regular data reviews, and conversations between school personnel and families. See question 27 for further detail on student assessment.

**Support for Anticipated Student Populations**

This academic plan directly supports the school's mission to provide a rigorous classical Christian education that is available to all in Knox County. The anticipated student population includes families seeking a high-quality academic program that integrates faith, virtue, and intellectual

excellence. As noted above in question 3, educational attainment has risen in Knox County. In 2018, 35% of adults aged 25 and older in the area held at least a bachelor's degree; by 2023, that figure had increased to 38%. Household incomes have similarly grown. As communities become more affluent and more highly educated, families tend to be increasingly selective about their children's educational opportunities. This underscores the importance of providing rigorous, high-quality academic programs in the region.

WAK anticipates serving a student population that includes students with disabilities, English learners (EL), and students entering with academic skill deficits due to interrupted or inconsistent prior educational experiences. To meet the needs of these anticipated student populations, the school will implement a tiered system of academic and behavioral supports aligned with Tennessee's Response to Instruction and Intervention ($RTI^2$) framework. Tier I supports will include daily scaffolding, differentiation, and explicit instruction within the general education classroom, ensuring access to grade-level content for all students. Tier II and Tier III interventions will provide increasingly targeted and intensive supports, delivered in alignment with students' Individualized Education Programs (IEPs), Section 504 plans, and EL service delivery models, as applicable. Student progress will be monitored using multiple measures including classroom observation, curriculum-embedded formative and summative assessments, and nationally norm-referenced standardized assessments to inform instructional decisions and ensure timely adjustments to supports. Through this comprehensive and responsive approach, instructional staff and interventionists will work collaboratively to promote academic growth and equitable outcomes for all students.

In addition to this structured instructional and intervention model, intentional curricular choices have been made to support inclusion such as Singapore mathematics, Carnegie Learning, and Literacy Essentials, which intrinsically differentiate within whole group instruction, employ multimodal instructional techniques, and include built-in teacher cues for EL students. Another example is the selection of classical literature, which is intrinsically inexhaustible and therefore affords advanced students the opportunity for continuous extension alongside peers who are receiving reteaching supports.

19. *Describe the basic learning environment for a typical student (e.g., classroom-based, independent study), including class size and structure. Explain how this plan supports the school's mission, anticipated student population and planned outcomes.*

The learning environment at WAK will be classroom-based, structured, teacher-led, and designed to support focused instruction, meaningful discussion, and strong academic habits for all students. At full capacity, class sizes will be intentionally capped at 20 students in grades K-3 and 25 students in grades 4-8, maintaining a schoolwide teacher-to-student ratio of approximately 1:18 to ensure close guidance and accountability. Instruction progresses from self-contained classrooms in the early grades to subject-specific rotations in the upper grades, supporting

students' growing independence while preserving instructional coherence (see question 5). This intentional structure aligns with the school's mission to provide an equitable, intellectually rigorous education that prepares students for responsible citizenship and lifelong learning. The sections below outline the basic learning environment, instructional use of technology, classroom structure, teacher-led instruction, class size and teacher-to-student ratios, student grouping and grade-level structure, and use of instructional time.

**Overview of the Learning Environment**

The learning environment permeates every aspect and area of the school, including the culture of each individual classroom, the personality of the faculty, the neat appearance of students and faculty, and the architectural design and interior decoration of the building. For this reason, even though students will be grouped according to their grade for most of the day, all students, faculty, and administration will gather together at the beginning of each school day for morning assembly and at least once a month for Town Hall gatherings. The students thus come to see that their individual experiences in the classroom are not isolated but participate in a broader school culture and community that collectively comprise the learning environment. At these all-school gatherings, students will come to know all faculty members as they speak in rotation and will encounter moral and intellectual exemplars in their peers as character and intellectual awards are given. Participation in these gatherings ushers students into civic life as the faculty and student body are a small representation and imitation of the larger community.

The halls and common spaces in the school will be decorated with high-resolution reproductions of beautiful art from the Western tradition that features moral, intellectual, and civic exemplars in order to bring the learning environment that begins at the all-school gatherings into the physical spaces of the school. Student uniforms and professional teacher dress will further support an atmosphere free from unnecessary distractions, promoting equity among students, giving them a sense of pride in their neat physical appearance, and helping them focus on learning, character formation, and participation in the community of learners that develops in each classroom and across the school.

**Class Size and Teacher-to-Student Ratios**

Class size is intentionally calibrated to support student development and instructional goals and be in compliance with state law. In all classes, students will be grouped by grade rather than blended. Classes will not exceed 20 students per section in grades K-3 and 25 students per section in grades 4-8. Including homeroom teachers and content-specific teachers such as art, music, and physical education teachers, the teacher-to-student ratio will stand at 1:18. Smaller class sizes in the early grades allow teachers to provide close guidance in foundational skills such as literacy, numeracy, and classroom habits. As students mature academically, the modest increase to class sizes supports increased independence while preserving meaningful teacher oversight and robust discussion.

WILBERFORCE ACADEMY

**Student Grouping and Grade-Level Structure**
Classrooms will be self-contained in grades K-4, where students stay in the same classroom with the homeroom teacher for all academic instruction. In grades 5-6, students will have different teachers for ELA and math, introducing them to rotating schedules and subject specialization. Grades 7-8 will feature a rotating schedule where students have a different teacher for every subject. As students move toward higher grades with subject-specific teachers, they will benefit from having the same teachers across multiple years (e.g., the same math teacher in grades 5 and 6) to better facilitate teacher-student relationships and to better track academic progress. This also makes the learning environment more structured and equitable for students as teachers are more familiar with students' strengths and struggles since they have taught them before and have already established relationships with them.

Students will interact with peers across grades at morning assembly and the monthly Town Hall gatherings. Recess periods and lunch will be shared by grades K-4, 5-6, and 7-8. Such cross-grade contact serves to strengthen school culture, enable mentorship as older students become moral and intellectual exemplars for younger students, and to help younger students gain a sense of belonging to the community of learners that is the school. These interactions also broaden friendships, reduce isolation, and build a more equitable and inclusive school culture.

**Daily Schedule and Use of Instructional Time**
As noted in question 5, in addition to the core academic subjects of reading, language arts, mathematics, science, and history, the daily schedule includes dedicated intervention periods for academic support to allow for small group and individualized instruction based on student performance, benchmark assessment, interest, and capacity. The daily schedule is thus structured to support the needs of diverse learners by balancing focused instructional time with opportunities for movement, reflection, repetition and practice, and varied forms of engagement so all types of learners receive ample attention and opportunities for growth.

After morning assembly, the school hours of 7:45am-3:00pm include for grades K-4: 45 minutes of dedicated time for ELA; 60 minutes of dedicated time for math; 25 minutes of recess; 45 further minutes for ELA; 30 minutes for lunch; 25 additional minutes of recess; 45 minutes dedicated to ELA intervention groups; 35 minutes dedicated to history or science on alternating days; 35 minutes dedicated to music (M/TH), art (T/W), and civics and entrepreneurism (F); 20 minutes dedicated to teacher-led literature and poetry reading and discussion; 15 additional minutes dedicated to math; and 35 minutes dedicated to Bible (M/W/F) and physical education (T/TH).

After morning assembly, grades 5-6 receive 55 minutes of dedicated time for ELA; 55 minutes for math instruction; a block of 45 minutes dedicated to music (on M/Th), art (T/W), and civics (F); 20 minutes for recess; 20 minutes for lunch; 45 minutes dedicated to intervention and enrichment in math and ELA; 45 minutes that alternates between a Bible class (M/W/F) and

physical education (T/Th); a second recess of 20 minutes; 35 minutes for history; and 35 minutes for science.

After morning assembly, grades 7-8 receive 55 minutes of dedicated time for ELA; 55 minutes for math instruction; a block of 45 minutes dedicated to music (M/Th), art (T/W), and civics (F); 20 minutes for lunch; 20 minutes for recess; 45 minutes for study hall where additional instruction and intervention in any subject can take place as needed; 45 minutes for history; and 45 minutes for science. The spaced, interleaved, and varied practice of ELA and math enables teachers better to assess and gauge student understanding, better forms habits of mind, and increases long-term retention in students.[83]

The daily schedule is thus structured to benefit and support diverse learners. Core academic blocks are intentionally sequenced to allow students to encounter material in multiple modalities, while regular transitions, enrichment periods, intervention periods, and recess help sustain attention and well-being. Differentiated support time is built into the schedule so that students who need additional support, reinforcement, or challenge can receive it regularly and without stigma, whether in small groups considering the classroom layout or in private at the teacher's desk. This thoughtful rhythm of the day promotes accessibility while maintaining high expectations for all students to ensure that every learner is given equitable opportunities to thrive.

The anticipated student population includes families seeking a structured academic setting with high expectations, as well as students who benefit from clear routines, strong teacher leadership, and a coherent and integrated curriculum. By combining small-to-moderate class sizes, explicit instruction, discovery-based learning, and Socratic discussion, the school creates a learning environment that promotes strong academic outcomes, intellectual confidence, and the habits of mind necessary for lifelong learning. Thus, the structured and rigorous learning environment, as the school mission states, prepares the hearts and minds of students to live free and purposeful lives as responsible citizens and steward leaders.

**Classroom Structure and Organization**

The learning environment for a typical student will be classroom-based and teacher-led, designed to provide a structured, orderly setting that maximizes instructional time and supports academic excellence for all learners. Classrooms will be intentionally organized to facilitate direct instruction, guided discovery and practice, and Socratic discussion in a rigorous and joyful academic culture that is nurturing and joyful. Students will be in self-contained classrooms in the lower grades (K-4), with one classroom and teacher dedicated to each section of every grade; grades 5-6 will help students transition to a rotating schedule by introducing new teachers for ELA and math; and students will rotate between subject-specific classrooms and subject-specific teachers in the middle school grades (7-8).

[83] Peter C. Brown, Henry L. Roediger III, and Mark A. McDaniel, *Make It Stick: The Science of Successful Learning* (Belknap Press of Harvard University Press, 2014), 46-66.

In grades K-6, student desks will be arranged in orderly rows that allow all students clear sightlines to instruction and equal access to the teacher's attention. The teacher's desk will be positioned at the front or side of the classroom to support strong classroom management while maintaining ease of movement among students. Students will rotate to different classrooms for ELA and Mathematics in grades 5 and 6, and they will rotate for all subjects in grades 7 and 8, supporting growing independence and responsibility within a structured learning environment. In grades 7-8, the classroom layout will increasingly emphasize Socratic discussion, with student desks often arranged in the round or with students seated around a central seminar table to promote shared inquiry, respectful dialogue, and intellectual collaboration, though the teacher will maintain a separate desk to establish healthy authority in the classroom. The teacher will provide direct instruction and lecture from the front of the room but will sit with students to facilitate Socratic discussion. In every classroom, the teacher's desk creates a space for private, individualized tutoring and instruction, differentiation, discipline, and praise. The rows of student desks and the seminar table allow for small-group instruction by homeroom, subject-specific, and special education teachers, where students can be grouped by and across tiers as needed.

Each elementary classroom will also include a "leisure corner," featuring a comfortable rug and chairs and bookshelves for a classroom library that contains texts, at and above grade level that complement the curriculum and encourage students toward deeper and more ambitious reading. Classroom walls, like the common spaces of the school, will display several high-resolution reproductions of masterpieces that complement the curriculum of that grade or course, as well as several carefully selected pieces of student artwork, reinforcing that students are able to participate in the ideals of beauty and virtue that help comprise the learning environment of the school. Classrooms will also have living plants and beautiful artifacts from nature that inspire wonder and stimulate a desire to know. Laminated educational posters that are cheap and cluttered will not be present so as to avoid dividing students' attention and divorcing knowledge from their natural objects.

The aural space of the classroom will also be structured to create a safe and joyful learning environment. As students enter classrooms, in the morning, after recess, and after lunch, they will encounter classical music that is beautiful and calm and thus prepares students to quiet their minds and bodies. As the daily schedule progresses, and teachers lead students into each new subject in the lower grades or as students rotate between subject-specific classrooms in the upper grades, students will stand and recite poems, execute classroom routines and rehearse content (e.g., skip counting in math, the Preamble to the Constitution in history and civics, and the parts of speech and their definitions in ELA), and well-crafted memory exercises proper to each subject. The effect of such exercises is to train and stock the memory; create a beautiful, joyful, and structured environment; focus student attention on the subject at hand; and prepare the students for learning.

**Teacher-Led Instruction and Student Experience**

In a teacher-led classroom, the teacher is the focal point of the students, modeling the moral and intellectual character traits and virtues students at Wilberforce will acquire and habituate over time through repeated practice. The role of the teacher will transform as the students progress through the lower and upper elementary grades to middle school in order to reflect students' growth and increased responsibility for their own learning: in the lower grades, the teacher will lead from the front of the room and as the intellectual authority in the classroom; in the upper grades, the teacher will lead by way of example, participating as the lead-learner of the classroom though Socratic instruction and inquiry. In all grades, the teacher will model wonder, a profound depth of inquiry, intellectual humility, and charity.

Teaching begins with direct instruction and discovery guided by the classroom teacher. Teachers will present content clearly and systematically, model analytical thinking and inquiry, and ensure that all students acquire essential background knowledge. This approach is particularly supportive of students who may not arrive with prior exposure to academic language or content, as it reduces reliance on unguided discovery. The mode of instruction is thus equitable and nurturing to all learners.

In addition to direct instruction and guided discovery, students regularly participate in teacher-guided Socratic discussions and conversations, especially in literature and language arts, mathematics, science, and history. Through structured questioning grounded in shared texts, artifacts, and experiences, students learn to listen attentively, articulate their ideas clearly, and engage respectfully and empathetically with differing viewpoints. Discussion is purposeful and disciplined, reinforcing comprehension and deepening understanding as a complement to direct instruction. These Socratic discussions are shorter and more pointed at the lower grades, lasting 5-10 minutes, and evolve into proper seminars at the upper grades where students are actively engaged for the duration of a class period. They are equally effective for younger and older learners.[84] [85]

Whether in Socratic discussions about art, music, literature, history, or math, students come to acquire the habits of learning. Thus, the Gradual Release of Responsibility model (the "I do, we do, you do" method described in question 18) develops not only within each grade but also progressively across each grade band, expanding the learning environment beyond the classroom to permeate the culture of the school at large.

**Instructional Use of Technology**

In light of the research and findings documented by Jonathan Haidt in *The Anxious Generation*, the minimization of smart devices and digital technology in the classroom and the school at large will help create a structured and joyful learning environment where students enjoy longer attention spans, experience deeper learning, undergo healthier social development, experience

[84] Mortimer J. Adler, *The Paideia Program: An Educational Syllabus* (Touchstone, 1984).

[85] Michael Strong, *The Habit of Thought: From Socratic Seminars to Socratic Practice* (New York: New View, 1997).

less anxiety and emotional dysregulation, have fewer behavior problems, enjoy a more equitable learning environment, and develop stronger habits and executive functioning skills.[86] Screens and digital technology will thus be strictly limited in common spaces to direct students' attentions toward the more permanent things, such as beauty, goodness, and virtue, embodied in the art that elevates the physical spaces of the school into a learning environment. Likewise, digital technology will be limited in the classrooms, better enabling students to cultivate intellectual and moral virtues and to attend to their studies, peers, and teachers.

Teachers will use computers to take attendance and occasionally project images or short science videos for observation, but will otherwise limit the use of digital technology, including but not limited to smartphones and smartwatches, in view of the students. Such work as needs to be done on digital devices, including emails to parents, will be done during designated times when teachers are not present with students, such as before and after school and during lunch, recess, and prep periods.

Students in the lower grades (K-4) will not be permitted to bring smart devices to school; students in the upper grades (5-8) who have smartphones or watches will deposit them in phone lockers in the office upon arriving at school and will retrieve them after school ends or upon dismissal.

*20. Describe the primary instructional strategies that the school will expect teachers to use and why they are well-suited for the anticipated student population. Describe the methods and systems general education teachers will have for providing differentiated instruction to meet the needs of all students.*

**Primary Instructional Strategies**

WAK's academic approach is animated by the belief that the best education calls students to strive for both academic and moral excellence. Academic and moral excellence are best achieved within a community of learners, starting with the School Director down to each individual student. To that end, teachers are called not only to be subject experts and moral leaders, but to motivate their students by demonstrating a genuine love for the subject matter they teach and for each individual student in their care. Students also have a critical role to play within the classroom. They are called to be actively engaged during each lesson, rather than passive recipients of information. As described above in question 18, the three key pedagogical characteristics of the academic experience at WAK are: Teacher-Led Classrooms, Relational Learning, and Recognizing the Dignity of Every Student. The primary instructional strategies that teachers will use to achieve these pedagogical characteristics are the Socratic method, which provides guided discovery, and direct instruction. These strategies allow students to encounter mathematic and scientific phenomena, great literature, stories of the past, and the structure and

[86] Jonathan Haidt, *The Anxious Generation: How the Great Rewiring of Childhood Is Causing an Epidemic of Mental Illness* (New York: Penguin, 2024).

function of the English language. Additionally, these encounters foster a deep love for learning and a robust understanding of the subject matter in each course.

The Socratic Method

Teachers will utilize the Socratic method in classroom discussion. The Socratic method is a pedagogical technique centered on guided questions and discovery of the truth. When using the Socratic method, each lesson begins with an experience, question, problem, or scenario, rather than with a presentation of information. For example, in mathematics, rather than starting the lesson by giving students the equation for the Pythagorean theorem, students are presented with a scenario that guides them to derive, or discover, the equation. In a science lesson on digestion, students are first asked to describe what happens when they eat something, rather than starting first with a description of the process. By beginning with a direct encounter with the phenomena, students are given the opportunity to come to important conclusions on their own with the teacher providing supportive guidance. The Socratic approach is thus discovery-based and cultivates students' curiosity, independent thought, argumentation with evidence, classroom engagement, keen observational skills, and close reading and listening skills.

The Socratic method is adapted in early grades to be age-appropriate, supportive, and structured, helping students actively construct understanding through dialogue. An outline for such an adaptation can be found above in question 18.

Based on several research studies, The Center for Inspired Teaching states there are strong arguments for incorporating discovery- or inquiry-based teaching in the classroom in all subject areas. Inquiry-based teaching is "a pedagogical approach that invites students to explore academic content by posing, investigating, and answering questions." The studies showed that the benefits of inquiry-based teaching include: (1) increasing student achievement overall when compared to conventional methods, (2) yielding significant gains in student achievement without sacrificing state curriculum standards, (3) narrowing the gap between high- and low-achieving students, and (4) benefitting culturally and linguistically diverse students as well as special needs students.[87]

As noted earlier, though classroom conversation takes place among peers, it is guided by the teacher who supplies precise, explicit explanations expediently as students come across content objectives. Additionally, the guided discovery and structured discussion of the Socratic method allow for differentiated instruction. At the most basic level, students and teachers ask and answer comprehension questions throughout the conversation and clarify concepts. Classroom conversation also allows for deep exploration of ideas and synthesis of knowledge.

Direct Instruction

As outlined in question 18, WAK's teachers will utilize explicit instruction through lecture and the Gradual Release of Responsibility model, often referred to as "I Do, You Do, We Do," outlined in

[87] inspiredteaching.org/wp-content/uploads/impact-research-briefs-inquiry-based-teaching.pdf

Zach Groshell's book *Just Tell Them: The Power of Explanations and Explicit Teaching*. Groshell's method of explicit teaching models the classical method of imitation, which emphasizes the importance of deeply studying and replicating excellent work as part of the process of learning. Mortimer Adler, in *The Paideia Proposal*, argues that skills like reading, writing, and thinking are learned through coaching, which requires a student to watch an "expert" perform the skill and then attempt to imitate the performance. Adler states that this supervised practice is critical for students to develop "habits of doing."[88] Groshell's method provides the scaffolding necessary to move students from being dependent on the teacher to working independently through the process of imitation. In the **I Do** stage, the teacher models how to do a specific task or process (complete a math problem, diagram a sentence, etc.). Then, in the **We Do** stage, the teacher helps students by providing scaffolds such as prompts or partially completed procedures, and the teacher works through the process with the students. Finally, in the **You Do** stage, students perform the procedure or show understanding on their own. When students have a model to follow, it reduces their cognitive load, allowing them to focus on mastering one specific skill at a time. This method moves the cognitive responsibility from the teacher to the student through incremental steps. By the time students reach the "You Do" stage (independent practice), they are exercising a skill they have understood.

WAK's pedagogy will be decidedly teacher-led, with an emphasis on seeking truth by encountering meaningful content in community with others and direct instruction and guided discovery, as opposed to project-based learning or unguided discovery. Direct instruction allows the teacher to pass on knowledge to students in a clear and organized manner. While Socratic, discovery-based instruction will be utilized most when introducing new topics and discussing texts, direct instruction with the "I Do, You Do, We Do" method will be used to acquire, practice, and master skills. For example, after deriving the Pythagorean Theorem together as a class through a Socratic process of discovery, the teacher will use the "I Do, You Do, We Do" method to model how to use the Pythagorean Theorem with a particular problem. Beginning in the early grades, students will be taught how to take notes. Students will be introduced to guided notes, as well as graphic organizers, growing in their note taking skills as appropriate based on their age.

**Instructional Techniques**

Our faculty will incorporate many instructional techniques from Doug Lemov's book, *Teach Like a Champion 3.0* (TLAC). Wilberforce's professional development program will include training in these techniques throughout the school year. Specific Teach Like a Champion techniques will be selected to support the academic and behavioral goals of WAK. Lemov argues that teaching is an art form that is mastered through the refinement of specific, high-leverage skills.[89] TLAC outlines a series of "concrete, specific, and actionable" strategies that teachers can implement which have been proven to be highly effective in promoting strong measurable outcomes for student

[88] Mortimer J. Adler, *The Paideia Proposal: An Educational Manifesto* (New York: Macmillan, 1982), 27-28.

[89] Doug Lemov. *Teach Like a Champion 3.0: 63 Techniques That Put Students on the Path to College* (San Francisco: Jossey-Bass, 2021), 1.

achievement. The following are examples of TLAC techniques that teachers will learn and use in classrooms:

- *Threshold*: This technique is found in the Procedures and Routines section and focuses on the transition of students from the hallway to the classroom. It emphasizes that the culture of the classroom begins before the student enters the classroom and takes their seat. By greeting students at the threshold of the door, teachers have a positive interaction with each student before class begins, expectations for a focused classroom environment are reinforced, and the teacher can monitor the hall and the classroom simultaneously.[90]
- *Precise Praise*: This technique is found in the Building Character and Trust section and is the practice of providing positive reinforcement that is specific, descriptive, and focused on the learning process rather than just general personality traits of a student. It focuses on reinforcing the action, not the person, communicating to the student exactly which "habit" to repeat. For example, instead of saying, "You're a great writer" a teacher would say, "I noticed you used three pieces of evidence to support your thesis in that paragraph."[91]
- *No Opt Out*: This technique encourages active engagement and participation in class, offering concrete ways to ensure that students cannot opt out by saying "I don't know." If a student responds to a question with "I don't know" or an incorrect answer, the teacher works to draw out a correct answer from the student by providing more context or asking another student to supply a cue and then returning to the original student who uses the cue to find the answer. When used consistently, this technique supports active student engagement and emphasizes that students and teachers work together to move from a state of "not knowing" to understanding.[92]
- *Board = Paper*: This technique helps teachers to use the board effectively by emphasizing that the teacher's board is the model for the student's paper. It is a tool for teaching students how to take notes and organize information well, allowing for information to be presented both visually and verbally and providing a resource for students to reference when doing homework or studying for assessments. Specific strategies within this technique are the graphic organizer, live modeling, visual cues, check for transfer, and the "double board" method where teachers use one side of the board for permanent information and other side for practice work and examples.[93]

**Differentiated Instruction**

As stated earlier, at WAK, a single-track curriculum that prioritizes inclusion, accompanied by intervention, tutoring, and extended learning supports will be used. Careful curricular choices have been made to support inclusion, such as Singapore mathematics which intrinsically differentiates within whole group instruction, including with built-in teacher cues for EL students.

---

[90] Lemov. *Teach Like a Champion*, 391.
[91] Lemov. *Teach Like a Champion*, 487.
[92] Lemov. *Teach Like a Champion*, 141.
[93] Lemov. *Teach Like a Champion*, 127.

Singapore mathematics also provides natural scaffolding and differentiation by using manipulatives to make concepts concrete. Carnegie Learning utilizes small group instruction to allow for ability grouping and skills practice worksheets to allow students to receive personalized support with specific math skills. The curricular choice of including classical literature also allows for differentiation as it is intrinsically inexhaustible and therefore affords advanced students the opportunity for continuous extension alongside peers who are receiving reteaching support. In early elementary grades, students will be placed in differentiated reading groups, according to their ability level. Socratic conversations allow students of all abilities to benefit from the variety of questions asked by both students and teachers. Each conversation includes comprehension questions focusing on basic student understanding and information retention, as well as higher level questions that allow for deeper understanding and synthesis of information. Literacy Essentials builds in differentiation by having students do activities orally, with their fingers, or with a pencil. Teachers will present content in different ways such as by using tangible objects, oral explanation, and visual/symbolic models. When needed, in the "I Do, You Do, We Do" framework, teachers can remain in the "We Do" stage longer before moving on to individual student work.

WAK is confident that the rich content of its selected curriculum and the quality of its teachers coupled with strong pedagogy and instructional methods will serve all students well and allow them to succeed. The anticipated student population includes families seeking a structured academic setting with high expectations, as well as students who benefit from clear routines, strong teacher leadership, and a coherent and integrated curriculum. Wilberforce believes the combination of Socratic and direct instruction will serve all students well, allowing for deep student engagement through guided discovery, questioning, and discussion, as well as clear teacher-led instruction. The specific methods listed for differentiating instruction in the classroom environment, some built into the curriculum itself and others provided directly by the teacher, will ensure that all students have access to the curriculum and are able to achieve mastery of the skills being taught in each class.

21. *Identify the curriculum the school will offer in alignment with T.C.A. § 49-6-2206 and explain the process for selecting these materials, including a description of why these materials are appropriate for the anticipated student population. If the sponsor plans to apply for a waiver to use textbooks and materials that have not been approved by the State Board, identify the high-quality instructional materials the sponsor plans to use and describe the research demonstrating that they will meet the academic needs of students. Note that all anticipated waiver requests should be included in the Waivers section of this application.*

In alignment with T.C.A. § 49-6-2206, WAK will use high-quality instructional materials that are fully aligned with Tennessee Academic Standards, with a particular emphasis on ensuring all students attain mastery and fluency in foundational skills.

## Curriculum Selection

WAK undertook a deliberate and research-informed process to identify the curricular materials that best advance the school's mission and vision, achieve its planned academic outcomes, and meet the needs of its anticipated student population. The founding team conducted a comprehensive review of instructional programs implemented by high-performing classical charter schools nationwide, including schools and networks such as Knoxville Prep, Valor Collegiate, Emerald Academy, and Great Hearts Academies, drawing on both empirical research and the established practices of organizations serving diverse student populations.

Multiple curricular options were reviewed for each academic discipline, with materials evaluated for academic rigor, coherence, and alignment with WAK's educational model and local context. Final selections were made based on the following criteria:

- Alignment with Tennessee Academic Standards
- Evidence of effectiveness in improving academic outcomes for WAK's anticipated student population
- Alignment with Wilberforce's classical mission and educational vision
- Compatibility with Wilberforce's instructional model and pedagogical approach
- Richness, coherence, and depth of content
- Availability of high-quality teacher and student resources
- Suitability for differentiated instruction, practice, and review

The selection process, guided by these criteria, resulted in the selection of a rigorous classical curriculum that is grounded in evidence-based instructional practices, supported by documented success across diverse school settings, and well suited to the mission, vision, and operational realities of WAK. The chosen materials have demonstrated effectiveness in promoting strong academic outcomes for all student subgroups, including students with disabilities, economically disadvantaged students, and English learners, while ensuring that all students have access to the richness and depth of a classical education.

WAK will maintain a formal process to verify and monitor alignment of all instructional materials to the Tennessee Academic Standards. Prior to adoption, the Dean of Curriculum and Instruction will lead a systematic review of each core curriculum using subject-specific alignment rubrics and grade-level crosswalks that map unit objectives, lesson content, and assessments directly to applicable Tennessee standards. This review will confirm scope-and-sequence coherence, vertical progression across grade levels, and alignment to required statutory components, including foundational literacy skills and civics requirements. Alignment artifacts, including standards crosswalks and internal review summaries, will be maintained as part of the school's curriculum documentation.

After implementation, WAK will review alignment through annual curriculum audits and quarterly instructional leadership meetings. These reviews will examine student performance data, lesson-level implementation fidelity, assessment results, and teacher feedback to confirm

continued standards alignment and instructional effectiveness. Any recommended adjustments whether to pacing, supplemental supports, or instructional emphasis will be reviewed and approved by the School Director and Dean of Curriculum and Instruction prior to implementation. Through this structured verification and review process, WAK will ensure that all instructional materials remain aligned to Tennessee standards, responsive to student needs, and consistent with the school's classical academic model.

**Alignment of Curriculum to School Mission and Educational Vision**

WAK's high-quality curriculum and instruction will support the school mission by making a rigorous classical education accessible to all students. Students will develop mastery in literacy and numeracy while pursuing the truth and building broad and systematic background knowledge in history, science, literature, biblical studies, the fine arts, and physical education. Curriculum and instruction will cultivate students' ability to read attentively, write clearly and confidently, think logically, and reason quantitatively. Students' intellectual formation will be enriched through sustained engagement with historically significant texts, enduring works of literature, Scripture, and artistic and musical masterpieces. In concert with the core curriculum, we will provide explicit instruction in the principles of American government and civics, as well as entrepreneurism, preparing students to become thoughtful, responsible citizens who engage meaningfully in their communities. As a whole, WAK's curriculum is designed to cultivate students intellectually, morally, spiritually, socially, and physically, preparing them for success in high school and beyond.

**Curriculum Design for Wilberforce's Anticipated Student Population**

WAK's curriculum design aims to provide an education that is high-quality, values-driven, and responsive to the needs of our anticipated student population. As noted in question 6, WAK anticipates serving a student population—with diverse backgrounds, preparation levels, and learning needs—who will benefit from strong, systematic instruction in core academic subjects. WAK has identified the following academic needs in our anticipated student population:

- Strong direct and content-rich instruction in core subjects
- Additional education in civics and entrepreneurship
- Targeted intervention and acceleration

<u>Strong Direct and Content-Rich Instruction in Core Subjects</u>

The elementary and middle schools closest to the region WAK will serve exhibit significant variability in ELA, math, and science achievement scores, underscoring the need for educational options and curricula that emphasize mastery of foundational literacy and numeracy skills (see data in question 4). In order to serve this need, the entire WAK curriculum is intentionally built upon three pillars: explicit, systematic phonics instruction; discovery-based mathematics; and content-rich, knowledge-building instruction across disciplines.

1. *Explicit Phonics Instruction:*

Through recent reporting on the Science of Reading, the American public has become more informed about an approach to literacy instruction that has long been foundational in classical schools: explicit, systematic phonics instruction. The Science of Reading refers to a broad and growing interdisciplinary body of research examining how children learn to read most effectively. Drawing on decades of findings from education, cognitive psychology, developmental psychology, linguistics, and neuroscience, this research converges on five essential components of skilled reading: phonemic awareness, phonics, fluency, vocabulary, and comprehension. Tennessee has formally affirmed this research base through the Tennessee Literacy Success Act, which requires districts and schools to adopt literacy instruction grounded in the Science of Reading and aligned to these foundational components.

Explicit phonics instruction is strongly supported by the Science of Reading because it is intentionally designed to develop all five components in a coherent and cumulative manner. Such instruction is systematic, sequential, explicit, and responsive to ongoing assessment, ensuring that students master foundational skills before progressing to more complex tasks. Unlike balanced literacy or leveled-reader approaches, explicit phonics instruction is grounded in the understanding that learning to read is not a natural or intuitive process in the same way that learning to speak is. As the National Reading Panel concluded, children must be directly taught how the alphabetic system works in order to become proficient readers.[94]

The Council for the Accreditation of Educator Preparation (CAEP) similarly compares reading to breaking a code, noting that "reading involves deciphering written symbols (letters) and connecting them to spoken sounds (phonemes)," a process that "is not intuitive and needs to be taught."[95] Seminal research syntheses—including the National Academy of Education's *Becoming a Nation of Readers* (1985),[96] the National Reading Panel's *Teaching Children to Read* (2000),[97] and *The Handbook of Early Literacy Research* (2003)[98]—have consistently demonstrated that systematic phonics instruction leads to stronger reading outcomes, particularly for beginning readers and students at risk for reading difficulties. More recent cognitive and neuroscience research has reinforced these conclusions, showing that explicit instruction in phonemic awareness and phonics supports the development of efficient neural pathways necessary for fluent reading and comprehension.[99]

This research base affirms that explicit phonics instruction is essential and particularly well suited to WAK's anticipated student population, many of whom may enter school with uneven early

---

[94] https://www.nichd.nih.gov/publications/pubs/nrp/findings

[95] https://www.improvingliteracy.org/resource/the-science-of-reading-an-overview

[96] R. C. Anderson, E. H. Hiebert, J.A. Scott, and I.A.G. Wilkinson, *Becoming a Nation of Readers* (National Academy of Education, 1985).

[97] National Reading Panel, *Teaching Children to Read* (National Institute of Child Health and Human Development: 2000).

[98] Susan B. Neuman and David K. Dickinson, eds., *Handbook of Early Literacy Research*, vol. 1. (New York: The Guilford Press: 2003).

[99] Stanislas Dehaene, *Reading in the Brain* (Viking, New York: 2009).

literacy experiences or unfinished foundational skills. By providing structured, cumulative instruction with frequent assessment and targeted reinforcement, this approach ensures that all students—regardless of background—develop the decoding accuracy and fluency necessary for grade-level reading and long-term academic success.

2. *Discovery-Based Mathematics:*

WAK's mathematics program will take a discovery-based approach that is intentionally guided, leading students to develop deep conceptual understanding by observing concrete mathematical phenomena, solving meaningful problems, and articulating their reasoning. In both Singapore mathematics (Primary Mathematics) and Carnegie Learning, lessons are structured so students encounter new ideas first through carefully designed tasks, often using manipulatives, visual models, and real-world contexts, before formal procedures are named and practiced. In the Singapore approach, students progress through a concrete-pictorial-abstract sequence, using objects and diagrams (e.g., number bonds and bar models) to notice patterns, represent relationships, and derive efficient strategies, with the teacher explicitly guiding students toward accurate generalizations and mastery. Carnegie Learning extends this same logic into the middle grades through rich, problem-based lessons that invite students to test conjectures, compare multiple solution pathways, and justify conclusions, while the teacher facilitates discussion, provides timely scaffolds, and connects student thinking to precise mathematical language and representations. In both programs, "discovery" is not unguided exploration; it is a deliberate instructional design in which students learn mathematics by doing mathematics—reasoning from concrete examples to clear models and, ultimately, to fluent and transferable procedures.

WAK will implement a Singapore mathematics curriculum for grades K-6. Singapore is widely recognized as a global leader in mathematics achievement, a distinction consistently documented by major international comparative studies over multiple decades. According to the Trends in International Mathematics and Science Study (TIMSS), which measures mathematics achievement in grades 4 and 8, Singapore has ranked among the top three participating countries in both grades in every administration of the assessment since 1995.[100] Similarly, the Programme for International Student Assessment (PISA), a triennial international study evaluating the mathematical literacy of 15-year-old students across OECD and partner countries, has consistently ranked Singapore first or second in mathematics since 2009.[101]

Singapore mathematics refers to the instructional approach developed by Singapore's Ministry of Education and the Curriculum Development Institute of Singapore in the 1980s. Prior to the adoption of this approach, Singaporean students ranked in the lower half of participating countries in mathematics. Following its systematic implementation, Singapore rapidly rose in international rankings and has since consistently achieved TIMSS "High" (550) to "Advanced"

[100] https://timssandpirls.bc.edu/timss2015/international-results/timss2015/wp-content/uploads/2016/T15-20-years-of-TIMSS.pdf

[101] https://www.oecd.org/content/dam/oecd/en/publications/reports/2023/12/pisa-2022-results-volume-i_76772a36/53f23881-en.pdf

(625) international benchmarks. In the 2019 TIMSS assessment, Singapore was the highest-scoring nation in mathematics, outperforming the United States by 90 points on a 1,000-point scale, a difference equivalent to multiple years of schooling.[102]

In addition to its strong international record, Singapore mathematics has demonstrated positive results in U.S. educational contexts. Studies examining the use of Singapore math-aligned curricula in American classrooms have found improvements in students' conceptual understanding, problem-solving ability, and performance on standardized assessments in the elementary grades.[103] Case studies from districts and charter schools implementing Singapore math have likewise reported increased student proficiency, stronger number sense, improved test scores, and reduced achievement gaps, especially when the curriculum is implemented with fidelity and supported by teacher training.[104] [105] These findings suggest that the core features of Singapore mathematics which are conceptual focus, concrete-pictorial-abstract progression, and mastery-based sequencing, translate effectively to diverse U.S. classrooms and support strong outcomes for a wide range of learners.

At the instructional level, Singapore mathematics is distinguished by its emphasis on conceptual understanding, number sense, and mastery. From the earliest grades, students engage deeply with mathematical concepts through mental math, structured problem-solving, mathematical modeling, and carefully sequenced practice. Instruction follows a concrete-pictorial-abstract (CPA) progression, in which students first manipulate physical objects, then represent ideas visually, and finally reason symbolically using numbers and equations. Research in mathematics education has shown that this progression strengthens conceptual understanding, supports long-term retention, increases student confidence and enjoyment of math, and reduces reliance on rote procedures by helping students internalize the meaning behind mathematical operations.[106] [107] These findings hold for students both with and without learning disabilities.[108]

Rather than accelerating prematurely through content, the Singapore approach prioritizes mastery at each stage, ensuring that all students develop a secure foundation before advancing to more complex topics. This emphasis on depth over speed aligns with research demonstrating that strong early number sense and conceptual understanding are critical predictors of later success in mathematics.[109] Through its deliberate sequencing, visual modeling, and focus on

---

[102] https://nces.ed.gov/timss/results19/doc/TIMSS2019_compiled.pdf
[103] https://eric.ed.gov/?id=EJ1115242&utm
[104] https://www.discovery.org/education/2024/03/13/could-singapore-math-be-a-fix-for-u-s-mathematics-education/?utm
[105] https://www.edweek.org/leadership/opinion-how-singapore-math-improved-scores-at-a-u-s-school/2018/01?utm
[106] https://files.eric.ed.gov/fulltext/EJ1265106.pdf?utm
[107] https://www.researchgate.net/profile/Jasmine-Lutfi/publication/381830510_Research_Trends_on_Learning_Mathematics_with_The_CPA_Concrete-Pictorial-Abstract_Approach/links/6680de172aa57f3b8260b456/Research-Trends-on-Learning-Mathematics-with-The-CPA-Concrete-Pictorial-Abstract-Approach.pdf
[108] https://doi.org/10.1016/j.ridd.2016.11.006
[109] https://www.tandfonline.com/doi/full/10.1080/2331186X.2025.2558303#abstract

reasoning, Singapore mathematics equips students with the skills and habits of mind necessary for advanced mathematical thinking in the upper grades.

In the middle grades, students will use Carnegie Learning's research-tested mathematics program, which aligns closely with the discovery-based approach introduced through Singapore mathematics in the elementary years. Each lesson is intentionally launched with a carefully designed mathematical problem that invites students to explore relationships, test ideas, and reason through unfamiliar situations before formal methods are introduced. Through this problem-based structure, students develop conceptual understanding by engaging in productive struggle, analyzing multiple solution pathways, and making sense of mathematical structures rather than relying on rote procedures. Carnegie Learning is one of the few middle school mathematics programs to earn perfect scores across all three EdReports gateways: Focus and Coherence, Rigor and Mathematical Practice, and Usability.[110] In addition, a landmark RAND Corporation study of more than 18,000 students found that implementation of Carnegie Learning's blended instructional model nearly doubled typical algebra learning growth by the second year, demonstrating its effectiveness in supporting deep understanding and sustained mathematical progress.[111]

Discovery-based mathematics will directly address the needs of WAK's anticipated student population, many of whom may enter with gaps in number sense or inconsistent prior instruction. By emphasizing mastery, visual modeling, the concrete-pictorial-abstract progression, problem-solving, and critical thinking, the curriculum supports diverse learners, including English language learners and students with learning differences, by making mathematical concepts accessible, coherent, multimodal, and transferable across grade levels.

3. *Content-Rich Instruction:*

In the conviction that human beings love to know, WAK will employ a content-rich curricular approach across the core academic areas of English language arts, history (social studies), and science. Rather than focusing narrowly on abstract skills divorced from content, our school seeks to prepare students' minds and hearts by cultivating long-term memory of background knowledge across the full range of academic subjects. Background knowledge is essential to critical thinking: in order to think productively, the mind must have substantive content to think about. Students with well-developed background knowledge also benefit from increased cultural literacy, reading comprehension, and a deeper capacity to engage meaningfully with the world around them.

The importance of cultural literacy was articulated and popularized by E.D. Hirsch, Jr., professor emeritus of education humanities at the University of Virginia and founder of the Core

[110] https://edreports.org/reports/detail/carnegie-learning-middle-school-math-solution-2022-2022/sixth-grade/gateway-one
[111] https://cdn.carnegielearning.com/cli_theme/_img/www-2020/clear-imagery/research/2023-essa-math-report.pdf?_gl=1*1e6546*_gcl_au*MTUzMDUwMDczLjE3Njg1NDIzOTY.*_ga*MTkxMjg5MzU3LjE3Njg1NDIzOTQ.*_ga_HT75DMPVPG*czE3Njg1NDIzOTckbzEkZzEkdDE3Njg1NDI5OTEkajYwJGwwJGgw

Knowledge Foundation. Through influential works such as *The Schools We Need and Why We Don't Have Them*, *How to Educate a Citizen: The Power of Shared Knowledge to Unify a Nation*, and *The Ratchet Effect*, Dr. Hirsch has demonstrated that "a common, sequenced curriculum, particularly in preschool through eighth grade, can unite communities, narrow achievement gaps, and prepare all children for informed citizenship."[112] His research shows that building a shared body of knowledge reverses patterns of inequitable outcomes by ensuring that all students, regardless of background, gain access to the vocabulary, concepts, and references necessary for academic success. Through content-rich curricula, students develop a shared cultural foundation that contributes to their identity as Americans and prepares them to be engaged, thoughtful, and sympathetic citizens.

In addition to its civic and cultural benefits, content-rich instruction plays a decisive role in strengthening reading comprehension. After students complete the foundational work of learning to decode words and associate symbols with sounds in grades K-3 (when they transition from learning to read to reading to learn) many experience a decline in reading comprehension in the upper elementary grades. This decline is often not the result of weak decoding skills but of insufficient background knowledge.[113] Research summarized in the American Federation of Teacher's *American Educator* (2003) explains that reading comprehension depends heavily on oral language development, repeated exposure to academic vocabulary, sustained engagement with nonfiction and informational texts, and systematic accumulation of background knowledge.[114] The research shows that students comprehend texts more effectively when they already possess familiarity with the topic, its vocabulary, and its underlying concepts. In contrast, students who can decode fluently but lack background knowledge struggle to make sense of grade-level texts, particularly in science, history, and other content-heavy subjects. Background knowledge also supports comprehension of literary fiction, enabling students to recognize allusions, interpret imagery and metaphor, and grasp the cultural, historical, and textual references that give depth and meaning to works of literature.

The Science of Reading further clarifies why content knowledge is essential to comprehension. Reading comprehension is the product of two interdependent processes: word recognition and language comprehension.[115] While word recognition allows students to accurately decode printed words, language comprehension depends on having mental concepts associated with those words. When students hear or read language, comprehension occurs only if the words evoke meaningful ideas, images, and relationships already stored in memory. The richer and more extensive a student's background knowledge, the stronger his or her language comprehension and, consequently, overall reading comprehension. For this reason, instruction that systematically builds knowledge across subjects is not ancillary to literacy development but foundational to it.

---

[112] https://www.coreknowledge.org/meet-founder-e-d-hirsch-jr/
[113] https://www.academia.edu/75756284/Poor_Childrens_Fourth_Grade_Slump
[114] https://www.aft.org/sites/default/files/media/2015/ae_spring2003_web.pdf
[115] https://www.lexialearning.com/blog/a-full-breakdown-of-the-science-of-reading-components

Given the anticipated diversity of academic preparation among WAK students, a content-rich curriculum provides an equitable foundation by ensuring that essential knowledge is taught explicitly rather than assumed. This approach reduces disparities rooted in prior access to knowledge, strengthens reading comprehension across disciplines, and supports all students in meeting Tennessee Academic Standards.

Education in Civics and Entrepreneurism

As detailed in question 6, many Tennesseans lack sufficient education in civics and entrepreneurism. In addition to our content-rich curriculum that builds cultural literacy and historical awareness, WAK will address this need through civics and entrepreneurship instruction as a special-area class for all grades. Thus, all students at WAK will receive developmentally appropriate instruction in the structure and principles of American government, the rights and responsibilities of citizenship, and the role of entrepreneurship in strengthening communities. Through this program, students will gain both the knowledge and habits necessary for informed civic participation and responsible self-government.

The civics and entrepreneurship curriculum aligns with Tennessee Academic Standards in social studies and draws from authoritative sources, including the Tennessee Blue Book and primary documents such as the Declaration of Independence, the United States Constitution, the Tennessee Constitution, the Emancipation Proclamation, and the Gettysburg Address, enabling students to study American self-government through original texts and historical context. In alignment with T.C.A. § 49-6-1028, students in grades 4-8 will complete at least one project-based civics assessment measuring their understanding of government systems, constitutions, public policy, and relevant social studies standards.

Civics instruction is developmentally sequenced across grade levels, beginning in the early grades with vivid storytelling that introduces historical figures, foundational civic ideas, and the basic purposes of government, and progressing in the upper grades toward increasingly analytical, text-based study of democratic principles, constitutional structures, and the historical development of federal and state governments using primary sources.

Civics and entrepreneurship instruction will also include experiential learning opportunities that connect classroom study to real-world civic engagement. Students will have opportunities to participate in activities such as the Secretary of State's student mock election and civics essay contest, encouraging active participation in democratic processes. The entrepreneurship component of the course will emphasize initiative, problem-solving, stewardship, and service, helping students understand how private enterprise and civic responsibility contribute to the common good. Students' experiential study of civics at WAK will culminate in a capstone civic service project completed in middle school.

In accordance with state requirements, civics and entrepreneurship classes will participate in and contribute to WAK's annual observance of Celebrate Freedom Week, including Constitution Day on September 17. During this observance, students will study and memorize selected portions of America's founding documents, reinforcing students' understanding of liberty, self-government, and civic responsibility.

Through this civics program, WAK will prepare students for informed citizenship and community leadership, intentionally pursuing eligibility for the Governor's Civics Seal while ensuring that all students, regardless of background, gain access to the civic knowledge, skills, and dispositions necessary for participation in a free and self-governing society.

<u>Targeted Intervention and Acceleration</u>
WAK's curriculum has been intentionally selected to be accessible to all learners through multimodal instruction, built-in differentiation, targeted intervention, and structured opportunities for acceleration and enrichment. Across all core subjects, daily instruction will incorporate multiple modes of content delivery, including explicit oral instruction, physical manipulatives, visual representations, structured discussion, hands-on learning experiences, and guided practice. This instructional approach supports all learners and is particularly responsive to students who are English learners, come from economically disadvantaged backgrounds, or exhibit characteristics of dyslexia, attention-related challenges, or other learning differences.

WAK's instructional materials are intentionally designed to support targeted intervention by making student learning visible, diagnosable, and responsive to ongoing assessment. The school's core curricula in literacy and mathematics are structured around clearly sequenced skill progressions, frequent checks for understanding, and cumulative review, allowing teachers to identify specific gaps in foundational skills such as phonemic awareness, decoding, fluency, number sense, and mathematical reasoning. Because our selected curricular materials break complex learning into discrete, mastery-based components, they enable teachers to pinpoint precisely where a student is struggling and to intervene at the appropriate instructional level.

When students demonstrate gaps in foundational skills, the instructional materials themselves provide built-in pathways for targeted support, including scaffolded lessons, guided practice, corrective feedback, and opportunities for repeated, focused practice. These supports will be used in small-group or individualized settings aligned directly to the core curriculum, ensuring that intervention is not disconnected from grade-level instruction. The coherence between core instruction and intervention allows students to receive timely, targeted support while continuing to engage with essential content and classroom routines.

In addition to targeted intervention, WAK's curriculum will provide structured opportunities for acceleration and extended learning for students who demonstrate early mastery or advanced readiness. Through regular literacy and mathematics assessments embedded within the instructional materials, teachers will identify students prepared for more advanced reading

experiences and higher-level mathematical tasks. The school's literature curriculum, grounded in the study of classic and enduring works, offers rich opportunities for deeper analysis of language, theme, and the human experience as expressed through story and poetry.

The content-rich design of the curriculum further supports extended learning by enabling students to make substantive interdisciplinary connections and exercise intellectual curiosity across subject areas. Because these opportunities for extension are embedded directly within the core instructional materials, teachers can differentiate instruction within the classroom while maintaining coherence with grade-level standards and shared learning objectives. This materials-based approach to acceleration emphasizes depth, complexity, and intellectual rigor rather than pace, ensuring that advanced learners remain engaged and challenged while continuing to participate fully in the WAK's classical academic program.

When paired with robust teacher training, evidence-based instructional practices, and targeted academic and behavioral supports, WAK's curriculum is designed to be both inclusive and accessible, ensuring that all students are supported in achieving high academic standards, regardless of prior academic experience or learning need.

**Instructional Materials for Core Subjects**

Pursuant to T.C.A. § 49-6-2206, WAK will apply for a waiver to use specific high-quality, standards-aligned instructional materials not included on the state-approved textbook list in order to support the school's classical academic model. These materials are identified by grade band and core subject in the charts below, with publishers in parentheses. WAK intends to use the current published edition unless otherwise noted.

<u>Grades K-6</u>

| Core Subject | Core Curriculum | Supplemental Resources | Literature & Reading Lists |
|---|---|---|---|
| ELA | • **Literacy Essentials** (Access Literacy, LLC)<br>• **Well-Ordered Language** (Classical Academic Press)<br>• **Structure and Style for Students** (Institute for Excellence in Writing) | • **Primary Phonics** (Access Literacy, LLC)<br>• **Logic of English** (Logic of English, Inc.)<br>• **English from the Roots Up** (Educators Publishing Service) | • **WAK classic literature list** |
| Mathematics | • **Primary Mathematics 2022 Edition** (Marshall Cavendish Education) | — | — |

WILBERFORCE ACADEMY

| | | | |
|---|---|---|---|
| Science | • **Core Knowledge Science** (Core Knowledge Foundation) | • **FOSS Equipment Kits** (Lawrence Hall of Science, University of California, Berkeley) | — |
| History/ Social Studies | • **Core Knowledge History** (Core Knowledge Foundation) | — | • **Primary source excerpts**<br>• **Story of the World** (Peace Hill Press) |

Grades 7-8

| Core Subject | Core Curriculum | Supplemental Resources | Literature & Reading Lists |
|---|---|---|---|
| ELA | • **Structure and Style for Students** (Institute for Excellence in Writing)<br>• **Fix It! Grammar** (Institute for Excellence in Writing) | — | • **WAK classic literature list**<br>• **Realms of Gold** (Core Knowledge Foundation) |
| Mathematics | • **Carnegie Learning Middle School Mathematics** (Carnegie Learning, Inc.) | — | — |
| Science | • **Core Knowledge Science** (Core Knowledge Foundation) | • **FOSS Equipment Kits** (Lawrence Hall of Science, University of California, Berkeley) | — |
| History/ Social Studies | • **Core Knowledge History** (Core Knowledge Foundation) | — | • **Primary source excerpts**<br>• **Land of Hope** (Encounter Books) |

Materials identified as **Core Curriculum** will serve as the primary instructional programs responsible for mastery of Tennessee Academic Standards, while **Supplemental Resources** and **Reading Lists** will be used to reinforce, extend, and enrich instruction and do not function as standalone curricula.

ELA: Literacy, Grammar, Composition, and Literature

WAK's English Language Arts (ELA) curriculum is grounded in a classical, language-rich approach to learning in which both the content and methods of instruction are rooted primarily in written

and spoken language rather than in images, videos, or other screen-based media. This emphasis reflects the conviction that language is the primary vehicle for human thought, reasoning, and understanding. Written language conveys meaning in a linear, logical sequence that requires readers to engage actively with ideas, concepts, and relationships. In reading, the brain must translate abstract symbols into meaning, strengthening cognitive discipline, attention, comprehension, and memory. By contrast, visual media often appeal directly to the senses and allow the mind to remain largely passive. With appropriate structure and support, WAK's ELA curriculum intentionally challenges students to develop their rational faculties by engaging deeply with language through the arts of reading, writing, and speaking.

WAK's ELA curriculum is fully aligned with Tennessee Academic Standards and encompasses the integrated study of foundational literacy, grammar, composition, and literature. Across grades K-8, instruction is intentionally sequenced so that students move from learning to read toward reading to learn, and from learning to write toward writing as a means of clear, confident, and purposeful communication. At each stage, students encounter increasingly complex texts and ideas, supported by explicit instruction, guided practice, and cumulative review.

*Literacy:* In grades K-5, the primary objective of the ELA curriculum is to ensure that all students develop strong and durable foundational literacy skills. During these years, students receive systematic instruction in phonemic awareness, phonics, fluency, vocabulary, and comprehension, laying the groundwork for proficient reading and writing.

To support this goal, WAK will implement Literacy Essentials (LE) along with Primary Phonics, LE's recommended resource for leveled reading practice. LE is grounded in the early work of neuroscientist Dr. Samuel T. Orton and educator Anna Gillingham, whose research in the 1930s and 1940s led to the development of the Orton-Gillingham approach to reading instruction for students with dyslexia. Reflecting this tradition, LE employs a multisensory, explicit, cumulative, and systematic instructional design that engages students through auditory, visual, and kinesthetic channels—listening, speaking, seeing, and writing—as they learn to read through spelling and writing while attending carefully to sounds, symbols, and patterns in language. From kindergarten to grade 3, students progress from mastery to automaticity in recognizing the 72 phonograms of English, segmenting and decoding words, reading on level, and developing efficient handwriting. Instruction is structured, patient, and rigorous, ensuring that students acquire accuracy before speed and fluency. In accordance with T.C.A. § 49-6-1034, LE provides explicit instruction in both manuscript and cursive handwriting.

The instructional design of LE aligns with longstanding research associated with the Science of Reading, including *Becoming a Nation of Readers* (1985), as well as the requirements of the Tennessee Literacy Success Act. The program directly supports Tennessee's Foundational Literacy Skills Plan by providing evidence-based instruction in phonemic awareness, phonics, fluency, vocabulary, and comprehension (see the Explicit Phonics Instruction section above).

Because of its structured and multisensory approach, LE is particularly effective for English learners and students exhibiting characteristics of dyslexia, while remaining robust and engaging for students performing at or above grade level. In addition to its capacity for supporting diverse learners, the curriculum includes day-by-day instructional guidance, extensive teacher supports, and clearly sequenced lessons. Features such as interleaved practice, spiral review, built-in differentiation, and opportunities for both whole-class and small-group instruction ensure that all students develop the foundations for strong reading.

Logic of English will be used in grades 1-3 to reinforce phonics, spelling generalizations, and language structure, complementing Literacy Essentials through explicit orthography instruction and practice. In grades 4-5, students will further extend literacy development through the systematic study of Greek and Latin roots using *English from the Roots Up*, which strengthens academic vocabulary, the ability to decode unfamiliar words, reading comprehension, and precision in speech and writing across all content areas.

*Grammar and Composition*: Grammar and composition will be taught explicitly and in coordination to ensure that students understand how language functions and how to use it effectively. Grammar and composition instruction will be integrated within early literacy instruction and become increasingly formal as students mature. Writing instruction will progress from sentence construction in the early grades to structured paragraphs, essays, and analytical writing in middle school. Across all grades, students will learn to write with clarity, coherence, and purpose, using language as a tool for disciplined thought.

Grades 3-6 will use Well-Ordered Language and Structure and Style for Students (IEW) as the primary grammar and composition curricula, respectively. Grades 7-8 will use Fix It! Grammar (IEW) and Structure and Style for Students (IEW) as their primary curricula. These programs seamlessly integrate analytical grammar, literary texts, and persuasive communication skills through activities such as sentence analysis, memorization of parts of speech, structured outlining, composition with varied sentence structures, editing, and oral presentations. Thus, students will gain a thorough understanding of the English language while developing the skills of clear thinking and communication in both writing and speaking.

Case studies examining the Institute for Excellence in Writing's (IEW) grammar and composition curricula indicate positive outcomes for diverse groups of learners, with schools and districts reporting measurable gains in ELA assessment performance following implementation.[116] IEW's structured instructional approach, including explicit modeling, guided imitation, writing and editing checklists, and other scaffolded supports, clarifies expectations and supports student success. These features make the curriculum accessible to a wide range of learners, including students with varied academic backgrounds and learning needs, while maintaining clear standards for quality writing.[117]

[116] https://iew.com/schools/research#berwyn
[117] https://iew.com/support/blog/special-education-series-part-3

*Classic Literature*: Across all grade levels, students will engage with a carefully curated body of literature drawn from the Western and American traditions. WAK's reading selections are informed by the Core Knowledge Foundation's *Realms of Gold* and the school's own reading list and include classic fables, myths, poems, short stories, novels, and speeches that have shaped Western culture and American civic life. Texts range from Aesop's fables and the legends of King Arthur in the early grades to Shakespeare, Mark Twain, and foundational American writings in the upper grades.

Literature selections are chosen based on developmental appropriateness, reading level, and thematic richness. The aim of studying literature at WAK is to engage deeply with texts of enduring value and which offer insight into the nature of human beings, their relationships with God and one another, their virtues, and their vices. Included among these selections will be passages of Scripture and related texts, such that Bible instruction will support the fulfillment of Tennessee Academic Standards for ELA.

In the early grades, teachers will read texts aloud to the class and guide conversation about the characters, plots, and words in the texts. In the older grades, students will take increasing responsibility for reading the texts themselves and discussing them in greater depth. Students will be guided to read closely, annotate, ask thoughtful questions, and analyze texts' meanings, all while developing comprehension, interpretation, and expressive skill. In two randomized controlled trials, researchers found that ELA curricula like WAK's, which pair systematic literacy, grammar, and composition instruction with content-rich texts, support students who may enter with limited prior exposure to academic language or literature while strengthening comprehension, vocabulary, textual analysis, and expressive skill across disciplines.[118]

<u>Mathematics</u>

WAK's math curriculum is designed to cultivate disciplined, flexible, and confident mathematical thinkers who understand not only how to perform mathematical procedures but also why those procedures work. Grounded in the conviction that all students can achieve mathematical competence with appropriate structure and support, math instruction at WAK will emphasize conceptual understanding, procedural fluency, and problem-solving in equal measure. Instruction will be explicit and mastery-based, prioritizing depth over speed so that students build durable understanding and long-term retention rather than superficial familiarity with isolated skills. Students will encounter new concepts through multiple representations such as concrete manipulatives, visual models, and symbolic notation, so that mathematical ideas are made visible, understandable, and transferable.

Mathematics instruction will be coherently sequenced from kindergarten through grade 8 to support steady growth in number sense, conceptual understanding, procedural fluency, and problem-solving ability. In the early grades, students will develop foundational skills in counting,

[118] https://cehhs.fsu.edu/sites/g/files/upcbnu4516/files/research/Sonia%20Cabell%2C%202020.pdf

place value, and operations through extensive use of manipulatives and visual models. In the upper elementary grades, instruction will deepen students' understanding of operations and extend learning to fractions, decimals, measurement, geometry, and multi-step problem-solving. Grade 6 will serve as a transition to formal algebraic reasoning, with grades 7-8 emphasizing algebra-readiness through work with linear relationships, equations, functions, geometry, and introductory statistics.

Grades K-6 will use Primary Mathematics 2022 Edition, an award-winning U.S. adaptation of the Singapore mathematics approach. As noted above, international studies have consistently recognized Singapore mathematics' effectiveness and its emphasis on conceptual understanding, number sense, and problem-solving.[119] [120] Singapore instruction follows a concrete-pictorial-abstract (CPA) progression in which students first work with physical objects (manipulatives), then visual representations (drawings, diagrams, bar models), and finally symbolic notation (math symbols, equations). The CPA approach supports diverse learners by reducing cognitive load, clarifying abstract concepts, and ensuring that students develop both confidence and competence as they progress. Additionally, it helps students internalize mathematical concepts and reduces reliance on rote memorization.

Because WAK anticipates that grades 7-8 may serve as a common entry point for new students, the mathematics curriculum in these grades was selected in part for its accessibility, coherence, and capacity to support students with varied prior mathematical preparation. Grades 7-8 will use Carnegie Learning as the core mathematics curriculum, relying on its print-based textbooks and workbooks rather than its digital components. Carnegie Learning employs a problem-based instructional model that aligns closely with the instructional approach used in grades K-6 by emphasizing conceptual understanding, mathematical reasoning, and productive struggle. Lessons are structured to engage students in analyzing rich mathematical tasks, discussing multiple solution strategies, and articulating their reasoning with clarity and precision. The curriculum carefully sequences concepts from concrete reasoning to increasingly abstract algebraic thinking. Students are regularly asked to interpret representations, make conjectures, justify conclusions, and revise their thinking based on evidence and feedback. Clear worked examples, guided practice, and cumulative review support both conceptual understanding and procedural fluency while maintaining high expectations for mathematical discourse and reasoning, ensuring that all students are prepared for success in high school mathematics.

Carnegie Learning's instructional approach has been studied extensively in U.S. classrooms and is grounded in research on how students best learn mathematics, particularly during the transition to algebra. Its emphasis on coherent progressions, multiple representations, and teacher-facilitated discussion supports diverse learners by making mathematical thinking explicit

[119] https://timssandpirls.bc.edu/timss2015/international-results/timss2015/wp-content/uploads/2016/T15-20-years-of-TIMSS.pdf

[120] https://www.oecd.org/content/dam/oecd/en/publications/reports/2023/12/pisa-2022-results-volume-i_76772a36/53f23881-en.pdf

and accessible. When implemented through structured classroom instruction, the curriculum has been shown to support strong outcomes for students with varied levels of prior preparation, including those who enter middle school with unfinished learning.[121] By using Carnegie Learning's thoughtfully designed print resources, WAK will ensure that all students develop deep understanding and readiness for high school mathematics through focused instruction, careful practice, and sustained engagement with meaningful mathematical problems.

WAK's mathematics curriculum is intentionally designed to serve a diverse student population, including students with varied levels of prior preparation and those who may enter with unfinished learning. Across all grade levels, instruction emphasizes explicit modeling, guided practice, visual representations, and structured problem-solving routines that make mathematical thinking clear, accessible, and transferable. The consistent use of multiple representations supports English learners and students with language-based learning differences, while mastery-based pacing ensures that students are not advanced before they have secured foundational understanding. Opportunities for small-group instruction, targeted intervention, and enrichment are embedded within the curriculum structure, allowing teachers to respond effectively to individual student needs without fragmenting instruction.

This coherent, mastery-oriented approach is particularly well suited to students who require additional support to close foundational gaps, while also providing appropriate challenge for students ready to extend their learning. By pairing the conceptual strength and coherence of Singapore mathematics in the elementary grades with the algebra-focused progression of Carnegie Learning in middle school, WAK will ensure a smooth and intentional transition from concrete reasoning to abstract mathematical thinking. As a result, students will develop the skills, confidence, and habits of mind necessary for success in high school mathematics and for informed participation in a numerate society.

Science

WAK's science curriculum rests on the understanding that children are born investigators with a natural sense of wonder and curiosity about the way things work. In science classes at WAK, students will be treated as young scientists who are developing the knowledge, skills, and dispositions necessary to become attentive observers, thoughtful and capable problem-solvers, and informed and respectful stewards of the natural world. The structured and joyful study of science supports WAK's mission by providing a meaningful avenue for the pursuit of truth and the cultivation of virtues such as humility, patience, wonder, and respect.

Across all grade levels, science content will be carefully scaffolded so that students build progressively more complex explanations of scientific concepts and natural phenomena while practicing core scientific skills such as inquiry, observation, classification, analysis, and evidence-based reasoning. Through this progression, WAK's science curriculum will cultivate students'

[121] https://www.carnegielearning.com/why-cl/research/

curiosity and wonder toward the natural world while strengthening their capacity for disciplined inquiry, careful observation, and thoughtful problem-solving.

Science instruction will follow a content-rich, discovery-based approach that emphasizes first-hand observation of natural phenomena and is developmentally sequenced across grade levels. In the early grades (K-2), students will engage in concrete observation and description of the natural world, such as studying life cycles or weather patterns, while building foundational scientific vocabulary and habits of attention. In the upper elementary and middle grades (3-8), students will revisit and extend earlier concepts with increasing precision as they investigate physical, life, earth, and engineering sciences; analyze data; develop models; and construct evidence-based explanations using increasingly formal scientific language. Through this coherent progression, students will build durable scientific knowledge while practicing core skills of inquiry, observation, classification, analysis, and reasoning.

Grades K-8 at WAK will utilize Core Knowledge Science (CKSci) as the primary science curriculum, supplemented by FOSS equipment kits for experiments and demonstrations. CKSci provides developmentally appropriate, content-rich instruction across physical, life, earth, and space sciences, as well as engineering and technology. CKSci's units, Teacher Guide, and read-aloud Student Books intentionally spiral content and integrate science-based informational texts to support academic vocabulary development and reading comprehension.

FOSS kits are closely aligned with CKSci's sequence and will be used strategically to reinforce core concepts through hands-on, discovery-based, and experiential learning. FOSS's accessible and multimodal approach engages all students in active investigation of local and relevant phenomena, allowing them to observe firsthand and relate scientific concepts to the world they know in Tennessee. This approach "leverages students' prior knowledge, offers direct access and connection to their world, levels the playing field for all students, allows student-generated questioning and experimentation, and ensures developmentally appropriate phenomena."[122]

Both CKSci and FOSS are aligned to Tennessee Academic Standards in science and English language arts, the Next Generation Science Standards (NGSS), and the National Research Council's *Framework for K-12 Science Education* (2012). Together, they integrate disciplinary core ideas, crosscutting concepts, and science and engineering practices within a coherent, carefully sequenced progression.

The CKSci curriculum has been selected for its content-rich materials and its proven success with diverse student populations. Schools implementing the Core Knowledge Sequence have demonstrated strong academic outcomes relative to national benchmarks. A national study conducted by researchers from the University of Missouri examined student achievement in 22 Core Knowledge schools across 13 states over a six-year period (1998-2003) and found that students consistently scored higher than the national average across multiple content areas,

[122] https://www.foss-science.com/foss-in-your-state/tennessee/

including science.[123] Disaggregated analyses further showed that schools serving higher proportions of minority, EL, and economically disadvantaged students also performed above national norms. Based on these findings, the researchers concluded that there is a strong relationship between student performance and the Core Knowledge curriculum.

Subsequent research in cognitive science and curriculum design has reinforced the conclusion that systematic exposure to knowledge-rich curricula is strongly associated with improved student performance, including gains in reading comprehension and more equitable outcomes for historically under-served students (see the Content-Rich Instruction section above). National assessment frameworks recognize the central role of background knowledge in academic success.

Developed by the University of California, Berkeley's Lawrence Hall of Science, FOSS has also demonstrated effectiveness in improving science achievement across diverse settings, including districts in Tennessee.[124] Its collaborative, hands-on approach to investigating observable phenomena has been shown over decades to raise science test scores, narrow achievement gaps, and support all students in achieving proficiency. According to a 2019 FOSS report, the program "has been taught by over 100,000 teachers to more than 3.5 million students in all 50 states" and "has earned recognition by experts and organizations for its proven quality, rigor, support, and effectiveness."[125] In a study of Hampton City schools from 2013 to 2018, "FOSS was implemented in a large Virginia district that lagged nationwide test norms by 17 percentage points. By 2018, just three years after full-scale Foss implementation, the gap was completely closed."[126] FOSS consistently helps raise science test scores where implemented, in addition to offering extensive resources for professional learning, ongoing teacher support, Spanish language support, standards alignment, and best-in-class leadership as the "largest publisher of curriculum-based elementary school science kits in the United States."[127]

This curriculum is particularly well suited to WAK's anticipated student population, as its combination of systematic knowledge-building and hands-on investigation supports students with varied prior experiences, language backgrounds, and learning needs. By pairing the systematic progression of Core Knowledge Science with the experiential learning opportunities provided by FOSS, WAK prepares all students to engage thoughtfully with scientific ideas, succeed on Tennessee assessments, and approach the study of science with curiosity, discipline, and joy.

---

[123] https://www.coreknowledge.org/wp-content/uploads/2016/12/CK_National_Study_2004.pdf
[124] https://www.foss-science.com/foss-in-your-state/tennessee/
[125] https://cdn.edreports.org/series/ag9zfmVkcmVwb3J0cy13ZWJyHAsSCVB1Ymxpc2hlchhRDAsSBlNlcmllcxiqAQw/publisher-background_6-8.pdf
[126] https://cdn.edreports.org/series/ag9zfmVkcmVwb3J0cy13ZWJyHAsSCVB1Ymxpc2hlchhRDAsSBlNlcmllcxiqAQw/publisher-background_6-8.pdf
[127] https://cdn.edreports.org/series/ag9zfmVkcmVwb3J0cy13ZWJyHAsSCVB1Ymxpc2hlchhRDAsSBlNlcmllcxiqAQw/publisher-background_6-8.pdf

History

Wilberforce's history curriculum meets the Tennessee Academic Standards for Social Studies across all required content strands—culture, economics, geography, history, politics/government, Tennessee, and Tennessee Code Annotated—with a particular emphasis on American civics. In addition to meeting state standards, the curriculum's content-rich, language-centered approach supports the development of literacy and English language arts skills by building students' background knowledge, academic vocabulary, and comprehension of complex texts. Given the anticipated diversity of academic preparation among WAK's students, a content-rich and chronological history curriculum ensures that essential historical knowledge is taught explicitly rather than assumed, providing all students equitable access to the background knowledge required for literacy, civic understanding, and success on Tennessee assessments.

Across all grades, the goals of the history curriculum will be to develop long-term memory of historical events, lessons, and texts; to cultivate the skills of historical thinking; and to foster a disposition of respect, humility, and appreciation toward the past. Overall, the study of history at WAK will introduce all students to the story of the past while progressively cultivating their ability to think like historians and informed citizens.

To these ends, history at WAK will be taught as a coherent, chronological narrative that enables students to understand the development of civilizations, cultures, ideas, and institutions over time. This approach intentionally prioritizes *what* happened before asking students to analyze *why* events occurred or *with what consequences*. By first establishing a shared body of historical knowledge in the earlier grades, students will acquire the background understanding necessary for deeper discussion, comparison, and analysis later in their education.

History instruction will be intentionally content-rich, emphasizing key events, dates, figures, geography, and vocabulary across world regions and time periods so that students build a strong foundation for historical thinking and civic understanding. Teachers will employ vivid storytelling, maps, timelines, and artifacts to help students form a coherent mental framework of time, place, and causation. Emphasis will also be given to primary source texts, enabling students to encounter history through the voices of the past on their own terms rather than exclusively through modern summaries. Where applicable, history classes will make frequent and explicit connections to the ideas, historical contexts, and civic principles that have shaped American and Tennessean self-government.

Content and instruction will be carefully scaffolded across grade levels. In early elementary (K-2), history instruction will be primarily story-based, focusing on foundational narratives, major figures, and simple cause-and-effect relationships, with an emphasis on listening, retelling, and memorization of key facts. In the upper elementary grades (3-6), students will revisit earlier material while expanding their study to include a broader range of civilizations, regions, and historical periods, along with increased attention to geography, timelines, and civic ideas. By the middle grades (7-8), students will return again to familiar content with greater depth and

sophistication, comparing civilizations, forms of government, and historical events; analyzing primary sources; and engaging more explicitly with questions of political philosophy, constitutional principles, and historical interpretation. Across all grades, students will memorize age-appropriate passages from foundational historical founding documents, speeches, and poems.

The primary history curriculum at WAK will be Core Knowledge History, supplemented by Susan Wise Bauer's *The Story of the World* (K-6) and Dr. Wilfred McClay's *Land of Hope* (7-8). History classes will also utilize materials from the Tennessee Blue Book, as well as primary documents from world and American history.

These curricular materials were chosen for their content richness and endorsement by the Tennessee Department of Education, expert historians, and the research base on content rich-instruction and Core Knowledge referenced above (see the Content-Rich Instruction and Science sections). *The Story of the World* and *Land of Hope* use a chronological, narrative approach well suited to the K-8 grade span and are rich in maps, illustrations, timelines, and primary source references.

Research in educational psychology and pedagogy indicates that narrative approaches to history instruction increase both teacher and student engagement while improving comprehension and retention of content.[128] Powerful stories capture students' imagination, inspire wonder, and help them understand how the past has shaped the present. By pairing this narrative approach with systematic content progression and primary-source engagement, WAK's history curriculum supports the school mission to pursue truth in a patient and structured environment, and it ensures that students enter high school with both a shared historical foundation and the habits of mind necessary for thoughtful civic participation.

**Summary**

In summary, WAK has selected a coherent set of high-quality instructional materials that advance the school's mission and are designed to ensure mastery of the Tennessee Academic Standards across all core subjects. The curriculum selection process was deliberate and research-informed, grounded in evidence-based practices and aligned to the needs of the anticipated student population, including students with varied prior preparation and learning needs. Pursuant to T.C.A. § 49-6-2206, WAK will seek approval to use specific standards-aligned materials not on the state-approved textbook list, as summarized in the Waivers section, and will maintain a formal process for verifying standards alignment and monitoring effectiveness over time. Together, these materials provide a rigorous, content-rich classical education supported by clear instructional coherence, targeted intervention and extension pathways, and a commitment to continuous improvement in service of strong student outcomes.

[128] https://fordhaminstitute.org/national/commentary/case-storytelling-history-curriculum

*22. For schools that will serve any of grades K-5, explain how the proposed school will incorporate foundational literacy instruction in accordance with T.C.A. § 49-1-905. If the proposed school will not serve any of grades K-5, indicate N/A.*

WAK will serve students in grades K-8 and will implement a literacy program in full compliance with the Tennessee Literacy Success Act (TLSA). Wilberforce's literacy program is grounded in the Science of Reading and is designed to ensure that all students in grades K-5 receive systematic, explicit, cumulative, and evidence-based instruction in foundational literacy skills that support long-term reading and writing proficiency.

A core purpose of WAK is to prepare the hearts and minds of students through the patient and rigorous pursuit of truth. This pursuit depends on a firm foundation in reading and writing. Primary literacy is not merely a discrete academic skill but the gateway to all further learning. Fluent reading and writing enable students to engage deeply with language, think clearly, communicate effectively, and encounter the great thinkers and texts that have shaped Western civilization and American civic life. Accordingly, Wilberforce's literacy program emphasizes mastery of phonemic awareness, phonics, spelling, handwriting, vocabulary, syntax, and oral language so that students are prepared to move from learning to read to reading in order to learn.

Without this foundation, which must be patiently and thoroughly laid in grades K-3, access to higher-order logical thinking, rich texts, and disciplined inquiry is limited. Fluent readers and writers are better equipped to succeed across the curriculum in mathematics, science, history, and literature, as well as to participate thoughtfully in discussion and written expression. Wilberforce will promote reading fluency and comprehension through a language-rich environment, explicit phonics instruction, and a content-rich curriculum that gives students the background knowledge and vocabulary which are essential to achieving high levels of reading comprehension and writing skills.

Wilberforce wholeheartedly affirms the findings and policy goals of the General Assembly as set forth in T.C.A. § 49-1-902: "It is the policy of this state that LEAs and the department of education move toward the goal of every […] student being able to read at an appropriate level before being promoted beyond the third grade" because

1. "A literate society is essential to maintaining a free society;
2. "There is a need to improve literacy rates across the state;
3. "In 2019, Tennessee's third grade English language arts proficiency rate was thirty-six and nine-tenths percent (36.9%);
4. "In 2019, Tennessee's eighth grade English language arts proficiency rate was twenty-seven and one-tenth percent (27.1%); and
5. "In 2019, Tennessee ranked thirty-first in the nation in fourth grade reading proficiency and thirtieth in eighth grade reading proficiency."

In alignment with T.C.A. § 49-1-905(a), strong literacy outcomes will be the principal goal of WAK's English language arts (ELA) program in grades K-3. Wilberforce will support students in achieving high rates of literacy through proactive, research-supported, and phonics-based foundational literacy instruction. Pursuant to T.C.A. § 49-1-905(f), Wilberforce will develop and submit to the Tennessee Department of Education for approval a foundational literacy skills plan (FLSP) for students in grades K-5. Wilberforce's FLSP will address each of the required statutory elements, including instructional time, curriculum materials, assessment, intervention, and professional development, as described below.

**Daily Foundational Literacy Skills Instructional Time for Grades K-3**

In accordance with T.C.A. § 49-1-905(f)(1), Wilberforce's foundational literacy instruction will specify the amount and use of daily instructional time devoted to foundational literacy skills in grades K-5. The daily academic schedule in grades K-3 will include 150 minutes of ELA instruction aligned to Tennessee academic standards and consistent with Tennessee Department of Education's Response to Instruction and Intervention ($RTI^2$) framework. This time will include:

- 90 minutes of Tier 1 core instruction (broken into 2 45-minute blocks),
- 40 minutes of leveled reading practice and/or targeted intervention and support for students identified through the $RTI^2$ framework as needing Tier 2 or Tier 3 intervention, and
- 20 minutes of classical literature and poetry.

Wilberforce will implement Tennessee's $RTI^2$ framework to ensure "all students have access to grade level curriculum and the greatest opportunity for academic success" through scaffolded instruction and early individualized intervention.[129] According to the $RTI^2$ framework manual, high-quality core instruction is considered the first and primary means of establishing strong foundational literacy. At Wilberforce, core instruction will be explicit, direct, multi-sensory, scaffolded, responsive to student needs, and informed by formative assessment and universal screener data. Specific multisensory instructional practices will include structured oral and written phonemic awareness activities, whole-class choral recitation of phonograms and spelling rules, oral and written blending and segmenting, finger tracing, handwriting modeling, dictation, and punctuated review to reinforce skills to mastery. Literacy instruction at Wilberforce will emphasize understanding the structure of language rather than rote memorization alone, enabling students to internalize sound-symbol relationships and efficient handwriting techniques so that they can apply the skills of reading and writing independently in any context.

During leveled reading practice, students of similar reading levels will be paired to read aloud, providing practice for on-level readers and enrichment for advanced readers. This time will also serve as an intervention period for students identified through Tennessee's Response to Instruction and Intervention ($RTI^2$) framework as needing Tier 2 or Tier 3 intervention, as defined

[129] https://www.tn.gov/content/dam/tn/education/special-education/rti/Updated_RTI2_Manual.pdf

in Rule 0520-01-03-.15(1)(c)-(d). Those students will receive early and targeted intervention to close skill gaps and reinforce foundational concepts.

During the literature block, teachers will read classical literature and poetry aloud to their students, and selections will be memorized and discussed as a class. In addition to forming students' imaginations through rich stories, these activities build students' oral vocabulary and accelerate their ability to read, comprehend, and spell more advanced vocabulary in the future.[130]

**Foundational Literacy Skills Instructional Materials for Grades K-3**

In accordance with T.C.A. § 49-1-905(b), Wilberforce will use high-quality instructional materials aligned to Tennessee Academic Standards and grounded in the Science of Reading. The primary Tier 1 curriculum for grades K-3 will be Literacy Essentials by Access Literacy, LLC. A structured, sequential, and Orton-Gillingham-based program, Literacy Essentials provides explicit instruction in phonemic awareness, phonics, spelling, handwriting, grammar, vocabulary, and reading comprehension. The curriculum includes daily teacher resources for lesson planning, cumulative review and assessment, and built-in differentiation to support diverse learners. Consistent with T.C.A. § 49-6-1034, Literacy Essentials provides instruction in both manuscript and cursive writing, beginning with oral phonemic awareness and proper pencil grip and progressing systematically to stroke-by-stroke letter formation and writing fluency. Along with the Literacy Essentials curriculum, Wilberforce will use Primary Phonics readers for leveled reading practice.

To support oral language development, background knowledge, and reading skills, Wilberforce will implement a content-rich curriculum that includes a classical literature and poetry program for grades K-8 informed by the reading lists of other successful classical charter schools. Teachers will regularly read classic stories, fables, myths, and poems that awaken students' wonder for language, support their phonemic awareness, and expand their comprehensible vocabulary. As recommended by Literacy Essentials, each read-aloud text will be "approximately two grade levels above their reading level so that students are exposed to higher level vocabulary and more complex sentence structure than they are using. Reading aloud rich text with conversation builds the next level of oral comprehensible vocabulary, i.e., words more advanced from the vocabulary students use in their personal oral language. They are practicing orally the vocabulary we will teach them to spell and read in the future."[131] All literacy instruction at Wilberforce will be supported by a language-rich environment because strong oral language skills support strong written language skills.

In addition to Literacy Essentials, supplementary instructional materials will include The Logic of English to reinforce phonics and morphology in grades 1-3, and *English from the Roots Up* to support vocabulary development through Greek and Latin roots in grades 4-5. For students in

---

[130] Dorothy Kardatzke and Melody Furno, *Literacy Essentials: The Journey from Spelling to Reading, Kindergarten First Semester* (Access Literacy, Hillsdale College, 2019), 8.

[131] Kardatzke and Furno, *Literacy Essentials*, 8.

any grade who exhibit characteristics of dyslexia or other language-based learning disabilities, Wilberforce will use the Wilson Reading System, an "evidence-backed, multi-tiered reading system [that] empowers students to become fluent, independent readers" using the Science of Reading and the Orton-Gillingham principles of instruction.[132] Wilson has demonstrated success in improving reading scores, and its teacher training programs are accredited by the International Dyslexia Association (IDA).

**Use of an Approved Universal Screener**

In compliance with T.C.A. § 49-1-905(c) and State Board Rule 0520-01-03-.15, Wilberforce will administer a Tennessee-approved universal reading screener, DIBELs, 8th Edition, to all students in grades K-3 three times per year. This screener complies with the $RTI^2$ and Say Dyslexia requirements in State Board of Education Rule 0520-01-03-.15. Screener data will be used to identify students with a significant reading deficiency or who are at risk for such deficiency, and to inform instructional planning and intervention placement.

**Interventions and Support for Literacy**

Wilberforce anticipates that many of our students will enter the school below grade level in literacy. Accordingly, Wilberforce has designed its daily schedule to include significant portions of high-quality core ELA instruction and a daily block devoted to literacy practice and intervention in grades K-5. Students identified through universal screening as having significant reading deficiency (≤15th percentile) or as at risk (16th-40th percentile) will receive timely, individualized, and data-based intervention in accordance with the $RTI^2$ framework manual and State Board Rules 0520-01-03-.15(1)(c)-(d). Intervention will occur during the daily intervention block and, as appropriate, through optional no-cost after-school tutoring through Wilberforce's partnership with Thrive and summer learning opportunities.

If a screener indicates that a student exhibits characteristics of dyslexia, Wilberforce will notify the parent, provide required informational resources, implement appropriate dyslexia interventions, and monitor progress, consistent with T.C.A. § 49-1-905(d) and T.C.A. § 49-1-229.

**Ongoing Professional Development and Training for Teachers**

Pursuant to T.C.A. § 49-1-906(b), Wilberforce will provide ongoing professional development to ensure high-quality literacy instruction. Teachers in grades K-5 will receive initial and ongoing training in the school's standards-aligned literacy curriculum, universal screening process, evidence-based instructional methods, and the use of formative and summative assessment data to guide instruction. Professional development will be overseen by the Dean of Curriculum and Instruction and will include summer training, coaching, collaborative planning, and ongoing instructional support throughout the school year.

---

[132] https://www.wilsonlanguage.com

*23. For schools that will serve any of grades 9-12, describe the proposed school's plans for ensuring students have opportunities to meet college and career readiness indicators (e.g., early post-secondary opportunities, work-based learning, ACT, advanced coursework, dual enrollment). If the proposed school will not serve any of grades 9-12, indicate N/A.*

N/A

## 1.7 Special Populations

*24. Describe the proposed school's plans to ensure adequate numbers of appropriately certified staff to support the anticipated population of students with disabilities, English learner students, and gifted students (e.g., contract with a vendor, hire staff member(s) internally).*

WAK is committed to ensuring that all students, including students with disabilities, English learners, and students identified as gifted, are supported by an adequate number of appropriately certified and qualified educators. Based on comparable enrollment and demographic data from surrounding public schools in Knox County, WAK anticipates that its students with disabilities population will grow to approximately 18% of the total student population, and that the English learners population will grow to approximately 11%. These projections have informed a staffing model intentionally designed to meet anticipated needs while remaining flexible and responsive as enrollment grows.

In its first year of operation, WAK will have a team of three employees (2.5 FTEs) to meet the needs of our special populations. Oversight of all special populations will be provided by a Director of Specialized Services, who will be responsible for ensuring compliance with the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973, Title III of the Every Student Succeeds Act (ESSA), and all applicable Tennessee Department of Education rules and guidance. This role will include supervising service delivery, monitoring caseloads, overseeing contracts, and ensuring that all staff and service providers hold appropriate Tennessee licensure and endorsements.

WAK will launch with a full-time licensed special education teacher who meets all Tennessee licensure requirements. This teacher will provide Specialized Academic Instruction (SAI) and support the faithful implementation of students' Individualized Education Programs (IEPs) with both rigor and care, ensuring that each student is supported academically and developmentally. In keeping with the school's commitment to attending to the hearts and minds of students, caseloads will be closely monitored by the Director of Specialized Services, and staffing levels will be adjusted as necessary to ensure appropriate service intensity and individualized support.

WAK will serve English learners in compliance with Title VI of the Civil Rights Act of 1964, Title III of ESSA, and the principles established in Lau v. Nichols.[133] Wilberforce will open with one part time EL teacher. As with special education teachers, caseloads will be closely monitored by the Director of Specialized Services, and staffing levels will be adjusted as necessary to ensure appropriate service and support is delivered. The Director of Specialized services will ensure that EL instructional staff are appropriately trained to provide evidence-based language supports, such as Specially Designed Academic Instruction in English (SDAIE strategies), and trained in the English Language Proficiency (ELP) standards. Identification, placement, progress monitoring, and reclassification procedures will align with Tennessee Department of Education guidance and will be overseen by the Director of Specialized Services.

The Director of Specialized Services will also oversee gifted identification and service delivery, ensuring that students receive instruction from educators who are trained in gifted and talented education standards and strategies. Staffing and service models will be reviewed annually and adjusted based on identification rates and student need.

To ensure access to highly qualified related service providers, WAK will contract with a provider such as River Valley Health (formerly Cherokee Health Systems) for the provision of speech-language pathology, occupational therapy, physical therapy, and any other related services required beyond SAI. This approach allows WAK to leverage existing expertise and ensures that all required services are delivered by credentialed professionals at no cost to families, as required under federal law. Services will be provided in accordance with students' IEPs and coordinated to minimize disruption to instructional time.

WAK recognizes that enrollment growth and evolving student needs will require additional staffing or expanded contracted services over time. We are committed to ongoing review of caseloads, service effectiveness, and compliance obligations and will add personnel or services as needed to ensure that all students receive equitable, high-quality support.

Through this staffing model, grounded in local data, legal compliance, and respect for student dignity, WAK will ensure that students with disabilities, English learners, and gifted students are supported by qualified professionals and provided meaningful access to a rigorous and supportive educational program.

*25. Explain how the school will identify and meet the learning needs of students with disabilities, including students with higher needs, in the least restrictive environment possible. Specify the programs, strategies, and supports you will provide, including the following:*

- *Methods for identifying students with special education needs (and avoiding misidentification);*

[133] https://www.tn.gov/content/dam/tn/tn-public-charter-school-commission/documents/rules-and-policies/lea_policies/2025-audit/4207_English%20Learners%20Policy_Current_ADA.pdf

- *Specific instructional programs, practices, strategies, curriculum, and materials the school will employ to provide a continuum of services; ensure students' access to the general education curriculum; abide by required minutes; and ensure academic success for students with special education needs; and*
- *Plans for monitoring and evaluating the progress and success of special education students with mild, moderate, and severe needs to ensure the attainment of each student's goals as set forth in the Individualized Education Program (IEP) or 504 Plan.*

**Identification and Service Delivery for Students with Disabilities**

WAK is committed to identifying and meeting the learning needs of students with disabilities through an inclusion-focused service model that provides individualized supports in the least restrictive environment (LRE) appropriate for each student, as required by the Individuals with Disabilities Education Act (IDEA, 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114). The school will ensure that all students with disabilities, including those with mild, moderate, and higher needs, have access to the general education curriculum while receiving the specialized instruction and related services necessary to make meaningful progress toward their Individualized Education Program (IEP) goal or 504 accommodations.

**Identification of Students with Disabilities and Prevention of Misidentification**

WAK will fully comply with federal Child Find requirements, which require covered schools to identify, locate, and evaluate all children suspected of having disabilities and in need of special education or related services.[134]

To meet these obligations while preventing inappropriate referrals or misidentification, WAK will implement the following practices:

- Universal Screening and Benchmark Assessments:
  - DIBELS (K-2) to assess early literacy development
  - NWEA MAP Growth (grades 3-8) to measure academic achievement and growth
- RTI² Framework: As discussed in questions 22 and 29, WAK will implement Tennessee's RTI² (Response to Instruction and Intervention) framework,[135] providing tiered, research-based interventions with progress monitoring to determine student responsiveness prior to referral for special education evaluation when appropriate.
- Data-Based Referral Decisions: Referral decisions will be based on multiple data sources and not on a single measure, consistent with IDEA requirements (34 C.F.R. § 300.304). Such data sources may include universal screeners, benchmark assessments and teacher observations.
- Family Engagement: Families will be engaged throughout the identification and evaluation processes and provided procedural safeguards as required by IDEA (20 U.S.C. § 1415; 34 C.F.R. § 300.504).

---

[134] https://sites.ed.gov/idea/regs/b/b/300.111

[135] https://www.tn.gov/content/dam/tn/education/special-education/rti/Updated_RTI2_Manual.pdf

**Student Study and IEP Teams:**
WAK will utilize a multidisciplinary Student Study Team (SST) process to review concerns about a student's academic, behavioral, or social-emotional performance prior to referral for a special education evaluation, when appropriate. The SST will include school leadership, general education teachers, interventionists, and other relevant staff, and will meet regularly to analyze student data, review intervention fidelity and progress monitoring results, and determine next steps. When a student is suspected of having a disability, the SST will recommend a formal evaluation in accordance with IDEA requirements.

For students found eligible for special education, an Individualized Education Program (IEP) Team, which is comprised of the parent/guardian, general and special education teachers, a school administrator or designee, and other required participants, will develop, implement, and regularly review the student's IEP. IEP Team decisions will be data-driven, individualized, and focused on ensuring access to the general education curriculum in the least restrictive environment, consistent with IDEA (20 U.S.C. § 1414; 34 C.F.R. §§ 300.320-300.324).

**Comprehensive Evaluations and Related Services**
WAK plans to partner with a provider such as River Valley Health (formerly known as Cherokee Health Systems) to provide comprehensive special education evaluations in order to determine eligibility, and to provide related services, including speech-language therapy, occupational therapy (OT), and physical therapy (PT). These services will be delivered by appropriately licensed and credentialed providers in accordance with IDEA requirements.

This partnership will ensure:

- Timely and comprehensive evaluations in all suspected areas of disability
- Access to qualified related service providers as required to ensure students with disabilities receive appropriate educational services under T.C.A. § 49-13-111(a)(5)
- Compliance with IDEA provisions allowing LEAs, including charter schools, to fulfill obligations through interagency or contractual arrangements (34 C.F.R. §§ 300.154, 300.208).

WAK will maintain oversight of all services delivered through the provider to ensure alignment with students' IEPs, required service minutes, and fidelity to special education regulations.

**Students Enrolling with Existing IEPs**
When a student enrolls with an existing IEP from another public school, the Director of Specialized Services will review the IEP paperwork, and WAK will immediately provide comparable services consistent with IDEA requirements for transfer students (34 C.F.R. § 300.323). The IEP team will convene promptly to review the existing IEP and revise it as needed to reflect current student needs and the school's instructional context. Services will not be interrupted during this process.

**Instructional Programs, Services, and Continuum of Supports**
WAK will serve students with disabilities primarily through an inclusive general education setting, supplemented by targeted pull-out services when required by the student's IEP.

Key components include:

- Inclusion-Based Instruction: Students will be educated alongside peers to the maximum extent appropriate, supported through co-teaching, push-in services, and collaborative planning.
- Targeted Pull-Out Services: When specified in the IEP, students will receive small-group or individualized pull-out instruction focused on specific IEP goals.
- Specialized Academic Instruction (SAI): Licensed special education teachers will deliver explicit, evidence-based instruction aligned to IEP goals.
- Curriculum Access: Students with disabilities will access the same core curriculum as their peers, with appropriate accommodations, modifications, assistive technology, and supplemental supports (20 U.S.C. § 1412(a)(1)).
- Service Minute and Accommodation Compliance: All required special education and related service minutes and/or accommodations will be delivered as documented in students' IEPs or 504 plans.

**Support for Students with Moderate and Higher Needs**
WAK will provide increased instructional intensity, individualized supports, and related services (including those delivered through the specialized service provider such as River Valley Health), while maintaining placement in the least restrictive environment appropriate to the student's needs (34 C.F.R. § 300.115).

**Monitoring Progress, Evaluation, and Reevaluation**
WAK will maintain a structured system to monitor progress and ensure compliance:

- Progress Monitoring: Regular monitoring of progress toward IEP goals using classroom data, progress monitoring tools such as teacher observations or classroom assessments, and benchmark assessments will occur monthly.
- Benchmark Data Review: Use of DIBELS (K-2) and NWEA MAP Growth (3-8) to inform instructional adjustments.
- Classroom Formative and Summative Assessment Data Review: Use of classroom assessment data to show progress on goals.
- Progress Reporting: Regular progress reports to families delivered in alignment with school wide reporting periods (34 C.F.R. § 300.320).
- Annual IEP Review: IEPs will be reviewed and revised at least annually (20 U.S.C. § 1414(d)). IEP meetings will be held with the IEP team which includes the parents and/or guardians of the student.
- Triennial Reevaluation: Students will be reevaluated at least every three years, or more frequently if warranted (20 U.S.C. § 1414(a)(2); 34 C.F.R. § 300.303).

- Administrative Oversight: The Director of Specialized Services will oversee compliance, service delivery, and coordination with specialized service providers to ensure fidelity to IDEA, and Tennessee statutes

*26. Explain how the school will meet the needs of English learner (EL) students, including the following:*
- *Methods for identifying EL students (and avoiding misidentification);*
- *Specific instructional programs, practices, strategies, curriculum, and materials the school will employ to ensure academic success and equitable access to the core academic program for these students; and*
- *Plans for monitoring and evaluating the progress and success of EL students to ensure the attainment of each student's goals as set forth in the Individualized Learning Plan (ILP), including exiting students from EL services.*

WAK is committed to ensuring that English learners (ELs) have equitable access to high-quality instruction and meaningful participation in the core academic program, in full compliance with Tennessee Public Charter School Commission EL Policy (4207), State Board Rule 0520-01-19, and federal requirements including Title III of the Every Student Succeeds Act (ESSA). Wilberforce's approach honors the dignity of each student and is designed to support both English language development and academic achievement.

**Identification of English Learners and Avoiding Misidentification**

Upon enrollment, every parent will complete a Home Language Survey (HLS) for their child(ren) to determine if a language other than English is used in the home or by the student. This two-step process, beginning with the HLS and followed by an assessment of English proficiency using the state-approved ELPA21 screener, aligns with Tennessee's required identification process and ensures timely and reliable classification of EL students. If a student's primary or home language indicates a potential language need, the ELPA21 Dynamic Screener will be administered to measure English speaking, listening, reading, and writing. Students with disabilities who cannot access the traditional screener will be assessed using an alternate screener, ensuring we do not incorrectly identify students due to accessibility barriers. This process helps avoid misidentification that can occur when language proficiency challenges are confused with other needs.[136] [137]

**Instructional Programs and Practices for Academic Success and Equitable Access**

Upon identification as English learners (ELs), students at Wilberforce will be served through a Structured English Immersion (SEI) program designed to provide intensive, explicit English

[136] https://www.tn.gov/content/dam/tn/tn-public-charter-school-commission/documents/rules-and-policies/lea_policies/2025-audit/4207_English%20Learners%20Policy_Current_ADA.pdf

[137] https://www.tn.gov/content/dam/tn/tn-public-charter-school-commission/documents/rules-and-policies/lea-procedures/2025-procedure-audit/LEA_1005_English%20Learners%20Monitoring%20Procedures_FINAL_ADA.pdf?utm

language instruction while ensuring meaningful access to grade-level academic content. The SEI program will be educationally sound, evidence-based, and fully aligned with the Tennessee English Language Development (ELD) Standards, Title III requirements, and applicable state and federal laws.

The primary language of instruction in the SEI program will be English, with targeted linguistic supports to promote rapid English language acquisition across listening, speaking, reading, and writing domains.

**Instructional Model and Service Delivery**

EL instruction will be delivered through a clearly defined continuum of services that includes:

- Direct ESL Instruction: EL students will receive scheduled, direct English language development instruction focused on vocabulary acquisition, language structures, academic discourse, and comprehension aligned to Tennessee ELD standards. Direct ESL instruction may occur in small-group or push-in settings, depending on student proficiency levels and instructional needs.
- Integrated Language Support in Core Content: In addition to direct ESL instruction, EL students will receive structured language supports embedded within core academic instruction in English language arts, mathematics, science, and social studies. Instruction will emphasize both accelerated English acquisition and access to grade-level standards, ensuring that language development occurs in meaningful academic contexts.
- Linguistic Scaffolding and Differentiation: Teachers will implement research-based instructional strategies such as explicit vocabulary instruction, sentence frames, visual supports, modeled language, and structured academic talk to scaffold comprehension and production while maintaining high academic expectations.

**Staffing and Instructional Expertise**

Wilberforce will open with one part-time EL teacher, with plans to hire more as enrollment and needs rise. This teacher will support the direct ESL services of identified students. He or she will also collaborate closely with the general education teacher to ensure delivery of high-quality English language development instruction and consistent language supports across the core subjects.

General education teachers will receive ongoing professional development to support effective SEI implementation, including training in:

- Sheltered instruction and SDAIE strategies
- Differentiation and scaffolding for language learners
- Use of formative language assessments to guide instruction
- Culturally responsive instructional practices that support student engagement and belonging

**Indirect ESL Services and Parent Choice**

Title III of the Every Student Succeeds Act (ESSA) guarantees parents the right to waive Direct ESL services. In such cases, students will receive Indirect ESL services within the general education classroom. General education teachers, under the guidance of the school's EL coordinator, will implement appropriate accommodations, scaffolds, and language supports to ensure meaningful access to instruction. All services and supports will be documented and implemented in compliance with district policy and Tennessee Charter School Commission expectations.

**Monitoring, Evaluation, and ILP Implementation**

For each EL student receiving Direct or Indirect ESL Services, WAK will develop an Individualized Learning Plan (ILP) that clearly articulates language proficiency goals, academic benchmarks, instructional strategies, and accommodations. ILPs will integrate multiple data sources including English language proficiency assessment results, demographic data, relevant benchmark assessments such as DIBELS (K-2) and NWEA Map Growth (3-8), and classroom performance measures. These plans are designed to support language acquisition while enabling meaningful access to core instruction throughout the school day.

ILPs will be monitored at least quarterly to evaluate progress toward language and academic goals, and the EL team, including the EL coordinator, classroom teachers, and families, will adjust supports as needed based on data. Students will be annually assessed with the state-adopted English language proficiency assessment to determine readiness for exiting EL services. Once students achieve proficiency sufficient to access grade-level instruction without targeted language support, they will be exited from direct ESL services but will continue to be monitored as Transitional ELs for up to four years, ensuring continued success and providing interventions if necessary.

**Family Communication and Involvement**

Consistent with Tennessee and federal policy, families of EL students will receive clear information in a language they understand regarding the reasons for EL identification, English proficiency levels, instructional supports provided, and exit criteria. They will also be apprised of how the program meets their child's needs and how to participate in ongoing planning and monitoring of their student's progress, strengthening the home-school partnership needed to support EL success.

By implementing a comprehensive EL identification process, evidence-based instructional programs, and robust ILP development and monitoring, WAK will ensure that English learners are supported academically and linguistically, equitably accessing all aspects of the school's curriculum and opportunities for success.

1.8 Student Assessment and Evaluation

*27. In addition to all mandatory state assessments, identify other formative and/or summative assessments the school will use to assess student learning needs and progress throughout the year and describe the frequency with which those assessments will be administered. Explain how those assessments are aligned with Tennessee Academic Standards and the proposed school's curriculum and instructional model.*

WAK believes that a balanced program of assessments is critical for student success. To that end, WAK will utilize a combination of standardized assessments to measure academic growth against national norms alongside curriculum-specific, internally developed assessments to ensure mastery of the core knowledge and skills articulated in our classical curriculum and classroom instruction. Formative, interim, summative, and diagnostic assessments are included in the overall assessment plan. Each assessment program serves a different function, and they complement one another, helping to inform, direct, and track student learning in each class by providing teachers and parents with timely, accurate, and actionable data. While Wilberforce does not place undue emphasis on formal assessments, having regular meaningful assessments ensures that instruction is evidence-informed, focused, and impactful.

**Assessment Overview**

NWEA MAP

The NWEA MAP assessments (Measure of Academic Progress) are computer-based, adaptive assessments. WAK will administer the reading and mathematics assessments to students. The Dean of Curriculum and Instruction will be designated as the NWEA MAP Coordinator. The coordinator will create the testing schedule, testing sessions, and train classroom teachers on how to manage testing sessions, provide testing accommodations, and monitor the testing process. NWEA MAP math assessment measures the eight standards for mathematical practice and the four literacy standards for mathematical proficiency, as well as the foundational literacy standards for K-5 students and the language standards for students in grades 6-8. NWEA MAP assessments also measure individual student academic growth over time against national norms. It provides teachers with immediate, accurate data (Rasch Unit scores or RTI scores) to differentiate instruction and set targeted goals according to TN state standards, measure growth, and inform both intervention and whole-class instruction. The Rasch Unit (RIT) cut scores on the MAP Growth assessments correspond to the TNReady achievement levels and place students into one of four achievement levels: Below, Approaching, On Track, and Mastered. MAP Growth and MAP Reading Fluency met the requirements of the Tennessee Literacy Success Act and the Say Dyslexia Law and are approved as qualified universal reading screeners by the Tennessee Department of Education.

- Type: Diagnostic/Formative/Interim
- Grades: 3-8
- Proctor: Classroom Teacher and Interventionist

- Frequency: Beginning of Year, Winter, End of Year

DIBELS 8th Edition

DIBELS (Dynamic Indicators of Basic Early Literacy Skills) provides efficient, effective measure of reading skills (e.g., Phonemic Awareness, Phonics, Fluency). Data from the DIBELS assessment will be used to inform whole-class instruction, place students into appropriate reading groups, target reading interventions for specific students who are identified as at risk for reading difficulties and track the effectiveness of early literacy instruction. This test has been approved by TDOE as a qualified universal reading screener as part of the Tennessee Literacy Success Act.

- Type: Diagnostic/Interim
- Grades: K-3
- Proctor: Classroom Teacher and Interventionist
- Frequency: Beginning of Year, Winter, Spring

Teacher-Designed Summative Assessments

Teachers will create comprehensive unit tests, designed to measure students' mastery of the core content, skills, and vocabulary covered during each unit. Summative assessments will align with Tennessee Academic Standards, as well as school curricular standards. The unit tests will include a variety of types of questions: multiple choice, fill-in-the blank, short answer, essay, and computational. The variety of questions will assess student mastery of factual knowledge, broad knowledge, recall and application of knowledge, problem-solving skills, higher-level learning, and critical thinking. In courses that have corresponding TCAP assessments, teachers will ensure the following subject-area skills are assessed:

- English language arts tests will assess each student's ability to read closely, analyze text, answer text-dependent questions, provide written response to a prompt, and demonstrate command of the English Language.
- Mathematics tests will assess each student's ability to demonstrate a deep conceptual understanding of mathematics, number sense, fluency, problem-solving, and an understanding of the grade-level horizontal coherence embedded within the standards.
- Science tests will assess each student's understanding of scientific concepts in each core area (life, earth and space, physical, and applied sciences) and key skills such as questioning, modeling, experimentation, data interpretation, evidence-based reasoning, explanation, and computational thinking.
- History tests will assess each student's historical awareness, geographic reasoning, civic and economic literacy, and their ability to analyze primary and secondary source documents from Tennessean, American, and world history—the skills and knowledge embedded in Tennessee's social studies standards.

Data from the unit tests will be used for student grading, identifying knowledge gaps, and evaluating curriculum alignment.

- Type: Summative
- Grades: K-8

- Test Administrator: Classroom Teacher
- Frequency: At the end of each instructional unit (approximately every 1-3 weeks)

Teacher- Designed Formative Assessments

Teachers will design assessments to gather real-time feedback on student comprehension on a frequent basis. Formative assessments will align with Tennessee state standards, as well as school curricular standards. Examples of these assessments are reading checks, quizzes, participation in Socratic discussions, skill practice activities, and exit tickets.

- Type: Formative
- Grades: K-8
- Test Administrator: Classroom Teacher
- Frequency: Multiple times a week (2-5 times)

Literacy Essentials Spelling Assessments

Spelling mastery is assessed using spelling tests based on the list of phonograms or spelling words for the week. Literacy Essentials is a comprehensive literacy program for grades K-3 that utilizes the sound linguistic theory of Orton-Gillingham-based literacy with reading fluency and comprehension and writing and grammar. Spelling assessments ensure mastery of phonics rules and spelling patterns. Data is used immediately by the classroom teacher to reteach specific concepts until mastery is achieved.

- Type: Formative
- Grades: K-3
- Test Administrator: Classroom Teacher
- Frequency: Weekly

Cumulative Primary Mathematics Assessments

Primary Mathematics' cumulative assessments monitor student retention of all previous content. These assessments are given after every two or three chapters and include differentiated questions. Cumulative assessments ensure long-term retention. Data is used by the classroom teacher to determine what concepts need to be reviewed and help inform small group ability groupings and intervention plans.

- Type: Summative
- Grades: K-6
- Test Administrator: Classroom Teacher
- Frequency: Periodic (every 2-3 instructional units)

WAK's rich, rigorous curriculum is fully aligned to Tennessee Academic Standards. In addition to this alignment, the academic rigor, richness of the curriculum, and pedagogy used to instruct students will help ensure that all students meet both state standards and the internal standards of the school. Assessments created and provided by external entities (NWEA, DIBELS, Singapore Math, Literacy Essentials, etc.) are fully evaluated and documented as aligned with Tennessee Academic Standards.

As part of WAK's professional development plan, faculty and staff will be trained in how to administer the TCAPs, as well as in the content and goals of the school's rigorous classical academic program. Professional development will occur during a multi-day all-faculty orientation as well as weekly all-faculty and grade-level team meetings. The Dean of Curriculum and Instruction will be designated as test coordinator and will be responsible for training teachers to create effective assessments, analyze data from internal and external assessments, use the data to improve classroom instruction, and, if needed, assist in intervention plans. Faculty will meet in grade level groups periodically to discuss best practices for creating and grading assessments, and if needed, receive assistance from lead teachers or the testing coordinator with creating and analyzing assessments.

*28. Describe how the school will collect and analyze student academic achievement data, use the data to refine and improve instruction, and report the data to the school community.*

WAK will use data from frequent formative, summative, and standardized assessments to measure student growth, gauge instructional and curricular effectiveness, design continuing assignments, guide lesson planning, and make instructional decisions that result in course adjustments in scope and sequence throughout the academic year. This data will be collected from the following internal and external assessments: NWEA MAP, DIBELS, formative and summative teacher-designed assessments, internal assessments connected to curricula (Literacy Essentials spelling assessments and cumulative Primary Mathematics assessments), and state assessments.

One of the primary ways that teachers will collect data is from curricular formative and summative assessments. These assessments include but are not limited to quizzes, unit exams, exit tickets, key word outlines, papers, projects, reading checks, verbal responses to questions posed in class, and active participation in Socratic discussions. On a weekly basis, teachers will send home graded student work to parents as one means of communicating student progress. Teachers will also bring data from formative and summative assessments to weekly professional development periods with fellow grade-level teachers and the Dean of Curriculum of Instruction so that they can make adjustments to daily, weekly, and semester lesson plans. Frequent collection and analysis of data from formative assessments allows teachers to adjust teaching by pinpointing areas of confusion, modifying lessons in real time to allow for reteaching, offering targeted feedback to students, and to group students for focused intervention or enrichment. Teachers will use curricular assessments to calculate the grades they communicate to students and parents on quarterly grade reports. Grade reports will be sent home to parents on a quarterly basis as one way to communicate student progress with parents. Wilberforce's school management software, Infinite Campus, has a parent portal that allows parents to see student grades, monitor missing homework assignments, and notice downward trending grades. Students' academic progress, strengths, and areas for improvement will also be communicated

to parents during semester parent teacher conferences. Students found to need academic support, as evidenced by a progress report, may be referred to tutoring or intervention. Teachers will also call parents when a student encounters academic challenges, reaching out both to inform parents of the student's difficulties and to discuss how to support the student and foster improvement. A member of the Student Support Team may also contact parents to determine if additional support, inside or outside the classroom, may benefit the student as well.

WAK will also use external assessments—NWEA MAP and DIBELS 8th Edition—to measure academic skills and monitor student growth. After each testing window, the Dean of Curriculum and Instruction will meet with classroom teachers to review data trackers for each class. In preparation for these data conversations, all teachers will receive training in how to effectively interpret data reports, identifying key standards and skills on which individual students and/or the whole class requires further targeted instruction. During these data-based conversations, teachers, in collaboration with the Dean of Curriculum and Instruction, will develop action plans for addressing the needs of both individual students and the class as a whole. Additionally, families will receive the parent report (DIBELS) or family report (MAP) for each assessment. Students who fall below the 40th percentile on the reading or math score for MAP or DIBELS will be included in intervention to receive high-dosage tutoring individually or in small groups. WAK has built 45 minutes into the schedule each day for student intervention and enrichment, allowing for dedicated time for students to receive intervention and tutoring in order to accelerate growth and close performance gaps. Instruction during intervention will be provided by the classroom teacher, the academic interventionist, or qualified volunteers. When a student is identified as needing intervention, the classroom teacher or the interventionist will set up a conversation with his/her parents to go over the data and discuss the intervention plan.

Finally, WAK will use data from state assessments to refine and improve instruction. Parents can use the TCAP Family Portal to access individual student results. It provides detailed information about student progress and how it aligns with grade-level expectations. School leaders and teachers will analyze student data from the TCAP after testing data is released to develop action plans for addressing the needs of both individual students and the class as a whole.

On an annual basis, WAK will publish a report highlighting student data on the following assessments: TCAP Mathematics (Grades 3-8), TCAP ELA (Grades 3-8), TCAP Science (Grades 3-8), and TCAP Social Studies (Grades 6-8), as well as the school letter grade awarded to the school for that current year with achievement and growth data. This report will be posted on the Wilberforce school website with the link emailed to the school community. This will ensure that all stakeholders have access to the data, including families, the school's board, authorizer, and the public.

*29. Outline the school's strategies to identify and address academic underperformance, including plans for Response to Instruction and Intervention (RTI²) that align with Tennessee guidelines pursuant to State Board Rule 0520-01-03-.03.*

WAK is committed to providing effective instruction and setting a culture of high expectations for all students, which is the foundation of the RTI² framework. By cultivating a love of learning in each student coupled with high expectations in student engagement and behavior, Wilberforce will create a learning environment where students' intellect is formed through practice, feedback, and perseverance, as noted in questions 17 and 19. Furthermore, the careful selection of content-rich curriculum that is aligned to Tennessee Academic Standards and selecting qualified and motivated faculty will ensure that students develop the knowledge, skills, and abilities in order to transition into high school with the skills necessary to flourish and ensure that students are on the path to post-secondary success.

**Leadership**

WAK will develop a Student Study Team (SST) to implement the RTI² program. The SST will include the School Director or Elementary Principal or his/her designee, classroom teachers, interventionists, literacy/numeracy coaches, school counselors, English as a Second Language (ESL) teachers, special education teachers, and other staff, as necessary. This team will ensure that interventions are matched to the specific area(s) of deficit for each student, meeting quarterly and at the close of each universal screening window. The interventionist provides the intervention and conducts the regular monitoring of student progress. The classroom teacher and interventionist will work closely together to ensure that student interventions are appropriate for the student and progress is being made toward grade-level mastery of the subject matter. As indicated in Tennessee's Updated RTI² Manual, this team works to organize the following:

- Lead school implementation efforts and provide feedback to the district leadership team
- Facilitate and support data-based decision-making at school and student levels
- Guide selection and use of evidence-based instructional practices
- Engage school faculty and staff in the support of all learners
- Expect and monitor the use of data to match instructional practices to student need
- Engage families and students in decision making and learning opportunities
- Gather feedback to confirm practices and/or make necessary adjustments[138]

**Assessment**

Wilberforce has chosen assessments to use for all students that are aligned with grade-level instruction and administered continuously throughout the year. As stated in question 22, in compliance with T.C.A. § 49-1-905(c) and State Board Rule 0520-01-03-.15, Wilberforce will administer a Tennessee-approved universal reading screener (DIBELs, 8th Edition) to all students in grades K-3 three times per year. In addition to DIBELS, the school will also administer the NWEA

[138] https://www.tn.gov/content/dam/tn/education/special-education/rti/Updated_RTI2_Manual.pdf

MAP reading and mathematics assessments three times a year to students in grades 3-8. MAP provides teachers with immediate, accurate data to determine student growth, areas of deficiency, and student progress toward standards and/or skill mastery that is aligned with grade-level instruction. For assessing written work, Wilberforce will use writing samples from Literacy Essentials and writing assessments/checklists through the IEW curriculum to determine student mastery and progress in writing. Teacher-designed summative and formative assessments also provide important data to help determine if students are making progress and measure learning at the end of the semester or year in relation to the grade level expectations.

**Data-Based Decision Making**

The Student Support Team will use data collected from DIBELS, NWEA MAP, teacher-designed summative and formative assessments, and classroom observations to determine how best to respond to student needs. After a student is referred to the Student Support Team, data will also be used from progress monitoring as part of an ongoing process of collecting and analyzing data to ensure that interventions are appropriate and to determine if students are progressing toward established goals.

The Wilberforce three-tiered model is as follows:

Tier 1

Wilberforce will implement Tennessee's RTI$^2$ framework to ensure "all students have access to grade level curriculum and the greatest opportunity for academic success" through scaffolded instruction and early individualized intervention.[139] According to the RTI$^2$ framework manual, high-quality core instruction is considered the first and primary means of establishing strong foundational literacy.

Wilberforce has also prioritized early literacy as evidenced by selecting Literacy Essentials as the Tier I curriculum for foundational phonics and reading. By choosing this curriculum, as well as English from the Roots Up, Well-Ordered Language, and IEW Composition, Wilberforce believes it is providing students with the skills necessary to succeed in all content areas. Literacy Essentials is a research-based, multi-sensory, phonics, and reading approach that addresses multiple student learning styles. It provides explicit instruction in phonemic awareness, phonics, spelling, handwriting, grammar, vocabulary, and reading comprehension. Literacy Essentials provides a solid foundation for all students and is an effective program for students with academic challenges or deficits. English language teachers will provide differentiated instruction for specific student learning needs, timely and specific feedback, and high student engagement to ensure the greatest impact. In the area of writing, Wilberforce is using the Institute for Excellence in Writing (IEW) Structure and Method. The program is built around two distinct components: Structure (organizational skills) and Style. IEW breaks writing down into nine structural units: note making and outlines, writing from notes, retelling narrative stories, summarizing a reference, writing from pictures, summarizing multiple references, inventive writing, formal

[139] https://www.tn.gov/content/dam/tn/education/special-education/rti/Updated_RTI2_Manual.pdf

essay models, and formal critique. The program is mastery based, introducing one skill at a time and moving to the next level only after mastery of the skill. Each assignment comes with a specific checklist, making expectations clear for the student and the grading objective for the teacher. This curriculum gives teachers and students structured writing instruction that moves students from foundational skills to more advanced skills: creativity, narrative flow, academic report and research, and original thought and formal analysis.

For mathematics in grades K-6, Wilberforce will use Singapore Primary Mathematics 2022. This award-winning program was chosen not only for its standard aligned content, but also because of the way concepts are sequenced, introduced, and reinforced. As with Literacy Essentials, Tier I supports are built into the instructional materials and teachers receive in-depth training in the specific techniques used to implement the program. Students in grades 7-8 will use Carnegie Learning. Carnegie Learning's middle school materials are designed around a problem-based instructional model that emphasizes conceptual understanding, mathematical reasoning, and productive struggle. Lessons are structured to engage students in analyzing rich mathematical tasks, discussing multiple solution strategies, and articulating their reasoning with clarity and precision. Carnegie Learning is one of the few middle school programs to earn perfect scores across all three EdReports gateways: Focus & Coherence, Rigor & Mathematical Practice, and Usability.[140] A landmark RAND Corporation study of 18,000 students showed that using Carnegie's blended model nearly doubled typical algebra learning growth in the second year of implementation.[141]

During leveled reading practice in grades K-4, students of similar reading levels will be paired to read aloud, providing practice for on-level readers and enrichment for advanced readers. Students in grades 5-8 will have a 45-minute dedicated intervention period designed to provide targeted, data driven academic support. During this time, teachers will deliver small-group or individualized instruction based on student performance data.

WAK follows the Tier I instructional time guidance provided in the Updated RTI$^2$ Manual.[142]

| | English Language Arts | Mathematics |
|---|---|---|
| K-2 | 155 minutes | 75 minutes |
| 3-4 | 155 minutes | 90 minutes |
| 5-6 | 105 minutes | 90 (5th) & 55 (6th) minutes |
| 7-8 | 55 minutes | 55 minutes |

[140] https://edreports.org/reports/detail/carnegie-learning-middle-school-math-solution-2022-2022/sixth-grade/gateway-one
[141] https://cdn.carnegielearning.com/cli_theme/_img/www-2020/clear-imagery/research/2023-essa-math-report.pdf?_gl=1*1e6546*_gcl_au*MTUzMDUwMDczLjE3Njg1NDIzOTY.*_ga*MTkxMjg5MzU3LjE3Njg1NDIzOTQ.*_ga_HT75DMPVPG*czE3Njg1NDIzOTckbzEkZzEkdDE3Njg1NDI5OTEkajYwJGwwJGgw
[142] https://www.tn.gov/content/dam/tn/education/special-education/rti/Updated_RTI2_Manual.pdf

Tier 2

Students identified through screening significant reading or math deficiency (≤15th percentile) or as at risk (16th-40th percentile), will be referred to the Student Study Team, contact will be made with the parent, and a Tier II intervention letter will be sent home. Using multiple data sources (NWEA MAP, DIBELS, and classroom assessments), the team will identify the area(s) of deficit and create an intervention plan for the student. At a minimum, the student will have three thirty-minute intervention sessions per week providing skills-based instruction to address the specific deficits grounded in grade-level content and expectations. The interventionist will be responsible for collecting and maintaining documentation for each student, including progress monitoring data (ongoing assessments and documentation from direct and indirect checks listed in the Fidelity Check Guidance found in the Updated RTI² Manual[143]), attendance records, and communications with family. The Student Study Team, after implementing an intervention plan, will collect data and meet again at an interval of every eight weeks to determine if the student is making progress. If the student is not making progress, the team will consider increasing the frequency of intervention sessions, changing interventions, changing the interventionist, moving the student into Tier 3 interventions, or referring the student to special education. When a student is suspected of having a disability, the SST will recommend a formal evaluation in accordance with IDEA requirements.

Tier 3

When the Student Study Team determines that the interventions in Tier II are not sufficient, the student may be referred to Tier III, and the intervention plan will be updated to include individualized intensive interventions that target the student's skill deficits. The parent will receive a Tier III intervention letter. The Student Study Team, after implementing the intervention plan, will collect data and meet again at an interval of every 8 weeks to determine if the student is making progress. Intervention will occur during the daily 45-minute intervention block and, as appropriate, through optional no-cost after-school tutoring through Wilberforce's partnership with Thrive and summer learning opportunities. Students who do not achieve the desired level of progress in response to these targeted interventions will then be referred for a comprehensive evaluation and considered for eligibility for special education services under the Individuals with Disabilities Education Improvement Act. The data collected during Tiers I, II, and III are included and used to make the eligibility determination.

## 1.9 Educational Program and Capacity

*30. Complete **Table 4**, adding rows as needed, to identify all individuals who are part of the proposed school. The table should include all school-based staff, board members, and all members of the applicant team identified on the Cover Sheet of this application. For members of the applicant team, please indicate whether those individuals plan to continue with the*

[143] https://www.tn.gov/content/dam/tn/education/special-education/rti/Updated_RTI2_Manual.pdf

WILBERFORCE ACADEMY

*school if authorized and if so, what their role will be. Additionally, for each individual who will be part of the proposed school, if authorized, include:*

- ***Attachment 2:** Resumes for each school-based staff member*
- ***Attachment 3:** Resumes/biographies for each board member*

**Table 4. Team Members**

| Name | City and State of Residence | Current Title and Employer | Area(s) of Expertise | Part of the Applicant Team? (Y/N) | Position in Proposed School (e.g., board chair, school leader) |
|---|---|---|---|---|---|
| Zach Wishart | Knoxville, TN | Middle and High School Principal - River's Edge Christian Academy | School Leadership, Education Administration, Team Leadership, Public Policy, Strategic Planning, Curriculum Development | Y | School Director |
| Doug Harris | Knoxville, TN | President - Harris Enterprise Group, Founder and Board Member of multiple organizations | Board Governance, Community Engagement, Academic Performance Monitoring | Y | Board Chair |
| David Colquitt | Knoxville, TN | Business Owner of multiple hospitality projects | Board Governance, Academic Performance Monitoring | Y | Board Treasurer |
| Parker Bartholomew | Knoxville, TN | Real Estate Developer, Entrepreneur | Real Estate, Facilities, Community Engagement, Board Governance | Y | Board Secretary |
| Laura Beaman | Knoxville, TN | Real Estate Investor, School Board Member, Former Nurse | Real Estate, Business Operations, Board Governance, Academic Performance Monitoring | Y | Board Member |

WILBERFORCE ACADEMY

*31. If the sponsor has identified a proposed principal/head of school candidate, explain why this individual is well-qualified to lead the proposed school in achieving its mission, including:*
- *A summary of the proposed leader's academic and organizational leadership record as it relates to the role and expectations at the proposed school*
- *Specific evidence that demonstrates capacity to design, launch, and manage a high-performing charter school. If the proposed leader has never run a school, describe any leadership training programs that (s)he has completed or is currently participating in.*

The sponsor has identified Zach Wishart as the proposed School Director. Given his role as principal at River's Edge Christian Academy, Mr. Wishart brings quality leadership experience and has demonstrated success in managing instructional programs, developing and evaluating staff, and leading a mission-aligned school community. As such, River's Edge has been recognized as the #1 Best Christian High School in Knoxville Area by *Niche* and the #2 Best Private Middle School in Knoxville by *CityView*.

**Academic Leadership and Instructional Management**

Mr. Wishart has served as Principal of River's Edge since 2022, where he has held primary responsibility for academic leadership, instructional oversight, staff supervision, and school operations. His passion is to create a safe, supportive, Christ-centered learning environment that fosters academic excellence and spiritual growth for all students. Executing on this passion, he has led the implementation and ongoing management of the school's instructional program, ensuring alignment between curriculum, instruction, assessment, and the school's mission.

As Principal, Mr. Wishart has:
- Provided instructional leadership by setting clear academic expectations and supporting effective teaching practices
- Supervised, coached, and evaluated faculty to strengthen instructional quality and professional growth
- Led staff development efforts aligned to school priorities and student needs
- Fostered a collaborative school culture that supports staff retention and continuous improvement

**Organizational Leadership**

Through his tenure as Principal, Mr. Wishart has demonstrated the capacity to lead and sustain a functioning school organization. His work includes building and maintaining systems that support:
- Effective instructional delivery and classroom consistency
- Ongoing teacher development and performance evaluation
- Strong family engagement and school-home partnerships
- Stable school operations and organizational clarity

While Mr. Wishart's leadership of River's Edge is rooted in a traditional private school context, Mr. Wishart's responsibilities and outcomes reflect transferable skills directly applicable to the charter school environment.

**Alignment with Mission, Culture, and School Leadership Demands**

Mr. Wishart's academic preparation further supports his readiness to lead a high-performing charter school. He holds a B.S. in Interdisciplinary Studies from Liberty University, a Master of Education in Christian School Administration from Bryan College, and an Education Specialist degree from Columbia International University. Furthermore, he is certified as a School Counselor and a School Principal by the Association of Christian Schools International. His advanced training has equipped him with expertise in instructional leadership, organizational management, staff supervision, and school governance.

Mr. Wishart demonstrates strong alignment with the Wilberforce's mission and culture, particularly in his commitment to partnering with parents, developing the whole child, and fostering a values-driven educational environment. This alignment strengthens his ability to lead staff effectively and maintain mission fidelity while pursuing strong academic outcomes.

**Summary**

Mr. Wishart is an experienced school leader with a proven record of instructional leadership, staff development, and organizational management. His experience as a sitting principal, combined with advanced administrative training and strong mission alignment, meets the standard for leading Wilberforce and positions him to nurture the school in its crucial beginning years.

*32. Describe the collective capacity and qualifications of the currently identified team of school-based staff (not board members) to design and execute the academic plan in areas such as:*

- *School leadership, administration, and governance;*
- *Curriculum, instruction and assessment;*
- *Meeting the needs of special populations including students with disabilities, English learners, homeless students, students in foster care, migrant students, at-risk students, and gifted students;*
- *Performance management;*
- *Parent and community engagement.*

As WAK plans to open in the fall of 2027, no school-based staff have yet been hired. However, we address in question 33 the plan for executing a disciplined recruitment and vetting process to ensure that the right team is in place come opening.

*33. Identify any gaps in the current school leadership team, including the school leader if applicable, and describe plans to fill those gaps with future hires. Discuss the timeline, qualifications, criteria, and recruiting and selection process for hiring key leadership positions.*

**Leadership Team Gaps**

WAK will open in Fall 2027. At this stage, the school has identified a founding School Director (Zach Wishart) but has not yet hired the remainder of the school-based leadership and administrative team. This is intentional: Wilberforce is using the runway to ensure that key leadership hires are made at the right time, with the right competencies, and through a disciplined, evidence-based selection process aligned to the school's academic plan, start-up milestones, and year-one scale (including opening grades and enrollment).

Because Wilberforce is a new-start school, the primary leadership gap is not due to insufficient planning or intent but instead is an intentional plan to make initial hires during Year 0 and to build the full founding leadership team needed to implement the academic plan and support its growth as additional grades are added each year. This section identifies the current school leadership team's gaps and describes Wilberforce's timeline, qualifications, criteria, and recruitment/selection approach to fill them.

**Identified Gaps**

With Mr. Wishart identified as School Director, Wilberforce's remaining leadership needs fall into three essential functions that must be covered—whether by direct hires, shared roles, or high-quality contracted support—before opening:

1. <u>Teaching & Learning Leadership (Curriculum, Instruction, Assessment, Teacher Development)</u>
   *Gap to fill:* A dedicated leader with deep expertise in implementing a coherent K-8 instructional program, building assessment cycles, coaching teachers, and ensuring consistency and rigor across classrooms.
2. <u>Student Services Leadership (Special Populations & Student Supports)</u>
   *Gap to fill:* A leader responsible for designing and managing the systems that ensure strong service delivery and compliance for students with disabilities (IDEA/IEP), 504 plans, English learners, RTI² interventions, gifted services, and protections for students in foster care, experiencing homelessness, or otherwise at-risk (including McKinney Vento coordination).
3. <u>Operations & Finance Leadership (Business, Compliance, Facilities, Procurement, and Systems)</u>
   *Gap to fill:* A leader who can manage "school business" functions with precision—budget execution, purchasing controls, vendor management, facilities readiness, transportation/food/IT coordination, compliance calendars, and operational risk management—so the School Director can remain focused on mission, culture, and instructional leadership.

Mr. Wishart brings demonstrated strengths in school leadership, culture-building, faculty leadership, and launching/leading systems. Wilberforce's hiring plan is designed to augment those strengths with specialized expertise in: (1) K-8 curriculum and instructional coaching systems, (2) special populations and compliance, and (3) charter start-up operations and financial stewardship. The result will be a founding leadership team with complete coverage of the school's responsibilities—without diluting accountability or blurring roles.

**Positions & Qualifications**

Wilberforce will hire a *Founding Leadership Team* that can execute the academic plan at opening and build the structures needed to scale as the school grows.

Note on start-up size: Because Wilberforce expects to open with limited grades and a modest initial enrollment, the school will begin with a lean leadership structure, with some roles combined initially and expanded over time as grades are added. Regardless of staffing model, Wilberforce will ensure each required functional responsibility is clearly assigned and managed.

<u>Founding Dean of Curriculum and Instruction</u>

*Primary purpose:* Build and execute a coherent instructional system that drives student learning outcomes, including curriculum implementation, Tennessee Academic Standards alignment, assessment cycles, intervention structures, and teacher development.

Minimum qualifications/criteria:

- Demonstrated success improving student outcomes (achievement and/or growth) through curriculum implementation and teacher coaching
- Strong knowledge of K-8 literacy and mathematics instruction and assessment practices
- Experience leading PLCs/data meetings and building a consistent instructional cycle (plan-teach-assess-respond)
- Ability to coach teachers through observation, feedback, and targeted professional development
- Track record working effectively with diverse learners and collaborating with student services to ensure access

Preferred qualifications:

- Experience in a classical or content-rich model (or clear demonstrated alignment and ability to implement it)
- Experience supporting a new school launch, school redesign, or rapid improvement context
- Tennessee licensure and/or experience working with TN standards and state assessment expectations (as applicable)

WILBERFORCE ACADEMY

Founding Director of Specialized Services

*Primary purpose:* Design and oversee systems to meet the needs of special populations and ensure compliant, high-quality service delivery.

Minimum qualifications/criteria:

- Demonstrated experience leading special education systems (Child Find, evaluations, IEP development, service delivery, progress monitoring)
- Working knowledge of 504 processes and student accommodations systems
- Experience with EL identification and service models and/or proven ability to lead language support systems
- Strong operational discipline: timelines, documentation, compliance calendars, vendor management for related services
- Proven ability to collaborate with general education teachers and leaders so supports are integrated, not siloed

Preferred qualifications:

- RTI² design and progress monitoring systems
- Experience supporting students in foster care, homelessness (McKinney Vento), and other at-risk categories through systems and partnerships
- Experience designing inclusive, high-expectation supports within a rigorous academic model

Founding Director of Operations (Business & Compliance)

*Primary purpose:* Ensure operational excellence and financial discipline so that the school opens ready, runs smoothly, and remains sustainable.

Minimum qualifications/criteria:

- Strong competence in school operations: facilities readiness, vendor management, compliance calendars, student information systems, and day-to-day operational planning
- Ability to manage budgets, purchasing, and internal controls with precision
- Experience developing SOPs and establishing operational routines for a new or rapidly changing environment
- Strong project management skillset (milestones, dependencies, risk mitigation)

Preferred qualifications:

- Experience in charter schools or public-school finance/operations
- Experience implementing operational systems (procurement controls, enrollment systems, transportation/food service coordination, safety planning)
- Demonstrated ability to create operational dashboards and "early warning" indicators

WILBERFORCE ACADEMY

**Hiring Timeline to Ensure Readiness for Fall 2027**

Wilberforce will hire key leaders early enough to meaningfully contribute to design work—not just to "show up" at opening. The timeline below reflects the school's intention to have the full founding leadership team in place with sufficient runway to design systems, hire teachers, and prepare for opening.

18-15 months before opening (Spring-Summer 2026): Design and preparation

- Finalize the founding leadership org chart for Year 1 and early growth years
- Write Position Success Profiles (role mission, outcomes, competencies) for each key leadership role
- Set preliminary compensation bands aligned to budget and market benchmarks
- Build a recruiting pipeline: outreach lists, partner contacts, talent databases, and posting strategy
- Confirm selection tools: interview rubrics, performance tasks, reference check protocols

15-13 months before opening (Summer 2026): Launch searches for the first two key roles

- Post and recruit for:
  - Founding Director of Operations
  - Founding Dean of Curriculum and Instruction
- Target hire dates: August 2026
- These roles are prioritized early because they directly drive operational readiness, curriculum/assessment planning, and teacher hiring needs.

9-6 months before opening (Spring 2027): Office systems hire

- Post and recruit for an Office Manager to assist with student enrollment and records
- Target hire dates: February 2027

6-4 months before opening (Winter 2026-Spring 2027): Specialized services leadership hire

- Post and recruit for Founding Director of Specialized Services
- Target hire date: July 2027
- This leader must be in place early enough to help design service delivery models, build compliance systems, and plan staffing/contracting for related services.

6-3 months before opening (Late Spring-Summer 2027): Teacher hiring and onboarding

- Hire lead teachers and classroom staff
- Conduct a summer onboarding institute and finalize academic/operational routines

This schedule ensures that Wilberforce's key leaders are hired early enough to participate in system design, staff hiring, and launch execution rather than trying to assemble core leadership in the final weeks before opening.

**Recruiting Strategy**
Wilberforce will recruit through multiple pipelines to ensure a strong candidate pool and avoid "single-source" dependence. Recruiting will be led by the School Director, supported by the board (within governance boundaries), and executed using structured outreach and selection tools.

Primary sourcing channels:
- Local and regional educator pipelines (Knoxville-area school leaders and instructional coaches; teacher leadership networks; school improvement networks)
- University pipelines for leadership and specialist roles (education leadership and special education programs)
- Charter-school and school leadership job boards and professional associations
- Classical education networks and content-rich curriculum communities (for the Dean of Curriculum and Instruction and teacher leaders)
- Special education and student services networks (for a director with strong IDEA/504/EL systems experience)
- Referral networks from trusted leaders, board members, and partner organizations (with conflicts screened)

Approach to recruitment messaging:
- Role postings will describe the school's mission, instructional model, performance expectations, and launch responsibilities with clarity.
- Each posting will include "what success looks like" in the first year (e.g., core systems implemented, dashboards running, compliance timelines met, teacher coaching cycles executed).

**Selection Process**
Wilberforce will use a structured, multi-stage selection process designed to identify leaders with both competence and fit, while maintaining clear governance boundaries (the board hires/evaluates the School Director; the School Director hires staff).

Step 1: Role definition and success criteria (before posting)
- Finalize the Position Success Profile for the role
- Confirm reporting lines and decision rights
- Confirm salary range and start date
- Publish the role with clear "first-year outcomes"

Step 2: Structured screening
- Initial application screening using a rubric aligned to minimum qualifications
- Phone/video screening focused on motivation, readiness for start-up demands, and functional expertise

Step 3: Performance task (role-specific)
Finalists complete a practical task aligned to the role, such as:

- Dean of Curriculum and Instruction: Analyze a sample data set and draft a 6-week instructional improvement cycle; provide teacher feedback on a lesson artifact; build an assessment/calendar plan
- Specialized Services: Draft a service delivery map for Year 1 (SPED/504/EL/RTI²), including staffing ratios and compliance calendar
- Operations: Build a start-up readiness plan and risk register (facilities, compliance, systems, procurement); draft a cash-flow risk mitigation approach

Step 4: Panel interviews and values alignment

- Structured panel interviews with standardized questions and scoring
- Panel includes the School Director and, when appropriate, one board representative in an observer/advisory role to confirm leadership fit and mission alignment (without the board directing management)

Step 5: Reference checks, background checks, and verification

- Multiple professional references (including prior supervisors)
- Verification of licenses/certifications where applicable
- Background checks consistent with school policy and applicable requirements

Step 6: Final decision and offer

- School Director makes final recommendation and extends offer
- Board is informed of key leadership hires and receives a summary of selection rationale and onboarding plan (consistent with governance/management delineation)

**Onboarding & Early-Year Effectiveness**
Because start-up schools can fail not just from lack of talent but from lack of alignment and systems, Wilberforce will onboard key leaders with a structured, performance-oriented approach:

- Founding Leadership Onboarding Institute (2-3 days): mission and model, academic plan, year-one priorities, and governance boundaries
- 30-60-90 Day Plan: each leader produces a written plan with milestones, deliverables, and early indicators
- Quarterly progress checkpoints: School Director conducts quarterly reviews of leadership deliverables aligned to the academic plan and start-up priorities, ensuring early accountability and support

WAK's current leadership gap is the absence of a full founding school-based leadership team beyond the identified School Director. Wilberforce will fill that gap through a disciplined, staged hiring plan that prioritizes the most mission-critical leadership functions early (curriculum & instruction and operations), brings student services expertise on board early enough to design

compliant and effective supports, and uses a structured, evidence-based recruiting and selection process with clear success criteria, performance tasks, and verification steps. This approach is designed to ensure that Wilberforce enters Fall 2027 with a strong, complementary leadership team ready to execute the academic plan and build a high-performing school from day one.

*34. Describe the collective qualifications of the current set of board members (not school-based staff) to provide effective oversight and strategic direction in the following areas:*

- *Governance and fiduciary responsibilities, including compliance with legal regulatory requirements;*
- *Oversight of academic performance, including holding the school leader accountable, monitoring progress toward academic goals, and ensuring alignment with the school's mission;*
- *Financial oversight, including budget approval, financial controls and long-term fiscal planning; and*
- *Community engagement and stakeholder responsiveness, including maintaining trust and transparency with families and local partners.*

**Collective Qualifications**

WAK's current founding board of directors—David Colquitt, Doug Harris, Parker Bartholomew, and Laura Beaman—brings complementary expertise in governance and fiduciary oversight, academic accountability, financial stewardship, and community trust-building. Collectively, the board combines education governance experience at scale, charter school board experience, legal training and risk management, and deep operational, entrepreneurial, and nonprofit leadership rooted in the Knoxville community.

**Governance & Fiduciary Responsibilities**

The founding board includes leaders who have governed complex organizations, have served in fiduciary roles on multiple nonprofit boards, and bring direct experience with legal reasoning, policy, and large-scale education governance, providing a strong foundation for compliance oversight, conflict of interest discipline, risk management, and sound board practice.

<u>David Colquitt: legal training and multi-board nonprofit governance</u>

- Mr. Colquitt holds a J.D. from the University of Virginia School of Law and worked as a litigation associate (Bracewell & Giuliani LLP), which supports the board's ability to read and evaluate contracts, manage legal risk, and maintain compliance discipline.
- He currently serves on multiple boards, including Emerald Academy, and other civic/nonprofit organizations, reflecting active governance experience and fiduciary responsibility in board settings.

Doug Harris: education governance chair experience and extensive nonprofit board leadership

- Mr. Harris served as a Knox County Schools School Board Member (2012-2016) and Chair (2016), a role requiring high standards of governance process, legal/regulatory awareness, and fiduciary oversight.
- He has also held senior nonprofit board leadership roles (e.g., National Christian Foundation East TN, Board Chair) and finance leadership on a major youth-focused nonprofit (Emerald Youth Foundation, Board Member and Finance Chair), strengthening board governance and fiduciary oversight capacity.

Parker Bartholomew: board chair leadership and strategic planning governance

- Mr. Bartholomew currently chairs the boards of Align9 and Angelic Ministries Inc. and has been directly involved in organizational growth and strategic planning, which supports Wilberforce's governance maturity as it scales from start-up to sustainable operations.

Laura Beaman: education governance and strategic planning/financial oversight

- Ms. Beaman currently serves on the board of River's Edge Christian Academy and has helped lead the school's transition from a managerial governance model to a policy governance structure, applying best practices in strategic oversight and school leadership.
- She has also served in the healthcare field for 14 years and developed a strong skillset in project management, business operations, and financial stewardship as a real-estate investor.

**Oversight of Academic Performance**

The board's academic oversight capacity is strengthened by direct experience governing a large school system and supporting the launch and success of a Knoxville charter school, paired with charter-board experience that understands how to hold school leadership accountable to mission-specific outcomes.

Doug Harris: district-level academic governance and charter launch familiarity

- As Board Chairman of Knox County Schools, Mr. Harris led governance work for a district serving 58,000 students across 90 schools, giving him direct experience with board-level accountability and oversight of academic systems at scale.
- His has also provided support for major district initiatives (e.g., implementation of one-to-one computers in 23 schools) and support for Emerald Academy, the first public charter school in urban Knoxville (opened 2015; recognized as TN Charter School of the Year in 2021). This experience is directly relevant to how boards oversee outcomes and hold school leadership accountable while honoring mission.

David Colquitt: charter board experience and mission stewardship

- Mr. Colquitt's service on the board of Emerald Academy provides direct governance experience in a charter setting, including the central work of boards: monitoring academic

progress, ensuring mission alignment, and evaluating school leadership performance through data and evidence.

Parker Bartholomew: strategic direction and accountability discipline

- Mr. Bartholomew's nonprofit board chair roles, with an emphasis on organizational growth and strategic planning, strengthen the board's ability to maintain clarity about mission, priorities, and performance indicators, especially during the critical design-to-launch phase when early decisions determine long-term academic success.

Laura Beaman: school board experience and teaching

- Through her service on the board of River's Edge Christian Academy, Ms. Beaman is experienced in stewarding the mission of an educational institution and ensuring long-term fidelity of the academic model to that mission.
- Ms. Beaman's own experience of educating her children gives her insight into the day-to-day experience of implementing curricula and forming young people intellectually and morally.

**Financial Oversight**

Wilberforce's founding board brings large-budget public governance experience, multi-site business operations experience, and real estate/development experience—a strong combination for responsible charter finance oversight, internal controls, cash planning, and facilities stewardship.

Doug Harris: high-volume operations and finance leadership and large public budget exposure

- Mr. Harris's business leadership includes operating 30+ franchise businesses, co-founding and operating a restaurant software business with over 26,000 locations, and leading an organization that owns/operates 30 restaurants and over 500 employees—experience directly relevant to budgeting, cash discipline, internal controls, and performance management.
- As KCS board chair, he worked in a public governance environment involving an annual budget reported at $700 million, strengthening his readiness to oversee large-scale budgeting, approvals, and financial reporting expectations.
- His nonprofit board finance leadership (e.g., Emerald Youth Foundation, Finance Chair) further reinforces fiduciary oversight capacity, including audit readiness and financial controls.

David Colquitt: multi-entity business ownership and corporate operational leadership experience

- Mr. Colquitt and his family own and operate multiple hospitality projects (including RT Lodge, The Swag, and Cataloochee Ranch), indicating experience with multi-entity budgeting, operational management, and long-term planning.

- His leadership experience includes senior management roles at Pilot Flying J (including "Chief of Staff" and other operational leadership roles), strengthening board capacity to evaluate operational plans, vendor contracts, and performance reporting.

Parker Bartholomew: real estate development and facilities-oriented stewardship

- As a real estate developer with experience leading development projects around Knoxville, Mr. Bartholomew brings practical insight into facilities planning, site evaluation, project timelines, and risk management, which are critical elements of long-term fiscal stewardship for a start-up charter school.

Laura Beaman: real estate development and facilities-oriented stewardship

- As a real estate developer, Ms. Beaman is experienced in leading development projects in the Knoxville area, practicing responsible financial stewardship, and strategic planning.
- Ms. Beaman's role as a school board member provides firsthand understanding of best practices in financial oversight for educational institutions.

**Community Engagement & Stakeholder Responsiveness**

The founding board is deeply embedded in the Knoxville community through civic, nonprofit, faith, and business leadership. This local credibility supports transparent engagement with families, partnership-building with community organizations, and steady, responsive governance—especially important during enrollment, launch, and early growth years.

David Colquitt: civic board service and local community ties

- Mr. Colquitt has been involved in civic and charitable causes since moving to Knoxville and serves on boards including the Knoxville Symphony Orchestra, Friends of the Smokies, Wears Valley Ranch, and UT Knoxville's Baker School of Public Policy, reflecting broad community relationships and trust.
- He is also an elder at Cedar Springs Presbyterian Church, further strengthening connection to local community networks.

Doug Harris: deep local civic leadership and education-community credibility

- Mr. Harris's leadership as Chair of the Knox County Board of Education provides demonstrated experience engaging stakeholders in a public education environment.
- His community involvement and nonprofit work (including work through TivaWater and other initiatives) reflects sustained commitment to community service and mission-driven engagement.

Parker Bartholomew: local community leader with outreach to underserved populations

- Mr. Bartholomew is a community leader whose nonprofit board chair work emphasizes expanding outreach to underserved populations, supporting Wilberforce's commitment to trust-building and responsive partnership in the Knoxville community.

Laura Beaman: healthcare service and church involvement and local community ties

- Ms. Beaman is a Tennessee native who earned her Bachelor of Science in Nursing from Belmont University, after which she spent 14 years serving diverse patient populations across Tennessee and California as a nurse.
- Ms. Beaman's family is established in the Knoxville community, and she is actively involved in her local church's ministry, giving her deep and meaningful connections to a wide cross-section of local community members.

Taken together, the founding board combines:

- Public education governance at scale (KCS board chair experience and district-wide oversight)
- Charter governance familiarity (board service connected to a Knoxville charter school)
- Legal training and risk management (J.D. and litigation experience)
- Financial/operational and facilities expertise (multi-site business leadership, finance chair service, and real estate development)
- Community engagement strengths (connections to churches, nonprofits, charities, civic organizations, and schools)

*35. Explain the process by which board members have been and will be selected, including the criteria that have been and will be used to evaluate potential board members. Identify any gaps in the current governing board and describe plans to fill those gaps with future recruitment efforts.*

**Board Selection to Date**

The founding governing board has been assembled through an intentional, mission-driven process aimed at ensuring that the board is equipped to govern a start-up charter school with excellence. Consistent with best practice, the founding group has recruited board members who demonstrate deep alignment to WAK's mission and culture and collectively provide the core capabilities required for responsible oversight, including academic accountability, operational governance, and financial stewardship. The board has prioritized candidates with proven leadership, strong judgment, and a record of service and trust in the Knoxville community, while also ensuring that the board includes the practical "work capacity" needed in a start-up phase.

Founding candidates have been vetted through direct conversations and review of qualifications, with an emphasis on governance mindset, integrity, and role clarity. The board also considers potential conflicts of interest before inviting a director to serve, and each director is expected to operate with the prudence, confidentiality, and accountability appropriate to public trust.

WILBERFORCE ACADEMY

**Future Formal Process**
Going forward, Wilberforce will use a consistent, repeatable process led by the Governance & Nominating Committee, with final selection by vote of the full board. This approach aligns with best practice that discovery, vetting, and nomination are often committee-led, with final approval by the full board.

Step 1: Annual "board needs" review and skills/asset matrix
At least annually (and whenever a seat opens), the Governance & Nominating Committee will review board composition against the school's stage (start-up, launch, growth) and needs. This includes maintaining a board skills/asset matrix to identify coverage and gaps and to target recruitment accordingly.

Step 2: Candidate sourcing and cultivation (building a "bench")
The committee will recruit candidates through:
- Community referrals and networks of current directors
- Recommendations from the School Director (as a collaborative partner who brings valuable insight into mission-aligned leaders and community trust)
- Cultivation opportunities (inviting prospective candidates to observe a board meeting, serve on an advisory group, or assist with a defined committee project), so the board can assess follow-through and fit before nomination

Step 3: Nomination packet & preliminary screening
Prospective directors will complete a nomination packet modeled on best-practice tools (capturing skills, committee fit, helpful affiliations, and prior board experience).

The committee will screen for:
- Mission alignment and commitment to the school's purpose
- Ability to maintain governance boundaries (govern vs. manage)
- Time capacity and reliability
- Any apparent conflicts of interest (vendor relationships, related-party ties, or other issues that could compromise independent judgment)

Step 4: Structured interviews using a consistent rubric
Shortlisted candidates will participate in interviews using a consistent set of questions that assess mission connection, skillset contribution, commitment, and ability to represent the school well in the community. (The Board of Directors Training Manual provides examples of candidate interview question categories such as personal connection to mission, skillset, commitment, and networking/community representation.)

Step 5: Due diligence & conflict-of-interest review

Before nomination to the full board, the committee will conduct due diligence proportionate to the role (reference checks as appropriate, review of public-facing professional reputation as appropriate, and a formal conflict-of-interest disclosure review).

Step 6: Committee recommendation & full-board vote

The Governance & Nominating Committee will bring a recommendation to the full board and explicitly assess the candidate with regards to the skills/asset matrix and the board's current gaps. The board will vote in accordance with bylaws and record the action in minutes.

Step 7: Orientation & onboarding

New board members will complete onboarding led by the Governance & Nominating Committee (often including the Board Chair and School Director), with a Board Book that includes bylaws, key policies, board norms, academic/financial dashboards, and core governance processes. Consistent with best practices, that orientation will include the foundational governance documents and role clarity.

The Governance Committee also maintains a tool for tracking prospective members against board needs and coordinates onboarding and orientation.

**Evaluation Criteria**

Wilberforce will evaluate prospective board members using criteria aligned to best practices for mission-driven, results-oriented boards and to the practical requirements of governing a start-up school. Criteria include:

1. Mission & cultural alignment: Understanding of, and commitment to, the school's mission and long-term aims
2. Governance mindset: Willingness to govern at the right altitude (policy, accountability, oversight) rather than manage staff or intervene in day-to-day matters
3. Relevant expertise: Demonstrated competence in one or more domains needed for charter governance (academics, finance/audit, law/compliance, facilities, HR/talent, operations, communications, community engagement)
4. Capacity & "working board" posture: Ability to attend meetings prepared, serve on committees, and contribute time/energy appropriate to a start-up organization
5. Integrity, confidentiality, & sound judgment: Strong character, prudence with confidential matters, and ability to hold others accountable while maintaining respectful collaboration—factors identified as important to board effectiveness
6. Community trust & connectivity: Credibility and relationships in the community served; ability to represent the school well
7. Diversity of experience & perspective: The board recruits for a diversity of backgrounds and perspectives that strengthens decision quality and community credibility. The Training Manual notes that boards often consider factors such as personal style and diversity characteristics as part of a holistic assessment.

**Current Governing Board Strengths**

The founding board has already secured meaningful strengths in key governance domains:

- Public education governance and large-system oversight: Doug Harris previously served on the Knox County Schools Board of Education (including as Chair) and brings experience working with large-scale district governance and budgets.
- Charter school familiarity in Knoxville: Mr. Harris's experience includes involvement in initiatives connected to Emerald Academy, which strengthens contextual understanding of charter authorization and start-up realities.
- Business operations, HR, and execution: Mr. Harris also brings extensive operational leadership through ownership/operation of multi-site businesses and large teams (including training/retention and people management).
- Legal/policy literacy and nonprofit governance: David Colquitt holds a J.D. and has litigation experience; he also serves on multiple boards and civic organizations, including Emerald Academy, which supports governance discipline and policy fluency.
- Facilities/real estate and community development: Parker Bartholomew and Laura Beaman's backgrounds as real estate developers and entrepreneurs support the board's capacity for facility strategy, development oversight, and local project execution.
- Community connectivity and board leadership: Mr. Colquitt and Mr. Bartholomew each have meaningful nonprofit board involvement and local relationships that strengthen community credibility and partnership capacity.

**Identified Gaps**

Even with strong founding capacity, the board recognizes that start-up charter governance requires a deliberately rounded board profile. Using the annual skills/asset matrix process described above, the board has identified the following priority gaps to fill through targeted recruitment:

1. <u>K-8 academic leadership expertise (classical, literacy, assessment, and data cycles)</u>
   The board will recruit at least one director with deep experience in K-8 instruction (e.g., former principal, curriculum director, instructional coach, or teacher-leader) who can strengthen board-level academic oversight, especially around standards alignment, interim assessment interpretation, and systems for continuous improvement.

2. <u>Special populations expertise (SPED/IDEA, 504, EL)</u>
   The board will recruit a director with direct experience overseeing special education and/or multilingual learner systems (e.g., former SPED director, school psychologist, special education attorney, or administrator). This strengthens governance-level assurance that systems are compliant, resourced, and equitable.

3. Independent finance/audit depth (CPA-level or equivalent)
   While the board has strong business and budgeting experience, the board will recruit at least one director with formal finance/audit leadership (e.g., CPA, controller/CFO, audit committee experience) to chair or strengthen the Finance & Audit Committee and oversee internal controls and audit readiness.

4. Facilities compliance & risk management depth (code/ADA/safety)
   Complementing development expertise, the board will recruit additional facility capacity specifically tied to school regulatory environments (code compliance, accessibility, safety, lease structures, and project controls) to mitigate opening risk.

5. Parent perspective
   The board will add a parent representative within six months of school opening as required (see question 37). This will close an important representation gap and ensure parent voice is structurally embedded in governance.

**How the Board Will Fill the Gaps**

- The Governance & Nominating Committee will maintain a standing "candidate bench" aligned to the matrix and will prioritize recruitment based on stage and gaps, which is the approach recommended in the Training Manual.
- The board will use structured nomination and interview tools to keep selection consistent and disciplined.
- The School Director will be engaged as a collaborative partner in identifying candidates, while the board retains independent decision-making authority.
- The board will conduct an annual board self-evaluation and update recruitment priorities based on evidence of what the board needs next (finance, facilities, governance, leadership accountability, etc.).

WILBERFORCE ACADEMY

## Section Two: Operations Plan and Capacity

### 2.1 Governance

*36. Describe powers and duties of the board, specifically describing the board's role in academics, operations, and finance.*

**Governing Authority & Fiduciary Duty**

WAK will be governed by an independent nonprofit board that holds ultimate fiduciary responsibility for the school's academic performance, operational compliance, and financial stewardship under the Tennessee Public Charter Schools Act (T.C.A. § 49-13-101). The board will set policy; hire, support, evaluate, and, if necessary, replace the School Director; establish executive limitations; approve contracts and legal agreements; and ensure compliance with the charter agreement and all applicable federal, state, and authorizer requirements, including public records and open meetings obligations and conflicts of interest standards, as outlined in T.C.A. § 49-13-111.

**Role in Academics**

Set Mission-Aligned Goals and Guardrails

The board will adopt clear, mission-aligned academic goals, including proficiency, TVAAS growth, attendance, and subgroup performance targets, and will incorporate them into the School Director's annual priorities and the board's performance dashboard. It will require that curriculum, assessment, and intervention strategies align with Tennessee Academic Standards and the academic performance framework set by the authorizer.

Monitor Performance

At each regular meeting, the board will review an academic dashboard that includes:

- State assessment and TVAAS results (as available)
- Comparative performance to the resident district
- Progress toward mission-specific goals
- Disaggregated subgroup outcomes

When performance falls below agreed thresholds, the board will require the School Director to present an improvement plan with milestones, resource allocations, and timelines, and will monitor implementation until performance is restored.

Protect Student Rights and Compliance

The board will oversee compliance with laws and charter terms governing students with disabilities, English learners, assessment participation, discipline, and educator licensure requirements. It will require transparent reporting and disaggregated analysis to ensure that no subgroup is underserved.

Respect Management
The board will not manage instruction or select classroom materials. Instead, it will define academic “ends” and hold the School Director accountable for achieving them through clear reporting, evaluation, and performance review.

**Role in Operations**

Policy, Compliance, and Transparency
The board will adopt and enforce the policies necessary for lawful, ethical, and transparent operations, including open meetings and records, conflicts of interest, grievance procedures, enrollment and lottery administration, data privacy, procurement, and safety. It will ensure timely submission of all authorizer-required reports and material compliance with governance and reporting obligations (T.C.A § 49-13-111).

Leader Oversight and Contractual Authority
The board will hire the School Director, approve annual goals and executive limitations, and evaluate performance against academic, operational, and financial expectations. It will approve material contracts and legal agreements—including facilities, transportation, food service, insurance, audits, and major vendors—retaining ultimate authority for contract compliance and school performance.

Risk Management and Safety
The board will require and review a comprehensive Emergency Operations Plan and will receive regular reports on safety, attendance, discipline, facilities, transportation, technology, and compliance. When indicators show elevated risk, the board will direct corrective action and monitor resolution.

Board Self-Governance
The board will maintain bylaws, committee charters, an annual meeting calendar, and a standing performance dashboard. It will conduct regular training of board members, including any annual training required by state law, with documentation provided to the authorizer.

**Role in Finance**

Budget, Reserves, and Solvency
The board will adopt a multi-year operating budget and cash-flow plan, establish reserve targets, and approve any debt, leases, or lines of credit. All funds received by the school will be spent according to the budget approved by the governing body as required under state law (T.C.A. § 49-13-112). The board will review monthly financial statements, including budget-to-actuals, cash position, and enrollment-driven revenue projections, and will require corrective action when key indicators do not meet targets.

Internal Controls and Audit

The board will approve internal control policies governing segregation of duties, spending authority, procurement, and conflict disclosure. It will ensure the timely submission of all required financial and compliance reports, engage an independent auditor annually, and review audit findings and corrective action plans in accordance with T.C.A. § 49-13-127.

Insurance and Risk

The board will ensure the school maintains appropriate insurance coverage and will review risk exposure related to facilities, transportation, data security, and personnel on a regular basis.

Delegation and Lines of Authority

The board will govern and the School Director will manage. The board will hold the School Director accountable for executing the academic plan, operating within policy and law, and delivering the approved budget, while preserving the independence and integrity of governance. Board members will disclose conflicts of interest and comply with applicable state conflict laws, recuse themselves when required, and avoid related-party transactions whenever possible. When such transactions are unavoidable, the board will require competitive pricing, documentation of fairness, and approval by disinterested directors, with recusals recorded in the minutes.

**Pre-Opening and Start-Up Responsibilities**

During the pre-opening and start-up phases, the board's role is to accelerate readiness without collapsing governance into management. Toward this end, the board will provide oversight, approve major commitments, and lend targeted operational support in the facility search and fundraising efforts, while the School Director executes the work. This division of labor will be supported by a disciplined start-up plan, defined committee roles, and clear approval thresholds so that decisions are timely, accountable, and well-governed.

Examining the division of labor between the board and School Director during year 0 in greater detail, the board, with input from the School Director, will establish the criteria and overall strategy for facilities, including whether the school will lease or purchase and any major financial or legal commitments, based on documented feasibility. The board will manage the site search and will evaluate options with the School Director before approving a location that supports the academic model and enrollment plan.

The board will adopt a conservative, multi-year financial plan that includes operating budgets, cash-flow projections, reserves, and contingency triggers, and will approve start-up funding sources and financial controls. The School Director will maintain the detailed budget and cash-flow model, implement spending controls, and provide regular financial readiness updates as enrollment, staffing, and facility plans are finalized.

The board will approve enrollment policies, procedures, and public communications and will monitor progress toward enrollment targets, requiring corrective action if needed. The School Director will lead community outreach and enrollment efforts, track pipeline data, and report progress in a way that informs staffing and budget decisions.

Finally, the board will approve the Year 1 staffing structure and ensure required HR and compliance systems are in place. The School Director will recruit, hire, and onboard staff and establish operating rhythms that support strong instruction and organizational health. Throughout start-up, the board will oversee readiness through clear milestones and objective “go/no-go” criteria, while the School Director will maintain the project plan, surface risks early, and provide the documentation needed to keep approvals timely and the launch on track.

*37. Describe plans to add a parent representative to the board within six months of the school’s opening pursuant to T.C.A. § 49-13-109. Detail the process for recruitment, selection, and onboarding of the parent representative.*

WAK’s governing board will add at least one (1) parent representative to the board within six (6) months of the school’s opening date, in accordance with T.C.A. § 49-13-109. The parent representative will be a full voting board member whose child is currently enrolled in WAK. The board will treat this seat as an essential part of effective governance, not as a symbolic role, ensuring that parent voice is present in board deliberations while maintaining proper governance boundaries (the board governs; school leadership manages).

**A. Pre-Work (before opening)**

Establish the Seat & the Rules of Engagement
No later than 90 days prior to the first day of instruction, the board’s Governance Committee will present, and the full board will adopt, a “Parent Representative Policy” that defines:

*Eligibility:* Parent or legal guardian of a student currently enrolled at WAK; able to serve the full term; willing to comply with ethics and confidentiality requirements; and able to meet attendance expectations.

*Role Clarity:* The parent representative serves as a fiduciary of the nonprofit, not as an ombudsman for individual family complaints. The parent representative helps the board understand broad family experience and community trust, while individual grievances follow the school’s formal complaint and grievance procedures.

*Term & Continuity:* A standard term length (e.g., two years, staggered when possible). If the board member’s child is no longer enrolled, the board will initiate an orderly transition and appoint a replacement in a timely manner.

*Guardrails for Conflicts of Interest:* Required annual disclosure forms, recusals where appropriate, and prohibitions on self-dealing. The parent representative is subject to the same conflict-of-interest rules as every director.

*Training Requirement:* Completion of onboarding modules within the first 60 days of appointment.

Prepare Recruitment & Selection Toolkit

The Governance Committee will develop, approve, and publish a toolkit that includes:

- A one-page *Parent Board Member Role Description* (time expectations, meeting schedule, committee service expectations, responsibilities, and boundaries)
- A short application form and a consistent interview rubric tied to board needs (judgment, confidentiality, collaboration, willingness to govern rather than manage, and commitment to the school's mission)
- A standard onboarding plan and calendar, with required readings and training sessions
- A simple communications plan so families know the requirement, the timeline, and how to apply

Create Board Book & Mission/Culture Orientation

To ensure a smooth onboarding experience, the board will assemble a digital and printed Board Book containing, at minimum:

- Charter application and (once executed) the charter agreement, bylaws, key board policies (ethics/COI, open meetings/records, complaint policy)
- Academic plan overview (curriculum, assessment calendar, goals/dashboards, student supports)
- Annual budget, cashflow summary, monthly financial statement format, internal controls overview
- Student/Family Handbook and culture materials so the new director understands Wilberforce's mission and formation practices

**B. Recruitment Process (after opening)**

Recruitment will begin immediately after families have enrolled and the school community is established, with the expectation that the board will make its appointment well in advance of the six-month deadline.

Recruitment Launch (first 30-45 days after opening)

Within the first month of school, the board will publicly announce the parent board seat through multiple channels:

- Back-to-school family communications (email/newsletter and the school website)
- A brief announcement at a family event (e.g., curriculum night or orientation)

- A dedicated "Parent Board Representative" webpage with the role description, application, deadlines, and contact information for the Governance Committee

Information Session & Q&A
The board will host a short information session for interested parents explaining:

- What a governing board does (and does not do)
- Fiduciary responsibilities and confidentiality
- Time commitments and meeting cadence
- How parent voice is gathered and how individual issues are handled (through proper channels)
- The selection timeline and process

Application Window
The school will maintain an application window of at least 30 days. Families may self-nominate, and staff may share the opportunity broadly, but staff will not control or decide the selection.

**C. Selection & Appointment Process**

Screening & Eligibility Verification
The Governance Committee will review applications and verify threshold requirements:

- Child currently enrolled at WAK
- Ability to meet attendance expectations and serve the term
- Completion of initial disclosure questions (potential conflicts, vendor relationships, employment relationships)

The board will conduct intentional outreach to ensure broad awareness and participation across the full parent community. Notices will be distributed through multiple channels (email, printed backpack copies, website posting, and in-person announcements) and will be provided in families' home languages where applicable. The board will host at least one information session at a family-accessible time and will provide a simple application process to reduce barriers to participation. In selection, the board will consider how candidates collectively strengthen representation and trust across the school community while remaining focused on governance fitness and fiduciary responsibility.

Interviews & Reference Checks
The Governance Committee will interview finalists using a consistent rubric focused on governance fitness, including:

- Understanding of the difference between governance vs. management
- Sound judgment, discretion, and ability to maintain confidentiality
- Ability to deliberate respectfully and prioritize schoolwide interests over individual preferences
- Willingness to support rigorous academics, strong culture, and the mission of WAK

WILBERFORCE ACADEMY

- Readiness to engage with data, budgets, and compliance responsibilities

Where appropriate, the committee may request references or conduct an additional conversation to ensure good fit.

Committee Recommendation & Board Vote
The Governance Committee will present a recommended candidate (and, if desired, an alternate) at a regularly scheduled board meeting. The full board will appoint the parent representative by vote at an open meeting and record the appointment in the minutes. This timeline ensures compliance well before the statutory six-month requirement.

If the first recruitment round yields too few qualified applicants, the board will extend the application window and intensify outreach while still meeting the six-month deadline.

**D. Onboarding Program**
The board will provide a comprehensive onboarding experience designed to equip the parent representative to govern with confidence and integrity.

First-week Orientation: Mission, Expectations, & Confidentiality.
Within the first two weeks, the board chair (and/or Governance Committee chair) will conduct an orientation meeting covering:

- WAK's mission and culture, including the school's formative practices and expectations for community life
- The board's annual priorities and performance dashboard
- Board meeting norms, committee structures, and how to raise questions appropriately
- Confidentiality expectations and what can/cannot be discussed outside the boardroom

Fiduciary Duties & Ethics Training.
Within the first 30 days, the parent representative will complete training on the core obligations of a nonprofit charter board member:

- Duty of Care: preparing for meetings, reading materials in advance, asking good questions, and making prudent decisions
- Duty of Loyalty: acting in the best interest of the school, avoiding self-dealing, and disclosing conflicts
- Duty of Obedience: ensuring the school follows its charter, bylaws, and applicable legal requirements
- Conflicts of interest procedures and annual disclosures
- Open meetings/open records basics and how board communications are handled

The parent representative will sign all standard board documents (ethics statement, conflict-of-interest disclosures, and confidentiality acknowledgement) consistent with all other directors.

Board-Management Delineation Training

Because parent representatives can unintentionally be pulled into operational matters, the onboarding includes explicit instruction on:

- The board's job: set policy, approve budgets, hire/evaluate the School Director, monitor performance, ensure compliance
- The School Director's job: manage staff, implement curriculum, run operations, handle individual family issues through the school's established processes
- Proper channels: how the parent representative can surface themes from family experience without adjudicating individual grievances or directing staff

Academic & Student Supports Immersion

Within the first 60 days, the School Director and academic lead will provide a structured briefing on:

- Curriculum and instructional design (K-8)
- Assessment plan, data cycles, and academic goals
- Special populations service delivery (IEP/504/EL/RTI²) and compliance safeguards
- School culture systems and discipline framework (including due process principles)

Finance & Operational Stewardship Immersion

The board treasurer (and/or finance committee chair) will walk the parent representative through:

- The annual budget and how it connects to staffing, enrollment, and facility costs
- Monthly financial reports (budget vs. actual, cash position, enrollment variance)
- Internal controls, approval thresholds, procurement norms, and audit process
- Key contracts and operational risk areas (insurance, facilities, transportation, safety)

Mentorship & Integration.

The parent representative will be paired with a "board mentor" (an experienced director) for the first year. The mentor will meet briefly before and after the first two board meetings to answer process questions, support preparation, and help the new director engage effectively.

**E. Ongoing Support, Evaluation, & Continuity**

- The parent representative will participate in the board's annual training and self-evaluation cycle.
- The Governance Committee will review annually whether the parent voice structure is effective (and may recommend additional parent advisory mechanisms), while maintaining the statutory board seat.
- If the parent representative's child is no longer enrolled, the Governance Committee will initiate a transition plan and recommend a replacement to the board in a timely manner, ensuring continuous compliance with T.C.A. § 49-13-109.

WILBERFORCE ACADEMY

*38. Explain how the board will interact with the school leader, including how the board will support, develop, and evaluate the school leader each year. Include, as **Attachment 4**, an organization chart that shows the relationship among the school's governing board, management, and leadership in:*

- *Year 1; and*
- *At full capacity.*

WAK's governing board will maintain a clear, healthy, and disciplined working relationship with the School Director that preserves strong executive authority while ensuring rigorous oversight of academic outcomes, operational performance, and financial stewardship. The board will interact with the School Director through:

- a defined delegation model
- a quarterly performance review cadence anchored in an annual Performance Success Plan
- an aligned Personalized Professional Development Plan (PPDP)
- a set of executive limitations that establish the decisions and commitments requiring board review and approval

**Governance Model & Delegation of Authority**

<u>One Board, One Voice; One Leader, Clear Authority</u>
The board governs through written policies and official votes in duly called meetings. Individual directors do not direct staff, supervise day-to-day work, or make requests of employees outside the agreed reporting structure. The School Director is the board's single point of executive authority for school management.

<u>Strategy & Guardrails, Not Management</u>
The board sets the school's mission-aligned outcomes ("ends"), establishes a small number of non-negotiable guardrails ("Executive Limitations"), and then evaluates the School Director based on results and compliance. Within those policies, the School Director has broad discretion to design systems, hire and manage staff, implement the academic program, and run daily operations.

Committees may support the board's work (e.g., Academic Excellence, Finance & Audit, Governance), but committees do not supervise staff. Committee work is conducted in coordination with the School Director and is reported back to the full board for action.

**Regular Interaction & Communication Protocols**
To ensure clarity, responsiveness, and appropriate boundaries, the board will interact with the School Director through the following protocols:

<u>Chair-Leader Check-Ins</u>

The board chair (or board chair and vice chair) will hold a brief, scheduled check-in with the School Director (typically every 1-2 weeks). These are not "mini-board meetings." They are used to:

- Preview upcoming board agendas and materials
- Surface emerging risks early (enrollment, staffing, facilities, compliance, safety)
- Ensure the School Director has the board's support and clarity on board expectations
- Confirm that requests coming to the board are framed for governance-level decision making

<u>Board Interaction</u>

The School Director will submit a concise written "Leader Report" in advance of each regular board meeting, including high-level academic, operational, and financial indicators, key decisions required, and any items that implicate Executive Limitations. The board will reserve meeting time for:

- Monitoring performance against the PSP and board dashboard
- Reviewing compliance and risk indicators
- Approving matters that fall within Executive Limitations
- Providing strategic guidance (without directing tactics)

<u>Communication</u>

The School Director may contact the board chair immediately if a significant risk event occurs (e.g., safety incident, material facility disruption, serious compliance notice, unanticipated cash crisis). The chair will determine whether an emergency meeting is needed, consistent with applicable open meetings requirements.

**Leader Position Success Profile (PSP)**

The board will anchor leader expectations, support, and evaluation in a Position Success Profile (PSP) for the School Director. This PSP is not a "to-do list." It is a disciplined statement of why the role exists, what outcomes define success, and what competencies and practices are required to deliver those outcomes. The board will adopt and use the PSP to ensure clarity, preserve healthy delegation, and evaluate performance consistently.

The PSP begins with a one-paragraph "role mission" that answers: *What is the enduring purpose of the School Director role at the Wilberforce Academy of Knoxville?* It is written in mission-anchored, outcome-oriented language that emphasizes responsibility for student achievement, operational integrity, and financial stewardship.

Outcomes are the non-negotiable results the board expects the leader to produce. Each outcome will include a clear result statement and the metrics and thresholds that indicate "on track" vs. "off track."

Outcomes will be organized in four domains:

- Academic Outcomes: student achievement and growth, implementation fidelity to curriculum and assessment cycles, subgroup progress
- Culture & Talent Outcomes: school culture strength, staff health and retention, disciplined execution of behavior systems, family trust and communication
- Operational Outcomes: compliance, safety and risk management, systems and routines, enrollment and attendance stability
- Financial Outcomes: balanced budget execution, cash management, reserves, internal controls, clean audit posture

The PSP will also include a small number of “first-year build” outcomes (for start-up phases) that address opening readiness: staffing, facility readiness, safety, enrollment, and core operating systems.

The PSP also identifies the competencies required to deliver the outcomes at WAK. These are not generic virtues; they are observable capacities tied to school leadership performance, such as:

- Instructional Leadership: driving a data cycle, building teacher practice, ensuring curriculum fidelity
- Operational Leadership: systems-building, project management, compliance discipline
- Financial Stewardship: budget ownership, resource allocation, internal controls mindset
- People Leadership: selecting and developing leaders, coaching, accountability, retention
- Communication and Stakeholder Trust: clear messaging, family partnership, crisis communication
- Judgment and Integrity: risk awareness, candor with the board, ethical decision-making

Each competency will include brief “look-fors” so the board and leader can recognize strong practice in real time.

The board will adopt an initial PSP for the School Director prior to (or at) the start of the academic year so that expectations are explicit from Day 1. Each year, the board and School Director will update the PSP in light of prior year performance, the school’s growth stage, and the charter commitments and strategic priorities. This keeps the PSP stable in mission but responsive in annual emphasis (e.g., launch year vs. expansion year).

The PSP will be operationalized through a quarterly review cadence. Each quarter, the leader will submit evidence tied to the PSP outcomes (dashboard, academic data, compliance reports, budget-to-actual, staffing and culture indicators). The board will review progress against the PSP, identify what is on track, what is at risk, and what corrective actions or supports are needed, without stepping into management.

The board will use the PSP to generate a “Personalized Professional Development Plan” (PPDP) for the leader each year. The PPDP will be derived directly from the PSP competencies and any

outcome domains that require strengthened executive capacity. This ensures development is not abstract (e.g., "grow as a leader") but targeted (e.g., strengthening data-cycle execution, strengthening financial forecasting discipline, strengthening leader-team coaching routines). The board will monitor PPDP progress quarterly alongside PSP outcomes.

The annual leader evaluation will be anchored in the PSP. The board's evaluation will be based on the following evidence:

1. the extent to which the leader delivered the PSP outcomes
2. the demonstrated strength of PSP competencies required to sustain those outcomes

This approach ensures clarity, fairness, and a strong line of sight between the charter commitments and the leader's performance expectations.

**Personalized Professional Development Plan**

The board will pair the PSP with the PPDP for the School Director. The PPDP will be directly derived from the PSP and any growth opportunities surfaced in the prior year's evaluation.

The design will include:

- 2-4 priority leadership development focus areas for the year
- A planned set of learning experiences (coaching, mentorship, targeted training, peer school visits, conferences, reading and reflection)
- A timeline with quarterly checkpoints
- Evidence of learning and application (e.g., improved dashboard accuracy, stronger leader-team performance, observable system improvements, staff retention outcomes)

Board Support for PPDP will include:

- Approving a dedicated professional development budget line for leader growth
- Providing access to a mentor or executive coach (where appropriate)
- Facilitating peer connections, site visits, or networks aligned to the school model
- Ensuring the School Director has the time and authority to implement improvement work (without adding conflicting initiatives)

The School Director will provide brief quarterly reflections tied to the PPDP (what was done, what was learned, what changed, what results are emerging). The board's role is to ensure the plan is executed and is improving leadership capacity, not to micro-manage the method.

**Executive Limitations**

To protect strong executive leadership while ensuring proper governance oversight, the board will adopt Executive Limitations that define the decisions, commitments, or risk events that must be brought to the board for review and approval (or formal notification). These limitations clarify what the School Director must seek board action on, while preserving broad operational discretion in all other matters.

Some categories of executive limitations will include:

Charter & Mission-Critical Changes

- Any proposed change to grade span, enrollment cap, calendar model, or school design that would materially alter the charter commitments
- Material changes to the academic program design or assessment strategy that affect how the school meets Tennessee standards and accountability requirements
- Any waiver requests or amendments requiring authorizer or Commission approval

Finance & Contracting

- Annual budget adoption and any mid-year budget amendments above board-set thresholds
- Any debt, line of credit, lease, real estate commitment, or financial guarantee
- Contracts above a board-set threshold amount and/or multi-year commitments above a defined total value
- Selection of the independent auditor; acceptance of the annual audit and corrective action plans
- Establishment or changes to key financial controls (spending authority levels, procurement rules, signatory authority)

Personnel Matters at Governance Level

- Hiring, evaluation, contract terms, and separation of the School Director
- Changes to the school-wide organizational structure, leadership team design, or compensation framework that have material budget impact
- Any settlement agreements, litigation-related employment decisions, or extraordinary severance packages above a board-set threshold

Safety, Compliance, & Reputational Risk

- Significant safety incidents or major changes to the school's security plan
- Material compliance notices from the authorizer, state, or federal agencies
- Any investigation, litigation, or event that could materially impact the school's operations, finances, or reputation
- Required insurance coverage changes or claims that exceed a defined threshold

Transparency & Public Accountability

- Significant public communications related to closures, emergencies, or major operational disruptions (board chair coordination)

The Executive Limitations are designed to make governance predictable: the School Director knows what must come to the board, and the board stays out of daily management.

**Evaluation & Support Cycle with Quarterly Cadence**
The board will evaluate the School Director through a disciplined annual cycle with formal quarterly reviews, culminating in an annual written evaluation and contract decision.

<u>Quarterly PSP Reviews (formal, board-documented)</u>

- Quarter 1 Review: progress on start-up execution and early leading indicators, confirmation that systems and dashboards are functioning
- Quarter 2 Review (Mid-Year): deeper review of academic trajectory, culture, staffing stability, and financial health; adjustments made if off-track
- Quarter 3 Review: trajectory toward end-of-year goals; risk mitigation for testing season, staffing plans, and budget build for next year
- Quarter 4 Review (Annual Closeout): final PSP results, summary of outcomes, evaluation narrative, and recommended goals for the next PSP

<u>Annual Evaluation (written, board vote acknowledged)</u>

- A results-based assessment of PSP goals (academic/operational/financial)
- Leadership practice assessment (execution strength, culture-building, team health, compliance leadership)
- A summary of strengths and growth priorities
- The next year's PPDP focus areas
- Contract, compensation, and continuation decisions (as applicable)

If quarterly reviews show the School Director is materially off-track, the board will require a written corrective action plan with clear milestones and support resources. The board's aim is timely course correction, not surprise evaluation.

**Protecting Healthy Boundaries**
This plan is intentionally designed to protect the line between governance and management:

- The board measures outcomes, reviews compliance, and enforces Executive Limitations.
- The School Director designs and runs the systems that achieve those outcomes.
- The board supports the School Director through clarity, resources, and structured feedback, without becoming an operating team.

*39. Describe the board's policies related to:*

- *Planned meeting frequency;*
- *Committee or advisory board structure(s);*
- *Ethical standards and procedures for identifying and addressing conflicts of interest; and*
- *Hearing and addressing complaints.*

## Board Policies Related to Meetings, Committees, Ethics, and Complaints

Planned Meeting Frequency

The WAK board of directors will establish and maintain a regular meeting schedule to ensure disciplined oversight of the school's academic, operational, and financial performance. Consistent with WAK's Bylaws and the Tennessee Public Charter Schools Act, the board will hold a minimum of one regularly scheduled meeting per quarter, with additional meetings convened as needed to fulfill its fiduciary duties, including timely adoption of the annual budget, review of audit reports, key contract approvals, and compliance reporting to the authorizer and to the public. The board recognizes its obligation to comply with the Tennessee Open Meetings Act and the Tennessee Public Records Act and will publish a calendar of regular meetings annually, including reasonable advance public notice of meetings and agendas (T.CA. § 49-13-111(h) §§ 8-44-101 et seq., §§ 10-7-101 et seq).

Committee and Advisory Board Structures

To support informed governance while preserving the board's ultimate authority, the board will establish standing and ad hoc committees governed by written charters that define purpose, scope, membership, meeting frequency, and reporting expectations. Committee roles are advisory; final decision authority resides exclusively with the full board, except where the board has expressly delegated limited authority by resolution.

The board will maintain committees that align with its core fiduciary functions, such as:

- The Governance and Nominating Committee, which supports the board in fulfilling its responsibilities for board recruitment, orientation, ongoing development, annual self-evaluation, policy review, and oversight of ethical standards and conflict of interest compliance
- The Finance and Audit Committee, which supports the board's financial oversight responsibilities, including budget development, financial reporting review, internal controls, audit oversight, and risk monitoring
- The Academic Excellence and School Culture Committee, which supports the board's duty to monitor academic performance and mission fidelity, including academic goal attainment, assessment results, culture indicators, and recommendations for board action
- The Operations and Safety Committee, which supports the board's oversight of facilities planning and safety readiness, major operational contracts, and compliance with legal obligations related to student and staff welfare

The board may also convene non-governing advisory groups, such as a parent advisory council or community advisory council, to provide structured input. Advisory groups do not hold decision authority and are organized solely to inform the board and school leadership.

Ethical Standards and Conflicts of Interest

The board will govern with integrity, transparency, and fidelity to its legal obligations and to WAK's mission. The board will adopt and annually reaffirm a written Code of Ethics and Conflict of Interest Policy that applies to all directors and key leaders and will make that policy available for public inspection as required by law, and according to T.C.A. § 49-13-111.

Standards of Conduct

Board members will:

- Act in good faith and in the best interests of WAK and its students
- Comply with their duties of care, loyalty, and obedience to mission
- Maintain confidentiality of legally protected information
- Avoid using board service for personal gain
- Support board decisions collectively once made
- Treat families, staff, and the public with respect and fairness

Conflict of Interest Policy

A conflict exists when a director's personal, professional, or financial interests could compromise or appear to compromise independent judgment, including contracts with a director's business or relationships that create direct interests prohibited under state law (T.C.A § 49-13-111, §§ 12-4-101 and 12-4-102),

To identify and address conflicts:

- Each director will complete an annual written disclosure form and will update it within ten business days of any material change.
- At the start of each board meeting, directors will disclose any interests related to agenda items.
- Directors will disclose potential conflicts as soon as they become aware of them.

When a conflict is identified:

- The director will disclose the nature of the conflict in sufficient detail for the board to evaluate it.
- The director will recuse from discussion and voting on the matter.
- The board will document the disclosure and recusal in the minutes.
- For related-party transactions, the board will require evidence of market comparability and a determination by disinterested directors that the transaction is in WAK's best interest before approval.

The board will ensure training on ethical governance and conflict awareness during orientation and on an annual basis.

Hearing and Addressing Complaints

WAK will address complaints with clarity, timeliness, and respect, encouraging resolution at the most direct level while preserving clear governance boundaries. The board's role is to ensure that

fair policies exist and are followed, not to serve as the first point of resolution for routine operational questions.

Complaint Policy Overview

The complaint policy will be publicly available and will include the following tiers:

1. Informal Resolution: Complainants are encouraged to seek resolution directly with the staff member most closely connected to the concern.
2. School-Level Formal Complaint: If unresolved, a written complaint may be submitted to the School Director, who will respond within a defined timeframe.
3. Governance-Level Appeal to the Board: A complainant may appeal to the board when the complaint involves:
    a. An alleged violation of board policy
    b. Alleged material non-compliance with the charter contract or applicable law
    c. An allegation that due process was not followed in a significant decision
    d. A concern that implicates the School Director directly

Board Intake and Review

Complaints presented to the board will be received by the Board Secretary and routed to the Board Chair or Governance Committee for screening. If the matter is within the board's jurisdiction, it will be scheduled for consideration at the next appropriate meeting and handled with appropriate confidentiality and legal compliance.

Board Response and Boundaries

The board will issue a written outcome describing any action taken, which may include policy clarification, directives to school leadership to follow policy, commissioning independent review, referral to the authorizer, or a determination that the matter is outside the board's authority.

The board will not:

- Reconsider routine student discipline decisions unless there is credible evidence of policy violation or due process failure
- Override leadership decisions that are within properly delegated authority and consistent with established policy
- Interfere with routine day-to-day management of staff, instruction, or operations

Monitoring and Continuous Improvement

The School Director will maintain a complaint log with appropriate privacy safeguards and will report to the board quarterly on complaint themes, resolution timelines, and corrective actions. This enables the board to address systemic issues through policy refinement and leadership accountability.

Authorizer Escalation

Nothing in this complaint policy limits a complainant's right to file grievances or appeals directly with the school's authorizer or other legal authorities. When a complaint involves potential violation of the charter contract or legal non-compliance, the board will, as appropriate, notify the authorizer in accordance with reporting requirements in T.C.A. § 49-13-111(d).

*40. Provide the following attachments:*

- ***Attachment 5**: Articles of Incorporation*
- ***Attachment 6**: Proof of nonprofit* and tax-exempt status*
- ***Attachment 7**: Governing board bylaws*

Please see Attachments 5, 6 and 7.

2.2 Staffing

*41. Describe the school's leadership and staffing structure.*

WAK will launch under the founding School Director, Mr. Zach Wishart. The School Director is responsible for mission alignment and fulfillment, including the overall welfare and development of the school, its faculty, staff, students, and school community in addition to overseeing all academic, operational, and financial components of the school. He will be responsible for hiring and developing the team that in turn establishes the school's culture and operational excellence. For this reason, the director- and dean-level positions will all report into the School Director, who will be tasked with leading them to become a healthy and cohesive team, aligned around a shared vision.

When the school has reached maturity, the School Director will retain direct leadership of the middle school, in addition to leading the whole school, but will delegate direct leadership of the elementary school to the Elementary Principal. The School Director's leadership team at this phase will consist of the following: the Elementary Principal, the part-time Director of Finance, the Director of Operations, the Dean of Curriculum and Instruction (K-8), Dean of Culture, the Director of Development, and the Director of Specialized Services, all of whom report to the School Director. Completing the administrative team will be a Registrar and an Office Manager who will report to the Director of Operations.

This team will start small and grow with the school as the budget allows. In Year 0, before the school opens, the School Director's team will consist of the Director of Operations, the Dean of Curriculum and Instruction, and the Office Manager. The director and dean will report to the School Director, while the Office Manager will report to the Director of Operations. Having a small team at the outset will ensure that there are enough hands to do the work, while remaining

within budget and keeping mission and vision alignment tight. In Year 1, this team will grow to include the Director of Specialized Services, Director of Development, Registrar, Custodian, and faculty. The directors, dean, and faculty will report to the School Director, while the Registrar, Office Manager, and Custodian will report to the Director of Operations. In Year 3, the part-time Director of Finance and the Dean of Culture will be hired. They will report to the School Director. In Year 4, WAK will enter the final phase of growth for the administration team by hiring the Elementary Principal, which will allow for increased instructional focus and faculty support in grades K-6 without fragmenting leadership or introducing premature layers of administration. It will also allow the School Director to stay on top of the increasing complexity of instructional leadership as the school grows and the middle school is added.

Before the Elementary Principal is hired, faculty will be hired by and report directly to the School Director. All other administrators will have delegated authority with which to direct aspects of faculty. Elementary faculty will be in teams of four, given that there are four sections per grade, and grade-level team leads will be designated to facilitate team meetings and communicate team needs to administration, but team leads will not have direct authority over their team members. Once the Elementary Principal is in place, elementary faculty will then report directly to that person, while the middle school faculty continue to report directly to the School Director.

To further delineate the reporting structures, the Director of Operations will have the following direct reports: Office Manager, Registrar, Custodian, School Nurse, and any other non-academic, non-instruction staff positions that are put into place. The Director of Specialized Services will have the following direct reports: Special Education Teachers, EL Teachers, and the School Counselor/Therapist. This team will grow with the student population.

The main role of Dean of Curriculum and Instruction is to continually evaluate and seek improvements for the curriculum and its delivery. This will mean leading the review process of textbooks and curriculum, developing and delivering trainings for faculty, and observing and giving feedback on teacher performance. In Years 1-3, the Director of Curriculum and Instruction will oversee instructional leadership and schoolwide culture systems, including student onboarding and behavior supports. As enrollment grows, cultural responsibilities will transition to a dedicated Dean of Culture beginning in Year 4.

The Director of Operations is responsible for the operational excellence of WAK. They will be responsible for designing and implementing the systems and processes that make the school function, as well as establishing and maintaining healthy relationships with vendors and third-party organizations, supporting the School Director in developing the budget (before the part-time Director of Finance is hired), ensuring the budget is followed, and establishing a culture of hospitality and joyful order amongst their team.

The Director of Specialized Services is responsible for ensuring excellence in WAK's delivery of services to meet the diverse needs of students. This role will oversee the design, compliance, and

implementation of systems and processes that ensure those needs are met. This role will also cultivate and maintain strong relationships with related vendors and third-party providers, collaborate with the School Director on budget development and foster a culture of joyful order within the Specialized Services team.

The Director of Development is responsible for meeting fundraising goals. Duties include cultivating donor relationships, executing the annual campaign, obtaining grants, and generating the income necessary to secure the school's financial position.

*42. Explain the school's strategy to recruit and retain high-performing teachers. Outline the school's proposed salary ranges, employment benefits, and any incentive structures. Compare the salary ranges to the resident district and explain how they are sufficient to recruit teachers.*

WAK seeks to build and maintain school culture through the recruitment and retention of talented, high-performing teachers. We believe that the backbone of a school is its faculty, the people who teach the curriculum daily, build relationships with students and families, and lead their classrooms by example. To fulfil our mission and vision, Wilberforce will develop a collegial faculty culture in which teachers pursue moral and professional excellence, exercise intellectual curiosity and humility, and enjoy trust and collaboration with their peers and leaders.

Our strategy to recruit high-performing teachers will be led by the School Director and will focus on communicating clarity of mission and vision, developing year-round and targeted talent pipelines, conducting a rigorous and respectful selection process, and offering competitive and transparent compensation.

- **Clarity of Mission and Vision:** WAK's recruitment will be clear and transparent about the school's unique educational mission and vision. WAK will use mission-oriented language consistently across job postings, interviews, and outreach. Job postings will highlight our school's identity and culture and will explicitly name what kind of teacher will thrive at our school. Our clarity and purpose will attract mission-aligned teachers to apply, interview, and accept job offers because we will offer them a Christian workplace with a high-quality vision for pedagogy, curriculum, and culture.
- **Year-Round Recruiting and Targeted Talent Pipelines:** WAK will recruit teachers throughout the year, not just during narrow periods in the spring and summer. We will foster relationships with local and non-local teaching talent through partnerships with teacher preparation programs, classical or faith-based education networks, and graduate programs that align with WAK's educational vision. We will explore talent pipelines through Johnson University, Carson Newman University, University of Tennessee Knoxville, and other colleges and universities for intern placement and teacher recruitment.

WILBERFORCE ACADEMY

- **Rigorous and Respectful Selection Process:** WAK will conduct multi-step interviews that cover content knowledge, pedagogy, and cultural fit. Candidates may be asked to perform a teaching demonstration and provide a writing sample. Throughout the process, we will treat candidates with collegiality and intellectual respect, characteristics reflected in the faculty culture of the school.
- **Competitive and Transparent Compensation:** WAK will attract teachers through transparent and clear growth opportunities and long-term financial stability. In accordance with T.C.A. § 49-3-306, WAK will adopt salary ranges aligned with the state salary schedule for teachers and mandated base salary minimum, as shown in the chart below. This proposed salary structure is based on bands that are aligned to experience, ladders that are aligned to educational training, and merit pay available within each band. Additionally, cost-of-living adjustment (COLA) raises will be given to every teacher every year to offset inflation and maintain teachers' purchasing power. WAK will also offer meaningful employment benefits in very competitive amounts—in our proposed budget, WAK's benefits package totals about 35% of the teachers' salaries. Because we will follow a similar salary schedule as all other district and charter schools, plus offer additional raises, incentives, and benefits, our compensation will be on par with the other schools in Knox County and will be well-positioned to attract talented, mission-driven teachers.

| Band | Years of Experience | Credential | Min | Mid | Max |
|---|---|---|---|---|---|
| Band 1 | 0-3 | Bachelor's | 50,000 | 52,000 | 54,000 |
| Band 1 | 0-3 | Master's | 54,000 | 56,000 | 58,000 |
| Band 1 | 0-3 | Ed.S. | 55,500 | 57,500 | 59,500 |
| Band 1 | 0-3 | Doctorate | 57,000 | 59,000 | 61,000 |
| Band 2 | 4-7 | Bachelor's | 53,000 | 55,000 | 57,000 |
| Band 2 | 4-7 | Master's | 57,000 | 59,000 | 61,000 |
| Band 2 | 4-7 | Ed.S. | 58,500 | 60,500 | 62,500 |
| Band 2 | 4-7 | Doctorate | 60,000 | 62,000 | 64,000 |
| Band 3 | 8-12 | Bachelor's | 56,000 | 58,000 | 60,000 |
| Band 3 | 8-12 | Master's | 60,000 | 62,000 | 64,000 |
| Band 3 | 8-12 | Ed.S. | 61,500 | 63,500 | 65,500 |
| Band 3 | 8-12 | Doctorate | 63,000 | 65,000 | 67,000 |
| Band 4 | 13+ | Bachelor's | 59,000 | 61,000 | 63,000 |
| Band 4 | 13+ | Master's | 63,000 | 65,000 | 67,000 |
| Band 4 | 13+ | Ed.S. | 64,500 | 66,500 | 68,500 |
| Band 4 | 13+ | Doctorate | 66,000 | 68,000 | 70,000 |

WAK's strategy to retain high-performing teachers will focus on offering competitive compensation and performance-based raises, clear and reasonable job expectations, ongoing professional formation, a collegial faculty culture, quality support and feedback structures, recognition of excellent work, opportunities for career growth, and data use from exit interviews.

WILBERFORCE ACADEMY

- **Competitive Compensation and Performance-Based Raises:** The proposed salary schedule above is designed to promote teacher retention by rewarding seniority, excellence in teaching, and educational attainment. Teachers will be encouraged to invest in their position at the school and earn performance-based raises for excellence in teaching.
- **Clear and Reasonable Job Expectations:** Teachers at WAK will have reasonable, openly communicated workloads with clear priorities. We will minimize unnecessary administrative duties and meetings so that teachers can focus on the most important part of their job: quality teaching. Teachers will have planning periods every day to lesson plan and collaborate with their grade-level team. These measures will help prevent burnout and promote a well-balanced professional culture.
- **Ongoing Professional Formation:** Just as students learn what is good, true, and beautiful through the curriculum, teachers are renewed personally and professionally through ongoing training and formation. Wilberforce will offer our teachers ample opportunities for continued learning and professional development in content matter, pedagogy, classical education, and other topics that are edifying to them as educators. These opportunities will include summer faculty trainings, conferences, webinars, guest speakers, reading groups, and more.
- **Collegial Faculty Culture:** Strong faculty culture is essential to retaining teachers. Wilberforce will create a culture of community and purpose so that teachers feel that what they are doing matters. The faculty culture will unite teachers around a sense of friendship, intellectual curiosity, and commitment to Christian classical education, providing a shared basis for satisfaction in the workplace.
- **Quality Support and Feedback:** Administrators and lead teachers will regularly observe classes and provide tiered feedback and support to teachers. Observations will open the door for honest conversations about classroom management and pedagogy, and help teachers improve their craft. Feedback after observations will positively reinforce the things teachers do well while also offering a few actionable steps to improve. In addition, every teacher will be part of a subject- or grade-level team that supports each other in lesson planning and pedagogy. New teachers will also have a mentor teacher who supports them as they integrate into the school faculty and realize WAK's educational vision.
- **Recognition of Excellence:** WAK will actively recognize and promote excellence in teaching. This will occur through quarterly and annual awards for quality teaching, presented during faculty meetings or all-school Town Hall assemblies. Being recognized for a job well done will increase teacher satisfaction and positively reinforce teachers' effort to grow as educators.
- **Opportunities for Career Growth:** By distinguishing themselves as excellent educators, teachers can grow their careers at WAK. Excellent teachers will have potential opportunities to become a grade-level or subject-area lead, an instructional coach, or a mentor teacher. These roles will provide opportunities for growth without removing excellent teachers from their valuable position in the classroom.

- **Data from Exit Interviews:** The data gathered from exit interviews will be systematically used to analyze why teachers leave and to adjust school structures based on those findings. This will help WAK make informed decisions about how to retain teachers, and in the long term, will help WAK achieve a low rate of teacher turnover.

These specific principles and strategies will help make WAK an attractive workplace where talented teachers enjoy and thrive in their profession. The downstream effect of our happy, supported, and talented faculty will be a joyful school culture built around positive adult relationships.

*43. Describe the core components of the school's professional development plan and detail how those components will support effective implementation of the school model and instructional plan.*

The WAK professional development (PD) plan is intended to serve as a living model that can be responsive to the specific needs of the Wilberforce faculty and student body. The objectives and design principles (core components) of the plan are established below as the enduring guidelines for future adaptations of an initial two-year sample plan.

**Professional Development Objectives**

- To help faculty grow in knowledge and passion for the Wilberforce educational mission and vision
- To equip teachers to successfully implement the pedagogies particular to each curriculum
- To align classroom management with pedagogical goals
- To form faculty and faculty culture with rich content via Socratic seminars
- To articulate together, as a faculty, the conviction that motivates Christians to offer education to all
- To equip teachers to confidently and competently implement the school's assessment, health and safety, and special education programs

**Structure of the Annual Professional Development Plan**

WAK's professional development plan will:

- Include a one-hour all-faculty meeting every other week, some portion of which will necessarily be devoted to practical and operational matters best covered in person rather than via memo (called by the in-house name "Housekeeping")
- Operate in tandem with an ongoing cycle of individualized teacher observation and support (called "Review and Resource")
- Have teachers collectively read and discuss one short book each year, alternating a book on pedagogy with a classic work (of literature, history, mathematics, philosophy, etc.)
- Allow for the sequence of presentation topics to proceed on two tracks, one for K-3rd grade faculty and one for 4th-8th grade faculty, when needed

- Set aside time for teacher teams to meet by grade or discipline to discuss best practices, solutions to challenges, and any other needed work in clarity or alignment

**Alignment to Tennessee Educator Acceleration Model (TEAM)**
WAK's professional development program, informed by multiple sources of instructional and student data, is aligned to the expectations set out by the state legislature in T.C.A. § 49-1-302 and detailed in State Board of Education Policy 5.201 and Evaluation Rule 0520-02-01. Professional learning priorities are aligned to the Tennessee Educator Acceleration Model (TEAM), with particular emphasis on instruction, planning, learning environment, and professional responsibility.

Professional development will be evaluated for effectiveness and refined based on classroom observations, walkthroughs, student performance data, and faculty feedback. The school intends to use professional learning circles, coaching conversations, and targeted summer training to support continuous improvement in instructional practice. Selected classroom management and instructional strategies are drawn from research-based sources, including *Teach Like a Champion*, and are implemented as tools to support TEAM-aligned instructional practices rather than as a standalone framework.

In addition to instructional professional development, WAK will ensure that all faculty and staff complete required health, safety, and compliance trainings in accordance with Tennessee law and authorizer expectations.

These trainings, scheduled so as to allow required staff to attend alongside faculty include:

- **CPR and First Aid certification**, including training in the use of automated external defibrillators (AEDs), as required for designated staff
- **Mandatory reporter training** related to child abuse and neglect
- **Suicide prevention training** as required by Tennessee statute
- **Bloodborne pathogens and universal precautions training**
- **School safety and emergency procedures**, including drills and crisis response protocols
- **FERPA and student data privacy training**
- **Special education compliance training**, including IDEA and Section 504 requirements, as applicable to staff roles

Completion of required compliance training is monitored by school leadership and documented annually. Staff who do not complete required training are not permitted to assume instructional or supervisory duties until requirements are met. The PD plan also supports effective implementation of Tennessee Academic Standards, Response to Instruction and Intervention ($RTI^2$) practices, and inclusive instructional strategies to meet the needs of all learners, including students with disabilities and other students requiring academic support.

WILBERFORCE ACADEMY

A two-year sample plan for all-faculty PD follows below, blocked out by week for both school years and by PD hours for the summer plan. This is an example of the above principles in action, not a plan for WAK's startup year.

**Summer Before Year 1**

Each summer before school starts, WAK will host the faculty and staff for several days of in-service trainings, team meetings, and room set-up. Prior to this will be additional summer training for new hires. The basic summer training plan follows. New hires and mid-year hires that missed the summer training will be required to attend.

**New Hire Summer Trainings**

| | |
|---|---|
| Day 1: | Wilberforce mission, vision, history (in future years), culture, and expectations as a charter school |
| Day 2: | Wilberforce approach to education, pedagogy, Biblical integration, and student formation |
| Days 3-8: | Intensive curriculum training in Singapore mathematics and ELA curricula such as Literacy Essentials and IEW |

**All-Faculty Summer In-Service**

Over the course of the school-wide in-service days, administration will cover Wilberforce mission, vision, and thematic goal for the year, school policy and procedure training, as well as ensuring a strong start to completing the required trainings including CPR and First Aid certification, mandatory reporter training, school safety and emergency procedures, FERPA and student data privacy training, special education compliance training including IDEA and Section 504 requirements, suicide prevention training, and bloodborne pathogens and universal precautions training.

**School Year 1 (Sample)**

Merged cells indicate a combined K-8 training. Presentation topics are underlined.

| | K-3 | 4-8 |
|---|---|---|
| **Quarter 1** | | |
| Week 1 | • <u>Our School's Unique Mission</u><br>• Introduce *Consider This* by Karen Glass as the faculty book of the year. | |
| Week 3 | • Introduce *Teach Like a Champion* (TLAC) strategy of the month: "Threshold."<br>• <u>Teaching Writing in Stages: Narration, Dictation, and Copywork</u> | |
| Week 5 | Discuss *Consider This*, Chapter 1-2. | |
| Week 7 | • Debrief "Threshold." Introduce TLAC strategy of the month: "Without Apology."<br>• <u>Example Poetry Lesson with Differentiated Instruction</u> | |
| Week 9 | Discuss *Consider This,* Chapter 3-4. | |
| **Quarter 2** | | |

WILBERFORCE ACADEMY

| | |
|---|---|
| Week 2 | • Debrief "Without Apology." Introduce TLAC strategy of the month: "Habits of Discussion."<br>• Teaching Biblical Literacy |
| Week 4 | • Debrief biblical literacy presentations<br>• Discuss *Consider This,* Chapters 5-6. |
| Week 6 | • Debrief "Habits of Discussion." Introduce TLAC strategy of the month: "Precise Praise."<br>• Why and How We Read Fairy Tales? with video presentation by Vigen Guroian |
| Week 8 | • Debrief (i.e., pair and share) on Guroian's video presentation on How Do We Read Fairy Tales?<br>• Discuss *Consider This,* Chapter 7-8. |
| **Quarter 3** | |
| Week 1 | Debrief "Precise Praise." Introduce TLAC strategy of the month: "Control the Game."<br>Professional Learning Circle small groups: Reading Aloud and Narration — Discuss: "Didactic Instruction" by Mortimer Adler, Chapter 3 of *The Paideia Program: An Educational Syllabus* |
| Week 3 | Hold for compliance training |
| Week 5 | • Debrief "Control the Game." Introduce TLAC strategy of the month: "Batch Process."<br>• Example of Whole-to-Parts Lessons: Nature Study and History |
| Week 7 | Hold for compliance training |
| Week 9 | • Debrief "Batch Process." Introduce TLAC strategy of the month: "Least Invasive Intervention."<br>• Professional Learning Circle small groups: Aligning Writing Expectations across Subjects and across Grades |
| **Quarter 4** | |
| Week 2 | Discuss *Consider This,* Chapter 9-10. |
| Week 4 | Presentation by guest speaker |
| Week 6 | Discuss *Consider This,* Chapter 11-Afterword. |
| Week 8 | • Debrief "Least Invasive Intervention."<br>• Coming up Next Year: Singapore and the Good of Arithmetic |

| **K-3rd Grade Summer Curriculum Training** | | | |
|---|---|---|---|
| **Content/Text** | **Delivery** | **Schedule** | **Who Attends** |
| **Literacy Essentials** | In-person | Recommended 10 days, 2-3 hours per day | All NEW K-3 classroom instructors and any returning teachers requiring re-training |
| **Well-Ordered Language & IEW Training** | Combination of in-person, video, and readings with guided discussion | Recommended 2 days, 3-4 hours per day | All NEW K-3 classroom instructors and any returning teachers requiring re-training |

WILBERFORCE ACADEMY

| | | | |
|---|---|---|---|
| **Socratic Pedagogy** | In-person | Recommended 1 day, 2-3 hours | All K-3 classroom instructors |
| **Singapore Math** Primary Mathematics 2022 Edition | In-person | Recommended 10 days, 3-4 hours per day | All NEW K-3 classroom instructors and any returning teachers requiring re-training |
| **4th-8th Grade Summer Curriculum Training Recommendations** | | | |
| **Content/Text** | **Delivery** | **Schedule** | **Who Attends** |
| **Seminar Training** | In-person, readings with guided discussion & how to craft seminar discussion questions, how to annotate, and how to assess | Recommended 2 days, 3-4 hours per day | All teachers in grades 4-8 |
| **Pedagogy of Narration and Dictation** | Combination of In-person, video, and readings with guided discussion | Recommended 1 day of 3-4 hours or 2 days of 2-3 hours | All teachers in grades 4-8 |
| **Pedagogy for Traditional Educators** | In-person (classroom order, lesson planning, lesson implementation, assessments); teachers create and share lesson plans and assessments as part of the training | Recommended 2 days, 2-3 hours per day | All teachers in grades 4-8 |
| **Singapore* & Carnegie Math** * Primary Mathematics 2022 Edition | In-person | Recommended 10 days, 3-4 hours per day | All NEW math instructors and any returning instructors requiring re-training |

**School Year 2 (Sample)**

| **K-8** | |
|---|---|
| **Quarter 1** | |
| Week 1 | • "Encounter First" with Socratic Pedagogy and Singapore<br>• Introduce *The Abolition of Man* by C.S. Lewis as the faculty book of the year. |
| Week 3 | Discuss *The Abolition of Man, Chapter* 1, first half. |
| Week 5 | • Introduce TLAC strategy of the month: "Show Me."<br>• Singapore Mathematics CPA Approach Review |
| Week 7 | Discuss *The Abolition of Man, Chapter* 1, second half |
| Week 9 | • Debrief "Show Me." Introduce TLAC strategy of the month: "Be Seen Looking."<br>• Singapore Math: Pictorial Representations [Click Cubes and Number Bonds to Bar Models] |
| **Quarter 2** | |
| Week 2 | Discuss *The Abolition of Man,* Chapter 2, first half. |

| | |
|---|---|
| Week 4 | • Debrief "Be Seen Looking." Introduce TLAC strategy of the month: "Engineer Efficiency."<br>• Professional Learning Circle small groups: Kodo Kit and Math Manipulative Management |
| Week 6 | Discuss *The Abolition of Man,* Chapter 2, second half. |
| Week 8 | • Debrief "Engineer Efficiency." Introduce TLAC strategy of the month: "No Opt Out."<br>• Singapore Mathematics: Parts of a Lesson—From Anchor Task to Algorithm Mastery |
| **Quarter 3** | |
| Week 1 | Discuss *The Abolition of Man*, Chapter 3, first half. |
| Week 3 | • Debrief "No Opt Out" Introduce TLAC strategy of the month: "Cold Call."<br>• Singapore Mathematics: Supporting Mental Math and Making Ten Through Games |
| Week 5 | Discuss *The Abolition of Man*, Chapter 3, second half |
| Week 7 | • Debrief "Cold Call" Introduce TLAC strategy of the month: "Stretch It."<br>• Singapore Mathematics: Achieving Automaticity with Number Facts |
| Week 9 | Presentation by guest speaker |
| **Quarter 4** | |
| Week 2 | • Debrief "Stretch It." Introduce TLAC strategy of the month: "All Hands."<br>• Socratic Teaching Review: What is a Good Question? |
| Week 4 | • Debrief "All Hands." Introduce TLAC strategy of the month: "Reject Self-Report."<br>• Professional Learning Circle small groups: Socratic Pedagogy |
| Week 6 | • Debrief "Reject Self-Report." Introduce TLAC strategy of the month: "Format Matters."<br>• Example Lessons: Socratic Openers Across the Curriculum |
| Week 8 | • Debrief "Format Matters."<br>• Coming up Next Year: [Area of Focus] |

## 2.3 Facilities

*44. Describe facility needs based on the educational program and projected enrollment.*

**Facility Needs Based on Educational Program and Projected Enrollment**

WAK's facility needs are guided by its mission to provide a rigorous, values-based education in a nurturing and structured environment, as well as by projected enrollment growth. In determining our needs, we used the enrollment projections from question 7, which is 100% of our maximum enrollment. The following considerations inform facility requirements:

- **Classroom and Instructional Space:** The campus will ideally be sized at approximately 75-80 square feet per student to support individualized instruction, inclusive special education supports, small-group interventions, and structured English immersion. At full enrollment of 693 students by Year 6, the permanent facility would require approximately 55,440 square feet.

- **Specialized Program Space**: The facility must include spaces for Specialized Academic Instruction, pull-out services, related services (speech, occupational therapy, physical therapy), and English language development instruction.
- **Common and Support Areas**: Additional spaces will include a cafeteria, administrative offices, library/media center, teacher planning areas, meeting rooms for parent and community engagement, gymnasium or multipurpose areas, playground and outdoor field space, and a health office. Student, staff, and visitor restrooms will be appropriately distributed throughout the campus to support daily operations and supervision. Site design will also consider safe traffic flow for arrival and dismissal, staff and visitor parking, and separation of pedestrian and vehicle pathways to promote student safety.
- **Compliance and Safety:** All facilities will meet or exceed applicable Tennessee and federal legal requirements, including local zoning and land-use approvals, certificate of occupancy requirements, and applicable building and fire codes as enforced by local authorities and the Tennessee State Fire Marshal, as indicated in T.C.A. §§ 68-120-101 et seq. Facilities will comply with the Americans with Disabilities Act (42 U.S.C. §§ 12101 et seq.) and Section 504 of the Rehabilitation Act, including requirements for accessible entrances, restrooms, and programmatic access through ramps, elevators, or lifts as required for multilevel structures. Safety standards will address fire protection systems, HVAC, plumbing, and electrical systems in compliance with adopted International Building Code (IBC) and Life Safety Code standards used by Tennessee jurisdictions, as well as school safety planning requirements under T.C.A. § 49-6-807.
- **Growth and Flexibility:** Facilities will allow phased enrollment growth, beginning with smaller cohorts while maintaining flexibility to expand classroom capacity, special services, and enrichment spaces as enrollment increases. This approach ensures operational efficiency in the early years while supporting long-term growth to full enrollment without compromising instructional quality, safety, or regulatory compliance.

*45. Describe the progress to date of identifying and securing a facility in the proposed neighborhood/community that will meet the needs of the proposed school, as described above. Name the individual(s) on the sponsor's team leading the search as well as any brokers or real estate consultants supporting the search.*

**Progress in Identifying and Securing a Facility**

WAK has developed a primary facility strategy (Plan A) and a contingency option (Plan B) to support the school's growth from startup to established in alignment with the enrollment projections:

<u>Plan A: Incubator/Temporary Space Leading to Permanent Construction</u>

Phase 1, Incubator Space (Years 1-3): Wilberforce is assessing rental spaces to accommodate initial enrollment. Properties under consideration include:

- Site 1 Address: 109-297 N Seven Oaks Dr, a large retail space with flexible space options, renting for $15/sq. foot/year
- Site 2 Address: 11130 Kingston Pike, a large commercial space with 87,426 square feet available, renting for $18/sq. foot/year
- Site 3 Address: 9305 Kingston Place, a 31,557 square foot retail space, renting for $10/sq. foot/year

Each of these locations would be able to house our school for the first three years assuming 75-80 square feet per student, with a maximum of 468 students in Year 3. Rental rates for viable spaces in the areas under consideration are approximately $15-20 per square foot. Renovation estimates for these spaces, including fire/safety upgrades, ADA compliance, classroom build-outs, and utilities, are estimated at $35/square foot.

Phase 2, Permanent Facility Construction (Year 3): Pending enrollment growth, Wilberforce plans to purchase approximately 10 acres of land at $100,000 per acre (total cost of $1,000,000) and construct a 55,440 sq. foot facility sufficient for full projected enrollment of 693 students. This facility would include all programmatic spaces outlined above and comply with Tennessee and federal building codes. Our team estimates the cost at $23,176,000 for permanent facility construction.

<u>Plan B: Extended Rental Space</u>
If enrollment growth is slower than projected, the school may continue operating in a rental space beyond Year 3. This contingency option would allow the school to concentrate on strengthening its enrollment while avoiding entering long-term facility commitments until we are ready to do so.

Note: Facility plans are preliminary and subject to change. The final site selection, lease or purchase agreements, and construction timelines may vary with charter approval date, enrollment realities, and other operational considerations applicable when the school opens in 2027 or later.

**Leadership and Support in Facility Search**
The search for suitable facilities is led by Parker Bartholomew, a licensed real estate broker with extensive experience managing education-related construction projects. Mr. Bartholomew previously served as project manager for the River's Edge Christian Academy expansion, overseeing the addition of 12 classrooms while ensuring compliance with educational occupancy laws, city and state building codes, and budget constraints. He also managed reporting for grant funding provided by the State of Tennessee through federal COVID relief funds.

Supporting Mr. Bartholomew are David Colquitt (Board Treasurer) and Laura Beaman (Board Member), along with School Director Zach Wishart. Mr. Colquitt brings experience in large real estate acquisitions, including hotels, while Ms. Beaman has extensive real estate investing

experience. All three provide strategic oversight, feasibility assessment, and guidance on lease negotiations and long-term site planning.

This team ensures that WAK's facilities—temporary or permanent—will support the educational program, projected enrollment, and operational needs while remaining flexible, compliant with state and federal regulations, and aligned with the school's growth plans.

## 2.4 Transportation

*46. Describe the plan to provide daily transportation to students, if applicable. Detail whether the proposed school will provide its own transportation services, contract out for transportation, or a combination thereof. If the school will not provide daily transportation services to and from school, describe how students will get to and from school and how the school will address any transportation barriers for student attendance.*

**Transportation Plan**
WAK will open in Knoxville's Cedar Bluff area, a strategically selected location near two major thoroughfares, I-40 and I-140, which provide convenient countywide access. The neighborhoods surrounding Cedar Bluff are among the fastest-growing in Knox County, with the population in the zip codes within 10 miles increasing by 7% between 2018 and 2023, including 4,350 additional children ages 0-14.[144] Western Knox County communities such as Hardin Valley and Karns continue to experience large-scale housing growth and incoming migration, making Cedar Bluff an accessible hub for families throughout the county.[145] These geographic and demographic trends strongly inform our transportation model.

**Transportation Provider Model and Rationale**
WAK will not provide daily bus transportation during its initial years of operation. This decision is based on the following factors:

- Geography and Accessibility: Our campus will sit at the intersection of major regional transportation corridors, enabling short drive times from high-growth residential areas. Families across western and central Knox County can access the school efficiently.
- Enrollment Area: As a countywide charter school, families choose to enroll. Early interest data indicates that many prospective families live in nearby neighborhoods with high rates of personal-vehicle access.
- Responsible Operational Launch: Prioritizing academic programming, staffing, and school culture during the start-up phase requires careful resource allocation. Operating without bus service initially allows us to gather accurate data on actual transportation needs before committing funds to contracted or in-house services.

[144] https://www.census.gov/programs-surveys/acs.html
[145] https://www.wate.com/news/knox-county-news/new-businesses-booming-in-farragut-as-population-grows/state

Should enrollment patterns or family needs demonstrate that bus service is necessary, we are committed to developing bus routes informed by student address data and ridership demand. We are dedicated to ensuring that if and when bus routes are needed, the updated transportation plan will meet all state and local laws including but not limited to bus standards, safety, and insurance. In accordance with T.C.A. § 49-13-114 (2024), WAK will notify parents of the transportation options upon enrollment.

**Morning Arrival: Daily Operational Details**

Because we will not offer before-school care, morning arrival will occur through:

- Family drop-off via personal vehicles
- Coordinated carpools supported by a school-managed voluntary registry
- A supervised, streamlined carline system with:
    - staggered arrival windows
    - designated traffic flow patterns developed with local officials
    - staff positioned to ensure safety, efficiency, and timely transitions into the school day

As described in the facility section of this application, we intend to secure a facility in the Cedar Bluff region. This will provide immediate access to I-40 and I-140, thus reducing congestion and enabling manageable arrival patterns even for families commuting from farther parts of Knox County.

**Afternoon Dismissal: Daily Operational Details**

Afternoon dismissal will operate through:

- Family pick-up via personal vehicles with the use of a family placard system to ensure student safety
- Carpools organized through the voluntary registry
- On-site after-school care provided by Thrive, a Knoxville nonprofit with established youth development programs

Our partnership with Thrive ensures that:

- Students enrolled in Thrive have a supervised, reliable, and low-cost option if families cannot arrive at dismissal time.
- Thrive coordinates its internal procedures with our dismissal plan to ensure smooth handoffs and safe transitions.

This partnership significantly reduces transportation-related burdens for working families and increases after-school accessibility for students who may otherwise face attendance barriers.

**Addressing Transportation Barriers for All Students**

Although we will not offer buses at launch, we are committed to ensuring that every student has a reliable way to get to school. We will implement multiple supports for families facing transportation challenges:

- Carpool Matching Program: A school-managed system that connects families by neighborhood and schedules.
- Community Partnership Coordination: We will collaborate with community organizations, youth programs, and faith-based partners that already transport students.
- Individualized Transportation Support: During enrollment and throughout the school year, we will identify students with transportation barriers through surveys and attendance monitoring, then work directly with families to develop tailored solutions.
- Extended-Day Support through Thrive: Families who need a later pickup time may enroll students in Thrive's on-site after-school program, reducing logistical and transportation strain.

By providing both structural supports (carline systems, carpools, partnerships) and individualized solutions, we will ensure that transportation limitations do not become attendance barriers.

**Future Transportation Expansion Based on Demonstrated Need**

During our first year, we will conduct a comprehensive transportation needs assessment by:

1. Mapping student addresses to identify population clusters
2. Surveying families to determine transportation challenges and interest in bus service
3. Analyzing attendance data to identify transportation-related absences
4. Evaluating provider models, including contracted charter transportation vendors or a limited set of school-operated routes

If the data indicate a clear need for bus service, we will implement targeted routes, prioritizing neighborhoods with the highest need and the greatest number of students facing transportation challenges.

WAK's transportation plan is grounded in the realities of Knoxville's west-side growth, the accessibility of the Cedar Bluff location, and the needs of our diverse countywide enrollment area. While we will not provide bus transportation initially, we have developed a comprehensive system that enables all students to arrive safely and reliably each day. Our layered approach—including carline operations, carpools, individualized family support, and our after-school partnership with Thrive—ensures equitable access from day one, with a clear pathway to transportation expansion as our school grows and community needs evolve.

*47. Describe the plan to provide transportation to students whose individualized education plan (IEP) or 504 plan requires transportation to ensure the student receives a free and appropriate*

WILBERFORCE ACADEMY

*public education (FAPE) pursuant to 34 CFR § 300.34(c) and Section 504 of the Rehabilitation Act of 1973.*

**Transportation for Students Requiring Services Under IDEA or Section 504**
WAK is committed to ensuring that all students with disabilities receive a Free Appropriate Public Education (FAPE), in full compliance with IDEA (34 C.F.R. § 300.34(c)) and Section 504 of the Rehabilitation Act of 1973. Under these federal laws, transportation is considered a related service when it is necessary for a student to access FAPE. Accordingly, any student whose Individualized Education Program (IEP) or 504 plan specifies that transportation is required will be provided transportation at no cost to the family.

**Planned Transportation for Students with Disabilities**
Even though WAK will not operate general education bussing at launch, we will provide transportation for students whose IEP or 504 plan requires it. Our plan ensures that all accessibility needs are fully accommodated. Specifically:

- Provider Model: Transportation will be provided through licensed and insured contractors experienced in transporting students with disabilities, or through school-arranged vehicles equipped with accessibility features, as needed. In limited cases where appropriate, the school may reimburse parents if parent-provided transportation is determined by the IEP/504 team to be the most appropriate method.
- Accessibility Accommodations: Vehicles and routes will be configured to safely accommodate students who require wheelchair lifts, harnesses, specialized seating, or assistance from a trained aide. All drivers and aides will be trained in the safe operation of specialized equipment, disability awareness, and emergency procedures.
- Operational Details: Transportation will ensure students arrive on time and ready to learn, without creating an abbreviated school day. Routes will be designed based on student addresses, medical or mobility considerations, and safety requirements. Students requiring transportation between programs or services as specified in their IEP will also be accommodated.

**Determination and Implementation**
The need for transportation will be determined during the initial evaluation, annual review, or IEP/504 team meetings, taking into account the student's disability, mobility, medical or behavioral needs, and accessibility requirements. Once transportation is determined necessary by the IEP team, it will be implemented immediately and at no cost to the family, in accordance with federal law.

WAK ensures that transportation will be provided as a legally required related service for all students whose IEP or 504 plan mandates it. This includes full accessibility accommodations, safe and reliable vehicle operation, and careful coordination with staff to ensure that all students can access a Free Appropriate Public Education every day.

WILBERFORCE ACADEMY

2.5 Health and Safety

*48. Describe the plan for meeting the medical needs of students, including how the school will provide nursing services.*

WAK is committed to caring for the whole child—mind, body, and spirit—while honoring the dignity of every student entrusted to our care. Our approach to student health services reflects both compassion and compliance, ensuring that students' medical needs are met safely, respectfully, and in full accordance with federal and Tennessee law.

**Oversight of Nursing and Health Services**
The Director of Operations will oversee all student health services and will be responsible for developing, implementing, and monitoring the school's health protocols. This role includes ensuring compliance with:

- Individuals with Disabilities Education Act (IDEA)
- Section 504 of the Rehabilitation Act of 1973
- Tennessee Code Annotated (TCA), Title 49 (Education)
- Tennessee State Board of Education rules and Tennessee Department of Education guidance

Health services will be administered in a manner that safeguards student privacy, dignity, and well-being, in full compliance with the Family Educational Rights and Privacy Act (FERPA). All student health records, including immunization records, medication logs, nursing notes, health plans and documentation related to disabilities or medical accommodations, will be maintained as confidential education records under FERPA.

Access to student health information will be limited to authorized school personnel with a legitimate educational interest, as defined by FERPA and school policy. Health records will be securely store in locked physical files and/or password protected electronic systems, and information will only be disclosed to parents/guardians, eligible students, or third parties as permitted or required by law, including in cases of health or safety emergencies.

The Director of Operations will ensure that all staff involved in student health services receive training on FERPA requirements, confidentiality expectations, and proper handling of personally identifiable information. Policies and procedures will be regularly reviewed to ensure ongoing compliance with federal and state privacy laws and to protect students' rights with respect to their education and health records.

**Year 1 Health Services Model**

During its first year of operation, WAK will not employ a school nurse, however, nursing services will be available from the campus administration or designee. To ensure student safety and compliance during Year 1, WAK will implement the following systems:

**Trained Staff and Emergency Preparedness**

- The Director of Operations will designate school personnel to receive CPR/AED and First Aid certification.
- Staff will be trained to recognize and respond appropriately to medical emergencies while maintaining calm, discretion, and respect for students.
- Emergency medical services (EMS) protocols will be clearly established and practiced.

**Medication Administration**

- Medications will be administered only in compliance with Tennessee Department of Education guidance and applicable provisions of TCA Title 49, with:
  - written parent/guardian consent,
  - proper physician orders, and
  - secure storage and documentation.
- Emergency medications (e.g., epinephrine, glucagon) will be accessible and administered by trained staff consistent with Tennessee law.

**Individual Health Plans (IHPs)**

- Students with chronic or acute medical needs will have Individual Health Plans developed collaboratively with families and healthcare providers.
- These plans will outline accommodations, emergency procedures, and staff responsibilities, ensuring students are supported with care, discretion, and dignity.

**Students with Disabilities and Medical Needs (IDEA and Section 504)**

WAK fully complies with federal requirements to provide health-related services when necessary for a student to receive a Free Appropriate Public Education (FAPE).

- Under IDEA (34 C.F.R. § 300.34), health services—including nursing or related medical supports—must be provided if required for FAPE.
- Under Section 504 of the Rehabilitation Act of 1973, the school must provide reasonable accommodations to ensure equal access to education.

For students whose IEP or 504 plan includes medical or health-related services:

- Required services will be provided at no cost to families.
- Services will be documented in the student's plan and implemented promptly.
- Staff will be trained on student-specific needs while preserving confidentiality and respecting student dignity.

**State Health Requirements and Screenings**
WAK will comply with all applicable Tennessee health requirements, including:

- Student health screenings and immunization requirements[146]
- Compliance with communicable disease reporting and exclusion requirements as guided by the Tennessee Department of Health
- Maintenance of student health records in accordance with state and federal privacy laws

**Year 2 and Beyond: Expansion of Nursing Services**
Beginning in Year 2, WAK has budgeted to employ a part-time school nurse. The nurse will:

- Provide direct nursing services to students
- Support medication administration and health monitoring
- Manage immunization and exemption records[147]
- Assist in managing care for students with chronic medical conditions
- Train and support staff in health and emergency procedures
- Contribute to ongoing refinement of the school's health and safety plan

As enrollment grows and student needs evolve, we will reassess staffing levels to ensure health services remain responsive and sufficient.

**Culture of Care and Student Dignity**
At WAK, health services are not merely procedural—they are relational. Students will be treated with compassion, discretion, and respect, ensuring that medical needs are addressed without stigma or embarrassment. Our staff will be trained to protect students' physical safety and emotional dignity, recognizing that trust and care are foundational to student well-being and academic success.

Our plan for meeting student medical needs is legally compliant, developmentally appropriate, and deeply rooted in care for students. Under the leadership of the Director of Operations, the school will ensure safe health practices from day one and will expand nursing services responsibly as the school grows. This phased approach meets the expectations of the Tennessee Public Charter School Commission while honoring our commitment to serve every child with dignity, love, and excellence.

*49. Identify the person or position responsible for school safety operations, detailing the responsibilities of this position, and providing the approach and timeline to develop a school safety plan in accordance with T.C.A. § 49-6-804 through T.C.A. § 49-6-808.*

---

[146] https://www.tn.gov/content/dam/tn/stateboardofeducation/documents/2021-sbe-meetings/july-23%2C-2021-sbe-meeting/7-23-21%20II%20J%20School%20Health%20Policies%20Perm%20Rule%200520-01-13-.01%20Clean.pdf
[147] https://www.tn.gov/health/cedep/immunization-program/ip/immunization-requirements.html

The Director of Operations will serve as the school administrator responsible for school safety operations at WAK. This position will have primary responsibility for compliance with all state and local school safety laws, including the development, implementation, and ongoing monitoring of the school's School Safety Plan in accordance with T.C.A. §§ 49-6-804 through 49-6-808. As a member of the school's leadership team, the Director of Operations will work in close coordination with the School Director, faculty, staff, local emergency responders, and the governing board to ensure that WAK maintains a safe, secure, and nurturing learning environment that protects both the physical safety and dignity of students.

**Responsibilities of the Director of Operations Related to School Safety**

The Director of Operations' safety-related responsibilities will include, but are not limited to:

- Developing and maintaining the School Safety Plan in compliance with T.C.A. §§ 49-6-804-808
- Serving as the school's primary point of contact for safety coordination with:
    - Local law enforcement agencies
    - Fire and emergency medical services
    - The Knox County emergency management community
- Ensuring required safety drills are conducted and documented, including armed intruder, incident command, tornado drills, emergency safety bus and fire drills
- Coordinating staff training related to emergency procedures, threat response, and student supervision
- Overseeing visitor management, facility access controls, and emergency communication systems
- Ensuring that safety procedures are implemented in a manner that is developmentally appropriate, and respectful of student dignity

**Approach to Developing the School Safety Plan**

WAK's School Safety Plan will be developed in alignment with state law and best practices, while reflecting the school's size, grade configuration, and phased opening model. In accordance with T.C.A. § 49-6-804, the School Safety Plan will address, at a minimum:

- Procedures for fire, natural disasters, intruders, and other emergencies
- Lockdown, evacuation, and shelter-in-place protocols
- Coordination with local emergency response agencies
- Communication protocols for staff, students, families, and first responders
- Procedures to protect student confidentiality and emotional well-being during and after emergencies

As an additional layer of security, WAK will implement the Raptor Visitor Management System to monitor and control all non-student access to campus. All parents, guardians, and visitors will be required to present a government-issued photo ID upon entry, which will be scanned through the Raptor system to verify identity and screen against relevant databases, in accordance with applicable privacy and data-protection laws. Approved visitors will be issued a visible, time-

limited visitor badge that must be worn while on campus. In addition, we will utilize a badge-based access control system for staff entry, maintain locked exterior doors during the instructional day, and deploy security cameras in key interior and exterior locations. These measures support an enhanced campus security system while preserving a welcoming environment that respects the dignity of students and families. Consistent with T.C.A. § 49-6-805, the plan will be reviewed and updated annually and revised as needed based on drills, incidents, or changes in school operations.

**Timeline for Safety Plan Development and Implementation**

Pre-Opening (6-9 months prior to first day of school):

- Director of Operations drafts the initial School Safety Plan
- Plan is developed using Tennessee Department of Education guidance and aligned to statutory requirements
- Initial consultation with local law enforcement and emergency services

Pre-Opening (3-4 months prior to first day of school):

- Safety Plan reviewed by school leadership and governing board
- Emergency procedures incorporated into staff training materials
- Safety infrastructure (e.g., communication systems, access controls) finalized

Staff Onboarding (prior to student attendance):

- All staff receive training on emergency procedures and their specific roles
- A school safety team is organized
- Required drills scheduled for the school year
- Safety expectations communicated clearly and consistently

First Year of Operation:

- Required safety drills conducted and documented in compliance with T.C.A. § 49-6-807
    - WAK will conduct drills quarterly
- Safety Plan reviewed by school safety team following drills and adjusted as necessary
- Ongoing collaboration with emergency responders

Annual Review:

- Safety Plan formally reviewed and updated at least once per year, as required by T.C.A. § 49-6-805
- Adjustments made based on enrollment growth, facility changes, or updated state guidance

**Student-Centered and Dignity-Focused Safety Culture**

WAK approaches school safety as an extension of its mission to care for the whole child. Safety procedures will be implemented in ways that are calm, respectful, and developmentally appropriate, avoiding unnecessary fear or trauma. Students will be taught safety expectations

clearly and compassionately, and staff will prioritize preserving students' sense of security and dignity during drills and emergency responses.

## 2.6 Insurance

50. Please see **Attachment 8** for a letter of coverage from an insurance company that:

- Lists the types and corresponding amounts of insurance coverage the proposed school will secure; and
- States that the company will provide the required coverage upon approval of the charter application; and
- Includes provisions for assuring that the insurance provider will notify the Tennessee Department of Education within ten (10) days of the cancellation of any insurance it carries on the charter school, pursuant to T.C.A. § 49-13-107(b)(19).

## 2.7 Food Service

*51. Describe the plan to offer food service to the students, including how a food service vendor will be selected or, in the alternative, how the proposed school will provide meals in-house, including food preparation, storage, service, and staffing.*

**Food Service Plan**

WAK is committed to students' health, well-being, and academic success. Recognizing the important role nutrition plays in student learning and development, the school will provide daily meal service through a qualified third-party food service management organization. This approach will allow the school to prioritize food quality, flexibility in menu design, and alignment with the school's mission, while ensuring compliance with all applicable state and local health and safety requirements.

**Food Service Model and Vendor Partnerships**

WAK will contract with an experienced food service vendor to provide daily lunch service. Meals will be prepared off-site in licensed commercial kitchens and delivered to the school campus each school day.

Anticipated vendors include, but are not limited to:

- Taher, Inc. (Chef-driven professional food service management)
- SLA Management
- Chartwells School Dining Services
- My Hot Lunchbox
- Other comparable local vendors

WILBERFORCE ACADEMY

Each of these organizations has extensive experience providing off-site meal preparation and/or delivery for K-12 schools and is equipped to meet nutritional standards, food safety regulations, and operational reliability expectations.

**Vendor Selection Process**

The food service vendor will be selected through a formal procurement process prior to school opening. This process will include:

- Issuance of a Request for Proposals (RFP) outlining nutritional expectations, delivery logistics, food safety requirements, cost structures, staffing models, and compliance obligations
- Evaluation of vendor experience serving K-12 schools, references, and performance history
- Review of proposed menus, ingredient sourcing, dietary accommodations, and allergy management protocols
- Assessment of cost controls and pricing models to ensure fiscal sustainability and affordability for families

In Year 0, an RFP will be issued by March and the vendor selected by May. Final vendor selection will be approved by the school's governing board, with contract oversight provided by the School Director.

**Meal Delivery, Storage, and Service**

Meals will be delivered daily to WAK in compliance with all Knox County Health Department and Tennessee Department of Health regulations governing food transport.

Upon delivery:

- Hot meals will be maintained in approved warming equipment capable of sustaining safe holding temperatures
- Cold and perishable items will be stored in commercial-grade refrigeration units
- Temperature logs will be maintained to document compliance with food safety standards
- Food storage areas will be secured, sanitary, and accessible only to authorized personnel

Meals will be served in designated dining spaces using procedures that promote orderly service, cleanliness, and appropriate supervision.

**Staffing and Oversight**

Food service personnel responsible for delivery and service will be employed or contracted by the food service vendor.

All personnel will be required to:

- Hold appropriate food safety and handling certifications

- Successfully complete background checks consistent with Tennessee school safety requirements
- Receive training in allergy awareness, student safety, and emergency procedures

The school administration will provide ongoing oversight through routine monitoring of delivery reliability, food quality, temperature compliance, and service standards. To aid in the lunch distribution and the monitoring of students during lunch time, we will hire two part-time staff for 2.5 hours each day. The wages for these personnel are included in the “School lunch monitors” line item of the budgets.

**Family Communication**

The selected food service vendor will be required to accommodate documented student dietary needs and food allergies in accordance with state and federal guidelines.

WAK will maintain clear protocols for:

- Collection and documentation of dietary and allergy information during enrollment
- Communication between families, school leadership, and the vendor
- Training for supervising staff on allergy awareness and response

Families will receive regular communication regarding menus, nutritional information, ingredient disclosures, meal pricing, and service procedures.

**Access and Affordability**

Although WAK will not participate in the NSLP, the school remains committed to ensuring that meals are accessible and affordable. The school and its vendor partner will explore strategies such as:

- Competitive pricing structures
- Prepaid and electronic meal payment systems
- Partnerships with community organizations or philanthropic supports, as is feasible

Participation in the meal program is completely optional, and all payment will be managed by the vendor. Families who choose to participate will pay the food service vendor directly through the vendor’s payment system, and students may always bring lunch from home as an alternative.

**Emergency Meals and Milk Access**

To ensure that no student goes without nourishment during the school day, we will maintain a supply of emergency meals for students who arrive at school without a lunch. These meals will be shelf-stable, nutritionally appropriate, and stored in compliance with food safety and expiration guidelines. Emergency meals will be made available discreetly and without stigma, in coordination with school administration and designated staff. In addition, WAK will offer milk for purchase on a daily basis as part of its food service program. Milk will be stored under appropriate refrigeration and served in accordance with applicable health and safety regulations. Together,

these measures ensure continuity of care, support student well-being, and reinforce the school's commitment to the health of every child.

**Compliance and Accountability**

WAK will operate its food service program in compliance with all applicable Tennessee and federal laws and Knox County Health Department regulations. The school's governing board will maintain oversight of the program as part of its fiduciary and compliance responsibilities, ensuring alignment with the school's mission and commitment to student well-being.

## 2.8 Start-up Plan

*52. Provide a detailed timeline of key milestones and deadlines that the founding team must meet to open the proposed school on time. Include key areas such as hiring, student recruitment, and facilities acquisition and who is responsible for overseeing progress and completion.*

**Proposed Timeline of Key Milestones and Responsibilities**

Target Opening: Fall 2027

WAK has developed a comprehensive, multi-year implementation timeline designed to ensure the school opens on time and in full compliance with all Tennessee Public Charter School Commission requirements. The School Director, Zach Wishart, is responsible for the day-to-day execution of all pre-opening activities. The board of directors provides governance, fiscal oversight, and accountability, reviewing progress through formal milestones and holding leadership accountable for timely completion of all tasks.

**Phase I: Charter Approval and Pre-Opening Infrastructure**

- Fall 2025-Winter 2026 (24-20 months prior to opening)
- Key Focus Areas: Governance, Facilities Planning, and Startup Readiness
    - Execute charter contract and establish pre-opening compliance calendar
    - Form board committees (Finance, Governance, Academics, Facilities)
    - Develop detailed project management timeline with monthly benchmarks
    - Conduct facilities search and feasibility analysis (size, location, zoning, cost)
    - Develop preliminary staffing model and enrollment targets
    - Refine startup and multi-year operating budgets
- Primary Responsibility: School Director
- Oversight: board of directors

**Phase II: Facilities Acquisition and Organization Design**

- Spring-Summer 2026 (20-14 months prior)
- Key Focus Areas: Facilities, Staffing Structure, and Operational Systems
    - Identify preferred facility and conduct due diligence (zoning, ADA, fire, occupancy)

  - Determine necessary facility renovation plans and construction timeline
  - Finalize organizational chart, staffing plan, and compensation framework
  - Begin development of HR, finance, and operations policies
  - Hire Director of Operations and Dean of Curriculum and Instruction
- Primary Responsibility: School Director
- Oversight: board of directors (contract and financial approvals)

**Phase III: Leadership Hiring and Student Recruitment Launch**

- Fall 2026 (12-10 months prior)
- Key Focus Areas: Leadership Capacity and Enrollment Pipeline
  - Finalize employee handbook and personnel policies
  - Launch comprehensive student recruitment and enrollment campaign, including:
    - Community information sessions
    - Targeted social media marketing
    - Partnerships with community organizations
  - Publish enrollment and lottery procedures in compliance with state law
  - Monitor enrollment applications against established recruitment benchmarks
  - Prepare plan for furnishing and equipping facility including entry, common spaces, offices, physical education, nutrition, and classrooms
- Primary Responsibility: School Director, Director of Operations
- Oversight: board of directors (leadership hiring and enrollment monitoring)

**Phase IV: Staffing, Curriculum, and Facility Readiness**

- Winter 2026-Spring 2027 (9-5 months prior)
- Key Focus Areas: Staffing, Instructional Program, and Facility Completion
  - Recruit and hire instructional staff and student support personnel, including an Office Manager in January or February
  - Finalize curriculum, assessments, and instructional resources
  - Establish special education, English learner, RTI², and student services systems
  - Plan teacher onboarding, training, and professional development provision
  - Implement financial systems, payroll, and student information systems
  - Continue and intensify student recruitment to meet enrollment targets
  - Execute necessary leasehold improvements with appropriate scheduled inspections
- Primary Responsibility: School Director, Dean of Curriculum and Instruction, and Director of Operations
- Oversight: board of directors (academic and operational readiness reviews)

**Phase V: Final Staffing, Compliance, and Pre-Opening Readiness**

- Spring-Summer 2027 (5-1 months prior)
- Key Focus Areas: Staff Training, Compliance, and Operational Finalization
  - Complete staffing hires and assign roles and responsibilities

  - Conduct staff onboarding, training, and professional development
  - Finalize and Board-approve all required policies (IDEA, EL, discipline, health and safety)
  - Secure certificates of occupancy and final facility approvals
  - Finalize food service, and vendor contracts
  - Occupy facility, inventory purchased goods, assemble and place furnishings and equipment
- Primary Responsibility: School Director, Dean of Curriculum and Instruction, and Director of Operations
- Oversight: board of directors

**Phase VI: School Launch and Opening**
- Summer-Fall 2027 (2-0 months prior)
- Key Focus Areas: Enrollment Finalization and School Opening
  - Finalize enrollment, class rosters, and schedules
  - Arrange time for teachers to occupy and decorate their classrooms
  - Conduct family orientations and student onboarding
  - Complete final operational readiness checks and pre-opening site visits
  - Open WAK for the first day of instruction
- Primary Responsibility: School Director, Dean of Curriculum and Instruction, and Director of Operations
- Oversight: board of directors

This timeline demonstrates WAK's strong organizational readiness, clear task ownership, and disciplined approach to student recruitment, staffing, and facilities preparation, ensuring the school is fully prepared to open successfully in Fall 2027.

*53. Describe contingency plans for common startup challenges including:*
- *Not meeting enrollment targets;*
- *Not meeting fundraising goals;*
- *Hiring challenges; and*
- *Facility delays.*

**Contingency Plans for Common Startup Challenges**
WAK anticipates common startup risks related to enrollment, fundraising, staffing, and facilities. To mitigate these risks, WAK has prepared monitoring systems and contingency plans to respond quickly and effectively. The School Director, Zach Wishart, working in coordination with the board of directors, is responsible for identifying risks, implementing mitigation strategies, and ensuring timely adjustments that safeguard instructional quality, financial stability, and compliance.

**Not Meeting Enrollment Targets**
Given that enrollment is the primary income driver, lower-than-projected enrollment poses a risk of significant impact to budget and staffing stability. To mitigate enrollment risks, the school has developed conservative enrollment projections and will closely monitor progress throughout the enrollment process by reviewing data on applications, acceptances, and registrations on a weekly basis against monthly targets and quarterly benchmarks. This frequent monitoring will allow leadership to identify shortfalls early and take appropriate action.

If enrollment targets and benchmarks are not met, the school will intensify recruitment by taking such steps as hosting additional community information sessions, engaging in targeted outreach to prospective families, spreading the word through community and faith-based organizational partners, and increasing digital marketing. Outreach will include early childhood providers and homeschool networks. Staffing plans will be adjusted as needed by consolidating sections, while maintaining a cap on class sizes, or delaying grade-level expansion while maintaining appropriate ratios and instructional quality.

Oversight and implementation are led by the School Director, with board review of enrollment data and staffing adjustments.

**Not Meeting Fundraising Goals**
Inadequate fundraising would limit startup flexibility and could delay planned investments. To mitigate this risk, the school has already established strong fundraising relationships, notably from the Colquitt Foundation as detailed in question 57 to support the school in closing budget gaps in the opening years of operation. To further mitigate risk, the school will prioritize core instructional and operational expenses in its startup budget and regularly review cash flow and fundraising progress.

If fundraising goals are not achieved, the school will defer nonessential expenditures and hires, delay discretionary facility enhancements, and adjust spending timelines, as detailed in question 57. The school will maximize public revenue and allowable federal funds, including Title I, II, and III. Board members will actively support additional fundraising efforts through philanthropic and community partnerships. Staffing or expansion timelines may be adjusted as needed without compromising safety or instructional quality.

The School Director manages financial adjustments, with board approval of revised budgets and strategies.

**Hiring Challenges**
Difficulty hiring qualified staff could affect instructional readiness. To reduce this risk, recruitment will begin early and draw from multiple pipelines, including educator preparation programs and professional networks, with a focus on mission alignment and flexibility.

If hiring challenges occur, recruitment efforts will be expanded geographically and across additional platforms. The school may prioritize candidates with multiple certifications or demonstrated adaptability. Temporary staffing, short-term contracts, or staggered start dates may be used to ensure continuity. School leaders will provide targeted onboarding and instructional support as needed.

The School Director oversees staffing decisions, with board monitoring of readiness benchmarks.

**Facility Delays**
Delays in securing or preparing a facility could impact the school's opening timeline. To mitigate this risk, the school will identify multiple facility options early and closely monitor timelines for permitting, construction, or renovation.

If delays occur, the school will pursue temporary or alternate facilities that meet all safety and occupancy requirements. Nonessential improvements may be deferred to prioritize instructional spaces. Enrollment caps or phased grade-level openings may be adjusted to align with available space. Any significant changes will be promptly coordinated with the Tennessee Public Charter School Commission.

The School Director manages facilities planning and contingencies, with board approval of facility-related decisions.

## 2.9 Operations Capacity

*54. Based on the team identified in **Table 4**, describe the sponsor's team's individual and collective qualifications for implementing the operational plan successfully. Identify any gaps in the sponsor's team and describe plans to fill those gaps with future hires. The discussion of both current team capacity and future hires should include a discussion of capacity in areas such as the following:*

- *Professional development and performance management;*
- *Student health;*
- *School safety and security;*
- *School operations such as food service and transportation; and*
- *Facilities acquisition and management.*

Assuming the charter is granted, Fall 2026 will constitute Year 0 for WAK. During this year of planning and preparation, the sponsor will form a Launch Team responsible for drafting founding documents, building community awareness, recruiting and hiring initial faculty, executing the board-approved facilities plan, and preparing the school for a Year 1 opening in Fall 2027. This work will be carried out under the oversight of a founding board whose members collectively

bring deep expertise in school governance, large-scale operations, facilities development, and organizational leadership.

WAK will launch under the leadership of its founding School Director, Zach Wishart, who brings extensive experience in school administration, faculty leadership, student support, and culture formation. He currently serves as Middle and High School Principal at River's Edge Christian Academy in Knoxville, where he leads more than 45 faculty and staff members and has overseen significant enrollment growth, improved school culture, and top regional school rankings. His background includes prior roles as a school counselor, restorative interventionist, and foster care case manager, equipping him with substantial experience in student well-being, behavioral health, crisis intervention, and family engagement. He holds graduate degrees in Education Administration and maintains principal and counseling certifications.

This experience positions the School Director to lead professional development, performance management, student services, and school culture during the launch phase. He will be responsible for hiring and developing the initial leadership team and faculty, ensuring mission alignment, and establishing systems for instructional quality, staff evaluation, and student support.

The Year 0 Launch Leadership Team will include the School Director, Director of Operations, Dean of Curriculum and Instruction, and Office Manager. Together, this team will provide capacity across core operational domains:

- **Professional Development and Performance Management:** Led by the School Director and Dean of Curriculum and Instruction, drawing on proven experience in faculty supervision, instructional coaching, evaluation cycles, and mission-aligned professional development
- **Student Health, Well-Being, and Safety:** Supported by the School Director's prior experience in counseling, restorative practices, trauma-informed intervention, and crisis response, with additional services provided through licensed staff and contracted providers as the school opens
- **School Operations:** Overseen by the Director of Operations, including systems design, vendor coordination, compliance, scheduling, and day-to-day operational readiness

WAK's founding board of directors provides substantial additional operational strength, particularly in facilities acquisition and oversight, governance, and large-scale operations. Several board members bring direct experience of owning, developing, and managing complex properties and businesses, including hospitality, restaurant, and real estate ventures across East Tennessee and the Southeast. Collectively, these members have overseen site selection, acquisition, renovation, regulatory compliance, vendor contracting, and long-term facilities management.

Board members with deep local real estate and development expertise will actively support the Launch Leadership Team during the facility search process, lending market knowledge, advisory

guidance, and development experience. Parker Bartholomew is a seasoned real estate developer with extensive experience leading commercial development projects in the Knoxville area. Doug Harris brings experience owning and operating multiple hospitality properties and currently serves on the board of an established Knoxville charter school, providing valuable insight into charter facilities planning and governance. Laura Beaman also brings deep experience in real estate investment and business development. All advisory support related to facilities will be subject to conflict-of-interest disclosures and recusals, and all final decisions will be made by the full board in accordance with board policy. This combination of staff-led execution and board-supported facilities expertise ensures that WAK has credible, real-world capacity to secure, prepare, and manage a compliant and appropriate facility for launch and long-term growth.

The collective experience of the team also supports key operational systems such as food service, transportation, and vendor management. Founding board members include senior leaders who have managed large, multi-site organizations employing hundreds of staff and overseeing complex vendor relationships, logistics, compliance requirements, and training systems. This experience ensures that any systems put into effect regarding food services, transportation, and third-party vendors will be cost-effective, compliant, and aligned with the school's expectations for safety and quality.

Day-to-day coordination of these services will be managed by the Director of Operations, with board support as needed.

**Identified Gaps and Plans to Address Them**

As a startup school, WAK recognizes that not all specialized operational roles will be in place during Year 0. Certain capacities—such as full-time student health services, expanded safety staffing, and additional operational support—will be added as enrollment grows. These needs will be addressed through a combination of licensed staff hires, contracted service providers, and phased expansion of the operations team, consistent with enrollment, grade-level growth, and budget capacity.

Following launch, WAK will add one grade level per year and expand leadership and support staff accordingly. By Year 4, the school anticipates serving approximately 540 students with an expanded administrative team, while the board continues to oversee long-term facilities planning and the transition to a permanent campus.

Taken together, the qualifications of the School Director, the operational expertise of the Launch Leadership Team, and the founding board's deep experience in governance, facilities development, and large-scale operations provide WAK with strong operational capacity for a successful launch. The sponsor has demonstrated both the experience required to execute the operational plan and a clear, phased approach to filling additional capacity gaps as the school grows.

*55. Explain how organizational health will be measured, including performance in pre-operations, during early years, and as an established organization. If the board determines a need to intervene regarding organizational performance, what form(s) would that take?*

WAK will monitor its organizational health through a disciplined, systems-based approach that aligns with Tennessee law, State Board rules, and WAK's internal operations framework. Organizational health will be reviewed continuously and formally reported to the board of directors at quarterly meetings to ensure healthy operational outcomes as outlined in the Organizational Framework section of the Model Charter School Performance Framework.[148] The Operations and Safety Committee will use established operational metrics and indicators—including school enrollment and retention, adherence to Child Find and implementation of students' IEP or Section 504 Plans, financial audits, governance audits, evaluations of School Director, audits of reporting requirements to the Tennessee Department of Education, audits of policies protecting the rights of students and employees, audits of teacher and other staff licensing and credentialing requirements, audits of background check requirements, and audits of facilities and transportation, health and safety, and data and information management—to assess the school's organizational health in the following areas: Education Program, Financial Management and Oversight, Governance and Reporting, Students and Employees, and School Environment. The board will use the data to inform strategic decisions, assess operational compliance, and evaluate the effectiveness of operational management practices. Annual audits will be reviewed and approved by the board.

**Pre-Operational Phase (Planning Year)**

During the Pre-Operations phase, Wilberforce will determine organizational health by timely completion of the operational readiness milestones listed in Phases I-VI of question 52. Those milestones include enrollment targets, facility acquisition, development of operational systems, hiring of key leadership positions, implementation of the enrollment campaign, staffing, finalization of curriculum, implementation of financial plans, payroll, student information systems, onboarding, implementation of professional development, and operational readiness checks. The School Director and Director of Operations will give academic and operational readiness reports to the board at each of their regular meetings. Key indicators during this phase include cash on hand, budget adherence, enrollment numbers, and readiness benchmarks tied to operational launch as related to the Education Program, Financial Management and Oversight, Governance and Reporting, Students and Employees, and School Environment.

The School Director, Director of Operations, and Director of Specialized Services will create internal audit processes to ensure compliance with operational requirements by collecting data from the specific indicators listed in the Model Charter School Performance Framework. The audit will contain these specific indicators: charter terms, compliance with education requirements, student enrollment over time, student retention rates, student retention rates by

[148] https://www.tn.gov/content/dam/tn/stateboardofeducation/documents/charter_schools/Charter-School-Model-Performance-Framework.pdf

subgroup, rights of students with disabilities, rights of English learners, financial reporting and compliance, generally accepted accounting principles, financial oversight, governance requirements, accountability of management, reporting requirements, rights of students, chronic absenteeism, licensing and credentialing, rights of employees, background checks, facilities and transportation, health and safety, and data and information management.

**Early Years of Operation (Years 1-3)**
In the early years, Wilberforce will prioritize operational stability by creating and implementing systems and processes that make the school function well. It will be the primary responsibility of the Director of Operations to ensure that the budget and operational processes are followed. The Director of Specialized Services also has an important role to play in implementing the systems and processes that ensure special needs of students are met. Because the organizational health of the school will be reflected academically, both operational and academic data will be used to determine overall organizational health.

The following academic performance indicators will be met in the early years of operation:
- WAK will earn a Level 3 TVASS designation and a C rating by TDOE in the first year of operation
- WAK will perform in the top 35% statewide on TCAP math and ELA in the first year and improve by 5% each year until reaching the top 15%
- Historically underserved student groups will show annual growth in the top 30% statewide on TCAP math and ELA
- WAK will earn the Tennessee Governor's Civics Seal in the second year of operation
- WAK will begin collecting and implementing NWEA MAP data in Year 1

The following Cultural and Operational goals will be met in the early years of operation:
- Faculty satisfaction rate of 80% or greater on spring survey
- Faculty retention rate of over 75% in Year 1
- Family satisfaction rate of 70% or more on spring survey
- Net Promoter Score of 30 in first year, growing by 5 points per year until reaching 70
- Student retention rate over 75% in Year 1
- Average daily attendance at or above 95%
- Enrollment meeting or exceeding 100% of budgeted enrollment
- 1.5 applications for every available seat by Year 3
- Over 90% of families reporting positive character development in students attending for 3 years consecutively

While academic outcomes are primarily addressed through the academic performance framework, WAK views sustained academic results as a downstream indicator of organizational health.

In addition to the above expectations, Wilberforce will also ensure that internal audits confirm the school is meeting standards of operational expectations as outlined in the Model Charter School Performance Framework on each of the indicators listed in the Pre-Operational Phase.

**Established Organization (Year 4 and Beyond)**
In subsequent years, WAK will focus on strengthening operational stability and fine-tuning operational systems to continue to improve and thrive. In this phase, organizational health will be determined by meeting the following academic goals:

- WAK will earn a Level 4 TVAAS designation and a B rating by TDOE
- WAK will perform in the top 15% statewide on TCAP math and ELA
- Historically underserved student groups will perform in the top 40% statewide on TCAP math and ELA
- WAK will earn the National Blue Ribbon School designation by Year 6
- WAK will perform at or above the national average on the NWEA MAP assessment

Long-term cultural and operational goals will be measured by the school earning the designation as a "Flourishing School" by Best Christian Workplaces and the following benchmarks:

- Annual faculty retention rate at or above 85% annual average
- Family satisfaction rate consistently at or above 85% on spring survey
- Net Promoter Score at or above 60 annually
- Annual student retention rate at or above 90%
- Average daily attendance at or above 95%
- Enrollment that meets or exceeds 100% of budgeted enrollment as the school grows each year
- Two applications for every available seat annually
- Alumni surveys revealing healthy life choices (college, career, marriage, etc.) well in excess of statistical norms

In addition to the above expectations, the school will also ensure that internal audits confirm that the school is meeting standards of operational expectations as outlined in the Model Charter School Performance Framework on each of the indicators listed in the Pre-Operational Phase.

**Board Intervention: Triggers and Actions**
If operational performance indicates emerging or actual poor organizational health, the board will intervene promptly. Intervention may be triggered by audit findings, internal-control weaknesses, or missed benchmarks. Examples of interventions include the following:

<u>Enrollment & Budget Interventions</u>
If applications or budget targets are missed, the board may direct an increase in targeted marketing (geo-targeted social media, community presence at local events, traditional advertising) and a review of the enrollment process. Immediate cost-control measures will be implemented to protect the school's fiscal position.

Academic Interventions

If TCAP or MAP benchmarks are missed, the Academic Committee may conduct a root-cause analysis of curriculum implementation, teacher performance, and $RTI^2$/SPED sub-population data. Remediation plans may include intensive teacher training, revising instructional coaching plans, or adjusting intervention schedules.

Operation Interventions

If governance requirements or compliance reporting are missed, the board may require the school to review, update, and submit operational processes to be approved by the board, increase the frequency of reporting organizational health indicators to the board, and require additional training of staff members through a charter support organization.

If organizational health does not improve after interventions have been implemented, the board may pursue more significant actions such as requiring leadership to put in place a performance improvement plan for a staff member or teacher, renegotiate contracts, or replace staff members. All interventions will be tied to specific performance outcomes and tracked through follow-up reporting to ensure resolution and accountability.

WILBERFORCE ACADEMY

**Section Three: Budget and Finance**

3.1 Operating Budget

56. Included as **Attachment 9** is the completed budget using the state's required template.

*57. Provide a budget narrative that includes a detailed description of assumptions and revenue estimates, including but not limited to the basis for revenue projections, staffing levels, and costs. The narrative should:*

- *Address the degree to which the school budget will rely on variable income (e.g., grants, donations, fundraising);*
- *Describe anticipated funding sources. Indicate the amount and sources of funds, property, or other resources expected to be available through banks, lending institutions, corporations, foundations, grants, etc. Note which have been committed and which are anticipated;*
- *Describe the minimum student enrollment needed to open and operate in Year 1;*
- *Discuss the school's planned approach to teacher salaries over time, including whether the school plans to use a step-and-ladder pay schedule or offer annual raises;*
- *Describe the year 1 cash flow contingency, in the event that revenue projections are not met in advance of opening; and*
- *Explain the school's contingency plan to meet financial needs for any year the school projects to be operating at a budget deficit.*

WAK is committed to launching a high-quality, nurturing, and safe charter school that delivers rigorous liberal arts academics, cultivates virtue, emphasizes civics and entrepreneurship, and ensures equitable access for all students. Our budget is intentionally designed to reflect and support these priorities. All financial planning is grounded in conservative assumptions, multi-year modeling, and disciplined stewardship to ensure the school opens responsibly and becomes financially sustainable over time. We recognize that we will be entrusted with taxpayer funds under the oversight of a public fiduciary, and we have built our financial plan accordingly.

Every school must navigate constraints and make deliberate choices about how to allocate limited resources. At WAK, those choices are guided by a clear set of academic and cultural priorities. Because we believe deeply in teacher-led instruction and the power of small learning environments, we have chosen to invest in highly effective educators and to set salaries at competitive levels. We also commit to maintaining small class sizes so that every student is known, supported, and challenged. In addition, we have allocated enhanced funding for curriculum and special education services to ensure that all students have the tools and supports they need to learn to the best of their abilities.

WILBERFORCE ACADEMY

Our model emphasizes personal connection and a strong, coherent curriculum rather than high-cost technology initiatives. Similarly, instead of offering an expansive menu of electives and amenities, we focus on rigorous core academics—supplemented by civics and entrepreneurship—because we believe these subjects are essential for students in Knox County to thrive in school and in life.

We are also intentionally phasing in administrative positions as enrollment grows. Because Wilberforce expects to open with limited grades and a modest initial enrollment, the school will begin with a lean leadership structure, with some roles combined initially and expanded over time as grades are added. This approach protects the school's financial health while ensuring that resources remain concentrated where they matter most: in the classroom. In these ways, our budget directly reflects and reinforces our academic philosophy and mission.

Our financial assumptions are intentionally conservative. When projecting future costs, we assumed annual cost-of-living and cost-of-doing-business increases of 3%, even though Knoxville's recent averages have been closer to 1%. On the revenue side, we assumed no annual increases in TISA or federal funding for either the "minimum" or the "plan" budget. To remain prudent, we used only the TISA amount provided by the authorizers and made no upward adjustments. As a result, our budgets are highly conservative, and we anticipate that actual margins may be stronger than those reflected in this workbook.

**Revenue Projections**

For financial analysis purposes, we have constructed two different budgets:

1. The "minimum" budget which allows for enrollment at 75% of our maximum capacity in Year 1, gradually increasing each year until 92% in Year 5
2. The "plan" budget which shows enrollment at 90% of our maximum capacity in Years 1 and 2, then 95% of our maximum capacity in Years 3 through 5

We wanted to budget conservatively, assuming that some students will move into and out of the school in any given year, so 100% enrollment is not guaranteed. *Our goal will still be to have full enrollment.*

At **full enrollment**, we will have the following student count:

| STUDENT ENROLLMENT: FULL ENROLLMENT | | | | | |
|---|---|---|---|---|---|
| | Year 1 (100% of maximum) | Year 2 (100% of maximum) | Year 3 (100% of maximum) | Year 4 (100% of maximum) | Year 5 (100% of maximum) |
| Kindergarten | 80 | 80 | 80 | 80 | 80 |
| 1st Grade | 80 | 80 | 80 | 80 | 80 |
| 2nd Grade | 80 | 80 | 80 | 80 | 80 |
| 3rd Grade | 78 | 78 | 78 | 78 | 78 |

| | | | | | |
|---|---|---|---|---|---|
| 4th Grade | | 75 | 75 | 75 | 75 |
| 5th Grade | | | 75 | 75 | 75 |
| 6th Grade | | | | 75 | 75 |
| 7th Grade | | | | | 75 |

For our "**plan**" **budget**, these are the enrollment numbers we used:

| STUDENT ENROLLMENT: PLANNED | | | | | |
|---|---|---|---|---|---|
| | Year 1 (90% of maximum) | Year 2 (90% of maximum) | Year 3 (95% of maximum) | Year 4 (95% of maximum) | Year 5 (95% of maximum) |
| Kindergarten | 72 | 72 | 76 | 76 | 76 |
| 1st Grade | 72 | 72 | 76 | 76 | 76 |
| 2nd Grade | 72 | 72 | 76 | 76 | 76 |
| 3rd Grade | 70 | 70 | 74 | 74 | 74 |
| 4th Grade | 0 | 68 | 71 | 71 | 71 |
| 5th Grade | 0 | 0 | 71 | 71 | 71 |
| 6th Grade | 0 | 0 | 0 | 71 | 71 |
| 7th Grade | 0 | 0 | 0 | 0 | 71 |

For our "**minimum" budget**, these are the enrollment numbers we used:

| STUDENT ENROLLMENT: MINIMUM | | | | | |
|---|---|---|---|---|---|
| | Year 1 (75% of maximum) | Year 2 (84% of maximum) | Year 3 (87% of maximum) | Year 4 (90% of maximum) | Year 5 (92% of maximum) |
| Kindergarten | 60 | 67 | 70 | 72 | 74 |
| 1st Grade | 60 | 67 | 70 | 72 | 74 |
| 2nd Grade | 60 | 67 | 70 | 72 | 74 |
| 3rd Grade | 59 | 66 | 68 | 70 | 72 |
| 4th Grade | 0 | 63 | 65 | 68 | 69 |
| 5th Grade | 0 | 0 | 65 | 68 | 69 |
| 6th Grade | 0 | 0 | 0 | 68 | 69 |
| 7th Grade | 0 | 0 | 0 | 0 | 69 |

WAK's primary revenue source is the Tennessee Investment in Student Achievement (TISA) formula. For all five years, we use the authorizer-provided conservative estimate of $12,000 per pupil, which incorporates both state and local contributions. We have incorporated federal funding streams. These estimates are based on current Tennessee Department of Education guidance and are adjusted annually in our multiyear model to reflect projected enrollment growth and changes in student demographics:

- Title I (Low-Income Students): $550 per eligible student
- Title II (Supporting Effective Instruction): $30 per student
- Title III (English Learners): $135 per EL student
- IDEA (Special Education): $1,100 per SPED student

Our budget assumes a Year 1 SPED population of 10%, growing to 18% by Year 5 (as explained in question 8), and an EL population of 11%. Both of these are consistent with Knox County averages.

We have budgeted for the following grants and philanthropy, beginning in Year 0 and continuing through Year 5. These variable income sources are anticipated but not yet secured:

- Charter Schools Program (CSP) Grant: $250,000 anticipated annually over Years 0-2 (federal planning and implementation grant). We assume that the CSP Grant would be paid on an expense reimbursement basis. Eligible expenses would be approved upfront. WAK's staff would make allowed purchases, keep required documentation, and submit expenses for reimbursement. As these expenses get verified, funds would be paid accordingly. To allow for this expense reimbursement cycle in year 0, we projected that $60,000 in funds would be released in month 3, $60,000 would be released in month 6, and $60,000 in funds would be released in month 9 with a final payment of $70,000 in month 12. Through upfront fundraising from a committed foundation, WAK would maintain the cash balance necessary to support the CSP Grant expense reimbursement process.
- E-Rate Funding: WAK intends to apply for E-Rate funding to offset technology and connectivity costs. Based on Knoxville poverty rates, the school anticipates a reimbursement rate of approximately 70-85%**,** ensuring cost-effective access to high-quality internet and internal connections. This funding will reduce annual operating expenses and strengthen the school's financial sustainability. In both the "minimum" budget and "plan" budget scenarios, we assume E-Rate funds at $10,000 per year for each of years 1-5. As with the CSP Grant, we anticipate that E-Rate funding will be provided on an expense reimbursement basis once eligible expenses have been incurred, properly documented, submitted, and verified.
- Local Fundraising: The budget projections assume $375,000 for Year 0, and $575,000-$850,000 in Year 1 (depending on actual enrollment numbers). Because grants are not provided on an expense reimbursement basis, they will provide essential cash flow to support WAK's planning and startup. For subsequent years, we have projected this amount to decrease somewhat as the budget becomes more self-sustaining with just per-pupil funding. One exception is seen in Year 4 in our "plan" budget when we expect to engage in a Capital Campaign to cover some of the initial costs of moving into a permanent facility. In that year, we expect we may need to raise about $850,000, but we also expect that we will have reserves built up from budget surpluses in the preceding

years, so there is a high possibility that the full amount will not need to be raised through donations.

To ensure that the applicant has sufficient resources, the Colquitt Foundation has provided a letter stating their intent to contribute up to $2,000,000 over the first years of Wilberforce's planning and startup as needed. In addition, we anticipate additional funds from local individuals and community-based organizations. The School Director maintains a longstanding relationship with Pinnacle Bank and will pursue financing there as needed to ensure full funding. Because of these assurances, we are confident that we can finance the school effectively even if the CSP Grant or E-Rate funding were not approved.

**Anticipated Funding Sources: Amounts, Sources, and Commitment Status**

| Funding Source | Amount (Year 1) | Status | Notes |
|---|---|---|---|
| TISA (State + Local) | $2,868,000 - $3,432,000 | Formula-driven and enrollment-dependent | Based on 239 (75% enrollment) to 286 (90% enrollment) student counts @ $12,000 per pupil |
| Federal (Title I, II, III, IDEA, E-Rate) | $70,515 - $82,415 | Anticipated | Based on eligible student counts and current per-pupil allocations from TDOE (range is minimum to planned enrollment) |
| CSP Grant | $250,000 | Anticipated | Application pending; Expected allocations in Years 0-2 |
| Local Fundraising | $575,000-$850,000 | Committed and Anticipated | Letter of commitment from the Colquitt Foundation to provide up to $2 million over the first 3 years; additional local fundraising will be pursued. |
| Facilities Grants | TBD | Not secured | Will pursue state and local opportunities |

Note**:** All philanthropic and grant funding is anticipated, not yet secured. TISA and federal allocations are committed based on enrollment and compliance.

**Dependence on Variable Income**

Depending on actual enrollment, the proportion of per-pupil funding to grants and fundraising for Years 1-3 are as follows:

WILBERFORCE ACADEMY

| | Year 1 | | Year 2 | | Year 3 | |
|---|---|---|---|---|---|---|
| **Enrollment** | **Per-Pupil Funding** | **Variable Income** | **Per-Pupil Funding** | **Variable Income** | **Per-Pupil Funding** | **Variable Income** |
| **Minimum** *(75%-87% of max)* | 72.8% | 27.2% | 90.5% | 9.5% | 96.9% | 3.1% |
| **Planned** *(90%-95% of max)* | 81.0% | 19.0% | 91.6% | 8.4% | 97.3% | 2.7% |

WAK's dependence on variable income is greatest at the outset, which is to the applicant's benefit. We are confident that we will be able raise the funds necessary, especially because we have a solid, generous commitment from the Colquitt Foundation. However, if something unexpected happens, and the funds are not secured, we can delay the school's opening until the funds are in hand. Once the school is operating and growing, our dependence on variable income decreases dramatically.

**Staffing Levels and Organizational Structure**

Our staffing model is designed to support a robust academic and operational launch with a full leadership team and instructional staff aligned to our mission. In Year 0, we will hire four critical roles:

- A School Director will oversee all school academic, financial, and operational activities, functioning as the effective Principal beginning in Year 1.
- A Director of Operations will oversee the business, financial, human resources, and operational activities, maintaining vendor relationships and relationships with the state of Tennessee and Knox County.
- A Dean of Curriculum and Instruction will be responsible for designing the academic and virtue training for all teachers and students, choosing curriculum, and assessing teachers and students.
- An Office Manager will help with the coordination of enrollment, records management, attendance, grading systems, testing logistics, purchasing and tracking of school materials, including books, equipment, and furniture.

In Year 0, the School Director, Director of Operations, and Dean of Curriculum and Instruction will all be contracted to begin work in August, so annual salaries are pro-rated for 11 months (August-July). The Office Manager will be hired in February to help with student accounts and preparation for the school year. These positions will be compensated with benefit packages as well as salaries. They will be maintained once the school commences operation.

Salaries for these positions are based on current comparable school levels, adjusted for cost-of-living increases over the next several years, with the School Director salary being set at $112,000 for Year 0, pro-rated for 11 months of work. The Director-level positions will all be two-thirds of

the School Director's salary, or $75,040 for Year 0, pro-rated for 11 months of work. The Office Manager position's salary of $40,500 was set at a level comparable to area schools in Knox County, and pro-rated for the months of employment in Year 0. These salaries will increase by 3% for Year 1.

In addition, three more administrative positions will be added in Year 1:

- A Director of Development will be responsible for all fundraising and community relations.
- A Director of Specialized Services will oversee services provided to our special populations, including SPED, ELL, highly gifted, and students with 504 plans.
- A Registrar will assist with increasing enrollment and student records management.

This strong administrative core will provide the managerial expertise and staffing support WAK needs to open and serve students from across the county. In the next two years, as the school grows and adds additional grades and students, we plan to add the following administrative positions:

- A part-time Director of Finance in Year 3 to bring the financial planning in-house to ensure future goals are met
- A Dean of Culture in Year 3 to aid with building strong school culture and student behavior norms
- An Elementary Principal in Year 4 to aid with administrative responsibilities once a middle school has been established

Our educational model is teacher-led, and the hiring of virtuous, high-quality staff is of utmost priority. Each classroom will be staffed with one full-time teacher. In Year 1, WAK will have 16 class sections and 16 teachers. By Year 5, we will have 28 class sections and 31 teachers. In addition, there will be three "special subjects" (besides civics and Bible, which will be taught by each grade section's homeroom teacher and/or school counselor) offered at the school: art, music, and physical education, with one teacher hired for each subject. Special education will be covered by one full-time teacher in Year 1, increasing steadily over the five years until we have 2.5 SPED teachers on staff in Year 5. For our expected EL population, we will have a part-time teacher in Year 1, increasing to a full-time position by Year 2. We plan to hire aides for special education or other individualized instruction beginning in Year 2, growing from one to three in Year 5.

Additional hires include a full-time custodian beginning in Year 1, a school counselor in Year 1, a part-time nurse in Year 2, and a librarian in Year 4. In addition, we will maintain a strong pool of substitute teachers, which we will pay on a daily basis. To estimate this cost for the budgets, we assumed each full-time teacher may need a substitute five times during a year and estimated a cost of $150 per day.

**Reduced Enrollment Options**

In planning for reduced enrollment scenarios, our priority is to maintain full compliance with Tennessee requirements for certified staff, ensure adequate support for all students—including those requiring special education and English learner services—and preserve the school's capacity for strategic growth. Our "minimum enrollment" budget reflects a responsible, phased approach to staffing that protects instructional quality while allowing the school to remain financially sustainable if enrollment falls below projections.

Trade-offs will have to be made if our budget is constrained due to lower-than-expected enrollment. Because we place a high value on teacher-led, small-size classroom instruction, we will not cut classroom teachers and will choose to have smaller classes accordingly. We will, instead, delay hiring of some of the administrative positions, with the understanding that the existing administrators will cover the extra functions temporarily. Any such adjustments will be presented to the board of directors in advance, with sufficient time for review, discussion, and approval. This ensures transparency, fiscal stewardship, and alignment with the school's mission and operational needs.

**Positions Potentially Subject to Delayed Hiring**

The following roles may be phased in as enrollment grows, with responsibilities temporarily absorbed by existing leadership and staff:

- Director of Development: Fundraising and external relations can be managed initially by the School Director, Director of Operations, and trained volunteers. This preserves development capacity while deferring the cost of a full-time position.
- Dean of Culture: The School Director and Dean of Curriculum and Instruction can jointly support student culture, behavior systems, and family engagement until enrollment reaches a level that warrants a dedicated dean.
- Registrar: In Year 1, student records, enrollment processing, and compliance reporting can be handled by the Office Manager and Director of Operations, with the Registrar role added as the student body grows.
- Instructional Aides: If special education caseloads or classroom needs are lower than projected, instructional aides may be added gradually. Staffing will be adjusted to ensure all IEP requirements and student supports are fully met.
- Additional Special Education Teacher: The Director of Specialized Services can serve as the primary provider for specialized instruction and case management until enrollment and caseload size justify hiring an additional SPED teacher.
- Librarian: The Dean of Curriculum and Instruction can oversee access to instructional materials, classroom libraries, and digital resources until student enrollment supports a full-time librarian.

This phased staffing model ensures that WAK remains compliant, student-centered, and financially responsible under reduced enrollment conditions, while preserving the flexibility to scale staffing as the school grows.

**Compensation Strategy and Market Alignment**

Our starting teacher salary will be $50,000, aligned with Knox County Schools and state minimums. The pay schedule will implement a step-and-lane structure with merit pay bands, offering differentiated compensation for years of experience, advanced degrees, leadership roles, and performance. (See table below)

**Salary Schedule for Year 1**

| *Band* | *Years of Experience* | *Credential* | *Min* | *Mid* | *Max* |
|---|---|---|---|---|---|
| Band 1 | 0-3 | Bachelor's | $ 50,000 | $ 52,000 | $ 54,000 |
| Band 1 | 0-3 | Master's | $ 54,000 | $ 56,000 | $ 58,000 |
| Band 1 | 0-3 | Ed.S. | $ 55,500 | $ 57,500 | $ 59,500 |
| Band 1 | 0-3 | Doctorate | $ 57,000 | $ 59,000 | $ 61,000 |
| Band 2 | 4-7 | Bachelor's | $ 53,000 | $ 55,000 | $ 57,000 |
| Band 2 | 4-7 | Master's | $ 57,000 | $ 59,000 | $ 61,000 |
| Band 2 | 4-7 | Ed.S. | $ 58,500 | $ 60,500 | $ 62,500 |
| Band 2 | 4-7 | Doctorate | $ 60,000 | $ 62,000 | $ 64,000 |
| Band 3 | 8-12 | Bachelor's | $ 56,000 | $ 58,000 | $ 60,000 |
| Band 3 | 8-12 | Master's | $ 60,000 | $ 62,000 | $ 64,000 |
| Band 3 | 8-12 | Ed.S. | $ 61,500 | $ 63,500 | $ 65,500 |
| Band 3 | 8-12 | Doctorate | $ 63,000 | $ 65,000 | $ 67,000 |
| Band 4 | 13+ | Bachelor's | $ 59,000 | $ 61,000 | $ 63,000 |
| Band 4 | 13+ | Master's | $ 63,000 | $ 65,000 | $ 67,000 |
| Band 4 | 13+ | Ed.S. | $ 64,500 | $ 66,500 | $ 68,500 |
| Band 4 | 13+ | Doctorate | $ 66,000 | $ 68,000 | $ 70,000 |

For purposes of budgeting, we assumed an average salary of $60,000 in Year 1, assuming that the school will hire a mixture of newer and experienced teachers. The current average elementary teacher salary in Tennessee is about $55,240, according to the Bureau of Labor and Statistics,[149] but with the salary minimum increasing, we expect the average to increase as well. The benefit offerings are in line with comparable schools, including 6.2% and 1.45% on all wages each year for Social Security and Medicare employer contributions, 2.7% of first $7,000 in wages for each FTE for unemployment insurance, an 11% employer contribution to the TCRS Hybrid retirement plan and 14% employer contribution to health insurance.

[149] https://www.bls.gov/oes/2023/may/oes_tn.htm#25-0000

Our compensation model is competitive with local and state benchmarks, designed to attract and retain high-performing educators while maintaining fiscal discipline. Annual raises will be provided through cost-of-living adjustments, along with step advancement and merit pay, with differentiated compensation for hard-to-staff subjects, leadership roles, and high performance. These raises could not be indicated in the budget workbooks because the calculating formulas were locked, but we do anticipate those extra costs in future years.

The compensation model supports retention and recognizes excellence, while maintaining fiscal discipline. Salary schedules will be reviewed every three to five years to ensure continued market alignment and sustainability. Adjustments will be made based on state mandates, local market trends, and budget capacity.

**Notes on Expenses and Assumptions**
For budgeting purposes, we have allocated the following amounts for contracted services:

- Annual Audit: $12,000, increasing by 3% to allow for cost-of-living adjustments each year
- Financial Services: $20,000 in Year 0 and $40,000 in Year 1, based on comparable schools' contracts. This rate will drop in Year 3 when Wilberforce hires a fractional Director of Finance to manage some of the services in-house.
- Payroll Services: $20,000, increasing by 3% to allow for cost-of-living adjustments each year. This estimate is based upon comparable schools' budget numbers.
- Special Education Services: $23,900 (minimum enrollment) to $28,600 (planned enrollment) for Year 1, increasing each year with expected number of students receiving services. This estimate is based on a cost of $1,000 per day, increasing by 3% annually to allow for cost-of-living adjustments. We will be contracting for speech, physical and occupational therapies from a provider such as River Valley Health (formerly known as Cherokee Health Systems). The rate of $1,000 is higher than normal for Knox County, but we are budgeting conservatively since other schools have estimated this daily amount.
- Transportation Services: $54,000 is budgeted for Year 1 to provide for students with IEPs that require transportation. This amount will allow for a specialized van to transport up to 5-10 students each day. The estimate is based on a cost of $300 per day, increasing by 3% annually to allow for cost-of-living adjustments. If more students require transportation, services will be extended accordingly.
- Copier Lease: Assuming $9,000 for Year 1, increasing by a cost-of-living adjustment each year. This estimate assumes $750/month based on comparable schools' payments. By Year 3, we have budgeted for an additional copier to keep up with increasing enrollment.
- Internet and Telephone: Assuming $24,000 in Year 1, based on school averages. Will increase by cost-of-living adjustment each year.
- Bank Charges: $1,500 for Year 1, based on other school estimates.
- Postal Services: $2,500 for Year 1, based on other school estimates

For school operational costs, we have made the following allocations:

- Annual Board Training: $3,000 in Year 1, increasing by 3% to allow for cost-of-living adjustments each year. We expect the training to be provided by the Tennessee Charter School Center or another qualified party.
- Field Trips: $7,190 (minimum enrollment) to $7,660 (planned enrollment) in Year 1, increasing proportionally by student growth in the following years. This amount is based on the assumptions that each grade will take one field trip per year, with each bus costing approximately $400 per trip, plus an additional $10/student for entrance fees.
- Classroom Supplies and Materials: $100,100 for Year 1 (for planned enrollment) adjusting down to $83,650 if enrollment is only 75% of projections. This amount will increase proportionally by student growth in the following years. Comparable schools in the area spend about $300 per student on these materials, so we budgeted for $350 per student to be conservative and allow for margin, as strong curriculum is one of WAK's top priorities.
- Special Education Supplies and Materials: Assuming an additional $75 per SPED student, we have budgeted between $1,800 (for minimum enrollment) and $2,145 (for planned enrollment) for Year 1. This amount will increase proportionally along with the number of projected SPED students each year. If more students qualify for SPED services than estimated, the budget will be adjusted accordingly.
- Staff Development: $45,000 in Year 1, allowing for on-site training for Singapore Math and specific training in Literacy Essentials, along with other professional development, as outlined in question 43. In future years, $700 is budgeted for professional development for veteran teachers and $3,000 is budgeted for new hires. Our unique, classical pedagogy requires extra training, and we prioritize that in our budgets.
- Student Recruitment and Marketing: Allowing for $20,000 per year for Years 0 and 1, and decreasing to $15,000 in Year 2, after school is established. This amount will increase annually by cost-of-living adjustments.
- Student Testing and Assessment: $17,925 (for minimum enrollment) to $21,450 (for planned enrollment) in Year 1, increasing proportionally by student growth in the following years. This estimate is based the following estimates: TCAP testing between $30-$60/student; NWEA/MAP between $13-$20/student; and DIBELS between $5 and $15 student. Since K-2 students will not take TCAP, an overall average of $75/student is estimated for budgeting.
- Supplies and Other Materials: This estimate is based on an assumption of $40/student for consumables plus faculty supplies of $800 per teacher. In addition, money has been added for lunch room supplies: $2000 in Year 1, increasing by $1000 each year after.
- Other Equipment: Initial outlays for stocking the health room and the kitchen will be in Year 0, a total of $10,000 across 2 months.
- Technology: $34,500 in Year 0 as all new staff for the upcoming year will be given laptops. In future years only proportional amounts for additional staff will be needed. $1,500 for each new hire is allocated.

- Student Information System: WAK has budgeted $30,000 in Year 0 for the initial set up of Infinite Campus student information system software, inclusive of licensing, implementation, and training. Ongoing annual costs are projected at $7,500-$16,008 as enrollment grows (and assuming costs increase at 3% per year) ensuring robust data management, compliance reporting, and family communication tools. If enrollment goals are not met, the "Minimum Budget" shows these numbers decreased proportionally.
- Library Books: Beginning in Year 3, we have allocated $15,000 for purchasing books for the library to be opened in Year 4. Prior to Year 4, we will provide students with access to rich resources in the classrooms as our classical, content-rich curricula is better utilized with classroom-level libraries. The need for a centralized library will not be realized until the school is larger and serving more grades -- by Year 4 if enrollment is tracking with our "plan" budget or Year 5 if operating under the "minimum" budget.
- Health Supplies (consumables): $5,000 increasing by cost-of-living adjustments annually
- Lunch Monitors: We will hire 2 part-time staff to cover the lunch shift of 2.5 hours, at minimum wage ($7.25/hour). The total is $6,525.
- Substitute teachers: As mentioned above, the amount of $12,000 for Year 1 was calculated based on the rate of $150/day and the assumption that each teacher may utilize an average of 5 sick days per year. For future years, this amount increases proportionally with the number of full-time teachers.
- Authorizer fee: We have allocated $35,000 each year for the authorizer fee.

All other operational expenses are estimated based on area charter school averages.

**Facilities Costs**

For facility operations and management, we are taking a measured approach to ensure that WAK can launch successfully and expand in a methodical way without assuming an undue facilities commitment before we have a solidified a loyal parent following.

Our plan is to rent a suitable space for the first 3 years while enrollment is growing, and then transition into a newly constructed building in Year 4. To estimate costs for this scenario, we are engaged in a property search, headed by a proven real estate search agent, Parker Bartholomew, and supported by Board Treasurer David Colquitt and Board Member Laura Beaman who also has extensive real estate experience, to identify potential rental locations.

For rental purposes, there are three suitable locations currently on the market:

- Site 1 Address: 109-297 N Seven Oaks Dr, a large retail space with flexible space options, renting for $15/sq foot
- Site 2 Address: 11130 Kingston Pike, a large commercial space with 87,426 square feet available, renting for $18/sq. foot
- Site 3 Address: 9305 Kingston Place, a 31,557 square foot retail space, renting for $10/sq foot

Each of these locations would be able to house our school for the first 3 years assuming 75-80 square feet per student, with a maximum of 468 students in Year 3.

To get rental space up to Tennessee code for a charter school, we estimate it will cost approximately $35/square foot. This will include the new fire/safety systems, ADA compliance measures, build-out for classrooms, and electrical, plumbing, and HVAC system upgrades. (Security measures are an additional line item in the budget.) For a 37,000 square foot space, this upfitting cost totals about $1.3 million. Assuming a construction loan for 5 years at a rate of 6%, WAK will need to service a debt payment of $301,604 each year for Years 1-5. The school would also have rental costs of approximately $740,000, assuming an average rental price of $20/sq. foot (based on the properties listed above) and a building size of 37,000 square feet.

The facilities costs for Years 1-3 are as follows:

- Rental fees: $740,000
- Construction Loan Payment: $301,604
- **Total Annual Facilities Cost: $1,041,604**

If enrollment projections are on target with our plan, by Year 4, we will have a new building constructed and ready for the school. For this new building, we have made the following assumptions:

- Purchase 10 acres of land at a cost per acre of $100,000, totaling $1,000,000
- 55,440 square-foot building, allowing for 80 square feet per student at maximum school enrollment of 693 students
- $400 cost per square foot
- Estimated $22,476,000 estimated total building cost (including land)
- Estimated loan terms of 30 years at 6% interest

With these assumptions, WAK's lease payments beginning in Year 4 will be $1,632,857. Including the remaining payments of the initial construction (upfit) loan, this means the facility costs for Years 4 and 5 will be:

- New Building Lease Annual Payment: $1,683,711
- Construction Loan Annual Payment: $301,604
- **Total Annual Facilities Cost: $1,985,315**

If enrollment does not meet our projections, the school would be operating at or near our "minimum" budget. Under this scenario, we would not begin construction on a new building as planned. Instead, the school would continue to operate in the rented space, with much lower facilities costs. Assuming the landlord increases rental costs by 3% a year after the initial rental terms have expired, we project total costs of $1,063,804 in Year 4 and $1,086,670 in Year 5. These totals include the annual rental costs and construction loan payments. There is a surplus in the budget projected by Years 4 and 5 under this scenario, so if portable classrooms are needed for extra enrollment, those could be obtained.

**Other Facilities Costs**

- Utilities: $74,000 in Year 1, increasing by 3% to allow for cost-of-living adjustments each year. This is based on an estimate of $2 per square foot. When the new building is constructed, this number will increase proportionally by square footage beginning in Year 4. On the "minimum" budget, the utilities costs are based on the rented space all 5 years.
- Janitorial Services: $10,000, increasing by 3% to allow for cost-of-living adjustments each year. Because we will have a full-time custodian on staff, this amount is solely for janitorial supplies needed on an annual basis.
- Security: Since we will not contract with an SRO at the outset, we are planning on outfitting the school with cameras, access control system, radios and a panic system, estimating initial start-up costs of $50,000 for Year 1. In the following years, annual subscriptions, maintenance, and training costs are estimated to be $11,000 in Year 2, increasing with cost-of-living adjustments thereafter.
- Insurance: Estimated at $25,000 for Year 1, based on averages at comparable schools. This cost will increase with cost-of-living adjustments each year.
- Equipment Costs: Estimated at $48,000 for Year 0, as the school is built out with projectors, white boards, and other necessities. Future costs will be lower and will increase with cost-of-living adjustments each year.
- Furniture Costs: Estimated at $51,500 for Year 0 as the initial classrooms and offices are set up. This assumes $150/student for classroom furniture and $700 for each new office. The additional costs in the following years will be to set up 3 new classrooms a year until maximum school capacity is met.
- Repairs and Maintenance Costs: Estimated to be $10,000 for Year 1, based on averages at comparable schools. This cost will increase with cost-of-living adjustments each year.

**Fixed vs. Variable Expenses**

While many of the school's expenses are fixed—such as facility costs, salaries and benefits of teachers and staff, financial services and payroll contracted fees, professional development costs, marketing and recruitment costs, and the annual authorizer fee, to name some of the larger ones—there are some that are variable expenses as well. We expect the following costs to vary according to enrollment numbers:

- Special education services
- Special education supplies and materials
- Classroom supplies and teaching materials
- Supplies and other materials
- Student testing and assessment

In our "minimum" budget, these costs are adjusted to be lower than in our "plan" budget based on lower enrollment. In addition, some of the school's personnel could be considered "semi-variable" expenses. Certain positions will have delayed hiring until enrollment meets thresholds,

as indicated in our "minimum" budget and in the section above with the heading, "Positions Potentially Subject to Delayed Hiring."

**Minimum Student Enrollment to Open and Operate**

To develop our enrollment plans, we conducted outreach to gauge family interest in our service region, considered our management team's experience operating other schools, benchmarked what other Knoxville charter schools have done, evaluated charter school requirements, and carefully weighed programmatic and staffing priorities. To determine the minimum enrollment required to open and operate the school responsibly, we conducted an analysis that incorporated:

- Tennessee's TISA funding formula
- Required staffing for instruction, student support, and operations
- Facility requirement and factors of expense
- Special education and intervention services
- Safety and compliance requirements
- Reasonable contingencies for enrollment variability
- Projected philanthropy

Based on this analysis, we have determined that the school can operate sustainably as a safe, nurturing, and effective school at approximately 75% of projected enrollment in its opening year and still remain financially healthy. The "minimum" budget is constructed to be viable at this level of enrollment, with proportional adjustments to staffing, supplies, and discretionary spending.

Enrollment is the primary driver of revenue which ensures budget stability and missional impact. We will employ a robust recruitment strategy, as detailed in question 9 above, including community outreach, targeted marketing, and partnerships with local organizations, to ensure we meet or exceed minimum enrollment. Should enrollment fall short, immediate adjustments to staffing and discretionary spending will be made, and a greater enrollment push will be initiated.

If, by July of Year 0, enrollment is even lower than 75%, the school will consider delaying the opening until the following year or opening with fewer grades. In addition, because our operational budget is partially dependent on variable income—philanthropy—for Year 1, the decision can be made to delay the opening of the school if the full amount needed has not materialized by June of Year 0. These safeguards ensure the school does not open without the financial capacity to deliver high quality instruction and student services.

**Cash Reserves, Fundraising Plans, and Break-Even Point**

Both our "minimum" and "plan" budgets project positive net income in each of the first five years, based on the assumptions outlined above. Should the CSP grant not materialize as anticipated, we are prepared to utilize additional philanthropic contributions, from Colquitt Foundation or others, or bank financing to close the gap. We will have secured a line of credit

from Pinnacle Bank to address any short-term cash flow challenges that may arise from delayed revenues, unexpected expenses, or billing timing.

We are committed to disciplined, annual fundraising. If enrollment meets projections, we will hire a Director of Development in Year 1 to lead advancement efforts, with clear goals, metrics, and alignment to our five-year rolling budget. The level of philanthropic need will vary year to year based on staffing, facilities, and other operational priorities. The Director of Development will have early and ongoing visibility into these targets to ensure proactive planning and execution.

If enrollment falls below projections and a Director of Development is not hired, our "minimum" budget reflects a reduced reliance on philanthropy after Year 1. These more modest fundraising goals remain well within reach for the School Director, supported by staff, board members, and a volunteer parent organization.

In both budget scenarios, fundraising targets are calibrated to ensure a positive net income annually. In years where we anticipate significant surpluses, those funds will be reserved to offset future fundraising needs and strengthen long-term financial sustainability.

In our "plan" budget, we expect the school to be able to break-even—or sustain operations without any outside donations—by Year 3. In that year, the revenues from just TISA and federal funds will more than cover the planned expenses. However, we still plan to do fundraising in that year because by Year 4, WAK would like to be in a permanent facility to meet its growing enrollment. Year 4 will be an expensive year with a new lease payment as well as a continued construction loan from upfitting of the rental space, so extra fundraising will be required. This is a one-time situation, and once the school is in full operation as a K-8 school, it will be in a very strong financial position.

In our "minimum" budget, the break-even point occurs in Year 4. By Year 5, we project to have built significant financial reserves, positioning the school well to move into a permanent facility within the next year or two.

**Contingency Plans**

Wilberforce recognizes that all new charter schools face inherent financial risks, particularly related to enrollment volatility, timing of state and federal funding, and potential cost escalations. Our financial model incorporates conservative assumptions, and we have established a multi-layered contingency framework to ensure operational continuity. If revenue projections are not met prior to opening—or in any subsequent year—the following actions will be implemented in a sequenced and strategic manner, in the following order:

1. Revenue Enhancement: The school will pursue additional revenue through targeted fundraising, competitive grant applications, and strategic enrollment efforts. The board's strong community relationships position the school to secure support from mission-

WILBERFORCE ACADEMY

aligned individuals, foundations, and local organizations. These efforts will prioritize recurring or multiyear commitments to strengthen long-term financial stability.

2. Expense Reduction: The leadership team will implement controlled cost containment measures, including deferring non-essential hires, reducing discretionary spending, and renegotiating vendor contracts. These reductions will be prioritized to protect core instructional programming and student services.
3. Bridge Financing: For temporary cash flow gaps, particularly those caused by delayed reimbursements, the school may utilize an existing line of credit or short-term financing. Our established relationship with Pinnacle Bank will provide access to additional credit capacity if needed. All borrowing will require board approval and will adhere to prudent debt management practices, with repayment scheduled from anticipated revenue streams.
4. Board Designated Reserves: In the event of a midyear or year over year shortfall, the board may authorize the use of board designated reserves. The school will maintain a minimum reserve equal to at least 5% of annual operating expenses, consistent with fiscal oversight best practices. Reserve draws will require a corrective action plan approved by the Board Finance Committee and monitored monthly.
5. Strategic Financial Review: The Board Finance Committee will initiate a comprehensive budget review, engage external financial experts if necessary, and adjust multiyear projections to restore fiscal balance. This may include revising staffing plans, adjusting programmatic expenditures, or modifying long-term growth assumptions.

Ongoing financial oversight will include monthly financial statements, variance analyses, cash flow projections, and annual independent audits. The board will monitor key performance indicators, such as enrollment trends, cash on hand, and budget to actual performance, and will implement corrective actions or operational restructuring if financial thresholds are not met. Strong internal controls, segregation of duties, and compliance with state and federal reporting requirements will be maintained to ensure transparency, prevent deficits, and safeguard public funds. Monthly cash flow projections have been developed for Year 0 and are included in the budget workbook in Row 8.

**Deficit Year Contingency Plan**

In any year the school projects a deficit, WAK will implement a formal deficit reduction plan that includes:

- Immediate spending freezes on nonessential purchases
- Deferral of planned hires or program expansions
- Renegotiation of vendor contracts and service agreements
- Monthly cashflow monitoring and reporting to the Board Finance Committee
- A corrective action plan designed to restore structural balance within 12 months

If necessary, the board may authorize temporary use of reserves or short-term financing, paired with a multi-year recovery plan to ensure long-term sustainability.

WILBERFORCE ACADEMY

**Budget Surpluses**
In the event that WAK ends a year in a surplus position, we will manage it with an approach grounded in long-term financial stewardship, mission alignment, and compliance with Tennessee charter school financial best practices. Because charter schools must remain financially stable while also reinvesting in high quality programming, our policy is to allocate any surplus in a way that strengthens the school's long-term sustainability and enhances student learning.

First, we will build and maintain healthy operating reserves, with the goal of sustaining a minimum reserve equal to at least three months of operating expenses. This reserve protects the school against enrollment fluctuations, delayed state payments, unexpected facility costs, or other unforeseen financial pressures.

Secondly, we will reinvest in academic and student support priorities, such as:

- Strengthening academic programming
- Expanding intervention and student support services
- Enhancing curriculum and instructional materials
- Increasing access to enrichment, arts, and extracurricular opportunities

These investments ensure that surplus funds directly benefit students and advance the school's instructional model.

Thirdly, we would use any surplus to support strategic staffing and talent development. We would seek to provide targeted professional development, support teacher retention initiatives, and add staff positions that improve student-teacher ratios or expand services. This approach reinforces our commitment to a nurturing, relationship centered school culture.

If reserves and instructional priorities are fully funded, remaining surplus may be allocated toward facility improvements, safety and security enhancements, and long-term capital planning. This ensures that the school's physical environment remains safe, welcoming, and aligned with student needs.

All decisions regarding surplus allocation will be approved by the governing board, documented in board minutes, reflected in annual audits, and reported to the authorizer as required to ensure full transparency and adherence to Tennessee's financial accountability standards.

Our budgets are constructed to ensure operational viability even at minimum enrollment (75% of projections in Year 1), with core funding from TISA and federal sources, competitive compensation, and robust internal controls. Comprehensive contingency plans address cash flow and deficit risks, ensuring sustainability and resilience. Our financial strategy is aligned with state and local benchmarks, best practices in charter school finance, and the operational rigor required to fulfill our mission for Knoxville's students and families.

## 3.2 Budget and Finance Capacity

*58. Describe the systems, policies, and processes the school will use for financial planning, accounting, purchasing, and payroll, including the method for conducting annual audits of the financial, administrative, and program operations of the school. Describe how the school will establish and maintain strong internal controls and ensure compliance with all financial reporting requirements. Identify the role and key responsibilities of the individual who will be responsible for overseeing day-to-day financial management and system oversight.*

In its first five years, WAK will manage accounting, purchasing, payroll, and audits through a combination of outsourced financial services and the development of robust internal controls. The right outsourced providers bring proven systems, field-tested expertise, and efficient execution. To guide its in-house management, WAK will implement an annually ratified Fiscal Policy Manual, which addresses legal compliance, Generally Accepted Accounting Principles (GAAP), and best governance practices. The board will collaborate with an expert financial services provider to draft and refine this manual, ensuring that it aligns with the school's financial objectives and regulatory requirements. We will maintain a stringent system of internal controls to prevent fraud, error, and noncompliance. These controls will include segregation of duties, role-based system access, dual approval for key transactions, spending transparency, and periodic internal reviews.

We are committed to ensuring that WAK takes pride in how it uses the public funds with which it is entrusted and exceeds the financial management standards outlined in the Charter School Model Performance Framework,[150] including maintaining:

- A Current Ratio greater than 1.1
- 30-days cash or greater for the first two years of operation, increasing to 60 days thereafter
- A positive cumulative Total Margin for the first two years of operation, moving to a positive Aggregated Three-Year Total Margin thereafter
- A Debt to Asset ratio of less than .9
- Positive cash flow for the first two years of operation, and maintaining a positive Multi-Year Cumulative Cash Flow thereafter
- A Debt Service Coverage Ratio greater than or equal to 1.1

These standards, combined with regular board reporting and monitoring by outsourced providers, will protect against default on loans and delinquency in payments.

[150] https://www.tn.gov/content/dam/tn/education/nonpublic/chtr_sch/Charter_School_Model_Performance_Framework.pdf

**Financial Planning and Budget Development**
WAK will implement a financial planning process, which will culminate in board review and approval of an annual budget and multi-year business plan, designed to ensure long-term sustainability, transparency, and alignment between financial resources and academic priorities. Before even opening, the school will maintain a rolling five-year financial projection to model enrollment growth, staffing assumptions, facilities costs, and reserve levels. This model will be updated annually as an active management tool rather than a static compliance document. These projections will be used to stress-test enrollment variability, staffing scenarios, and fixed-cost obligations so that WAK's board and management can identify financial risk early and adjust proactively.

Each year, beginning in Year 0, the Director of Operations, in collaboration with the School Director, will develop an annual operating budget aligned with Tennessee Investment in Student Achievement (TISA) funding assumptions, anticipated federal program allocations, and other projected revenue sources. The budget will prioritize personnel and facilities as the largest cost drivers, and in so doing, will limit discretionary spending on other lesser priorities. The proposed budget will be reviewed by the board finance committee and formally adopted by the full board of directors in an open meeting, consistent with T.C.A. § 49-13-111 requirements for annual budget adoption.

Throughout the year, leadership will provide the board with monthly financial reports that include budget-to-actual comparisons, cash flow statements, balance sheets, and income statements. These reports will be structured to allow the board to evaluate the school's near-term cash position recognizing that startup charter schools may experience cashflow pressure even when budgets appear balanced on paper. To protect its cash position, WAK will maintain a minimum cash reserve target equivalent to at least sixty days of operating expenses and will actively manage the timing and sequencing of expenditures to avoid overextension of cash resources.

**Accounting Systems, Chart of Accounts, and Financial Reporting**
WAK will work with a reputable local accounting firm to ensure that all accounting systems and financial reporting are fully compliant with GAAP, GASB standards, and applicable federal Uniform Guidance (2 CFR 200). The system will be configured in accordance with the uniform accounting requirements and chart of accounts prescribed by the Tennessee Comptroller of the Treasury, as required by T.C.A. § 49-13-111. The accounting structure will allow revenues and expenditures to be coded consistently by fund, function, and object, enabling accurate reporting to the authorizer, the Tennessee Department of Education, and auditors. WAK will follow the Tennessee Internal School Uniform Accounting Policy Manual for all school-level cash handling, receipting, and activity fund management.

The Director of Operations will ensure that the school follows a disciplined monthly close process to ensure timely, accurate, and auditable financial reporting. Monthly close procedures will include reconciliation of all bank and credit card accounts; review of accounts payable and receivable; accruals for payroll, benefits, and other obligations; and review of capital asset activity and depreciation schedules. This cadence ensures that governance-level oversight is grounded in reliable, timely information rather than retrospective or ad hoc reporting. All financial records, including invoices, contracts, purchase documentation, payroll records, bank reconciliations, grant documentation, and audit materials, will be retained in accordance with state and federal record-retention requirements and available for public inspection as required by law.

**Purchasing, Procurement, and Accounts Payable Controls**

WAK will implement a formal procurement policy designed to ensure fiscal responsibility, transparency, and compliance with state and federal requirements. Procurement thresholds will comply with both Tennessee law and federal Uniform Guidance (2 CFR 200.320), including micro-purchase, small purchase, and competitive procurement requirements. Invoices will be reviewed and coded at the time of receipt and matched to approved purchase orders prior to payment.

Vendor accounts will be established by the School Director only for approved purposes within the adopted budget and chart of accounts. With the help of our financial management service provider, payment systems will be evaluated to ensure transparency and reviewability; where electronic invoicing or bill-pay systems do not allow sufficient oversight, alternative controls will be implemented. WAK will place particular emphasis on cash flow management during startup, actively sequencing payments to ensure that minimum reserve thresholds are maintained and that the school's bank account is never overdrawn. Vendor relationships will be managed proactively by the Director of Operations, including early communication when payment timing must be adjusted to protect WAK's financial stability. After establishing our clear needs, required qualifications, timeline, and budget requirements, we will use a competitive procurement process to ensure that all firms receive the same information and can be judged fairly.

For acquisitions valued at $10,000 or more, purchases shall be conducted through a competitive bidding process or by obtaining comparative pricing from at least three vendors, in accordance with Tennessee state law. Any purchase or disposition of assets valued at $10,000 or more requires the approval of the Board Finance Committee. Transactions involving higher-value assets or any real estate acquisitions or dispositions must receive full board approval.

Recognizing the heightened risk associated with credit card use, particularly in a startup environment, WAK will implement strict credit card controls. Credit cards will be issued sparingly and only to designated staff whose responsibilities require them, initially the Director of Operations and the School Director, with heightened restrictions during early years of operation. All credit card purchases will require documented pre-approval through a requisition process. Transaction limits will be established to prevent incremental misuse.

Credit card statements will be reconciled monthly and reviewed independently of the cardholder. The Director of Operations will review the statements monthly with supervision from the School Director and independent review by the board treasurer. Itemized receipts will be required for all transactions, and purchases may not be split to circumvent approval thresholds. Any unapproved or non-school-related purchases will require reimbursement to WAK and may result in disciplinary action, including revocation of card privileges. Where appropriate, employee reimbursement processes may be used in lieu of broader credit card distribution as an additional internal control.

We will minimize the use of school cash wherever possible. If petty cash is necessary for sporting events, booster fundraisers, or other purposes, it will be capped at a modest amount, stored securely, documented through standardized reconciliation forms with itemized receipts, and reconciled monthly by staff independent of cash custody.

**Payroll Administration and Controls**

Payroll will be administered through a reputable, local accounting firm to ensure accurate wage payments, tax withholdings, benefits administration, and regulatory filings. Time and attendance will be approved by supervisors, payroll runs will be prepared by designated staff, and final payroll registers will be reviewed by the School Director or the Director of Operations prior to submission. Because personnel costs represent the largest portion of a charter school operating budget, staffing decisions will be managed conservatively during the early years of operation. Leadership will closely monitor enrollment trends and avoid locking WAK into staffing structures or compensation commitments that cannot be adjusted if enrollment falls short of projections. Payroll liabilities and benefits invoices will be reconciled monthly to ensure accuracy and prevent the accumulation of hidden liabilities.

**Allowable Cost and Restricted Funds Compliance.**

WAK will implement a structured process for determining the allowability of costs charged to restricted funding sources, including federal grants and donor-restricted funds. Each proposed restricted-fund expenditure will be evaluated against a standardized decision framework to confirm that it is included in an approved budget, permitted under applicable laws and regulations, consistent with cost principles, and aligned with the purpose of the funding source.

All costs will be reviewed for allowability under federal and state rules. Instructional materials will be made publicly accessible in compliance with Tennessee's Textbook Transparency Act. These controls will ensure compliance with T.C.A. § 49-13-111 and safeguard the school against financial mismanagement. WAK will maintain clear separation between allowable and unallowable costs and will ensure that prohibited expenditures are never charged to restricted funds.

**Bank Reconciliations and Segregation of Duties**

Stringent controls will be embedded throughout WAK's financial operations. Duties will be segregated so that no single individual has responsibility for authorizing expenditures, processing

payments, and reconciling bank accounts. Both the School Director and the Director of Operations will be involved in transaction execution, review, and reconciliation to reduce risk and strengthen accountability. Bank and credit card accounts will be reconciled monthly by the Director of Operations, with reconciliations reviewed by the School Director. Copies of bank statements, credit card statements, and reconciliations will be provided to the board treasurer to support the board's oversight and substantiate monthly documentation. Reconciliation procedures will include verification of deposits, matching of cleared payments to accounting records, and investigation of outstanding or unusual items.

**Audits, Financial Reporting, and Continuous Oversight**
WAK will cause an annual independent audit of its accounts and records—including internal school activity funds—to be conducted in accordance with T.C.A. § 49-13-127. The audit will be performed by a qualified CPA firm and will conform to generally accepted auditing standards. Copies of the audit will be furnished to the local board of education, the Commissioner of Education, and the Comptroller of the Treasury as required by law. Audit results, including any management letter, will be presented to the board of directors in a public meeting. WAK will treat the audit process as a tool for continuous improvement, incorporating auditor recommendations into updated procedures and internal controls. WAK will also prepare and submit an annual progress report that includes financial records, revenues, expenditures, and a detailed accounting of all funds received, in compliance with T.C.A. § 49-13-120. Financial policies and procedures will be reviewed annually by the board and updated deliberately, rather than reactively, as the school matures. (See question 61 for detail on how we will select the firm to conduct the audit.)

**Roles and Responsibilities for Financial Oversight**
Day-to-day financial management and system oversight will be led by the Director of Operations. This role is responsible for budgeting, purchasing controls, accounts payable workflows, cash flow monitoring, bank and credit card reconciliations, payroll coordination, compliance documentation, asset tracking, and audit preparation. The School Director will provide supervisory oversight at the management level. The Board Treasurer will provide oversight at the board level. Outsourced service providers will serve as an additional check and balance. This includes reviewing payroll registers, monitoring program budgets, managing cash flow priorities, and ensuring that internal controls are implemented consistently without collapsing financial duties into a single role or relegating oversight to two paid staff.

At the governance level, the board of directors, through its treasurer and finance committee, will provide fiduciary oversight. The board will approve the annual budget, review monthly and quarterly financial statements, oversee the audit, approve major contracts, and monitor internal controls while remaining focused on governance rather than day-to-day execution. Although bank and credit card statements will not be reconciled by the board, the Treasurer will review records provided by the Director of Operations and School Director. Board members and senior staff will adhere to a formal conflict-of-interest policy and will disclose and recuse themselves

from decisions where personal interests could reasonably be perceived. Board members will complete required governance training, including financial oversight and ethics, consistent with State Board Rule 0520-14-01-.07. All financial decisions, including budget adoption and audit acceptance, will occur in compliance with Tennessee's Open Meetings Act. Financial records will be maintained and disclosed in accordance with the Tennessee Public Records Act.

**Policies Ensuring Strong Internal Controls and Compliance with State, Federal, and Authorizer Reporting**

As detailed above, we will implement a comprehensive internal control framework designed to safeguard assets, ensure accurate financial reporting, and maintain full compliance with state, federal, and authorizer requirements. These policies will be codified in the annually adopted Fiscal Policy Manual and reinforced through staff training, board oversight, and ongoing monitoring.

WAK will maintain strict segregation of duties across all financial functions, as indicated above, ensuring that no individual or two individuals have unilateral authority over authorization, custody, and recordkeeping. All financial transactions including purchasing, payroll, receipting, and bank reconciliation will require dual review and documented approval with board reporting. System access will be role-based, with permissions aligned to job responsibilities and reviewed annually, as detailed above. Cash handling will follow the Tennessee Internal School Uniform Accounting Policy Manual, and petty cash will be minimized and reconciled monthly by staff independent of cash custody.

All accounting and reporting will comply with GAAP, GASB, the Tennessee Comptroller's chart of accounts, and federal Uniform Guidance (2 CFR 200). Restricted funds, including federal grants, will be subject to an allowability review prior to expenditure, ensuring alignment with approved budgets, cost principles, and program requirements. WAK will maintain documentation sufficient to support all expenditures, including purchase orders, invoices, contracts, time-and-effort records, and procurement documentation. Financial records will be retained in accordance with state and federal retention schedules and made available for public inspection under the Tennessee Public Records Act.

WAK will meet all financial reporting requirements established by its authorizer, including monthly financial statements, annual budgets, audited financials, grant expenditure reports, and any supplemental documentation requested for monitoring or compliance reviews. Reports will be submitted on time, in the required format, and supported by reconciled accounting records. The Board Finance Committee will review reports prior to submission to ensure accuracy and completeness.

WAK will undergo an annual independent financial audit in accordance with T.C.A. § 49-13-127. Any findings or recommendations will be addressed promptly through corrective action plans approved by the board. Internal controls and financial policies will be reviewed annually and updated to reflect audit feedback, regulatory changes, and best practices.

WILBERFORCE ACADEMY

*59. Describe the procedures governing the deposit of idle funds, purchasing procedures, and comprehensive travel regulations.*

**Deposit and Management of Idle Funds**

WAK will safeguard all idle funds in accordance with Tennessee law, the Tennessee Comptroller's guidance, and the Internal School Uniform Accounting Policy Manual. All school funds will be deposited promptly, within 24-48 hours, into authorized bank accounts held in the name of the school. Idle funds, defined as cash balances not immediately required for payroll, accounts payable, or operating expenditures, will be deposited in low-risk, interest bearing accounts or other permitted uses that prioritize safety, liquidity, and compliance. Such permitted uses could include certificates of deposit, obligations of the United States or agencies, repurchase agreements, banker's acceptances, commercial paper or savings accounts. Monies earned on deposits and investments will be used to support the instructional program of WAK.

The Director of Operations will monitor cash balances weekly to ensure that all idle funds remain fully collateralized and that the school maintains adequate liquidity to meet its obligations. The Board Treasurer and Finance Committee will review monthly cash flow reports, bank statements, and investment activity to ensure proper oversight and adherence to state requirements. WAK will not engage in speculative investments; all decisions regarding the placement of idle funds will be approved by the Finance Committee and documented in accordance with board policy.

**Purchasing Procedures**

WAK will implement a comprehensive procurement system that ensures transparency, fiscal responsibility, and compliance with Tennessee law and federal Uniform Guidance (2 CFR 200). Staff members initiating a purchase will complete a requisition form that verifies need, budget alignment, and allowability; the Director of Operations will review and approve all requisitions before issuing a purchase order. The Director of Operations will also ensure that purchasing thresholds are applied correctly, including micro purchase, small purchase, and competitive procurement standards. For purchases of $10,000 or more, the Director of Operations will coordinate the collection of at least three competitive bids or quotes, while purchases above the board established threshold will be submitted to the Board Finance Committee for approval. The School Director will establish vendor accounts only after confirming approved use, required documentation, and conflict of interest disclosures. Upon receipt of goods or services, designated staff will verify delivery and complete receiving documentation, after which the Director of Operations will match invoices to purchase orders and receiving records before authorizing payment. This workflow ensures proper segregation of duties, oversight, and compliance at every stage of the procurement process.

Credit card use will be tightly controlled, limited to designated staff, and subject to preapproval, transaction limits, and monthly independent reconciliation. Petty cash, if used, will be capped at a modest amount, secured, and reconciled monthly. These procedures ensure compliance with

T.C.A. § 49-13-111, the Tennessee Comptroller's accounting requirements, and federal procurement standards.

**Comprehensive Travel Regulations**

WAK will adopt a formal travel policy that governs all staff and board travel, ensuring that travel expenditures are reasonable, necessary, directly related to the school's mission, and compliant with Tennessee Comprehensive Travel Regulations. All travel must be preapproved by the School Director (or Board Chair for School Director travel) and must be supported by itemized receipts. The school will maintain comprehensive travel regulations that ensure all travel-related expenses are reasonable, mission-aligned, and compliant with the State of Tennessee Comprehensive Travel Regulations. These regulations will include:

1. Allowable Expenses

Only expenses directly related to approved school business will be reimbursed. Allowable expenses include:

- Transportation: airfare, mileage, rental car, parking, tolls
- Lodging: within GSA CONUS per diem limits
- Meals: subject to per diem rates and compliance with travel status
- Registration Fees: limited to approved conferences or trainings

Personal travel, alcohol, entertainment, and other unallowable costs will not be reimbursed. Expenses must be necessary, reasonable, and incurred while conducting official school business.

2. Approval Requirements

All travel will be pre-approved by the School Director or his/her designee. Travelers must submit a travel request form, estimated costs, and the purpose and dates of travel. Travel may not be undertaken unless authorized in advance.

3. Reimbursement Process

Employees must submit itemized receipts along with a completed reimbursement form within 10 business days of returning from travel. Reimbursements will follow:

- IRS standard mileage rate (currently $0.73/mile as of January 2026)
- Maximum GSA CONUS per diem rates for meals and lodging
- Maximum parking fee without receipt: $8/day

Reimbursements will be based on the most direct and cost-effective route. Employees will be expected to be as conservative as circumstances permit.

4. Compliance and Documentation

All travel must comply with Tennessee Policy 8's Comprehensive Travel Regulations and Federal Uniform Grant Guidance (2 CFR Part 200) if federal funds are used. Records will be maintained for audit purposes and submitted to the authorizer upon request. All travel reimbursements will

be processed through the accounts payable system and subject to the same internal controls, segregation of duties, and documentation requirements as other expenditures.

*60. Describe any services to be contracted, such as business services, payroll, and auditing services, including the anticipated costs and criteria for selecting such services.*

**Anticipated Contracted Services**

WAK plans to contract business services, accounting, financial services, and payroll from a reputable, local accounting firm with non-profit expertise, preferably charter schools. Based on services provided at a comparable school by a reputable financial services firm here in Knoxville, we anticipate a starting annual cost of $40,000 for accounting and financial services plus an additional $20,000 for payroll services. These costs are expected to increase proportionally as the size of the school increases although, through competitive bidding and cost comparisons, WAK's management will strive to keep costs minimal without compromised service provision.

We also plan to contract with an external firm for auditing services to be conducted in accordance with T.C.A. § 49-13-127. The audit will be performed by a qualified external auditor licensed by the State of Tennessee and with experience auditing charter schools or public education institutions. The Board Finance Committee will identify and recommend a reputable auditing firm to the board of directors for approval. The firm must meet the qualifications outlined in the Tennessee School Auditing Law. Based on estimates provided by other charter schools in the area, we have assumed an initial annual cost of $12,000 for the first year of operation, with inflation-adjusted costs for future years.

For legal services, we plan to contract with a reputable firm in Knoxville. The estimated retainer amount for the first year of operation is $10,000. We assume that this retainer will increase following a cost-of-living percentage adjustment thereafter. Internet and phone services will be contracted at an estimated rate of $1,400/month for internet connectivity and $500/month for phone services.

For special education services, we are planning to contract with a provider such as River Valley Health (formally known as Cherokee Health Systems). We have budgeted $28,600 for our first year (for planned enrollment), based on an estimated rate of $1,000/day for our SPED students for occupational, physical, and speech therapies. This rate seems high for Knoxville, but consistent with other schools we have benchmarked, we are conservatively projecting this amount. The projections assume that service costs will increase proportionally as WAK's special education population increases. If needed, we will contract with a transportation service to transport students whose IEPs indicate this need. We have budgeted $54,000 for Year 1 (planned enrollment budget), anticipating the need for up to 10 students needing transportation by van. Accessible van costs are estimated at $300/day.

We plan to contract for food services, but since the families will pay the vendor directly, we have not included any costs or revenues from this in our budgets.

**Vendor Procurement Process**

When selecting organizations for these and other future contracted services, we will follow a transparent and competitive process, reflecting standard practice among Tennessee public charter schools and aligning with public sector procurement principles. After establishing our clear needs, required qualifications, timeline, and budget requirements, we will use a competitive procurement process to ensure that all firms receive the same information and can be judged fairly.

For contracted services, we will employ:

- Request for Proposals (RFP) for complex or high value services
- Request for Qualifications (RFQ) when expertise and experience are the primary factors
- Request for Quotes (RFQ/Quote) for smaller, routine services

Proposals will be evaluated using a rubric that considers:

- Demonstrated experience and qualifications
- Cost effectiveness and value
- Capacity to meet timelines
- References and past performance
- Alignment with the school's mission, culture, and student needs
- Compliance with all legal and regulatory requirements

The evaluation team may include school leadership, board members, and subject matter experts. Contracts above $10,000 will be reviewed by the School Director, recommended to the governing board, and approved in a public meeting. This procedure ensures transparency and adherence to Tennessee's open meetings expectations.

The school will maintain a strict conflict of interest policy. Individuals involved in procurement must disclose any potential conflicts, recuse themselves as appropriate, and avoid any appearance of preferential treatment. Policy implementation will align with charter school best practices. Once a firm is selected, the school will monitor performance against contract, conduct periodic reviews, and renew, renegotiate, or terminate contracts based on performance.

*61. Based on the team identified in **Table 4**, describe the sponsor's team's individual and collective qualifications for implementing the financial plan successfully. Identify any gaps in the sponsor's team and describe plans to fill those gaps with future hires. The discussion of both current team capacity and future hires should include a discussion of capacity in areas such as the following:*

- *Financial management;*

- *Fundraising and development; and*
- *Accounting and internal controls.*

The sponsor team brings a strong combination of entrepreneurial leadership, multisite business management, nonprofit governance, and school administration experience that collectively positions the organization to implement the school's financial plan with discipline, transparency, and long-term sustainability. The team's backgrounds demonstrate deep experience in financial oversight, organizational growth, and operational accountability—core competencies for launching and sustaining a charter school.

**Relevant Individual Qualifications**

1. Parker Bartholomew: Entrepreneur, Real Estate Developer, Nonprofit Board Chair

In his capacity serving as WAK's board chairman, Mr. Bartholomew brings extensive experience in business development, real estate projects, and organizational leadership, all of which are central to managing a school's facility planning, capital budgeting, and long-term financial strategy. His leadership roles at Align9 and Angelic Ministries demonstrate oversight of organizational growth and strategic planning; experience managing budgets, fundraising initiatives, and community partnerships; and a track record of building and sustaining mission driven organizations. His real estate development background is particularly valuable for facility acquisition, lease negotiations, and construction oversight—major components of the school's financial plan.

2. David Colquitt: Hospitality Owner, Attorney, Nonprofit Board Member

In his capacity serving as a board member of WAK, Mr. Colquitt contributes high level experience in business operations, legal compliance, and nonprofit governance. As an owner of multiple hospitality ventures, he has managed multimillion dollar operating budgets, had oversight of financial controls across multiple sites, managed staffing, payroll, and vendor management, and has ensured regulatory compliance. His service on boards such as Emerald Academy, Friends of the Smokies, and the Knoxville Symphony Orchestra demonstrates deep experience in fundraising and donor engagement, audit and finance committee oversight, and strategic planning for nonprofit organizations. His legal training further strengthens the team's capacity to ensure compliance with state and federal financial regulations.

3. Doug Harris: President, Harris Enterprise Group; Former Knox County School Board Chair

In his capacity serving as a board member of WAK, Mr. Harris brings the strongest direct experience in largescale financial management and internal controls. As the operator of 30+ franchise businesses employing over 500 people, he has decades of experience in financial oversight and multisite budgeting, internal controls, HR systems and operational accountability, technology systems for financial management, strategic growth planning, and risk mitigation. His service as Chair of the Knox County School Board adds direct experience with school budgeting, finance oversight, and compliance expectations. His background in both business and education

governance provides a rare combination of skills directly aligned with charter school financial management.

4. Laura Beaman: Real Estate Developer, School Board Member

In her capacity serving as a board member of WAK, Ms. Beaman contributes experience in financial management, business operations, and organizational oversight developed through both her professional background and her work in real estate investment. Through managing residential properties, she has overseen project budgets, coordinated contractors, managed timelines, and made data-driven financial decisions, strengthening her understanding of cash flow, expense control, and responsible financial stewardship. Additionally, her service on the board of River's Edge Christian Academy during its transition from a managerial to a policy governance model has deepened her understanding of board-level financial accountability, internal controls, and the importance of clear financial reporting, role clarity, and mission-aligned oversight in supporting effective school leadership.

5. Zach Wishart: School Principal, Policy Fellow, Organizational Leader

In his capacity serving as WAK's School Director, Mr. Wishart brings deep experience in school operations, data driven decision making, and organizational leadership. While his background is primarily instructional and administrative, he has demonstrated abilities to implement data systems that support accountability, lead large teams and schoolwide initiatives, and manage school level budgets. He also has policy experience through the American Federation for Children, strengthening his understanding of compliance and reporting. Mr. Wishart's operational leadership has ensured that financial practices are aligned with academic priorities and day-to-day school needs.

**Collective Strength of the Team**

Together, the sponsor team brings proven capabilities and expertise in the following domains:

Financial Management Capacity

- Multisite business operations (Harris, Colquitt)
- Real estate and development budgeting (Bartholomew, Beaman)
- School-based resource management (Wishart)
- Public sector financial oversight (Harris)

Fundraising & Development Capacity

- Nonprofit board leadership with fundraising responsibilities (Bartholomew, Colquitt, Harris)
- Established networks in Knoxville's philanthropic, business, and faith communities (Bartholomew, Colquitt, Harris, Beaman, Wishart)
- Experience securing capital for business and nonprofit ventures (Harris, Colquitt, Bartholomew, Beaman)

WILBERFORCE ACADEMY

Accounting & Internal Controls

- Experience implementing financial systems across multiple businesses (Harris)
- Oversight of audit and finance committees (Colquitt)
- Organizational governance and compliance experience (Bartholomew, Beaman)
- School-based operational accountability (Wishart)

This combination provides a strong foundation for responsible financial stewardship, transparent reporting, and sustainable growth.

**Identified Gaps and Plans to Fill Them**

While the sponsor team brings obvious strengths to planning, startup, and governance, we are acutely aware of the need to assemble a staff with dedicated specialization and capacity in the following areas:

1. Bookkeeping and Compliance Reporting

Our plan to fill this gap in staffing capacity includes contracting with a professional charter experienced financial services firm with deep charter experience for monthly bookkeeping, payroll, accounts payable/receivable, state and federal reporting, refinement of internal controls, and audit preparation. We also plan to hire a Director of Operations in Year 1 to manage purchasing, vendor contracts, and compliance.

2. Grant-Writing & Donor Reporting

Our plan to fill this gap in staffing capacity is to hire a Director of Development in Year 1 to manage annual fundraising, donor cultivation, grant writing, donor reporting, and capital campaign support. We are leveraging the sponsor team and board members' networks to support early-stage fundraising.

3. Transition from Startup to Sustainability

The sponsor team is bringing distinguished expertise to WAK's planning and startup but will rely on engaging experts to support WAK through the transition from startup to a sustainable long-term institutional trajectory. Our plan to fill this gap is two-phased. In the first few years of operation, we will depend on the schools Director of Operations to work closely with our contracted financial services firm to strategize and execute the school's growth. Then, beginning in Year 3, we will engage a part-time Director of Finance to provide multiyear forecasting, debt service planning, facility financing, and long-term sustainability modeling as the school reaches an established stage in its development and transitions to a permanent facility.

The sponsor team brings a robust combination of business leadership, nonprofit governance, financial oversight, and school administration experience that collectively equips them to implement the school's financial plan with rigor and accountability. By supplementing this leadership capacity with professional financial services, a Director of Operations, and a Director

of Development, the school will have a complete and sustainable financial management structure from preopening through long-term growth.

*62. Explain how the proposed school's financial health will be monitored and measured, including performance in pre-operations, during early years, and as an established organization. If the board determines a need to intervene regarding financial performance, what form(s) would that take?*

**Overview of Financial Health Monitoring**

WAK will monitor its financial health through a disciplined, systems-based approach that aligns with Tennessee law, State Board rules, and WAK's internal financial management framework. Financial performance will be reviewed frequently and formally reported to the board of directors through monthly financial statements, cash-flow analyses, and variance reports. The Finance Committee will use established financial metrics and indicators, including liquidity ratios, fund balance position, enrollment and attendance trends, debt-service coverage, and grant compliance indicators, to assess the school's financial condition and ensure long-term viability. The board will use this data to inform strategic decisions, assess financial risks, and evaluate the effectiveness of financial management practices. Annual budgets will be approved, and annual audits will be reviewed and approved by the board.

**Pre-Operational Phase (Planning Year)**

During pre-operations, WAK will focus on ensuring financial readiness for opening. Leadership will maintain updated cash-flow projections that reflect actual fundraising, grant reimbursements, and pre-opening expenditures; monitor adherence to the approved startup budget; and ensure sufficient liquidity prior to the receipt of TISA funding. Procurement and contract commitments for facilities, technology, and services will be reviewed to ensure alignment with budgeted assumptions. Federal reimbursements will be tracked through ePlan to ensure timely drawdowns and compliance with allowable-cost requirements. The Finance Committee will meet monthly to review the following metrics and indicators: enrollment projections, family enrollment interest forms and applications, staffing hiring commitments and signed contracts, cash balances and reserves, Year 0 monthly budget-to-actual position statements, and overall financial preparedness for launch. Key indicators during this phase include cash on hand, budget adherence, and readiness benchmarks tied to operational launch.

**Early Years of Operation (Years 1-3)**

In the early years, WAK will prioritize enrollment stability, monthly student attendance, tardiness, and retention reporting, cash reserves, and adherence to the board-approved operating budget. Monthly financial reports will include revenue, expenditures, cash position, and budget-to-actual variances. Enrollment and attendance will be monitored closely given their direct impact on TISA revenue and potential mid-year adjustments. WAK will maintain a minimum reserve of sixty days of operating expenses and update quarterly financial forecasts to identify emerging risks and

adjust spending as needed. Federal and state grant compliance—including time-and-effort documentation, allowable-cost reviews, and timely reimbursement requests—will be monitored rigorously. If applicable, WAK will also track debt-service coverage for facility financing. Financial performance will be evaluated against authorizer financial frameworks, including liquidity, fund balance, and operational efficiency metrics. The metrics and indicators, as identified in the Charter School Model Performance Framework,[151] include the Current Ratio, Total Margin, Debt to Asset Ratio, and Debt Service Coverage Ratio. The board will use these metrics and others to assess financial stability, identify trends, and determine whether midyear adjustments or strategic pivots are necessary.

**Established Organization (Year 4 and Beyond)**

As WAK matures, financial monitoring will expand to emphasize long-term sustainability and multi-year planning. Five-year financial projections will be updated annually to reflect enrollment trends, staffing models, and facility obligations. WAK will strengthen its long-term reserve strategy, building operating reserves beyond the sixty-day minimum, and implement multi-year capital planning for technology, equipment, and facility maintenance. Audit results and any corrective actions will inform continuous improvement of internal controls. WAK will benchmark its financial performance against peer charter schools and authorizer frameworks and will regularly assess compensation structures to ensure long-term affordability. The board will continue to receive monthly financial reports and will conduct an annual financial health review as part of strategic planning. Key metrics and indicators in this stage will include be student enrollment, attendance, tardiness, and retention; fund reserve growth and stability; and capital investment ratios. In addition to the metrics and indicators already being tracked in previous years, the school will now be monitoring the Aggregated Three-Year Total Margin and Multi-Year Cumulative Cash Flow as well.

**Board Intervention: Triggers and Actions**

If financial performance indicates emerging or actual risk, the board will intervene promptly in accordance with its fiduciary responsibilities under T.C.A. § 49-13-111. Intervention may be triggered by material budget variances, declining enrollment or attendance, cash reserves falling below the sixty-day threshold, audit findings, or internal-control weaknesses, delayed federal reimbursements, negative cash-flow projections, or failure to meet authorizer reporting requirements and financial performance standards.

When intervention is required, the board may increase oversight by requiring more frequent reporting or corrective action plans, implement spending controls such as freezing non-essential expenditures or delaying discretionary hires, or adjust the budget through mid-year revisions or re-forecasting. The board may also direct leadership or vendors to take corrective measures, including engaging external financial consultants or restructuring outsourced financial services. If financial distress persists, the board may pursue more significant actions such as renegotiating contracts, restructuring debt obligations, or initiating a formal financial recovery plan in

---

[151] https://www.tn.gov/content/dam/tn/education/nonpublic/chtr_sch/Charter_School_Model_Performance_Framework.pdf

WILBERFORCE ACADEMY

consultation with the authorizer. All interventions will be tied to specific performance outcomes and tracked through follow up reporting to ensure resolution and accountability.

WILBERFORCE ACADEMY

## Attachment 1: Evidence of Community Engagement

**Wilberforce Academy of Knoxville Website: Analytics Page**
January 14-27, 2026 (14 days)
https://www.wilberforceknox.org




**Wilberforce Academy of Knoxville Website: Parent Interest Sign-Up**



WILBERFORCE ACADEMY

To Whom It May Concern,

I am pleased to offer my enthusiastic endorsement of Wilberforce Academy. The ministry I lead provides year-round tutoring, meals, and mentorship to at-risk students, and we would welcome the presence of a school in our region capable of addressing needs that are currently unmet.

Academically, we would be encouraged to see a program that recognizes and supports gifted students through appropriate IEP services. Knox County has struggled to provide meaningful accommodations for this population, placing our community at a disadvantage compared to cities such as Chattanooga, Murfreesboro, Nashville, and Memphis. Students with exceptional ability but limited financial means often fall through the cracks, lacking both access to private education and the specialized support they require.

Spiritually, Wilberforce Academy would give families the freedom to choose an educational environment aligned with their convictions. Offering genuine choice restores balance and respects the diversity of worldviews held by families in our community.

Our organization would be glad to partner with Wilberforce Academy by providing services to enrolled students without any government funding. Choice changes the culture of a classroom. When students attend by desire rather than compulsion, they become participants instead of captives. That shift alone fosters excellence, even in settings with higher expectations and more rigorous standards. We would anticipate meaningful academic gains alongside measurable growth in character, emotional regulation, and the capacity for delayed gratification.

Thank you for considering this opportunity.

All best,

Clayton Wood

Executive Director, Thrive

WILBERFORCE ACADEMY

**Attachment 2: School-Based Team Resume**

# ZACH WISHART

Knoxville, TN 37931
8652576105 - zachwishart@gmail.com

## PROFESSIONAL SUMMARY

Dynamic education leader with a proven track record at River's Edge Christian Academy, driving significant enrollment growth and achieving top school rankings. Expert in strategic planning and team leadership, implementing data-driven initiatives to enhance curriculum and fostering community engagement. Committed to educational excellence and policy advocacy for student success.

## SKILLS

- Education Administration
- Team Leadership
- Change Management
- Public Policy
- Strategic Planning
- Curriculum Development

## WORK HISTORY

12/2024 to Current **Middle & High School Principal**
**River's Edge Christian Academy** – Knoxville, TN

- Lead the Middle & High School as Principal, achieving #1 Best Christian High School and #2 Best Middle School ranking in Knoxville.
- Spearhead initiatives to improve school culture and community engagement, resulting in increased student enrollment and retention.
- Lead a team of faculty of over 45 faculty and staff members.

08/2024 to 12/2024 **Middle School Principal & Interim High School**
**River's Edge Christian Academy** – Knoxville, TN
• Implemented a data-driven testing system to inform student progress and lead to data-driven instruction.
• Developed a new high school graduation plan emphasizing a biblical worldview education.

06/2022 to 08/2024 **Middle School Principal**
**River's Edge Christian Academy** – Knoxville, TN
• Increased teacher retention to record high and boosted student enrollment by 12%.
• Oversaw a successful temporary facility transition
• Developed new elective class opportunities and implemented a new bible class program, enhancing the school's curriculum offerings.

01/2022 to 12/2022 **Education Policy Fellow**
**American Federation for Children** – Knoxville, TN

WILBERFORCE ACADEMY

• Collaborated with leading voices in education policy and reform to analyze and advocate for choice policy initiatives.
• Conducted research on the impact of choice policy on student outcomes and educational equal opportunity.
• Developed policy briefs and recommendations to influence decision-makers in the education sector.

07/2021 to 06/2022 **School Counselor**
**Grace Christian Academy** – Knoxville, TN
- Developed and implemented a comprehensive school counseling program for K-8 students.
- Conducted 19 classroom guidance lessons per week focusing on biblical truth, career exploration, and study skills.
- Collaborated with teachers and parents to support students' academic and personal growth.

11/2020 to 06/2021 **Administrative Services Manager**
**Private Company** – Knoxville, TN
- Joined family business temporarily as a third generation member at a time of rapid growth to aide in organizational restructuring.
- Streamlined processes by implementing a new revenue and financial management system with vendors.
- Onboarded and trained new employees in system utilization to enhance efficiency and productivity.

06/2019 to 10/2020 **Foster Care Case Manager**
**Tennessee Baptist Children's Homes** – Knoxville, TN
- Conducted foster parent trainings classes to education and support caregivers in providing a safe and nurturing environment to children in need.
- Completed thorough home studies to assess the suitability of potential foster homes, ensuring the well-being of children placed in care.
- Provided case management and crisis intervention services to support foster families and children in navigating challenges and promoting stability.

07/2017 to 05/2019 **Restorative Interventionist**
**Mooreland Heights Elementary** – Knoxville, TN
- Served as part of the school PIT team, collaborating with other members of the student support team to assess student needs and provide interventions.
- Led the Therapeutic Crisis Intervention team, providing trauma-informed crisis response.
- Provided assistance and coaching to teachers on effective behavior intervention and classroom management strategies.

## Education

**Education Specialist** : **Education Administration**
**Columbia International University**

WILBERFORCE ACADEMY

**Master of Education: Education Administration**
**Bryan College**

**Bachelor of Science**
**Liberty University**

## Certifications

- All-Levels School Principal Certification, Association of Christian Schools International
- School Counselor Certification, Association of Christian Schools International

## Volunteer work

- Foster Care Review Board, Knox County
- Board Member, Metro Drug Coalition
- School Leaders Fellow, American Federation for Children
- Fellow, Education Reformers Academy
- Advisory Board, Knoxville Prep School

WILBERFORCE ACADEMY

## Attachment 3: Board Member Resumes/Bios

### Resume for Douglas A. Harris

1212 Great Oaks Way
Knoxville, TN 37909
*www.linkedin.com/in/dougharrishrg/*

---

Introduction

I have been working in the restaurant industry for over thirty years. My management company, Harris Enterprise Group, owns and operates 30 restaurants and over 500 employees. I believe my company strengths are in training and retaining great people who live our core values of: **Leadership, Teamwork, Quality and People.**

Work History

**Harris Enterprise Group, President**—1992-Present

- Involved in operating 30+ franchise businesses.
- Co-founded and operate a restaurant software business with over 26,000 locations.
- Consult and advise businesses in construction, HR, strategic growth, operations and other disciplines.

**Medical Sales**—1983-1992 Worked with Surgitek and Bristol Meyers selling medical devices.

Education

University of Tennessee Knoxville 1982 BS in Business Administration, Marketing
Massey Graduate School of Business, 1988 (Completed 50% of MBA curriculum.)

Community Involvement

Knox County Schools – School Board Member 2012-2016, Chair 2016
Compassion Coalition – Co-Founder & Former Board Member
National Christian Foundation East TN – Board Chair
Emerald Youth Foundation – Board Member, Finance Chair

International Involvement

World Water Project/ TivaWater – Co-founder and Board Chair
Traveled to Africa on 40 trips helping with clean water, orphan care, indigenous business start-ups, medical clinics and Christian discipleship ministry.

**David Colquitt** lives in Knoxville, Tennessee with his wife, Annie, and three children, Will (11), Ruby (8), and Davy (6). Together, they are owners of numerous hospitality projects, including RT Lodge in Maryville, Tennessee; The Swag and Cataloochee Ranch in Western North Carolina; and Provision in Fairhope, Alabama.

Originally from Houston, Texas, David met Annie during their freshman year at Princeton University. After receiving an AB in Politics from Princeton and a JD from the University of Virginia School of Law, David and Annie moved to Houston where he worked as a litigation associate for Bracewell & Giuliani LLP and, later, with Pilot Travel Centers.

David and Annie moved to Knoxville in 2015 and have been involved in various charitable and civic causes. David currently serves on the boards of Emerald Academy, the Knoxville Symphony Orchestra, the Friends of the Smokies, Wears Valley Ranch, and The Baker School of Public Policy at The University of Tennessee, Knoxville. He is an active member of Cedar Springs Presbyterian Church where he also serves as an elder.

WILBERFORCE ACADEMY

Parker Bartholomew is an entrepreneur, real estate developer, and community leader rooted in East Tennessee. A graduate of the University of Tennessee, Parker has spent his career building businesses and organizations that strengthen local communities, including founding successful restaurants and leading development projects around Knoxville.

In addition to his business ventures, Parker serves in nonprofit leadership and currently chairs the boards of Align9 and Angelic Ministries Inc., where he focuses on organizational growth, strategic planning, and expanding outreach to underserved populations.

Family is central to Parker's life. He has been married to his wife, Amanda, for over twenty years, and together they are the proud parents of two daughters. Whether in business, ministry, or civic engagement, Parker's work is guided by his faith, love for his family, and commitment to helping people thrive.

WILBERFORCE ACADEMY

Laura Beaman is a Tennessee native who graduated from Belmont University in 2006 with a Bachelor of Science in Nursing (BSN). She spent 14 years working in a variety of nursing roles across Tennessee and California, gaining broad clinical experience, and serving diverse patient populations. In 2020, Laura made the intentional decision to step away from the healthcare field in order to focus more fully on her family during a season of transition.

Since that time, Laura has devoted much of her energy to part-time teaching and educating her three children, active involvement in her local church, and real estate investment. Through her work in real estate, she has developed a strong skill set in project management, business operations, and finance. Managing properties has required her to oversee renovations, coordinate contractors, manage timelines, and make sound financial decisions, strengthening her ability to balance strategic planning with hands-on execution while practicing responsible financial stewardship.

Laura has served on the board of River's Edge Christian Academy since 2023. During her tenure, she has had the opportunity to participate in the school's transition from a managerial governance model to a policy governance structure. This experience has given her a firsthand understanding of best practices in board operations for educational institutions, including the importance of clear roles, strategic oversight, accountability, and mission alignment in supporting effective school leadership.

Laura lives in Knoxville with her husband and children on a small farm. As a family, they enjoy traveling, spending time outdoors, and appreciating God's creation through nature and shared experiences.

WILBERFORCE ACADEMY

## Attachment 4: Organizational Chart

### Year 0




### Year 1




### Year 4



WILBERFORCE ACADEMY

## Attachment 5: Articles of Incorporation

**Division of Business and Charitable Organizations**
**Department of State**
State of Tennessee
312 Rosa L. Parks Avenue, 6th Floor
Nashville, Tennessee 37243
Phone: 615-741-2286
sos.tn.gov/

**Tre Hargett**
Secretary of State

WILLIAM D EDWARDS
1111 N NORTHSHORE DRIVE, STE. S-700
KNOXVILLE, TN 37919, USA

11/24/2025

### Filing Acknowledgment

Please review the filing information below and notify our office immediately of any discrepancies.

| | | | |
|---|---|---|---|
| Entity Name: | THE WILBERFORCE ACADEMY OF KNOXVILLE | | |
| SOS Control #: | 002066148 | Initial Filing Date: | 11/21/2025 |
| Entity Type: | Nonprofit Corporation | Formation Locale: | TENNESSEE |
| Status: | Active | Duration Term: | Perpetual |
| Fiscal Year Close: | October | Annual Report Due: | 02/01/2027 |
| Business County: | Knox | | |
| Benefit Type: | Public Benefit Corporation | Religious Type: | Non-Religious |

**Document Receipt**

| | | |
|---|---|---|
| Receipt #: 2025-780254 | Filing Fee: | $100.00 |
| Payment: Credit Card - 3910516411 | | $100.00 |

**Registered Agent Address:**
WILLIAM D EDWARDS
1111 N Northshore Dr Ste S700
Knoxville, TN 37919

**Principal Office Address:**
448 N CEDAR BLUFF RD # 404
KNOXVILLE, TN 37923
Knox County, USA

Congratulations on the successful filing of your Charter Nonprofit Corporation for **THE WILBERFORCE ACADEMY OF KNOXVILLE** in the State of Tennessee which is effective **11/21/2025**. You must also file this document in the office of the Register of Deeds in the county where the entity has its principal office if such principal office is in Tennessee. Please visit the Tennessee Department of Revenue website (www.tn.gov/revenue) to determine your online tax registration requirements. If you need to obtain a Certificate of Existence for this entity, you can request, pay for, and receive it from our website.

You must file an Annual Report with this office on or before the Annual Report Due Date noted above and maintain a Registered Office and Registered Agent. Failure to do so will subject the business to Administrative Dissolution/Revocation.

Tre Hargett
Secretary of State

WILBERFORCE ACADEMY

**Tracking Number**
**B2025832623**

# Charter Nonprofit Corporation

**Division of Business and Charitable Organizations**
**Department of State**
State of Tennessee
312 Rosa L. Parks Avenue, 6th Floor
Nashville, Tennessee 37243
Phone: 615-741-2286
sos.tn.gov/businesses

THE GREAT SEAL OF THE STATE OF TENNESSEE XVI AGRICULTURE COMMERCE 1796

**Tre Hargett**
Secretary of State

Control #: 002066148
Filed: 11/21/2025 02:09 PM
Tre Hargett
Secretary of State

## Entity Information

**Entity Name:** THE WILBERFORCE ACADEMY OF KNOXVILLE

**Entity Type:** Nonprofit Corporation

**Fiscal Year Ending Month:** October

**Additional Designation:** *(No additional designation)*

**Principal Office Address**
448 N CEDAR BLUFF RD # 404
KNOXVILLE, TN 37923
Knox County, USA

**Mailing Address**
448 N CEDAR BLUFF RD # 404
KNOXVILLE, TN 37923
Knox County, USA

**Will this filing have a delayed effective date?**
☐ Yes ☑ No

**Period of Duration:**
Perpetual

**This corporation is a:**
☑ Public Benefit Corporation ☐ Mutual Benefit Corporation
☐ Religous Corporation ☑ Not Religous Corporation

**This corporation will:**
☐ Have Members ☑ Not Have Members

**Provisions regarding the distribution of assets upon dissolution:**
See attached.

**Other Provisions:**
See attached.

Do you have additional uploads you would like to attach to this filing?
☑ Yes ☐ No

## Incorporators

WILLIAM EDWARDS
1111 N NORTHSHORE DR, STE. S-700
KNOXVILLE, TN 37919, USA

WILBERFORCE ACADEMY

## Registered Agent Information

WILLIAM D EDWARDS
1111 N NORTHSHORE DR STE S700
KNOXVILLE, TN 37919
Knox County, USA

## Incorporator's Signature

☑ By entering my name in the space provided below, I certify that I am authorized to file this document on behalf of this entity, have examined the document and, to the best of my knowledge and belief, it is true, correct and complete as of this day.

☑ The undersigned, acting as incorporator of the nonprofit corporation under the provisions of the Tennessee Nonprofit Corporation Act, adopt the above Articles of Incorporation.

**Signed Electronically:** WILLIAM D EDWARDS **Date:** 11/21/2025

WILBERFORCE ACADEMY

B2025832623

# THE WILBERFORCE ACADEMY OF KNOXVILLE

## Charter of Incorporation

Pursuant to Tenn. Code Ann. Section 48-52-102 under the Tennessee Nonprofit Corporation Act, the described Corporation hereby adopts the following Charter for such Corporation:

1. **Name.** The name of the Corporation is **The Wilberforce Academy of Knoxville**.

2. **Registered Office and Registered Agent.** The street address, zip code and county of the Corporation's initial registered office are 1111 N. Northshore Drive, Ste. S-700, Knoxville, Knox County, Tennessee 37919. The name of its initial registered agent at that office is William D. Edwards, and his email address is wedwards@lrwlaw.com.

3. **Principal Office.** The mailing address, physical address and zip code of the principal office of the Corporation are 448 N. Cedar Bluff Road # 404, Knoxville, Tennessee 37923.

4. **Incorporator.** The name, physical address, mailing address and zip code of the incorporator are William D. Edwards, 1111 N. Northshore Drive, Ste. S-700, Knoxville, Tennessee 37919.

5. **Not for Profit.** The Corporation is not for profit.

6. **Public Benefit.** The Corporation is a public benefit corporation.

7. **No Members.** The Corporation will not have members.

8. **Purposes and Powers.**

(a) General Purposes. The purposes for which the Corporation is formed are charitable, and in particular religious and educational, within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

(b) Specific Purposes. Without limitation of the foregoing, the Corporation is formed to provide Christian educational services, operate a Christian charter school, and conduct activities ancillary thereto. The Corporation affirms the truth of the Apostles' Creed and the inerrancy and infallibility of the Holy Bible. The Corporation intends to be recognized as an educational institution pursuant to Tenn. Code Ann. Section 48-101-502.

(c) Powers. To these ends, the Corporation shall have the following powers:

(1) To take and hold by bequest, devise, gift, grant, purchase, lease, or otherwise, any property, real, personal, tangible or intangible, or any undivided interest therein,

without limitation as to amount or value, and to sell, convey, lease, or otherwise dispose of any such property, and to invest, reinvest, or deal with the principal or the income thereof in such manner as, in the judgment of the Board of Directors, will best promote the purposes of the Corporation without limitation, except such limitations, if any, as may be contained in the instrument under which such property is received, this Charter, the Bylaws of the Corporation, or any laws applicable thereto;

(2) To possess and exercise all the powers and privileges granted to nonprofit corporations by the Tennessee Nonprofit Corporation Act, or any act amendatory thereto, or by any other law of the State of Tennessee (including, without limitation, Tenn. Code Ann. Section 49-13-124, Charter School Powers) or by this Charter of Incorporation, together with any powers incidental thereto, either as principal or agent and either alone or in connection with other corporations, organizations or individuals, to the extent that such powers and privileges are necessary, convenient, proper, or incidental to the accomplishment of any of the purposes of this Corporation, or directly or indirectly to promote the interests of this Corporation, or to enhance the values of its properties; and

(3) To do any other act or thing incidental to or connected with the foregoing purposes or in advancement thereof.

**9. Tax-Exempt Status.** The Corporation is constituted so as to accept support from contributions, directly or indirectly, from the general public, and has not been formed for pecuniary profit or financial gain. No part of the net earnings of the Corporation shall inure to the benefit of any director or officer of the Corporation or any private individual (except that reasonable compensation may be paid for services rendered to or for the Corporation for effecting one or more of its purposes), and no director or officer of the Corporation or any private individual shall be entitled to share in the distribution of the corporate assets upon dissolution of the Corporation. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in or intervene in (including the publication or distribution of statements) any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Charter, the Corporation shall not conduct or carry on any other activities not permitted to be carried on by an organization exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code and its regulations, or by an organization contributions to which are deductible under Sections 170(b)(1)(A) and 170(c)(2) of such Code and regulations.

**10. Directors.** The affairs of the Corporation shall be managed by a Board of not less than three directors, the number of which shall be determined by the Board from time to time. The Incorporator shall appoint the initial Board of Directors. The composition of the Board of Directors shall comply with Tenn. Code Ann. Section 49-13-109.

**11. Director and Officer Liability.** Pursuant to and expanding upon Tenn. Code Ann. Section 48-52-102(b)(3), the directors and officers of the Corporation shall have no

WILBERFORCE ACADEMY

B2025832623



personal liability to the Corporation for monetary damages for breach of fiduciary duty as a director or officer; provided, however, that this provision shall not eliminate or limit liability of a director or officer for any breach of a director's or officer's duty of loyalty to the Corporation or for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or for any violation of Tenn. Code Ann. Section 48-58-304 relating to unlawful distributions.

**12. Indemnification.** Each officer, director, or employee of the Corporation shall be indemnified by the Corporation against expenses reasonably incurred by him or her in connection with any action, suit or proceeding to which he or she may be made a part by reason of being, or having been, an officer, director, or employee of the Corporation, except in relation to matters as to which he or she shall be finally adjudged in such action, suit, or proceeding to have been derelict in the performance of his or her duty as an officer, director, or employee. "Derelict" shall mean grossly negligent, criminally negligent, or intentionally engaging in tortious conduct with the intent to defraud, deceive, misrepresent, or take advantage improperly of a corporate opportunity.

**13. Dissolution.** The directors may dissolve the Corporation voluntarily by distributing the assets of the Corporation in accordance with a plan of distribution whereby the assets are distributed exclusively to one or more organizations that (1) are not for profit, (2) are engaged in activities that are consistent with one or more of the charitable activities of the charter of the Corporation, and (3) are exempt organizations under the provisions of Section 501(c)(3) of the Code. Provided, however, the plan of distribution shall comply with the requirements of Tenn. Code Ann. Section 49-13-110(f) with respect to unencumbered public funds and property purchased with public funds.

**14. Amendment.** The provisions of this Charter are subject to amendment as provided under the laws of the State of Tennessee; provided, however, that no provision contained herein shall be changed, modified, or repealed in such manner as to be inconsistent with the objectives and purposes for which this Corporation is formed.

**15. Duration; Fiscal Year.** The duration of the Corporation shall be perpetual. The fiscal year of the Corporation shall end on October 31.

Dated this 21th day of November, 2025.

[signature]

**William D. Edwards**
**Incorporator**

WILBERFORCE ACADEMY

**Division of Business and Charitable Organizations**
**Department of State**
State of Tennessee
312 Rosa L. Parks Avenue, 6th Floor
Nashville, Tennessee 37243
Phone: 615-741-2286
sos.tn.gov/

**Tre Hargett**
Secretary of State

**Date:** 11/21/2025 **Invoice:** 2025-780254

**Customer Information**

WILLIAM D EDWARDS
THE WILBERFORCE ACADEMY OF KNOXVILLE
1111 N NORTHSHORE DRIVE, STE. S-700
KNOXVILLE, TN 37919, USA

| Tracking # | Description | Amount Paid |
| --- | --- | --- |
| B2025832623 | Charter Nonprofit Corporation for THE WILBERFORCE ACADEMY OF KNOXVILLE (Corporation Filings) | $ 100.00 |

**Payment Details**

| | |
| --- | --- |
| Fee Total: | $ 100.00 |
| Payment Total: | $ 100.00 |
| Amount Due: | $ 0.00 |

**Payment Method**

Payment Type: Credit Card

Check/Confirmation Number: 3910516411

WILBERFORCE ACADEMY

## Attachment 6: Proof of Nonprofit and Tax-Exempt Status

David Wilson Long
Dennis B. Ragsdale
John B. Waters III
J. Michael Ivens
Garrett P. Swartwood
Lee A. Popkin
W. Michael Baisley
Taylor D. Forrester
Alexander O. Waters
Oliver D. Adams
William D. Edwards

LRW

Long, Ragsdale & Waters, P.C.

ATTORNEYS AT LAW

Katherine Sanford Goodner
Ryan P. McNally
Brenden S. Moriarty **
Leah W. McClanahan
Mycol E. Scott
C. Paul Harrison†
Jennifer Milligan Swindle*†
Angelia M. Nystrom†
Christopher A. Hall†

John B. Waters, Jr. (1929-2018)
R. Louis Crossley, Jr. (1953-2019)

January 29, 2026

Mr. Zach Wishart
The Wilberforce Academy of Knoxville
448 N. Cedar Bluff Road #404
Knoxville, TN 37923

Re: Form 1023, Application for Recognition of Exemption

Dear Mr. Wishart:

Please be advised that I submitted Form 1023, Application for Recognition of Exemption for your organization to the Internal Revenue Service on November 24, 2025. The Internal Revenue Service is reviewing the application and has submitted an information request, as is customary.

The IRS has requested that Wilberforce submit a draft charter agreement as part of its review of Wilberforce's 501(c)(3) application. We are continuing to work with the IRS to complete the 501(c)(3) application process. Generally, if you file Form 1023 within 27 months after the end of the month in which you were legally formed, and the IRS approves your application, the effective date of your exempt status will be your legal date of formation.

If you have any questions, please call.

Sincerely,

**LONG, RAGSDALE & WATERS, P.C.**

William D. Edwards

1111 N. Northshore Drive, Suite S-700, Knoxville, Tennessee 37919
Tel: (865) 584-4040 Fax: (865) 584-6084 www.lrwlaw.com
* Also admitted in New York ** Also admitted in Florida † Of Counsel

WILBERFORCE ACADEMY

An official website of the United States government Here's how you know

MENU

For your security, we recommend you close your browser when you complete your payment.

# Payment Confirmation - Application for Recognition of Exemption Under Section 501(c)(3)

Before You Begin | Complete Agency Form | Enter Payment Info | Review & Submit | 5 Confirmation

## Your payment is complete

You can find your receipt in your account payment activity. A confirmation email has been sent to utedwards@hotmail.com, wedwards@lrwlaw.com.

**We value your feedback!**

Do you have any feedback regarding your Pay.gov experience?
Please share it here.

You successfully submitted your Form 1023 user fee payment to Pay.gov and the details are below. For information on the status of your application, visit IRS.gov and search for Where's My Application. If you submitted your application before the date indicated on that page and haven't been contacted, you can call the toll-free Customer Account Services number, Monday through Friday, 8 a.m. - 5 p.m. (local time), at 877-829-5500 to check on the status. You will need the information specified on the Where's My Application page, including your name and employer identification number (EIN), when calling.

## Tracking Information

Pay.gov Tracking ID: 27TATK11

Agency Tracking ID: 77220497562

WILBERFORCE ACADEMY

Form Name: Application for Recognition of Exemption Under Section 501(c)(3)

Application Name: Form 1023

## Payment Information

Payment Type: Debit or credit card

Payment Amount: $600.00

Transaction Date: 11/24/2025 04:57:51 PM EST

Payment Date: 11/24/2025

## Account Information

Cardholder Name: William D Edwards

Card Type: [redacted]

Card Number: ************[redacted]

View this payment on the Payment Activity page.
View this form on the My Forms page.

### Need Help?

**Contact:**
IRS Customer Service

**Phone:**
877-829-5500

Return to top

**Accessibility Policy** **Privacy and Security Policy** **Notices and Agreements**

**For Agencies** * **Feedback**

Pay.gov
Pay.gov is a program of the U.S. Department of

Pay.gov Support

the Treasury, Bureau of the Fiscal Service

WARNING WARNING WARNING

You have accessed a U.S. Government information system, which includes (1) this computer, (2) this network, (3) all computers connected to this network, and (4) all devices and storage media attached to this network or to a computer on this network. U.S. Government information systems are provided for the processing of official U.S. Government information only. Unauthorized or improper use of this information system is prohibited and may subject you to disciplinary action, as well as civil and criminal penalties. All data contained on U.S. Government information systems is owned by the U.S. Government and may, for the purpose of protecting the rights and property of the U.S. Government, be monitored, intercepted, recorded, read, searched, copied, or captured in any manner and disclosed or used for any lawful government purpose at any time. THERE IS NO RIGHT TO PRIVACY IN THIS SYSTEM. System personnel may give to law enforcement officials any potential evidence of crime found on U.S. Government information systems. USE OF THIS SYSTEM BY ANY USER, AUTHORIZED OR UNAUTHORIZED, CONSTITUTES YOUR UNDERSTANDING AND CONSENT TO THIS MONITORING, INTERCEPTION, RECORDING, READING, COPYING, OR CAPTURING AND DISCLOSURE.

Note: This system may contain Sensitive But Unclassified (SBU) data that requires specific data privacy handling.

WILBERFORCE ACADEMY

**Attachment 7: Governing Board Bylaws**

Docusign Envelope ID: 8C0D6E03-12AB-4DA4-ADFE-7419520282C0

# THE WILBERFORCE ACADEMY OF KNOXVILLE

## Bylaws

### ARTICLE I
### NAME AND LOCATION

**Section 1.** **Name.** The name of this Corporation shall be **The Wilberforce Academy of Knoxville.**

**Section 2.** **Location.** The location of the initial principal office of this Corporation in the State of Tennessee shall be 448 N. Cedar Bluff Road, Ste. 404, Knoxville, TN 37923. This Corporation may change the location of the principal office and may have such other offices either in or out of the State of Tennessee as the Board of Directors may from time to time designate.

### ARTICLE II
### OBJECTIVES, PURPOSES, AND POWERS

**Section 1.** **Public Benefit Corporation.** This Corporation shall operate as a public benefit corporation under the laws of the State of Tennessee.

**Section 2.** **Purposes.**

(a) General Purposes. The purposes for which the Corporation is formed are charitable, and in particular religious and educational, within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

(b) Specific Purposes. Without limitation of the foregoing, the Corporation is formed to provide Christian educational services, operate a Christian charter school, and conduct activities ancillary thereto. The Corporation affirms the truth of the Apostles' Creed and the inerrancy and infallibility of the Holy Bible. The Corporation intends to be recognized as an educational institution pursuant to Tenn. Code Ann. Section 48-101-502.

**Section 3.** **Tax-Exempt Status.** The Corporation is constituted so as to accept substantial support from contributions, directly or indirectly, from the general public and has not been formed for pecuniary profit or financial gain. No part of the net earnings of the Corporation shall inure to the benefit of any director or officer of the Corporation or any private individual (except that reasonable compensation may be paid for services rendered to or for the Corporation for effecting one or more of its purposes), and no director or officer of the Corporation or any private individual shall be entitled to share in the distribution of the corporate assets upon dissolution of the Corporation. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in or intervene in (including the publication or distribution of

Docusign Envelope ID: 8C0D6E03-12AB-4DA4-ADFE-7419520282C0



statements) any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of these Bylaws, the Corporation shall not conduct or carry on any other activities not permitted to be carried on by an organization exempt from federal income tax under Section 501(c)(3) of the Code and its regulations, or by an organization contributions to which are deductible under Section 170(c)(2) of such Code and regulations.

**Section 4.** **Powers.** To these ends, the powers of the Corporation are:

(a) To take and hold by bequest, devise, gift, grant, purchase, lease, or otherwise, any property, real, personal, tangible or intangible, or any undivided interest therein, without limitation as to amount or value, and to sell, convey, lease, or otherwise dispose of any such property, and to invest, reinvest, or deal with the principal or the income thereof in such manner as, in the judgment of the Board of Directors, will best promote the purposes of the Corporation without limitation, except such limitations, if any, as may be contained in the instrument under which such property is received, the Charter or the Bylaws of the Corporation, or any laws applicable thereto.

(b) To possess and exercise all the powers and privileges granted to nonprofit corporations by the Tennessee Nonprofit Corporation Act, or any act amendatory thereto, or by any other law of the State of Tennessee (including, without limitation, Tenn. Code Ann. Section 49-13-124, Charter School Powers) or by the Charter of Incorporation or by these bylaws, together with any powers incidental thereto, either as principal or agent and either alone or in connection with other corporations, organizations, or individuals, to the extent that such powers and privileges are necessary, convenient, proper, or incidental to the accomplishment of any of the purposes of this Corporation, or directly or indirectly to promote the interests of this Corporation, or to enhance the values of its properties.

(c) To do any other act or thing incidental to or connected with the foregoing purposes or in advancement thereof.

## ARTICLE III
## NO MEMBERS

The Corporation shall have no members.

## ARTICLE IV
## BOARD OF DIRECTORS

**Section 1.** **Board of Directors.** The management of the property, activities, and affairs of the Corporation shall be vested in its Board of Directors.

Docusign Envelope ID: 8C0D6E03-12AB-4DA4-ADFE-7419520282C0



**Section 2. Number and Qualification.**

(a) Number. The Incorporator shall appoint the initial Board of Directors. The number of Directors shall not be fewer than three (3), nor more than nine (9), as determined by the Board of Directors from time to time. The composition of the Board of Directors shall comply with Tenn. Code Ann. Section 49-13-109.

(b) Qualification. Directors shall be at least 21 years of age and interested in and committed to the stated purposes of this Corporation.

(c) Election and Terms. Each Director shall be elected to serve for a term of three years, or until his or her successor is elected and qualified.

(d) Vacancies. Any vacancy in the office of a Director due to the death, disability, resignation, expiration of term, or removal of a Director shall be filled by election by the Board of Directors at its next meeting. Any successor so appointed shall serve the remaining term for the Director he or she replaces, or in the case of the replacement for a Director whose term has expired, shall begin a three-year term.

(e) Resignation. Any Director may resign upon written notice to all other Directors.

(f) Removal. Any Director may be removed with or without cause from office as a Director at any time by a two-thirds (2/3) vote of all of the Directors (other than the Director being removed).

**Section 3. Meetings of the Board of Directors.**

(a) Regular Meetings. Regular meetings of the Board of Directors shall be held at such times and places as the Board shall decide, which shall include at least one meeting each year.

(b) Special Meetings. Special meetings of the Board of Directors: (1) may be called by the President of this Corporation; or (2) shall be called by the President when at least one-third (1/3) of the members of the Board submit a request in writing for such meeting.

(c) Notice. The Secretary shall cause notice of the time and place of each annual meeting or special meeting to be received by each Director by direct or oral communication at least three (3) days prior to the meeting date. Notice need not be given of regular meetings of the Board of Directors held at times fixed by resolution of the Board of Directors. No notice of any meeting need be given any Director who attends such meeting, unless any such Director attending at the beginning of such meeting states an objection to the place or time of the meeting, to the manner in which it has been called or convened, or to the

WILBERFORCE ACADEMY

Docusign Envelope ID: 8C0D6E03-12AB-4DA4-ADFE-7419520282C0



transaction of business therein. Further, notice shall not be required to be given any Director who, at any time before or after the meeting, waives notice of the meeting in writing. Notwithstanding the above, any action to remove a Director or to approve a matter, which would require approval by the members if the Corporation had members, shall not be valid unless each Director is given at least seven (7) days' written notice that the matter will be voted upon at a meeting of the Board of Directors or unless notice is waived pursuant to Tenn. Code Ann. Section 48-58-204.

(d) Telephone Meetings. Meetings of the Board may be held by telephone or similar communications equipment if all Directors are given either (1) written notice at least five (5) days in advance of such meeting or (2) telephone notice at least 24 hours in advance of such meetings, and if all Directors participating can hear each other at the same time. Participation by such means shall constitute presence in person at the meeting.

(e) Roberts Rules. Roberts Rules of Order shall govern the proceedings at all meetings of the Board of Directors of the Corporation except where any are in conflict with the Charter or Bylaws of this Corporation.

**Section 4. Voting.**

(a) Votes. Each voting Director shall have one vote.

(b) Vote Required to Adopt. Except as provided in Article IV, Section 2(f) (regarding removal of directors), and Article X, Section 1 (regarding amending these Bylaws), the affirmative vote of a majority of the votes of the voting Directors present at a meeting with a quorum shall be sufficient to pass any motion at any meeting of the Board of Directors.

(c) Quorum. A quorum at any meeting of the Directors shall consist of a majority of Directors.

(d) Manner of Voting. All voting at meetings of the Board of Directors shall be by voice or a show of hands, except when otherwise specified, or when a written ballot is requested by a majority of those Directors present at such meeting.

**Section 5. Action Without Meeting.** Any action required or permitted by these Bylaws or otherwise to be taken at any meeting of the Board of Directors or of any committee established by the Board may be taken without a meeting, if written consent setting forth the action so taken shall be signed by all of the Directors or members of such committee, as the case may be, and such written consent is filed with the minutes of the proceedings of the Board or committee, as the case may be.

WILBERFORCE ACADEMY

Docusign Envelope ID: 8C0D6E03-12AB-4DA4-ADFE-7419520282C0



**Section 6.** **Powers and Duties.** The Board of Directors shall have the following powers and duties in addition to those given by the Charter of this Corporation and/or applicable law:

(a) Policy. It shall have control of and be responsible for the property, activities and affairs of the Corporation and determine matters of policy pertaining thereto.

(b) Annual Statement. It shall cause to be prepared each year a statement of the affairs of this Corporation for the preceding year.

(c) Employment. It shall approve the employment of any person by the Corporation and his or her salary.

## ARTICLE V
## OFFICERS

**Section 1.** **Composition.** The officers of the Corporation shall be a President and Secretary, and such other officers or agents as may be elected or appointed by the Board of Directors, who may be, but need not be, voting members of the Board of Directors. Unless an officer dies, resigns, or is removed, he or she shall hold office until the next annual meeting of the Board and until his or her successor is elected or appointed. An individual may fill more than one office, except that the President and Secretary must be different individuals.

**Section 2.** **Election, Duties, and Powers.** The officers of the Corporation shall be elected by the Board and shall have the responsibilities and duties described below.

(a) President. The President shall serve as the Chief Executive Officer of the Corporation, subject to the policy direction of the Board of Directors. The President shall have and exercise the general powers and duties usually vested in the president of a nonprofit corporation, including without limitation the exercise of general control and supervision over the affairs of the Corporation. The President shall preside at all meetings of the Board and shall appoint committee members and their chairs. The President shall be an ex-officio member of all committees except the Audit Committee, if one exists. The President shall see that all orders and resolutions of the Board are carried into effect. The President shall perform such other duties and exercise such other powers and authority as may be required of him or her by these Bylaws or assigned to him or her from time to time by the Board.

(b) Vice President. The Vice President, if one is elected or appointed by the Board of Directors, shall serve as acting President in the absence of the President, and shall have and exercise such powers and duties as may be granted by the Board.

(c) Treasurer. The Treasurer, if one is elected or appointed by the Board of Directors, shall have the general supervision over the finances of the Corporation. The Treasurer shall be responsible for the receipt and deposit of all monies of the Corporation in its

name and to its credit in such depositories as may be designated by the Board and shall be charged with safekeeping all securities and other valuable documents and properties of the Corporation. The Treasurer shall keep or cause to be kept in books belonging to the Corporation, accurate records showing all transactions of the Corporation, its assets, liabilities, financial condition, expenses, and income, and shall see that all expenditures are duly authorized and evidenced by proper receipts and vouchers. The Treasurer shall prepare a full report of the financial condition of the Corporation, including a statement of income and expenses for annual and other regular meetings of the Board, and shall make such other reports and statements as may be required of him or her by the Board or legal authority. The Treasurer shall be an ex-officio member of the Investments and Budget Committees, if one exists. The Treasurer shall perform such other duties and exercise such other powers and authority as may be required of him or her by these Bylaws or assigned to him or her from time to time by the Board.

(d) Secretary. The Secretary shall give notice of all meetings of the Board, keep minutes of such meetings permanently in books provided especially for such purpose, and ensure that they are approved at subsequent meetings; shall notify all officers of their election; and shall have custody of the corporate records. He or she shall perform such other duties and exercise such other powers and authority as may be required of him or her by these Bylaws or assigned to him or her from time to time by the Board or the President of the Corporation.

**Section 3.** **Resignation and Removal.** An officer may resign at any time by delivering notice to the President (for any officer other than the President) or the Board of Directors. Such resignation is effective when such notice is delivered unless such notice specifies a later effective date. An officer may be removed at any time at any legally held special meeting of the Board.

**Section 4.** **Vacancies.** Vacancies caused by resignation, removal, or death of an officer, or any other cause, may be filled for the unexpired portion of the term by a majority vote of the members of the Board at any regular or special meeting.

## ARTICLE VI
## CONTRACTS, LOANS, CHECKS, AND DEPOSITS

**Section 1.** **Contracts.** The Board of Directors may authorize any Officer or Officer's agent or agents of the Corporation to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

**Section 2.** **Loans.** No loan shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless specifically authorized by a resolution of the Board of Directors. Such resolutions may be general or confined to specific instances.

Docusign Envelope ID: 8C0D6E03-12AB-4DA4-ADFE-7419520282C0



**Section 3. Checks, Drafts, Etc.** All checks, drafts, or other orders for the payment of money, notes, or other evidence of indebtedness issued by or in the name of this Corporation shall be signed by such Officer or Officers, or Officer's agent or agents of this Corporation and in such a manner as shall from time to time be authorized by resolution of the Board of Directors.

**Section 4. Deposits.** All funds of the Corporation, not otherwise employed, shall be deposited from time to time to the credit of the Corporation in such bank, or banks of trust companies, or other depositories as the Board of Directors shall authorize by resolution.

**Section 5. Fiscal Year.** The fiscal year of the Corporation shall commence on January 1 and end on December 31.

**Section 6. Bond.** Any Officer or agent of the Corporation authorized to disburse corporate funds may be required by the Board of Directors to give bond.

## ARTICLE VII
## COMMITTEES

Standing or special committees, advisory boards, or honorary boards may be created or appointed from time to time by the Board of Directors or by the President as the affairs of this Corporation may require. Provided, however, the Board of Directors shall at all times remain the governing body of the Corporation.

## ARTICLE VIII
## DIRECTOR AND OFFICER LIABILITY

Pursuant to and expanding upon Tenn. Code Ann. Section 48-52-102(b)(3), the directors and officers of the Corporation shall have no personal liability to the Corporation or to its members for monetary damages for breach of fiduciary duty as a director or officer; provided, however, that this provision shall not eliminate or limit liability of a director or officer for any breach of a director's or officer's duty of loyalty to the Corporation or for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or for any violation of Tenn. Code Ann. Section 48-58-304 relating to unlawful distributions.

## ARTICLE IX
## INDEMNITY

Each Officer, Director, Committee Member, or employee of the Corporation shall be indemnified by the Corporation against expenses reasonably incurred by him or her in connection with any action, suit or proceeding to which he or she may be made a part by reason of being, or having been, an Officer, Director, Committee Member, or employee of the Corporation, except in relation to matters as to which he or she shall be finally adjudged in such action, suit, or proceeding to have been derelict in the performance of his or her duty as an

WILBERFORCE ACADEMY

Docusign Envelope ID: 8C0D6E03-12AB-4DA4-ADFE-7419520282C0



Officer, Director, Committee Member, or employee. "Derelict" shall mean grossly negligent, criminally negligent, or intentionally engaging in tortious conduct with the intent to defraud, deceive, misrepresent, or take advantage improperly of a corporate opportunity.

## ARTICLE X
## AMENDMENTS

**Section 1.** **Required Vote.** These Bylaws may be amended by an affirmative vote of at least two-thirds (2/3) of the Board of Directors. A written notice to the Board of Directors shall be provided at least five days prior to such meeting and shall contain the proposed amendment or amendments.

**Section 2.** **Action to Amend.** Initiation of action to amend these Bylaws may be by:

(a) action of the Board of Directors; or

(b) recommendation of an ad hoc committee appointed by the President.

## CERTIFICATION

I hereby certify that these Bylaws for the Corporation were duly adopted as of 11/24/2025.

DocuSigned by:
Parker Bartholomew
EDFCB03EBB0040D

Parker Bartholomew, Secretary

WILBERFORCE ACADEMY

## Attachment 8: Proof of Insurance

Bob Johnson Insurance, Inc.

BJI

7121 AFTON DRIVE
KNOXVILLE, TENNESSEE 37918
PHONE 865-922-3111 • FAX 865-922-0613
www.bobjohnsonins.com

To Whom it may concern,

Wilberforce Academy of Knoxville

448 N. Cedar Bluff Road, Ste. 404, Knoxville, TN 37923

This letter is to confirm that for the above listed charter school, we have investigated with the different insurance companies we represent and have confirmed that currently we can provide quotes for policy purchase for the following insurance coverages:

-General liability with excess liability equal to or greater than $5,000,000

-Directors & Officers Professional liability with excess liability equal to or greater than $5,000,000

-Teachers Professional liability equal to or greater than $1,000,000

-Owned, hired and non-owned auto liability with excess liability equal to or greater than $5,000,000

-Workers compensation as required by Tennessee law

-Sexual abuse liability equal to or greater than $1,000,000

-Property & Boiler insurance

While we do not anticipate any changes, insurance carrier underwriting can change without notice and current eligibility does not guarantee future coverage eligibility.

Respectfully,

Ben Johnson

President

SERVING YOUR INSURANCE NEEDS SINCE 1964
AUTO • HOMEOWNERS • BOAT • BUSINESS • LIFE • CHURCHES • MOTORCYCLE • HEALTH • INVESTMENTS

WILBERFORCE ACADEMY

## Appendix: Donor Commitment Letter

THE COLQUITT FOUNDATION

January 20, 2026

Dear Mr. Wishart,

My wife and I established The Colquitt Foundation with the belief that every person is made in the image of God and that our community is best served when there are vibrant Gospel-centered churches; strong, loving, and stable families; and opportunities for every child to receive a high-quality education.

We believe that no single system, or school, is the best fit for every child. Every family, regardless of wealth or zip code, deserves to be able to choose from several high-quality options as to how to best educate their children. We are proud and honored to support efforts to do just that.

As individuals, through our businesses, and through The Colquitt Foundation, we have been blessed to support traditional public schools, private schools (secular and religious), and charter schools.

We are excited by the vision of Wilberforce Academy of Knoxville and the tuition-free option it would represent for families across Knox County. We believe the demand for such a school will prove to be quite high, and we are committed to helping bridge any funding gap as it ramps up operations.

We stand ready to commit up to $500,000 pre-opening (Year 0), $1.2 million in Year 1, and $500,000 in Year 2 to ensure the financial stability and success of Wilberforce Academy of Knoxville. For reference, as of December 31, 2025, the foundation has over $28 million in assets, and we look forward to adding additional funds to the foundation in the future.

We are grateful for your efforts, and I look forward to following your efforts in the weeks, months, and years ahead to make this exciting option available for Knox County families.

Sincerely,

David Colquitt

# EXHIBIT 9

| STUDENT ENROLLMENT SUMMARY MINIMUM | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Kindergarten | 60 | 67 | 70 | 72 | 74 |
| 1st Grade | 60 | 67 | 70 | 72 | 74 |
| 2nd Grade | 60 | 67 | 70 | 72 | 74 |
| 3rd Grade | 59 | 66 | 68 | 70 | 72 |
| 4th Grade | 0 | 63 | 65 | 68 | 69 |
| 5th Grade | 0 | 0 | 65 | 68 | 69 |
| 6th Grade | 0 | 0 | 0 | 68 | 69 |
| 7th Grade | 0 | 0 | 0 | 0 | 69 |
| 8th Grade | 0 | 0 | 0 | 0 | 0 |
| 9th Grade | | | | | |
| 10th Grade | | | | | |
| 11th Grade | | | | | |
| 12th Grade | | | | | |
| **Total Enrollment** | 239 | 330 | 408 | 490 | 570 |
| **Change in Net Enrollment** | 239 | 91 | 78 | 82 | 80 |

| Percentages of Full Enrollment Assumed | | | | |
|---|---|---|---|---|
| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| 75% | 84% | 87% | 90% | 92% |

## PERSONNEL COUNTS MINIMUM

| ADMINISTRATIVE STAFF | AVERAGE ANNUAL SALARY | NUMBER OF FTE Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|---|
| Executive Management (CEO, ED)- (School Director) | $115,000 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | Salary based on regional averages |
| School Leadership (Principals, Assistant Principals) (El | $104,000 | 0.0 | 0.0 | 0.0 | 1.0 | 1.0 | Salary based on regional averages |
| Deans, Directors, and Coordinators (Dean of Curr/Instr | $77,050 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 67% of School Director's salary |
| CFO/Director of Finance | $105,000 | 0.0 | 0.0 | 0.5 | 0.5 | 0.5 | Salary based on regional averages |
| Director of Operations/Business (Dir. of Operations) | $77,050 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 67% of School Director's salary |
| Administrative Staff/Registrar (Registrar) | $42,000 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | Salary based on regional averages |
| Other Administrative Staff (Office Manager) | $42,000 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | Salary based on regional averages |
| Director of Specialized Services | $77,050 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 67% of School Director's salary |
| Director of Development | $77,050 | 0.0 | 0.0 | 0.0 | 1.0 | 1.0 | 67% of School Director's salary |
| Dean of Culture | $77,050 | 0.0 | 0.0 | 0.0 | 1.0 | 1.0 | 67% of School Director's salary |
| **ADMINISTRATIVE STAFF SALARY TOTALS** | | **$430,150** | **$430,150** | **$482,650** | **$740,750** | **$740,750** | |

| INSTRUCTIONAL STAFF | AVERAGE ANNUAL SALARY | NUMBER OF FTE Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|---|
| Teachers - Regular | $60,000 | 16.0 | 19.0 | 23.5 | 28.0 | 31.0 | Assuming base salaries of 50,000 in 26-27, and accounting for varying levels of experience and academic training; BLS has $55,240 as average teacher salary in TN |
| Teachers - SPED | $60,000 | 0.0 | 1.0 | 2.0 | 2.5 | 2.5 | Assuming base salaries of 50,000 in 26-27, and accounting for varying levels of experience and academic training; BLS has $55,240 as average teacher salary in TN |
| Teachers - EL | $60,000 | 0.5 | 0.5 | 1.0 | 1.0 | 1.0 | Assuming base salaries of 50,000 in 26-27, and accounting for varying levels of experience and academic training; BLS has $55,240 as average teacher salary in TN |
| Teaching Assistant | | | | | | | |
| Specialty Teachers | $60,000 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | Assuming base salaries of 50,000 in 26-27, and accounting for varying levels of experience and academic training; BLS has $58,800 as average teacher salary nationally |
| Aides | $30,000 | 0.0 | 0.0 | 0.0 | 1.0 | 3.0 | Based on salary estimates for Knoxville |
| Therapists and Counselors | $61,300 | 0.0 | 0.5 | 1.0 | 1.0 | 1.0 | Based on salary estimates for Knoxville |
| Librarian | $51,300 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | Library starting in Year 5 (delayed) |
| Other Instructional Staff | | | | | | | |
| *Insert custom instructional staff* | | | | | | | |
| *Insert custom instructional staff* | | | | | | | |
| **INSTRUCTIONAL STAFF SALARY TOTALS** | | **$1,170,000** | **$1,440,650** | **$1,831,300** | **$2,161,300** | **$2,452,600** | |

| NON-INSTRUCTIONAL STAFF | AVERAGE ANNUAL SALARY | Cut Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|---|
| Nurse | $58,000 | 0 | 0.5 | 0.5 | 0.5 | 0.5 | Median nurse salary in Knoxville |
| Custodian | $42,000 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | Median school custodian salary in Knoxville |
| Security | | | | | | | |
| Other Non-Insructional Staff | | | | | | | |
| *Insert custom non-instructional staff* | | | | | | | |
| *Insert custom non-instructional staff* | | | | | | | |
| **NON-INSTRUCTIONAL STAFF SALARY TOTALS** | | **$42,000** | **$71,000** | **$71,000** | **$71,000** | **$71,000** | |

## BENEFITS MINIMUM

| PAYROLL TAXES AND BENEFITS | % OF SALARIES | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|---|
| Social Security | 6.20% | $101,813 | $120,392 | $147,867 | $184,329 | $202,390 | Mandated 6.2% |
| Employer Medicare | 1.45% | $23,811 | $28,156 | $34,582 | $43,109 | $47,333 | Mandated 1.45% |
| State Unemployment | 0.50% | $8,211 | $9,709 | $11,925 | $14,865 | $16,322 | 2.7% of first $7,000 in wages; using .5% as conservative estimate |
| Worker's Compensation Insurance | 0.75% | $12,316 | $14,564 | $17,887 | $22,298 | $24,483 | 0.75% |
| Health/Medical Insurance | 14.00% | $229,901 | $271,852 | $333,893 | $416,227 | $457,009 | Based on area school averages |
| Dental Insurance | 1.20% | $19,706 | $23,302 | $28,619 | $35,677 | $39,172 | Based on area school averages |
| Vision Insurance | 0.00% | $0 | $0 | $0 | $0 | $0 | |
| Life Insurance | 0.00% | $0 | $0 | $0 | $0 | $0 | |
| Pensions/Retirement | 11.00% | $180,637 | $213,598 | $262,345 | $327,036 | $359,079 | Based on TCRS hybrid plan option |
| *Insert custom benefit* | | | | | | | |
| *Insert custom benefit* | | | | | | | |
| **PAYROLL TAXES AND BENEFITS TOTALS** | **35.10%** | **$576,395** | **$681,572** | **$837,117** | **$1,043,541** | **$1,145,787** | |

## SALARY AND BENEFITS SUMMARY MINIMUM

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|
| Total Administrative Staff Salaries | $430,150 | $430,150 | $482,650 | $740,750 | $740,750 | |
| Total Administrative Staff Benefits | $150,983 | $150,983 | $169,410 | $260,003 | $260,003 | |
| Total Instructional Staff Salaries | $1,170,000 | $1,440,650 | $1,831,300 | $2,161,300 | $2,452,600 | |
| Total Instructional Staff Benefits | $410,670 | $505,668 | $642,786 | $758,616 | $860,863 | |
| Total Non-Instructional Staff Salaries | $42,000 | $71,000 | $71,000 | $71,000 | $71,000 | |
| Total Non-Instructional Staff Benefits | $14,742 | $24,921 | $24,921 | $24,921 | $24,921 | |
| **TOTAL SALARIES AND BENEFITS** | **$2,218,545** | **$2,623,372** | **$3,222,067** | **$4,016,591** | **$4,410,137** | |

## BUDGET SUMMARY MINIMUM

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|
| Total revenue | $4,038,515 | $4,485,816 | $5,187,258 | $6,126,408 | $7,099,484 | |
| Total expenditures | $3,954,074 | $4,381,011 | $5,053,377 | $5,976,289 | $6,487,297 | |
| Net operating income | $84,441 | $104,805 | $133,881 | $150,119 | $612,187 | |
| Revenue per pupil | $16,898 | $13,593 | $12,714 | $12,503 | $12,455 | |
| Expenses per pupil | $16,544 | $13,276 | $12,386 | $12,197 | $11,381 | |

## REVENUE MINIMUM

| PER-PUPIL FUNDING | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|
| Average per-pupil state and local funding | $2,868,000 | $3,960,000 | $4,896,000 | $5,880,000 | $6,840,000 | Using TISA rate of $12,000 for all 5 years to be conservative |
| Average per-pupil federal funding | | | | | | Left this row blank to avoid double-counting with section below |
| **TOTAL FEDERAL, STATE, LOCAL PER-PUPIL REVENUE** | **$2,868,000** | **$3,960,000** | **$4,896,000** | **$5,880,000** | **$6,840,000** | |
| **OTHER (FUNDRAISING, LOANS, ETC.)** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **NOTES AND ASSUMPTIONS** |
| *Local Fundraising* | 850,000 | 175,000 | 160,000 | 80,000 | 55,000 | Colquitt Foundation commitment plus other local donors |
| *CSP Startup Grant* | 250,000 | 250,000 | - | - | - | Assuming $750,000 grant over 3 years, Years 0-2 |
| *E-Rate Funding* | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | Assuming $10,000 per year based on area school averages |
| *Title I* | 23,900 | 33,000 | 40,800 | 49,000 | 57,000 | $500 per student, 20% low-income population |
| *Title II* | 7,170 | 9,900 | 12,240 | 14,700 | 17,100 | $30 per student |
| *Title III* | 3,155 | 4,356 | 5,386 | 6,468 | 7,524 | $120 per student, EL% at 11% |
| *IDEA* | 26,290 | 43,560 | 62,832 | 86,240 | 112,860 | $1100 per student, SPED % at 10% for Year 1, increasing to 18% by year 5 |
| **TOTAL OTHER REVENUE** | **$1,170,515** | **$525,816** | **$291,258** | **$246,408** | **$259,484** | |

## EXPENDITURES MINIMUM

| SALARIES AND BENEFITS | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|
| **TOTAL SALARIES AND BENEFITS** | **$2,218,545** | **$2,623,372** | **$3,222,067** | **$4,016,591** | **$4,410,137** | |
| **CONTRACTED SERVICES** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **NOTES AND ASSUMPTIONS** |
| Accounting/audit | 12,000 | 12,360 | 12,731 | 13,113 | 13,506 | Estimating $12,000 for Year 1, with inflationary increases annually |
| Legal | 10,000 | 10,300 | 10,609 | 10,927 | 11,255 | Estimating $10,000 for Year 1, with inflationary increases annually |
| Management company fee | - | - | - | - | - | 0 |
| Payroll service | 20,000 | 20,600 | 21,218 | 21,855 | 22,510 | Estimating $20,000 for Year 1, with inflationary increases annually |
| School lunch/food service | - | - | - | - | - | 0 |
| Special education services | 23,900 | 40,788 | 60,599 | 85,670 | 115,477 | Assuming $1000/day in Year 1, increasing by 3% year |
| Student support services | - | - | - | - | - | 0 |
| Transportation services | 54,000 | 55,620 | 57,289 | 59,007 | 60,777 | Assuming $300 day for accessible van services for 5-10 students with IEPs |
| Financial services | 40,000 | 41,200 | 20,000 | 20,600 | 21,218 | Based on estimate from comparable school |
| Copier lease | 9,000 | 9,270 | 19,096 | 19,669 | 20,259 | Assuming $750/month lease; 2 copiers by Year 3 |
| Internet and phone | 24,000 | 24,720 | 25,462 | 26,225 | 27,012 | Assuming 1400/month for internet connectivity and $600/month for phone |
| Bank charges | 1,500 | 1,545 | 1,591 | 1,639 | 1,688 | Based on area school averages |
| Postal Service | 2,500 | 2,575 | 2,652 | 2,732 | 2,814 | Based on area school averages |
| | | | | | | |
| **TOTAL CONTRACTED SERVICES** | **$196,900** | **$218,978** | **$231,246** | **$261,437** | **$296,517** | |
| **SCHOOL OPERATIONS** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **NOTES AND ASSUMPTIONS** |
| Board expenses | 3,000 | 3,090 | 3,183 | 3,278 | 3,377 | Board training by TCSC or comparable |
| Classroom / Teaching Supplies and Materials | 83,650 | 115,500 | 142,800 | 171,500 | 199,500 | Using $350/student, above area averages of about $300 per student |
| Field Trips | 7,190 | 9,300 | 11,280 | 13,300 | 15,300 | Assuming $400 per bus per trip, 1 trip per grade, plus $10 per student for entrance fees |
| Fundraising Expenses | - | - | - | - | - | Will cover expenses with fundraising |
| Office Expenses | 13,000 | 13,390 | 13,792 | 14,205 | 14,632 | Based on area school averages |
| Other Equipment | - | - | - | - | - | |
| Other Student Services | - | - | - | - | - | |
| Special Education Supplies and Materials | - | - | - | - | - | Additional $75/SPED student |
| Staff Development | 45,000 | 28,550 | 34,700 | 43,050 | 38,250 | Initial Singapore Math training on site in Year 1, initial Literacy Essentials training, then assuming $700 per veteran staff per year, plus $3K for new hires (Singapore is $2k) |
| Staff Recruitment | 5,000 | 5,150 | 5,305 | 5,464 | 5,628 | Based on area school averages, adjusted for inflation |
| Staff Travel | - | - | - | - | - | |
| Student Recruitment / Marketing | 20,000 | 15,000 | 15,450 | 15,914 | 16,391 | Initial budget of $20,000 to build awareness in Years 0 and 1, decreasing slightly after school is established |
| Student Testing and Assessment | 17,925 | 24,750 | 30,600 | 36,750 | 42,750 | Assuming $75/student/year for TCAP, NWEA MAP and DIBELS |
| Student Transportation | - | - | - | - | - | Covered in Transportation Services |
| Supplies and Other Materials | 24,360 | 31,400 | 39,120 | 47,000 | 53,600 | Assuming $40/student consumables plus faculty supplies of $800 per teacher, plus lunch/kitchen supplies of $2000 in year 1 |
| Technology | 4,500 | 9,000 | 9,000 | 4,500 | 4,500 | Faculty laptops: 1500 per classroom teacher/admin for first year; each year paying for next year's new staff |
| Telephone | - | - | - | - | - | |
| Library books | - | - | - | 15,000 | 25,000 | Starting library in Year 5 |
| Educational software | 5,625 | 5,975 | 8,498 | 10,821 | 13,386 | Infinite Campus, which Knox County uses (initial cost paid in Year 0) |
| Health supplies - consumables | 5,000 | 5,150 | 5,305 | 5,464 | 5,628 | Based on area school averages |
| Substitute Teachers | 12,000 | 14,250 | 17,625 | 21,000 | 23,250 | Assuming $150/day, 5 sick days per teacher |
| School Lunch Monitors | 6,525 | 6,525 | 6,525 | 6,525 | 6,525 | 2 lunch monitors at minimum wage for 2.5 hours/day |
| Authorizer Fee | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | |
| **TOTAL SCHOOL OPERATIONS** | **$287,775** | **$322,030** | **$378,181** | **$448,771** | **$502,715** | |
| **FACILITY OPERATIONS & MAINTENANCE** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **NOTES AND ASSUMPTIONS** |
| Equipment | 30,000 | 30,900 | 31,827 | 32,782 | 33,765 | Based on area school averages, adjusted for inflation |
| Facilities cost (rent/debt, interest payments, etc.) | 1,041,604 | 1,041,604 | 1,041,604 | 1,063,804 | 1,086,670 | Assuming rental+upfit for 3 years, staying for all 5 years, 5 year construction loan of $1.3 million |
| Furniture | 11,250 | 11,588 | 11,935 | 12,293 | 12,662 | Costs to set up 3 new classrooms per year, $150/student |
| Insurance | 25,000 | 25,750 | 26,523 | 27,318 | 28,138 | Based on area school averages, adjusted for inflation |
| Janitorial Services | 9,000 | 9,270 | 9,548 | 9,835 | 10,130 | Custodian on staff, extra planned for supplies |
| Repairs and Maintenance | 10,000 | 10,300 | 10,609 | 10,927 | 11,255 | Based on area school averages, adjusted for inflation |
| Security | 50,000 | 11,000 | 11,330 | 11,670 | 12,020 | Higher than area school averages, one-time setup and then subscriptions and maintenance |
| Utilities | 74,000 | 76,220 | 78,507 | 80,862 | 83,288 | Assuming $2.00 per sq foot, adjusted for inflation |
| Insert custom facilities expense | | | | | | |
| Insert custom facilities expense | | | | | | |
| *Insert custom facilities expense* | | | | | | |
| **TOTAL FACILITY OPS & MAINTENANCE** | **$1,250,854** | **$1,216,632** | **$1,221,882** | **$1,249,491** | **$1,277,927** | |

## PERSONNEL COUNTS PLANNED

| ADMINISTRATIVE STAFF | AVERAGE ANNUAL SALARY | NUMBER OF FTE | | | | | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|---|
| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | |
| Executive Management (CEO, ED)- (School Director) | $115,000 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | Salary based on regional averages |
| School Leadership (Principals, Assistant Principals) (Elementary Principa | $104,000 | 0.0 | 0.0 | 0.0 | 1.0 | 1.0 | Salary based on regional averages |
| Deans, Directors, and Coordinators (Dean of Curr/Instruction) | $77,050 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 67% of School Director's salary |
| CFO/Director of Finance | $105,000 | 0.0 | 0.0 | 0.5 | 0.5 | 0.5 | Salary based on regional averages |
| Director of Operations/Business (Dir. of Operations) | $77,050 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 67% of School Director's salary |
| Administrative Staff/Registrar (Registrar) | $42,000 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | Salary based on regional averages |
| Other Administrative Staff (Office Manager) | $42,000 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | Salary based on regional averages |
| *Director of Specialized Services* | $77,050 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 67% of School Director's salary |
| *Director of Development* | $77,050 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 67% of School Director's salary |
| *Dean of Culture* | $77,050 | 0.0 | 0.0 | 1.0 | 1.0 | 1.0 | 67% of School Director's salary |
| **ADMINISTRATIVE STAFF SALARY TOTALS** | | **$507,200** | **$507,200** | **$559,700** | **$663,700** | **$663,700** | |

| INSTRUCTIONAL STAFF | AVERAGE ANNUAL SALARY | NUMBER OF FTE | | | | | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|---|
| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | |
| Teachers - Regular | $60,000 | 16.0 | 19.0 | 23.5 | 28.0 | 31.0 | Assuming base salaries of 50,000 in 26-27, and accounting for varying levels of experience and academic training; BLS has $55,240 as average teacher salary in TN |
| Teachers - SPED | $60,000 | 1.0 | 1.0 | 2.0 | 2.5 | 2.5 | Assuming base salaries of 50,000 in 26-27, and accounting for varying levels of experience and academic training; BLS has $55,240 as average teacher salary in TN |
| Teachers - EL | $60,000 | 0.5 | 1.0 | 1.0 | 1.0 | 1.0 | Assuming base salaries of 50,000 in 26-27, and accounting for varying levels of experience and academic training; BLS has $55,240 as average teacher salary in TN |
| Teaching Assistant | | | | | | | |
| Specialty Teachers | $60,000 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | Assuming base salaries of 50,000 in 26-27, and accounting for varying levels of experience and academic training; BLS has $55,240 as average teacher salary in TN |
| Aides | $30,000 | 0.0 | 1.0 | 1.0 | 2.0 | 3.0 | Based on salary estimates for Knoxville |
| Therapists and Counselors | $61,300 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | Based on salary estimates for Knoxville |
| Librarian | $51,300 | | | | 1.0 | 1.0 | Median librarian salary in Knoxville |
| Other Instructional Staff | | | | | | | |
| *Insert custom instructional staff* | | | | | | | |
| *Insert custom instructional staff* | | | | | | | |
| **INSTRUCTIONAL STAFF SALARY TOTALS** | | **$1,291,300** | **$1,531,300** | **$1,861,300** | **$2,242,600** | **$2,452,600** | |

| NON-INSTRUCTIONAL STAFF | AVERAGE ANNUAL SALARY | NUMBER OF FTE | | | | | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|---|
| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | |
| Nurse | $61,000 | 0.00 | 0.5 | 0.5 | 0.5 | 0.5 | Median nurse salary in Knoxville |
| Custodian | $42,000 | 1 | 1 | 1 | 1 | 1 | Median school custodian salary in Knoxville |
| Security | | 0 | 0 | 0 | 0 | 0 | |
| Other Non-Insructional Staff | | | | | | | |
| *Insert custom non-instructional staff* | | | | | | | |
| *Insert custom non-instructional staff* | | | | | | | |
| **NON-INSTRUCTIONAL STAFF SALARY TOTALS** | | **$42,000** | **$72,500** | **$72,500** | **$72,500** | **$72,500** | |

## BENEFITS PLANNED

| PAYROLL TAXES AND BENEFITS | % OF SALARIES | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|---|
| Social Security | 6.20% | $114,111 | $130,882 | $154,597 | $184,686 | $197,706 | Mandated 6.2% |
| Employer Medicare | 1.45% | $26,687 | $30,610 | $36,156 | $43,193 | $46,238 | Mandated 1.45% |
| State Unemployment | 0.50% | $9,203 | $10,555 | $12,468 | $14,894 | $15,944 | 2.7% of first $7,000 in wages; using .5% as conservative estimate |
| Worker's Compensation Insurance | 0.75% | $13,804 | $15,833 | $18,701 | $22,341 | $23,916 | 0.75% |
| Health/Medical Insurance | 14.00% | $257,670 | $295,540 | $349,090 | $417,032 | $446,432 | Based on area school averages |
| Dental Insurance | 1.20% | $22,086 | $25,332 | $29,922 | $35,746 | $38,266 | Based on area school averages |
| Vision Insurance | | $0 | $0 | $0 | $0 | $0 | |
| Life Insurance | | $0 | $0 | $0 | $0 | $0 | |
| Pensions/Retirement | 11.00% | $202,455 | $232,210 | $274,285 | $327,668 | $350,768 | Based on TCRS hybrid plan option |
| *Insert custom benefit* | | $0 | $0 | $0 | $0 | $0 | |
| *Insert custom benefit* | | $0 | $0 | $0 | $0 | $0 | |
| **PAYROLL TAXES AND BENEFITS TOTALS** | **35.10%** | **$646,016** | **$740,961** | **$875,219** | **$1,045,559** | **$1,119,269** | |

## SALARY AND BENEFITS SUMMARY PLANNED

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|
| Total Administrative Staff Salaries | $507,200 | $507,200 | $559,700 | $663,700 | $663,700 | |
| Total Administrative Staff Benefits | $178,027 | $178,027 | $196,455 | $232,959 | $232,959 | |
| Total Instructional Staff Salaries | $1,291,300 | $1,531,300 | $1,861,300 | $2,242,600 | $2,452,600 | |
| Total Instructional Staff Benefits | $453,246 | $537,486 | $653,316 | $787,153 | $860,863 | |
| Total Non-Instructional Staff Salaries | $42,000 | $72,500 | $72,500 | $72,500 | $72,500 | |
| Total Non-Instructional Staff Benefits | $14,742 | $25,448 | $25,448 | $25,448 | $25,448 | |
| **TOTAL SALARIES AND BENEFITS** | **$2,486,516** | **$2,851,961** | **$3,368,719** | **$4,024,359** | **$4,308,069** | |

## STUDENT ENROLLMENT SUMMARY PLANNED

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Kindergarten | 72 | 72 | 76 | 76 | 76 |
| 1st Grade | 72 | 72 | 76 | 76 | 76 |
| 2nd Grade | 72 | 72 | 76 | 76 | 76 |
| 3rd Grade | 70 | 70 | 74 | 74 | 74 |
| 4th Grade | 0 | 68 | 71 | 71 | 71 |
| 5th Grade | 0 | 0 | 71 | 71 | 71 |
| 6th Grade | 0 | 0 | 0 | 71 | 71 |
| 7th Grade | 0 | 0 | 0 | 0 | 71 |
| 8th Grade | | | | | |
| 9th Grade | | | | | |
| 10th Grade | | | | | |
| 11th Grade | | | | | |
| 12th Grade | | | | | |
| **Total Enrollment** | 286 | 354 | 444 | 515 | 586 |
| **Change in Net Enrollment** | 286 | 68 | 90 | 71 | 71 |

| Percentages of Full Enrollment Assumed | | | | |
|---|---|---|---|---|
| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| 90% | 90% | 95% | 95% | 95% |
| Full Enrollment (used in Projections in Question 7): | | | | |
| 80 | 80 | 80 | 80 | 80 |
| 80 | 80 | 80 | 80 | 80 |
| 80 | 80 | 80 | 80 | 80 |
| 78 | 78 | 78 | 78 | 78 |
| | 75 | 75 | 75 | 75 |
| | | 75 | 75 | 75 |
| | | | 75 | 75 |
| | | | | 75 |
| **318** | **393** | **468** | **543** | **618** |

## BUDGET SUMMARY PLANNED

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|
| **Total revenue** | $4,339,415 | $4,755,421 | $5,619,957 | $7,204,388 | $7,516,943 | |
| **Total expenditures** | $4,254,090 | $4,631,058 | $5,246,133 | $6,961,943 | $7,337,293 | |
| **Net operating income** | $85,326 | $124,363 | $373,823 | $242,445 | $179,650 | Reserves built in Year 3 to aid with Capital Campaign in Year 4 |
| **Revenue per pupil** | $15,173 | $13,433 | $12,658 | $13,989 | $12,828 | |
| **Expenses per pupil** | $14,874 | $13,082 | $11,816 | $13,518 | $12,521 | |

## REVENUE PLANNED

| PER-PUPIL FUNDING | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|
| Average per-pupil state and local funding | $3,432,000 | $4,248,000 | $5,328,000 | $6,180,000 | $7,032,000 | Using TISA rate of $12,000 for all 5 years to be conservative |
| Average per-pupil federal funding | | | | | | Left this row blank to avoid double-counting with section below |
| **TOTAL FEDERAL, STATE, LOCAL PER-PUPIL REVENUE** | **$3,432,000** | **$4,248,000** | **$5,328,000** | **$6,180,000** | **$7,032,000** | |
| **OTHER (FUNDRAISING, LOANS, ETC.)** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **NOTES AND ASSUMPTIONS** |
| *Local Fundraising* | $575,000 | $150,000 | $150,000 | $850,000 | $275,000 | Colquitt Foundation + others + Capital campaign in Year 4 |
| *CSP Startup Grant* | $250,000 | $250,000 | | | | Assuming $750,000 grant over 3 years, Years 0-2 |
| *E-Rate Funding* | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | Assuming $10,000 per year based on area school averages |
| *Title I* | $28,600 | $35,400 | $44,400 | $51,500 | $58,600 | $500 per student, 20% low-income population |
| *Title II* | $8,580 | $10,620 | $13,320 | $15,450 | $17,580 | $30 per student |
| *Title III* | $3,775 | $4,673 | $5,861 | $6,798 | $7,735 | $120 per student, EL% at 11% |
| *IDEA* | $31,460 | $46,728 | $68,376 | $90,640 | $116,028 | $1100 per student, SPED % at 10% for Year 1, increasing to 18% by year 5 |
| **TOTAL OTHER REVENUE** | **$907,415** | **$507,421** | **$291,957** | **$1,024,388** | **$484,943** | |
| | 19% | $1,433.39 | | | | |

## EXPENDITURES PLANNED

| SALARIES AND BENEFITS | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | NOTES AND ASSUMPTIONS |
|---|---|---|---|---|---|---|
| **TOTAL SALARIES AND BENEFITS** | **$2,486,516** | **$2,851,961** | **$3,368,719** | **$4,024,359** | **$4,308,069** | |
| **CONTRACTED SERVICES** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **NOTES AND ASSUMPTIONS** |
| Accounting/audit | $12,000 | $12,360 | $12,731 | $13,113 | $13,506 | Estimating $12,000 for Year 1, with inflationary increases annually |
| Legal | $10,000 | $10,300 | $10,609 | $10,927 | $11,255 | Estimating $10,000 for Year 1, with inflationary increases annually |
| Management company fee | | | | | | |
| Payroll service | $20,000 | $20,600 | $21,218 | $21,855 | $22,510 | Estimating $20,000 for Year 1, with inflationary increases annually |
| School lunch/food service | | | | | | |
| Special education services | $28,600 | $43,754 | $65,946 | $90,041 | $118,719 | Assuming $1000/day in Year 1, increasing by 3% year |
| Student support services | | | | | | |
| *Transportation services* | $54,000 | $55,620 | $57,289 | $59,007 | $60,777 | Assuming $300 day for accessible van services for 5-10 students with IEPs |
| *Financial services* | $40,000 | $41,200 | $20,000 | $20,600 | $21,218 | Based on estimate from comparable school |
| *Copier lease* | $9,000 | $9,270 | $19,096 | $19,669 | $20,259 | Assuming $750/month lease; 2 copiers by Year 3 |
| *Internet and phone* | $24,000 | $24,720 | $25,462 | $26,225 | $27,012 | Assuming 1400/month for internet connectivity and $600/month for phone |
| *Bank charges* | $1,500 | $1,545 | $1,591 | $1,639 | $1,688 | Based on area school averages |
| *Postal Service* | $2,500 | $2,575 | $2,652 | $2,732 | $2,814 | Based on area school averages |
| **TOTAL CONTRACTED SERVICES** | **$201,600** | **$221,944** | **$236,593** | **$265,808** | **$299,759** | |
| **SCHOOL OPERATIONS** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **NOTES AND ASSUMPTIONS** |
| Board expenses | $3,000 | $3,090 | $3,183 | $3,278 | $3,377 | Board training by TCSC or comparable |
| Classroom / Teaching Supplies and Materials | $100,100 | $123,900 | $155,400 | $180,250 | $205,100 | Using $350/student, above area averages of about $300 per student |
| Field Trips | $7,660 | $9,540 | $11,640 | $13,550 | $15,460 | Assuming $400 per bus per trip, 1 trip per grade, plus $10 per student for entrance fees |
| Fundraising Expenses | | | | | | Will cover expenses with fundraising |
| Office Expenses | $13,000 | $13,390 | $13,792 | $14,205 | $14,632 | Based on area school averages |
| Other Equipment | | | | | | |
| Other Student Services | | | | | | |
| Special Education Supplies and Materials | $2,145 | $3,186 | $4,662 | $6,180 | $7,911 | Additional $75/SPED student |
| Staff Development | $45,000 | $28,550 | $34,700 | $43,050 | $38,250 | Initial Singapore Math training on site in Year 1, initial Literacy Essentials training, then assuming $700 per veteran staff per year, plus $3K for new hires (Singapore is $2k) |
| Staff Recruitment | $5,000 | $5,150 | $5,305 | $5,464 | $5,628 | Based on area school averages, adjusted for inflation |
| Staff Travel | | | | | | |
| Student Recruitment / Marketing | $20,000 | $15,000 | $15,450 | $15,914 | $16,391 | Initial budget of $20,000 to build awareness in Years 0 and 1, decreasing slightly after school is established |
| Student Testing and Assessment | $21,450 | $26,550 | $33,300 | $38,625 | $43,950 | Assuming $75/student/year for TCAP, NWEA MAP and DIBELS |
| Student Transportation | | | | | | Covered in Transportation Services |
| Supplies and Other Materials | $26,240 | $32,360 | $40,560 | $48,000 | $54,240 | Assuming $40/student consumables plus faculty supplies of $800 per teacher, plus lunch/kitchen supplies of $2000 in year 1 |
| Technology | $4,500 | $9,000 | $9,000 | $4,500 | $4,500 | Faculty laptops: 1500 per classroom teacher/admin for first year; each year paying for next year's new staff |
| Telephone | | | | | | |
| Library books | | | $15,000 | $15,000 | $25,000 | Starting library in year 4 |
| *Educational software* | $7,500 | $8,850 | $11,433 | $13,659 | $16,008 | Infinite Campus, which Knox County uses (initial cost paid in Year 0) |
| *Health supplies - consumables* | $5,000 | $5,150 | $5,305 | $5,464 | $5,628 | Based on area school averages |
| *Substitute Teachers* | $12,000 | $14,250 | $17,625 | $21,000 | $23,250 | Assuming $150/day, 5 sick days per teacher |
| *School Lunch Monitors* | $6,525 | $6,525 | $6,525 | $6,525 | $6,525 | 2 lunch monitors at minimum wage for 2.5 hours/day |
| *Authorizer Fee* | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | |
| **TOTAL SCHOOL OPERATIONS** | **$314,120** | **$339,491** | **$417,878** | **$469,663** | **$520,849** | |
| **FACILITY OPERATIONS & MAINTENANCE** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **NOTES AND ASSUMPTIONS** |
| Equipment | $30,000 | $30,900 | $31,827 | $32,782 | $33,765 | Based on area school averages, adjusted for inflation |
| Facilities cost (rent/debt, interest payments, etc.) | $1,041,604 | $1,041,604 | $1,041,604 | $1,985,315 | $1,985,315 | Assuming rental of 37,000 sq ft for years 1-3, and new building in Year 4, 5 year upfit construction loan of $1.3 spread out over 5 years |
| Furniture | $11,250 | $11,588 | $11,935 | $12,293 | $12,662 | Costs to set up 3 new classrooms per year, $150/student |
| Insurance | $25,000 | $25,750 | $26,523 | $27,318 | $28,138 | Based on area school averages, adjusted for inflation |
| Janitorial Services | 10,000 | 10,300 | 10,609 | 10,927 | 11,255 | Custodian on staff, extra planned for supplies, adjusted for inflation |
| Repairs and Maintenance | $10,000 | $10,300 | $10,609 | $10,927 | $11,255 | Based on area school averages, adjusted for inflation |
| Security | $50,000 | $11,000 | $11,330 | $11,670 | $12,020 | Higher than area school averages, one-time setup and then subscriptions and maintenance |
| Utilities | $74,000 | $76,220 | $78,507 | $110,880 | $114,206 | Assuming $2.00 per sq foot, adjusted for inflation |
| *Insert custom facilities expense* | | | | | | |
| *Insert custom facilities expense* | | | | | | |
| *Insert custom facilities expense* | | | | | | |
| **TOTAL FACILITY OPS & MAINTENANCE** | **$1,251,854** | **$1,217,662** | **$1,222,943** | **$2,202,113** | **$2,208,617** | |

# EXHIBIT 10

# THE WILBERFORCE ACADEMY OF KNOXVILLE

## ACTIONS OF DIRECTORS

Pursuant to T.C.A. § 48-58-202 of the Tennessee Nonprofit Corporation Act, the undersigned, being all of the directors of **The Wilberforce Academy of Knoxville**, do hereby consent to and take the following actions, to the same extent and to have the same force and effect as if adopted at a formal meeting, as evidenced by our signatures hereto:

1. We hereby elect each of the following persons to hold the office set forth opposite his name, to hold such office until his successor is duly elected and qualified or is otherwise provided in the Corporation's Bylaws:

| Name | Office |
|---|---|
| Doug Harris | President |
| Parker Bartholomew | Secretary |
| David Colquitt | Treasurer |

2. The President, Secretary, and Treasurer shall be authorized to conduct banking transactions, including establishing accounts, opening and closing accounts, and making deposits and withdraws.

3. We hereby appoint Zach Wishart as Executive Director of the Corporation to have

4. We hereby approve, ratify, and confirm the Bylaws of the Corporation attached hereto as Exhibit A. The Secretary is hereby authorized and directed to execute the Bylaws and place said Bylaws with the records of the Corporation.

5. We hereby approve, ratify, and confirm the Conflict of Interest Policy of the Corporation attached hereto as Exhibit B. The Secretary is hereby authorized and directed to execute the Conflict of Interest Policy and place said Policy with the records of the Corporation.

6. We hereby ratify and affirm all acts taken on behalf of the Corporation by William D. Edwards as Incorporator of the Corporation.

7. Any officer is hereby authorized to sign and file Form 1023, Application for Exemption.

8. The Wilberforce Academy of Knoxville admits students of any race, color, national and ethnic origin to all the rights, privileges, programs, and activities generally accorded or made available to students at said academy and does not discriminate on the basis of race, color, national and ethnic origin in administration of its educational

policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs.

These Actions of Directors shall be effective upon all of the Directors signing below. These Actions of Directors may be executed in counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same agreement.

DocuSigned by:
Parker Bartholomew
EDFCB03EBB0640D...
Parker Bartholomew, Director

Date: 11/24/2025

DocuSigned by:
Laura Beaman
8B4F80DABF5A42E...
Laura Beaman, Director

Date: 11/24/2025

Signed by:
David Colquitt
022CEC4744CE459...
David Colquitt, Director

Date: 11/24/2025

DocuSigned by:
8B6D30DCD731475...
Doug Harris, Director

Date: 11/24/2025

# EXHIBIT 11

Gmail

Zach Wishart <zachwishart@gmail.com>

## Wilberforce Academy Letter of Intent

Chartering Authority <charteringauthority@knoxschools.org> Tue, Dec 2, 2025 at 8:00 AM
To: Zach Wishart <zachwishart@gmail.com>, "charterschool.applications@tn.gov" <charterschool.applications@tn.gov>
Cc: "Gary Dupler [Knox County]" <gary.dupler@knoxcounty.org>

KCS | KNOX COUNTY SCHOOLS

Dear Charter Sponsor:

On November 25, 2025, Knox County Schools received your *Letter of Intent to Apply to Open a Tennessee Public Charter School* in accordance with T.C.A. §49-13-107(a). Based on the application provided by the Tennessee State Board, there are two items on the *Letter of Intent Form* (page 4) to which each sponsor is asked to respond, indicating Sponsor Eligibility (T.C.A. §49-13-104(16)). You indicated your 501(c)(3) status but left the other box (related to T.C.A. §49-6-3001(c)(3)(A)) unchecked. Therefore, at this time, your Letter of Intent is considered incomplete.

If you would like to update your Letter of Intent to indicate eligibility as a sponsor, we can accept a completed letter until December 3, 2025, at 11:59 PM CST (based on T.C.A. §49-13-107(a)). Please let us know if you have any questions.

School: *The Wilberforce Academy of Knoxville*

**From:** Zach Wishart <zachwishart@gmail.com>
**Date:** Tuesday, November 25, 2025 at 9:43 AM
**To:** Chartering Authority <charteringauthority@knoxschools.org>, charterschool.applications@tn.gov <charterschool.applications@tn.gov>
**Subject:** Wilberforce Academy Letter of Intent

**CAUTION:** External Email. This message originated from outside of the KCS e-mail system.

[Quoted text hidden]

img-d9e76be6-d884-4ac6-b52d-9d772a343afd
49K

# EXHIBIT 12

Gmail

**Ryan Proctor <ryan@consovoymccarthy.com>**

## Fwd: Wilberforce Academy Letter of Intent

1 message

**Zachary Wishart** <zachwishart@gmail.com> Fri, Dec 5, 2025 at 3:45 PM
To: Cam <cam@consovoymccarthy.com>, Ryan Proctor <ryan@consovoymccarthy.com>

Sent from my iPhone

Begin forwarded message:

**From:** Chartering Authority <charteringauthority@knoxschools.org>
**Date:** December 5, 2025 at 3:35:06 PM EST
**To:** Zach Wishart <zachwishart@gmail.com>, charterschool.applications@tn.gov
**Cc:** "Gary Dupler [Knox County]" <gary.dupler@knoxcounty.org>
**Subject: Re: Wilberforce Academy Letter of Intent**

KCS | KNOX COUNTY SCHOOLS

Dear Charter Sponsor:

On November 25, 2025, Knox County Schools received your *Letter of Intent to Apply to Open a Tennessee Public Charter School* in accordance with T.C.A. §49-13-107(a). We indicated in an email response sent on Tuesday, December 2, 2025, that the Sponsor Eligibility section (based on the Letter of Intent form) was incomplete. A charter sponsor should comply with T.C.A. §49-13-104(16) and T.C.A. §49-6-3001(c)(3)(A). Knox County Schools stated that you would have the opportunity to correct this error, and a submission would be accepted through the state deadline of December 3, 2025, at 11:59 PM CST. Knox County Schools did not receive a completed Letter of Intent indicating your eligibility as a sponsor.

Since you have not submitted a revised letter, we recognize that you are proceeding with the process in accordance with T.C.A. §49-13-107 based upon your original Letter of Intent submitted on November 25, 2025. All resources related to the application process can be found on the State Board of Education's website. Additional information can be found on the KCS website. With a per-pupil funding estimate of $12,000, the funding in Knox County is near the state average. Please let us know if you have any questions.

School: *The Wilberforce Academy of Knoxville*

---

**From:** Chartering Authority <charteringauthority@knoxschools.org>
**Date:** Tuesday, December 2, 2025 at 8:00 AM
**To:** Zach Wishart <zachwishart@gmail.com>, charterschool.applications@tn.gov <charterschool.applications@tn.gov>

**Cc:** Gary Dupler [Knox County] <gary.dupler@knoxcounty.org>
**Subject:** Re: Wilberforce Academy Letter of Intent

KCS | KNOX COUNTY SCHOOLS

Dear Charter Sponsor:

On November 25, 2025, Knox County Schools received your *Letter of Intent to Apply to Open a Tennessee Public Charter School* in accordance with T.C.A. §49-13-107(a). Based on the application provided by the Tennessee State Board, there are two items on the *Letter of Intent Form* (page 4) to which each sponsor is asked to respond, indicating Sponsor Eligibility (T.C.A. §49-13-104(16)). You indicated your 501(c)(3) status but left the other box (related to T.C.A. §49-6-3001(c)(3)(A)) unchecked. Therefore, at this time, your Letter of Intent is considered incomplete.

If you would like to update your Letter of Intent to indicate eligibility as a sponsor, we can accept a completed letter until December 3, 2025, at 11:59 PM CST (based on T.C.A. §49-13-107(a)). Please let us know if you have any questions.

School: *The Wilberforce Academy of Knoxville*

---

**From:** Zach Wishart <zachwishart@gmail.com>
**Date:** Tuesday, November 25, 2025 at 9:43 AM
**To:** Chartering Authority <charteringauthority@knoxschools.org>, charterschool.applications@tn.gov <charterschool.applications@tn.gov>
**Subject:** Wilberforce Academy Letter of Intent

**CAUTION:** External Email. This message originated from outside of the KCS e-mail system.

Knox County Schools & Tennessee Charter Commission,

Below is an attached Letter of Intent and Executive Summary for The Wilberforce Academy of Knoxville.

Thank you!

Zach Wishart
865-257-6105

---

**2 attachments**

**img-d9e76be6-d884-4ac6-b52d-9d772a348afd**
49K

**img-a2c43efa-8f02-424c-a645-f2b57c6b238e**
49K

# EXHIBIT 13

App.0407

Gmail

# Wilberforce Academy of Knoxville: Application

**Chartering Authority** <charteringauthority@knoxschools.org> Wed, Feb 4, 2026 at 5:05 PM
To: "zachwishart@gmail.com" <zachwishart@gmail.com>, "charterschool.applications@tn.gov" <charterschool.applications@tn.gov>

KCS | KNOX COUNTY SCHOOLS

Dear Charter Sponsor:

In accordance with T. C A. §49-13-107, a sponsor of a charter school should submit two components to the local authorizer: a letter of intent (60 days prior to when the application is due) and an application (on or before February 1). In addition to the electronic submission, Knox County Schools requests five paper copies and an application fee of $2,500.

For an application to be considered complete as defined in State Board of Education Rule 0520-14-01-.01, the authorizer must receive the letter of intent, the electronic submission of the application, and paper copies with fee by the specified due dates. While Knox County Schools did receive your letter of intent on November 25, 2025, we did not receive the application via our district's Chartering Authority email account by the deadline (February 2, 2026, at 11:59 pm CST). We also did not receive the application fee and paper copies either via mail or in-person delivery by our extended deadline (due to weather) of Wednesday, February 4 at 4:30 pm EST.

| Item | Deadline | Receipt |
|---|---|---|
| Letter of Intent | December 3, 2025 (11:59 pm CST) | November 25, 2025 |
| Application (electronic) | February 2, 2026 (11:59 pm CST) | Did not receive |
| Application (paper) and Fee | February 4, 2026 (4:30 pm EST) | Did not receive |

As we did not receive a completed application for Wilberforce Academy of Knoxville, Knox County Schools will be unable to review an application submission from you to open a charter school in the 2027-2028 school year. Please let us know if you have any questions.

School: **Wilberforce Academy of Knoxville**


WILB-ACAD-0865

img-7290f412-50a6-4917-9b31-cf13c83e6241
49K

---

**Zach Wishart** <zachwishart@gmail.com> Wed, Feb 4, 2026 at 5:06 PM
To: Cam Norris <cam@consovoymccarthy.com>, Ryan Proctor <ryan@consovoymccarthy.com>

img-7290f412-50a6-4917-9b31-cf13c83e6241
49K

# EXHIBIT 14

Department of the Treasury
Internal Revenue Service
Tax Exempt and Government Entities
IRS P.O. Box 2508
Cincinnati, 45201

Date:
04/01/2026
Taxpayer ID number:
41-2741642
Taxpayer or applicant name:
THE WILBERFORCE ACADEMY OF KNOXVILLE
Form or application number:
1023
Person to contact:
Name: Ms. Peterson-Tucker
ID number: 4305531
Telephone: 877-829-5500

WILLIAM D EDWARDS ESQ
1111 N NORTHSHORE DRIVE S-700
KNOXVILLE, TN 37919

Dear Representative:

We're sending the enclosed material to you because of a power of attorney or other authorization we have on file.

If you have questions, contact the person listed at the top of this letter.

Sincerely,

Stephen A. Martin

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

Enclosures:
Letter 947

Department of the Treasury
Internal Revenue Service
Tax Exempt and Government Entities
P.O. Box 2508
Cincinnati, OH 45201

THE WILBERFORCE ACADEMY OF KNOXVILLE
448 N CEDAR BLUFF RD 404
KNOXVILLE, TN 37923

**Date:**
04/01/2026
**Employer ID number:**
41-2741642
**Person to contact:**
Name: Ms. Peterson-Tucker
ID number: 4305531
Telephone: 877-829-5500
**Accounting period ending:**
November 30
**Public charity status:**
170(b)(1)(A)(ii)
**Form 990 / 990-EZ / 990-N required:**
Yes
**Effective date of exemption:**
November 21, 2025
**Contribution deductibility:**
Yes
**Addendum applies:**
No
**DLN:**
26053730006035

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax under Internal Revenue Code (IRC) Section 501(c)(3). Donors can deduct contributions they make to you under IRC Section 170. You're also qualified to receive tax deductible bequests, devises, transfers or gifts under Section 2055, 2106, or 2522. This letter could help resolve questions on your exempt status. Please keep it for your records.

Organizations exempt under IRC Section 501(c)(3) are further classified as either public charities or private foundations. We determined you're a public charity under the IRC Section listed at the top of this letter.

If we indicated at the top of this letter that you're required to file Form 990/990-EZ/990-N, our records show you're required to file an annual information return (Form 990 or Form 990-EZ) or electronic notice (Form 990-N, the e-Postcard). If you don't file a required return or notice for three consecutive years, your exempt status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the enclosed addendum is an integral part of this letter.

For important information about your responsibilities as a tax-exempt organization, go to www.irs.gov/charities. Enter "4221-PC" in the search bar to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, which describes your recordkeeping, reporting, and disclosure requirements.

We sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

Stephen A. Martin

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

# EXHIBIT 15

App.0414

WATE 6 On Your Side




# Christian group sues Knox Co. Board of Education, seeks to establish religious charter school

Matt Hollingsworth 4 months ago

POTENTIALLY GET THAT WINTRY

KNOXVILLE, Tenn. (WATE) — The Wilberforce Academy of Knoxville filed a lawsuit against the Knox County Board of Education alleging religious discrimination.

Wilberforce Academy is a private nonprofit organization that "is unapologetically Christian," the

App.0415

lawsuit said. It is trying to open a charter school in Cedar Bluff, but it claims it doesn't have a fair opportunity to do so because of state laws.

Up Next - Smokies baseball beginning second season in Knoxvi

AdChoices

US Marshals capture escaped Davidson County inmate in Knoxville

According to the lawsuit, Tennessee only lets "nonsectarian" and "nonreligious" schools participate in its charter-school program, excluding religious groups. The application form for the program requires sponsors to affirm that the schools will be nonreligious, the lawsuit said. Tennessee's website said that charter school sponsors cannot promote the agenda of a religious denomination.

The lawsuit argued that this violates the free exercise clause of the first amendment. It also alleged the provisions preventing the state from aiding "sectarian" institutions were originally made to discriminate against Catholic and Jewish organizations and are thus "born of bigotry." It also cited examples of the government funding denominational or church schools and recent Supreme Court decisions.


WILB-ACAD-0900

Next, the lawsuit argued that the provisions go against Tennessee's general support for religious schools, saying that the majority of scholarships through its School Choice program went to religiously affiliated schools. With Knox County growing, the lawsuit said that more schools are needed.




KCS BOE member Kristi Kristy responded to the lawsuit, saying in part that "Knox County Schools adheres to all applicable state and federal laws."

Some groups have criticized attempts by states to sponsor religious education saying it imposes beliefs on others.

## William Blount High School student accused of bringing gun to school

Stephen Triplett, a member of the KCS Board of Education said, "As a Christian, my hope is that more students in our community come to know Jesus as their Savior and Lord. That matters far more to me than anything else. I will always support the advancement of the Gospel. If the board takes a vote on this school I will recuse myself from voting due to personal ties to the school's founders, yet even still I will always support Christ in the public square."

One of the Wilberforce board members is a former chair of the Knox County Board of Education, and another is also a member at a different charter school, the lawsuit said. Its executive director

App.0417

is also a principal at an existing Christian school in the county.




"Wilberforce Academy aims to unite high-quality academics with a strong biblical foundation," the lawsuit said. "In particular, it seeks to restore the proven principles that shaped America's earliest and most successful schools: teacher-led, direct instruction; a culture of disciplined learning; and high expectations for every student. Above all, Christ serves as the cornerstone of Wilberforce Academy's mission, guiding the formation of students who are academically prepared, spiritually grounded, and equipped to lead lives of purpose."

The school said it plans to teach biblical literacy and catechisms, which are series of questions and answers designed to teach the major beliefs of a religion. Students would read scripture, pray, sing, and recite creeds and confessions each morning. However, the lawsuit emphasized that the school would be open to all, including non-Christians.

"No student will be required to affirm Christian doctrine or engage in Christian worship, or be penalized for failing to do so," it said.

The school also plans to inspire a commitment to public service in the style of its namesake William Wilberforce, a Christian leader who fought against slavery. Finally, it plans to teach entrepreneurship and business.



WILB-ACAD-0902

App.0418




The lawsuit asked the court to declare that policies preventing religious charter schools violate the First and Fourteenth Amendments and to prohibit the county's education board from enforcing these policies. It also asked for "actual and nominal damages" from the board as well as compensation for the costs and expenses of this lawsuit.

Another KCS Board of Education member, Lauren Morgan, said, "My personal understanding is that the underlying issue is rooted in state law, so if Wilberforce Academy is looking to change that, their time might be better spent engaging with our legislators."

## WATE Operation Honor Guard Day of Giving Fundraiser underway

The organization believes that Christian instruction and practice are an important part of education and that "a purely secular education is necessarily an inferior one." However, if Wilberforce Academy is denied the opportunity to open a religious charter school, it said it plans to apply to form a nonreligious charter school instead, adding that such a school "would still glorify God" but "in a lesser way."

The lawsuit said it anticipates having 100 K-1 students in its first year ultimately reaching 450 K-8 students.

6 News reached out to the other members of the Knox County Board of Education for comment but has not heard back at the time of writing.



WILB-ACAD-0903

Categories: Education and Schools, Knox County News, Local News, News, Top Stories

Tags: Knox County News, Knox County Schools Board of Education, Knoxville


## You May Like

Sponsored Links by Taboola

**She Mixed Gelatin With This - Now She Can't Stop Losing Weight**

USA Wellness Times

**Brain Fog Has Been Linked to This Everyday Food. Have You Eaten It Today?**

Silver Mind Research

Read More

**Don't Moisturize Crepe Skin! Tighten It With This Household Item Instead**

Skin Tightening

**Neuropathy Is Now Linked to a Common Habit — Do You Do It?**

nativebarksupply

Read More

**Walking shoes for elderly with poor balance**

Totria™ Orthopedic Shoes

Shop Now

**Costco Shoppers Say This $35 Find Is the "Facelift" in a Bottle**

Olavita

**WATE 6 On Your Side**

Back to top

Your Privacy Choices



# EXHIBIT 16

ACLU

PRESS RELEASES ›

# Oklahomans File Lawsuit to Stop State From Sponsoring Nation's First Religious Public Charter School

**Case**: Oklahoma Statewide Charter School Board v. Drummond
July 31, 2023 11:00 am

**Spokesperson**

**Daniel Mach ›**
Director
ACLU Program on Freedom of Religion and Belief

**Media Contact**

media@aclu.org
(212) 549-2666

125 Broad Street
18th Floor
New York, NY
10004
United States

OKLAHOMA CITY — Nine Oklahoma residents and a nonprofit organization dedicated to supporting public education in Oklahoma filed a lawsuit today in state court to stop Oklahoma from sponsoring and funding the nation's first religious public charter school, St. Isidore of Seville Catholic Virtual School. The plaintiffs are faith leaders, public school parents, and public education advocates who object to their tax dollars funding a public charter school that will discriminate against students and families based on their religion and LGBTQ+ status, fail to adequately serve students with disabilities, and indoctrinate students into one religion — all in violation of Oklahoma law and our country's promises of the separation of church and state and public schools that are open to all. (A link to a descriptive list of

App.0423

plaintiffs is available below.)

Americans United for Separation of Church and State, the American Civil Liberties Union (ACLU), Education Law Center and Freedom From Religion Foundation represent the plaintiffs in *OKPLAC, Inc. v. Statewide Virtual Charter School Board*. They are assisted by Oklahoma-based counsel Odom & Sparks PLLC and J. Douglas Mann.

The lawsuit demonstrates that the Oklahoma Statewide Virtual Charter School Board violated the Oklahoma Constitution, the Oklahoma Charter Schools Act, and the board's own regulations when it approved St. Isidore's application for charter-school sponsorship on June 5, 2023. Reasons that the application was unlawful include:

- St. Isidore plans to discriminate in its policies and practices based on religion, sexual orientation, gender identity, and other protected characteristics. Students could be denied admission, disciplined, or even expelled if they or their family members are LGBTQ+, a different religious faith, or do not otherwise conform to certain Catholic religious beliefs.
- St. Isidore reserves the right to discriminate against students on the basis of disability and failed to show that it would provide adequate services to students with disabilities.
- St. Isidore plans to provide a religious education and indoctrinate its students in Catholic religious beliefs. The school's application states that the school will "participate in the evangelizing mission of the [Catholic] Church" and will fully incorporate the Church's teachings "into every aspect of the School," including "all subjects" taught and all activities offered.
- The Archdiocese of Oklahoma City will have control over the school in violation of board regulations that require a charter school to be independent of its educational management organization.

The plaintiffs are asking the District Court of Oklahoma County to block (1) St. Isidore from operating as a charter school, (2) the charter school board from entering into or implementing any contracts with St. Isidore, and (3) the state from funding St. Isidore.

The plaintiffs in *OKPLAC, Inc. v. Statewide Virtual Charter*


WILB-ACAD-0912

App.0424

*School Board* include OKPLAC Inc. (Oklahoma Parent Legislative Action Committee), Melissa Abdo, Krystal Bonsall, Leslie Briggs, Brenda Lené, Michele Medley, Dr. Bruce Prescott, the Rev. Dr. Mitch Randall, the Rev. Dr. Lori Walke, and Erika Wright. (Detailed descriptions of the plaintiffs are available here.)

In response to today's filing, **Daniel Mach, director of the ACLU Program on Freedom of Religion and Belief**, said:

"The very idea of a religious public school is a constitutional oxymoron. Charter schools, like all public schools, must be open to all students, and they must be free from religious indoctrination. St. Isidore will be neither. The unprecedented decision to approve this religious charter school violates the separation of church and state and tramples the rights of Oklahoma taxpayers, students, and their families."

Additional quotes from the organizations sponsoring the lawsuit and the plaintiffs are available here.

Defendants in the lawsuit are the Statewide Virtual Charter School Board; its five members; the Oklahoma State Department of Education; State Superintendent of Public Instruction Ryan Walters; and St. Isidore of Seville Virtual Charter School, Inc.

The team of attorneys that represents the plaintiffs is led by Alex J. Luchenitser and Kenneth D. Upton, Jr. of Americans United and includes Kalli A. Joslin of Americans United; Daniel Mach and Heather L. Weaver of the ACLU; Robert Kim, Jessica Levin, and Wendy Lecker of the Education Law Center; Patrick Elliott of FFRF; Benjamin H. Odom, John H. Sparks, Michael W. Ridgeway, and Lisa M. Millington of Odom & Sparks; and J. Douglas Mann.

**Resources:**

- Media kit that includes photos and descriptions of the plaintiffs.


WILB-ACAD-0913



U.S. Supreme Court Jul 2025

**Religious Liberty**

## Oklahoma Statewide Charter...

Nine Oklahoma residents and a nonprofit...

**Status:** Closed...

**Explore case**

U.S. Supreme Court Jul 2025



**Religious Liberty**

## Oklahoma Statewide Charter School Board v. Drummond

Nine Oklahoma residents and a nonprofit organization dedicated to supporting public education in Oklahoma filed a lawsuit in July 2023 in state court to stop Oklahoma from sponsoring and funding the nation's first religious public charter school, St. Isidore of Seville Catholic Virtual School. The plaintiffs are faith leaders, public school parents, and public education advocates who object to their tax dollars funding a public charter school that will discriminate against students and families based on their religion and LGBTQ+ status, fail to adequately serve students with disabilities, and indoctrinate students into one religion — all in violation of Oklahoma law and our country's promises of the separation of church and state and public schools that are open to all.

**Status:** Closed (Judgment)

**Next press release about this case**

## Statement on Contract Approval for

App.0426

**Oklahoma's St. Isidore of Seville Catholic Virtual School**

October 9, 2023 3:45 pm

## Learn More About the Issues in This Press Release

**Religious Liberty** **Religion and Public Schools**

**Government Funding of Religion**

**Government Promotion of Religion**

## Related Content

Press Release Apr 2026



**Religious Liberty**

### Oklahoma families, teachers, and clergy seek to block unconstitutional religious public school

OKLAHOMA CITY, Okla. — In support of church-state separation and public education, a predominantly Jewish group of seven Oklahoma taxpayers – including families with children attending public schools, teachers and clergy – filed a motion today in federal court seeking to intervene in a lawsuit brought by the National Ben Gamla Jewish Charter School Foundation. This religious organization is trying to open the nation's first religious public charter school in Oklahoma – a clear violation of state and federal law that defines charter schools as public schools that must be secular and open to all students. Like all public schools, charter schools cannot lawfully indoctrinate religion or discriminate. But Ben Gamla's charter school application makes clear that Jewish religious teachings will be integrated into "every


WILB-ACAD-0915

App.0427

dimension of . . . life" at the school, including classroom instruction and other activities. Additionally, Ben Gamla's application indicates that the school plans to exclude students and staff who do not share its faith. Ben Gamla's application states that "[a]dmission assumes the student and family willingness to adhere with respect to the beliefs, expectations, policies, and procedures of the school." Because the school would promote the beliefs of a specific religion, students and families outside that faith would effectively be excluded on the taxpayer's dime. And Ben Gamla's application further states that the school may base employment decisions on religion. The public school families are seeking to join the lawsuit, The National Ben Gamla Jewish Charter School Foundation, Inc. v. Drummond, to oppose Ben Gamla's effort to force Oklahoma to authorize and fund an unconstitutional religious public charter school. They object to their tax dollars funding a public charter school that will indoctrinate students into a particular religion, in violation of Oklahoma and federal law and our nation's longstanding commitment to the separation of church and state. They also object to public funds being diverted from their nonreligious and inclusive public schools – which already face serious resource limitations – to a religious school that plans to discriminate based on religion. These taxpayers are asking the U.S. District Court for the Western District of Oklahoma to allow them to participate in the case in order to safeguard their interests in public education, religious freedom and church-state separation. "Public education is a foundation of our pluralistic society, and it is worth protecting," said proposed intervenor Rabbi Dan Kaiman, Principal Rabbi of Congregation B'nai Emunah in Tulsa, Okla., and the parent of two public school students. "I care deeply about Jewish education, but our community does not need or want the government's help to pass our values on to our children. The separation of church and state is what protects every faith community, including my own." "My family is Jewish. We know firsthand that people of all faiths are best served when public schools don't impose one idea of religion over others," said Kara Joy McKee, another proposed intervenor and parent of a public school student. "A religious public charter school would undermine religious freedom and drain tax dollars from schools that are welcoming to students of all faiths, families, and backgrounds." The proposed intervenors are represented by Americans United for Separation of Church and State, the Oklahoma Appleseed Center for Law and Justice, Education Law Center, the American Civil Liberties Union, and Freedom From Religion Foundation. Many of these organizations represented Oklahomans who challenged the first attempt to establish a religious charter school in their state, which the Oklahoma Supreme Court declared unconstitutional two years ago. "Our clients are seeking to vindicate the age-old, basic constitutional principle that religious schools can't be public schools, and public schools can't be religious," said Daniel Mach, Director of the ACLU Program on Freedom of Religion and Belief. "That vital protection, guaranteed by both Oklahoma and federal law, helps ensure that public education remains available to all students, free from religious pressure or discrimination." "The courts, Oklahoma public school families and taxpayers, and Jewish leaders in the state all have rejected the creation of the nation's first religious public school," said Americans United President and CEO Rachel Laser. "We're proud to represent Oklahomans who won't let a religious organization backed by Christian Nationalists strong-arm the people of Oklahoma into violating the Constitution's promises of religious freedom and church-state separation." "Oklahoma kids and families deserve public schools that embrace everyone," noted Oklahoma Appleseed Interim Executive Director Brent Rowland. "That includes respecting the religious freedom of every child and family rather than imposing a


WILB-ACAD-0916

App.0428

government-supported religious viewpoint on students, regardless of what the viewpoint is. We're grateful for partners and for Oklahomans who steadfastly insist on religious freedom within every public school — whether neighborhood or charter — and stand against diversion of public school resources to establish religious schools." "There is a concerted effort underway to demolish the church-state separation and antidiscrimination guarantees that are crucial parts of this nation's public school system," said Jessica Levin, Litigation Director at Education Law Center. "The Oklahoma Supreme Court has declared religious charter schools unconstitutional, but just two years later we must defend against them once more. We will never stop fighting to protect and strengthen the public education opportunities that are the bedrock of our democracy." "We're honored to be part of this pushback against religious imposition," said Freedom From Religion Foundation Co-President Annie Laurie Gaylor. "The public school system must remain secular — and we'll do our utmost to ensure that." Ben Gamla's lawsuit was filed less than two weeks after Oklahoma Attorney General Gentner Drummond filed a lawsuit in state court arguing that the Oklahoma Statewide Charter School Board intentionally and improperly manipulated the administrative record of its denial of Ben Gamla's application in a manner designed to aid Ben Gamla's litigation position. Concern about statements by a majority of the board's members expressing disagreement with state law prohibiting religious public charter schools is one reason that the proposed intervenors are seeking to participate in Ben Gamla's lawsuit. Americans United Associate Vice President and Associate Legal Director Alex J. Luchenitser is the lead attorney for the proposed intervenors, representing them together with AU Constitutional Litigation Fellow Luke Anderson; Brent Rowland and Morgan Bandy of Oklahoma Appleseed Center for Law and Justice; Dan Mach and Heather L. Weaver of the ACLU; Jessica Levin, Wendy Lecker, Patrick Cremin, and Katrina Reichert of Education Law Center; and Nancy A. Noet and Samuel T. Grover of Freedom From Religion Foundation. A link to the filing can be found here: https://assets.aclu.org/live/uploads/2026/04/Ben-Gamla-Intervention-Filing.pdf

Press Release Mar 2026



**Religious Liberty**

## Court Permanently Blocks Arkansas Law Requiring Ten Commandments in Every Public School Classroom and Library


WILB-ACAD-0917

App.0429

FAYETTEVILLE, Ark. – In a victory for religious freedom and church-state separation, a federal district court issued a permanent injunction today in Stinson v. Fayetteville School District No. 1, prohibiting the school district defendants from implementing an Arkansas law that requires all public schools to permanently display a government-chosen, Protestant version of the Ten Commandments in every classroom and library. In his decision U.S. District Court Judge Timothy Brooks wrote, "Act 573 must be permanently enjoined. Failing to do so would violate the Establishment Clause rights of all Arkansas public-school children and their parents and also violate Plaintiffs' Free Exercise rights." Ruling that the law would lead to unconstitutional religious coercion of the child plaintiffs and interfere with their parents' rights to direct their children's religious education, Brooks explained: "Act 573's purpose is only to display a sacred, religious text in a prominent place in every public-school classroom. And the only reason to display a sacred, religious text in every classroom is to proselytize to children. The State has said the quiet part out loud." Brooks added: "Nothing could possibly justify hanging the Ten Commandments—with or without historical context—in a calculus, chemistry, French, or woodworking class, to name a few. And the words 'curriculum,' 'school board,' 'teacher,' or 'educate' don't appear anywhere in Act 573. Accordingly, there is no need to strain our minds to imagine a constitutional display mandated by Act 573. One doesn't exist." "Act 573 is a direct infringement of our religious-freedom rights, and we're pleased that the court ruled in our favor," said Samantha Stinson, who is a plaintiff in the case along with her husband, Jonathan Stinson. "The version of the Ten Commandments mandated by Act 573 conflicts with our family's Jewish tenets and practice, and our belief that our children should receive their religious instruction at home and within our faith community, not from government officials." "Today's ruling is a resounding affirmation that public schools are not Sunday schools. The Constitution protects every student's right to learn free from government-imposed religious doctrine," said John C. Williams, legal director for ACLU of Arkansas. "Arkansas lawmakers cannot sidestep the First Amendment by mandating that a particular version of the Ten Commandments be displayed in every classroom. As the court recognized, this law served no educational purpose and instead placed the authority of the state behind a specific religious message. We're grateful that the court has permanently blocked this unconstitutional law and protected the religious freedom of Arkansas students and families of all faiths and none." "Today's decision ensures that our clients' classrooms will remain spaces where all students, regardless of their faith, feel welcomed and can learn without worrying that they do not live up to the state's preferred religious beliefs," said Heather L. Weaver, senior counsel for the ACLU's Program on Freedom of Religion and Belief. "Today's decision honors the Constitution's promise of church-state separation and religious freedom," said Rachel Laser, president and CEO of Americans United for Separation of Church and State. "It will ensure that Arkansas families – not politicians or public-school officials – get to decide how and when their children engage with religion." "We are delighted that reason and our secular Constitution have prevailed, and that children will be spared this unconstitutional proselytizing," said Annie Laurie Gaylor, co-president of the Freedom From Religion Foundation. "Our public schools exist to educate, not to evangelize a captive audience." "Today's thoughtful decision reinforces a bedrock principle of our constitutional system: the government may not compel adherence to any religious doctrine," said Jon Youngwood, co-chair of Simpson Thacher's Litigation Department. "This ruling is a critical affirmation of the First Amendment rights of students and families to decide for themselves whether—and in what ways—they engage with religion." The injunction, issued by the U.S.


WILB-ACAD-0918

App.0430

District Court for the Western District of Arkansas, permanently prohibits the school-district defendants, including Bentonville School District No. 6, Conway School District, Fayetteville School District No. 1, Lakeside School District No. 9, Siloam Springs School Dist. No. 21, and Springdale School District No. 50, from "complying with Act 573." Last year, the court issued a preliminary injunction temporarily barring the school district defendants from displaying the Ten Commandments in classrooms and libraries. Represented by the American Civil Liberties Union of Arkansas, the ACLU, Americans United for Separation of Church and State, and the Freedom from Religion Foundation, with Simpson Thacher & Bartlett LLP serving as pro bono counsel, the plaintiffs in Stinson v. Fayetteville School District No. 1 are a group of 10 multifaith and nonreligious Arkansas families with children in public schools.

**Affiliate:** Arkansas


WILB-ACAD-0919

App.0431

Press Release Feb 2026



Religious Liberty

## Fifth Circuit: Too Soon to Rule on Constitutionality of Louisiana Law Requiring Public Schools to Display Ten Commandments

NEW ORLEANS – The Fifth U.S. Circuit Court of Appeals ruled today that it is premature to determine the constitutionality of House Bill 71, a Louisiana law requiring public schools to permanently display a government-approved, Protestant version of the Ten Commandments in every classroom. The decision vacates a federal district court's November 2024 preliminary injunction in Rev. Roake v. Brumley, which prevented the defendant state officials and school boards from implementing the law. In its ruling, the appeals court held that the Roake lawsuit was premature because the scriptural displays had not yet been posted in the children plaintiffs' classrooms, so it "cannot yet know . . . how the text will be used." The court acknowledged, however, that "nothing in today's narrow holding prevents future as-applied challenges once the statute is implemented and a concrete factual record exists." Represented by the ACLU, ACLU of Louisiana, Americans United for Separation of Church and State, and the Freedom From Religion Foundation, with Simpson Thacher & Bartlett LLP serving as pro bono counsel, the plaintiffs in Roake v. Brumley are a multifaith group of nine Louisiana families with children in public schools. The organizations representing the plaintiffs issued the following statement in response to the decision: "Today's ruling is extremely disappointing and would unnecessarily force Louisiana's public school families into a game of constitutional whack-a-mole in every school district. Longstanding judicial precedent makes clear that our clients need not submit to the very harms they are seeking to prevent before taking legal action to protect their rights. But this fight isn't over. We will continue fighting for the religious freedom of Louisiana's families." The appeals court's opinion today does not address the lawsuit Rabbi Nathan v. Alamo Heights Independent School District that challenges a similar law in Texas, Senate Bill 10. The court, sitting en banc, heard oral arguments in both cases on Jan. 20. Plaintiffs' legal counsel is exploring all legal pathways forward to continue the fight against this unconstitutional law. A copy of the ruling can be found here: https://assets.aclu.org/live/uploads/2026/02/Roake-Fifth-Circuit-en-banc-decision.pdf

**Court Case:** Rev. Roake v. Brumley
**Affiliate:** Louisiana


WILB-ACAD-0920

Press Release Feb 2026



Religious Liberty

## Civil Rights Groups Urge Oklahoma Officials to Reject Application for Ben Gamla Religious Public Charter School

OKLAHOMA CITY — A coalition of civil rights organizations today urged the Oklahoma Statewide Charter School Board to reject Ben Gamla Jewish Charter School's application to form the nation's first religious public charter school, which would be a flagrant violation of Oklahomans' religious freedom and the constitutional promise of church-state separation, as well as Oklahoma's guarantee that public schools be open to all. In a letter to the board, the coalition explained the many ways Ben Gamla's proposed school would violate state and federal law by indoctrinating students in a specific religion and discriminating against students, staff, and, potentially, parents. The groups also pointed to substantial deficiencies in required elements throughout the application. The letter was authored by Americans United for Separation of Church and State, the American Civil Liberties Union, Education Law Center, Freedom From Religion Foundation and Oklahoma Appleseed Center for Law and Justice. Most of these organizations represented Oklahoma public school advocates, parents, and faith leaders in a 2023 lawsuit to block Oklahoma from creating and funding St. Isidore of Seville Catholic Virtual School, a proposed religious public charter school that was ruled unconstitutional by the Oklahoma Supreme Court in 2024, a decision the U.S. Supreme Court let stand in 2025. In today's letter, the groups detail how Ben Gamla's proposal would similarly violate the U.S. Constitution, the Oklahoma Constitution, the Oklahoma Charter Schools Act and the board's own regulations, which make clear that charter schools are public schools that must be secular and open to all students and cannot use religion as a license to discriminate in admissions or employment. "Establishing the nation's first religious public school would be a dangerous sea change for American democracy," said Rachel Laser, president and CEO of Americans United. "We urge the board to protect public education and the religious freedom of Oklahoma taxpayers and students by rejecting Ben Gamla's application. Public schools aren't and should never be religious schools." "The very idea of a religious public school is a constitutional oxymoron," said Daniel Mach, director of the ACLU Program on Freedom of Religion and Belief. "We hope the board rejects this application and safeguards the religious liberty of Oklahoma students, families, and taxpayers." "Although the Oklahoma

Supreme Court has already made crystal clear that a religious charter school would violate the law, we are again faced with the need to oppose the establishment and public funding of such a school in the state," said Jessica Levin, litigation director at Education Law Center. "We are proud to stand with a large and diverse group of people in Oklahoma and across the country who will fight to maintain a secular public education system that is open to all and rejects discrimination of any kind." "Public charter schools are public schools, and public schools must be secular," said Annie Laurie Gaylor, co-president of the Freedom From Religion Foundation. "Allowing a religious charter school would open the door to government-funded religious indoctrination and discrimination, undermining the religious freedom of students, families and taxpayers alike. Oklahoma has already seen where this road leads, and there is no lawful basis to repeat that mistake." "Public dollars should strengthen public schools that welcome every child, not be diverted to religious institutions that exclude or indoctrinate," said Brent Rowland, interim executive director and legal director at Oklahoma Appleseed. "The Constitution's separation of church and state protects both religious freedom and public education. When the state funds a religious charter school, it violates that promise and drains scarce resources from the neighborhood public schools that most Oklahoma families rely on. At a moment when our communities are desperate for meaningful investment in public education, Oklahoma officials should reject this application and uphold the constitutional guardrails that serve all students." Attorneys authoring the letter include Alex J. Luchenitser and Luke Anderson at Americans United; Daniel Mach at the ACLU; Jessica Levin, Wendy Lecker, Patrick Cremin and Katrina Reichert at ELC; Samuel T. Grover and Kyle J. Steinberg at FFRF; and Brent L. Rowland and Morgan Bandy at Oklahoma Appleseed.

ACLU

© 2026 American Civil Liberties Union

# EXHIBIT 17

Board members present: Doug Harris, David Colquitt, Parker Bartholomew, Laura Beaman

Others present: Zach Wishart, Cam Norris, Ryan Proctor

**Agenda**

*Opening Prayer* by Zach Wishart

*Financials Update* by Treasurer, David Colquitt

Notes: David reports that the Wilberforce account has $4,282.25 with no outstanding obligations.

*Litigation Update*

Notes: Wilberforce attorneys provided an update on litigation and board members were provided time to ask questions.

*Select officers for 2026-2028 term*

Notes: Initial officers were voted into full term upon recommendation of the Executive Director. Doug Harris will continue as chair, David Colquitt and Treasurer and Parker Bartholomew as Secretary.

*Discussion and possible action on litigation*

Notes: Two motions were made and approved during discussion. The first motion is for a continuance of litigation with continued intent to apply for a charter school. Motion to affirm intent to open a religious charter school by David Colquitt and received a second. All members voted in the affirmative.

Discussion occurred around applying for a secular charter school, with Wilberforce as the Christian organization sponsor should the court rule this is the only path forward. After discussion, a motion to affirm intent to open a secular charter school sponsored by our organization should the court not allow the court to be explicitly Christian was made by David Colquitt and seconded. All board members voted in the affirmative.

*Meeting adjourned*

# EXHIBIT 18

Board members present: Doug Harris, David Colquitt, Parker Bartholomew, Laura Beaman

Others present: Zach Wishart

**Agenda**

*Opening Prayer* by Doug Harris

*Meeting Notice* by David Colquitt

Notes: All directors are present and no objections to holding the meeting today. The board unanimously deemed the meeting to be properly notified. Motion made by Mr. Colquitt, second by Mr. Bartholomew. All members voted in favor.

*Board Resolution* by Doug Harris

Notes: Mr. Harris reviewed each of the five points of the resolution . During point 3, it was noted that the letter of intent is part of the application. While reviewing point 4 of the resolution, Mr. Wishart highlighted that some small changes were made to the secular application to remove additional religious references. After reviewing the resolution, Mr. Harris opened the floor for questions. No questions were asked. Motion by Mr. Colquitt to approve the Wilberforce Ratification Resolution. Second by Mr. Bartholomew. All members voted in favor of the resolution.

*Treasury Report* by David Colquitt

Notes: Mr. Colquitt, treasurer, reported that the account balance is $4,282.25. There are no outstanding obligations. Mr. Colquitt reported that an accounting firm will be needed for Wilberforce's taxes. Mr. Bartholomew made a motion that an accounting firm be hired for Wilberforce's taxes with Mr. Colquitt and/or Mr. Wishart selecting a firm. Second by Mrs. Beaman. All members voted in favor.

*Meeting adjourned*

# EXHIBIT 19

**THE WILBERFORCE ACADEMY OF KNOXVILLE**
**RESOLUTION OF THE BOARD OF DIRECTORS**

The following resolution was duly adopted by the Board of Directors of The Wilberforce Academy of Knoxville, a Tennessee nonprofit public benefit corporation ("Wilberforce Academy"), at a meeting of the Board held on the date set forth below, a quorum being present and acting throughout.

**WHEREAS**, the affairs of Wilberforce Academy are managed by its Board of Directors pursuant to Section 10 of the Wilberforce Academy's Charter of Incorporation and the Wilberforce Academy's Bylaws;

**WHEREAS**, the Board appointed Zachary Wishart as Executive Director of Wilberforce Academy and delegated to him authority to act on behalf of Wilberforce Academy, including authority with respect to the preparation of charter school applications, the submission or non-submission thereof, and decisions concerning Wilberforce Academy's litigation;

**WHEREAS**, it is, and has at all relevant times been, the view of the Board that the Executive Director possessed full authority to take each of the actions described below at the time each such action was taken, and that no such action required prior or further approval by the Board;

**WHEREAS**, the authority of the Executive Director to take such actions has unjustifiably been called into question by some parties in litigation;

**WHEREAS**, the Board therefore wishes to act, out of an abundance of caution and to remove any and all doubt as to the authority underlying such actions, to confirm, approve, and ratify each of them, without thereby conceding that any such confirmation, approval, or ratification was necessary;

**WHEREAS**, the Board has reviewed and considered each of the actions described below and finds each to have been taken in furtherance of, and to be consistent with, the purposes and best interests of Wilberforce Academy;

**NOW, THEREFORE, BE IT RESOLVED**, that each of the following actions taken on behalf of Wilberforce Academy be, and hereby is, in all respects confirmed, approved, ratified, and adopted as the act of Wilberforce Academy, effective as of the date each such action was originally taken:

1. **Engagement of Litigation Counsel.** The engagement of Consovoy McCarthy PLLC as litigation counsel to represent Wilberforce Academy in connection with the matters described herein;

2. **Commencement of Litigation.** The filing and prosecution of the action styled *The Wilberforce Academy of Knoxville v. Knox County Board of Education, et al.*, No. 3:25-cv-00584-CEA-DCP, in the United States District Court for the Eastern District of Tennessee;

3. **Religious Charter Application.** The preparation of Wilberforce Academy's application to sponsor and operate a Christian charter school, attached hereto as Exhibit A;

4. **Alternative Secular Charter Application.** The preparation, in the alternative, of an application to sponsor and operate a secular charter school, to be pursued in the event Wilberforce Academy is unable to obtain relief permitting it to operate a Christian charter school, attached hereto as Exhibit B; and

5. **Decision Not to Submit Application.** The decision not to submit a charter school application by the February 1, 2026 deadline, the Board having determined that submission would be futile under Tennessee law and Knox County policy.

**FURTHER RESOLVED**, that nothing in these resolutions shall be construed as an admission or concession that any of the foregoing actions exceeded the authority of the Executive Director or required Board approval, the Board reaffirming its view that the Executive Director was at all times authorized to take each such action;

**FURTHER RESOLVED**, that in the event Wilberforce Academy is unable to obtain relief permitting it to operate a Christian charter school and elects to pursue an application to sponsor and operate a secular charter school, the Board will adopt any amendments to Wilberforce Academy's Charter of Incorporation and Bylaws as are necessary to apply for and operate such a school, without thereby conceding that any such amendment is in fact necessary;

**FURTHER RESOLVED**, that the officers and Executive Director of Wilberforce Academy be, and each hereby is, authorized and directed to take all such further actions and to execute and deliver all such further documents as they may deem necessary or appropriate to carry out the purposes of the foregoing resolutions; and

**FURTHER RESOLVED**, that all actions previously taken by the officers, directors, Executive Director, or agents of Wilberforce Academy in connection with the matters described in these resolutions be, and they hereby are, confirmed, approved, and ratified in all respects.

**ADOPTED** this 23rd day of June, 2026.

# EXHIBIT 20

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

THE WILBERFORCE ACADEMY OF KNOXVILLE, §
§ NO. 3:25-CV-584-CEA-CCP
PLAINTIFF, §
§
V. §
§
KNOX COUNTY BOARD OF EDUCATION, ET AL., §
§
DEFENDANTS, §
§
RICHARD COBLE, ET AL., §
§
INTERVENOR-DEFENDANTS, §
§
ADRIENNE CARROLL, ET AL., §
§
INTERVENOR-DEFENDANTS. §

REMOTE DEPOSITION OF DAVID DENTON
JULY 6, 2026

REMOTE DEPOSITION OF DAVID DENTON, produced as a witness at the instance of the Intervenor-Defendants and duly sworn, was taken in the above styled and numbered cause on Monday, July 6, 2026, from 9:02 a.m. to 3:10 p.m., before TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of Texas, reported remotely by computerized stenotype machine in Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record herein.

Job No. J15114029



A P P E A R A N C E S

FOR THE PLAINTIFF:
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
703-243-9423
cam@consovoymccarthy.com

FOR THE DEFENDANTS:
David M. Sanders
KNOX COUNTY LAW DIRECTOR'S OFFICE
400 Main Street, Suite 612
Knoxville, Tennessee 37902
865-215-2327
david.sanders@knoxcounty.org

FOR ARCADIA AND THE WITNESS:
Andrew Gould
George Gould
HOLTZMAN VOGEL
2555 East Camelback Road, Suite 700
Phoenix, Arizona 85016
602-388-1262
agould@holtzmanvogel.com
ggould@holtzmanvogel.com

FOR THE INTERVENOR-DEFENDANTS ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, AND HOLLY SLATER:
David D. Ayliffe
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ P.C.
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
865-549-7000
dayliffe@bakerdonelson.com



A P P E A R A N C E S

FOR THE INTERVENOR-DEFENDANTS RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, AND KATINA SHARP:
Wanqian Zhang
MORRISON FOERSTER LLP
425 Market Street
San Francisco, California 94105
415-718-9737
wzhang@mofo.com

Adam J. Hunt
MORRISON FOERSTER LLP
250 West 55th Street
New York, New York 10019
212-468-7900
adamhunt@mofo.com

Jon J. McNeal
MORRISON FOERSTER LLP
12531 Bluff High Drive, Suite 200
San Diego, California 92130
858-720-5100
jmcneal@mofo.com

Mitchell E. Feldman
MORRISON FOERSTER LLP
John Hancock Tower
200 Clarendon Street, Floor 21
Boston, Massachusetts 02116
617-648-4750
mfeldman@mofo.com

ALSO PRESENT:
Alex Bigman, summer associate, Morrison & Foerster
Feiyang Peng, summer associate, Morrison & Foerster
Lisa Charette, paralegal, Holtzman Vogel



I N D E X


| | PAGE |
|---|---|
| DAVID DENTON | |
| EXAMINATION | |
| BY MS. ZHANG | 8 |
| BY MR. NORRIS | 133 |
| BY MR. SANDERS | 139 |
| BY MR. SANDERS | 155 |
| BY MR. GOULD | 160 |
| CORRECTION PAGE | 171 |
| SIGNATURE PAGE | 172 |
| REPORTER'S CERTIFICATION | 173 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | LinkedIn profile of David Denton (No Bates - 3 pages) | 11 |
| Exhibit 2 | 2023-24 Public Charter Schools Annual Report, from Tennessee Department of Education (No Bates - 38 pages) | 22 |
| Exhibit 3 | Letter from David Denton to Zach Wishart dated 11/20/2025 (ARCADIA000298 - ARCADIA000321) | 25 |
| Exhibit 4 | Email chain ending with an email from Joy Lambrecht to David Denton, Mary Kathryn Boucher, Amy Frank, Joshua Trevino, and others, dated 1/29/2026, Subject "Wilberforce Project Completion," with attachments "Charter School Application -- Wilberforce Academy of Knoxville.pdf" (ARCADIA000398 - ARCADIA000526) | 38 |

E X H I B I T S (CONTINUED)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 5 | Email chain ending with an email from Joy Lambrecht to Zach Wishart, dated 1/23/2026, Subject "Re: Wilberforce Insurance Letter" (ARCADIA000328 - ARCADIA000397) | 40 |
| Exhibit 6 | Team lead meeting notes (1/15/2026) (ARCADIA000763 - ARCADIA000780) | 54 |
| Exhibit 7 | Email from David Denton to Ben Lindquist, Mary Kathryn Boucher, Joy Lambrecht, and others, dated 12/1/2025, Subject "FW: The Wilberforce Academy of Knoxville," with attachments "Wilberforce LOI & Executive Summary.pdf," "Bylaws.2025.docx.pdf," "Wilberforce Purpose & Mission.pdf," "Wilberforce copy.pdf," "Nondisclosure Agreement.pdf" (ARCADIA000606 - ARCADIA000717) | 70 |
| Exhibit 8 | LinkedIn profile of David Denton (No Bates - 3 pages) | 81 |
| Exhibit 9 | Application Cover Sheet titled "Educational Program Design And Capacity" from The Wilberforce Academy Of Knoxville, dated 6/9/2026 (ARCADIA002964 - ARCADIA003214) | 81 |
| Exhibit 10 | Team lead meeting notes (1/15/2026) (ARCADIA000763 - ARCADIA000780) | 83 |



E X H I B I T S (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Email chain ending with an email from Joy Lambrecht to Zach Wishart, dated 1/23/2026, Subject "Re: Wilberforce Insurance Letter" (ARCADIA000328 - ARCADIA000397) | 85 |
| Exhibit 12 | Email from David Denton to Ben Lindquist, Mary Kathryn Boucher, Joy Lambrecht, and others, dated 12/1/2025, Subject "FW: The Wilberforce Academy of Knoxville," with attachments "Wilberforce LOI & Executive Summary.pdf," "Bylaws.2025.docx.pdf," "Wilberforce Purpose & Mission.pdf," "Wilberforce copy.pdf," "Nondisclosure Agreement.pdf" (ARCADIA000606 - ARCADIA000717) | 87 |
| Exhibit 13 | Email chain ending with an email from Joy Lambrecht to David Denton, Mary Kathryn Boucher, Amy Frank, Joshua Trevino, and others, dated 1/29/2026, Subject "Wilberforce Project Completion," with attachments "Charter School Application -- Wilberforce Academy of Knoxville.pdf" (ARCADIA000398 - ARCADIA000526) | 88 |
| Exhibit 14 | Email from David Denton to Zachary Wishart, dated 4/30/2026, Subject "RE: Rescheduling" (ARCADIA000718 - ARCADIA000762 | 101 |
| Exhibit 15 | Letter of Intent to Apply to Open a Tennessee Public Charter School for The Wilberforce Academy of Knoxville, dated 8/2025 (ARCADIA002232 - ARCADIA002237) | 125 |
| Exhibit 16 | Email chain ending with an email from Zach Wishart to Cam and Ryan Proctor, dated 12/5/2025, Subject "Fwd: Wilberforce Academy Letter of Intent" (No Bates - 3 pages) | 128 |



MR. GOULD: Andy Gould, counsel for Arcadia and Mr. Denton.

MR. G. GOULD: George Gould, Holtzman Vogel, also representing Arcadia and Mr. Denton.

MR. NORRIS: Cameron Norris, Consovoy McCarthy for the plaintiff.

MR. SANDERS: David Sanders. I am with the Law Director's Office. I am here on behalf of Knox County Board of Education.

MS. ZHANG: Hi, I'm Wan Zhang. I'm at Morrison Foerster. I am counsel for Coble Intervenors.

(Discussion off the record.)

MR. HUNT: Good morning. This is Adam Hunt from Morrison & Foerster, counsel for the Coble Intervenors. And one of our summer associates, Alexander Bigman, is joining us as well this morning.

MR. AYLIFFE: And this is David Ayliffe with Baker Donelson, representing the Carroll Intervenors.

MS. PENG: One more summer associate from Morrison & Foerster. I am Feiyang.

MR. GOULD: Oh, Feiyang. I didn't see you on the Zoom. All the way on the far side of



the screen. Okay.

DAVID DENTON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. ZHANG:

Q. Thank you, Mr. Denton. We're officially on record.

Could you please state your name for the record.

A. David Denton.

Q. Do you understand you're under oath?

A. Yes, ma'am.

Q. Do you understand this is the same oath you would take in court?

A. Yes.

Q. Do you understand your testimony could be used at a trial in this matter?

A. Yes.

Q. Please listen to my question and answer them to the best of your ability. If you don't understand, ask me to clarify. If you understand, I will assume -- if you answer I will assume you understand. Is that fair?

A. Yes.

Q. The court reporter, Tamara, is taking

Page 133

MR. GOULD: Foundation and form.
A. Forgive me. I was blowing my nose. Could you -- could you say that one more time?
Q. Is there any category of Arcadia documents concerning Wilberforce that you believe still exist but has not been produced?
MR. GOULD: Objection, form.
A. I don't believe so, no.
Q. Thank you.
MS. ZHANG: No further questions.
MR. NORRIS: I don't know if other defendants or intervenor-defendants have questions, but plaintiff does.
So I would propose that we just go in order of plaintiff, defendant, intervenors.
MR. AYLIFFE: I don't have any, so by all means.
MR. NORRIS: Does that sound good to you, David Sanders.
MR. SANDERS: Yeah, go ahead.
If I have any questions, I'll follow up.
MR. NORRIS: Okay.
EXAMINATION
BY MR. NORRIS:

Page 134

Q. All right. Good afternoon Eastern time. I'm Cam Norris. I'm one of the attorneys for plaintiff Wilberforce Academy. How are you?
A. I'm doing well. Thank you, sir.
Q. Thanks for being here. I hope lunch was good. Thanks for taking the time today.
I just have a few questions for you. This shouldn't take too long. My first one is: In your own words, why should someone who wants to open a charter school in Tennessee hire Arcadia to help draft its application?
A. Well, our team has --
MS. ZHANG: Objection; form.
A. -- our team has pretty deep experience in operating charter schools, also in -- we -- also, of course, in the Christian school space.
The -- we also have two people on our team who have done several charter applications before. And so we -- and just putting a team together, that we had a -- we had a strong team for the -- I think for the project.
Q. Are you proud of the work that you did with Wilberforce?
A. I am.
MS. ZHANG: Objection; form.

Page 135

THE WITNESS: Apologies. I'm sorry, Counsel. I didn't mean to talk over you.
MS. ZHANG: No worries.
A. The -- yes, I was very proud of the work we produced. We wanted to, you know, write one that we would feel good about -- you know, if it -- if it launched, that we would feel really good about that school existing.
Q. Is it fair to say that Arcadia put substantial work into Wilberforce's application?
A. Yes. Yes. Equivalent to --
MS. ZHANG: Objection; leading.
Sorry. Sorry. Could you give me time to put in my objection before you talk. Thank you.
THE WITNESS: Yes, forgive me. I apologize, Counsel.
Q. In light of the objection, how much did Arcadia put in, into Wilberforce's application?
A. I believe 1,200 hours between all of the -- everybody on the team, which would've been equivalent to -- you know, had it been on even a longer timeline, that would have been an equivalent number of hours. It really on the -- it was, you know, probably on the high end for getting it all done.

Page 136

Q. Did Mr. Wishart put in a substantial amount of work into the application?
MS. ZHANG: Objection; form.
A. Yes, I believe so. He was running a school at the same time, but it was, you know, meetings, reading drafts, giving feedback. He pulled his weight.
Q. In all of your interactions with Mr. Wishart did you ever get the impression that he's passionate about education?
A. Yes.
MS. ZHANG: Objection; form.
A. Yes, I certainly did.
Q. What gave you that impression?
A. Zach is a high energy, very cheerful, excited to tell you what he's -- what he's working on, what he's trying to get done. And, you know, we always are looking to -- engagements are different based on who you're working with. It's always more fun to work with folks that are -- where you feel equally yoked, you know, where you feel like you've got a good partner. And Zach certainly was one of those.
Q. Did you get the sense that he's

Page 137

passionate about Christian education in particular?
A. Very much so, yes.
MS. ZHANG: Oh, sorry. Objection. Exceeding -- sorry. Could you -- I'd appreciate a -- like a slight pause before you answer. Thank you.
Objection, exceeding scope of cross.
Q. And you can answer.
A. Could you repeat the question, sir?
MS. ZHANG: And form.
Q. Yeah, let me -- I've already forgotten it, so let me get a chance to rephrase it and potentially avoid the objection.
Did you get the impression that Mr. Wishart is passionate about Christian education in particular?
A. I did get that.
MS. ZHANG: Objection. Objection; exceeding scope of cross and form.
MR. GOULD: It's still direct examination.
Q. You can answer now.
A. Yes, I did. He -- it was noteworthy that he had moved from the public school system to the Christian school that he was in. And he was -- he

Page 138

was very consistent in, you know, just saying exactly what he thought and being high energy about being able to provide -- I can't -- I lost count of how many times I heard him say he was very excited to bring a Christian education to -- or make a Christian education available for, you know, all students.
And I was -- and it seemed very sincere when he would -- every time when he would say it.
Q. And by bringing a Christian education to all students, are you referring to opening Wilberforce Academy?
A. Yes. Yeah. One in which there would not be a -- tuition wouldn't be an obstacle.
Q. So in your view, does Wilberforce sincerely intend to open a charter school in Knox County?
A. As far as I understand --
MS. ZHANG: Objection; form.
A. As far as I understand, yes.
Q. Can you elaborate on that?
A. I -- I never -- in every -- in all of our interactions, it was very clear that we were working to meet the deadline. We were -- we -- I mean, that's a lot of hours to invest in -- in something

Page 139

that -- I don't know that you weren't willing to see through it all the way, and, you know, I mean school leaders, get -- they get slings and arrows, maybe from their own community. That's just kind of par for the course. And so you're -- you're -- you know, you're putting yourself out there where you're going to be -- you know, it's just going to be hard for you. So you really have to -- if you're going to go down that road, you're going to have to really want to do it.
And I -- so I -- my sense -- just -- the way he would show up to meetings with energy and focus and drive, all of that conveys that this -- this was something he really wanted.
MR. NORRIS: Thank you. No further questions.

EXAMINATION

BY MR. SANDERS:
Q. This is David Sanders from Knox County Board of Ed. How are you today?
A. Hey, doing well. Thank you, sir.
Q. I just have a few questions for you. Specifically, how many times did you communicate with Zach Wishart verbally or in person?
A. So -- so meaning, like, on a phone call

Page 140

or in a meeting?
Q. Right. Excluding email or text messages, excluding written communications.
A. Yeah, because I don't think we've ever met in person. It'd be -- obviously, it'd be kind of a rough estimate and I don't have the exact number. But if we just assume three -- three touch points a week would seem about right, and it was roughly three times -- three weeks before Christmas break and roughly four more weeks after. That's seven weeks. That'd be roughly 21 times. I would say 25.
Q. Okay. And were you -- you've already said you did not meet in person at all with him?
A. No, I don't believe so, no. We've never traveled to Tennessee.
Q. All right. Were -- do you have reason to believe that, at the time of these communications, Mr. Wishart was never anywhere other than in Tennessee?
A. Never had that thought.
Q. Okay. Were these meetings by telephone or by some sort of Zoom or telephonic or video conference like we're having now?
A. Right. So there were several by Teams

Page 169

to make the decision for you, because it cost more the sooner you get it.

MR. GOULD: Let's do it -- can we do it in five business days?

THE REPORTER: Oh, yeah, that's not a problem. Does anybody need it any sooner than that?

MS. ZHANG: If you have a rough sooner, that'd be great. Also, Coble Intervenors would like a copy.

THE REPORTER: Just so I have it straight, if you just want to state if you want a copy and a rough, and then when you need it by.

So just tell me who wants a copy, who wants a rough, and when you want it.

MR. GOULD: Counsel for the deponent will take the standard deposition, we'll read and sign. And in addition to that we would like a rough when it's available. Five business days.

MS. ZHANG: Coble Intervenors would like a copy of the rough and the final transcript. Rough if today, great. And the final transcript when ready.

MR. AYLIFFE: We don't order a copy.

MR. NORRIS: We'd like a copy on the same timeline as everybody else.

Page 170

MR. SANDERS: Yes.

Page 171

CORRECTION PAGE

WITNESS NAME: DAVID DENTON DATE: 07/06/2026

PAGE LINE CHANGE REASON

Page 172

SIGNATURE PAGE

I, DAVID DENTON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page.

____________________________

DAVID DENTON

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

THE WILBERFORCE ACADEMY OF KNOXVILLE, §
§ NO. 3:25-CV-584-CEA-CCP
PLAINTIFF, §
§
V. §
§
KNOX COUNTY BOARD OF EDUCATION, ET AL., §
§
DEFENDANTS, §
§
RICHARD COBLE, ET AL., §
§
INTERVENOR-DEFENDANTS, §
§
ADRIENNE CARROLL, ET AL., §
§
INTERVENOR-DEFENDANTS. §

REPORTER'S CERTIFICATION
DEPOSITION OF DAVID DENTON
TAKEN JULY 6, 2026

I, TAMARA CHAPMAN, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DAVID DENTON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to WANQIAN ZHANG;

That a copy of this certificate was served on all



parties and/or the witness shown herein on
________________________.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

X was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 9th day of July, 2026.

________________________________
Tamara Chapman, CSR, RPR-CRR
CSR NO. 7248; Expiration Date: 12-31-26
Firm Registration No. 77
ESQUIRE DEPOSITION SOLUTIONS, LLC
9901 IH 10 West, No. 800
San Antonio, Texas 78230
210.331.2280

# EXHIBIT 21

**David Denton**

**From:** Joy Lambrecht
**Sent:** Thursday, January 29, 2026 5:20 PM
**To:** David Denton; Mary Kathryn Boucher; Amy Frank; TREVINO, JOSHUA /0L5935 /GA081; Josh Herring; Sam McClelland; Nate Antiel; Brittany Trevino; Courtney Gunn
**Subject:** Wilberforce Project Completion

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Dear Wilberforce team,

Our 62 labors of Hercules are complete! Today, we delivered the complete charter application to Zach and his team! They were very pleased with the product and expressed their deep gratitude for Arcadia's work.

From me and David, I want to thank each of you for the time, care, and effort you put into this project. Next week, we'd like to get everyone together to debrief.

Thank you again, and I look forward to seeing everyone soon!

Cheers,
Joy

**Joy Lambrecht**
Academy Operations Consultant

ARCADIA EDUCATION
**C:** (740) 877-2535
PO Box 80041, Phoenix, AZ 85060

www.arcadiaed.com

# EXHIBIT 22

## David Denton

**From:** Ben Lindquist
**Sent:** Friday, January 30, 2026 8:56 AM
**To:** Mary Kathryn Boucher; Joy Lambrecht; Amy Frank
**Cc:** David Denton
**Subject:** Well Done!

Mary Kathryn, Joy, and Amy,

Happy Friday! I hope the three of you have a celebratory weekend in store.

That charter application was an enormous undertaking. Tireless week after tireless week through Advent, Christmas, New Years, and January, the three of you poured yourselves into it with exacting attention and remarkable diligence – yet always with good cheer and God's grace to boot!

THANK YOU for everything you did – seen and unseen – to get the application across the finish line. I personally am hopeful that Wilberforce represents a breakthrough for faith formation in American education. If it gets approved and opens, you will have done something of historic significance.

Of course, David also deserves gratitude for his leadership, but I wanted to take this email to honor the three of you directly.

God bless you and your families,

Ben

# EXHIBIT 23

**David Denton**

---

**From:** Joy Lambrecht
**Sent:** Thursday, January 29, 2026 1:50 PM
**To:** Zach Wishart
**Cc:** David Denton; Amy Frank; Mary Kathryn Boucher
**Subject:** Re: Wilberforce Application

You're very welcome, Zach!! It was truly a pleasure. We will wait with bated breath for WAK updates! 🙂

Joy

**Joy Lambrecht**
Academy Operations Consultant

ARCADIA EDUCATION
**C:** (740) 877-2535
PO Box 80041, Phoenix, AZ 85060

www.arcadiaed.com

---

**From:** Zach Wishart <zachwishart@gmail.com>
**Date:** Thursday, January 29, 2026 at 2:42 PM
**To:** Joy Lambrecht <jlambrecht@arcadiaed.com>
**Cc:** David Denton <ddenton@arcadiaed.com>, Amy Frank <afrank@arcadiaed.com>, Mary Kathryn Boucher <mboucher@arcadiaed.com>
**Subject:** Re: Wilberforce Application

Joy,

I am thrilled to receive this and I am so thankful for all of the team's work on making this happen. Arcadia is phenomenal! I will keep everyone updated as we move forward and make this school a reality!

Thank you, thank you, thank you!

Zach

On Thu, Jan 29, 2026 at 2:33 PM Joy Lambrecht <jlambrecht@arcadiaed.com> wrote:

> Zach,
>
> On behalf of the Arcadia team, I'm pleased to deliver Wilberforce Academy's completed charter application! We're grateful for the trust and confidence you bestowed on us, and for the privilege of supporting your work.

If you look over the document and find anything you'd like us to change or correct before submission, please notify us and we will make those changes promptly!

Sincerely,
Joy

**Joy Lambrecht**
Academy Operations Consultant

**C:** (740) 877-2535
PO Box 80041, Phoenix, AZ 85060

www.arcadiaed.com

# EXHIBIT 24

**UNITEDSTATES DISTRICTCOURT**
**FOR THE EASTERN DISTRICTOF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br><br>Plaintiff,<br><br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION AND JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT AND KRISTI KRISTY, in their official capacities as Members of the Knox County Board of Education,<br><br>Defendants. | ) | No. 3:25-cv-584-CEA-CCP |

**DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION**

Come the Defendants, Knox County Board of Education, John Butler, Anne Templeton, Patricia Fontenot-Ridley, Katherine Bike, Lauren Morgan, Betsy Henderson, Steve Triplett, Travis Wright and Kristi Kristy in their official capacities as Members of the Knox County Board of Education (collectively "Defendants") and respond to the Plaintiff's First Set of Request for Production propounded to them as follows:

**1. From January 1, 2025 onward, all documents and communications related to the Wilberforce Academy of Knoxville, including, but not limited to, documents and communications with the State of Tennessee, Defendant-Intervenors, and any potential intervenors.**

RESPONSE: Defendants objects to this Interrogatory on the grounds that it is overbroad, not proportional to the needs of the case, and seeks information protected by the attorney-client privilege. Specifically, KCS employs approximately 6,000 employees. Searching and reviewing each employee's email inbox for documents responsive to this request is not proportional to the needs of this case. Accordingly, Defendants have provided email communications from 2022-present based on searches of the following custodians: Theresa Nixon, Keith Wilson, Kori Lautner, Jon Rysewyk, the Chartering Authority email account, and all individual Defendants. Defendants are willing to discuss searches of additional custodians. Subject to and without waiving these objections, responsive, non-privileged documents responsive to this Interrogatory can be found at: KCBOE00001-00053, 02955-03047, 03051-03082, and 10700-10704.

**2. From January 1, 2002 onward, all documents and communications related to whether charter schools can be religious, including, but not limited to, documents and communications with the State of Tennessee, Defendant-Intervenors, and any potential intervenors.**

RESPONSE: Defendants object to this Interrogatory on the grounds that it is overly broad, not proportional to the needs of the case, and seeks information protected by the attorney-client privilege. Specifically, KCS employs approximately 6,000 employees. Searching and reviewing each employee's email inbox for documents responsive to this request is not proportional to the needs of the case. Further, many employees have left KCS since 2002 and those emails inboxes are no longer available. Accordingly, Defendants have provided communications from 2022-present based on searches of the following custodians: Theresa Nixon, Keith Wilson, Kori Lautner, Jon Rysewyk, the Chartering Authority email account, and all individual Defendants. Defendants are willing to discuss searches of additional custodians. Subject to and without waiving these

objections, Defendants state that responsive, non-privileged documents responsive to this request may be found at KCBOE00054-03159 and KCBOE06527-06532. KCBOE has provided its only official policy on Public Charter Schools which may be found at KCBOE03899-03900. Additional guidance is found in KCBOE's administrative procedure (KCBOE10698-10699), the Charter School Handbook (KCBOE03867-03891), The Charter School Application Protocol (KCBOE03901-03915), and state law which KCBOE is obligated to follow.

**3. From January 1, 2002 onward, all documents and communications related to charter-school applications and letters of intent in Knox County.**

RESPONSE: Defendant objects to this Interrogatory on the grounds that it is overly broad, not proportional to the needs of the case, and seeks information protected by the attorney-client privilege. Specifically, KCS employes over 6,000 employees and has employed countless others since 2002 that are no longer employes by KCS. Searching and reviewing each employee's inbox for documents responsive to this request is not proportional to the needs of the case and documents which are responsive may not be retrievable because the employee is no longer employed. Accordingly, Defendants have provided communications from 2022-present based on searches of the following custodians: Theresa Nixon, Keith Wilson, Kori Lautner, Jon Rysewyk, the Chartering Authority email account, and all individual Defendants. Defendants are willing to discuss searches of additional custodians. Subject to and without waiving these objections, Defendants have also provided charter school applications and Letters of Intent which can still be located with the Board's records from 2002-2025 which may be found at KCBOE06688-10697. Communications regarding charter school applications may be found at KCBOE00001-03915, KCBOE05436-06687, and KCBOE10700-10704.

**4. All documents and communications you relied on, referenced, or reviewed when responding to Plaintiff's first set of interrogatories.**

RESPONSE: Documents responsive to this request may be found at KCBOE 03812-03915 and 05434-05435.

Respectfully submitted.

*s/Jessica Jernigan-Johnson*
David M. Sanders (BPR # 016885)
Senior Deputy Law Director
Jessica Jernigan-Johnson (BPR #032192)
Deputy Law Director
Knox County Law Director's Office
400 Main Street, Suite 612
Knoxville, TN 37902
(865) 215-2327
david.sanders@knoxcounty.org
jessica.johnson@knoxcounty.org

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2026, a copy of the foregoing Defendants' Responses to Plaintiff's First Set of Interrogatories and Requests for Production were served on counsel of record via email.

*s/Jessica Jernigan-Johnson*
JESSICA JERNIGAN-JOHNSON

# EXHIBIT 25

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br><br>Plaintiff,<br><br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION, et al.,<br><br>Defendants,<br><br>RICHARD COBLE, et al.,<br><br>Intervenor-Defendants,<br><br>ADRIENNE CARROLL, et al.,<br><br>Intervenor-Defendants. | No. 3:25-cv-584-CEA-CCP |

**<u>KNOX COUNTY BOARD OF EDUCATION'S AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION</u>**

Comes Defendant, Knox County Board of Education ("KCBOE") and responds to the Plaintiff's First Set of Requests for Admission propounded to it as follows:

**<u>OBJECTIONS TO INSTRUCTIONS</u>**

KCBOE objects to the Instructions to the extent that they purport to impose obligations beyond those required by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Eastern District of Tennessee. KCBOE further objects to the Instructions as vague, overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks to place heightened requirements and/or obligations for objecting and responding to requests which are not required by the Federal Rules of Civil Procedure or the Local

Rules for the United States District Court for the Eastern District of Tennessee. Finally, KCBOE objects to the extent the Instructions seek information protected the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.

1. Admit that the Knox County Board of Education "must comply with the requirements of the [Tennessee Public Charter Schools] Act." MTD (Doc.57) 16.

**RESPONSE:** KCBOE admits that as a local education agency ("LEA") it must fully comply with all Tennessee state laws and regulations governing LEAs.

2. Admit that "Knox County Schools must ensure that" charter schools "correct" "violations of State . . . laws," including the Tennessee Public Charter Schools Act. KCBOE10698.

**RESPONSE:** KCBOE objects to this Request on the grounds that is vague, speculative, and purports to quote a document without quoting it in full. Subject to and without waiving those objections, KCBOE denies this request as stated. As explained in Knox County Schools Administrative Procedure AP-I-450, if an approved charter school breaches the charter agreement or violates an applicable State or Federal law, KCS is required to ensure that the charter school is informed of any deficiency so that it might be corrected. As explained in the procedure, each approved charter school is assigned a status following the annual monitoring process. If serious deficiencies are noted, there is a series of escalating steps available to KCS and the charter school for improvement. In order to assist charter schools who have been informed of deficiencies after the annual monitoring process, KCS can help the school develop a Performance Improvement Plan. However, charter schools are given autonomy for how to implement improvement plans and achieve the goals outlined in the Charter Agreement.

3. Admit that the Knox County Board of Education "has no authority or discretion . . . to approve a charter school that is religious in nature." MTD.16.

**RESPONSE:** KCBOE objects to this Request on the grounds that it is vague, ambiguous, and calls for a legal conclusion. Subject to and without waiving said objections, KCBOE admits that, as the local education agency, it must follow all applicable state laws and regulations. As currently written, the State Board of Education rules do not allow the Knox County Board of Education to grant a waiver to a school that seeks to adopt an explicitly religious curriculum. However, the Commissioner of Education is vested with the authority to waive the requirements of the State Board of Education rules. Accordingly, the State of Tennessee has the ability to waive any such requirements.

4. Admit that, under Knox County Schools' Charter School Handbook, a Knox County charter school musts operate as a "nonsectarian, nonreligious school." Doc. 70-2 at 10.

**RESPONSE:** Admitted, with the caveat that KCBOE denies the implication that the Charter School Handbook is an independent set of requirements established exclusively by KCBOE. The Charter School Handbook references and incorporates Tennessee state law which currently states that charter schools must "[o]perate as a public, nonsectarian, nonreligious public school." Tenn. Code Ann. § 49-13-111(a)(2).

5. Admit that, under the Knox County Schools' Charter Performance Framework, "the Establishment Clause" prohibits Knox County charter schools "from engaging in religious instruction." KCBOE3859.

**RESPONSE:** KCBOE objects to this Request on the grounds that is vague, ambiguous, and purports to quote a document without quoting it in full. Subject to and without waiving those objections, KCBOE admits that the current charter school performance framework requires that

charter schools, in order to meet the performance standard, complies with all "applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students" which includes "the Establishment Clause restrictions prohibiting public schools from engaging in religious instruction." However, KCBOE denies the implication that the Charter Performance Framework is an independent performance framework established by KCBOE. The current performance framework was adopted on May 22, 2022, and is based on the Tennessee Department of Education's model performance framework. As explained in the framework, Knox County School's performance framework "is based on the framework created by the Tennessee State Board of Education in 2014 and revised in 2018." KCBOE03841.

6. Admit that Wilberforce Academy's proposed religious charter school (*see* WILB-ACAD-1-279) is "an explicitly religious school in violation of the Tennessee Public Charter School Act." MTD.6.

**RESPONSE:** KCBOE objects to this Request on the grounds that it is vague, ambiguous, calls for speculation and calls for a legal conclusion. Subject to and without waiving these objections, KCBOE admits that Wilberforce has represented in this litigation that it would like to open an explicitly religious charter school. Wilberforce has never submitted an application for any charter school, so KCBOE has never reviewed or voted upon any "proposed religious charter school" as allegedly contemplated by Wilberforce. Further, because KCBOE has never received an application from Wilberforce, it has not evaluated any application and accordingly, cannot affirm or deny that Wilberforce's proposed charter school plan would (1) be an explicitly religious charter school or (2) be approved under the scoring rubric promulgated by the State of Tennessee regardless of Wilberforce's alleged religious status.

7. Admit that, as of February 9, 2026, Wilberforce's alternative plan "to sponsor a school giving a secular education while maintaining [Wilberforce's] own religious identity" (*see* WILB-ACAD-1955-2233) was "in violation of the Tennessee Public Charter School Act." MTD.6.

**RESPONSE:** KCBOE objects to this Request on the grounds that it is vague, ambiguous, calls for speculation, and calls for a legal conclusion. Specifically, the phrase "a school giving a secular education while maintaining [Wilberforce's] own religious identity" is vague and undefined. Subject to and without waiving those objections, KCBOE denies this request as stated. As explained in Request to Admit 6, Wilberforce has represented in this litigation that it would operate a school with secular curriculum, but KCBOE has never received or evaluated any application from Wilberforce. KCBOE adopts by reference its entire answer to Request to Admit 6. Further, prior to May 22, 2026, religious organizations could not, under Tennessee law, sponsor charter schools. That law was amended by Public Chapter 1128. Under current Tennessee law, the only organizations which may not sponsor a charter school are (1) for-profit entities; (2) non-public schools; and (3) post-secondary institutions which are not regionally accredited. Tenn. Code Ann. § 49-13-104. Further, Tennessee law now explicitly permits private postsecondary institutions that are religiously affiliated to sponsor charter schools. Tenn. Code Ann. § 49-13-106(c)(2).

8. Admit that "the State Board of Education rules prevent" the Knox County Board of Education "from considering a request to waive the requirements of the Tennessee Public Charter School Act." MTD.16 (citing Tenn. R. and Reg. 0520-14-02.01(2)).

**RESPONSE:** KCBOE objects to this Request on the grounds that it is vague, ambiguous, and calls for a legal conclusion. Subject to and without waiving those objections, KCBOE admits that Tennessee state law solely vests the authority to grant waivers from the requirements of the

Tennessee Public Charter School Act in the Commissioner of Education. Tenn. Code Ann. § 49-1-203.

9. Admit that a request to waive the requirement that a charter school shall operate as a "nonsectarian, nonreligious" school, Tenn. Code § 49-13-111(a)(2), would be a request for a wavier of "statutory requirements related to . . . [f]ederal and state civil rights," Tenn. Code § 49-13-111(p)(1).

**RESPONSE:** KCBOE objects to this Request on the grounds that it is vague, ambiguous, and calls for a legal conclusion. Subject to and without waiving those objections, KCBOE admits that it cannot consider a waiver of the requirement that a charter school operate as a "nonsectarian, nonreligious school." KCBOE further admits that Tennessee state law solely vests the authority to grant waivers from the requirements of the Tennessee Public Charter School Act in the Commissioner of Education. Tenn. Code Ann. § 49-1-203.

10. Admit that the Tenn. Code § 49-13-111(p)(1), which forbids waivers of regulatory or statutory requirements related to "civil rights," would be "applicable" to a request for "a waiver for a religious charter school." KCBOE10701.

**RESPONSE:** KCBOE objects to this Request on the grounds that it is vague, ambiguous, and calls for a legal conclusion. Subject to and without waiving those objections, KCBOE denies this request as stated. While § 49-13-111(p)(1) could be applicable to a request for a waiver for a religious charter school, Tennessee law does permit the Commissioner of Education to waive statutory requirements including the provisions of the Tennessee Public Charter School Act.

11. Admit that, at a February 5, 2026 meeting of the Knox County Board of Education, Deputy Law Director Gary Dupler stated that the Knox County "Law Department dispute[s]" that

"the Tennessee Commissioner of Education or relevant county school board could" grant a "waiver for a religious charter school." KCBOE10701-02.

**REPONSE:** KCBOE denies that referenced quote and KCBOE denies that it is the position of KCBOE that the Commissioner of Education would be unable to grant a waiver for a religious charter school. KCBOE has consistently maintained that the Board is unable to grant a waiver and that the power to grant a waiver from Tennessee state law is vested solely in the Tennessee Commissioner of Education. Further, the February 5, 2026, called meeting of the Knox County Board of Education was video and audio recorded and is available at knoxschools.org. In that recording at 23:46 and 33:44, Mr. Dupler references and quotes the Wilberforce Amended Complaint and only disputes that a local school board may grant a waiver for a religious charter school.

12. Admit that, at a February 5, 2026, meeting of the Knox County Board of Education, Chair Kristy Kristi stated that "we do follow" state law, meaning Tennessee law prohibiting religious charter schools. *See* KCS TV, *2/5/26 KCS BOE Called Meeting* (Feb. 5, 2025), www.youtube.com/watch?v=lqLgLLJPwCs (timestamp 38:35).

**RESPONSE:** It is admitted that Ms. Kristi made that statement at the February 5, 2026 meeting. It is further admitted that the Board only speaks as a body and not through the statements of the individual members. It is further admitted that as the local education agency, KCBOE is required to follow all applicable state laws and regulations.

13. Admit that the only county or city taxes that fund Knox County's General Purpose School Fund are "County Property Taxes," "County Local Option Taxes," and the "Wheel Tax." Knox County, *FY2026 Adopted Budget* 18, perma.cc/EJF8-X7M3.

**RESPONSE:** Denied as stated. While the County Property Tax and County Local Option Tax do fund the Knox County General Purpose School fund, additional revenue sources, including taxes from the City of Farragut and portions of the litigation tax, also fund the General Purpose School fund. The General Purpose School fund also no longer receives any funding from the wheel tax. The County Local Option Sales Taxes also include a portion of the City of Knoxville sales tax.

14. Admit that the Tennessee state gas tax does not fund Knox County's General Purpose School Fund. *See* Knox County, *FY2026 Adopted Budget* 18, perma.cc/EJF8-X7M3.

**RESPONSE:** Admitted.

15. Admit that Emerald Academy was not a registered 501(c)(3) non-profit at the time it submitted its charter application. *See* KCBOE9626.

**RESPONSE:** Denied as stated. Emerald Academy is not the sponsoring organization, but the charter school itself. Tennessee law requires that the sponsoring organization, not the school, be a registered 501(c)(3) non-profit. It is admitted that Emerald Academy's sponsoring organization was not a registered 501(c)(3) non-profit at the time it submitted its charter application.

16. Admit that The Wilberforce Academy of Knoxville is a registered 501(c)(3) non-profit. *See* Doc.83-1 at 3-4.

**RESPONSE:** KCBOE admits that Wilberforce became a registered 501(c)(3) non-profit on April 1, 2026.

17. Admit that many factors besides the opening of a charter school affect the funding for individual district schools in Knox County, including (but not limited to) the overall school-age population in Knox County, how the Knox County Board of Education chooses to allocate funds among district schools, the amount of local tax revenue, the proportion of Knox County

schoolchildren attending private schools, and the amount of funding the Tennessee General Assembly annually allocates to education.

**RESPONSE:** KCBOE objects to this Request on the grounds that it is vague and ambiguous. Specifically, "funding for individual district schools" is vague and undefined. Subject to and without waiving those objections, KCBOE denies the implication that the opening of a charter school does not affect the funding for individual district schools as it directly affects the allocation of funds to public schools because charter schools are funded by public money. KCBOE admits that there are other factors which affect the amount of funding that schools receive.

Respectfully submitted.

*s/Jessica Jernigan-Johnson*

David M. Sanders (BPR # 016885)
Senior Deputy Law Director
Jessica Jernigan-Johnson (BPR #032192)
Deputy Law Director
Rachel K. Harrison (BPR #038807)
Knox County Law Director's Office
400 Main Street, Suite 612
Knoxville, TN 37902
(865) 215-2327
david.sanders@knoxcounty.org
jessica.johnson@knoxcounty.org
rachel.harrison@knoxcounty.org

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2026, a copy of the foregoing Defendants' Amended Responses to Plaintiff's First Requests for Admission were served on counsel of record via email.

Richard Anderson
gabe@consovoymccarthy.com

Ryan MacKenzie Proctor
ryan@consovoymccarthy.com

Cameron T. Norris
cam@consovoymccarthy.com

Adam J. Hunt
adamhunt@mofo.com

Alex J. Lushenitser
luchenistser@au.org

Daniel Mach
dmach@aclu.org

Heather L. Weaver
hweaver@aclu.org

Jessica Levin
jlevin@edlawcenter.org

Jon J. McNeal
jmcneal@mofo.com

Katrina Reichert
kreichert@edlawcenter.org

Kyle J. Steinberg
steinbergk@ffrf.org

Lauren Winkler
Lauren.winkler@splcenter.org

Lucas Cameron-Vaughn
lucas@aclu-tn.org

Luke Anderson
anderson@au.org

Michael Joseph Tafelski
Michael.tafelski@splcenter.org

Mitchell E. Feldman
mfeldman@mofo.com

Neil Ranu
Neil.ranu@splcenter.org

Patrick Cremin
pcremin@edlawcenter.org

Sam T.S. Boyd
Sam.boyd@splcenter.org

Samuel T. Grover
sgrover@ffrf.org

Sophia Mire Hill
Sophia.mire@splcenter.org

Wanquian Zhang
wzhang@mofo.com

Wendy Lecker
wlecker@edlawcenter.org

David Demar Ayliffe
dayliffe@bakerdonelson.com

Erika Leigh Hughes
ehughes@bakerdonelson.com

Thomas Howard Jarvis
tjarvis@bakerdonelson.com

Joseph F. Whalen, III
Joe.whalen@ag.tn.gov

*s/Jessica Jernigan-Johnson*
JESSICA JERNIGAN-JOHNSON

# EXHIBIT 26

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:25-cv-584-CEA-CCP |
| KNOX COUNTY BOARD OF EDUCATION, et al., | ) | |
| Defendants, | ) | |
| RICHARD COBLE, et al., | ) | |
| Intervenor-Defendants, | ) | |
| ADRIENNE CARROLL, et al., | ) | |
| Intervenor-Defendants. | ) | |

**DEFENDANTS' RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES**

Comes Defendant Knox County Board of Education, and responds to the Plaintiff's Second Set of Interrogatories propounded to them as follows:

**3. Identify and fully describe all provisions of law (including Tennessee statutes, federal statutes, Tennessee regulations, federal regulations, Knox County ordinances, Knox County regulations, the Tennessee Constitution, and the U.S. Constitution) that prohibit Wilberforce Academy, because it is a religious organization, from sponsoring or operating a charter school that is "nonsectarian" and "nonreligious" under Tenn. Code § 49-13-111(a)(2). Limit your response to provisions of law that remain in effect after the enactment of Pub. Ch. 1128, 114th Gen. Assem. (Tenn. 2026) (SB2318).**

RESPONSE: KCBOE objects to this Interrogatory on the grounds that it is vague, ambiguous, and calls for disclosure of attorney-client communications and attorney work-product, as it asks KCBOE to provide legal research and analysis of the U.S. Constitution, the Tennessee Constitution, federal statutes and regulations, Tennessee states and regulations, and Knox County ordinances. Further, this Interrogatory is unduly burdensome and not proportional to the needs of the case as it seeks information which is available to the Plaintiff. Subject to and without waiving these objections, KCBOE states as follows: Wilberforce's stated intention in this lawsuit is to determine the constitutionality of the Tennessee Public Charter Schools Act and its accompanying regulations as well as established case law preventing religious organizations from sponsoring explicitly religious charter schools under the Establishment Clause. It has not yet been determined if those laws are constitutional given that this litigation remains pending. Tennessee law has changed since May 22, 2026, when Public Chapter 1128 went into effect. Specifically, Tennessee law now only excludes three entities from sponsoring a public charter school: (1) for-profit entities; (2) non-public schools; and (3) post-secondary institutions which are not regionally accredited. Tenn. Code Ann. § 49-13-104. Further, Tennessee law now explicitly permits private postsecondary institutions that are religiously affiliated to sponsor charter schools. Tenn. Code Ann. § 49-13-106(c)(2). However, charter schools must "[o]perate as a public, nonsectarian, nonreligious public school." Tenn. Code Ann. § 49-13-111(a)(2). Given these recent changes to the laws governing charter schools, the Tennessee State Board of Education will have to revise its policy and regulations to conform with the new laws. KCBOE cannot state or know when those changes will be made. As the local education agency, KCBOE will follow Tennessee and federal law and the State Board of Education's revised rules, policies, and procedures. Further, KCBOE will update its policy on charter schools when and if required by the Tennessee State Board of Education. KCBOE can affirmatively state that no Knox County Ordinance or KCBOE Policy prohibits the establishment of a charter school by a religious or sectarian organization.

# VERIFICATION

STATE OF TENNESSEE
COUNTY OF KNOX

I, Theresa J. Nixon, acknowledge that I am the authorized representative of Knox County Board of Education in the above-styled matter; that I have read the foregoing Response to Interrogatory No. 1 and the response is true to the best of my knowledge, information and belief.

Theresa J. Nixon
**THERESA J. NIXON**
Title: Executive Director of Academic Supports

Sworn to and subscribed before me
this the 6th day of July, 2026.

Sheri D. Hamblin
Notary Public
My Commission Expires: 08/28/2029

SHERI D. HAMBLIN
STATE OF TENNESSEE NOTARY PUBLIC
Comm. Exp. 8-28-2029
KNOX COUNTY

As to objections, this the 6th day of July, 2026.

Jessica Jernigan-Johnson
**DAVID S. SANDERS (BPR #016885)**
Senior Deputy Law Director
Jessica Jernigan-Johnson (BPR #032192)
Deputy Law Director
Knox County Law Director's Office
400 Main Street, Suite 612
Knoxville, TN 37902
(865) 215-2327
david.sanders@knoxcounty.org
jessica.johnson@knoxcounty.org

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2026, a copy of the foregoing Defendants' Amended Responses to Plaintiff's First Requests for Admission were served on counsel of record via email.

Richard Anderson
gabe@consovoymccarthy.com

Ryan MacKenzie Proctor
ryan@consovoymccarthy.com

Cameron T. Norris
cam@consovoymccarthy.com

Adam J. Hunt
adamhunt@mofo.com

Alex J. Lushenitser
luchenistser@au.org

Daniel Mach
dmach@aclu.org

Heather L. Weaver
hweaver@aclu.org

Jessica Levin
jlevin@edlawcenter.org

Jon J. McNeal
jmcneal@mofo.com

Katrina Reichert
kreichert@edlawcenter.org

Kyle J. Steinberg
steinbergk@ffrf.org

Lauren Winkler
Lauren.winkler@splcenter.org

Lucas Cameron-Vaughn
lucas@aclu-tn.org

Luke Anderson
anderson@au.org

Michael Joseph Tafelski
Michael.tafelski@splcenter.org

Mitchell E. Feldman
mfeldman@mofo.com

Neil Ranu
Neil.ranu@splcenter.org

Patrick Cremin
pcremin@edlawcenter.org

Sam T.S. Boyd
Sam.boyd@splcenter.org

Samuel T. Grover
sgrover@ffrf.org

Sophia Mire Hill
Sophia.mire@splcenter.org

Wanquian Zhang
wzhang@mofo.com

Wendy Lecker
wlecker@edlawcenter.org

David Demar Ayliffe
dayliffe@bakerdonelson.com

Erika Leigh Hughes
ehughes@bakerdonelson.com

Thomas Howard Jarvis
tjarvis@bakerdonelson.com

Joseph F. Whalen, III
Joe.whalen@ag.tn.gov

Jessica Jernigan-Johnson

JESSICA JERNIGAN-JOHNSON (BPR #032192)

# EXHIBIT 27

TENNESSEE
STATE BOARD OF EDUCATION

# Letter of Intent to Apply to Open a Tennessee Public Charter School

For Charter School Sponsors Planning to Submit a

# Charter School Application by February 1, 2026

# Letter of Intent to Apply to Open a Tennessee Public Charter School

**Overview**

The first step in creating a new public charter school is for a sponsor[1] to file a letter of intent with the selected authorizer[2] and the Tennessee Public Charter School Commission (Commission) using the form below. Sponsors must complete a separate letter of intent for each public charter school application they plan to submit.

The purpose of the letter of intent is to provide an authorizer with advance notice that an application to open a public charter school may be forthcoming. Sponsors should provide the most accurate information available at the time of submission.

**This letter of intent form is for non-replication applications only.** If a sponsor is seeking to replicate an existing Tennessee public charter school, the sponsor must complete a different letter of intent form, which can be found on the Tennessee State Board of Education's (State Board) website.

**Submission Requirements**

Pursuant to T.C.A. § 49-13-107(a), all sponsors must file a Letter of Intent at least 60 days prior to the application deadline of February 1. Therefore, this letter must be delivered no later than December 3. If December 3 falls on a Saturday, Sunday, or state-observed holiday, the Letter of Intent is due on the next business day.

An electronic copy of the letter of intent must be converted to a PDF file and submitted to the selected authorizer and the Commission by the deadline. Sponsors must contact the authorizer to determine the process for filing the letter of intent with the authorizer and submit a copy to the Commission via email at CharterSchool.Applications@tn.gov.

Within 10 business days of receipt of a letter of intent, the authorizer shall share with the sponsor the most up to date per-pupil estimate of combined state and local funding. Sponsors must input that number into the budget template that accompanies the application to support accurate budgeting.

---

[1] "Sponsor" means a proposed governing body filing an application for the establishment of a public charter school, that is not a for-profit entity; nonpublic school as defined in § 49-6-3001; other private, religious, or church school; or postsecondary institution not regionally accredited; and does not promote the agenda of any religious denomination or religiously affiliated entity. T.C.A. § 49-13-104.

[2] "Authorizer" means a local board of education or the Tennessee public charter school commission as defined in § 49-1-614, that makes decisions regarding approval, renewal, and revocation of a public charter school application or agreement. T.C.A. §49-13-140.

**Primary Point of Contact**

In the table below, identify the primary point of contact (PPOC) for this letter of intent. The PPOC will handle all communications, scheduling, and notices related to the application. The PPOC is responsible for ensuring timely dissemination of information to all involved parties. All information provided in this form is considered public information.

| | |
|---|---|
| **Name** | Zachary Wishart |
| **Role in proposed school** | Executive Director |
| **Mailing address** | 448 N. Cedar Bluff Road, Ste. 404 |
| **Mailing address line 2** | |
| **City, State, Zip code** | Knoxville, TN 37923 |
| **Primary telephone** | 865-257-6105 |
| **Alternate telephone** | |
| **Email address** | zachwishart@gmail.com |

**General Information About the Proposed School**

Complete the table below.

| | | | |
|---|---|---|---|
| **Name of proposed charter school** | The Wilberforce Academy of Knoxville | | |
| **Sponsor/Sponsoring Entity** | The Wilberforce Academy of Knoxville | | |
| **Proposed Authorizer** | Knox County Schools | | |
| **Academic Focus of Proposed School** | Faith-Based Christian with focus on civics and entrepreneurship | | |
| **Grade Structure (e.g., K-5, 6-8, 9-12)** | Year 1 | Year 5 | At Capacity |
| | K-1 | K-5 | K-8 |
| **Projected Enrollment** | Year 1 | Year 5 | At Capacity |
| | 100 | 300 | 450 |
| **Neighborhood and/or community in which the school plans to locate** | Cedar Bluff | | |
| **Projected opening school year** | 2027 | | |

**Sponsor Eligibility**

Tennessee law limits who may sponsor a charter school and prescribes the type of entity that may operate a charter school.[3] Please read the following statements and check the box to confirm eligibility to apply and verify the status of, or plans for, the governing body.

☐ Note: Sponsor is not a "for-profit entity," "nonpublic school," "other private, religious, or church school," or "postsecondary institution"; but Sponsor does "promote the agenda of any religious denomination or religiously affiliated entity." T.C.A. § 49-13-104(15).

The sponsor of this charter school is not: "a for-profit corporation;" "a non-public school, as defined in Tenn. Code Ann. § 49-6-3001(c)(3)(A), or other private, religious, or church school;" and the proposed charter school is not cyber-based.

Charter schools must be operated by entities that are exempt from federal taxation under § 501(c)(3) of the Internal Revenue Code. Please check one of the following, as applicable:

☐ The sponsor of this charter school is a not-for-profit organization with 501(c)(3) status.

X The sponsor of this charter school is a not-for-profit organization and has applied for 501(c)(3) status.

**Sponsor History and Intent**

Read the following statements and select "yes" or "no" to indicate whether each of the following descriptors is true of the sponsor or sponsoring entity's history or intent. Sponsors may indicate "yes" to more than one descriptor. Sponsors will be required to complete an addendum to the charter school application for each descriptor to which they respond "yes".

| Yes | No | Sponsor History and Intent |
|---|---|---|
| | X | The sponsor currently has, or has previously had, any affiliation with a charter school in the United States, including but not limited to, its establishment, operation, or management. |
| | X | Sponsors proposing to open a new school that will create a network or as part of an existing network/ charter management organization (CMO). |
| | X | The sponsor is seeking to contract with a third-party education service provider (ESP), including a CMO. |
| | X | The sponsor is seeking approval of multiple schools during this application cycle. |
| | X | The sponsor is seeking to convert a non-charter public school to a charter school. |
| | X | The sponsor is seeking to open an Opportunity Public Charter School. |

[3] T.C.A. § 49-13-106: The complete Tennessee Public Charter Schools Act is contained in T.C.A. §§ 49-13-101 through 145.

| | | |
|---|---|---|
| | X | The sponsor is a higher education institution seeking to open a charter school. |

By my signature below, I affirm that all the above statements are true to the best of my knowledge and belief.

Zach Wishart — 11/25/2025

Signature of Authorized Representative — Date

Zachary Wishart

Printed Name of Authorized Representative

Executive Director

Title of Authorized Representative

# EXHIBIT 28

**Executive Summary**

We propose the launch of **The Wilberforce Academy of Knoxville**, a K–8 school dedicated to providing families with an exceptional educational option that unites high-quality academics with a strong biblical foundation. The Wilberforce Academy will restore the proven principles that shaped America's earliest and most successful schools: teacher-led, direct instruction; a culture of disciplined learning; and high expectations for every student. Above all, Christ will serve as the cornerstone of our mission, guiding the formation of students who are academically prepared, spiritually grounded, and equipped to lead lives of purpose. The school will have the following key characteristics:

- **Key Characteristic 1 - A Biblical Foundation**: Inspired by The New England Primer, the primary textbook of the American colonies, students will develop early biblical literacy in grades K-2, primarily walking through The Biggest Story bible and curriculum. Building on that early foundation, students will continue in grades 3, 4 and 5 with another key element found in The New England Primer, catechisms. Students will walk through The New City Catechism, memorizing key biblical truths. Each morning, all grades will begin their day with a morning assembly where students will hear Scripture read, participate in prayers, recite creeds and confessions and sing.
- **Key Characteristic 2 - Civics Education:** The Wilberforce Academy of Knoxville is named in honor of William Wilberforce, the Christian leader and slavery abolitionist whose faith inspired his commitment to public service. Following his example, the Academy emphasizes strong civic engagement and social responsibility. Civics will be a defining element of the Wilberforce experience, highlighted by the pursuit of the Governor's Civic Seal. Students will participate in Tennessee Blue Book lessons, mock elections, project-based assessments, and real-world learning experiences. In addition, the Academy will host a school-wide monthly Town Hall featuring celebrations, speakers, and community-building activities.
- **Key Characteristic 3 – Entrepreneurial Program**
  The Wilberforce Academy of Knoxville will inspire the next generation of thoughtful, purpose-driven innovators through a dynamic, hands-on entrepreneurial program. Grounded in Christian values such as integrity, stewardship, and service, students will explore early financial literacy, gain awareness of meaningful career pathways, and develop an entrepreneurial mindset shaped by character and responsibility. By middle school, learners won't just *study* business—they'll *build* it. Through engaging instruction in key entrepreneurial concepts, students will design, launch, and operate their own in-school, student-led ventures. Along the way, they will practice sound decision-making, responsible resource management, and leadership that puts

people first. This experience empowers students to create value, contribute positively to their communities, and pursue their future callings with confidence and purpose.

**Geographic and population considerations.**
The Wilberforce Academy of Knoxville will be strategically located in the Cedar Bluff community, a central and highly accessible area that sits at the crossroads of major interstate corridors. This placement ensures that families from every corner of Knox County can conveniently reach the school, making it an ideal hub for a county-wide public charter institution. As the first Christian charter school in the region, The Wilberforce Academy of Knoxville is designed not merely to serve the surrounding neighborhood, but to welcome students from diverse communities across the entire county.

By adopting a county-wide recruitment strategy, the school seeks to open its doors to families who desire a high-quality public Christian education, an option currently unavailable through Knox County Schools. Its location in Cedar Bluff supports this mission by offering proximity to a broad and growing population base. Many of Knox County's most rapidly expanding residential areas lie just minutes from the school's proposed site, positioning Wilberforce Academy to meet the needs of families who are seeking both academic excellence and a values-driven environment.

Population growth intensifies those needs. The Tennessee State Data Center projects an influx of more than 75,000 new residents by 2040, a surge that will place increasing strain on an already stretched public school system. Many schools in the county are operating near, at, or above capacity, and demographic trends indicate that this pressure will continue to rise in the years ahead. The Wilberforce Academy of Knoxville will play an important role in addressing this challenge by offering families an additional, high-quality educational choice while helping to alleviate overcrowding in existing district schools.

In this way, the school's location, mission, and timing converge to meet a real and growing need within Knox County. By providing accessible transportation routes, intentionally broad recruitment, and a meaningful alternative to traditional public schools, The Wilberforce Academy of Knoxville will serve as both a solution for families seeking a public Christian education and a valuable partner in supporting the county's long-term educational capacity.

**Challenges.**

The Wilberforce Academy of Knoxville recognizes the profound responsibility involved in launching and sustaining a high-quality, high-performing, Christ-centered charter school. A comprehensive strategic analysis has highlighted several key challenges that must be thoughtfully addressed to ensure a successful launch and long-term excellence. These include:

- **Faculty & Staff Recruitment and Hiring**
  Delivering a public Christian education with meaningful biblical integration requires educators who are deeply aligned with the school's mission and vision. The leadership team is committed to recruiting and hiring mission-driven faculty who affirm the school's foundational alignment with the Apostles' Creed, believe in the inerrancy and infallibility of Scripture and are prepared to integrate faith and learning with excellence.
- **Student Recruitment**
  As a public charter school, The Wilberforce Academy of Knoxville will welcome all students, regardless of religious background. Recruitment and marketing efforts will clearly communicate that, while Wilberforce is a Christian charter school, enrollment is open to every student eligible for public education. Ensuring clarity and transparency in messaging will be essential to attracting a diverse and engaged student body.
- **Curriculum Development and Selection**
  High-Quality Instructional Materials are indispensable to strong academic outcomes. The Wilberforce Academy of Knoxville will adopt curricula that are both academically rigorous and thoughtfully aligned with the school's faith-based mission. Ensuring this dual alignment, academic excellence and faith integration, will be a central focus in curriculum planning and implementation.

**Capacity to successfully open and operate a high-quality school.**
With a school design and leadership team that brings deep experience and a proven record of success in operating faith-based schools, The Wilberforce Academy of Knoxville enters its founding phase with a strong and capable foundation. This leadership strength is matched by an exceptionally committed board of directors whose collective expertise spans education, governance, business, and community leadership. The board includes a former chair of the Knox County Board of Education, an experienced community charter school board member, and respected business and civic leaders, each bringing valuable insight into effective oversight, strategic planning, and long-term organizational stewardship.

Just as important as their credentials is the board's shared conviction in the school's mission. Every board member is fully aligned with the faith-based vision of The Wilberforce Academy of Knoxville and united in their commitment to establishing a Christ-centered charter school that exemplifies academic excellence and biblical integration. Their wholehearted investment in the mission ensures that governance decisions will consistently support the school's foundational values, strengthen its culture, and uphold its distinctive purpose.

Together, this combination of experienced leadership, strong governance, and mission-aligned commitment positions The Wilberforce Academy of Knoxville for lasting success.

# EXHIBIT 29

KCS | KNOX COUNTY SCHOOLS

We have received your Letter of Intent (LOI) as a sponsor to apply for a charter school in Knox County (Authorizer: Knox County Schools). Below are the upcoming deadlines and procedures for submitting your application. We look forward to reviewing your application and speaking with you in person in the coming weeks. All documents used are provided by the State Board of Education (SBE).

## APPLICATION LOGISTICS

The process and documents used should follow those provided under the *New Start Application* section on the SBE website. After receiving confirmation for your LOI, the sponsor will want to review the application, guidance, templates, and scoring rubric provided by SBE. Potential charter sponsors can find additional KCS-specific application assistance on our KCS charter webpage.

Full application proposals are due **no earlier than 60 days after submission of the LOI or no later than February 1 at 11:59 PM CT the year preceding the year in which the proposed public charter school plans to begin operation**. The charter school sponsor should prepare and file an electronic copy of the state charter school application with KCS as the authorizer (T.C.A. §49-13-107(b) and SBE Rule 0520-14-01.01(e)). Note: If the February 1 due date for charter applications falls on a Saturday, Sunday, or state-observed holiday, the application materials shall be due on the next business day. Late or incomplete applications will be returned at the applicant's expense or destroyed after 30 days.

## APPLICATION SUBMISSION

Please follow the instructions from the SBE for submitting applications. KCS should receive one (1) electronic copy and five (5) hard copies. The physical copies should be placed in three-ring binders with the front cover and spine labeled with, at a minimum, the name of the proposed charter school and its authorizer. Applications must be accompanied by a **$2,500** application fee made payable to ***Knox County Schools***, which will be used to defer the cost of reviewing the application. If an application is insufficient and is returned to the applicant without review, KCS will return the fee. Once the review process has begun, the fee is nonrefundable.

The electronic copy should be emailed to KCS at charteringauthority@knoxschools.org. The hard copies (which are an exact duplicate of the electronic version) and fee should be submitted to the following address:

| In-person delivery | Mailing Address |
|---|---|
| Knox County Schools<br>Office of Academic Supports<br>Attn: Theresa Nixon<br>UT Tower #435<br>400 W Summit Hill Drive<br>Knoxville, TN 37902<br>***SUBMISSION DUE on the specified date, by 4:30 PM ET.*** | Knox County Schools<br>Office of Academic Supports<br>Attn: Theresa Nixon<br>505 Summer Place<br>UT Tower #435<br>Knoxville, TN 37902<br>***SUBMISSION must be received by the specified date.*** |

KCS | KNOX COUNTY SCHOOLS

When formatting the application, please use the SBE guidelines:

- Formatting requirements to include: margin, font style and size, page numbers, and table of contents.
- The application may not exceed 250 pages; attachments are in addition to the 250-page limit.
- The submitted electronic application has been formatted as one PDF and hyperlinked as appropriate to address either internal or external references.
- Budget documents should be created using the SBE *Budget Template*. Please submit the template as an Excel document. This should be a separate file when submitting the application.
- Five (5) hard copies and one electronic copy should be submitted. In the event of any discrepancies between the hard and electronic copies, KCS will consider the electronic copy as the official copy.
- Each application, whether submitted electronically or as hard copies, contains appropriate signatures on all copies.
- For the paper version, tab and label each section and ensure it follows the order as outlined in the application template's table of contents. Include all attachment cover sheets, and ensure attachments are properly referenced in the narrative.

## APPLICATION REVIEW

The SBE Application Scoring Rubric will be used by the KCS Charter Review Committee to make final recommendations. A strong application should align and/or enhance all relevant KCS priorities outlined in the Request for Proposal (RFP). Proposals that meet the "completeness review" (see below) will be evaluated by the review committee.

### Completeness Review by Authorizer

According to SBE Rule 0520-14-01-.01, KCS as the authorizer will complete within ten (10) business days an initial review of the application for completeness shall notify the sponsor. An application is considered complete if the following its are received by the deadlines.

- An electronic copy of the written application including any required attachments, using the SBE's charter application for the current application cycle.
- Five (5) paper copies of the written application.
- The application fee.

### Application Committee Review & Capacity Interview

The application review consists of an evaluation of the application as submitted **and** a capacity interview with the prospective applicant and their proposed governing board. The district review committee will use the SBE Application Scoring Rubric for the review process. All data collected from the application and capacity interview will be used to submit recommendations to the KCS Board of Education.

Part of the application process is a capacity interview with each applicant and their governing board. The purpose is to further evaluate the leadership team's capacity before making a recommendation to our school board. Using the SBE Application Scoring Rubric, the authorizer will prepare questions for the capacity interview. Upon both a review of the application and the capacity interview, a consensus committee

recommendation will be submitted to the KCS Board of Education to rule by resolution to approve or deny the application within 90 calendar days from the application submission date.

For transparency with our community, we will house all LOI(s), charter application(s), scoring criteria, and other relevant materials from the review cycle on the KCS Charter Schools webpage. We will also provide an opportunity for public comment, which can occur either as a part of a public forum during a school board meeting or via a survey on our charter webpage. The written public comments will be shared with our school board as a part of their decision process.

Once the committee recommendation is ready, we anticipate submitting the recommendation to the KCS Board of Education at a regular voting meeting. However, in the event the review process cannot be completed by that time, we reserve the right for a special-called meeting of the Board within the 90-day application period.

Please let us know if you have any additional questions by emailing charteringauthority@knoxschools.org.

| **Definitions** | |
|---|---|
| Authorizer | A local board of education (Knox County Schools) that makes decisions regarding approval of a charter school application and the renewal or revocation of a charter school agreement. |
| Authorizing | The process of approving an application, negotiating a contract, and conducting ongoing monitoring and oversight of a charter school, including the decision to close or renew. |
| Governing Body | The organized group who will operate a public charter school that's responsible for deciding on budgeting, curriculum, operating procedures, and overseeing administration of the school. |
| Sponsor | The proposed non-profit organization filing an application for the establishment of a public charter school. |

# EXHIBIT 30

**From:** KRISTI KRISTY
**Sent:** Tuesday, December 2, 2025 1:40 PM
**Subject:** Fw: Wilberforce lawsuit

---

**From:** KRISTI KRISTY <kristi.kristy@knoxschools.org>
**Sent:** Tuesday, December 2, 2025 1:22:10 PM
**To:** Matt Hollingsworth <MHollingsworth@wate.com>
**Subject:** Re: Wilberforce lawsuit

Hi Matt,

My understanding is that the board has not yet been formally served with this lawsuit. My knowledge of the pending litigation is based solely on today's reports from local media.

Knox County Schools adheres to all applicable state and federal laws. For any additional comments, I will need to refer you to the Knox County Law Department.

Kristi

*Kristi Kristy*
Knox County Board of Education
9th District
Board Chair

---

**From:** Matt Hollingsworth <MHollingsworth@wate.com>
**Sent:** Tuesday, December 2, 2025 11:54:15 AM
**To:** JOHN BUTLER <john.butler@knoxschools.org>; ANNE TEMPLETON <anne.templeton@knoxschools.org>; PATRICIA FONTENOTRIDLEY <patricia.fontenotridley@knoxschools.org>; KATHERINE BIKE <katherine.bike@knoxschools.org>; LAUREN MORGAN <lauren.morgan@knoxschools.org>; BETSY HENDERSON <betsy.henderson@knoxschools.org>; STEPHEN TRIPLETT <stephen.triplett@knoxschools.org>; TRAVIS WRIGHT <travis.wright@knoxschools.org>; KRISTI KRISTY <kristi.kristy@knoxschools.org>
**Cc:** WATE WebAdmin <WATEWebAdmin@nexstar.tv>
**Subject:** Wilberforce lawsuit

**CAUTION:** External Email. This message originated from outside of the KCS e-mail system.

Hello,

I hope you are all doing well.

We are writing an article on the lawsuit Wilberforce Academy of Knoxville filed against the Knox County Board of Education that names you as defendants. Would you be able to comment on the lawsuit or give us any additional information?

Matt Hollingsworth
Digital Producer
WATE 6 On Your Side
1306 North Broadway
Knoxville, TN 37917
865-633-6938
mhollingsworth@wate.com
www.wate.com

**EAST TENNESSEE'S FIRST TELEVISION STATION**

*Your workday may not be my workday. Please don't feel obligated to reply to this email outside your normal working hours. If it's urgent, I will let you know.*

WATE does not discriminate in advertising contracts on the basis of race, ethnicity or gender and further requires that in the performance of all WATE advertising agreements, WATE requires that each party not discriminate on the basis of race or ethnicity.

This e-mail and any files transmitted with it are the property of Nexstar Broadcasting, Inc., are confidential, and are intended solely for the use of the individual or entity to whom this email is addressed and/or as indicated in the applicable file. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.