**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION (KNOXVILLE)**

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br>*Plaintiff*,<br>v.<br>KNOX COUNTY BOARD OF EDUCATION,<br>*Defendant*,<br>RICHARD COBLE, et al.,<br>*Intervenor-Defendants*,<br>ADRIENNE CARROLL, et al.,<br>*Intervenor-Defendants*. | Case No. 3:25-cv-584-CEA-DCP<br>District Judge Charles E. Atchley<br>Magistrate Judge Debra C. Poplin |

**APPENDIX TO PLAINTIFF'S POST-DISCOVERY MOTION FOR SUMMARY JUDGMENT, VOLUME 3 (APP.1446-2009)**

## TABLE OF CONTENTS


Exhibit 1: Declaration of Zachary Wishart ........ App.1

Exhibit 2: Declaration of Douglas Harris ........ App.19

Exhibit 3: Declaration of David Colquitt ........ App.26

Exhibit 4: Deposition of Zachary Wishart ........ App.34

Exhibit 5: Deposition of Douglas Harris ........ App.75

Exhibit 6: Deposition of David Colquitt ........ App.91

Exhibit 7: Email from Zachary Wishart (Jan. 29, 2026) ........ App.109

Exhibit 8: Wilberforce Charter Application ........ App.111

Exhibit 9: Wilberforce Budget ........ App.391

Exhibit 10: Wilberforce Actions of Directors ........ App.398

Exhibit 11: Email from KCBOE (Dec. 2, 2025) ........ App.401

Exhibit 12: Email from KCBOE (Dec. 5, 2025) ........ App.403

Exhibit 13: Email from KCBOE (Feb. 4, 2026) ........ App.406

Exhibit 14: Wilberforce 501(c)(3) Letter ........ App.409

Exhibit 15: *Christian Group Sues KCBOE* ........ App.413

Exhibit 16: ACLU Oklahoma Press Release ........ App.421

Exhibit 17: Wilberforce Board Meeting Minutes (Apr. 3, 2026) ........ App.434

Exhibit 18: Wilberforce Board Meeting Minutes (June 23, 2026) ........ App.437

Exhibit 19: Wilberforce Board Ratification Resolution ........ App.440

Exhibit 20: Deposition of David Denton ........ App.443

Exhibit 21: Email from Joy Lambrecht (Jan. 29, 2026, 5:20 p.m.) ........ App.450

Exhibit 22: Email from Ben Lindquist (Jan. 30, 2026) ........ App.452

Exhibit 23: Email from Joy Lambrecht (Jan. 29, 2026, 1:50 p.m.) ........ App.454

Exhibit 24: KCBOE's Amended R&Os to Wilberforce's RFPs ........ App.457

Exhibit 25: KCBOE's Amended R&Os to Wilberforce's RFAs ........ App.462

Exhibit 26: KCBOE's Amended R&Os to Wilberforce's Second Interrogatories....................App.473

Exhibit 27: Wilberforce Letter of Intent..........................................................................App.479

Exhibit 28: Wilberforce Letter of Intent Executive Summary....................................................App.486

Exhibit 29: KCBOE Charter Application Guidance.................................................................App.491

Exhibit 30: Email from Kristi Kristy (Dec. 2, 2025).....................................................................App.495

Exhibit 31: Emerald Application ....................................................................................App.498

Exhibit 32: Knoxville Prep Application..............................................................................App.789

Exhibit 33: Emerald Original Charter Agreement ..........................................................App.1446

Exhibit 34: Emerald Renewal Charter Agreement.............................................................App.1463

Exhibit 35: KCBOE Board Meeting Minutes (June 5, 2025) ...........................................App.1481

Exhibit 36: Knoxville Prep Charter Agreement ..................................................................App.1490

Exhibit 37: Memorandum from Jon Rysewyk (May 29, 2014)............................................App.1507

Exhibit 38: KCBOE Technical Assistance Workshop Video ...............................................App.1512

Exhibit 39: KCBOE Technical Assistance Workshop Slides................................................App.1514

Exhibit 40: KCBOE Board Meeting Minutes (Apr. 9, 2026) ..............................................App.1543

Exhibit 41: KCBOE Policy I-450 ......................................................................................App.1551

Exhibit 42: KCBOE Charter School Handbook.................................................................App.1554

Exhibit 43: KCBOE Charter Performance Framework......................................................App.1580

Exhibit 44: KCBOE Annual Authorizer Report (2024-25)...................................................App.1608

Exhibit 45: KCBOE Called Board Meeting Video (Feb. 5, 2026)........................................App.1676

Exhibit 46: KCBOE Called Board Meeting Minutes (Feb. 5, 2026) ...................................App.1678

Exhibit 47: Tennessee Charter Application Form ..............................................................App.1683

Exhibit 48: Tennessee Charter School Pre-Opening Checklist............................................App.1728

Exhibit 49: *Education Freedom Scholarship FAQs* .................................................................App.1754

Exhibit 50: *Tennessee Education Freedom Scholarship Program* ...........................................App.1774

Exhibit 51: Wooddale Middle School Charter Agreement ........ App.1777

Exhibit 52: Wooddale Middle School Charter Application ........ App.1801

Exhibit 53: LEAD Neely's Bend Charter Agreement ........ App.1822

Exhibit 54: LEAD Neely's Bend Charter Application ........ App.1846

Exhibit 55: Tennessee Public Charter School Commission Policy 4804 ........ App.1856

Exhibit 56: Tennessee Public Charter School Commission Charter Performance Framework ........ App.1858

Exhibit 57: ACLU of Tennessee Amended and Restated Charter ........ App.1910

Exhibit 58: Carroll Intervenors' Amended R&Os to Wilberforce's First Interrogatories ........ App.1916

Exhibit 59: Deposition of Holly Slater ........ App.1931

Exhibit 60: Deposition of Richard Coble ........ App.1946

Exhibit 61: Deposition of Kerry Dooley ........ App.1955

Exhibit 62: Deposition of Amanda Collins ........ App.1963

Exhibit 63: Deposition of Elizabeth Porter ........ App.1972

Exhibit 64: Deposition of Katina Sharp ........ App.1983

Exhibit 65: Coble Intervenors' Amended R&Os to Wilberforce's RFAs ........ App.1992

# EXHIBIT 33

# Charter School Agreement

This Charter Agreement (the "agreement") is entered into this, the 1st day of April 2015, by and between the Knox County Board of Education ("KCBE," the Chartering Authority) and Emerald Charter Schools (the Sponsor or Charter School, those terms being used interchangeably herein; provided that references herein to "Charter School" shall not include other schools operated by the Sponsor). Chartering Authority and Sponsor are collectively the Parties to this Charter Agreement. This Charter Agreement shall be binding upon the Governing Body, as defined by T.C.A. §49-13-104, selected by the Sponsor to operate the public charter school proposed in the Sponsor's Application, which, together with any addenda supplied for the Chartering Authority's consideration during the course of the application process, shall be referred to and considered collectively as the "Application,"which Governing Body is the Board of Directors of Emerald Academy.

This contract consists of the following documents:

- This document;
- Approved charter school Application; and
- Pre-opening Checklist.

**Recitals:**

WHEREAS, the State of Tennessee enacted the Tennessee Public Charter Schools Act of 2002 (T.C.A. § 49-13-101 et. seq.) effective July 4, 2002 (the Act) authorizing the establishment of independent, publicly supported schools known as charters schools; and

WHEREAS, the purposes of the Act include providing "options relative to the governance and improvement of high priority schools, the delivery of instruction for those students with special needs, improv[ing] learning for all students and clos[ing]...achievement gap[s];" and

WHEREAS, charter schools "provide [one] alternative means within the public school system for ensuring accomplishment of the necessary outcomes of education by allowing the establishment and maintenance of public charter schools that operate within a school district structure but are allowed maximum flexibility to achieve their goals;" and

WHEREAS, the Act empowers the Chartering Authority to ensure that only those charter schools open and remain open that are meeting the best interests of the pupils, the school district or the community, and the Act enables the Chartering Authority to do this through rigorous authorization processes, ongoing monitoring of the academic, organizational and financial performance of charter schools, and, when necessary, through the revocation or non-renewal of charters;

WHEREAS, KCBE has approved the Sponsor's application to operate a charter school;

WHEREAS, pursuant to T.C.A. § 49-13-111(a)(1), the Charter School, known as Emerald Academy, shall operate as a public, nonsectarian, nonreligious public school, with control of instruction vested in the Governing Body of the Charter School under the general supervision of KCBE and in compliance with this agreement and the Act; and

WHEREAS, pursuant to T.C.A. § 49-13-124, the Charter School may conduct all activities necessary and appropriate to carry out its responsibilities, including but not limited to the power to contract, the power to buy and lease property, and the power to borrow funds; and

WHEREAS, the Chartering Authority has developed a Pre-Opening Manual to provide guidance and articulate expectations to Emerald Academy and future charter schools regarding the process for opening a charter school in Knox County.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **General Terms**

1.1 **Applicable Law.** This Charter Agreement and the Charter School's operations shall be governed by and construed in accordance with the laws of the state of Tennessee and applicable federal laws of the United States. Though the Governing Body may, pursuant to T.C.A. § 49-13-105, seek waivers from the Chartering Authority or the commissioner of education from Tennessee laws or rules of the State Board of Education that inhibit the Charter School's mission, the Parties understand that waivers may not be provided from the types of laws and rules specifically listed in T.C.A. § 49-13-105, from any provisions of Title 49, Chapter 13 (the Tennessee Public Charter Schools Act) or those included in the Act by reference, or from other laws specifically applicable to charter schools (such as those related to benefits or retirement of charter school employees contained in Title 8, Chapter 27, Part 3). Nothing in this section shall require staff members who work in a regional or national capacity and are not teachers at a school located in Tennessee to comply with the requirements of Title 8, Chapter 27, Part 3.

As required by T.C.A. §49-13-110, this Charter Agreement includes all components of the Sponsor's Application, which is incorporated herein by reference and attached hereto as Exhibit 1.

By signing this agreement, the Chartering Authority approves any waivers requested in the Sponsor's Application. Those requests and any others subsequently requested by the Governing Body are attached as part of the approved charter application.

1.2 **Effective Date.** This Agreement shall be effective immediately following signature by Sponsor and the Chartering Authority. The Agreement shall expire on June 30 of the tenth year after the date of opening the Charter School for instruction (June 30, 2025), unless earlier terminated or renewed pursuant to the terms of this Agreement or state law.

1.3 **Pre-Opening Process.** Upon approval by the Knox County Board of Education (KCBE) the sponsor will begin the pre-opening process as prescribed by the Pre-Opening Checklist, a copy of which is attached hereto as Exhibit 2, and outlined in the pre-opening manual. If the pre-opening process is substantially incomplete at the time of inspection, the KCBE may decide not to open the school until it has completed all pre-opening steps under T.C.A. 49-13-111 and T.C.A. 49-13-113.

1.4 **Charter School Performance.** The operation of the Charter School by the Governing Body shall be subject to the terms and conditions of this Charter Agreement and the Act. Decisions by the Chartering Authority regarding renewal or revocation of the Charter Agreement shall be based upon T.C.A. § 49-13-122 and any other applicable laws and rules. Pursuant to T.C.A. § 49-13-111(a)(1), Emerald Academy shall operate as a public, nonsectarian, nonreligious public school under the general supervision of KCBE.

Consistent with the right to exercise general supervision, KCBE may take all reasonable steps to oversee the Charter School's performance, including compliance with this Agreement and applicable law. This includes the opportunity: a) to visit and inspect the school building; b) to examine public records of the Charter School, upon reasonable notice; c) upon reasonable notice, to interview Charter School employees and Governing Body members; and d) to interview students and families.

The Parties agree that the most critical performance measures are the academic measures, which may include student achievement, student growth measures (including annual measurable objectives), readiness for successive school levels (middle and high school), as well as mission specific academic goals defined in the application.

The Chartering Authority shall – at least annually – monitor and periodically report on the Charter School's progress in relation to the indicators, measures, metrics, and targets set out in the charter school application and reported on the State Report Card. Such reporting shall become part of the Charter School's annual report to the Chartering Authority and the state commissioner of education.

The Chartering Authority shall also conduct an interim review at the end of the fifth year after the effective date of the Agreement, pursuant to T.C.A. § 49-13-121.

The performance expectations outlined in the charter school application may need to be modified to align with changes to applicable state or federal accountability requirements as requested by the Chartering Authority. Such changes shall apply to the Charter School as required by law. In the event that any such modifications or amendments are required, the Chartering Authority will use best efforts to apply expectations for school performance in a manner consistent with those set forth in the charter school application as initially established in the most recent charter agreement.

Changes to performance expectations that are not required by state or federal law will not become binding upon the Charter School without the Charter School's consent, except at the time of charter renewal or amendment.

1.5 **Location.** The Charter School is located at 220 Carrick Street, Knoxville, TN 37921. Such location shall be subject to and in accordance with the Application and its Addendum, as well as all applicable laws and codes governing the location and occupation of educational facilities. If the school were to be changed to a location at a site controlled by the Chartering Authority, the use of such site shall be subject to and governed by a Facilities Agreement between the Parties. If the Charter School decides to change the location of the Charter School, the Charter School shall notify the Chartering Authority at least 30 business days prior to any such change of location. The determination of such location shall be subject to the approval of the Chartering Authority, in accordance with the approved Application and Addendum.

1.6 **Employment Status.** All teachers and other staff of the charter school shall be employed by the Charter School, not the Chartering Authority. Nothing in this agreement shall prevent the Charter School from contracting with any other non-profit organization to provide employees for the Charter School.

2. **Charter School and Chartering Authority Organizational Responsibilities**

2.1 **Student Enrollment and Retention.** The Charter School shall enroll students according to T.C.A. §49-13-113 but will not use the Chartering Authority's application process. The Charter School shall not discriminate with respect to admissions on the basis of race, ethnicity, religion, national origin, English language proficiency, academic or athletic ability, gender identity, sexual orientation or the need for special education and related services as set forth in the Application and the Act.

The Charter School may enroll students up to a total maximum of 540 students. Enrollment shall be determined initially at the start of each academic year, but will be recalculated periodically within each year by the Charter School and Chartering Authority. Increases in total enrollment numbers greater than 5% or 25 students, whichever is less, constitute a material change in this Charter Agreement, and are not permitted unless formal amendment to this Charter Agreement is secured in advance according to the provisions outlined in T.C.A. §49-13-110(b). Reductions in enrollment greater than 15% or 50 students, whichever is less, must be reported to the Office of Innovation and reductions in enrollment at such levels in any year or over two or more years may be considered material and require an amendment to this Charter Agreement or other action by the Chartering Authority. Multi-year reductions in enrollment which affect the financial viability of the Charter School may be considered material and require an amendment to this Charter Agreement or other action by the Chartering Authority. For purposes of determining whether a reduction in enrollment under this section is a material change, the calculation of total enrollment numbers shall not include reductions in enrollment for causes outside the control of the Charter School (such as the family of an enrolled student moving out of the school district). Accurate and true enrollment numbers shall always be maintained by the Charter School, and reported to the Chartering Authority and other entities (e.g., Tennessee Department of Education or State Board of Education) upon request. When providing said enrollment numbers to the Chartering Authority, the Charter School may include a listing of students withdrawing for reasons claimed to be outside the control of the Charter School. A parent or guardian's decision to withdraw his or her student from the Charter School, if that student still lives within the district, shall be determined on a case by case basis to determine whether the student's withdrawal may fairly be attributed to the Charter School or to causes outside the control of the Charter School.

"If the number of applications exceeds the capacity of a program, class, grade level or building, enrollment shall occur according to the preferences in T.C.A. § 49-13-113(b)(2)(A). "If enrollment within a group of preferences set out in subdivision (b)(2)(A) exceeds the planned capacity of the school, enrollment within that group shall be determined on the basis of a lottery" that complies with the quoted statutes.

The Charter School may not "counsel out" or discourage students from attending the Charter School for any reason nor will the Charter School use the purported failure of compliance with a letter of commitment or a contract between the Charter School and students/parents as a mechanism to encourage withdrawal of students from the Charter School.

Approved enrollment at Emerald Academy, by grade level, shall be as follows for each academic year governed by this Agreement:

| Year | Grade Level | Total Enrollment |
|---|---|---|
| Year 1 | K, 1 | 120 |
| Year 2 | K, 1, 2, 5 | 240 |
| Year 3 | K, 1, 2, 3, 5, 6 | 360 |
| Year 4 | K, 1, 2, 3, 4, 5, 6, 7 | 480 |
| Year 5 | K, 1, 2, 3, 4, 5, 6, 7, 8 | 540 |
| Year 6 | K, 1, 2, 3, 4, 5, 6, 7, 8 | 540 |
| Year 7 | K, 1, 2, 3, 4, 5, 6, 7, 8 | 540 |
| Year 8 | K, 1, 2, 3, 4, 5, 6, 7, 8 | 540 |
| Year 9 | K, 1, 2, 3, 4, 5, 6, 7, 8 | 540 |
| Year 10 | K, 1, 2, 3, 4, 5, 6, 7, 8 | 540 |

2.2 **Academic Program.** Pursuant to TCA § 49-13-111(a)(1), Emerald Academy shall operate as a public, nonsectarian, nonreligious public school, with control of instruction vested in the Governing Body of the Charter School. The Charter School shall operate the academic program in accordance with the charter agreement and academic state and federal law, including providing the same equivalent time of instruction as other public schools and complying with assessment and accountability laws and rules (T.C.A. §49-13-105).

2.2.1 **Assessments.** The charter school must use the required state assessments.

2.3 **Students with Disabilities.** Special education services, related services, and accommodations for students who are eligible under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973 (Section 504), the Americans with Disabilities Act (ADA), or any applicable provisions of state law, shall be provided in accordance with applicable state and federal law, this Agreement and the Chartering Authority's policy. The Chartering Authority is the local education agency (LEA) for purposes of compliance with the Individuals with Disabilities Education Act (IDEA). The Chartering Authority, pursuant to state law, addresses the needs of services for students with disabilities and gifted services in its Student Support Services division.

2.3.1 **Responsibility of the Chartering Authority.** THE CHARTERING AUTHORITY is responsible for ensuring that the requirements of federal and state special education law and regulations are met in the Charter School, and that special education and related services are provided in the Charter School in a comparable manner as they are provided in the district's direct-run schools. Additionally, THE CHARTERING AUTHORITY will oversee procedural compliance with federal and state law and regulations concerning accommodation of and education of students with disabilities.

THE CHARTERING AUTHORITY will collaborate with the Charter School in the same manner in which it works with its other schools in the identification and referral process, and in conducting initial evaluations for exceptional education. THE CHARTERING AUTHORITY will notify the Charter School if an enrolling student has an existing individualized education program (IEP) and will provide the Charter School with records within 10 business days of receipt of a request by the Charter School for the records.

**2.3.2 Responsibility of the Charter School.** The Charter School shall have an effective educational model for the delivery of special education services that complies with federal and state law. Once a student has been identified as eligible for special education services, the Charter School assumes responsibility for the provision of services, development and implementation of individualized education programs (IEPs), procedures and documentation. Special education services at the Charter School will be delivered by individual or agencies licensed and/or qualified to provide special education services required by the Tennessee Public Charter Schools Act and the IDEA. Charter School staff may participate in any Chartering Authority professional development related to special education or the provision of services pursuant to Section 504.

The Charter School may also enter into a separate fee for services agreement with a third party provider of educational services (Contract Services Provider), provided that such third party provider complies with all applicable laws and the requirements imposed on contractors by this Charter Agreement.

The Charter School, or Contract Service Provider, shall have a qualified special education coordinator who will be responsible for monitoring individual case management of all special education students and for arranging the provision of services required by their IEP. Charter School, or Contract Service Provider, shall maintain a file documenting Charter School's compliance with special education requirements.

**2.3.3. Costs for Special Education.**
THE CHARTERING AUTHORITY is financially responsible for child find, including student identification and initial assessment expenses. Once a student has been determined eligible for special education services and has an individualized education program (IEP), all costs associated with providing educational services to students with disabilities are the responsibility of the Charter School. The Charter School shall bear the financial responsibility for reevaluations and the provision of all services consistent with IEP's. The Charter School's financial obligation begins once a student has an IEP.

THE CHARTERING AUTHORITY will pass Federal funding to the Charter School on a reimbursement basis for services provided to students who are eligible pursuant to the Individuals with Disabilities Education Act. Funding is available on a reimbursement basis at the end of the first semester for all eligible students enrolled and served at the end of the first attendance period. The allocation for the second semester will be based on the number of eligible students enrolled and served on the December 1 census of eligible exceptional students. In addition, when THE CHARTERING AUTHORITY submits requests to the state department of education for high cost students, THE CHARTERING AUTHORITY will include students at the Charter School in its count. THE CHARTERING AUTHORITY will pay a pro rata share of any high costs reimbursement received from the state for such students at the Charter School.

**2.3.4 Compliance.** No student shall be denied admission nor counseled out of the Charter School due to the nature, extent, or severity of his/her disability or due to the student's request for, or actual need for, special education services or accommodations pursuant to Section 504.

The Charter School shall promptly report to the Chartering Authority any and all alleged infractions, complaints, and other non-compliance issues relating to special education.

2.4 **English Language Learners.** The Charter School shall address the needs of English Language Learner (ELL) students pursuant to applicable federal and state laws and regulations (including Title III of the Elementary and Secondary Act (ESEA). The Charter School agrees to maintain and consistently implement a policy to identify students in need of ELL services, to provide services in an equitable manner to ensure access to the school's educational program (including the provision to appropriate accommodations), and to facilitate exit from ELL services according to individual student capacity. The Chartering Authority will provide equitable services and/or funding to the Charter School in the same manner as services and/or funding is provided to private schools in Knox County.

2.5 **Student Discipline/Due Process.** The Charter School is responsible for administering its discipline policy in a manner that ensures students' due process rights are satisfied, including the provision of appropriate informal or formal hearings. The Charter School shall promptly notify the Chartering Authority of students expelled. The Chartering Authority shall provide expelled charter school students access to the Chartering Authority's alternative school programs in the same manner as it provides access to any student within the LEA.

2.6 **Student Information Reporting.** While ensuring compliance with federal and state law regarding student records, the Charter School shall report student information as follows:

- Enrollment projections for the coming year no later than February 15.
- Daily attendance using the Chartering Authority's Student Management System (Aspen SIS).
- Student enrollment for determining average daily membership by the date required by the department of education.

The charter school shall monitor their student population with respect to student withdrawals, suspensions, transfers and expulsions. A quarterly report is due to the Chartering Authority.

| Quarter | Withdrawal | Transfer | Suspension | Expulsion |
|---|---|---|---|---|
| Q1 | | | | |
| Q2 | | | | |
| Q3 | | | | |
| Q4 | | | | |

3. Staffing

3.1 **Teachers.** The Charter School shall ensure that teachers are licensed pursuant to state statutes and state board of education rules, and meet applicable federal qualifications including highly qualified, special education certified and ESL certified.

3.2 **Background Checks.** All current employees of the Charter School who have or will have contact with children at the Charter School within the scope of the individuals' employment, and employees of contractors or sub-contractors of the Charter School who

have contact with children within the scope of the individual's employment, shall complete criminal background checks as required by state law.

4. **Facility**

The Charter School shall ensure the Charter School's grounds and facilities comply with applicable health and safety laws, including the Americans with Disabilities Act, state fire marshal codes and state and local zoning and land use codes.

The Charter School may not commence instruction prior to completion of applicable inspections and receipt of a completed Pre-Opening Checklist (Exhibit 2) or letter from the Chartering Authority.

5. **Food Service**

Food service for students at Emerald Academy shall be provided pursuant to the requirements of state law. The Chartering Authority and the Charter School will enter into a separate memorandum of understanding ("MOU"), which shall define the parties' obligations with respect to food service. Unless otherwise agreed by the Governing Body of the Charter School, THE CHARTERING AUTHORITY shall provide food services pursuant to the terms of the Application, with Addendum, as approved by the Chartering Authority. The parties authorize their respective agents to execute a MOU regarding food services and further authorize their respective agents to alter or amend such MOU in future years to redefine the obligations of the parties.

6. **Transportation**

Transportation for students shall be provided pursuant to the requirements of state law. If the Charter School elects to provide transportation for its students, the Chartering Authority shall provide to the Charter School the funds that would otherwise have been spent to provide transportation as provided in T.C.A. § 49-13-114. In order to receive these funds, the Charter School must comply with state laws and state board of education rules regarding student transportation. Students shall be transported in buses that have been approved for the transportation of students by the department of safety. The Charter school shall provide transportation services to its students by either (a) contracting with such services through a properly licensed and qualified sub-contractor, (b) providing such services itself, or (c) entering into a separate memorandum of understanding with the Chartering Authority to provide such services, though the parties are not obligated to enter into such an agreement.

7. **Insurance**

The Charter School shall maintain the following insurance:

- General Aggregate & Commercial Automobile: must be equal to or greater than $5,000,000. This insurance shall be primary insurance. Any insurance or self-insurance programs covering the KCBE or Knox County Government, their officials, employees, and volunteers shall be in excess of this insurance and shall not contribute to it. The first one million dollars must be with a company licensed to do business in the state of Tennessee. The remaining $4,000,000 can be covered under an excess liability policy (also known as an "umbrella" policy). <u>The policy must name Knox County Board of Education and Knox County, Tennessee as additional insureds.</u> The policy must cover liability for transportation of students, including transportation by outside vendors with

whom the Charter School has contracted. Automobile coverage shall cover vehicles owned, hired, and non-owned.

- Professional Liability Policies: Directors and Officers Policy: equal to or greater than $2,000,000. Teachers Professional Liability Policy equal to or greater than $1,000,000.
- Workers Compensation and Employers Liability Policy: The amount of coverage required for Workers Compensation is determined by statute. Sponsor must comply with state statutes. Employers Liability must be a minimum of $100,000.
- Property and Boiler Insurance Policy: If the Charter School purchases the property that will be used by the Charter School, it shall purchase "all risks" property and boiler insurance. Insurance shall be for the full replacement cost of the property and contents with no coinsurance penalty provision.
- Sexual Abuse Policy: $1,000,000 required coverage

Certificates of insurance, in a form satisfactory to the Chartering Authority, evidencing coverage shall be provided to the Chartering Authority according to the following schedule:

General/Automotive Liability: Within thirty (30) days of the execution of this agreement.
Professional Liability (D&O): Within thirty (30) days of the execution of this agreement.
Professional Liability (Teachers): No later than upon hiring of teachers.
Workers' Compensation: No later than when required by statute.
Property and Boiler: No later than upon acquisition of property.
Sexual Abuse: Prior to staff interaction with students or prospective students.

Throughout the term of this Charter Agreement, Sponsor shall provide updated certificates of insurance upon expiration of the current certificates.

## 8. Governance

**8.1** The Charter School's Articles of Incorporation, a Certificate of Incorporation evidencing its incorporation as a nonprofit and evidence of its exemption from federal taxation under IRC § 501(c)(3), its Bylaws and amendments or modifications thereto shall be made part of this Agreement.

The Governing Body shall comply with the provisions of T.C.A. §49-13-109.

The Charter School shall comply with all applicable provisions of the Tennessee Open Meetings Act, including with regard to the scheduling of Governing Body meetings, meeting agendas, public notice of meetings, and records of those meetings. At the start of each school year the Charter School shall provide to the Chartering Authority a schedule of Governing meetings for that school year.

As required by T.C.A. § 49-13-111(g), the Governing Body shall be subject to the conflict of interest provisions contained in T.C.A. § 12-4-101 and 102.

**8.2 Complaints.** In that control of instruction is vested in the Governing Body of the Charter School, the Governing Body shall be the first avenue for response in case of any complaints or grievances filed against the Charter School or its employees and volunteers before matters are brought to the administration or board of the Chartering Authority The Governing Body will ensure that the Charter School establishes policies and procedures for employees and policies and procedures regarding complaints and grievances. The Governing Body will make those policies available to students, parents/guardians, employees and any other persons who

request it. If grievances persist following the actions of the Governing Body, those complaints will be investigated and resolved by the Chartering Authority. Investigation and sanctions by the Chartering Authority are limited to alleged violations of laws or the Charter Agreement.

The Charter School shall notify the Chartering Authority immediately if at any time the Charter School receives notice or is informed that it is a party to a lawsuit.

The Charter School shall report the following to the Chartering Authority within five (5) working days of change:

- The names and contact information of individuals who leave or join the Governing Body;
- Names and contact information of any individuals who, during the prior quarter, resign from or are hired to a leadership position in the Charter School, including any administrative position; and
- Any change to the Charter School's corporate legal status or any change in its standing with the Tennessee Secretary of State's Office.

8.3 By signing and submitting an application, the sponsor requests a waiver of all education statutes and rules of the state board or Department of Education and the KCBE, except those listed in T.C.A. § 49-13-105 or included by reference (such as statutes and rules related to licensing of charter school teachers) in Title 49, Chapter 13 (the Tennessee Public Charter Schools Act). The approval of this charter school contract by the KCBE shall include the approval of these waivers by the Commissioner of Education, and such automatic waivers shall be reflected in the contract.

**9. Finance**

**9.1. State and Local Funds.** The Chartering Authority shall allocate one hundred percent (100%) of the state and local funds to the Charter School on a per pupil expenditure basis as provided in T.C.A. § 49-13-112 and as calculated by the formula provided by the Tennessee State Department of Education. The Chartering Authority shall distribute funds to the Charter School after each attendance reporting interval (ten (10) consecutive months throughout each school year) beginning in August, 2015. Each distribution will include documentation reflecting how the amount was calculated, as well as any necessary adjustments to reflect actual attendance and tax revenue data. In the event that the Charter School does not contribute the required costs, the Chartering Authority may withhold funds to cover the costs of participation in the LEA's benefits and retirement plans by the Charter School's employees, pursuant to T.C.A. §§ 49-13-112 and 119.

**9.2 Fee for Services Agreement.** The Parties may enter into a separate fee for services agreement, for the provision of services not already identified in this agreement by the Chartering Authority to the Charter School (e.g., computer network services, food services, special education providers, professional development service). Failure of the Charter School to enter such an agreement shall not be grounds for revocation or non-renewal of this Agreement.

**9.3 Tuition.** The Charter School shall not charge tuition.

**9.4 Charter School Debt.** The Charter School is solely responsible for all debt it incurs, and the Chartering Authority shall not be contractually bound on Charter School's account to any third party. The Chartering Authority shall not be liable for the Charter School's

unpaid debts if the Charter School does not have sufficient funds to pay all of its debts in the event that it ceases operations.

The Charter School shall notify the Chartering Authority immediately of a default on any obligation owed to the Chartering Authority, which shall include debts for which payments are past due by sixty (60) business days or more. If debts are incurred in the provision of employee benefits pursuant to T.C.A. § 49-13-119, the Chartering Authority may withhold the amount owed from the monthly payment until such debts are satisfied. Any other debts owed to the Chartering Authority must be satisfied prior to the release of the last annual payment.

9.5 **Financial Management.** The Charter School shall control and be responsible for financial management and performance of the Charter school including budgeting and expenditures. Before receiving Basic Education Program (BEP) funds through the Chartering Authority, the Charter School must demonstrate (if not already demonstrated in the application) the existence of appropriate governance and managerial procedures and financial controls including

- Accounting methods complying with T.C.A. § 49-13-111(m);
- A checking account
- Adequate payroll procedures
- An organizational chart;
- Procedures for the creation and review of monthly and quarterly financial report, including identification of the individual responsible for preparing such financial reports in the following fiscal year;
- Internal control procedures for cash receipts, disbursements and purchases; and
- Maintenance of asset inventory lists and financial procedures for federal grants in accordance with applicable federal law.

The Charter School shall comply with T.C.A. §§ 49-13-111, 120, and 124 regarding completion and submission of annual financial reports and audits to the Chartering Authority and the state. Pursuant to T.C.A.§ 49-13-111(m), the Chartering Authority may require additional financial reports beyond the annual report if the Chartering Authority has reason or reasons to believe that the Charter School is not in compliance with the Act and if the reason or reasons are stated in writing to the sponsor. Prior to the implementation of the requirement for additional reports, the Charter School shall have ten (10) days from receipt of the written notice to provide a response to the Chartering Authority.

9.6 **Financial Records.** Upon reasonable notice, all financial records of the Charter School pertaining to the management and operation of the School are subject to inspection and production as required for fulfillment of the Chartering Authority's fiduciary responsibilities.

10. **Benefits.** The Charter School shall be responsible for following the requirements set forth in the Memorandum of Understanding between the KCBE, the State of Tennessee Department of Finance and Administration Benefits Administration and the Charter School.

The Charter School shall be responsible for any penalties imposed for failure to comply with the Patient Protection and Affordable Care Act (PPACA) (Public Law 111-148 as

amended by Public Law 111-152). This includes but is not limited to penalties under the PPACA amendments to the Public Health Service Act (42 U.S.C. 300gg et. seq.), the employer responsibility section of the Internal Revenue Code (26 U.S.C. 498OH), and regulations implementing those provisions.

11. **Amendments.** Pursuant to T.C.A. § 49-13-110, petitions to amend this Agreement shall follow the timelines established in T.C.A. § 49-13-108 for approval or denial by the Chartering Authority and appeal to the state board of education. An amendment shall not become effective, and the Charter School may not take action or implement the change requested in the amendment until the amendment is approved by the Chartering Authority.

Not all changes to school operation constitute material changes to the Agreement that require an amendment. However, the following changes are considered material and require an amendment:

- Changes in any Material Term of this Charter Agreement;
- Changes in the Charter School's mission;
- Changes in school location (change of site and/or adding or deleting sites);
- Changes in enrollment beyond the maximum limit established in this Agreement – increases of more than 5 % total enrollment or 25 students, whichever is less; or reductions of more than 50 students or 15%, *whichever is less;* and
- Changes in school calendar that reduce the calendar below the requirement to provide at least the same equivalent time of instruction as required in regular public schools in T.C.A. § 49-13-105.

Pursuant to TCA § 49-13-111(a)(1), educational program matters not specifically identified in this Agreement shall remain within the Charter School's authority and discretion.

The following changes do not require an amendment, but the Charter School must notify the Chartering Authority of any of the following within thirty (30) days:

- Changes to the budget submitted in the attached Application, subject to the requirements of state and federal law;
- Changes in the mailing address, phone or fax number, or web address of the Charter School;
- Changes in the members and duties of the Governing Body;
- Changes in the school leader or, if applicable, the chief executive of the charter management organization; and
- Changes in signing authority for the school.

12. **Renewal, Revocation, Appeals, Closure and Dissolution**

**12.1 Renewal.** Pursuant to T.C.A. § 49-13-121, the Charter School may apply for renewal of this Charter Agreement by application submitted no later than April 1 of the year preceding the year in which this agreement expires and in accordance with KCBE renewal policies (April 1, 2024). Pursuant to T.C.A. § 49-13-121(b), the Chartering Authority shall rule by resolution upon whether to approve or deny the renewal application by February 1 of the tenth year of this agreement (February 1, 2025). The Agreement may be renewed without modification, except for the incorporation by attachment of the approved renewal application. Pursuant to T.C.A. § 49-13-121, the Parties may also amend the Agreement as part of the renewal process.

The Chartering Authority may elect not to renew this Charter Agreement pursuant to T.C.A. § 49-13-121, for any of the applicable reasons in T.C. A. § 49-13-122, including a material violation of any of the conditions, standards or procedures set forth in this Agreement. Pursuant to T.C.A. § 49-13-122(b), the Chartering Authority shall state its reasons for the nonrenewal. Pursuant to T.C.A. § 49-13-121(e), the Chartering Authority shall provide the Charter School with a performance report that directly reflects the renewal evaluation no later than April 1 of the eighth year of this agreement (April 1, 2022 ).

**Revocation.** Except for immediate threats to the health, safety and welfare of a child where the Charter School has not taken immediate and appropriate action, the Chartering Authority will provide reasonable notice to the Charter School of non-compliance with applicable laws, rules, or this agreement, and will give the Charter School a reasonable opportunity to cure the non-compliance prior to instituting revocation proceedings pursuant to T.C.A. § 49-13-121 and 122.

Except for immediate threats to the health, safety and welfare of a child where the Charter School has not taken immediate and appropriate action, the Chartering Authority will follow a progressive system of notification and calls for corrective action on the part of the Charter School.

The Chartering Authority may revoke this Charter Agreement for any reason set forth in T.C.A. § 49-13-122, including a material violation of any of the conditions, standards, or procedures set forth in this Agreement.

If the Chartering Authority determines that any grounds for revocation exist, it may revoke this Charter Agreement according to the procedures set forth in T.C.A. § 49-13-122. Pursuant to T.C.A. § 49-13-122(b), the Chartering Authority shall state its reasons for the revocation.

**Appeals.** Except for violations of T.C.A. § 49-13-122(a), appeals of a nonrenewal or revocation may be appealed to the state board of education. Such appeal shall be taken within ten (10) days of the Charter School receiving written notice of the nonrenewal or revocation.

**12.2 Closure and Dissolution.** In the event that the Charter School is required to cease operation for any reason, including but not limited to non-renewal, revocation, or voluntary surrender of the charter, the Charter School shall cooperate with the Chartering Authority to ensure orderly closure of the charter School including, but not limited to:

- Timely notification of parents and teachers of the closure decision;
- Securing student records and transporting them to the chartering authority;
- Assisting in placing students in appropriate schools;
- Managing all financial records consistent with the Chartering Authority's school closure requirements and policies; and
- Disposal of school assets in accordance with the Act and this Agreement. "School Assets" shall be defined to include only those assets directly related to the operation of schools within Knox County, and shall not include any other assets the Governing body may hold in other regions.

Dissolution of the Charter School following revocation or non-renewal shall comply with T.C.A. § 49-13-110(c). The Charter School shall be responsible for winding down operations, including

payment of any and all debts, obligations, or liabilities incurred at any time by the Charter School. Under no circumstances shall the Chartering Authority be responsible for such obligations.

**13. Litigation Notice & Cooperation**

The Chartering Authority and Charter School each shall give prompt written notice to the other of the assertion of any claim or the commencement of any litigation involving the operation of the Charter School and shall cooperate with each other in the defense of the claim or litigation.

**14. Contract Construction**

**14.1. Waiver.** The failure of either Party to insist on strict performance of any term or condition of this Agreement shall not constitute a waiver of that term or condition, even if the Party accepting or acquiescing in the nonconforming performance knows of the nature of the performance and fails to object to it.

**14.2 Non-assignability.** No right or interest in this Agreement shall be assigned by anyone on behalf of the Charter School, and delegation of any contractual duty of the Charter School shall not be made without prior written approval of the Chartering Authority. A violation of this provision shall be grounds for immediate termination of this Agreement and revocation of the Charter.

Should the Charter School propose to enter into a contract with another non-profit entity to manage the School, the Charter School agrees to submit all information requested by the Chartering Authority regarding the management arrangement, including a copy of the proposed contract and a description of the management company, with identification of its principals and their backgrounds. The Charter School shall not enter into a management contract without written approval from the Chartering Authority.

**14.3 Agreement.** Except as stated herein, the Parties intend this Agreement, including all attachments and exhibits, to represent a final and complete expression of their agreement, which shall be considered the Agreement. All prior representations, understandings and discussions are merged herein, and no course of prior dealings between Parties shall supplement or explain any terms used in this document. The Parties recognize that amendments to this Agreement may be executed from time to time hereafter.

**14.4 Survival of Representations and Warranties.** All representations and warranties hereunder shall be deemed to be material and relied upon the Parties with or to whom the same were made, notwithstanding any investigation or inspection made by or on behalf of such Party or Parties. The representations and warranties covered in this Agreement will survive the termination or expiration of this Agreement.

**14.5 Severability.** The provisions of this Agreement are severable. Any term or condition deemed illegal or invalid shall not affect any other term or condition, and the remainder of the Agreement shall remain in effect unless otherwise terminated by one or both of the Parties.

**14.6 Authority.** The individual officers, agents and employees of the parties hereto who execute this Agreement do hereby individually represent and warrant that they have full power and authority to execute this Agreement.

**14.7 Notice.** Any notice required under Section 1.5 (change in location), Section 8.2 & 13 (notice of litigation), Section 7.3 (members of governing body or leadership of Charter School or Charter School's corporate legal status or standing), Section 9.4 (default on debts), Section 11 (requests for amendments and notifications of changes in program or operation), and Section 12.1 (renewal and revocation) of this Agreement shall be in writing, delivered in person or sent by certified mail, postage prepaid. Such notice shall be effective immediately upon personal delivery, subject to verification of service or acknowledgement of receipt, or three (3) business days after mailing when sent by certified mail, postage prepaid.

Unless otherwise agreed in writing, notice shall be sent to the following persons:

For KCBE: The Director of Schools/Superintendent of Knox County Schools, with a copy to the Chair of the Board of the Knox County Board of Education

For Emerald Academy: The School Director, with a copy to the President of the Charter School.

**EMERALD CHARTER SCHOOLS**

[signature]

**STEVE DIGGS, President**

**Date:** 6/9/15

**KNOX COUNTY BOARD OF EDUCATION**

[signature]

**MICHAEL M. MCMILLAN, Chair**

**Date:** 4/1/2015

**CONTRACT NO.** 14-537

**APPROVED AS TO LEGAL FORM**

[signature]

**DAVID M. SANDERS**
**Knox County Deputy Law Director**

**Date:** 6/4/15

Approved by
Knox County Board of Education
4/1/2015 (9C)

**This Contract is approved by the Knox County Board of Education on the 1st day of April, 2015, as reflected in its minutes.**

Michael M McMillan

**Certified by its Chairperson**

**Date:** 4/1/2015

# EXHIBIT 34

**2025 Renewal Charter Agreement**
**Emerald Academy**

This Renewal Charter Agreement (the "Agreement") is entered into this, the ___day of _________2025, by and between the Knox County Board of Education ("KCBOE," "Chartering Authority," or "the Authorizer") and Emerald Charter Schools to operate Emerald Academy (the "Governing Body" or "Charter School," those terms being used interchangeably herein; provided that references herein to "Charter School" shall not include other schools operated by the Governing Body). The Chartering Authority and Governing Body are collectively the Parties to this Charter Agreement. This Charter Agreement shall be binding upon the KCBOE and the Governing Body (the Board of Directors operating Emerald Academy), as defined by T.C.A. § 49-13-104, selected by the original sponsor to operate the public charter school proposed in the original application, which, together with any addenda supplied for the Chartering Authority's consideration during the course of the renewal application process, shall be referred to and considered collectively as the "Application."

This contract consists of the following documents:

- This document and any exhibits hereto or documents incorporated herein by reference
- Approved Charter School's Original Application and Addendum (Exhibit 1)
- Current Approved Performance Framework (Exhibit 2).
- Original Agreement Approved Waivers (Exhibit 3)
- Approved Charter Schools' Renewal Application (Exhibit 4)
- Waivers Requested for the Renewal Agreement (Exhibit 5)

**Recitals:**

WHEREAS, the State of Tennessee enacted the Tennessee Public Charter Schools Act of 2002 (T.C.A. § 49-13-101 *et. seq.)* effective July 4, 2002 (the Act) authorizing the establishment of independent, publicly supported schools known as charter schools; and

WHEREAS, the purposes of the Act include providing "options relative to the governance and improvement of high priority schools," "the delivery of instruction for those students with special needs," and "improv[ing] learning for all students and clos[ing]...achievement gap[s];" and

WHEREAS, charter schools "provide [one] alternative means within the public school system for ensuring accomplishment of the necessary outcomes of education by allowing the establishment and maintenance of public charter schools that operate within a school district structure but are allowed maximum flexibility to achieve their goals;" and

WHEREAS, the Act empowers the Chartering Authority to ensure that only those charter schools open and remain open that are meeting the best interests of the pupils, the school district or the community, and the Act enables the Chartering Authority to do this through rigorous authorization processes, ongoing monitoring of the academic, organizational, and financial performance of charter schools, and, when necessary, through the revocation or non-renewal of charters; and

WHEREAS, KCBOE approved the Governing Body's original application to operate a charter school and entered into an agreement with the Governing Body in 2015; and

WHEREAS, the Charter School has operated a school known as Emerald Academy from July 27, 2015 to the present; and

WHEREAS, the Charter School submitted an application to the KCBOE for the renewal of its charter (the Renewal Application" pursuant to T.C.A. § 49-13-121; and

WHEREAS, the Charter Review Committee approved by the KCBOE recommended to the Knox County Board of Education that the renewal be approved; and

WHEREAS, the KCBOE signed a resolution to approve the renewal on January 9, 2025; and

WHEREAS, pursuant to T.C.A. § 49-13-111(a)(2), the Charter School, known as Emerald Academy, shall continue to operate as a public, nonsectarian, nonreligious public school, with control of instruction vested in the Governing Body of the Charter School under the general supervision of KCBOE and in compliance with this Agreement and the Act; and

WHEREAS, pursuant to T.C.A. § 49-13-124, the Charter School may conduct all activities necessary and appropriate to carry out its responsibilities, including but not limited to the power to contract, the power to buy and lease property, and the power to borrow funds; and

WHEREAS, the Parties desire to renew the original agreement as stated herein.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

**1. General Terms**

**1.1 Applicable Law.** This Charter Agreement and the Charter School's operations shall be governed by and construed in accordance with the laws of the State of Tennessee and applicable federal laws of the United States. Though the Governing Body may, pursuant to T.C.A. § 49-13-111, seek waivers from the Chartering Authority or the Commissioner of Education from Tennessee laws or rules of the State Board of Education that inhibit the Charter School's mission, the Parties understand that waivers may not be provided from the types of laws and rules specifically listed in T.C.A. § 49-13-111, from any provisions of T.C.A. § 49-13 (the Tennessee Public Charter Schools Act, hereinafter referred to as the "Act") or those included in the Act by reference, or from other laws specifically applicable to charter schools (such as those related to benefits or retirement of charter school employees contained in T.C.A. § 8-27-Part 3).

As required by T.C.A. § 49-13-110, this Charter Agreement includes all material components of the Governing Body's Original Application and Renewal Application, which are incorporated herein by reference and attached hereto as Exhibit 1 and Exhibit 4, respectively.

By signing this agreement, the Chartering Authority approves any waivers requested in the Governing Body's Original Application (Exhibit 3) with the updated request (Exhibit 5). Those requests and any others subsequently requested by the Governing Body are attached as part of the approved charter application (Exhibit 1). The Chartering Authority will be notified when the Charter School makes future waiver requests.

The Governing Body and the Chartering Authority shall adhere to policies, rules and regulations of the State Board of Education and the Tennessee Department of Education, as such apply to Tennessee charter schools, unless waivers have been provided.

**1.2 Effective Date.** This Agreement shall be effective immediately following signature by the Governing Body and the Chartering Authority. The Agreement shall expire on June 30, 2035, unless earlier terminated or renewed pursuant to the terms of this Agreement or state law.

**1.3 Charter School Performance.** The operation of the Charter School by the Governing Body shall be subject to the terms and conditions of this Agreement and the Act, in accordance with the Performance Framework adopted by the Knox County Board of Education in 2018 (Exhibit 2). See T.C.A. § 49-13-143. Decisions by the Chartering Authority regarding renewal or revocation of the Charter Agreement shall be based upon T.C.A. § 49-13-121, T.C.A. § 49-13-122, and any other applicable laws and rules. Pursuant to T.C.A. § 49-13-111(a)(1), Emerald Academy shall operate as a public, nonsectarian, nonreligious public school with control of instruction vested in the Governing Body of the Charter School under the general supervision of KCBOE.

Consistent with the right to exercise general supervision, KCBOE may take all reasonable steps to oversee the Charter School's performance, including compliance with the Agreement and applicable laws. . This includes the opportunity: a) to visit and inspect the school building; b) to examine public records of the Charter School, upon reasonable notice; c) upon reasonable notice, to interview Charter School employees, Governing Body members, students, and families; and d) investigate a complaint (notice of which shall be given to the Charter School).

The Parties agree that the most critical performance measures are the academic measures, which may include student achievement, student growth measures (including annual measurable objectives), and readiness for successive school levels (middle and high school).

For the purposes of accountability, renewal, and/or revocation evaluation, the Performance Framework supersedes all assessment measures, education goals and objectives, financial operations metrics, and organizational performance metrics set forth in the Charter School's original and renewal applications and not explicitly incorporated into the Performance Framework (Exhibit 2). The specific terms, form, and requirements of the Performance Framework are maintained and disseminated by the Chartering Authority and shall be binding on the Charter School.

The Chartering Authority shall, at least annually, monitor and report on the Charter School's progress in relation to the indicators, measures, metrics, and targets specified in the currently adopted Performance Framework (Exhibit 2) and those reported on the State Report Card. Such reporting shall become part of the Charter School's annual report to the Chartering Authority and the state Commissioner of Education to the extent that the Chartering Authority's reporting is available by the state-specified annual deadline for the Charter School's annual report.

The Chartering Authority shall also conduct an interim review at the end of the fifth year after the effective date of the Agreement, pursuant to T.C.A. § 49-13-121.

The performance expectations outlined in the Charter School's original and renewal application may need to be modified to align with changes applicable to state or federal accountability requirements as requested by the Chartering Authority. Such changes shall apply to the Charter School as required by law. In the event that any such modifications or amendments are required, the Chartering Authority will use its best efforts to apply expectations for school performance in

a manner consistent with those set forth in the charter school application as initially established in the most recent charter agreement.

Changes to performance expectations that are not required by state or federal law will not become binding upon the Charter School without the Charter School's consent.

**1.4 Location & Target Area.** The Charter School is located at 220 Carrick Street, Knoxville, TN 37921. In accordance with the Renewal Application, the target area for students is the area encompassed by the zones for those schools listed on page 40 of the Renewal Application. Such location shall be subject to and in accordance with the original and renewal applications, as well as all applicable laws and codes governing the location and occupation of educational facilities, including T.C.A. § 49-13-136 regarding vacant and underutilized property operated by the Chartering Authority. If the school were to be changed to a location at a site controlled by the Chartering Authority, the use of such site shall be subject to and governed by a Facilities Agreement between the Parties. If the Charter School decides to change the location of the Charter School, the Charter School shall notify the Chartering Authority at least 60 business days prior to any such change of location. The determination of such location shall be subject to the approval of the Chartering Authority in accordance with the approved Application, Addendum, and state law. The Parties recognize that, as a charter school operating within the geographic boundaries of the LEA, the Governing Body shall have a right of first refusal to vacant and underutilized buildings pursuant to T.C.A. § 49-13-136(c). Nothing herein shall be construed to limit or restrict the rights of the Governing Body pursuant to these provisions of state law.

**1.5 Employment Status.** All teachers and other staff of the Charter School shall be employed by the Charter School, not the Chartering Authority. None of the provisions in this Agreement shall prevent the Charter School from contracting with any other non-profit organization to provide employees for the Charter School.

**1.6 Mission.** The Charter School, in its work, shall progress toward its established missional direction as stated on page 5 of the Renewal Application, in accordance with T.C.A. § 49-13-107(b)(1). If over the duration of this agreement, the Charter School needs to change any part of the mission, the Charter School shall notify the Chartering Authority in alignment with the (TDOE) Department of Education Amendment process. The Chartering Authority will determine if the change is material such that it requires an amendment to this agreement.

## 2. Charter School and Chartering Authority Organizational Responsibilities

**2.1 Student Enrollment and Retention.** The Charter School shall enroll students according to T.C.A. § 49-13-113. The Charter School shall not discriminate with respect to admissions on the basis of race, ethnicity, religion, national origin, English language proficiency, academic or athletic ability, sex, or the need for special education and related services as set forth in the Applications and the Act.

Similar to T.C.A. § 49-6-3401(f), nothing in this Section shall require the Charter School to enroll a student who is under suspension or expelled in an LEA or another charter school either in Tennessee or another state. The Charter School shall make a decision with regard to enrollment only after an investigation of the facts surrounding the suspension from the former school system. If the Charter School accepts enrollment of a student from another LEA or charter school, the

Charter School may dismiss that student if it is determined subsequent to enrollment that the student had been suspended or expelled by another LEA or charter school.

The Charter School may enroll students up to a maximum of 540 K-8 students. Enrollment shall be determined initially at the start of each academic year but will be recalculated periodically within each year by the Charter School and Chartering Authority. Increases in total enrollment numbers greater than 5% or 25 students, whichever is less, constitute a material change in this Charter Agreement and are not permitted unless a formal amendment to this Charter Agreement is secured in advance according to the provisions outlined in T.C.A. § 49-13-110(d). Reductions in enrollment greater than 15% or 50 students, whichever is less, must be reported to the Chartering Authority within the LEA and reductions in enrollment at such levels in any year or over two or more years may be considered material and require an amendment to this Charter Agreement or other action by the Chartering Authority. Multi-year reductions in enrollment that affect the financial viability of the Charter School may be considered material and require an amendment to this Charter Agreement or other action by the Chartering Authority. For purposes of determining whether a reduction in enrollment under this section is a material change, the calculation of total enrollment numbers shall not include reductions in enrollment for causes outside the control of the Charter School (such as the family of an enrolled student moving out of the school district). Accurate and true enrollment numbers shall always be maintained by the Charter School and reported to the Chartering Authority and other entities (e.g., Tennessee Department of Education or State Board of Education) upon request. When providing said enrollment numbers to the Chartering Authority, the Charter School may include a listing of students withdrawing for reasons claimed to be outside the control of the Charter School. A parent or guardian's decision to withdraw his or her student from the Charter School, if that student still lives within the district, shall be determined on a case-by-case basis to determine whether the student's withdrawal may fairly be attributed to the Charter School or to causes outside the control of the Charter School.

If the number of applications exceeds the capacity of a program, class, grade level, or building, the Charter School shall select students through a lottery, provided that students who attended the Charter School during the previous year shall be given preference for enrollment and shall be excluded from the lottery. The Charter School shall give preferences in a lottery as set out in T.C.A. § 49-13-113.

The Charter School may not "counsel out" or discourage students from attending the Charter School for any reason nor will the Charter School use the purported failure of compliance with a letter of commitment or a contract between the Charter School and students/parents as a mechanism to encourage withdrawal of students from the Charter School. However, the Charter School will remain open and honest with students and their parents/guardians regarding course offerings, career counseling, and other factors that could affect whether a student remains enrolled with the Charter School. (Example: If a parent expressed interest in welding or other CTE course offerings not available within the Charter School's college prep framework, the Charter School would and should remain open and honest with that parent and the student regarding all options moving forward.)

**2.2 Academic Program.** The Charter School shall operate the academic program in accordance with the Agreement, the Charter School's original and renewal applications, and academic state and federal law, including providing the same equivalent time of instruction as other public schools and complying with assessment and accountability laws and rules under T.C.A. § 49-13- 111.

**2.2.1 Assessments.** The Charter School must use the required state-mandated assessments to the extent such assessments are required by the Tennessee Department of Education. The Charter School shall comply with all Department of Education-required assessment administration, security, and reporting requirements. The Charter school may use additional assessments of its own choosing.

**2.3 Students with Disabilities.** Special education services, related services, and accommodations for students who are eligible under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504), the Americans with Disabilities Act (ADA), or any applicable provisions of state law, shall be provided in accordance with applicable state and federal law, this Agreement and the Chartering Authority's policy. The Chartering Authority is the local education agency (LEA) for purposes of compliance with IDEA, Section 504, and all other federal and state laws and regulations concerning accommodation of and education of students with disabilities. The Chartering Authority, pursuant to state law, addresses the needs of services for students with disabilities and gifted services in its Student Support Services division.

**2.3.1 Responsibility of the Chartering Authority.** The Chartering Authority is responsible for ensuring that the requirements of federal and state special education law and regulations are met in the Charter School and that special education and related services are provided in the Charter School in a comparable manner as they are provided in the district's direct-run school. Additionally, the Chartering Authority will oversee procedural compliance with federal and state laws and regulations concerning accommodations for the education of students with disabilities.

The Chartering Authority will collaborate with the Charter School in the same manner in which it works with its other schools in the identification and referral process and in conducting initial evaluations for exceptional education. The Chartering Authority will also collaborate with the Charter School in the same manner in which it works with its other schools when a Charter School student is in need of services which cannot be provided at the Charter School but may be provided by a Knox County Schools' alternative placement. If a Charter School student is enrolled in a Knox County Schools' alternative placement, the student becomes a Knox County Schools' student. The Chartering Authority will notify the Charter School if an enrolling student has an existing individualized education program (IEP) and will provide the Charter School with records within ten (10) business days of receipt of a request by the Charter School for the records.

**2.3.2 Responsibility of the Charter School.** The Charter School shall have an effective educational model for the delivery of special education services that complies with federal and state law. Once a student has been identified as eligible for special education services, the Charter School assumes responsibility for the provision of services, development, and implementation of individualized education programs (IEPs), procedures, and documentation. Special education services at the Charter School will be delivered by the individual or agencies licensed and/or qualified to provide special education services required by the Tennessee Public Charter Schools Act and the IDEA. Charter School staff may participate in any Chartering Authority professional development related to special education or the provision of services pursuant to Section 504.

The Charter School may also enter into a separate fee-for-services agreement with a third-party provider of educational services (Contract Services Provider), provided that such third-party provider complies with all applicable laws and the requirements imposed on contractors by this Charter Agreement.

The Charter School, or Contract Service Provider, shall have a qualified special education

coordinator who will be responsible for monitoring individual case management of all special education students and for arranging the provision of services required by their IEP. Charter School, or Contract Service Provider, shall maintain a file documenting the Charter School's compliance with special education requirements.

**2.3.3 Costs for Special Education.** The Chartering Authority is financially responsible for Child Find, including student identification and initial assessment expenses. Once a student has been determined eligible for special education services and has an individualized education program (IEP), all costs associated with providing educational services to students with disabilities are the responsibility of the Charter School. The Charter School shall bear the financial responsibility for reevaluations and the provision of all services consistent with the IEPs. The Charter School's financial obligation begins once a student has an IEP.

The Chartering Authority will pass federal funding to the Charter School in the same manner as all other public schools. Resources may be in the form of services provided by the Chartering Authority and may include but not be limited to supervisors, behavioral liaisons, technology, equipment, etc. In addition, when the Chartering Authority submits requests to the state Department of Education for high-cost students, the Chartering Authority will include students at the Charter School in its count. The Chartering Authority will pay a pro-rata share of any high-cost reimbursement received from the state for such students at the Charter School being subject to utilize such funds in the same manner as required for all other of the Chartering Authority's public schools.

**2.3.4 Compliance.** No student shall be denied admission nor counseled out of the Charter School due to the nature, extent, or severity of his/her disability or due to the student's request for, or actual need for, special education services or accommodations pursuant to Section 504.

The Charter School shall promptly report to the Chartering Authority all alleged infractions, complaints, and other non-compliance issues relating to special education.

**2.4 English Language Learners.** The Charter school shall address the needs of English Language Learner (ELL) students pursuant to applicable federal and state laws and regulations (including Title III of the Every Student Succeeds Act (ESSA) and Title VI of the Civil Rights Act of 1964. The Charter School agrees to maintain and consistently implement a policy to identify students in need of ELL services, to provide services in an equitable manner to ensure access to the school's educational program (including the provision to appropriate accommodations), and to facilitate exit from ELL services according to individual student capacity. The Chartering Authority will provide equitable services and/or funding to the Charter School in the same manner as services and/or funding is provided to non-public schools in Knox County.

The Charter School assumes responsibility for the provision of services, development, and implementation of individualized learning plans (ILPs), screening, assessment and all other obligations under state law and State Board Rule for students identified as limited English proficient and/or English learner enrolled in the school. The Charter School shall have a qualified English language learner educator who will be responsible for monitoring individual case management of all English learner students, both direct services and transitional, and for arranging the provision of services required by their ILP. The Charter School shall maintain documentation of the Charter School's compliance as required by law and State Board Rule.

**2.5 Student Discipline/Due Process.** In accordance with T.C.A. § 49-6-4002(a)(1), the Charter School administers its discipline policy in a manner consistent with state and federal law and

rules that ensures students' due process rights are satisfied, including providing appropriate informal or formal hearings. The Charter School shall promptly notify the Chartering Authority of students expelled. The Chartering Authority shall provide expelled Charter School students access to the Chartering Authority's alternative school programs in the same manner as it provides access to any student within the LEA.

2.6 **Student Information Reporting.** While ensuring compliance with federal and state law regarding student records, the Charter School shall report student information as follows:

- Enrollment projections for the coming year no later than February 15;
- Daily attendance, major offenses and grades using the Chartering Authority's student management system updating at least weekly;
- Student enrollment for determining average daily membership by the date required by the Department of Education.

The charter school shall monitor their student population with respect to student withdrawals, suspensions, transfers, and expulsions. An annual report is due to the Chartering Authority.

| Quarter | Withdrawal | Transfer | Suspension | Expulsion |
|---|---|---|---|---|
| Q1 | | | | |
| Q2 | | | | |
| Q3 | | | | |
| Q4 | | | | |

## 3. Staffing

3.1 **Teachers and Staff.** The Charter School shall ensure that teachers and staff are licensed and endorsed pursuant to state statutes, State Board rules, and meet applicable federal qualifications including, special education certified, and ESL certified. The Charter School shall also provide any training required by state or federal law.

3.2 **Background Checks.** All employees of the Charter School who have or will have contact with children at the Charter School within the scope of the individual's employment, and employees of contractors or sub-contractors of the Charter School who have contact with children within the scope of the individual's employment shall complete criminal background checks as required by state law.

## 4. Facility

The Charter School shall ensure the Charter School's grounds and facilities comply with applicable health and safety laws, including the ADA, state fire marshal codes, and state and local zoning and land use codes.

## 5. School Nutrition

School Nutrition for students at the Charter School shall be provided pursuant to state law requirements on its own or through a third-party contract. If mutually agreed upon, the Chartering Authority and the Charter School may enter a separate memorandum of understanding (MOU), which shall define the Parties' obligations with respect to school nutrition.

## 6. Transportation

Transportation for students shall be provided pursuant to the requirements of state law.

If the Charter School has elected to provide transportation for its students, the Chartering Authority shall provide to the Charter School the funds that would otherwise have been spent to provide transportation as provided in T.C.A. § 49-13-114. In order to receive these funds, the Charter School must comply with state laws and State Board of Education rules regarding student transportation. Students shall be transported in buses that have been approved for the transportation of students by the Department of Safety, or any other manner allowable by state and federal law. The Charter School shall provide transportation services to its students by either (a) contracting with such services through a properly licensed and qualified sub-contractor or (b) providing such services itself.

## 7. Insurance

The Charter School shall maintain the following insurance, in accordance with T.C.A. § 49-13-107(b)(19):

- General Aggregate & Commercial Automobile: must be equal to or greater than This insurance shall be primary insurance. Any insurance or self-insurance programs covering the KCBOE or Knox County Government, their officials, employees, and volunteers shall be in excess of this insurance and shall not contribute to it. The first one million dollars must be with a company licensed to do business in the State of Tennessee. The remaining $4,000,000 can be covered under an excess liability policy (also known as an "umbrella" policy). The policy must name Knox County Board of Education and Knox County, Tennessee as additional insureds. The policy must cover liability for transportation of students, including transportation by outside vendors with whom the Charter School has contracted. Automobile coverage shall cover vehicles owned, hired, and non-owned.
- Professional Liability Policies: Directors and Officers Policy: equal to or greater than $2,000,000. . Teachers Professional Liability Policy equal to or greater than $1,000,000.
- Workers Compensation and Employers Liability Policy: The amount of coverage required for Workers Compensation is determined by statute. The Governing Body must comply with state statutes. Employer liability must be a minimum of $100,000.
- Property and Boiler Insurance Policy: If the Charter School purchases the property that will be used by the Charter School, it shall purchase "all risks" property and boiler insurance. Insurance shall be for the full replacement cost of the property and contents with no coinsurance penalty provision.
- Sexual Abuse Policy: $1,000,000 required coverage.

Certificates of insurance, in a form satisfactory to the Chartering Authority, evidencing coverage, shall be provided to the Chartering Authority prior to commencement of performance of this Charter Agreement. Throughout the term of this Charter Agreement, the Governing Body shall provide updated certificates of insurance upon expiration of the current certificates.

## 8. Governance

**8.1 Incorporation, Meetings, and Conflicts of Interest.** The Charter School's Articles of Incorporation, a Certificate of Incorporation evidencing its incorporation as a non-profit and evidence of its exemption from federal taxation under IRC § 501(c)(3), its Bylaws and amendments or modifications thereto shall be made part of this Agreement.

The Governing Body shall comply with the provisions of T.C.A. § 49-13-109.

The Charter School shall comply with all applicable provisions of the Tennessee Open Meetings Act, including with regard to the scheduling and posting of Governing Body meetings, meeting agendas, public notice of meetings, and records of those meetings. At the start of each school year, the Charter School shall provide the Chartering Authority with a schedule of Governing meetings for that school year.

As required by T.C.A. § 49-13-111(f), the Governing Body shall be subject to the conflict of interest provisions contained in T.C.A. §§ 12-4-101 and 12-4-102.

**8.2 Complaints.** In that control of instruction is vested in the Governing Body of the Charter School, the Governing Body shall be the first avenue for response in case of any complaints or grievances filed against the Charter School or its employees and volunteers before matters are brought to the administration or board of the Chartering Authority. The Governing Body will ensure that the Charter School establishes policies and procedures for receiving and addressing complaints or grievances directed toward the Charter School or its employees. The Governing Body will make those policies available to students, parents/guardians, employees, and any other persons upon request. If grievances persist following the actions of the Governing Body, or for complaints regarding alleged violations of law or the Charter Agreement, including any violations that may subject the school to revocation or non-renewal under T.C.A. §§ 49-13-121 or 122, such complaints will be investigated and resolved by the Chartering Authority using the procedures outlined in the KCS Charter School Guidance and in alignment with KCS Charter School Handbook.. Investigation and sanctions by the Chartering Authority are limited to alleged violations of laws or the Agreement.

The Charter School shall notify the Chartering Authority within three (3) business days if it receives notice or is informed that it is a party in a lawsuit.

**8.3 Management.** The Charter School shall report the following to the Chartering Authority within five (5) business days of change:

- The names and contact information of individuals who leave or join the Governing Body;
- Names and contact information of any individuals who, during the prior quarter, resign from or are hired to a leadership position in the Charter School, including any administrative position; and
- Any change to the Charter School's corporate legal status or any change in its standing with the Tennessee Secretary of State's Office.

**8.4 Waivers.** By signing and submitting the original and renewal application, the Governing Body requests a waiver of all education statutes and rules of the state board or department of education and the KCBOE, except those listed in T.C.A. § 49-13-111(p) or included by reference (such as statutes and rules related to licensing of charter school teachers) in Title 49, Chapter 13 (the

Tennessee Public Charter Schools Act). The school, in its original agreement, had the waivers as requested in Exhibit 3, the school is requesting approval of the updated list in Exhibit 5. The approval of this charter school contract by the KCBOE shall include the approval of these waivers by the Commissioner of Education, and such automatic waivers shall be reflected in the contract.

## 9. Finance

### 9.1 State and Local Funds

(1) The Chartering Authority shall allocate to the Charter School an amount equal to the per-student state and local funds received by the Chartering Authority and all appropriate allocations or services as provided in federal laws, regulations, and T.C.A. § 49-13-112.

(2) Allocations to the Charter School shall be based on the Tennessee Investment in Student Achievement (TISA) student-generated state and required local funding amount calculated from the Charter School's prior school year student membership, plus the Chartering Authority's current school year per student funding (in excess of the TISA local required contribution) calculated from the Charter School's current year student membership.

(3) Allocations to the Charter School shall not be reduced by the Chartering Authority for any category of cost(s) except for the annual authorizer fee. Any services the Charter School chooses to purchase from the Chartering Authority may be governed by a separate services contract between both parties. The Chartering Authority may deduct associated funds resulting from the cost(s) of any such service(s) from allocations sent to the Charter School.

(4) The Chartering Authority shall distribute funds to the Charter School in no fewer than nine (9) installments beginning in August 2025 in a manner consistent with how state funds are distributed to the Chartering Authority. Each distribution will include documentation reflecting how the amount was calculated, as well as any necessary adjustments, at a minimum reflected in October, February, and June, based on changes in revenue, student enrollment, and/or student services in accordance with Tenn. Comp. R. & Regs. 0520-14-01.03(1)(f) and the calculations provided by the Tennessee Department of Education.

**9.2 Tuition.** The Charter School shall not charge tuition, pursuant to T.C.A. § 49-13-106(e).

**9.3 Federal Funds.**

(1) Eligibility: Each year, the Chartering Authority shall provide to the Charter School the school's proportionate share of applicable federal ESSA funding (e.g. Title I-A) and other federal grants received by the Authorizer for which the Charter School is eligible. Schools are eligible for such funds or equitable services upon approval of their plans for such funds either by the Authorizer and/or the TDOE, as applicable. The Authorizer may reduce the allocation to charter schools by a percentage allowable under federal rules and regulations for administrative, indirect, or any other category of cost or charges.

(2) Fund Distribution & Reporting: Funds shall be distributed on a documented expenditure reimbursement basis with the required documentation or spent per Knox County procurement guidelines. The Charter School shall submit grant reimbursement reports to the Authorizer at least quarterly but no more frequently than monthly. The Authorizer shall distribute to the Charter School federal reimbursement funds with 30 days approval of expenditure reimbursement requests.

(3) Use of funds: The Charter School shall comply with all regulations tied to such federal funds, including 2 C.F.R. 200- Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, ESSA, IDEA, and any other applicable federal or state laws.

**9.4 Charter School Debt.** The Charter School is solely responsible for all debt it incurs, and the Chartering Authority shall not be contractually bound on Charter School's account to any third party. The Chartering Authority shall not be liable for the Charter School's unpaid debts if the Charter School does not have sufficient funds to pay all its debts even in the event that it ceases operations.

The Charter School shall notify the Chartering Authority immediately of a default on any obligation owed to the Chartering Authority, which shall include debts for which payments are past due by sixty (60) business days or more. If debts are incurred in the provision of employee benefits pursuant to T.C.A. § 49-13-119, the Chartering Authority may withhold the amount owed from the monthly payment until such debts are satisfied. Any other debts owed to the Chartering Authority must be satisfied prior to the release of the last annual payment.

**9.5 Financial Management.** The Charter School shall control and be responsible for financial management and performance of the Charter School, including budgeting and expenditures., The Charter School must continue to demonstrate the existence of appropriate governance and managerial procedures and financial controls including the following:

- Accounting methods complying with T.C.A. § 49-13-111(m);
- A checking account;
- Adequate financial procedures, policies, systems, and processes for accounting and payroll;
- An organizational chart;
- Procedures for the creation and review of monthly and quarterly financial reports, including identification of the individual(s) responsible for preparing such financial reports;
- Internal control procedures for cash receipts, disbursements, and purchases; and
- Maintenance of asset inventory lists and financial procedures for federal grants in accordance with applicable federal law.

The Charter School shall comply with T.C.A. §§ 49-13-111 and 120 regarding completion and submission of annual financial reports and audits to the Chartering Authority and the state.

**9.6 Financial Records.** All financial records of the Charter School pertaining to the management and operation of the school will be subject to inspection and production as required for fulfillment of the Chartering Authority's fiduciary responsibilities, upon at least 10 days' notice, in accordance with T.C.A. § 49-13-111(g).

## 10. Benefits

The Charter School shall be responsible for following the requirements set forth in the Memorandum of Understanding between the KCBOE, the State of Tennessee Department of Finance and Administration Benefits Administration, and the Charter School.

The Charter School shall be responsible for any penalties imposed for failure to comply with the Patient Protection and Affordable Care Act (PPACA) (Public Law 111-148 as amended by Public Law 111-152). The Chartering Authority is responsible for its own acts or omissions. This includes but is not limited to penalties under the PPACA amendments to the Public Health Service Act (42 U.S.C. 300gg et. seq.), the employer responsibility section of the Internal Revenue Code (25 U.S.C. 498OH), and regulations implementing those provisions.

**11. Amendments**

Pursuant to T.C.A. § 49-13-110, petitions to amend this Agreement shall follow the guidelines shared by the Tennessee Department of Education for approval or denial by the Chartering Authority as defined by Charter Commission rule 1185-01-01-.04. An amendment shall not become effective, and the Charter School may not take action or implement the change requested in the amendment until the amendment is approved in writing by the Chartering Authority.

Not all changes to school operations constitute material changes to the Agreement that require an amendment. However, the following changes are considered material and require an amendment, which includes, but not limited to:

- Changes in any Material Term of this Charter Agreement;
- Changes in the Charter School's missional direction;
- Changes in school location (change of site);
- Changes in enrollment beyond the maximum limit established in this Agreement, such as increases of more than 5% total enrollment or 25 students, whichever is less; or reductions of more than 50 students or 15%, whichever is less;
- The addition or removal of a grade level or levels; and
- A change in governance structure (including, but not limited to, a change in the non-profit entity governing the school), or addition of or changes to the charter management organization; and
- Changes in school calendar that reduce the calendar below the requirement to provide at least the same equivalent time of instruction as required in regular public schools in T.C.A. § 49-13-111 (p)(12).

Pursuant to T.C.A. § 49-13-111(a)(2), educational program matters not specifically identified in this Agreement shall remain within the Charter School's authority and discretion.

The following changes do not require an amendment, but the Charter School must notify the Chartering Authority of any of the following within thirty (30) days:

- Changes to the July 1st budget submitted to the Authorizer, subject to the requirements of state and federal law;
- Changes in the mailing address, phone or fax number, or web address of the Charter School;
- Changes in the members and duties of the Governing Body, including names and contact information;
- Changes in the school leader or, if applicable, the chief executive of the charter management organization including names and contact information; and
- Changes in signing authority for the school.
- Adding one or more additional sites for instruction pursuant to the rights of the Governing Board under T.C.A. § 49-13-136(c).

Any material change initiated by the Chartering Authority, requiring an amendment to this Agreement, must be agreed to in writing by both parties. An amendment shall be effective at the agreed upon date in the amendment or upon approval in writing by the Authorizer.

## 12. Renewal, Revocation, Appeals, Closure and Dissolution

**12.1. Renewal.** Pursuant to T.C.A. § 49-13-121, the Charter School may apply for renewal of this Charter Agreement by application submitted no later than April 1, 2034 and in accordance with the provisions of state law on the standardized application form developed by the Tennessee Department of Education Pursuant to T.C.A. § 49-13-121(d), the Chartering Authority shall rule by resolution upon whether to approve or deny the renewal application by February 1, 2035. "The authorizer shall consider the renewal application, the annual progress reports required under T.C.A. § 49-13-120, and the renewal performance report required under subsection (b) when deciding whether to approve or deny the public charter school's renewal application." The Chartering Authority shall state its reasons for the non-renewal. The Agreement may be renewed without modification, except for the incorporation by attachment of the approved renewal application. Pursuant to T.C.A. § 49- 13-121, the Parties may also amend the Agreement as part of the renewal process.

The Chartering Authority may elect not to renew this Charter Agreement pursuant to T.C.A. § 49-13-121 for any of the applicable reasons in T.C.A. § 49-13-122, including a material violation of any of the conditions, standards, or procedures set forth in this agreement. Pursuant to T.C.A. § 49-13-121(e), the Chartering Authority shall provide the Charter School with a performance report that directly reflects the renewal evaluation no later than January 1, 2034.

**12.2 Revocation.** Except for immediate threats to the health, safety and welfare of a child where the Charter School has not taken immediate and appropriate action, the Chartering Authority will provide reasonable notice to the Charter School of non-compliance with applicable laws, rules, or this Agreement, and will give the Charter School a reasonable opportunity to cure the non-compliance prior to instituting revocation proceedings pursuant to T.C.A. § 49-13-122.

Except for immediate threats to the health, safety and welfare of a child where the Charter School has not taken immediate and appropriate action , the Chartering Authority will follow a progressive system of notification and calls for corrective action on the part of the Charter School.

The Chartering Authority may revoke this Charter Agreement for any reason set forth in T.C.A. § 49-13-122, including a material violation of any of the conditions, standards, or procedures set forth in this Agreement.

If the Chartering Authority determines that any grounds for revocation exist, it may revoke this Charter Agreement according to the procedures set forth in T.C.A. § 49-13-122 and shall state its reasons for the revocation.

**12.3 Appeals.** Except for violations of T.C.A. § 49-13-122(a), appeals of a nonrenewal or revocation may be appealed to the Tennessee Public Charter School Commission. Such appeal shall be taken within ten (10) days of the Charter School receiving written notice of the nonrenewal or revocation except for revocations based on the violations specified in § 49-13-122 (subsection a).

**12.4 Closure and Dissolution**. In the event that the Charter School is required to cease operation for

any reason, including but not limited to non-renewal, revocation, or voluntary surrender of the charter, the Charter School shall cooperate with the Chartering Authority to ensure orderly closure of the Charter School including, but not limited to:

- Timely notification of parents and teachers of the closure decision;
- Securing student records and transporting them to the Chartering Authority;
- Assisting in placing students in appropriate schools;
- Managing all financial records consistent with the Chartering Authority's school closure requirements and policies; and
- Disposal of school assets in accordance with the Act and this Agreement. "School Assets" shall be defined to include only those assets directly related to the operation of schools within Knox County and shall not include any other assets the Governing Body may hold in other regions.

The Charter School shall comply with any closure policies or protocols established by the Chartering Authority.

Dissolution of the Charter School following revocation or non-renewal shall comply with T.C.A. § 49-13-110(f) and § 49-13-130. The Charter School shall be responsible for winding down operations, including payment of all debts, obligations, or liabilities incurred at any time by the Charter School. Under no circumstances shall the Chartering Authority be responsible for such obligations. Charter School personnel and the Governing Board shall cooperate fully with any activity related to school closure or phase out.

## 13. Litigation Notice & Cooperation

The Chartering Authority and Charter School each shall give prompt written notice to the other of the assertion of any claim or the commencement of any litigation involving the operation of the Charter School and shall cooperate with each other in the defense of the claim or litigation.

## 14. Contract Construction

**14.1 Waiver.** The failure of either Party to insist on strict performance of any term or condition of this Agreement shall not constitute a waiver of that term or condition, even if the Party accepting or acquiescing in the nonconforming performance knows of the nature of the performance and fails to object to it.

**14.2 Non-Assignability.** No right or interest in this Agreement shall be assigned by anyone on behalf of the Charter School, and delegation of any contractual duty of the Charter School shall not be

made without prior written approval of the Chartering Authority. A violation of this provision shall be grounds for immediate termination of this Agreement and revocation of the Charter.

Should the Charter School propose to enter into a contract with another non-profit entity to manage the School, the Charter School agrees to submit all information requested by the Chartering Authority regarding the management arrangement, including a copy of the proposed contract and a description of the management company, with identification of its principals and their backgrounds. The Charter School shall not enter into a management contract without written approval from the Chartering Authority, which shall not be unreasonably withheld. e.

14.3 **Agreement.** Except as stated herein, the Parties intend this Agreement, including all the attachments and exhibits, to represent a final and complete expression of their agreement, which shall be considered the Agreement. All prior representations, understandings, and discussions are merged herein, and no course of prior dealings between Parties shall supplement or explain any terms used in this document. The Parties recognize that amendments to this agreement may be executed from time to time hereafter.

14.4 **Survival of Representations and Warranties.** All representations and warranties hereunder shall be deemed to be material and relied upon by the Parties with or to whom the same were made, notwithstanding any investigation or inspection made by or on behalf of such Party or Parties provided that this Section shall not affect whether a violation of any condition, standard, or procedure in this Agreement is material for the purposes of T.C.A. § 49-13-122(b). The representations and warranties covered in this Agreement will survive the termination or expiration of this Agreement.

14.5 **Severability.** The provisions of this Agreement are severable. Any term or condition deemed illegal or invalid shall not affect any other term or condition, and the remainder of the Agreement shall remain in effect unless otherwise terminated by one or both of the Parties.

14.6 **Authority.** The individual officers, agents, and employees of the parties hereto who execute this Agreement do hereby individually represent and warrant that they have full power and authority to execute this Agreement.

14.7 **Change of Law.** If, due to any change in applicable law, regulation or interpretation thereof by any court of law or other governing body having jurisdiction subsequent to the date of this Agreement, performance of any provision of this Agreement or any transaction contemplated hereby shall become impracticable or impossible, the parties hereto shall use their best effort to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such provision.

14.8 **Notice.** Any notice required or permitted under this Agreement shall be in writing, delivered in person or sent by certified mail, postage prepaid. Such notice shall be effective immediately upon personal delivery, subject to verification of service or acknowledgement of receipt, or three (3) business days after mailing when sent by certified mail, postage prepaid.

Unless otherwise agreed in writing, notice shall be sent to the following persons:

For KCBOE: The Director of Schools/Superintendent of Knox County Schools, with a copy to the Chair of the Board of the Knox County Board of Education.

For Emerald Academy: The President of Emerald Charter Schools, with a copy to its General Counsel and School Director.

**EMERALD CHARTER SCHOOLS**

[signature]

**STEVE DIGGS, President**

**Date:** 6/26/2025

**KNOX COUNTY BOARD OF EDUCATION**

Betsy Henderson

**BETSY HENDERSON, Chair**

**Date:** 6/5/2025

**KNOX COUNTY GOVERNMENT**

[signature]

**GLENN JACOBS, Mayor**

**Date:** 6/9/25

**CONTRACT NO.** 25-224

**APPROVED AS TO LEGAL FORM**

[signature]

**GARY DUPLER,**
**Knox County Deputy Law Director**

**Date:** 6/2/2025

# EXHIBIT 35

Return

**KNOX COUNTY BOARD OF EDUCATION**
**REGULAR SESSION**
**June 5, 2025**

**MINUTES**

**The Knox County Board of Education met in Regular Session on Thursday, June 5, 2025 in the Boardroom of the Summer Place Building at 500 W. Summit Hill Drive, Knoxville, Tennessee. The meeting could be viewed in its entirety on the video located on the Knox County Board of Education website at knoxschools.org. All supporting documents were posted with the agenda on the website.**

**Present:** **John Butler, District 1**
**Anne Templeton, District 2**
**Patricia Fontenot-Ridley, District 3**
**Katherine Bike, District 4**
**Lauren Morgan, District 5**
**Betsy Henderson, District 6**
**Steve Triplett, District 7**
**Travis Wright, District 8**
**Kristi Kristy, District 9**
**Sophia Elkins, Student Representative**

## Chair Henderson presiding

1 A Moment of Silence was observed followed by the Pledge of Allegiance to the Flag led by Ms. Fontenot-Ridley.

2 Announcements

- Ms. Henderson welcomed all attendees.
- A Policy Review meeting was scheduled for Thursday, June 26 at 10:00 am in the Summer Place Boardroom.
- On June 10 at 6:00 pm at Covenant Park, Knox County Mayor Glenn Jacobs would be honoring local high school athletes and coaches at the fourth annual "Night of Champions," recognizing more than 150 students from across the region for their outstanding achievements during the 2024-2025 school year.

3 Changes to the Agenda

- Agenda Item 6D2 was withdrawn at the request of Emerald Charter Schools.

4 Approval of the Agenda

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

5 AI -9229 Consideration of 2025-2030 Strategic Plan - *Recommended by Strategic Plan Committee*

Ms. Kristy made a motion to approve the 2025-2030 Strategic Plan as proposed. Mr. Triplett seconded the motion.

Dr. Butler noted that during one of the Strategic Plan Committee meetings, he had asked two questions that he wanted to

share during this meeting so that Board Members and the public could hear the responses. He asked if the proposed district Strategic Plan would allow stakeholders to see and understand what type of actions were being taken to help decrease disparities in educational outcomes that had been experienced over the last several years, and also how the Region 5 Strategic Plan actions to address the same issues were interwoven into the proposed district Strategic Plan. Assistant Superintendent of Strategy Kori Lautner stated that she would be glad to share her responses and invited other Strategic Plan Committee members to feel free to add additional information. Ms. Lautner shared that on pages 26 and 27 under the Success for Every Student goal, the focus of objective 4B was strengthening and streamlining academic interventions. She noted that over the past couple of years, Annual Action Plans had included information on individual student subgroups, as well as progress made on achievement gaps by student subgroups in English Language Arts and math. Ms. Lautner said that stakeholders would see that type of reporting continued as progress was reported. She said that from an academic standpoint, as the administration thought about access to general classroom instruction and the Tier 1 learning environment and making sure that behavioral practices were geared toward making sure that every student had as much time in the general education setting as possible would be where information could be found related to that objective. Ms. Lautner added that objective 4C, regarding all the wraparound supports, such as the whole child support teams and the work that schools were doing to inject as much support as possible into school and student populations, would be where the Region 5 Strategic Plan initiatives were integrated throughout. She added that priority-based objectives were referenced under Great Educator objectives and also called out explicitly in two other priorities, including Excellence in Foundational Skills and Career Empowerment and Preparation, and that the administration was going to be very focused on making sure that work was still conducted and fulfilled in a meaningful way. Dr. Butler asked how information would be reported going forward. Ms. Lautner said that semesterly reports would continue to be available on the KCS website in January and June.

Ms. Templeton thanked Dr. Butler for sharing the questions and responses. She asked if Tier 2 and Tier 3 information could also be included in the reporting. Ms. Lautner said she would absolutely love to see that in the future as discussions continued on closing achievement gaps, but currently the reporting and monitoring systems were not set up in such a way to make that an easy report. She said it was certainly worthwhile to dig into, and her team would include that information as soon as it was feasible to do so in a responsive and intentional way.

Ms. Henderson stated that Ms. Kristy had made a motion to approve the 2025-2030 Strategic Plan as proposed, and the motion had been seconded by Mr. Triplett.

**Vote:** 9-0 Passed

6 Consent Agenda

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

A Payment of Bills

B AI -9206 Approve Minutes of Meetings

- April 29, 2025 Called Meeting
- May 5, 2025 Work Session

App.1484

- May 8, 2025 Regular Session

C Ratification of Executive Committee Action

1 AI -9224 Approve Tennessee Department of Education Fiscal Year 2025 Summer Learning Camps Grant in the amount of $7,670,598.81 - *Recommended by Superintendent*

D Items/Contracts:

1 AI -9145 Approve request of William Coulter, Vice President of Meridian Trust and Investment Company, LLC, Trustee for The 2012 Land Trust and property owner John Coulter to construct a permanent pavilion structure in an existing easement at Rocky Hill Elementary School (original Grant of Permanent Easement approved by the Board on October 11, 2017)

2 AI -9188 ~~Approve Agreement with Emerald Charter Schools, Inc. for provision of breakfasts and lunches for Emerald Academy Charter School for the period of July 1, 2025 through June 30, 2026, which may be renewed annually for nine (9) additional terms~~ *WITHDRAWN*

3 AI -9189 Approve annual Form Agreement for School Bus Services

4 AI -9207 Approve Educator Preparation Provider/Local Education Agency Primary Partnership and State Recognized Partnership Agreements with Knox County Schools Educator Preparation Program (KCS EPP) for the 2025-2026 school year

5 AI -9208 Approve Data Disclosure Agreement between the Tennessee Department of Education and the Knox County Schools Educator Preparation Program (KCS EPP)

6 AI -9155 Approve Online Subscription Agreement with The DBQ Project for a license to access DBQ's proprietary online educational Social Studies materials at a cost of $71,231.25 for the term of July 1, 2025 through June 30, 2026

7 AI -9212 Approve Worksite Agreement with East Tennessee Human Resource Agency (ETHRA) for provision of work-based learning opportunities for KCS students

8 AI -9213 Approve Production Contract with Music Theatre International for Bearden High School's production of "Legally Blonde" November 13-16, 2025 at no cost to Knox County Schools

9 AI -9214 Approve Production Contract with Music Theatre International for Central High School's production of "Hairspray" April 23-25, 2026 at no cost to Knox County Schools

10 AI -9232 Approve Performance License Agreement with Luke McMillan Music Company for license to "Time After Time" for the Central High School Marching Band's 2025 season field show at no cost to Knox County Schools

11 AI -9233 Approve request of Central High School to purchase and install an electronic sign to replace an existing sign at a cost of $30,000.00 using donated funds from the Central High School Foundation in the amount of $20,000.00 and from recording artist Kelsea Ballerini in the amount of $10,000.00

12 AI -9215 Approve Memorandum of Agreement with Iambic Ltd., care of Alan Brodie Representation, Ltd., and Agreement with Suhrkamp Verlag GmbH for Hardin Valley Academy's production of "The Arsonists" by Alistair Beaton and "Biedermann Und Die Brandstifter" by Max Frisch December 5-7, 2025 at no cost to Knox County Schools

13 AI -9218 Approve requests of Dr. Paul L. Kelley Volunteer Academy and Lonsdale Elementary School to install outdoor learning facilities donated by The University of Tennessee, Knoxville with funding provided by the Inflation Reduction Act and the USDA Forest Service, Urban and Community Forest Program with an estimated total value of $25,870.00

14 AI -9164 Approve request of Northshore Elementary School to purchase and install four (4) shade structures and benches and a gaga ball pit on the school's playground area at a cost of $78,181.65 using $41,000.00 of donated funds from the Northshore Elementary School PTO and Coupon Book Funds

15 AI -9220 Approve Concessions Subcontract with Aramark Sports and Entertainment Services, LLC to permit the Powell High School girls' soccer team to engage in concession operations as a fundraising initiative for the term of June 1, 2025 through May 31, 2026

App.1485

16 AI -9221 Approve Agreement with Native Design & Hardscape, LLC and request of Sequoyah Elementary School to construct a covered playground pavilion at an estimated cost of $84,341.61 using donated funds from the Sequoyah Elementary School PTO

17 AI -9222 Approve Retreat Season Agreement with Camp BaYoCa for West High School's chorus retreat August 15-17, 2025 at no cost to Knox County Schools

7 Board Policies

A AI -9193 Approve first reading of Knox County Board of Education Policy E-200 "Insurance Management" as amended - *Discussed at Policy Review*

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

B AI -9194 Approve first reading of Knox County Board of Education Policy G-162 "Nepotism" as amended - *Discussed at Policy Review*

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

C AI -9195 Approve first reading of Knox County Board of Education Policy G-212 "Employee Background Checks" as amended - *Discussed at Policy Review*

On motion made by John Butler, seconded by Kristi Kristy

**Vote:** 9 - 0 Passed

D AI -9196 Approve first reading of Knox County Board of Education Policy G-410 "Retirement" as amended - *Discussed at Policy Review*

On motion made by Steve Triplett, seconded by Kristi Kristy

**Vote:** 9 - 0 Passed

E AI -9197 Approve first reading of Knox County Board of Education Policy G-461 "Sick and Bereavement Leave" as amended - *Discussed at Policy Review*

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

F AI -9199 Approve first reading of Knox County Board of Education Policy G-462 "Personal and Professional Leave" as amended - *Discussed at Policy Review*

On motion made by John Butler, seconded by Kristi Kristy

**Vote:** 9 - 0 Passed

G AI -9200 Approve first reading of Knox County Board of Education Policy G-467 "Paid Parental Leave" as amended - *Discussed at Policy Review*

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

H AI -9202 Approve first reading of Knox County Board of Education Policy I-171 "Interscholastic Athletics" as amended - *Discussed at Policy Review*

On motion made by John Butler, seconded by Kristi Kristy

**Vote:** 9 - 0 Passed

I AI -9203 Approve first reading of Knox County Board of Education Policy I-330 "Senior Classification" as amended - *Discussed at Policy Review*

Ms. Kristy made a motion to approve Policy I-330 as amended. Mr. Triplett seconded the motion.

Dr. Butler said he would not belabor the point, but he still felt that the policy amendments had only gone half-way, since KCS could adopt the Latin Honors System as well as recognize the highest GPA. He stated that he would not be supporting the motion to approve this policy as amended for that reason. Ms. Templeton asked Dr. Butler to elaborate. Dr. Butler said he believed that if students were being measured, it should be competitive. He noted it had been said that competition was not how some wanted students to experience high school, but basing honors on percentages only would simply be forcing students to compete against themselves.

Ms. Henderson thanked Dr. Butler and said that she looked at it as honoring students who were all in the same bucket. She stated that Ms. Kristy had made a motion to approve Policy I-330 as amended, and Mr. Triplett had seconded the motion.

Roll call
Dr. Butler - No
Ms. Templeton - Yes
Ms. Fontenot-Ridley - Yes
Ms. Bike - Pass
Ms. Morgan - Yes
Ms. Henderson - Yes
Mr. Triplett - Yes
Mr. Wright - Yes
Ms. Kristy - Yes

**Vote:** 7-1-1 Passed

J AI -9204 Approve first reading of Knox County Board of Education Policy I-440 "Wellness Policy" as amended - *Discussed at Policy Review*

Ms. Kristy made a motion to approve Policy I-440 as amended. Mr. Triplett seconded the motion.

Ms. Fontenot-Ridley noted that she had requested that a second amended version of the policy be included for Board consideration with the words "nor imposed upon" included on page 3, line 32, since she felt strongly that physical activity should not be used as a punishment. She stated that she would be glad to share information from national associations regarding the issue.

Mr. Triplett asked Assistant Superintendent of Academics Dr. Keith Wilson if the added words would create any problems. Dr.

App.1487

Wilson said he did not have any large concerns since it was only referring to unstructured physical activity. Ms. Morgan thanked Ms. Fontenot-Ridley and Mr. Triplett and stated that she would support the new amendment.

Ms. Kristy clarified her motion to approve version 2 of Policy I-440 as amended. Mr. Triplett seconded the motion.

**Vote:** 9-0 Passed

K AI -9205 Approve first reading to rescind Knox County Board of Education Policy J-340 "Student Insurance Program" - *Discussed at Policy Review*

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

8 Grants

A AI -9223 Approve Consolidated Grant Application and receipt of funds from the Tennessee Department of Education for Fiscal Year 2026 Federal Title I-A, Title I-D, Title I-N, Title II-A, Title III, and Title IV in the amount of $18,857,717.40 - *Recommended by Superintendent*

On motion made by John Butler, seconded by Katherine Bike

**Vote:** 9 - 0 Passed

B AI -9226 Approve Consolidated Grant Application and receipt of funds from the Tennessee Department of Education for Fiscal Year 2026 IDEA Part B in the amount of $15,394,458.00 and IDEA Preschool in the amount of $472,571.00 - *Recommended by Superintendent*

On motion made by Katherine Bike, seconded by Kristi Kristy

**Vote:** 9 - 0 Passed

C AI -9225 Approve Tennessee Department of Education Fiscal Year 2026 Carl D. Perkins Career and Technical Education Grant in the amount of $978,536.14 - *Recommended by Superintendent*

On motion made by Katherine Bike, seconded by Kristi Kristy

**Vote:** 9 - 0 Passed

D AI -9227 Approve Tennessee Department of Education Fiscal Year 2025 Additional Targeted Support and Improvement (ATSI) 24 Grant in the amount of $200,000.00 - *Recommended by Superintendent*

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

E AI -9209 Approve Second Amended and Restated Memorandum of Understanding with Simon Youth Foundation, Inc. regarding the continued development and operation of the Dr. Paul L. Kelley Volunteer Academy and receipt of grant funds in the amount of $100,000.00 - *Recommended by Superintendent*

App.1488

On motion made by John Butler, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

9 Contracts

A AI -9230 Approve Terms and Conditions and Privacy Policy with Kiddom Inc. for the purchase of Kiddom 6-8th Grade Science Curriculum at a cost of $3,400,000.00 (Adoption and Fund Balance Designation approved by Board on March 6, 2025) - *Recommended by Superintendent*

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

B AI -9231 Approve Contract with Lewis Group Architects for the design of the new K-8th Grade School for the Mechanicsville, Lonsdale and Beaumont area in the amount of $3,256,000.00 - *Recommended by Superintendent*

Ms. Templeton thanked Assistant Superintendent of Operations Dr. Garfield Adams for working through the Request for Quotations (RFQ) line by line on this contract to be creative. She stated that she would certainly be supporting the contract, and said it was her hope that Lewis Group Architects would be creative and innovative in their designs for the new school, and that it would set standards for the future. She expressed her sincerest appreciation. Dr. Adams recognized Facilities Director Doug Shover and noted that he had worked closely with the Academics team and the Special Education staff on the RFQ details.

On motion made by John Butler, seconded by Kristi Kristy

**Vote:** 9 - 0 Passed

C AI -9228 Approve Contracts with Amergis Healthcare Staffing, Inc., ESS South Central, LLC, and Stellar Therapy Services for provision of Supplemental Staffing Services for the term of July 1, 2025 through June 30, 2026 - *Recommended by Superintendent*

On motion made by Kristi Kristy, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

10 Regular Agenda Items

A AI -9235 Approve Resolution Donating Certain Land to the Commission of Knox County, Tennessee for Its Reservation for the Sole Purposes of Construction, Use, and Maintenance of the Gibbs Pedestrian Bridge and Related Improvements and, Further, Reserving Said Donated Land and Additional Land Owned by Knox County for Said Purposes

On motion made by Travis Wright, seconded by Kristi Kristy

**Vote:** 9 - 0 Passed

B AI -9179 Approve Renewal Charter Agreement with Emerald Academy through June 30, 2035 pursuant to Board Resolution 25-001 dated January 9, 2025

Ms. Kristy made a motion to approve the Emerald Academy Charter School Renewal Charter Agreement. Mr. Triplett seconded the motion.

Ms. Bike stated that she believed there were some items of concern noted during the review of Emerald Academy, so she would be passing on this item and would not be voting in favor of or necessarily against the agreement.

Ms. Henderson requested a roll call vote.

Roll call:
Dr. Butler - Pass
Ms. Templeton - Pass
Ms. Fontenot-Ridley - Pass
Ms. Bike - Pass
Ms. Morgan - Yes
Ms. Henderson - Yes
Mr. Triplett - Yes
Mr. Wright - Yes
Ms. Kristy - Yes

**Vote:** 5-4 Passed

11 Public Forum

- Candace Bannister of Knox County, Tennessee addressed the Board regarding bullying.

The meeting was adjourned at 5:41 pm.

Date Approved: July 10, 2025

Chair:

Secretary:

GO TO PREVIOUS PAGE GO TO THE TOP OF THE PAGE

WAI-AA WCAG 2.0
AgendaQuick ©2005 - 2026 Destiny Software Inc. All Rights Reserved.

# EXHIBIT 36

**Amended Charter School Agreement**

This Amendment to the Charter Agreement (the "Agreement") is entered into this, the _____ day of _____________ 2024, by and between the Knox County Board of Education ("KCBOE" or the Chartering Authority) and Prep Public Schools to operate Knoxville Preparatory School (the "Sponsor" or "Charter School," those terms being used interchangeably herein; provided that references herein to "Charter School" shall not include other schools operated by the Sponsor). The Chartering Authority and Sponsor are collectively the Parties to this Charter Agreement. This Charter Agreement shall be binding upon the Governing Body (the Board of Directors of Knoxville Preparatory School), as defined by T.C.A. § 49-13-104, selected by the Sponsor to operate the public charter school proposed in the Sponsor's Application, which, together with any addenda supplied for the Chartering Authority's consideration during the course of the application process, shall be referred to and considered collectively as the "Application."

This contract consists of the following documents:

- This document;
- Approved Charter School Application (Exhibit 1);
- Pre-Opening Checklist (Exhibit 2); and
- Current TDOE Performance Framework (Exhibit 3).

**Recitals:**

WHEREAS, the State of Tennessee enacted the Tennessee Public Charter Schools Act of 2002 (T.C.A. § 49-13-101 *et. seq.)* effective July 4, 2002 (the Act) authorizing the establishment of independent, publicly supported schools known as charter schools; and

WHEREAS, the purposes of the Act include providing "options relative to the governance and improvement of high priority schools," "the delivery of instruction for those students with special needs," and "improv[ing] learning for all students and clos[ing]...achievement gap[s];" and

WHEREAS, charter schools "provide [one] alternative means within the public school system for ensuring accomplishment of the necessary outcomes of education by allowing the establishment and maintenance of public charter schools that operate within a school district structure but are allowed maximum flexibility to achieve their goals;" and

WHEREAS, the Act empowers the Chartering Authority to ensure that only those charter schools open and remain open that are meeting the best interests of the pupils, the school district or the community, and the Act enables the Chartering Authority to do this through rigorous authorization processes, ongoing monitoring of the academic, organizational, and financial performance of charter schools, and, when necessary, through the revocation or non-renewal of charters; and

WHEREAS, KCBOE has approved the Sponsor's application to operate a charter school and entered into an agreement with the Sponsor in 2023; and

WHEREAS, pursuant to T.C.A. § 49-13-111(a)(2), the Charter School, known as Knoxville Preparatory School, shall operate as a public, nonsectarian, nonreligious public school, with control of instruction vested in the Governing Body of the Charter School under the general supervision of KCBOE and in compliance with this agreement and the Act; and

WHEREAS, pursuant to T.C.A. § 49-13-124, the Charter School may conduct all activities necessary and appropriate to carry out its responsibilities, including but not limited to the power to contract, the power to buy and lease property, and the power to borrow funds; and

WHEREAS, the Chartering Authority has developed a Pre-Opening Checklist to provide guidance and articulate expectations to Knoxville Preparatory School and future charter schools regarding the process for opening a charter school in Knox County.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

**1. General Terms**

**1.1 Applicable Law.** This Charter Agreement and the Charter School's operations shall be governed by and construed in accordance with the laws of the State of Tennessee and applicable federal laws of the United States. Though the Governing Body may, pursuant to T.C.A. § 49-13-111, seek waivers from the Chartering Authority or the Commissioner of Education from Tennessee laws or rules of the State Board of Education that inhibit the Charter School's mission, the Parties understand that waivers may not be provided from the types of laws and rules specifically listed in T.C.A. § 49-13-111, from any provisions of T.C.A. § 49-13 (the Tennessee Public Charter Schools Act) or those included in the Act by reference, or from other laws specifically applicable to charter schools (such as those related to benefits or retirement of charter school employees contained in T.C.A. § 8-27-3). Nothing in this section shall require staff members who work in a regional or national capacity and are not teachers at a school located in Tennessee to comply with the requirements of T.C.A. § 8-27-3.

As required by T.C.A. § 49-13-110, this Charter Agreement includes all material components of the Sponsor's Application, which is incorporated herein by reference and attached hereto as Exhibit 1.

By signing this agreement, the Chartering Authority approves any waivers requested in the Sponsor's Application. Those requests and any others subsequently requested by the Governing Body are attached as part of the approved charter application. The Knox County Board of Education will be notified when the Charter School makes future waiver requests.

**1.2 Effective Date.** This Agreement shall be effective immediately following signature by the Sponsor and the Chartering Authority. The Agreement shall expire on June 30 of the tenth year after the date of opening the Charter School for instruction (June 30, 2035), unless earlier terminated or renewed pursuant to the terms of this Agreement or state law.

**1.3 Pre-Opening Process.** Upon approval by the Knox County Board of Education (KCBOE) the sponsor will begin the pre-opening process as prescribed by the Pre-Opening Checklist, a copy of which is attached hereto as Exhibit 2. If the pre-opening process is substantially incomplete at the time of the pre-opening action visit and inspection, the KCBOE may decide not to open the Charter School until it has completed all pre-opening steps under T.C.A. § 49-13-111 and T.C.A. § 49-13-113. The pre-opening process shall be deemed substantially incomplete if the Charter School is not prepared to begin providing instruction in compliance with state and federal laws and within an environment that complies with applicable health and safety standards.

If the Governing Body and the Chartering Authority cannot agree on whether the Charter School is "substantially incomplete," KCBOE's Director of Schools or designee and the Governing Body's Chief Executive Officer or designee must meet within five (5) business days of the Chartering Authority deeming the Charter School "substantially incomplete," with both officers working toward finding common ground and outlining steps to promptly and efficiently open the Charter School to students.

**1.4 Charter School Performance.** The operation of the Charter School by the Governing Body shall be subject to the terms and conditions of this Charter Agreement and the Act. Decisions by the Chartering Authority regarding renewal or revocation of the Charter Agreement shall be based upon T.C.A. § 49-13-121, T.C.A. § 49-13-122, and any other applicable laws and rules. Pursuant to T.C.A. § 9-13-111(a)(1), Knoxville Preparatory School shall operate as a public, nonsectarian, nonreligious public school under the general supervision of KCBOE.

Consistent with the right to exercise general supervision, KCBOE may take all reasonable steps to oversee the Charter School's performance, including compliance with the Agreement and applicable law. This includes the opportunity: a) to visit and inspect the school building; b) to examine public records of the Charter School, upon reasonable notice; c) upon reasonable notice, to interview Charter School employees and Governing Body members; and d) to interview students and families.

The Chartering Authority shall, at least annually, monitor and report on the Charter School's progress in relation to the indicators, measures, metrics, and targets set out in the charter school application, reported on the State Report Card, and specified in the currently adopted Tennessee Department of Education *Charter School Performance Framework* (Exhibit 3). Such reporting shall become part of the Charter School's annual report to the Chartering Authority and the state Commissioner of Education.

The Chartering Authority shall also conduct an interim review at the end of the fifth year after the effective date of the Agreement, pursuant to T.C.A. § 49-13-121.

The performance expectations outlined in the charter school application may need to be modified to align with changes applicable to state or federal accountability requirements as requested by the Chartering Authority. Such changes shall apply to the Charter School as required by law. In the event that any such modifications or amendments are required, the Chartering Authority will use its best efforts to apply expectations for school performance in a manner consistent with those set forth in the charter school application as initially established in the most recent charter agreement.

Changes to performance expectations that are not required by state or federal law will not become binding upon the Charter School without the Charter School's consent, except at the time of charter renewal or amendment.

**1.5 Location.** The Charter School is located at 967 Irwin Street. Such location shall be subject to and in accordance with the Application, as well as all applicable laws and codes governing the location and occupation of educational facilities. If the school were to be changed to a location at a site controlled by the Chartering Authority, the use of such site shall be subject to and governed by a Facilities Agreement between the Parties. If the Charter School decides to change the location of the Charter School, the Charter School shall notify the Chartering Authority at

least 90 business days prior to any such change of location. The determination of such location shall be subject to the approval of the Chartering Authority, in accordance with the approved Application and Addendum.

**1.6 Employment Status.** All teachers and other staff of the Charter School shall be employed by the Charter School, not the Chartering Authority. Nothing in this Agreement shall prevent the Charter School from contracting with any other non-profit organization to provide employees for the Charter School.

## 2. Charter School and Chartering Authority Organizational Responsibilities

**2.1 Student Enrollment and Retention.** The Charter School shall enroll students according to T.C.A. § 49-13-113 but will not use the Chartering Authority's application process. The Charter School shall not discriminate with respect to admissions on the basis of race, ethnicity, religion, national origin, English language proficiency, academic or athletic ability, sex, or the need for special education and related services as set forth in the Application and the Act.

Similar to T.C.A. § 49-6-3401(f), nothing in this Section shall require the Charter School to enroll a student who is under suspension or expelled in an LEA or another charter school either in Tennessee or another state. The Charter School shall make a decision with regard to enrollment only after an investigation of the facts surrounding the suspension from the former school system. If the Charter School accepts enrollment of a student from another LEA or charter school, the Charter School may dismiss that student if it is determined subsequent to enrollment that the student had been suspended or expelled by another LEA or charter school.

The Charter School may enroll students up to a maximum of 700 students. Enrollment shall be determined initially at the start of each academic year but will be recalculated periodically within each year by the Charter School and Chartering Authority. Increases in total enrollment numbers greater than 5% or 25 students, whichever is less, constitute a material change in this Charter Agreement and are not permitted unless a formal amendment to this Charter Agreement is secured in advance according to the provisions outlined in T.C.A. §49-13-110(b). Reductions in enrollment greater than 15% or 50 students, whichever is less, must be reported to the Chartering Authority within the LEA and reductions in enrollment at such levels in any year or over two or more years may be considered material and require an amendment to this Charter Agreement or other action by the Chartering Authority. Multi-year reductions in enrollment which affect the financial viability of the Charter School may be considered material and require an amendment to this Charter Agreement or other action by the Chartering Authority. For purposes of determining whether a reduction in enrollment under this section is a material change, the calculation of total enrollment numbers shall not include reductions in enrollment for causes outside the control of the Charter School (such as the family of an enrolled student moving out of the school district). Accurate and true enrollment numbers shall always be maintained by the Charter School and reported to the Chartering Authority and other entities (e.g., Tennessee Department of Education or State Board of Education) upon request. When providing said enrollment numbers to the Chartering Authority, the Charter School may include a listing of students withdrawing for reasons claimed to be outside the control of the Charter School. A parent or guardian's decision to withdraw his or her student from the Charter School, if that student still lives within the district, shall be determined on a case-by-case basis to determine

whether the student's withdrawal may fairly be attributed to the Charter School or to causes outside the control of the Charter School.

If the number of applications exceeds the capacity of a program, class, grade level, or building, the Charter School shall select students through a lottery, provided that students who attended the Charter School during the previous year shall be given preference for enrollment and shall be excluded from the lottery. The Charter School shall give preferences in a lottery as set out in T.C.A. § 49-13-113 and within the Rules of the Tennessee Department of Education.

The Charter School may not "counsel out" or discourage students from attending the Charter School for any reason nor will the Charter School use the purported failure of compliance with a letter of commitment or a contract between the Charter School and students/parents as a mechanism to encourage withdrawal of students from the Charter School. However, the Charter School will remain open and honest with students and their parents/guardians regarding course offerings, career counseling, and other factors that could affect whether a student remains enrolled with the Charter School. (Example: If a parent expressed interest in welding or other CTE course offerings not available within the Charter School's college prep framework, the Charter School would and should remain open and honest with that parent and the student regarding all options moving forward.)

Approved enrollment at Knoxville Preparatory School, by grade level, shall be as follows for each academic year governed by this agreement:

| Year | Grade Level | Total Enrollment |
|---|---|---|
| Year 1 | 6 | 105 |
| Year 2 | 6,7 | 207 |
| Year 3 | 6,7,8 | 306 |
| Year 4 | 6,7,8,9 | 409 |
| Year 5 | 6,7,8,9,10 | 509 |
| Year 6 | 6,7,8,9,10,11,12 | 700 |
| Year 7 | 6,7,8,9,10,11,12 | 700 |
| Year 8 | 6,7,8,9,10,11,12 | 700 |
| Year 9 | 6,7,8,9,10,11,12 | 700 |
| Year 10 | 6,7,8,9,10,11,12 | 700 |

2.2 **Academic Program.** Pursuant to T.C.A. § 49-13-111(a)(2), Knoxville Preparatory School shall operate as a public, nonsectarian, nonreligious public school, with control of instruction vested in the Governing Body of the Charter School. The Charter School shall operate the academic program in accordance with the Charter Agreement and academic state and federal law, including providing the same equivalent time of instruction as other public schools and complying with assessment and accountability laws and rules, under T.C.A. § 49-13-105.

2.2.1 **Assessments.** The Charter School must use the required state assessments.

2.3 **Students with Disabilities.** Special education services, related services, and accommodations for students who are eligible under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973 (Section 504), the Americans with Disabilities Act (ADA), or

any applicable provisions of state law, shall be provided in accordance with applicable state and federal law, this Agreement and the Chartering Authority's policy. The Chartering Authority is the local education agency (LEA) for purposes of compliance with the Individuals with Disabilities Education Act (IDEA). The Chartering Authority, pursuant to state law, addresses the needs of services for students with disabilities and gifted services in its Student Support Services division.

**2.3.1 Responsibility of the Chartering Authority.** The Chartering Authority is responsible for ensuring that the requirements of federal and state special education law and regulations are met in the Charter School and that special education and related services are provided in the Charter School in a comparable manner as they are provided in the district's direct-run school. Additionally, The Chartering Authority will oversee procedural compliance with federal and state laws and regulations concerning accommodations for the education of students with disabilities.

The Chartering Authority will collaborate with the Charter School in the same manner in which it works with its other schools in the identification and referral process, and in conducting initial evaluations for exceptional education. The Chartering Authority will also collaborate with the Charter School in the same manner in which it works with its other schools when a Charter School student is in need of services which cannot be provided at the Charter School but may be provided by a Knox County Schools' alternative placement. If a Charter School student is enrolled in a Knox County Schools' alternative placement, the student becomes a Knox County Schools' student. The Chartering Authority will notify the Charter School if an enrolling student has an existing individualized education program (IEP) and will provide the Charter School with records within ten (10) business days of receipt of a request by the Charter School for the records.

**2.3.2 Responsibility of the Charter School.** The Charter School shall have an effective educational model for the delivery of special education services that complies with federal and state law. Once a student has been identified as eligible for special education services, the Charter School assumes responsibility for the provision of services, development, and implementation of individualized education programs (IEPs), procedures, and documentation. Special education services at the Charter School will be delivered by the individual or agencies licensed and/or qualified to provide special education services required by the Tennessee Public Charter Schools Act and the IDEA. Charter School staff may participate in any Chartering Authority professional development related to special education or the provision of services pursuant to Section 504.

The Charter School may also enter into a separate fee-for-services agreement with a third-party provider of educational services (Contract Services Provider), provided that such third-party provider complies with all applicable laws and the requirements imposed on contractors by this Charter Agreement.

The Charter School, or Contract Service Provider, shall have a qualified special education coordinator who will be responsible for monitoring individual case management of all special education students and for arranging the provision of services required by their IEP. Charter School, or Contract Service Provider, shall maintain a file documenting the Charter School's compliance with special education requirements.

**2.3.3 Costs for Special Education.** The Chartering Authority is financially responsible for Child Find, including student identification and initial assessment expenses. Once a student has been

determined eligible for special education services and has an individualized education program (IEP), all costs associated with providing educational services to students with disabilities are the responsibility of the Charter School. The Charter School shall bear the financial responsibility for reevaluations and the provision of all services consistent with IEP's. The Charter School's financial obligation begins once a student has an IEP.

The Chartering Authority will pass federal funding to the Charter School in the same manner as all other public schools. Resources may be in the form of services provided by the Chartering Authority and may include but not be limited to supervisors, behavioral liaisons, technology, equipment, etc. In addition, when the Chartering Authority submits requests to the state Department of Education for high-cost students, the Chartering Authority will include students at the Charter School in its count. The Chartering Authority will pay a pro-rata share of any high-cost reimbursement received from the state for such students at the Charter School being subject to utilize such funds in the same manner as required for all other of the Chartering Authority's public schools.

**2.3.4 Compliance.** No student shall be denied admission nor counseled out of the Charter School due to the nature, extent, or severity of his/her disability or due to the student's request for, or actual need for, special education services or accommodations pursuant to Section 504.

The Charter School shall promptly report to the Chartering Authority all alleged infractions, complaints, and other non-compliance issues relating to special education.

**2.4 English Language Learners.** The Charter school shall address the needs of English Language Learner (ELL) students pursuant to applicable federal and state laws and regulations (including Title III of the Elementary and Secondary Act (ESEA)). The Charter School agrees to maintain and consistently implement a policy to identify students in need of ELL services, to provide services in an equitable manner to ensure access to the school's educational program (including the provision to appropriate accommodations), and to facilitate exit from ELL services according to individual student capacity. The Chartering Authority will provide equitable services and/or funding to the Charter School in the same manner as services and/or funding is provided to non-public schools in Knox County.

**2.5 Student Discipline/Due Process.** The Charter School administers its discipline policy in a way that ensures students' due process rights are satisfied, including providing appropriate informal or formal hearings. The Charter School shall promptly notify the Chartering Authority of students expelled. The Chartering Authority shall provide expelled Charter School students access to the Chartering Authority's alternative school programs in the same manner as it provides access to any student within the LEA.

**2.6 Student Information Reporting.** While ensuring compliance with federal and state law regarding student records, the Charter School shall report student information as follows:

- Enrollment projections for the coming year no later than February 15
- Daily attendance, conduct, and grades using the Chartering Authority's student management system (Aspen SIS), updating at least weekly;
- Student enrollment for determining average daily membership by the date required by the department of education, updated at least weekly.

The charter school shall monitor their student population with respect to student withdrawals, suspensions, transfers, and expulsions. A quarterly report is due to the Chartering Authority.[1]

| Quarter | Withdrawal | Transfer | Suspension | Expulsion |
|---|---|---|---|---|
| Q1 | | | | |
| Q2 | | | | |
| Q3 | | | | |
| Q4 | | | | |

## 3. Staffing

**3.1 Teachers.** The Charter School shall ensure that teachers are licensed pursuant to state statutes and state board of education rules, and meet applicable federal qualifications including highly qualified, special education certified, and ESL certified.

**3.2 Background Checks.** All employees of the Charter School who have or will have contact with children at the Charter School within the scope of the individual's employment, and employees of contractors or sub-contractors of the Charter School who have contact with children within the scope of the individual's employment shall complete criminal background checks as required by state law.

## 4. Facility

The Charter School shall ensure the Charter School's grounds and facilities comply with applicable health and safety laws, including the Americans with Disabilities Act, state fire marshal codes, and state and local zoning and land use codes.

The Charter School may not commence instruction prior to completion of applicable inspections and receipt of a completed Pre-Opening Checklist (Exhibit 2) or letter from the Chartering Authority.

## 5. School Nutrition

School Nutrition for students at Knoxville Preparatory School shall be provided pursuant to state law requirements. If mutually agreed upon, the Chartering Authority and the Charter School may enter a separate memorandum of understanding (MOU), which shall define the parties' obligations with respect to school nutrition. Unless otherwise agreed by the Governing Body of the Charter School, the

---

[1] Methodology - Student Attrition is determined by the number of students who left the school between October 1 of one year and prior to October 1 of the next year. Students that are unable to return due to completing the highest grade level or students that are enrolled during the summer rollover process but deemed as "no-Shows" are excluded from this count. (Data Source - Aspen Student Information System). The divisor is determined by using Period 2 End of Month Membership numbers for the next school year. (Data Source - State Data Reports)

Chartering Authority shall provide school nutrition pursuant to the terms of the Application, as approved by the Chartering Authority. The parties authorize their respective agents to execute an MOU regarding school nutrition and further authorize their respective agents to alter or amend such MOU in future years to redefine the obligations of the parties. The Knox County Board of Education will be notified when the Charter School enters into a memorandum of understanding regarding school nutrition.

**6. Transportation**

If the Charter School elects to provide transportation for students, transportation for students shall be provided pursuant to the requirements of state law as provided in T.C.A. § 49-6-2116. If the Charter School elects to provide transportation for its students, other than through an agreement with the Chartering Authority, the Chartering Authority shall provide to the Charter School the funds that would otherwise have been spent to provide transportation as provided in T.C.A. § 49-13-114. In order to receive these funds, the Charter School must comply with state laws and State Board of Education rules regarding student transportation. Students shall be transported in buses that have been approved for the transportation of students by the Department of Safety, or any other manner allowable by state and federal law. The Charter School shall provide transportation services to its students by either (a) contracting with such services through a properly licensed and qualified sub-contractor, (b) providing such services itself, or (c) entering into a separate memorandum of understanding with the Charter Authority to provide such services, though the parties are not obligated to enter into such an agreement.

**7. Insurance**

The Charter School shall maintain the following insurance:

- General Aggregate & Commercial Automobile: must be equal to or greater than $5,000,000. This insurance shall be primary insurance. Any insurance or self-insurance programs covering the KCBOE or Knox County Government, their officials, employees, and volunteers shall be in excess of this insurance and shall not contribute to it. The first one million dollars must be with a company licensed to do business in the State of Tennessee. The remaining $4,000,000 can be covered under an excess liability policy (also known as an "umbrella" policy). The policy must name Knox County Board of Education and Knox County, Tennessee as additional insureds. The policy must cover liability for transportation of students, including transportation by outside vendors with whom the Charter School has contracted. Automobile coverage shall cover vehicles owned, hired, and non-owned.
- Professional Liability Policies: Directors and Officers Policy: equal to or greater than $5,000,000. Teachers Professional Liability Policy equal to or greater than $1,000,000.
- Workers Compensation and Employers Liability Policy: The amount of coverage required for Workers Compensation is determined by statute. Sponsor must comply with state statutes. Employer liability must be a minimum of $100,000.
- Property and Boiler Insurance Policy: If the Charter School purchases the property that will be used by the Charter School it shall purchase "all risks" property and boiler insurance. Insurance shall be for the full replacement cost of the property and contents with no coinsurance penalty provision.
- Sexual Abuse Policy: $1,000,000 required coverage.

Certificates of insurance, in a form satisfactory to the Chartering Authority, evidencing coverage, shall be provided to the Chartering Authority according to the following schedule:

- General/Automotive Liability: Within thirty (30) days of the execution of this agreement.
- Professional Liability (D&O): Within thirty (30) days of the execution of this agreement.
- Professional Liability (Teachers): No later than upon hiring of teachers.
- Workers' Compensation: No later than when required by statute.
- Property and Boiler: No later than upon acquisition of property.
- Sexual Abuse: Prior to staff interaction with students or prospective students.

Throughout the term of this Charter Agreement, the Sponsor shall provide updated certificates of insurance upon expiration of the current certificates.

## 8. Governance

**8.1 Incorporation, Meetings, and Conflicts of Interest.** The Charter School's Articles of Incorporation, a Certificate of Incorporation evidencing its incorporation as a non-profit and evidence of its exemption from federal taxation under IRC § 501(c)(3), its Bylaws and amendments or modifications thereto shall be made part of this Agreement.

The Governing Body shall comply with the provisions of T.C.A. § 49-13-109.

The Charter School shall comply with all applicable provisions of the Tennessee Open Meetings Act, including with regard to the scheduling and posting of Governing Body meetings, meeting agendas, public notice of meetings, and records of those meetings. At the start of each school year, the Charter School shall provide the Chartering Authority with a schedule of Governing meetings for that school year.

As required by T.C.A. § 49-13-111(f), the Governing Body shall be subject to the conflict of interest provisions contained in T.C.A. § 12-4-101 and 12-4-102.

**8.2 Complaints.** In that control of instruction is vested in the Governing Body of the Charter School, the Governing Body shall be the first avenue for response in case of any complaints or grievances filed against the Charter School or its employees and volunteers before matters are brought to the administration or board of the Chartering Authority. The Governing Body will ensure that the Charter School establishes policies and procedures for employees and policies and procedures regarding complaints and grievances. The Governing Body will make those policies available to students, parents/guardians, employees, and any other persons upon request. If grievances persist following the actions of the Governing Body, those complaints will be investigated and resolved by the Chartering Authority using the procedures outlined in the KCS Charter School Handbook. Investigation and sanctions by the Chartering Authority are limited to alleged violations of laws or the Charter Agreement.

The Charter School shall notify the Chartering Authority within three (3) business days if it receives notice or is informed that it is a party in a lawsuit.

**8.3** **Management.** The Charter School shall report the following to the Chartering Authority within five (5) working days of change:

- The names and contact information of individuals who leave or join the Governing Body;
- Names and contact information of any individuals who, during the prior quarter, resign from or are hired to a leadership position in the Charter School, including any administrative position; and
- Any change to the Charter School's corporate legal status or any change in its standing with the Tennessee Secretary of State's Office.

**8.4** **Waivers.** By signing and submitting an application, the sponsor requests a waiver of all education statutes and rules of the state board or department of education and the KCBOE, except those listed in T.C.A. § 49-13-111(p) or included by reference (such as statutes and rules related to licensing of charter school teachers) in Title 49, Chapter 13 (the Tennessee Public Charter Schools Act). The approval of this charter school contract by the KCBOE shall include the approval of these waivers by the Commissioner of Education and such automatic waivers shall be reflected in the contract.

## 9. Finance

### 9.1 State and Local Funds

(1) The Chartering Authority shall allocate to the Charter School an amount equal to the per-student state and local funds received by the Chartering Authority and all appropriate allocations or services as provided in federal laws, regulations, and T.C.A. § 49-13-112.
(2) Allocations to the Charter School shall be based on the Tennessee Investment in Student Achievement (TISA) student-generated state and required local funding amount calculated from the Charter School's prior school year student membership, plus the Chartering Authority's current school year per student funding (in excess of the TISA local required contribution) calculated from the Charter School's current year student membership.
(3) Allocations to the Charter School shall not be reduced by the Chartering Authority for any category of cost(s) except for the annual authorizer fee. Any services the Charter School chooses to purchase from the Chartering Authority may be governed by a separate services contract between both parties. The Chartering Authority may deduct associated funds resulting from the cost(s) of any such service(s) from allocations sent to the Charter School.
(4) The Chartering Authority shall distribute funds to the Charter School in no fewer than nine (9) installments beginning in August 2024 in a manner consistent with how state funds are distributed to the Chartering Authority. Each distribution will include documentation reflecting how the amount was calculated, as well as any necessary adjustments, at a minimum reflected in October, February, and June, based on changes in revenue, student enrollment, and/or student services.

**9.2** **Tuition.** The Charter School shall not charge tuition.

**9.3** **Charter School Debt.** The Charter School is solely responsible for all debt it incurs, and the Chartering Authority shall not be contractually bound on Charter School's account to any third party. The Chartering Authority shall not be liable for the Charter School's unpaid debts if the

Charter School does not have sufficient funds to pay all its debts in the event that it ceases operations.

The Charter School shall notify the Chartering Authority immediately of a default on any obligation owed to the Chartering Authority, which shall include debts for which payments are past due by sixty (60) business days or more. If debts are incurred in the provision of employee benefits pursuant to T.C.A. § 49-13-119, the Chartering Authority may withhold the amount owed from the monthly payment until such debts are satisfied. Any other debts owed to the Chartering Authority must be satisfied prior to the release of the last annual payment.

**9.4 Financial Management.** The Charter School shall control and be responsible for financial management and performance of the Charter School including budgeting and expenditures. Before receiving the per pupil allocated funds through the Chartering Authority, the Charter School must demonstrate (if not already demonstrated in the application) the existence of appropriate governance and managerial procedures and financial controls including

- Accounting methods complying with T.C.A. § 49-13-111(m);
- A checking account;
- Adequate financial procedures, policies, systems, and processes for accounting and payroll;
- An organizational chart;
- Procedures for the creation and review of monthly and quarterly financial reports, including identification of the individual(s) responsible for preparing such financial reports;
- Internal control procedures for cash receipts, disbursements and purchases; and
- Maintenance of asset inventory lists and financial procedures for federal grants in accordance with applicable federal law.

The Charter School shall comply with T.C.A. § 49-13-111, 120, and 124 regarding completion and submission of annual financial reports and audits to the Chartering Authority and the state.

**9.5 Financial Records.** After no less than 10 days notice to the Charter School and its Governing Body, all financial records of the Charter School pertaining to the management and operation of the school will be subject to inspection and production as required for fulfillment of the Chartering Authority's fiduciary responsibilities.

## 10. Benefits

The Charter School shall be responsible for following the requirements set forth in the Memorandum of Understanding between the KCBOE, the State of Tennessee Department of Finance and Administration Benefits Administration, and the Charter School.

The Charter School shall be responsible for any penalties imposed for failure to comply with the Patient Protection and Affordable Care Act (PPACA) (Public Law 111-148 as amended by Public Law 111-152). The Chartering Authority is responsible for its own acts or omissions. This includes but is not limited to penalties under the PPACA amendments to the Public Health Service Act (42 U.S.C. 300gg et. seq.), the employer responsibility section of the Internal Revenue Code (25 U.S.C. 498OH), and regulations implementing those provisions.

## 11. Amendments

Pursuant to T.C.A. § 49-13-110, petitions to amend this Agreement shall follow the timelines established in by the Tennessee Public Charter School Commission for approval or denial by the Chartering Authority and appeal to the state board of education. An amendment shall not become effective, and the Charter School may not take action or implement the change requested in the amendment until the amendment is approved by the Chartering Authority.

Not all changes to school operations constitute material changes to the Agreement that require an amendment. However, the following changes are considered material and require an amendment:

- Changes in any Material Term of this Charter Agreement;
- Changes in the Charter School's mission;
- Changes in school location (change of site and/or adding or deleting sites);
- Changes in enrollment beyond the maximum limit established in this Agreement such as increases of more than 5% total enrollment or 25 students, whichever is less; or reductions of more than 50 students or 15%, whichever is less; and
- Changes in school calendar that reduce the calendar below the requirement to provide at least the same equivalent time of instruction as required in regular public schools in T.C.A. § 49-13-111 (p)(12).

Pursuant to T.C.A. § 49-13-111(a)(2), educational program matters not specifically identified in this Agreement shall remain within the Charter School's authority and discretion.

The following changes do not require an amendment, but the Charter School must notify the Chartering Authority of any of the following within thirty (30) days:

- Changes to the budget submitted in the attached Application, subject to the requirements of state and federal law;
- Changes in the mailing address, phone or fax number, or web address of the Charter School;
- Changes in the members and duties of the Governing Body;
- Changes in the school leader or, if applicable, the chief executive of the charter management organization; and
- Changes in signing authority for the school.

## 12. Renewal, Revocation, Appeals, Closure and Dissolution

**12.1. Renewal.** Pursuant to T.C.A. § 49-13-121, the Charter School may apply for renewal of this Charter Agreement by application submitted no later than April 1 of the year preceding the year in which this agreement expires and in accordance with KCBOE renewal policies on the standardized application form developed by the Department of Education (April 1, 2034). The renewal application must contain a report of the Charter School's operations, including students' standardized test scores, financial statements, and audits for the eight years immediately preceding the date of the renewal application. No later than January 1, 2034 (three months prior to April 1, 2034), the Chartering Authority shall submit to the Charter School a performance report that reflects the renewal evaluation. T.C.A. § 49-13-121(c). Pursuant to T.C.A. § 49-13-1021(d), the Chartering Authority shall rule by resolution upon whether to approve or deny the renewal application by February 1 of the tenth year of this agreement year in which the Charter Agreement expires (February 1, 2035). "The authorizer shall consider the renewal application,

the annual progress reports required under T.C.A. § 49-13-120, and the renewal performance report required under subsection (b) when deciding whether to approve or deny the public charter school's renewal application." The Chartering Authority shall state its reasons for the non-renewal. The Agreement may be renewed without modification, except for the incorporation by attachment of the approved renewal application. Pursuant to T.C.A. § 49-13-121, the Parties may also amend the Agreement as part of the renewal process.

The Chartering Authority may elect not to renew this Charter Agreement pursuant to T.C.A. § 49-13-121, for any of the applicable reasons in T.C.A. § 49-13-122 including a material violation of any of the conditions, standards, or procedures set forth in this agreement.

**Revocation.** Except for instances of fraud; misappropriation of funds; flagrant violation of health and safety laws, rules, and regulations; flagrant disregard of the charter agreement; or similar misconduct, the Chartering Authority will provide reasonable notice to the Charter School of non-compliance with applicable laws, rules, or this agreement, and will give the Charter School a reasonable opportunity to cure the non-compliance prior to instituting revocation proceedings pursuant to T.C.A. § 49-13-121 and 22.

Except for instances of fraud; misappropriation of funds; flagrant violation of health and safety laws, rules, and regulations; flagrant disregard of the charter agreement; or similar misconduct, the Chartering Authority will follow a progressive system of notification and calls for corrective action on the part of the Charter School.

The Chartering Authority may revoke this Charter Agreement for any reason set forth in T.C.A. § 49-13-122, including a material violation of any of the conditions, standards, or procedures set forth in this agreement.

If the Chartering Authority determines that any grounds for revocation exist, it may revoke this Charter Agreement according to the procedures set forth in T.C.A. § 49-13-122. Pursuant to T.C.A. § 49-13-122(b), the Chartering Authority shall state its reasons for the revocation.

**Appeals.** Except for violations of T.C.A. § 49-13-122(a), appeals of a nonrenewal or revocation may be appealed to the state board of education. Such appeal shall be taken within ten (10) days of the Charter School receiving written notice of the nonrenewal or revocation.

**12.2 Closure and Dissolution**. In the event that the Charter School is required to cease operation for any reason, including but not limited to non-renewal, revocation, or voluntary surrender of the charter, the Charter School shall cooperate with the Chartering Authority to ensure orderly closure of the Charter School including, but not limited to:

- Timely notification of parents and teachers of the closure decision;
- Securing student records and transporting them to the chartering authority;
- Assisting in placing students in appropriate schools;
- Managing all financial records consistent with the Chartering Authority's school closure requirements and policies; and
- Disposal of school assets in accordance with the Act and this Agreement. "School Assets" shall be defined to include only those assets directly related to the operation of schools within Knox County and shall not include any other assets the Governing body may hold in other regions.

Dissolution of the Charter School following revocation or non-renewal shall comply with T.C.A. § 49-13-110(f) and § 49-13-130. The Charter School shall be responsible for winding down operations, including payment of all debts, obligations, or liabilities incurred at any time by the Charter School. Under no circumstances shall the Chartering Authority be responsible for such obligations.

## 13. Litigation Notice & Cooperation

The Chartering Authority and Charter School each shall give prompt written notice to the other of the assertion of any claim or the commencement of any litigation involving the operation of the Charter School and shall cooperate with each other in the defense of the claim or litigation.

## 14. Contract Construction

**14.1 Waiver.** The failure of either Party to insist on strict performance of any term or condition of this Agreement shall not constitute a waiver of that term or condition, even if the Party accepting or acquiescing in the nonconforming performance knows of the nature of the performance and fails to object to it.

**14.2 Non-Assignability.** No right or interest in this Agreement shall be assigned by anyone on behalf of the Charter School, and delegation of any contractual duty of the Charter School shall not be made without prior written approval of the Chartering Authority. A violation of this provision shall be grounds for immediate termination of this Agreement and revocation of the Charter.

Should the Charter School propose to enter into a contract with another non-profit entity to manage the School, the Charter School agrees to submit all information requested by the Chartering Authority regarding the management arrangement, including a copy of the proposed contract and a description of the management company, with identification of its principals and their backgrounds. The Charter School shall not enter into a management contract without written approval from the Chartering Authority, which shall not be unreasonably withheld.

**14.3 Agreement.** Except as stated herein, the Parties intend this Agreement, including all the attachments and exhibits, to represent a final and complete expression of their agreement, which shall be considered the Agreement. All prior representations, understandings, and discussions are merged herein, and no course of prior dealings between Parties shall supplement or explain any terms used in this document. The Parties recognize that amendments to this agreement may be executed from time to time hereafter.

**14.4 Survival of Representations and Warranties.** All representations and warranties hereunder shall be deemed to be material and relied upon by the Parties with or to whom the same were made, notwithstanding any investigation or inspection made by or on behalf of such Party or Parties provided that this Section shall not affect whether a violation of any condition, standard, or procedure in this Agreement is material for the purposes of T.C.A. § 49-13-122(b). The representations and warranties covered in this Agreement will survive the termination or expiration of this Agreement.

**14.5 Severability.** The provisions of this Agreement are severable. Any term or condition deemed illegal or invalid shall not affect any other term or condition, and the remainder of the Agreement shall remain in effect unless otherwise terminated by one or both of the Parties.

**14.6 Authority.** The individual officers, agents, and employees of the parties hereto who execute this Agreement do hereby individually represent and warrant that they have full power and authority to execute this Agreement.

**14.7 Notice.** Any notice required under Section 1.5 (change in location), Sections 8.2 & 13 (notice of litigation), Section 7.3 (members of governing body or leadership of Charter School or Charter School's corporate legal status or standing), Section 9.4 (default on debts), Section 11 (requests for amendments and notifications of changes in program or operation), and Section 12.1 (renewal and revocation) of this Agreement shall be in writing, delivered in person or sent by certified mail, postage prepaid. Such notice shall be effective immediately upon personal delivery, subject to verification of service or acknowledgment or receipt, or three (3) business days after mailing when sent by certified mail, postage prepaid.

Unless otherwise agreed in writing, notice shall be sent to the following persons:

For KCBOE: The Director of Schools/Superintendent of Knox County Schools, with a copy to the Chair of the Board of the Knox County Board of Education.

For Knoxville Preparatory School: The School Director, with a copy to the CEO of the Charter School.

**KNOXVILLE PREPARATORY SCHOOL**

[signature]
**BRAD SCOTT, President**

**Date:** 3/20/24

**KNOX COUNTY GOVERNMENT**

[signature]
**GLENN JACOBS, Mayor**

**Date:** 3/11/24

Approved by
Knox County Board of Education
3/7/2024

**KNOX COUNTY BOARD OF EDUCATION**

Betsy Henderson
**BETSY HENDERSON, Chair**

**Date:** 3/7/2024

**CONTRACT NO.** 24-112

**APPROVED AS TO LEGAL FORM**

[signature]
**GARY DUPLER,**
**Knox County Deputy Law Director**

**Date:** 2/27/2024

# EXHIBIT 37

KNOX COUNTY SCHOOLS
ANDREW JOHNSON BUILDING

*Dr. James P. McIntyre Jr., Superintendent*

**MEMORANDUM**

**TO:** Dr. James P. McIntyre, Jr., Superintendent of Schools

**FROM:** Dr. Jon Rysewyk, Executive Director of Innovation and School Improvement And the Knox County Schools Charter School Review Committee

**DATE:** May 29, 2014

**RE:** **KCS Charter School Review Committee Recommendation for the Emerald Academy Charter School Application**

On February 3, 2014, a letter of intent to apply for a Tennessee public charter school in Knox County was received from Emerald Charter Schools for the Emerald Academy Charter School. Subsequent to receiving this letter of intent, the Knox County Schools (KCS) conducted a Technical Assistance Workshop on February 24, 2014, to thoroughly review the state charter school application, scoring criteria and rubric, and the district priorities delineated in the KCS RFP. Members from the Emerald Charter School Board participated in this meeting remotely. On April 1, 2014, an application for the Emerald Academy Charter School was delivered to the Knox County Schools Board of Education Office. The full application was distributed to the members of the KCS Charter School Review Committee (see attachment) on April 4, 2014. Committee members were asked to individually review and score the application using the state scoring criteria and rubric.

On April 15, 2014, the KCS Charter School Review Committee convened to review the potential merits of the charter school application and determine whether or not it met the standards as defined in the state scoring criteria. The Committee was asked to consider the extent to which the charter school proposer demonstrated the "capacity to design and implement an academic program, operate a business, and be a good steward of public trust and funds, in order to prepare students for successful post-secondary education, work and citizenship," (Rich Haglund, former Tennessee Department of Education Director of Charter Schools). During the meeting, the committee discussed each section of the application, with detailed attention given to each component of the scoring rubric. Areas needing additional clarification were noted and a set of questions was generated and sent to the Emerald Charter Schools Board of Directors in advance of the in-person interview.

On April 24, 2014, an in-person interview was conducted with the Emerald Charter Schools Board of Directors. Following a pre-established protocol, the Emerald Charter School board members were given the opportunity to provide responses to the Committee's questions, as well as an overview statement for the proposed school. At the conclusion of the in-person interview, the KCS Charter School Review Committee considered the totality of information in order to develop its recommendation. The Committee agreed that the applicant had submitted a strong charter school proposal; however, the Committee also agreed that there were still a few key areas that had not been adequately addressed in the application. These concerns were shared with Emerald Charter Schools, who submitted an addendum to their application on May 23, 2014. Upon review of the Addendum, the KCS Charter School Review Team was able to provide the following summary assessment and recommendation:

**Section 1 – Academic Plan Design and Capacity – *Meets/Exceeds Expectations***
**Strengths:**

- Clear vision and mission grounded in the needs of the community.
- Specific target population to be served.
- Ambitious school goals aligned with the state's accountability system
- Emphasis on strong relational culture and a belief in the potential of every child
- Partnership with a successful charter school model – Breakthrough Schools
- Diversity, strength and experience of the board
- Standards based curriculum (Common Core and TN state standards)
- Strong research base to guide curriculum planning, instruction, and assessment, e.g., seven step planning process, co-teaching models, differentiation, data-driven instructional decision making.
- A proposed plan to meet the new RTI2 requirements for literacy instruction.
- Quality time built into the schedule for professional development, e.g., Summer Institute, early release time, data analysis days.
- Character Education
- Small student/teacher ratios
- Life coaches for every student
- Family handbook
- Strong efforts to engage the community and generate interest in the school

**Concerns and Recommendations:**

- The design of the school will require strong instructional leadership. It will be essential that the school hire an outstanding principal who possesses these skills.
- The proposed plan reflects the hiring of a Curriculum Specialist in year three. The Committee strongly suggests that this position be hired in year one.

- It is recommended that the school develop a school wide positive supports plan that complements its stated mission and goals.

**Section 2 – Operations Plan and Capacity –** ***Meets/Exceeds Expectations***
**Strengths:**

- Clear, detailed start-up plan for leading the development of the school from post-approval to opening.
- Strong individual and collective qualifications for implementing the Operations Plan successfully.
- Proposed governance structure for the school is clearly articulated and supported by the Emerald Youth Foundation resources.
- Governance plan includes opportunities for meaningful parent participation.
- Hiring plan reflects the needs of the school as it scales from opening to full capacity.
- Strong plans for ongoing, job-embedded professional development.
- Evidence of a strong commitment from the governing board to ensure that Emerald Academy meets its stated mission and vision.
- A commitment from the Knoxville Chief of Police to assist with the development of a comprehensive safety and security plan.

**Concerns and Recommendations:**

- The proposed salaries may not be sufficient to successfully recruit and retain high quality teachers and administrators. The assumption of a 5% higher salary based on 5% more time worked may not be an accurate assumption.

**Section 3 - Financial Plan and Capacity –** ***Meet/Exceeds Expectations***
**Strengths:**

- The application reflects a balanced budget that is clearly outlined and explained in the narrative.
- The applicant reconsidered its baseline revenue assumptions and submitted a revised budget in the Addendum that also included a detailed fund raising plan necessary to achieve its goals
- The applicant provided a revised budget in the Addendum that reflected a clarification of capital outlay funds provided through the BEP formula.

**Concerns and Recommendations:**

- None

**Additional Attachments –** ***Meets/Exceeds Expectations***
**Strengths:**

- The applicant has identified the former Moses School building as a proposed location and has a detailed facilities plan and timeline (see Addendum). Additionally, the Emerald Charter Schools Board has obtained the services of Lawler-Wood to serve as project manager for the facilities acquisition, financing and renovation.
- The Emerald Academy has developed a transportation plan for its students and is interested in potentially contracting with KCS for these services.
- The Emerald Academy has a detailed food service plan and proposes to contract with the KCS Nutrition Department for these services.
- The application includes appropriate commitments for insurance coverage.
- The application includes a number of state waiver requests that are aligned with the vision and mission of the school.

**Concerns and Recommendations**

The applicant proposes to potentially contract with Knox County Schools for food services, transportation and special education services. Where feasible, KCS will work collaboratively with the applicant. However, details regarding specific services and fee structures will need to be negotiated at the time of contract development.

In conclusion, the KCS Charter Review Committee unanimously agreed that the Emerald Academy application generally reflected a high quality charter school plan, and therefore recommends approval of the application. Furthermore, the Committee commends the Emerald Charter Schools Board of Directors for their diligence in developing a school proposal that is anchored in the needs of the community, and for their responsiveness in addressing Committee's questions and concerns.

EA/ea

# EXHIBIT 38

## Video Exhibit

2026 KCS Technical Assistance Workshop-20260116_143224-Meeting Recording.mp4

# EXHIBIT 39

# Charter Application

2026 Technical Assistance Workshop

KCS | KNOX COUNTY SCHOOLS

knoxschools.org

REC

# Overview

# Today's meeting

Purpose

- To provide an overview of the charter school application process specific to Knox County Schools (KCS) in Knoxville, Tennessee.
- To address any questions you might have.

Agenda

- KCS Context and Contacts
- Resources
- Application Process
- Questions

# Today’s meeting

- We will pause in each section to address any questions.
- Feel free to use the chat feature to post any questions or raise your hand.
- We will have you muted for the meeting and will ask you to unmute as needed.



# KCS Context and Contacts

# Knox County Schools

- 60,000 students
- Third (3rd) largest public school system in TN
- 508 square miles of rural, urban, and suburban communities
- 93 schools: 52 elementary; 16 middle; 17 high; 1 K-12; and 7 other
- Student population: 64% white, 17% Black/African-American, 15% Hispanic/Latino, 4% Asian, 0.6% American/ Alaskan-Native; 0.4% Native Hawaiian/Pacific Islander.
- 17% Students with disabilities, 11% ELL, 19% Economically Disadvantaged

App.1521

# Knox County Schools Priorities







- Four Priorities
  - Excellence in foundational skills, particularly early literacy and middle-school math;
  - Providing great educators in every school;
  - Career empowerment and preparation; and
  - Success for every student.

# Knox County Schools

## Vision and Mission for Authorizing

KCS believes charter schools can be a valuable choice to educate Knox County students effectively, especially by providing families with additional options for high-quality educational opportunities. All charter schools in Knox County are expected to cultivate strong school capacity to provide quality academic instruction that addresses student performance outcomes.

The Knox County Schools Chartering Authority is dedicated to quality authorizing practices in alignment with the standards provided by the State Board of Education. The focus for students in Knox County will be to ensure that **every student is *future-ready*.**

*The mission for authorization of charter schools in Knox County is to create diverse and future-focused environments that empower every student to take ownership of their learning, shape their future, and contribute meaningfully to their community.*

# KCS Contacts

- Knox County Schools (KCS) Board of Education
  charteringauthority@knoxschools.org
- Executive Director of Academic Supports, Theresa Nixon
  theresa.nixon@knoxschools.org
- Innovative Schools Coordinator, Katie Wheeler Jordan
  katie.wheeler@knoxschools.org

# Resources

| | TN Department of Education | Tennessee State Board of Education | Tennessee Public Charter School Commission |
|---|---|---|---|
| **Charter School Rules and Policies** | Supports charter schools and charter authorizers in the implementation of rules and policies | Sets rules and policies for K-12 public education, including charter schools and charter authorizers | Sets rules and policies for the charter school appeals processes |
| **Charter School Applications *(New Start, Amendment, Renewal)*** | Maintains record of charter authorizer decisions for charter school applications | Develops and publishes charter school applications | Appellate body responsible for hearing appeals of charter authorizer decisions on charter school applications; may also receive applications directly in specific instances outlined in law |
| **Charter School Authorizing** | Does not authorize charter schools | Does not authorize charter schools | Can authorize charter schools upon appeal and in specific instances outlined in law |
| **Charter Oversight and Accountability** | Monitors state reporting requirements for charter schools | Ensures the effective operation of charter authorizers and evaluates authorizer quality | Oversees and evaluates the charter schools it authorizes |

# Tennessee Charter Schools

- Tennessee Code Annotated (T.C.A.) Title 49 Chapter 13
- State Board of Education (SBE) Rules for Charter Schools 0520-14 (November 2025: new Rule)
- State Board of Education Charter Applications Webpage
  - Application Materials (LOI, Application, Budget Template, Rubric)
  - Application Training Session: Recording and Presentation

# Knox County Schools Charter

- www.knoxschools.org/charter webpage
  - RFP
  - Application Documents
- Other Items
  - Underutilized/Vacant Properties: TDOE website
  - Email follow-up: Presentation, Recording of Meeting, and Application Assistance Guide
- Current Charter Schools
  - Emerald Academy: Approved in 2014/Renewal in 2025
  - Knoxville Preparatory School: Approved in 2023

# Application Process

# What is a Charter School?

- Charter schools are public schools operated by independent, non-profit governing bodies with oversight and monitoring conducted by the authorizer.
- Charter schools are required to teach the same state standards and administer the same state assessments as traditional public schools.
- Charter schools receive state letter grades and are held to the same accountability metrics as traditional public schools in addition to metrics established by the authorizer.
- Pursuant to Tennessee Code Annotated (T.C.A.) § 49-13-106, a charter will not be granted to a for-profit corporation, a nonpublic school, as defined in T.C.A. § 49-6- 3001, or other private, religious, or church school. Cyber-based public charter schools are not allowed.

## Sponsor Eligibility

Tennessee law limits who may sponsor a charter school and prescribes the type of entity that may operate a charter school.[4] Please read the following statements and check the box to confirm eligibility to apply and verify the status of, or plans for, the governing body.

☐ The sponsor of this charter school is not: "a for-profit corporation;" "a non-public school, as defined in Tenn. Code Ann. § 49-6-3001(c)(3)(A), or other private, religious, or church school;" and the proposed charter school is not cyber-based.

Charter schools must be operated by entities that are exempt from federal taxation under § 501(c)(3) of the Internal Revenue Code. Please check one of the following, as applicable:

☐ The sponsor of this charter school is a not-for-profit organization with 501(c)(3) status.

☐ The sponsor of this charter school is a not-for-profit organization and has applied for 501(c)(3) status.

| Definitions | |
|---|---|
| Authorizer | A local board of education (Knox County Schools) or the TN Public Charter School Commission that makes decisions regarding approval of a charter school application and the renewal or revocation of a charter school agreement. Tennessee authorizers also serve as the LEA for their charter schools. |
| Authorizing | The process of approving an application, negotiating a contract, and conducting ongoing monitoring and oversight of a charter school, including the decision to close or renew. |
| Governing Body | The organized group who will operate a public charter school that's responsible for deciding on budgeting, curriculum, operating procedures, and overseeing administration of the school. |
| Sponsor | The proposed non-profit organization filing an application for the establishment of a public charter school. |

# State Application Timeline



# Capacities to Observe

- Strategic Focus on Mission
- Community Commitment
- Building a Coalition
- Reflective Learning
- Creative Problem-Solving
- Effective Decision-Making
- Relationship with Success & Failure
- Team Awareness
- Knowledge, Skills, & Execution

**Potential Evidence**

- All touchpoints with the sponsor
  - Authorizer Informational Meetings (Tech Assistance Workshop)
  - Communication
  - Community Meeting/Task Force Meeting Observations
- LOI, Written Application
- Capacity Interview

# Please use the SBE Initial Application

- Share your plans for academic (education program design), operational, and financial capacity for your school
- Checklist (p.10-11)
- Request any waivers and include the relevant addenda.
- Budget Template
- Technical Support and Resources (p. 41)
- Glossary of Terms (p. 42-44)
- Application Scoring Rubric

Questions for KCS please send to charteringauthority@knoxschools.org.






# Initial Application Submission

- Deadline: 11:59pm Central on February 1, 2026* (this year 2nd)
- Sponsors submit an electronic copy of their completed application to to KCS via charteringauthority email.

KCS Request in addition to electronic copies:

- 5 hard copies in three ring binders (see formatting instructions detailed in the SBE guidelines and mailing information in Application Assistance Guide or Application Protocol).
- Application fee: $2,500





See State Board Rule 0520-14-01-.01

# The application will be review and "complete" if…

- The electronic copy of the written application and its required attachments use the state's application form and are received by the deadline.
- The five (5) paper copies of the written application and its required attachments use the state's application form and are received by the deadline.
- The application fee of $2500 is received by the deadline.

# Timeline

- Application Deadline: February 2, 11:59 pm CT (electronic copy) ***if delivering in-person it is 4:30 pm ET.
- Notification of Completeness: 10 calendar days after receipt
- Charter School Review Committee: Application Review and Capacity Interview
- KCS Board of Education Vote by Resolution: 90 days after receipt of application
  - Committee Recommendation: Application & Capacity Interview
  - Public Comment (Board Forum and Survey Comments)

We will be in communication with you throughout the process.

# Capacity Interview

- Gain clarity on any remaining questions related to the proposed school
- Assess the sponsor's capacity to implement the plans
- In-person with the committee and the sponsor's staff/governing board (no more than six (6) people)
- Already reviewed the written plan, and want to determine the team's capacity to adapt while executing the vision to have a successful student experience.

# Resolution Rule

- Approval: Sponsor will receive written notification within 10 calendar days and we will begin negotiation for the charter agreement.
- Denial: Sponsor will receive written notification within 10 calendar days specifying the objective reasons for denial and the deadline to submit an amended application (30 days).

# Amended Application

- After receiving written notification of the denial, sponsors may choose to submit an amended application using the same application form to correct the deficiencies identified by the authorizer.
- Within 60 days of receiving an amended application, the review committee will submit a recommendation to the KCBOE who will rule by resolution to approve or deny.
- Notification within 5 calendar days and if approved, move to agreement discussion. If denied, then the sponsor will have the right to appeal to the TN Public Charter School Commission.

# Questions

# Contacts

- Application Questions: TN State Board of Education
  - charter.applications@tn.gov
- Appeal Questions: TN Public Charter School Commission
  - CharterSchool.Appeals@tn.gov
- Charter Funding & State Reporting Questions: TDOE
  - Charter.Schools@tn.gov
- KCS Specific Questions
  - charteringauthority@knoxschools.org

# EXHIBIT 40

**KNOX COUNTY BOARD OF EDUCATION**
**REGULAR SESSION**
**April 9, 2026**

**MINUTES**

The Knox County Board of Education met in regular session at 5:00 pm on Thursday, April 9, 2026 in the Boardroom of the Summer Place Building at 500 W. Summit Hill Drive, Knoxville, Tennessee. The meeting agenda and all supporting documents were posted on the Knox County Board of Education webpage. The meeting could be viewed in its entirety on the video posted on the Knox County Board of Education webpage.

Present: John Butler, District 1
Anne Templeton, District 2
Patricia Fontenot-Ridley, District 3
Katherine Bike, District 4
Lauren Morgan, District 5
Betsy Henderson, District 6
Steve Triplett, District 7
Travis Wright, District 8
Kristi Kristy, District 9
Albert Liu, Student Representative

**Chair Kristy presiding**

1 A Moment of Silence was observed followed by the Pledge of Allegiance to the Flag led by Mr. Wright.

2 Announcements

- Ms. Kristy welcomed all attendees.
- A community budget meeting was scheduled for Tuesday, April 14 at 5:00 pm in the Summer Place Boardroom.
- A called meeting was scheduled for Thursday, April 23 for the Board's consideration of the Fiscal Year 2027 Annual Budget.

3 Changes to the Agenda

No changes to the agenda were requested.

4 Approval of the Agenda

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

5 Consent Agenda

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

A Payment of Bills

B Approve Minutes of Meetings

- March 2, 2026 Work Session
- March 5, 2026 Regular Session
- March 27, 2026 Policy Review

C Items/Contracts:

1 Approve Award of Bid 3709 to Sysco Knoxville, LLC for provision of Commercially Delivered Food for School Cafeterias for a one (1) year term, which may be extended for four (4) additional years

2 Approve Memorandum of Understanding with the Knoxville-Knox County Community Action Committee (CAC) for provision of Meals at 2026 Summer Learning Camps at an estimated cost of $100,000.00 using Summer Learning Camp Funds or a General Purpose Fund Balance Designation

3 Approve Terms and Conditions with LIFTONE, LLC for Purchase of a Yale Veracitor GC050VX Lift Truck for Carter High School at a cost of $44,485.10 using Greenheck Fan Corporation Donated Funds

4 Approve Standard Terms and Conditions with TriMech Solutions LLC for provision of SOLIDWORKS® Software Training for Carter High School at a cost of $4,880.00 using Greenheck Fan Corporation Donated Funds

5 Approve Contract with SouthCoast Music & Design, LLC for production of Percussion Arrangements for the Bearden High School Marching Band at no cost to Knox County Schools

6 Approve Musical Agreement with Concord Theatricals Corporation for Farragut High School's production of "Rodgers & Hammerstein's Cinderella (Enchanted Edition)" December 10-12, 2026 at no cost to Knox County Schools

7 Approve Agreement with Dramatic Publishing for Farragut High School's production of "The Outsiders" May 7-8, 2026 at no cost to Knox County Schools

8 Approve Agreement with Heritage Education and Festivals, LLC d/b/a WorldStrides for Hardin Valley Middle School's Band and Orchestra Performance Trip to Orlando, Florida March 31-April 4, 2027 at no cost to Knox County Schools

9 Approve Agreement with Crazy Imagination Travel, Inc. for Holston Middle School's Show Choir Trip to Walt Disney World Resort November 27-December 1, 2026 at no cost to Knox County Schools

10 Approve Agreement with Music Theatre International for Northshore Elementary School's Dramatic Performing Rights License to "Disney's Dare to Dream Jr." for the term of March 20, 2026 to March 20, 2027 at no cost to Knox County Schools

11 Approve Request of Rocky Hill Elementary School to complete Playground Surfacing, Border, and Site Work and to Purchase and Install two (2) Playground Structures at a cost of $28,846.50 using Rocky Hill Elementary School Foundation Donated Funds

12 Approve Contract with John Knox Center for Sequoyah Elementary School's 5th Grade Trip to River Ridge on October 23, 2026 at no cost to Knox County Schools

13 Approve 2026 Music Rental Agreement with Fannin Musical Productions for South-Doyle High School's 2026 Marching Band Field Show on October 20, 2026 at no cost to Knox County Schools

14 Approve Production Contract with Music Theatre International for West High School's production of "Little Shop of Horrors (Broadway Version)" February 11-14, 2027 at a cost of $1,145.00 at no cost to Knox County Schools

15 Approve Artwork Agreement with Orel Brodt and Gared Luquet for completion of a Mural at Whittle Springs Middle School at a cost of $8,996.00 using donated funds from Partners in Education Foundation

16 Approve Consulting Services Agreement and Proposal with Boldsquare Group, LLC through December 31, 2026 for Carter High School at a cost of $24,790.00 using Greenheck Fan Corporation Donated Funds

6 Board Policies

A Approve first reading of Knox County Board of Education Policy J-190 "Code of Behavior and Discipline" as amended - Discussed at Policy Review

Ms. Templeton noted that Board Members had been provided with Administrative Procedure AP-J-190. She said that she understood that information currently in Policy J-191 would be moved into Administrative Procedure J-190, but to be transparent, she had requested that a proposed statement be added to the procedure giving the Board five (5) days notice in the event any changes to the procedure were made. Assistant Superintendent of Student Services Dr. Andrew Brown confirmed that he agreed with Ms. Templeton's request and that it created no issue to add the statement. Ms. Templeton thanked Dr. Brown and said that her goal was just to make sure changes to the procedure were communicated to the Board since the information was referenced often by families. Mr. Triplett stated that he liked the change and that there may be other procedures where he would like the statement to be added. He asked if the statement had to be in Board policy to be enforced. Assistant Superintendent of Impact and Policy Kori Lautner stated that had been considered, but the recommendation would be to add it to the procedure to ensure that the communication occurred, since if it was not done it would make the administration out of compliance with its own procedure.

Ms. Bike asked how the statement would be followed in the future. Ms. Lautner noted that it would be added to the specific procedure if the policy revisions were approved on second reading. Ms. Bike asked how often procedures changed. Ms. Lautner noted that it varied and that there may be slightly more changes in the fall and winter when state law changes occurred. She confirmed the change to this procedure would be permanent.

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

B Approve first reading to rescind Knox County Board of Education Policy J-191 "Misbehaviors and Disciplinary Options" -Discussed at Policy Review

On motion made by John Butler, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

C Approve first reading of Knox County Board of Education Policy J-193 "Student Suspension" as amended - Discussed at Policy Review

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

D Approve first reading of Knox County Board of Education Policy J-195 "Student Disciplinary Hearing Authority" as amended - Discussed at Policy Review

On motion made by John Butler, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

E Approve first reading of Knox County Board of Education Policy J-196 "Admission of Suspended or Expelled Students" as amended - Discussed at Policy Review

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

F Approve first reading of Knox County Board of Education Policy J-211 "Harassment, Intimidation, and Bullying or Cyber-Bullying" as amended - Discussed at Policy Review

On motion made by John Butler, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

G Approve first reading of Knox County Board of Education Policy J-212 "Student Conduct and Safe Relocation of Students" as amended - Discussed at Policy Review

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

H Approve first reading of Knox County Board of Education Policy J-250 "Bus Conduct" as amended - Discussed at Policy Review

On motion made by John Butler, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

I Approve first reading of Knox County Board of Education Policy J-280 "Alternative School Programs" as amended - Discussed at Policy Review

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

J Approve first reading of Knox County Board of Education Policy J-281 "Alternative School Services" as amended - Discussed at Policy Review

On motion made by John Butler, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

K Approve first reading of Knox County Board of Education Policy J-320 "Independent Evaluation of Students" as amended - Discussed at Policy Review

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

L Approve first reading of Knox County Board of Education Policy J-330 "Student Counseling Program" as amended - Discussed at Policy Review

On motion made by John Butler, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

7 Grants

A Approve Tennessee Department of Education Occupational Educator Scholarships in the amount of $24,600.00 for Eligible Candidates in the Knox County Schools Educator Preparation Program (EPP) - Recommended by Superintendent

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

B Approve Memorandum of Agreements with the Boys & Girls Clubs of the Tennessee Valley, SHADES of Development, Shora Foundation, and Wesley House Community Center in support of their Lottery for Education Afterschool Programs (LEAPs) Grant Applications - Recommended by Superintendent

On motion made by John Butler, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

C Approve Tennessee Hospitality & Tourism Beef Bucks Grants in the total amount of $1,000.00 for Austin-East Magnet High School and Karns High School - Recommended by Superintendent

On motion made by John Butler, seconded by Betsy Henderson

**Vote:** 9 - 0 Passed

D Approve Grant Agreements with the National Environmental Education Foundation and receipt of Grant Funding in the total amount of $35,000.00 for Belle Morris Elementary School, Green Magnet Academy, South-Doyle Middle School, and Spring Hill Elementary School - Recommended by Superintendent

On motion made by Patricia Fontenot-Ridley, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

E Approve National Park Trust Kids to Parks Day School Grants in the total amount of $1,500.00 for Belle Morris Elementary School and South-Doyle High School - Recommended by Superintendent

On motion made by Anne Templeton, seconded by Patricia Fontenot-Ridley

**Vote:** 9 - 0 Passed

F Approve Tennessee Society of Professional Engineers Knoxville Chapter GEARS Program Grant in the amount of $1,000.00 for Holston Middle School - Recommended by Superintendent

On motion made by Travis Wright, seconded by Patricia Fontenot-Ridley

**Vote:** 9 - 0 Passed



KCBOE10694

G Approve Guitar Center Music Foundation Instrument Program Grant in the amount of $1,500.00 for Karns Middle School - Recommended by Superintendent

On motion made by Betsy Henderson, seconded by Patricia Fontenot-Ridley

**Vote:** 9 - 0 Passed

H Approve Regranting Fiscal Sponsorship Agreement with Edward Charles Foundation related to a Johnny Knoxville Charity Fundraiser for South-Doyle High School Athletics and Academics - Recommended by Superintendent

On motion made by Patricia Fontenot-Ridley, seconded by Lauren Morgan

**Vote:** 9 - 0 Passed

8 Contracts

A Approve Contract with Professional Environmental Consulting, Incorporated for provision of Asbestos Monitoring Services up to $200,000.00 annually for the term of May 1, 2026 through April 30, 2027, which may be extended for four (4) additional years - Recommended by Superintendent

On motion made by Betsy Henderson, seconded by Steve Triplett

**Vote:** 9 - 0 Passed

B Approve Contract with Skilled Services Quality Construction, LLC in the amount of $262,100.00 for Innovative School Model Phase 4 Projects at Austin-East Magnet High School, Fulton High School, and West Valley Middle School - Recommended by Superintendent

On motion made by John Butler, seconded by Lauren Morgan

**Vote:** 9 - 0 Passed

9 Regular Agenda Items

A Approve Budget Line-Item Transfer with the School Construction Fund in the amount of $8,410,406.00 to reallocate savings from various projects to support the Mechanicsville-Lonsdale-Beaumont Project -Recommended by Superintendent

On motion made by John Butler, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

B Approve School Turnaround Program School Improvement Plan for Northwest Middle School - Recommended by Superintendent

On motion made by Betsy Henderson, seconded by Anne Templeton

**Vote:** 9 - 0 Passed

C

10 Public Forum

- Gavin Gambuzza of Knox County, Tennessee addressed the Board regarding his request for a public apology for the family of a Bearden High School student who went missing while on a field trip in 1976.
- Buck Fleming of Knox County, Tennessee addressed the Board regarding teachers publicly shaming students in classrooms.
- Candace Bannister of Knox County, Tennessee addressed the Board regarding bullying.
- Sherri Garrett of Knox County, Tennessee addressed the Board regarding possible changes to Board policy related to artificial intelligence.

The meeting was adjourned at 5:36 pm.

Date Approved: May 7, 2026

Chair:

Secretary:

# EXHIBIT41

<table>
<tr><td rowspan="3">Section I:<br><br>**Instructional Goals and Objectives**</td><td colspan="3">**Knox County Board of Education Policy**</td></tr>
<tr><td rowspan="2">Descriptor Term:<br><br>**Public Charter Schools**</td><td>Descriptor Code:<br>**I-450**</td><td>Issued:<br>**10/11**</td></tr>
<tr><td>Reviewed:<br>**5/26**</td><td>Revised:<br>**7/26**</td></tr>
</table>

## EXPECTATIONS

The Board of Education believe high quality charter schools have the potential to be a useful structure to help effectively educate Knox County students and enhance quality public education choices for all students and their families. Charter schools are meant to serve as innovative learning centers where strong teachers and experienced administrators advance each student's achievement every day, regardless of race, color, national-origin, religion, gender, disability, proficiency in English, academic ability, social capital or family income. Every student in the Knox County Schools deserves high quality opportunities to learn, grow and achieve their full potential.

The Board's goal is to build a system of schools that provides every student with the foundation of knowledge, skills, and competencies necessary to excel in higher education, the work place and in life. All charter schools in Knox County are expected to cultivate strong school capacity to provide high quality academic instruction addressing student performance outcomes.[1]

## MAINTAINING HIGH STANDARDS

The Board shall maintain clarity, consistency, and public transparency in all authorizing policies, practices, and decisions regarding charter schools. Charter schools shall be accountable for meeting the performance standards and targets defined in their charter agreements. The Board shall maintain high expectations for all charter schools under its oversight and take appropriate action, including closure, when a school fails to meet those standards or the requirements of state law.[2]

Each charter school's governing board shall operate independently of the Board and maintain full authority over instructional programming, financial management, personnel decisions, school culture, and scheduling. The Board's role is not to manage the success or failure of individual schools, but to hold schools accountable for performance and compliance with applicable laws and regulations.

The Board shall hold charter school governing boards accountable for maintaining fiscal responsibility, operational transparency, and adherence to all legal and ethical standards. Charter schools are part of the public education program and must adhere to non-selective, nondiscriminatory enrollment practices, and ensure the fair treatment of all students. They shall provide appropriate services to all enrolled students in accordance with state and federal laws.[3]

The Board shall impose additional requirements on charter schools only when there is a legal obligation or a compelling reason to do so.

## AUTHORIZER FEES

The Board will annually withhold 3% of a charter school's funds or $35,000, whichever is lesser, for the performance of the authorizing obligations and responsibilities by Knox County Schools. If, for the

school year, the total amount of the authorizer fees collected by the LEA exceeds the amount used by the LEA to perform its authorizing obligations and responsibilities, the LEA shall distribute the amount remaining to its authorized charter schools. This allowance may also prevent a substantial loss if the Knox County Schools provides services, such as food service, transportation or other contracted student services, and a charter closes prior to paying for such services or obligations.

---

Legal References:

1 T.C.A. § 49-13-108; State Board of Education Policy 6.111; TN Comp. R & Reg § 0520-14-01-.01.
2 T.C.A. §§ 49-13-111; 49-13-120; 49-13-122.
3 T.C.A. § 49-13-111

# EXHIBIT 42

KNOX COUNTY SCHOOLS

# Charter School Handbook

Updated July 2025

# Table of Contents


**Introduction....3**
- Vision and Mission for Knox County Schools....3
- Vision and Mission for Authorizing....3
- Commitment to Quality Authorizing....4
- KCS Demographics and Governance....6

**Charter School Authorizing....7**
- KCS Chartering Authority....7
- Compliance....8
- Request for Proposals....8

**Resources & Legal Responsibilities....9**
- Tennessee Public Charter Schools Act....9
- State Board of Education Rules and Policies....9
- Legal Responsibilities....9
- Charter Agreement....10
- Amendment....10
- Waiver....11

**Charter School Applications....11**
- The Application Process....12
- Approval of an Application....13

**Performance Monitoring & Accountability....14**
- Performance Monitoring....14
- Performance Framework....14
- Charter School Renewal....15
- Replication of an Existing Charter School....17
- Intervention of Performance....17
- Charter School Reporting....20
- Authorizer Reporting....22

**KCS Resources & Charter School Expectations....23**
- Assessment....23
- Enrollment....23
- Finance....24
- Human Resources....24
- Transportation....25

**Summary & Acknowledgements....25**

# Introduction

This handbook is designed to provide guidance and information for potential and current charter school operators in Knox County Schools (KCS), in accordance with Tennessee charter law, the State Board of Education's (SBE) Rules and Policies, and the Tennessee Department of Education's (TDOE) Guidance. KCS desires successful outcomes for every charter school it authorizes and commits to supporting each school in a manner aligned with the district's mission and vision.

## Vision and Mission for Knox County Schools

The **vision** of KCS is to be the cornerstone of education in Knox County, empowering students to grow their talents, strengths, and skills to build a stronger community.
The **mission** of KCS is to prepare students for life by providing a high-quality education that is accessible, meaningful, and future-focused.

The district's four core priorities include: Excellence in Foundational Skills, Great Educators in Every School, Career Empowerment and Preparation, and Success for Every Student. Additional details about the Strategic Plan can be found on our website.

## Vision and Mission for Authorizing

KCS believes charter schools can be a valuable choice to educate Knox County students effectively, especially by providing families with additional options for high-quality educational opportunities. All charter schools in Knox County are expected to cultivate strong school capacity to provide quality academic instruction that addresses student performance outcomes.

The Knox County Schools Chartering Authority is dedicated to quality authorizing practices in alignment with the standards provided by the State Board of Education. The focus for students in Knox County will be to ensure that **every student is *future-ready*.**

*The mission for authorization of charter schools in Knox County is to create diverse and future-focused environments that empower every student to take ownership of their learning, shape their future, and contribute meaningfully to their community.*

Our core values for charter authorizing are as follows:

- **Equity and Access**: Ensure all students—regardless of background, ability, or income—have access to high-quality educational opportunities through non-selective admissions and inclusive practices.

- **Academic Excellence**: Promote rigorous academic standards and innovative instructional models that prepare students for success in college, career, and life.
- **Accountability and Transparency**: Uphold clear performance expectations and monitor academic, financial, and operational outcomes through consistent, standards-based evaluations that upholds the student and public interest.
- **Autonomy with Responsibility**: Respect the independence of charter schools while holding them accountable for meeting legal, ethical, and performance obligations in alignment to their mission.
- **Community Engagement**: Encourage meaningful collaboration with families, educators, and local stakeholders to ensure schools reflect and serve their communities effectively.
- **Continuous Improvement**: Support a culture of learning and growth by fostering professional development, data-driven decision-making, and innovation in school design and operations.

## Commitment to Quality Authorizing

KCS will strive to function as a high-quality charter authorizer in alignment with state law and using the Tennessee State Board of Education Policy 6.111 as a framework for providing high-quality authorization practices.

For each of the following standards, KCS will commit to:

### KCS Commitment and Capacity

- setting clear goals and regularly improving our work to ensure every charter school offers a high-quality education.
- making decisions based on solid evidence, student outcomes, and expert input—always following Tennessee law.
- hiring and supporting staff with the right skills to oversee academics, finances, legal issues, and student needs—and to help them grow through ongoing training.
- using organized systems and policies that help us work effectively and stay focused on our mission.
- using our financial resources wisely, reporting how we spend authorizer fees, and making sure our work benefits students and the public.

### Application Process and Decision Making

- providing clear, public guidance and timelines for charter school applications, including the state-required application and scoring rubric.
- using a well-defined, open, and unbiased process for reviewing applications, with qualified evaluators and consistent standards.

- approving only those applicants who show strong capacity, sound educational and financial plans, and readiness to serve all students effectively.
- making decisions based on merit and evidence—not political or community pressure—and ensuring full transparency and disclosure of any potential conflicts of interest.
- promptly notifying applicants of decisions, providing clear reasons and guidance for next steps, including any rights to appeal or resubmission.

## Performance Contracting

- executing charter agreements that clearly define the roles, responsibilities, and expectations for both the authorizer and the school, ensuring legal compliance and mutual understanding.
- protecting the school's right to make decisions about its educational program, staffing, budgeting, and operations, while holding it accountable for results.
- including clear performance standards in every charter agreement, aligned with state law and focused on student success.
- granting initial charter terms of ten years, with high-stakes reviews every five years and annual performance reports to monitor progress and guide renewal decisions.

## Ongoing Oversight and Evaluation

- maintaining a performance accountability and compliance monitoring system that is clearly defined. This system will provide the necessary data to make rigorous, standards-based decisions regarding renewal, revocation, and intervention.
- conducting at least one formal on-site review of each charter school annually.
- respecting each school's authority over its day-to-day operations and refraining from directing educational decisions that fall within the school's purview. We will collect performance and compliance data in a way that minimizes administrative burden and protects student and public interests.
- ensuring that all charter schools admit students through a fair, random selection process and provide equitable access and inclusive services to all students, including those with disabilities, English learners, and other underserved populations, in accordance with federal and state law.
- producing and publicly sharing an annual authorizer report that includes accurate performance data for each charter school, reports on overall portfolio performance, and evaluates our own performance in meeting authorizing goals.

## Amendment, Renewal, and Revocation Decision Making

- designing and implementing a transparent and rigorous process that uses academic, financial, and operational data to make renewal and revocation decisions.

- approving renewal and/or amendments in a fair and evidence-based process aligned with the school's mission and showing strong, well-prepared plans.
- providing a full performance report before renewal decisions, with time to respond and provide additional evidence.
- granting renewal only to schools that meet academic, financial, and operational goals and follow the charter agreement and law.
- communicating decisions for renewal or revocation promptly to the school community and public, consistent with state law and policies.
- revoking charters when necessary to protect student and public interest, with a fair and transparent closure process.

## KCS Demographics and Governance

Knox County Schools proudly serves approximately 60,000 students every day. The third-largest public school system in the state and one of the largest in the nation, KCS spans more than 508 square miles of rural, urban, and suburban communities, including the City of Knoxville and Town of Farragut. As of the 2024-25 school year, the district comprises 93 schools, as shown in the following chart.

| School Type | Count |
|---|---|
| Elementary | 52 |
| Middle School | 16 |
| High School | 17 |
| K-12 | 1 |
| ***Other Schools*** | ***7*** |

Knox County Schools is a diverse school system serving students from more than 126 countries with 118 languages spoken. The diverse student population includes 3% Asian, 17% Black/African American, 12% Hispanic/Latino, 0.6% Native American/Alaska Native, 0.4% Native Hawaiian/Pacific Islander, and 67% White.

A nine-member elected Board of Education and its appointed Superintendent lead the school district. The Board provides leadership and policy direction to KCS. As the Board of Education has no taxing authority, the Knox County Schools' funding comes primarily from state and local tax dollars. The KCS budget is approved annually by the Knox County Commission. KCS is committed to continuous improvement and providing students with the best education possible.

The KCS authorizer portfolio currently includes two charter schools. KCS's first charter school, Emerald Academy, serves approximately 450 students in grades K-8 and completed the renewal process during the 2024-2025 school year. Knoxville Preparatory School opened in 2024-25 and currently serves middle school boys, with plans to serve grades 6-12.

# Charter School Authorizing

## KCS Chartering Authority

The charter school office of Knox County Schools serves as the charter school authorizing staff for potential and currently operating charter schools. Each school goes through a rigorous application process, and only the most qualified candidates are selected. Based on the vision and mission for charter schools, our core values, and commitment to quality authorizing (pages 3-5), KCS desires for each authorized charter school to be successful for the students of Knox County.

The Knox County Board of Education (KCBOE) makes all decisions related to approving, renewing, or closing charter schools within Knox County, with the KCS charter school office providing them with the necessary information to make sound decisions. As an authorizer, KCS and the KCBOE hold charter schools accountable for student outcomes while preserving the autonomy granted to them under Tennessee laws.

The charter school office offers support in collaboration with our charter schools, to include annual site visits and optional professional development opportunities. It is the charter school's governing board that is responsible for student outcomes, but the charter school office is available for support.

Within the KCS district office, a support team is available to potential and existing charter school operators. Other KCS departments work alongside our charter schools, including, but not limited to, finance, special education, and information technology.

| Contact | Role | Email |
|---|---|---|
| Theresa Nixon | Executive Director of Academic Supports | theresa.nixon@knoxschools.org |
| Katie Jordan | Innovative Schools Coordinator | katie.wheerler@knoxschools.org |
| Knox County Board of Education | | charteringauthority@knoxschools.org |

## Compliance

Each charter school is expected to comply with all applicable state and federal laws, Tennessee SBE Rules and Policies, and TDOE guidance unless a waiver has been approved. It is the responsibility of the charter school office to ensure that schools align with these requirements.

There are clear intervention procedures for each deadline not met, non-compliance with established state or federal laws, rules, policies, guidance, and/or the charter agreement. The charter school office will provide guidelines for all reporting deadlines and a process for submissions. We encourage schools to proactively request support that might be needed to remain in compliance.

## Request for Proposals

Charter schools are meant to serve as innovative learning centers where strong teachers and experienced administrators advance each student's achievement every day, regardless of race, color, national origin, religion, gender, disability, proficiency in English, academic ability, social capital, or family income. KCS calls for proposals that address the following priorities as identified in the KCS Strategic Plan.

- **Excellence in Foundational Skills**: Increase student academic achievement and growth for all students, particularly in high-poverty and high-needs populations, to ensure that all students receive a high-quality education in strong learning environments.
- **Great Educators in Every School**: Ensure the school is staffed with a cadre of highly effective educators who are continually working collaboratively to improve their craft to benefit students.
- **Career Empowerment & Preparation**: Engage families and school community meaningfully in the education process to ensure that every student has individualized plans for the next step in their education/life.
- **Success for Every Student**: Develop an infrastructure and use of evidence-based strategies that enable, facilitate, support, and accelerate student learning and success.
- **Communication & Engagement**: Engage and communicate in a meaningful and intentional way with stakeholders and KCS to enhance the student experience.

The full Request for Proposals may be found on the KCS Charter Schools webpage.

# Resources & Legal Responsibilities

## Tennessee Public Charter Schools Act

The Tennessee Public Charter Schools Act of 2002 (T.C.A. Section 49, Chapter 13) establishes six purposes for the creation of charter schools.

> "(1) Improve learning for all students and close the achievement gap between high and low students;
> (2) Provide options for parents to meet educational needs of students;
> (3) Encourage the use of different and innovative teaching methods, and provide greater decision-making authority to schools and teachers in exchange for greater responsibility for student performance;
> (4) Measure performance of pupils and faculty, and ensure that children have the opportunity to reach proficiency on state academic assessments;
> (5) Create new professional opportunities for teachers; and
> (6) Afford parents substantial, meaningful opportunities to participate in the education of their children."

## State Board of Education Rules and Policies

Additional guidance for charter schools can be found in SBE Rules 0520-14-01 and 0520-14-02 for charter schools and waiver requests. SBE policies provide guidance on Quality Charter Authorizing Standards (6.111), Charter School Governing Body Training (6.112), Charter School Authorizer Evaluations (6.113), and Opportunity Public Charter Schools (6.114).

## Legal Responsibilities

The governing board of the charter school retains primary legal liability. This liability does not transfer to KCS, allowing charter schools considerable autonomy. All details of legal responsibilities are cited in state and federal law and SBE rules and policies, with guidance from TDOE.

The charter school shall be operated by a not-for-profit corporation and should operate as a public, nonsectarian, nonreligious school with control vested in the governing board, with general supervision by the authorizer, and in compliance with the charter agreement and the Tennessee Public Charter Schools Act of 2002. Education services should be provided for all students, including students with disabilities, English language

learners, and other students with diverse needs, in accordance with state and federal law.

Additional details will be provided in the charter agreement between KCS and the operator.

### Charter Agreement

After the KCBOE approves the initial or renewal application of a school's charter, the charter school office will coordinate with the Knox County Law Directors to negotiate the terms of a new charter agreement. The charter agreement will be in writing and contain all material components of the approved application. The charter agreement will expire after ten (10) academic years. The KCBOE must approve the charter agreement before it is fully executed.

### Amendment

During a contract term, charter school operators may petition to amend the material terms of the charter agreement. As provided in T.C.A. §49-13-110, the Tennessee Public Charter School Commission (Charter Commission) has outlined the process in Rule 1185-01-01-.04. There are two steps to the process: a Letter of Intent followed by the Amendment Petition. Details for submission, including the forms, are provided by the SBE and can be found on their Charter School Applications webpage. There are two submission windows annually. The requests should be in the year preceding the school year in which the proposed amendment is to take effect.

| | Fall Submission | Spring Submission |
|---|---|---|
| **Letter of Intent Deadline** | September 1 | January 15 |
| **Amendment Petition Deadline** | October 1 | February 14 |

**If the date falls on a Saturday, Sunday, or state-observed holiday, the submission is due the next business day on or before 11:59 pm CST.*

Charter school operators may submit an emergency amendment petition at any time if good cause exists. The proposed amendments will be reviewed by the charter review committee, and a recommendation will be submitted to the KCBOE. The KCBOE will have final voting authority on all amendments.

### Waiver

Waivers submitted as part of the charter school application process will be approved for the term of the charter agreement. Additionally, according to T.C.A. §49-13-111, a public charter school may apply to either the authorizer or to the Commissioner of Education for a waiver of any state board rule or statute that inhibits or hinders the charter school's ability to meet its goals and comply with its mission statement. The request process aligns with SBE Rule 0520-14-02 and is in alignment with the TDOE guidance Local Education Agency and Public Charter School Waiver Guidance (July 2025). All submissions should be sent on the KCS template and submitted via email to charteringauthority@knoxschools.org. A recommendation will be completed by the KCS charter office using feedback from experts as needed, including legal guidance. The recommendation will be submitted to the KCBOE, which will have the final decision to approve or deny the request. All waivers will remain in effect for a period of one year from the time the waiver is granted unless otherwise noted.

## Charter School Applications

The charter school application process is governed by T.C.A. §§49-13-107 and 49-13-108, State Board Rule 0520-01-14-.01, and State Board Policy 6.111. The materials for new and replication applications can be found on the SBE website. Applicants should look closely at all materials, including the application scoring rubric, which will outline the criteria used by the KCS review committee. Additional application assistance will be provided by training from the State Board staff, followed by a technical assistance workshop provided by the KCS charter office. Additional details can be found on the KCS Charter Schools webpage.

Additional questions to clarify expectations and answer questions may be made via the charterauthority@knoxschools.org email account. This guidance, if requested, should be considered carefully in crafting the final application. Responses may include references to the law or other resources that may be necessary for developing the application, meeting deadlines, and/or indicating specific documents that must be submitted as a part of the application.

KCS will be impartial to all potential applicants seeking assistance and will not compose sections for applicants or complete research and development for which the applicant is responsible. Applicants must take full accountability for what is written and submitted.

## The Application Process

This information provides an overview of the process. Additional details can be found on the KCS Charter Schools webpage.

| Timeline | Resource(s) on the SBE Website | Action |
|---|---|---|
| by December 3* | • Letter of Intent (LOI) | • Electronically submit the completed LOI form to both KCS and the Charter Commission. |
| by February 1* | • Application<br>• Application Scoring Rubric<br>• Application Budget Template | • Submit 1 electronic and 5 paper copies of the application materials (narrative, attachments, and addenda) to KCS.<br>• A $2500 application must accompany all submissions. |
| within 90 days | • SBE Rule 0520-14-01-.01<br>• Application Scoring Rubric | • Authorizers will determine if the application is complete and will notify the sponsor following SBE Rule 0520-14-01-.01.<br>• The Charter Review Committee will complete an analysis of the application.<br>• A capacity interview will be completed.<br>• The Charter Review Committee will develop consensus on the rubric.<br>• The KCS charter office will prepare a recommendation report for the KCBOE.<br>• The KCBOE will rule by resolution to approve or deny the application. |
| within 30 days | • Application Scoring Rubric | • If the application is denied, the charter school sponsor may submit an amended application to correct the deficiencies. |
| within 60 days | | • If an amended application is submitted, the Charter Review Committee will complete an analysis of the amended application.<br>• The Charter Review Committee will develop consensus on the rubric.<br>• The KCS charter office will prepare a recommendation report for the KCBOE.<br>• The KCBOE will rule by resolution to approve or deny the application. |
| within 10 days | | • If the amended application is denied, the charter school sponsor can submit an appeal to the Charter Commission. |
| within 75 days | | • The Charter Commission will approve or deny the public charter school application. Their decision is final and not subject to appeal. |

**For all dates in the timeline for the LOI or application, if the date falls on a Saturday, Sunday, or state-observed holiday, the submission is due the next business day on or before 11:59 pm CST.*

The LOI and application should be formatted per the application formatting and submission instructions provided by the SBE. The electronic copy of the completed LOI and application should be submitted as one PDF that includes all requirements. The budget should be completed using the state-provided budget template and should remain as an Excel attachment. All electronic submissions to the KCBOE should be emailed to charteringauthority@knoxschools.org.

Five (5) paper copies should be compiled in alignment with the SBE application guidance. Applications must be accompanied by a $2500 application fee made out to *Knox County Schools*. If an application is deemed incomplete based on SBE Rule 0520-14-01-.01, the fee may be returned. Once the review process has begun, the fee is nonrefundable. This information should be submitted in the following manner and received by the application deadline. No additions or revisions will be accepted during the initial ninety-day application review process.

All letters of intent and applications become public record after submission and will be posted on the KCS charter webpage.

| In-person delivery | Mailing Address |
|---|---|
| Knox County Schools<br>Office of Academic Supports<br>Attn: Theresa Nixon<br>400 W Summit Hill Drive<br>UT Tower #435<br>Knoxville, TN 37902 | Knox County Schools<br>Office of Academic Supports<br>Attn: Theresa Nixon<br>505 Summer Place<br>UT Tower #435<br>Knoxville, TN  37902 |

## Approval of an Application

Each application will be reviewed by the KCS Charter Review Committee using the rubric provided by the SBE. Applications will be reviewed for academic, operational, and financial capacity. Strong applications outline the capability of the sponsor to open and sustain a long-term and high-quality learning environment for students in Knox County.

It is the practice of the charter office to conduct due diligence in the review of applications, which will include all application materials submitted and an assessment of the capacity of the sponsor throughout the entirety of the review period. All information will be included in the recommendation submitted to the KCBOE.

# Performance Monitoring & Accountability

## Performance Monitoring

To effectively monitor each school, the charter office will:

- Conduct at least one site visit per year.
- Finalize a performance review each year.
- Complete a rigorous interim five (5)-year review.
- Curate and deliver a cumulative performance report by January 1 in the year a renewal application is due.
- Meet with charter school personnel in a monthly check-in and on a consultative basis as often as needed.
- Provide updates (at least weekly) regarding policies, deadlines, or other pertinent information to charter schools.
- Connect charter school personnel with appropriate resources.

## Performance Framework

The KCBOE has adopted a performance framework aligned with the state-provided model framework, which includes evaluation criteria for the charter school. The components of the framework include indicators and metrics for academic, financial, and organizational performance. Additionally, the framework includes expectations for ensuring that state and federal laws are followed to preserve the rights and safety of staff and students.

The charter office will make a site visit annually and has adopted a protocol for the process that is shared with the school during the site visit planning process, and includes a final written report submitted to the school. This allows for a transparent process so that the school is aware of any areas for improvement. The final performance framework will be submitted annually to the KCBOE, including an indication of the progress toward renewal. The performance review for each school will be included with the annual Authorizer Report submitted to the state by January 1 of each year.

In accordance with Tennessee charter law (T.C.A. §49-13-121(k)), the KCS charter office will conduct an interim review in the fifth (5th) year of the current charter term. The results of the interim review will be clearly communicated to the school's leadership and governing board and will inform the charter school of its current renewal status. As part of the interim review, charter schools are required to submit a report to the authorizer on the progress of the charter school in achieving its goals and objectives, including student performance and other terms of the charter agreement. Each annual performance review, as well as the interim review, will be considered as part of the record during renewal.

## Charter School Renewal

In accordance with T.C.A. §49-13-121, no later than April 1 of the year prior to the year in which the charter agreement expires, the governing board of a public charter school has the opportunity to submit a renewal application to the local board of education (guidance is provided on the SBE website). As the charter agreement has a term of ten (10) years, the currently authorized schools in Knox County will have the following timeline:

| School | End of Current Charter Term | Renewal Application | Decision by KCBOE |
|---|---|---|---|
| Emerald Academy | June 30, 2035 | by April 1, 2034 | by February 1, 2035 |
| Knoxville Preparatory School | June 30, 2034 | by April 1, 2033 | by February 1, 2034 |

**If the date falls on a Saturday, Sunday, or state-observed holiday, the submission is due the next business day on or before 11:59 pm CST.*

Renewal recommendations follow a protocol provided and led by the charter office, which is in alignment with all state laws and guidance. Three months before the renewal application submission (**by January 1)**, the KCS charter office will provide a cumulative performance report. The rigorous renewal process will include a Charter Review Committee, which will offer a recommendation to the KCBOE based on evidence of the academic, financial, and operational status of the charter school. The KCBOE will make a final decision no later than February 1 of the renewal year.

Materials that may be considered during the renewal process:

- Charter school's annual reports (if applicable);
- Annual performance reports for the charter school (included in the cumulative report);
- Authorizer annual reports (included in the cumulative report);

- Evidence collected during the charter term including, but not limited to, the interim review and annual audit information.
- Evidence collected during the renewal process (renewal site visit, public comment, and capacity interview (if completed)); and
- Correspondence from the authorizer to the governing body regarding the status of the school during the charter term and any required plans of correction.

| Date | Action |
|---|---|
| **Year 9 of the charter agreement** | |
| by January 1 | • KCS staff sends a cumulative 8-year performance report to the school. |
| by April 1 | • Charter school submits a renewal application to KCS. |
| April-August | • A review committee is convened and begins review of the renewal application.<br>• A renewal visit is planned for early fall.<br>• Public comment on the renewal school collected by the authorizer. |
| **Year 10 of the charter agreement** | |
| August-September | • A renewal site visit is completed. A report is shared with the school.<br>• If needed, a capacity interview will be scheduled to address any remaining questions. |
| October | • Charter review committee develops a consensus and completes the recommendation report to be submitted to the KCBOE. |
| November | • A final renewal recommendation report is compiled and sent to the school. |
| December | • Recommendation report due to KCBOE to be reviewed at the January KCBOE meeting. |
| before February 1 | • KCBOE decision concerning renewal.<br>• The renewal applicant will receive a letter with the KCBOE decision/resolution.<br>• The decision is sent to the TDOE and the Charter Commission. |
| IF DENIED by KCBOE, Within 10 days of the decision | • If denied, the applicant will have 10 days to appeal to the Charter Commission.<br>• The Charter Commission will decide to approve or deny. |

| | |
|---|---|
| IF APPROVED by KCBOE, March-May | ● If approved, a new charter agreement is drafted and brought before the KCBOE for approval. |

**If the date falls on a Saturday, Sunday, or state-observed holiday, the submission is due the next business day on or before 11:59 pm CST.*

## Replication of an Existing Charter School

Pursuant to Chapter 275 of the Public Acts of 2025 (PC 275) (to be codified in T.C.A. §49-13-104), a governing board that is currently operating a public charter school authorized by KCBOE or the Charter Commission and has been in operation for at least one year may apply for replication. The request for replication may be made to KCBOE or directly to the Charter Commission. All details can be found on the SBE website for the Replication Letter of Intent and Application.

## Intervention of Performance

When there are breaches in charter contracts or violations of state and federal laws, Knox County Schools must ensure that the school corrects deficiencies. Charters are granted autonomy for methods used to achieve the goals outlined in the charter; however, Knox County Schools must ensure that charter schools are held to the same expectations as district-run schools. The following table summarizes our intervention policy and the charter school's standing and possible actions to address the status. Charter schools that do not correct deficiencies will not be renewed or may have their charter revoked.

When intervention is needed, the charter office will engage with intervention timelines that are reasonable and strategies and processes that preserve charter school autonomy and responsibility by identifying what should be corrected without prescribing solutions. The charter office reserves the right to place a charter school in any status at any time if more immediate actions are warranted. The table below identifies the intervention as outlined in KCBOE board policy and accompanying procedures.

*newly proposed for Fall 2025 (awaiting board approval)

| Status and Notice/Letter | Possible Triggers | Possible Actions/Consequences |
|---|---|---|
| Level 0: Good Standing<br>***Noncompliance*** | ● Non-emergency situations related to T.C.A., SBE, Model Performance Framework, and/or contractual agreement that can be remedied with specific follow-up from school-level leadership. | ● An email is sent to school/network leadership to identify the infraction. |

| Status and Notice/Letter | Possible Triggers | Possible Actions/Consequences |
|---|---|---|
| Level 1: Concern<br>***Notice of Concern*** | ● Weak performance is identified through routine monitoring, implementation, compliance, or performance review, or by any other means.<br>● Financial weakness was identified through an annual financial audit.<br>● Repeated failure to submit required compliance documents on a timely basis.<br>● Achievement of "falls far below standard" in one area of the performance framework or achievement "does not meet standard" in multiple (2-4) areas of the performance framework. | ● A written ***Notice of Concern*** is sent to the identified school/network leadership detailing the area of concern, the process for administrative review, and resources for compliance. Corrective action steps with a timeline may be requested. |
| Level 2: Deficient<br>***Notice of Deficiency*** | ● Achievement of "falls far below standard" in multiple (2-4) areas of the performance framework of achievement of "does not meet standard" in a significant (5 or more) number of areas of the performance framework.<br>● Significant financial weakness was identified through an annual financial audit.<br>● Failure to comply with applicable state laws and/or policies, terms of the charter, or other regulations.<br>● Failure to rectify previously identified areas of concern in a timely manner. | ● A written ***Notice of Deficiency*** is sent to the charter school's governing board and the identified school/network leadership detailing the deficiency. A Performance Improvement Plan is developed by the school to include specific improvements, objectives, timelines, and measures, and submitted to the KCS charter office within 10 days. The KCS charter office must approve the plan. |
| Level 3: Probationary<br>***Notice of Probation*** | ● Continued failure to meet multiple performance targets (state accountability, charter contract, or performance framework).<br>● Identified as a priority school as defined by the TDOE's accountability system (T.C.A. §49-13-122).<br>● Failure to meet objectives set forth in the Deficiency Status Performance Improvement Plan.<br>● Continued or significant financial weakness identified through an annual financial audit or other means.<br>● Continued or significant failure to comply with applicable state laws and/or policies, terms of the charter, or other regulations. | ● A written ***Notice of Probation*** is sent to the charter school's governing board and the identified school/network leadership detailing the deficiency and outlining the terms of the probation. A Corrective Action Plan will be co-created with the charter school and will have measurable outcomes, a timeline, improvement expectations, and comprehensive support. The KCS charter office must approve the plan. |

| Status and Notice/Letter | Possible Triggers | Possible Actions/Consequences |
|---|---|---|
| Level 4: Charter Revocation Review<br>***Revocation Review Letter*** | ● Pattern of failure to meet multiple performance targets (state accountability, charter agreement, or performance framework).<br>● Three consecutive years of achieving "falls far below standard' on the performance framework in the same category.<br>● Failure to meet objectives set forth in the Probationary Status Corrective Action Plan.<br>● According to T.C.A. §49-13-122, a flagrant disregard of the charter agreement, misappropriation of funds, extended patterns of failure to comply with law, and extended failure to comply with the terms of the charter, including academic performance.<br>● Two years identified as a priority school from the TDOE (T.C.A. §49-13-122). | ● A ***Revocation Review Letter*** is sent to the charter school's governing board, the identified school/network leadership, and the KCBOE detailing the deficiency and outlining the terms of the review.<br>● A decision by the KCBOE will follow and may be for revocation of the charter agreement or may impose lesser sanctions.<br>● A copy of the letter, as well as the final decision, will be sent to the parents and staff of the charter school. |
| Level 5: Charter Revocation<br>***Revocation Letter*** | ● The Charter Revocation Review results in a decision to revoke the charter agreement. | ● A ***Revocation Letter*** is sent to the charter school's governing board, the identified school/network leadership, and the KCBOE detailing the deficiency and outlining the terms of the charter revocation.<br>● A plan and timeline for charter school closure will be included following state closure guidance and laws (T.C.A. §49-13-130).<br>● A copy of the letter, as well as the school closure plan, will be sent to the parents and staff of the charter school. |

If the KCBOE or the school decides to close a charter school, the KCS charter office and the charter school and/or network administration, as identified, will work closely together as a transition team to protect the interests of students, families, and all stakeholders. The closure protocol will be developed to comply with T.C.A. §§ 49-13-110, 49-13-122, and 49-13-130, as well as all applicable state guidance (TDOE Charter School Guidance).

According to T.C.A. §49-13-122, a charter agreement revocation may be revoked for the following reasons:

- Committed a material violation of the conditions, standards, or procedures set forth in the charter agreement;
- Failed to meet or make sufficient progress toward the performance expectations set forth in the charter agreement;

- Failed to meet generally accepted standards of fiscal management; or
- Receiving a priority school status.

If a school is identified as a priority school and the charter school agreement is not revoked, then a comprehensive support and improvement plan will be developed. If the charter school is identified as a priority school for two (2) consecutive cycles, the charter agreement shall be revoked. The revocation takes effect immediately following the close of the school year in which the public charter school is identified as a priority school for the second consecutive cycle.

Additionally, according to T.C.A. §49-3-112, any public school that receives a "D" or "F" letter grade may be required to appear for a hearing before the state board or a committee of the state board appointed by the chair of the state board to report on the public school's performance. These hearings will include how spending decisions have affected the ability of the school to achieve certain performance goals. The board may recommend that the TDOE impose corrective action upon completion of the hearing. If a school is required to attend an Accountability Hearing (SBE Policy 1.600 (to be adopted November 2025)) based on their performance and a corrective action plan is imposed, this information will be added to or may supersede any corrective action plan currently in place with KCS, as communicated by the authorizer.

If the decision to close a charter school has been made, the Knox County Schools charter office has three primary goals to accomplish:

- Provide educational services in accordance with the charter contract until the end of the school year, or the agreed-upon date when instruction will cease.
- Reassign students to schools that meet their educational needs.
- Address the school's financial, legal, and reporting obligations.

The closure plan, including responsible parties and completion dates, will be developed by the transition team to ensure a transparent and smooth closure. The KCS charter office will attend stakeholder meetings to explain not only the mechanics of the closure, but also the reasons for closing the school.

## Charter School Reporting

The following operator reports are required annually to be submitted and is a non-exhaustive list. Additional reporting requirements can be found in state law and State Board Rule.

| Submission Deadline | Report | Requirements |
|---|---|---|
| July 1 | Artificial Intelligence Report | Each year, the governing body shall report to the TDOE the adopted Artificial Intelligence policy and how it will implemented and enforced. |
| August 31 | Charter Management Organization (CMO) Annual Financial Report | Each CMO should file an annual financial report with the Comptroller of the Treasury. |
| September 1 and October 1 | Charter Amendment Petition (Fall) | To amend the charter agreement, operators may petition to amend the material terms of the agreement. The Letter of Intent is submitted by September 1 to the authorizer and the Charter Commission. The amendment petition should be submitted by October 1. |
| December 3 and February 1 | Charter Application | Each charter sponsor that desires to open a public charter school should file a charter school application. The Letter of Intent is submitted by December 3 to the authorizer and the Charter Commission. The final application must be submitted by February 1. |
| January 15 and February 14 | Charter Amendment Petition (Spring) | To amend the charter agreement, operators may petition to amend the material terms of the agreement. The Letter of Intent is submitted by January 15 to the authorizer and the Charter Commission. The amendment petition should be submitted by February 14. |
| April 1 | Charter Renewal Application | In the year prior to the year in which the charter agreement expires, the governing body of the public charter school submits a renewal application to the authorizer, who will then report submissions to the Charter Commission. |
| As soon as practical after June 30 | Annual Financial Audit | The governing body of the public charter schools should furnish an audit to the authorizer, the commissioner, and the comptroller of the treasury. |
| Annually | Governing Board Training | The governing body of a public charter school should complete training from courses approved by the SBE. |

KCS will additionally provide clear communication, a calendar, reminders if needed, and a digital submission option to ensure all local, state, and federal compliance reporting is met on time.

## Authorizer Reporting

As a charter school authorizer, the KCS charter office must regularly and thoughtfully evaluate each school's performance, protect student rights, and communicate transparently to the public. It is essential to adhere to charter school law while protecting school autonomy. The following authorizer reports are required annually to be submitted and is a non-exhaustive list. Additional reporting requirements can be found in state law and State Board Rule.

| Submission Deadline | Report | Requirements |
|---|---|---|
| August 1 | Projected Charter Budget | The authorizer must provide their projected charter school office budget for the upcoming school year to the SBE. The authorizer reports on their website. |
| December 1 | Authorizer Fee Report | The authorizer reports to the SBE:<br>● The total amount of authorizer fees collected in the previous school year<br>● The authorizing obligations fulfilled using the fee.<br>The SBE and KCS posts this information on their website. |
| January 1 | Annual Authorizer and Waiver Report | The authorizer reports to the SBE:<br>● The operating status of all charter schools;<br>● The oversight and contracted services provided by the authorizer; and<br>● A performance report for each charter school aligned to the authorizer's school performance framework.<br>The authorizer posts on their website. |
| January 1 | Self-Assessment for Authorizers in a Non-Evaluation Year | Authorizers in a non-evaluation year shall complete and submit a self-assessment using a template provided by SBE. The authorizer submits to the SBE. KCS posts on its website. |
| January 1 | Charter Agreement Renewal Performance Report | Authorizers submit a performance report that reflects the renewal evaluation to the public charter school. |
| February 1 | Charter Agreement Renewal Resolution | A decision (rule by resolution) to approve or deny a renewal application occurs in the year in which the charter agreement expires. |
| April 15 | Enrollment Projections for New and Expanding Charter Schools | For any new or expanding charter school, authorizers must verify with TDOE the |

| | | |
|---|---|---|
| | | projected enrollment counts. |
| May 1 | Catalog of Vacant/ Underutilized Facilities | The LEA submits a comprehensive list of all underutilized or vacant properties to the TDOE and the Comptroller of the Treasury. The authorizer and TDOE will publish on their websites. |
| Rolling State Reporting Requirements (no later than 10 days after the decision) | Approval/Denial of an Application, Petition, Renewal, or Revocation | Each authorizer shall report to the TDOE and the Charter Commission any approval or denial of a charter school application, amendment petition, renewal, or revocation of a charter agreement. |
| Rolling State Reporting Requirements | Waiver Approval | All waivers are submitted via the Annual Authorizer Report. If any waivers are approved outside of the typical reporting schedule, the TDOE will be notified no later than 30 days after the decision. |

# KCS Resources & Charter School Expectations

## Assessment

All public charter schools are held accountable for student academic performance through state law and the charter agreement, which includes the performance framework. All charter schools must use the required state-mandated assessments as required by the TDOE. The school should comply with TDOE guidance, including administration, security, and reporting requirements. KCS will support charter schools with student identification and initial assessment expenses for special education via Child Find. All assessments are the responsibility of the charter school, including students with disabilities and English Language Learners.

## Enrollment

Participation in a public charter school is based on family choice. According to T.C.A. § 49-13-132, KCS shall provide at no cost a list of students and their accompanying information in accordance with T.C.A. §10-7-504 and the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g). The charter school is open to any student residing within the geographic boundaries of Knox County unless a provision has been

made in accordance with T.C.A. § 49-13-113(c). Any student who applies should be enrolled unless the number of applications exceeds the capacity of the school. If the number of applications exceeds the capacity of the school, the charter school shall select students through a lottery with an enrollment preference for students who attended the charter school during the previous year. A charter school should provide certification by an independent accounting or law firm that each lottery conducted complied with T.C.A. § 49-13-113.

## Finance

Funding is allocated to charter schools based on a student-generated funding model (TISA) and calculations by the TDOE. Charter schools are also allocated federal monies, such as Title I and ESEA funds. Allocations to the charter school are not reduced by KCS for any category of costs except for the annual authorizer fee.

KCS shall distribute funds to the charter school in no fewer than nine (9) installments in a manner consistent with how funds are distributed to the authorizer. Each distribution will include documentation reflecting how the amount was calculated, as well as any necessary adjustments. Funds are adjusted at a minimum in October, December, February, April, and June based on changes in revenue, student enrollment, and/or student services.

All funds received by the charter school should be spent according to the yearly budget submitted by the governing body, which is subject to the requirements of federal and state law. Appropriate governance and managerial procedures, and financial controls are expected for strong financial management. All financial records of the school are subject to inspection as required by the authorizer's fiduciary responsibilities upon reasonable notice and in alignment with T.C.A. § 49-13-111.

The charter school should conduct an annual independent audit of all accounts and records. The audit should be completed in alignment with T.C.A. § 49-13-127 and as soon as practical after June 30. The audit should be submitted to KCS, the Commissioner of Education, and the Comptroller of the Treasury.

## Human Resources

Under Tennessee charter law, charter schools are non-profit organizations and can hire their own personnel and set their own wage and benefit packages. Tennessee law, State Board Rule, and TDOE Guidance require that all educators be licensed in Tennessee. The TDOE website contains specific information concerning licensing- https://www.tn.gov/education/educators/licensing/educator-licensure.html.

It is the responsibility of the charter school to ensure that teachers and staff are licensed and are provided all training required by state or federal law and SBE rule or policy. In

alignment with T.C.A. § 49-5-413, all employees of the charter school who have contact with students within the scope of the individual's employment and employees of contractors should complete a criminal background check and:

- Agree to release all investigative records to the board for examination; and
- Supply a fingerprint sample and submit to a criminal history records check.

### Transportation

T.C.A. § 49-13-114 ensures that if a charter school offers transportation, then the transportation is the responsibility of the charter school. If the charter school provides transportation or chooses to contract with a third-party provider, the operator must comply with state laws and SBE rules regarding student transportation. Students should be transported in buses that have been approved for the transportation of students by the Department of Safety, or any other manner allowable by state and federal law. In electing to provide transportation services to students, the charter school is eligible for all funds that would otherwise have been spent to provide transportation for those students.

## Summary & Acknowledgements

It is the practice of the charter office to work collaboratively with our charter schools, focusing on student success through continuous improvement. It is our goal for our charter schools to be successful and an option for families in Knox County. If you have any questions, please email charteringauthority@knoxschools.org.

*KCS would like to extend gratitude to the other Tennessee charter school authorizing offices, the TDOE, and the SBE for their willingness to share resources, provide guidance, and collaborate to benefit all students across the state.*

# EXHIBIT 43

TN Department of Education | Charter Schools

# Knox County Schools

# Charter Performance Framework

May 2022

KCS | KNOX COUNTY SCHOOLS

## Introduction

Pursuant to Tennessee Code Annotated (T.C.A.) § 49-13-143, the chartering authority must adopt a performance framework for its charter schools. Knox County Schools has adopted the model performance framework developed by The Tennessee Department of Education with a few modifications to comply with this statute and to provide objective assessment and feedback to the charter schools within its supervision.

This model is based on the framework created by the Tennessee State Board of Education in 2014 and revised in January 2018.

## Section I. Academic Performance & School Culture

Pursuant to T.C.A § 49-13-102, two of the purposes of a charter school are to improve learning for all students and to ensure that children have the opportunity to reach proficiency on state academic assessments. In addition, the law states that "[t]he performance-related provisions within a charter agreement shall be based on a performance framework that clearly sets forth the academic and operational performance indicators, measures, and metrics that will guide the authorizer's evaluation of each public charter school."[1] For students, families, and the community, the main question that needs to be answered is: "Is this school a high-achieving school?" With increased school autonomy, a bedrock of charter school authorization, comes the expectation of high academic achievement. The following pages outline the measures by which a charter school's academic performance may be evaluated for purposes of yearly monitoring, potential interventions and plans of correction, and renewal and revocation decisions. A school will be evaluated on each performance measure and will receive a rating for each measure as well as a composite score that encompasses the entire academic performance framework.

[1] T.C.A. § 49-13-143(a)

The academic performance framework is made up of three key areas, which are outlined below. Additional details and explanations around these areas are included in the pages that follow.

1. Student Achievement (50%)

2. Comparative Performance (30%)

3. School Culture (20%)

## 1: STUDENT ACHIEVEMENT (50%)

Charter schools will be evaluated in the following three areas in student achievement. The total weight of the following three areas equals 50 percent of the total final score for this area.

1. *Absolute Achievement:* Absolute achievement will be measured by the percentage of students scoring “On Track” or “Mastered” on the Tennessee state assessments in the subject areas of ELA, math, and science.[2] The total scoring weight for absolute achievement is 25 percent with each subject area consisting of 8.3 percent of the total 25 percent. If a school is not being tested in a certain area, the total of 25 percent will be reallocated equally among the total tested subject areas.

2. *Growth:* Growth in achievement will be measured by the TVAAS overall composite index. TVAAS composites are reported on a 1-5 scale and are one-year scores.

3. *Chronic Absenteeism:* Defined as the percent of students missing 10 percent or more of enrolled school days.

[2] The science thresholds are based on Tennessee state assessment data from 2017. Once the new aligned science TNReady assessments are released, these science thresholds will be updated to be more consistent with the latest science assessment data.

ABSOLUTE ACHIEVEMENT CHART

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| Absolute Achievement | 25% | 0% | All students' achievement grade as reported on the TN state report card. Letter grade reflects the best of performance against absolute performance targets and AMO performance targets | | F | D | C | A or B | | |
| Growth | 20% | 0% | TVAAS overall Composite Level (All Students, All Subjects) | | Level 1 | Level 2 | Level 3 | Level 4&5 | | |
| Chronic Absenteeism | 5% | 0% | Chronic absenteeism grade as reported on the TN state report card. Letter grade reflects the best of performance against absolute performance targets and AMO performance targets | | F | D | C | A or B | | |

## 2: COMPARATIVE PERFORMANCE (30%)

This section of the performance framework measures comparative performance between the charter school and the authorizing district average in the subject areas of English/language arts, mathematics, science, and social studies. Comparison of charter performance to the authorizing district average allows for the evaluation of whether the charter school is providing a better option for students. Comparative achievement will be measured by evaluating the percentage of students who scored "On Track" or "Mastered" on the state assessments at the charter school, as compared to the authorizing district average.

- In grades 3-8, an average percent "On Track" or "Mastered" of all grades will be calculated for each tested subject.
    - This average will be calculated by taking the total number of students scoring "On Track" or "Mastered" and dividing it by the total number of students who took the test in grades 3-8.

- In high school, an average percent "On Track" or "Mastered" will be calculated for end-of-course (EOC) assessments in English I and II, Algebra or Integrated Math I, Geometry or Integrated Math II, Algebra II or Integrated Math III, Biology, and U.S. History.
    - This average will be calculated by taking the total number of students scoring "On Track" or "Mastered" and dividing it by the total number of students who took the tests, which will be grouped by subject.
    - EOC assessments will be grouped by subject in the following way:
        - ELA: English I and II
        - Math: Algebra or Integrated Math I, Geometry or Integrated Math II, Algebra II or Integrated Math III
        - Science: Biology
        - Social Studies: U.S. History

*If a school is not being tested in certain subject areas, the total weight will be reallocated equally among the total tested subject areas

## COMPARATIVE PERFORMANCE CHART

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| Comparative Performance | 3.3% | 0.00% | Emerald Academy percentile rank, Grade 3-5 ELA* | | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | | |
| | 3.3% | 0.00% | Emerald Academy percentile rank, Grade 3-5 Math* | | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | | |
| | 3.3% | 0.0% | Emerald Academy percentile rank, Grade 3-5 Science | | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | | |
| | 3.3% | 0.0% | Emerald Academy percentile rank, Grade 6-8 ELA | | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | | |
| | 3.3% | 0.0% | Emerald Academy percentile rank, Grade 6-8 Math | | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | | |
| | 3.3% | 0.0% | Emerald Academy percentile rank, Grade 6-8 Science | | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | | |

## 3: SCHOOL CULTURE (20%)

This section on the performance framework measures aspects of the school culture by assessing the school's suspension, student attrition, teacher retention, and student attendance rates.

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| School Culture | 1.9% | 0.0% | Suspension rate***, Elementary School grades | | 5% or more | 4%-4.9% | 3%-3.9% | Less than 3% | | |
| | 1.9% | 0.0% | Suspension rate***, Middle School grades | | 20% or more | 13%-19.9% | 5%-12.9% | Less than 5% | | |
| | 3.8% | 0.0% | Student attrition Rate | | 35% or more | 25%-34.9% | 15%-24.9% | Less than 15% | | |
| | 3.8% | 0.0% | Teacher retention rate | | Less than 65% | 65%-74.9% | 75%-84.9% | 85% or more | | |
| | 3.8% | 0.0% | Student attendance rate | | Less than 90% | 90%-93.9% | 94%-96.9% | 97% or more | | |

[3a]: The suspension rate is measured as the percentage of individual students suspended one or more times at a school during the school year. This rate includes out-of-school suspensions only.

[3b]: The student attrition rate is measured as the total percentage of students who left the school for reasons other than completing the highest grade in one annual cycle between Oct. 1 of a given year and Oct. 1 of the next year. This annual cycle was selected to account for student attrition during the school year and during the summer months.

[3c]: Teachers who are non-renewed are not included as part of the teacher retention rate. This metric will also hold harmless teachers who move into a different role at the school or in the charter management organization.

[3d]: The student attendance rate is measured as an average number of days students attend school as compared to the average number of days students are enrolled.

[3e]: Oct. 1 is commonly used as the date by which schools track official enrollment numbers, because typical beginning-of-year fluctuations in enrollment even out by Oct. 1. The National Center for Education Statistics (NCES) also uses this date when referencing enrollment for a given year.

## SECTION II. FINANCIAL PERFORMANCE

In addition to academic performance, another important indicator of short-term and long-term success of charter schools is financial performance. Annually, a charter school will be rated on the following near term and sustainability indicators. Any school that receives a "Falls Far Below" rating in any category will receive an immediate Plan of Correction to assist in remedying the deficiencies in this financial area. Three or more successive years of ratings that include a measure in the "Falls Far Below" category may result in a recommendation of immediate revocation of the charter.

| Indicators and Measures: | |
|---|---|
| **1.Near Term Indicators:** | **2. Sustainability Indicators:** |
| Current Ratio | Total Margin |
| Enrollment Variance | Debt to Asset Ratio |
| Unrestricted Days Cash | Cash Flow |
| Default | Debt Service Coverage Ratio |
| | |

**1: Near Term Indicators**

## 1(A). CURRENT RATIO:

*The Current Ratio is determined by dividing the charter school's total current assets divided by the current liabilities.*

- □ **Meets Standard**
  - □ Current Ratio is greater than or equal to 1.1, OR
  - □ Current Ratio is between 1.0 and 1.1 and one-year trend is positive (current year ratio is higher than last year's)
  - □ *For schools in their first or second year of operation, the Current Ratio is greater than or equal to 1.1*

- □ **Does Not Meet Standard**
  - □ Current Ratio is between 0.9 and 1.0 or equal to 1.0, OR
  - □ Current Ratio is between 1.0 and 1.1 and one-year trend is negative

- □ **Falls Far Below Standard**
  - □ Current Ratio is less than or equal to 0.9, OR
  - □ If a school is in their first or second year of operation, Current Ratio is less than 1.1

## 1(B). UNRESTRICTED DAYS CASH:

*Unrestricted Days Cash divided by ([Total Expense minus Depreciation Expenses] Divided by 365)*

- □ **Meets Standard**
  - □ 60 Days Cash, OR
  - □ Between 30- and 60-Days Cash and one-year trend is positive
  - □ For schools in their first or second year of operation, Days Cash is 30 days or greater

- □ **Does Not Meet Standard**
  - □ Days Cash is between 15-30 days, OR
  - □ Days Cash is between 30-60 days and one-year trend is negative

- □ **Falls Far Below Standard**
  - □ Fewer than 15 days cash, OR
  - □ For schools in their first or second year of operation, Days Cash is less than 30 days

### 1(C). ENROLLMENT VARIANCE:

*Actual Enrollment divided by Enrollment Projection in Charter School Board-Approved Budget*

- □ **Meets Standard**
  - □ Enrollment Variance equals or exceeds 95 percent in the most recent year
- □ **Does Not Meet Standard**
  - □ Enrollment Variance is between 85 percent and 95 percent in the most recent year
- □ **Falls Far Below Standard**
  - □ Enrollment Variance is less than 85 percent in the most recent year

### 1(D). DEFAULT:

- □ **Meets Standard**
  - □ School is not in default of loan covenant(s) and/or is not delinquent with debt service payments
- □ **Does Not Meet Standard**
  - □ School is in default of loan covenant(s), but has worked with lender(s) to restructure debt service payments
- □ **Falls Far Below Standard**
  - □ School is in default of loan covenant(s) and/or is delinquent with debt service payment

## 2: Sustainability Measures

### 2(A). TOTAL MARGIN:

*Total Margin is Net Income divided by Total Revenue, and Aggregated Total Margin is Total Three-Year Net Income divided by Total Three-Year Revenues*

- □ **Meets Standard**
  - □ Aggregated Three-Year Total Margin is positive, and the most recent year Total Margin is positive, OR
  - □ Aggregated Three-Year Total Margin is greater than -1.5 percent, the trend is positive for the last two years, and the most recent year Total Margin is positive
  - □ For schools in their first or second year of operation, the cumulative Total Margin is positive

- □ **Does Not Meet Standard**
  - □ Aggregated Three-Year Total Margin is greater than -1.5 percent, but trend does not "Meet Standard"
- □ **Falls Far Below Standard**
  - □ Aggregated Three-Year Total Margin is less than or equal to -1.5 percent,
  - □ The most recent year Total Margin is less than -10 percent, OR
  - □ For schools in their first or second year of operation, the cumulative Total Margin is negative.

## FINANCIAL PERFORMANCE CHART

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| Financial Performance | 3% | 3.0% | Annual budget variance | NA | Exceeds 15% of the annual budget | Exceeds between 10% - 15% of the annual budget | Does not exceed 10% of the annual budget | Does not exceed the annual budget | | |
| | 3% | 3.0% | Most recent annual audit | NA | Audit does not have an unqualified opinion and finds material weakness in controls | Audit either does not have an unqualified opinion or finds material weakness in controls | Audit has an unqualified opinion and finds no material weakness in controls | Audit has an unqualified opinion, finds no material weakness in controls, and the organization receives the Certificate of Excellence in Financial Reporting Award from the Association of School Business Officials | | |
| | 3% | 3.0% | Monthly financial reports | NA | No monthly financial reports provided to Chartering Authority | Financial reports provided to the Chartering Authority, but not monthly | Financial reports provided to the Chartering Authority on a monthly basis, but not within 30 days of each month's end | Financial reports provided to the Chartering Authority on a monthly basis, with each report submitted within 30 days of that month's end | | |
| | 1% | 1.0% | Fundraising | NA | Less than 80% of all targets met | 80% - 89.9% of all targets met | 90% - 100% of all targets met | all targets exceeded | | |
| | 1% | 1.0% | Enrollment variance | NA | Less than 85 % in the most recent year | 85% - 94.9% in the most recent year | 95% - 99.9% in the most recent year | equals or exceeds 100% in the most recent year | | |
| | 1% | 1.0% | Current Ratio | N/A | less than 0.9 | 0.9 - 1.0 | 1.1 - 1.2 | greater than 1.2 | | |
| | 3% | 3.0% | Debt Analysis/Default | NA | School is in default of loan covenant(s) and/or is delinquent with debt service payment | School is in default of loan covenant(s), but has worked with lender(s) to restructure debt service payments | School is not in default of loan covenant(s) and/or is not delinquent with debt service payments | School is not in default of loan covenant(s) and/or is not delinquent with debt service payments. Principal balance has declined from prior year. | | |

## 2(B). DEBT TO ASSET RATIO:

*Total Liabilities divided by Total Assets*

- **Meets Standard**
  - Debt to Asset Ratio is less than 0.9
- **Does Not Meet Standard**
  - Debt to Asset Ratio is between 0.9 and 1.0
- **Falls Far Below Standard**
  - Debt to Asset Ratio is greater than 1.0

## 2(C). CASH FLOW:

*Multi-Year Cash Flow = Year 3 Total Cash – Year 1 Total Cash; One-Year Cash Flow = Year 2 Total Cash – Year 1 Total Cash*

- **Meets Standard**
  - Multi-Year Cumulative Cash Flow is Positive, and Cash Flow is positive each year, OR
  - Multi-Year Cumulative Cash Flow is positive, Cash Flow is positive in one of two years, and Cash Flow in the most recent year is positive
  - For schools in their first or second year of operation, cash flow is positive

- **Does Not Meet Standard**
  - Multi-Year Cumulative Cash Flow is positive, but trend does not "Meet Standard"

- **Falls Far Below Standard**
  - Multi-Year Cumulative Cash Flow is negative, OR
  - For schools in their first or second year of operation, cash flow is negative 2(d). Debt Service Coverage Ratio:

*(Net Income + Depreciation + Interest Expense) divided by (Annual Principal, Interest, and Lease Payments)*

- **Meets Standard**
  - Debt Service Coverage Ratio is equal to or exceeds 1.1

- **Does Not Meet Standard**
  - Debt Service Coverage Ratio is less than 1.1

- **Falls Far Below Standard**
  - Not Applicable

## SECTION III: ORGANIZATIONAL PERFORMANCE

A charter school's performance in the organizational measures is a large piece of the overall health of a charter school. Deficiencies or weaknesses in organizational performance may be an indicator of the overall health of the charter school. Any school that receives a "Falls Far Below" rating in any category will receive an immediate Plan of Correction to assist in remedying the deficiencies in this organizational area. Three or more successive years of ratings that include a measure in the "Falls Far Below" category may result in a recommendation of immediate revocation of the charter.

| Indicators and Measures: | |
|---|---|
| **1. Education Program:** | **4. Students and Employees** |
| a. Charter Terms | a. Rights of Students |
| b. Compliance with Education Requirements | b. Credentialing |
| c. Students with Disabilities Rights | a. Rights of Students |
| d. English Language Learner Rights | d. Background Checks |
| | |
| **2. Financial Management and Oversight** | **5. School Environment** |
| a. Financial Reporting and Compliance Reporting | a. Facilities and Transportation |
| b. Generally Accepted Accounting Principles | b. Health and Safety |
| | c. Information Handling |
| | |
| **3. Governance and Reporting** | **6. Additional Obligations** |
| a. Governance Requirements | a. All Other Obligations |
| b. Accountability of Management | |
| c. Reporting Requirement | |

## 1: EDUCATION PROGRAM

### 1(A). IS THE SCHOOL IMPLEMENTING THE MATERIAL TERMS OF THE EDUCATION PROGRAM AS DEFINED IN THE CURRENT CHARTER CONTRACT?

- ☐ **Meets Standard**
  - ☐ The school implemented the material terms of the education program in all material respects and the education program in operation reflects the material terms as defined in the charter contract, or the school has gained approval for a charter modification to the material terms.
- ☐ **Does Not Meet Standard**
  - ☐ The school failed to implement the material terms of the education program as defined in the charter agreement; however, the school promptly came into compliance once the shortcoming(s) were identified.
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to implement the material terms of the education program as defined in the charter agreement in the manner described above.

### 1(B). IS THE SCHOOL COMPLYING WITH APPLICABLE EDUCATION REQUIREMENTS?

- ☐ **Meets Standard**
  - ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to education requirements, including but not limited to:
    - Instructional days or minutes requirements
    - Graduation and promotion requirements
    - Content standards
    - State assessments
    - Implementation of mandated programming as a result of state or federal funding
- ☐ **Does Not Meet Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to education requirements as described above; however, the school promptly came into compliance once the shortcoming(s) were
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to education requirements as described above.

## 1(C). IS THE SCHOOL PROTECTING THE RIGHTS OF STUDENTS WITH DISABILITIES?

□ **Meets Standard**

- □ Consistent with the school's status and responsibilities, the school materially complies with applicable laws, rules, regulations, and provisions of the charter contract (including the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act) relating to the treatment of students with identified disabilities and those suspected of having a disability, including but not limited to:
  - Equitable access and opportunity to enroll
  - Identification and referral
  - Appropriate development and implementation of Individualized Education Plans and Section 504 plans
  - Operational compliance, including provision of services in the least restrictive environment and appropriate inclusion in the school's academic program, assessments, and extracurricular activities
  - Discipline, including due process protections, manifestation determinations, and behavioral intervention plans
  - Access to the school's facility and programs in a lawful manner and consistent with students' IEPs or Section 504 Plans
  - Securing of all applicable funding

□ **Does Not Meet Standard**

- □ The school did not materially comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the treatment of students with identified disabilities and those suspected of having a disability in the manner described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

□ **Falls Far Below Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to the treatment of students with identified disabilities and those suspected of having a disability in the manner described above.

## 1(D). IS THE SCHOOL PROTECTING THE RIGHTS OF ENGLISH LANGUAGE LEARNER (ELL) STUDENTS?

- □ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract (including Title III of the Elementary and Secondary Education Act (ESEA) and the US Department of Education authorities) relating to the English Language Learner requirements, including but not limited to:
    - Required policies related to the service of ELL students
    - Proper steps for identification of students in need of ELL services
    - Appropriate and equitable delivery of services to identified students
    - Appropriate accommodations on assessments
    - Exiting of students from ELL services
    - Ongoing monitoring of exited students

- □ **Does Not Meet Standard**
  - □ The school did not materially comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to English Language Learner requirements in the manner described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

- □ **Falls Far Below Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to English Language Learner requirements in the manner described above.

## 2: FINANCIAL MANAGEMENT

### 2(A). IS THE SCHOOL MEETING FINANCIAL REPORTING AND COMPLIANCE REQUIREMENTS?

□ **Meets Standard**

- □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to financial reporting requirements, including but not limited to:
  - o Complete and on-time submission of financial reports, including annual budget, revised budget (if applicable), periodic financial reports as required by the authorizer, and any reporting requirements if the board contracts with an Education Service Provider (ESP)
  - o On-time submission and completion of annual independent audit and corrective action plans, if applicable.
  - o All reporting requirements related to the use of public fund

□ **Does Not Meet Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial reporting requirements as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

□ **Falls Far Below Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial reporting requirements as described above.

### 2(B). IS THE SCHOOL FOLLOWING GENERALLY ACCEPTED ACCOUNTING PRINCIPLES?

□ **Meets Standard**

- □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to financial management and oversight expectations as evidence by an annual independent audit, including but not limited to:
  - o An unqualified audit opinion
  - o An audit devoid of significant findings and conditions, material weaknesses, or significant internal control weaknesses
  - o An audit that does not include a going concern disclosure in the notes or an explanatory paragraph within the audit report

□ **Does Not Meet Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial management and oversight expectations as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

□ **Falls Far Below Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial management and oversight expectations as described above.

## 3: GOVERNANCE AND REPORTING

### 3(A). IS THE SCHOOL COMPLYING WITH GOVERNANCE REQUIREMENTS?

- □ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to governance by its board, including but not limited to:
    - o Board policies, including those related to oversight of an Education Service Provider (ESP), if applicable
    - o Board bylaws
    - o State open meetings law
    - o Code of ethics
    - o Conflicts of interest
    - o Board composition and/or membership rules (e.g., requisite number of qualified teachers, ban on employees or contractors serving on the board, etc.)
    - o Compensation for attendance at meetings
- □ **Does Not Meet Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to governance by its board as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.
- □ **Falls Far Below Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to governance by its board as described above

### 3(B). IS THE SCHOOL HOLDING MANAGEMENT ACCOUNTABLE?

- □ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to oversight of school management, including but not limited to:
    - o (For Education Service Providers [ESPs]) Maintaining authority over management, holding it accountable for performance as agreed under a written performance agreement, and requiring annual financial reports of the ESP
    - o (For Others) Oversight of management that includes holding it accountable for performance expectations which may or may not be agreed to under a written performance agreement
- □ **Does Not Meet Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to oversight of school management; however, the school promptly came into compliance once the shortcoming(s) were identified.
- □ **Falls Far Below Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to oversight of school Management as described above.

## 3(C). IS THE SCHOOL COMPLYING WITH REPORTING REQUIREMENTS?

□ **Meets Standard**

- □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to relevant reporting requirements to the school's authorizer, State Education Agency (SEA), , and/or federal authorities, including but not limited to:
    - Accountability tracking
    - Attendance and enrollment reporting
    - Compliance and oversight
    - Additional information requested by authorizer

□ **Does Not Meet Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to relevant reporting requirements as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

□ **Falls Far Below Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement as described above.

4: STUDENTS AND EMPLOYEES

## 4(A). IS THE SCHOOL PROTECTING THE RIGHTS OF ALL STUDENTS?

- ☐ **Meets Standard**
  - ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students, including but not limited to:
    - Policies and practices related to admissions, lottery, waiting lists, fair and open recruitment, and enrollment (including rights to enroll or maintain enrollment)
    - The collection and protection of student information (that could be used in discriminatory ways or otherwise contrary to law)
    - Due process protections, privacy, civil rights, and student liberties requirements, including First Amendment protections and the Establishment Clause restrictions prohibiting public schools from engaging in religious instruction
    - Conduct or discipline (discipline hearings and suspension and expulsion policies and practices)

- ☐ **Does Not Meet Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students as described above.

## 4(B). IS THE SCHOOL MEETING TEACHER AND OTHER STAFF CREDENTIALING REQUIREMENTS?

- □ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract (including the federal Highly Qualified Teacher and Paraprofessional requirements within Title II of the Elementary and Secondary Education Act [ESEA]) relating to state certification requirements.
- □ **Does Not Meet Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to state certification requirements; however, the school promptly came into compliance once the shortcoming(s) were identified.
- □ **Falls Far Below Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to state certification requirements.

## 4(C). IS THE SCHOOL COMPLYING WITH LAWS REGARDING EMPLOYEE RIGHTS?

- □ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations, including those relating to the Family Medical Leave Act, the Americans with Disabilities Act, and employment contracts. The school does not interfere with employees' rights to organize collectively or otherwise violate staff collective bargaining rights.
- □ **Does Not Meet Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations; however, the school promptly came into compliance once the shortcoming(s) were identified.
- □ **Falls Far Below Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations.

## 4(D). IS THE SCHOOL COMPLETING REQUIRED BACKGROUND CHECKS?

- □ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to background checks of all applicable individuals (including staff and members of the charter community, where applicable).

- □ **Does Not Meet Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to state certification requirements; however, the school promptly came into compliance once the shortcoming(s) were identified.

- □ **Falls Far Below Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to state certification requirements.

## 4(C). IS THE SCHOOL COMPLYING WITH LAWS REGARDING EMPLOYEE RIGHTS?

- □ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations, including those relating to the Family Medical Leave Act, the Americans with Disabilities Act, and employment contracts. The school does not interfere with employees' rights to organize collectively or otherwise violate staff collective bargaining rights.

- □ **Does Not Meet Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations; however, the school promptly came into compliance once the shortcoming(s) were identified.

- □ **Falls Far Below Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations

## 4(D). IS THE SCHOOL COMPLETING REQUIRED BACKGROUND CHECKS?

- □ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to background checks of all applicable individuals (including staff and members of the charter community, where applicable).

- □ **Does Not Meet Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to background checks; however, the school promptly came into compliance once the shortcoming(s) were identified.

- □ **Falls Far Below Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to background checks.

## 5: SCHOOL ENVIRONMENT

## 5(A). IS THE SCHOOL COMPLYING WITH FACILITIES AND TRANSPORTATION REQUIREMENTS?

- □ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to the school facilities, grounds, and transportation, including but not limited to:
    - Americans with Disabilities Act (ADA)
    - Fire inspections and related records
    - Viable certificate of occupancy or other required building use authorization
    - Documentation of requisite insurance coverage
    - Student transportation
- □ **Does Not Meet Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the school facilities, grounds, and transportation as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.
- □ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to school facilities, grounds, and transportation as described above.

## 5(B). IS THE SCHOOL COMPLYING WITH HEALTH AND SAFETY REQUIREMENTS?

☐ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to safety and the provision of health-related services, including but not limited to:
  - Appropriate nursing services and dispensing of pharmaceuticals
  - Food service requirements
  - Other district services, if applicable

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to safety and the provision of health-related services as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to safety and the
- ☐ provision of health-related services as described above.

## 5(C). IS THE SCHOOL HANDLING INFORMATION APPROPRIATELY?

□ **Meets Standard**

- □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to handling of information, including but not limited to:
  - o Maintaining the security of and providing access to student records under the Family Educational Rights and Privacy Act and other applicable authorities
  - o Accessing documents maintained by the school under the state's Freedom of Information law and other applicable authorities
  - o Transferring of student records
  - o Proper and secure maintenance of testing materials.

□ **Does Not Meet Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the handling of information as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

□ **Falls Far Below Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the handling of information as described above.

## 6: ADDITIONAL OBLIGATIONS

### IS THE SCHOOL COMPLYING WITH ALL OTHER OBLIGATIONS?

□ **Meets Standard**

- □ The school materially complies with all other material legal, statutory, regulatory, or contractual requirements contained in its charter contract that are not otherwise explicitly stated herein, including but not limited to requirements from the following sources:
    - Revisions to state charter law
    - Consent decrees
    - Intervention requirements by the authorizer
    - Requirements by other entities to which the school is accountable (e.g. State Education Agency [SEA])

□ **Does Not Meet Standard**

- □ The school failed to materially comply with all other material, legal, statutory, regulatory, or contractual requirements contained in its charter contract that are not otherwise explicitly stated herein as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

□ **Falls Far Below Standard**

- □ The school failed to comply with all applicable laws, rules, regulations, and provisions contained in its charter contract that are not otherwise explicitly stated herein as described above.

**KNOX COUNTY BOARD OF EDUCATION**

This Document is approved by the Knox County Board of Education on the 4th day of May, 2022, as reflected in its minutes, and certified by its Chairperson.

______________________________
**Kristi Kristy, Chair**

**Date:** ______________________________

**KNOX COUNTY GOVERNMENT**

______________________________
**Glenn Jacobs, Mayor**

**Date:** ______________________________

**KNOX COUNTY LAW DEPARTMENT**

**CONTRACT #:** 22-188

**APPROVED AS TO LEGAL FORM**

______________________________
**Gary Dupler, Deputy Law Director**

**Date:** 4/20/2022

# EXHIBIT 44

KCS | KNOX COUNTY SCHOOLS

# 2024-25 Annual Authorizer Report

Knox County Schools: Knoxville, TN
Office of Academic Supports
Ms. Theresa Nixon, Executive Director
theresa.nixon@knoxschools.org
865.594.1787
Submitted by January 1, 2026

# Authorized School Data

| | |
|---|---|
| **Name of School** | Emerald Academy |
| **Current School Address** | 220 Carrick St. Knoxville, TN 37921 |
| **Current School Phone Number** | (865) 249-7223 |
| **School Leader Name(s)** | Steve Diggs, Board President, Emerald Charter Schools<br>Carlissa Weeks, School Director |
| **School Leader(s) Email Address(es)** | sdiggs@emeraldyouth.org<br>carlissa.weeks@emeraldcharterschools.org |
| **Operating Status** | (B) Open and Operating |
| **Contracted Services** | **KCS IT Department:** Internet Service |

| | |
|---|---|
| **Name of School** | Knoxville Preparatory School |
| **Current School Address** | 967 Irwin Street, Knoxville, TN 37917 |
| **Current School Phone Number** | (865)394-8989 |
| **School Leader Name(s)** | Troy Kemp, Chief Executive Officer, PREP Public Schools<br>Chad Everett, Executive Director |
| **School Leader(s) Email Address(es)** | troykemp@prepschools.org<br>chadeverett@prepschools.org |
| **Operating Status** | (B) Open and Operating |
| **Contracted Services** | |

# Authorized Approved School Waivers

## Emerald Academy

The following waivers for **Emerald Academy** were requested and approved as part of the renewal application process and renewal charter agreement.

The following waivers were approved on June 5, 2025, and were granted for the 10-year duration of the renewal charter agreement.

| Citation of Statute or State Board Rule Waiver Approved | Content of Active Waiver Granted |
|---|---|
| T.C.A. § 49-3-306(a) | **Licensed Personnel Salaries**<br>Emerald Academy will create its own compensation structure using salary bands.<br>*We anticipate that we will need flexibility with our compensation structure in order to hire and retain the highest-caliber staff.* |
| T.C.A. § 8-23-206(a) | **Longevity Pay**<br>Emerald Academy will create its own compensation structure.<br>*We anticipate that we will need flexibility with our compensation structure in order to hire and retain the highest-caliber staff.* |
| T.C.A. § 49-6-2206-2207 | **Use of Unapproved Textbooks**<br>Emerald Academy may use both state-approved textbooks and other textbooks.<br>*Emerald Academy may use both state-approved textbooks and other textbooks to help accelerate scholar achievement.* |
| T.C.A. § 49-5-408 | **Contracts**<br>Emerald Academy will employ all teachers and staff on an at-will basis.<br>*A critical key to scholar success is being* |

| | |
|---|---|
| | *able to select, hire, and retain high-performing staff members who are committed to the school's mission and vision. As such, we require the flexibility to employ staff on an at-will basis.* |
| T.C.A. § 49-5-409 | **Termination of Contracts**<br>Emerald Academy will employ all teachers and staff on an at-will basis.<br>*A critical key to scholar success is being able to select, hire, and retain high-performing staff members who are committed to the school's mission and vision. As such, we require the flexibility to employ staff on an at-will basis.* |
| T.C.A. § 49-5-510-513 | **Tenure**<br>Emerald Academy will employ all teachers and staff on an at-will basis.<br>*The key to our success is being able to select, hire, and retain high-performing staff members who are committed to our mission and vision. As such, we require the flexibility to employ staff on an at-will basis.* |
| T.C.A. § 49-5-701-713 | **Leave**<br>Emerald Academy will create its own personnel policies, including leave policies.<br>*We believe that scholar success is dependent upon the consistent presence of teaching staff. Therefore, in order to best meet the needs of our scholars, we require flexibility with our leave policy.* |
| T.C.A. § 49-5-806-810 | **Sick Leave Bank**<br>Emerald Academy will create its own personnel policies, including leave policies.<br>*We believe that scholar success is dependent upon the consistent presence of teaching staff. Therefore, in order to best meet the needs of our scholars, we* |

| | |
|---|---|
| | *require flexibility with our leave policy.* |
| T.C.A. § 49-3-306(a)<br>SBE Policy 5.600<br>State Board Rule 0520-1-02-.02 | **Salary Schedules**<br>Emerald Academy will create its own compensation structure.<br>*We anticipate that we will need flexibility with our compensation structure in order to hire and retain the highest-caliber staff.* |
| State Board Rule 0520-01-02-.07 (2) | **Library Information Center Personnel**<br>Emerald Academy does not intend to hire library information center personnel.<br>*Emerald Academy intends to use classroom libraries in addition to a small centralized book collection. As such, we do not need to hire library center personnel.* |
| State Board Rule 0520-01-02-.07 (3) | **Library Information Center Collections**<br>Emerald Academy does not intend to have a library information center and, therefore, will not have the required library collections.<br>*Emerald Academy will develop classroom libraries to meet the needs of scholars in addition to a small centralized book collection.* |
| State Board Rule 0520-1-02-.04 | **Leave for Teachers**<br>Emerald Academy will create its own personnel policies, including leave policies.<br>*We believe that scholar success is dependent upon the consistent presence of teaching staff. Therefore, in order to best meet the needs of our scholars, we require flexibility with our leave policy.* |
| T.C.A. § 49-2-303(a)(3)<br>State Board Rule 0520-02-03-.10 | **Administrative Licensure**<br>Emerald Academy will hire and employ qualified, best-fit candicates for school director (principal). |

| | |
|---|---|
| | *We believe flexibility with licensure will allow the best-fit candidates to be staffed in administrative roles, particularly in the unlikely event of an unforeseen department or need. This allow for flexibility in selected a candidate who may not yet have licensure but who is willing tand intends to obtain it.* |

## Knoxville Preparatory School

The following waiver for **Knoxville Preparatory School** was requested and approved as part of the application process and original charter agreement. All information below was copied directly from the submitted application, including the replacement policy/practice, and addresses how the waiver would increase student achievement.

This waiver was approved on December 7, 2023, and was granted for the 10-year duration of the charter agreement.

| Citation of Statute or State Board Rule Waiver Approved | Content of Active Waiver Granted |
|---|---|
| State Board Rule 0520-05-.01 | **Instructional Materials**<br>Knoxville Preparatory has requested to use *Red Thread Knowledge* (ELA), *Math for Meaning* (Math), *HCS Created Materials* (Social Studies), *Knox Prep Created Materials* (Science)<br>*We believe that these instructional materials best fit the needs for our academic scholars.* |

## Portfolio Performance Reports

### I. Individual School Portfolio

The following section outlines each charter school's performance based on the components of the performance framework defined in the charter agreement. For full details of each school, see **Appendix A.**

In accordance with the *KCS Charter School Performance Framework*, the rating criteria are as follows:

| Academic Performance and Financial Performance | | Organizational Performance (There is no *Exceeds Standard* option and no number scores associated with this domain.) |
|---|---|---|
| 4- Exceeds Standard | | |
| 3- Meets Standard | | Meets Standard |
| 2- Does Not Meet Standard | | Does Not Meet Standard |
| 1- Falls Far Below Standard | | Falls Far Below Standard |

KCS
KNOX COUNTY SCHOOLS

# Emerald Academy

## Academic Outcomes 2024-25

### Student Achievement

| Indicator | Rating/ Score |
|---|---|
| Absolute Achievement | 3 |
| Growth | 4 |
| Chronic Absenteeism | 2 |

### Comparative Performance

| Indicator | Rating/ Score |
|---|---|
| Grades 3-5 ELA | 4 |
| Grades 3-5 Math | 4 |
| Grades 3-5 Science | 4 |
| Grades 6-8 ELA | 4 |
| Grades 6-8 Math | 4 |
| Grades 6-8 Science | 4 |

### School Culture

| Indicator | Rating/ Score |
|---|---|
| Suspension rate (Elementary) | 1 |
| Suspension rate (Middle) | 1 |
| Student attrition rate | 4 |
| Teacher retention rate | 4 |
| Student attendance rate | 3 |

## Financial Outcomes 2024-25

### Financial Performance
*additional questions: all 8 Meets Standards

| Indicator | Rating/Score |
|---|---|
| Annual Budget Variance | 3 |
| Most Recent Annual Audit | 3 |
| Monthly Financial Reports | 4 |
| Fundraising | 4 |
| Enrollment Variance | 3 |
| Current Ratio | 4 |
| Debt Analysis/Default | 4 |

## Organizational Outcomes 2024-25

### Organizational Performance

| Indicator | Rating/Score |
|---|---|
| Education Program (4) | Meets Standard |
| Financial Management & Oversight (2) | Meets Standard |
| Governance & Reporting (3) | Meets Standard |
| Students & Employees (4) | Meets Standard |
| School Environment (3) | Meets Standard |
| Additional Obligations (1) | Meets Standard |

KCS KNOX COUNTY SCHOOLS

# Knoxville Preparatory School

## Academic Outcomes 2024-25

| Student Achievement | | Comparative Performance | | School Culture | |
|---|---|---|---|---|---|
| Indicator | Rating/ Score | Indicator | Rating/ Score | Indicator | Rating/ Score |
| Absolute Achievement | 2 | Grades 6-8 ELA | 4 | Suspension rate (Middle) | 1 |
| Growth | 1 | Grades 6-8 Math | 4 | Student attrition rate | 3 |
| Chronic Absenteeism | 2 | Grades 6-8 Science | 4 | Teacher retention rate | 1 |
| | | | | Student attendance rate | 2 |

## Financial Outcomes 2024-25

**Financial Performance**
***additional questions: 3 Meets, 2 Does Not Meet, and 1 Falls Far Below**

| Indicator | Rating/Score |
|---|---|
| Annual Budget Variance | 4 |
| Most Recent Annual Audit | 3 |
| Monthly Financial Reports | 3 |
| Fundraising | 4 |
| Enrollment Variance | 2 |
| Current Ratio | 4 |
| Debt Analysis/Default | 4 |

## Organizational Outcomes 2024-25

**Organizational Performance**

| Indicator | Rating/Score |
|---|---|
| Education Program (4) | Meets Standard (3)<br>Does Not Meet Standard (1) |
| Financial Management & Oversight (2) | Meets Standard (1)<br>Does Not Meet Standard (1) |
| Governance & Reporting (3) | Meets Standard (1)<br>Does Not Meet Standard (2) |
| Students & Employees (4) | Meets Standard (4) |
| School Environment (3) | Meets Standard (2)<br>Does Not Meet Standard (1) |
| Additional Obligations (1) | Meets Standard (1) |

## Overall Authorizer Portfolio

The chart below summarizes the overall results of our schools' academic, financial, and organizational performance based on the *Knox County Charter Schools Performance Framework*.

| Charter School | Academic Performance | Financial Performance | Organizational Performance |
|---|---|---|---|
| **Emerald Academy** | 3-Meets Standard | 4- Exceeds Standard | Meets Standard |
| **Knoxville Preparatory School** | 2- Does Not Meet Standard | 2- Does Not Meet Standard | Meets Standard |

# Performance

The Knox County Schools (KCS) Charter Office remains committed to its mission for authorizing:

*…to create diverse and future-focused environments that empower every student to take ownership of their learning, shape their future, and contribute meaningfully to their community.*

To ensure our work consistently reflects this mission, the KCS Charter Office maintains a strong commitment to continuous improvement, regularly examining and refining our systems and processes to ensure optimal effectiveness.

The 2024–25 school year marked the first year in which KCS had two charter schools open and operating. When we had only one school in our portfolio, it was feasible for compliance submissions to be sent directly to our office via email. With two schools, however, it quickly became evident that a more streamlined and efficient system was needed to manage compliance. In response, the charter office established a goal to enhance the efficiency of its compliance tracking processes. This goal aligns with Quality Charter Authorizing Standard 4a.iii, which states, *A quality authorizer implements an accountability system that effectively streamlines federal, state, and local performance expectations and compliance requirements while protecting schools' legally entitled autonomy and minimizing schools' administrative and reporting burdens.*

To advance this goal, KCS purchased an all-in-one platform that streamlines compliance and reporting for both authorizers and charter schools. To ensure the system reflected the appropriate timelines and expectations, charter staff collaborated with KCS supervisory teams to gather detailed information about each department's compliance reporting requirements. This information informed the creation of report templates within the system, including due dates and step-by-step submission directions for each item. While we continue to refine the process based on school user feedback, our system has already provided a more transparent and efficient approach to monitoring compliance.

Another goal identified by the charter office over the past year was to update the Knox County Schools Charter Handbook to better align with Tennessee Charter law, the State Board of Education's Rules and Policies, and the Tennessee Department of Education's guidance. This goal aligns with many of the Quality Charter Authorizing Standards, but particularly relates to Standard 1a.iv, which states, *A quality authorizer implements policies, processes, and practices that streamline and systematize its work toward stated goals and executes its duties efficiently.*

To progress toward this goal, the Charter Office conducted a comprehensive review of existing Tennessee law and State Board of Education rules and policies. Staff analyzed areas where requirements, timelines, or processes were outdated or unclear and

collaborated internally to reconcile those gaps with current practice. The office then revised sections of the handbook to clarify expectations across the charter lifecycle. This iterative process resulted in a more accurate, coherent, and policy-aligned handbook that better supports our work as an authorizer for both current and potential charter school operators.

Additionally, feedback from the 2023 Annual Authorizer Evaluation conducted by the State Board noted that while a comprehensive performance accountability and compliance monitoring system was clearly articulated in the KCS Charter Handbook, it was not fully reflected in the Board's charter school policy. This need was reaffirmed in the most recent 2025 evaluation. As a result, KCS plans to continue to revise charter policies and administrative procedures to ensure seamless alignment with the handbook.

Together, these efforts reflect the charter office's ongoing dedication to strengthening our authorizing practices in service of students, families, and schools. By implementing highly efficient systems, increasing transparency, and ensuring alignment with current laws and authorizing standards, we continue to build a more responsive, consistent, and mission-aligned approach to oversight. As we move forward, the KCS Charter Office remains committed to continuous improvement and to fostering strong partnerships that support high-quality charter school options across Knox County.

APPENDIX A

Department of Education | Charter Schools

# Knox County Schools

# Emerald Academy

# Charter Performance Framework

## Introduction

Pursuant to Tennessee Code Annotated (T.C.A.) § 49-13-143, the chartering authority must adopt a performance framework for its charter schools. Knox County Schools has adopted the model performance framework developed by the Tennessee Department of Education with a few modifications to comply with this statute and to provide objective assessment and feedback to the charter schools within its supervision.

This model is based on the framework created by the Tennessee State Board of Education in 2014 and revised in February 2020.

## Section I. Academic Performance & School Culture

Pursuant to T.C.A § 49-13-102, two of the purposes of a charter school are to improve learning for all students and to ensure that children have the opportunity to reach proficiency on state academic assessments. In addition, the law states that "[t]he performance-related provisions within a charter agreement shall be based on a performance framework that clearly sets forth the academic and operational performance indicators, measures, and metrics that will guide the authorizer's evaluation of each public charter school."[1] For students, families, and the community, the main question that needs to be answered is: "Is this school a high-achieving school?" With increased school autonomy, a bedrock of charter school authorization, comes the expectation of high academic achievement. The following pages outline the measures by which a charter school's academic performance may be evaluated for purposes of yearly monitoring, potential interventions and plans of correction, and renewal and revocation decisions. A school will be evaluated on each performance measure and will receive a rating for each measure as well as a composite score that encompasses the entire academic performance framework.

[1] T.C.A. § 49-13-143(a)

The academic performance framework is made up of three key areas, which are outlined below. Additional details and explanations about these areas are included in the pages that follow.

1. Student Achievement (50%)
2. Comparative Performance (30%)
3. School Culture (20%)

App.1623



KCBOE03174

## 1: Student Achievement (50%)

Charter schools will be evaluated in the following three areas in student achievement. The total weight of the following three areas equals 50 percent of the total final score for this area.

1. *Absolute Achievement:* Absolute achievement will be measured by the percentage of students scoring "On Track" or "Mastered" on the Tennessee state assessments in the subject areas of ELA, Math, and Science. The total scoring weight for absolute achievement is 25 percent with each subject area consisting of 8.3 percent of the total 25 percent. If a school is not being tested in a certain area, the total of 25 percent will be reallocated equally among the total tested subject areas.[2]

2. *Growth:* Growth in achievement will be measured by the TVAAS overall composite index. TVAAS composites are reported on a 1-5 scale and are one-year scores.

3. *Chronic Absenteeism:* Defined as the percent of students missing 10 percent or more of enrolled school days.

---

[2] For the 2024-2025 report, Knox County Schools has used the following process. As of November 2, 2023, a new process to calculate school letter grades (A-F) was presented to the State Board of Education. At the time this report was submitted to the Knox County Board of Education (November 5, 2025), the school letter grades have not yet been released. To create a metric for Achievement and Chronic Absenteeism, the KCS Research, Evaluation, and Assessment department used the federal accountability outcomes for SY2425 for the charter school (All students group weighted at 60% with the average of available subgroups weighted at 40%). Then per the SY2122 accountability protocol (the most recent protocol available), the indicator scores were translated to grades (page 44 of the state protocol). These calculations were used to determine both **Absolute Achievement** and **Chronic Absenteeism** for this report.

**Timeline of Review**

November 5, 2025: KCS Shared Performance Framework with Schools and submitted for KCBOE review

December 4, 2025: Regular Voting Session for KCBOE

November/December: Performance Review shared with the charter school governing board

January 1, 2026: KCS Annual Report submitted to the state

## Absolute Achievement Chart

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| *Absolute Achievement* | *25%* | *25%* | *All students' achievement grade as reported on the TN state report card. Letter grade reflects the best of performance against absolute performance targets and AMO performance targets (see page 3 for calculation)* | C | *F* | *D* | *C* | *A or B* | 3 | 0.75 |
| Growth | 20% | 20% | TVAAS overall Composite Level (All Students, All Subjects) | 5 | Level 1 | Level 2 | Level 3 | Level 4&5 | 4 | 0.80 |
| *Chronic Absenteeism* | *5%* | *5%* | *Chronic absenteeism grade as reported on the TN state report card. Letter grade reflects the best of performance against absolute performance targets and AMO performance targets (see page 3 for calculation)* | D | *F* | *D* | *C* | *A or B* | 2 | 0.10 |



App.1625

KCBOE03176

## 2: Comparative Performance (30%)

This section of the performance framework measures comparative performance between the charter school and the authorizing district average in the subject areas of English/language arts, mathematics, science, and social studies. Comparison of charter performance to the authorizing district average allows for the evaluation of whether the charter school is providing a better option for students. Comparative achievement will be measured by evaluating the percentage of students who scored "On Track" or "Mastered" on the state assessments at the charter school, as compared to the authorizing district average.

- In grades 3-8, an average percent "On Track" or "Mastered" of all grades will be calculated for each tested subject.
    - This average will be calculated by taking the total number of students scoring "On Track" or "Mastered" and dividing it by the total number of students who took the test in grades 3-8.

- In high school, an average percent "On Track" or "Mastered" will be calculated for end-of-course (EOC) assessments in English I and II, Algebra or Integrated Math I, Geometry or Integrated Math II, Algebra II or Integrated Math III, Biology, and U.S. History.
    - This average will be calculated by taking the total number of students scoring

      "On Track" or "Mastered" and dividing it by the total number of students who took the tests, which will be grouped by subject.

    - EOC assessments will be grouped by subject in the following way:
        - ELA: English I and II
        - Math: Algebra or Integrated Math I, Geometry or Integrated Math II, Algebra II or Integrated Math III
        - Science: Biology
        - Social Studies: U.S. History

*If a school is not being tested in certain subject areas, the total weight will be reallocated equally among the total tested subject areas

## Comparative Performance Chart

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| Comparative Performance | 30.0% | 3.3% | Emerald Academy percentile rank, Grade 3-5 ELA* | 29.4 | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | 4 | 0.13 |
| | | 3.3% | Emerald Academy percentile rank, Grade 3-5 Math* | 31.4 | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | 4 | 0.13 |
| | | 3.3% | Emerald Academy percentile rank, Grade 3-5 Science | 21.6 | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | 4 | 0.13 |
| | | 3.3% | Emerald Academy percentile rank, Grade 6-8 ELA | 26.3 | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | 4 | 0.13 |
| | | 3.3% | Emerald Academy percentile rank, Grade 6-8 Math | 63.2 | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | 4 | 0.13 |
| | | 3.3% | Emerald Academy percentile rank, Grade 6-8 Science | 42.1 | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | 4 | 0.13 |

App.1628

## 3: School Culture (20%)

This section on the performance framework measures aspects of the school culture by assessing the school's suspension, student attrition, teacher retention, and student attendance rates.

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| School Culture | 20.0% | 1.9% | Suspension rate***, Elementary School grades | 5.01% | 5% or more | 4%-4.9% | 3%-3.9% | Less than 3% | 1 | 0.02 |
| | | 1.9% | Suspension rate***, Middle School grades | 21.37% | 20% or more | 13%-19.9% | 5%-12.9% | Less than 5% | 1 | 0.02 |
| | | 3.8% | Student attrition rate | 13.96% | 35% or more | 25%-34.9% | 15%-24.9% | Less than 15% | 4 | 0.15 |
| | | 3.8% | Teacher retention rate | 90.0% | Less than 65% | 65%-74.9% | 75%-84.9% | 85% or more | 4 | 0.15 |
| | | 3.8% | Student attendance rate | 94.7% | Less than 90% | 90%-93.9% | 94%-96.9% | 97% or more | 3 | 0.11 |

3a: The suspension rate is measured as the percentage of individual students suspended one or more times at a school during the school year. This rate includes out-of-school suspensions only.

3b: The student attrition rate is measured as the total percentage of students who left the school for reasons other than completing the highest grade in one annual cycle between Oct. 1 of a given year and Oct. 1 of the next year. This annual cycle was selected to account for student attrition during the school year and during the summer months.

3c: Teachers who are non-renewed are not included as part of the teacher retention rate. This metric will also hold harmless teachers who move into a different role at the school or in the charter management organization.

3d: The student attendance rate is measured as the average number of days students attend school as compared to the average number of days students are enrolled.

3e: Oct. 1 is commonly used as the date by which schools track official enrollment numbers because typical beginning-of-year fluctuations in enrollment even out by Oct. 1. The National Center for Education Statistics (NCES) also uses this date when referencing enrollment for a given year.

## Section II. Financial Performance

In addition to academic performance, another important indicator of short-term and long-term success of charter schools is financial performance. Annually, a charter school will be rated on the following near term and sustainability indicators. Any school that receives a "Falls Far Below" rating in any category will receive an immediate Plan of Correction to assist in remedying the deficiencies in this financial area. Three or more successive years of ratings that include a measure in the "Falls Far Below" category may result in a recommendation of immediate revocation of the charter.

| **Indicators and Measures:** | |
|---|---|
| **1.Near Term Indicators:** | **2. Sustainability Indicators:** |
| Current Ratio: 825.82 (1,302,312/1577) | Total Margin: 1.3% (98,238/7,491,389) |
| Enrollment Variance: 98.92% (445.12/450) | Debt to Asset Ratio: 53.75% (3,988,795/7,421,171) |
| Unrestricted Days Cash: 62 days (1,158,907/(6,836,781/365)) | Cash Flow: Positive |
| Default: No | Debt Service Coverage Ratio: 2.53 (654,607/258,732) |

**1: Near Term Indicators**

1(A). CURRENT RATIO:

*The Current Ratio is determined by dividing the charter school's total current assets divided by the current liabilities.*

✓ **Meets Standard**
- ☐ Current Ratio is greater than or equal to 1.1, OR
- ☐ Current Ratio is between 1.0 and 1.1 and one-year trend is positive (current year ratio is higher than last year's)
- ☐ *For schools in their first or second year of operation, the Current Ratio is greater than or equal to 1.1*

☐ **Does Not Meet Standard**
- ☐ Current Ratio is between 0.9 and 1.0 or equal to 1.0, OR
- ☐ Current Ratio is between 1.0 and 1.1 and one-year trend is negative

☐ **Falls Far Below Standard**
- ☐ Current Ratio is less than or equal to 0.9, OR
- ☐ If a school is in their first or second year of operation, Current Ratio is less than 1.1

1(B). UNRESTRICTED DAYS CASH:

*Unrestricted Days Cash divided by ([Total Expense minus Depreciation Expenses] Divided by 365)*

✓ **Meets Standard**
- ☐ 60 Days Cash, OR
- ☐ Between 30- and 60-Days Cash and one-year trend is positive
- ☐ For schools in their first or second year of operation, Days Cash is 30 days or greater

☐ **Does Not Meet Standard**
- ☐ Days Cash is between 15-30 days, OR
- ☐ Days Cash is between 30-60 days and one-year trend is negative

☐ **Falls Far Below Standard**
- ☐ Fewer than 15 days cash, OR
- ☐ For schools in their first or second year of operation, Days Cash is less than 30 days

App.1630



KCBOE03181

### 1(c). Enrollment Variance:

*Actual Enrollment divided by Enrollment Projection in Charter School Board-Approved Budget*

✓ **Meets Standard**
- ☐ Enrollment Variance equals or exceeds 95 percent in the most recent year

☐ **Does Not Meet Standard**
- ☐ Enrollment Variance is between 85 percent and 95 percent in the most recent year

☐ **Falls Far Below Standard**
- ☐ Enrollment Variance is less than 85 percent in the most recent year

### 1(d). Default:

✓ **Meets Standard**
- ☐ School is not in default of loan covenant(s) and/or is not delinquent with debt service payments

☐ **Does Not Meet Standard**
- ☐ School is in default of loan covenant(s), but has worked with lender(s) to restructure debt service payments

☐ **Falls Far Below Standard**
- ☐ School is in default of loan covenant(s) and/or is delinquent with debt service payment

## 2: Sustainability Indicators:

### 2(a). Total Margin:

*Total Margin is Net Income divided by Total Revenue, and Aggregated Total Margin is Total Three-Year Net Income divided by Total Three-Year Revenues*

✓ **Meets Standard**
- ☐ Aggregated Three-Year Total Margin is positive, and the most recent year Total Margin is positive, OR
- ☐ Aggregated Three-Year Total Margin is greater than -1.5 percent, the trend is positive for the last two years, and the most recent year Total Margin is positive
- ☐ For schools in their first or second year of operation, the cumulative Total Margin is positive

☐ **Does Not Meet Standard**
- ☐ Aggregated Three-Year Total Margin is greater than -1.5 percent, but trend does not "Meet Standard"

☐ **Falls Far Below Standard**
- ☐ Aggregated Three-Year Total Margin is less than or equal to -1.5 percent,
- ☐ The most recent year Total Margin is less than -10 percent, OR
- ☐ For schools in their first or second year of operation, the cumulative Total Margin is negative.



App.1631
KCBOE03182

### 2(B). Debt to Asset Ratio:

*Total Liabilities divided by Total Assets*

✓ **Meets Standard**
- ☐ Debt to Asset Ratio is less than 0.9

☐ **Does Not Meet Standard**
- ☐ Debt to Asset Ratio is between 0.9 and 1.0

☐ **Falls Far Below Standard**
- ☐ Debt to Asset Ratio is greater than 1.0

### 2(C). Cash Flow:

*Multi-Year Cash Flow = Year 3 Total Cash – Year 1 Total Cash; One-Year Cash Flow = Year 2 Total Cash – Year 1 Total Cash*

✓ **Meets Standard**
- ☐ Multi-Year Cumulative Cash Flow is Positive, and Cash Flow is positive each year, OR
- ☐ Multi-Year Cumulative Cash Flow is positive, Cash Flow is positive in one of two years, and Cash Flow in the most recent year is positive
- ☐ For schools in their first or second year of operation, cash flow is positive

☐ **Does Not Meet Standard**
- ☐ Multi-Year Cumulative Cash Flow is positive, but trend does not "Meet Standard"

☐ **Falls Far Below Standard**
- ☐ Multi-Year Cumulative Cash Flow is negative, OR
- ☐ For schools in their first or second year of operation, cash flow is negative

### 2(D). Debt Service Coverage Ratio:

*(Net Income + Depreciation + Interest Expense) divided by (Annual Principal, Interest, and Lease Payments)*

✓ **Meets Standard**
- ☐ Debt Service Coverage Ratio is equal to or exceeds 1.1

☐ **Does Not Meet Standard**
- ☐ Debt Service Coverage Ratio is less than 1.1

☐ **Falls Far Below Standard**
- ☐ Not Applicable

App.1632



KCBOE03183

## Financial Performance Chart

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| Financial Performance | 3% | 3.0% | Annual budget variance | NA | Exceeds 15% of the annual budget | Exceeds between 10% - 15% of the annual budget | Does not exceed 10% of the annual budget | Does not exceed the annual budget | 3 | 0.09 |
| | 3% | 3.0% | Most recent annual audit | NA | Audit does not have an unqualified opinion and finds material weakness in controls | Audit either does not have an unqualified opinion or finds material weakness in controls | Audit has an unqualified opinion and finds no material weakness in controls | Audit has an unqualified opinion, finds no material weakness in controls, and the organization receives the Certificate of Excellence in Financial Reporting Award from the Association of School Business Officials | 3 | 0.09 |
| | 3% | 3.0% | Monthly financial reports | NA | No monthly financial reports provided to Chartering Authority | Financial reports provided to the Chartering Authority, but not monthly | Financial reports provided to the Chartering Authority on a monthly basis, but not within 30 days of each month's end | Financial reports provided to the Chartering Authority on a monthly basis, with each report submitted within 30 days of that month's end | 4 | 0.12 |
| | 3% | 3.0% | Fundraising | NA | Less than 80% of all targets met | 80% - 89.9% of all targets met | 90% - 100% of all targets met | all targets exceeded | 4 | 0.12 |
| | 3% | 3.0% | Enrollment variance | NA | Less than 85 % in the most recent year | 85% - 94.9% in the most recent year | 95% - 99.9% in the most recent year | equals or exceeds 100% in the most recent year | 3 | 0.09 |
| | 1% | 1.0% | Current Ratio | N/A | less than 0.9 | 0.9 - 1.0 | 1.1 - 1.2 | greater than 1.2 | 4 | 0.04 |
| | 3% | 3.0% | Debt Analysis/Default | NA | School is in default of loan covenant(s) and/or is delinquent with debt service payment | School is in default of loan covenant(s), but has worked with lender(s) to restructure debt service payments | School is not in default of loan covenant(s) and/or is not delinquent with debt service payments | School is not in default of loan covenant(s) and/or is not delinquent with debt service payments. Principal balance has declined from prior year. | 4 | 0.12 |

**OVERALL** (Absolute Achievement Chart- p. 4; Comparative Performance Chart- p. 6; School Culture Chart- p. 7; Financial Performance Chart- p. 12)

**Weighted Average Total Score = 3; Meets Standard**

## SECTION III: ORGANIZATIONAL PERFORMANCE

A charter school's performance in the organizational measures is a large piece of the overall health of a charter school. Deficiencies or weaknesses in organizational performance may be an indicator of the overall health of the charter school. Any school that receives a "Falls Far Below" rating in any category will receive an immediate Plan of Correction to assist in remedying the deficiencies in this organizational area. Three or more successive years of ratings that include a measure in the "Falls Far Below" category may result in a recommendation of immediate revocation of the charter.

| **Indicators and Measures:** | |
|---|---|
| **1. Education Program:** | **4. Students and Employees** |
| a. Charter Terms | a. Rights of Students |
| b. Compliance with Education Requirements | b. Credentialing |
| c. Students with Disabilities Rights | a. Rights of Students |
| d. English Language Learner Rights | d. Background Checks |
| | |
| **2. Financial Management and Oversight** | **5. School Environment** |
| a. Financial Reporting and Compliance Reporting | a. Facilities and Transportation |
| b. Generally Accepted Accounting Principles | b. Health and Safety |
| | c. Information Handling |
| | |
| **3. Governance and Reporting** | **6. Additional Obligations** |
| a. Governance Requirements | a. All Other Obligations |
| b. Accountability of Management | |
| c. Reporting Requirement | |



App.1634

KCBOE03185

## 1: Education Program

### 1(a). Is the school implementing the material terms of the education program as defined in the current charter contract?

- ✓ **Meets Standard**
  - □ The school implemented the material terms of the education program in all material respects and the education program in operation reflects the material terms as defined in the charter contract, or the school has gained approval for a charter modification to the material terms.
- □ **Does Not Meet Standard**
  - □ The school failed to implement the material terms of the education program as defined in the charter agreement; however, the school promptly came into compliance once the shortcoming(s) were identified.
- □ **Falls Far Below Standard**
  - □ The school failed to implement the material terms of the education program as defined in the charter agreement in the manner described above.

### 1(b). Is the school complying with applicable education requirements?

- ✓ **Meets Standard**
  - □ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to education requirements, including but not limited to:
    - o Instructional days or minutes requirements
    - o Graduation and promotion requirements
    - o Content standards
    - o State assessments
    - o Implementation of mandated programming as a result of state or federal funding
- □ **Does Not Meet Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to education requirements as described above; however, the school promptly came into compliance once the shortcoming(s) were
- □ **Falls Far Below Standard**
  - □ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to education requirements as described above.

### 1(c). Is the school protecting the rights of students with disabilities?

✓ **Meets Standard**

- ☐ Consistent with the school's status and responsibilities, the school materially complies with applicable laws, rules, regulations, and provisions of the charter contract (including the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act) relating to the treatment of students with identified disabilities and those suspected of having a disability, including but not limited to:
  - Equitable access and opportunity to enroll
  - Identification and referral
  - Appropriate development and implementation of Individualized Education Plans and Section 504 plans
  - Operational compliance, including provision of services in the least restrictive environment and appropriate inclusion in the school's academic program, assessments, and extracurricular activities
  - Discipline, including due process protections, manifestation determinations, and behavioral intervention plans
  - Access to the school's facility and programs in a lawful manner and consistent with students' IEPs or Section 504 Plans
  - Securing of all applicable funding

☐ **Does Not Meet Standard**

- ☐ The school did not materially comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the treatment of students with identified disabilities and those suspected of having a disability in the manner described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to the treatment of students with identified disabilities and those suspected of having a disability in the manner described above.



App.1636

KCBOE03187

### 1(D). IS THE SCHOOL PROTECTING THE RIGHTS OF ENGLISH LANGUAGE LEARNER (ELL) STUDENTS?

- ✓ **Meets Standard**
  - ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract (including Title III of the Elementary and Secondary Education Act (ESEA) and the US Department of Education authorities) relating to the English Language Learner requirements, including but not limited to:
    - Required policies related to the service of ELL students
    - Proper steps for identification of students in need of ELL services
    - Appropriate and equitable delivery of services to identified students
    - Appropriate accommodations on assessments
    - Exiting of students from ELL services
    - Ongoing monitoring of exited students
- ☐ **Does Not Meet Standard**
  - ☐ The school did not materially comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to English Language Learner requirements in the manner described above; however, the school promptly came into compliance once the shortcoming(s) were identified.
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to English Language Learner requirements in the manner described above.



App.1637

KCBOE03188

## 2: Financial Management

### 2(A). Is the school meeting financial reporting and compliance requirements?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to financial reporting requirements, including but not limited to:
  - o Complete and on-time submission of financial reports, including annual budget, revised budget (if applicable), periodic financial reports as required by the authorizer, and any reporting requirements if the board contracts with an Education Service Provider (ESP)
  - o On-time submission and completion of annual independent audit and corrective action plans, if applicable.
  - o All reporting requirements related to the use of public fund

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial reporting requirements as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial reporting requirements as described above.

### 2(B). Is the school following Generally Accepted Accounting Principles?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to financial management and oversight expectations as evidenced by an annual independent audit, including but not limited to:
  - o An unqualified audit opinion
  - o An audit devoid of significant findings and conditions, material weaknesses, or significant internal control weaknesses
  - o An audit that does not include a going concern disclosure in the notes or an explanatory paragraph within the audit report

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial management and oversight expectations as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial management and oversight expectations as described above.

App.1638



KCBOE03189

## 3: Governance and Reporting

### 3(A). Is the school complying with governance requirements?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to governance by its board, including but not limited to:
  - o Board policies, including those related to oversight of an Education Service Provider (ESP), if applicable
  - o Board bylaws
  - o State open meetings law
  - o Code of ethics
  - o Conflicts of interest
  - o Board composition and/or membership rules (e.g., requisite number of qualified teachers, ban on employees or contractors serving on the board, etc.)
  - o Compensation for attendance at meetings

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to governance by its board as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to governance by its board as described above.

### 3(B). Is the school holding management accountable?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to oversight of school management, including but not limited to:
  - o (For Education Service Providers [ESPs]) Maintaining authority over management, holding it accountable for performance as agreed under a written performance agreement, and requiring annual financial reports of the ESP
  - o (For Others) Oversight of management that includes holding it accountable for performance expectations which may or may not be agreed to under a written performance agreement

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to oversight of school management; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to oversight of school Management as described above.

### 3(c). Is the school complying with reporting requirements?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to relevant reporting requirements to the school's authorizer, State Education Agency (SEA), and/or federal authorities, including but not limited to:
  - Accountability tracking
  - Attendance and enrollment reporting
  - Compliance and oversight
  - Additional information requested by authorizer

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to relevant reporting requirements as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement as described above.

## 4: Students and Employees

### 4(A). Is the school protecting the rights of all students?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students, including but not limited to:
  - o Policies and practices related to admissions, lottery, waiting lists, fair and open recruitment, and enrollment (including rights to enroll or maintain enrollment)
  - o The collection and protection of student information (that could be used in discriminatory ways or otherwise contrary to law)
  - o Due process protections, privacy, civil rights, and student liberties requirements, including First Amendment protections and the Establishment Clause restrictions prohibiting public schools from engaging in religious instruction
  - o Conduct or discipline (discipline hearings and suspension and expulsion policies and practices)

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students as described above.



App.1641
KCBOE03192

### 4(B). IS THE SCHOOL MEETING TEACHER AND OTHER STAFF CREDENTIALING REQUIREMENTS?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract (including the federal Highly Qualified Teacher and Paraprofessional requirements within Title II of the Elementary and Secondary Education Act [ESEA]) relating to state certification requirements.

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to state certification requirements; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to state certification requirements.

### 4(C). IS THE SCHOOL COMPLYING WITH LAWS REGARDING EMPLOYEE RIGHTS?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations, including those relating to the Family Medical Leave Act, the Americans with Disabilities Act, and employment contracts. The school does not interfere with employees' rights to organize collectively or otherwise violate staff collective bargaining rights.

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations.



App.1642

KCBOE03193

### 4(d). Is the school completing required background checks?

✓ **Meets Standard**
- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to background checks of all applicable individuals (including staff and members of the charter community, where applicable).

☐ **Does Not Meet Standard**
- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to background checks; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**
- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to background checks.

## 5: School Environment

### 5(a). Is the school complying with facilities and transportation requirements?

✓ **Meets Standard**
- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to the school facilities, grounds, and transportation, including but not limited to:
  - Americans with Disabilities Act (ADA)
  - Fire inspections and related records
  - Viable certificate of occupancy or other required building use authorization
  - Documentation of requisite insurance coverage
  - Student transportation

☐ **Does Not Meet Standard**
- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the school facilities, grounds, and transportation as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**
- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to school facilities, grounds, and transportation as described above.



App.1643

KCBOE03194

### 5(B). IS THE SCHOOL COMPLYING WITH HEALTH AND SAFETY REQUIREMENTS?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to safety and the provision of health-related services, including but not limited to:
  - Appropriate nursing services and dispensing of pharmaceuticals
  - Food service requirements
  - Other district services, if applicable

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to safety and the provision of health-related services as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to safety and the provision of health-related services as described above.

### 5(C). IS THE SCHOOL HANDLING INFORMATION APPROPRIATELY?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to handling of information, including but not limited to:
  - Maintaining the security of and providing access to student records under the Family Educational Rights and Privacy Act and other applicable authorities
  - Accessing documents maintained by the school under the state's Freedom of Information law and other applicable authorities
  - Transferring of student records
  - Proper and secure maintenance of testing materials.

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the handling of information as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the handling of information as described above.



App.1644

KCBOE03195

## 6: Additional Obligations

Is the school complying with all other obligations?

✓ **Meets Standard**

- ☐ The school materially complies with all other material legal, statutory, regulatory, or contractual requirements contained in its charter contract that are not otherwise explicitly stated herein, including but not limited to requirements from the following sources:
  - o Revisions to state charter law
  - o Consent decrees
  - o Intervention requirements by the authorizer
  - o Requirements by other entities to which the school is accountable (e.g., State Education Agency [SEA])

☐ **Does Not Meet Standard**

- ☐ The school failed to materially comply with all other material, legal, statutory, regulatory, or contractual requirements contained in its charter contract that are not otherwise explicitly stated herein as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions contained in its charter contract that are not otherwise explicitly stated herein as described above.

## Charter Evaluation Feedback:

Commendations:

- In the Student Achievement section, Emerald Academy achieved a Level 5 in the *Growth* metric. Additionally, the school increased from last year's data to a grade level of C for the *Absolute Achievement* metric. Both of these improvements from last year show the positive impact that Emerald Academy is having on student learning in both achievement and growth.
- The entire Comparative Performance section has remained steady at a level 4 on the performance framework, with significant growth in grades 6-8, specifically in Math and Science.
- A continued trend over the last three years has been an increase in the *Teacher Retention Rate* metric, which was at 90% for the current year (increasing from 70.5% and 84% in the two prior years). Recruiting and retaining high-quality educators will lead to academic gains for students.
- Emerald Academy continues to have fiscally sound financial operations that either meet or exceed all standards.

Recommendations:

- Emerald Academy should review the factors surrounding *Chronic Absenteeism,* which is now at a grade of D, where it had been an A for the prior two consecutive years.
- Within the School Culture section for the *Suspension Rate for middle school grades*, we had seen a decreasing trend since 2020 (20.1% in 2020-21, 19.9% in 2021-22, and 12.9% in 2022-23). Both last year (18.2%) and this year (21.4%), we have seen an increased rate. An additional examination of the reasons for suspension may highlight opportunities to review behavioral expectations.

As a result of the above evaluation, Emerald Academy is:

__✓__Approved and in good standing (On track for renewal)

_____Approved and in need of improvement

_____Unapproved (Plan of Correction required to address the following deficiency: Due Date______)

Signature: Theresa Nixon Date: November 12, 2025

Theresa Nixon, Executive Director of Academic Supports, Knox County Schools

Signature: Steve Diggs Date: November 20, 2025

Steve Diggs, President, Emerald Charter Schools



KCBOE03197

App.1646

**KNOX COUNTY BOARD OF EDUCATION**

This Document is approved by the Knox County Board of Education on the 4th day of December, 2025 as reflected in its minutes, and certified by its Chairperson.

Kristi Kristy

**Kristi Kristy, Chair**

**Date:** 12-04-2025

Approved by
Knox County Board of Education
December 4, 2025

**DIRECTOR OF SCHOOLS**

**Dr. Jon Rysewyk, Superintendent**

**Date:** 12/8/2025

**KNOX COUNTY LAW DEPARTMENT**

**CONTRACT #:** 25-739

**APPROVED AS TO LEGAL FORM**

**Gary Dupler, Deputy Law Director**

**Date:** 11/7/2025

**Emerald Academy Response**
**November 13, 2025**

Emerald Academy (EA) opened as a new charter school on July 27, 2015. The 2024-25 school year was Emerald Academy's tenth year of operations, during which its charter was renewed for another 10-year term. The school served scholars in grades K-8, with an average daily enrollment of 444 scholars.

- In its first year (2015-16), Emerald served kindergarten and first grade scholars.
- In 2016-17, Emerald expanded by two grade levels, to serve second and sixth graders.
- In 2017-18, 2018-19, and 2019-20, Emerald expanded the grade levels it served, as current scholars moved to subsequent grade levels.
- The 2019-20 school year was the first year in which EA served scholars in every grade level, K-8.

EA's mission is *to prepare urban scholars for the college of their choice and community leadership.*

We are pleased that 2024-25 state assessment data confirms that Emerald Academy continues to change the trajectory of learning outcomes for urban youth and is closing the academic achievement gap for our scholars as a result.

- ***Schoolwide proficiency—across all tested grades and subjects—has increased every year for the past five school years***, including an 11% increase from 2023-24 to 2024-25. Over the past five years, EA's schoolwide proficiency rate has increased by 56%, from 19.7% in 2020-21 to 30.7% in 2024-25. This exceeds the statewide five-year rate of increase in each of the four tested subjects (ELA – 37%, Math – 48%, Science – 23%, and Social Studies – 31%).
- ***Emerald Academy 3rd graders had the largest one-year gain in reading proficiency across all of Knox County***, a clear indication that EA is setting up its young scholars for future success. In addition, our 3rd graders outperformed both the district and the entire state in reading proficiency.
- ***Emerald Academy's lower-income scholars outperformed their peers across the entire state in ELA and Math.*** They also outperformed their peers across the district in each of the four tested subjects – ELA, Math, Science, and Social Studies.
- ***Emerald Academy earned a Level 5 growth score—the highest rating possible***—indicating that our scholars' academic progress was significantly greater than students across the entire state.
- In addition, ***the majority of Emerald Academy teachers who taught tested subjects achieved at least Level 3 growth with their scholars***. This demonstrates that EA is providing scholars with high-quality instruction across grade levels and academic subjects.

We also are pleased by the progress Emerald Academy has made in areas related to school culture. Our teacher retention rate in 2024-25 was the highest in school history and our scholar attrition rate remained low – testaments to staff and family satisfaction with the school. In addition, we have taken steps to reduce chronic absenteeism and suspension rates, while maintaining high expectations. To date in 2025-26, we have had no out-of-school suspensions in our middle school grades and only one overall.

In summary, Emerald Academy continues to deliver on the mission outlined in its charter agreement with Knox County Schools. Academically, financially, and culturally, the school is well-managed and is delivering on its mission by achieving strong results.

Department of Education | Charter Schools

# Knox County Schools

# Knoxville Preparatory School (Knox Prep)

# Charter Performance Framework



App.1649

KCBOE03200

## Introduction

Pursuant to Tennessee Code Annotated (T.C.A.) § 49-13-143, the chartering authority must adopt a performance framework for its charter schools. Knox County Schools has adopted the model performance framework developed by The Tennessee Department of Education with a few modifications to comply with this statute and to provide objective assessment and feedback to the charter schools within its supervision.

This model is based on the framework created by the Tennessee State Board of Education in 2014 and revised in February 2020.

## Section I. Academic Performance & School Culture

Pursuant to T.C.A § 49-13-102, two of the purposes of a charter school are to improve learning for all students and to ensure that children have the opportunity to reach proficiency on state academic assessments. In addition, the law states that "[t]he performance-related provisions within a charter agreement shall be based on a performance framework that clearly sets forth the academic and operational performance indicators, measures, and metrics that will guide the authorizer's evaluation of each public charter school."[1] For students, families, and the community, the main question that needs to be answered is: "Is this school a high-achieving school?" With increased school autonomy, a bedrock of charter school authorization, comes the expectation of high academic achievement. The following pages outline the measures by which a charter school's academic performance may be evaluated for purposes of yearly monitoring, potential interventions and plans of correction, and renewal and revocation decisions. A school will be evaluated on each performance measure and will receive a rating for each measure as well as a composite score that encompasses the entire academic performance framework.

---

[1] T.C.A. § 49-13-143(a)

The academic performance framework is made up of three key areas, which are outlined below. Additional details and explanations about these areas are included in the pages that follow.

1. Student Achievement (50%)
2. Comparative Performance (30%)
3. School Culture (20%)



KCBOE03201

## 1: Student Achievement (50%)

Charter schools will be evaluated in the following three areas in student achievement. The total weight of the following three areas equals 50 percent of the total final score for this area.

1. *Absolute Achievement:* Absolute achievement will be measured by the percentage of students scoring "On Track" or "Mastered" on the Tennessee state assessments in the subject areas of ELA, Math, and Science. The total scoring weight for absolute achievement is 25 percent with each subject area consisting of 8.3 percent of the total 25 percent. If a school is not being tested in a certain area, the total of 25 percent will be reallocated equally among the total tested subject areas.

2. *Growth:* Growth in achievement will be measured by the TVAAS overall composite index. TVAAS composites are reported on a 1-5 scale and are one-year scores.

3. *Chronic Absenteeism:* Defined as the percent of students missing 10 percent or more of enrolled school days.

---

[2] For the 2024-2025 report, Knox County Schools has used the following process. As of November 2, 2023, a new process to calculate school letter grades (A-F) was presented to the State Board of Education. At the time this report was submitted to the Knox County Board of Education (November 5, 2025), the school letter grades had not yet been released. To create a metric for Achievement and Chronic Absenteeism, the KCS Research, Evaluation, and Assessment department used the federal accountability outcomes for SY2425 for the charter school (All students group weighted at 60% with the average of available subgroups weighted at 40%). Then per the SY2122 accountability protocol (the most recent protocol available), the indicator scores were translated to grades (page 44 of the state protocol). These calculations were used to determine both **Absolute Achievement** and **Chronic Absenteeism** for this report.

**Timeline of Review**

November 5, 2025: KCS Shared Performance Framework with Schools and submitted for KCBOE review

December 4, 2025: Regular Voting Session for KCBOE

November/December: Performance Review shared with the charter school governing board

January 1, 2026: KCS Annual Report submitted to the state



App.1651

KCBOE03202

## Absolute Achievement Chart

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| *Absolute Achievement* | *25%* | *25%* | *All students' achievement grade as reported on the TN state report card. Letter grade reflects the best of performance against absolute performance targets and AMO performance targets (see page 3 for calculation)* | D | *F* | *D* | *C* | *A or B* | 2 | 0.50 |
| Growth | 20% | 20% | TVAAS overall Composite Level (All Students, All Subjects) | 1 | Level 1 | Level 2 | Level 3 | Level 4&5 | 1 | 0.20 |
| *Chronic Absenteeism* | *5%* | *5%* | *Chronic absenteeism grade as reported on the TN state report card. Letter grade reflects the best of performance against absolute performance targets and AMO performance targets (see page 3 for calculation)* | D | *F* | *D* | *C* | *A or B* | 2 | 0.10 |

**As this was the first year of operation for Knoxville Preparatory School, no AMO performance targets were available for Absolute Achievement or Chronic Absenteeism. All data reflect only the absolute performance target.*

App.1652

KCBOE03203

## 2: Comparative Performance (30%)

This section of the performance framework measures comparative performance between the charter school and the authorizing district average in the subject areas of English/language arts, mathematics, science, and social studies. Comparison of charter performance to the authorizing district average allows for the evaluation of whether the charter school is providing a better option for students. Comparative achievement will be measured by evaluating the percentage of students who scored "On Track" or "Mastered" on the state assessments at the charter school, as compared to the authorizing district average.

- In grades 3-8, an average percent "On Track" or "Mastered" of all grades will be calculated for each tested subject.
  - This average will be calculated by taking the total number of students scoring "On Track" or "Mastered" and dividing it by the total number of students who took the test in grades 3-8.

- In high school, an average percent "On Track" or "Mastered" will be calculated for end-of-course (EOC) assessments in English I and II, Algebra or Integrated Math I, Geometry or Integrated Math II, Algebra II or Integrated Math III, Biology, and U.S. History.
  - This average will be calculated by taking the total number of students scoring

    "On Track" or "Mastered" and dividing it by the total number of students who took the tests, which will be grouped by subject.

  - EOC assessments will be grouped by subject in the following way:
    - ELA: English I and II
    - Math: Algebra or Integrated Math I, Geometry or Integrated Math II, Algebra II or Integrated Math III
    - Science: Biology
    - Social Studies: U.S. History

*If a school is not being tested in certain subject areas, the total weight will be reallocated equally among the total tested subject areas

App.1653



KCBOE03204

App.1654

## Comparative performance Chart

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| Comparative Performance | 30.0% | 6.7% | Knox Prep percentile rank, Grade 6-8 ELA | 21.1 | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | 4 | 0.27 |
| | | 6.7% | Knox Prep percentile rank, Grade 6-8 Math | 21.1 | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | 4 | 0.27 |
| | | 6.7% | Knox Prep percentile rank, Grade 6-8 Science | 21.1 | Achievement (%otm) less than 10th percentile in district | Achievement (%otm) greater than or equal to the 10th percentile, but less than the 15th percentile in district | Achievement (%otm) greater than or equal to the 15th percentile, but less than the 20th percentile in district | Achievement (%otm) at or above the 20th percentile in the district | 4 | 0.27 |



KCBOE03205

## 3: School Culture (20%)

This section on the performance framework measures aspects of the school culture by assessing the school's suspension, student attrition, teacher retention, and student attendance rates.

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| School Culture | 20.0% | 3.8% | Suspension rate***, Middle School grades | 32.29% | 20% or more | 13%-19.9% | 5%-12.9% | Less than 5% | 1 | 0.04 |
| | | 3.8% | Student attrition rate | 23.18% | 35% or more | 25%-34.9% | 15%-24.9% | Less than 15% | 3 | 0.11 |
| | | 3.8% | Teacher retention rate | 62.5% | Less than 65% | 65%-74.9% | 75%-84.9% | 85% or more | 1 | 0.04 |
| | | 3.8% | Student attendance rate | 91.8% | Less than 90% | 90%-93.9% | 94%-96.9% | 97% or more | 2 | 0.08 |

[3a]: The suspension rate is measured as the percentage of individual students suspended one or more times at a school during the school year. This rate includes out-of-school suspensions only.

[3b]: The student attrition rate is measured as the total percentage of students who left the school for reasons other than completing the highest grade in one annual cycle between Oct. 1 of a given year and Oct. 1 of the next year. This annual cycle was selected to account for student attrition during the school year and during the summer months.

[3c]: Teachers who are non-renewed are not included as part of the teacher retention rate. This metric will also hold harmless teachers who move into a different role at the school or in the charter management organization.

[3d]: The student attendance rate is measured as the average number of days students attend school as compared to the average number of days students are enrolled.

[3e]: Oct. 1 is commonly used as the date by which schools track official enrollment numbers because typical beginning-of-year fluctuations in enrollment even out by Oct. 1. The National Center for Education Statistics (NCES) also uses this date when referencing enrollment for a given year.

In addition to academic performance, another important indicator of short-term and long-term success of charter schools is financial performance. Annually, a charter school will be rated on the following near term and sustainability indicators. Any school that receives a "Falls Far Below" rating in any category will receive an immediate Plan of Correction to assist in remedying the deficiencies in this financial area. Three or more successive years of ratings that include a measure in the "Falls Far Below" category may result in a recommendation of immediate revocation of the charter.

| **Indicators and Measures:** | |
|---|---|
| **1. Near-Term Indicators:** | **2. Sustainability Indicators:** |
| Current Ratio: 11.89 (3,047,589.71/256,231.40) | Total Margin: -1% (-28,767.68/2,777,184.13) |
| Enrollment Variance: 85% (89.2/105) | Debt to Asset Ratio: 18.58% (847,987.71/4,564,638.39) |
| Unrestricted Days Cash: 6 days (43,982/(2,732,100/365)) | Cash Flow: Positive |
| Default: No | Debt Service Coverage Ratio: .4246 ((-28,767.68+55,772.18)/63,605.28) |

**1: Near-Term Indicators**

### 1(A). Current Ratio:

*The Current Ratio is determined by dividing the charter school's total current assets divided by the current liabilities.*

- ✓ **Meets Standard**
  - ☐ Current Ratio is greater than or equal to 1.1, OR
  - ☐ Current Ratio is between 1.0 and 1.1 and one-year trend is positive (current year ratio is higher than last year's)
  - ☐ *For schools in their first or second year of operation, the Current Ratio is greater than or equal to 1.1*
- ☐ **Does Not Meet Standard**
  - ☐ Current Ratio is between 0.9 and 1.0 or equal to 1.0, OR
  - ☐ Current Ratio is between 1.0 and 1.1 and one-year trend is negative
- ☐ **Falls Far Below Standard**
  - ☐ Current Ratio is less than or equal to 0.9, OR
  - ☐ If a school is in their first or second year of operation, Current Ratio is less than 1.1

### 1(B). Unrestricted Days Cash:

*Unrestricted Days Cash divided by ([Total Expense minus Depreciation Expenses] Divided by 365)*

- ☐ **Meets Standard**
  - ☐ 60 Days Cash, OR
  - ☐ Between 30- and 60-Days Cash and one-year trend is positive
  - ☐ For schools in their first or second year of operation, Days Cash is 30 days or greater
- ☐ **Does Not Meet Standard**
  - ☐ Days Cash is between 15-30 days, OR
  - ☐ Days Cash is between 30-60 days and one-year trend is negative
- ✓ **Falls Far Below Standard**
  - ☐ Fewer than 15 days cash, OR
  - ☐ For schools in their first or second year of operation, Days Cash is less than 30 days

App.1657

KCBOE03208

### 1(c). Enrollment Variance:

*Actual Enrollment divided by Enrollment Projection in Charter School Board-Approved Budget*

- ☐ **Meets Standard**
  - ☐ Enrollment Variance equals or exceeds 95 percent in the most recent year
- ✓ **Does Not Meet Standard**
  - ☐ Enrollment Variance is between 85 percent and 95 percent in the most recent year
- ☐ **Falls Far Below Standard**
  - ☐ Enrollment Variance is less than 85 percent in the most recent year

### 1(d). Default:

- ✓ **Meets Standard**
  - ☐ School is not in default of loan covenant(s) and/or is not delinquent with debt service payments
- ☐ **Does Not Meet Standard**
  - ☐ School is in default of loan covenant(s), but has worked with lender(s) to restructure debt service payments
- ☐ **Falls Far Below Standard**
  - ☐ School is in default of loan covenant(s) and/or is delinquent with debt service payment

## 2: Sustainability Indicators:

### 2(a). Total Margin:

*Total Margin is Net Income divided by Total Revenue, and Aggregated Total Margin is Total Three-Year Net Income divided by Total Three-Year Revenues*

- ☐ **Meets Standard**
  - ☐ Aggregated Three-Year Total Margin is positive, and the most recent year Total Margin is positive, OR
  - ☐ Aggregated Three-Year Total Margin is greater than -1.5 percent, the trend is positive for the last two years, and the most recent year Total Margin is positive
  - ☐ For schools in their first or second year of operation, the cumulative Total Margin is positive
- ☐ **Does Not Meet Standard**
  - ☐ Aggregated Three-Year Total Margin is greater than -1.5 percent, but trend does not "Meet Standard"
- ✓ **Falls Far Below Standard**
  - ☐ Aggregated Three-Year Total Margin is less than or equal to -1.5 percent,
  - ☐ The most recent year Total Margin is less than -10 percent, OR
  - ☐ For schools in their first or second year of operation, the cumulative Total Margin is negative.



App.1658

KCBOE03209

### 2(B). Debt to Asset Ratio:

*Total Liabilities divided by Total Assets*

- ✓ **Meets Standard**
  - ☐ Debt to Asset Ratio is less than 0.9
- ☐ **Does Not Meet Standard**
  - ☐ Debt to Asset Ratio is between 0.9 and 1.0
- ☐ **Falls Far Below Standard**
  - ☐ Debt to Asset Ratio is greater than 1.0

### 2(C). Cash Flow:

*Multi-Year Cash Flow = Year 3 Total Cash – Year 1 Total Cash; One-Year Cash Flow = Year 2 Total Cash – Year 1 Total Cash*

- ✓ **Meets Standard**
  - ☐ Multi-Year Cumulative Cash Flow is Positive, and Cash Flow is positive each year, OR
  - ☐ Multi-Year Cumulative Cash Flow is positive, Cash Flow is positive in one of two years, and Cash Flow in the most recent year is positive
  - ☐ For schools in their first or second year of operation, cash flow is positive
- ☐ **Does Not Meet Standard**
  - ☐ Multi-Year Cumulative Cash Flow is positive, but trend does not "Meet Standard"
- ☐ **Falls Far Below Standard**
  - ☐ Multi-Year Cumulative Cash Flow is negative, OR
  - ☐ For schools in their first or second year of operation, cash flow is negative

### 2(D). Debt Service Coverage Ratio:

*(Net Income + Depreciation + Interest Expense) divided by (Annual Principal, Interest, and Lease Payments)*

- ☐ **Meets Standard**
  - ☐ Debt Service Coverage Ratio is equal to or exceeds 1.1
- ✓ **Does Not Meet Standard**
  - ☐ Debt Service Coverage Ratio is less than 1.1
- ☐ **Falls Far Below Standard**
  - ☐ Not Applicable

| Section | Section Weight | Redistributed Weight | Indicator | Metric | Falls Far Below Standard 1 | Does Not Meet Standard 2 | Meets Standard 3 | Exceeds Standard 4 | Section Score | Weighted Score |
|---|---|---|---|---|---|---|---|---|---|---|
| Financial Performance | 3% | 3.0% | Annual budget variance | NA | Exceeds 15% of the annual budget | Exceeds between 10% - 15% of the annual budget | Does not exceed 10% of the annual budget | Does not exceed the annual budget | 4 | 0.12 |
| | 3% | 3.0% | Most recent annual audit | NA | Audit does not have an unqualified opinion and finds material weakness in controls | Audit either does not have an unqualified opinion or finds material weakness in controls | Audit has an unqualified opinion and finds no material weakness in controls | Audit has an unqualified opinion, finds no material weakness in controls, and the organization receives the Certificate of Excellence in Financial Reporting Award from the Association of School Business Officials | 3 | 0.09 |
| | 3% | 3.0% | Monthly financial reports | NA | No monthly financial reports provided to Chartering Authority | Financial reports provided to the Chartering Authority, but not monthly | Financial reports provided to the Chartering Authority on a monthly basis, but not within 30 days of each month's end | Financial reports provided to the Chartering Authority on a monthly basis, with each report submitted within 30 days of that month's end | 3 | 0.09 |
| | 3% | 3.0% | Fundraising | NA | Less than 80% of all targets met | 80% - 89.9% of all targets met | 90% - 100% of all targets met | all targets exceeded | 4 | 0.12 |
| | 3% | 3.0% | Enrollment variance | NA | Less than 85 % in the most recent year | 85% - 94.9% in the most recent year | 95% - 99.9% in the most recent year | equals or exceeds 100% in the most recent year | 2 | 0.06 |
| | 1% | 1.0% | Current Ratio | NA | less than 0.9 | 0.9 - 1.0 | 1.1 - 1.2 | greater than 1.2 | 4 | 0.04 |
| | 3% | 3.0% | Debt Analysis/Default | NA | School is in default of loan covenant(s) and/or is delinquent with debt service payment | School is in default of loan covenant(s), but has worked with lender(s) to restructure debt service payments | School is not in default of loan covenant(s) and/or is not delinquent with debt service payments | School is not in default of loan covenant(s) and/or is not delinquent with debt service payments. Principal balance has declined from prior year. | 4 | 0.12 |

**OVERALL** (Absolute Achievement Chart- p. 4; Comparative Performance Chart- p. 6; School Culture Chart- p. 7; Financial Performance Chart- p. 12)

**Weighted Average Total Score = 2; Does Not Meet Standard**



App.1660

KCBOE03211

App.1661

## Section III: Organizational Performance

A charter school's performance in the organizational measures is a large piece of the overall health of a charter school. Deficiencies or weaknesses in organizational performance may be an indicator of the overall health of the charter school. Any school that receives a "Falls Far Below" rating in any category will receive an immediate Plan of Correction to assist in remedying the deficiencies in this organizational area. Three or more successive years of ratings that include a measure in the "Falls Far Below" category may result in a recommendation of immediate revocation of the charter.

| Indicators and Measures: | |
|---|---|
| **1. Education Program:** | **4. Students and Employees** |
| a. Charter Terms | a. Rights of Students |
| b. Compliance with Education Requirements | b. Credentialing |
| c. Students with Disabilities Rights | c. Rights of Employees |
| d. English Language Learner Rights | d. Background Checks |
| | |
| **2. Financial Management and Oversight** | **5. School Environment** |
| a. Financial Reporting and Compliance Reporting | a. Facilities and Transportation |
| b. Generally Accepted Accounting Principles | b. Health and Safety |
| | c. Information Handling |
| | |
| **3. Governance and Reporting** | **6. Additional Obligations** |
| a. Governance Requirements | a. All Other Obligations |
| b. Accountability of Management | |
| c. Reporting Requirement | |



KCBOE03212

## 1: Education Program

### 1(A). Is the school implementing the material terms of the education program as defined in the current charter contract?

✓ **Meets Standard**

- ☐ The school implemented the material terms of the education program in all material respects and the education program in operation reflects the material terms as defined in the charter contract, or the school has gained approval for a charter modification to the material terms.

☐ **Does Not Meet Standard**

- ☐ The school failed to implement the material terms of the education program as defined in the charter agreement; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to implement the material terms of the education program as defined in the charter agreement in the manner described above.

### 1(B). Is the school complying with applicable education requirements?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to education requirements, including but not limited to:
  - o Instructional days or minutes requirements
  - o Graduation and promotion requirements
  - o Content standards
  - o State assessments
  - o Implementation of mandated programming as a result of state or federal funding

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to education requirements as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to education requirements as described above.



App.1662

KCBOE03213

### 1(c). IS THE SCHOOL PROTECTING THE RIGHTS OF STUDENTS WITH DISABILITIES?

- ☐ **Meets Standard**
  - ☐ Consistent with the school's status and responsibilities, the school materially complies with applicable laws, rules, regulations, and provisions of the charter contract (including the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act) relating to the treatment of students with identified disabilities and those suspected of having a disability, including but not limited to:
    - Equitable access and opportunity to enroll
    - Identification and referral
    - Appropriate development and implementation of Individualized Education Plans and Section 504 plans
    - Operational compliance, including provision of services in the least restrictive environment and appropriate inclusion in the school's academic program, assessments, and extracurricular activities
    - Discipline, including due process protections, manifestation determinations, and behavioral intervention plans
    - Access to the school's facility and programs in a lawful manner and consistent with students' IEPs or Section 504 Plans
    - Securing of all applicable funding
- ✓ **Does Not Meet Standard**
  - ☐ The school did not materially comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the treatment of students with identified disabilities and those suspected of having a disability in the manner described above; however, the school promptly came into compliance once the shortcoming(s) were identified. [*Notice of Deficiency resolved May 8, 2025*.]
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to the treatment of students with identified disabilities and those suspected of having a disability in the manner described above.

App.1663



KCBOE03214

## 1(D). IS THE SCHOOL PROTECTING THE RIGHTS OF ENGLISH LANGUAGE LEARNER (ELL) STUDENTS?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract (including Title III of the Elementary and Secondary Education Act (ESEA) and the US Department of Education authorities) relating to the English Language Learner requirements, including but not limited to:
  - o Required policies related to the service of ELL students
  - o Proper steps for identification of students in need of ELL services
  - o Appropriate and equitable delivery of services to identified students
  - o Appropriate accommodations on assessments
  - o Exiting of students from ELL services
  - o Ongoing monitoring of exited students

☐ **Does Not Meet Standard**

- ☐ The school did not materially comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to English Language Learner requirements in the manner described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to English Language Learner requirements in the manner described above.



KCBOE03215

## 2: Financial Management

### 2(a). Is the school meeting financial reporting and compliance requirements?

- ☐ **Meets Standard**
  - ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to financial reporting requirements, including but not limited to:
    - o Complete an on-time submission of financial reports, including annual budget, revised budget (if applicable), periodic financial reports as required by the authorizer, and any reporting requirements if the board contracts with an Education Service Provider (ESP)
    - o On-time submission and completion of annual independent audit and corrective action plans, if applicable.
    - o All reporting requirements related to the use of public funds
- ✓ **Does Not Meet Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial reporting requirements as described above; however, the school promptly came into compliance once the shortcoming(s) were identified. [*All financial reports were submitted after reminders; this item is resolved.*]
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial reporting requirements as described above.

### 2(b). Is the school following Generally Accepted Accounting Principles?

- ✓ **Meets Standard**
  - ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to financial management and oversight expectations as evidenced by an annual independent audit, including but not limited to:
    - o An unqualified audit opinion
    - o An audit devoid of significant findings and conditions, material weaknesses, or significant internal control weaknesses
    - o An audit that does not include a going concern disclosure in the notes or an explanatory paragraph within the audit report
- ☐ **Does Not Meet Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial management and oversight expectations as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to financial management and oversight expectations as described above.



App.1665

KCBOE03216

## 3: Governance and Reporting

### 3(a). Is the school complying with governance requirements?

- ☐ **Meets Standard**
  - ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to governance by its board, including but not limited to:
    - Board policies, including those related to oversight of an Education Service Provider (ESP), if applicable
    - Board bylaws
    - State open meetings law
    - Code of ethics
    - Conflicts of interest
    - Board composition and/or membership rules (e.g., requisite number of qualified teachers, ban on employees or contractors serving on the board, etc.)
    - Compensation for attendance at meetings
- ✓ **Does Not Meet Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to governance by its board as described above; however, the school promptly came into compliance once the shortcoming(s) were identified. [*Notice of Deficiency resolved August 11, 2025.*]
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to governance by its board as described above.

### 3(b). Is the school holding management accountable?

- ✓ **Meets Standard**
  - ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to oversight of school management, including but not limited to:
    - (For Education Service Providers [ESPs]) Maintaining authority over management, holding it accountable for performance as agreed under a written performance agreement, and requiring annual financial reports of the ESP
    - (For Others) Oversight of management that includes holding it accountable for performance expectations which may or may not be agreed to under a written performance agreement
- ☐ **Does Not Meet Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to oversight of school management; however, the school promptly came into compliance once the shortcoming(s) were identified.
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to oversight of school Management as described above.



App.1666

KCBOE03217

### 3(c). Is the school complying with reporting requirements?

- ☐ **Meets Standard**
  - ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to relevant reporting requirements to the school's authorizer, State Education Agency (SEA), and/or federal authorities, including but not limited to:
    - Accountability tracking
    - Attendance and enrollment reporting
    - Compliance and oversight
    - Additional information requested by authorizer
- ✓ **Does Not Meet Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement relating to relevant reporting requirements as described above; however, the school promptly came into compliance once the shortcoming(s) were identified. [*All missing items have been resolved.*]
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter agreement as described above.



App.1667

KCBOE03218

## 4: Students and Employees

### 4(A). Is the school protecting the rights of all students?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students, including but not limited to:
  - Policies and practices related to admissions, lottery, waiting lists, fair and open recruitment, and enrollment (including rights to enroll or maintain enrollment)
  - The collection and protection of student information (that could be used in discriminatory ways or otherwise contrary to law)
  - Due process protections, privacy, civil rights, and student liberties requirements, including First Amendment protections and the Establishment Clause restrictions prohibiting public schools from engaging in religious instruction
  - Conduct or discipline (discipline hearings and suspension and expulsion policies and practices)

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the rights of students as described above.

### 4(B). IS THE SCHOOL MEETING TEACHER AND OTHER STAFF CREDENTIALING REQUIREMENTS?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract (including the federal Highly Qualified Teacher and Paraprofessional requirements within Title II of the Elementary and Secondary Education Act [ESEA]) relating to state certification requirements.

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to state certification requirements; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to state certification requirements.

### 4(C). IS THE SCHOOL COMPLYING WITH LAWS REGARDING EMPLOYEE RIGHTS?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations, including those relating to the Family Medical Leave Act, the Americans with Disabilities Act, and employment contracts. The school does not interfere with employees' rights to organize collectively or otherwise violate staff collective bargaining rights.

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to employment considerations.



App.1669

KCBOE03220

#### 4(D). IS THE SCHOOL COMPLETING REQUIRED BACKGROUND CHECKS?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to background checks of all applicable individuals (including staff and members of the charter community, where applicable).

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to background checks; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to background checks.

## 5: SCHOOL ENVIRONMENT

#### 5(A). IS THE SCHOOL COMPLYING WITH FACILITIES AND TRANSPORTATION REQUIREMENTS?

☐ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to the school facilities, grounds, and transportation, including but not limited to:
  - Americans with Disabilities Act (ADA)
  - Fire inspections and related records
  - Viable certificate of occupancy or other required building use authorization
  - Documentation of requisite insurance coverage
  - Student transportation

✓ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the school facilities, grounds, and transportation as described above; however, the school promptly came into compliance once the shortcoming(s) were identified. [*Notice of Deficiency resolved August 11, 2025.*]

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to school facilities, grounds, and transportation as described above.



KCBOE03221

App.1670

## 5(B). Is the school complying with health and safety requirements?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to safety and the provision of health-related services, including but not limited to:
  - o Appropriate nursing services and dispensing of pharmaceuticals
  - o Food service requirements
  - o Other district services, if applicable

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to safety and the provision of health-related services as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to safety and the provision of health-related services as described above.

## 5(C). Is the school handling information appropriately?

✓ **Meets Standard**

- ☐ The school materially complies with applicable laws, rules, regulations, and provisions of the charter contract relating to handling of information, including but not limited to:
  - o Maintaining the security of and providing access to student records under the Family Educational Rights and Privacy Act and other applicable authorities
  - o Accessing documents maintained by the school under the state's Freedom of Information law and other applicable authorities
  - o Transferring of student records
  - o Proper and secure maintenance of testing materials.

☐ **Does Not Meet Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the handling of information as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.

☐ **Falls Far Below Standard**

- ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions of the charter contract relating to the handling of information as described above.

## 6: Additional Obligations

### Is the school complying with all other obligations?

- ✓ **Meets Standard**
  - ☐ The school materially complies with all other material legal, statutory, regulatory, or contractual requirements contained in its charter contract that are not otherwise explicitly stated herein, including but not limited to requirements from the following sources:
    - Revisions to state charter law
    - Consent decrees
    - Intervention requirements by the authorizer
    - Requirements by other entities to which the school is accountable (e.g., State Education Agency [SEA])
- ☐ **Does Not Meet Standard**
  - ☐ The school failed to materially comply with all other material, legal, statutory, regulatory, or contractual requirements contained in its charter contract that are not otherwise explicitly stated herein as described above; however, the school promptly came into compliance once the shortcoming(s) were identified.
- ☐ **Falls Far Below Standard**
  - ☐ The school failed to comply with all applicable laws, rules, regulations, and provisions contained in its charter contract that are not otherwise explicitly stated herein as described above.

## Charter Evaluation Feedback:

<u>Overview</u>

The 2024-25 school year was the first year of operation for Knoxville Preparatory School. When reviewing the performance framework, the Organizational Performance Section had various items (1C, 2A, 3A, 3C, 5A) that were labeled as "Does Not Meet the Standard," which means the school failed to comply with the standard. The intervention procedure was used to provide clarity of compliance requirements and the appropriate next steps, as indicated for each item; all deficiencies are now resolved. Additionally, during the 2024-25 year, Prep Public Schools and Knox Prep experienced changes in leadership of the governing board, network team, and local school leadership.

For the Academic Performance and School Culture section of the performance framework, there are some recommendations (listed below), and the school has addressed their plans as part of their school improvement submission in the Fall of 2025. We are, however, requesting a response from the governing board concerning their intent to address the financial performance of the school.

<u>Commendations:</u>

- There are strong indicators in the Academic Performance section for students who were "on-track" or "mastered" between the charter school and Knox County Schools. In all subject areas reported, Knox Prep exceeded standards.
- In the spring of 2025, at the time of the site visit, new leadership was in place, and they had begun to lay the framework for new structures within the school to address school culture and academics.

<u>Recommendations:</u>

- An important indicator of the short-term and long-term success of a charter school is financial performance. The following indicators were identified as "Does Not Meet Standard" or "Falls Far Below Standard." KCS is requesting a response concerning this performance.
    - Falls Far Below Standard: Unrestricted Days Cash, Total Margin
    - Does Not Meet Standard: Enrollment Variance, Debt Service Coverage Ratio
- A review of the School Culture section indicates that Knox Prep "Falls Far Below Standard" for Suspension Rate, Student Attrition Rate, and Teacher Retention Rate. They have received a "Does Not Meet Standard" for Student Attendance Rate. ***The school has established plans for school improvement as submitted via InformTN/ePlan in the Fall of 2025.***
- For Absolute Achievement, no AMO performance target pathways are optional for Absolute Achievement and Chronic Absenteeism, as it was the first year of operation. Knox Prep was rated as "Does Not Meet Standard" for both Absolute Achievement and Chronic Absenteeism and was rated as "Falls Far Below Standard" for Growth. ***The school has identified these areas for improvement and submitted a plan via InformTN/ePlan in the Fall of 2025.***



App.1673

KCBOE03224

As a result of the above evaluation, Knoxville Preparatory School is:

_______Approved and in good standing (On track for renewal)

__✓___Approved and in need of improvement (Request for a response from the governing board addressing the concerns for Financial Performance).

_______Unapproved (Plan of Correction required to address the following deficiency: Due Date_________)

Signature: Theresa Nixon (signature) Date: November 12, 2025

Theresa Nixon, Executive Director of Academic Supports, Knox County Schools

Signature: (signature) Date: November 24, 2025

Chad Everett, Executive Director, Knoxville Preparatory School

**KNOX COUNTY BOARD OF EDUCATION**

This Document is approved by the Knox County Board of Education on the 4th day of December, 2025 as reflected in its minutes, and certified by its Chairperson.

Kristi Kristy, Chair

Date: 12-04-2025

Approved by
Knox County Board of Education
December 4, 2025

**DIRECTOR OF SCHOOLS**

Dr. Jon Rysewyk, Superintendent

Date: 12/8/2025

**KNOX COUNTY LAW DEPARTMENT**

CONTRACT #: 25-740

APPROVED AS TO LEGAL FORM

Gary Dupler, Deputy Law Director

Date: 11/17/2025

# EXHIBIT 45

**Video Exhibit**

2_5_26 KCS BOE Called Meeting.mp4

# EXHIBIT 46

**KNOX COUNTY BOARD OF EDUCATION**
**CALLED MEETING**
**FEBRUARY 5, 2026**

**MINUTES**

The Knox County Board of Education met in a called meeting at 3:00 pm on Thursday, February 5, 2026 in the Boardroom of the Summer Place Building at 500 W. Summit Hill Drive, Knoxville, Tennessee. The meeting agenda and all supporting documents were posted on the Knox County Board of Education webpage. The meeting could be viewed in its entirety on the video posted on the Knox County Board of Education webpage.

**Chair Kristy Presiding**

| | |
|---|---|
| Present: | John Butler, District 1 |
| | Anne Templeton, District 2 |
| | Patricia Fontenot-Ridley, District 3 |
| | Katherine Bike, District 4 |
| | Lauren Morgan, District 5 |
| | Betsy Henderson, District 6 |
| | Steve Triplett, District 7 |
| | Travis Wright, District 8 |
| | Kristi Kristy, District 9 |
| Absent: | Albert Liu, Student Representative |

1 A Moment of Silence was observed followed by the Pledge of Allegiance to the Flag led by Ms. Morgan.

2 Approval of the Agenda

On motion made by Steve Triplett, seconded by Travis Wright

**Vote:** 9 - 0

3 Public Forum

- Lance McCold of Knox County, Tennessee addressed the Board regarding their oath to uphold the United States Constitution.

4 Consideration of a Resolution to Request the Tennessee Commissioner of Education Decide the Waiver Request of Wilberforce Academy of Knoxville to Operate a Religious Public Charter School

Ms. Bike made a motion to postpone indefinitely. Ms. Templeton seconded the motion.

As a point of order, Dr. Butler asked what the motion would mean. Ms. Kristy stated it would mean the Board would not be voting on the proposed resolution at this meeting. She asked Mr. Dupler if he would like to address the motion. Mr. Dupler stated that it was not his motion, but he thought it sounded as though the Board may not vote on the resolution today or ever vote on it.

Ms. Kristy requested a roll call vote on Ms. Bike's motion to postpone.

Roll Call:
Dr. Butler - Yes
Ms. Templeton - Yes

Ms. Fontenot-Ridley - Yes
Ms. Bike - Yes
Ms. Morgan - No
Ms. Henderson - Recused
Mr. Triplett - Recused
Mr. Wright - No
Ms. Kristy - No

**Vote:** 4-3-2 Failed

Ms. Kristy asked Mr. Dupler if he would like to explain the reason for this meeting and the proposed resolution. Mr. Dupler thanked Ms. Kristy and stated that the resolution was about a very narrow legal point and that discussion on litigation was not something that happened in a public Board meeting very often. He reminded Board members that, normally, information regarding litigation was shared with them during executive sessions, but that because of the nature of the proposed resolution, it was being presented to the Board so they could either vote it up or down. Mr. Dupler said he could not discuss all the aspects of the active lawsuit, but specifically the proposed resolution dealt with the fact that in the plaintiff's lawsuit they were claiming that somebody, maybe the Board, could grant the plaintiff a waiver from Tennessee law. He stated that the Knox County Law Department disagreed with that claim and also disagreed that even the Tennessee Commissioner of Education could grant the plaintiff a waiver from Tennessee law. Mr. Dupler explained that the Board would not be deciding whether they could grant a waiver, but would simply be sending the proposed resolution to ask Tennessee Commissioner of Education Lizzette Reynolds whether she wanted to grant a waiver in this case. He stated that the proposed resolution was not political, and it was not a constitutional request, but simply a narrow legal ask that was available under Tennessee law.

Mr. Wright made a motion to approve the proposed resolution. Ms. Morgan seconded the motion.

Ms. Bike asked if she was correct by stating that Wilberforce Academy of Knoxville had not filed a charter school application with the Knox County Board of Education. Mr. Dupler clarified that electronic applications for this year were due on Monday, February 2, with paper copies to be filed by Wednesday, February 4. He confirmed that neither an electronic nor paper application had been received from Wilberforce Academy of Knoxville. Ms. Bike asked if an application could have been filed without the requested waiver. Mr. Dupler confirmed an application could have been filed. Ms. Bike said that the fact that an application was not even filed was the concerning part for her. She stated that she was not sure why the Board would work on behalf of an organization that could not even complete an application, so that the Board could examine it to see if they even wanted to request a waiver on their behalf. She said it felt to her like the Board would be passing the question off and that they were doing work for an organization that could not even file an application. Mr. Dupler stated that, legally, the Board was not doing any type of work on behalf of the organization. He clarified that Wilberforce Academy of Knoxville had sued the Board and stated that it was futile for their organization to file an application since they believed the Board would deny it anyway, and they noted that a waiver could be requested. Mr. Dupler explained that the Law Department was not asking the Board to approve or deny any type of waiver, but noted the proposed resolution would simply ask the State of Tennessee to weigh in on a state law and whether they wanted to waive state law. He noted that the State of Tennessee was not even named as a party to the lawsuit, and the Law Department believed they should weigh in about their own state law. Ms. Bike repeated that to her, it seemed like just being here and having this called meeting, felt like the Board was working on behalf of Wilberforce Academy of Knoxville.

Ms. Fontenot-Ridley asked if the Board would have to vote on whether to approve Wilberforce Academy of Knoxville as a charter school if the Board sent the resolution to the State Board of Education, and they replied that they would grant the organization a waiver. Mr. Dupler said that it could come back for Board consideration eventually, but today, the Board was not voting on whether a waiver was valid, since that would be up to the State. He confirmed that if the State were to grant a waiver, an application could come back to the Board perhaps the next year or the year after. Mr. Dupler clarified that it could not happen this year, because the application window had passed.

Ms. Kristy asked Mr. Dupler to confirm that if a charter school application were to be filed by Wilberforce Academy of Knoxville in the future, the Board would simply be considering the application on the merits only and through the same processes as any other charter school application. Mr. Dupler confirmed that was correct, and that was even assuming that the State would grant a waiver for a religious charter school.

Ms. Templeton asked what the process would be if the resolution were approved. Mr. Dupler said, that if the resolution were approved, Superintendent Rysewyk, as the Director of Schools, would formally submit a request on the Board's behalf for the Commissioner of Education to either grant or deny a waiver. Ms. Templeton asked if Wilberforce Academy of Knoxville had the ability to ask the Commissioner for a waiver on their own. Mr. Dupler said that the organization could ask this Board for a waiver, of course, but the problem was that the State Board of Education had already indicated that there were certain waivers that a local board could not grant, such as civil rights, which was applicable in this case. He noted that the state law indicated that a local board or local education agency could ask the Commissioner of Education for a waiver. Ms. Templeton asked if Wilberforce Academy of Knoxville had asked Knox County Schools to submit a waiver request to the Commissioner. Mr. Dupler clarified that Wilberforce Academy had alleged in their lawsuit that if the Board were to submit a waiver request to the State, that it could possibly be granted. Ms. Templeton noted that she believed the Board was being asked to do presumptive work by an organization that was essentially bullying the Board with a lawsuit to think ahead of what they might need to make their pathway easier. She asked if the Board not requesting a waiver on the organization's behalf could result in the case becoming larger. Mr. Dupler explained that in paragraph 22 of the amended complaint, it was stated that the Tennessee Commissioner of Education or relevant county school board could waive any State Board rule or

statute that inhibited or hindered the proposed public charter school's ability to meet the school's goals or comply with the school's mission statement. He said the Law Department disputed that statement, but because the question was raised, the Law Department wanted to make sure that this Board was taking all the proper steps under state law, and that was why they were asking the Board to approve the proposed resolution. Ms. Templeton said she could appreciate their desire for the Board to do what was correct under the law, but her concern was creating an avenue for an organization that had not even filed an application for Board consideration. She said she did not believe they had even completed the first step, but had just started with filing a lawsuit, and for that reason, she was questioning if what they were doing was legal. She stated that she did not understand why the organization would not just automatically go through the proper process, and for that reason, she would not support pandering to this kind of work-around.

Dr. Butler said he was struggling with the proposed resolution as well, since it was his understanding that this Board did not have the authority to grant a waiver, and therefore, really did not even have the authority to deal with an application for a religious charter school. He believed the State should deal with the request and whatever process the organization had to go through. Dr. Butler said for that reason, the proposed resolution was not something that he could vote for, since the Board did not have the authority to grant a waiver from state law. He also noted that the Board could be setting precedence and encouraging organizations to ask the Board to request a waiver from the Commissioner to allow them to get what they wanted through that avenue. Dr. Butler said that he did not think that was how the Board should respond, since the Board did not have a responsibility to do it nor the authority to do it. He added that the Board had not done anything wrong, so he did not see why they should take this action. Mr. Dupler said he certainly respected Ms. Templeton's and Dr. Butler's comments and opinions, and he agreed that the Board had done nothing wrong, but the Law Department simply believed the proposed resolution would help get the case dismissed, since if the organization wanted to change state law, they should take the matter up with the State.

Ms. Kristy said she believed that Board members, and perhaps the Law Department as well, were confused as to why Knox County Schools was being sued to begin with, since, obviously, the Board had not denied anything at this point, and could not do so outside of a public meeting. She said that she personally had no problem considering a charter school based on its application and merits, so her hope was that the lawsuit would be dismissed since the Board did not create state law. She also wondered whether the intent behind the lawsuit was to put the barrier into focus. Mr. Dupler said he thought that was correct.

Ms. Morgan asked Mr. Dupler if the proposed resolution would help the Board's defense against the lawsuit. Mr. Dupler said the Law Department believed it would since it would give them another argument to say that the Board and/or Knox County Schools had done what they could to follow the law. Ms. Morgan said that she had talked with Executive Director of Academic Supports Theresa Nixon, who had explained the charter school application process to her, and that Ms. Bike, Ms. Templeton, Ms. Fontenot-Ridley, and Dr. Butler were all correct that no application had been submitted. She stated that she also agreed that Knox County Schools nor the Board were the right entities to be sued in this case since they did not create state law, but she maintained that they still had to defend the lawsuit. Ms. Morgan said she did not like being sued and that she wanted the Board to defend themselves to the best of their ability, and since she was not an attorney and the Law Department was recommending the proposed resolution, she did not have a problem supporting what they believed was most helpful in the pursuit of a defense in the suit.

Ms. Templeton asked Mr. Dupler if he believed it fell within the Board's jurisdiction to help pave the way for religious charter school applications to be accepted because that was what the Law Department was asking them to do, instead of arguing the organization should do it on their own. Mr. Dupler said that was not how the Law Department saw the issue at hand. He said the Law Department was strictly just defending the lawsuit and, as had been discussed, handing it over to the State, since Tennessee had a State Attorney General that would question the constitutionality of a law.

Ms. Kristy noted that a motion to approve the proposed resolution had been made by Mr. Wright and seconded by Ms. Morgan. She requested a roll call vote.

<u>Roll Call</u>
Dr. Butler – Pass
Ms. Templeton – No
Ms. Fontenot-Ridley – No
Ms. Bike – No
Ms. Morgan – Yes
Ms. Henderson – Recused
Mr. Triplett – Recused
Mr. Wright – Yes
Ms. Kristy – Yes

**Vote:** 3-3-3 Failed

5 Adjourn

The meeting was adjourned at 3:38 pm.

Date Approved: March 5, 2026

Chair:

Secretary:

# EXHIBIT 47

App.1684

TENNESSEE
STATE BOARD OF EDUCATION

# Charter School Application

For Charter School Sponsors Submitting a
Charter School Application by February 1, 2026

# Table of Contents

INSTRUCTIONS FOR APPLYING TO OPEN A PUBLIC CHARTER SCHOOL IN TENNESSEE .......................... 3
APPLICATION CHECKLIST .......................................................................................................... 10
APPLICATION COVER SHEET .................................................................................................... 12
STATEMENT OF ASSURANCES .................................................................................................. 14
WAIVERS (OPTIONAL) ............................................................................................................. 16
EDUCATIONAL PROGRAM DESIGN AND CAPACITY .................................................................... 18
OPERATIONS PLAN & CAPACITY ............................................................................................... 25
BUDGET AND FINANCE ........................................................................................................... 28
ADDENDA ............................................................................................................................... 30
TECHNICAL SUPPORT AND RESOURCES .................................................................................... 41
GLOSSARY OF TERMS .............................................................................................................. 42

# Instructions for Applying to Open a Public Charter School in Tennessee

## Overview

This document assists sponsors in completing Tennessee's Charter School Application and its accompanying documents. Sponsors must complete a separate application for each public charter school they seek to open.

**This form is for non-replication applications only.** If a governing body is seeking to replicate an existing Tennessee public charter school, the governing body must complete the Charter School Replication Application, which can be found on the Tennessee State Board of Education's (State Board) website.

As a reference, a glossary of terms is included at the end of this document.

### Sponsoring a Public Charter School

In Tennessee, charter schools are public schools and may be established in one of the following ways:

- Creating a new public charter school or opportunity public charter school; or
- Converting a traditional public school to a charter school

Tennessee law limits who may sponsor a charter school and prescribes the type of entity may operate a charter school. Only entities that are exempt from federal taxation under 26 U.S.C. § 501(c)(3) of the Internal Revenue Code may operate a public charter school in Tennessee. Pursuant to Tennessee Code Annotated (T.C.A.) § 49-13-106, a charter will not be granted to a for-profit corporation, a nonpublic school, as defined in T.C.A. § 49-6-3001, or other private, religious, or church school. Cyber-based public charter schools are not allowed.

### Funding a Charter School

T.C.A. § 49-13-112 outlines how public charter schools are funded. Generally, charter schools are funded through the following sources:

- State and local student-generated funds;
- Federal grants allocated through the authorizing LEA;
- Grants, gifts, devises, or donations from any private sources; and
- State funds appropriated for the support of the public charter school, if any.

More information related to funding sources is available at the following Tennessee Department of Education websites:

- Tennessee Investment in Student Achievement (TISA) Formula
- Charter School Grants

## The Application Process

The charter school application process is defined by the following Tennessee state laws and State Board rules and policies. Sponsors should review the following resources before starting the public charter school application process:

- The Tennessee Public Charter Schools Act (T.C.A. Title 49, Chapter 13)
- State Board Rule 0520-14-01: Charter Schools
- State Board Rule 0520-14-02: Charter School Waivers
- State Board Policy 6.111 – Quality Charter Authorizing Standards

The complete application process includes the following steps, illustrated in the visual and further detailed below:

- Letter of Intent
- Initial application submission
- Initial application vote
- Amended application submission, as applicable
- Amended application vote, as applicable
- Decision appeal, as applicable



**Letter of Intent**

The first step in the application process is to submit a Letter of Intent using the required form to both the authorizer to which the sponsor is applying and the Tennessee Public Charter School Commission (Commission). Pursuant to T.C.A. § 49-13-107(a), sponsors must electronically file the Letter of Intent at least 60 days prior to the application deadline of February 1. Therefore, the Letter of Intent must be completed and filed with all required parties no later than December 3. If December 3 falls on a Saturday, Sunday, or state-observed holiday, the Letter of Intent is due on the next business day.

**Initial Application Submission**

Sponsors must submit all application materials – the application narrative, required attachments, and applicable addenda – to the authorizer on or before 11:59 p.m. CT on February 1 of the year preceding the year in which the proposed public charter school plans to begin operation. If February 1 falls on a Saturday, Sunday, or state-observed holiday, the application is due on the next business day. Authorizers may charge an application fee of up to $2,500 per application and may request up to 5 paper copies of the application. Sponsors should inquire about how to submit the application materials and these additional requirements directly with the authorizer.

During the initial application review, the authorizer's review team will evaluate each application using the State Board's required scoring rubric and will conduct a capacity interview with the sponsor to elicit evidence-based explanations that allow the sponsor to determine clear evidence of capacity to execute the charter school plan successfully. The capacity interview will be scheduled by the authorizer in advance of the authorizer's initial vote on the application.

**Initial Application Vote**

Pursuant to T.C.A. § 49-13-108(b)(2), authorizers must rule by resolution, at a regular or specially called meeting, to approve or deny a public charter school application no later than 90 calendar days after receipt of the initial completed application. If the authorizer fails to approve or deny a public charter school application within 90 days, the public charter school application will be deemed approved.

**Amended Application Submission**

Pursuant to T.C.A. § 49-13-108(b)(3), if an initial charter school application is denied, the charter school sponsor will have 30 calendar days from receipt of the grounds for denial to submit an amended application using this same application form to correct the deficiencies.

**Amended Application Vote**

Pursuant to T.C.A. § 49-13-108(b)(3), if an amended application is submitted, the authorizer has 60 days from receipt of an amended application to approve or deny the amended application. If the authorizer fails to approve or deny the amended application within 60 days, then the amended application will be deemed approved.

**Decision Appeal**

A sponsor may appeal an authorizer's decision to deny a public charter school application to the state's appellate body, the Commission, no later than 10 days after the date of the authorizer's decision. The Commission must either approve or deny a public charter school application no later than 75 days from the Commission's receipt of the notice of appeal. The Commission's decision is final and is not subject to appeal.

## Required Application Components

In accordance with State Board Rule 0520-01-14-.01, the following components are required by the deadline for the charter school application to be deemed complete and therefore reviewed by the authorizer:

☐ The written application and its required attachments using this application form;

☐ Up to 5 paper copies of the written application and budget template, if requested by the authorizer; and

☐ The application fee, if required by the authorizer.

**Written Application**

The Written Application is comprised of all items in this form: the application narrative, required attachments, and applicable addenda. As detailed in the accompanying form, some sections of the application require the sponsor to submit additional, supporting documentation as attachments and/or one or more Addenda based on the proposed school's model and sponsor history.

Addenda are required for the following sponsors:

A. Sponsors that currently have or have ever had any relationship to a charter school anywhere in the United States, including but not limited to opening, operating, or managing a charter school
B. Sponsors proposing to open a new school that will create a network or as part of an existing network/CMO
C. Sponsors seeking to contract with a third-party education service provider (ESP), including a management organization
D. Sponsors seeking approval of multiple schools during this application cycle
E. Sponsors seeking to convert a traditional public school to a charter school
F. Sponsors seeking to open an Opportunity Public Charter School (see next page for more information)
G. Higher education institutions seeking to open a charter school

*Note that if the proposed school is approved, authorizers will ask for additional documents not requested here (e.g., student handbook, final versions of board policies, detailed professional development plans, etc.) during the pre-opening year (Year 0) to verify readiness to open. NACSA's*

*Ready-to-Open resources provide a range of resources and checklists that sponsors can reference to understand all the components of successfully opening and operating a charter school.*

## Application Formatting and Submission Instructions

The written application, excluding attachments, tables, cover sheets, and budget worksheets, should not exceed 250 pages and meet Section 508 of the Workforce Investment Act of 1998 compliance requirements. Sponsors can find more information about 508 compliance on the Section 508 Homepage and the Section 508 Accessible Electronic Documents Resource Page.

Formatting for written response is as follows:

- One-inch margins
- 12-point font size
- Calibri, Open Sans, or Arial font
- Numbered responses aligned to question numbers
- Page numbers in the bottom right-hand corner of each page
- A table of contents that includes identifying page numbers for each section and all attachments

The electronic copy of the completed application is compiled as one PDF that includes all requirements and uses the following file naming structure:

- Complete application: "Charter School Application – School Name"
- Operating budget attachment: "School Name – Attachment 9: Operating Budget"
- Network budget attachment: "School Name – Attachment 10: Network Budget"

The Operating Budget (Attachment 9) must be completed using the state's budget template, which is an excel document and should not be converted to PDF format. Sponsors should attach the budget as a separate file when filing the application. Sponsors completing Addendum B should also upload the network budget, Attachment 10, as a separate file.

If an authorizer requires paper copies, sponsors should use the following guidance when creating:

- Place paper copies in three-ring binders, with the front cover and spine labeled with, at a minimum, the name of the proposed charter school and its applicable authorizer.
- Tab and label each section of the application, and ensure it follows the order as outlined in the application template's table of contents.
- Number all applicable pages in the charter application sequentially.
- Include all attachment cover sheets, and ensure attachments are properly referenced in the narrative.

Additionally, to ensure the application meets the highest standards, sponsors should carefully review and refer to the State Board's required scoring rubric as they complete each section. The required

scoring rubric provides clear guidelines about what evaluators are looking for and how the application will be assessed.

Sponsors must file their application directly with the authorizer by the application deadline. Sponsors must contact authorizers directly for information and instructions related to filing the application as well as any application fee and requested paper copies.

## About Opportunity Public Charter Schools

Sponsors applying to operate an Opportunity Public Charter School should carefully review the following information.

Pursuant to T.C.A. § 49-13-104, opportunity public charter schools are charter schools serving grades 6-12 where at-risk students constitute at least 75% of the school's enrolled student population. "At-risk student" means a student who, at the time of enrollment in an opportunity public charter school, is a member of a family with a household income that does not exceed four hundred percent (400%) of the federal poverty level, and meets at least one (1) of the following criteria:

- The student has dropped out of school without obtaining a high school diploma or a high school equivalency credential;
- The student has been adjudicated as a juvenile delinquent or is awaiting disposition of charges that may result in adjudication as a delinquent;
- The student has previously been detained or incarcerated in a juvenile detention center;
- The student has been retained at least twice in any of the grades kindergarten through eight (K-8), or the student is one (1) or more years behind in obtaining the credit required for promotion to the next grade level or to graduate from high school in four (4) years with the student's cohort;
- The student is chronically absent, as defined in Tennessee's Every Student Succeeds Act (ESSA) plan established pursuant to the Every Student Succeeds Act (20 U.S.C. § 6301 et seq.);
- The student is pregnant or a parent, as defined in T.C.A. § 49-1-903;
- The student has a documented substance abuse issue; or
- The student has experienced circumstances of abuse or neglect.

If an opportunity public charter school's at-risk enrollment drops below 75% for three consecutive years, the school must amend its charter agreement to forfeit its designation as an opportunity public charter school, or voluntarily close.

An opportunity public charter school may operate a residential program if 50% or more of the students enrolled are residents of the LEA where the opportunity public charter school is located and were residents of such LEA when the students applied to enroll in the opportunity public charter school. If serving at-risk students in six through twelve grades in a residential program, the school program must

be operated on a year-round basis pursuant to T.C.A. § 49-13-106 and State Board Rule 0520-14-01-.04.

Sponsors seeking to open an opportunity public charter school must complete Addendum E at the end of this document. In addition to that addendum, the application narrative, in its entirety, should reflect the vision and mission of the proposed opportunity public charter school. The specific ways in which the sponsor plans to design the school's academics, operations, and finances to meet the needs of at-risk students should be readily observable throughout the sponsor's responses to the application questions.

# Application Checklist

The checklist below is provided as a tool for sponsors to ensure all required application components are complete. If an authorizer determines that a component of the application is missing, the authorizer may request additional information during the capacity interview and/or as part of the amended application submission, if the initial application is denied.

| Application Components | | Applicant Check |
|---|---|---|
| **Application Narrative** | **General Application Information** | |
| | Application Cover Sheet | |
| | Statement of Assurances | |
| | Waivers (Optional) | |
| | **Educational Program Design & Capacity** | |
| | School Overview | |
| | School Mission and Model | |
| | Anticipated Student Population | |
| | Family and Community Engagement and Support | |
| | School Culture and Discipline | |
| | Curriculum and Instruction | |
| | Special Populations | |
| | Student Assessment and Evaluation | |
| | Educational Program Capacity | |
| | **Operations Plan & Capacity** | |
| | Governance | |
| | Staffing | |
| | Facilities | |
| | Transportation | |
| | Health and Safety | |
| | Insurance | |
| | Food Service | |
| | Start-up Plan | |
| | Operations Capacity | |
| | **Budget and Finance** | |
| | Operating Budget | |
| | Budget and Finance Capacity | |
| **Required Attachments** | Attachment 1: Evidence of Community Engagement | |
| | Attachment 2: School-based Team Resumes | |
| | Attachment 3: Board Member Resumes | |
| | Attachment 4: Organization Chart | |
| | Attachment 5: Articles of Incorporation | |
| | Attachment 6: Proof of Nonprofit and Tax-Exempt Status | |
| | Attachment 7: Governing Board Bylaws | |

| | | |
|---|---|---|
| | Attachment 8: Letter of Insurance Coverage | |
| | Attachment 9: Operating Budget Template | |
| | Attachment 10: Network Budget<br>*(Only required for sponsors completing Addendum B)* | |
| | Attachment 11: Network Organization Chart<br>*(Only required for sponsors completing Addendum B)* | |
| | Attachment 12: ESP Contract<br>*(Only required for sponsors completing Addendum C)* | |
| | Attachment 13: Evidence of Support for Conversion<br>*(Only required for sponsors completing Addendum E)* | |
| | Attachment 14: Residential Facility Documentation<br>*(Only required for sponsors completing Addendum F)* | |
| **Applicable Addenda*** | Addendum A: Sponsors with past or present relationships to other charter schools | |
| | Addendum B: Sponsors opening a new school that will create a network or as part of an existing network | |
| | Addendum C: Sponsors contracting with a third-party ESP | |
| | Addendum D: Sponsors seeking approval of multiple schools in this application cycle | |
| | Addendum E: Sponsors seeking to convert a traditional public school to a charter school | |
| | Addendum F: Sponsors applying to operate an opportunity public charter school | |
| | Addendum G: Higher education institutions seeking to open a charter school | |

**Sponsors must complete all addenda that are applicable to their status and application, as identified in the Letter of Intent. Sponsors may mark "N/A" in this checklist for any addenda that are not applicable to their application.*

# Application Cover Sheet

**General Information**

| | | | |
|---|---|---|---|
| **Name of Proposed Charter School** | | | |
| **Sponsor/Sponsoring Entity** | | | |
| **Proposed Authorizer** | | | |
| **Academic Focus of Proposed School** | | | |
| **Grade Structure (e.g., K-5, 6-8, 9-12)** | Year 1 | Year 5 | At Capacity |
| | | | |
| **Projected Enrollment** | Year 1 | Year 5 | At Capacity |
| | | | |
| **Neighborhood and/or Community in which the school plans to locate** | | | |
| **Projected Opening School Year** | | | |

**Primary Point of Contact for this Application**

In the table below, identify the primary point of contact (PPOC) for this application. The PPOC will handle all communications, scheduling, and notices related to the application. The PPOC is responsible to ensure timely dissemination of information to all involved parties. The PPOC's name will be public information.

| | |
|---|---|
| **Name** | |
| **Role in Proposed School** | |
| **Mailing Address** | |
| **Mailing Address Line 2** | |
| **City, State, Zip Code** | |
| **Primary Telephone** | |
| **Alternate Telephone** | |
| **Email Address** | |

**Applicant Team**

In the table below, identify all individuals who supported the development of this application, their current job and employer, and the role they played in drafting the content included here. Add rows as needed.

| Name | Current Job Title and Employer | Role in Drafting this Charter School Application |
|---|---|---|
| | | |
| | | |

## Statement of Assurances

As the authorized representative of the sponsor applying to open a charter school in Tennessee, I hereby certify that the information submitted in this application is true to the best of my knowledge and belief, realizing that any misrepresentation could result in disqualification from the application process or revocation after award; and if awarded a charter, the school must comply with all assurances within this section, and all applicable state and federal laws and regulations related to public charter schools. Furthermore, the governing body of the proposed charter school hereby assures that it accepts full legal and financial responsibility for the operation of the school.

I affirm that the public charter school will:

1. Be operated by a not-for-profit organization that is exempt from federal taxation under § 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3));
2. Operate as a public, nonsectarian, non-religious public school, with control of instruction vested in the governing body of the school under the general supervision of the authorizer and in compliance with the charter agreement and the Tennessee Public Charter Schools Act;
3. Follow all federal, state, and local laws and regulations pertaining to the operation of a public charter school, unless waived according to T.C.A. § 49-13-111(p);
4. Provide special education services for students with disabilities as provided in T.C.A. Title 49, Chapter 10, Part B of the Individuals with Disabilities Education Act, Title II of the Americans with Disabilities Act of 1990, and Section 504 of the Rehabilitation Act of 1973;
5. Adhere to applicable state and federal law relating to students who are limited English proficient, including Title VI of the Civil Rights Act of 1964, and the Equal Educational Opportunities Act of 1974;
6. Offer curriculum, textbook, and instructional materials that meet state and federal requirements, including that they are aligned to state academic standards (T.C.A. § 49-6-2202), do not include or promote prohibited concepts (T.C.A. § 49-6-1019), were not created to align exclusively to the Common Core State Standards, and are not marketed as Common Core textbooks or materials (T.C.A. § 49-6-2202);
7. Follow all federal and state laws and constitutional provisions prohibiting discrimination on the basis of disability, race, creed, color, national origin, religion, ancestry, or need for special education services;
8. Follow non-discriminatory admission policies pursuant to T.C.A. § 49-13-107, and processes for conducting an enrollment lottery, if applicable, in alignment with T.C.A. § 49-13-106 & 113 and State Board Rule 0520-14-01-.04;
9. Maintain a school term of no less than two hundred (200) days, including one hundred eighty (180) days for classroom instruction, pursuant to T.C.A. § 49-6-3004;
10. Ensure each instructional day consists of the minimum requirements, pursuant to T.C.A. § 49-6-3004, T.C.A. § 49-6-201, and State Board Rule 0520-01-02-.31(1);

11. Utilize this application as a contract with the authorizer, if no other agreement is signed, pursuant to Tennessee Attorney General Opinion No. 10-45;
12. Exclusively employ teachers who hold an active teaching license and any appropriate endorsement(s) to teach in a public school in Tennessee;
13. Comply with Open Meetings and Open Records laws (T.C.A. §§ 8-44-101 et seq.; 10-7-503, 504);
14. Not charge tuition, except for students transferring from another district to the school pursuant to the local board's out-of-district enrollment policy and T.C.A. § 49-6-3003;
15. Not charge registration fees or enrollment fees, except as authorized by T.C.A. § 49-13-106;
16. Follow state financial (budgeting and audit) procedures and reporting requirements according to T.C.A. §§ 49-13-111, 120, and 127;
17. Require governing body members, employees, officers, and other authorized persons who receives funds for the charter school, has access to the charter schools' funds, or has authority to make expenditures from the charter schools' funds, to give a surety bond in the form prescribed by T.C.A. § 8-19-101; and
18. Maintain all necessary and appropriate insurance coverage;
19. Notify its authorizer immediately of any change in circumstances that may have a significant impact on the school's ability to fulfill its goals as stated in its charter agreement; and
20. Submit to its authorizer a request to amend its charter agreement for any material modifications as defined by the charter agreement and TN Public Charter Commission rules.

______________________________ ______________
Signature of Authorized Representative Date

______________________________
Printed Name of Authorized Representative

______________________________
Title of Authorized Representative

## Waivers (Optional)

Pursuant to T.C.A. § 49-13-111, a sponsor of a proposed charter school may apply to either the authorizer or to the Commissioner of Education for a waiver of any State Board Rule or statute that inhibits or hinders the proposed charter school's ability to meets its goals or comply with its mission statement.

Waivers may not be granted for requirements related to:

- Federal and state civil rights;
- Federal, state, and local health and safety;
- Federal and state public records;
- Immunizations;
- Possession of weapons on school grounds;
- Background checks and fingerprinting of personnel;
- Federal and state special education services;
- Student due process;
- Parental rights;
- Federal and state student assessment and accountability;
- Open meetings; and
- At least the same equivalent time of instruction as required in regular public schools.

Authorizers and the Commissioner of Education have discretion to approve or deny a waiver request. While approval decisions may vary among authorizers, the list below includes commonly requested waivers by charter school sponsors and operators. Statute references are current as of the publication of this document and are subject to change.

- Contracts and Employment Termination (T.C.A. § 49-5-408-409)
- Duty Free Lunch (T.C.A. § 49-1-302(e))
- Leave (T.C.A. § 49-5-702-716 and T.C.A. § 49-5-801-816)
- Library Information Center (State Board Rule 0520-01-03-.07)
- Licensed Personnel Salaries (T.C.A. § 49-3-306(a), State Board Rule 0520-01-02-.02 and State Board Policy 5.600)
- Teacher Assignment (T.C.A. § 49-5-401)
- Tenure (T.C.A. § 49-5-501-513)
- Use of Unapproved Textbooks and Instructional Materials (T.C.A. § 49-6-2206-2207)

**Proposed Waiver Requests**

Sponsors planning to apply for one or more waivers must complete the following table, adding rows as needed. Note that the information included in this table is for the purposes of contextualizing the sponsor's charter school application only and does not constitute a formal waiver request. There is no guarantee that authorizers or the Commissioner of Education will approve the waivers included here, and approval of this application does not indicate or constitute approval of waiver requests.

Waiver requests will be finalized during the contracting process and must be included in an approved charter agreement pursuant to T.C.A. § 49-13-110. Additionally, charter school operators may request a waiver at any time during the school's operation.

While this section is not a scored component of the application and will not be used as a determining factor in an authorizer's decision to approve or deny a sponsor's application to operate a charter school, authorizers may choose to discuss waiver requests during the capacity interview.

| Proposed Waiver Requests | | |
|---|---|---|
| **Identify the statute or State Board rule for which the sponsor plans to submit a waiver.** | **Describe the statute or rule the sponsor wants to waive.** | **Explain how the statute or rule inhibits or hinders the sponsor's ability to meet its goals or comply with its mission.** |
| | | |
| | | |

# Educational Program Design and Capacity

**School Overview**

1. In 2-3 paragraphs, describe the overall vision for the proposed school. Include relevant details such as the academic focus, the students it will serve, and what success will look like.

**School Mission and Model**

2. Provide the mission statement for the proposed charter school.

3. Describe any mission-specific short- and/or long-term educational goals and targets that the school will have and how internal and external stakeholders, including the public, will know the extent to which the school is achieving its mission.

4. Describe how the sponsor assessed the need for the proposed school, including considerations around availability of school choice options in the community, capacity, and number and quality of available seats.

5. Describe the structure of the school day and week for the typical student. Differentiate by grade bands (e.g., K-5, 6-8, 9-12) as needed.

**Anticipated Student Population**

6. Describe the anticipated student population, including their anticipated academic and non-academic needs. Describe your methodology and identify your sources for determining these projections.

7. Complete **Table 1** and describe your sources and methodology for determining initial enrollment projections.

| Table 1. Projected Enrollment | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade Level | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Full Capacity |
| K | | | | | | | | | | | |
| 1 | | | | | | | | | | | |
| 2 | | | | | | | | | | | |
| 3 | | | | | | | | | | | |
| 4 | | | | | | | | | | | |
| 5 | | | | | | | | | | | |
| 6 | | | | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **7** | | | | | | | | | | | |
| **8** | | | | | | | | | | | |
| **9** | | | | | | | | | | | |
| **10** | | | | | | | | | | | |
| **11** | | | | | | | | | | | |
| **12** | | | | | | | | | | | |
| **TOTAL** | | | | | | | | | | | |

8. Complete **Table 2** and describe your sources and methodology for determining initial demographic projections. If the sponsor is proposing to operate an Opportunity Public Charter School, detail the anticipated percent of the student population that will be at risk, as defined in T.C.A. § 49-13-104.

| **Table 2. Anticipated Demographics** | |
|---|---|
| **Student Population*** | **Estimated Percent of Total Enrollment at Capacity** |
| Economically Disadvantaged | |
| Students with Disabilities | |
| English Learners | |
| At-Risk *(for opportunity public charter schools only)* | |

**See the Glossary of Terms for definitions*

9. Describe the proposed school's plan to recruit students both before and after the school has opened.

10. Describe the proposed school's policy for backfilling open seats, if applicable. If the proposed school does not plan to backfill open seats, explain why not.

**Family and Community Engagement and Support**

11. Explain how the sponsor has engaged with families and the community about the proposed school. Describe what the sponsor has learned through community engagement activities and how that engagement has informed the application and school design.

12. Provide, as **Attachment 1**, evidence of community engagement and support for the school. Complete **Table 3**, adding rows as needed, to identify and describe each item submitted as part of the attachment. Sponsors have discretion over what types of community engagement activities

they undertake and the supporting documents they submit; however, each piece of evidence should demonstrate authentic engagement with and investment in the community. For example, evidence could include letters of support from confirmed or potential partner organizations or photos and sign-in sheets from community meetings.

| Table 3. Evidence of Community Engagement and Support | |
|---|---|
| **Briefly describe each piece of evidence included as part of Attachment 1.** | **Explain how and why the submitted item is evidence of the sponsor's engagement with the community and the community's support for the school.** |
| | |
| | |

13. Describe how the school will continue to engage parents and community members once it is open.

**School Culture and Discipline**

14. Describe the culture or ethos of the proposed school and how it will promote a positive academic environment and reinforce the school's mission and goals.

15. Explain how this culture will be established for students, teachers, administrators, and parents from the first day of school, how it will be reinforced throughout the school year, and the plan for integrating students who enroll midyear.

16. Describe any goals related to student attendance and describe the structures the school will put in place, including collaboration with families and the community, to support student attendance and address chronic absenteeism.

17. Describe the proposed school's discipline approach. Discuss how this approach aligns with the school's mission and state law and will meet the needs of the anticipated student population.

**Curriculum and Instruction**

18. Provide an overview of the academic plan and program of the proposed school, including any non-negotiables of the school model (e.g., advisory model, instructional methods, length of school day). Explain how this plan supports the school's mission, anticipated student population, and planned outcomes.

19. Describe the basic learning environment for a typical student (e.g., classroom-based, independent study), including class size and structure. Explain how this plan supports the school's mission, anticipated student population, and planned outcomes.

20. Describe the primary instructional strategies that the school will expect teachers to use and why they are well-suited for the anticipated student population. Describe the methods and systems general education teachers will have for providing differentiated instruction to meet the needs of all students.

21. Identify the curriculum the school will offer in alignment with T.C.A. § 49-6-2206 and explain the process for selecting these materials, including a description of why these materials are appropriate for the anticipated student population. If the sponsor plans to apply for a waiver to use textbooks and materials that have not been approved by the State Board, identify the high-quality instructional materials the sponsor plans to use and describe the research demonstrating that they will meet the academic needs of students. *Note that all anticipated waiver requests should be included in the Waivers section of this application.*

22. For schools that will serve any of grades K-5, explain how the proposed school will incorporate foundational literacy instruction in accordance with T.C.A. § 49-1-905. *If the proposed school will not serve any of grades K-5, indicate N/A.*

23. For schools that will serve any of grades 9-12, describe the proposed school's plans for ensuring students have opportunities to meet college and career readiness indicators (e.g., early post-secondary opportunities, work-based learning, ACT, advanced coursework, dual enrollment). *If the proposed school will not serve any of grades 9-12, indicate N/A.*

**Special Populations**

24. Describe the proposed school's plans to ensure adequate numbers of appropriately certified staff to support the anticipated population of students with disabilities, English Learner students, and gifted students (e.g., contract with a vendor, hire staff member(s) internally).

25. Explain how the school will identify and meet the learning needs of students with disabilities, including students with higher needs, in the least restrictive environment possible. Specify the programs, strategies, and supports you will provide, including the following:
    - Methods for identifying students with special education needs (and avoiding misidentification);
    - Specific instructional programs, practices, strategies, curriculum, and materials the school will employ to provide a continuum of services; ensure students' access to the general education curriculum; abide by required minutes; and ensure academic success for students with special education needs; and
    - Plans for monitoring and evaluating the progress and success of special education students with mild, moderate, and severe needs to ensure the attainment of each student's goals as set forth in the Individualized Education Program (IEP) or 504 Plan.

26. Explain how the school will meet the needs of English Learner (EL) students, including the following:
    - Methods for identifying EL students (and avoiding misidentification);
    - Specific instructional programs, practices, strategies, curriculum, and materials the school will employ to ensure academic success and equitable access to the core academic program for these students; and
    - Plans for monitoring and evaluating the progress and success of EL students to ensure the attainment of each student's goals as set forth in the Individualized Learning Plan (ILP), including exiting students from EL services.

**Student Assessment and Evaluation**

Pursuant to T.C.A. § 49-13-111, public charter schools must administer state-mandated assessments (e.g., TCAP, TCAP End-of-Course Assessments, ACT, ELPA21). Pursuant to T.C.A. § 49-1-905, public charter schools must administer an approved universal reading screener to all students in grades K-3 during three administration windows each school year.

27. In addition to all mandatory state assessments, identify other formative and/or summative assessments the school will use to assess student learning needs and progress throughout the year and describe the frequency with which those assessments will be administered. Explain how those assessments are aligned with Tennessee Academic Standards and the proposed school's curriculum and instructional model.

28. Describe how the school will collect and analyze student academic achievement data, use the data to refine and improve instruction, and report the data to the school community.

29. Outline the school's strategies to identify and address academic underperformance, including plans for Response to Instruction and Intervention (RTI2) that align with Tennessee guidelines pursuant to State Board Rule 0520-01-03-.03.

**Educational Program Capacity**

30. Complete **Table 4**, adding rows as needed, to identify all individuals who are part of the proposed school. The table should include all school-based staff, board members, and all members of the applicant team identified on the Cover Sheet of this application. For members of the applicant team, please indicate whether those individuals plan to continue with the school if authorized and if so, what their role will be.

    Additionally, for each individual who will be part of the proposed school, if authorized, include:
    - **Attachment 2:** Resumes for each school-based staff member
    - **Attachment 3:** Resumes/biographies for each board member

| Table 4. Team Members | | | | | |
|---|---|---|---|---|---|
| Name | City and State of Residence | Current Title and Employer | Area(s) of Expertise | Part of the Applicant Team? (Y/N) | Position in Proposed School (e.g., board chair, school leader) |
| | | | | | |
| | | | | | |

31. If the sponsor has identified a proposed principal/head of school candidate, explain why this individual is well-qualified to lead the proposed school in achieving its mission, including:
    - A summary of the proposed leader's academic and organizational leadership record as it relates to the role and expectations at the proposed school
    - Specific evidence that demonstrates capacity to design, launch, and manage a high-performing charter school. If the proposed leader has never run a school, describe any leadership training programs that (s)he has completed or is currently participating in.

32. Describe the collective capacity and qualifications of the currently-identified team of school-based staff (not board members) to design and execute the academic plan in areas such as:
    - School leadership, administration, and governance;
    - Curriculum, instruction, and assessment;
    - Meeting the needs of special populations including students with disabilities, English learners, homeless students, students in foster care, migrant students, at-risk students, and gifted students;
    - Performance management; and
    - Parent and community engagement.

33. Identify any gaps in the current school leadership team, including the school leader if applicable, and describe plans to fill those gaps with future hires. Discuss the timeline, qualifications, criteria, and recruiting and selection process for hiring key leadership positions.

34. Describe the collective qualifications of the current set of board members (not school-based staff) to provide effective oversight and strategic direction in the following areas:
    - Governance and fiduciary responsibilities, including compliance with legal and regulatory requirements;
    - Oversight of academic performance, including holding the school leader accountable, monitoring progress toward academic goals, and ensuring alignment with the school's mission;
    - Financial oversight, including budget approval, financial controls, and long-term fiscal planning; and

- Community engagement and stakeholder responsiveness, including maintaining trust and transparency with families and local partners.

35. Explain the process by which board members have been and will be selected, including the criteria that have been and will be used to evaluate potential board members. Identify any gaps in the current governing board and describe plans to fill those gaps with future recruitment efforts.

# Operations Plan & Capacity

**Governance**

36. Describe powers and duties of the board, specifically describing the board's role in academics, operations, and finance.

37. Describe plans to add a parent representative to the board within six months of the school's opening pursuant to T.C.A. § 49-13-109. Detail the process for recruitment, selection, and onboarding of the parent representative.

38. Explain how the board will interact with the school leader, including how the board will support, develop, and evaluate the school leader each year. Include, as **Attachment 4**, an organization chart that shows the relationship among the school's governing board, management, and leadership in:
    - Year 1; and
    - At full capacity.

    *Note the organization chart should clearly delineate the roles, responsibilities, and lines of authority and reporting among the governing board, school leadership, any related bodies (such as advisory bodies or parent/ teacher councils), and any external organizations that will play a role in managing the school and how these roles and responsibilities will evolve between Year 1 and full capacity.*

39. Describe the board's policies related to:
    - Planned meeting frequency;
    - Committee or advisory board structure(s);
    - Ethical standards and procedures for identifying and addressing conflicts of interest; and
    - Hearing and addressing complaints.

40. Provide the following attachments:
    - **Attachment 5**: Articles of Incorporation
    - **Attachment 6**: Proof of nonprofit* and tax-exempt status
    - **Attachment 7**: Governing board bylaws

    **If a sponsor has applied for nonprofit status and not yet received approval, the sponsor should submit evidence of the application and describe the steps that have been taken. As required in state law, a charter shall not be granted to a for-profit corporation. Proof of nonprofit status must be provided in order to be recommend and approved by the authorizer.*

**Staffing**

41. Describe the school's leadership and staffing structure.

42. Explain the school's strategy to recruit and retain high-performing teachers. Outline the school's proposed salary ranges, employment benefits, and any incentive structures. Compare the salary ranges to the resident district and explain how they are sufficient to recruit teachers.

43. Describe the core components of the school's professional development plan and detail how those components will support effective implementation of the school model and instructional plan.

**Facilities**

44. Describe facility needs based on the educational program and projected enrollment.

45. Describe the progress to date of identifying and securing a facility in the proposed neighborhood/community that will meet the needs of the proposed school, as described above. Name the individual(s) on the sponsor's team leading the search as well as any brokers or real estate consultants supporting the search.

**Transportation**

46. Describe the plan to provide daily transportation to students, if applicable. Detail whether the proposed school will provide its own transportation services, contract out for transportation, or a combination thereof. If the school will not provide daily transportation services to and from school, describe how students will get to and from school and how the school will address any transportation barriers for student attendance.

47. Describe the plan to provide transportation to students whose individualized education plan (IEP) or 504 plan requires transportation to ensure the student receives a free and appropriate public education (FAPE) pursuant to 34 CFR § 300.34(c) and Section 504 of the Rehabilitation Act of 1973.

**Health and Safety**

48. Describe the plan for meeting the medical needs of students, including how the school will provide nursing services.

49. Identify the person or position responsible for school safety operations, detailing the responsibilities of this position, and providing the approach and timeline to develop a school safety plan in accordance with T.C.A. § 49-6-804 through T.C.A. § 49-6-808.

**Insurance**

State law requires that charter schools have appropriate insurance coverage. Types of insurance should include, at minimum, workers' compensation, employer liability, property, professional liability, surety bonds pursuant to T.C.A. § 49-13-111(n), and sexual abuse. If the proposed school intends to have school athletics, additional liability coverage will be required. Sponsors should check with their authorizer to determine the necessary coverage amounts.

50. Include, as **Attachment 8**, a letter of coverage from an insurance company that:
    - Lists the types and corresponding amounts of insurance coverage the proposed school will secure; and
    - States that the company will provide the required coverage upon approval of the charter application; and
    - Includes provisions for assuring that the insurance provider will notify the Tennessee Department of Education within ten (10) days of the cancellation of any insurance it carries on the charter school, pursuant to T.C.A. § 49-13-107(b)(19).

**Food Service**

51. Describe the plan to offer food service to the students, including how a food service vendor will be selected or, in the alternative, how the proposed school will provide meals in-house, including food preparation, storage, service, and staffing.

**Start-up Plan**

52. Provide a detailed timeline of key milestones and deadlines that the founding team must meet to open the proposed school on time. Include key areas such as hiring, student recruitment, and facilities acquisition and who is responsible for overseeing progress and completion.

53. Describe contingency plans for common startup challenges including:
    - Not meeting enrollment targets;
    - Not meeting fundraising goals;
    - Hiring challenges; and
    - Facility delays.

**Operations Capacity**

54. Based on the team identified in **Table 4**, describe the sponsor's team's individual and collective qualifications for implementing the operational plan successfully. Identify any gaps in the sponsor's team and describe plans to fill those gaps with future hires. The discussion of both current team capacity and future hires should include a discussion of capacity in areas such as the following:
    - Professional development and performance management;
    - Student health;
    - School safety and security;
    - School operations such as food service and transportation; and
    - Facilities acquisition and management.

55. Explain how organizational health will be measured, including performance in pre-operations, during early years, and as an established organization. If the board determines a need to intervene regarding organizational performance, what form(s) would that take?

# Budget and Finance

**Operating Budget**

56. Include, as **Attachment 9**, the completed budget using the state's required template. At a minimum, the budget must include:
    - A month-by-month accounting of anticipated revenues and expenditures in Year 0 and revenues and expenditures for two scenarios (minimum and planned/anticipated) for years 1-5 of the school's operation.
    - Anticipated budgetary assumptions for the following:
        - Student enrollment counts for years 1-5 of the school's operation;
        - Staff FTE counts for years 0-5 of the school's operation;
        - All anticipated funding sources, including state and local funding, secured grants, philanthropy, and fundraising; and
        - All relevant expenditures, expenses, and assumptions for each of the following expenditure/expense classification categories: salaries and benefits, contracted services, school operations, and facilities operations and maintenance.

57. Provide a budget narrative that includes a detailed description of assumptions and revenue estimates, including but not limited to the basis for revenue projections, staffing levels, and costs. The narrative should:
    - Address the degree to which the school budget will rely on variable income (e.g., grants, donations, fundraising);
    - Describe anticipated funding sources. Indicate the amount and sources of funds, property, or other resources expected to be available through banks, lending institutions, corporations, foundations, grants, etc. Note which have been committed and which are anticipated;
    - Describe the minimum student enrollment needed to open and operate in Year 1;
    - Discuss the school's planned approach to teacher salaries over time, including whether the school plans to use a step-and-ladder pay schedule or offer annual raises;
    - Describe the year 1 cash flow contingency, in the event that revenue projections are not met in advance of opening; and
    - Explain the school's contingency plan to meet financial needs for any year the school projects to be operating at a budget deficit.

**Budget and Finance Capacity**

58. Describe the systems, policies, and processes the school will use for financial planning, accounting, purchasing, and payroll, including the method for conducting annual audits of the financial, administrative, and program operations of the school. Describe how the school will establish and maintain strong internal controls and ensure compliance with all financial reporting requirements. Identify the role and key responsibilities of the individual who will be responsible for overseeing day-to-day financial management and system oversight.

59. Describe the procedures governing the deposit of idle funds, purchasing procedures, and comprehensive travel regulations.

60. Describe any services to be contracted, such as business services, payroll, and auditing services, including the anticipated costs and criteria for selecting such services.

61. Based on the team identified in **Table 4**, describe the sponsor's team's individual and collective qualifications for implementing the financial plan successfully. Identify any gaps in the sponsor's team and describe plans to fill those gaps with future hires. The discussion of both current team capacity and future hires should include a discussion of capacity in areas such as the following:
    - Financial management;
    - Fundraising and development; and
    - Accounting and internal controls.

62. Explain how the proposed school's financial health will be monitored and measured, including performance in pre-operations, during early years, and as an established organization. If the board determines a need to intervene regarding financial performance, what form(s) would that take?

# Addenda

Addenda are required of all sponsors meeting any of the criteria included below. Sponsors must complete all addenda that are applicable to their status and application. The addenda that the sponsor completes should align to the sponsor's history and intent as indicated on their letter of intent.

Additionally, sponsors may find that some addenda questions closely linked to questions asked in prior sections of the application narrative. Sponsors must answer each of the questions in the addendum, even if they feel they have answered the question previously. Sponsors may refer to previous questions and build upon prior answers when responding to addendum questions.

| Addenda | Criteria |
| --- | --- |
| Addendum A | Sponsors that currently have or have ever had any relationship to a charter school anywhere in the United States, including but not limited to opening, operating, or managing a charter school |
| Addendum B | Sponsors proposing to open a new school that will create a network or as part of an existing network/CMO |
| Addendum C | Sponsors seeking to contract with a third-party education service provider (ESP), including a management organization |
| Addendum D | Sponsors seeking approval of multiple schools during this application cycle |
| Addendum E | Sponsors seeking to convert a traditional public school to a charter school |
| Addendum F | Sponsors seeking to open an Opportunity Public Charter School |
| Addendum G | Higher education institutions seeking to open a charter school |

## Addendum A: Relationships with Other Charter Schools

*Must be completed by sponsors or governing boards that currently have or have ever had any relationship to a charter school anywhere in the United States, including but not limited to opening, operating, or managing a charter school.*

1. Complete **Table A1**, adding rows as needed, and include all charter schools with which the sponsor is currently or was previously affiliated. Provide all context that is necessary to understand the relationship between the sponsor and the affiliated school(s).

| Table A1. Affiliated Charter Schools | | | | |
|---|---|---|---|---|
| **School Name** | **Location (city, state) and Authorizer** | **Link to Most Recent State Performance Summary (e.g., state report card)** | **Link to Most Recent Authorizer Evaluation, if available** | **Description of Affiliation** |
| | | | | |
| | | | | |

2. Describe the similarities and differences between the needs and demographic profiles of students the schools listed above compared to the proposed school. What adjustments do you anticipate needing to make to ensure the proposed school is successful?

3. Select one or more consistently high-performing schools affiliated with the sponsor and describe why these schools are successful. Detail the specific academic and other outcomes that classify these schools as successful. Discuss the primary drivers of this success.

4. Select one or more underperforming schools affiliated with the sponsor and describe why these schools struggle to be successful. Detail the specific academic and other outcomes that classify these schools as underperforming and discuss the primary causes of their underperformance.

5. If applicable, list all charter revocations, non-renewals, shortened or conditional renewals, and withdrawals/non-openings of schools operated, and explain what caused these actions.

6. If applicable, explain any performance deficiencies or compliance violations that have led to formal authorizer intervention (e.g., a notice of deficiency or concern from the authorizer, probationary status) with any school operated in the last three years and how such deficiencies or violations were resolved.

7. If applicable, detail any current or past litigation and the resolution thereof related to charter schools sponsored, operated, or managed by the network and/or sponsor.

8. If the sponsor has never opened or operated a school in Tennessee, detail the adjustments the sponsor plans to make or consider making in expanding to Tennessee.

## Addendum B: Network/CMO

*Must be completed by sponsors or governing boards proposing to open a new school that will create a network or as part of an existing network/CMO.*

1. If applicable, describe the sponsor's strategic vision, desired impact, and five-year growth plan for developing new schools in Tennessee. Include the following information:
    - proposed years of opening;
    - number and types of schools;
    - any pending applications;
    - all currently targeted markets/communities and criteria for selecting them; and
    - projected enrollments.

2. Identify the network's leadership team and their specific roles and responsibilities. Describe the leadership team's capacity to open and simultaneously operate high-quality schools in Tennessee and elsewhere.

3. Describe the fiscal health of other schools in the network. Disclose any school(s) that have been subject to financial enforcement action, including but not limited to corrective action via an audit, fiscal probation, in default on a financial commitment, or in bankruptcy. Explain the circumstances around these schools.

4. Include, as **Attachment 10**, a detailed budget for the network. Where applicable, reference the school-level budgets provided within this application. The sponsor's network budget must detail:
    - Costs related to back-office services;
    - Costs related to the network's facilities plan;
    - All revenue assumptions for funding sources including but not limited to state, local, federal, grants, and philanthropy;
    - Anticipated financial transfers between the school and the network or its affiliates, if applicable (including start-up or other funds provided or loaned to the school, management fees, and other payments to be made by the school);
    - All anticipated network expenditures including but not limited to:
        - Total employee compensation (network/CMO level), including the percentage of the total compensation allocated for the proposed school;
        - Management fees and any other management compensation to the CMO or network (if applicable); and
        - Other network expenditures.

5. Explain any shared or centralized support services the network will provide to schools in Tennessee, including the cost of those services, how costs will be allocated among schools, and specific service goals. Describe how the proposed school will measure successful delivery of these services.

6. Complete **Table B1** to identify whether the school or the network is responsible for owning and executing key functions. Describe any changes to the ownership and execution of these tasks that will occur once the school is established.

**Table B1. Ownership and Execution of Key Functions**

| Function | Responsible for Execution | |
|---|---|---|
| | Network | School |
| Data management | | |
| Budget, finance, and accounting | | |
| Student recruitment | | |
| School staff recruitment and hiring | | |
| Community relations | | |
| Facilities acquisition and management | | |

7. Provide, as **Attachment 11**, the following organization charts:
   - Year 1 network as a whole (including both network management and schools within the network)
   - Year 3 network as a whole
   - Year 5 network as a whole

   *Note the organization charts should clearly delineate the roles and responsibilities of – and lines of authority and reporting among – the governing board, staff, any related bodies (such as advisory bodies or parent/teacher councils), and any external organizations that will play a role in managing the schools. The school-level organization charts should likewise present clear lines of authority and reporting within the school. If the school intends to contract with a charter management organization or other education service provider, clearly show the provider's role in the organizational structure of the school.*

8. Describe the following as it relates to the network-level governing board:
   - The size and composition (current and desired) of the board. Explain what, if anything, will change with the addition of a new school.
   - How this governance structure and composition will help ensure that the proposed replication school will be an educational and operational success.
   - The plan to ensure information relative to the proposed replication school's academic, operational, and fiscal performance will be communicated to the network's board.
   - How the network's board balances the interests of the network and individual schools.

## Addendum C: Third-Party Educational Service Provider (ESP)

*Must be completed by sponsors seeking to contract with a third-party ESP, including a management organization, in alignment with the State Board's Quality Charter Authorizing Standards.*

1. Describe evidence of the service provider's educational and management success.

2. Describe the process for selecting the ESP.

3. Include, as **Attachment 12**, a draft (or existing) service/management contract that sets forth proposed key terms, including roles and responsibilities of the school governing board, the school staff, and the service provider; the services and resources to be provided; performance-evaluation measures and mechanisms; detailed explanation of compensation to be paid to the provider; financial controls and oversight; investment disclosure; methods of contract oversight and enforcement; and conditions for contract renewal and termination.

4. Disclose and explain any existing or potential conflicts of interest between the school governing board and proposed service provider or any affiliated business entities.

5. Indicate whether the ESP currently services one or more schools operated by the governing body. If yes:
   - Detail any changes to the ESP agreement that will result from the addition of a new school.
   - Describe evidence that indicates the ESP has the necessary capacity to take on an additional school.

## Addendum D: Approval for Multiple Schools

*Must be completed by sponsors seeking approval of multiple schools during this application cycle, including any applications to replicate a Tennessee public charter school.*

1. Describe the organization's organizational and financial capacity to open and simultaneously operate multiple high-quality schools on the same timeline. Detail specific timelines for building or deploying organizational capacity to support the proposed schools.

2. Complete **Table B1**, adding rows as needed, to identify all charter schools applications, including replication, the governing body is seeking approval for during the current application cycle.

| Table B1. Other Charter School Applications | | |
|---|---|---|
| **Proposed School Name** | **Grade Levels to be Served at Capacity** | **Anticipated Authorizer** |
| | | |
| | | |

## Addendum E: Conversion Charter Schools

*Must be completed by sponsors seeking to convert a traditional public school to a charter school.*

1. Describe the rationale for converting the identified traditional public school to a charter school. Include, as **Attachment 13**, evidence that the sponsor has met the requirements for a conversion pursuant to T.C.A. § 49-13-106(j)(3).

2. Describe the sponsor's experience with conversion and turnaround of underperforming public schools, and detail how these changes affected student success within these schools. Describe how the sponsor achieved these results and address any challenges. If the sponsor lacks this experience, provide evidence and a rationale that details the sponsor's ability to successfully transform a struggling school.

3. Outline the plan for engaging in two-way dialogue and partnership with local neighborhood, community, and student population before school conversion.

4. Describe the school's existing school culture and the specific culture changes the sponsor plans to implement, including the process for determining which parts of the existing culture to keep, change, or add. Explain how the sponsor will create a new identity that respects and reinforces the school's history and role in the community.

5. If proposing a phase-in[1] conversion approach, describe how the proposed school will share physical space and resources with the existing school. Outline essential elements needed for successful cohabitation. Describe measures to minimize disruptions if the LEA transitions students out earlier than planned.

6. If proposing a full-school takeover[2] conversion approach, describe the transition plan and communication strategies with existing staff and the supports for students to mitigate disruption. Identify additional teaching and non-teaching personnel required to ensure student success.

[1] A phase-in conversion approach occurs when a traditional public school is converted into a charter school over time, typically by starting with one grade level and adding additional grade levels each year until the entire school is operated under the charter.

[2] A full-school takeover conversion approach occurs when the entire traditional public school is converted into a charter school all at once, with the sponsor assuming full control of all grade levels and operations from the beginning.

## Addendum F: Opportunity Public Charter Schools

*Must be completed by sponsors applying to operate an Opportunity Public Charter School.*

1. Detail how the school plans to verify a student's "at-risk" status upon enrollment, in accordance with State Board Rule 0520-14-01-.04 and Policy 6.114. Describe the plan to recruit students to ensure that at-risk students constitute at least 75% of the school's enrolled student population pursuant to T.C.A. § 49-13-104 (see the Opportunity Public Charter Schools overview at the beginning of this document for a list of criteria for at-risk students).

2. Describe how the proposed school model is designed to serve the anticipated at-risk student population well.

3. Describe how the school will define and measure its success, balancing academics and youth development. Detail the primary measures or indicators (e.g., academic achievement, academic growth, student engagement, postsecondary and workforce readiness) the school plans to use.

4. Based on the team identified in Table 4 in the application narrative above, describe the founding team's experience with the anticipated student population. Include evidence of team members' success meeting the academic and non-academic needs of these students.

5. Describe how the proposed school's schedule will create ample time and structures for students to build strong connections with staff and peers while providing the necessary time and structure to achieve each student's individual goals, while still being compliant with state requirements related to the length of the school day and year.

6. Explain how the school's structure, policies, and practices will allow sufficient flexibility and options to accommodate the unique needs of at-risk students while remaining compliant with relevant state law (e.g., school calendar, zero tolerance, etc.). As needed, describe any differences in structure and practices to accommodate different groups of at-risk students.

7. Detail any additional supports, including community partnerships and wraparound services, the school will offer to students to support students in meeting their individual academic goals. (Please ensure any confirmed or potential partnerships are captured in Table 3 in the application narrative above.)

8. Describe how the school will provide individualized case management/support services to students to help them meet academic and non-academic goals.

9. Describe the long-term funding plan and contingency plans to ensure the school is able to continue to offer the supports and services described in previous questions.

10. If the sponsor plans to operate a residential opportunity public charter school, describe the following:
    - A detailed plan for the construction, development, or purchase of residential facilities. Include, as **Attachment 14**, copies of all required permits, certificates, and other relevant documentation.
    - The plan to ensure the health and safety of students in the proposed residential facilities. Outline safety protocols, staffing plans for residential supervision, and emergency response plans.
    - The additional funding sources the sponsor has secured or expects to secure to support the operations of a residential Opportunity Public Charter School. Detail the amounts, timing, and duration of each secured and expected funding source.

*Note that both the budget template and the budget narrative provided as part of the application narrative for a proposed Opportunity Public Charter School should clearly reflect the facilities, staffing, and/or other needs described in this addendum.*

## Addendum G: Higher Education Institutions

*Must be completed by higher education institutions seeking to open a charter school.*

1. Describe the rationale for the institution opening and operating a charter school. How does operating a charter school align with the institution's core mission, strategic plan, and/or public service obligations?

2. Explain how the governing board of the charter school will interact with the board of the institution. Describe the decision-making responsibilities, if any, that board of the institution will have over the charter school.

3. Describe the internal structures at the institution that will oversee key elements of the charter school's operations (e.g., student information system, compliance requirements, school operations, transportation, food services, special populations staff, etc.).

4. Explain what, if any, institutional resources (e.g., facilities, technology, staff expertise, funding) will be allocated to the charter school and how students will access those resources.

5. Explain what, if any, direct academic integration (e.g., dual enrollment, early college credit) will exist between the charter school and higher education institution and be available to students.

6. Detail how the institution will manage potential conflicts of interest between its higher education operations and the charter school, particularly in areas such as contracting, employment, and shared services.

7. If the sponsor plans to locate the charter school on the institution campus, detail the plan to integrate the charter school with the university while maintaining the safety and security of the students. *Sponsors may mark N/A if they do not plan to locate the charter school on the institution campus.*

# Technical Support and Resources

For additional application support and resources, please visit the State Board's charter school webpage. Questions regarding the application may be submitted via email to charter.applications@tn.gov.

The State Board publishes a Tennessee Charter Authorizers and Agency Contact list, available on the State Board's charter school webpage. This list contains current local education agencies that have authorized or are currently operating a charter school. To contact local education agencies that do not currently have any operating charter schools, please visit the Tennessee School Directory for contact information.

**State Education Agency Websites**

- Tennessee Department of Education Website | Department School Choice Page
- Tennessee State Board of Education Website | State Board of Education Charter School Page
- Tennessee Public Charter School Commission Website

**Tennessee Governing Statutes**

- Tennessee Code Annotated
- Tennessee Code Annotated, Title 49 Education
- Tennessee Code Annotated, Title 49, Chapter 13 Tennessee Public Charter Schools Act

**Tennessee State Board of Education Rules and Regulations**

- Tennessee State Board of Education Rules
- Tennessee State Board of Education Policies
- Tennessee State Board of Education Pending Rules and Policies

**Tennessee Public Charter School Commission Rules and Regulations**

- Tennessee Public Charter School Commission Rules
- Tennessee Public Charter School Commission Policies
- Tennessee Public Charter School Commission Pending Rules and Policies

**Vacant and Underutilized Facilities Reports**

- The Department maintains a list of vacant and underutilized facilities as reported by LEAs. Governing bodies should review this resource and engage in a conversation with the authorizer regarding a potential facility.

**External Resources**

- National Charter School Resource Center
- National Alliance for Public Charter Schools
- National Association of Charter School Authorizers
- Tennessee Charter School Center

## Glossary of Terms

| | |
|---|---|
| **Academic Focus**[3] | A distinctive, thematic program such as math, science, arts, general academics, or an instructional program such as Montessori or Paideia. |
| **Academic Plan**[4] | A platform that supports the academic focus of the charter school and will include instructional goals and methods for the school, which, at a minimum, must include teaching and classroom instruction methods, materials and curriculum that will be used to provide students with knowledge, proficiency and skills needed to reach the goals of the school. |
| **Authorizer**[5] | A local board of education, the Tennessee public charter school commission, or the achievement school district that makes decisions regarding approval, renewal, and revocation of a public charter school application or agreement. For the purposes of this application, the authorizer is the local board of education. |
| **At Risk** | The term "at-risk" is defined for public schools in 20 USC § 6472 and further defined for Opportunity Public Charter Schools in Chapter 1066 of the Public Acts of 2024. Sponsors should ensure that they are using the correct definition when completing their application. |
| **Charter Agreement**[6] | A fixed-term renewable agreement between a public charter school and the authorizer that outlines the rights, responsibilities, and performance expectations of each party. |
| **CMO or Charter Management Organization**[7] | A nonprofit entity that manages or operates two (2) or more public charter schools; at least one (1) of which is in Tennessee. |
| **Commission or TPCSC**[8] | Tennessee public charter school commission was created by Chapter 219 of the Public Acts of 2019. The Commission serves primarily as an appellate authorizer for charter schools in Tennessee. |
| **Conversion Public Charter School**[9] | A charter school established by the conversion of an existing traditional public school into a charter school. |
| **Currently Operating** | The school is open and educating students as of the date of this application. |
| **Curriculum**[10] | A list of courses available to students enrolled in the LEA, accompanied by a course description and a list of the materials that will be used to provide instruction for the course. |

[3] T.C.A. § 49-13-104(1)
[4] T.C.A. § 49-13-104(2)
[5] T.C.A. § 49-13-104(3)
[6] T.C.A. § 49-13-104(4)
[7] T.C.A. § 49-13-104(5)
[8] T.C.A. § 49-13-104(6)
[9] T.C.A. § 49-13-104(7)
[10] T.C.A. § 49-2-138

| | |
|---|---|
| **Tennessee Department of Education** | The Tennessee Department of Education is a state agency that provides support to districts and public charters schools in the implementation of state law, rules and policies. |
| **Economically disadvantaged** | As defined in Tennessee's Every Student Succeeds Act (ESSA) plan established pursuant to the federal Every Student Succeeds Act (20 U.S.C. § 6301 et seq.), a homeless, foster, runaway, or migrant student or a student eligible for free or reduced-price school meals or milk through the direct certification eligibility guidelines established pursuant to 42 U.S.C. §§ 1751-176. |
| **Elementary[11]** | Schools serving any combination of kindergarten through grade six (K-6). For purposes of federal funding, "elementary schools" are schools serving any combination of pre- kindergarten through grade six (pre-K - 6). |
| **EL[12] and NELB** | **EL** - English Learner (EL) means an NELB student who qualifies for ESL services via a Department of Education approved English Language Proficiency screener.<br><br>**NELB** - NELB Student means a Non-English Language Background Student whose parent(s) or guardian(s) list a language other than English in response to any question on the home language survey. A NELB student may or may not qualify for ESL services. |
| **Foreign[13]** | A country or jurisdiction outside of any state or territory of the United States. |
| **Governing Body[14]** | Organized group of persons who will operate a public charter school(s) by deciding matters, including, but not limited to, budgeting, curriculum and other operating procedures for the public charter school and by overseeing management and administration of a public charter school. |
| **Intellectually gifted[15]** | Intellectually gifted means a child whose intellectual abilities, creativity, and potential for achievement are so outstanding that the child's needs exceed differentiated general education programing, adversely affect educational performance, and require specifically designed instruction or support services. |
| **Licensed teacher[16]** | A person over the age of eighteen (18) who meets the qualifications of T.C.A § 49-5-101 and holds a valid Tennessee educator license in compliance with the rules and regulations of the state board of education. |
| **Local Education Agency or LEA[17]** | Any county, city, or special school district, unified school district, school district of any metropolitan form of government or any other school system established by law. |
| **Middle schools[18]** | Schools designed to serve grades five through eight (5-8) only, or any combination of grades five through eight (5-8). |

[11] T.C.A. § 49-6-301(a)

[12] State Board 0520-01-19

[13] T.C.A. § 49-13-104(8)

[14] T.C.A. § 49-13-104(9)

[15] State Board Rule 0520-01-09-.03

[16] T.C.A. § 49-13-104(10)

[17] T.C.A. § 49-13-104 (11)

[18] T.C.A. § 49-6-301(b)

| | |
|---|---|
| **Network** | For purposes of this application, "Charter Network" has the same definition as CMO or Charter Management Organization, as defined above. |
| **Opportunity Public Charter School**[19] | Opportunity public charter school means a public charter school serving any of the grades six through twelve (6-12) for which at least seventy-five percent (75%) of the students enrolled in the public charter school, at the time of enrollment, are at-risk students and that provides instruction to students in a traditional classroom setting; or a residential program for enrolled students and provides instruction to such students in a traditional classroom setting. |
| **Proposed school** | The new charter school that the sponsor is proposing to open. |
| **Public charter school**[20] | A public school in this state that is established and operating under the terms of a charter agreement and in accordance with the Tennessee Public Charter Schools Act of 2002. |
| **State Board or State Board of Education** | The Tennessee State Board of Education is a state agency that sets the rules and policies for Pre-K through 12th grade public education. The State Board also conducts charter authorizer evaluations. |
| **Senior high schools**[21] | Senior high schools are schools in which are taught any combination of grades corresponding to grade nine through grade twelve (9-12); however, the school must include grade twelve (12). |
| **Sponsor**[22] | A proposed governing body filing an application for the establishment of a public charter school, that is not a for-profit entity; nonpublic school as defined in T.C.A. § 49-6-3001; other private, religious, or church school; or postsecondary institution not regionally accredited; and does not promote the agenda of any religious denomination or religiously affiliated entity. |
| **Students with disabilities**[23] | "Child with a Disability" means a child between three (3) and twenty-one (21) years of age, both inclusive, who has been evaluated and determined as having a disability under IDEA, state special education law, or Section 504 of the Rehabilitation Act of 1973. |
| **TCA** | Tennessee Code Annotated |
| **TCAP** | Tennessee Comprehensive Assessment Program |
| **TVAAS** | Student growth is measured by the Tennessee Value-Added Assessment System (TVAAS). |

[19] Chapter 1066 of the Public Acts of 2024

[20] T.C.A § 49-13-104(12)

[21] T.C.A. § 49-6-401(b)

[22] T.C.A. § 49-13-104(13)

[23] State Board Rule 0520-01-09-.02

# EXHIBIT 48

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**Charter School Pre-Opening Checklist**

**New Operator to the Tennessee Public Charter School Commission**

**Approved to Open in 2026-27 School Year**

## Introduction

After a charter school application is approved and authorized, there are a significant number of steps to be taken before a school is ready to open its doors to students, families, teachers, and the community. This will serve as a guiding document for charter schools that have been authorized by the Tennessee Public Charter School Commission (Commission) in conjunction with the provided pre-opening guide. Operators are expected to fulfill all the requirements outlined in the following table to ensure that the charter school opens with a strong first-year enrollment, clear facility plans, and a staff ready to serve all students. These are the foundations to succeed as a high-quality school.

Commission staff will work with the charter school to complete the pre-opening checklist, but it is the ultimate responsibility of the charter school to ensure it has completed all steps to be ready to open. Schools must complete all items listed in the pre-opening checklist. However, there are some items for which the Commission may not need to see the materials or documentation. These items are designated as attestations. Pre-opening schools will sign an attestation to confirm these deliverables have been completed each month. These deliverables will be starred (*) on the pre-opening checklist to indicate they are attestations. By signing the attestation, schools are confirming that they have completed the indicated items by their due dates. Commission staff may ask to see documentation or materials for items at any time, and should staff deem appropriate, will move to request submission of all items instead of attestations.

Additionally, the checklist begins with "Ready to Open" criteria, which outlines foundational items necessary for a school to be ready to open. These items will consistently be part of pre-opening check-ins and should be considered priorities for all pre-opening schools. These deliverables generally align with the material terms stated in the charter application, and the operator should aim to complete all items in accordance with the timelines specified within the criteria. The Commission understands that opening a school takes a significant amount of time and energy, and failure to complete one compliance item does not mean the school will not open. However, the Ready to Open criteria are considered foundationally important to opening, particularly within the outlined timeline. The Commission reserves the right to require the school delay its opening by one academic year[1] should the school be materially off-track for a successful opening.

All items will be uploaded to a Microsoft Teams channel, shared between the school and Commission staff. The Teams channel will contain folders corresponding with each month of submissions. When uploading documents, please ensure each document is clearly named, aligned to how the item is listed on the pre-opening checklist, to streamline the review process.

---

[1] T.C.A. § 49-13-108(b)(5)(D)

Commission staff will conduct a pre-opening visit to verify that the school is ready to open its doors to students. If a charter school does not complete all of the items on the Pre-Opening Checklist by December 31st of the year it opens, the school's charter will be recommended for immediate revocation[2].

[2] T.C.A. § 49-13-122(a)(5).

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**READY TO OPEN CRITERIA**

The "Ready to Open" criteria outline foundational items necessary for a school to be ready to open. These items will consistently be part of pre-opening check-ins and are considered priorities for all pre-opening schools. Schools should also ensure alignment between their approved charter applications, their approved charter agreements, and the ready to open criteria. If a school does not meet the dates listed within the timeline, it does not necessarily mean a delay is required; however, schools should strongly consider exercising their right to delay if they are not meeting the following dates or not on track to meet them within the general timeframe.

Schools are expected to submit an updated plan/timeline for key "Ready to Open" pre-opening items (facilities, financing, community engagement, etc.) by the December pre-opening meeting. Schools should update the startup plan included in the charter application for this submission.

| Item | Deliverables | Timeline |
| --- | --- | --- |
| Updated Startup Plan | Submit an updated plan/timeline for key "Ready to Open" pre-opening items (facilities, financing, community engagement, etc.). Plan should include facility information, staffing projections/timeline for hiring school leadership, enrollment targets, and corresponding budget for pre-opening and year one. The plan should also identify the primary individual(s) responsible for each item.<br><br>Schools should update the startup plan included in the charter application for submission. | December 1 |
| Facility | Identify a facility suitable for the school in alignment with the facility plan outlined in the application and start up plan, as well as necessary financing for the facility. This facility should be conducive to fulfilling the school's mission, vision, and instructional model. The facility must comply with the plan and location outlined within the approved charter application and approved charter agreement. Any modifications to the facility plan beyond what is approved may be deemed a material change and require an amendment to the charter agreement. | December 1 |

| | | |
|---|---|---|
| | If construction and/or renovations are needed, submit a scope of work and anticipated timeline. (If this is already included in the updated start-up plan, it does not need to be resubmitted, unless there is a material change.) If construction and/or renovations fall materially behind schedule, the school will need to provide Commission staff with updates bi-weekly, or as agreed upon.<br><br>Submit final lease or purchase agreement and minutes with Governing Board approval. | March 1<br><br>April 1 |
| Enrollment | Submit preliminary enrollment projections. Pursuant to State Board Rule 0520-14-01-.03, new and expanding charter schools are funded based off of projected enrollment and based on a per-student average of state and local funds. The enrollment projections, including proposed grades served in Year 1, must align with the approved application and approved charter agreement. Any modifications beyond what is approved may be deemed a material change and require an amendment to the charter agreement.<br><br>Submit preliminary enrollment and special education projections by funding option to begin the district planning and funding application processes.<br><br>Submit enrollment numbers after closing the enrollment period and lottery. *(Update monthly until July)*<br>• Estimated total enrollment on the first day of school<br>• Estimated number of SWD<br>• Estimated number of EL/LEP students<br>• Estimated number of directly certified (ED) students | February 15<br><br>February 15<br><br>*March 15 (Received student applications from at least* 25% of budgeted enrollment target)<br><br>April 15 *(received applications from at least 50% of budgeted enrollment)* |

| | | |
|---|---|---|
| | • Current enrollment count (total students, SWD, EL/LEP, ED)<br><br>If enrollment is not at target, then a contingency plan must be identified, discussed with the governing board, and submitted to the Commission to demonstrate financial feasibility at lower enrollment based on enrollment trends. | May 15 *(received applications for at least 75% of budgeted enrollment and at least 50% enrollments completed)*<br><br>June 15 *(75% enrollments completed)*<br><br>July 15 *(fully enrolled)* |
| Staffing | Hire head of school/principal. Submit the name and contact information. The Commission must be notified of any change in head of school/principal made after the due date and within 30 days of hire.<br><br>Have an adequate number of teachers that matches the staffing plan outlined in the startup plan and is aligned to student enrollment. On a monthly basis, submit an employee list that specifies the following: role/assignment, teacher license number (if required for role), and status of TBI background check. Please update this information in the personnel tracker provided. Clearly identify staff members assigned to provide SPED and EL services. | March 1<br><br>March 1<br>April 1<br>May 1<br>June 1<br><br>*NOTE: July and August submissions of this staffing plan are submitted through the reporting calendar.* |
| Financial Plan | Complete operating budget for the upcoming school year and receive approval from the Governing Board. In accordance with T.C.A. 49-13-111(l), a charter school must operate on a July 1 to June 30 fiscal year and the school's budget must be prepared on the LEA Chart of Accounts. Submit preliminary budget to the Commission reflective of projected enrollment numbers and facility commitments. Budget must specify the student enrollment assumption, and it should align with the approved charter agreement. | April 1<br><br>*NOTE: April 1 submission will be on a template to be provided by the Commission on LEA Chart of Accounts. Will clearly outline updates on enrollment, staffing, grants/revenue coming from sources outside of the state, etc.* |

| | | |
|---|---|---|
| | If enrollment is not on track to meet projected targets, Commission staff must be notified to determine if it is a material change to the charter agreement, and school should prepare a contingency budget to document financial feasibility should enrollment targets not be met.<br><br>Submit final board approved budget. Budget must specify the student enrollment assumption. | <br><br><br><br><br><br>July 1<br><br>*NOTE: July 1 submission will be the basis for the enrollment variance calculation in the school performance framework.* |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

**PRE-OPENING CHECKLIST**

The following compliance items need to be submitted throughout a school's pre-opening. Items will be submitted through a Microsoft Teams channel shared between the school and Commission staff. If a significant number of other items are not completed by the deadlines set by the Commission, the school's opening may be delayed, in accordance with Section 1.3 of the Charter Agreement.

Note: There are items in the pre-opening checklist for which networks may decide to be consistent across schools, and therefore have already submitted to the Commission. (For example, a network may decide to use the same student application form across schools.) For those items, notifying Commission staff that the materials are the same across network schools suffices as submission.

| **Beginning Months: November – January** | | |
|---|---|---|
| **Item** | **Deliverable** | **Due Date** |
| Name of contact for pre-opening checklist. | Submit name, title, and contact information of individual overseeing the pre-opening checklist. Submit to Commission staff's pre-opening lead. | November 15 |
| Submit student application form. | Submit the student application form the school plans to use for review and approval. If it is the same application that other schools in the network uses, and therefore has already been submitted, notify Commission staff. | December 15 |
| Submit lottery procedures. | In accordance with T.C.A. § 49-13-113 (b)(8), submit to the TDOE a certification by an independent accounting firm or by a law firm of the lottery process used for enrollment purposes OR request that the TDOE review and approve the lottery process at least 30 business days prior to the opening of the initial application window using the Charter Document Upload Form. Schools should reach out to Charter.Schools@tn.gov with questions.<br><br>Submit written documentation to the Commission. | **If utilizing TDOE pre-approval:** at least 30 business days prior to the application window opening<br><br>**If utilizing certification by an independent accounting firm or law firm:** 30 days after lottery is complete |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

| | | |
|---|---|---|
| Establish processes for food service.* | Contact the Tennessee Department of Education to set up a National School Lunch and Breakfast Program. Please consult the Office of Operations --> District Operations --> School Nutrition list on the TDOE Directory here for current points of contact. | January 15 |
| **February** | | |
| **Item** | **Deliverable** | **Due Date** |
| Sign up for employee benefits.* | Charter schools authorized by the Commission may participate in the state group insurance plans, in accordance with T.C.A. § 49-13-119 or select their own group insurance plan. Opt-in or opt-out of the State of Tennessee's Health, Dental, and Vision Plans.<br><br>Complete and submit required participation paperwork. | February 1<br><br>March 1 |
| Sign up eligible employees for TCRS. **This will be an attestation once processes have been established.* | Charter schools' employees must participate in the Tennessee Consolidated Retirement System (TCRS), pursuant to T.C.A. § 8-35-242.<br><br>Provide name of person responsible for TCRS reporting for the school.<br><br>Enroll eligible employees into TCRS and begin monthly internal reporting by the first payroll in which an eligible employee is paid. Maintain confirmation that the school has been established with TCRS.*<br><br>(Note: TCRS requires a signed copy of the charter agreement; work with Commission staff ahead of deliverable as needed) | February 1<br><br>March 1 |
| Establish a process for background screening for all employees and collect documentation of background checks, | Any individual in close proximity to school children must complete a satisfactory TBI background check prior to employment and every 5 years thereafter, pursuant to T.C.A. § 49-5-413. | February 1 |

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

| | | |
|---|---|---|
| including employees in transportation, food service, custodial, and security. | Obtain an ORI number from the TBI Submit confirmation of ORI number to the Commission. | |
| Submit e-mail domain. | Share with Commission staff what the email domain will be for all school personnel. If already in use by school personnel, confirm it is the domain that should be used for the Commission's submission into TDOE Whitelist. (For example, the Commission's email domain is @tn.gov) | February 1 |
| Update the school website to include information regarding SPED and EL services. | In accordance with T.C.A. 49-13-111(a)(5), charter schools must provide educational services to all students regardless of disability, English proficiency, or other diverse needs.<br><br>Provide a link to the school's website where there is information about the SPED and EL services provided by the school and that the school is open to all students and will serve the needs of all students who enroll. | February 1 |
| **March** | | |
| **Item** | **Deliverable** | **Due Date** |
| Name main contact for reporting calendar, federal programs compliance, and general compliance. | Submit name, title, and contact information of reporting calendar and general compliance contact.<br><br>Submit name and contact information of human resources lead. This individual should be able to provide staffing and licensure information to the Commission.<br><br>Submit name, title, and contact information of federal programs contact.<br><br>Hire and designate leads for special education, student discipline, testing coordinator, SIS/Data Manager, Homeless Services, Foster Care, Migrant, 504, | March 1 |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

| | | |
|---|---|---|
| | and ESL Services. Submit list of names and contact information of school-level and/or network-level leads.<br><br>(Note: Please include the contact information for each role, even if one individual will serve multiple roles. Schools may list the same person for as many roles as necessary).<br><br>Include within the contact information list uploaded in the Microsoft Teams channel. | |
| Adopt and implement a plan for identifying and assessing English proficiency for students classified as Non-English Language Background (NELB) through a Home Language Survey. | Create and submit a Home Language Survey (HLS) to use with all enrolled students who do not already have an HLS in their cumulative folder. HLS must comply with State Board Rule 0520-01-19. | March 1 (or two weeks before the beginning of the enrollment period) |
| Submit student enrollment form.<br><br>Establish process for collecting immunization records or proper exemption forms.* | Submit the enrollment form that the school plans to use for review and approval. The enrollment form must have: Occupational Survey (migrant identification) and Residency Questionnaire (McKinney Vento identification), and other requirements outlined in the Commission's Student Enrollment procedures.<br><br>Submit documentation of record process and written assurance that students who do not have such records will be barred from school (except where allowances are permitted), in accordance with T.C.A. § 49-6-5001. | March 1 (or two weeks before the enrollment form is used) |
| | | March 1 |

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

| | | |
|---|---|---|
| Submit completed mission-specific goal template. | Use mission-specific goal template provided by Commission at the beginning of pre-opening.<br><br>Mission-specific goals are included as an appendix to the charter agreement and schools will be held accountable to the mission-specific goal in the academic section of the school performance framework.<br><br>After March submission, Commission staff will review mission-specific goal with the operator as part of the April pre-opening meeting. | |
| Establish school calendar for year, start and end times, and class schedules, and circulate this information to staff, parents, and students. | Submit calendar, including start and end times, stockpile PD day requests, and 200-day accountability report to Commission for review. Please use calendar and PD day templates in Templates folder.<br><br>Submit proposed bell schedule(s). Pursuant to T.C.A. § 49-6-3004 and State Board Rule 0520-01-02-.31(1), a minimum of 6.5 hours of instructional time is required daily for the full academic year. Submit school bell schedules for both regular instructional days and any regularly scheduled early release days (such as for weekly PD) that reflect the minimum daily requirement.<br><br>Documentation of parental notification of calendar and schedules should be readily available for review if needed. This may take the form of an email or post on school's website* | March 1<br><br>March 1<br><br>April 1 |
| Establish school number. | Work with Commission staff to submit State School Approval Form. | April 1 |
| **April** | | |
| **Item** | **Deliverable** | **Due Date** |
| Sign up eligible employees for TCRS.* | Document TCRS payroll contributions monthly. | April 1<br>May 1 |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

| | | |
|---|---|---|
| | | June 1<br>July 1 |
| **May** | | |
| **Item** | **Deliverable** | **Due Date** |
| Update the school website with governance documents.* | In accordance with T.C.A. § 49-13-111(h), ensure that the school's website has governance documents posted, including open meetings law requirements (agendas, minutes, list of board members, etc.). Continue to update throughout pre-opening and beyond. Commission staff will be checking the website regularly to ensure compliance. | May 1 (or earlier if Board has meetings prior to this date) |
| Provide updated Governing Board information. | Submit list of the current members of the Governing Board including contact information and positions held on the Governing Board. The Commission must be notified of any change to the Governing Board made after the due date within 30 days of the change. | June 1 |
| Establish and approve by-laws. | Submit copy of ratified by-laws and copy of minutes with ratification vote to the Commission. | June 1 |
| Submit payment information to TDOE/Edison. | Submit W9 and ACH routing information to establish school as a vendor in Edison here or confirm vendor number if already established. | May 1 |
| Select a teacher evaluation system.* | In accordance with T.C.A. § 49-1-302, T.C.A. § 49-5-108, and State Board Rule 0520-02-04, the school must select a teacher evaluation system and notify the Tennessee Department of Education of the system. If the school chooses to adopt an alternative observation model, it must be approved by the State Board in accordance with State Board Policy 5.201. If you have questions about teacher evaluations, please contact TDOE at TEAM.Questions@tn.gov. | May 1 |

| | | |
|---|---|---|
| Complete TCRS payments for eligible employees. | Document TCRS payroll contributions monthly. | April 1<br>May 1<br>June 1<br>July 1 |
| **June** | | |
| **Item** | **Deliverable** | **Due Date** |
| Ensure school has appropriate management and oversight of student information in place. | Identify student information system (SIS) manager within the school and notify the Commission staff of name and contact information. Commission staff will work with SIS manager to secure access by mid-June. | June 1 |
| Execute a management contract. (If applicable) | Submit contract that is signed by management company and Governing Board and minutes from meeting approving the contract. Commission staff will review the contract to ensure it is in alignment with the requirements of the Charter Agreement and includes all required elements. | June 1 |
| Draft and submit all plans/procedures/policies required to the pre-opening process and designate policy point of contact. | See attached sheet for required plans/procedures/policies.<br><br>Submit main point of contact for policy audit to Commission staff. | June 1 |
| Complete initial requirements for federal funding compliance. | *For Title I Schools Only:* Create and submit school/parent/student compact forms to the Commission and plans to host annual Title I meeting by Oct. 1. | June 1 |
| Establish processes for food service. | Determine lead for food services and submit name and contact information.<br><br>If contracting with a third-party vendor ensure contract is documented and available for review.* | June 1 |

| | | |
|---|---|---|
| Execute contract with a custodial service vendor. | Submit contract with custodial vendor, if applicable. | June 1 |
| If transportation will be provided, select transportation service provider. Service must meet specifications outlined in the Charter Contract. | Submit contract and insurance information of transportation provider and provide school contact for handling transportation, if applicable. | June 1 |
| Obtain federal tax-exempt status for the school's education corporation.<br><br>Submit EIN and Unique Entity ID numbers. | Submit copies of all applications (Form 1023) and filings regarding tax-exempt status to the Commission, including final Internal Revenue Service determination letter.<br><br>Submit copy of school's EIN and Unique Entity ID. | June 1<br><br>July 1 |
| Meet with local law enforcement to establish partnership and complete safety walkthrough. | Submit written assurance of walkthrough, including any safety recommendations made by law enforcement. This item is due to the TDOE and we recommend getting this scheduled as soon as possible. Please submit communication or confirmation regarding scheduled security assessment and submit final assessment once complete.<br><br>NOTE: Email Homeland.security@tn.gov to request extension for school security assessment if facility won't be ready by June 15. Submit evidence extension has been granted. | June 15 |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

| | | |
|---|---|---|
| Complete TCRS payments for eligible employees.* | Document TCRS payroll contributions monthly. | April 1<br>May 1<br>June 1<br>July 1 |
| **July** | | |
| **Item** | **Deliverable** | **Due Date** |
| Submit Foundational Literacy Skills Plan for approval to TDOE (schools serving K-5).* | For schools serving K-5, submit a Foundational Literacy Skills Plan to the TDOE for approval, pursuant to T.C.A. § 49-1-905(f).<br><br>Please see the TDOE's website for further information. This is a submission to the TDOE, not to the Commission. | July 1 |
| Develop student/family handbook. | Submit copy of Student and Family Handbook containing the required policies/procedures. The handbook must have all required notices including student discipline, complaints/grievances, FERPA, etc.<br><br>For handbook requirements, see Commission Student Handbook under the Commission's LEA Procedures. | July 1 |
| Ensure school has appropriate management and oversight of student information in place.<br><br>Ensure Student Information System (SIS) and state reporting system has all of the required information from the school. | Identify any final requests for plug-ins or auto-comm/auto-send (no additional plug-ins will be added after this date).<br><br>Ensure all currently identified English Learners and student with disabilities are entered into the Commission PowerSchool instance and error free. (July 31 deadline)<br><br>Submit a request for all personnel who will need SSO, TN Pulse, InformTN, and ELPA 21 usernames. | July 1<br><br>(Date and link for requests will be communicated) |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

| | | |
|---|---|---|
| Establish a payroll system.* | Ensure contract with a payroll company is available or have evidence of employment of or contract with persons to handle payroll and copy of deduction policy. | July 1 |
| Designate individual responsible for back-office operations/reporting. | Submit evidence of employment or contract with an accountant, bookkeeper, or other person who will handle financial matters. Include this individual in the personnel tracker. | July 1 |
| Retain an independent certified public accountant for auditing requirements.* | Ensure contract with independent certified public accountant is available, in accordance with T.C.A. § 49-13-111(k). | July 1 |
| Establish a process for background screening for all employees and collect documentation of background checks, including employees in transportation, food service, custodial, and security. * | Conduct TBI background checks for each new employee, contractor, or volunteer.<br><br>Schools are responsible for running their own DCS checks. In order to gain access, operator must submit names and emails for up to four individuals to Commission staff to provide to DCS. From there, DCS will work with schools to get them set up.<br><br>This will continue with our reporting and compliance specialist in the coming months through the reporting calendar.<br><br>Maintain background checks in a secure location in accordance with state and federal law. Files should be available for inspection at any time. (Storage must be in place for July 1 and will be checked during walk through, no submission required.) | July 1<br><br>Ongoing |
| Establish human resource system for maintaining information.* | Identify Human Resource Information System to collect and maintain employee information required under Personnel Information Reporting System (PIRS). | July 1 |

| | | |
|---|---|---|
| | Gain access to TNCompass through TDOE. | |
| Adopt and implement a plan for identifying and assessing English proficiency for students classified as Non-English Language Background (NELB) through a Home Language Survey. | Submit written documentation of the school's plan to administer the ELPA screener to eligible students, and how the school plans to meet the anticipated needs of the EL students in accordance with federal and state law, in alignment with State Board Rule 0520-01-19.<br><br>A final service plan will be submitted as part of the reporting calendar. | July 1 |
| Adopt and implement a plan to deliver required services to students with disabilities. | Submit written documentation monthly on progress on hiring appropriate staff or contracts with other vendors for special education teacher(s), school psychologist, speech and language therapists, and occupational and physical therapists, or other services or equipment, if required by student IEPs.<br><br>Identify staff hired to support projected enrollment of students with IEPs, ILPs, ILP-Ds, and 504 Plans. Identify who coordinates this work at the school level.<br><br>Submit written documentation of anticipated students and their anticipated needs to the Commission and how the school plans to meet the needs of the students. A final plan will be submitted as part of the August reporting calendar (deadline is September 5th). | July 1 |
| Submit student record request plans. | Ensure that records have been requested and/or received, are or will be in locked storage, and locked storage is present at the time of inspection. This is an attestation for this month. Commission staff will inspect records storage at the Closeout Walkthrough. | July 1 |

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

| | | |
|---|---|---|
| | (NOTE: The Commission strongly recommends schools begin requesting records as early as May to have the files in time for the beginning of the school year. Schools may use the optional Commission tracker.)<br><br>Submit copy of FERPA procedures for storage/handling of student files in school. Locked storage of student files will be inspected during pre-opening walkthrough. | |
| Complete initial requirements for federal funding compliance. | Create and submit a draft of the state required School Improvement Plan (School Plan). | July 1 |
| Hire or contract with a nursing services provider and create a plan and procedures for the administration of prescription and non-prescription medications to students and for provision of required health services. | Submit documentation of the school's relationship with a registered nurse and/or physician. | July 1 |
| Acquire required insurance.* | Ensure certificate of insurance meets the minimum levels as required by TCA § 49-13-107 and the Charter Agreement. | July 1 |
| Obtain an asbestos-free certification under 40 CFR 763.99. | If constructing a new school building, obtain a statement from an architect, project engineer responsible for the construction of the new building, or an accredited inspector that no asbestos-containing building material (ACBM) was specified as a building material in any construction document for the building, or, to the best of his or her knowledge, no ABCM was used as a building material in the building. | July 1 |

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

| | | |
|---|---|---|
| | If not constructing a new school building, submit assurance of proper inspection for ACBM by an accredited inspector, as required by Federal laws and regulations governing asbestos in schools. | |
| Obtain a Certificate of Occupancy and any other required permits from local building department before Pre-Opening Visit. | Submit Certificate of Occupancy and any other required permits.<br><br>This will be examined as part of the walkthrough process. | July 1 |
| Complete Fire Marshal inspections on any major renovation work done to facility to ensure approval for occupancy as an educational space. | Submit documentation of Fire Marshal inspection.<br>This will be examined as part of the walkthrough process. | July 1 |
| Complete TCRS payments for eligible employees.* | Document TCRS payroll contributions monthly. | April 1<br>May 1<br>June 1<br>July 1 |
| Ensure all necessary staff have access to TN Pulse.* | Ensure all necessary staff have acquired an SSO account. Schools will need to request an SSO through Commission staff.<br><br>Ensure all staff who support IEPs, ILPs, ILP-Ds, and 504 plans have a TN Pulse account, can login, and have the appropriate user roles. | July 31 |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

**UPCOMING ITEMS FOR REPORTING CALENDAR RELATED TO PRE-OPENING**

These items are included in this list not to be submitted through the pre-opening process, but as flags for upcoming items that will be submitted through the reporting calendar.

| | | |
|---|---|---|
| Establish processes for food service. | Complete registration and submit required forms to the State Department of Education to finalize operation of a National School Lunch and Breakfast Program. | July 31 |
| Ensure Student Information System (SIS) and state reporting system has all of the required information from the school. | Enroll all students and complete staff profiles in student information system. | July 31 |
| | Finalize all student and staff profiles, including resolving any errors in student information system. | August 31 |
| Develop written safety plans for life safety procedures such as fire drills and emergency evacuation, including school safety plans in accordance with Project SAVE. These plans are in the student and employee handbooks, and the school hires appropriate security personnel. | Submit copy of SAVE plan and Emergency Operations Plan in Navigate Prepared. | August 1 |
| Hire or contract with a nursing services provider and create a plan and procedures for the administration of prescription and non-prescription medications to students and for provision of required health services. | Submit written documentation of anticipated students and their anticipated health needs to the Commission and how the school plans to meet the needs of the students in accordance with required services. | August 1 |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

**FINAL PRE-OPENING VISIT**
**WALKTHROUGH CHECKLIST**

The following items will be inspected as part of the final pre-opening visit:

| Topic | Item | Completion Status | Notes |
|---|---|---|---|
| **Facilities Readiness and Signage** | Utilities and water are turned on and working properly in all areas of the building. | | |
| | Submit Asbestos Certification, Certificate of Occupancy and any other required permits from local building department. | | |
| | Space is safe and secure; entrance and egress from the school's space is adequately controlled. | | |
| | All exterior doors close and lock properly. | | |
| | School safety zone signage. (optional) | | |
| | Complete Fire Marshal inspections on any major renovation work done to facility to ensure approval for occupancy as an educational space. | | |
| | Inspection of appropriately secured medical storage. | | |
| | Ensure that classroom space, restrooms, and special purpose space meet the requirements of the program and the number of students enrolled. | | |
| | Distribute necessary instructional materials and supplies to classrooms at every grade level, including age-appropriate classroom furniture. | | |

| Topic | Item | Completion Status | Notes |
| --- | --- | --- | --- |
| | Public displays of signage (noted in required postings section of Charter Handbook and included below). | | |
| **Emergency Operations** | Ensure that fire extinguishers have been recently inspected. | | |
| | Ensure that there is adequate signage for the school and that the school building is appropriately numbered for emergency response purposes. | | |
| | Make certain each room has emergency exit plans and maps that will not be covered by any materials. | | |
| | Ensure two (2) fire drills are planned and will occur within the first thirty (30) full days of the school year. | | |
| **Records Storage** | Medical records are separate from academic records, in locked storage, and locked storage is present at time of Pre-Opening Visit. | | |
| | Student records have been requested and/or received, are or will be in locked storage, and locked storage is present at the time of inspection. | | |
| **Food Service and Preparation** | The school has the necessary equipment to either prepare food on site or accept food service delivery and properly store food and beverage until it is consumed. Inspection will be completed at Pre-Opening Visit. | | |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

| Topic | Item | Completion Status | Notes |
|---|---|---|---|
| **Transportation** | Inspection of school transportation plans and spaces for buses, traffic flow-thru, and student drop off/pick up. | | |
| **TDOE Best Practices (optional, but strongly encouraged)** | All classroom doors remain locked during school hours. | | |
| | Vestibule-style door entry system. | | |
| | The school has a visitor management procedure that includes checking IDs. | | |

**Required Postings**

(From Commission Charter School Handbook)

| Required Posting/Notice | Completion Status | Notes |
|---|---|---|
| Notice prohibiting weapons on school property | | |
| Visitor code of conduct | | |
| Notice that lockers and other storage areas, containers, and packages brought into the school by students or visitors are subject to search for drugs, drug paraphernalia, dangerous weapons, or any property that is not properly in the possession of the student | | |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

| Required Posting/Notice | Completion Status | Notes |
|---|---|---|
| Notice visible from the school parking lot that vehicles parked on school property by students or visitors are subject to search for drugs, drug paraphernalia, or dangerous weapons | | |
| Notice that the school does not discriminate on the basis of sex and prohibits sex discrimination in any education program or activity that it operates, as required by Title IX, including in admission and employment. | | |
| Notice that displays prominently the contact information required to be listed for the Title IX Coordinator in each available handbook or catalog | | |
| DCS/child abuse reporting notice (Guidance found here) | | |
| Homeless information posters - with correct school and district contact information (English and Spanish) | | |
| Child Find information posters | | |
| National Motto | | |
| Notice that use of tobacco, electronic/battery operated devices, vapor products, and all other associated paraphernalia are prohibited | | |

# EXHIBIT 49

# EFS FAQs

## General Program

### What are Tennessee Education Freedom Scholarships?

Education Freedom Scholarships allow students who are entitled to attend a Tennessee public school in grades K-12 to use state funds for education expenses while enrolled in an EFS-registered Category I, II, or III non-public school located in Tennessee, prioritizing expenses for tuition and fees.

### Are the ESA, the IEA, and the EFS Programs now the same?

No, the Education Savings Account (ESA) Program, the Individualized Education Account (IEA) Program, and the Education Freedom Scholarship (EFS) Program will operate as three separate school choice programs. The student application and school application/registration process will be different for each program. For more information on requirements, awards, and participation in each choice program, please visit the following webpages:

- ESA Program (https://www.tn.gov/education/esa.html)
- IEA Program (https://www.tn.gov/education/iea.html)
- EFS Program (https://www.tn.gov/education/efs.html)

Each program operates as a separate platform and account. If you already have a username for ESA or IEA, you will still need to create a new account in the EFS platform.

### When will the EFS application be available for new students for School Year 2026-27?

The EFS application will open on January 13, 2026, at noon CT/1 p.m. ET for new 2026-27 applicants and provide scholarships for the 2026-27 school year. The EFS application can be found on the department's EFS webpage (https://www.tn.gov/education/efs.html). The deadline to apply is January 30, 2026, at 4 p.m. CT/5 p.m. ET.

### When will the EFS renewal application be available for current EFS recipients to renew for School Year 2026-27?

App.1756

The EFS renewal application opened on December 9, 2025, at noon CT/1 p.m. ET for current EFS recipients to provide scholarships for the 2026-27 school year (SY). The EFS renewal application can be accessed via the online portal accessible through the department's EFS webpage. (https://www.tn.gov/education/efs.html) The deadline to apply is January 30, 2026, at 4 p.m. CT/5 p.m. ET.

### How can I stay up to date on the EFS Program?

The EFS webpage (https://www.tn.gov/education/efs.html) is the best source for the most accurate information on the EFS Program. To receive regular updates, please sign up for the EFS Family Newsletter (https://forms.office.com/Pages/ResponsePage.aspx?id=vUUkRyQkj064UN90iOGLSge9ryQQXmhMvveNN88fYupUOFdZMlVGU1JVRjJXVFE3Tk9XM1lBOUQ5TS4u).

---

## Student Application/Eligibility

### Application Details

#### When will the student application be available, and what is the process for families to apply?

App.1757

- The EFS **renewal** student application for the 2026-27 school year launched on December 9, 2025, at noon CT/1 p.m. ET, within your current EFS account in the online portal.
  - The renewal application is only available for students who have an active EFS at the time of application submission.
  - If your 2025-26 application is currently in an Eligible status, you must submit a **new** student application to be considered for a scholarship in the 2026-27 school year.
- The 2026-27 SY EFS New Student Application (https://app.efs.tnedu.gov/users/sign_in) will launch on **January 13, 2026, at noon CT/1 p.m. ET.**
- The application deadline for the 2026-27 school year for both renewal and new applications is **January 30, 2026, at 4 p.m. CT/5 p.m. ET.**
- If you created an account in SY 2025-26, regardless of whether you submitted an application, make sure you can still access your account and that your password is up to date.
  - Sign in to your existing account: https://app.efs.tnedu.gov/users/sign_in (https://app.efs.tnedu.gov/users/sign_in).
- If you did **not** create an account for SY 2025-26, please set one up and retain your login credentials so you are ready on January 13, 2026.
  - Create a new account: https://app.efs.tnedu.gov/users/sign_up (https://app.efs.tnedu.gov/users/sign_up).
- The EFS **renewal application** includes four sections:
  - *Student Information*: Information previously provided prepopulates for review and is editable for any updates as needed.
  - *Eligibility*: Applicant will be prompted to confirm whether or not the previously provided documentation demonstrating U.S. citizenship or lawfully presence status is still current. If so, no further action is necessary. If not, applicant must upload updated supporting documentation to demonstrate the **student's** eligibility for the EFS program as either a U.S. citizen (1 document) or lawfully present in the U.S. (2 documents), under one of the immigration categories in the EFS rule (see the EFS Renewal Application Checklist on the EFS webpage (https://www.tn.gov/education/efs.html)).
  - *TN Residency*: Current EFS recipients must upload two (2) proof documents from the approved list to confirm Tennessee residency. Even if last year's proof documents are still current, you must upload two (2) proof documents again.
- *Assurances & Submit*: Review and agree to EFS Assurances and a FERPA release.
- The EFS **application for new applicants** includes four sections:
  - *Student Information*: Provide information about the student for whom the EFS application is submitted and the parent/legal guardian.
  - *Eligibility*: Applicant must upload supporting documentation to demonstrate the **student's** eligibility for the EFS program as either a U.S. citizen (1 document) or lawfully present in the U.S. (2 documents), under one of the immigration categories in the EFS rule (see EFS Application checklist on the EFS webpage (https://www.tn.gov/education/efs.html)).
    - *Priority Categories*: Applicant may respond to additional questions to demonstrate eligibility for priority categories related to income eligibility, IEA/ESA program eligibility, or current enrollment in a Tennessee public school.
- *Tennessee Residency*: New applicants must upload two (2) proof documents from the approved list to confirm TN residency.

- *Assurances & Submit*: Review and agree to EFS Assurances and a FERPA release.

## What happens after I submit my application?

- Upon application submission, a confirmation of receipt email will be sent to the family from Notifications@TheoLearning.com (mailto:Notifications@TheoLearning.com), efs-notifications@tnedu.gov (mailto:efs-notifications@tnedu.gov), or EFS.Questions@tn.gov (mailto:EFS.Questions@tn.gov). The time it takes to review an application will depend on the volume of applications received.
- After review of the application is complete, families will receive an email from Notifications@TheoLearning.com, (mailto:Notifications@TheoLearning.com) efs-notifications@tnedu.gov, (mailto:efs-notifications@tnedu.gov) or EFS.Questions@tn.gov (mailto:EFS.Questions@tn.gov) with a decision and next steps.
- Incomplete Applications:
  - **Incomplete applications will have one (1) opportunity to resubmit the application with corrected documentation. The corrected application must be resubmitted by 4 p.m. CT on the fifth business day after email notification of the incomplete status is sent. If the application is not resubmitted or the resubmission is incomplete, your application will be Expired.**
  - **For all applications, only Tennessee residency and/or U.S. Citizenship/lawful presence documentation will be accepted on resubmission of an incomplete application. Information regarding priority category consideration will not be accepted beyond the initial submission of the application. A resubmitted incomplete application will not retain the original timestamp but will be reconsidered within the initially demonstrated priority category.**
  - *Example: Student submits a new application that includes an illegible document to demonstrate U.S. citizenship and, although Student currently attends a Tennessee public school, Student does not include information demonstrating that Student is eligible for Priority 4. Because of the illegible citizenship document, student's application is returned as incomplete. Student may resubmit a citizenship document, but Student may not submit information to demonstrate student is eligible for Priority 4. Student's resubmitted, completed application will be considered in Priority 5, and the order of receipt will be determined by the resubmission date.*

## How will applications be managed if I apply for more than one student in my family?

- An individual application must be submitted for each student intending to participate in the EFS Program in the 2026-27 school year.
- Parent/guardian information and Tennessee residency documentation will be pre-populated on subsequent applications after it is entered in one new student application.
- All applications will be processed by priority category and in the order in which they are received by the department; no preference is given for approval of sibling applications.

## What are the criteria by which the EFS scholarships are awarded in the 2026-27 school year?

If the number of applications received by the Tennessee Department of Education (department) exceeds the number of EFS available for the 2026-27 school year, then the department shall award EFS in the following order in alignment with the Education Freedom Act:

- Priority 1: Current EFS Recipient - A Recipient in the immediately preceding school year who has a current EFS at the time of application;
- Priority 2: Income Eligibility (100% FRPL, SNAP/TANF, ESA/IEA Eligibility) - An Eligible Student whose annual household income does not exceed one hundred percent (100%) of the amount required for the student to qualify for free or reduced price lunch, as provided in the income eligibility guidelines published by the United States Department of Agriculture's Food and Nutrition Service for the most recent school year, or who is an Eligible Student as defined by T.C.A. § 49-6-2602 for an ESA or by T.C.A. § 49-10-1402 for an IEA, in the order in which the department receives Completed Applications;
- Priority 3: Income Eligibility (300% FRPL) - An Eligible Student whose annual household income does not exceed three hundred percent (300%) of the amount required for the student to qualify for free or reduced-price lunch, as provided in the income eligibility guidelines published by the United States Department of Agriculture's Food and Nutrition Service for the most recent school year, in the order in which the department receives Completed Applications;
- Priority 4: Current TN Public School Enrollment or Eligible to Enroll in Kindergarten- An eligible Student who, at the time of submitting a Completed Application, is currently enrolled in a Tennessee public school or who is eligible to enroll in Kindergarten in a public school for the respective school year, in the order in which the department receives Completed Applications; and
- Priority 5: All Other Eligible Students - An Eligible Student, in the order in which the department receives Completed Applications.

*Applicants may respond to questions to demonstrate eligibility for multiple priority categories. The highest priority category demonstrated by the application on original submission will be assigned to the application. No additional information provided after the initial submission will be considered for priority categorization. The following information outlines the documentation required to determine eligibility for prioritization categories.*

- *Example: Student submits a new, complete application that includes documentation related to Priority 3 and Priority 4. If the documentation demonstrates eligibility for both categories, or only Priority 3, then the application will be considered in Priority 3, which is the higher category. If the documentation demonstrates eligibility for Priority 4, but not Priority 3, then the application will be considered in Priority 4. If the documentation does not demonstrate eligibility for either category, then the Student will not have an opportunity to submit additional documentation, and the application will be considered in Priority 5.*

All scholarships are subject to available appropriations.

### Once I apply, what is my next step? When will I know if I'm getting a scholarship?

Applications will be processed by priority category and in the order in which they are received by the department. Monitor your email inbox that was provided in your application for an email indicating the results of the review from Notifications@TheoLearning.com (mailto:Notifications@TheoLearning.com), efs-notifications@tnedu.gov, (mailto:efs-notifications@tnedu.gov) or EFS.Questions@tn.gov (mailto:EFS.Questions@tn.gov). If your student is conditionally approved for a scholarship, then the conditional approval email will contain next steps to choose an EFS-registered school and enroll.

### What if I do not have an email address?

- Even if submitting a paper application, an email address is required to maintain the application and, if applicable, eventual enrollment and payment of funds to the EFS-registered school and/or service providers. Please note that paper applications will not be accepted for renewal applications. Renewal applicants must use their existing account holder credentials to submit a renewal application in the online portal.

### Will families know their place in line once they complete the application?

- No, families will not know their place in line when they complete their application. Families will receive an email confirming that their application has been submitted. Once a completed application is reviewed, a family will know their priority categorization, as demonstrated by the documentation the family provided.

### How should my 18-year-old student apply for an EFS?

*IMPORTANT: 18-year-old students must apply on their own behalf and be listed as the applicant and the student on the application* unless the student has executed a valid power of attorney appointing the parent/guardian as the student's attorney in fact, or a judge has appointed the parent/guardian as the student's conservator. If residency or other documentation is not in the student's name, ensure the parent/guardian is included as an Additional Parent/Guardian on the application or the application will be deemed incomplete. For more information, please visit the EFS webpage (https://www.tn.gov/education/efs.html).

## General Eligibility

# What are the student eligibility requirements?

- Student is a resident of Tennessee who is entitled to attend a public school in any of the grades kindergarten through twelve (K-12) during the year for which the EFS would be used.
- Student is a U.S. citizen or lawfully present in the United States, as defined in the EFS rule.
- Student will have completed fewer than 13 years of school in K-12 at the beginning of the 2026-27 school year.
- More information regarding required eligibility documentation, as well as optional documentation regarding priority status, can be found in the EFS Application Checklist on the EFS webpage (https://www.tn.gov/education/efs.html).

# Can an EFS be used for students enrolled in pre-K programs?

No. The EFS Program is for eligible students entering grades K-12 for the 2026-27 school year.

# Once a family receives a scholarship, do they need to reapply every year?

- Yes. Families must reapply for each recipient student every year. Current recipients will complete an abbreviated renewal application in the online portal.

# Can a family apply for more than one child?

- Yes. The family must submit a separate application for each student. The online portal will copy certain elements of the applications, including parent/guardian contact and Tennessee residency documentation, from one new application to another within the same family.

# If a student is already enrolled in a non-public school, can the student apply for and receive a scholarship?

Yes. However, the student must **enroll** in an **EFS-registered** Category I, II, or III non-public school to become a recipient of EFS funds. A list of EFS-registered schools is available on the EFS (/content/tn/education/efs.html) webpage. (/content/tn/education/efs.html)

App.1762

### Does a student have to be currently enrolled in an EFS-registered school before applying?

No. However, the student must **enroll** in an **EFS-registered** Category I, II, or III non-public school to become a recipient of EFS funds. A list of EFS-registered schools is available on the EFS (/content/tn/education/efs.html) webpage. (/content/tn/education/efs.html)

### Can a homeschooling student apply for and receive a scholarship?

Yes. However, the student must **enroll** in an **EFS-registered** Category I, II, or III non-public school to become a recipient of EFS funds. A list of EFS-registered schools is available on the EFS (/content/tn/education/efs.html) webpage. (/content/tn/education/efs.html)

## Verifying Eligibility Requirements

### To prove Tennessee residency, may I provide one proof document from each parent/guardian? For example, a utility bill lists one parent, but the driver's license that I upload is for another parent.

Yes, provided both documents list the same address as listed on the application and both parents/guardians are listed on the application.

### May I provide the same type of proof document to demonstrate Tennessee residency. For example, may each parent upload a driver's license?

Yes, provided both documents list the same address as listed on the application and both parents/guardians are listed on the application.

### What date is considered for Tennessee residency documents?

- For residency documentation, the issued date is what determines whether a document meets the date requirements (e.g., issued within the last 90 or 365 days).
- Effective dates on documents do not meet the requirement unless they also clearly show the date the document was issued or generated. For example, an insurance policy card that demonstrates a year-long coverage period only meets this requirement if it also includes an issuance date within the last 90 days.
- Due dates on documents do not meet the requirement unless they also clearly show the date the document was issued or generated.
- Please ensure your document includes a visible issued date within the required timeframe.
- Please reference the EFS application checklist on the EFS webpage (https://www.tn.gov/education/efs.html) for examples of accepted documentation.

## Can a mother's copy of the student's birth certificate be used to prove U.S. citizenship?

No. If using a birth certificate to prove U.S. citizenship, it must be an official birth certificate (not the mother's copy) issued by a state, jurisdiction or territory of the United States, including Puerto Rico, U.S. Virgin Islands, Northern Mariana Islands, American Samoa, Swains Island, and Guam.

## Can I submit my student's Social Security card for proof of U.S. citizenship?

No, a Social Security card is not allowable proof of U.S. citizenship.

## Where can I obtain a copy of the student's birth certificate?

- For a Tennessee birth certificate, the quickest way to obtain one is to go in person to your county's health department to request it. Turnaround times when requesting official birth certificates from state vital records offices may vary.
- Please note that Puerto Rican birth certificates issued before July 1, 2010, shall not be accepted.

## I do not currently live in Tennessee, but I will move to Tennessee before the new school year. Can I apply for a scholarship now?

If you are able to demonstrate residency in the state of Tennessee using approved documents listed in the handbook (https://www.tn.gov/education/efs.html) and on the application checklist, (https://www.tn.gov/education/efs.html) then you are eligible to apply now.

For example, if you are still in the process of moving to the state, but you already have a mortgage or lease in place, you can submit that documentation.

## What is 100% of the free or reduced lunch income (Priority 2)?

This chart lists the federal income guidelines at 100% by household size for the upcoming school year of the EFS Program.

| Household Size # | 100% of 2024 Federal Free or Reduced-Price Lunch Guidelines |
|---|---|
| 2 | $37,814 |
| 3 | $47,767 |
| 4 | $57,720 |
| 5 | $67,673 |
| 6 | $77,626 |
| 7 | $87,579 |

## What is 300% of the free or reduced lunch income (Priority 3)?

This chart lists the federal income guidelines at 300% by household size for the upcoming school year of the EFS Program.

| Household Size # | 300% of 2024 Federal Free or Reduced-Price Lunch Guidelines |
|---|---|
| 2 | $113,442 |
| 3 | $143,301 |
| 4 | $173,160 |
| 5 | $203,019 |
| 6 | $232,878 |

App.1765

| | |
|---|---|
| 7 | $262,737 |

## Do I need to submit my entire Form 1040 document?

No, if you choose to demonstrate eligibility for priority categories 2 or 3, the sections of the 1040 document listed below must be submitted with your application:

- The name, address, entire list of dependents, and Line 9 of the document must be visible. The student's name must be listed as a dependent.
- If there are dependents listed on an additional dependent statement, then that statement must be included in the upload.
- If you are providing a Form 1040X, please ensure you include the full Form 1040X that was filed to demonstrate dependents.
- A handwritten Form 1040 is not acceptable.

## Can I submit a tax transcript or W-2 instead of my Form 1040?

- No, only 2024 Form 1040 tax returns may be used to verify the income eligibility for EFS Scholarships.

## What documentation can I use for SNAP/TANF verification?

- Current (within last 365 days) benefits documentation that lists the name of the parent/legal guardian or student must be provided
- If you are providing an eligibility letter for a household member not listed as a parent/legal guardian or student on this application, please upload additional documentation from the One DHS portal that lists the eligible student (e.g. a screenshot of the household member list).
- The program team must be able to identify the parent/guardian listed on the application, the student applicant, and the date the benefits started to determine if the SNAP/TANF requirement will be satisfied.

## What information do I need to have available when responding to Priority 4: Current TN Public School Enrollment or Eligible for Kindergarten?

If your student is not entering kindergarten in 2026-27, you will need:

- The name of your student's current public school district
- The name of the public school your student currently attends

If your student is entering kindergarten in 2026-27, you will complete all necessary information on the Student Information Page of the application. You will select kindergarten in the grade level drop-down on the Student Information page and enter the student's c birthdate, which must be on or before September 30, 2021.

## Funding Disbursement and Use

### How much will each scholarship recipient receive? Will it change from year to year?

- The EFS amount will likely change each year. The EFS scholarship is 100% state funded and equivalent to the Tennessee Investment in Student Achievement (TISA) education funding formula base per student. All scholarships are subject to available appropriations.

### What can I purchase with scholarship funds?

- The Education Freedom Act requires EFS funds to first be used to pay tuition and fees at an EFS-registered Category I, II, or III non-public school. Any remaining scholarship funds available after payment of tuition and fees may be used for the following educational expenses:
- Textbooks, curricula, instructional materials, and uniforms at the EFS-registered Category I, II, or III non-public school in which the student is enrolled;
- Tuition, textbooks, curricula, and instructional material fees for approved educational summer education programs and specialized after-school academic programs *(EFS funds cannot be used for after school or summer childcare programs);*
- Tutoring services provided by an individual or agency who meets department requirements *(an individual must hold an active TN teacher license, and an agency must have accreditation through one of the groups listed in SBE Rule 0520-01-24-.07(1)(b)(2.)* (https://www.tn.gov/content/dam/tn/stateboardofeducation/documents/2025-sbe-meetings/march-20%2c-2025-sbe-special-called-meeting/3-20-25%20III%20A%20Education%20Freedom%20Scholarships%20Permanent%20Rules%200520-01-24%20Clean.pdf)*);*
- Transportation to and from the EFS-registered Category I, II, or III non-public school in which the student is enrolled *(fees are paid only to a commercial fee-for-service provider (e.g., a bus); this does not include private transportation by a parent, family member, or participating student.)*;
- Fees for early postsecondary opportunity courses, examinations, or entrance examinations required for college admission and industry credentials as approved by the department;
- Educational therapies or services for participating students provided by a department-approved licensed therapist; and
- Computer hardware, technological devices, or other department-approved technology fees. *(This use is permitted only if the technology is used for educational needs, is purchased at or below fair market value, and is purchased through a registered school or service provider.)*
  - Students may **not** use EFS funds to purchase internet services or any type of software. ***Note:*** *If the software is part of an approved expense (i.e., a bundled package), it is allowable because it is not an additional expense.*
  - If EFS funds are used to purchase computer hardware or a technological device, a student's account may not purchase more than one device per student per year.
  - Technology purchases must be made directly through the portal in the Marketplace.
- Families must confirm receipt of all technology and uniform deliveries in the portal. To do this, click on Marketplace Orders, and then, click the "Confirm Receipt" button

## Do families need to claim this scholarship on their taxes? Will a 1099 be issued?

- The EFS is not considered taxable income pursuant to the Education Freedom Act. A 1099 will not be issued.

## How are the scholarship payments distributed, and what is required from the school to receive them?

- EFS funds are managed via the online portal and are not directly paid to the parent, legal guardian, or student. The online portal facilitates payments to schools, and other approved purchases must be made through the portal's online Marketplace. Account holders will use the portal to track account balances, expenses, and upload any required documentation.

- Funds will be disbursed in the online portal on a quarterly basis throughout the school year, beginning in late summer. EFS registered schools are made aware of the distribution schedule below; however, billing schedules are determined by each school in the family-school contract.

| Allocation Dates | Allocation Percentages |
|---|---|
| August 15 | Quarter 1 - 50% EFS Funds Disbursed |
| October 15 | Quarter 2 - 20% EFS Funds Disbursed |
| January 15 | Quarter 3 - 20% EFS Funds Disbursed |
| March 15 | Quarter 4 - 10% EFS Funds Disbursed |

- To receive the funds for participating EFS students, a school must first complete the EFS registration process, which can be initiated by a verified school representative emailing EFS.Questions@tn.gov (mailto:EFS.Questions@tn.gov).

## Are families required to spend all EFS funds each year?

No, funds available in a scholarship account are available to a recipient beyond the academic year in which they are awarded, in alignment with the *Unused Funds* section of the EFS Handbook on the EFS (/content/tn/education/efs.html) webpage (/content/tn/education/efs.html). Funds that remain when the student withdraws from the EFS program for any reason, including high school graduation, are forfeited

## Can EFS funds be utilized at a school located outside of Tennessee?

No, funds must be used at an EFS-registered Category I, II, or III non-public school located within the state of Tennessee.

## What happens if a student withdraws from the school during the year?

App.1769

A school must refund any prepaid tuition amounts covered by EFS funds if the student withdraws during the school year. If a participating student enrolls in the program for less than an entire school year, then the scholarship for that school year will be prorated based on the number of days enrolled. A school must refund any pre-paid amount of the scholarship that exceeds the prorated amount.

### What happens if a student receiving an EFS scholarship moves out of Tennessee during the school year?

If a student withdraws from the EFS Program, including due to moving out of state during the school year, a school must refund any prepaid tuition amounts covered by EFS funds. If a participating student enrolls in the program for less than an entire school year, the scholarship for that school year will be prorated based on the number of days enrolled. A school must refund any pre-paid amount of the scholarship that exceeds the prorated amount.

---

# Schools

## Registration and Roles

### What are the requirements for a non-public school to accept EFS funds?

- The school must be physically located in Tennessee, be a Category I, II, or III non-public school, and register to receive EFS funds with the Tennessee Department of Education (department). A school located in Tennessee has a physical location owned or leased by the non-public school located in the state of Tennessee where students may receive educational services and testing and registers with the department to receive funds from the program.

### What are the requirements for Category I, II, and III non-public schools?

- The requirements for non-public schools are set by the State Board of Education and can be found here (https://publications.tnsosfiles.com/rules/0520/0520-07/0520-07-02.20240616.pdf). This information can also be found on the department's non-public schools webpage (https://www.tn.gov/education/families/school-options/non-public-schools.html).

### How does a school register for the EFS program?

App.1770

- Schools not already accepting EFS funds will complete a registration (https://forms.office.com/Pages/ResponsePage.aspx?id=vUUkRyQkj064UN90iOGLStSptquwsa9PuC0tEnpQiYxUMFBBUkwwMERRVzNSWlpLQk4yUElaNVRRVS4u) form to accept funds from the department. Please email EFS.Questions@tn.gov (mailto:EFS.Questions@tn.gov) if you would like to receive a registration form. Schools currently accepting EFS funds will be asked to renew their registration with the program.
- The school registration process for the EFS Program is different from the school application process for the ESA and IEA programs, which require separate applications for each program.

## Will schools appear on an approved list that can accept EFS scholarships?

- Once a Category I, II, or III non-public school has registered with the department to receive EFS funds, the school's name will be listed on the EFS webpage to signal to the school's participation to families.

## Are registered schools required to provide a different curriculum, adjust hiring practices, or alter religious instruction?

- No. According to the Education Freedom Act, non-public schools that enroll recipients must have the maximum freedom to provide for the educational needs of recipients without governmental control. A non-public school that enrolls recipients is not required to alter its creed, practices, admission policies, hiring policies, or curriculum in order to accept recipients.

## Is there a cap on how many scholarships a school can receive? Will there be additional qualifications that are needed for schools to accept EFS scholarship recipients?

- No. There is no cap on how many scholarships a school can receive. There will be no additional requirements for schools to accept EFS scholarship recipients.

## If a school accepts EFS students and then there are changes to the program that cause the school to no longer want to participate, can the school stop the process at any time?

- Yes, if the school no longer wishes to participate, they may inform the department.

## Student Admission

### Is a school required to accept EFS students who apply?

No, EFS-registered Category I, II, or III non-public schools that enroll recipients must have the maximum freedom to provide for the educational needs of recipients without governmental control. A non-public school that enrolls recipients is not required to alter its creed, practices, admission policies, hiring policies, or curriculum to accept recipients.

### How will EFS student enrollment at the school be handled?

Student acceptance for a particular school is determined by the school's own admissions process and does not include the department.

### Can the EFS scholarship be awarded to the family before receiving admission to a school so that the schools can offer admission knowing that the family will get the scholarship?

Yes, a family may apply and be conditionally approved for the EFS scholarship before enrolling in a school. However, the student must enroll in an EFS-registered Category I, II, or III non-public school to become a recipient of EFS funds. Families are encouraged to share their notification of EFS approval with their school of choice as soon as it is determined.

### How is athletic eligibility impacted if a family wishes to take advantage of the funds available from the Educational Freedom Act and transfer to an independent school?

A student's eligibility for interscholastic athletics is established by the Tennessee Secondary School Athletic Association (TSSAA). For more information on athletic eligibility, please reference this FAQ (https://cms-files.tssaa.org/documents/tssaa/health-safety-information/Education-Freedom-Act-Eligibility-Information.pdf) from TSSAA.

### Once approved for one of the scholarships, what is the deadline for confirming enrollment in an EFS-registered school?

Student enrollment must be confirmed by the school in the EFS Portal by June 30, 2026, or the student's scholarship offer will expire.

## Supporting Families

### How are schools notified of a family's approval?

The department encourages communication between families and schools regarding a student's EFS approval. A family will be notified via email when they have been approved for the EFS. The family will select their school of choice in the online portal. The school will be able to view a list of scholarship recipients who have selected the school, and then the school administrator will confirm the student's enrollment in the portal to finalize the scholarship approval.

### Can a student apply for both an EFS and an ESA?

Yes, however, the student can only participate in one of the programs.

### How can schools help prepare families for the application process? What should schools do if there are interested parents/guardians?

- The department encourages schools to share resources such as this FAQ document and the EFS (/content/tn/education/efs.html) webpage (/content/tn/education/efs.html) with families.

## Assessment

### Are schools required to administer the Tennessee Comprehensive Assessment Program (TCAP) test?

No, schools can use their current nationally standardized achievement test. Administering the TCAP is not required. In alignment with existing SBE requirements for Category I, II, and III non-public schools, EFS-registered schools receiving EFS funds must ensure that students in grades 3 through 11 participate either in a nationally standardized achievement test that is aligned to the respective non-public school's instructional plan or the Tennessee Comprehensive Assessment Program (TCAP) tests in math and English language arts for the grade in which the student is enrolled, each year of enrollment in the EFS Program.

## Will a list of approved standardized tests be accessible before a school commits to participating in the EFS?

Schools may use their current nationally standardized achievement test in alignment with existing State Board of Education requirements for Category I, II, and III non-public schools.

## Are the test scores of students involved in the EFS Program the only scores that must be submitted to the Office of Research and Education Accountability (OREA)?

Yes.

## What testing data must be reported, how will it be reported, and how will it be used?

The Education Freedom Act requires each private school that enrolls scholarship recipients to annually administer the TCAP or a nationally standardized achievement test. Each private school must provide the results of those tests for scholarship recipients to the Office of Research and Accountability (OREA). Prior to the reporting deadline, OREA will publish the form schools will use to provide the results. In addition to the required test results for scholarship recipients, the form will include fields for race, sex, and household income level. OREA will provide additional guidance to private schools as the reporting deadline approaches. Test results and other data pertaining to students who are not scholarship recipients are not subject to the reporting.

# EXHIBIT 50

App.1775

# Tennessee Education Freedom Scholarship Program

## EFS Applications Closed for 2026-27 School Year

### What is EFS?

During the Tennessee General Assembly's extraordinary legislative session in January 2025, the Tennessee General Assembly passed Tenn. Code Ann. 49-6-3501 et al (https://advance.lexis.com/documentpage/?pdmfid=1000516&crid=028f8581-0d54-4535-bc13-5a33583cb8c2&nodeid=ABXAAGABLAAB&nodepath=%2fROOT%2fABX%2fABXAAG%2fABXAAGABL%2fABXAAGABLAAB&level=4&haschildren=&populated=false&title=49-6-3501.+Short+title.&config=025054JABlOTJjNmIyNi0wYjI0LTRjZGEtYWE5ZC0zNGFhOWNhMjFlNDgKAFBvZENhdGFsb2cDFQ14bX2GfyBTaI9WcPX5&pddocfullpath=%2fshared%2fdocument%2fstatutes-legislation%2furn%3acontentItem%3a6F5C-2K00-R03M-G4GX-00008-00&ecomp=6gf5kkk&prid=c4925797-b854-44b3-a100-d65a435a26e0)., and Governor Bill Lee signed the landmark legislation on February 12, 2025, to establish Tennessee's universal school choice program into law. The Tennessee EFS Program is also guided by State Board of Education Rule 0520-01-24 (https://publications.tnsosfiles.com/rules/0520/0520-01/0520-01-24.20250918.pdf).

EDUCATION FREEDOM

### Contact Information

Click Here to Sign in to EFS Portal (https://app.efs.tnedu.gov/users/sign_in)

**Email:** EFS.Questions@tn.gov (mailto:EFS.Questions@tn.gov)

**Phone:** For questions related to all available school choice programs, please call (615) 741-5158 and select the prompts for Office of Programs and School Choice.

### Contact the EFS Team

(/content/dam/tn/education/efs/EFS_Contacts_List.pdf)

### EFS Key Dates

- EFS Quarter 1 Disbursement- **August 15, 2026** (Projected)
- EFS Quarter 2 Disbursement- **October 15, 2026** (Projected)
- EFS Quarter 3 Disbursement- **January 15, 2027** (Projected)
- EFS Quarter 4 Disbursement- **March 15, 2027** (Projected)

App.1776



# What are Tennessee Education Freedom Scholarships?

Education Freedom Scholarships allow students who are residents of Tennessee and entitled to attend a public school in grades K-12 to use state funds toward education expenses, while enrolled in grades K-12 at registered Category I, II, or III non-public schools located in Tennessee, prioritizing tuition and fees.

## Which Choice program is right for me?

- School Choice Programs Comparison (/content/dam/tn/education/esa/School_Choice_Programs_Comparison-2026-27.pdf)

## How much is each scholarship worth?

The scholarship amount for the 2025-26 school year is $7,295.

The scholarship amount for the 2026-27 school year is $7,530.

# EXHIBIT 51

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**CHARTER AGREEMENT**
**WOODDALE MIDDLE SCHOOL**

This Charter Agreement (hereinafter referred to as "this Agreement") is entered into this, the 24th day of January 2025, by and between the Tennessee Public Charter School Commission (hereinafter referred to as "the Commission" or "the Authorizer") and IOTA Community Schools (the "Applicant(s)") (collectively, the "Parties") to operate Wooddale Middle School (hereinafter referred to as "the Charter School").

For purposes of this Agreement, "Charter School" refers to the Governing Body and the charter school. The terms "Charter School" and "Governing Body" are used interchangeably herein; however, references herein to "Charter School" shall not include other schools operated by the Governing Body.

Whereas the Commission was authorized for the service as the LEA for any public charter school it authorizes in accordance with T.C.A. § 49-13-105(a);

This Agreement consists of the following documents:

- This document and any exhibits hereto or documents incorporated herein by reference
- Approved Charter School's Application (Exhibit 1)
- Current Approved Performance Frameworks – Academic, Organizational, and Financial (Exhibit 2)
- Pre-Opening Checklist (Exhibit 3)
- Approved Waivers (Exhibit 4)

In consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

## 1. General Terms

**1.1. Applicable Law.** This Agreement and the Charter School's operations shall be governed by and construed in accordance with the laws of the state of Tennessee and applicable federal laws. Though the Charter School may, pursuant to Tennessee Code Annotated ("T.C.A.") § 49-13-111, seek waivers from the Authorizer or the commissioner of education from Tennessee laws or rules of the State Board of Education that inhibit the Charter School's ability to meet its goals or comply with the school's mission, the Parties understand that currently, waivers may not be provided from the types of laws and rules specifically listed in T.C.A. § 49-13-111, from any provisions of Title 49, Chapter 13 (the Tennessee Public Charter Schools Act, hereinafter referred to as the "Act"), those included in the Act by reference, or from other laws specifically applicable to charter schools (such as those related to benefits or retirement of charter school employees contained in Title 8, Chapter 27, Part 3).

To the extent there is a conflict between the terms of this Agreement and the Charter School's Application, the terms of this Agreement shall govern.

By signing this Agreement, the Authorizer approves any waivers requested in the Charter School's Application, unless such waivers are excluded from Exhibit 4. Approved waivers are attached as **Exhibit 4**.

**1.2. Effective Date.** This Agreement shall be effective immediately following signature by the Charter School and the Authorizer. This Agreement shall expire on June 30 of the tenth (10th) year after the date of opening of the Charter School, unless earlier terminated or renewed pursuant to the terms of this Agreement or state law.

**1.3 Pre-Opening Process.** Upon approval by the Authorizer, the pre-opening checklist (the "Pre-Opening Checklist", incorporated into this Agreement as **Exhibit 3**), will be sent to the Charter School outlining specific actions that must be put in place and completed prior to the Charter School opening for instruction under the authorization of the Commission. If the Pre-Opening Checklist is substantially incomplete at the time of inspection, the Authorizer may decide to not allow the Charter School to open until the Charter School has completed all pre-opening steps under T.C.A. § 49-13-111, Authorizer policies, and the Pre-Opening Checklist. Further, if the Authorizer may require the Charter School to delay opening for up to one (1) school year through an amendment to this charter agreement as set forth in Section 10, pursuant to T.C.A. § 49-13-108(5)(D).

If the Charter School is allowed to open under the Commission's authority despite the failure to complete all items required by the Pre-Opening Checklist, the Charter School must provide proof to the Authorizer that all items on the Pre-Opening Checklist have been completed by the date specified by the Authorizer. The failure of the Charter School to complete all items on the Pre-Opening Checklist by the specified date shall be a material violation of this Agreement and shall subject the Charter School to corrective actions, including but not limited to revocation, in accordance with the Authorizer's Intervention policy. The Authorizer retains the right to delay the effective date of this agreement by one (1) year in accordance with T.C.A. § 49-13-108(b)(5)(D) upon written notification if the Applicant fails to complete the **Ready to Open** items on the Pre-Opening Checklist by the specified date.

The Authorizer shall notify the Applicant of any changes to the Pre-Opening Checklist but do not constitute material changes. Any such changes will be acknowledged in an addendum to this Agreement, if applicable. Any changes to the Pre-Opening Checklist which constitute material changes will not become binding upon the Charter School without the Applicant's consent, except through amendment to this Agreement.

**1.4. Charter School Performance.** The operation of the Charter School shall be subject to the terms and conditions of this Agreement and the Act, in accordance with T.C.A. § 49-13-143. Decisions by the Authorizer regarding amendment, renewal, or revocation of this

Agreement shall be based upon applicable laws, rules, policies, this Agreement, and/or the academic, organizational, and financial Performance Frameworks (the "Performance Frameworks") incorporated into this Agreement as **Exhibit 2**, as well as the Authorizer's Intervention Policy.

The Authorizer shall have broad oversight authority over the Charter School and may take all reasonable steps necessary to oversee compliance with this Agreement and applicable laws, rules, and policies. This oversight authority includes, but is not limited to, the right to visit, examine, and inspect the Charter School and its records during the pre-opening year, during the annual monitoring visit, and to investigate a complaint (notice including a statement of the complaint shall be given to the Charter School, unless in the judgment of the Authorizer such notice would inhibit the Authorizer's ability to investigate the complaint. Information that may identify the complainant may be redacted if deemed necessary by the Authorizer).

Upon reasonable notice, the Authorizer may interview Charter School employees, Board members, students, and families as necessary to resolve complaints and grievances. With respect to complaints and grievances, additional information is contained in Section 8.2.

The Authorizer shall provide in writing to the Charter School no later than July 1 of each school year a Master Reporting Calendar which will set out key deadlines for the Charter School to provide certain information and reports. Additionally, at least thirty (30) days prior to any site visit, the Authorizer shall provide the Charter School with a written list of any required documentation and/or specified actions for the site visit.

The Parties agree that the most critical performance measures contained in the Performance Frameworks are the academic measures, which may include student achievement, student growth measures (including annual measurable objectives), readiness for successive school levels (middle, high, or post-secondary) and employment, as well as mission-specific academic goals defined in the Performance Frameworks.

For the purposes of accountability, renewal, and/or revocation evaluation, the Performance Frameworks supersede all assessment measures, educational goals and objectives, financial operations metrics, and organizational performance metrics set forth in the Charter School's Application and not explicitly incorporated into the Performance Frameworks. However, this shall not prevent the Authorizer from holding the Charter School accountable for any goals contained in the Charter School's Application that do not conflict with Performance Frameworks for purposes of accountability, renewal, and/or revocation evaluation. The specific terms, form and requirements of the Performance Frameworks are maintained and disseminated by the Authorizer and shall be binding on the Charter School.

The Authorizer shall—at least annually—monitor and report on the Charter School's progress in relation to the indicators, measures, metrics, and targets set out in the

Performance Frameworks, as well as compliance with federal and state laws and regulations, and when required by the Performance Frameworks and such laws and regulations. The Authorizer will conduct an annual scheduled comprehensive site visit each year, which will be used to the Charter School's progress on the Performance Frameworks.

The Authorizer shall conduct an interim review at the end of the fifth year after the effective date of the Agreement, pursuant to T.C.A. § 49-13-121.

Changes to the Performance Frameworks to align with changes to applicable state or federal accountability requirements shall apply to the Charter School. In the event of such changes, the Authorizer will use best efforts to apply expectations for school performance in a manner consistent with those set forth in the Performance Frameworks as initially established in the most recent charter agreement.

Changes to the Performance Frameworks that are not required by state or federal law or accountability requirements will not become binding upon the Charter School without the Charter School's consent, except at the time of charter renewal or amendment.

**1.5. Location.** The location of the Charter School is governed by T.C.A. §§ 49-13-107, 49-13-110, and 49-13-113. The Charter School location is in the Southeast Region of Memphis, Tennessee. If the Charter School proposes to change its location, such change shall not require an amendment to this Agreement unless the location change is materially different from the location of the Charter School as discussed in the Charter School's Application and described in this agreement. Non-material changes in location shall require at least thirty (30) days prior notice to the Authorizer. Any change in location that is determined by the Authorizer to be materially different from the Charter School's Application shall require an amendment to this Agreement as set forth in Section 10. If the Charter School is located at a site owned or controlled by the local education agency (LEA) in which the Charter School is located or a site owned or controlled by the local government where the Charter School is located, the use of such site shall be subject to and governed by a Facilities Agreement between the Applicant and the LEA or local government. The Authorizer shall have no rights or responsibilities regarding any Facilities Agreement.

**1.5.1. Inspections**. The Authorizer will have access at all reasonable times to any facility owned, leased, or utilized in any way by the Charter School for purposes of inspection and review of the Charter School's operation and to monitor the Charter School's compliance with the terms of this Agreement.

**1.5.2. Impracticability of Use.** If use by the Charter School of a facility is rendered impracticable by any cause whatsoever, or if the funds necessary to construct/renovate or upgrade a facility cannot be secured, the Charter School shall notify the Authorizer. The Authorizer shall not be obligated to provide an alternative facility for use by the Charter School.

**1.6. Employment Status.** All teachers and other staff of the Charter School shall be employed by the Charter School, and not the Authorizer. None of the provisions in this Agreement shall be construed to create a relationship of agency, representation, joint venture, ownership, or control of employment between the Parties.

**1.7. Mission.** The Charter School, in its work, shall progress toward its established mission, in accordance with T.C.A. § 49-13-107(b)(1). The Authorizer shall evaluate the mission of the Charter School in accordance with the goal and indicators established within the School Performance Framework, as detailed in Exhibit 2, on an annual basis. If over the duration of this agreement, the Charter School needs to change any part of the mission-specific goal in the School Performance Framework, the Charter School shall notify the Authorizer within thirty (30) days. The Authorizer will determine if the change is material such that is requires an amendment to this agreement pursuant to Section 10.

## 2. Charter School Organizational Responsibilities

**2.1. Student Enrollment and Retention.** The Charter School shall enroll students according to T.C.A. § 49-13-113. The Charter School shall not discriminate with respect to admissions on the basis of race, color, ethnicity, religion, national origin, English language proficiency, sex, disability, or the need for special education and related services as set forth in the Charter School's Application and the Act.

The Charter School may enroll students up to a total maximum enrollment of 600. Increases in total enrollment numbers greater than 600 must be reported to the Authorizer and evaluated to determine if they are material changes to this agreement. Reductions in enrollment greater than 15% must be reported to the Authorizer and evaluated to determine if they are material changes to this Agreement. The Authorizer will annually evaluate the school against the enrollment submitted in the July 1st budget and against the maximum enrollment of 600. If, after completion of the annual enrollment evaluation, the Charter School's actual enrollment fall below 15% of the projected enrollment, the Authorizer shall have the right to determine if the actual enrollment is a material change to this Agreement or if any corrective action is necessary. Reductions in enrollment in successive years or changes that affect the financial solvency of the Charter School are considered material and shall require an amendment to this Agreement. Any change in enrollment that is considered to be material to this Agreement shall not be permitted unless a formal amendment to this Agreement is secured in advance according to the provisions outlined in T.C.A. § 49-13-110(d), Commission Rule 1185-01-01-.04, and this Agreement.

The Charter School may enroll students in the grade levels approved in the Charter School's Application.

**Enrollment**

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

| Grade Level | Year Approved to Enroll |
|---|---|
| 6-8 | Year 1 |

If the number of applications for the Charter School exceeds the capacity of a program, class, grade level, or building, enrollment shall occur according to the preferences in T.C.A. § 49-13-113. If enrollment within a group of preference set out in subdivision (d)(4) exceeds the planned capacity of the Charter School, enrollment within that group shall be determined on the basis of a lottery that complies with statute. The Charter School shall ensure a random selection process, equitable to all students and publicly verifiable, in accordance with federal, state, and local law. The Charter School shall be responsible for adherence to the obligations of a public charter school, in accordance with T.C.A. § 49-13-101 et. seq., including but not limited to enrollment of all eligible students where space is available.

**2.1.1 Student Transfers and Exits.** The Charter School will comply with the Tennessee Department of Education's student transfer and exit reporting requirements and shall provide information to the Authorizer upon request. The Charter School shall enact a discipline policy that complies with Authorizer's policies as well as federal, state, and local laws and may not counsel out enrolled students.

**2.2. Academic Program.** The Charter School shall operate the academic program in accordance with this Agreement, the Charter School's Application, and applicable state and federal law, including providing at least the same equivalent time of instruction as other public schools and complying with assessment and accountability laws and rules (T.C.A. § 49-13-111). If the Charter School is performing below standards, the Authorizer may review the academic program. The Charter School will notify the Authorizer of any material changes to the academic program that are a change from the Charter School's Application, and the Authorizer will evaluate to determine if they are material changes to this Agreement. Any changes to the school structure shall be considered material to this Agreement and shall not be permitted unless a formal amendment to this Agreement is secured in advance according to the provisions outlined in T.C.A. § 49-13-110(d), Commission Rule 1185-01-01-.04, and this Agreement. For purposes of this Agreement, school structure shall be defined as the academic focus or goals of the Charter School and grade levels served.

**2.2.1. Assessments.** The Charter School shall administer all state-mandated assessments to the extent such assessments are required by the Tennessee Department of Education, which currently include but are not limited to TCAP or its successor assessment, writing assessments, and English learner (EL) assessments for the required grades and testing windows, in accordance with T.C.A. § 49-13-111(a)(6). The Charter School shall comply with all Department of Education required assessment administration, security, and reporting requirements. The Charter School may use additional assessments of its own choosing.

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**2.3. Special Education.** Special education services, related services, and accommodations for students who are eligible under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504), the Americans with Disabilities Act (ADA), or any applicable provisions of state law, shall be provided in accordance with applicable state and federal law, this Agreement and Authorizer rules and policies. The Authorizer is the LEA for purposes of ensuring compliance with IDEA, Section 504, and all other federal and state laws and regulations concerning accommodation of and education of students with disabilities.

**2.3.1. Responsibility of the Charter School.** The Charter School assumes responsibility for the provision of services, development, and implementation of individualized education programs (IEPs), 504 plans, child find, evaluation and re-evaluation, and all other obligations under IDEA and/or Section 504 for students identified as eligible for special education services and/or disability accommodations that have enrolled in the school. The Charter School shall have a qualified special education coordinator who will be responsible for monitoring individual case management of all special education students and disabled students and for arranging the provision of services required by their IEP and/or 504 plan. The Charter School shall maintain documentation of the Charter School's compliance with IDEA and Section 504 as required by law. No student shall be denied admission nor counseled out of the Charter School due to the nature, extent, or severity of his/her disability or due to the student's request for, or actual need for, exceptional education services or accommodations pursuant to IDEA, Section 504, or the ADA. Any attempts by the Applicant to counsel out students for any reason, including due to the nature, extent, or severity of his/her disability or suspected disability or due to the student's request for, or actual need for, exceptional education services or accommodations pursuant to IDEA, Section 504, or the ADA, shall be deemed a material violation of this Agreement.

The Charter School shall also implement the requirements of Response to Instruction and Intervention ("RTI[2]"), as set forth by the Tennessee Department of Education.

The Charter School shall report to the Authorizer any and all formal complaints, relating to IDEA Due Process for special education and Office of Civil Rights complaints for disability accommodations within five (5) business days of the Charter School's notification of such occurrences. The Charter School shall comply with any state or federal investigation as required by the Authorizer. Nothing herein shall obligate the Authorizer to represent or defend the Charter School in any legal matter resulting from a federal or state investigation related to IDEA Due Process for special education and Office of Civil Rights complaints for disability accommodations, as noted in Section 12 of this Agreement.

The Charter School's indemnity of the Authorizer relating to special education and disability accommodations is provided in Section 12.

**2.3.2. Costs for Special Education.** The Charter School is financially responsible for child find including student identification, evaluation, and assessment expenses. All costs associated with providing educational services to students with disabilities are the responsibility of the Charter School. The Charter School shall bear the financial responsibility for evaluations and reevaluations and the provision of all services consistent with student IEPs and 504 plans.

The Authorizer will pass federal funding to the Charter School based on the allocation received from the Tennessee Department of Education and in accordance with the Authorizer's funding procedures. Funding is available on a reimbursement basis.

**2.4. English Learners (EL).** The Charter School shall address the needs of EL students pursuant to applicable federal and state laws and regulations (including Title III of the Every Student Succeeds Act (ESSA) and Title VI of the Civil Rights Act of 1964 (Title VI)). The Charter School agrees to maintain and consistently implement a policy to identify students in need of EL services, to provide services in an equitable manner to ensure meaningful access to the school's educational program (including the provision of appropriate accommodations), and to facilitate obtaining English proficiency and exit from EL services according to individual student capacity. In addition, the Charter School shall ensure that Limited English Proficiency (LEP) parents and guardians have meaningful access to school-related information.

The Charter School assumes responsibility for the provision of services, development, and implementation of individualized learning plans (ILPs), screening, assessment and all other obligations under state law and State Board Rule for students identified as limited English proficient and/or English learner enrolled in the school. The Charter School shall have a qualified English language coordinator who will be responsible for monitoring individual case management of all English learner students, both active and transitional, and for arranging the provision of services required by their ILP. The Charter School shall maintain documentation of the Charter School's compliance as required by law and State Board Rule.

**2.5. Student Discipline/Due Process.** In accordance with T.C.A. § 49-6-4002(a)(1), the Charter School is responsible for administering its discipline policy in a manner consistent with state and federal law and rules, and the Authorizer's policies that ensure students' due process rights are satisfied, including the provision of appropriate informal or formal hearings. The Charter School shall promptly notify the Authorizer and the LEA in which the student resides of any student expulsion. The Charter School shall not remand a student prior to a decision of suspension or expulsion, in accordance with federal and state laws, rules, Authorizer policies, and regulations. If the LEA in which the student resides determines that the expelled student is eligible for its Alternative School program and the LEA in which the student resides allows for the student to attend the Alternative School program, the Charter School shall work with the LEA in which the student resides to provide an expelled student access to the LEA's alternative school programs, in accordance with T.C.A. § 49-6-3402(h)(1).

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

**2.6.1. Student Information Systems.** The Charter School shall adopt the Student Information System selected by the Authorizer. The Authorizer shall bear the cost of any needed licenses for the Charter School.

**2.6.2. Student Information Reporting.** To ensure compliance with federal and state law regarding student records, the Charter School shall report to the Authorizer student information enrollment projections for the coming year by March 1, or sooner if required by the Tennessee Department of Education.. Any errors in data reported to the State by the Charter School shall be the sole responsibility of the Charter School to identify and correct.

**3. Staffing**

**3.1. Teachers and Staff.** The Charter School shall ensure that all teachers and staff are licensed and endorsed as required by state statutes, State Board rules, Authorizer policies and rules, and meet applicable federal qualifications including exceptional education certified and ESL certified, in accordance with T.C.A. § 49-5-406. The Charter School shall also provide any training required by state or federal law.

**3.2. Background Checks.** All current employees of the Charter School who have or who will have contact with children at the Charter School within the scope of the individuals' employment, and employees of contractors or sub-contractors of the Charter School who have contact with children within the scope of the individuals' employment, shall complete criminal background checks as required by state law using the ORI number of the Charter School and Department of Children's Services background checks through the Authorizer.

**4. Facilities**

The Charter School shall ensure the Charter School's grounds and facilities comply with applicable health and safety laws, including the ADA, state fire marshal codes, and state and local zoning and land use codes.

The Charter School shall not commence instruction prior to completion of applicable inspections and receipt of a completed Pre-Opening Checklist (attached as Exhibit 3) from the Authorizer, unless the Authorizer permits the Charter School to open and provide later certification of completion of all items on the Pre-Opening Checklist.

**5. Food Service**

If the Charter School offers food services on its own or through a third-party contract, the Charter School may apply directly to, and if approved, operate school nutrition programs with reimbursement from the United States Department of Agriculture, under supervision of the Tennessee Department of Education.

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**6. Transportation**

The Charter School will provide transportation as set forth in the Charter School's Application. Transporting students in buses that have not been approved for operation by the Tennessee Department of Safety may be grounds for non-renewal or revocation of this agreement. A change to the Charter School's plan to provide or not provide transportation for its students is considered material and requires an amendment. However, a modification in a plan to provide transportation is not considered material.

**7. Insurance**

The Charter School shall maintain the following insurance, in accordance with T.C.A. § 49-13-107(b)(19):

a. General Liability/Automobile Liability Policy: must be equal to or greater than $5,000,000. This insurance shall be primary insurance. Any insurance or self-insurance programs covering the State of Tennessee, its officials, employees, and volunteers shall be in excess of this insurance and shall not contribute to it. The first one million dollars must be with a company licensed to do business in the state of Tennessee. The remaining $4,000,000 can be covered under an excess liability policy (also known as an "umbrella" policy). The policy must name the State of Tennessee as an additional insured. The policy must cover contractual liability. Automobile coverage shall cover vehicles owned, hired, and non-owned.
b. Professional Liability Policies: Directors and Officers Policy must be equal to or greater than $5,000,000. Teachers Professional Liability Policy must be equal to or greater than $1,000,000.
c. Workers Compensation and Employers Liability Policy: The amount of coverage required for Workers Compensation is determined by statute. Charter School must comply with state statutes. Employers Liability must be a minimum of $100,000.
d. Property and Boiler Insurance Policy: If the Charter School purchases the property that will be used by the Charter School, it shall purchase "all risks" property and boiler insurance. Insurance shall be for the full replacement cost of the property and contents with no coinsurance penalty provision.
e. Sexual Abuse: Must have $1,000,000 required coverage.
f. State of Tennessee shall be named as an additional insured on the charter school insurance policy.

Certificates of insurance, in a form satisfactory to the Authorizer, evidencing coverage shall be provided to the Authorizer prior to commencement of performance of this Charter Agreement. Throughout the term of this Charter Agreement, Charter School shall provide updated certificates of insurance upon renewal of the current certificates.

**TENNESSEE**
PUBLIC CHARTER SCHOOL COMMISSION

**8. Governance**

**8.1. General Requirements.** The Charter School shall notify the Authorizer of any change to its status as a nonprofit federal tax exempt organization under IRC § 501(c)(3).

The Governing Body and/or Charter School shall include parent participation in governance through membership on the Governing Body or establishment of a school advisory council pursuant to T.C.A. § 49-13-109.

The Charter School shall comply with all applicable provisions of the Tennessee Open Meetings Act, including statutory provisions concerning the scheduling of Governing Body meetings, meeting agendas, public notice of meetings, and records of those meetings. At the start of each school year, the Charter School shall provide to the Authorizer the list of names of all board members and a schedule of Governing Body meetings for that school year.

As required by T.C.A. § 49-13-111, the Governing Body shall be subject to the conflict of interest provisions contained in T.C.A §§ 12-4-101 and 102.

The Charter School shall be nonsectarian in its programs, admissions policies, employment practices and all other operations. The Charter School shall not be to any extent under the control or direction of any religious denomination.

The Charter School shall not discriminate against any student, employee or any other person on the basis of race, ethnicity, national origin, sex (except with respect to admission of students by single-sex schools), disability or any other ground that would be unlawful if done by any other public school. The Charter School shall take all steps necessary to ensure that discrimination does not occur, as required by law.

**8.2. Complaints.** Except as otherwise provided by this Agreement, the Governing Body shall be the first avenue for formal appeal in case of any complaints or grievances filed against the Charter School or its employees and volunteers. The Governing Body will ensure that the Charter School establishes policies and procedures for receiving and addressing complaints or grievances directed toward the Charter School or its employees and will make those policies available to students, parents/guardians, employees, and any other persons who request it. If grievances persist following an appeal to the Governing Body, or for complaints regarding alleged violations of law or the Charter Agreement, including any violations that may subject the school to revocation or non-renewal under T.C.A. §§ 49-13-121 or 122 may be investigated by the Authorizer. The Authorizer shall also have the ability to investigate complaints in compliance with the Authorizer's policies and procedures. Grievances that are not resolved by the Charter School or Governing Body, or a pattern of serious grievances, may be considered in any application for renewal of this Agreement or any action to revoke the charter.

The Charter School shall notify the Authorizer within seven (7) business days if the Charter School has been named a party to a lawsuit that has been filed in court.

**8.3. Reporting of Corporate Status.** The Charter School shall report any change to the Charter School's corporate legal status or any change in its standing with the Tennessee Secretary of State's Office to the Authorizer within five business (5) days of the change. Any change to the Charter School's corporate legal status as a not-for-profit organization shall constitute grounds for immediate revocation unless, during the term of this Agreement, the Act is amended to allow Charter Schools to be operated by organizations other than not-for-profit organizations.

**8.4 Required Policies and Procedures**. The Charter School shall adopt all required policies, procedures, and plans as required by the Authorizer's LEA policies and procedures pursuant to federal law, state law, and the State Board of Education's rules and policies. The Authorizer will conduct periodic policy and procedure audits to ensure compliance with these requirements.

**9. Finance**

**9.1. State and Local Funds.** The Authorizer shall allocate one hundred percent (100%) of state and local student-generated funds for member schools as provided in T.C.A. § 49-13-112 and as calculated by the formula provided by the Tennessee Department of Education, in accordance with T.C.A. § 49-3-101 et. seq. The Authorizer shall allocate and distribute state and local funds to the Charter School by the 15th of the month in August, September, October, November, December, January, February, March, April, and June, in accordance with Tenn. Comp. R. & Regs. 0520-14-01-.03(1)(f) and the calculations provided by the Tennessee Department of Education. The Parties agree that the student-generated local funds for member schools shall be subject to recoupment, in whole or in part, wherever reductions to total school and/or district allocations, as calculated by the Tennessee Department of Education or Authorizer, result in an amount due to the State of Tennessee or geographic LEA. Any such calculations or reductions shall be determined in accordance with the requirements of applicable law and State Board of Education rule.

**9.2. Federal Funds.**

a. Eligibility: Each year, the Authorizer shall provide to the Charter School the school's proportionate share of applicable federal ESSA funding (e.g. Title I, Title II, Title III, Title IV, or Title V) and other federal grants received by the Authorizer for which the Charter School is eligible. Schools are eligible for such funds upon approval of their plans for such funds either by the Authorizer and/or the Tennessee Department of Education (TDOE), as applicable. The Authorizer may reduce the allocation to charter schools by a percentage allowable under federal rules and regulations for administrative, indirect, or any other category of cost or charges.

b. Fund Distribution & Reporting: Funds shall be distributed on a documented expenditure reimbursement basis with the required documentation. The Charter School shall submit grant reimbursement reports to the Authorizer at least quarterly but no more frequently than monthly. The Authorizer shall distribute to the Charter School federal reimbursement funds within 30 days approval of expenditure reimbursement requests.
c. Use of funds. The Charter School shall comply with all regulations tied to such federal funds, including 2 C.F.R. 200 – Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, ESSA, IDEA, and any other applicable federal or state laws.

**9.3. Fee for Services Agreement.** Pursuant to T.C.A. § 49-13-142(f), the Charter School may enter into a separate fee for services agreement, for the provision of services (including but not limited to school or student support services such as food services and transportation) to be provided to the Charter School by the LEA in which the Charter School is located. The Charter School may also enter into a separate fee for services agreement with the Authorizer for the provision of services. Fees for services provided to the Charter School by the Authorizer shall be deducted from the state and local funding provided to the Charter School. Failure of the Charter School to enter such an agreement with the Authorizer shall not be grounds for revocation or non-renewal of this Agreement.

Annually, the Charter School shall notify the Authorizer of any fee for services agreement(s) entered into with the LEA in which the Charter School is located or with any other vendor or outside contractor specific to the Charter School, including, but not limited to any agreement for the provision of services relating to the service of special populations and shall provide a copy to the Authorizer of any agreement(s) entered into. This shall only apply to those contracts or agreements that have a value of more than $25,000; however, the Charter School shall provide a copy of any fee for services agreement(s) with a value of $25,000 or less at the Authorizer’s request.

**9.3.1. External Service Provider (ESP) Contracts.** The Charter School may contract for services, as provided by T.C.A. § 49-13-124. In such case, the Charter School shall notify the Authorizer of the contract(s) no later than seven (7) business days of signing the contract(s) and shall provide a copy of the contract(s) to the Authorizer upon the Authorizer’s request.

The external service provider (“ESP”) is a vendor of services, but the Governing Board remains ultimately responsible for the success or failure of the school. All contract(s) between the ESP and the Charter School should articulate:

a. The roles and responsibilities of the Charter School and the ESP, including all services to be provided under the contract;

b. The performance measures, consequences, and mechanisms by which the Charter School will hold the ESP accountable for performance, aligned with the performance measures in this Agreement;
c. All compensation to be paid to the ESP, including all fees, bonuses, and what such compensation includes or requires;
d. Terms of any facility agreement that may be part of the relationship;
e. Financial reporting requirements and provisions for the school's governing board's financial oversight;
f. Require all instructional materials, furnishings, and equipment purchased or developed with public funds to be the property of the Charter School, not the ESP, in compliance with state law.
g. All other financial terms of the contract, including disclosure and documentation of all loans or investments by the ESP to the Charter School, and provision for the disposition of assets in accordance with law;
h. Assurances that the Charter School, at all times, maintains independent fiduciary oversight and authority over the Charter School budget and ultimate responsibility for the Charter School's performance;
i. Provisions for contract termination; and
j. Respective responsibilities of the Charter School and ESP in the event of school closure, including transparency in the Charter School's revenues and expenditures as well as those managed by the ESP.

Governing Board members shall not be employed, selected, approved, or compensated by the ESP. Governing Board members are prohibited from serving as members of the Charter School and a member of the ESP.

To the extent there is a conflict between the terms of this Agreement and an ESP contract, the terms of this Agreement shall govern.

**9.4. Tuition.** The Charter School shall not charge tuition unless otherwise permitted by Authorizer policy, pursuant to T.C.A. § 49-13-106(e).

**9.5. Charter School Debt.** The Charter School is solely responsible for all debt it incurs, and the Authorizer shall not be contractually bound on the Charter School's account to any third party. The Authorizer shall not be liable in any instance for the Charter School's unpaid debts if the Charter School does not have sufficient funds to pay all of its debts.

The Charter School shall notify the Authorizer immediately of a default on any obligation owed to the Authorizer, which shall include debts for which payments are past due by sixty (60) days or more. If debts are incurred in the provision of employee benefits pursuant to T.C.A. § 49-13-119, the Authorizer may withhold the amount owed from the

monthly payment until such debts are satisfied. Any other debts owed to the Authorizer must be satisfied prior to release of the last annual payment.

**9.6. Financial Management.** The Charter School shall control and be responsible for financial management and performance of the Charter School including budgeting and expenditures. Before receiving state and local funds through the Authorizer, the Charter School must demonstrate (if not already demonstrated in the Charter School's Application) the existence of appropriate governance and managerial procedures and financial controls including:

a. Accounting methods complying with T.C.A. § 49-13-111(m);
b. A checking account;
c. Adequate payroll procedures;
d. An organizational chart;
e. Procedures for the creation and review of monthly and quarterly financial reports, including identification of the individual responsible for preparing such financial reports in the following fiscal year;
f. Internal control procedures for cash receipts, disbursements, and purchases; and
g. Maintenance of asset inventory lists and financial procedures for federal grants in accordance with applicable federal law.

The Authorizer reserves the right to require, consistent with the Act, the submission of financial reports as indicated in Authorizer policies.

The Charter School shall comply with T.C.A. §§ 49-13-111 and 120 regarding completion and submission of annual budgets, financial reports, and audits to the Authorizer and the State. The Charter School shall undergo an independent financial audit conducted in accordance with T.C.A. §§ 49-13-111(l) and 49-13-127. The audit shall be furnished to the Authorizer, the Commissioner of Education, and the Comptroller of the Treasury by December 31 of each year in accordance with the Authorizer's reporting calendar. If such audit is not received by the Authorizer on or before December 31 of each year, it shall be considered a material breach of this Agreement, which the Charter School shall have 15 business days, or such other time as the Parties may agree, to cure. The audit should express an unqualified opinion on the financial statements. A qualified audit opinion will result in an automatic review and request for explanation from the Charter School. In addition, any material weaknesses in controls should be disclosed during the audit. A material weakness will result in a potential review and explanation from the Charter School. The Charter School shall also prepare and provide to the Authorizer a copy of its final annual budget for the upcoming fiscal year no later than July 1 of each year. In addition, the Charter School shall submit any other financial and/or operational reports pursuant to T.C.A. § 49-13-111(d).

**9.7. Financial Records.** All financial records of the Charter School pertaining to the management and operation of the school are subject to inspection and production as

required for fulfillment of the Authorizer's fiduciary responsibilities, upon reasonable notice, in accordance with T.C.A. § 49-13-111(g).

**9.8. Authorizer Fee.** Pursuant to T.C.A. § 49-13-128(e), the Charter School agrees to the payment of an annual authorizer fee of up to 3% of the charter school's per pupil state and local funding. By May 1 of each year, the Authorizer shall set the percentage of the authorizer fee. The Authorizer shall use the authorizer fee to fulfill obligations consistent with the authority of the Authorizer set forth in Title 49, Chapter 13.

**10. Amendments**

Pursuant to T.C.A. § 49-13-110, petitions to amend this Agreement, initiated by the Charter School, shall follow the timelines established in Commission Rule 1185-01-01-.04 for approval or denial by the Authorizer. An amendment shall not become effective, and the Charter School shall not take action or implement the change requested in the amendment, until the amendment is approved in writing by the Authorizer.

Not all changes to the Charter School's operation constitute material changes to this Agreement that require an amendment. However, the following changes, as well as any other changes mentioned in other sections of this Agreement as being material and requiring an amendment as well as changes outlined in Commission Rule 1185-01-01-.04 are considered material and shall require an amendment:

a. Material changes in the Charter School's mission, as defined in Section 1.7;
b. Changes in the Charter School's calendar that reduce the calendar by 5 or more days in the first year of operation or by more than ten (10) days in subsequent years, in the absence of timely notification of parents;
c. Changes in school location that are materially different from the location of the Charter School as discussed in the Charter School's Application and this Agreement pursuant to Section 1.5; and
d. Change in governance structure (including, but not limited to, a change in the non-profit entity governing the school), or addition of or changes to the charter management organization.

Educational program matters not specifically identified in this Agreement or the Charter School's Application shall remain within the Charter School's authority and discretion.

The following changes do not require an amendment; however, the Charter School shall notify the Authorizer of any of the following within thirty (30) days:

a. Changes to the July 1st budget submitted to the Authorizer, subject to the requirements of state and federal law;

b. Changes in the mailing address of the school, phone or fax number, or web address of the Charter School;
c. Changes in the members and duties of the Governing Body relating to oversight of the Charter School, including names and contact information;
d. Changes in the school leader or, if applicable, the chief executive of the Charter School or charter management organization including names and contact information;
e. Changes in any leadership in the Charter School or individuals serving as main contacts with the Authorizer, including names and contact information; and
f. Changes in school location to a location permitted by Section 1.5.

Any material change initiated by the Authorizer, requiring an amendment to this Agreement, must be agreed to in writing by both parties. An amendment shall be effective at the agreed upon date in the amendment or upon approval in writing by the Authorizer.

**11. Renewal, Revocation, Closure, and Dissolution**

**11.1. Renewal**. Pursuant to T.C.A. § 49-13-121, the Charter School may apply for renewal of this Charter Agreement by application submitted no later than April 1 of the year prior to the year in which this Agreement expires and in accordance with Authorizer renewal rules and policies. This Agreement may be renewed without modification, except for the incorporation by attachment of the approved renewal application. The Parties may also amend this Agreement as part of the renewal process.

The Authorizer may elect not to renew this Charter Agreement pursuant to the Authorizer rules, policies, and T.C.A. § 49-13-121. Any changes to this Agreement proposed during the renewal process that are rejected by one of the Parties shall constitute denial of the renewal application. Denial of the renewal application by the Authorizer shall be final and not subject to appeal.

The Charter School shall also comply with any renewal criteria, policies, or protocols established by the Authorizer.

**11.2. Revocation.** During the term of this Agreement, in accordance with the Authorizer's policies, the Authorizer will provide notice to the Charter School of non-compliance with applicable laws, rules, or this Agreement and give the Charter School an opportunity to cure the non-compliance prior to instituting revocation proceedings pursuant to T.C.A. § 49-13-122 and Authorizer rules and policies, unless the Authorizer determines that the violations are so severe that such notice and an opportunity to cure should be waived. Such notice and opportunity to cure shall not be required for grounds upon which this Agreement or state law calls for immediate revocation of the charter.

At any time during the term of this Agreement, the Authorizer may revoke this Agreement for any reason set forth in T.C.A. § 49-13-122, and/or a material violation of any of the conditions, standards, or procedures set forth in this Agreement.

If the Authorizer determines that any grounds for revocation exist, it may revoke this Charter Agreement according to the procedures set forth in T.C.A. § 49-13-122 and Authorizer policies.

**11.3. Closure and Dissolution.** In the event that the Charter School is required to cease operation for any reason, including but not limited to closure, non-renewal, revocation, or voluntary surrender of the charter, the Charter School shall cooperate with the Authorizer to ensure orderly closure of the Charter School including, but not limited to:

a. Timely notification of parents and teachers of the closure decision;
b. Securing student records and transferring them to the LEA in which the Charter School is located;
c. Assisting in placing students in appropriate schools;
d. Managing all financial records consistent with the Authorizer's school closure requirements and policies; and
e. Disposal of school assets in accordance with the Act and this Agreement.

The Charter School shall also comply with any closure policies or protocols established by the Authorizer.

Dissolution of the Charter School following revocation, expiration of this Agreement, dissolution or cessation of operations, or non-renewal shall comply with T.C.A. §§ 49-13-110(e) and 49-13-122. The Charter School shall be responsible for winding down operations, including payment of any and all debts, obligations, or liabilities incurred at any time by the Charter School. Under no circumstances shall the Authorizer be responsible for such obligations. Charter School personnel and the Governing Board shall cooperate fully with any activity related to school closure or phase out. If assets of the Charter School were funded with funds from the Authorizer, other than funds described in Sections 9.1 and 9.2, and such assets remain after paying the Charter School's debts and obligations and not requiring return or transfer to donors or grantors, such assets will become the property of the Authorizer.

## 12. Indemnification and Hold Harmless

The Authorizer and Charter School each shall give immediate written notice to the other of the assertion of any claim or the commencement of any litigation for which indemnification is sought and shall cooperate with each other in the defense of the claim or litigation.

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

Each party to this Agreement shall indemnify and hold harmless the other, and their respective officers, agents, and employees from and against any and all claims, actions, damages, expenses, losses or awards--including attorney fees--arising out of (i) the negligence of the other party, (ii) any action taken or not taken by the other party, or (iii) any noncompliance or breach by the other party of any of the terms of this Agreement, or laws applicable to the party's operations during the term of this Agreement.

In the event of any such suit or claim relating to actions by the Charter School, the Parties shall provide all assistance required in defense of actions by the Charter School. Nothing contained herein shall be deemed to afford to the Charter School, through its attorney(s), the right to represent the State of Tennessee in any legal matter, such rights being governed by T.C.A. § 8-6-106.

**13. Contract Construction**

**13.1. Waiver.** The failure of either of the Parties to this Agreement to insist on strict performance of any term or condition of this Agreement shall not constitute a waiver of that term or condition, even if the Party accepting or acquiescing in the nonconforming performance knows of the nature of the performance and fails to object to it.

**13.2. Non-assignability.** No right or interest in this Agreement shall be assigned by anyone on behalf of the Charter School, and delegation of any contractual duty of the Charter School shall not be made without prior written approval of the Authorizer. A violation of this provision shall be grounds for immediate termination of this Agreement and revocation of the Charter.

Should the Charter School propose to enter into a contract with another non-profit entity to manage the school, this constitutes a material change that requires an amendment to this Agreement. The Charter School agrees to submit all information requested by the Authorizer regarding the management arrangement, including a copy of the proposed contract and a description of the management company, with identification of its principals and their backgrounds. The Charter School shall not enter a management contract without written approval from the Authorizer. Failure to receive approval from the Authorizer prior to entering into a contract shall be grounds for immediate revocation.

**13.3. Agreement.** The Parties intend this Agreement, including all attachments and exhibits hereto, to represent a final and complete expression of their agreement, which shall be considered the Agreement. All prior representations, understandings, and discussions are merged herein, and no course of prior dealings between the Parties shall supplement or explain any terms used in this document. The Parties recognize that amendments to this Agreement may be executed from time-to-time hereafter.

**13.4. Survival of Representations and Warranties.** All representations and warranties hereunder shall be deemed to be material and relied upon by the Parties with or to whom the same were made, notwithstanding any investigation or inspection made by or on behalf of such Party or Parties. The representations and warranties covered in this Agreement will survive the termination or expiration of this Agreement.

**13.5. Severability.** The provisions of this Agreement are severable. Any term or condition deemed illegal or invalid shall not affect any other term or condition, and the remainder of the Agreement shall remain in effect unless otherwise terminated by one or both Parties. For any term or condition deemed illegal or invalid, the Parties shall, upon the request of either party, negotiate in good faith to adopt any necessary or appropriate replacement provision.

**13.6. Authority.** The individual officers, agents, and employees of the Parties hereto who execute this Agreement do hereby individually represent and warrant that they have full power and lawful authority to execute this Agreement.

**13.7. Change of Law.** If, due to any change in applicable law, regulation, or interpretation thereof by any court of law or other governing body having jurisdiction subsequent to the date of this Agreement, performance of any provision of this Agreement or any transaction contemplated hereby shall become impracticable or impossible, the parties hereto shall use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such provision.

**13.8 Notice.** Any notice required or permitted under this Agreement shall be in writing, sent via electronic or other means, and shall be effective immediately upon personal delivery, subject to verification of service or acknowledgment of receipt, or three (3) days after mailing when sent by certified mail, postage prepaid. Such noticed shall be sent to:

If to the Authorizer:

Mailed to:
Tennessee Public Charter School Commission
Attn: General Counsel
500 James Robertson Parkway, 8th Floor
Nashville, TN 37243
and emailed to:
ashley.thomas2@tn.gov

If to the Charter School:

Mailed to:
Executive Director
IOTA Community Schools

6000 Poplar Ave., Suite 250
Memphis, TN 38119
and emailed to:
info@iotaschools.org

Either party may change its address for notices under this Agreement by notice to the other party.

**13.9 No Third-Party Beneficiary.** This Agreement shall not create any rights in any third parties who have not entered into this Agreement, nor shall any third party by entitled to enforce any rights or obligations that may be possessed by either party to this Agreement.

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

| THE STATE OF TENNESSEE BY AND THROUGH THE TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION: | CHARTER SCHOOL: |
|---|---|
| By: Tess S Stovall | By: Amertice Allen |
| Printed Name: Tess Stovall | Printed Name: Amertice Allen |
| Title: Executive Director | Title: Board Chair |
| Date: 2/12/2025 | Date: 02/05/2025 07:57PM UTC |
| By: Christine P. Richards | |
| Printed Name: Christine Richards | |
| Title: Chairman, Tennessee Public Charter School Commission | |
| Date of Commission Approval: 01/24/2025 | |

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**EXHIBITS**

**Exhibit 1**- Approved Charter Application ("Charter School Application")
**Exhibit 2**- Current Approved Performance Frameworks
**Exhibit 3**- Pre-Opening Checklist/ Protocol
**Exhibit 4**- Approved Waivers

# EXHIBIT 52

# Wooddale Middle School

## Amended Application for Existing ASD School Sponsors Seeking Authorization from their Home LEA

Opening in the 2025-2026 School Year,
Transitioning during the 2024-2025 School Year

## Part 1 - General Information

Cover Sheet

### *Primary Point of Contact*

Identify the primary point of contact for your application.

| | |
|---|---|
| **Name of School** | Wooddale Middle School |
| **Name of Sponsor / Sponsoring Entity** | Green Dot Public Schools Tennessee (GDPST) |
| **Name of Proposed Authorizer** | Memphis Shelby County Schools |

| | |
|---|---|
| **Primary Contact Name** | Jocquell Rodgers |
| **Primary Contact Role** | GDPST Executive Director |
| **Primary Contact Mailing Address** | 3467 Castleman Street, Memphis, TN 38118 |
| **Primary Contact Email Address** | Jocquell.Rodgers@greendot.org |
| **Primary Contact Phone Number** | 901.237.5608 |
| **Primary Contact Alternate Number** | 901.237.4440 |

### *School Information*

| | |
|---|---|
| **Name of School** | Wooddale Middle School |
| **Projected Year of School Opening under Identified Authorizer** | 2024-2025 |
| **Name of Sponsor / Sponsoring Entity** | Green Dot Public Schools Tennessee (GDPST) |
| **Name of Proposed Authorizer** | Memphis Shelby County Schools |
| **Model or focus of school** | College Preparatory |
| **City or geographic community for school** | Memphis: Parkway Village community |

### *Sponsor & School Transition Team*

| Full Name | Current Job Title | Key Transition Responsibilities |
|---|---|---|
| Ms. Denai Greene | Principal, Wooddale Middle School | Serve as administrator and instructional leader of the school, direct and supervise the curriculum and guidance program of the school; oversee implementation of school based academic programming |
| Jocquell Rodgers | Executive Director, GDPST | Assume responsibility for the school's overall success; manage the GDPST Leadership Team and reports directly to the GDPST Board of Directors |
| Christina Austin | Chief Academic Officer, GDPST | Manage a team of Curriculum Specialists to coach teachers, vet, select, and ensure fidelity of curriculum execution, and implement the assessment model. The CAO supports SPED program development and implementation, compliance monitoring, professional development, and psychologist supervision and management. She also manages the overarching vision for counseling and clinical services. |
| Daniel Penaranda | Chief Operating Officer, GDPST | Manage the financial and operational aspects of the Tennessee Regional Office and all Green Dot Tennessee schools; collaborate with principals to determine resource allocations for the schools and manages the facilities and IT teams |
| Jovan Orozco | Director of Finance, GDPST | Manage the financial aspects of the Tennessee Regional Office and all Green Dot Tennessee schools; collaborate with principal to determine the budget(s) |
| Marysa Utley | Chief of Schools, GDPST | Provide direct coaching and support to the principals and assistant principals |

| | |
|---|---|
| **Is the sponsor a not-for-profit organization with 501(c)(3) status?** | X Yes<br>□ No<br>□ In Progress |
| *If no or in progress, please explain:* | |

| | |
|---|---|
| **Is the school currently in contract with or partnering with a charter management organization (CMO)?** | X Yes<br>□ No |
| *If yes, identify the CMO or other partner organization:* Green Dot Public Schools Tennessee | |

# Assurances Form



## Assurances

As the authorized representative of the sponsor, I hereby certify that the information submitted in this application for a charter for Wooddale Middle School. is true to the best of my knowledge and belief, realizing that any misrepresentation could result in disqualification from the application process or revocation after award; and if awarded a charter, the school:

1. Will operate as a public, nonsectarian, non-religious public school, with control of instruction vested in the governing body of the school under the general supervision of the authorizer and in compliance with the charter agreement and the Tennessee Public Charter Schools Act;
2. Will follow all federal, state, and local laws and regulations that pertain to the operation of a public school, unless waived according to Tenn. Code Ann. § 49-13-111(p);
3. Will provide special education services for students as provided in Tenn. Code Ann. Title 49, Chapter 10, Part B of the Individuals with Disabilities Education Act, Title II of the Americans with Disabilities Act of 1990, and Section 504 of the Rehabilitation Act of 1973;
4. Will adhere to all provisions of federal law relating to students who are limited English proficient, including Title VI of the Civil Rights Act of 1964 and the Equal Educational Opportunities Act of 1974, that are applicable to it;
5. Will follow all federal and state laws and constitutional provisions prohibiting discrimination on the basis of disability, race, creed, color, national origin, religion, ancestry, or need for special education services;
6. Will utilize this application as a contract with the authorizer, if no other agreement is signed, pursuant to Tennessee Attorney General Opinion No. 10-45;
7. Will comply with all provisions of the Tennessee Public Charter Schools Act, including, but not limited to
   a. employing individuals to teach who hold a license to teach in a public school in Tennessee;
   b. complying with Open Meetings and Open Records laws (Tenn. Code Ann. §§ 8-44-101 *et seq.*; 10- 7-503, 504) (guidance is available from the Office of Open Records Counsel);
   c. not charging tuition, except for students transferring from another district to the school pursuant to the local board's out-of-district enrollment policy and Tenn. Code Ann. § 49- 6-3003;
   d. following state financial (budgeting and audit) procedures and reporting requirements according to Tenn. Code Ann. §§ 49-13-111, 120, and 127;
   e. requiring any member of the governing body, employee, officer, or other authorized person who receives funds, has access to funds, or has authority to make expenditures from funds, to give a surety bond in the form prescribed by Tenn. Code Ann. § 8-19-101; and
8. Will, at all times, maintain all necessary and appropriate insurance coverage.

[signature]

Signature

Jocquell Rodgers

Printed Name of Authorized Representative

Executive Director, GDPST

Title of Authorized Representative



© Tennessee Department of Education

**Executive Summary**

**Mission and Vision:** The **mission** of Green Dot Public Schools Tennessee (Green Dot or GDPST) is to help transform public education so *all* students graduate prepared for **college**, **leadership**, and **life**. At Wooddale Middle School (Wooddale MS), transformation is rooted in a culture of resiliency where students, parents, faculty/staff, and community members will demonstrate intentional effort to surpass academic as well as behavioral expectations while establishing trust in the community as we serve as a growth catalyst through transparency of self and others. Wooddale MS' vision is focused on promoting students and fully preparing them for **college, leadership, and life.** Our vision calls us to develop effective leaders and teachers capable of delivering a rigorous academic model, individualizing support for all students, and creating a safe, nurturing school environment.

**Students Served:** Wooddale MS currently enrolls 558 sixth to eighth-grade students who live in the southeast (SE) region of Memphis in the Parkway Village and Hickory Hill communities, which are in the 38118-zip code. Wooddale MS students are primarily low-income Black and Hispanic students. The SY2023-24 (YTD) demographic profile of the student population includes 58% African American, 40% Hispanic/Latinx, 93% Free and Reduced Lunch, 58% economically disadvantaged, 23% English Learners, and 7% students with disabilities. Between SY2015-16 and SY2023-24, the percentage of our students Hispanic/Latinx students more than doubled. Given consistently low-performance data of 3rd to 8th-grade proficiency in the Memphis Shelby County Schools (MSCS), the majority of our population are students who are not meeting minimum standards of academic proficiency, students at risk of dropping out of high school, and students in chronically low-performing schools. Wooddale MS enrolls all students, particularly students who are far below grade level. For example, the 2023 beginning of the year (BOY) iReady data shows 5% of our incoming sixth graders enrolled on grade level in reading and 10% of our incoming sixth-grade students enrolled on grade level in math. Most students enroll two or three grade levels below with an average incoming sixth-grade level placement of 3.12 (in reading and math).

According to the Educational Priorities Document Rubric, the potential for student need across the community is substantial (i.e., 2,352 middle school students in the region need a quality seat). The SE region has 17 schools with a School Performance Scorecard rating below 3. Eleven schools are on the Comprehensive Support and Improvement (CSI) list while six schools are on the Targeted Support and Improvement (TSI) list, and one school is on the Additional Targeted Support and Improvement (ATSI) list. Wooddale MS does not fall into any of the federal designations for intervention: CSI, ATSI, or TSI. **Wooddale MS has exited the priority list** based on its academic performance. When comparing the academic options for students in the Parkway Village community, **Wooddale MS, in conjunction with GDPST, offers the greatest opportunity for college and career readiness.** In SY 2022-23, Wooddale MS earned a "C" grade, our first letter grade since the system was revamped. All other neighborhood middle schools earned an "F." In 2018, 2022, and 2023, Wooddale MS achieved a schoolwide TVAAS Literacy & Numeracy Composite score of 5 while other area middle schools generally earned a 2. Further, the state report card shows significant evidence (5 of 5 points) that our economically disadvantaged students, English Learners, and Black or African American students made more academic growth and are learning and growing compared to the relative performance of their peers across the state. Wooddale MS has been on a strong academic trajectory because of reflective practices based in data, an unyielding admin team, and teachers who work collaboratively with each other to build capacity not only in their instructional practices but also in students.

**Academic Program:** Wooddale MS focuses on preparing students in grades 6-8 for **college, leadership, and life** by providing a small, college-preparatory program where all stakeholders actively engage in the education process. The TN Academics Standards drive instruction at Wooddale MS by providing the road map of what students need to know to be prepared for **college, leadership, and life.** The standards are expressly addressed in ELA, math, science, and social studies. Wooddale MS also offers a STEM pathway and various electives to allow students to explore their passions. Wooddale MS teachers utilize diverse teaching methods, differentiated instruction, and personalized learning plans. They engage parents in their child(ren)'s education through open and ongoing communication, allowing for collaboration in addressing a student's specific educational needs.

Additionally, Wooddale MS offers extensive programming for students requiring special education and English language development support. Wooddale MS prepares all students for college success in a strategically-cultivated school learning environment in which each student is actively engaged in learning. The academic plan is structured upon the following four academic elements that are common across all Green Dot schools: 1) Cultivating a College-going Culture, 2) Eliminating Barriers to Instruction, 3) Ensuring Quality Teaching and Instruction, and 4) Promoting Leadership and Life Skills. Standards-based curriculum supports us in achieving our mission and goals based on research-based evidence of effectiveness with a similar population to our student population, and best practices in high-performing schools across the State and nation. Our instructional methods and curriculum empower teachers to differentiate to meet students' individual needs and accelerate learning across the content areas to ensure students master the TN Academic Standards and the World-class Instructional Design and Assessments (WIDA) English Language Proficiency Standards. This approach is well-suited for our student population given varying incoming performance levels. Further, the college prep focus emphasizes skills needed for long-term success.

**Successes:** The goal of the partnership with GDPST and the Achievement Schools District (ASD) was to raise academic achievement to move Wooddale MS from the bottom 5% on the state performance framework. As of the 2023-24 school year, Wooddale MS has met the criteria for Priority School Exit status under the support of GDPST per the Tennessee Department of Education (TDOE). Wooddale MS and GDPST have successfully met the tenets of the agreement with the ASD, the TDOE, and the families of Parkway Village. This accomplishment demonstrates the academic growth and achievement Wooddale MS can continue to attain by remaining in partnership with GDPST (which will continue serving Memphis families as a newly named organization, IOTA, (Innovation, Opportunity, Transformation, and Access) Community Schools, beginning July 1, 2024). Moreover, Wooddale MS's Letter Grade Dashboard indicates Wooddale MS is closing the achievement gap. The Dashboard shows our economically disadvantaged, English Learners, and Black or African American student groups achieved Level 5 growth. Over the past three years (SY2020-21, 2021-22, 2022-23) Wooddale MS has successfully worked to rebound from disruptions to learning brought forth by the COVID-19 school closures which brought severe declines in academic achievement to schools across the nation, most significantly in low-income neighborhoods. In SY 2022-23, the percentage of students scoring proficient on TNReady state assessments in math has not only returned to but exceeded pre-pandemic rates. Prior to becoming a Green Dot school, Wooddale MS's success rate on state assessments was in the bottom 5% of TN schools. Now, (based on 2023 overall success rates), **Wooddale MS outscores 9% of all TN schools and outscores 10.3% of TN middle schools.** As shown within internal iReady and state assessment data, Wooddale MS students have made strong annual growth. For the past two school years, Wooddale MS students have achieved well over the typical amount of growth for similar students nationwide, in both math and ELA. In the current year, students have already averaged more than the typical goal amount in ELA and 87% of the goal amount in math, based on fall-to-winter growth (see assessment data in Attachments AA and BB).

The stability of the leadership team and high teacher retention has been the foundation of the success at Wooddale MS. Stability in leadership and personnel will endure as GDPST moves forward as IOTA Community Schools). This transition, formalized after submission of our initial application and capacity interview (until which time we were advised to not publicly discuss), will allow IOTA to continue to provide the same level of operational efficiency as it did as GDPST by providing the back-office support services previously provided by Green Dot Public Schools National in-house. Key operations and support team members, including members that have been engaged since Wooddale's first year under Green Dot (2015-2016) will shift to IOTA beginning on July 1, 2024. Retention of these staff members will facilitate high-quality continuity of services. IOTA will directly provide all back-office services (e.g., finance and accounting), data operations, IT systems, etc. as we remain devoted to serving students and families in the Memphis community as we have done for the past decade.

The team recognizes Wooddale MS experienced some data setbacks, including years when testing was not counted because of systematic errors and the pandemic; however, Wooddale MS has been on a strong academic trajectory because of reflective practices based on data, an unyielding admin team, and teachers who work collaboratively with each other to build capacity in their instructional practices. As evidenced through TCAP

proficiency data, our assessment strategies are aligned to TN standards to ensure that children have the opportunity to reach proficiency on state academic assessments. As shown in 2023 TCAP proficiency data, Wooddale MS students are trending positively toward proficiency; and, in math, they are outperforming their SCMS peers. Two other impactful opportunities for academic growth have been the implementation of an intervention program and the addition of daily double-blocked ELA and math periods (80 minutes each). The intervention program addressed the needs of the students with disabilities population at the school, while also improving outcomes for English Learners, who now make up approximately 40% of the student population. Intervention addressed the academic challenges of Tier 3 students while building support for students in Tier 2, moving them toward proficiency.

**Challenge:** A challenge Wooddale MS continues to face is the low-performance level of incoming students. Students are enrolling far below grade level. To address the challenge of students entering multiple years behind grade level, we have developed and implemented a robust RTI2 plan to provide students with foundational learning and skills needed to serve all students with fidelity. Finally, we've historically served a population for whom residential mobility is common. Despite efforts (e.g., creating a welcoming environment, quick turnaround for student records, offering resources that address the specific needs of students, working to understand and address reasons behind relocations), high student mobility rates are associated with lower school engagement and poorer grades in reading and math. **Lessons:** Our academic plan has evolved to meet the ever-changing needs of students, shifts in state standards; and in response to student achievement data and staff feedback. Since 2015, TN students and teachers have experienced changing standards in all four core content areas, as well as numerous shifts in TN Ready testing vendors. The shift is significant because a thoughtful academic plan includes opportunities for students to experience learning activities and assessments that incorporate the technology and item types the vendor utilizes. In response, we implemented a standards-aligned curriculum, formed a partnership with the Lavinia Group, and supported an IP collaboration for teachers to complement the delivery of data-driven and targeted PD. Lessons learned indicate teachers benefit from and are more effective when provided with robust PD, training, and ongoing instructional support. Our FT curriculum specialists' responsibilities include training and partnering with curriculum developers to provide meaningful PD. The curriculum specialists model lessons and offer an on-demand resource center to support teachers. We have also learned that staff welcome and appreciate the support and voice. Our 88.9% overall staff retention rate is an indicator showing we value and respond to feedback.

**Material Modifications:** IOTA's leadership team is embracing the opportunity to reimagine how to bring more innovation to its work of providing students with access to opportunities that expand possibilities and encourage them to dream bigger for their futures. One material modification is being requested. We seek to become IOTA Community Schools, effective July 1, 2024. Green Dot Public Schools National supports this next step for the Memphis organization and is assisting in its transition to IOTA Community Schools. As shown in the board resolution (See Attachment L that has been amended to include the two board resolutions), the GDPST Board voted on February 5, 2024, to approve action to change the name "Green Dot Public Schools Tennessee" to "IOTA Community Schools". On May 16, 2024, the GDPST Board voted (Please see board resolution in Attachment L) to amend its bylaws and articles of incorporation, and to approve modification of the intellectual property license agreement with Green Dot Public School National (GDPSN). Further, after analyzing WMS's current data and comparing current curriculum choices to these options, we saw a need for a shift to be more in alignment with the state of TN Therefore, in SY2023-24 Wooddale MS began to pilot curriculum and instructional materials recommended by the State Textbook and Instructional Materials Quality Commission and included on the Official List of Textbooks and Instructional Materials. The State review process uses TN standards and considers the needs of TN classrooms (https://www.tn.gov/education/districts/textbook-services/textbook-reviews.html). As the pilot demonstrates the materials are proven effective with our students, we anticipate making a schoolwide transition in SY2024-25. All selections are made to ensure teachers are fully supported in aligning their instruction with standards while continuing to meet various student needs and making learning accessible for all students.

## Table of Contents

**Section 1: Academic Plan and Design……………………………………………………………..…1**
**1.1 School Mission and Vision…………………………………………………………………..…1**
**1.2 Enrollment Summary…………………………………………………..…………………….…6**
**1.3 Academic Focus and Plan…………………………………………..…………………..…13**
**1.4 Academic Performance Standards……………………..………………………………..…21**
**1.5 Assessments……………………………………………………………………………….…29**
**1.6 School Calendar and Schedule……………………………………………………………..…34**
**1.7 Special Populations……………………………………………………………………….…37**
**1.8 School Culture and Discipline……………………..……………….………………..…59**
**1.9 Recruitment and Enrollment…………………………………..………………………..…65**
**1.10 Parent and Community Engagement and Support…………………………………..…77**
**Section 2: Operations Plan and Capacity……………………………………….……………..…82**
**2.1 Governance………………………………………………………………….………………..…82**
**2.2 Transition Plan…………………………………………………………….……………………..…87**
**2.3 Facilities………………………………………………………………………………………..…91**
**2.4 Personnel/Human Capital……………………………………………….…….……………..…93**
**2.5 Transportation……………………………………………………..………………..…104**
**2.6 Food Service……………………………………………………………………..…106**
**2.7 Additional Operations…………………………………………..……………………..…107**
**2.8 Charter Management Organization…………………………………………………..…108**
**Section 3: Financial Plan and Capacity……………………….……………………………..…110**
**3.1 Planning and Budget Worksheet……………………………………………………..…110**
**3.2 Budget Narrative………………………………………………………………………..…111**
**Section 4: Portfolio Review and Performance Record…..…………………………………..…112**
**4.1 Portfolio Summary………………………………………………………………………..…112**
**4.2 Performance Record: Academics……………………………………………………..…113**
**4.3 Performance Record: Operations……………………………………………………..…120**
**4.4 Performance Record: Finance……………………………………………………..…122**
**Attachment A: Foundational Literacy Plan…………………………………………………..…134**
**Attachment B: Testing Plan………………………………..……………………..…135**
**Attachment C: Annual Academic Calendar……………………………………………..…162**
**Attachment D: Daily Schedule……………………………………………………………..…163**

**Attachment E: Additional Program Plans…………………………………………………………………..….164**

**Attachment F: Student Handbook and Required Forms……………………………………………….….184**

**Attachment G: Student Discipline Policy……………………………………….……………………..….272**

**Attachment H: Enrollment Policy……………………………………………..…………………..….360**

**Attachment I: Letters of Support………………………………………………………………………..….364**

**Attachment J: Articles of Incorporation…………………………….…………………………..….479**

**Attachment K: Proof of Non-Profit and Tax-Exempt Statue……………………………………..….488**

**Attachment L: By-Laws…………………………………………………………………..…………..….491**

**Attachment M: Code of Conduct……………………………………………………………………..….543**

**Attachment N: Conflict of Interest Policy……………………………………………..………………….544**

**Attachment O: Board Member Biographies……………………………………………..……………….551**

**Attachment P: Board Policies………………………………………………………………………..….553**

**Attachment Q: Facility Map……………………………………..…………………………………..….565**

**Attachment R: Organizational Chart……………………………………………………………….….577**

**Attachment S: Student Achievement Information……………………….……………………..….583**

**Attachment T: Employee Manual and Personnel Policies………………………………………..….590**

**Attachment U: Food Vendor Contract………………………………………………………………..….680**

**Attachment W: CMO Agreement……………………………………………………………………..….684**

**Attachment X: Planning and Budget Worksheet…………………………………………………..….701**

**Attachment Y: Budget Narrative……………………………………………………………………..….724**

**Attachment Z: Portfolio Summary……………………………………….……………………..….733**

**Attachment AA: Internal Assessment Results…………………………………………………….….734**

**Attachment BB: State Assessment Results……………………………………………………..….738**

**Attachment CC-DD: Performance and Evaluation Reports…………………………………..….742**

**Attachment EE: Renewal Reports…………………………………………………………………..….771**

**Attachment FF: Annual Reports……………………………………………………………………..….772**

**Attachment GG: Litigation Documents…………………………………………………………..….845**

**Attachment HH: Audited Financial Statements…………………………………………………..….847**

**Attachment II: Transportation Documents……………………………………………………..….1186**

**Attachment V: Previously Approved and Authorized Charter Application…………………………..….1211**

# ORGANIZATIONAL CERTIFICATE OF THE INCORPORATOR OF GREEN DOT PUBLIC SCHOOLS TENNESSEE

The undersigned, who is named in the Charter of Green Dot Public Schools Tennessee, a Tennessee nonprofit corporation, as the incorporator, acting pursuant to the Tennessee Nonprofit Corporation Act, including, without limitation, provisions permitting incorporators to adopt initial Bylaws for the corporation, hereby adopts Bylaws for that corporation in the form attached hereto and made a part hereof.

Unless and until changed as provided in the Bylaws, the authorized number of directors of the corporation shall be three (3). The undersigned hereby appoints each of the following persons as a director of the corporation, to serve until his or her term as director expires and, if the director's office otherwise would become vacant, thereafter until the director's successor is selected as provided in the Bylaws, in each case unless and until removed from office as provided in the Bylaws:

| Name of Director | Term Ending |
|---|---|
| Jim Boyd | December 31, 2014 |
| Tom Marino | December 31, 2014 |
| Terence Patterson | December 31, 2014 |

The undersigned hereby executes this certificate at Memphis, Tennessee, on this 20th day of June 2014 and hereby resigns his position as incorporator.

Jeffrey C. Smith, Incorporator

# FORM OF BYLAWS

See attached.

**STATE OF TENNESSEE**
**Tre Hargett, Secretary of State**
Division of Business Services
William R. Snodgrass Tower
312 Rosa L. Parks AVE, 6th FL
Nashville, TN 37243-1102

Green Dot Public Schools Tennessee
STE 700
6075 POPLAR AVE
MEMPHIS, TN 38119-0100

May 29, 2014

## Filing Acknowledgment

Please review the filing information below and notify our office immediately of any discrepancies.

| | | | |
|---|---|---|---|
| **SOS Control # :** | **759433** | Formation Locale: | TENNESSEE |
| Filing Type: | Corporation Non-Profit - Domestic | Date Formed: | 05/29/2014 |
| Filing Date: | 05/29/2014 3:56 PM | Fiscal Year Close: | 6 |
| Status: | Active | Annual Report Due: | 10/01/2014 |
| Duration Term: | Perpetual | Image # : | A0238-2024 |
| Public/Mutual Benefit: | Public | | |
| Business County: | SHELBY COUNTY | | |

**Document Receipt**

| | | | |
|---|---|---|---|
| Receipt # : 1520961 | | Filing Fee: | $104.25 |
| Payment-Credit Card - State Payment Center - CC #: 156511198 | | | $104.25 |

**Registered Agent Address:**
JEFFREY C. SMITH
STE 700
6075 POPLAR AVE
MEMPHIS, TN 38119-0100

**Principal Address:**
STE 700
6075 POPLAR AVE
MEMPHIS, TN 38119-0100

Congratulations on the successful filing of your **Charter** for **Green Dot Public Schools Tennessee** in the State of Tennessee which is effective on the date shown above. You must also file this document in the office of the Register of Deeds in the county where the entity has its principal office if such principal office is in Tennessee. Visit the TN Department of Revenue website (apps.tn.gov/bizreg) to determine your online tax registration requirements.

You must file an Annual Report with this office on or before the Annual Report Due Date noted above and maintain a Registered Office and Registered Agent. Failure to do so will subject the business to Administrative Dissolution/Revocation.

Tre Hargett
Tre Hargett
Secretary of State

# CHARTER

# OF

# GREEN DOT PUBLIC SCHOOLS TENNESSEE

The undersigned incorporator under the provisions of the Tennessee Nonprofit Corporation Act (the "Act") adopts the following charter for the listed corporation, consistent with the requirements set forth in § 48-52-102:

1. The name of the corporation is:

   Green Dot Public Schools Tennessee

2. (a) The name of the initial registered agent, located at the address listed in 2(b), is as follows:

   Jeffrey C. Smith.

   (b) The complete address of the corporation's initial registered office in Tennessee is in the County of Shelby and is as follows:

   6075 Poplar Avenue, Suite 700
   Memphis, Tennessee 38119

3. The fiscal year end of the corporation is June 30.

4. The duration of the corporation is perpetual.

5. The corporation is not for profit.

6. The corporation is a public benefit corporation and is not a religious organization.

7. The corporation will have no members.

8. The name and complete address of the incorporator is as follows:

   Jeffrey C. Smith
   6075 Poplar Avenue, Suite 700
   Memphis, Tennessee 38119

9. The complete address of the corporation's initial principal office is:

   6075 Poplar Avenue, Suite 700
   Memphis, Tennessee 38119

10. The governing body of the corporation is its Board of Directors.

11. The purposes for which the corporation is organized are:

 (a) To establish and operate schools and/or other educational programs and instructional activities to provide students in Tennessee with the knowledge, proficiency and skills needed to promote greater opportunities for educational and academic achievement and advancement, including, but not limited to, promoting the advancement of education and to lessen the burdens of government by managing the development and operation of one or more public charter schools under the Tennessee Public Charter Schools Act of 2002.

 (b) To engage in any lawful activities which are appropriate to carry out and fulfill any or all of the forgoing purposes.

 (c) To do any and all things and to exercise any and all powers which a nonprofit corporation may do or exercise under the laws of the state of Tennessee and under Section 501(c)(3) of the Internal Revenue Code of 1986, or the corresponding provision of any future United States Internal Revenue law.

12. The corporation is organized and operated exclusively for charitable, scientific, literary, and education purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended; no part of the net earnings of the corporation shall inure to the benefit of any private shareholder, member, director, or individual, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered; no substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, except as otherwise provided in Section 501(h) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States Internal Revenue law, and the corporation shall not participate in, or intervene in (including publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

13. Notwithstanding any other provision of this Charter, the corporation shall not carry on any activity not permitted to be carried on by (i) a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986 or the corresponding part of any future United States Internal Revenue law, or (ii) a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 or any other corresponding provision of any future United States Internal Revenue law.

14. In the event of dissolution, the residual assets of the corporation shall be turned over to one or more educational organizations which themselves are exempt as organizations described in Sections 501(c)(3) and 170(c)(2) and described in Section 509(a)(1) or (2) of the Internal Revenue Code of 1986, or the corresponding provision of any future United States Internal Revenue law.

15. To the extent allowed by the laws of the State of Tennessee, no director of the corporation (or his or her estate, heirs and personal representatives) shall be liable to the corporation for monetary damages for breach of fiduciary duty as a director of the corporation. Any liability of a director (or his or her estate, heirs and personal representatives) shall be further eliminated or limited to the fullest extent allowed by the laws of the State of Tennessee, as may hereafter be adopted or amended.

16. With respect to claims or liabilities arising out of service as a director of the corporation, the corporation shall indemnify and advance expenses to the present and future director (and his or her estate, heirs and personal representatives) to the fullest extent allowed by laws of the State of Tennessee, both as now in effect and as hereafter adopted or amended.

17. The corporation shall not discriminate on the basis of race, creed, color, sex, national origin, religion, ancestry, disability, need for special education services or any other legally protected status in the administration of its policies, the operation of its programs and any school admissions.

Dated this the 29th day of May, 2014.

Jeffrey C. Smith, Incorporator

# CHARTER
# NONPROFIT CORPORATION (ss-4418)

Division of Business Services
**Tre Hargett, Secretary of State**
**State of Tennessee**
312 Rosa L. Parks AVE, 6th FL
Nashville, TN 37243-1102
(615) 741-2286

Filing Fee: $100

*For Office Use Only*

Control # 000759433
FILED: May 29, 2014 3:56PM
DLN # A0238-2024.001
Tre Hargett,
Secretary of State

**The undersigned, acting as incorporator(s) of a nonprofit corporation under the provisions of the Tennessee Nonprofit Corporation Act, adopt the following Articles of Incorporation.**

**1. The name of the corporation is:** Green Dot Public Schools Tennessee

**2. Name Consent: (Written Consent for Use of Indistinguishable Name)**
☐ This entity name already exists in Tennessee and has received name consent from the existing entity.

**3. This company has the additional designation of:**

**4. The name and complete address of its initial registered agent and office located in the State of Tennessee is:**
JEFFREY C. SMITH
STE 700
6075 POPLAR AVE
MEMPHIS, TN 38119-0100
SHELBY COUNTY

**5. Fiscal Year Close Month:** June **Period of Duration:** Perpetual

**6. If the document is not to be effective upon filing by the Secretary of State, the delayed effective date and time is:**
(none) (Not to exceed 90 days)

**7. The corporation is not for profit.**

**8. Please complete all of the following sentences by checking one of the two boxes in each sentence:**
This corporation is a ☑ public benefit corporation / ☐ mutual benefit corporation.
This corporation is a ☐ religious corporation / ☑ not a religious corporation.
This corporation will ☐ have members / ☑ not have members.

**9. The complete address of its principal executive office is:**
STE 700
6075 POPLAR AVE
MEMPHIS, TN 38119-0100
SHELBY COUNTY

***(Note: Pursuant to T.C.A. §10-7-503 all information on this form is public record.)***

# CHARTER
# NONPROFIT CORPORATION (ss-4418)

Division of Business Services
**Tre Hargett, Secretary of State**
**State of Tennessee**
312 Rosa L. Parks AVE, 6th FL
Nashville, TN 37243-1102
(615) 741-2286

Filing Fee: $100

*For Office Use Only*

Control # 000759433
FILED: May 29, 2014 3:56PM
DLN # A0238-2024.002
Tre Hargett,
Secretary of State

**The name of the corporation is:** Green Dot Public Schools Tennessee

**10. The complete mailing address of the entity (if different from the principal office) is:**
STE 700
6075 POPLAR AVE
MEMPHIS, TN 38119-0100

**11. List the name and complete address of each incorporator:**

| Title | Name | Business Address | City, State, Zip |
|---|---|---|---|
| | Jeffrey C. Smith | 6075 POPLAR AVE STE 700 | MEMPHIS, TN 38119-0100 |
| | | | |
| | | | |
| | | | |

**12. School Organization:** (required if the additional designation of "School Organization - Exempt" is entered in section 3.)

- ☐ I certify that pursuant to T.C.A. §49-2-611, this nonprofit corporation is exempt from the $100 filing fee required by T.C.A. §48-51-303(a)(1).
- ☐ This nonprofit corporation is a "school support organization" as defined in T.C.A. §49-2-603(4)(A).
- ☐ This nonprofit corporation is an educational institution as defined in T.C.A. §48-101-502(b).

**13. Insert here the provisions regarding the distribution of assets upon dissolution:**
In the event of dissolution of the Corporation, all assets will be distributed to another nonprofit organization with a similar purpose.

**14. Other Provisions:**

***(Note: Pursuant to T.C.A. §10-7-503 all information on this form is public record.)***

May 29, 2014 3:56PM
Signature Date

Electronic
Incorporator's Signature

Jeffrey C. Smith
Incorporator's Name (printed or typed)

# Tom Leatherwood

Shelby County Register / Archives

As evidenced by the instrument number shown below, this document has been recorded as a permanent record in the archives of the Office of the Shelby County Register.

14058287

06/06/2014 - 01:43 PM

| | |
|---|---|
| 2 PGS | |
| TAMMY 1219757-14058287 | |
| VALUE | 0.00 |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 0.00 |
| RECORDING FEE | 5.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 0.00 |
| WALK THRU FEE | 2.00 |
| TOTAL AMOUNT | 9.00 |

TOM LEATHERWOOD
REGISTER OF DEEDS SHELBY COUNTY TENNESSEE

1075 Mullins Station, Suite W165 ~ Memphis, Tennessee 38134 (901) 222-8100
Website: http://register.shelby.tn.us Email: Tom.Leatherwood@shelbycountytn.gov
Join us on Facebook

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: JUN 15 2015

GREEN DOT PUBLIC SCHOOLS TENNESSEE
4950 FAIRLEY RD
MEMPHIS, TN 38119

Employer Identification Number:
47-0970499
DLN:
17053069312035
Contact Person:
JUSTIN R PALMER ID# 31674
Contact Telephone Number:
(877) 829-5500
Accounting Period Ending:
June 30
Public Charity Status:
170(b)(1)(A)(ii)
Form 990 Required:
Yes
Effective Date of Exemption:
May 29, 2014
Contribution Deductibility:
Yes
Addendum Applies:
Yes

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

For important information about your responsibilities as a tax-exempt organization, go to www.irs.gov/charities. Enter "4221-PC" in the search bar to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, which describes your recordkeeping, reporting, and disclosure requirements.

Sincerely,

Tamera Ripperda

Director, Exempt Organizations

Letter 947

ADDENDUM

INFORMATION FOR CHARTER SCHOOLS

You are not subject to the specific publishing requirements of Revenue Procedure 75-50, 1975-2 C.B., page 587, as long as you are operating under a contract with the local government. If your method of operation changes to the extent that your charter is terminated, cancelled, or not renewed, you will be required to comply with Revenue Procedure 75-50.

# EXHIBIT 53

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

# 2025 CHARTER AGREEMENT
# LEAD NEELY'S BEND

This Charter Agreement (hereinafter referred to as "this Agreement") is entered into this, the 24th day of January 2025, by and between the Tennessee Public Charter School Commission (hereinafter referred to as "the Commission" or "the Authorizer") and Neely's Bend College Prep, Nonprofit LLC, a subsidiary of LEAD Public Schools, Inc. (the "Applicant(s)") (collectively, the "Parties") to operate LEAD Neely's Bend (hereinafter referred to as "the Charter School").

For purposes of this Agreement, "Charter School" refers to the Governing Body and the charter school. The terms "Charter School" and "Governing Body" are used interchangeably herein; however, references herein to "Charter School" shall not include other schools operated by the Governing Body.

Whereas the Commission was authorized for the service as the LEA for any public charter school it authorizes in accordance with T.C.A. § 49-13-105(a);

This Agreement consists of the following documents:

- This document and any exhibits hereto or documents incorporated herein by reference
- Approved Charter School's Application (Exhibit 1)
- Current Approved Performance Frameworks – Academic, Organizational, and Financial (Exhibit 2)
- Transition Checklist (Exhibit 3)
- Approved Waivers (Exhibit 4)
- Tennessee Public Charter School Commission Charter Agreement (Exhibit 5)

In consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

## 1. General Terms

**1.1. Applicable Law.** This Agreement and the Charter School's operations shall be governed by and construed in accordance with the laws of the state of Tennessee and applicable federal laws. Though the Charter School may, pursuant to Tennessee Code Annotated ("T.C.A.") § 49-13-111, seek waivers from the Authorizer or the commissioner of education from Tennessee laws or rules of the State Board of Education that inhibit the Charter School's ability to meet its goals or comply with the school's mission, the Parties understand that currently, waivers may not be provided from the types of laws and rules specifically listed in T.C.A. § 49-13-111, from any provisions of Title 49, Chapter 13 (the Tennessee Public Charter Schools Act, hereinafter referred to as the "Act"), those included in the Act by reference, or from other laws specifically applicable to charter schools (such as those related to benefits or retirement of charter school employees contained in Title 8, Chapter 27, Part 3).

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

To the extent there is a conflict between the terms of this Agreement and the Charter School's Application, the terms of this Agreement shall govern.

By signing this Agreement, the Authorizer approves any waivers requested in the Charter School's Application, unless such waivers are excluded from Exhibit 4. Approved waivers are attached as **Exhibit 4**.

**1.2. Effective Date.** This Agreement shall be effective on the 1st day of July 2025 (the "Effective Date") following signature by the Governing Board Chair of the Charter School and the Authorizer. This Agreement shall expire on June 30 of the tenth (10th) year after the Effective Date, unless earlier terminated or renewed pursuant to the terms of this Agreement or state law.

**1.3 Transition Process.** As of the date of this Agreement, the Charter School has completed all items listed in the Transition Checklist, incorporated into this Agreement as **Exhibit 3**.

**1.4. Charter School Performance.** The operation of the Charter School shall be subject to the terms and conditions of this Agreement and the Act. Decisions by the Authorizer regarding amendment, renewal, or revocation of this Agreement shall be based upon applicable laws, rules, policies, this Agreement, and/or the academic, organizational, and financial Performance Frameworks (the "Performance Frameworks") incorporated into this Agreement as **Exhibit 2**, as well as the Authorizer's Intervention Policy.

The Authorizer shall have broad oversight authority over the Charter School and may take all reasonable steps necessary to oversee compliance with this Agreement and applicable laws, rules, and policies. This oversight authority includes, but is not limited to, the right to visit, examine, and inspect the Charter School and its records during the transition year, during the annual monitoring visit, and to investigate a complaint (notice including a statement of the complaint shall be given to the Charter School, unless in the judgment of the Authorizer such notice would inhibit the Authorizer's ability to investigate the complaint. Information that may identify the complainant may be redacted if deemed necessary by the Authorizer).

Upon reasonable notice, the Authorizer may interview Charter School employees, Board members, students, and families as necessary to resolve complaints and grievances. With respect to complaints and grievances, additional information is contained in Section 8.2.

The Authorizer shall provide in writing to the Charter School no later than July 1 of each school year a Master Reporting Calendar which will set out key deadlines for the Charter School to provide certain information and reports. Additionally, at least thirty (30) days prior to any site visit, the Authorizer shall provide the Charter School with a written list of any required documentation and/or specified actions for the site visit.

The Parties agree that the most critical performance measures contained in the Performance Frameworks are the academic measures, which may include student

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

achievement, student growth measures (including annual measurable objectives), readiness for successive school levels (middle, high, or post-secondary) and employment, as well as mission-specific academic goals defined in the Performance Frameworks.

For the purposes of accountability, renewal, and/or revocation evaluation, the Performance Frameworks supersede all assessment measures, educational goals and objectives, financial operations metrics, and organizational performance metrics set forth in the Charter School's Application and not explicitly incorporated into the Performance Frameworks. However, this shall not prevent the Authorizer from holding the Charter School accountable for any goals contained in the Charter School's Application that do not conflict with Performance Frameworks for purposes of accountability, renewal, and/or revocation evaluation. The specific terms, form and requirements of the Performance Frameworks are maintained and disseminated by the Authorizer and shall be binding on the Charter School.

The Authorizer shall—at least annually—monitor and report on the Charter School's progress in relation to the indicators, measures, metrics, and targets set out in the Performance Frameworks, as well as compliance with federal and state laws and regulations, and when required by the Performance Frameworks and such laws and regulations. The Authorizer will conduct an annual scheduled comprehensive site visit each year, which will be used to the Charter School's progress on the Performance Frameworks.

The Authorizer shall conduct an interim review at the end of the fifth year after the effective date of the Agreement, pursuant to T.C.A. § 49-13-121.

Changes to the Performance Frameworks to align with changes to applicable state or federal accountability requirements shall apply to the Charter School. In the event of such changes, the Authorizer will use best efforts to apply expectations for school performance in a manner consistent with those set forth in the Performance Frameworks as initially established in the most recent charter agreement.

Changes to the Performance Frameworks that are not required by state or federal law or accountability requirements will not become binding upon the Charter School without the Charter School's consent, except at the time of charter renewal or amendment.

**1.5. Location.** The Charter School location is in the Hunters Lane neighborhood of Nashville, Tennessee. If the Charter School proposes to change its location, such change shall not require an amendment to this Agreement unless the location change is materially different from the location of the Charter School as discussed in the Charter School's Application and described in this agreement. Non-material changes in location shall require at least thirty (30) days prior notice to the Authorizer. Any change in location that is determined by the Authorizer to be materially different from the Charter School's Application shall require an amendment to this Agreement as set forth in Section 10. If the Charter School is located at a site owned or controlled by the local education agency (LEA) in which the Charter School is located or a site owned or controlled by the local government where the Charter School is located, the use of such site shall be subject to and governed by a Facilities Agreement

between the Applicant and the LEA or local government. The Authorizer shall have no rights or responsibilities regarding any Facilities Agreement.

**1.5.1. Inspections**. The Authorizer will have access at all reasonable times to any facility owned, leased, or utilized in any way by the Charter School for purposes of inspection and review of the Charter School's operation and to monitor the Charter School's compliance with the terms of this Agreement.

**1.5.2. Impracticability of Use.** If use by the Charter School of a facility is rendered impracticable by any cause whatsoever, or if the funds necessary to construct/renovate or upgrade a facility cannot be secured, the Charter School shall notify the Authorizer. The Authorizer shall not be obligated to provide an alternative facility for use by the Charter School.

**1.6. Employment Status.** All teachers and other staff of the Charter School shall be employed by the Charter School, and not the Authorizer. None of the provisions in this Agreement shall be construed to create a relationship of agency, representation, joint venture, ownership, or control of employment between the Parties.

**1.7. Mission.** The Charter School, in its work, shall progress toward its established mission. The Authorizer shall evaluate the mission of the Charter School in accordance with the goal and indicators established within the School Performance Framework, as detailed in Exhibit 2, on an annual basis. If over the duration of this Agreement, the Charter School needs to change any part of the mission-specific goal in the School Performance Framework, the Charter School shall notify the Authorizer within thirty (30) days. The Authorizer will determine if the change is material such that is requires an amendment to this Agreement pursuant to Section 10.

## 2. Charter School Organizational Responsibilities

**2.1. Student Enrollment and Retention.** The Charter School shall enroll students according to T.C.A. § 49-13-113. The Charter School shall not discriminate with respect to admissions on the basis of race, color, ethnicity, religion, national origin, English language proficiency, sex, disability, or the need for special education and related services as set forth in the Charter School's Application and the Act.

The Charter School may enroll students up to a total maximum enrollment of 300. Increases in total enrollment numbers greater than 300 must be reported to the Authorizer and evaluated to determine if they are material changes to this agreement. Reductions in enrollment greater than 15% must be reported to the Authorizer and evaluated to determine if they are material changes to this Agreement. The Authorizer will annually evaluate the school against the enrollment submitted in the July 1st budget and against the maximum enrollment of 300. If, after completion of the annual enrollment evaluation, the Charter School's enrollment fall below 15% of the projected enrollment, the Authorizer shall have the right to determine if the actual enrollment is a material change to this Agreement or if any corrective

action is necessary. Reductions in enrollment in successive years or changes that affect the financial solvency of the Charter School are considered material and shall require an amendment to this Agreement. Any change in enrollment that is considered to be material to this Agreement shall not be permitted unless a formal amendment to this Agreement is secured in advance according to the provisions outlined in T.C.A. § 49-13-110(d), Commission Rule 1185-01-01-.04, and this Agreement.

The Charter School may enroll students in the grade levels approved in the Charter School's Application.

If the number of applications for the Charter School exceeds the capacity of a program, class, grade level, or building, enrollment shall occur according to the preferences in T.C.A. § 49-13-113. If enrollment within a group of preference set out in subdivision (d)(4) exceeds the planned capacity of the Charter School, enrollment within that group shall be determined on the basis of a lottery that complies with statute. The Charter School shall ensure a random selection process, equitable to all students and publicly verifiable, in accordance with federal, state, and local law. The Charter School shall be responsible for adherence to the obligations of a public charter school, in accordance with T.C.A. § 49-13-101 et. seq., including but not limited to enrollment of all eligible students where space is available.

**2.1.1 Student Transfers and Exits.** The Charter School will comply with the Tennessee Department of Education's student transfer and exit reporting requirements and shall provide information to the Authorizer upon request. The Charter School shall enact a discipline policy that complies with Authorizer's policies as well as federal, state, and local laws and may not counsel out enrolled students.

**2.2. Academic Program.** The Charter School shall operate the academic program in accordance with this Agreement, the Charter School's Application, and applicable state and federal law, including providing at least the same equivalent time of instruction as other public schools and complying with assessment and accountability laws and rules (T.C.A. § 49-13-111). If the Charter School is performing below standards, the Authorizer may review the academic program. The Charter School will notify the Authorizer of any material changes to the academic program that are a change from the Charter School's Application, and the Authorizer will evaluate to determine if they are material changes to this Agreement. Any changes to the school structure shall be considered material to this Agreement and shall not be permitted unless a formal amendment to this Agreement is secured in advance according to the provisions outlined in T.C.A. § 49-13-110(d), Commission Rule 1185-01-01-.04, and this Agreement. For purposes of this Agreement, school structure shall be defined as the academic focus or goals of the Charter School and grade levels served.

**2.2.1. Assessments.** The Charter School shall administer all state-mandated assessments to the extent such assessments are required by the Tennessee Department of Education, which currently include but are not limited to TCAP or its successor assessment, writing assessments, and English learner (EL) assessments for the required grades and testing windows. The Charter School shall comply with all Department of Education-required

assessment administration, security, and reporting requirements. The Charter School may use additional assessments of its own choosing.

**2.3. Special Education.** Special education services, related services, and accommodations for students who are eligible under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504), the Americans with Disabilities Act (ADA), or any applicable provisions of state law, shall be provided in accordance with applicable state and federal law, this Agreement and Authorizer rules and policies. The Authorizer is the LEA for purposes of ensuring compliance with IDEA, Section 504, and all other federal and state laws and regulations concerning accommodation of and education of students with disabilities.

**2.3.1. Responsibility of the Charter School.** The Charter School assumes responsibility for the provision of services, development, and implementation of individualized education programs (IEPs), 504 plans, child find, evaluation and re-evaluation, and all other obligations under IDEA and/or Section 504 for students identified as eligible for special education services and/or disability accommodations that have enrolled in the school. The Charter School shall have a qualified special education coordinator who will be responsible for monitoring individual case management of all special education students and disabled students and for arranging the provision of services required by their IEP and/or 504 plan. The Charter School shall maintain documentation of the Charter School's compliance with IDEA and Section 504 as required by law. No student shall be denied admission nor counseled out of the Charter School due to the nature, extent, or severity of his/her disability or due to the student's request for, or actual need for, exceptional education services or accommodations pursuant to IDEA, Section 504, or the ADA. Any attempts by the Applicant to counsel out students for any reason, including due to the nature, extent, or severity of his/her disability or suspected disability or due to the student's request for, or actual need for, exceptional education services or accommodations pursuant to IDEA, Section 504, or the ADA, shall be deemed a material violation of this Agreement.

The Charter School shall also implement the requirements of Response to Instruction and Intervention ("$RTI^2$"), as set forth by the Tennessee Department of Education.

The Charter School shall report to the Authorizer any and all formal complaints, relating to IDEA Due Process for special education and Office of Civil Rights complaints for disability accommodations within five (5) business days of the Charter School's notification of such occurrences. The Charter School shall comply with any state or federal investigation as required by the Authorizer. Nothing herein shall obligate the Authorizer to represent or defend the Charter School in any legal matter resulting from a federal or state investigation related to IDEA Due Process for special education and Office of Civil Rights complaints for disability accommodations, as noted in Section 12 of this Agreement.

The Charter School's indemnity of the Authorizer relating to special education and disability accommodations is provided in Section 12.

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**2.3.2. Costs for Special Education.** The Charter School is financially responsible for child find including student identification, evaluation, and assessment expenses. All costs associated with providing educational services to students with disabilities are the responsibility of the Charter School. The Charter School shall bear the financial responsibility for evaluations and reevaluations and the provision of all services consistent with student IEPs and 504 plans.

The Authorizer will pass federal funding to the Charter School based on the allocation received from the Tennessee Department of Education and in accordance with the Authorizer's funding procedures. Funding is available on a reimbursement basis.

**2.4. English Learners (EL).** The Charter School shall address the needs of EL students pursuant to applicable federal and state laws and regulations (including Title III of the Every Student Succeeds Act (ESSA) and Title VI of the Civil Rights Act of 1964 (Title VI)). The Charter School agrees to maintain and consistently implement a policy to identify students in need of EL services, to provide services in an equitable manner to ensure meaningful access to the Charter School's educational program (including the provision of appropriate accommodations), and to facilitate obtaining English proficiency and exit from EL services according to individual student capacity. In addition, the Charter School shall ensure that Limited English Proficiency (LEP) parents and guardians have meaningful access to school-related information.

The Charter School assumes responsibility for the provision of services, development, and implementation of individualized learning plans (ILPs), screening, assessment and all other obligations under state law and State Board Rule for students identified as limited English proficient and/or English learner enrolled in the school. The Charter School shall have a qualified English language coordinator who will be responsible for monitoring individual case management of all English learner students, both active and transitional, and for arranging the provision of services required by their ILP. The Charter School shall maintain documentation of the Charter School's compliance as required by law and State Board Rule.

**2.5. Student Discipline/Due Process.** The Charter School is responsible for administering its discipline policy in a manner consistent with state and federal law and rules, and the Authorizer's policies that ensure students' due process rights are satisfied, including the provision of appropriate informal or formal hearings. The Charter School shall promptly notify the Authorizer and the LEA in which the student resides of any student expulsion. The Charter School shall not remand a student prior to a decision of suspension or expulsion, in accordance with federal and state laws, rules, Authorizer policies, and regulations. If the LEA in which the student resides determines that the expelled student is eligible for its Alternative School program and the LEA in which the student resides allows for the student to attend the Alternative School program, the Charter School shall work with the LEA in which the student resides to provide an expelled student access to the LEA's alternative school programs, in accordance with T.C.A. § 49-6-3402(h)(1).

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**2.6.1. Student Information Systems.** The Charter School shall adopt the Student Information System selected by the Authorizer. The Authorizer shall bear the cost of any needed licenses for the Charter School.

**2.6.2. Student Information Reporting.** To ensure compliance with federal and state law regarding student records, the Charter School shall report to the Authorizer student information enrollment projections for the coming year by March 1, or sooner if required by the Tennessee Department of Education. Any errors in data reported to the State by the Charter School shall be the sole responsibility of the Charter School to identify and correct.

**3. Staffing**

**3.1. Teachers and Staff.** The Charter School shall ensure that all teachers and staff are licensed and endorsed as required by state statutes, State Board rules, Authorizer policies and rules, and meet applicable federal qualifications including exceptional education certified and ESL certified. The Charter School shall also provide any training required by state or federal law.

**3.2. Background Checks.** All current employees of the Charter School who have or who will have contact with children at the Charter School within the scope of the individuals' employment, and employees of contractors or sub-contractors of the Charter School who have contact with children within the scope of the individuals' employment, shall complete criminal background checks as required by state law using the ORI number of the Charter School.

**4. Facilities**

The Charter School shall ensure the Charter School's grounds and facilities comply with applicable health and safety laws, including the ADA, state fire marshal codes, and state and local zoning and land use codes.

The Charter School shall not commence instruction prior to completion of applicable inspections and receipt of a completed Transition Checklist (attached as Exhibit 3) from the Authorizer, unless the Authorizer permits the Charter School to open and provide later certification of completion of all items on the Transition Checklist.

**5. Food Service**

If the Charter School offers food services on its own or through a third-party contract, the Charter School may apply directly to, and if approved, operate school nutrition programs with reimbursement from the United States Department of Agriculture, under supervision of the Tennessee Department of Education.

**6. Transportation**

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

The Charter School will provide transportation as set forth in the Charter School's Application. If the Charter School has elected to provide transportation for its students, the Authorizer shall provide to the Charter School the funds that would otherwise have been spent to provide transportation as provided in T.C.A. § 49-13-114. In order to receive these funds, the Charter School must comply with state laws and Authorizer rules and policies regarding student transportation. Transporting students in buses that have not been approved for operation by the Tennessee Department of Safety may be grounds for non-renewal or revocation of this agreement. A change to the Charter School's plan to provide or not provide transportation for its students is considered material and requires an amendment. However, a modification in a plan to provide transportation is not considered material.

**7. Insurance**

The Charter School shall maintain the following insurance:

a. General Liability/Automobile Liability Policy: must be equal to or greater than $5,000,000. This insurance shall be primary insurance. Any insurance or self-insurance programs covering the State of Tennessee, its officials, employees, and volunteers shall be in excess of this insurance and shall not contribute to it. The first one million dollars must be with a company licensed to do business in the state of Tennessee. The remaining $4,000,000 can be covered under an excess liability policy (also known as an "umbrella" policy). The policy must name the State of Tennessee as an additional insured. The policy must cover contractual liability. Automobile coverage shall cover vehicles owned, hired, and non-owned.
b. Professional Liability Policies: Directors and Officers Policy must be equal to or greater than $5,000,000. Teachers Professional Liability Policy must be equal to or greater than $1,000,000.
c. Workers Compensation and Employers Liability Policy: The amount of coverage required for Workers Compensation is determined by statute. Charter School must comply with state statutes. Employers Liability must be a minimum of $100,000.
d. Property and Boiler Insurance Policy: If the Charter School purchases the property that will be used by the Charter School, it shall purchase "all risks" property and boiler insurance. Insurance shall be for the full replacement cost of the property and contents with no coinsurance penalty provision.
e. Sexual Abuse: Must have $1,000,000 required coverage.
f. State of Tennessee shall be named as an additional insured on the charter school insurance policy.

Certificates of insurance, in a form satisfactory to the Authorizer, evidencing coverage shall be provided to the Authorizer prior to commencement of performance of this Charter Agreement. Throughout the term of this Charter Agreement, Charter School shall provide updated certificates of insurance upon renewal of the current certificates.

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

**8. Governance**

**8.1. General Requirements.** The Charter School shall notify the Authorizer of any change to its status as a nonprofit federal tax exempt organization under IRC § 501(c)(3).

The Governing Body and/or Charter School shall include parent participation in governance through membership on the Governing Body or establishment of a school advisory council pursuant to T.C.A. § 49-13-109.

The Charter School shall comply with all applicable provisions of the Tennessee Open Meetings Act, including statutory provisions concerning the scheduling of Governing Body meetings, meeting agendas, public notice of meetings, and records of those meetings. At the start of each school year, the Charter School shall provide to the Authorizer the list of names of all board members and a schedule of Governing Body meetings for that school year.

As required by T.C.A. § 49-13-111, the Governing Body shall be subject to the conflict of interest provisions contained in T.C.A §§ 12-4-101 and 102.

The Charter School shall be nonsectarian in its programs, admissions policies, employment practices and all other operations. The Charter School shall not be to any extent under the control or direction of any religious denomination.

The Charter School shall not discriminate against any student, employee or any other person on the basis of race, ethnicity, national origin, sex (except with respect to admission of students by single-sex schools), disability or any other ground that would be unlawful if done by any other public school. The Charter School shall take all steps necessary to ensure that discrimination does not occur, as required by law.

**8.2. Complaints.** Except as otherwise provided by this Agreement, the Governing Body shall be the first avenue for formal appeal in case of any complaints or grievances filed against the Charter School or its employees and volunteers. The Governing Body will ensure that the Charter School establishes policies and procedures for receiving and addressing complaints or grievances directed toward the Charter School or its employees and will make those policies available to students, parents/guardians, employees, and any other persons who request it. If grievances persist following an appeal to the Governing Body, or for complaints regarding alleged violations of law or this Charter Agreement, including any violations that may subject the Charter School to revocation or non-renewal under T.C.A. §§ 49-13-121 or 122 may be investigated by the Authorizer. The Authorizer shall also have the ability to investigate complaints in compliance with the Authorizer's policies and procedures. Grievances that are not resolved by the Charter School or Governing Body, or a pattern of serious grievances, may be considered in any application for renewal of this Agreement or any action to revoke the charter.

The Charter School shall notify the Authorizer within seven (7) business days if the Charter School has been named a party to a lawsuit that has been filed in court.

**8.3. Reporting of Corporate Status.** The Charter School shall report any change to the Charter School's corporate legal status or any change in its standing with the Tennessee Secretary of State's Office to the Authorizer within five business (5) days of the change. Any change to the Charter School's corporate legal status as a not-for-profit organization shall constitute grounds for immediate revocation unless, during the term of this Agreement, the Act is amended to allow Charter Schools to be operated by organizations other than not-for-profit organizations.

**8.4 Required Policies and Procedures**. The Charter School shall adopt all required policies, procedures, and plans as required by the Authorizer's LEA policies and procedures pursuant to federal law, state law, and the State Board of Education's rules and policies. The Authorizer will conduct periodic policy and procedure audits to ensure compliance with these requirements.

**9. Finance**

**9.1. State and Local Funds.** The Authorizer shall allocate one hundred percent (100%) of state and local student-generated funds for member schools as provided in T.C.A. § 49-13-112 and as calculated by the formula provided by the Tennessee Department of Education, in accordance with T.C.A. § 49-3-101 et. seq. The Authorizer shall allocate funds to the Charter School after each of the ten (10) attendance-reporting intervals. The Authorizer shall allocate and distribute one-tenth of state and local funds to the Charter School by the 15th of the month in August, September, October, November, December, January, February, March, April, and June, in accordance with Tenn. Comp. R. & Regs. 0520-14-01-.03. Each state and local payment from October through April and the final payment in June is contingent on the Charter School's reporting of the Charter School's Average Daily Membership (ADM) in the Tennessee Department of Education's Education Information System (EIS). Each payment starting in October will be reconciled to the reported ADM for the period before being released. The final (tenth) payment will not be released until the year's ADMs have been reconciled.

The Parties agree that the student-generated local funds for member schools shall be subject to recoupment, in whole or in part, as calculated by the Authorizer wherever reductions to total school and/or district allocations, as calculated by the Tennessee Department of Education or Authorizer, result in an amount owed back due to the State of Tennessee or geographic LEA. Any such calculations or reductions shall be determined in accordance with the requirements of applicable law and State Board of Education rule.

**9.2. Federal Funds.**

a. Eligibility: Each year, the Authorizer shall provide to the Charter School the school's proportionate share of applicable federal ESSA funding (e.g. Title I, Title II, Title III, Title IV, or Title V) and other federal grants received by the

Authorizer for which the Charter School is eligible. Schools are eligible for such funds upon approval of their plans for such funds either by the Authorizer or the Tennessee Department of Education (TDOE).

b. Fund Collection: The LEA in which the Charter School operates shall pay to the TDOE one hundred percent (100%) of the per student share of any federal funding in the custody of the LEA that is due to the charter school. The TDOE shall withhold from the LEA one hundred percent (100%) of all federal funding in the custody of the TDOE that is due to the charter school. The TDOE shall then allocate and disburse one hundred percent (100%) of these funds to the Authorizer in accordance with procedures developed by the TDOE. The Authorizer may reduce the allocation to charter schools by a percentage allowable under federal rules and regulations for administrative, indirect, or any other category of cost or charges.
c. Fund Distribution & Reporting: Funds shall be distributed on a documented expenditure reimbursement basis with the required documentation. The Charter School shall submit grant reimbursement reports to the Authorizer at least quarterly but no more frequently than monthly. The Authorizer shall distribute to the Charter School federal reimbursement funds within 30 days approval of expenditure reimbursement requests.
d. Use of funds. The Charter School shall comply with all regulations tied to such federal funds, including 2 C.F.R. 200 – Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, ESSA, IDEA, and any other applicable federal or state laws.

**9.3. Fee for Services Agreement.** Pursuant to T.C.A. § 49-13-142(f), the Charter School may enter into a separate fee for services agreement, for the provision of services (including but not limited to school or student support services such as food services and transportation) to be provided to the Charter School by the LEA in which the Charter School is located. The Charter School may also enter into a separate fee for services agreement with the Authorizer for the provision of services. Fees for services provided to the Charter School by the Authorizer shall be deducted from the BEP payments provided to the Charter School. Failure of the Charter School to enter such an agreement with the Authorizer shall not be grounds for revocation or non-renewal of this Agreement.

Annually, the Charter School shall notify the Authorizer of any fee for services agreement(s) entered into with the LEA in which the Charter School is located or with any other vendor or outside contractor specific to the Charter School, including, but not limited to any agreement for the provision of services relating to the service of special populations and shall provide a copy to the Authorizer of any agreement(s) entered into. This shall only apply to those contracts or agreements that have a value of more than $25,000, however, the Charter School shall provide a copy of any fee for services agreement(s) with a value of $25,000 or less at the Authorizer's request.

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**9.3.1. External Service Provider (ESP) Contracts.** The Charter School may contract for services, as provided by T.C.A. § 49-13-124. In such case, the Charter School shall notify the Authorizer of the contract(s) no later than seven (7) business days of signing the contract(s) and shall provide a copy of the contract(s) to the Authorizer upon the Authorizer's request.

The external service provider ("ESP") is a vendor of services, but the Governing Board remains ultimately responsible for the success or failure of the school. All contract(s) between the ESP and the Charter School should articulate:

a. The roles and responsibilities of the Charter School and the ESP, including all services to be provided under the contract;
b. The performance measures, consequences, and mechanisms by which the Charter School will hold the ESP accountable for performance, aligned with the performance measures in this Agreement;
c. All compensation to be paid to the ESP, including all fees, bonuses, and what such compensation includes or requires;
d. Terms of any facility agreement that may be part of the relationship;
e. Financial reporting requirements and provisions for the school's governing board's financial oversight;
f. Require all instructional materials, furnishings, and equipment purchased or developed with public funds to be the property of the Charter School, not the ESP, in compliance with state law.
g. All other financial terms of the contract, including disclosure and documentation of all loans or investments by the ESP to the Charter School, and provision for the disposition of assets in accordance with law;
h. Assurances that the Charter School, at all times, maintains independent fiduciary oversight and authority over the Charter School budget and ultimate responsibility for the Charter School's performance;
i. Provisions for contract termination; and
j. Respective responsibilities of the Charter School and ESP in the event of the Charter School's closure, including transparency in the Charter School's revenues and expenditures as well as those managed by the ESP.

Governing Board members shall not be employed, selected, approved, or compensated by the ESP. Governing Board members are prohibited from serving as members of the Charter School and a member of the ESP.

To the extent there is a conflict between the terms of this Agreement and an ESP contract, the terms of this Agreement shall govern.

**9.4. Tuition.** The Charter School shall not charge tuition unless otherwise permitted by Authorizer policy, pursuant to T.C.A. § 49-13-106(e).

**9.5. Charter School Debt.** The Charter School is solely responsible for all debt it incurs, and the Authorizer shall not be contractually bound on the Charter School's account to

any third party. The Authorizer shall not be liable in any instance for the Charter School's unpaid debts if the Charter School does not have sufficient funds to pay all of its debts.

The Charter School shall notify the Authorizer immediately of a default on any obligation owed to the Authorizer, which shall include debts for which payments are past due by sixty (60) days or more. If debts are incurred in the provision of employee benefits pursuant to T.C.A. § 49-13-119, the Authorizer may withhold the amount owed from the monthly payment until such debts are satisfied. Any other debts owed to the Authorizer must be satisfied prior to release of the last annual payment.

**9.6. Financial Management.** The Charter School shall control and be responsible for financial management and performance of the Charter School including budgeting and expenditures. Before receiving BEP funds through the Authorizer, the Charter School must demonstrate (if not already demonstrated in the Charter School's Application) the existence of appropriate governance and managerial procedures and financial controls including:

a. Accounting methods complying with T.C.A. § 49-13-111(m);
b. A checking account;
c. Adequate payroll procedures;
d. An organizational chart;
e. Procedures for the creation and review of monthly and quarterly financial reports, including identification of the individual responsible for preparing such financial reports in the following fiscal year;
f. Internal control procedures for cash receipts, disbursements, and purchases; and
g. Maintenance of asset inventory lists and financial procedures for federal grants in accordance with applicable federal law.

The Authorizer reserves the right to require, consistent with the Act, the submission of financial reports as indicated in Authorizer policies.

The Charter School shall comply with T.C.A. §§ 49-13-111 and 120 regarding completion and submission of annual budgets, financial reports, and audits to the Authorizer and the State. The Charter School shall undergo an independent financial audit conducted in accordance with T.C.A. §§ 49-13-111(m) and 49-13-127. The audit shall be furnished to the Authorizer, the Commissioner of Education, and the Comptroller of the Treasury by December 31 of each year in accordance with the Authorizer's reporting calendar. If such audit is not received by the Authorizer on or before December 31 of each year, it shall be considered a material breach of this Agreement, which the Charter School shall have 15 business days, or such other time as the Parties may agree, to cure. The audit should express an unqualified opinion on the financial statements. A qualified audit opinion will result in an automatic review and request for explanation from the Charter School. In addition, any material weaknesses in controls should be disclosed during the audit. A material weakness will result in a potential review and explanation from the Charter School. The Charter School shall also prepare and provide to the Authorizer a copy of its final annual budget for the upcoming fiscal year no later

than July 1 of each year. In addition, the Charter School shall submit any other financial and/or operational reports pursuant to T.C.A. § 49-13-111(d).

**9.7. Financial Records.** All financial records of the Charter School pertaining to the management and operation of the school are subject to inspection and production as required for fulfillment of the Authorizer's fiduciary responsibilities, upon reasonable notice.

**9.8. Authorizer Fee.** Pursuant to T.C.A. § 49-13-128(e), the Charter School agrees to the payment of an annual authorizer fee of up to 3% of the charter school's per pupil state and local funding. By May 1 of each year, the Authorizer shall set the percentage of the authorizer fee. The Authorizer shall use the authorizer fee to fulfill obligations consistent with the authority of the Authorizer set forth in Title 49, Chapter 13.

## 10. Amendments

Pursuant to T.C.A. § 49-13-110, petitions to amend this Agreement, initiated by the Charter School, shall follow the timelines established in Commission Rule 1185-01-01-.04 for approval or denial by the Authorizer. An amendment shall not become effective, and the Charter School shall not take action or implement the change requested in the amendment, until the amendment is approved in writing by the Authorizer.

Not all changes to the Charter School's operation constitute material changes to this Agreement that require an amendment. However, the following changes (as well as any other changes mentioned in other sections of this Agreement as being material and requiring an amendment as well as changes outlined in Commission Rule 1185-01-01-.04 are considered material and shall require an amendment:

a. Material changes in the Charter School's mission, as defined in Section 1.7;
b. Changes in the Charter School's calendar that reduce the calendar by 5 or more days in the first year of operation or by more than ten (10) days in subsequent years, in the absence of timely notification of parents; and
c. Changes in school location that are materially different from the location of the Charter School as discussed in the Charter School's Application and this Agreement pursuant to Section 1.5, and;
d. Change in governance structure (including, but not limited to, a change in the non-profit entity governing the school), or addition of or changes to the charter management organization.

Educational program matters not specifically identified in this Agreement or the Charter School's Application shall remain within the Charter School's authority and discretion.

The following changes do not require an amendment; however, the Charter School shall notify the Authorizer of any of the following within thirty (30) days:

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

a. Changes to the July 1st budget submitted to the Authorizer, subject to the requirements of state and federal law;
b. Changes in the mailing address of the school, phone or fax number, or web address of the Charter School;
c. Changes in the members and duties of the Governing Body relating to oversight of the Charter School, including names and contact information;
d. Changes in the school leader or, if applicable, the chief executive of the Charter School or charter management organization including names and contact information;
e. Changes in any leadership in the Charter School or individuals serving as main contacts with the Authorizer, including names and contact information; and
f. Changes in school location to a location permitted by Section 1.5.

Any material change initiated by the Authorizer, requiring an amendment to this Agreement, must be agreed to in writing by both parties. An amendment shall be effective at the agreed upon date in the amendment or upon approval in writing by the Authorizer.

**11. Renewal, Revocation, Closure, and Dissolution**

**11.1. Renewal**. Pursuant to T.C.A. § 49-13-121, the Charter School may apply for renewal of this Charter Agreement by application submitted no later than April 1 of the year prior to the year in which this Agreement expires and in accordance with Authorizer renewal rules and policies. This Agreement may be renewed without modification, except for the incorporation by attachment of the approved renewal application. The Parties may also amend this Agreement as part of the renewal process.

The Authorizer may elect not to renew this Charter Agreement pursuant to the Authorizer rules, policies, and T.C.A. § 49-13-121. Any changes to this Agreement proposed during the renewal process that are rejected by one of the Parties shall constitute denial of the renewal application. Denial of the renewal application by the Authorizer shall be final and not subject to appeal.

The Charter School shall also comply with any renewal criteria, policies, or protocols established by the Authorizer.

**11.2. Revocation.** During the term of this Agreement, in accordance with the Authorizer's policies, the Authorizer will provide notice to the Charter School of non-compliance with applicable laws, rules, or this Agreement and give the Charter School an opportunity to cure the non-compliance prior to instituting revocation proceedings pursuant to T.C.A. § 49-13-122 and Authorizer rules and policies, unless the Authorizer determines that the violations are so severe that such notice and an opportunity to cure should be waived. Such notice and opportunity to cure shall not be required for grounds upon which this Agreement or state law calls for immediate revocation of the charter.

At any time during the term of this Agreement, the Authorizer may revoke this Agreement for any reason set forth in T.C.A. § 49-13-122, and/or a material violation of any of the conditions, standards, or procedures set forth in this Agreement.

If the Authorizer determines that any grounds for revocation exist, it may revoke this Charter Agreement according to the procedures set forth in T.C.A. § 49-13-122 and Authorizer policies.

**11.3. Closure and Dissolution.** In the event that the Charter School is required to cease operation for any reason, including but not limited to closure, non-renewal, revocation, or voluntary surrender of the charter, the Charter School shall cooperate with the Authorizer to ensure orderly closure of the Charter School including, but not limited to:

a. Timely notification of parents and teachers of the closure decision;
b. Securing student records and transferring them to the LEA in which the Charter School is located;
c. Assisting in placing students in appropriate schools;
d. Managing all financial records consistent with the Authorizer's school closure requirements and policies; and
e. Disposal of school assets in accordance with the Act and this Agreement.

The Charter School shall also comply with any closure policies or protocols established by the Authorizer.

Dissolution of the Charter School following revocation, expiration of this Agreement, dissolution or cessation of operations, or non-renewal shall comply with T.C.A. §§ 49-13-110(e) and 49-13-122. The Charter School shall be responsible for winding down operations, including payment of any and all debts, obligations, or liabilities incurred at any time by the Charter School. Under no circumstances shall the Authorizer be responsible for such obligations. Charter School personnel and the Governing Board shall cooperate fully with any activity related to school closure or phase out. If assets of the Charter School were funded with funds from the Authorizer, other than funds described in Sections 9.1 and 9.2, and such assets remain after paying the Charter School's debts and obligations and not requiring return or transfer to donors or grantors, such assets will become the property of the Authorizer.

## 12. Indemnification and Hold Harmless

The Authorizer and Charter School each shall give immediate written notice to the other of the assertion of any claim or the commencement of any litigation for which indemnification is sought and shall cooperate with each other in the defense of the claim or litigation.

Each party to this Agreement shall indemnify and hold harmless the other, and their respective officers, agents, and employees from and against any and all claims, actions, damages, expenses, losses or awards--including attorney fees--arising out of (i) the negligence

of the other party, (ii) any action taken or not taken by the other party, or (iii) any noncompliance or breach by the other party of any of the terms of this Agreement, or laws applicable to the party's operations during the term of this Agreement.

In the event of any such suit or claim, the Charter School shall provide all assistance required by the State in the State's defense. Nothing contained herein shall be deemed to afford to the Charter School, through its attorney(s), the right to represent the State of Tennessee in any legal matter, such rights being governed by T.C.A. § 8-6-106.

**13. Contract Construction**

**13.1. Waiver.** The failure of either of the Parties to this Agreement to insist on strict performance of any term or condition of this Agreement shall not constitute a waiver of that term or condition, even if the Party accepting or acquiescing in the nonconforming performance knows of the nature of the performance and fails to object to it.

**13.2. Non-assignability.** No right or interest in this Agreement shall be assigned by anyone on behalf of the Charter School, and delegation of any contractual duty of the Charter School shall not be made without prior written approval of the Authorizer. A violation of this provision shall be grounds for immediate termination of this Agreement and revocation of the Charter.

Should the Charter School propose to enter into a contract with another non-profit entity to manage the school, this constitutes a material change that requires an amendment to this Agreement. The Charter School agrees to submit all information requested by the Authorizer regarding the management arrangement, including a copy of the proposed contract and a description of the management company, with identification of its principals and their backgrounds. The Charter School shall not enter a management contract without written approval from the Authorizer. Failure to receive approval from the Authorizer prior to entering into a contract shall be grounds for immediate revocation.

**13.3. Agreement.** The Parties intend this Agreement, including all attachments and exhibits hereto, to represent a final and complete expression of their agreement, which shall be considered the Agreement. All prior representations, understandings, and discussions are merged herein, and no course of prior dealings between the Parties shall supplement or explain any terms used in this document. The Parties recognize that amendments to this Agreement may be executed from time-to-time hereafter.

**13.4. Survival of Representations and Warranties.** All representations and warranties hereunder shall be deemed to be material and relied upon by the Parties with or to whom the same were made, notwithstanding any investigation or inspection made by or on behalf of such Party or Parties. The representations and warranties covered in this Agreement will survive the termination or expiration of this Agreement.

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**13.5. Severability.** The provisions of this Agreement are severable. Any term or condition deemed illegal or invalid shall not affect any other term or condition, and the remainder of the Agreement shall remain in effect unless otherwise terminated by one or both Parties. For any term or condition deemed illegal or invalid, the Parties shall, upon the request of either party, negotiate in good faith to adopt any necessary or appropriate replacement provision.

**13.6. Authority.** The individual officers, agents, and employees of the Parties hereto who execute this Agreement do hereby individually represent and warrant that they have full power and lawful authority to execute this Agreement.

**13.7. Change of Law.** If, due to any change in applicable law, regulation, or interpretation thereof by any court of law or other governing body having jurisdiction subsequent to the date of this Agreement, performance of any provision of this Agreement or any transaction contemplated hereby shall become impracticable or impossible, the parties hereto shall use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such provision.

**13.8 Notice.** Any notice required or permitted under this Agreement shall be in writing, sent via electronic or other means, and shall be effective immediately upon personal delivery, subject to verification of service or acknowledgment of receipt, or three (3) days after mailing when sent by certified mail, postage prepaid. Such noticed shall be sent to:

If to the Authorizer:

Mailed to:
Tennessee Public Charter School Commission
Attn: General Counsel
500 James Robertson Parkway, 8th Floor
Nashville, TN 37243
and emailed to:
ashley.thomas2@tn.gov

If to the Charter School:

Mailed to:
Neely's Bend College Prep, Nonprofit LLC
c/o LEAD Public Schools, Inc.
Attn: Ricki Gibbs
7101 Executive Center Drive
Brentwood, TN 37027

and emailed to:
ricki.gibbs@leadpublicschools.org

Either party may change its address for notices under this Agreement by notice to the other party.

**13.9 No Third-Party Beneficiary.** This Agreement shall not create any rights in any third parties who have not entered into this Agreement, nor shall any third party by entitled to enforce any rights or obligations that may be possessed by either party to this Agreement.

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

| THE STATE OF TENNESSEE BY AND THROUGH THE TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION: | CHARTER SCHOOL: Neely's Bend College Prep Nonprofit LLC |
|---|---|
| By: [signature]<br>Printed Name: Tess Stovall<br>Title: Executive Director<br>Date: 3/5/25 | By: Michael Honious<br>Printed Name: Michael Honious Title: Chairman<br>Date: 27/02/2025 |
| By: [signature]<br>Printed Name: Christine Richards<br>Title: Chairman, Tennessee Public Charter School Commission<br><br>Date of Commission Approval: 01/24/2025 | |

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**EXHIBITS**

**Exhibit 1**- Approved Charter Application ("Charter School Application")
**Exhibit 2**- Current Approved Performance Frameworks
**Exhibit 3**- Transition Checklist/ Protocol
**Exhibit 4**- Approved Waivers
**Exhibit 5-** Tennessee Public Charter School Commission Charter Agreement

**Signature:** Michael Honious
Michael Honious (Feb 27, 2025 09:27 CST)

**Email:** mike.honious@geodis.com

# 2025_LEAD Neely's Bend Charter Agreement

Final Audit Report 2025-02-27

| | |
|---|---|
| Created: | 2025-02-24 |
| By: | Jenny Sawyer (jennifer.sawyer@leadpublicschools.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAo4Or_d9_8TN2qJ83W94EX2hcODfdz_ct |

## "2025_LEAD Neely's Bend Charter Agreement" History

Document created by Jenny Sawyer (jennifer.sawyer@leadpublicschools.org)
2025-02-24 - 7:31:21 PM GMT

Document emailed to Mike Honious (mike.honious@geodis.com) for signature
2025-02-24 - 7:31:26 PM GMT

Email viewed by Mike Honious (mike.honious@geodis.com)
2025-02-27 - 3:26:16 PM GMT

Signer Mike Honious (mike.honious@geodis.com) entered name at signing as Michael Honious
2025-02-27 - 3:26:59 PM GMT

Document e-signed by Michael Honious (mike.honious@geodis.com)
Signature Date: 2025-02-27 - 3:27:01 PM GMT - Time Source: server

Agreement completed.
2025-02-27 - 3:27:01 PM GMT

# EXHIBIT 54

LEAD Neely's Bend
Charter Application

For use by Achievement School District Charter Schools
Applying to Tennessee Public Charter School Commission
Opening in the 2023-2024 School Year

# TABLE OF CONTENTS


**GENERAL INFORMATION** 1

**ASSURANCES** 2

**SECTION 1: ACADEMIC PLAN DESIGN AND CAPACITY** 3
- 1.1 School Mission 3
- 1.2 Enrollment Summary 5
- 1.3 Academic Focus and Plan 10
- 1.4 Academic Performance Standards 13
- 1.5 High School Graduation and Postsecondary Readiness (high schools only) 16
- 1.6 Assessments 16
- 1.7 School Calendar and Schedule 20
- 1.8 Special Populations 22
- 1.9 School Culture and Discipline 28
- 1.10 Recruitment and Enrollment 32
- 1.11 Parent and Community Engagement and Support 35

**SECTION 2: OPERATIONS PLAN AND CAPACITY** 38
- 2.1 Governance 38
- 2.2 Facilities 41
- 2.3 Personnel/Human Capital 42
- 2.4 Insurance 47
- 2.5 Transportation 48
- 2.6 Food Service 49
- 2.7 Additional Operations 50
- 2.8 Charter Management Organization (if applicable) 51
- 2.9 Waivers 51

**SECTION 3 FINANCIAL PLAN AND CAPACITY** 59
- 3.1 Budgeting 59
- 3.2 Budget Narrative 60
- 3.3 Network Financial Plan (only applicable if the charter school is a part of a larger network) 60

**SECTION 4: PORTFOLIO REVIEW/PERFORMANCE RECORD** 62
- 4.1 Past Performance 62

**ATTACHMENTS** 68

# ARTICLES OF ORGANIZATION
# OF
# NEELY'S BEND COLLEGE PREP, NONPROFIT LLC
# A TENNESSEE NONPROFIT LIMITED LIABILITY COMPANY

Pursuant to the provisions of Tennessee Code Annotated § 48-101-801 et. seq., relating to the Tennessee Revised Nonprofit Limited Liability Company Act, the sole nonprofit member of Neely's Bend College Prep, Nonprofit LLC hereby adopts the following Articles of Organization:

## Article I. Name

The name of the nonprofit limited liability company is Neely's Bend College Prep, Nonprofit LLC (the "Company").

## Article II. Registered Office and Agent

The street address of the registered office of the Company shall be 531 Metroplex Dr, Suite 200-A, Nashville, Tennessee 37211. The name of the registered agent at that office shall be Chris Reynolds.

## Article III. Organizer

The name and address of the organizer of the Company is Christopher C. Whitson, Sherrard & Roe, PLC, 150 Third Avenue South, Nashville, Tennessee 37201.

## Article IV. Purpose

The Company is organized exclusively for charitable and educational purposes. Specifically, the Company shall establish and operate a Charter School in accordance with the Tennessee Public Charter Schools Act of 2002 (Tennessee Code Annotated § 49-13-101 et. seq.), as amended, restated or replaced from time to time (the "Charter Act"), and the requirements of the Metropolitan Board of Public Education for Nashville and Davidson County (the "Metro School Board") and the Tennessee Achievement School District. The Company is organized to engage in any activity, and to exercise any and all powers, rights and privileges, afforded a nonprofit limited liability company under the Tennessee Revised Nonprofit Company Act, as amended from time to time (the "Act"). The Company may engage in all activities proper under applicable law, provided such activities are not inconsistent with the Act, the Charter Act, the requirements of the Metro School Board, the requirements of the Tennessee Achievement School District, or the Company's Operating Agreement.

The Company is organized to engage in any activity, and to exercise any and all powers, rights and privileges, afforded a nonprofit limited liability company under the Act; provided, however, that the Company shall not carry on any other activities not permitted to be carried on by a nonprofit limited liability company organized under the laws of the State of Tennessee pursuant to the Act or the Charter Act.

## Article V. Member Managed

The Company shall be managed by its sole Member, LEAD Public Schools, Inc., in accordance with Tennessee Code Annotated §48-249-401(a), and by an Advisory Board and such officers, as shall be described in the Operating Agreement of the Company. The Operating Agreement of the Company shall be adopted by the sole Member of the Company.

## Article VI. Sole Member

The sole member of the Company is LEAD Public Schools, Inc., 531 Metroplex Dr, Suite 200-A, Nashville, Tennessee 37211. As required by Tennessee Code Annotated § 48-101-805, there is one member at the date of the filing of these Articles, which is a nonprofit corporation within the meaning of Tenn. Code Ann. § 48-101-802(2). As provided in Tennessee Code Annotated § 48-101-805, the Company shall not have more than one member at any time and that member shall be a nonprofit corporation within the meaning of Tennessee Code Annotated § 48-101-802(2).

## Article VII. Principal Executive Office

The address of the principal executive office of the Company shall be 531 Metroplex Dr, Suite 200-A, Nashville, Tennessee 37211.

## Article VIII. No Private Inurement

No part of the net earnings of the Company shall inure to the benefit of, or be distributable to, its officers, Directors, or other private persons. However, the Company shall be authorized and empowered to pay reasonable compensation for services rendered to it or on its behalf, pay reimbursements for expenses incurred on its behalf, and make payments and distributions in furtherance of the charitable and educational purposes, and other purposes set forth in the Company's Articles of Organization and/or Operating Agreement, as amended from time to time.

## Article IX. No Legislative or Political Activity

No substantial part of the activities of the Company shall be the carrying on of propaganda, or otherwise attempting to influence legislation; and the Company shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

## Article X. Indemnification and Advancement of Expenses

1. Mandatory Indemnification of Directors and Officers. To the maximum extent permitted by the provisions of Section48-101-806(b) of the Act and Tennessee Code Annotated Section 48-249-115, as amended from time to time (provided, however, that if an amendment to the Act in any way limits or restricts the indemnification rights permitted by law as of the date hereof, such amendment shall apply only to the extent mandated by law and only to activities of persons subject to indemnification under this paragraph 1 which occur subsequent to the effective date of such amendment), the Company shall indemnify and advance expenses to any person who is or was a director or officer of the Company, or to such person's heirs, executors, administrators, or legal representatives, for the defense of any threatened, pending or completed

action, suit or proceeding, whether civil, criminal, administrative or investigative, and whether formal or informal (any such action, suit or proceeding being hereinafter referred to as the "Proceeding"), to which such person was, is or is threatened to be made, a named defendant or respondent, which indemnification and advancement of expenses shall include counsel fees actually incurred as a result of the Proceeding or any appeal thereof, reasonable expenses actually incurred with respect to the Proceeding, all fines, judgments, penalties and amounts paid in settlement thereof, subject to the following conditions:

(a) The Proceeding was instituted by reason of the fact that such person is or was a director or officer of the Company; and

(b) The director or officer conducted himself or herself in good faith, and he or she reasonably believed (i) in the case of conduct in his or her official capacity with the Company, that his or her conduct was in its best interest; (ii) in all other cases, that his or her conduct was at least not opposed to the best interests of the Company; and (iii) in the case of any criminal proceeding, that he or she had no reasonable cause to believe his or her conduct was unlawful. The conduct of the director or officer with respect to an employee benefit plan for a purpose he or she reasonably believed to be in the interest of the participants in, and beneficiaries of, the plan shall be conduct that satisfies the requirements that such person's conduct was at least not opposed to the best interests of the Company. The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the director or officer did not meet the standard of conduct herein described.

2. Permissive Indemnification of Employees and Agents. The Company may, to the maximum extent permitted by the provisions of Section 48-101-806(b) of the Act, as amended from time to time (provided, however, that if an amendment to the Act in any way limits or restricts the indemnification rights permitted by law as of the date hereof, such amendment shall apply only to the extent mandated by law and only to activities of persons subject to indemnification under this paragraph 2 which occur subsequent to the effective date of such amendment), indemnify and advance expenses in a Proceeding to any person who is or was an employee or agent of the Company, or to such person's heirs, executors, administrators, or legal representatives, to the same extent as set forth in paragraph 1 above, provided that the Proceeding was instituted by reason of the fact that such person is or was an employee or agent of the Company and met the standards of conduct set forth in subparagraph 1(b) above. The Company may also indemnify and advance expenses in a Proceeding to any person who is or was an employee or agent of the Company to the extent, consistent with public policy, as may be provided by its by laws, by contract, or by general or specific action of the Board of Directors.

3. Non-Exclusive Application. The rights to indemnification and advancement of expenses set forth in paragraphs 1 and 2 above are contractual between the Company and the person being indemnified, and his or her heirs, executors, administrators, or legal representatives, and are not exclusive of other similar rights of indemnification or advancement of expenses to which such person may be entitled, whether by law, by these Articles of Organization, by a resolution of the Board of Directors, by the Operating Agreement of the Company, by the purchase and maintenance by the Company of insurance on behalf of a director, officer,

employee or agent of the Company, or by an agreement with the Company providing for such indemnification, all of which means of indemnification and advancement of expenses are hereby specifically authorized. The rights of indemnification and advancement of expenses set forth in this Article shall also apply, as appropriate, to any person who was an officer, director, employee or agent (or any such person's heirs, executors, administrators, or legal representatives) of any association, company, partnership or trust which was a predecessor to this Company, and to any officer, director, employee or agent of this Company (or any such person's heirs, executors, administrators, or legal representatives) who is serving or served in any capacity for another association, corporation, partnership or trust at the request of this Company.

4. Non-Limiting Application. The provisions of this Article X shall not limit the power of the Company to pay or reimburse expenses incurred by a director, officer, employee or agent of the Company in connection with such persons' appearing as a witness in a Proceeding at a time when he or she has not been made a named defendant or respondent to the Proceeding.

5. Prohibited Indemnification. Notwithstanding any other provision of this Article X, the Company shall not indemnify or advance expenses to or on behalf of any director, officer, employee or agent of the Company, or any such person's heirs, executors or administrators:

(a) In connection with a Proceeding by or in the right of the Company in which such person was adjudged liable to the Company; or

(b) In connection with any other Proceeding charging improper personal benefit to such person, whether or not involving action in his or her official capacity, in which he or she was adjudged liable on the basis that personal benefit was improperly received by him or her.

6. Repeal or Modification Not Retroactive. No repeal or modification of the provisions of this Article X, either directly or by the adoption of a provision inconsistent with the provisions of this Article, shall adversely affect any right or protection, as set forth herein, existing in favor of a particular individual at the time of such repeal or modification.

**Article XI. Limited Personal Liability of Directors**

To the maximum extent permitted by the provisions of Section 48-101-806(c) of the Act, no person who is or was a director or officer of the Company, nor such person's heirs, executors, administrators, or legal representatives (collectively referred to as a "director or officer"), shall be personally liable to the Company for monetary damages for breach of fiduciary duty as a director or officer. However, this provision shall not eliminate or limit the liability of a director or officer (a) for any breach of a director's duty of loyalty to the Company, or (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law. No repeal or modification of the provisions of this Article, either directly or by the adoption of provisions inconsistent with the provisions of this Article, shall adversely affect any right or protection, as set forth herein, existing in favor of a particular individual at the time of such repeal or modification.

**Article XII. Dissolution**

Upon the dissolution of the Company, after paying or making provision for the payment of all liabilities of the Company then outstanding and unpaid, the Board of Directors shall distribute the assets of the Company to LEAD Public Schools, Inc. Any assets not distributed to LEAD Public Schools, Inc., for any reason, shall be distributed to one or more organizations which qualify as exempt organizations under Section 501(c)(3) of the Code for exclusively public purposes and whose purpose is similar to those of the Company. Any assets not so disposed of by the Board of Directors shall be disposed of by a court having equity jurisdiction in the county in which the principal office of the Company is then located, with the distribution of assets to be made to such organization or organizations which are organized and operated exclusively for such purposes, as such court shall determine.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Organization on this 9th day of April 2015.

LEAD Public Schools, Inc.

By ________________________

Chris Reynolds, Chief Executive Officer

Note: this document shows the legal name change from "LEAD Academy" to "LEAD Public Schools, Inc." and updates the name for both nonprofit status and tax exempt status



**STATE OF TENNESSEE**
**Tre Hargett, Secretary of State**
Division of Business Services
William R. Snodgrass Tower
312 Rosa L. Parks AVE, 6th FL
Nashville, TN 37243-1102

# Filing Information

Name: **LEAD Public Schools, Inc.**

## General Information

| | | | |
|---|---|---|---|
| **Control # :** | **488781** | Formation Locale: | Davidson County |
| Filing Type: | Corporation Non-Profit - Domestic | Date Formed: | 03/03/2004 |
| Filing Date: | 03/03/2004 9:28 AM | Fiscal Year Close | 12 |
| Status: | Active | | |
| Duration Term: | Perpetual | | |
| Public/Mutual Benefit: | Public | | |

**Registered Agent Address**
JEREMY D KANE
1704 HEIMAN AVE
NASHVILLE, TN 37208

**Principal Address**
1704 HEIMAN AVE
NASHVILLE, TN 37208

The following document(s) was/were filed in this office on the date(s) indicated below:

| Date Filed | Filing Description | Image # |
|---|---|---|
| 06/29/2010 | Amended and Restated Formation Documents | 6739-0748 |
| | Filing Name Changed From: LEAD ACADEMY To: LEAD Public Schools, Inc. | |
| 04/08/2010 | 2009 Annual Report | 6704-0206 |
| 09/11/2009 | Restated Formation Documents | 6594-1561 |
| 02/05/2009 | 2008 Annual Report | 6440-1162 |
| 05/02/2008 | 2007 Annual Report | 6309-1321 |
| | Principal Address Changed | |
| | Registered Agent Physical Address Changed | |
| 04/08/2008 | Administrative Amendment | 6284-2594 |
| | Mail Address Changed | |
| 04/04/2007 | 2006 Annual Report | 6029-1403 |
| 08/02/2006 | Articles of Amendment | 5840-0059 |
| | Name Changed | |
| 05/09/2006 | 2005 Annual Report | 5786-1727 |
| 03/03/2004 | Initial Filing | 5376-2208 |

| Active Assumed Names (if any) | Date | Expires |
|---|---|---|

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: JUL 24 2007

LEAD ACADEMY
C/O JEREMY D KANE
5202 IDAHO AVE
NASHVILLE, TN 37209-3307

Employer Identification Number:
20-2526508
DLN:
406289069
Contact Person:
JOYCE DARBY ID# 95011
Contact Telephone Number:
(877) 829-5500
Accounting Period Ending:
December 31
Public Charity Status:
170(b)(1)(A)(ii)
Form 990 Required:
Yes
Effective Date of Exemption:
March 3, 2005
Contribution Deductibility:
Yes

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Please see enclosed Information for Exempt Organizations Under Section 501(c)(3) for some helpful information about your responsibilities as an exempt organization.

Sincerely,

Robert Choi
Director, Exempt Organizations
Rulings and Agreements

Enclosures: Information for Organizations Exempt Under Section 501(c)(3)

Letter 947 (DO/CG)

# EXHIBIT 55

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

## 4804 – Religion in the Curriculum

**ADOPTED: April 9, 2021**

**REVISED:**

**MONITORING: Annually**

The Commission recognizes the significant role that religious events, beliefs, and figures have played in world history, including the founding of the United States and the state of Tennessee. The Commission is committed to providing appropriate, accurate, and comprehensive instruction in the social studies and affirms that educational content consisting of religious themes shall be presented in a factual, objective, and respectful manner. Each authorized charter school shall approach religion in the curriculum with the understanding that:

- Religious themes shall be permitted in the curriculum provided they are essential to the learning experience in the various fields of study;
- These fields of study may include history, music, art, literature, or drama;
- Inclusion of religion in academic standards, curriculum, instructional materials, teaching materials, textbooks, and teaching aids shall be for educational purposes only[1];
- An emphasis on religious themes shall be only as extensive as necessary for a comprehensive study of the curriculum;
- Teachers and school personnel are prohibited from using religion to proselytize, promote, or show bias toward one particular religion or attempt to indoctrinate or establish any religion or religious belief over another; and
- Teachers and school personnel are prohibited from using studies of religion to demean any religion or religious beliefs.

---

**Legal References:**

[1] T.C.A. § 49-6-1005

# EXHIBIT 56

# Tennessee Public Charter School Commission
# Policy 3.700 - Charter School Performance Framework

## Policy Sections

I. Academic Performance............................................ 3
II. Financial Performance............................................ 19
III. Organizational Performance.................................. 26
Appendix A – Mission-Specific Goal.................................... i

Adopted: October 28, 2020
Revised: July 25, 2025

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

## Acknowledgements

The Tennessee Public Charter School Commission ("Commission") would like to acknowledge and appreciate the feedback and collaboration received from the Tennessee Department of Education, Commission-authorized schools, and other quality authorizers to develop this revised framework.

## About the Performance Framework

This document outlines the comprehensive benchmarks by which charter schools authorized by the Commission will be measured and evaluated in alignment to the Commission's mission. The framework addresses the academic, financial, and organizational benchmarks by which schools will be scored to indicate the overall success and health of the charter school. A charter school's performance on these measures will be published in the annual report produced by the Commission.

## Section I. Academic Performance

Pursuant to Tennessee Code Annotated (T.C.A) § 49-13-102, two of the purposes of a charter school are to improve learning for all students and to ensure that children have the opportunity to reach proficiency on state academic assessments. In addition, the law states that "[t]he performance-related provisions within a charter agreement shall be based on a performance framework that clearly sets forth the academic and organizational performance indicators, measures, and metrics that will guide the authorizer's evaluation of each public charter school."[1] For students, families, and the community, the main question that needs to be answered is: "Is this school a high-achieving school?" With increased school autonomy, a bedrock of charter school authorization, comes the expectation of high academic achievement and student growth. The following pages outline the measures by which a charter school's academic performance will be evaluated for purposes of yearly monitoring, potential interventions and plans of correction, and renewal and revocation decisions. A school will be evaluated on each performance measure and will receive a rating for each measure as well as a composite score that encompasses the entire academic performance framework. The Commission's Charter School Intervention Policy 3.400 lays out the possible interventions and sanctions for failure to meet the standards set forth in the performance framework.[2]

The Academic Performance framework is made up of four key areas, which are outlined below. Additional details and explanations for these areas are included in the pages that follow.

1. Student Outcomes (25%-35%)
2. Mission-Specific Goal (10%)
3. Comparative Performance (40%)
4. Overall TVAAS Composite Index (15%-25%)

---

[1] T.C.A. § 49-13-143(a)

[2] For example, the governing board of any school that receives a "Falls Far Below" rating in any category will receive a Notice of Concern detailing the areas of concern on the Performance Framework. Achievement of a rating of "Falls Far Below" in multiple areas or "Does Not Meet Standard" in a significant number of ratings will result in a Notice of Deficiency being issued to the school's governing board and a Plan of Correction being developed. Additional information regarding possible interventions and sanctions, including charter revocation, are available in the Charter School Intervention Policy 3.400.

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

## 1(a). Student Outcomes (25%-35%)

The Student Outcomes section of the Commission's School Performance Framework aligns with the Tennessee Department of Education (TDOE)'s accountability framework. If the TDOE adjusts any indicators in future accountability protocols, the Commission will adjust the same within the performance framework such that this section will continue to align with the state's accountability model.

| Measure | Description | Falls Far Below Standard | Does Not Meet Standard | Meets Standard | Exceeds Standard | Total Weight |
|---|---|---|---|---|---|---|
| 1a | School academic performance, as measured by the Tennessee Department of Education | D or F | C | B | A | 25%-35%* |

Notes regarding the Student Outcomes Section:

- Minus grades for schools will not influence the overall ratings category of the school. For example, a school receiving a B- will be designated as "Meets Standard."
- For this indicator, a C letter grade qualifies as "Does Not Meet Standard." However, a school can still achieve a meets standard for the academic section of the School Performance Framework based on its performance on the other indicators.
- *The student outcomes and TVAAS sections have a range of weights due to re-allocation of weight for schools scoring a TVAAS 4 or 5. If a school meets standard at a TVAAS 3 or earns a TVAAS 1 or 2, the allocation of weights will be 35% for student outcomes and 15% for TVAAS. If a school earns a TVAAS 4, the allocation of weights will be 30% for student outcomes and 20% for TVAAS. If a school earns a TVAAS 5, the allocation of weights will be 25% student outcomes and 25% TVAAS. This is to reward schools for having higher growth scores.
- The Commission aligns with the state's accountability system for College and Career Readiness (CCR) measures and high school graduation rates are also reviewed and considered.

In the event there is a pause of the state's accountability system by the TDOE, the Commission shall reallocate the 25% weight of student outcomes equally to all other sections within the academic section of the framework. The supplemental guidance document will provide further information on other measures such as chronic absenteeism that the schools will be held accountable to in the event of a pause or interruption. The chart below demonstrates an example of the reallocation of weight in the event of enacting the contingency plan in the absence of a letter grade designation:

**Example Contingency Weighting in Event of Pause or Interruption in State's Accountability System**

| **Area of Academic Framework** | **Weighting** |
|---|---|
| Student Outcomes | 10% |
| Mission-Specific Goal | 15% |
| Comparative Performance | Total Weight – 50%<br>• Overall Resident District Comparison – 25%<br>• Subgroup Comparison – 25% |
| TVAAS Composite Score | 25% |

## 1(b). Student Outcomes for New Schools (25%-35%)

If a school is scaling opening year over year, and will not have state assessment data available, the school will be held to any available data they have within the framework, including the mission-specific goal. Weights will be reallocated as necessary within the framework to accommodate available data.

If a school only has a mission-specific goal as available data for this section of the framework, the school shall not earn "Exceeds Standard" on the overall academic section, but may earn only "Meet Standard", "Does Not Meet Standard", or "Falls Far Below Standard".

## 2: Mission-Specific Goal (10%)

Each school authorized by the Commission will define a mission-specific goal within their charter agreement to be evaluated within the School Performance Framework. See Appendix A for the school's mission-specific goal.

Each mission-specific goal is unique and pre-determined in collaboration with Commission staff. The inclusion of this goal offers an opportunity:

1. For schools to showcase what makes them unique based on the model described within their charter application.
2. For elementary schools who may be missing state student outcomes data due to the majority of their students being in non-tested grade levels, this goal can track growth and achievement for students who do not take state testing through nationally normed assessments.
3. To include supplemental data for schools who are staggering their opening by grade level.
4. To capture additional important data aligned with their mission that schools believe are beneficial and are outside the scope of what is measured within the academic portion of the framework. This can include items such as ACT scores, postsecondary data, nationally normed internal assessment data, and curriculum rubrics.

The school must adhere to the guidelines established by the Commission to develop the proposed mission-specific goal. Further information on the development and guidelines for the mission-specific goals are available in the School Performance Framework Supplemental Guidance Manual.[3] The Commission will either approve the goal as is and incorporate it within the school's accountability and reporting, or it will engage in further negotiations. A school may choose to include both short- and long-term mission-specific goals depending on the outcomes the school is looking to measure during the tenure of its charter agreement. The school may choose to make changes to its mission-specific goal during the interim review. If a school must make adjustments to its mission-specific goal at any other time during the term of the charter agreement, the school must notify Commission staff to determine materiality of the adjustments.

The mission-specific goal will be discussed with the school during site visits and during interim reviews. The mission-specific goal will be included within the annual reporting for the school

[3] Available on the Commission's webpage for guidance documents and protocols.

which is public record. The mission-specific goal will also be considered in high-stakes decisions including intervention, renewal, and revocation. The school is responsible for reporting the pre-determined and aggregated data by the specified date within the charter agreement for site visits and annual reporting. Failure to report this data will result in the charter school receiving a "Does Not Meet Standard" for the mission-specific goal.

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

## 3: Comparative Performance (40%)

### 3a. School to Resident District – Overall (20%)[4]

| Measure | Description | Grade Level | Falls Far Below Standard | Does Not Meet Standard | Meets Standard | Exceeds Standard | Total Weight |
|---|---|---|---|---|---|---|---|
| 3a | School comparative performance to resident district in ELA | All Grades | More than 15 percentage points lower than the resident district | 5.1-15 percentage points lower than the resident district | Up to 5 percentage points below or above the resident district | Greater than 5 percentage points higher than the resident district | 25% |
| 3b | School comparative performance to resident district in math | All Grades | More than 15 percentage points lower than the resident district | 5.1-15 percentage points lower than the resident district | Up to 5 percentage points below or above the resident district | Greater than 5 percentage points higher than the resident district | 25% |

[4] The Commission may use more contextualized comparisons for high stakes decisions such as intervention, renewal, or interim reviews. These comparisons could include other schools nearby, other schools within the cluster of the resident district the school is located, and/or other schools with similar demographics.

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

| Measure | Description | Grade Level | Falls Far Below Standard | Does Not Meet Standard | Meets Standard | Exceeds Standard | Total Weight |
|---|---|---|---|---|---|---|---|
| 3c | School comparative performance to resident district in science | All Grades | More than 15 percentage points lower than the resident district | 5.1-15 percentage points lower than the resident district | Up to 5 percentage points below or above the resident district | Greater than 5 percentage points higher than the resident district | 25% |
| 3d | School comparative performance to resident district in social studies | All Grades | More than 15 percentage points lower than the resident district | 5.1-15 percentage points lower than the resident district | Up to 5 percentage points below or above the resident district | Greater than 5 percentage points higher than the resident district | 25% |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

**3b. School to Resident District – Subgroups (20%; 5% per subgroup)**

**Subgroup – Students with Disabilities (5%)**

| Measure | Description | Grade Level | Falls Far Below Standard | Does Not Meet Standard | Meets Standard | Exceeds Standard | Total Weight |
|---|---|---|---|---|---|---|---|
| 3a | School comparative performance to resident district in ELA | All Grades | More than 13 percentage points lower than the resident district | 3.1-13 percentage points lower than the resident district | Up to 3 percentage points below or above the resident district | Greater than 3 percentage points higher than the resident district | 50% |
| 3b | School comparative performance to resident district in math | All Grades | More than 13 percentage points lower than the resident district | 3.1-13 percentage points lower than the resident district | Up to 3 percentage points below or above the resident district | Greater than 3 percentage points higher than the resident district | 50% |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

**Subgroup – English Learners (5%)**

| Measure | Description | Grade Level | Falls Far Below Standard | Does Not Meet Standard | Meets Standard | Exceeds Standard | Total Weight |
|---|---|---|---|---|---|---|---|
| 3a | School comparative performance to resident district in ELA | All Grades | More than 13 percentage points lower than the resident district | 3.1-13 percentage points lower than the resident district | Up to 3 percentage points below or above the resident district | Greater than 3 percentage points higher than the resident district | 50% |
| 3b | School comparative performance to resident district in math | All Grades | More than 13 percentage points lower than the resident district | 3.1-13 percentage points lower than the resident district | Up to 3 percentage points below or above the resident district | Greater than 3 percentage points higher than the resident district | 50% |

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

**Subgroup – Economically Disadvantaged (5%)**

| Measure | Description | Grade Level | Falls Far Below Standard | Does Not Meet Standard | Meets Standard | Exceeds Standard | Total Weight |
|---|---|---|---|---|---|---|---|
| 3a | School comparative performance to resident district in ELA | All Grades | More than 13 percentage points lower than the resident district | 3.1-13 percentage points lower than the resident district | Up to 3 percentage points below or above the resident district | Greater than 3 percentage points higher than the resident district | 50% |
| 3b | School comparative performance to resident district in math | All Grades | More than 13 percentage points lower than the resident district | 3.1-13 percentage points lower than the resident district | Up to 3 percentage points below or above the resident district | Greater than 3 percentage points higher than the resident district | 50% |

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

**Subgroup – Black, Hispanic, Native American (5%)**

| Measure | Description | Grade Level | Falls Far Below Standard | Does Not Meet Standard | Meets Standard | Exceeds Standard | Total Weight |
|---|---|---|---|---|---|---|---|
| 3a | School comparative performance to resident district in ELA | All Grades | More than 13 percentage points lower than the resident district | 3.1-13 percentage points lower than the resident district | Up to 3 percentage points below or above the resident district | Greater than 3 percentage points higher than the resident district | 50% |
| 3b | School comparative performance to resident district in math | All Grades | More than 13 percentage points lower than the resident district | 3.1-13 percentage points lower than the resident district | Up to 3 percentage points below or above the resident district | Greater than 3 percentage points higher than the resident district | 50% |

1. Comparison of charter performance to the resident district average allows for the evaluation of whether the charter school is providing a better option for students. Comparative achievement will be measured by evaluating the percentage of students who scored "met or exceeded expectations" on the state assessments at the charter school, as compared to the resident district average.
    a. In grades 3-8, an average percent "met expectations"" or "exceeded expectations" of all grades will be calculated for each tested subject.
        i. This average will be calculated by taking the total number of students scoring "met or exceeded expectations" and dividing it by the total number of students who have a valid test in grades 3-8.
    b. In high school, an average percent "met or exceeded expectations" will be calculated for End-of-Course (EOC) assessments in English I, and II, Algebra or Integrated Math I, Geometry or Integrated Math II, Algebra II or Integrated Math III, Biology, and U.S. History as aligns to what is outlined within the current TDOE accountability protocol to determine overall subject proficiency for a high school.
        i. This average will be calculated by taking the total number of students scoring "met or exceeded expectations" and dividing it by the total number of students who have a valid test, which will be grouped by subject.
            1. *If a school is not being tested in certain subject areas, the total weight will be reallocated equally among the total tested subject areas.
2. Enrollment percentages for each subgroup defined above will be included in the Commission's annual reporting for each school. If the school's student count for any individual subgroup is less than 8 students per grade level, or 30 for a fully built out school of four tested grade levels, schools will not be held accountable due to statistical validity. In this instance, the individual subgroup indicator(s) will be suppressed and marked on the framework as "**", and the school will be held harmless for the specific subgroup(s). The corresponding weight(s) will be reallocated to the overall school to district comparison (up to 20%).
    a. Additionally, if resident district proficiency data for a particular subgroup falls below 1%, requiring suppression, the school will be compared to a district score of 0.9% for that subgroup for comparison purposes. If a school's data is suppressed publicly below 5%, the school will still be held accountable to the comparison, however the actual score will be suppressed in public reporting.

b. If a school has a proficiency score of zero for a particular subgroup, they cannot meet the standard, even if it falls within three percent of the resident district. A school must have a proficiency score above zero percent to qualify for this indicator.

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

## 4: Overall Tennessee Value-Added Assessment System (TVAAS) Composite Index (15%-25%)

| Measure | Description | Falls Far Below Standard | Does Not Meet Standard | Meets Standard | Exceeds Standard | Total Weight |
|---|---|---|---|---|---|---|
| 4a | The Tennessee Value-Added Assessment System[5] (TVAAS) measures student growth year over year, regardless of whether the student is proficient on the state assessment. In calculating a TVAAS score, a student's performance is compared relative to the performance of his or her peers who have performed similarly on past assessments. | TVAAS Composite Score of 1 | TVAAS Composite Score of 2 | TVAAS Composite Score of 3 | TVAAS Composite Score of 4 or 5 | 15%-25%* |

Note – if a school does not have a TVAAS score, the weight will be reallocated evenly amongst the other indicators in the academic section.

*The student outcomes and TVAAS sections have a range of weights due to re-allocation of weight for schools scoring a TVAAS 4 or 5. If a school meets standard at a TVAAS 3 or scores a TVAAS 2 or 1, the allocation of weights will be 35% for student outcomes and 15% for TVAAS. If a school earns a TVAAS 4, the allocation of weights will be 30% for student outcomes and 20% for TVAAS. If a school earns a TVAAS 5, the allocation of weights will be 25% student outcomes and 25% TVAAS. This is to reward schools for having higher growth scores.

[5] Tennessee Value-Added Assessment System: https://www.tn.gov/education/data/tvaas.html

| Section | Indicator | Falls Far Below Standard | Does Not Meet Standard | Meets Standard | Exceeds Standard | Percentage of Section Score | Percentage of Overall Score |
|---|---|---|---|---|---|---|---|
| **Student Outcomes** | **School academic performance, as measured by the Tennessee Department of Education** | **1** | **2** | **3** | **4** | **100%** | **25%-35%*** |
| **Mission-Specific Goal** | **Each school authorized by the Commission will define a mission-specific goal within their charter agreement to be evaluated within the School Performance Framework** | **1** | **2** | **3** | **4** | **100%** | **10%** |
| **Comparative Performance** | **Comparative Performance to Resident District** | **1** | **2** | **3** | **4** | **50%** | **40%** |
| Subsection | School comparative performance to resident district in ELA | 1 | 2 | 3 | 4 | 25% | n/a |
| Subsection | School comparative performance to resident district in math | 1 | 2 | 3 | 4 | 25% | n/a |
| Subsection | School comparative performance to resident district in science | 1 | 2 | 3 | 4 | 25% | n/a |
| Subsection | School comparative performance to resident district in social studies | 1 | 2 | 3 | 4 | 25% | n/a |
| **Comparative Performance** | **Comparative Subgroups Performance to Resident District** | **1** | **2** | **3** | **4** | **50%** | **40%** |
| Subsection | Students with disabilities comparative performance to resident district in ELA and math | 1 | 2 | 3 | 4 | 25% | n/a |
| Subsection | English learners comparative performance to resident district in ELA and math | 1 | 2 | 3 | 4 | 25% | n/a |
| Subsection | Economically disadvantaged students comparative performance to resident district in ELA and math | 1 | 2 | 3 | 4 | 25% | n/a |
| Subsection | Black, Hispanic, Native American students comparative performance to resident district in ELA and math | 1 | 2 | 3 | 4 | 25% | n/a |
| **TVAAS** | **Overall Tennessee Value-Added Assessment System (TVAAS) Composite Index** | **1** | **2** | **3** | **4** | **100%** | **15%-25%*** |

**Average Total Rating** (3 and above Meets Standard)**

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

* The student outcomes and TVAAS sections have a range of weights due to re-allocation of weight for schools scoring a TVAAS 4 or 5. If a school meets standard at a TVAAS 3 or scores a TVAAS 1 or 2, the allocation of weights will be 35% for student outcomes and 15% for TVAAS. If a school earns a TVAAS 4, the allocation of weights will be 30% for student outcomes and 20% for TVAAS. If a school earns a TVAAS 5, the allocation of weights will be 25% student outcomes and 25% TVAAS. This is to reward schools for having higher growth scores.

** To assign the final score determination, the "Average Total Rating" will be rounded to the nearest whole number. (For example, a score of 2.5 would be rounded up to a 3 and assigned the determination of a "Meets Standard". A score of 2.4 would be rounded down to a 2 and a determination of "Does Not Meet Standard".)

## Section II. Financial Performance

In addition to academic performance, another important indicator of short-term and long-term success of charter schools is financial performance. Annually, a charter school will be rated on the following near term and sustainability indicators. When a school does not meet the standard on a measure of the Financial Framework, it becomes necessary for the Commission to seek more information. A rating of "Does Not Meet Standard" on a single measure is not necessarily an indication of financial distress, instead, it is an invitation for the Commission to understand the reason for the financial underperformance, assess the severity of the situation, and if necessary, determine an appropriate course of action or intervention. Any intervention action based on the school's ratings received in financial performance will be dictated by Commission Policy 3.400 Charter School Intervention.

Financial performance metrics are calculated primarily by using the audited financial statements for each of the Commission's schools, which are prepared in conformity with accounting principles generally accepted in the United States of America as prescribed by the GASB. Consequently, the Statement of Net Position and Statement of Activities are presented in a consolidated manner with all schools operated under a single network. While the consolidated financial statements are utilized in the majority of the Financial Performance Framework for measuring the near term and sustainability measures of the charter school, the Commission will also consider each school's financial position and hold it independently accountable.

**Indicators and Measures:**

1. Near Term Indicators:
    a. Current Ratio
    b. Unrestricted Days Cash
    c. Enrollment Variance
    d. Default
2. Sustainability Indicators:
    a. Total Margin
    b. Debt to Asset Ratio
    c. Debt Service Coverage Ratio
    d. Unrestricted Net Position
    e. Total Margin by School (*if applicable*)

## 1. Near Term Indicators

**1(a). Current Ratio:**

*Current Assets divided by Current Liabilities*

Audit Source: "Statement of Net Position"

- Meets Standard
    - Current Ratio is greater than or equal to 1.1; OR
    - Current Ratio is between 1.0 and 1.1 and one-year trend is positive (current year ratio is higher than previous year ratio)
    - *(For schools in their first or second year of operation)* Current Ratio must be greater than or equal to 1.1
- Does Not Meet Standard
    - Current Ratio is between 0.9 and 1.0 or equal to 1.0; OR
    - Current Ratio is between 1.0 and 1.1 and one-year trend is negative
- Falls Far Below Standard
    - Current Ratio is less than or equal to 0.9
    - *(For schools in their first or second year of operation)* Current Ratio is less than 1.1

**1(b). Unrestricted Days Cash:**

*Unrestricted Cash divided by ([Total Expense minus Depreciation Expense] divided by 365)*

Audit Source: "Statement of Net Position" (Cash), "Statement of Activities" (Depreciation, Total Expenses)

Note: If Cash is not detailed in audit, then schools must provide this information directly to the Commission.

- Meets Standard
    - Days Cash is greater than or equal to 60 days; OR
    - Days Cash is between 30 and 60 days and one-year trend is positive
    - *(For schools in their first or second year of operation)* Days Cash is greater than or equal to 30 days
- Does Not Meet Standard
    - Days Cash is between 15-30 days or equal to 30 days; OR
    - Days Cash is between 30-60 days and one-year trend is negative
- Falls Far Below Standard

- Days Cash is less than or equal to 15 days
- *(For schools in their first or second year of operation)* Days Cash is less than 30 days

**1(c). Average Daily Membership (ADM) to Budget Variance:**

*Actual ADM (June 30 ADM) divided by Enrollment Projection used in June 1 Charter School Board-Approved Budget. Schools will be allowed one board-approved revised budget in a fiscal year.*

Source of Data: Received Directly from School

- Meets Standard
  - ADM to Budget Variance greater than or equal to 95 percent in the most recent year
- Does Not Meet Standard
  - ADM to Budget Variance is between 85 percent and 95 percent in the most recent year
- Falls Far Below Standard
  - ADM to Budget Variance is less than or equal to 85 percent in the most recent year

**1(d). Default:**

Source of Data: Audit and/or Received Directly from School

- Meets Standard
  - School is not in default of loan covenant(s) and/or is not delinquent with debt service payments
- Does Not Meet Standard
  - School is in default of loan covenant(s), but has worked with lender(s) to restructure debt service payments
- Falls Far Below Standard
  - School is in default of loan covenant(s) and/or is delinquent with debt service payments.

## 2. Sustainability Measures

**2(a). Total Margin:**

*Total Margin is Change in Net Position divided by Total Revenues; Aggregated Total Margin is Total Three-Year Change in Net Position divided by Total Three-Year Revenues*

Audit Source: "Statement of Activities" (*Total Revenues*) and "Statement of Activities" (*Change in Net Position*)

- Meets Standard
  - Aggregated Three-Year Total Margin is positive and the most recent year Total Margin is positive; OR
  - Aggregated Three-Year Total Margin is greater than -1.5%, the trend is positive for the last two years, and the most recent year Total Margin is positive
  - *(For schools in their first or second year of operation)* Aggregated Two-Year Total Margin (if applicable) is positive, and the most recent year Total Margin is positive
- Does Not Meet Standard
  - Aggregated Three-Year Total Margin is greater than -1.5%, but trend does not "Meet Standard"
- Falls Far Below Standard
  - Aggregated Three-Year Total Margin is less than or equal to -1.5%; OR
  - The most recent year Total Margin is less than –10%.
  - *(For schools in their first or second year of operation)* Aggregated Two-Year Total Margin (if applicable) is negative (or zero), OR the most recent year Total Margin is negative (or zero)

**2(b). Debt to Asset Ratio:**

*(Total Liabilities plus Deferred Inflows from Resources) divided by (Total Assets plus Deferred Outflows from Resources)*

Audit Source: "Statement of Net Position"

- Meets Standard
  - Debt to Asset Ratio is less than or equal to 0.9
- Does Not Meet Standard
  - Debt to Asset Ratio is between 0.9 and 1.0
- Falls Far Below Standard
  - Debt to Asset Ratio is greater than or equal to 1.0

**2(c). Debt Service Coverage Ratio:**

*(Change in Net Position + Depreciation Expense + Interest Expense + Rent/Lease Expense) divided by (Debt Due within One Year + Interest Expense + Rent/Lease Expense)*

Audit Source: "Statement of Activities" (Change in Net Position, Depreciation Expense, Interest Expense); "Statement of Net Position" (Debt Due within One Year); "Notes to Financial Statements" (Rent/Lease Expense)

Note: If Rent/Lease Expense is not detailed in audit, then schools must provide this information directly

- Meets Standard
  - Debt Service Coverage Ratio is greater than or equal to 1.1
- Does Not Meet Standard
  - Debt Service Coverage Ratio is less than or equal to 1.1
- Falls Far Below Standard
  - Not Applicable

**2(d). Unrestricted Net Position:**

*Unrestricted Net Position divided by total expenses*

Audit Source: "Balance Sheet" (Unrestricted Net Position) and "Statement of Activities" (Total Expenses)

- Meets Standard
  - Unrestricted Net Position is greater than or equal to 5%
- Does Not Meet Standard
  - Unrestricted Net Position is greater than 0.0% but less than 5%
- Falls Far Below Standard
  - Unrestricted Net Position is negative

**2(e). Total Margin by School (if applicable):**

*Total Margin by School is Change in Net Position for the authorized school divided by Total Revenues for the authorized school; Aggregated Total Margin is Total Three-Year Change in Net Position divided by Total Three-Year Revenues for the authorized school*

Audit Source: "Statement of Revenues, Expenditures, and Changes in Fund Balance by School"

Note: Charter schools may strategically plan to operate at a deficit in a given fiscal year. This often involves reducing unrestricted fund balance to support initiatives such as growth or expansion; investments in technology; adoption of new curricula; implementation of academic

corrective action plans to improve school performance; or facilities and other capital improvements. While any deficit in the most recent fiscal year results in a school not meeting this standard, a documented, planned deficit will be considered when evaluating schools that do not meet this standard.

- Meets Standard
  - Aggregated Three-Year Total Margin by School is positive, and the most recent year Total Margin by School is positive; OR
  - Aggregated Three-Year Total Margin by School is greater than -1.5%, the trend is positive for the last two years, and the most recent year Total Margin by School is positive
  - (For schools in their first or second year of operation) Aggregated Two-Year Total Margin by School (if applicable) is positive, and the most recent year Total Margin by School is positive
- Does Not Meet Standard
  - Aggregated Three-Year Total Margin by School is greater than -1.5%, but trend does not "Meet Standard"
- Falls Far Below Standard
  - Aggregated Three-Year Total Margin by School is less than or equal to 1.5%; OR
  - The most recent year Total Margin by School is less than -10%
  - (For schools in their first or second year of operation) Aggregated Two-Year Total Margin by School (if applicable) is negative (or zero), OR the most recent year Total Margin by School is negative (or zero).

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

## GASB Audit Data Sources for Financial Performance Framework:

| # | Metric | Data for Calculation | Data Source |
|---|---|---|---|
| 1a | Current Ratio | Current Assets | Statement of Net Position |
| 1a | Current Ratio | Current Liabilities | Statement of Net Position |
| 1b | Unrestricted Days Cash | Cash & Cash Equivalents | Statement of Net Position or Directly from School |
| 1b | Unrestricted Days Cash | Total Expenses | Statement of Activities |
| 1b | Unrestricted Days Cash | Depreciation | Statement of Activities |
| 1c | Enrollment Variance | Actual Enrollment | Directly from School |
| 1c | Enrollment Variance | Budgeted Enrollment | Directly from School |
| 1d | Default | Default/Delinquency | Directly from School |
| 2a | Total Margin | Total Revenues | Statement of Activities |
| 2a | Total Margin | Change in Net Position | Statement of Activities |
| 2b | Debt to Asset Ratio | Total Liabilities | Statement of Net Position |
| 2b | Debt to Asset Ratio | Deferred Inflows | Statement of Net Position |
| 2b | Debt to Asset Ratio | Total Assets | Statement of Net Position |
| 2b | Debt to Asset Ratio | Deferred Outflows | Statement of Net Position |
| 2c | Debt Service Coverage Ratio | Change in Net Position | Statement of Activities |
| 2c | Debt Service Coverage Ratio | Depreciation | Statement of Activities |
| 2c | Debt Service Coverage Ratio | Interest Expense | Statement of Activities |
| 2c | Debt Service Coverage Ratio | Rent and Lease Expenses | Notes to Financial Statements or Directly from School |
| 2c | Debt Service Coverage Ratio | Short-term Debt | Statement of Net Position |
| 2c | Debt Service Coverage Ratio | Current Portion of Long-term Debt | Statement of Net Position |
| 2d | Unrestricted Net Position | Unrestricted Net Position | Statement of Net Position |
| 2d | Unrestricted Net Position | Total Expenses | Statement of Activities |
| 2e | Total Margin by School | Total Revenues for Authorized School | Statement of Revenues, Expenditures, and Changes in Fund Balance by School |
| 2e | Total Margin by School | Change in Net Position for Authorized School | Statement of Revenues, Expenditures, and Changes in Fund Balance by School |

## Section III: Organizational Performance

A charter school's performance on the organizational measures is a large piece of the overall evaluation of a charter school. Deficiencies or weaknesses in organizational performance may be an indicator of the overall health of the charter school.

When a school does not meet the standard on a measure of the Organizational Performance portion of the framework, it becomes necessary for the Commission to seek more information. A rating of "Does Not Meet Standard" on a single measure may indicate non-compliance but is not necessarily an indication of overall organizational distress. Instead, it is an invitation for the Commission to understand the reason for the organizational underperformance, assess the severity of the situation, and if necessary, determine an appropriate course of action or intervention in alignment with the Commission's Charter School Intervention Policy – 3.400.[6] Conversely, if shortcomings are identified and the school promptly comes into compliance within a reasonable timeframe, the Commission staff reserves the right to use professional discretion to determine if the school is eligible to receive a "Meets Standard" rating.

[6] Tennessee Public Charter School Commission Charter School Intervention Policy – 3.400

**Indicators and Measures:**

1. Education Program:
    a. Charter Terms
    b. Compliance with Education Requirements
    c. Enrollment Over Time
    d. Student Retention Rates
    e. Student Retention Rates by Subgroup
    f. Students with Disabilities Rights
    g. English Learner Rights
2. Financial Management and Oversight
    a. Financial Reporting and Compliance Reporting
    b. Generally Accepted Accounting Principles
3. Governance and Reporting
    a. Governance Requirements
    b. Accountability of Management
    c. Reporting Requirements
4. Students and Employees
    a. Rights of Students
    b. Suspension Reporting Requirements
    c. Attendance
    d. Credentialing
    e. Employment Rights
    f. Background Checks
5. School Environment
    a. Facilities and Transportation
    b. Health and Safety
    c. Information Handling
6. Additional Obligation

## 1. Education Program

**1(a). Is the school implementing the material terms of the education program as defined in the current charter agreement?**

- Meets Standard
  - The school implemented the material terms of the education program in all material respects and the education program in operation reflects the material terms as defined in the charter agreement, or the school has gained approval for a charter modification to the material terms pursuant to T.C.A. § 49-13-110. If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
  - The school failed to implement the material terms of the education program in the manner described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to implement its program in the manner described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**1(b). Is the school complying with applicable education requirements?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to education requirements, including but not limited to:
    - Instructional days or minutes requirements
    - Graduation, promotion, and retention requirements
    - Content standards, including implementation of Tennessee Academic Standards
    - State Assessments
    - Implementation of Response to Instruction and Intervention (RTI2)
    - Implementation of mandated programming as a result of state or federal funding
  - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard

- The school failed to comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**1(c). Does the school have consistent enrollment over time?**

*A school that is scaling opening by grade level year over year will be held to the comparable enrollment of the previous year's enrollment count as outlined in the school's growth plan included in the charter agreement and/or charter application. The School Performance Framework Supplemental Guidance Manual includes additional guidance on this calculation.

** A school within its first year of operation will be held harmless on this indicator.

- Meets Standard
  - The school's enrollment is greater than or no more than 10% below its previous year's enrollment.
- Does Not Meet Standard
  - The school's enrollment is between 10% and 20% below its previous year's enrollment.
- Falls Far Below Standard
  - The school's enrollment is 20% below or greater than its previous year's enrollment.

**1(d). Is the school retaining students (students are staying enrolled throughout the year and year over year)?**

- Meets Standard
  - Maintained at least a 70% student retention rate, and
  - The school materially complies with applicable LEA policies and procedures; if shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
  - The school maintained a student retention rate between 60% and 70%, and/or;
  - The school failed to comply with LEA policies and procedures. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard

- The school maintained a student retention rate at or below 60%, and/or;
- The school failed to comply with LEA policies and procedures. Once shortcoming(s) were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**1(e). Is the school retaining students that fall within special populations subgroups including students with disabilities, English Learners, economically disadvantaged students, and Black, Hispanic, and Native American subgroups at a similar rate to their overall student retention rate?**

- Meets Standard
  - The school materially complies with applicable LEA policies and procedures, and provisions of the charter agreement relating to retention rate goals by subgroup, including but not limited to:
    - Maintaining subgroup retention rates within five percentage points of the school's overall student retention rate; and/or
    - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
  - The school has subgroup retention rates between five and ten percentage points below the school's overall student retention rate, and/or;
  - The school failed to comply with applicable LEA policies and procedures. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school has subgroup retention rates greater than or equal to ten percentage points below the school's overall student retention rate.
  - The school failed to comply with applicable LEA policies and procedures. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**1(f). Is the school protecting the rights of students with disabilities?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement (including the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act) relating to the treatment of students with identified disabilities and those suspected of having a disability, including but not limited to:

        - Equitable access and opportunity to enroll
        - Identification and referral
        - Appropriate development and implementation of Individualized Education Plans and Section 504 plans, in compliance with required timelines
        - Organizational compliance, including provision of services in the least restrictive environment and appropriate inclusion in the school's academic program, assessments, and extracurricular activities
        - Discipline, including due process protections, manifestation determinations, and behavioral intervention plans
        - Access to the school's facility and program in a lawful manner and consistent with students' IEPs or Section 504 Plans
        - Securing and properly accounting for all applicable federal and state funding
    - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
    - The school did not materially comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions relating to the treatment of students with identified disabilities and those suspected of having a disability in the manner described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
    - The school failed to comply with applicable laws, rules, regulations, LEA policies, and procedures, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**1(g). Is the school protecting the rights of English learner (EL) students?**

- Meets Standard
    - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement (including Title I and III of the Every Student Succeeds Act (ESSA)) relating to the English learner requirements, including but not limited to:
        - Required policies and notifications related to the service of EL students
        - Proper steps for identification of students in need of EL services, in compliance with required timelines.
        - Appropriate and equitable delivery of services to identified students
        - Compliance with 1:35 EL teacher to student ratio

- Annual assessment of EL students (screener and annual assessment)
    - Appropriate accommodations on assessments
    - Exiting of students from EL services
    - Ongoing monitoring of exited students
  - If shortcomings were identified, the school promptly came into compliance.

- Does Not Meet Standard
  - The school did not materially comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions relating to English learner requirements in the manner described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

## 2. Financial Management

**2(a). Is the school meeting financial reporting and compliance requirements?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to financial reporting requirements, including but not limited to:
    - Complete and on-time submission of financial reports, including initial and revised board adopted budgets, periodic financial reports as required by the Commission via the Reporting Calendar, and any reporting requirements if the board contracts with an Education Service Provider (ESP)
    - On-time submission and completion of annual independent audit and corrective action plans, if applicable
    - Complete and on-time submission of all additional reporting requirements related to the use of public funds
  - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions relating to financial reporting requirements as described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**2(b). Is the school following Generally Accepted Accounting Principles as outlined by the Governmental Accounting Standards Board?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to financial management and oversight expectations as evidenced by an annual independent audit, including but not limited to:
    - An unmodified audit opinion
    - An audit devoid of significant findings and conditions, material weaknesses, or significant internal control weaknesses

    - An audit that does not include a going concern disclosure in the notes or an explanatory paragraph indicative of concern related to GAAP or material compliance with LEA rules and/or policies within the audit report
  - If shortcomings were identified, the school promptly came into compliance.

- Does Not Meet Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions relating to financial management and oversight expectations described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

## 3. Governance and Reporting

**3(a). Is the school complying with governance requirements?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to governance by its board, including but not limited to:
    - Board policies, including those related to oversight of an Education Service Provider (ESP) or Charter Management Organization (CMO), if applicable
    - Board bylaws
    - State open meetings law
    - Code of ethics
    - Conflicts of interest
    - Board composition and/or membership rules pursuant to T.C.A. § 49-13-109 (e.g. inclusion of a parent on board or proper membership on school advisory council.)
  - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
  - The school failed to comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions relating to governance by its board as described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance or the failure was so severe that it outweighed any efforts to come into compliance.

**3(b). Is the school holding management accountable (Applicable to schools contracting with an Educational Service Provider (ESP) or Charter Management Organization (CMO))?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA Policies and Procedures, and provisions of the charter agreement relating to oversight of school management through an ESP or CMO, including but not limited to:
    - Maintaining authority over management, holding it accountable for performance as agreed under a written performance agreement, and

requiring annual financial reports of the ESP or CMO.

- Does Not Meet Standard
  - The school failed to comply with all applicable laws, rules, regulations, and provisions relating to oversight of school management. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with all applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**3(c). Is the school complying with reporting requirements?**

| Reporting Calendar On-Time Completion Rate* | Meets Standard | Does Not Meet or Falls Far Below |
|---|---|---|
| Submissions are on-time | ≥ 85% | < 85% |

*Note:

- Period= July –June
- On-Time= Within five (5) business days of the due date. If an item was not required of the school or an extension was granted and met, the item will be considered on time.
- Percentages will be rounded to the nearest whole number. (For example, an on-time percentage of 84.5 would be rounded up to an 85 and be eligible for a “Meets Standard” rating. An on-time percentage of 84.4 would be rounded down to an 84 and a rating of either “Does Not Meet Standard” or “Falls Far Below Standard.”)
- For schools in the first year of operation or transition to the Commission from the Achievement School District, completion rates will be reported, however, the school’s rating will not be tied to the on-time completion rate.

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to relevant reporting requirements to the Commission, Tennessee Department of Education, and/or federal authorities. The school submits timely, complete, and accurate reports, including, but not limited to:
    - On-time completion rate for Reporting Calendar submissions of at least 85%

(not applicable to schools in their first year of operation).
    - Timely and accurate attendance and enrollment reporting
    - Timely and accurate reporting related to state and federal compliance and oversight
    - Timely and accurate reporting of additional information requested by the Commission

- Does Not Meet Standard
    - The school failed to timely comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions relating to relevant reporting requirements described above.
- Falls Far Below Standard
    - The school exhibited a pattern of failure to comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

## 4. Students and Employees

### 4(a). Is the school protecting the rights of all students?

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to the rights of students, including but not limited to:
    - Policies and practices related to admissions, lottery, waiting lists, fair and open recruitment, and enrollment (including rights to enroll or maintain enrollment)
    - The collection and protection of student information (that could be used in discriminatory ways or otherwise contrary to law)
    - Due process protections, privacy, civil rights, and student liberties requirements, including First Amendment protections and the Establishment Clause restrictions prohibiting public schools from engaging in religious instruction
    - Conduct of discipline (discipline hearings and suspension and expulsion policies and practices)
  - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
  - The school failed to comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions relating to the rights of students as described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

### 4(b). Is the school meeting suspension reporting requirements?

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to accurately reporting suspensions.

- If shortcomings were identified, the school promptly came into compliance.

- Does Not Meet Standard
  - The school failed to comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions relating to accurately reporting suspensions. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions relating to accurately reporting suspensions. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**4(c). Is the school meeting attendance goals?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to attendance goals, including but not limited to:
    - Meeting attendance goals, including chronic absenteeism, outlined in the state and/or federal accountability measures.
    - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
  - The school failed to comply with applicable laws, rules, regulations, LEA policies and procedures, and provisions relating to attendance goals described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**4(d). Is the school meeting teacher and other staff credentialing requirements?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement (including the federal Highly Qualified Teacher and Paraprofessional requirements within Elementary and Secondary Education Act [ESEA] as amended by ESSA) relating to state certification

requirements.
  - If shortcomings were identified, the school promptly came into compliance.

- Does Not Meet Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions relating to state certification requirements. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**4(e). Is the school complying with laws regarding employee rights?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to employment considerations, including those relating to the Family Medical Leave Act, the Americans with Disabilities Act, and employment contracts (if applicable). The school does not interfere with employees' rights to organize collectively or otherwise violate staff collective bargaining rights.
  - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions relating to employment considerations. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**4(f). Is the school completing required background checks?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to background

checks of all applicable individuals (including staff, contractors and volunteers, where applicable).
    - If shortcomings were identified, the school promptly came into compliance.

- Does Not Meet Standard
    - The school failed to comply with applicable laws, rules, regulations, and provisions relating to background checks. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
    - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

## 5. School Environment

**5(a). Is the school complying with facilities and transportation requirements?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, and provisions of the charter agreement relating to the school facilities, grounds, and transportation, including but not limited to:
    - Americans with Disabilities Act (ADA)
    - Fire inspections and related records
    - Viable certificate of occupancy or other required building use authorization
    - Asbestos inspections
    - Documentation of requisite insurance coverage
    - Student transportation (including transportation for students with disabilities)
  - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions relating to the school facilities, grounds, and transportation as described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**5(b). Is the school complying with health and safety requirements?**

- Meets Standard
  - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions of the charter agreement relating to safety and the provision of health-related services, including but not limited to:
    - Appropriate nursing services, school health reporting requirements, and dispensing of medication
    - Food service requirements
    - Emergency Operations, including emergency operations plans and required drills/trainings

        - Other state/district requirements
    - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
    - The school failed to comply with applicable laws, rules, regulations, and provisions relating to safety and the provision of health-related services as described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
    - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

**5(c). Is the school handling information appropriately?**

- Meets Standard
    - The school materially complies with applicable laws, rules, regulations, LEA policies and procedures, and provisions regarding the handling of information, including but not limited to:
        - Maintaining the security of and providing access to student records under the Family Educational Rights and Privacy Act and other applicable laws
        - Access to documents maintained by the school under the state's open records law and other applicable authorities
        - Transferring of student records
        - Proper and secure maintenance of testing materials
    - If shortcomings were identified, the school promptly came into compliance.
- Does Not Meet Standard
    - The school failed to comply with applicable laws, rules, regulations, and provisions related to the handling of information as described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
    - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance.

## 6. Additional Obligations

**6(a). Is the school complying with all other obligations?**

- Meets Standard
  - The school materially complies with all other material legal, statutory, regulatory, or contractual requirements contained in its charter agreement that are not otherwise explicitly stated herein, including but not limited to requirements from the following sources:
    - Revisions to state law
    - LEA policies and procedures
    - Consent decrees
    - Intervention requirements by the authorizer
    - Requirements by other entities to which the school is accountable (e.g. Tennessee Department of Education)
- Does Not Meet Standard
  - The school failed to materially comply with other material, legal, statutory, regulatory, or contractual requirements as described above. Once the shortcoming(s) were identified, the school did not promptly come into compliance.
- Falls Far Below Standard
  - The school failed to comply with applicable laws, rules, regulations, and provisions described above. Once shortcomings were identified, the school did not come into compliance, or the failure was so severe that it outweighed any efforts to come into compliance

TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

## Appendix A – Mission-Specific Goal
## [Insert School Name]

1) **School's Mission:** What is the mission of the school?

2) **Student Profile Summary:** Who are the students at your school? Describe your student population in 2-3 sentences.

3) **Goal – Outcomes Driven:** What is your mission-specific goal? What metrics will you use to measure this goal?

4) **Goal's Connection to Mission:** In 3-4 sentences, explain how the goal reflects your school's mission.

5) **Targets and Rationale:** Input what would warrant an exceeds, meets, does not meet, or falls far below standard for your mission-specific goal and aligned metrics along with your rationale for these targets.

| Target | Rationale for Target |
|---|---|
| **Exceeds**<br>*(insert criteria)* | |
| **Meets**<br>*(insert criteria)* | |
| **Does Not Meet**<br>*(insert criteria)* | |
| **Falls Far Below**<br>*(insert criteria)* | |

6) **Assessment Details:** Please describe the assessment being used. How will data be collected and how frequently is data collected?

7) **Results Summary:** What will the results and targets tell you?

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

## Appendix A – Mission-Specific Goal
## Tennessee Nature Academy

1) **School's Mission:** What is the mission of the school?

The mission of Tennessee Nature Academy (TNA) is to cultivate happy and healthy young adults who are knowledgeable about the world, passionate about the outdoors, and motivated to do good work.

2) **Student Profile Summary:** Who are the students at your school? Describe your student population in 2-3 sentences.

Tennessee Nature Academy will serve middle and high school students in Nashville, TN. TNA will welcome 162 founding 5th and 6th grade students in Fall 2023 and will grow to serve 684 students in grades 5-12 by Fall 2029. Based on enrollment estimates from current middle schools in our community (e.g. recent data reported in the Antioch, Cane Ridge, and Overton school clusters), we expect that 42% of our students will identify as economically disadvantaged, 45% will identify as English language learners, and 12% will identify as students with disabilities.

3) **Goal – Outcomes Driven:** What is your mission-specific goal? What metrics will you use to measure this goal?

Students demonstrate mastery on performance tasks related to the mission of the school.

4) **Goal's Connection to Mission:** In 3-4 sentences, explain how the goal reflects your school's mission.

Tennessee Nature Academy provides a nature-based, project-based program in grades 5-12 which supports students' academic success and emphasizes college and career readiness. This approach to teaching and learning helps students master disciplinary, grade-level knowledge and skills, relate their learning to their own experiences, and participate in learning experiences that are tied to their community (which includes making relevant connections to nature). In addition to assessments like end-of-unit tests or end-of-course exams, Tennessee Nature Academy uses regular performance tasks to measure the effectiveness of our pedagogy.

5) **Targets and Rationale:** Input what would warrant an exceeds, meets, does not meet, or falls far below standard for your mission-specific goal and aligned metrics along with your rationale for these targets.

Tennessee Nature Academy assigns performance tasks throughout the year. At the end of the year, we measure progress relative to the mission-specific target by determining the percentage of students achieving mastery (that is, achieving a score of at least 70%) in each performance

task, and then determining the average of these percentages across performance tasks. Please see the example below.

EXAMPLE

**Performance Task Outcomes -- Grade 5 -- SY 2021-2022**

| | Task 1 ELA | Task 2 Social Studies | Task 3 Math | Task 4 Science | Task 5 Visual Arts | Task 6 Math | Task 7 PE | |
|---|---|---|---|---|---|---|---|---|
| Student A | 92% | 75% | 92% | 83% | 100% | 83% | 100% | |
| Student B | 83% | 92% | 100% | 92% | 100% | 75% | 92% | |
| Student C | 100% | 83% | 75% | 92% | 92% | 83% | 100% | |
| Student D | 92% | 83% | 92% | 100% | 67% | 100% | 100% | |
| Student E | 75% | 100% | 100% | 100% | 100% | 67% | 100% | |
| Student F | 100% | 67% | 83% | 75% | 100% | 92% | 75% | |
| Student G | 92% | 92% | 75% | 100% | 75% | 100% | 67% | |
| Student H | 83% | 75% | 92% | 100% | 58% | 100% | 100% | |
| Student I | 75% | 75% | 100% | 92% | 67% | 92% | 75% | |
| Student J | 100% | 92% | 92% | 92% | 100% | 83% | 100% | Mission-Specific Goal Target |
| Percentage of Students Achieving Mastery | 100% | 90% | 100% | 100% | 70% | 90% | 90% | 91% |

*Results of additional tasks would be added to the right.*

*Results of additional students would be added below.*

TNA then averages each grade level's performance relative to the mission- specific goal target to determine whether our organization has achieved "Exceeds," "Meets," "Does Not Meet," or "Falls Far Below" ratings. This is shown in the figure below.

EXAMPLE

**Performance Task Outcomes -- All Grades -- SY 2021-2022**

Percentage of Students Achieving Mastery

| | Grade 5 | Grade 6 |
|---|---|---|
| | 91% | 85% |
| Mission-Specific Goal Target *(Average Across Grades 5 and 6)* | 88% | |

*Results for additional grade levels would be added each year until TNA reaches full scale.*

Our targets and rationales for targets are as follows:

| Target | Rationale for Target |
|---|---|
| **Exceeds** *More than 80% of students demonstrate mastery (achieve a score of 70% or above) on performance task rubrics.* | In TNA's district (MNPS), students must earn a score of 70% or above to achieve mastery (e.g. earn a passing grade). We believe that for more than 80% of our students to demonstrate mastery on regular performance tasks exceeds the target for our mission-specific goal. |

| Target | Rationale for Target |
|---|---|
| **Meets**<br>*Between 70% and 80% of students demonstrate mastery (achieve a score of 70% or above) on performance task rubrics.* | In TNA's district (MNPS), a student must earn a score of 70% or above to achieve mastery (e.g. earn a passing grade). Accordingly, a score of 70% or above equates to mastery on TNA's outcome assessments, which includes performance tasks. We believe that students are meeting the standards if they achieve mastery scores between 70% and 80% on performance tasks. |
| **Does Not Meet**<br>*Between 50% and 69% of students demonstrate mastery (achieve a score of 70% or above) on performance task rubrics.* | In TNA's district, students earn a failing grade if they achieve a mastery score between 50% and 69%. Accordingly, a score between 50% and 69% indicates that students are not meeting standards on performance tasks. |
| **Falls Far Below**<br>*50% or fewer of students demonstrate mastery (achieve a score of 70% or above) on performance task rubrics.* | In TNA's district, students cannot be assigned a numeric grade below 50%. Accordingly, a score of 50% or below represents that students' mastery falls far below what is expected on performance tasks. |

6) **Assessment Details:** Please describe the assessment being used. How will data be collected and how frequently is data collected?

Performance tasks take place through student projects and could include formal written products, presentations, portfolios, and other artifacts of student work. Performance tasks occasionally require students to complete community-based field work or share their work with an audience. Performance tasks occur at least twice per year in each core academic and elective class (e.g. ELA, Math, Science, Social Studies, Art, Physical Education, Keyboarding, and Introduction to Agriscience). Examples of performance tasks could include:

- Students create a plan for a community garden based on the Community Farm at Mill Ridge and determine the fraction and area that each plant in each plot will take up. (Grade 5 Math)
- Students create a poster presentation for a community symposium on conserving Tennessee's freshwater mussels. The poster presentation includes: 1. A description of the importance of Tennessee's mussels, 2. An explanation of a specific threat facing

Tennessee's mussels, including how that threat was introduced and how it affects mussels, 3. A proposal for how Tennesseans might minimize or address that threat, and 4. Steps the audience can take to conserve Tennessee's freshwater mussels. (Grade 6 Science)

- Students write an informative problem-solution essay focused on their research about a solution that an innovator developed using design thinking to solve a critical problem. The essay explains the problem in detail, and then describes the process by which a solution was designed, tested, and revised. (Grade 6 ELA)
- Students work in teams to create a model of an exhibit for an art or history museum on the civilization or topic in ancient world history of their choice. Before creating the model, students develop a concept design, schematic design, and final design. (Grade 6 Social Studies)
- Students create a tempera painting that depicts an animal in its environment. In this task, students demonstrate their knowledge of foreground, middle-ground, and background and depict elements of the environment using dark, medium, and light tones. (Grade 5 Visual Arts)

While the focus and format of performance tasks vary widely, performance tasks align to Tennessee Academic Standards, support the development of disciplinary or industry-related skills, and require engagement with the community. Tennessee Nature Academy's general rubric is available below.

The general rubric will be used to evaluate all performance tasks. When designing the performance task, the teacher (and/or leadership team member) will determine how the performance task 1) Includes and assesses the Tennessee Academic Standards, 2) Promotes engagement with the community and 3) Includes and assesses disciplinary and industry-related skills. While the details of each performance task will vary (by grade level, by subject area, etc.), they will be assessed according to the general rubric.

7) **Results Summary:** What will the results and targets tell you?

"Meets" or "Exceeds" outcomes on performance tasks indicates that students have mastered disciplinary, grade-level knowledge and skills appropriate to the task and have demonstrated their understanding in ways which are consistent with TNA's approach to teaching and learning (e.g. nature-based and project-based pedagogies).

TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION

**Tennessee Nature Academy**
**Performance Task Rubric**

| | 4 | 3 | 2 | 1 |
|---|---|---|---|---|
| Mastery of the Tennessee Academic Standards<br><br>*Students are knowledgeable about the world.* | The student demonstrates 80% or higher mastery of the Tennessee Academic Standards assessed through the task. | The student demonstrates 70% - 79% mastery of the Tennessee Academic Standards assessed through the task. | The student demonstrates 50% - 69% mastery of the Tennessee Academic Standards assessed through the task. | The student demonstrates below 50% mastery of the Tennessee Academic Standards assessed through the task. |
| Engagement with the Community<br><br>*Students are passionate about the outdoors.* | The student effectively meets 80% or more of the participation requirements for the task. | The student effectively meets 70% - 79% of the participation requirements for the task. | The student effectively meets 50% - 69% of the participation requirements for the task. | The student meets below 50% of the participation requirements for the task. |
| Mastery of Disciplinary or Industry-Related Skills<br><br>*Students are motivated to do good work.* | The student demonstrates 80% or higher mastery of the disciplinary or industry-related skills assessed through the task. | The student demonstrates 70% - 79% mastery of the disciplinary or industry-related skills assessed through the task. | The student demonstrates 50% - 69% mastery of the disciplinary or industry-related skills assessed through the task. | The student demonstrates below 50% mastery of the disciplinary or industry-related skills assessed through the task. |

**Indicator Descriptions**

**Mastery of the Tennessee Academic Standards:** Performance tasks assess the Tennessee Academic Standards. Some tasks may assess standards associated with one content area, while some interdisciplinary tasks may assess standards across different content areas.

**Engagement with the Community:** Performance tasks require students to engage with the

community when preparing or sharing their work. This engagement could include:

- Completing field work or outdoor experiences needed for the task
- Collaborating with an expert or organization to complete the task
- Participating in opportunities to share the results of the task with an audience

**Mastery of Disciplinary or Industry-Related Skills:** Performance tasks require students to practice disciplinary or industry-related skills that they will later use to meet their college and career goals. Examples of these skills include:

- Research skills
- Reading or communication skills
- Using tools or technology
- Collaboration and teamwork
- Time management

# EXHIBIT 57

# AMENDED AND RESTATED CHARTER
# OF
# ACLU OF TENNESSEE, INC.

Corporate Control Number 000049900

Pursuant to the provisions of Section 48-60-106 of the Tennessee Nonprofit Corporation Act, the undersigned Corporation hereby amends and restates its charter, effective upon filing with the Tennessee Secretary of State, as follows:

## ARTICLE I.

The name of the Corporation is ACLU of Tennessee, Inc.

## ARTICLE II.

This Corporation is a public benefit corporation and is a nonprofit corporation.

## ARTICLE III.

The duration of the Corporation is perpetual.

## ARTICLE IV.

The Corporation's registered office shall be located at 922 Davidson Drive, Suite B, Nashville, Davidson County, Tennessee 37205, and the name of its registered agent at that office is Capital Corporate Services, Inc.

## ARTICLE V.

The address and zip code of the principal office of the Corporation in the State of Tennessee is 6339 Charlotte Pike, Unit No. B-152, Nashville, Tennessee 37209.

## ARTICLE VI.

This Corporation has members.

## ARTICLE VII.

The Corporation is organized and at all times shall be operated exclusively for purposes within the meaning of Section 501(c)(4) of the Internal Revenue Code of 1986 or the corresponding provision of any future United States Internal Revenue law (the "Code"). Notwithstanding any provision of this Charter, this Corporation shall not carry on any activities not permitted to be carried on by an organization exempt from Federal income tax under Section 501(c)(4) of the Code.

The purposes for which the Corporation is established include:

[1] To protect, expand, maintain and advance individual liberties including freedoms of association, press, religion, speech, due process of the law and equal protection of the law, and to take all appropriate action in furtherance and defense of civil liberties; and

[2] To protect and expand individual liberties through public education, to provide legal assistance to aggrieved persons and organizations and to provide bill of rights protection; and

[3] To affiliate itself with the American Civil Liberties Union, a corporation with headquarters in New York, New York and to conform to all regulations and requirements of said American Civil Liberties Union and to do all things impowered to do by virtue of said affiliation; and

[4] Any other purpose or cause the Corporation may establish or adopt from time to time which is not inconsistent with its principal purposes and which does not jeopardize its status as a tax exempt organization under Section 501(c)(4) of the Code.

**ARTICLE VIII.**

The Corporation is authorized to accept, hold, administer, invest, and disburse its funds and assets in any manner or fashion consistent with any one or more of its purposes, and in general to do all things that may appear necessary or useful in accomplishing any one or more of the purposes set out in Article VII of this Amended and Restated Charter.

**ARTICLE IX.**

No part of the net earnings of the Corporation shall inure to the benefit of or be distributable to any member, director, or officer of the Corporation, or any other private person, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and expenses incurred and to make payments and distributions in furtherance of its purposes as set forth in this Charter. Notwithstanding any other provision of this Charter, the Corporation shall not carry on any other activities not permitted to be carried on by a corporation organized and operated exclusively for exempt purposes within the meaning of the Internal Revenue Code.

**ARTICLE X.**

In the event of termination, dissolution, or winding up of the Corporation in any manner or for any reason whatsoever, the Directors shall, after paying or making provision for the payment of all of the liabilities of the Corporation, distribute all of the remaining assets of the Corporation (i) American Civil Liberties Union, Inc. if still recognized as an organization under § 501(c)(4) of the Internal Revenue Code of 1986 or, if not, to any organization which shall then qualify as exempt as an organization described in § 501(c)(4) of the Internal Revenue Code of 1986, or corresponding provisions of any prior or future law or to more than one such exempt organization; or (ii) to any state or any governmental subdivision thereof exclusively for public purposes. The distribution shall be determined by the Directors of the Corporation or, in default

of any such determination, distribution shall be made to the State of Tennessee exclusively for public purposes.

## ARTICLE XI.

The affairs and activities of the Corporation shall be managed by a Board of Directors. The Board of Directors shall be entitled and authorized to do any and all things and take any and all actions in the name of the Corporation and on behalf of the Corporation as are not inconsistent with the purposes of the Corporation and as may be allowed under the laws of the State of Tennessee, as amended from time to time. The manner in which directors shall be chosen and removed from the office, the qualifications, powers and limitations thereon, duties, compensation, and tenure of office of directors, the number of directors, the manner of filling vacancies on the Board of Directors, and the manner calling and holding meetings of the Board of Directors shall be as set forth in the Bylaws. The directors of the Corporation may take any action which they are required or permitted to take without a meeting on one or more written consents.

## ARTICLE XII.

The directors shall not be personally liable to the Corporation for breach of fiduciary duty except in the case of the breach of a director's duty of loyalty to the Corporation, or for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or liabilities under T.C.A. Section 48-58-304 of the Tennessee Nonprofit Corporation Act. If the Tennessee Nonprofit Corporation Act is amended or superseded after the filing of this Amended and Restated Charter to further eliminate or limit the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Tennessee Nonprofit Corporation Act as so amended or by such act as may supersede it. Any repeal or modification of this Article XII shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE XIII

This Charter may be amended at any time and from time to time by the affirmative vote of a majority of the directors then in office.

## CERTIFICATE

The Amended and Restated Charter was duly adopted on December 7, 2023 by the members of the Corporation.

Additional approval for the amendment, as permitted by §48-60-301 of the Tennessee Nonprofit Corporation Act, was not required.

Dated December ____, 2023.

ACLU OF TENNESSEE, INC.

By:____________________________
David Taylor
President

ATTEST:

____________________________
Buzz Sienknecht
Secretary

STATE OF TENNESSEE )
COUNTY OF DAVIDSON )

Personally appeared before me, a Notary Public of the County aforesaid, David Taylor and Buzz Sienknecht, with whom I am personally acquainted and who made oath before me in due form of law that David Taylor is the President and Buzz Sienknecht is the Secretary of ACLU of Tennessee, Inc. and that the statements made in the foregoing Amended and Restated Charter are true.

Witness my hand and official seal at office in Nashville, Tennessee this _____ day of December, 2023.

_______________________________
Notary Public

My commission expires:_________________

# EXHIBIT 58

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE | ) | |
| *Plaintiff*, | ) | No. 3:25-cv-00584 |
| v. | ) | |
| KNOX COUNTY BOARD OF EDUCATION, *et al.*, | ) | |
| *Defendants*. | ) | |

**CARROLL INTERVENOR-DEFENDANTS' SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33 and for the purposes of the above action only, Intervenors Adrienne Carroll, Ciara Crutcher, Tiffany Nash, Evelyn Henderson, Shakeithia Rice, and Holly Slater ("Tennessee Families"), by and through undersigned counsel, hereby supplement their May 11, 2026 Answers to the First Set of Interrogatories propounded by Plaintiff, The Wilberforce Academy of Knoxville to Tennessee Families, as discussed with Plaintiff's counsel during the meet and confer on May 28, 2026. For ease of reference, Tennessee Families' supplemental answers are set forth in boldface type.

**GENERAL OBJECTIONS**

1. Tennessee Families object generally to these interrogatories to the extent the requests seek information and documents subject to the attorney-client privilege, the work-product doctrine, and/or the joint defense or common interest privilege or any other applicable privilege or doctrine. None of Tennessee Families' responses are intended to be, or should be construed as, a

(b) The right to object on any grounds to the use of any of these responses, produced documents, or the subject matter thereof, in any proceeding or trial of this or any other action;

(c) The right to object on any grounds at any time to a demand for further responses to these or to any other interrogatories involving or related to the subject matter of the answers or responses herein; and

(d) The right to at any time revise, correct, supplement, clarify, or amend the responses and objections set forth herein based upon Tennessee Families' further investigation of the subject matter at issue in this civil action or as permitted by the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

Subject to Tennessee Families' general and specific objections and to Tennessee Families' reservation of rights set forth above and without waiving any general or specific objections or reservations, Tennessee Families responds to Plaintiff's individual interrogatories as set forth below:

## INTERROGATORIES

1. Identify and fully describe whether and under what circumstances a decision in Plaintiff's favor by the district court in this case would give you Article III standing to appeal.

**ANSWER:** Tennessee Families object to this interrogatory as overbroad, unduly burdensome, and outside the scope of permissible discovery under the Federal Rules of Civil Procedure because it does not seek discovery that is "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Tennessee Families further object to this interrogatory as premature and because it is an improper hypothetical insofar as it relates to undefined "circumstances" (which term is vague, ambiguous, and subject to multiple interpretations) and a decision by the district court that has not yet occurred and, thus, seeks information that is not and cannot be ascertained

at this time and/or is not within intervenors' possession, custody, or control. *See, e.g.*, *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) ("[A]n intervenor must independently demonstrate standing" if and when it seeks "to appeal a decision that the primary party does not challenge."); *Ass'n of Banks in Ins., Inc. v. Duryee*, 270 F.3d 397, 402–03 (6th Cir. 2001) ("When considering whether the intervenor-defendants have standing to appeal, our focus is on the injury caused by the judgment rather than the injury caused by the underlying facts."). Tennessee Families also object to this interrogatory because, as written, it seeks information protected by the attorney-client privilege and attorney work product doctrine.

**SUPPLEMENTAL ANSWER: Subject to these and to all of Tennessee Families' general and specific objections and reservation of rights and without waiving any of them, Tennessee Families state that, although the hypothetical basis for their future appellate standing if Plaintiff prevails in the district court cannot be known at this time, Intervenors Adrienne Carroll, Ciara Crutcher, Tiffany Nash, Evelyn Henderson, Shakeithia Rice, and Holly Slater are not taxpaying residents of Knox County, Tennessee.**

2. Identify each of your children by name, age, current grade, current school, and anticipated schools through 12th grade.

**ANSWER:** Tennessee Families object to this request as overbroad, unduly burdensome, and outside the scope of permissible discovery under the Federal Rules of Civil Procedure because it seeks personally identifying information for minor, non-parties and, therefore, does not seek discovery that is "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1); *see also* Fed. R. Civ. P. 5.2 (privacy protections for court filings involving an individual known to be a minor). Tennessee Families further object to this interrogatory because, to the extent that the requested information is relevant to prove that the Tennessee Families' children attend public charter

schools, all pertinent information was provided in Tennessee Families' respective declarations as filed with their Motion to Intervene (Docs. 60-1, 60-2, 60-3, 60-4, 60-5, 60-6).

**SUPPLEMENTAL ANSWER: Subject to these and to all of Tennessee Families' general and specific objections and reservation of rights and without waiving any of them as well as the caveat that the answers below are based on current information and intentions which may change, Tennessee Families state as follows with respect to Intervenors Adrienne Carroll, Ciara Crutcher, Tiffany Nash, Evelyn Henderson, Shakeithia Rice, and Holly Slater:**

**Adrienne Carroll: Ms. Carroll has one child, A.R., in a public charter school who is a rising 8th grader at Grizzlies Prep Charter School in Memphis. After 8th grade, her child plans to attend PURE Academy in Memphis until her child's high school graduation.**

**Ciara Crutcher: Ms. Crutcher has three children, C.C., C.C, and C.C., in public charter schools. Two are rising 5th and 7th graders, respectively, at East End Preparatory School in Nashville who plan to attend RePublic High School in Nashville after finishing 8th grade. Her other child is a rising 10th grader at RePublic High School in Nashville. All three children plan to attend these schools until each child's high school graduation from RePublic High School.**

**Tiffany Nash: Ms. Nash has one child, T.N., in a public charter school who is a rising 6th grader at Tennessee Career Academy in Memphis. Her child plans to attend Tennessee Career Academy until her child's high school graduation.**

**Evelyn Henderson: Ms. Henderson has two children, J.H. and V.H., in public charter schools. J.H. is a rising 2nd grader at Skillern Elementary in Soddy Daisy, and V.H. is a rising 5th grader at Skillern Elementary. After each completes 5th grade at Skillern Elementary, both children plan to attend Ivy Academy in Soddy Daisy until each child's high school graduation.**

**Shakeithia Rice: Ms. Rice has one child, J.B., in a public charter school who is a rising 6th grader at East End Preparatory School in Nashville. Her child plans to attend East End Prep through 8th grade. Ms. Rice has not yet determined where her child will attend high school.**

**Holly Slater: Ms. Slater has two children, H.S. and C.S., in public charter schools. H.S. is a rising 2nd grader at Skillern Elementary in Soddy Daisy, and C.S. is a rising 5th grader at Skillern Elementary. After each completes 5th grade at Skillern Elementary, both children plan to attend Ivy Academy in Soddy Daisy until each child's high school graduation.**

Respectfully submitted,

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.

*s/Thomas H. Jarvis*
David D. Ayliffe (BPR #024297)
Thomas H. Jarvis (BPR #036835)
Erika L. Hughes (BPR #035755)
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
(865) 549-7000
dayliffe@bakerdonelson.com
tjarvis@bakerdonelson.com
ehughes@bakerdonelson.com

*Attorneys for Adrienne Carroll, Ciara Crutcher, Tiffany Nash, Evelyn Henderson, Shakeithia Rice, and Holly Slater*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2026, a copy of the foregoing document was served by sending it via electronic mail to the counsel listed below:

Cameron T. Norris
Ryan M. Proctor*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
ryan@consovoymccarthy.com
*admitted pro hac vice

*Attorneys for Plaintiff*

David M. Sanders
Senior Deputy Law Director
Jessica Jernigan-Johnson
Deputy Law Director
Knox County Law Director's Office
400 Main Street, Suite 612
Knoxville, TN 37902
(865) 215-2327
david.sanders@knoxcounty.org
jessica.johnson@knoxcounty.org

*Attorneys for Defendants*

Adam J. Hunt*
Morrison Foerster LLP
250 West 55th Street
New York, NY 10019-9601
Telephone: 212.468.8000
Facsimile: 212.468.7900
Email: adamhunt@mofo.com

Wanqian Zhang*
Morrison Foerster LLP
425 Market Street
San Francisco, CA 91105
Telephone: 415.268.7108
Email: wzhang@mofo.com

Jonathan James McNeal*
Morrison Foerster LLP
12531 High Bluff Dr. #100
San Diego, CA 92130
Telephone: 858.720.5100
Email: jmcneal@mofo.com

Mitchell E. Feldman*
Morrison Foerster LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
Telephone: 617.648.4759
Facsimile: 617.830.0142
Email: mfeldman@mofo.com

Lucas Cameron-Vaughn
American Civil Liberties Union Foundation
of Tennessee
P.O. Box 120160
Nashville, TN 37212
Telephone: 615.645.5067
Email: lucas@aclu-tn.org

Alex J. Luchenitser*
Luke Anderson*
Americans United for Separation of Church
and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: 202.466.3234
Facsimile: 202.217.3783

Email: luchenitser@au.org
Email: anderson@au.org

Daniel Mach*
Heather L. Weaver*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Telephone: 202.675.2330
Facsimile: 202.546.0738
Email: dmach@aclu.org
Email: hweaver@aclu.org

Sophia Mire Hill
Sam Boyd*
Neil Ranu*
Lauren Winkler*
Michael Tafelski*
Southern Poverty Law Center
150 E. Ponce de Leon, Suite 340
Decatur, GA 30030
Telephone: 504.457.1553
Email: sophia.mire@splcenter.org
Email: sam.boyd@splcenter.org
Email: neil.ranu@splcenter.org
Email: lauren.winkler@splcenter.org
Email: michael.tafelski@splcenter.org

Jessica Levin*
Wendy Lecker*
Patrick Cremin*
Katrina Reichert*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: 973.624.1815
Facsimile: 973.624.7339
Email: jlevin@edlawcenter.org
Email: wlecker@edlawcenter.org
Email: pcremin@edlawcenter.org
Email: kreichert@edlawcenter.org

Samuel T. Grover*
Kyle J. Steinberg*
Freedom from Religion Foundation, Inc.
10 N. Henry St.

Madison, WI 53703
Telephone: 608.256.8900
Email: sam@ffrf.org
Email: steinbergk@ffrf.org
* Admitted pro hac vice.

*Attorneys for Intervenor-Defendants Rev. Dr. Richard Coble, Amanda Collins, Kerry Dooley, Elizabeth Porter, and Rev. Dr. Katina Sharp*

*s/ Thomas H. Jarvis*
*Attorney for Adrienne Carroll, Ciara Crutcher, Tiffany Nash, Evelyn Henderson, Shakeithia Rice, and Holly Slater*

# VERIFICATION

STATE OF TENNESSEE:

COUNTY OF Shelby :

I, Adrienne Carroll, execute the foregoing Answers to Interrogatories. The information in such Answers is personally known to me, and, to the best of my information and belief, the matters set forth in the Answers are true and correct.

The Answers are made without in any way waiving or intending to waive any objections that Carroll Intervenors may have with respect to the subsequent use of the Answers, and Carroll Intervenors specifically reserve (a) all questions as to the competency, privilege, relevancy, materiality, and admissibility of any and all of the Answers, in whole or in part, or the subject matter thereof; (b) the right to object to the use of any of the Answers in whole or in part, or the subject matter covered thereby, in any subsequent step or proceeding in this action, on any or all of the foregoing grounds or on any proper grounds whether or not enumerated above; and (c) the right to object on any and all grounds, at any time, to any interrogatories or other discovery procedures involving or related to the subject matter of the Interrogatories at any time, upon proper showing, to revise, correct, or clarify any of the Answers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of June, 2026.

Adrienne Carroll

## VERIFICATION

STATE OF TENNESSEE:

COUNTY OF HAMILTON:

I, Holly Slater, execute the foregoing Answers to Interrogatories. The information in such Answers is personally known to me, and, to the best of my information and belief, the matters set forth in the Answers are true and correct.

The Answers are made without in any way waiving or intending to waive any objections that Carroll Intervenors may have with respect to the subsequent use of the Answers, and Carroll Intervenors specifically reserve (a) all questions as to the competency, privilege, relevancy, materiality, and admissibility of any and all of the Answers, in whole or in part, or the subject matter thereof; (b) the right to object to the use of any of the Answers in whole or in part, or the subject matter covered thereby, in any subsequent step or proceeding in this action, on any or all of the foregoing grounds or on any proper grounds whether or not enumerated above; and (c) the right to object on any and all grounds, at any time, to any interrogatories or other discovery procedures involving or related to the subject matter of the Interrogatories at any time, upon proper showing, to revise, correct, or clarify any of the Answers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18 day of 6, 2026.

[signature]

Holly Slater

## VERIFICATION

STATE OF TENNESSEE:

COUNTY OF Hamilton :

I, Evelyn Henderson, execute the foregoing Answers to Interrogatories. The information in such Answers is personally known to me, and, to the best of my information and belief, the matters set forth in the Answers are true and correct.

The Answers are made without in any way waiving or intending to waive any objections that Carroll Intervenors may have with respect to the subsequent use of the Answers, and Carroll Intervenors specifically reserve (a) all questions as to the competency, privilege, relevancy, materiality, and admissibility of any and all of the Answers, in whole or in part, or the subject matter thereof; (b) the right to object to the use of any of the Answers in whole or in part, or the subject matter covered thereby, in any subsequent step or proceeding in this action, on any or all of the foregoing grounds or on any proper grounds whether or not enumerated above; and (c) the right to object on any and all grounds, at any time, to any interrogatories or other discovery procedures involving or related to the subject matter of the Interrogatories at any time, upon proper showing, to revise, correct, or clarify any of the Answers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26 day of June, 2026.

Evelyn S. Henderson
Evelyn Henderson

## VERIFICATION

STATE OF TENNESSEE:

COUNTY OF Shelby.

I, Tiffany Nash, execute the foregoing Answers to Interrogatories. The information in such Answers is personally known to me, and, to the best of my information and belief, the matters set forth in the Answers are true and correct.

The Answers are made without in any way waiving or intending to waive any objections that Carroll Intervenors may have with respect to the subsequent use of the Answers, and Carroll Intervenors specifically reserve (a) all questions as to the competency, privilege, relevancy, materiality, and admissibility of any and all of the Answers, in whole or in part, or the subject matter thereof; (b) the right to object to the use of any of the Answers in whole or in part, or the subject matter covered thereby, in any subsequent step or proceeding in this action, on any or all of the foregoing grounds or on any proper grounds whether or not enumerated above; and (c) the right to object on any and all grounds, at any time, to any interrogatories or other discovery procedures involving or related to the subject matter of the Interrogatories at any time, upon proper showing, to revise, correct, or clarify any of the Answers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of June, 2026.

Tiffany M. Nash

Tiffany Nash

## VERIFICATION

STATE OF TENNESSEE:

COUNTY OF Davidson :

I, Shakeithia Rice, execute the foregoing Answers to Interrogatories. The information in such Answers is personally known to me, and, to the best of my information and belief, the matters set forth in the Answers are true and correct.

The Answers are made without in any way waiving or intending to waive any objections that Carroll Intervenors may have with respect to the subsequent use of the Answers, and Carroll Intervenors specifically reserve (a) all questions as to the competency, privilege, relevancy, materiality, and admissibility of any and all of the Answers, in whole or in part, or the subject matter thereof; (b) the right to object to the use of any of the Answers in whole or in part, or the subject matter covered thereby, in any subsequent step or proceeding in this action, on any or all of the foregoing grounds or on any proper grounds whether or not enumerated above; and (c) the right to object on any and all grounds, at any time, to any interrogatories or other discovery procedures involving or related to the subject matter of the Interrogatories at any time, upon proper showing, to revise, correct, or clarify any of the Answers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of July, 2026.

Shakeithia Rice

Shakeithia Rice

# EXHIBIT 59

1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

THE WILBERFORCE ACADEMY OF :
KNOXVILLE, :
Plaintiff, : Case No.
v. : 3:25-cv-584-CEA-DCP
KNOX COUNTY BOARD OF EDUCATION,:
et al., :
Defendants. :
:
RICHARD COBLE, et al., :
Intervenor-Defendants, :
:
ADRIENNE CARROLL, et al., :
Intervenor-Defendants. :

REMOTE DEPOSITION of HOLLY SLATER
Thursday, June 18, 2026
9:18 a.m. CST
Job No.: 638640
Pages: 1 - 290
Stenographically Reported By:
Michelle M. Yohler, CSR, RMR, CRR

2

The deposition of HOLLY SLATER, held remotely pursuant to notice before Michelle M. Yohler, a Certified Shorthand Reporter, Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, CSR No. 84-4531, in and for the State of Illinois.

3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
MR. CAMERON T. NORRIS
MR. RYAN PROCTOR
CONSOVOY McCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
703.243.9423
cam@consovoymccarthy.com
ryan@consovoymccarthy.com

ON BEHALF OF DEFENDANT:
MR. DAVID M. SANDERS
KNOX COUNTY LAW DIRECTOR'S OFFICE
400 Main Street, Suite 612
Knoxville, Tennessee 37902
865.215.2327
david.sanders@knoxcounty.org

(Continued)

4

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF THE CARROLL INTERVENORS:
MR. DAVID D. AYLIFFE
MR. THOMAS H. JARVIS
BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ, PC
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
865.549.7000
dayliffe@bakerdonelson.com
tjarvis@bakerdonelson.com

ON BEHALF OF THE COBLE INTERVENORS:
MS. SOPHIA MIRE HILL
SOUTHERN POVERTY LAW CENTER
150 East Ponce de Leon Avenue, Suite 340
Decatur, Georgia 30030
334.315.0179
sophia.mire@splcenter.org

ALSO PRESENT:
MR. BLAKE WINCHESTER, Technician

133

Q Okay. You use "child's" apostrophe S; that's singular, correct?
**A Yes.**
Q Is that because only your youngest child still has a Section 504 plan in place?
**A Probably.**
**Yes, because I only have one child with a 504 plan at this time.**
Q Okay. Thank you.
You testify, quote: Plaintiff seeks to have charter schools in Tennessee, like Skillern, classified and treated as private schools, end quote.
Do you see that?
**A Yes.**
Q What is your basis for that representation -- sorry. What is your basis for that testimony?
**A I felt like what was trying to happen was if we brought in, you know, a Christian charter school, it would make it private, and it would -- you know, because charter schools are public, they're not private.**
Q Have you read the complaint that the plaintiff filed in this case?

134

**A No, I have not.**
Q It's not a good read, I promise, but did you read --
**A Okay. I think I might have been sent it at some point, but it's hard to understand and read, so I don't really remember exacts or anything.**
Q Did you read the second complaint that the plaintiff filed in this case?
**A I do not remember.**
Q Have you read the plaintiff's motion for summary judgment in this case?
**A I do not recall.**
Q Do you know what a motion for summary judgment is?
**A No, I do not.**
Q Do you know what a complaint is?
**A (Inaudible) problem with something.**
Q Can you repeat that? I'm sorry.
**A Having a problem with something.**
Q Do you know what a complaint is in a federal lawsuit?
**A No.**
Q I believe you can't -- your testimony is that you can't remember whether you've read either

135

the complaint, the second complaint, or the motion for summary judgment; is that correct?
**A Correct.**
MR. NORRIS: Can we pull up Exhibit 7.
(WHEREUPON, Slater Exhibit No. 7 was presented to the witness.)
BY MR. NORRIS:
Q Have you ever seen this document?
**A Some things look vaguely familiar, and I don't want to say I've never seen it just in case the lawyers sent it to me and I looked it over, but I don't really -- I don't remember it, no.**
Q Have you ever read it closely?
**A No.**
Q Okay.
MR. NORRIS: Can we pull up Exhibit 8.
(WHEREUPON, Slater Exhibit No. 8 was presented to the witness.)
BY MR. NORRIS:
Q Have you ever seen this document?
THE WITNESS: Just one page?
MR. AYLIFFE: Multiple pages.
BY THE WITNESS:
**A Same thing; I might have seen it; I don't recall, and I did not read it closely.**

136

**BY MR. NORRIS:**
Q And Exhibit 7 was --
MR. NORRIS: Can we go back to Exhibit 7 on the first page, please.
BY MR. NORRIS:
Q Just for the record, Exhibit 7 was the verified amended complaint in this case; is that correct?
**A Yes.**
Q And Exhibit 8, can we go to the first page. Exhibit 8 was plaintiff's motion for summary judgment on liability and declaratory and injunctive relief in this case, correct?
**A Yes.**
Q Okay. Do you recall in --
MR. NORRIS: Can we go back to Exhibit 6, please, Paragraph 21.
BY MR. NORRIS:
Q Do you recall your testimony that, quote, plaintiff seeks to have charter schools in Tennessee, like Skillern, classified and treated as private schools?
**A Yes.**
Q Is that testimony based in either the amended complaint, Exhibit 7, or the plaintiff's

137

motion for summary judgment, Exhibit 8?
MR. AYLIFFE: Object to the form.
But you can answer if you understand.
BY THE WITNESS:
**A I do not know.**
**BY MR. NORRIS:**
Q You didn't closely read either document, correct?
**A Correct.**
Q So is it fair to say your testimony in Paragraph 21 is not based on either of those two documents?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A Yes.**
**BY MR. NORRIS:**
Q Okay. What is the basis for your testimony in the last two lines of Paragraph 21 that plaintiff seeks to have charter schools in Tennessee, like Skillern, classified and treated as private schools?
MR. AYLIFFE: Object to the form as asked and answered.
And also to the extent you have to answer

138

that by relying on a confidential attorney-client communication, I'd instruct you not to do that, but to the extent you can answer without doing -- relying on attorney-client communication, then you're free to answer it.
BY THE WITNESS:
**A I won't answer.**
**BY MR. NORRIS:**
Q Okay. To clarify, there is no basis for that testimony in Paragraph 21 that does not come from your attorneys; is that correct?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A The Tennessee Charter School Center as well had sent out information about it.**
**BY MR. NORRIS:**
Q Okay. What information did the Tennessee Charter Center send out about this case?
**A Just --**
Q Scratch that.
What information did the Tennessee Charter Center send out about this case that you received?
**A I have -- I have the emails because I was instructed to keep all the emails from this case, but I don't remember exactly. But there was -- it**

139

**was just them reaching out because there was, you know, threats such as this to charter schools being treated as private.**
Q Are those emails newsletters that are sent out broadly?
**A I do not believe they were sent out broadly.**
Q Are those emails sent from the Tennessee Charter Center to a limited set of people?
**A Yes.**
Q Who were they sent to?
**A I cannot remember.**
Q How many people were they sent to?
**A I cannot remember.**
Q Were they sent to less than ten people?
**A I can't remember.**
Q Do you know if those emails were sent to the group of intervenors that you were a part of in this case?
**A I do not know.**
Q What is the nature of what those emails say?
**A That there is a case that could threaten for us to lose -- like, it's a threat because we could lose things like things that make us public**

140

**schools.**
Q Why did you receive that -- those emails?
**A I don't remember.**
Q Do you remember why you received any one of those emails?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A I don't. It was a long time ago. Just maybe informative and do you have anybody that can help, just because we're a part of the Tennessee Charter School Center.**
**BY MR. NORRIS:**
Q Do you know how long approximately the first of those emails was sent to you?
**A Maybe January or February.**
Q Is that the year 2026?
**A Yes.**
Q Were those emails sent to you because you are a leader of a Tennessee charter school?
MR. AYLIFFE: Object to the form.
You can answer if you know why.
BY THE WITNESS:
**A I do not remember.**

141

BY MR. NORRIS:
Q Were those emails addressed to Tennessee charter school leaders?
**A I do not remember.**
Q Were they addressed to Holly Slater?
**A I do not remember.**
Q You don't remember if you received an individual email from the Tennessee Public Charter Center about this case; is that your testimony?
**A Yes, I don't know if it went to, like you said, a group or if it went to -- like, a specific group or if it went just to me and a few individuals. I don't remember who it was addressed to.**
Q Let me be more specific. I'm not asking who was in the "To" line of the emails; I'm asking who the email is addressed to in the body: Dear so and so.
Does that distinction make sense?
**A Are you asking if it was my name, "Dear Holly"?**
Q Right. Is there an email, the body of which -- from the Tennessee Charter Center, the body of which says: "Dear Holly Slater"?
**A I do not believe so; I believe it was grouped, but I don't know what group, how many people. I don't remember.**

142

Q Do you recall, does this -- do you recall that those emails were addressed to East Tennessee school leaders?
**A I don't remember.**
Q And is it fair to say that Tennessee public -- the Tennessee Charter Center was recruiting individuals to join this litigation?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A I think they said something about there's an opportunity to help if, you know, you -- if there's somebody that wants to and they have experience, you know, they're -- if they have experience with students with 504s and gave you some information.**
**BY MR. NORRIS:**
Q Did you respond to one of those emails?
**A I must have.**
Q Is that how you came to be involved in this case?
**A Yes.**
Q So backing up -- I'm sorry. We got a little sidetracked there.

143

Backing up, the testimony you gave in Paragraph 21 of Exhibit 6, I believe your testimony -- but correct me if I'm wrong -- was that that testimony is based on information provided to you by the Tennessee Charter Center; is that correct?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A Can you ask that one more time?**
**BY MR. NORRIS:**
Q Yeah, the -- do you remember we were talking about Paragraph 21?
**A Yes.**
Q Your testimony in that paragraph, is it your testimony that that -- that's a terrible question -- scratch that.
Is it your testimony that Paragraph 21 is based on information that you received from the Tennessee Charter Center?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A Yes, and conversations between my -- the attorneys and I.**

144

**BY MR. NORRIS:**
Q Right. And I don't want you to reveal those, but thank you.
And there's no other basis for your testimony in Paragraph 21, correct?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A Yes.**
**BY MR. NORRIS:**
Q Do you know if Wilberforce Academy believes that its Christian charter school will be subject to Section 504?
**A Say that one more time.**
Q Yeah, actually scratch the question.
**A Okay.**
Q Has Wilberforce Academy said that its Christian charter school, if allowed to open, would not be subject to Section 504 of the Rehabilitation Act?
**A If they did and it was not considered public, then it would be private, and then they wouldn't have to do that.**
**Does that make sense?**
Q It does not, but maybe my question doesn't

145

either. Are you --
**A Okay --**
Q -- aware that Wilberforce Academy -- sorry. To your knowledge, has Wilberforce Academy ever stated publicly that its Christian charter school would not be subject to the standards of -- that apply to public schools under Section 504?
MR. AYLIFFE: Object to the form. Calls for a legal conclusion.
But you can answer to the extent you can.
BY THE WITNESS:
**A I would just assume if they were approved, they would be private, and with private schools, you don't have to do that.**
**No, no one said that they wouldn't, but they wouldn't be required to do that either.**
**BY MR. NORRIS:**
Q To your knowledge, has Wilberforce Academy ever said that its proposed Christian charter school would be a private school for purposes of Section 504 of the Rehabilitation Act?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A We -- I don't know. I assume that if**

146

**they're approved, they would be private so...**
**BY MR. NORRIS:**
Q You are assuming that Wilberforce Academy would be classified by the government as private; is that your testimony?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I'm assuming because public schools can't be religious, that this would be a private school.**
**BY MR. NORRIS:**
Q Is your assumption based on anything that you have seen, read, or heard of from Wilberforce Academy?
**A No.**
Q Have you seen Wilberforce Academy's draft charter application?
**A No.**
Q Are you aware that it was produced to you in this litigation?
**A I do not know.**
Q So you don't know whether that draft charter application says anything about Wilberforce Academy and its classification as public or private under Section 504; is that correct?

147

**A I do not -- yes, I do not know.**
Q Okay.
MR. NORRIS: Can we look at Paragraph 22 of Exhibit 6.
BY MR. NORRIS:
Q Paragraph 22 says: "It is my understanding that classifying charter schools in Tennessee, like Skillern, as private schools could result in the application of Section 504's provisions relating to private schools rather than the provisions regarding public schools, resulting in significantly reduced protections against discrimination and equal access for students like my child."
Did I read that correctly?
**A Yes.**
Q You used the words "could result," not "will result," correct?
**A Yes.**
Q Why did you hedge with the word "could"?
**A Because I think that you would have that choice. If you're private, you have the choice to do 504s or to not do 504s.**
Q Who is the "you" in that sentence?
**A Oh, a private school has a choice. So it**

148

**could result in the application of Section 504, provisions relating to private schools, rather than regarding to public schools.**
Q I think I understand. So your testimony is that Skillern could choose to behave like a public school for purpose -- Sorry. Scratch that.
Your testimony is that Skillern could choose to comply with the Section 504 requirements that apply to public schools, correct?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A If they were private schools. Private schools can choose whether to do that or not.**
**BY MR. NORRIS:**
Q Okay.
**A But they don't have to.**
Q Well, you reference in this paragraph: "Section 504's provisions relating to private schools."
Do you see that?
**A Mm-hm.**
Q What are --
MR. AYLIFFE: (Inaudible.)
BY THE WITNESS:
**A Yes.**

149

BY MR. NORRIS:
Q Thank you.
What are Section 504's provisions relating to private schools?
MR. AYLIFFE: Objection to the form. Calls for a legal conclusion.
You can answer if you know.
BY THE WITNESS:
**A I don't.**
**BY MR. NORRIS:**
Q You're concerned that Section 504's provision relating to private schools will govern at Skillern, correct?
MR. AYLIFFE: Object to the form.
BY MR. NORRIS:
Q Scratch the question.
If Wilberforce is successful in this litigation, you are concerned that Skillern will be governed by, quote, Section 504's provisions relating to private schools, quote; is that correct?
**A Yes.**
Q But you don't know what those provisions are; is that correct?
**A Where you don't have to do certain things.**

150

Q Is it your understanding that private schools do have to do certain things as well under Section 504?
**A I do not know.**
Q Okay. Do you think private schools that are subject to Section 504 have no obligations under Section 504?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I do not know.**
**BY MR. NORRIS:**
Q Let's say Section 504 was repealed tomorrow; could Skillern choose to accommodate your youngest child in all of the same ways they are doing so now?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A Yes.**
**BY MR. NORRIS:**
Q Is Skillern a school that is hospitable to students with disabilities?
**A Yes.**
Q Is the only reason it accommodates students with disabilities is because there's a

151

federal statute requiring it to do so?
**A No. The way it's done I think is based on, you know, legal requirements.**
Q But those legal requirements, if they were no longer legal requirements, Skillern could still choose to accommodate a student in all the same ways; that was your testimony, correct?
**A Yes. They may not be able to if they weren't getting federal funding to do so, though, so even if they wanted to, they may not be able to.**
Q So if Wilberforce Academy was successful and if Skillern was now classified as a private school, your fear about the end of Section 504 plans requires the federal government to cut off funding first for Skillern; is that correct?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A I would have definite fears about if it was a private school and it didn't get the same funding, yes.**
**BY MR. NORRIS:**
Q Who determines whether a school is public or private for purposes of Section 504?

152

**A If you're being funded by state and federal dollars.**
Q Is Section 504 a state statute?
**A I believe it's federal.**
Q Do you believe the U.S. Department of Education administers Section 504?
MR. AYLIFFE: Form.
You can answer.
BY THE WITNESS:
**A I'm not too familiar. I don't recall.**
**BY MR. NORRIS:**
Q Do you know if the federal government has a position on whether charter schools can be religious?
**A I do not know.**
Q Are you aware that the federal government's position is that charter schools have a right to be religious?
**A No.**
Q Do you think the federal government that took the position that charter schools have the right to be religious would also take the position that religious charter schools should have their funding cut off under Section 504?
MR. AYLIFFE: Object to the form.

153

You can answer.
BY THE WITNESS:
**A I do not know.**
**BY MR. NORRIS:**
Q If Wilberforce wins this case, will Skillern become a religious charter school?
**A I do not know.**
Q Why would Skillern become a religious charter school if Wilberforce Academy won this case?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A Oh, I said I don't know.**
**BY MR. NORRIS:**
Q Why do you not know the answer to that question?
**A I --**
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I'm not a leader at Skillern Elementary.**
**BY MR. NORRIS:**
Q Would Ivy Academy become a religious charter school if Wilberforce Academy wins this case?
**A I do not know that answer either -- even**

154

**though I am the leader of Ivy Academy because we've never talked about it.**
Q Why might it become a religious charter school if Wilberforce wins this case?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A I mean, if all options change, then some people's minds could change. It's kind of up to the school board and the state if they approved it, I guess.**
**BY MR. NORRIS:**
Q What religion would Ivy Academy choose?
MR. AYLIFFE: Object to the form.
But you can answer if you have a guess.
BY THE WITNESS:
**A No one's ever talked about making it a religious school, so I would not know.**
**BY MR. NORRIS:**
Q Do the -- does the leadership at Ivy Academy share the same religion?
**A I honestly do not know that.**
Q Do you know if any two people on the board of Ivy Academy have a different religion?
**A Give me one second. I'm thinking.**

155

**You know, I think I only know one person's religion because they said one time where they went to church, and so it's an assumption based on what they said. But I don't think anybody else has said or done anything to where I would know what their religion is.**
Q Is the religion you suspect that person holds also your religion?
**A No, it is not.**
Q Would you support an effort to turn Skillern -- sorry. Would you support an effort to turn Skillern or Ivy Academy into a religious charter school?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I never thought of it because it's just not in my realm of thinking because it's a public school, but probably not our school because I don't want to make changes because I like it how it is.**
**BY MR. NORRIS:**
Q Okay. Your testimony, correct me if I'm wrong, was that if a charter school was religious, it would be treated as a private school for purposes of Section 504; isn't that correct?

156

**A That's what I would think.**
Q So would you support Skillern becoming a religious charter school and, thus, under your view, no longer having to comply with Section 504?
MR. AYLIFFE: Object to the form. Asked and answered.
BY THE WITNESS:
**A No, I put my children in public schools by choice. So, no, I wouldn't be supportive necessarily of them changing who they are.**
**BY MR. NORRIS:**
Q Has any person affiliated with Skillern said that if Wilberforce Academy prevails in this case, Skillern will become a religious charter school?
**A No, no one's said that to me.**
Q If Wilberforce Academy wins this case, will you take the position that Skillern is now a private school for purposes of the Rehabilitation Act?
MR. AYLIFFE: Object to the form. Calls for a legal conclusion.
BY THE WITNESS:
**A I don't know.**

161

referring to?
**A Where they applied to be a charter school.**
Q And where did they apply to be a charter school?
**A Knox County.**
Q Is the Hamilton County Board of Education a party to this case?
MR. AYLIFFE: Object to the form.
You can answer if you know.
BY THE WITNESS:
**A I have no reason to believe that they are.**
**BY MR. NORRIS:**
Q Do you know what an intervenor is?
**A Yes.**
Q Are you an intervenor in this case?
**A Yes.**
Q Are there other individuals who are intervenors in this case?
**A I believe there are.**
Q Are there any schools that you know of who are intervenors in this case?
**A I do not know of any schools that are intervenors in this case.**
Q If I said that Skillern is not a party to this case, would you believe me?

162

MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A I don't know.**
**BY MR. NORRIS:**
Q You don't know whether the elementary school where you work is a party to this litigation; is that correct?
**A Yes. I don't work at Skillern Elementary; I work at Ivy.**
Q That was not my question. Do you know if Ivy Academy is a party to this litigation?
**A Oh, they are not.**
Q They are not. You know that.
Do you know if Skillern is a party to this litigation?
**A I do not know about Skillern.**
Q Are you in this litigation on behalf of Ivy Academy?
**A No.**
Q Are you here only on your own individual behalf?
**A Yes.**
Q Do you know who the judge in this case is?
**A No.**

163

Q Do you think the judge's decision in this case will be legally binding on Skillern?
MR. AYLIFFE: Object to the form.
But you can answer.
BY THE WITNESS:
**A I am worried that it can change things.**
**BY MR. NORRIS:**
Q My question was do you think that the judge's decision in this case will legally bind Skillern?
MR. AYLIFFE: Object to the form. Calls for a legal conclusion.
BY THE WITNESS:
**A I do not know.**
**BY MR. NORRIS:**
Q Do you know anything about the rules concerning when decisions of federal courts bind individuals or --
**A No.**
Q -- entities?
**A No.**
MR. NORRIS: Okay. Can we look at Paragraph 25 of Exhibit 6.
BY MR. NORRIS:
Q You stated in Paragraph 5 [sic] that:

164

"The position being advocated by plaintiff in this lawsuit..." skip ahead, quote, will result in the loss of TISA funding for Skillern and will force Skillern to close, end quote.
Did I read that correctly?
MR. AYLIFFE: You mean Paragraph 25, correct?
MR. NORRIS: Paragraph 25.
BY MR. NORRIS:
Q Do you see where I'm reading from?
**A Okay.**
**I've read it.**
Q This paragraph you say: "I believe that the position being advanced by plaintiff in this lawsuit" -- skip a few words ahead -- "will result in the loss of TISA funding for Skillern."
Do you see that?
**A Yes.**
Q Did I read that correctly?
**A Yes.**
Q Did you use the words "will result"?
**A "Will result in a loss of TISA funding for Skillern," yes.**
Q Remember earlier how we talked about the words you used "could result"?

165

**A Mm-hm.**
Q Why did you use the stronger words "will result" in this paragraph?
**A I do not know.**
Q Did you intend any difference in meaning from those difference in words?
**A I did not.**
Q Did you write those words?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A This is --**
MR. AYLIFFE: You can answer if you wrote them.
BY THE WITNESS:
**A No, with a lawyer.**
**BY MR. NORRIS:**
Q Did you write any of the words in this document?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A I spoke out loud and it was transcribed.**
**BY MR. NORRIS:**
Q This document is a transcription of things that you said out loud; is that correct?

166

**A Yes, and then put into -- and then put into paragraph form.**
Q Your testimony is that you orally said all of these things and they were transcribed word from word into this document?
MR. AYLIFFE: Object to the form.
I'm going to instruct you not to answer to the extent you -- it would require to divulge attorney-client communications, but if you can answer without doing so, you're free to do so.
THE WITNESS: Okay.
BY THE WITNESS:
**A It was just written with the attorneys.**
**BY MR. NORRIS:**
Q Without getting into the substance of what you discussed with your attorneys, they did not transcribe word for word something that you said out loud to them, correct?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A It is not word for word.**
**BY MR. NORRIS:**
Q Are any of the words in this litigation verbatim what you said -- scratch that.
Let's look at -- let's look back at

167

Paragraph 25. Do you recall your testimony that, if Wilberforce is successful in this lawsuit, it will result in the loss of TISA funding for Skillern?
**A What's the question?**
Q Do you recall that testimony?
MR. AYLIFFE: Are you referring to Paragraph 25?
BY MR. NORRIS:
Q Paragraph 25, do you recall your testimony in Paragraph 25 that if Wilberforce is successful in this lawsuit, that that will result in the loss of TISA funding for Skillern?
**A I probably said something along the lines -- I mean, I agree with this, if we all went private, we would lose our TISA funding.**
Q Has Wilberforce ever said anything to your knowledge about whether its proposed Christian charter school will receive TISA funding?
**A No, I would just assume if it were private, then it would not receive TISA funding.**
Q And, as with your prior testimony, that assumption is not based on anything you have seen, read, or heard from Wilberforce Academy; is that correct?

168

**A That's correct.**
Q Is your assumption based on what you were told by the Tennessee Charter Center?
**A And attorney.**
MR. AYLIFFE: Object to form.
And just instruct you not to answer to the extent you have to divulge attorney-client communication.
BY MR. NORRIS:
Q Let me ask it a different way.
You previously testified that -- about your opinion on Section 504 was based on what you were told by the Tennessee Charter Center and your attorneys, correct?
**A Yes.**
Q And the same is true for Paragraph 25; is that correct?
**A Yes.**
Q Okay. So you're not aware that Wilberforce Academy wants TISA funding for its proposed Christian charter school, correct?
**A I am not aware.**
Q And you have not read the draft charter application that Wilberforce Academy put together, correct?

169

**A I am not.**
Q And you're not aware that that draft charter application contemplates that Wilberforce will receive TISA funding, correct?
**A I am not aware.**
Q If Wilberforce Academy wins this case, will you advise Ivy Academy to take the position that it is now a private school for purposes of TISA?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I hope not.**
**BY MR. NORRIS:**
Q I'm asking what you would advise Ivy Academy. Would you advise Ivy Academy that it is now a private school that is ineligible for TISA funding?
MR. AYLIFFE: Object to the form.
You can answer if you give that kind of advice.
BY THE WITNESS:
**A I don't know. I mean, if we were all of a sudden private, then I would have to state that.**
**BY MR. NORRIS:**
Q Can you repeat that testimony?

170

**A If all of a sudden we were made private, then I would have to state that.**
Q Why would Wilberforce's success in this lawsuit make Ivy Academy a private school for purposes of TISA funding?
MR. AYLIFFE: Object to the form. Calls for a legal conclusion.
You can answer.
BY THE WITNESS:
**A I don't -- I don't know.**
**BY MR. NORRIS:**
Q But you fear that that would be the result of Wilberforce Academy's success, correct?
**A Yes, that it would privatize charter schools.**
Q But you don't know why Wilberforce's success would privatize Ivy Academy, correct?
**A I do not know.**
Q So is it fair to say your fear is not based on any information?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I don't know.**
**BY MR. NORRIS:**
Q You don't know if your fear is not based

171

on any information; is that correct?
MR. AYLIFFE: Object to the form. And this one's been asked and answered.
But you're free to answer it again.
BY THE WITNESS:
**A I don't know.**
**BY MR. NORRIS:**
Q Sorry. You don't know if you don't know if your belief is informed by any information; is that your testimony?
MR. AYLIFFE: Object to the form.
BY MR. NORRIS:
Q You can scratch that question. Don't -- I think we've covered it. Last question and then we can take a break; if that's okay? Last -- with the right for some follow-up.
Do you know if TISA is a state or federal statute?
**A TISA is Tennessee Investment Student Achievement, and you get certain money from the State, certain money from local, and basically you get, like, a base funding.**
**This replaced per-pupil funding, and you get base funding. And you get different tiers of financial support for different things that**

172

**students need or different types of students and things like that.**
Q Yeah, my question is is it a state or a federal statute?
MR. AYLIFFE: Object to the form.
You can answer.
BY THE WITNESS:
**A I believe it's state. It's how we get funding.**
**BY MR. NORRIS:**
Q Okay.
**A From the state.**
Q Can state statutes be amended by the state legislature?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I don't know.**
**BY MR. NORRIS:**
Q You don't know if state statutes can be amended; is that your testimony?
**A Yes.**
Q Yes. You don't --
**A I'm sure state statutes can be amended. I'm sorry. I'm trying --**
Q It's getting later in the day; I

173

understand.
**A It's okay.**
Q And if -- this is probably my last question.
If Wilberforce Academy is successful in this lawsuit, could the Tennessee legislature amend TISA such that charter schools still receive TISA funding?
MR. AYLIFFE: Object to the form.
But you can answer.
BY THE WITNESS:
**A I mean, I think it would be bigger than that because they'd have to say all private schools would have to be funded that way.**
**BY MR. NORRIS:**
Q You don't think the Tennessee legislature could amend TISA to say that all charter schools get TISA funding irrespective of whether they are public or private?
MR. AYLIFFE: Object to the form. Calls for a legal conclusion.
But you can answer to the extent you know what the TISA legislature may or will do.
BY THE WITNESS:
**A Yeah, I don't -- I don't know. It seems**

174

**far-fetched, but I don't know.**
MR. NORRIS: David, I think that, respectfully, that crossed the line there into coaching that rephrased a question that I didn't ask so --
MR. AYLIFFE: Well, I disagree with that, Cam. I think this question's been asked and answered numerous times, and she's made clear that she's not a lawyer and it calls for a legal conclusion. So I don't think that it does, respectfully.
MR. NORRIS: I think the question was asked once and then you rephrased it with your objection, so I just want to try it again.
BY MR. NORRIS:
Q Do you think it's possible that, if Wilberforce Academy wins this case, the Tennessee legislature could amend TISA such that all charter schools continue to get TISA funding?
MR. AYLIFFE: Object to the form.
If you know what's possible in the future.
BY THE WITNESS:
**A I do not know.**
**BY MR. NORRIS:**
Q Is it theoretically possible that they

175

could make that happen?
MR. AYLIFFE: Object.
BY THE WITNESS:
**A Could be theoretically possible.**
**BY MR. NORRIS:**
Q Okay.
MR. NORRIS: All right. I think that's definitely a good time for a break. Thank you for going for an extensive session there. I think that will help us wrap up earlier today, so I think that's good.
MR. AYLIFFE: Cam, what -- I'm not going to hold you to it, but what do you think, kind of, outside ballpark timing wise?
MR. NORRIS: I think I am two-thirds done. I've actually not kept track of the time which we have gone so far on the record.
MR. AYLIFFE: How much time do we have on the record?
THE TECHNICIAN: I have 3:35 on the record right now.
MR. NORRIS: Yeah, I'm going to hold you to not holding me to it, but I think another few hours, and that should be it.
MR. AYLIFFE: Fair enough.

176

(WHEREUPON, a recess was had.)
BY MR. NORRIS:
Q Are you ready, Ms. Slater?
**A Yes.**
Q Okay. If Ivy Academy no longer received TISA funding, would it have to close?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A Yes, we would, unless we went private and received tuition, which is unlikely due to our population.**
**BY MR. NORRIS:**
Q Okay.
MR. NORRIS: Could we pull up Exhibit 9.
(WHEREUPON, Slater Exhibit No. 9 was presented to the witness.)
BY MR. NORRIS:
Q Do you see the title of this document, it starts with the words: "Brief of Amicus Curiae"?
**A Yes.**
Q It says: "Brief of Amicus Curiae National Alliance for Public Charter Schools in Support of Respondent."
Do you see that?
**A Mm-hm. Yes.**

177

Q What is the National Alliance For Public Charter Schools?
**A I do not know.**
Q Have you ever heard of that organization?
**A I've heard of it, but I don't know anything about it.**
Q Was that the organization referenced in those emails you received from the Tennessee Charter Center that we talked about earlier?
**A I do not recall.**
Q Could it have been referenced in those emails?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I honestly just don't recall.**
**BY MR. NORRIS:**
Q Okay.
MR. NORRIS: Could we turn to Page 10 of this document.
It's actually Page 4 of the brief, but -- this is the right page.
BY MR. NORRIS:
Q Do you see the first full sentence that starts with the words: "A finding..."?
Do you see that sentence?

178

**A "A finding that a private entity is a state actor in one context does not mean it is a state actor for all purposes."**
Q Right. Thank you.
Do you agree with that sentence?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I don't really understand what it means. "State actor," I don't understand the vocabulary.**
**BY MR. NORRIS:**
Q Let me rephrase the sentence and see if you agree with my rephrased version.
A finding that a private -- sorry. Let me start over.
A finding that a school is private for some purposes does not mean it is public for all -- sorry. A finding that a school is private for some purposes does not mean it is a private for all purposes. Do you agree with my sentence?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I still don't really understand, so I'm going to have to say I don't know.**
**BY MR. NORRIS:**
Q Do you not understand because that's a

179

point of law?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A I just don't know what that means.**
**BY MR. NORRIS:**
Q I'm going to ask you one more way, and then we can move on.
In your view, could a charter school be considered private for purposes of the Constitution but public for purposes of statutes like the Rehabilitation Act and TISA?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A Could it be both? I don't know how, but theoretically if -- you know, laws change and things happen, I'm not in that world, but maybe so. But I do not see how.**
**BY MR. NORRIS:**
Q Do you see how not?
MR. AYLIFFE: Object to the form.
BY THE WITNESS:
**A It's either one way or the other way for me, but...**
**BY MR. NORRIS:**
Q Okay. I think I know your answer, but I

180

just want to make sure. Do you know what connection exists, if any, between the Tennessee Charter School Center and the National Alliance for Public Charter Schools?
**A I do not know.**
Q Let's move on.
MR. NORRIS: And we're going to skip ahead number-wise, but I'd like Exhibit 11, please.
(WHEREUPON, Slater Exhibit No. 11 was presented to the witness.)
BY MR. NORRIS:
Q I will represent to you that these are the Carroll Intervenor-Defendants' Answers to Plaintiff's Second Set of Interrogatories.
Did I read that title correctly?
**A Yes.**
MR. NORRIS: Can we scroll down just a little bit.
BY MR. NORRIS:
Q Do you see the date in the bottom left-hand corner of the document? It's small.
**A 6/17/26.**
Q That was yesterday, correct?
**A Yes.**
Q I'll represent to you that we received

285

charter -- scratch that.
Earlier you testified that the board could terminate you for wrongdoing. And I'm paraphrasing, but do you remember that testimony?
**A Yes.**
Q If the State revoked your charter, would your charter school still be able to operate?
**A No.**
Q Under that circumstance, would you also lose your job?
**A Yes.**
Q At one point there was a discussion about Skillern -- I'm sorry, I may be mispronouncing it -- but the elementary school operating in a building owned by a church; do you recall that?
**A Yes.**
Q During that time, did the elementary school remain a public school?
**A Yes.**
Q During that time, was religion part of the school's curriculum?
**A No.**
Q More generally, you've worked in both charter schools and traditional public schools; based on that experience, are there any

286

differences with respect to how religion may be taught or if religion may be taught in the curriculum?
**A There are no differences that I see except for the district may mandate a certain textbook that they're all using. Of course the textbook they use in Bible is the Bible so, you know, if you wanted to use some different curriculum, you could.**
Q Okay. Even where the schools may offer different curriculum, they are still required to meet the same State standards with respect to --
**A It's --**
Q -- taught?
**A Yes. That is correct.**
MS. MIRE: I believe those were all my questions. And I want to thank you, Ms. Slater, for your time.
And I also want to thank the court reporter and our stenographer and videographer and all counsel. Wishing everyone safe travels home.
MR. NORRIS: Nothing further from plaintiff.
MR. AYLIFFE: Nothing further from Carroll Intervenors. We'll read and sign.

287

(WHEREUPON, the deposition was concluded at 4:35 p.m. CST.)

288

ACKNOWLEDGMENT OF DEPONENT

I, HOLLY SLATER, do hereby acknowledge that I have read and examined the foregoing testimony and the same is a true, correct, and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.

______________________ ______________________
(SIGNATURE) (DATE)

C E R T I F I C A T E O F R E P O R T E R

I, MICHELLE M. YOHLER, a Certified Shorthand Reporter within and for the County of Will, State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken remotely before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.



IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois, this 6th day of July, 2026.

Michelle M. Yohler

Michelle M. Yohler, CSR, RMR, CRR
Certified Shorthand Reporter
CSR No.: 84-4531

# EXHIBIT 60

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

Case No. 3:25-cv-584 (CEA)(DCP)

THE WILBERFORCE ACADEMY OF KNOXVILLE,

Plaintiff,

v.

KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County School Board of Education,

Defendants,

REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. KATINA SHARP,

Intervenor-Defendants,

ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER,

Intervenor-Defendants.

DEPOSITION OF REV. DR. RICHARD COBLE

MAY 18, 2026



APPEARANCES:

FOR WILBERFORCE ACADEMY OF KNOXVILLE:

Cameron T. Norris
Ryan M. Proctor
R. Gabriel Anderson
CONSOVOY McCARTHY, PLLC
1600 Wilson Road, Suite 700
Arlington, Virginia 22209
(703)243-9423

FOR INTERVENOR-DEFENDANTS REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP:

Mitchell E. Feldman
Wangian Zhang
Jon J. McNeal
MORRISON FOERSTER, LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
(617)648-4759

FOR DEFENDANTS KNOX COUNTY:

Rachel K. Harrison
DEPUTY LAW DIRECTOR
400 Main Street, Suite 612
Knoxville, Tennessee 37902
(865)215-2327

FOR INTERVENOR-DEFENDANTS ADRIENNE CARROLL, et al:

Thomas H. Jarvis
BAKER DONELSON
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
(865)549-7132



INDEX OF EXAMINATIONS


| | Page No. |
|---|---|
| By Mr. Proctor | 5 |


INDEX OF EXHIBITS


| Exhibit | | Page No. |
|---|---|---|
| C-1 | Local Sales Tax Rates | 9 |
| C-2 | 2025 IRS Instructions for Schedule A (Form 1040) | 11 |
| C-3 | Declaration of Rev. Dr. Richard Cobble | 23 |
| C-4 | 1/27/2026 Article - Tennessee Parents and Faith Leaders Seek to Block Religious Public School | 28 |
| C-5 | Tire Environmental Act Program (TEAP) | 30 |
| C-6 | 5/4/2026 Article - TN School Board Clears Way for Nation's First Religious Charter School | 39 |
| C-7 | Coble Intervenor-Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories | 48 |




S T I P U L A T I O N S

The deposition of Rev. Dr. Richard Coble, herein, called at the instance of the Plaintiff, taken pursuant to all rules applicable to the Tennessee Rules of Civil Procedure, and taken by notice on the 18th day of May, 2026, beginning at approximately 10:32 a.m., at the law offices of Baker, Donelson, Bearman, Caldwell & Berkowitz, 265 Brookview Centre Way, Suite 600, Knoxville, Tennessee, before LORA R. BOATMAN, Licensed Court Reporter, pursuant to stipulation of counsel.

It being agreed that LORA R. BOATMAN, Licensed Court Reporter, may report the deposition in machine shorthand, afterwards reducing the same to typewritten form.

All objections except as to the form of the questions are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, et cetera, including the reading of the completed deposition by the witness and the signature of the witness, are expressly waived.

Page 9

A. I don't know it exactly. I believe it's higher than 10 percent.

MR. PROCTOR: I'm going to designate this Coble Exhibit 1.

THE WITNESS: Do you mind if I grab some glasses?

MR. PROCTOR: Oh, by all means. I'll put a C for Coble.

(Exhibit C-1, Local Sales Tax Rates, marked for identification.)

BY MR. PROCTOR:

Q. Do you see at the bottom of the page that this is from a Tennessee government website?

MS. ZHANG: May I have a copy?

MR. PROCTOR: Oh, sorry.

THE WITNESS: Yes, I see at the bottom it is from www.TN.gov.

BY MR. PROCTOR:

Q. I'm going to represent to you that this is a page from the Tennessee Department of Revenue.

A. Okay.

Q. Do you see what it says the local sales tax rate is on the document for Knox County?

A. I see under state, it is listed for

Page 10

Knoxville, 7 percent; local, 2.25 percent; food, 2.25 percent.

Q. All right. So according to this document, the local sales tax is 2.25 percent in Knox County; is that correct?

A. That is correct according to this document.

Q. Okay. Do you have any reason to doubt?

A. No, I don't have any reason to doubt the accuracy of this document.

Q. In an average year, how much sales tax does your household pay to Knox County?

A. I have no idea.

Q. Okay. Did you try to estimate this amount before your deposition today?

A. I did not.

Q. Did you try to estimate this amount before you signed any of your declarations in this case?

A. No, I did not.

Q. How were you able to testify that you paid sales tax?

A. Because I buy things in Knox County and I live in Knox County and there is sales tax in

Page 11

Knox County.

MR. PROCTOR: I'm going to hand you what I'll designate as Coble Exhibit 2.

(Exhibit C-2, 2025 IRS Instructions for Schedule A (Form 1040), marked for identification.)

BY MR. PROCTOR:

Q. I'll ask you to turn to the last page, page 18.

A. Page 18?

Q. Yes.

A. All right.

Q. I'm going to represent to you that this document is instructions from the IRS on how to estimate how much in local sales tax a family has paid in 2025.

A. Okay.

Q. All right. So if you see the -- do you see the table at the top of the page, "Which optional local sales tax table should I use?"

A. Okay.

Q. Do you see the column on the left for Tennessee?

A. I do.

Q. Do you see how that says to use

Page 12

Local Table B to estimate your local sales tax?

A. I see that, yes.

Q. Okay.

So turning to the bottom of the page, do you see Local Table B?

A. I see Local Table B.

Q. Okay.

So for a family of four, what does Local Table B estimate for a family of four making 180- to $200,000?

A. If I'm getting my lines correct, I see 268.

Q. Okay. Great.

All right. Do you see at the top of that table, that's based on a local sales tax rate of 1 percent?

A. Oh, okay. I see that, yes.

Q. Okay.

So I don't -- I'm not able to do it, but are you able to multiply 268 times 2.25? If not, I'm happy to make the representation to you.

A. I assume it is just under 750. No 7 -- no, I cannot do that.

Q. That's fine. That's totally fine.

A. That would be 3 percent.

Page 13

Q. I will represent to you that 2.25 times $268 is 603 rounding up a dollar.
A. Okay.
Q. All right. So --
A. I was way off.
Q. So Local Table B estimates that a family of four with an income of 180- to $200,000 paid $603 in sales tax to Knox County in 2025.
Do you have any basis to doubt that this is a good estimate for your family?
MS. ZHANG: Objection to form.
THE WITNESS: Off the top of my head, no, I can't think of any basis to doubt numbers that you've given me.
BY MR. PROCTOR:
Q. Do you think that the IRS -- or just to clarify. Do you think that the IRS estimates are not likely to be an accurate estimate of what a family with those specifications paid in sales tax?
MS. ZHANG: Objection. Vague.
THE WITNESS: I just told you that I don't have any reason to doubt the numbers that you've given me.
BY MR. PROCTOR:
Q. Okay.

Page 14

Do you receive a housing allowance from your church?
A. Yes. Part of my income is split between housing allowance and income, yeah.
Q. Do you use your house allowance to pay your property taxes?
A. That is -- so it all comes together in one check, right? And it's deducted from my bank account. But, yeah, I assume, like, I figured up the housing allowance based off of what comes out for our mortgage, and that includes escrow. So the short -- the long rambling answer I'm giving would be, yes, yeah, it would be used to help pay the property taxes.
Q. Are you familiar with the Wilberforce Academy of Knoxville?
MS. ZHANG: Objection. Vague.
THE WITNESS: Yeah, could you say a little bit more?
BY MR. PROCTOR:
Q. Have you heard of the Wilberforce Academy of Knoxville?
A. I have heard of Wilberforce Academy of Knoxville.
Q. What is the Wilberforce Academy of

Page 15

Knoxville in your understanding?
A. What is it presently?
The Wilberforce Academy of Knoxville is an entity that is suing our school board -- or has brought a lawsuit against our school board because it is a public charter school attempting to -- or attempting to become a public charter school while having religious designations and affiliations and religious curriculum.
Q. Do you object to your taxes going to support Wilberforce Academy?
A. Yes, I object to my taxes going to support Wilberforce Academy.
Q. What is your basis of your objection to Wilberforce Academy of Knoxville?
MS. ZHANG: Objection. Vague.
THE WITNESS: There are several. I am a parent of students in Knox County schools, and I believe that money would be diverted from Knox County schools, the secular Knox County schools, to Wilberforce Academy. I'm a member of the clergy. And as a member of the clergy, I believe that religion is best protected when the government doesn't side with one or the other. And I believe that

Page 16

giving public school funds to Wilberforce Academy would be putting the hand on the scale of one religion over others. And I believe that that is unhelpful for both the state and for religion -- religious communities as well including my own. I believe that's detrimental to them.
I also believe that -- oh, gosh, I had another one. I believe that Wilberforce's religious affiliations make it inherently discriminatory against students who do not identify under their brand of Christianity. I believe that Wilberforce's brand of Christianity -- and by that I mean conservative evangelical -- has a long history of discrimination against minorities, especially sexual minorities. I believe that students under that might be made to feel marginalized, shamed because of that.
I believe that our public schools should have, you know, the greatest amount of funding possible and reasonable for their flourishing, not just because of our kids but for all kids in our community. And I think that diverting funds away from the public

Page 21

Q. Do you find the doctrine of biblical inerrancy to be objectionable?

MS. ZHANG: Objection. Asked and answered.

THE WITNESS: As a member of the clergy, I do not hold to the doctrine of inerrancy.

BY MR. PROCTOR:

Q. If Wilberforce Academy opened, how much of your taxes would go to Wilberforce Academy?

A. I do not know how much of my taxes would go to Wilberforce Academy.

Q. Assume that only $100 of your taxes went to Wilberforce Academy, would you object to those hundred dollars going to Wilberforce Academy?

MS. ZHANG: Objection. Calls for speculation.

THE WITNESS: If a hundred dollars of my tax revenue went to Wilberforce Academy, I would object to those dollars going to Wilberforce Academy.

BY MR. PROCTOR:

Q. Would you still object to Wilberforce Academy opening if only one dollar of your taxes went to Wilberforce Academy?

Page 22

MS. ZHANG: Same objection.

THE WITNESS: This is more about principle than it is about money amounts. So if it was only a dollar, I would still object to that dollar going to Wilberforce Academy.

BY MR. PROCTOR:

Q. Do you know anyone else in Knox County who shares your objection to Wilberforce Academy?

A. I'm not sure if they would speak about it in the exact same way that I've spoken about it. I don't want to put words in people's mouths. But there are other intervenors in this case, and I am assuming that they would share similar objections. Again, maybe not on the same basis or the same principle, but similar objections to the ones that I hold.

Q. If other people in Knox County who object to Wilberforce Academy opening paid at least a dollar in taxes that goes to Wilberforce Academy, would you agree that those people are harmed by Wilberforce Academy in the same way that you are?

MS. ZHANG: Objection. Calls for speculation.

THE WITNESS: I believe that if

Page 23

public school funds are diverted from the existing public schools in Knox County and they would go to a religiously affiliated charter school, then that would be an egregious breach in the First Amendment, and that way other members of Knox County as American citizens would be harmed.

BY MR. PROCTOR:

Q. Would you agree that -- so would you agree that every taxpayer in Knox County would be harmed in exactly the same way that you are?

A. I'm not sure if I have anything to say beyond what I just said.

Q. All right.

MR. PROCTOR: I'm going to introduce what we'll call Coble Exhibit 3.

(Exhibit C-3, Declaration of Rev. Dr. Richard Cobble, marked for identification.)

THE WITNESS: Can I put these to the side?

BY MR. PROCTOR:

Q. Yes, of course.

Sorry, this is not the right one.

MR. FELDMAN: If you give us a

Page 24

second, we can pull it up.

MR. PROCTOR: Okay. Apologies for that.

MR. FELDMAN: No problem.

BY MR. PROCTOR:

Q. This is the Doc 23 on the public document.

Just let me know when you have it.

MR. FELDMAN: Yes.

Okay. We got it.

BY MR. PROCTOR:

Q. Thank you.

Is this your declaration?

A. Oh, you gave me two copies.

Yes, this appears to be my declaration.

Q. Okay.

Can you read paragraph 6 for me out loud?

A. Number 6, okay.

"I object to the use of tax dollars to support religious education of any kind, including my own religion. I believe

Page 33

Mischaracterizes his prior testimony.
THE WITNESS: Again, the only thing I can say is you're talking about programs I haven't given a lot of thought into and don't want to, you know, come down hard on it one way or the other, speculate on that.
BY MR. PROCTOR:
Q. Are you aware that your tax dollars are used to maintain roads in Knox County?
A. Yes, I am aware that my tax dollars are used to maintain roads in Knox County.
Q. Do you object to your tax dollars going to support roads that lead to private religious schools in Knox County?
MS. ZHANG: Objection. Vague as to support.
THE WITNESS: No, I don't object to tax dollars going to the maintenance of roads. Some of those roads lead to private schools.
BY MR. PROCTOR:
Q. Why don't you object?
A. I believe that is the job of the local government to maintain safety and transportation to the extent that there are public roads leading to all sorts of places. I guess the

Page 34

job for them to do so.
Q. Are you aware that your tax dollars are used to fund the police in Knox County?
A. Yes, I am aware that my tax dollars go to fund the police in Knox County.
Q. The hypothetical situation that we hope never happens, but in the hypothetical situation that a school shooter came to a private religious school in Knox County, would you object to the police showing up and responding?
MS. ZHANG: Objection. Calls for speculation.
THE WITNESS: I have never thought of that before. But, no, I don't see any reason why I would object to the police coming for the safety of anyone in the way of an active shooter.
BY MR. PROCTOR:
Q. Why wouldn't you object to the police coming to a private religious school?
A. I believe that it is the job of the police to maintain or to protect the lives of all people within Knox County, and if there is an active shooter at a -- anywhere, then it is the job of the police to protect those lives.

Page 35

Q. Are you opposed to the State of Tennessee providing vouchers to families to attend private religious schools?
A. I am opposed to the State of Tennessee providing vouchers to private religious schools.
Q. Is it fair to say that you intervened in this case to ensure that Wilberforce Academy never opens?
MS. ZHANG: Objection. Mischaracterizes prior testimony.
THE WITNESS: I intervened in this case to ensure that a private -- excuse me, a public religious school does not get tax dollars.
BY MR. PROCTOR:
Q. Is it fair to say that you intervened in this case to ensure that Wilberforce would never be approved to operate a religious charter school?
A. You'll have to forgive me. I'm not sure how that's different from the last question, but I'll just repeat that I intervened in this case because I don't believe that public funds should be used to fund a public charter school that is

Page 36

religiously affiliated.
Q. If Wilberforce is never able to open a religiously affiliated charter school, would your goal in intervening in this lawsuit be accomplished?
MS. ZHANG: Objection. Calls for speculation.
THE WITNESS: I have nothing in particular against Wilberforce itself. It's just simply the fact that a public charter school that is religiously affiliated is trying to use public school funds. That's the reason for my objection.
BY MR. PROCTOR:
Q. Is it fair to say that if Wilberforce Academy never opens a religiously affiliated charter school, then your tax dollars will not be used to support a religious charter school operated by Wilberforce Academy?
MS. ZHANG: Objection, asked and answered. Objection, calls for speculation.
THE WITNESS: It's outside my ability to speculate what's going to happen in the future if there's another entity that's going to use it. This happens to be the case before I swear --

BY MR. PROCTOR:
Q. Let me rephrase.
MR. FELDMAN: Sorry, can we just let him finish his testimony?
THE WITNESS: Yeah. This just happens to be the case where Wilberforce Academy happens to be the public charter school suing the school board for -- because of funding issues.
BY MR. PROCTOR:
Q. Sure. Okay.
Allow me to rephrase. If Wilberforce Academy is never approved to operate a religious charter school, will your tax dollars go to fund a religious charter school that Wilberforce operates?
MS. ZHANG: Objection. Asked and answered.
BY MR. PROCTOR:
Q. I'm not asking about could there be some other entity. I'm just asking if Wilberforce never opens, is it correct that your tax dollars will not fund a school that Wilberforce operates?
MS. ZHANG: Objection, asked and answered. Objection, calls for speculation.



THE WITNESS: To make sure I'm understanding your question. If Wilberforce Academy doesn't open, will my tax dollars be protected against Wilberforce opening?
BY MR. PROCTOR:
Q. Yes.
A. It seems like the question answers itself.
Q. Could you repeat the answer?
A. I don't -- I'm sorry, I'm not sure if I understand your question fully.
Q. It seems like a question with an easy answer.
MR. FELDMAN: I think he's already answered the question multiple times now, and he's answered the same way.
MR. PROCTOR: I'm going to keep asking until I feel like I have a clear answer on it.
MR. FELDMAN: It's been asked and answered.
BY MR. PROCTOR:
Q. If there is never a school that is approved to be a charter school, that is the Wilberforce Academy of Knoxville, will your tax



dollars ever fund a charter school that is the Wilberforce Academy of Knoxville?
MS. ZHANG: Same objection.
THE WITNESS: It's my understanding that if Wilberforce never receives tax dollars because it never opens, then my tax dollars would not go to Wilberforce --
BY MR. PROCTOR:
Q. Okay.
A. -- for it to open a public charter school.
Q. Okay.
MR. PROCTOR: I'm going to designate Coble Exhibit 6.
(Exhibit C-6, 5/4/2026 Article - TN School Board Clears Way for Nation's First Religious Charter School, marked for identification.)
BY MR. PROCTOR:
Q. Feel free to read page 2. Let me know when you've had a chance to do so.
A. This page?
Q. Yes, that page, page 2 of 4.
(Witness reviewing document.)
THE WITNESS: Okay.



BY MR. PROCTOR:
Q. Before reading this document, were you familiar at all with Union Academy in Madison County, Tennessee?
A. I had heard it mentioned in passing conversation before, but I had not looked into it in any depth at all, no.
Q. Okay.
Do you see how according to this document it's been -- it is a school that's been approved to operate as a religious charter school in Tennessee?
A. Approved by the...
Q. By the Madison County School Board.
A. Yes. It appears that the Madison County School Board has approved the application of Union Academy, a Christian college preparatory school, to operate within the state's charter school program.
Q. Do you object to your taxes going to Union Academy?
A. You're asking me an entirely different case. I don't live in Madison County, so I don't really know, like, how the tax system, like Knox County taxes go to Madison County schools.

Page 53

Q. Is it your understanding that at least part of the funding for Knox County schools is allocated on a per pupil basis?

MS. ZHANG: Objection, mischaracterizes prior testimony. Objection, asked and answered.

THE WITNESS: I believe it's -- I'm sorry, you're asking me to make a statement beyond my knowledge or expertise. Again, I apologize if I'm being oversimplistic here. It's just, you know, there's only so many funds available for schools. If some of those funds go to the funding of Wilberforce Academy, then they necessarily would be diverted from the other existing schools in the district.

BY MR. PROCTOR:

Q. Do you think Knox County public schools receive an adequate amount of funding right now?

MS. ZHANG: Vague as to adequate.

THE WITNESS: I believe my children's teachers and administrators can answer those questions a lot better than I can.

Page 54

BY MR. PROCTOR:

Q. Do you know how much funding your child's school receives from Knox County?

A. Same answer. Sorry, yeah, I can --

Q. Sorry. Go ahead.

A. I was just going to say, no, I think that those who run the school...

Q. Is the budget -- do you know if the budget funding for your child's school is higher or lower this year than it was last year?

A. I've heard that it is going to be lower because of the amount of students in the school system. But that's next year, though, right, not this year. So I don't know like for 2025 versus 2024, no.

Q. What did you mean by it's going to be lower because of the amount of students in the school system?

A. I just heard that there are -- I read stories in the news. I can't testify to their accuracy. I've read stories in the news that they are cutting positions in Knox County schools because of lower student enrollment next year.

Q. How specifically will your child's education be affected if Wilberforce Academy opens?

Page 55

MS. ZHANG: Objection. Calls for speculation.

THE WITNESS: Yeah, if Wilberforce Academy opens as a public charter school, as a religiously affiliated public charter school, then it would be a breach in the First Amendment that my kids are taught in school about separation of church and state. And it would affect their understanding of that amendment. Outside of that -- so it would affect their understanding of their rights.

Outside of that, I can't speculate on specific ways that their education would be changed other than the simple fact that -- again, I've said this before, but the limited amount of resources that are available for public education in Knox County. Some of those funds would go towards the opening of Wilberforce as a public religious charter school that would not go otherwise to my kids' schools and other schools in the district that are like those.

BY MR. PROCTOR:

Q. If Wilberforce Academy opens, will students leave Bluegrass Academy to attend

Page 56

Wilberforce Academy?

MS. ZHANG: Objection. Calls for speculation.

THE WITNESS: I don't know. I actually haven't spoken to any parents about Wilberforce Academy at Bluegrass, so I don't know what they would choose.

BY MR. PROCTOR:

Q. Is it your testimony that if Wilberforce Academy opens, predicting how your child's education would be affected requires speculation?

MS. ZHANG: Objection. Mischaracterizes prior testimony.

THE WITNESS: Could you rephrase the question? Sorry.

BY MR. PROCTOR:

Q. Is it your testimony that figuring out, predicting the impact that the Wilberforce Academy opening would have on your child's education requires speculation; you can only make a prediction by speculating?

MS. ZHANG: Objection, mischaracterizes prior testimony. Objection, asked and answered.

Page 57

THE WITNESS: Again, the only thing I would say is that there is a limited amount of funds. If Wilberforce were to open as a public religious charter school, out of that finite amount of funds, some would be diverted to the opening of Wilberforce and by necessity or -- you know, just by definition, those funds are finite. Those funds would not be going to my children's education and their schools, and in that way they would be impacted. How they would be impacted specifically is open to speculation, yes.

BY MR. PROCTOR:

Q. If a new secular charter school opens, would that -- in Knox County, would that divert funding away from your children's schools?

MS. ZHANG: Objection, calls for speculation. Objection, vague as to secular.

THE WITNESS: I guess the only thing I could say is the opening of other public schools, of course it affects the budget, that you know, that also houses my children's schools and would affect it in some way.

BY MR. PROCTOR:

Q. If more students move from Knox

Page 58

County public schools to private schools, would that divert resources away from your children's schools?

MS. ZHANG: Objection. Calls for speculation.

THE WITNESS: I mean, it depends, right, because other students could go in and replace those students as well. You know, it's not like there's just a finite amount of students. So it's hard to know, if you're talking about specific dollar amounts, how that would impact the funding of schools.

MR. PROCTOR: No further questions. Thank you.

MR. FELDMAN: Mind if we take a five-minute break?

MR. PROCTOR: Sure.

MR. FELDMAN: Thank you.

(Whereupon, a recess took place.)

MR. FELDMAN: Back on the record. No questions from the intervenor. Thank you.

(Whereupon, the deposition concluded at 12:09 p.m.)

Page 59

C E R T I F I C A T E

STATE OF TENNESSEE:

COUNTY OF KNOX:

I, LORA R. BOATMAN, Licensed Court Reporter, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am licensed by the State of Tennessee as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand this the 21st day of May, 2026.



LORA R. BOATMAN, LCR No. 106.
Expiration Date: 6/30/2026.

# EXHIBIT 61

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

Case No. 3:25-cv-584 (CEA)(DCP)

THE WILBERFORCE ACADEMY OF KNOXVILLE, )
Plaintiff, )
v. )
KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County School Board of Education, )
Defendants, )
REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. KATINA SHARP, )
Intervenor-Defendants, )

ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER, )
Intervenor-Defendants. )

DEPOSITION OF KERRY DOOLEY
MAY 18, 2026



APPEARANCES:

FOR WILBERFORCE ACADEMY OF KNOXVILLE:

Cameron T. Norris
Ryan M. Proctor
R. Gabriel Anderson
CONSOVOY McCARTHY, PLLC
1600 Wilson Road, Suite 700
Arlington, Virginia 22209
(703)243-9423

FOR INTERVENOR-DEFENDANTS REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP:

Mitchell E. Feldman
MORRISON FOERSTER, LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
(617)648-4759

FOR DEFENDANTS KNOX COUNTY:

Rachel K. Harrison
DEPUTY LAW DIRECTOR
400 Main Street, Suite 612
Knoxville, Tennessee 37902
(865)215-2327

FOR INTERVENOR-DEFENDANTS ADRIENNE CARROLL, et al:

Thomas H. Jarvis
BAKER DONELSON
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
(865)549-7132



APPEARANCES CONTINUED:

Patrick Cremin
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
(973)624-1815

Luke Anderson
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202)466-3234



INDEX OF EXAMINATIONS


| | Page No. |
|---|---|
| By Mr. Proctor | 6 |


INDEX OF EXHIBITS


| Exhibit | | Page No. |
|---|---|---|
| D-1 | Coble Intervenor-Defendants' First Supplemental Responses to Plaintiff's First Set of Interrogatories | 7 |
| D-2 | Local Sales Tax Rates | 11 |
| D-3 | 2025 IRS Instructions for Schedule A (Form 1040) | 12 |
| D-4 | Tire Environmental Act Program (TEAP) | 23 |
| D-5 | Declaration of Kerry Dooley | 33 |
| D-6 | Coble Intervenor-Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories | 35 |

Page 9

Q. What grade is he currently in?
A. He is in kindergarten.
Q. And just so I'm clear, this fall he will be starting first grade; is that correct?
A. That's correct.
Q. And what grades does Bearden Elementary cover?
A. Kindergarten through fifth grade.
Q. What middle and high school do you plan to send your child to?
A. He will go -- well, he's zoned for Bearden Middle and West High, and I intend to send him to the school he's zoned for.
Q. When will you no longer have any children in any Knox County public school?
A. I believe in 2038. When [redacted] graduates high school, I will no longer have children in Knox County schools.
Q. Are you employed?
A. I am.
Q. Where?
A. I work for the US Forest Service. Do you want to know the office location?
Q. What do you do for the Forest Service?

Page 10

A. I am an analyst for a specific program.
Q. And you're married to David Paul Shell; is that correct?
A. Yes.
Q. And is he employed?
A. He is.
Q. Where is your spouse employed?
A. At the University of Tennessee.
Q. And what does he do there?
A. He's a research associate in the plant sciences department.
Q. How many people live in your household?
A. Three.
Q. How many motor vehicles do you own?
A. Two.
Q. Roughly, what was your total household income in 2025?
A. Roughly, 150,000.
Q. All right. I'm going to hand you -- or, no, sorry. We're going to look back again at your interrogatory answers, on page 3, at this time.
You're still on Exhibit D-1.
So the first full paragraph on

Page 11

page 3 that's starting with "subject to and without waiving," you testified that you paid sales taxes for 2023, 2024, and 2025. Is that correct?
A. Yes.
Q. Do you know what the local sales tax rate is in Knox County?
A. Not precisely, no.
MR. PROCTOR: This is Exhibit D-2.
(Exhibit D-2, Local Sales Tax Rates, marked for identification.)
BY MR. PROCTOR:
Q. All right. So do you see at the bottom that this page says that it comes from the Tennessee Government web page?
A. Yes.
Q. Okay.
And then what local tax rate does this page report to Knox County as having?
A. 2.25 percent.
Q. Do you have any reason to doubt that figure?
A. I do not.
Q. How much sales tax did you pay to Knox County in 2025?
A. I have no idea.

Page 12

Q. Did you try to estimate the amount of sales tax you paid to Knox County in 2025 before your deposition today?
A. No.
Q. Did you try to estimate the amount of sales tax you paid to Knox County in 2025 before making your interrogatory answers?
A. No.
Q. How did you answer that you -- that you testified that you did pay sales taxes in your interrogatory answers?
A. I know that I did pay sales tax. I don't know how much sales tax, either in total, much less what percentage was to Knox County versus city or state tax.
Q. I'm handing what we'll mark as Exhibit D-3, which are -- I'm representing to you are the IRS's instructions for calculating itemized deductions for the tax year 2025, and then I'll ask you to turn to page 18, which is the last page.
(Exhibit D-3, 2025 IRS Instructions for Schedule A (Form 1040), marked for identification.)
BY MR. PROCTOR:
Q. I'll represent to you that this last

page is -- this last page explains how the IRS estimates an individual or household -- how much they paid in local sales tax for the year 2025.

Do you see the table at the top of the page which says "Which optional local sales tax table should I use?"

A. Yes.

Q. Do you see the row near the bottom that says Tennessee?

A. Uh-huh. Yes.

Q. Do you see that that row instructs to use Local Table B to calculate local sales tax in Tennessee?

A. Yes.

Q. Okay. I'm going to ask you to -- do you see Local Table B at the bottom of the page?

A. I found it.

Q. Okay. Could you tell me what Local Table B estimates a family of three to have paid when it has an income of between 140- and $160,000?

A. It looks like 230.

Q. I see that too.

Do you see right above the table how it says "Based on a local sales tax of 1 percent"?

A. Yes.



Q. So a sales tax rate of 2.25 percent would be 2.25 times that amount, correct?

A. Would 2.25 be -- sorry.

Q. If the 230 figure represents an estimate of how much you would pay with a 1 percent sales tax, would 2.25 times that amount represent an estimate of how much you would have paid with a 2.25 percent sales tax?

A. So if this table were based on 2.25 percent instead, the amount would go up by that same portion. Is that what you're saying?

Q. Yes.

A. Yeah, that -- that's...

Q. Okay. I'm not going to ask you to do math.

A. Okay.

Q. But I'll represent to you that 2.25 times 230 is $517.50. So based on that information, Local Table B estimates that a family of three with an income between 140- and 160,000 is $517.50, correct?

A. You said I wouldn't have to do math, but that sounds like a ballpark. That sounds accurate.

Q. Okay.



A. Right? Okay.

Q. Do you have any basis to contest this estimate -- sorry. Let me rephrase that question.

Do you have any basis to contest the accuracy of this estimate, $517.50 for your family for how much it paid in taxes in Knox County sales taxes in 2025?

A. I don't have a basis to confirm or contest it.

Q. Do you think that the IRS -- do you have any reason to believe that the IRS has not accurately determined what the average family of that size and that income pays in local sales taxes?

A. I have no reason to think the IRS is inaccurately estimating an average.

Q. Do you think that the average figure that the IRS -- sorry. Let me rephrase this question.

Do you have any reason to believe that your family pays more than the average that the IRS calculates?

A. That's a difficult question to answer. I do think I shop online considerably less than most people I know. As such, I would imagine



my family might spend a little more on local sales tax, but I don't feel confident estimating an amount at all.

Q. If it's the case that local sales tax isn't enclosed on online sales, do you have any reason to believe that you pay more than the average that the IRS calculates?

A. I still find it challenging to feel like I can answer this accurately because I really don't have a good estimate, but I have no reason -- I have no reason to believe I'm far from the average.

Q. Are you familiar with the Wilberforce Academy of Knoxville?

A. I have very limited knowledge of them.

Q. What -- in your understanding, what is the Wilberforce Academy of Knoxville?

A. My understanding is they are a Christian organization.

Q. What do you know about -- is there anything else that you know about the Wilberforce Academy of Knoxville?

MR. FELDMAN: Objection. Overbroad.

THE WITNESS: I understand they plan

to open a school, a public school in
Knoxville.
BY MR. PROCTOR:
Q. Do you know what kind of school that
Wilberforce wants to open?
MR. CREMIN: Objection. Vague.
THE WITNESS: I don't know many
details of what kind of school.
BY MR. PROCTOR:
Q. Do you know if Wilberforce intends
to open a charter school?
A. That's my understanding.
Q. Do you know anything about the
curriculum that Wilberforce would like to teach at
its charter school?
A. I don't have specific knowledge on
details of the curriculum.
Q. Do you know whether Wilberforce
intends to open a religious charter school?
A. It's my understanding that they do
intend to open a religious charter school.
Q. Do you object to your taxes going to
support Wilberforce Academy?
A. I object to my taxes going to
support a specific religious school.



Q. What do you mean by "a specific
religious school"?
A. A school that is based on -- that
includes religious teachings or guiding principles
as part of its...
Q. Would you consider Wilberforce
Academy to be a -- the intended school that
Wilberforce Academy would like to open to be a
school that includes religion in its curriculum?
A. Yes, I do believe that.
Q. And so would you object to your
taxes supporting Wilberforce Academy specifically?
A. Yes.
Q. What is the basis for your
objection?
A. I don't believe my taxes should go
to support a religious school, and I don't believe
funds should be diverted towards an additional
religious -- a religious school.
Q. Are there any other bases for your
objection to Wilberforce Academy?
A. I'm not sure I'm following.
Q. Are there any other reasons that you
at the moment have for not wanting your tax dollars
to fund Wilberforce Academy?



A. Aside from the fact that I think
it's a religious school and I don't want taxes taken
from other schools?
Q. Aside from those reasons that you've
given.
A. I can't think of another reason.
Q. Do you find any of Wilberforce's
religious beliefs objectionable?
A. I don't find religious beliefs
objectionable.
Q. If Wilberforce Academy opened, how
much of your taxes would go to Wilberforce Academy?
MR. CREMIN: Objection. Calls for
speculation.
THE WITNESS: I don't know how much
of my taxes would go to Wilberforce Academy.
BY MR. PROCTOR:
Q. Assume that only $100 of your taxes
went to Wilberforce Academy. Would you object to
those $100 going to Wilberforce Academy?
A. I would.
Q. Assume that only one dollar of your
taxes went to Wilberforce Academy, would you still
object to that one dollar going to Wilberforce
Academy?



A. I would.
Q. Assume that only one penny of your
taxes went to Wilberforce Academy. Would you still
object to that one penny going to Wilberforce
Academy?
A. I would.
Q. Assume that a fraction of a penny of
your taxes went to Wilberforce Academy. Would you
still object to that fraction of a penny?
A. Yes.
Q. If Wilberforce Academy opened a
religious charter school, would that school affect
you any more or any differently than it affects any
other Knox County taxpayer?
MR. CREMIN: Objection. Compound.
THE WITNESS: Can you -- sorry.
BY MR. PROCTOR:
Q. Sure.
If Wilberforce Academy opened, would
that affect you any more than it affects any other
Knox County taxpayer?
A. That's hard to answer. I don't know
if it would affect me as a person more than other
taxpayers, but perhaps as a group, other parents or
people who are taking care of kids in the public

Q. What makes a religious school's participation in the Tire Environmental Act Program different from providing funding for Wilberforce Academy as a religious charter school?

A. I'm not sure I could itemize all the differences, but right before K-12, a nonprofit umbrella, makes me think they should be included in this.

Q. Why do you think that the inclusion of religious schools in the Tire Environmental Act Program -- or sorry. Let me rephrase the question.

Do you think that the inclusion of religious schools in the Tire Environmental Act Program would violate the separation of church and state?

A. I feel a little out of my expertise here, but again, with this list of for-profit companies, nonprofit, I don't interpret that as the same as just looking at church and state with many entities involved.

Q. Are you aware that your tax dollars are used to maintain roads in Knox County?

A. Honestly, I assume they are, but I've never looked that up.

Q. Would you object to your tax dollars



going to support roads that lead to private religious schools in Knox County?

A. Like a private road, or a public road that happens to lead?

Q. Do you object to your tax dollars going to support public roads that lead to private religious schools in Knox County?

A. No.

Q. What makes your tax dollars going to support public roads that lead to private religious schools -- sorry. Let me rephrase the question.

From the standpoint of separation of church and state, why do you think that your tax dollars going to support roads that lead to private religious schools is different from your tax dollars going to support Wilberforce Academy's proposed religious charter school?

A. My understanding is that the tax dollars would be applied to a public road whereas my tax dollars going directly to the school, a religious school would be applied to the religious school.

Q. Are you aware that your tax dollars are used to fund the police in Knox County?

A. I am.



Q. If, in a hypothetical level, hopefully never come to pass, a school shooter came to a private religious school in Knox County, would you object to the police showing up and responding?

A. To the police coming to a school shooting, are you asking if I would object to that?

Q. I'm asking if you would object to the police coming and responding to a school shooting at a private religious school in Knox County.

A. No, I would not object to that.

Q. Why do you think that the police showing up and responding at a private religious school is different from the standpoint of the separation of church and state than tax dollars going to support Wilberforce's proposed religious charter school?

A. Because tax dollars are going to the police to protect all the people in Knox County.

Q. Do you object to the State of Tennessee providing vouchers for families to pay private school tuition at private religious schools?

A. I don't object to that being allowed.

Q. Why do you think that money going to



give parents vouchers to send their children to private religious schools is not objectionable?

A. I don't object to giving families money for vouchers essentially because it's been determined to be allowable, and that money is given to the family to make a decision.

Q. Would you object to any Tennessee charter school that professes to be Christian?

MR. FELDMAN: Objection. Vague.

THE WITNESS: That's a little hard to answer. I can't imagine a professed religious school that would not cause objection from me, but there are things that I can't imagine.

BY MR. PROCTOR:

Q. If a Baptist college opened a Baptist charter school and taught Baptist Christianity as true in the curriculum, would you object to that charter school?

A. Sorry for being naive, but when you say "charter school," is it presumed that you're talking about a K through 12?

Q. Yes. I'll rephrase the question.

A. Okay.

Q. If a Baptist college opened -- let

Page 29

me try again.

If a Baptist college opened a K through 12 charter school in Tennessee that was Baptist -- that was professedly Baptist and taught Baptist Christianity as true, would you object to that charter school?

A. I would.

Q. Is it fair to say that you intervened in this case to help ensure that Wilberforce Academy never opens a religious charter school?

MR. FELDMAN: Objection. Mischaracterizes prior testimony.

THE WITNESS: I intervened in this case because I object to tax dollars funding public religious schools.

BY MR. PROCTOR:

Q. Is it fair to say that your tax dollars will not be used to support Wilberforce Academy's religious charter school if Wilberforce Academy never opens a religious charter school?

MR. CREMIN: Objection. Speculation.

THE WITNESS: I'm not sure I understand this question.

Page 30

BY MR. PROCTOR:

Q. Is it fair to say -- if Wilberforce Academy is not approved, is never approved to operate a religious charter school, is it fair to say that your tax dollars will not support -- sorry. Let me rephrase the question.

Do your tax dollars support Wilberforce Academy's religious charter school today?

A. To my knowledge, Wilberforce Academy has not taken any of my tax dollars to date.

Q. Has Wilberforce Academy not taken any of your tax dollars to date because Wilberforce Academy has not opened?

A. Yes.

Q. Are you aware that Wilberforce Academy has also proposed opening a secular charter school?

MR. CREMIN: Objection. Vague as to secular.

THE WITNESS: I don't know details about that.

BY MR. PROCTOR:

Q. Have you reviewed the draft charter school application that we disclosed to you in which

Page 31

Wilberforce proposed opening a charter school that was secular?

MR. FELDMAN: Still objection as to secular.

THE WITNESS: I don't recall that part of it. I'm sorry.

BY MR. PROCTOR:

Q. Are you aware that Wilberforce Academy has also proposed opening a charter school that pledges to comply with the existing requirement in Tennessee law that charter schools be nonsectarian?

MR. CREMIN: Objection. Vague as to nonsectarian.

MR. FELDMAN: And objection, mischaracterizes the application submitted.

THE WITNESS: Sorry, can you repeat your question?

BY MR. PROCTOR:

Q. Sure.

MR. FELDMAN: And excuse me, I meant to say produced, not submitted.

BY MR. PROCTOR:

Q. Are you aware that Wilberforce Academy has also proposed opening a charter

Page 32

school -- sorry. Let me rephrase.

Are you aware that Wilberforce Academy has also proposed opening a charter school that would pledge to comply with the existing requirement in Tennessee law that the education provided in a charter school be nonsectarian?

MR. CREMIN: Same objection.

THE WITNESS: I don't recall that detail, so I can't really confirm or -- to that.

BY MR. PROCTOR:

Q. Do you oppose Wilberforce Academy sponsoring a charter school that pledged to comply with the existing requirement in Tennessee law that the education in a charter school be nonsectarian?

MR. CREMIN: Same objection.

THE WITNESS: I do still think I would object.

BY MR. PROCTOR:

Q. On what basis would you object?

A. My understanding is Wilberforce Academy is a religious organization.

Q. If Wilberforce Academy opens, would you consider enrolling your child in it?

A. I don't think that I would.

Page 37

Q. Do you believe -- do you believe that your -- do you believe that the budget for your child's school has changed since the last year?

A. I'm -- I'm not sure. My child's school has more students in it this year than last year. I don't know how the budget -- I don't know if there's delays in that.

Q. If Wilberforce Academy opens, will any students from your child's school leave to attend Wilberforce Academy?

A. I have no idea.

Q. How specifically will your child's education be affected if Wilberforce Academy opens?

A. If there's an additional charter school pulling from the same funds, those funds will be diverted away from the other schools.

Q. Are you aware that one of Knox County's two existing charter schools, Knoxville Prep, is closing?

A. I was not aware of that.

Q. Have you noticed any increase in funding as a result of that at your child's school?

MR. CREMIN: Objection. Vague as to funding.

THE WITNESS: Again, I don't know how much funding went to my child's school.

Page 38

BY MR. PROCTOR:

Q. Are there any specific resources you think your child will lose access to at their public school if Wilberforce Academy opens?

MR. FELDMAN: Objection. Calls for speculation.

THE WITNESS: I can't say I've thought of specific itemized resources.

BY MR. PROCTOR:

Q. If one charter school in Knox County is closing and another opens, will the funding for your child's school be affected?

MR. CREMIN: Objection. Calls for speculation.

THE WITNESS: I feel like that's impossible for me to know.

BY MR. PROCTOR:

Q. Is it possible that the effect would be zero?

A. That is one of the possibilities.

MR. PROCTOR: Okay. We have no further questions. Thank you.

MR. FELDMAN: Step out for a few.

MR. PROCTOR: We'll go off the record, yeah.

Page 39

(Whereupon, a recess took place from 5:07 p.m. until 5:19 p.m.)

MR. CREMIN: No further questions.

(Whereupon, the deposition concluded at 5:20 p.m.)

Page 40

C E R T I F I C A T E

STATE OF TENNESSEE:

COUNTY OF KNOX:

I, LORA R. BOATMAN, Licensed Court Reporter, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am licensed by the State of Tennessee as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand this the 1st day of June, 2026.

Lora R. Boatman

LORA R. BOATMAN, LCR No. 106.
Expiration Date: 6/30/2026.

# EXHIBIT 62

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

Case No. 3:25-cv-584 (CEA)(DCP)

THE WILBERFORCE ACADEMY OF KNOXVILLE, )
Plaintiff, )
v. )
KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County School Board of Education, )
Defendants, )
REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. KATINA SHARP, )
Intervenor-Defendants, )

ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER, )
Intervenor-Defendants. )

DEPOSITION OF AMANDA COLLINS

MAY 18, 2026



APPEARANCES:

FOR WILBERFORCE ACADEMY OF KNOXVILLE:

Cameron T. Norris
Ryan M. Proctor
R. Gabriel Anderson
CONSOVOY McCARTHY, PLLC
1600 Wilson Road, Suite 700
Arlington, Virginia 22209
(703)243-9423

FOR INTERVENOR-DEFENDANTS REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP:

Mitchell E. Feldman
Jon J. McNeal
MORRISON FOERSTER, LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
(617)648-4759

FOR DEFENDANTS KNOX COUNTY:

Rachel K. Harrison
DEPUTY LAW DIRECTOR
400 Main Street, Suite 612
Knoxville, Tennessee 37902
(865)215-2327

FOR INTERVENOR-DEFENDANTS ADRIENNE CARROLL, et al:

Thomas H. Jarvis
BAKER DONELSON
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
(865)549-7132



INDEX OF EXAMINATIONS


| | Page No. |
|---|---|
| By Mr. Anderson | 5 |


INDEX OF EXHIBITS


| Exhibit | | Page No. |
|---|---|---|
| AC-1 | Coble Intervenor-Defendants' First Supplemental Responses to Plaintiff's First Set of Interrogatories | 8 |
| AC-2 | Local Sales Tax Rates | 15 |
| AC-3 | 2025 IRS Instructions for Schedule A (Form 1040) | 19 |
| AC-4 | Tire Environmental Act Program (TEAP) | 36 |
| AC-5 | Declaration of Amanda Collins | 45 |
| AC-6 | Coble Intervenor-Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories | 47 |




S T I P U L A T I O N S

The deposition of Amanda Collins, herein, called at the instance of the Plaintiff, taken pursuant to all rules applicable to the Tennessee Rules of Civil Procedure, and taken by notice on the 18th day of May, 2026, beginning at approximately 2:44 p.m., at the law offices of Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., 265 Brookview Way, Suite 600, Knoxville, Tennessee, before LORA R. BOATMAN, Licensed Court Reporter, pursuant to stipulation of counsel.

It being agreed that LORA R. BOATMAN, Licensed Court Reporter, may report the deposition in machine shorthand, afterwards reducing the same to typewritten form.

All objections except as to the form of the questions are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, et cetera, including the reading of the completed deposition by the witness and the signature of the witness, are expressly waived.

A. It's called USAN, Inc. It is a telecom company in Norcross, Georgia. It's U-S-A-N, Inc., because it stands for United States Area Network.

Q. Got it.

And how many people live in your household?

A. Including the college kid who's not there all the time?

Q. Is your house your -- I apologize, I forgot their name. Is your house your college student's permanent residence?

A. Yes. There's five of us who live there, and she is very often in Savannah.

Q. So the size of your family, you're a family of five?

A. Right.

Q. And how many motor vehicles do you own?

A. Two. Two old motor vehicles, yes. We are about to have to buy a third.

Q. How soon will you buy a third motor vehicle?

A. When the 14 year old is ready to drive independently.



Q. Roughly speaking, what was your family's total income in 2025?

A. Over 200,000.

Q. Was it -- was your family's total income in 2025 between 200,000 -- just a second.

Was it between 200,000 and 225,000?

A. I believe that it's somewhere right in the like actual total cusp around that cutoff between 225 and like 225 to 250. So between two and 250 for sure. And I believe it's over 225.

Q. Do you believe it would be more accurate to say that your family's total income in 2025 would be between 225 and 250?

A. Yes. Thank you.

Q. So I'd like to return now to Deposition Exhibit AC-1.

A. Okay.

Q. Again, this is your sworn testimony in response to Plaintiff's First Set of Interrogatories. Do you mind just going to page 3?

So there you testified that you paid, quote, sales taxes to Knox County, end quote, in 2023, 2024, and 2025. Is that correct?

A. Correct.

Q. And do you know what the local sales



tax rate is in Knox County?

A. I would hesitate to say for sure. I believe it's around 9 percent at this point.

MR. ANDERSON: I will hand you what we'll mark as -- this will be Deposition Exhibit AC-2.

(Exhibit AC-2, Local Sales Tax Rates, marked for identification.)

BY MR. ANDERSON:

Q. So as I just mentioned, I handed you what we marked as Deposition Exhibit AC-2. This is a true and correct copy of a page from the Tennessee Department of Revenue's website. And as you can see in the middle of the page, I'm just looking around like you, too, it says that the Knox County and local sales tax is 2.25 percent. Do you see that?

A. I do.

Q. So Knox County's local sales tax is 2.25 percent, correct?

A. Knox County's portion of the local sales tax?

Q. Yeah, just Knox County's local sales tax alone. That sales tax is 2.25 percent, correct?

A. That's what it says, yes.

Q. And do you have any reason to



contest that figure?

A. No, I do not, other than I didn't look it up personally myself. But I have no reason to believe that this is in any way in error.

Q. And in an average year, how much sales tax do you individually pay to Knox County?

MR. MCNEAL: Objection. Speculation.

THE WITNESS: You would want me to think about an average year -- can you clarify exactly what you're saying? An average year...

BY MR. ANDERSON:

Q. Let's just say, for instance, 2025.

A. Okay.

Q. In that year, how much sales tax did you individually pay to Knox County?

A. That is not a number that I would be able to give you at this point in time.

Q. Can you -- my apologies for interrupting.

A. No.

Q. Can you roughly estimate the amount of sales tax that you paid to Knox County in 2025?

A. I am not comfortable venturing a

Page 17

guess.

Q. So it would just be a guess for you to estimate how much sales tax you paid to Knox County in 2025?

A. Without going through a wide variety of records that I do not have on hand at this point, and I'm not even certain that I could produce, right, it would only be a guess.

Q. Have you ever tried to estimate how much sales tax --

MR. MCNEAL: Objection.

BY MR. ANDERSON:

Q. -- you paid in 2025 to Knox County?

MR. MCNEAL: Objection. Overbroad.

THE WITNESS: No.

BY MR. ANDERSON:

Q. So before you entered this lawsuit, you didn't try to estimate how much sales tax you paid to Knox County in 2025; is that right?

A. Correct.

Q. And before you signed your responses to Plaintiff's First Set of Interrogatories, you didn't try to estimate how much sales taxes you paid to Knox County in 2025; is that correct?

A. Correct.

Page 18

Q. But then how can you say under penalty of perjury that you paid sales taxes to Knox County in 2023, 2024, and 2025?

MR. MCNEAL: Objection. Compound. Go ahead.

THE WITNESS: You have asked if I have a rough estimate of how much specifically of our sales tax payments has gone to Knox County. I know that we paid sales tax multiple times every time necessary in 2023, 2024, and 2025, and so I can fatefully say that we have done that without necessarily being able to produce a specific figure at this time.

BY MR. ANDERSON:

Q. Okay.

A. And it's not a conversation, but do you have kids? You pay sales tax. You are buying things constantly.

Q. I have a newborn. I now recently understand what that is like.

A. And there's no way that you necessarily track every single -- you're not returning your diapers for sure. So, yeah.

MR. FELDMAN: Is it fully necessary

Page 19

to go through, like, the schedule again? I mean, you have the information.

MR. NORRIS: Yes, it is necessary.

MR. FELDMAN: You have the information, right? Our clients are just going to read through.

(Exhibit AC-3, 2025 IRS Instructions for Schedule A (Form 1040), marked for identification.)

BY MR. ANDERSON:

Q. I'm handing you what will be marked Deposition Exhibit AC-3.

A. Okay.

MR. MCNEAL: What is this?

MR. ANDERSON: This is the 2025 instructions, the IRS's instructions for itemizing deductions for the 2025 tax year.

BY MR. ANDERSON:

Q. If you could, please turn to page 18. That's just the last page.

So this page contains tables for estimating the amount of local sales taxes that you paid in 2025. Do you see that the table at the top of the page tells you to use Local Table B to estimate the local sales tax if you live in Knox

Page 20

County -- or, excuse me, if you live in Tennessee. And that's just the column on the far left under the title "If you live in the state of" dot, dot, dot. Go all the way down to the bottom, the third from the bottom says Tennessee.

Do you see -- do you see that cell?

A. I do. Yes, sir, I see B as local table.

Q. Great.

And do you see, going across, that it says B as local table?

A. Oh. Yes, sir.

Q. Okay.

So then based on that reference to B, we'll go down to the next set of tables. This is titled under 2025 optional local sales tax tables. It's the sixth -- or five tables in total, income on the far left, Local Table A, Local Table B.

So let's estimate how much sales taxes your family in particular would pay. So if we go under the income column on the far left for the income of twenty twenty-five thousand -- or 225,000 to 250,000.

A. Uh-huh.

Q. And then we go over to the right,

Page 25

BY MR. ANDERSON:
Q. I'll break it into two questions.
A. Okay.
Q. First, do you have any reason to dispute that the highest figure of Local Table B, the highest average 2025 sales tax figure Local Table B for Knox County sales taxes would be $911.25?
MR. MCNEAL: Objection, the same exact.
THE WITNESS: I have no reason to dispute that the IRS has on their table that that would be the figure.
BY MR. ANDERSON:
Q. And do you have any reason to believe that you paid more than that figure?
A. Yes.
Q. Do you think you paid more than $911.25 in Knox County sales tax in 2025?
A. I would feel like that is an underestimate without having the data available to let you know for certain.
Q. So if you spent every penny of your let's say $250,000 income -- actually, first let me just circle back.

Page 26

Do you think that $219.25 figure could be an overestimate of how much you paid in 2025 for Knox County sales tax?
A. I really am uncomfortable trying to give a good solid estimate. I do know that my ninth grader is in band as a freshman at Bearden High School, which involves a lot of upfront costs that other families might not necessarily be engaging in, and are in fact prohibited for a lot of families. So just that fact alone skews the kinds of purchases that we made in 2025. So I really -- I don't feel like I have a good handle on and I don't want to tell you wrong.
Q. So if you spent every penny of your $250,000 income --
A. On band?
Q. -- on goods that are subject to sales tax, you would have paid $5,625 in local sales taxes in 2025.
MR. MCNEAL: Objection. Speculation as to spending every penny.
MR. NORRIS: I don't think he asked a question.
THE WITNESS: Oh, he didn't ask a question?

Page 27

BY MR. ANDERSON:
Q. To finish, do you have any reason to believe that you paid more than $5,625 in sales taxes to Knox County in 2025?
MR. MCNEAL: Same objection.
THE WITNESS: I do not know what we paid to Knox County in 2025.
BY MR. ANDERSON:
Q. So just to reiterate, you do not know if you paid more sales taxes to Knox County in 2025 than is possible to pay if every single cent of your $250,000 income went to goods that are subject to sales tax?
MR. MCNEAL: Objection, vague. Objection, compound.
MR. FELDMAN: Asked and answered too. She's already said she doesn't know. Can we please move on from this?
MR. NORRIS: No, she did not answer.
MR. FELDMAN: She said she doesn't know. That was her answer.
THE WITNESS: The -- the thing is about this table is that it is generated with guesses from the IRS that I don't necessarily know how they got those data. And then on top

Page 28

of that, anybody may spend more money than their income because income only reflects the new money that you have brought in that year. So again, I do not want to lead you astray in any kind of way, but reflecting on some sort of, like, pinpointing a figure at all.
I would find it unlikely that we paid more than that, I think it was probably $6,000 to Knox County in 2025 to Knox County specifically in terms of the portion of the sales tax that we pay when we make any purchase going directly to Knox County, but I don't want to tell you something that is not accurate. I really -- I don't know. And my finding it unlikely at this point in no way means that it is in any way unlikely.
I'm so sorry, I don't know a better way to tell you without, like, you know, making something up, and I don't want to do that.
MR. NORRIS: Can we go off the record?
(Whereupon, an off-the-record discussion took place.)
MR. NORRIS: We can go back on the

Page 29

record.

BY MR. ANDERSON:

Q. Are you familiar with the Wilberforce Academy of Knoxville?

A. Yes, to the degree that it has availability for familiarity.

Q. What do you mean by, quote, to the degree that it has the ability for familiarity?

A. That it doesn't have a history of existence in Knox County that I can necessarily refer to and say I'm familiar with.

Q. And what is Wilberforce Academy?

MR. MCNEAL: Objection. Vague.

THE WITNESS: My understanding is that it is a proposed charter school that submitted a -- some paperwork to Knox County schools to get the ball rolling in terms of setup and approval.

BY MR. ANDERSON:

Q. What type of proposed charter school is Wilberforce Academy?

A. My understanding of what they mentioned in the documents that are publicly available is that they are a Christian-based facility who intends to use biblical principles in

Page 30

their curriculum. I think that they are planning to serve both boys and girls in the school, as far as I can recollect. And that's about what I can say for certain.

Q. And do you object to your taxes going to support Wilberforce Academy?

A. Do you -- tell me more.

Q. Do you object to the use of state and county tax dollars going to fund the Wilberforce Academy?

A. I do.

Q. And --

A. I didn't know if you were just asking about the Knox County stuff because you asked that earlier.

Q. And why do you object to your taxes going to support Wilberforce Academy?

A. Oh. Okay. In the first place, I do not believe that public money, public taxpayer money that is intended for public schools should go to charter schools in the way that Tennessee has that setup at this point in time. But on top of that, I do not believe that there should be any faith-based educational institution that is operating as a public school and is overseen by the government

Page 31

should be operating or receiving taxpayer money that is intended for public schools.

Q. Do you object to all charter schools?

A. I do not object to all charter schools. I do object to the system that Tennessee has set up for that, but I have lived and worked in other places with different situations.

Q. Do you object to all Tennessee charter schools?

A. At this point in time, I do.

Q. Do you find any of Wilberforce Academy's religious beliefs objectionable?

A. I don't believe that I have seen anything that spells out their religious beliefs at this point in time.

Q. So right now, you don't find any of Wilberforce Academy's religious beliefs objectionable?

A. I fundamentally find the idea of an educational institution that is pervasively religious in purpose and did mention the inerrancy of the Bible as a guideline in their curriculum, I did find that objectionable.

Q. What in particular about the

Page 32

inerrancy of the Bible do you find objectionable?

A. I feel like that is a very specific indicator of how that school will operate, which is fine if it's a private school that is not overseen by the government, not part of the government. But Wilberforce is asking to be overseen by the government, funded by the government, and supported by the government.

Q. And if Wilberforce Academy opened today, how much of your taxes would go to Wilberforce Academy?

MR. MCNEAL: Objection. Speculation.

THE WITNESS: I don't think I can answer that.

BY MR. ANDERSON:

Q. Why can you not answer how much of your taxes would go to Wilberforce Academy if Wilberforce Academy opened today?

MR. MCNEAL: Objection. Again, asking for speculation.

THE WITNESS: I -- again, I haven't seen any kind of fully thought out plan or proposal for how Wilberforce intends to operate. But beyond that, any money

Page 33

designated for public schools that is then stipend into a private school or a charter school -- a charter school, necessarily comes from the single pool of money that is intended for public schools, whether it's pulling from, you know, the specific money that I personally paid in Knox County only taxes or from the entire pool of taxpayer money.

BY MR. ANDERSON:

Q. So let's assume that only $100 of your taxes went to Wilberforce Academy. Would you still object to your taxes going to Wilberforce Academy if only $100 of your taxes went to the school?

MR. MCNEAL: Objection. Speculation.

THE WITNESS: Yes.

BY MR. ANDERSON:

Q. The same question but --

A. I do want to clarify that Wilberforce, as we understand it, to be operating, which is very minimal at this point in time. Like, there's not really -- it was just kind of a paragraph of what they want to do.

Q. And what if only one dollar of your

Page 34

taxes went to Wilberforce Academy, would you still object then?

MR. MCNEAL: The same objection.

THE WITNESS: Of the tax money pool that is designated for public schools, government-operated public schools, a dollar of that pool, yes.

BY MR. ANDERSON:

Q. And what if only one penny of your taxes went to Wilberforce Academy?

MR. MCNEAL: Objection, speculation. Objection, asked and answered. You're asking the same question.

BY MR. ANDERSON:

Q. Would you still object then?

A. I would, I imagine.

Q. And then the last question on this line. If only a fraction of one penny went to Wilberforce Academy, would you still object then?

MR. MCNEAL: The same exact objection.

THE WITNESS: My personal issue is not only with my specific tax dollars going to Wilberforce. Therefore, yes, a fraction of the money would likely be objectionable, but I

Page 35

don't know because I don't know what they are proposing to do. I don't know how they propose to operate in a really functional day-to-day logistical situation. Again, we really only have a paragraph or so to make any guesses on.

BY MR. ANDERSON:

Q. Have you read Wilberforce's 279-page application to sponsor a religious charter school?

A. Is that a publicly available document?

Q. That is a document produced in this litigation.

A. Oh. No. To my knowledge, nothing like that has been submitted to the school board. And I certainly have not seen it.

Does it exist?

Q. Wilberforce's application has been submitted in this litigation.

A. In the litigation, but not here, right? Not like actually to the district; is that right? Sorry.

Q. We can just move on.

I'm going to turn now to what will be marked as Deposition Exhibit AC-4.

Page 36

(Exhibit AC-4, Tire Environmental Act Program (TEAP), marked for identification.)

THE WITNESS: Do I keep these or do they stay here?

MR. MCNEAL: They stay here.

THE WITNESS: Okay.

MR. MCNEAL: What is this?

MR. ANDERSON: This is --

MR. MCNEAL: That's the tire thing?

MR. ANDERSON: Yeah. Yeah, it's a copy of a document entitled Tire Environmental Act Program.

BY MR. ANDERSON:

Q. So please take a minute to review the first two pages.

(Witness reviewing document.)

THE WITNESS: Can we go off the record?

Whenever I hear or see tire/scrap tire heaps, I think about the fire that was a few years ago. It was very pungent. It was very smoky. It -- you can look it up. So part of that is just thinking about the tire fire. They caught on fire.

Page 53

A. I know. And I feel badly because I'm like I'm trying to be ready for when you ask, but then at the same time I need to listen. I don't mean to.

Q. Don't worry about it. Totally fine.

How will any diversion of funds from the opening of Wilberforce Academy affect your child's education? Your children's education specifically?

MR. MCNEAL: Objection, compound. Objection, speculation.

THE WITNESS: Which is it specifically that you're referring to?

BY MR. ANDERSON:

Q. I'll rephrase.

A. Okay.

Q. How will any diversion of funds will the opening of Wilberforce Academy affect your sixth grader's education particularly?

MR. MCNEAL: Objection. Speculation.

THE WITNESS: When a charter school opens with the district, that removes the moneys that are pooled district wide and distributed in a wide variety of ways from all schools. So what I can say for sure is that my sixth grader would be more affected than my ninth grader just due to the length of time remaining in the district. But in terms of specifics, that's not something that we could know at this point in time because there would be a whole budgetary process that would delineate that. And that is not something that we're -- to my knowledge, that is nothing that we're at the point of.

Page 54

Is that right, that we're not at the point of that whole piece of it?

BY MR. ANDERSON:

Q. We'll move on to a different line of questioning.

A. Okay.

Q. Are you aware that the earliest that Wilberforce could open is in the fall of 2028?

A. Huh-uh, I was not aware.

Q. And what grade would your sixth grader be in in the fall of 2028?

A. So this is the fall of 2027; seventh grade. The fall of 2028 will be eighth grade.

Q. So your youngest will be in eighth grade in the fall of --

Page 55

A. Wait. This is 2026. Seventh grade in the fall of 2026. Eighth grade in the fall of 2027. You said in 2028. So she will be in ninth grade at that time.

Q. So your youngest will be a high schooler in the fall of 2028; is that correct?

A. Lord willing. That is the plan, yes.

Q. And are you aware that Wilberforce Academy will, even at maximum capacity, only ever be open to students from kindergarten to eighth grade?

MR. MCNEAL: Objection. Speculation.

THE WITNESS: Yeah, I don't know that we know that. Because what a lot of charter schools do is they'll have like a transitional process for opening. They'll start with a few grades, and then add a few more, add a few more, a few more. But if that's the specific plan at this time and there's no necessarily way that they would change that, I don't know.

BY MR. ANDERSON:

Q. I'll represent to you that if Wilberforce opens in the fall of 2028, which is unrealistic, it will start as a K through third grade school.

Page 56

A. Okay.

Q. And then in the fall 2029, it will be K through fourth grade.

A. Yeah.

Q. And then the fall of 2030, K through fifth grade and so on only up to eighth grade.

So given that timeline as I just described it, how will funding for your youngest high school be affected at all by Wilberforce which will never open a high school?

MR. MCNEAL: Objection, assumes facts. Objection, compound. Objection, speculation.

THE WITNESS: I feel like it's the same answer that I gave before where any of those funds designated for Knox County schools, the LEA district, and not Knox County school specific schools is removed from the general funding, then every school in the district is affected by that, like, whether it's elementary school, middle school, high school, whether it's a special day school, whether it's the preschool program, any of it.

Page 57

BY MR. ANDERSON:

Q. Do you think any students will go from -- just to back up for a sec.

A. Okay.

Q. Your youngest will go to -- did you say Bearden?

A. Bearden High School, yes.

Q. Will any students from Bearden High School transfer out to a K through eight school?

A. I don't know. I'm sure there's scenarios where that would be possible, but I cannot think of any at this time.

I find it unlikely that any freshman, sophomores, juniors, or seniors would like to revisit kindergarten, but I don't know. You all have seen the movies. I don't think that they will, but I don't want to say for sure there's not something crazy down the road.

Q. Got it. Well, that's a good note to wrap up on. So we'll call it there.

A. Okay.

MR. ANDERSON: If we want to go off the record, and then I assume you guys will have a couple of questions.

MR. FELDMAN: Yeah, we'll take five

Page 58

minutes.

(Whereupon, a recess took place.)

MR. FELDMAN: We are just going on the record. No further questions. That's it.

(Whereupon, the deposition concluded at 4:02 p.m.)

Page 59

C E R T I F I C A T E

STATE OF TENNESSEE:
COUNTY OF KNOX:

I, LORA R. BOATMAN, Licensed Court Reporter, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am licensed by the State of Tennessee as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand this the 2nd day of June, 2026.



LORA R. BOATMAN, LCR No. 106.
Expiration Date: 6/30/2026.

# EXHIBIT 63

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

Case No. 3:25-cv-584 (CEA)(DCP)

THE WILBERFORCE ACADEMY OF KNOXVILLE,

Plaintiff,

v.

KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County School Board of Education,

Defendants,

REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. KATINA SHARP,

Intervenor-Defendants,

ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER,

Intervenor-Defendants.

DEPOSITION OF ELIZABETH A. PORTER

MAY 18, 2026



APPEARANCES:

FOR WILBERFORCE ACADEMY OF KNOXVILLE:

Cameron T. Norris
Ryan M. Proctor
R. Gabriel Anderson
CONSOVOY McCARTHY, PLLC
1600 Wilson Road, Suite 700
Arlington, Virginia 22209
(703)243-9423

FOR INTERVENOR-DEFENDANTS REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP:

Mitchell E. Feldman
Wanqian Zhang
MORRISON FOERSTER, LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
(617)648-4759

FOR DEFENDANTS KNOX COUNTY:

Rachel K. Harrison
DEPUTY LAW DIRECTOR
400 Main Street, Suite 612
Knoxville, Tennessee 37902
(865)215-2327

FOR INTERVENOR-DEFENDANTS ADRIENNE CARROLL, et al:

David D. Ayliffe
Thomas H. Jarvis
BAKER DONELSON
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
(865)549-7132



APPEARANCES CONTINUED:

Luke Anderson
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202)466-3234



INDEX OF EXAMINATIONS


| | Page No. |
|---|---|
| By Mr. Norris | 6 |
| By Mr. Feldman | 66 |


INDEX OF EXHIBITS


| Exhibit | | Page No. |
|---|---|---|
| 1 | Coble Intervenor-Defendants' First Supplemental Responses To Plaintiff's First Set of Interrogatories | 7 |
| 2 | Local Sales Tax Rates | 15 |
| 3 | 2025 IRS Instructions for Schedule A (Form 1040) | 17 |
| 4 | Tire Environmental Act Program (TEAP) | 32 |
| 5 | Education Freedom Scholarship Program | 41 |
| 6 | 5/4/2026 Article - TN School Board Clears Way for Nation's First Religious Charter School | 44 |
| 7 | Declaration of Elizabeth Porter | 47 |
| 8 | Coble Intervenor-Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories | 49 |
| 9 | State of Tennessee Public Chapter No. 963; House Bill No. 2532 | 55 |
| 10 | United States Code Annotated Title 42; Proceedings in Vindication of Civil Rights | 61 |

Page 13

A. I can tell you an estimate of mine. I cannot tell you an estimate of his.
Q. Okay. What was yours in 2024?
A. Somewhere between 60- and $70,000.
Q. Okay. What was yours in 2025?
A. The same.
Q. Sixty- to $70,000?
A. Uh-huh.
Q. What do you expect your income to be in 2026?
A. Relatively the same.
Q. When -- in 2024 when you were still married, your combined income, would you say it was less than a million dollars a year?
A. Yes, I think that's fair.
Q. Would you say it was less than $500,000?
A. Yes.
Q. Was it less than $300,000?
A. Very likely.
Q. Less than $100,000?
A. No. I would have to look. I don't deal with his finances.
Q. Is it fair to say a good estimate of your combined income in 2024 is between a hundred

Page 14

and $300,000?
A. Sure.
Q. Can you turn back to Exhibit No. 1. This time I really want you to look at page 3.
Do you see the first full paragraph that starts with the words "subject to"?
A. Yes, I do.
Q. Can you take a second to read that for me and let me know when you're finished.
A. I finished.
Q. Okay.
You testified here, am I correct, that you pay no property taxes; is that right?
A. That's correct.
Q. You also testified here that you paid sales taxes to Knox County in 2023, 2024, and 2025; is that correct?
A. I pay whatever taxes come with purchasing things.
Q. Right. So you paid sales tax in Knox County specifically; is that correct?
A. Yes.
Q. Do you know what the local sales tax rate is in Knox County?
A. I do not.

Page 15

Q. I'm going to hand you deposition Exhibit 2.
(Exhibit 2, Local Sales Tax Rates, marked for identification.)
BY MR. NORRIS:
Q. Can you take a second to read that and let me know when you're finished.
A. I finished.
Q. Okay.
Do you agree that the local sales tax rate for Knox County is 2.25 percent?
A. If that is what is indicated on this paper, but I've never seen this paper before.
Q. Do you have any reason to doubt that the local sales tax rate for Knox County is 2.25 percent?
MR. FELDMAN: Objection. I'm sorry, what is it we're looking at here?
MR. NORRIS: This is a printout of the local sales tax rates for counties in Tennessee, and this one shows the local sales tax rate in Knox County.
BY MR. NORRIS:
Q. Let me ask the question again. Do you have any reason to doubt that the local sales

Page 16

tax for Knox County is 2.25 percent?
A. I don't have any reason to have an opinion about it. This is the first time I've seen this paper.
Q. Okay. If you look in the bottom left-hand corner, can you see this is a printout from a website from Tennessee.gov?
A. Yes.
Q. Do you have any reason to doubt that the sales tax rate in Knox County is 2.25 percent --
MR. FELDMAN: Objection.
BY MR. NORRIS:
Q. -- after seeing that this is a printout from a Tennessee.gov website?
MR. FELDMAN: Objection. Asked and answered.
THE WITNESS: It is what you are telling me is correct.
BY MR. NORRIS:
Q. Let's assume for the rest of the deposition that the local sales tax is 2.25 percent. Given that assumption, in an average year, about how much sales tax do you think you pay to Knox County?
A. I have no way to estimate that.
Q. You have no way to estimate that?

Is that your testimony?
A. My testimony is I never tried to put a number on that before, and I don't have any idea where I would start to do that.
Q. Okay.
So you did not try to estimate that amount before your deposition today?
A. That's correct.
Q. Okay.
Did you try to estimate that amount before answering that interrogatory question in Deposition Exhibit No. 1?
A. My statement -- my statement in the paperwork is that I pay sales tax, not that I've estimated how much I pay.
Q. How did you answer that, yes, that you do pay sales tax in that interrogatory answer Deposition Exhibit No. 1?
A. Because when I purchase things, they automatically charge me tax for that.
Q. Okay.
I'm going to hand you Deposition Exhibit No. 3.
(Exhibit 3, 2025 IRS Instructions for Schedule A (Form 1040), marked



for identification.)
BY MR. NORRIS:
Q. I'm going to ask you to turn to page 18, which is the last page.
A. Okay.
Q. I'm going to represent to you that this document is the IRS instructions for estimating sales tax. Do you see that the last page, page 18, contains tables for estimating the amount of local sales taxes that a person paid in 2025?
A. Yes.
Q. Okay.
Do you see the table at the top of the page where it tells you that if you live in Tennessee, you should estimate your local sales tax by using Local Table B?
A. Yes.
Q. Okay.
Do you see Local Table B at the bottom of this page?
A. Yes.
Q. So let's assume in early 2025 a family of three making $300,000 -- do you see what the estimated sales tax is for such a family in Table B?



A. Yes.
Q. What number do you see?
A. Are you saying that my family made $300,000?
Q. I'm asking you to assume a family of three that makes $300,000 or more.
A. Just a generic family?
Q. Yes.
A. Okay. Yes, I see that.
Q. What is the number that it says there?
A. 327.
Q. Do you see at the title of Table B, that this is based on a -- that Table B is based on a local sales tax rate of 1 percent?
A. Yes.
Q. I cannot do this in my head, but do you know what 327 times 2.25 is?
A. I do not.
Q. I'm going to represent to you that that is $736. Do you have any reason to doubt that in 2025 that your family paid more than $736 in sales tax to Knox County?
MR. FELDMAN: Objection to form.
THE WITNESS: Could you repeat



yourself?
BY MR. NORRIS:
Q. Sure.
So the assumptions we're working here is that 2.25 times 327 is $736. We're assuming a family of three that makes over $300,000 a year. That spits out an amount of $736 in sales tax to Knox County. Do you have any reason to believe that your family's sales tax in 2025 would be more than $736?
A. Based on the information you're giving me, and without going through my own records, I don't know that I could -- I feel like it would be more useful to talk about my family and not -- not a hypothetical of three making $300,000.
Q. Okay.
Do you have any reason to doubt the IRS's estimate for the average family of three making over $300,000?
A. Based on the information you're giving me, I have to -- I have to make a determination based on that, right? I don't have a reason to argue with the IRS, I suppose.
Q. Okay.
Let's move away from taxes, which

Page 21

I'm sure we're all glad to do.
Are you familiar with the Wilberforce Academy of Knoxville?
A. Only vaguely.
Q. What is your vague familiarity?
A. That they hope to open a publicly funded religious school within the county.
Q. Okay.
Do you know what type of school they want to open within Knox County?
A. No. Could you be more specific?
Q. Do you know if it's a charter school that they intend to open in Knox County?
A. My understanding that it was a charter school.
Q. So apologies to go back to taxes one more time.
Do you object to your tax money going to support Wilberforce Academy?
A. I do.
Q. What is the basis for that objection?
A. That they are -- that their intention appears to be to promote religious education in their classrooms and in their

Page 22

institution but to use public funding for that.
Q. Okay. Are there any other bases for your objection?
A. That it would be a violation of our constitutional right for the separation of church and state.
Q. You mentioned constitutional right. Do you mean the Federal United States Constitution?
MR. FELDMAN: Objection. You're asking for a legal opinion from a witness.
THE WITNESS: I would leave that to my attorney.
BY MR. NORRIS:
Q. So your testimony was that it violates our Constitution, but you can't say what part of our Constitution it violates?
MR. FELDMAN: Objection. Asked and answered.
THE WITNESS: I believe that my attorney would be best suited to answer that.
BY MR. NORRIS:
Q. Okay.
Do you believe -- I believe you used the word "violates" our Constitution. Do you also mean the Constitution?

Page 23

A. I believe that would be best suited to be directed towards an attorney.
Q. Are there any religious beliefs that you believe Wilberforce Academy has that you find objectionable?
MR. FELDMAN: Objection. Compound and vague.
BY MR. NORRIS:
Q. Let me rephrase.
Do you find any of Wilberforce's religious beliefs objectionable?
A. I don't know enough about Wilberforce's belief system other than in a general manner, but I also believe that people should be free to practice whatever religion they believe in.
Q. Okay.
If Wilberforce Academy opened as a charter school in Knox County, how much of your tax dollars would go to support Wilberforce Academy?
MR. FELDMAN: Objection. Calls for speculation.
THE WITNESS: I have no way to determine that.
BY MR. NORRIS:
Q. Could you repeat your testimony?

Page 24

I'm sorry, I didn't hear you.
A. I would have no way to determine that.
Q. Okay.
Did you try to determine that before your deposition today?
A. I did not.
Q. Let's assume that only $100 of your tax dollars would go to support Wilberforce Academy. Would you object to that $100 going to Wilberforce Academy?
A. I don't think I can speculate in terms of any amount going there. I think that public funding is for public schools.
Q. Okay.
I asked you to assume that $100 of your tax dollars go to Wilberforce Academy. So assuming that $100 of yours goes to Wilberforce Academy and we can prove that and we know that, would you object to that $100 going to Wilberforce?
MR. FELDMAN: Objection. Asked and answered.
THE WITNESS: I don't think I'm in a position to make assumptions.
///

Page 25

BY MR. NORRIS:
Q. Okay.
I'm going to ask this one more way. Let's assume that the amount of your tax money going to Wilberforce Academy was one penny per year. On that assumption, would you object to that one penny going to Wilberforce Academy?
A. So I'm not going to make any assumptions about finances or where tax money is spent, only that public funding is for public education.
Q. Okay.
Am I correct that you do object to your tax dollars going to support a religious charter school?
A. Yes.
Q. What is the basis for that objection if it is not -- if you are not sure that your tax money will go to Wilberforce Academy?
MR. FELDMAN: Objection. Mischaracterizes prior testimony.
THE WITNESS: I think that public funding is for public schools and public education. And past that, I'm not party to how that money is spent in terms of a dollar

Page 26

or a penny.
BY MR. NORRIS:
Q. Are you sure that if Wilberforce Academy opened that some amount of your tax dollars would go to support that school?
A. My understanding is that's what they are asking for.
Q. Do you know anyone else in Knox County who shares your objection to Wilberforce Academy?
A. I have not spoken with anybody about the legal case.
Q. Have you spoken to anyone about Wilberforce Academy outside of the legal case?
A. Not directly.
Q. Other than your attorneys. I was not asking about that.
A. Correct.
Q. Have you spoken to anyone outside of Wilberforce Academy in the legal case about religious charter schools?
A. I can't recall any particular conversations. I know that things are oftentimes in the news and people talk, but I have not sought out any conversations.

Page 27

Q. Are you aware of anyone else who shares your objection to Wilberforce Academy?
A. Again, I have not spoken with anybody. I'm not seeking out information from my peers.
Q. Outside the context of conversations that involved your attorneys, have you ever spoken to any of the other four intervenors in this case?
A. No, I've never met them.
Q. Okay.
Is it fair to say that you intervened in this case to help ensure that Wilberforce Academy does not open?
A. No. I intervened in this case because I think that public education should be publicly funded and that's it.
Q. Okay.
If Wilberforce Academy never opened, then your tax dollars would not be used to support that religious charter school; is that correct?
MR. FELDMAN: Objection. Vague.
THE WITNESS: I don't understand the question.
BY MR. NORRIS:
Q. Sure.

Page 28

So am I right you previously testified that you object to your tax dollars going to support a religious charter school? Is that correct?
A. Yes.
Q. Okay.
So if Wilberforce Academy does not open, then your tax dollars will not go to support that religious charter school; is that correct?
A. My tax dollars would not go towards something that did not exist, correct.
Q. Okay.
Do you oppose charter schools generally?
MR. FELDMAN: Objection. Vague as to charter schools.
THE WITNESS: Yeah, I would need more information.
BY MR. NORRIS:
Q. Do you know what a charter school is?
A. In very simplistic terms, yes.
Q. Can you describe it in your terms?
A. That a charter school is publicly funded eduction that's an alternate to traditional

Page 45

BY MR. NORRIS:
Q. When you get done reading that page, can you let me know?
(Witness reviewing document.)
THE WITNESS: I'm done.
BY MR. NORRIS:
Q. Okay.
Prior to reading this document, were you familiar with Union Academy in Madison County, Tennessee?
A. No, not at all.
Q. Now that you have seen this document, are you aware that Union Academy is a proposed religious charter school in Madison County, Tennessee?
A. That is what this article purports to say.
Q. Okay.
Does this article say that Union Academy has been approved to open by Madison County, Tennessee?
A. This is the first time I've seen this document. I don't have an opinion on Madison County, and I don't know anything about Union Academy. I also don't know who these people are who

Page 46

wrote this.
Q. Okay.
Does the first paragraph of this page say that Union Academy was approved to open by Madison County, Tennessee?
A. That is what the words on this page say, yes.
Q. Okay.
Let's assume that Union Academy has been approved in that it is a religious charter school in Madison County, Tennessee. Do you object to your state and federal taxes going to support Union Academy?
A. My only concern is my Knox County taxes at this time.
Q. Okay.
So let's say Wilberforce Academy opened. Would you consider enrolling your child there?
A. No.
Q. Okay. Why not?
A. It has no interest to me. I don't intend to raise her in that particular dogmatic tradition.
Q. Okay. What dogmatic tradition is

Page 47

that that you're referring to?
A. They were affiliated with the Christian church or the Christian world religion. I'm not entirely sure which branch.
Q. Would you consider sending your child to any religious school through twelfth grade?
A. Um, I think that's too hypothetical.
Q. Okay. I'll hand you another exhibit.
I'm handing you Deposition Exhibit 7.
(Exhibit 7, Declaration of Elizabeth Porter, marked for identification.)
BY MR. NORRIS:
Q. I'd like you to turn to paragraph 7.
Is this your declaration?
A. Yes.
Q. Can you read for me paragraph 7?
A. (As read:)
"I believe that approval of a religious charter school would result in diversion of limited public funds away from other public schools, including my

Page 48

child's, that are appropriate for and welcoming to students of all faiths and backgrounds."
Q. Can I ask you what you meant by "diversion of limited public funds away from"?
A. Sure. So a religious charter school would take away funds from traditional public schools or public schools in general.
Q. Can you explain to me how a religious charter school would take away funds from other nonreligious public schools in Knox County?
A. My understanding is that they are requesting funds and that there is a limited pool of funding; so therefore, they would be taking funds away.
Q. Okay. This will be Deposition Exhibit No. 8.
Sorry, I don't need to make a new exhibit.
Do you have Exhibit No. 1 in front of you still?
A. Yes.
Q. Can you turn back to that?
Bear with me for a second.

A. I think that children in education should always be well funded, and I would never object to giving more funding to public schools.

Q. Okay.

Do you believe the current level of funding from the state is too low?

A. I don't have knowledge of the current level of funding from the state.

Q. Okay.

Do you know when at the earliest Wilberforce Academy could open?

A. No, I don't.

Q. Okay.

Do you know what grades Wilberforce Academy plans to cover?

A. No.

Q. All right. You believe that if Wilberforce Academy opens, it will defer funding from your child's school; is that correct?

A. I believe it would divert funding from all public schools in Knox County, or it has the potential to at least.

Q. Is it your testimony that one of the schools that has the potential to divert funding from is your child's school?



A. I think it's likely.

Q. That likely diversion of funding in your view, how would that affect your child's education?

MR. FELDMAN: Objection. Overbroad.

THE WITNESS: I would need more information.

BY MR. NORRIS:

Q. Would the likely diversion of funding from the opening of Wilberforce Academy away from your child's school have any effect on your child?

A. I think it's very likely that if funding is diverted, there are fewer resources.

Q. How would that likely decrease in resources affect your child specifically?

A. That she would have fewer resources in school.

Q. Can you name one resource that she would have less of?

A. I can't name a resource. It's hypothetical in a situation with a hypothetical budget.

Q. Okay.

Do you believe that if Wilberforce



Academy opened, your child's school would receive less per pupil funding in 2025-2026?

MR. FELDMAN: Objection.

THE WITNESS: I don't know how funding is calculated.

BY MR. NORRIS:

Q. Okay. One more exhibit. We are near the end here. This will be Deposition Exhibit 9.

(Exhibit 9, State of Tennessee Public Chapter No. 963; House Bill No. 2532, marked for identification.)

BY MR. NORRIS:

Q. I apologize. This is dense. But I want to direct you to -- do you see Section 3 of this document?

A. Yes.

Q. Okay.

So I'll represent to you that this document is a statute that was recently passed by the Tennessee legislature and signed by Governor Bill Lee. Can you take a second to read Section 3, but only to the extent it covers this first page. You can stop at the end of the first page.



A. I did not bring my glasses today, so I'm sorry, it will take me a second.

Q. That's okay. Take your time.

(Witness reviewing document.)

THE WITNESS: Okay.

BY MR. NORRIS:

Q. Okay. Have you seen this statute before?

A. No, I have not.

Q. Okay.

Do you agree that it says that if a school loses students in the 2027-2028 school year or 2028-2029 school here that the school's per pupil funding cannot decrease below the level it was at in 2025-2026?

MR. FELDMAN: Objection. I mean, we're asking statutory interpretation here, not for legal opinion.

THE WITNESS: I don't have legal education.

BY MR. NORRIS:

Q. Okay.

Let me represent to you that this statute means that if a school loses students, its funding cannot be decreased below 2025-2026 levels.

Page 57

On that assumption, are you still concerned that the opening of Wilberforce Academy would divert funding from existing public schools in Knox County?
A. I mean, I can't offer any sort of interpretation of this statute.
Q. I asked you to assume that my interpretation was correct. Under that assumption, does that change your opinion if my assumption is true?
MR. FELDMAN: I'm going to object to the extent that mischaracterizes the statute.
THE WITNESS: I think that that's a very broad question, and I would need more information.
BY MR. NORRIS:
Q. Okay.
Let's set aside the statute. Let's just say that Tennessee legislature guaranteed that all public schools could not lose funding if they lost students. Would you still be concerned if the Tennessee legislature did that that your child's school would lose funding if Wilberforce Academy opened?
A. I think it's a very general question.

Page 58

Q. What's your answer to it?
A. That I would need more information to form an opinion.
Q. What more information would you need?
A. I guess I would need information about the budget, about where that money is coming from, about lots of different things that I could not possibly speculate to based on like four sentences.
Q. Okay.
Would you agree that funding for Knox County public schools turns in part on how many students are enrolled in Knox County public schools?
A. I don't know.
Q. Okay.
In your opinion, if a new private school opened near your child's school, would the opening of that new private school divert funding away from your child's school?
MR. FELDMAN: Objection. Calls for speculation.
THE WITNESS: I would need more information.
///

Page 59

BY MR. NORRIS:
Q. What information would you need?
A. I mean, I can't speculate to a condition that does not exist.
Q. But you previously testified, correct, that the opening -- the hypothetical opening of Wilberforce Academy would divert funds from your child's school; is that correct?
A. I testified that it was likely or it was possible.
Q. Is your testimony that it's likely or that it's possible?
A. Both.
Q. Okay.
How are you able to testify that Wilberforce Academy's opening will likely divert funds from your child's school?
A. Because they are asking for public school money.
Q. If a new public school opens near your child's school, would that divert money from your child's school?
A. I don't know.
Q. Why do you not know the answer to that question?

Page 60

A. Because I don't have intimate knowledge of how budgets and funding for the public school system works on a granular level.
Q. But you have enough knowledge to testify that it's likely that Wilberforce Academy's opening will divert funds from your child's school; is that correct?
A. Wilberforce Academy is not a public school. They would want a charter school status.
Q. Okay.
But if a new charter school opens near your child's school, would that divert funding away from your child's school?
A. I think that is likely.
Q. Is that diversion likely irrespective of whether that charter school is religious or nonreligious?
A. I haven't considered that.
Q. If that charter school were nonreligious, would the diversion of funding away from your child's school differ in any way of the diversion that you claim is likely from Wilberforce Academy?
A. I haven't considered that.
Q. What would you need to know to

answer that question?

A. I think the issue is that this is all very hypothetical, right? My opinion is that public funding should go to public education.

Q. Does it remain your testimony that the opening of Wilberforce Academy would likely divert funds from your child's school?

MR. FELDMAN: Objection. Asked and answered.

THE WITNESS: I think that it is possible that that could happen.

BY MR. NORRIS:

Q. Okay.

Sorry, one more exhibit. I'm handing you Deposition Exhibit 10.

(Exhibit 10, United States Code Annotated Title 42; Proceedings in Vindication of Civil Rights, marked for identification.)

BY MR. NORRIS:

Q. I'm going to direct you to Subsection B. Let me know when you've had a chance to read Subsection B. And I apologize again, it's a little dense.

(Witness reviewing document.)



THE WITNESS: Okay.

BY MR. NORRIS:

Q. Okay. Have you seen this statute before?

A. No.

Q. Can you summarize what you believe Subsection B means?

MR. FELDMAN: Objection. Again, this is a statute. You're asking her to interpret a statute. She's not an attorney.

THE WITNESS: I think it's beyond my scope.

BY MR. NORRIS:

Q. I'm asking for your best guess at what Subsection B means.

MR. FELDMAN: Asked and answered.

THE WITNESS: I don't have a legal education, and I don't think that I could provide that to you.

BY MR. NORRIS:

Q. Okay.

Are you aware that in federal civil rights cases, that when the plaintiff prevails, the defendant often has to pay for the plaintiff's attorneys?



A. I have no knowledge of cases like that or how they are paid for.

Q. Okay.

Are you aware that by intervening in this case, you are now a defendant in this case?

MR. FELDMAN: Objection. She's not an attorney. And to the extent you're trying to threaten her with attorney fees, what is this line of questioning?

BY MR. NORRIS:

Q. It's not a threat. It's a question of, are you aware that you are a defendant in this case?

A. I am aware that I'm an intervenor.

BY MR. NORRIS:

Q. Okay.

Do you believe that you're a plaintiff in this case?

A. No.

Q. Okay.

Hypothetically, if Wilberforce Academy were to prevail in this case and there was an order that the defendants in this case must pay for its attorney fees, my question is, who will pay for the attorney's fees for you?



MR. FELDMAN: Objection. This is clearly a harassing line of questioning. Come on. I mean, are you serious right now?

MR. NORRIS: Stay on the record.

It's not harassing. It's about who controls the lawsuit, which goes to the scope of the ultimate judgment in this lawsuit and its res judicata effect.

MR. FELDMAN: You are harassing my client with a question on who's going to pay attorney's fees in a hypothetical situation. She testified she doesn't know what the statute means. She doesn't know the scope of the statute. And you're asking her to assume that plaintiffs would prevail and hypothetically could win attorney's fees under a statute she doesn't understand.

MR. NORRIS: Yeah, you've repeated my questions, but, yeah, I'd like an answer.

MR. FELDMAN: Okay.

You can answer if you can answer.

BY MR. NORRIS:

Q. I'll ask the question again.

If there were an award of attorney fees against you in this case, what is your

Page 65

understanding of who would pay those attorney's fees?

A. I would have to review my paperwork.

Q. I'm sorry, what paperwork are you referring to?

MR. FELDMAN: Objection to the extent this is calling for privileged information.

BY MR. NORRIS:

Q. I do not want the contents of any paperwork. Just what paperwork specifically are you referring to?

A. Like the confidentiality paperwork and things of that nature. The scope of representation.

Q. The paperwork you signed with your attorney; is that correct?

A. Correct. Yes.

Q. All right.

Give me one minute.

(Brief pause.)

MR. NORRIS: Okay. That is all from us. Thank you very much.

THE WITNESS: Yeah, thanks for your time. I presume I keep these?

Page 66

MR. FELDMAN: We'll hold on to those.

(Whereupon, a recess took place from 10:17 a.m. until 10:18 a.m.)

MR. FELDMAN: Did you close your final questions?

MR. NORRIS: Yes, plaintiffs are done.

EXAMINATION

BY MR. FELDMAN:

Q. I just have one follow-up question, Ms. Porter. Earlier Mr. Norris was asking you a line of questioning regarding TISA and whether if a public school opened up in the county, whether that would divert funds from your child's school. Do you recall that line of questioning?

A. Yes, I do.

Q. And do you have anything to clarify about that line of questioning?

A. That Wilberforce -- Wilberforce is putting forth an application to become a public charter school.

Q. Okay. Thank you.

MR. FELDMAN: That's all.

THE WITNESS: Okay.

Page 67

MR. FELDMAN: No further questions.

(Whereupon, the deposition concluded at 10:19 a.m.)

Page 68

C E R T I F I C A T E

STATE OF TENNESSEE:

COUNTY OF KNOX:

I, LORA R. BOATMAN, Licensed Court Reporter, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am licensed by the State of Tennessee as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand this the 21st day of May, 2026.



LORA R. BOATMAN, LCR No. 106.
Expiration Date: 6/30/2026.

# EXHIBIT 64

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

Case No. 3:25-cv-584 (CEA)(DCP)

THE WILBERFORCE ACADEMY OF KNOXVILLE, )
Plaintiff, )
v. )
KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County School Board of Education, )
Defendants, )
REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. KATINA SHARP, )
Intervenor-Defendants, )

ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER, )
Intervenor-Defendants. )

DEPOSITION OF REV. DR. KATINA SHARP

MAY 18, 2026



APPEARANCES:

FOR WILBERFORCE ACADEMY OF KNOXVILLE:

Cameron T. Norris
Ryan M. Proctor
R. Gabriel Anderson
CONSOVOY McCARTHY, PLLC
1600 Wilson Road, Suite 700
Arlington, Virginia 22209
(703)243-9423

FOR INTERVENOR-DEFENDANTS REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP:

Mitchell E. Feldman
MORRISON FOERSTER, LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
(617)648-4759

FOR DEFENDANTS KNOX COUNTY:

Rachel K. Harrison
DEPUTY LAW DIRECTOR
400 Main Street, Suite 612
Knoxville, Tennessee 37902
(865)215-2327

FOR INTERVENOR-DEFENDANTS ADRIENNE CARROLL, et al:

Thomas H. Jarvis
BAKER DONELSON
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
(865)549-7132



APPEARANCES CONTINUED:

Patrick Cremin
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
(973)624-1815



INDEX OF EXAMINATIONS


| | Page No. |
|---|---|
| By Mr. Anderson | 6 |


INDEX OF EXHIBITS


| Exhibit | | Page No. |
|---|---|---|
| S-1 | Coble Intervenor-Defendants' First Supplemental Responses to Plaintiff's First Set of Interrogatories | 7 |
| S-2 | Local Sales Tax Rates | 12 |
| S-3 | 2025 IRS Instructions for Schedule A (Form 1040) | 14 |
| S-4 | Tire Environmental Act Program (TEAP) | 25 |
| S-5 | 2025 Federal Historic Preservation Grants Announced | 29 |
| S-6 | Declaration of Rev. Dr. Katina Sharp | 36 |
| S-7 | Katina Sharp Website | 39 |
| S-8 | Education Freedom Scholarship Program | 41 |
| S-9 | 5/4/2026 Article - TN School Board Clears Way for Nation's First Religious Charter School | 48 |

Page 13

will look at the middle of the page, it says that Knox County's local sales tax rate is 2.25 percent, correct?

A. I see that.

Q. And do you have any reason to doubt that the Tennessee Department of Revenue statement about the local sales tax rate being 2.25 percent is correct?

A. I do not doubt the facts from the State of Tennessee.

Q. In an average year, how much sales tax do you individually pay to Knox County?

A. I have no idea.

Q. Can you -- do you think you would be able to roughly -- excuse me, let me rephrase.

Can you roughly estimate the amount of sales tax that you pay to Knox County in an average year?

A. I don't think I could quickly calculate how much I spend in a year and calculate the tax rate on that.

Q. So you cannot roughly estimate right now the amount of sales tax you paid to Knox County?

A. Correct.

Q. And have you ever tried to estimate

Page 14

the amount of Knox County sales tax that you paid in an average year?

A. I have not.

Q. So before you entered this lawsuit, you didn't try to estimate the amount of Knox County sales tax that you had paid in an average year; is that correct?

A. That's correct.

Q. And you didn't try to estimate the average amount of Knox County sales tax you paid in an average year before you signed your Responses to Plaintiff's First Set of Interrogatories. Is that also correct?

A. That is correct.

Q. But then how can you say under penalty of perjury that you paid, quote, "sales taxes to Knox County," end quote?

A. Because I made at least one purchase in the calendar year, and every purchase is taxed.

MR. ANDERSON: I'll hand you now what we'll mark as Deposition Exhibit S-3.

(Exhibit S-3, 2025 IRS Instructions for Schedule A (Form 1040), marked for identification.)

///

Page 15

BY MR. ANDERSON:

Q. So Deposition Exhibit S-3 is a true and correct copy of the IRS instructions for itemizing deductions for the 2025 tax year. If you would, could you please turn to page 18? And just to save you some time, it's the last page.

A. Okay.

Q. So this page contains tables for estimating the amount of local sales taxes that you paid in 2025. I'll just go to this page myself just to explain.

So do you see the furthest left column? If you go three from bottom, it says "Tennessee"?

A. Yes, I see that.

Q. And then if you go all the way across just in that row, it has the letter B.

A. I see that.

Q. So there what that B is referring to, and you're welcome to read this too, if you like, just to confirm yourself, but that B refers to what in this document is called the "local table."

Do you see that?

A. I see it.

Q. So then if we go down to the bottom

Page 16

of the page, under the title that says, quote, "2025 Optional Local Sales Tax Tables (Based on a local sales tax rate of 1 percent)," there is -- there's five different -- there's basically five different columns. If you start at the left, it says your income, and then the one to the right of that, Local Table A, Local Table B, so on and so on.

So we're going to go to Local Table B. As you mentioned earlier just to kind of table-set, you mentioned that your income for a family of over five is between 60,000 and $70,000.

MR. LUKE ANDERSON: Objection to the extent that it mischaracterizes prior testimony.

BY MR. ANDERSON:

Q. Would you agree with the statement that the income for your family of over five is between 60- and $70,000?

A. My income is between and 60- and $70,000.

Q. What would your income -- what would your family of -- sorry, it's a weird way to phrase it. What would your family of six's income be?

A. That would include my partner?

Q. It would include -- just to clarify,

Page 17

it would include only your children and not your partner. And it would include your children to the extent that they have jobs or earn money. So basically how this -- how summing your income here would work would be the 60- or $70,000 you mentioned earlier, plus any amount your children make as part of your household.

MR. LUKE ANDERSON: Objection. Vague as to children.

Are we talking dependents?

MR. ANDERSON: We are talking dependents.

BY MR. ANDERSON:

Q. So to rephrase, it would be the 60- or $70,000 you mentioned, plus the income any of your child dependents make.

A. I don't file taxes for my children, so I don't know what their income is.

Q. Okay. We'll just go off your $60,000 for now.

So going off of your $60,000, and I'm looking at the table here. $60,000 to Local Table B, and again this is for a family of over five, you get $214 per year for a local sales tax rate of 1 percent. So as we already explained, the

Page 18

Knox County local sales tax rate is 2.25 percent. So then to get your total Knox County sales tax rate in 2025, we would do 2.25 times in this case $214. Would you agree?

MR. LUKE ANDERSON: Objection. Compound.

BY MR. ANDERSON:

Q. Would you agree that 2.25 percent is 2.25 times larger than 1 percent?

A. That sounds like reasonable math.

Q. And 2.25 times 214 -- you're more than welcome to do this calculation too if you'd like is -- let's see -- $481.50. Do you dispute that figure? I'm more than happy to do the calculation if you like.

A. That sounds like a good estimate. Without seeing the calculation, I would hesitate to say that's accurate.

Q. We'll do the calculation just so we're sure. So 2.25 times 214, that's 214, equals $481.50. Do you agree with that?

A. I agree with the way you calculated it.

Q. So based on that math, the IRS would estimate that in 2025 for your family of over five,

Page 19

which is the IRS's language -- in 2025 for your family of over five, you paid $481.50 in Knox County local sales tax. Do you have any basis to contest the IRS's estimate?

A. I would not have a basis to contest it. I also would not be able to say with any confidence that it was accurate.

Q. But you have no basis based on the evidence in front of you right now, the IRS table that I've given you and the calculations that we've done -- you have no basis to contest the estimate that your 2025 local sales tax payment in Knox County is $481.50.

MR. LUKE ANDERSON: Objection. Asked and answered.

THE WITNESS: Following this table, that would be the number you would come up with.

BY MR. ANDERSON:

Q. Do you receive a housing allowance from your church?

A. I do.

Q. And do you use your housing allowance to pay for property taxes?

A. I think so.

Page 20

Q. Are you sure that you use your housing allowance to pay for property taxes, or do you just think?

A. I am not confident. I think that my housing does cover property taxes, but I would have to verify that that was accurate.

Q. So to the best of your knowledge today, right here, do you think your housing allowance pays your property taxes?

MR. LUKE ANDERSON: Objection. Asked and answered.

THE WITNESS: I think that that is the way my housing allowance -- my housing allowance pays my property taxes.

BY MR. ANDERSON:

Q. Are you familiar with the Wilberforce Academy of Knoxville?

A. I have heard of it.

Q. What is -- excuse me. What is the Wilberforce Academy of Knoxville?

MR. FELDMAN: Objection. Overbroad.

BY MR. ANDERSON:

Q. To the best of your knowledge, describe your understanding of the Wilberforce Academy of Knoxville.

A. It is my understanding that Wilberforce Academy is a proposed Christian public charter school.
Q. And do you object to your taxes going to support Wilberforce Academy?
A. I do.
Q. And why do you object to your taxes going to support Wilberforce Academy?
A. It is a violation of separation of church and state.
Q. Is that your only objection to Wilberforce Academy?
A. I don't know enough about Wilberforce Academy to have other objections yet.
Q. To rephrase my question. Is your only objection to Wilberforce Academy your belief that Wilberforce Academy is a violation of church and state?
A. The only thing I know about Wilberforce Academy is that it is a Christian public school, and that violates separation of church and state. I don't know enough about it beyond that to have objections or to have a fondness for it.
Q. You don't know enough about Wilberforce to have any objections to Wilberforce



outside of the fact, as you claim, that it violates the separation of church and state; is that correct?
A. Knowing that it is a Christian public school, it violates separation of church and state, and that is my objection.
Q. And do you find any of Wilberforce's religious beliefs objectionable?
A. I have not seen Wilberforce's religious beliefs.
Q. If Wilberforce Academy opened, how much of your taxes would go to Wilberforce Academy?
A. I don't know.
Q. Would you be capable of estimating how much of your taxes would go to Wilberforce Academy if Wilberforce Academy opened?
A. I don't know.
Q. You don't know that you would be capable of estimating?
A. I would not be capable of estimating.
Q. So let's just assume for this next question -- let's assume that only $100 of your taxes -- let's say specifically in 2026. Let's assume that only $100 of your taxes in 2026 went to Wilberforce Academy. Would you still object if only



$100 of your taxes went to Wilberforce Academy?
MR. LUKE ANDERSON: Object to form.
MR. ANDERSON: Counsel, can you be more specific?
MR. LUKE ANDERSON: Can you just restate the question more concisely.
BY MR. ANDERSON:
Q. Would you object to your tax dollars going to Wilberforce Academy if only $100 of your tax dollars went to Wilberforce Academy?
A. I would object.
Q. Okay.
And would you object if only one dollar of your taxes went to Wilberforce Academy?
A. I would object.
Q. And would you still object if only one penny of your taxes went to Wilberforce Academy?
A. I would object.
Q. And what about a fraction of a penny? What if only a fraction of a penny went to Wilberforce, would you still object?
MR. LUKE ANDERSON: Objection. Calls for speculation.
THE WITNESS: I would object.
///



BY MR. ANDERSON:
Q. Do you know anyone else in Knox County that shares your objection to Wilberforce Academy?
A. I do.
Q. And who are they?
A. I don't think I'm prepared to give a list of everyone who objects to the separation of church and state violations.
Q. I was asking just specifically about Wilberforce Academy. Can you give one example of someone that you know that objects specifically to Wilberforce Academy?
A. Are you asking for a name?
Q. No. We can just stick to something a little bit more general. Friend. Colleague.
A. Okay. A friend.
Q. And if your friend, who objects to Wilberforce Academy pays even one penny in taxes that goes to Wilberforce Academy, then your friend would be harmed in the same way that you're harmed; is that right?
MR. LUKE ANDERSON: Objection. Calls for speculation.
THE WITNESS: I don't think I can

Page 45

over that website? Is it yours?
A. It is my website. I did not create it.
Q. Are the positions on the website which is your -- yours, do they reflect your position?
A. They do reflect my position.
Q. Okay.
So are the vouchers that again, quote, "Katina opposes," end quote -- are those vouchers referring to the vouchers in the Tennessee Education Freedom Scholarship Program?
MR. LUKE ANDERSON: Objection. Asked and answered.
THE WITNESS: I have not specifically heard of this program, so I cannot intelligently answer.
BY MR. ANDERSON:
Q. Ms. Sharp, is it fair to say that you've intervened in this case to help ensure that Wilberforce Academy never opens?
A. No, that is not correct.
Q. Is it fair to say that you intervened in this case to help ensure that Wilberforce Academy is never approved as a religious

Page 46

charter school?
A. I don't like to give yes-or-no answers. Those are not my words, so I'm not comfortable specifically with the way you phrased it.
Q. Why did you intervene in the case, then? What motivated that decision?
A. I am opposed to violations of separation of church and state and tax dollars being used for entities that are a violation of that.
Q. And do you believe that it would be a violation of church and state if Wilberforce Academy is approved as a religious charter school?
A. My understanding is that they are a religious charter school, which would violate the separation of church and state.
Q. Okay.
MR. LUKE ANDERSON: Can I just jump in? If we're going to go much longer, could I request a quick break?
MR. ANDERSON: Yeah, sure.
(Whereupon, a recess took place from 2:04 p.m. until 2:11 p.m.)
BY MR. ANDERSON:
Q. Are you familiar -- or actually, one

Page 47

question first. Is it fair to say that your tax dollars will not be used to support Wilberforce Academy if Wilberforce Academy never opens?
A. I don't know. I would think not, but I couldn't say with certainty.
MR. FELDMAN: Yeah, objection.
BY MR. ANDERSON:
Q. It's not a trick question.
If Wilberforce Academy doesn't open, is it fair to say that your tax dollars wouldn't go to support Wilberforce Academy?
MR. FELDMAN: Objection. Vague as to whether you're talking about Wilberforce Academy as a religious public charter school or whether you're talking about religious private entity or voucher program or something like that.
THE WITNESS: I don't know what sources of revenue Wilberforce Academy might have or under what iterations of Wilberforce they might receive them.
BY MR. ANDERSON:
Q. So if Wilberforce never opens, public or private; there's no iterations of Wilberforce that ever open, is it fair to say that

Page 48

your tax dollars will not be used to support Wilberforce Academy?
A. My tax dollars will not be used to support something that does not exist.
Q. So another way to phrase this, little bit different. Actually not.
Are you familiar with Union Academy in Madison County, Tennessee?
A. I don't think so.
Q. Okay.
MR. ANDERSON: I'm handing you in a moment what we've marked as Deposition S-9.
(Exhibit S-9, 5/4/2026 Article - TN School Board Clears Way for Nation's First Religious Charter School, marked for identification.)
BY MR. ANDERSON:
Q. So take a moment to read page 2.
(Witness reviewing document.)
BY MR. ANDERSON:
Q. So specifically on page 2, it says that "Madison County voted to approve the application of Union County, a Christian college preparatory school, to operate within the state's charter school system."

Page 53

Would you only be able to form an objection to Wilberforce sponsoring a secular charter school after it has submitted its application to become a charter school?

A. It would at least not need to be a hypothetical concept.

Q. Have you seen Wilberforce's draft application to sponsor a secular charter school?

A. I have not.

Q. And if -- if Wilberforce Academy opens, would you consider applying to send any of your children there?

A. No.

Q. I'll reference back to your declaration now.

Do you have the declaration in front of you?

A. Is that 1 or 6? Is this -- this is it.

Q. Yeah, it should be Deposition Exhibit S-6.

A. Yes, I have it.

Q. So in your declaration, I'm specifically referencing paragraph 7, you testified that you believe that, quote, "A religious charter

Page 54

school would divert limited public funds away from other public schools," end quote. But in the declaration you didn't say that a religious charter school would divert resources away from your own child's school. So Wilberforce -- is it your testimony that Wilberforce wouldn't divert funds from your own child's school?

MR. LUKE ANDERSON: Objection. Mischaracterizes prior testimony.

THE WITNESS: Can you clarify your question?

BY MR. ANDERSON:

Q. Yeah. Would Wilberforce divert funds from your own child's school?

A. Specifically from Hardin Valley Academy?

Q. From the school that your son is currently a sophomore at, so Hardin Valley.

A. Wilberforce would divert funds from Knox County schools.

Q. Would Wilberforce divert funds from your child's Knox County public school in particular?

A. That's impossible to say because the board of education would have to draw a new budget

Page 55

including Wilberforce and make a determination of where the money came from.

Q. What do you think is the earliest that Wilberforce will open as a school?

A. I don't know.

MR. FELDMAN: Objection. Speculation.

BY MR. ANDERSON:

Q. And what grade levels do you think Wilberforce will have when it opens?

A. It is my understanding their plan is K through eight, but I don't know what grade levels that would include by the time it opens.

Q. So earlier in your deposition, you said that one of your children and only one is currently attending a Knox County public school and that he recently finished his sophomore year, right?

MR. LUKE ANDERSON: Objection. Compound.

BY MR. ANDERSON:

Q. Earlier in your testimony you mentioned that one of your children is attending a Knox County public school; is that correct?

A. I have a son in Knox County schools, yes.

Page 56

Q. And your son is finishing up his sophomore year?

A. Yes. It is not finished yet but close.

Q. So does your son graduate Knox County public schools, then, in the spring of 2028?

A. That is the plan.

Q. And are you aware that the earliest that Wilberforce could open is in the fall of 2028?

A. I have not seen that date.

Q. And are you aware that when Wilberforce Academy opens, even at its eventual max capacity, it will only ever be open to students from kindergarten to eighth grade?

MR. LUKE ANDERSON: Objection. Speculation.

THE WITNESS: I have seen that that is the proposed grade range.

BY MR. ANDERSON:

Q. So with Wilberforce Academy opening in the fall of 2028 and your son graduating in the spring of 2028, how could Wilberforce Academy opening affect your son's -- affect funding at your son's high school at all?

A. His school will not close when he

Page 57

leaves.

Q. How -- how could Wilberforce Academy opening in the fall of 2028, when your son graduates high school in the spring of 2028, affect your son's education in particular?

A. I don't know how to answer that because I don't know if or how it would affect my son in particular.

Q. Can you think of any way at this moment how Wilberforce Academy opening in the fall of 2028 could affect your son's education in particular given that he is graduating in the spring of 2028?

MR. FELDMAN: I'm just going to object, vague, as to opening.

Are you saying, like, the school actually opens in 2028 and, like, until then there might be startup costs to open the school, or are you saying, like, that's when the charter application would approve in 2028?

MR. ANDERSON: We'll confer.

MR. FELDMAN: Okay.

BY MR. ANDERSON:

Q. Will anyone leave your son's high school to attend Wilberforce, which will be a

Page 58

K-through-eight school?

A. I would have no way of seeing the future.

Q. Are you aware of anyone who would leave your son's high school, though, to go to a K-through-eight school?

A. To go to a hypothetical school?

Q. To go to a kindergarten-through-eighth-grade school in particular?

A. I don't imagine that any of the students particularly would go. Teachers possibly. Aides possibly. Principals possibly. Support staff, cafeteria, janitors, security officers certainly. But as for students, if it was K through eight, I can't imagine they would go backward in grade.

Q. And how are public schools in Knox County funded?

MR. LUKE ANDERSON: Objection. Overly broad.

BY MR. ANDERSON:

Q. Do you know how public schools in Knox County are funded?

A. I'm not sure I understand what

Page 59

you're asking. The source of the revenue? Who sets the budget?

Q. Yes, do you understand the source of the revenue for public school funding in Knox County?

A. Public schools are funded by tax dollars.

Q. And do you understand like the -- do you understand the revenue sources that are used to fund those public schools?

A. Do I understand them?

Q. Sorry. Do you understand where those -- what taxes go to fund a Knox County public school?

A. I'm not sure I know what you're asking.

Q. So this will be the last question.

Do you understand that the amount of funding for public schools in Knox County turns, in part, on the number of students attending that school?

A. That's an overgeneralization of how it's calculated.

Q. Do you understand that the amount of funding for public schools in Knox County depends at

Page 60

least in some way on the number of students attending that school?

A. The number of students is part of the formula.

MR. ANDERSON: Well, thank you for testifying today. That's all. We can go off record.

(Whereupon, off the record.)

MR. LUKE ANDERSON: Just one question for Mr. Anderson. Earlier in Reverend Sharp's testimony, you represented that there existed a draft application for a secular charter school from Wilberforce. Could you confirm whether you have produced that in discovery to us?

MR. ANDERSON: Yes.

MR. LUKE ANDERSON: Thank you. No further questions.

(Whereupon, the deposition concluded at 2:37 p.m.)

C E R T I F I C A T E

STATE OF TENNESSEE:
COUNTY OF KNOX:

I, LORA R. BOATMAN, Licensed Court Reporter, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am licensed by the State of Tennessee as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand this the 1st day of June, 2026.

Lora R. Boatman

LORA R. BOATMAN, LCR No. 106.
Expiration Date: 6/30/2026.

# EXHIBIT 65

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION (KNOXVILLE)**

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br><br>*Plaintiff*,<br><br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County Board of Education,<br><br>*Defendants*,<br><br>REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP,<br><br>*Intervenor-Defendants,*<br><br>ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER,<br><br>*Intervenor-Defendants.* | Case No. 3:25-cv-584 (CEA) (DCP) |

**COBLE INTERVENOR-DEFENDANTS' AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION**

Pursuant to Federal Rules of Civil Procedure 26 and 36, Intervenor-Defendants Rev. Dr. Richard Coble, Amanda Collins, Kerry Dooley, Elizabeth Porter, and Rev. Dr. Katina Sharp (each, an "Intervenor," and collectively, the "Coble Intervenor-Defendants"), by their attorneys, hereby provide amended responses and objections to the First Set of Requests for Admission to Coble Intervenor-Defendants (the "Requests") propounded by Plaintiff the Wilberforce Academy of Knoxville ("Plaintiff" or "Wilberforce") on April 14, 2026, as follows:

**OBJECTIONS TO INSTRUCTIONS**

1. Coble Intervenor-Defendants object to Instruction 2 to the extent that it purports to impose obligations beyond those required by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Eastern District of Tennessee (the "Local Rules"). Coble Intervenor-Defendants further object to this Instruction to the extent it purports to require Coble Intervenor-Defendants to answer "the remainder of the request to the fullest extent possible" where an objection applies to only part of a request, because the phrase "to the fullest extent possible" is vague, ambiguous, and undefined, lacks objective standards, and could be construed to require the disclosure of information beyond that required by the Federal Rules of Civil Procedure and the Local Rules. Coble Intervenor-Defendants further object to this Instruction as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks to dictate the manner in which objections must be asserted or to impose heightened obligations for responding to requests beyond those required by the Federal Rules of Civil Procedure and the Local Rules. Coble Intervenor-Defendants further object to the extent the Instruction seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or protection.

respect to individuals or entities not within their possession, custody, or control, and to the extent that it purports to expand the scope of discovery beyond that permitted under the applicable rules, including by seeking information that is not relevant to any claim or defense in this action and not reasonably calculated to lead to the discovery of admissible evidence, and requiring the Coble Intervenor-Defendants to speculate as to the structure of a separate government entity. Coble Intervenor-Defendants will interpret this term consistent with the Federal Rules of Civil Procedure, the Local Rules, and applicable law.

6. Coble Intervenor-Defendants object to paragraph 8 of the Definitions on the grounds that it is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case to the extent that it purports to require the Coble Intervenor-Defendants to "apply the broadest construction so as to produce the most comprehensive response," including to the extent it imposes obligations beyond those required by Federal Rule of Civil Procedure 26(b)(1).

**<u>SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION</u>**

**<u>REQUEST FOR ADMISSION NO. 1:</u>**

Admit that, under your interpretation of the federal Establishment Clause, the Knox County Board of Education could not lawfully approve Wilberforce Academy's charter-school application (WILB-ACAD-1-279, 465-70). *See, e.g.*, Coble Memo. iso Mot. to Intervene (Doc.22) at 9.

**<u>OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 1:</u>**

Coble Intervenor-Defendants object to this Request on the grounds that it is vague, ambiguous, and calls for a legal conclusion. Coble Intervenor-Defendants further object on the ground that the phrase "under your interpretation of the federal Establishment Clause" is vague and undefined. Coble Intervenor-Defendants further object to this Request to the extent it mischaracterizes Coble Intervenor-Defendants' position, because Coble Intervenor-Defendants' contention is not merely a matter of their own "interpretation" of the Establishment Clause; rather,

the Establishment Clause forbids the public funding and operation of a religious public charter school. Coble Intervenor-Defendants further object to this Request on the ground that Wilberforce Academy's charter-school application was never filed with or submitted to the Knox County Board of Education.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: Admit with the following clarification and limitation: The Knox County Board of Education could not lawfully approve an application by Wilberforce Academy to operate a religious charter school.

**REQUEST FOR ADMISSION NO. 2:**

Admit that, if Knox County approved Wilberforce Academy's charter-school application (WILB-ACAD-1-279, 465-70), you contend that the federal Establishment Clause would forbid Wilberforce from operating a charter school. *See, e.g.*, Coble Memo. iso Mot. to Intervene at 3 ("the First Amendment's Establishment Clause bars the operation of a religious public charter school").

**OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Coble Intervenor-Defendants object to this Request on the grounds that it is vague, ambiguous, speculative, hypothetical, and calls for a legal conclusion. Coble Intervenor-Defendants further object to this Request as speculative and hypothetical to the extent it asks Coble Intervenor-Defendants to opine on a contingent scenario premised on the phrase "if Knox County approved." Coble Intervenor-Defendants further object to this Request on the ground that Wilberforce Academy's charter-school application was never submitted to the Knox County Board of Education.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: Admit with the following clarification and limitation: Coble Intervenor-Defendants contend that the Establishment Clause forbids Wilberforce Academy from operating a religious charter school.

**REQUEST FOR ADMISSION NO. 3:**

Admit that, if Knox County approved Wilberforce Academy's charter-school application (WILB-ACAD-1-279, 465-70), you contend that the federal Establishment Clause would forbid governments from funding Wilberforce's charter school. *See, e.g.*, Coble Memo. iso Mot. to Intervene (Doc.22) at 9 ("The federal Establishment Clause prohibits public funding and operation of a religious public charter school.").

**OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Coble Intervenor-Defendants object to this Request on the grounds that it is vague, ambiguous, speculative, hypothetical, and calls for a legal conclusion. Coble Intervenor-Defendants further object to this Request as speculative and hypothetical to the extent it asks Coble Intervenor-Defendants to opine on a contingent scenario premised on the phrase "if Knox County approved." Coble Intervenor-Defendants further object to this Request on the ground that Wilberforce Academy's charter-school application was never submitted to the Knox County Board of Education.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: Admit with the following clarification and limitation: The Establishment Clause forbids governments from funding a religious charter school operated by Wilberforce Academy.

**REQUEST FOR ADMISSION NO. 4:**

Admit that, under your interpretation of the federal Establishment Clause, the Knox County Board of Education could not lawfully approve an application from Wilberforce Academy to sponsor a secular charter school.

**OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Coble Intervenor-Defendants object to this Request on the grounds that it is vague, ambiguous, and calls for a legal conclusion. Coble Intervenor-Defendants further object on the ground that the phrases "your interpretation of the federal Establishment Clause" and "secular charter school" are vague and undefined. Coble Intervenor-Defendants further object to this Request as irrelevant, as it concerns a hypothetical application that is not at issue in this litigation.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: The information known or readily obtainable by Coble Intervenor-Defendants is insufficient to enable them to admit or deny this Request as phrased.

**SUPPLEMENTAL OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Coble Intervenor-Defendants object to this Request as irrelevant because Wilberforce Academy's corporate charter does not permit the operation of a secular school.

Subject to and without waiving the foregoing objections, Coble Intervenor-Defendants respond as follows: Coble Intervenor-Defendants admit that Wilberforce Academy could not be lawfully approved to operate a public charter school, even if Wilberforce Academy claims such a school is "secular," because Wilberforce's corporate charter and IRS application do not permit it to operate a secular charter school. In the hypothetical scenario in which Wilberforce Academy amended its corporate charter to permit operation of a secular school—which is not permitted under the terms of the corporate charter—it is possible that such a school could be approved provided that it meets all criteria required for public charter schools, including non-discrimination requirements.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Knoxville Preparatory School (a/k/a Knoxville Prep) will close at the end of the 2025-26 school year.

**OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Coble Intervenor-Defendants object to this Request on the grounds that it is irrelevant and not proportional to the needs of the case, as the future closure of Knoxville Preparatory School does not bear on the legal positions or standing of Coble Intervenor-Defendants. Coble Intervenor-

Defendants further object on the grounds that information concerning the internal operations and future plans of Knoxville Preparatory School is not within their possession, custody, or control, and the Request therefore calls for information not in their knowledge.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: Admit with the following clarification and limitation: It has been reported that the Knoxville Preparatory School will close at the end of the academic year.

**REQUEST FOR ADMISSION NO. 6:**

Admit that, under the Tennessee Education Freedom Scholarship Program, your taxes are currently used to support private religious schools.

**OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Coble Intervenor-Defendants object to this Request on the grounds that it is vague and ambiguous, including as to the term "your taxes" as applied collectively to all Coble Intervenor-Defendants. Coble Intervenor-Defendants further object to this Request as irrelevant and not proportional to the needs of the case, as the constitutionality and operation of the Tennessee Education Freedom Scholarship Program is not at issue in this action, and any such program operates pursuant to legal mechanisms distinct from the public funding of a government-operated religious public charter school at issue here.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: Admit with the following clarification and limitation: Tennessee tax dollars are used to fund private schools, both religious and non-religious, under the Tennessee Education Freedom Scholarship Program.

**REQUEST FOR ADMISSION NO. 7:**

Admit that, in your opinion, the Tennessee Education Freedom Scholarship Program reduces per-pupil funding for Knox County's public schools. *See, e.g.*, *Court Cases – Young v. Lee*, ACLU Tennessee (Dec. 11, 2025), perma.cc/94BZ-WXRA ("Tennessee's Universal Voucher Program … strips $7,295 per student from Tennessee's public schools and redirects those funds to private schools.").

**OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Coble Intervenor-Defendants object to this Request on the grounds that it calls for an opinion on economic and policy matters. Coble Intervenor-Defendants further object to this Request as irrelevant and not proportional to the needs of the case, as the effects of the Tennessee Education Freedom Scholarship Program are not at issue in this action. Coble Intervenor-Defendants further object to this Request on the ground that the phrase "per-pupil funding" is vague and ambiguous, as it fails to identify with specificity the type of funding, the methodology for calculating per-pupil amounts, or the time period at issue.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: The information known or readily obtainable by Coble Intervenor-Defendants is insufficient to enable them to admit or deny this Request as phrased.

**SUPPLEMENTAL OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Subject to and without waiving all foregoing objections, Coble Intervenor-Defendants respond as follows: Coble Intervenor-Defendants admit that, as a general matter, voucher programs reduce funding available to public schools as a result of students leaving public schools and public funding being redirected to pay private education expenses.

**REQUEST FOR ADMISSION NO. 8:**

Admit that, if the challenged policies were declared unconstitutional in this case and Wilberforce submitted its charter-school application (WILB-ACAD-1-279, 465-70), then Wilberforce's application would be approved.

**OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Coble Intervenor-Defendants object to this Request on the grounds that it is vague, ambiguous, speculative, calls for improper speculation about the future actions of a third party (the Knox County Board of Education), and is not proportional to the needs of the case. Coble Intervenor-Defendants further object on the ground that the phrase "challenged policies" is vague and undefined, as it fails to identify with specificity which policies Plaintiff contends are at issue. Coble Intervenor-Defendants further object on the grounds that this Request is speculative because it assumes that Wilberforce's application would not be denied on other grounds, including but not limited to failure to satisfy applicable academic, financial, operational, or other requirements under Tennessee law. Coble Intervenor-Defendants further object on the grounds that this Request assumes facts, including that Wilberforce would submit a qualifying application and that such application would be evaluated and approved solely on the basis of the outcome of this litigation. Coble Intervenor-Defendants further object to the extent this Request calls for a legal conclusion regarding the effect of a judicial ruling on the Board's independent exercise of its discretion.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: Deny.

**REQUEST FOR ADMISSION NO. 9:**

Admit that, if the challenged policies were declared unconstitutional in this case and Wilberforce Academy's charter-school application were denied, then your taxes would not be used to support Wilberforce Academy's charter school. *Cf.* Coble Memo. iso Mot. to Intervene at 1.

**OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Coble Intervenor-Defendants object to this Request on the grounds that it is vague, ambiguous, speculative, and calls for improper speculation about future contingent events, including the outcome of this litigation, the Board's subsequent actions, and Wilberforce's future submissions. Coble Intervenor-Defendants further object on the ground that the phrase "challenged policies" is vague and undefined, as it fails to identify with specificity which policies Plaintiff contends are at issue. Coble Intervenor-Defendants further object on the ground that the term "support" is vague and ambiguous. Coble Intervenor-Defendants further object on the grounds that this Request assumes facts not in evidence.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: Admit with the following clarification and limitation: Admit only to the extent this Request refers to a final and unappealable denial of Wilberforce Academy's charter-school application, with no available waivers, exemptions, further approvals, or avenues to challenge the denial in court, and that Wilberforce Academy never opens or operates as a charter school. To the extent this Request contemplates any other scenario, Coble Intervenor-Defendants deny.

**REQUEST FOR ADMISSION NO. 10:**

Admit that, if the challenged policies were declared unconstitutional in this case and Wilberforce Academy's charter-school application were denied, then students would not leave your children's schools to attend Wilberforce Academy's charter school. *Cf.* Coble Memo. iso Mot. to Intervene at 1.

**OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Coble Intervenor-Defendants object to this Request on the grounds that it is vague, ambiguous, speculative, and calls for improper speculation about future contingent events,

including the outcome of this litigation, the Board's subsequent actions, and Wilberforce's future submissions. Coble Intervenor-Defendants further object on the ground that the phrase "challenged policies" is vague and undefined, as it fails to identify with specificity which policies Plaintiff contends are at issue. Coble Intervenor-Defendants further object on the grounds that this Request assumes facts not in evidence. Coble Intervenor-Defendants further object to this Request as irrelevant to the merits of this action.

Subject to and without waiving these objections, Coble Intervenor-Defendants respond as follows: Admit with the following clarification and limitation: Admit only to the extent this Request refers to a final and unappealable denial of Wilberforce Academy's charter-school application, with no available waivers, exemptions, further approvals, or avenues to challenge the denial in court, and Wilberforce Academy never opens or operates as a charter school. To the extent this Request contemplates any other scenario, Coble Intervenor-Defendants deny.

Dated: June 17, 2026

By: */s/ Adam J. Hunt*

Adam J. Hunt*
Morrison Foerster LLP
250 West 55th Street
New York, NY 10019-9601
Telephone: 212.468.8000
Facsimile: 212.468.7900
Email: AdamHunt@mofo.com

Mitchell E. Feldman*
Morrison Foerster LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
Telephone: 617.648.4759
Facsimile: 617.830.0142
Email: MFeldman@mofo.com

Jon McNeal*
Morrison Foerster LLP
12531 High Bluff Drive, Suite 200
San Diego, CA 92130-3588
Telephone: 858.720.5100
Facsimile: 858.720.5125
Email: JMcNeal@mofo.com

Wanqian Zhang*
Morrison Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415.718.9737
Facsimile: 415.268.7522
Email: WZhang@mofo.com

Lucas Cameron-Vaughn (BPR# 036284)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Telephone: 615.645.5067
Email: Lucas@aclu-tn.org

Alex J. Luchenitser*
Luke Anderson*
Americans United for Separation of
Church and State

1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: 202.466.3234
Facsimile: 202.217.3783
Email: luchenitser@au.org
Email: anderson@au.org

Daniel Mach*
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20008
Telephone: 202.675.2330
Facsimile: 202.546.0738
Email: dmach@aclu.org

Sophia Mire Hill (BPR# 040755)*
Sam Boyd*
Neil Ranu*
Lauren Winkler*
Michael Tafelski*
Southern Poverty Law Center
150 E. Ponce de Leon, Suite 340
Decatur, GA 30030
Telephone: 504.457.1553
Email: sophia.mire@splcenter.org
Email: sam.boyd@splcenter.org
Email: neil.ranu@splcenter.org
Email: lauren.winkler@splcenter.org
Email: michael.tafelski@splcenter.org

Jessica Levin*
Wendy Lecker*
Patrick Cremin*
Katrina Reichert*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: 973.624.1815
Facsimile: 973.624.7339
Email: jlevin@edlawcenter.org
Email: wlecker@edlawcenter.org
Email: pcremin@edlawcenter.org
Email: kreichert@edlawcenter.org

Samuel T. Grover*
Kyle J. Steinberg*

Freedom From Religion Foundation, Inc.
10 N. Henry St.
Madison, WI 53703
Telephone: 608.256.8900
Email: sam@ffrf.org
Email: steinbergk@ffrf.org

* Admitted *pro hac vice*

*Attorneys for Intervenor-Defendants Rev. Dr. Richard Coble, Amanda Collins, Kerry Dooley, Elizabeth Porter, and Rev. Dr. Katina Sharp*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Coble Intervenor-Defendants' Amended Responses and Objections to Plaintiff's First Set of Requests for Admission was served via email on:

David Ayliffe
Thomas Jarvis
Jessica Johnson
David Sanders
Ryan Proctor
Cam Norris

Dated: June 17, 2026

*/s/ Jon McNeal*
Jon McNeal