**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION (KNOXVILLE)**

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br>Plaintiff,<br>v.<br>KNOX COUNTY BOARD OF EDUCATION, et al.,<br>Defendants,<br>RICHARD COBLE, et al.,<br>Intervenor-Defendants,<br>ADRIENNE CARROLL, et al.,<br>Intervenor-Defendants. | Case No. 3:25-cv-584-CEA-DCP<br>District Judge Charles E. Atchley<br>Magistrate Judge Debra C. Poplin |

**PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DEREK BLACK**

The Coble intervenors have disclosed Derek Black as an expert witness. Black is a law professor who specializes in education law. His report addresses two "questions presented": whether "the provision of free education open to all is a traditional and an exclusive government function," and whether "Tennessee's charter schools" provide "free education open to all." Black-Rep. (Ex.A) 3-4. Black answers both questions in the affirmative. So intervenors have hired a legal expert to opine that Tennessee charter schools are state actors subject to the Establishment Clause.

This strategy fails for at least four reasons. One, intervenors have asked Black to answer the wrong question. For purposes of the state-action doctrine, the relevant question is whether education *generally* is a traditional and exclusive government function, not whether *free* education *open to all* is. Two, Black opines on a legal question, which an expert cannot do. Three, Black is a law professor, not a historian, and is not qualified to serve as an expert on history. Four, Black's methodology is

flawed and outcome driven. If this Court thinks Black's expert opinions are a reason to deny Wilberforce summary judgment, it should first address this motion and hold that Black's opinions are inadmissible under *Daubert*.

Intervenors oppose this motion. KCBOE does not currently take a position.

## Argument

Like all evidence, "expert testimony is admissible only if it is … relevant." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *see* Fed. R. Evid. 402. On top of that relevance floor, expert testimony is admissible only if it is

> (a) the product of his "scientific, technical, or other specialized knowledge,"
> (b) "based on sufficient facts or data,"
> (c) "the product of reliable principles and methods," and
> (d) "reflects a reliable application of the principles and methods to the facts of the case."

Fed. R. Evid. 702(a)-(d); *see Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589-90 (1993). Though the Court's gatekeeping responsibility is relaxed in a bench trial, it "is still required to rely only on admissible and reliable expert testimony." *Ky. Waterways All. v. Ky. Utilities Co.*, 539 F. Supp. 3d 696, 710 (E.D. Ky. 2021). And "[b]ecause the Court can consider only admissible evidence when deciding a motion for summary judgment," this Court often "must also consider and decide … *Daubert* Motion[s]" at this stage. *Wilson v. Summit TreeStands*, 2021 WL 5281601, at *1 (E.D. Tenn. Mar. 19) (Atchley, J.); *accord Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001) (party cannot oppose summary judgment based on "expert witness testimony" that is "inadmissible under *Daubert*").

Three of Rule 702's requirements matter most here. An expert "may not testify to a legal conclusion." *Hyland v. HomeServices of Am.*, 771 F.3d 310, 322 (6th Cir. 2014); *accord Berry v. Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."); *Shahid v. Detroit*, 889 F.2d 1543, 1548 (6th Cir. 1989) (excluding expert testimony that "amounted to a legal opinion"). The "party offering the ex-

pert's testimony has the burden to prove by a preponderance of the evidence that the expert is qualified." *United States v. 1.72 Acres*, 821 F.3d 742, 749 (6th Cir. 2016). And that party must prove the testimony "rests upon a reliable foundation," including by not resting on a "failure to adequately account for contrary evidence." *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024) (cleaned up).

The Court should exclude Black's expert testimony. It's inadmissible because he offers irrelevant testimony about an improper subject, on which he is not qualified, in an unreliable manner.

## I. Black's expert testimony is irrelevant.

Black's testimony fails the threshold requirement of relevance. The Coble intervenors tasked Black with addressing whether *free* education *open to all* is a traditional and exclusive government function, and whether Tennessee charter schools provide free education open to all. The clear purpose of that testimony is to establish that Tennessee charter schools are state actors subject to the Establishment Clause. But intervenors have misconstrued the inquiry that the state-action doctrine demands. The relevant question is whether education *generally* is a traditional and exclusive government function. The answer, given the long and continuous history of private schooling in this country, is "[o]bviously … not." *Logiodice v. Me. Cent. Inst.*, 296 F.3d 22, 26 (1st Cir. 2002); *see* Pltf.-MSJ (Doc.99) 20-21. Whatever the accuracy of Black's testimony, it simply has no bearing on whether Tennessee charter schools are state actors.

The state-action doctrine is central to the Coble intervenors' case on the merits. These intervenors maintain that operating a Christian charter school would violate the Establishment Clause. Doc.22 at 13. But the Establishment Clause (and the Fourteenth Amendment that existing precedent says incorporates the Establishment Clause against the States) applies only to the government. *Lindke v. Freed*, 601 U.S. 187, 195 (2024). Wilberforce is a private entity. Pltf.-MSJ.17-19. So is any charter school that Wilberforce would establish, were it appropriate to consider the school as distinct from Wilberforce itself. Pltf.-MSJ.19-20. To make their case, the Coble intervenors must therefore rely on

the state-action doctrine, which establishes "a few limited circumstances" in which "a private entity can qualify as a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019).

Black's testimony is designed to establish that Tennessee charter schools are state actors. As Black acknowledged in his deposition, the phrasing of his report's questions comes from "the state action doctrine set of cases." Tr. (Ex.B) 96-97. Those cases say that a private entity is a state actor if it performs a "traditional and exclusive government function." *United States v. Sykes*, 65 F.4th 867, 877 (6th Cir. 2023) (cleaned up); *see also Halleck*, 587 U.S. at 809 ("traditional, exclusive public function"). Black's report addresses whether the provision of free education open to all is "a traditional and an exclusive government function" and whether Tennessee charter schools perform that function. Black-Rep.3-4. Black did not use any of his purported expertise to define the scope of his inquiry. As he put it, the two questions presented "are the questions that" the attorneys for the Coble intervenors "tasked me with answering." Tr.96. Black acknowledged at his deposition that "people other than government" have "provided education throughout … American history." Tr.187. And his report could have "looked at education in general." Tr.106. But "I was asked to look at free education open to all. And so that's what I looked at." Tr.106.

The Coble intervenors gave their expert the wrong assignment. The state-action doctrine requires analyzing the "*relevant* function," not manipulating the scope of the inquiry to circumvent the doctrine's stringent requirements. *Halleck*, 587 U.S. at 811 (emphasis added). Precedent has consistently defined the relevant function based on the nature of the action itself, not on whether the action was performed for pay or for the general public. For example, "running elections and operating a company town" qualify as public functions, whereas "sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity" do not. *Id.* at 809-10 (collecting cases). In none of these examples do "adjectives" like "publicly funded" or "available to all"

get to be smuggled into the definition of the function at issue. *Logiodice*, 296. F.3d at 27. In line with this principle, controlling precedent has repeatedly recognized that, in the context of schooling, the relevant "functio[n]" is "the provision of … education," without qualification. *Phillips v. Tangilag*, 14 F.4th 524, 532 (6th Cir. 2021); *accord Jackson v. Metro. Edison Co.*, 419 U.S. 345, 354 n.9 (1974) ("maintenance of schools"); *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 753 (6th Cir. 2020) ("educat[ing]"); *Marie v. Am. Red Cross*, 771 F.3d 344, 362–63 (6th Cir. 2014) ("education").

Intervenors' attempt to gerrymander the relevant function cannot be squared with *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982). In that case, Massachusetts had a state-law obligation to provide "special needs" education to high schoolers who needed it. *Id.* at 832. To fulfill this obligation, the State contracted with a private school. *Id.* Under this contract, virtually all the school's "operating budget" came from "public funds," and "none" of the students "paid tuition." *Id.* Further, the school had to "agree to carry out the individualized plan developed for each student referred to the school by the Committee." *Id.* at 833. In other words, the school had to provide special education to *all* high schoolers who needed it, and it had to do so *for free*. Yet these features played no role in the Court's state-action analysis. Because "the education of maladjusted high students" is not traditionally "the exclusive province of the State," the school was not a state actor; the Court did not inquire whether private entities historically performed this function for free to all students who needed it. *Id.* at 842. The Court recognized that state law required the government to provide for the education of all "maladjusted high school students … at public expense," and so the school at issue in a sense "perform[ed] a 'public function.'" *Id.*. at 842. But these considerations simply were not "relevant" to the state-action analysis. *Id.*; *see also id.* at 849 (Marshall, J., dissenting) (arguing, contra the majority, that the school was a state actor because the State had "delegat[ed] its statutory duty" to "provide a free education to all children"). The Coble intervenors' framing "is foreclosed by *Rendell-Baker*." *Caviness v. Horizon Cmty. Learning Ctr.*, 590 F.3d 806, 815 (9th Cir. 2010).

*Halleck* also rules out the Coble intervenors' framing. *Halleck* held that the operator of Manhattan's "public access channels"—cable television channels that members of the general public can use—is not a state actor. 587 U.S. at 805. Resisting this conclusion, the respondent argued that "the operation of a *public* forum for speech," where "speech or speakers" cannot be excluded based on "viewpoint," is "a traditional exclusive public function." *Id.* at 811 (emphasis added). The Court rejected this argument as sidestepping "the threshold state-action question." *Id.* The proper framing was whether "[p]roviding *some kind of* forum for speech" is "an activity that only governmental entities have traditionally performed" (and the answer was no). *Id.* at 812 (emphasis added). So too here, intervenors cannot load the dice by framing the issue as essentially whether providing education *freely to all* is traditionally an exclusive government function. The right question is whether providing "some kind of" education, whether free and open to all or with tuition and selective admissions, is such a function. *Id.*

The state-action analysis in this case is straightforward. Since the "maintenance of schools" has never been an exclusive government prerogative, Wilberforce will not become a state actor if it opens a charter school. *Jackson*, 419 U.S. at 354 n.9. Whether it belongs to the government alone to "provide a free education to all children," *Rendell-Baker*, 457 U.S. at 849 (Marshall, J., dissenting), is simply not "the relevant question," *id.* at 842 (majority opinion). By opining on an irrelevant question, Black's expert opinions fail out of the gate.

## II. Black's expert testimony impermissibly opines on law.

Experts cannot testify about law. To be admissible, expert testimony must "help the trier of fact." Fed. R. Evid. 702(a). Only the Court decides questions of law. So "expert testimony that expresses a legal conclusion" is inadmissible. *Berry v. Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994). In the context of a bench trial, courts cannot "outsource to 'experts' their Article III duty to decide questions of law." *Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 607 (5th Cir. 2026) (en banc). The Court can consult academic "books and law-review articles" when deciding legal questions, but it

cannot *defer* to the purported expertise of "law professors" and historians on legal issues—let alone make findings of fact insulated by clear-error review on appeal. *Id.*

Black's testimony expresses purely legal conclusions. If it has any relevance, it concerns whether Tennessee charter schools are state actors. The state-action doctrine is a legal test for determining the outer "boundary" of the First and Fourteenth Amendments, since those amendments as a matter of "text and original meaning" limit "only *governmental*" action. *Halleck*, 587 U.S. at 808. The state-action doctrine is not a question of fact; it does not answer "who did what, when or where, how or why." *U.S. Bank Nat. Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 394 (2018). Thus, as the Sixth Circuit has recognized, whether "a private entity … is exercising powers traditionally reserved to the state" is an issue "of law" to be decided by the district court in the first instance, and reviewed "*de novo*" on appeal. *Romanski v. Detroit Ent.*, 428 F.3d 629, 636 (6th Cir. 2005); *see, e.g.*, *Halleck*, 587 U.S. at 810-11 (conducting the public-function analysis *de novo*). The "historical analysis" of "whether the party has engaged in an action traditionally reserved to the state" is one that "*the court* conducts," not the finder of fact. *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003) (emphasis added).

Intervenors cannot escape this conclusion by claiming that Black's testimony concerns the "facts" of history. *Cf.* Tr.263-64. This response "confuse[s] the kind of facts experts can help determine (so-called 'adjudicative facts') from facts that are decided by courts (so-called 'legislative facts')." *Nathan*, 173 F.4th at 608 n.56. "Adjudicative facts" refer to "the facts of the particular case"—who did what, when, where, and why. *United States v. Silvers*, 129 F.4th 332, 342 (6th Cir. 2025). They are the facts "determined in trials," *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012), "through the introduction of evidence," namely "the testimony of witnesses," Fed. R. Evid. 201 advisory committee's notes. "Legislative facts are quite different." *Id.* They are "facts which have relevance to legal reasoning," such as the fact that a term had a particular meaning at the time of a statute's enactment.

*Silvers*, 129 F.4th at 343. Courts necessarily must decide these facts for themselves "as a matter of law." *Id.* So when a legal standard establishes a history-based test, a court's resolution of the relevant "historical questions" is necessarily a "*legal*" determination. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 25 n.6 (2022).

Caselaw confirms the legal nature of the historical inquiry involved in the public-function test. When *Halleck* discussed the history of "public access channels," it made no mention of the record or the factual findings by the district court. *See* 587 U.S. at 810-11. Instead of reviewing a determination by a fact finder for reasonableness, the Court made its own assertions about the history of cable; and it cited outside secondary literature, not record evidence, to support its assertions. *Id.* The Supreme Court's approach would have been a gross subversion of the factfinder's role were the history of an alleged public function an adjudicative fact. *See* Fed. R. Civ. P. 52(a)(6). But because the "historical" scope of the First and Fourteenth Amendments is a "*legal* questio[n]," the Court's independent assessment of the history was both appropriate and necessary. *Bruen*, 597 U.S. at 25 n.6. As the Fifth Circuit recently recognized, "[w]hat the founding generation understood" the Establishment Clause to cover—which includes the scope of its state-action requirement—"is a legal question to be decided by a court, not a 'fact' question to be decided by experts, no matter how credentialed." *Nathan*, 174 F.4th at 607.

To make matters worse, Black expressly frames his opinions in "legal terms." *Berry*, 25 F.3d at 1353. When "the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular," "exclusion is appropriate." *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985). Such testimony "invade[s] the province of the court" by assuming the role of explaining the law, even if the witness's legal reasoning is "implicit." *Berry*, 25 F.3d at 1353. By opining on whether Tennessee charter schools engage in "a traditional and an exclusive government function," Black-3-4, Black's testimony tries to "trac[k] almost verbatim the language of the

applicable" legal test. *Id.*; *see, e.g.*, *Sykes*, 65 F.4th at 877 ("traditional and exclusive government function"). And that test has a specialized meaning. In vernacular expression, a "traditional" practice doesn't necessarily have a sharply defined temporal or geographical scope. A 50- or 100-year old practice might fairly be called traditional, as might a practice specific to a particular State or region. In the legal context of the state-action doctrine, however, matters are much less open ended. National practice is determinative; a purely state or regional practice does not count. *Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 141 & n.2 (6th Cir. 2023). Likewise, because the doctrine stems from the "original meaning" of the First and Fourteenth Amendments, the practices of governments in 1791 and 1868 take on special significance. *Halleck*, 587 U.S. at 808.

Black's testimony cannot be characterized as factual. His testimony addresses the legal question of the scope of the First and Fourteenth Amendments, and does so using specialized legal terminology. This Court should exclude his testimony. Black is free to give those opinions by seeking leave to file an amicus brief instead, as he did in the *Oklahoma* case. *See* Ex.E.

**III. Black is unqualified to give his expert opinions.**

The "trial court must determine whether the expert's training and qualifications relate to the subject matter of [her] proposed testimony." *Hous. Enter. Ins. Co. Inc. v. One S. Place*, 2018 WL 6329753, at *7 (E.D. Tenn. Dec. 4). "Exclusion is proper when 'the subject of the testimony lies outside the witness' area of expertise.'" *Rani v. Rivera*, 2025 WL 3033477, at *2 (S.D. Ohio Oct. 30) (quoting 4 *Weinstein's Fed. Evid.* §702.06, at 702-52 (2000)). In other words, Rule 702 "establishes a standard of evidentiary reliability," so the trial judge should exclude an expert whose opinion lacks "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert*, 509 U.S. at 590, 592.

Black is not qualified to give his expert opinions. Black represented his expertise as historical. He claimed that he opined just as to "the history of schools in public education" and that his report was "not in any way related to [his] knowledge of the state actor doctrine." Tr.99. He claims to have made no "legal conclusions" of any kind. Tr.265. As just explained, that is not accurate; the historical

questions Black addressed are necessarily legal. But even setting that point aside, Black is unqualified to opine on matters of history. Black is a law professor, not a historian. He possesses no qualifications to opine on history beyond those possessed by members of the legal profession generally.

Black has no degrees or certifications in history. Tr.36. He did not major or minor in history as an undergraduate. Tr.36. His only advanced degree is his J.D. Tr.37. He has never worked as a historian. After completing law school, he worked in litigation and public policy. Tr.37-39. He then became a law professor, where his classes have been listed exclusively in the law school, not in any history department. Tr.39-45. And he is not a member of the American Historical Association, the Organization of American Historians, or "any professional organization for historians." Tr.45. His full-length articles and essays have appeared exclusively in student-edited law reviews, not historical journals. *See* C.V. (Ex.C) 1-3; Tr.47. Some of his articles, he claims, have been peer reviewed, but he "would expect" that those peer reviewers are other "law professors." Tr.49. Black cannot identify any article that he knows was peer reviewed by "a professor in a history department." Tr.50; *cf. Daubert*, 509 U.S. at 593-94 (emphasizing the importance of "peer review" and "publication (or lack thereof) in a peer reviewed journal").

Black also states that he consulted two of his books in preparing his opinions, Black-Rep. ¶9, but neither is an academic work of history. The first, *Schoolhouse Burning: Public Education and the Assault on American Democracy* (2020), was published by Hachette, which is a "trade publisher," "not an academic publisher." Tr.64-65. The other, *Education Law and Policy: Equality, Fairness and Reform* (2021), is a "casebook" for law students. *See* Derek W. Black, archive.is/Ejcu2 (archived Aug. 4, 2026) ("*Black Website*"). In fact, Black claims he was "introduced … to genuine historical research" only recently, while writing his 2025 book *Dangerous Learning*, *see* Black, *Dangerous Learning: The South's Long War on Black Literacy* 335 (2025) (Ex.D); Tr.75-76, which he published *after* all his previous books and articles that he consulted for his expert report, Black-Rep. ¶9. Even on his own website, Black claims to be

an "Expert in education law and policy, educational equality and school funding for disadvantaged students," but not history. *See Black Website*.

Black may be a qualified law professor, but he is not a qualified historian. He cannot claim to possess historical expertise independent of his legal knowledge. And as explained, his legal knowledge is not the proper subject of expert testimony.

## IV. Black uses an unreliable methodology, resulting in unreliable opinions.

Finally, an expert must use a valid methodology. *Nelson*, 243 F.3d at 251. And a reliable methodology must be "reliably applied." *In re Onglyza & Kombiglyze*, 93 F.4th at 347. Expert testimony is inadmissible when the expert "cherry-pick[s] data," applies factors "inconsistently," or otherwise applies the methodology "in an unreliable fashion." *Id.* An expert who "fail[s] to adequately account for contrary evidence" or draws "unauthorized conclusions from limited data" does not satisfy Rule 702(b)'s demand for "sufficient facts or data." *Id.* at 345-36.

Black's testimony is unreliable to the point of exclusion. His central conclusion—that the provision of free education open to all is a traditional and exclusive government function—is based on little to no research. Black did not conduct *any* "new research on the national history of public education" before writing his expert report. Black-Rep. ¶21; *accord* Tr.23. He merely "consult[ed] [his] prior scholarship on the subject," ¶21, a task on which he spent "less than five hours," and possibly "[l]ess than three," Tr.24-25. Black's prior scholarship, however, is not on point. When asked to identify which of his prior writings that he consulted "discuss[ed] whether the provision of free education open to all is a traditional and exclusive government function," Black initially responded that he did not think that any of them did. Tr.124. He then claimed that his *amicus* brief in *Oklahoma Statewide Charter Sch. Bd. v. Drummond ex rel. Oklahoma*, 605 U.S. 165 (2025), might address the issue. Tr.125-26. In reality, it does not. *See* Ex.E. It never addresses whether "anyone else" besides the State has "provided free education, open to all." Tr.99. Since the state-action doctrine calls for a national inquiry,

not a state-specific one, Black's lack of *any* research on his central conclusion is indefensible. *See Nugent*, 72 F.4th 135 & n.2.

Black's report is also unreliable because he "cherry-pick[ed]" data and fails to consider "contrary evidence." *In re Onglyza & Kombiglyze*, 93 F.4th at 347. In particular, for nearly a quarter century, caselaw has identified historical examples of private schools that have offered free education open to all from the time of Reconstruction to the present day. *See Logiodice*, 296 F.3d at 27. Yet Black's report does not discuss these examples, much less provide a persuasive explanation for why they do not undermine his opinions.

Consider some key examples. Because Maine is "the most rural State in the Union," many school districts in the State do not "operate a public secondary school of their own." *Carson v. Makin*, 596 U.S. 767, 773 (2022). Some school districts instead "contrac[t] with a particular … private school for the education of [their] school-age children." *Id.*; *see* 20-A Me. Rev. Stat. §5204(3). The private school then "serves as the school of last resort for students in the district." *Logiodice*, 296 F.3d at 27. The school "admits all district students," and all "tuition payments" are made "by the school district." *Id.* at 25, 27. The private school thus provides free education open to all, just as a traditional public school does. *Id.* at 27. This is not a novel development. The system dates back to Maine's "first statewide high school law providing money to municipalities for the establishment of local public schools." *Id.* at 27 (citing 1873 Me. Laws ch. 124, §7). "Other states had similar laws early on," such as Vermont in 1904 and New Hampshire in 1874. *Id.*

When confronted with these examples, Black offered no reason to doubt their veracity. *See* Tr.194-96. If anything, he thought this method of providing universal free education through private schools "actually goes back further than those dates." Tr.196. Black thus has no basis for concluding that only the government provides free education open to all.

Black's testimony is also unreliable because it applies factors "inconsistently." *In re Onglyza & Kombiglyze*, 93 F.4th at 347. In particular, Black relied on two distinct definitions of "open to all" throughout his testimony, applying the more stringent definition to traditional private schools. When speaking of charter schools, Black relied on a definition that focused on the individual school. He opined that "charter schools are free and open to all" because they "are prohibited from picking and choosing their students and must accept all students who seek to enroll, or enroll students by lottery when they reach capacity." Black-Rep. ¶87. In his deposition, he again testified that "Tennessee charter schools are open to all in the way that I define it," because all students within the "district boundaries" are eligible to attend, just like "public schools." Tr.210-11. And he agreed that "an individual school" could qualify as "free and open to all." Tr.119-20. But when assessing private schools, Black took a different tack. He claimed that private schools have never provided "free and open to all education" in American history, because private schools have never produced a statewide "system" of free schooling. Tr.266-67. To provide "free public education open to all" on such an "enormous scope and scale" would require "authority to tax," which private schools do not have. Tr.267. At most, Black testified, "one school" might "happe[n] to be free," but that apparently is not enough to count as providing free education open to all. Tr.268.

In other words, Black redefined his criteria as needed to make charter schools "free and open to all" and traditional private schools not. A Maine private school that by contract is the school of last resort for the local school district ought to be considered *more* open to all than a charter school. The private school must "admi[t] *all* district students" who wish to attend, *Logiodice*, 296 F.3d at 27 (emphasis added), whereas charter schools can exclude students "by lottery when they reach capacity." Dep. ¶87. But that's not good enough, Black says, because the private school has not established a statewide *system* of free education. Yet Black does not hold charter schools to the "system" standard; an individual charter school gets to count as open to all, because every student in the district can

attend—or at least participate in a lottery to attend. Tr.210-11. Testimony that rests on outcome-oriented inconsistencies does not assist the trier of fact.

## CONCLUSION

This Court should exclude all expert testimony from Derek Black.

Dated: August 4, 2026

Respectfully submitted,


*/s/ Cameron T. Norris*
Cameron T. Norris (TN Bar No. 33467)
Ryan M. Proctor*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
ryan@consovoymccarthy.com

**admitted pro hac vice*