# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br><br>*Plaintiff*,<br><br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION,<br><br>*Defendant*, | Case No. 3:25-cv-584 (CEA) (DCP) |
| REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP,<br><br>*Intervenor-Defendants,* | |
| ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER,<br><br>*Intervenor-Defendants.* | |

**Expert Report of Derek W. Black**

## I. Summary of Qualifications

1. I am a professor of law and hold a Carolina Distinguished Professorship and the Ernest F. Hollings Chair in Constitutional Law at the University of South Carolina Joseph F. Rice School of Law. I teach education law and policy, constitutional law, civil rights, voting, and evidence and direct the Constitutional Law Center. I have also taught at Howard University School

of Law, Howard University School of Education, the University of North Carolina School of Law, and American University Washington College of Law. I have been invited to lecture and present at numerous other universities, including Harvard, Princeton, NYU, Virginia, Fordham, William & Mary, Washington and Lee, Indiana University-Bloomington, Colorado, California State, Temple, Drexel, Arkansas, and West Virginia. I have also been invited to offer expert testimony before various state and federal legislative bodies and commissions.

2. The focus of my scholarship is education law, history, and policy. I have published scholarly articles on the constitutional right to education, school desegregation, racial diversity, educational equality, school finance, school quality, school choice, school discipline, the history of education opportunity, teacher tenure, the federal role in education, and the state structure for public education. My scholarly articles have been published and are forthcoming in various legal and non-legal journals and books, including the YALE LAW JOURNAL, STANFORD LAW REVIEW, NEW YORK UNIVERSITY LAW REVIEW, CALIFORNIA LAW REVIEW, VIRGINIA LAW REVIEW, CORNELL LAW REVIEW, NORTHWESTERN LAW REVIEW, VANDERBILT LAW REVIEW, MINNESOTA LAW REVIEW, NOTRE DAME LAW REVIEW, BOSTON UNIVERSITY LAW REVIEW, GEORGE WASHINGTON LAW REVIEW, WILLIAM & MARY LAW REVIEW, BOSTON COLLEGE LAW REVIEW, and NORTH CAROLINA LAW REVIEW.

3. I have also authored multiple books. My first book was an education law and policy casebook titled EDUCATION LAW: EQUALITY, FAIRNESS AND REFORM (Aspen). It is now in its third edition and used at numerous leading universities, law schools, and schools of education across the country. The book identifies each of the major topics in education law and policy and analyzes them from legal, policy, historical, and social science perspectives. My second book was on school discipline and titled ENDING ZERO TOLERANCE: THE CRISIS OF ABSOLUTE SCHOOL DISCIPLINE

(NYU Press). My third book, SCHOOLHOUSE BURNING: PUBLIC EDUCATION AND THE ASSAULT ON AMERICAN DEMOCRACY (Public Affairs/Hachette), was on the history of the constitutional right to public education in the United States and the current challenges facing public education. My fourth book, DANGEROUS LEARNING (Yale University Press 2025), traces legal bans on black literacy and abolitionist books during slavery, the subsequent constitutionalization of public education in the South, and how those events shaped law and education policy over the next century. I am also a co-author of FEDERAL PUBLIC SCHOOL LAW GUIDEBOOK (2024). A full list of my publications can be found in my CV, which is attached.

4. I founded and directed the Education Rights Center at Howard University School of Law. The Center studied the causes and extent of educational inequalities in public schools, provided information and resources to parents, and informed national and local education policy.

5. Prior to teaching, I was the Education Project staff attorney at the Lawyers' Committee for Civil Rights Under Law, where I was responsible for litigation and policy regarding school desegregation, diversity, school finance equity, student discipline, and special education.

6. I attended law school at the University of North Carolina at Chapel Hill, where I was a member of the Law Review for two years and graduated with High Honors. I received my undergraduate degree from the University of Tennessee, Knoxville, summa cum laude, with majors in African and African American Studies, Philosophy, and Political Science.

## II. Statement of Compensation

7. I agreed to write this report for $12,500. I will be compensated at a rate of $350 per hour for any work related to this case beyond this report.

## III. Questions Presented

- Whether the provision of free education open to all is a traditional and an exclusive government function; and

- Whether Tennessee's charter schools are part of the state's system of free education open to all.

## IV. Information Considered in Forming Opinions

8. In preparing this report, I examined the Constitutional Conventions of Tennessee, which were held in 1796, 1834, 1870, 1953, 1959, 1966, 1971, and 1977; the Tennessee Constitutions of 1796, 1834, 1870, and 1977; MASS. CONST. of 1780; OHIO CONST. of 1802; CAL. CONST.; S.C. CONST. OF 1868; 20 U.S. CODE § 7221; Tennessee Public Charter Schools Act of 2002, H.B. 1131/S.B. 887 (2002); 2011 Tennessee Laws Pub. Ch. 466 sec. 6 (H.B. 1989); 2014 Tennessee Laws Pub. Ch. 850 § 6 (H.B. 702); the current Tennessee charter schools act, particularly T. C. A. § 49-13-105; JOHN EATON, FIRST REPORT OF THE SUPERINTENDENT OF PUBLIC INSTRUCTION OF THE STATE OF TENNESSEE (1869); the Tennessee State Library and Archives' directory of the constitutional convention records; John D. Barnhart, The Tennessee Constitution of 1796: A Product of the Old West, 9 J. of Southern History 532 (1943); JAMES PHELAN, SCHOOL HISTORY OF TENNESSEE (1889); CHARLES WILLIAM DABNEY, UNIVERSAL EDUCATION IN THE SOUTH, Vol. 1 (1936); CHARLES WILLIAM DABNEY, UNIVERSAL EDUCATION IN THE SOUTH, Vol. 2 (1936); John Taliaferro Rennolds, *The Evolution of the Public School System in Tennessee* (Master's Thesis, Univ. of Tenn. 1925); ANDREW DAVID HOLT, THE STRUGGLE FOR A STATE SYSTEM OF PUBLIC SCHOOLS IN TENNESSEE 1903-1936 (Teachers College Dissertation 1938); ROBERT MARGO, RACE AND SCHOOLING IN THE SOUTH, 1880-1950 (1990); U.S. DEP'T. OF EDUC., EVALUATION OF THE PUBLIC CHARTER SCHOOL PROGRAM: YEAR ONE EVALUATION REPORT (2000); National Alliance for Public Charter Schools, *Charter Schools 101 Fact Sheet;* NATIONAL ALLIANCE OF CHARTER SCHOOLS, DETAILS FROM THE DASHBOARD: CHARTER SCHOOLS BY GEOGRAPHIC REGION (2012); Aubri Juhasz, *20 Years After Katrina, New Orleans Schools Are Still* "*A Work in Progress*," NPR, August 25, 2025; TENN. DEP'T OF EDUC., CHARTER SCHOOLS 2015

ANNUAL REPORT 5 (March 2015); TENN. DEP'T OF EDUC., TENNESSEE INVESTMENT IN STUDENT ACHIEVEMENT GUIDE 2024-25 SCHOOL YEAR (2025); TENNESSEE COMPTROLLER OF THE TREASURY, THE EDUCATION IMPROVEMENT ACT: A PROGRESS REPORT (2004); Molly O'Brien and Amanda Woodrum, *Constitutional Common School*, 51 CLEV. ST. L. REV. 581 (2004); and INSTITUTE FOR EDUCATIONAL EQUITY AND OPPORTUNITY, EDUCATION IN THE 50 STATES: A DESKBOOK OF THE HISTORY OF STATE CONSTITUTIONS AND LAWS ABOUT EDUCATION (2008).

9. In addition to those sources, I also consulted my own prior research as found in DEREK W. BLACK, SCHOOLHOUSE BURNING: PUBLIC EDUCATION AND THE ASSAULT ON AMERICAN DEMOCRACY (2020); Derek W. Black, *The Constitutional Compromise to Guarantee Education*, 70 STAN. L. REV. 735 (2018); Derek W. Black, *The Education Power,* 110 VA. L. REV. 341 (2024); Derek W. Black, *The Fundamental Right to Education*, 94 NOTRE DAME L. REV. 1059 (2019); Derek W. Black, *Localism, Pretext, and the Color of School Dollars*, 107 MINN. L. REV. 1415 (2023); Derek W. Black, *Reforming School Discipline*, 111 NW. U. L. REV. 1 (2016); DEREK W. BLACK, EDUCATION LAW AND POLICY: EQUALITY, FAIRNESS, AND REFORM (2021); my expert report in *Cruz-Guzman v. State*; and an amicus brief which I co-authored in *Oklahoma Statewide Charter School Board v. Drummond*, 605 U.S. 165 (2025).

10. During my career, I have examined dozens of constitutional conventions. Thus, I also relied on my prior experience and knowledge of those state constitutional conventions, the debates regarding education clauses, and the changes made to education clauses across time. A good representation of my core knowledge on the subject is represented in the articles I wrote that are already listed above. In researching *The Constitutional Compromise to Guarantee Education*, for instance, I examined all the state constitutional conventions of new states admitted to the Union

between 1860 and 1870, as well as the conventions of all the southern states that reentered the Union pursuant to the Reconstruction Act of 1867.

11. In researching *The Education Power*, I examined constitutional conventions, regardless of time period, that included either a chief statewide education officer (i.e., state superintendent of education) or state board of education in the text of the constitution or made changes to that text. Those articles, however, do not capture the full extent of my background knowledge and experience. I have also examined or written about the constitutions and conventions of states admitted to the Union after the Civil War, states that made substantial changes to their education clauses, states that altered their method of financing education, and states that adopted seminal constitutional provisions.

## V. Other Testimony

12. I testified as an expert for the State of Louisiana in federal district court in *Jindal v. United States Dep't of Educ.*, No. CV 14-534-SDD-RLB, 2015 WL 5474290 (M.D. La. Sept. 16, 2015). The subject matter of that litigation was the Department of Education's implementation of a competitive grant program (Race to the Top) and statutory waivers under the Elementary and Secondary Education Act.

13. I testified as an expert in *Adams v. McMasters*, No. 2020-CP-38-00774 (Court of Common Pleas, First Judicial Circuit of South Carolina). The subject matter of that litigation was whether the allocation of federal emergency education funds violated the Education Article and the No Aid Clause in the South Carolina Constitution.

14. I testified as an expert in *William Penn School District v. Pennsylvania*, No. 587 M.D. 2014 (Commonwealth Court of Pennsylvania). The subject of that litigation was whether the Commonwealth was providing public school students with an education consistent with the state constitution. My testimony examined the original intent of the Education Article.

15. I submitted an expert report in *Columbus City School District, et al. v. State of Ohio, et. al.* (Court of Common Pleas, Franklin County, OH). The subject of that litigation is whether the Ohio Educational Choice Scholarship Programs violate the state constitution's public education mandates and prohibition on the funding of private education.

16. I submitted an expert report in *Cruz Guzman v. State of Minnesota,* No. 27-CV-15-19117 (District Court, Hennepin County). The subject of that litigation is whether segregation in Minnesota schools violates the state constitution's education clause.

17. I submitted an expert affidavit in *Falls v. DeSantis*, No. 4:22-cv-00166 (N.D. Fla.). The substance of my affidavit addressed Florida's rules and regulations regarding the approval of textbooks and the extent to which the state's textbook reviewers could reasonably and consistently interpret and apply those rules and regulations.

18. I submitted an expert affidavit in *Smith v. Henderson*, No. 13-420 (D.D.C.), a case involving the disparate impact of school closures in the District of Columbia.

## VI. Methodology

19. This report answers two major sets of questions, one pertaining to the history of public education in general and the other pertaining to charter schools. Those separate questions required two different lines of research. I researched the history of public education first and Tennessee's charter schools second.

20. As to the history of public education, I began with the history of Tennessee public education given my preexisting extensive knowledge of national history, aiming both to understand Tennessee's history and situate it within a larger context. My methodology for examining the history of public education in Tennessee involved multiple steps. First, I identified the relevant constitutional education provisions to examine and trace their history to identify any changes in constitutional text across time. In that process, I identified the original source of current

constitutional education text, as well as the constitution that preceded it. Second, I read and studied the convention debates that led to the adoption of constitutional text pertaining to education. Third, I identified points of contention and agreement among the delegates, reoccurring concerns, rejected proposals, and accepted proposals. Fourth, I examined and interpreted each comment and debate in the context of the overall convention debate, the educational context of the time period, and the convention's final proposed constitution. Throughout the process, I relied on my prior knowledge of other conventions and education history in identifying concepts, policies, principles, and language that may be reflective of terms of art, concepts, policies, principles, language, or events occurring in other states or nationally. Fifth, I examined secondary sources regarding the history of education in Tennessee, with particular attention to the statutory regimes and structures that preceded or followed these constitutional conventions.

21. As noted above, my knowledge of national education history is extensive. I have been researching and writing about the history of public education for most of my academic career. Thus, I did not conduct new research on the national history of public education but rather drew on my existing knowledge while also consulting my prior scholarship on the subject. My new research on the history of public education in Tennessee, however, further deepened my knowledge of the national history of public education, as each state has its own unique history and nuances. I relied on my prior research and the new research from Tennessee to make my findings and conclusions regarding the national history of public education.

22. My approach to this report's findings on charter schools was similar in that, given my existing extensive knowledge of charter schools nationally, I began my analysis with Tennessee's charter schools. First, I identified and examined Tennessee's first charter school law. Second, I identified and examined subsequent legislation that enacted notable changes to that law.

Third, I examined official reports by the state of Tennessee or its agencies regarding its charter schools. Fourth, I examined federal reports regarding charter schools. Fifth, I examined secondary sources that had compiled state and federal data regarding charter schools and their growth. Sixth, given my preexisting knowledge of and research on charter schools nationally, along with the coverage of that same topic in some of the secondary sources I examined on Tennessee, I did not conduct new research on charter schools nationally but rather consulted the federal code on charters, the chapter on charters in my casebook, DEREK W. BLACK, EDUCATION LAW AND POLICY: EQUALITY, FAIRNESS, AND REFORM (2021), and an amicus brief on charter school policy that I co-authored in *Oklahoma Statewide Charter School Board v. Drummond*, 605 U.S. 165 (2025).

## VII. Findings and Conclusions

### A. STATES HAVE PROVIDED FREE EDUCATION OPEN TO ALL THROUGHOUT AMERICAN HISTORY

23. Throughout American history, states have used public resources to create education systems that are free and open to all. The idea that government should provide for the education of citizens at public expense originated during the nation's founding era. But during the late eighteenth and early nineteenth centuries, meager resources and tax bases limited the scope of the education that states, particularly less developed states, could provide. As a result, purely private education was often the only education available, and it was only available in limited locations and only to those with the resources to pay. JOHANN N. NEEM, DEMOCRACY'S SCHOOLS: THE RISE OF PUBLIC EDUCATION IN AMERICA 64-66 (2017).

24. Frustrated with the slow growth of public education, state constitutional conventions increasingly imposed affirmative constitutional obligations on state legislatures regarding the provision of education. Congress, too, began to embed education duties into the official terms of statehood. Several states accepted and carried out that duty in the early nineteenth

century, while most others came to that duty during the mid-nineteenth century. Newer states came to that duty a little later, when they were first admitted to the Union. But all states have provided, and still do provide, public education that is free and open to all—most for nearly two centuries.

25. Tennessee falls in the middle category, not committing to the provision of public education when it became a state in 1796, but initiating a system not long thereafter when Congress granted the state large tracts of land to support public education, and then calling a constitutional convention in 1834 to correct the failures of the 1796 constitution. Over the next several decades, Tennessee continually improved and expanded on that constitutional system of public education, establishing a tax system to support it, state officials to run it, and mechanisms to extend it to communities that would otherwise struggle. The following subsections expand on both the national and Tennessee context in detail.

**a. National History of Public Education**

26. During the founding era, the belief that public education is a necessity of a republican form of government—and thus an obligation of government—was widely held, though implementation of that concept commenced slowly due to resource limitations. George Washington, John Adams, Thomas Jefferson, James Madison, and many other leading statesmen believed that the success of the American experiment depended on the education of its people.[1]

---

1 *See, e.g.*, George Washington, President of the United States, Eighth Annual Address (Dec. 7, 1796), *reprinted in* 1 JAMES D. RICHARDSON, A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 1789–1897, at 199, 202 (Washington, Gov't Printing Off. 1896) (advocating for education of young people from all quarters of society so as to guard liberty for the future); *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972) (summarizing Jefferson's argument that education is necessary to the preservation of freedom and independence); Benjamin Rush, *Of the Mode of Education Proper in a Republic, 1798: Selected Writings 87–89, 92, 94–96*, *in* 1 THE FOUNDERS' CONSTITUTION 686, 686 (Philip B. Kurland & Ralph Lerner eds., 1987); CARL F. KAESTLE, PILLARS OF THE REPUBLIC: COMMON SCHOOLS AND AMERICAN SOCIETY, 1780-1860, at 6 (Eric Foner ed., 1983); John Adams, *A Dissertation on the Canon and the Feudal Law, No. 3* (September 30, 1765), https://founders.archives.gov/documents/Adams/06-01-02-0052-0006; James Madison, *To W. T. Barry*, *in* 9 THE

John Adams was the first to translate this belief into constitutional text. During the revolutionary period, he had argued that "[l]aws for the liberal education of youth, especially of the lower class of people, are so extremely wise and useful, that, to a humane and generous mind, no expense for this purpose would be thought extravagant." John Adams, *Thoughts on Government*, *in* THE WORKS OF JOHN ADAMS 189, 199 (Charles Francis Adams ed., Boston, Little, Brown, & Co. 1865). As the author of the Massachusetts Constitution of 1780, he put that idea into legal text: "Wisdom, and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislators and magistrates, in all future periods of this Commonwealth, to cherish the interests of . . . public schools, and grammar schools in the towns. . . ." MASS. CONST. of 1780, ch. V, § 2. The point was for public education "to be the care of the public" and "maintained at the public expense." John Andrew Wimpey, *Pioneer Concepts of American Public Education*, 35 PEABODY J. EDUC. 83 (Sept. 1957) (quoting John Adams). Thomas Jefferson proposed similar ideas before the Virginia General Assembly, writing that the state should "illuminate, as far as practicable, the minds of the people at large" through public education "at the common expence of all." Thomas Jefferson, Preamble, Bill 79, A Bill for the More General Diffusion of Knowledge.

27. These ideas also took hold in northern states beyond Massachusetts very early in the nation's history. New Hampshire, for instance, added an education provision to its constitution

WRITINGS OF JAMES MADISON 103, 103 (Gaillard Hunt ed., 1910); DEREK W. BLACK, SCHOOLHOUSE BURNING: PUBLIC EDUCATION AND THE ASSAULT ON AMERICAN DEMOCRACY 54-57 (2020); *A Bill for the More General Diffusion of Knowledge*, THOMAS JEFFERSON ENCYCLOPEDIA, https://www.monticello.org/site/research-and-collections/bill-more-general-diffusion-knowledge.

in 1784 and, between 1789 and 1791, passed legislation setting the tax rate that towns should impose to support schools, as well as teacher qualifications. INSTITUTE FOR EDUCATIONAL EQUITY AND OPPORTUNITY, EDUCATION IN THE 50 STATES: A DESKBOOK OF THE HISTORY OF STATE CONSTITUTIONS AND LAWS ABOUT EDUCATION 108 (2008). Though its constitution did not address public education, Connecticut similarly granted local districts the authority to impose and collect taxes for schools in 1794 and, in 1795, established a perpetual trust fund for schools and "severed [those] schools from all religious and other municipal functions." *Id*. 57.

28. During the same period, the Confederation Congress passed the Land Ordinance of 1785, which dictated the path to statehood for the territories and required every town to reserve a central lot for schools and one-ninth of their total land and one-third of their natural resources to generate funds for their schools. Public Land Ordinance of 1785, reprinted in 1 LAWS OF THE UNITED STATES OF AMERICA 565-66 (Philadelphia, John Boren, W. John Duane & R.C. Weightman 1815). At first, Congress and the states presumed that requiring government to "encourage" education and protect against the diversion of trust funds toward other ends was sufficient to produce public education. *See, e.g.*, OHIO CONST. of 1802, Art. VIII, § 3.

29. However, as various circumstances, including the mismanagement of trust funds and the politics of taxes, proved otherwise, Congress and state constitutional conventions began to demand more specific legal obligations of states. Those demands were often an outgrowth of the common school movement of the 1830s and 1840s, which advocated for a system of "non-sectarian, publicly funded school[s] where children of all classes and backgrounds would be educated together." Molly O'Brien and Amanda Woodrum, *Constitutional Common School*, 51 CLEV. ST. L. REV. 581, 588 (2004). Ohio, for instance, amended its constitution in 1851, requiring the General Assembly to "make such provisions, by taxation or otherwise, as, with the income

arising from the school trust fund, will secure a thorough and efficient system of common schools through the state." OHIO CONST. of 1851, Art. VI, § 2. The centrality and essentiality of this duty, moreover, was evident in its location in the overall structure of the Constitution, immediately following the articles on the three branches of government and the right to vote. New York, whose education system was far more advanced than Ohio's, still saw the need to specify that its education trust funds, along with additional deposits it had received from Congress, were exclusively for "common schools." *See* N.Y. CONST. of 1846. Similarly, Pennsylvania's 1790 constitution had required it to provide free education to poor children, and subsequent legislation created a system of public education for all students, but the constitutional convention of 1872-73 brought those systems together and formally mandated that "The General assembly shall provide for the maintenance and support of a through and efficient system of public schools." PA. CONST. of 1872 Art. X, Sec. 1.

30. Congress also began making demands through enabling acts in the territories. For instance, the 1849 enabling act establishing Minnesota's territorial government required that two lots in each town be "reserved for the purpose of being applied to schools in said Territory, and in the states and Territories hereafter to be erected out of the same." An Act to Establish the Territorial Government of Minnesota, in 4 AMERICAN CHARTERS, CONSTITUTIONS, AND ORGANIC LAWS: 1492-1908 at 1987 (Thorpe ed., 1909). When Minnesota sought statehood in 1857, Congress required Minnesota to put specific provisions in its constitution to reserve its common territorial land "for the use of schools." *Id.* at 1989. When the Minnesota Constitutional Convention met later that year, one delegate explained that Congress had bequeathed those school lands as the "inheritance for every child in the Territory" and that it was their obligation to ensure the constitution held those lands "inviolate . . . as long as the world stands," even if "every other fund

should sink into the ocean." DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION FOR THE TERRITORY OF MINNESOTA 345-46 (1858).

31. A decade later, at the close of the Civil War, Congress was even more demanding—this time of existing states. Relying on its constitutional power under Art. IV § 4 to "guarantee to every State in this Union a Republican Form of Government," Congress required Southern states seeking to reenter the Union to draft new constitutions that conformed to a republican form of government and the U.S. Constitution. Reconstruction Act of 1867, ch. 153, § 5, 14 Stat. 428. Congress understood a republican form of government to require the provision of public education. Derek W. Black, *The Constitutional Compromise to Guarantee Education*, 70 STAN. L. REV. 735, 778-83 (2018). Unsure whether the last three confederate states to reenter the Union would maintain their constitutional commitments to public education, Congress explicitly conditioned their readmission on the perpetual provision of public education, prohibiting them from ever amending or changing their constitution "to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State." An Act to Admit the State of Mississippi, ch. 19, 16 Stat. 67, 68 (1870); An Act to Admit the State of Texas, ch. 39, 16 Stat. 80, 81 (1870); An Act to Admit the State of Virginia, ch. 10, 16 Stat. 62, 63 (1870).

32. These and other state constitutions during the reconstruction era explicitly obligated the states to provide public education. The South Carolina Constitution of 1868, for instance, dictated that the General Assembly "shall provide for a liberal and uniform system of free public schools throughout the State, and shall also make provisions for the division of the State into suitable School Districts," which "shall be kept open at least six months in each year." Art. X § 3. Further specifying the means of discharging that duty, the South Carolina Constitution required that the General Assembly "levy at each regular session after the adoption of this Constitution an

annual tax on all taxable property throughout the State for the support of public schools." *Id.* at § 5. To ensure the proper supervision of these schools, it created an independent state officer, the state superintendent. *Id.* at § 1. And nearly a century before the Supreme Court's decision in *Brown v. Board of Education*, the state constitution dictated that these "public schools . . . shall be free and open to all the children and youths of the State, without regard to race or color." *Id.* at § 10.

33. Other southern states adopted similar, often more elaborate, provisions. The Alabama Constitution of 1868, for instance, established the state board of education as the exclusive body in control of schools and required it to establish schools in every township and district. ALA. CONST. of 1868, art. XI, § 6. It required the legislature to reserve "one-fifth of the aggregate annual revenue of the State" for public schools and, in addition, to impose new annual taxes on railroads, banks, and insurance companies to be reserved exclusively for public schools. *Id.* at §§ 11, 13.

34. The concept of free schools at public expense redounded across the South. *See* ARK. CONST. of 1868, art. IX, § 1 (requiring "a system of free schools"); FLA. CONST. of 1868, art. VIII, § 1 (requiring "education of all the children residing within [the state's] borders"); GA. CONST. of 1868, art. VI, § 1 (requiring "a thorough system of general education"); LA. CONST. of 1868, tit. VII, art. 135 (requiring "at least one free public school in every parish throughout the State"); MISS. CONST. of 1868, art. VIII, § 1 (requiring "a uniform system of free public schools"); N.C. CONST. of 1868, art. IX, § 2 (requiring "a general and uniform system of public schools"); TEX. CONST. of 1869, art. IX, § 1 (requiring "suitable provisions for the support and maintenance of a system of Public Free Schools"); *id.* art. IX, § 4 (requiring "a uniform system of Public Free Schools throughout the State").

35. Equally important, those free schools were to be open to all. *See* ALA. CONST. of 1868, art. XI, § 6 (obligating the state to establish education for "all the children of the State" in a given age range); ARK. CONST. of 1868, art. IX, § 1 (mandating the provision of "instruction of all persons in this State" of suitable age); FLA. CONST. of 1868, art. VIII, § 1 (obligating the state to provide "for the education of all the children residing within its borders, without distinction or preference"); GA. CONST. of 1868, art. VI, § 1 (mandating that public education "be forever free to all children of the State"); LA. CONST. of 1868, tit. VII, art. 135 ("All children of this State [of suitable age] shall be admitted to the public schools . . . without distinction of race, color, or previous condition."); N.C. CONST. of 1868, art. IX, § 2 (mandating an education system "free of charge to all the children of the State"); S.C. CONST. of 1868, art. X, § 4 (providing for compulsory education of "all children").

36. Intertwined with the obligation to create free schools open to all was the obligation to create "systems" of schools or "uniform" systems of schools, such that these free schools would reach every community and child in the state. *See, e.g.*, ARK. CONST. of 1868, art. IX, § 1 ("system of free schools"); GA. CONST. of 1868, art. VI, § 1 ("system of general education"); MISS. CONST. of 1868, art. VIII, § 1 ( "uniform system"); N.C. CONST. of 1868, art. IX, § 2 ("general and uniform system"); TEX. CONST. of 1869, art. IX, § 4 (requiring "a uniform system of Public Free Schools throughout the State"). This system, moreover, was to operate under the directive and authority of the state. These state constitutions routinely created independent state superintendents or state boards of education to oversee and manage the state's public schools. JOHN MATHIASON MATZEN, STATE CONSTITUTIONAL PROVISIONS FOR EDUCATION: FUNDAMENTAL ATTITUDE OF THE AMERICAN PEOPLE REGARDING EDUCATION AS REVEALED BY STATE CONSTITUTIONAL

PROVISIONS, 1776–1929, at 36–51 (1931); *see also* Derek W. Black, *The Education Power,* 110 VA. L. REV. 341, 350 (2024) (indicating that 35 state constitutions still retain such provisions).

37. Consistent with the views of founding-era leaders, these and other state constitutional conventions made it clear—often with explicit constitutional text—that the commitment to free public schools open to all throughout the state was not merely in service of the individual or private good but in service of the state's obligation to secure and reinforce a republican form of government. Black, *Constitutional Compromise*, supra, at 784-86, 788; JOURNAL OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF NORTH CAROLINA 486 (Raleigh, Joseph W. Holden 1868); *see also* Derek W. Black, *The Fundamental Right to Education*, 94 NOTRE DAME L. REV. 1059, 1065 n. 34 (2019) (discussing the republican government justification for earlier education clauses).

38. To be clear, these affirmative provisions were not unique to reconstructed southern states. During the mid-nineteenth century, they became a standard aspect of the constitutions of western territories seeking statehood, as well as northern state constitutions when they revised their constitutions in due course. *See* KAN. CONST. of 1861, art. VI, § 2 (requiring that the state legislature "establish[] a uniform system of common schools"); NEB. CONST. of 1866, art. I, § 16 (requiring the legislature "to encourage schools and the means of instruction"); *id.* art. II, Education, § 1 (requiring the legislature to "secure a thorough and efficient system of common schools throughout the State"); NEV. CONST. of 1864, art. XI, § 2 (requiring the state legislature to "provide for a uniform system of common schools"); W. VA. CONST. of 1863, art. X, § 2 ("The Legislature shall provide, as soon as practicable, for the establishment of a thorough and efficient system of free schools."); IND. CONST. of 1851, art. VIII, § 1; MICH. CONST. of 1850, art. XIII, §

4; MINN. CONST. of 1857, art. VIII, § 1; OHIO CONST. of 1851, art. VI, § 2; OR. CONST. of 1857, art. VIII, § 3.

39. By 1868, eighty-one percent of all state constitutions clearly "recognized that children have a fundamental right to a free public education." Steven G. Calabresi & Michael W. Perl, *Originalism and* Brown v. Board of Education, 2014 MICH. ST. L. REV. 429, 460. From Reconstruction onward, Congress never admitted another state to the union without its constitution including an education mandate. Black, *Fundamental Right*, supra, at 1094. Between those new states and the constitutional revisions by old ones, every state except Connecticut (which had long-standing and robust education statutes) included an education clause in its constitution by 1875. *Id.*

40. One significant variation among the states was the manner by which they financed these free public schools. While their constitutions uniformly established perpetual trusts for schools that could not be diverted to any other purpose, states have varied in the extent to which they defer to the legislature regarding how to raise additional funds to support these schools. Some state constitutions specifically mandated particular taxes to support schools—from property taxes and poll taxes to targeted taxes on specific industries—while others mandated a specific level of funding or that public education appropriations precede other expenditures. PA. CONST. of 1874, art. X, § 1.; LA. CONST. of 1868, tit. VII, art. 139 (describing the mode by which Louisiana would fund its education system); NEV. CONST. art. XI, § 6 (requiring appropriations for education "before any other appropriation"); *Hornbeck v. Somerset Cnty. Bd. of Educ.*, 458 A.2d 758, 784 (Md. 1983) (discussing the Maryland Constitution's rigid regulation of the education appropriation). More often, however, state constitutions left the details of how best to generate school revenues to the legislature.

41. That discretion, at times, hampered the expansion and funding of public schools. Citizens of the early and mid-nineteenth century were not accustomed to taxes, and state legislatures were often reluctant to impose them. STUART G. NOBLE, A HISTORY OF EDUCATION 115, 122, 168–69 (1938); KAESTLE, supra note 1, at 34–35. They often placed the responsibility on local districts to raise them, hoping that payments to local officials would be more tolerable than those to state officials. Derek W. Black, *Localism, Pretext, and the Color of School Dollars*, 107 MINN. L. REV. 1415, 1454-55 (2023). Local authorities, however, were not necessarily eager to impose taxes either and, thus, states had to provide financial incentives to encourage local communities to act. *Id.* As Johann Neem explains, "increasing access to common schools was not spontaneous. It relied on nudges and ultimately mandates from state legislatures." JOHANN N. NEEM, DEMOCRACY'S SCHOOLS: THE RISE OF PUBLIC EDUCATION IN AMERICA 70 (2017). Over time, however, state leaders gradually increased taxes in support of public education. In fact, were it not for state leadership, public education would have been much further delayed in many rural communities, which lacked the resources and capacity to establish and maintain public schools on their own. Black, *Localism, supra*, at 1456. Eventually, citizens' steadfast commitment to a system of free public education open to all normalized these tax obligations. *Id.* at 1454-58.

42. This system of government-provided and funded free public education open to all stands in stark contrast to private education. First, though private schools were often the first to open in many locations, they came into being as a function of private rather than government initiative, and they were started and owned by private individuals. Second, private schools were not free; they charged tuition. Third, as a result of their tuition and fee structure—and just as often their religious mission or affiliation—they were not open to all. They enrolled a demographically distinct subset of students, generally the wealthier classes, while the masses went without formal

education. Fourth, the location of private schools was a function of private decision-making, interests, and variables, and private schools typically operated independently of one another. As a result, they were typically located in wealthier areas, rather than designed to spread and locate in ways that would serve entire communities and states. For all of these reasons combined, private schools lacked both the capacity and desire to offer free education open to all on a systematic basis.

**b. Conclusions Regarding the National History of Free Public Education**

43. Free public education open to all has been traditionally and exclusively delivered by government, more specifically states. Only states could make possible the collective mission of free public education open to all, an enormous task that inherently involved challenges regarding taxing, control, supervision, and fund management. This state tradition and exclusivity is evident in at least seven aspects of public education. First, support for the idea of public education delivered by government to the general public is a tenet of republican government, with the theory being that public education is necessary to effectuate the common democratic good. Second, Congress embedded this idea into the legal fabric of what it means to be a state, and states have readily accepted that responsibility financially and legally. Third, public education soon became an affirmative legal obligation that states etched into their constitutions. This made the obligation of public education inalienable, save constitutional amendment. Fourth, the constitutional and legal obligation to provide public education included the duty to hold public resources and land in perpetual trust for public education and to raise other revenues and taxes for the exclusive benefit of public education. Fifth, the state obligation goes beyond the creation and financing of a public educational system. State constitutions obligate legislatures and other state education officers to control, monitor, supervise, and run schools. Sixth, the provision of public education means more than just creating an assortment of public schools. The state's public schools must be free, open

to all, and constitute a statewide system of education. Seventh, all fifty state constitutions, though with different language, impose this responsibility on states. Derek W. Black, *Reforming School Discipline*, 111 NW. U. L. REV. 1, 10 (2016).

**c. History of Tennessee Public Education**

44. Tennessee's first constitution, the constitution of 1796, did not speak to education. As a result, very few people in the state had access to education during the state's first decades. The few schools that did exist were private. They were started and owned by individuals and groups and required the payment of tuition or subscription fees. These private schools were often for boys only. These private schools went under the name academies. Some later received charters from the state. These nineteenth century charters should not be confused with current charter schools. The charters those nineteenth century private schools received were the equivalent of the modern practice of granting businesses the right to conduct business as a corporation or non-profit. These nineteenth century schools were entirely private. They were not created or funded by the state, nor did the state dictate their activities. Rather, the charters simply formalized the private governance structure under which these private schools were operating and granted them the ability to confer degrees.

45. Tennessee's public education project began in 1806 when Congress granted the state large tracts of land, which the state was to hold and manage for the purpose of establishing and supporting public schools. Over the next three decades, Tennesseans advocated for specific state policies that would create and support public education. In the late 1820s and 1830s, the legislature passed significant pieces of legislation that established a rudimentary structure for creating a system of public education, but those legislative efforts failed to produce an actual system. The congressional land grants were not providing enough resources to support schools—

largely due to individuals squatting on the land or purchasing it with notes that they never repaid—and the state failed to offer additional resources. Resources aside, the state had also yet to assign particular officials with the responsibility of creating, organizing, and managing public schools.

46. When the Tennessee Constitutional Convention of 1834 met, one of its primary objectives was to rectify these educational failures. Early in the convention, Delegate Mabry called for the constitution to "be so amended as to form a system of education, and free schools, to educate those who are destitute of the means of education." JOURNAL OF THE CONVENTION OF THE STATE OF TENNESSEE 58 (1834). He proposed to fund those schools not just with the land grants but with a tax on banks. *Id.* Similarly recognizing that the primary challenge was funding, Delegate Kincannon emphasized that while people of the state generally objected to taxes, public education was one of the few things for which the people would submit to taxes and, thus, he proposed a poll tax to support schools. *Id.* at 154.

47. Regardless of the source of funds for public schools, Delegate Huntsman worried that any funds appropriated or reserved for public schools might be "diverted by the legislature to any other purpose." *Id.* at 178. When the select committee submitted its first report on education, it too expressed deep concern that the state's education resources would be "squandered and lost," leaving "the palladium of freedom and the 'ark of safety' of the union at risk." *Id.* at 204-05. According to the report, Tennessee had already fallen behind other states in the cause of "universal education" and "common school education." *Id.* at 205.

48. The convention settled on a solution to these problems, providing for the following constitutional amendment: "it shall be the duty of the General Assembly in all future periods of this government" to provide for "the diffusion of the opportunities and advantages of education throughout the different portions of the State." All funds in "the common school fund . . . shall

remain a perpetual fund …[and] be inviolably appropriated to the support and encouragement of common schools throughout the State, and for the equal benefit of all the people thereof; and [never] diverted to any other use than the support and encouragement of common schools." *Id.* at 405. The amendment also established a Board of Commissioners to manage and protect those funds. *Id.*

49. In 1835, Tennessee passed legislation to implement the new constitutional provision. It established a state superintendent of education to oversee the state's schools, who would then appoint agents in each county to oversee the local schools and resources. In 1837, the legislature further specified the responsibility of local district commissioners. Through these laws, Tennessee was gradually creating a "state-wide system" of education. JAMES PHELAN, SCHOOL HISTORY OF TENNESSEE 23 (1889). Though Tennessee was late to initiate this system, once it did, the legislature was ahead of its time in terms of the level of authority and systemization it asserted over money and personnel.

50. The system, nonetheless, continued to struggle for stability and resources over the next decade. The state's land grant and trust funds still failed to produce meaningful financial resources and the politics of imposing new taxes was difficult. The question of taxes to expand schools exposed the deep divisions of the state. East Tennesseans consistently supported school taxes, whereas Middle and West Tennesseans generally resisted. Those differing stances reflected the regional divides over slavery. Slavery was not prevalent in the mountainous region of East Tennessee but was in the rest of the state. Slaveholders generally opposed public education systems that would require them to contribute. As a leading scholar of the period explains, "two weeks after the adoption of the constitution [of 1834] the members proposed amendments to form a system of free education and establish a poll tax to be paid by the free whites of the state. This

amendment failed, Middle and West Tennessee voting against it." CHARLES WILLIAM DABNEY, UNIVERSAL EDUCATION IN THE SOUTH, Vol. 1, at 291 (1936).

51. In the 1840s, East Tennesseans continued to agitate for a taxation system to support public education, holding their own convention in 1847, as a matter of protest, to call for a plan of general state taxation for public education. "The nearest the legislature came to authorizing a tax was a law empowering the cities and towns to hold elections to decide whether they wanted to tax themselves for schools. The permission to do this was withheld from the country districts." *Id.* at 292.

52. Finally, in 1853, under the leadership of Governor Andrew Johnson—an East Tennessean—the state enacted a tax system for public schools. "Johnson sympathized deeply with the poor people who sought free schools for their children and resented intensely the opposition of the wealthy who supported private schools for their own and their neighbors' children." *Id.* at 293. Governor Johnson emphasized that the constitution of 1834 had committed the state to a general system of common schools and lamented that the state had failed to deliver it. "There is but one way the children of the State can be educated," Governor Johnson argued, "and that is to levy and collect a tax from the people of the whole state." *Id.* (quoting TENNESSEE SENATE JOURNAL 293-307 (1853-54)).

53. A bill consistent with Johnson's vision passed that legislative session. *Id.* at 294 (citing Acts of the State of Tennessee, chap. 71, 140-42 (1853-54)). It received unanimous support from East Tennessee's legislators and just enough from those in the rest of the state. It provided for both poll and property taxes to support schools, which doubled funding for common schools. Funding for the school system and the literacy it produced continued to improve until the Civil War. Speaking of the Civil War period, Governor Brownlow noted that "the children of the state

had been denied all privileges of education for four years." *Id.* at 295. The funds that were supposed to be reserved for public schools had been diverted to the war and other purposes.

54. After the war, the state's school system effectively started over again, facing many of the same challenges it had faced during the 1830s and 1840s. Eager to avoid repeating the mistakes of the past, the reports on the Constitutional Convention of 1870 include more commentary than the 1834 convention. Delegates forwarded multiple resolutions to the Committee tasked with education provisions. Early in the Convention, Delegate Kirkpatrick's resolution spoke to the longstanding historical principle that "a general diffusion of knowledge [is] essential to the preservation of the rights and liberties of the people" and, thus, it is the duty of the state "to provide for the maintenance within the reach of every child in this State, the means of such an education as will qualify him to discharge the duties of a citizen of the Republic." JOURNAL OF THE PROCEEDINGS OF THE CONVENTION OF THE DELEGATES ELECTED BY THE PEOPLE OF TENNESSEE 52-53 (1870). That much being obvious, he and others focused on the more practical need to constitutionalize a system of taxation to support those schools. Some proposed poll taxes, some proposed property taxes, and others proposed general taxes. *Id.* at 53, 75, 85-86, 191-92. The concerns were so significant that the convention formed a "Special Committee on Common Schools." *Id.* at 221-22.

55. The Special Committee initially proposed the following amendment to the Constitution: "It shall be the duty of the General Assembly to provide for the establishment and maintenance of free schools for the gratuitous instruction of all the children of the State between the ages of ___ and ___ years. And the ordinary tax assessed on polls, under the provisions of this Constitution, with such other of the revenue of the State as the General Assembly may from time to time set apart therefor, shall never be applied to other than educational purposes." *Id.* at 221–

22 (blanks in the original). Delegate Jones moved that "educational purposes" be replaced with the more specific term "free or common schools," which the body adopted. *Id.* at 307–08. The following day the body approved another amendment: "The whole amount of taxes collected for Common School purposes under this Section shall be paid over directly to the proper fiscal officer of the several counties of the State in which the same may be collected and, under the direction of the County Court, shall be expended for the support of Common Schools in the respective counties; Provided, nothing herein shall be construed to prevent the several counties in this State from levying a tax for Common School purposes." *Id.* at 315-16.

56. Fearing that the final provision would still fail to do enough, three delegates filed a formal protest expressing their intention to vote against the amended education clause as it stood. They argued that "while declaring that 'knowledge, learning and virtue are essential to the preservation of Republican institutions,'" the proposed language did not "make operative that great truth" because it did not require the immediate adequate funding of public schools. *Id.* at 322–23.

57. Although the final language adopted by the Convention was better than its predecessor, it did not entirely solve the problem. It made it the "duty" of the state to "cherish literature and science" and prohibited the legislature from using common school funds for anything but common schools. It also required that any funds derived from poll taxes were to be used for education. However, it deferred to the legislature as to how and whether to raise additional tax revenues for schools. *Id.* at 437-38.

58. Nonetheless, after the convention, the legislature took significant steps to fund schools well beyond the reliance on the existing common school trust funds. In 1873, the state passed legislation "to establish and maintain a uniform system of public schools." John Taliaferro Rennolds, *The Evolution of the Public School System in Tennessee* 36 (Master's Thesis, Univ. of

Tenn. 1925). It issued certificates of indebtedness to the trust fund, in recognition that those funds had been incorrectly depleted during the Civil War, plus interest. *Id.* at 36-40 (condensing the Act). It also increased the poll tax and provided for a local school tax to be collected by counties. *Id.* On the personnel side, the legislature established the offices of the state superintendent, county superintendents, and district directors (and specified their duties and qualifications). *Id.* It also addressed more practical aspects of education, including the issuance of teaching certificates and the major subjects to be taught in school. *Id.*

59. This general legislative system did not produce dramatic immediate changes in the conditions of public schools, and it never ensured perfect execution. But it created the conditions by which public education steadily grew in subsequent decades. Between 1874 and 1900, public-school enrollment grew from 258,577 to 485,354 students, which amounted to 44% of children between the ages of 6 and 18. *Id.* at 63. The percentage in elementary school was much higher. *Id.* Enrollment in private school, by contrast, was small and saw much less growth, standing at 31,416 students in 1876, increasing to 33,743 by 1884, and 43,342 in 1894. *Id.* at 64.

60. While public education steadily and rapidly grew during this period, the growth was often uneven, largely due to the state having placed the funding obligations on local counties. "The first money paid by the State of Tennessee for public education, other than the interest on the school fund or the certificate issued to represent the fund 'lost' during the war, was the appropriation made by the legislature of 1903 on the recommendation of Governor Frazier." CHARLES WILLIAM DABNEY, UNIVERSAL EDUCATION IN THE SOUTH, Vol. 2, 363 (1936). In the 1903 legislation, the state also exerted significant structural control over the system, requiring, for instance, that school districts "be co-extensive with the civil districts except where otherwise provided by special act of the Legislature." Rennolds, supra, at 66. In 1907, the legislature

provided for a definite appropriation for the elementary schools and provided a special fund for poor counties. DABNEY, Vol. 2, at 365-66. In 1909, the state further increased the money available to public schools and asserted more control over those schools in the process. Rennolds, supra, at 71-73.

61. Between 1902 and 1911, the total income for public schools in the state rose from $1.8 million to $5.5 million. DABNEY, Vol. 2, at 367. And the number of public high schools in the state increased from 1 to 50. *Id.* This period and its various legislative enactments and increases in funding reflected the principle that "the state owes each child within its bounds the right to a common school education, and has the right to dictate such policies as are deemed necessary to guarantee this right." ANDREW DAVID HOLT, THE STRUGGLE FOR A STATE SYSTEM OF PUBLIC SCHOOLS IN TENNESSEE 1903-1936, 258 (Teachers College Dissertation 1938). The challenge in the following decades was to both build upon and maintain that progress.

62. The next major hurdle was for Tennessee to not only expand schools in general but to equalize educational opportunities across the state. While that equalization largely ignored racial equalization, it did address geographic and wealth inequality. Between 1913 and 1921, for instance, the state's equalization fund increased by nearly 700%. HOLT, supra, at 327. Additional funding and access generally continued to expand (except for the Great Depression), and the overall structure and system of education remained fixed. *Id.* at 331. From 1910 to 1950, per-pupil expenditures in Tennessee nearly quadrupled, which also caused class sizes to substantially shrink. ROBERT MARGO, RACE AND SCHOOLING IN THE SOUTH, 1880-1950 at 21, 27 (1990).

63. Between 1953 and 1977, Tennessee called five more constitutional conventions. The first four conventions did not take any steps to alter the education system established by the Constitution of 1870 or its evolution and implementation by subsequent statutes. In the 1953 and

1959 conventions, the topics of education arose but only in relationship to the question of whether to lower the voting age to 18. The 1965 convention was called to address issues related to voting district reapportionment and did not address education at all. In 1971, the convention rejected two potentially significant changes to education. The first involved a motion to extend tax credits to parents who send their children to private school. JOURNAL AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF TENNESSEE 98 (1971). The second involved an amendment to authorize gambling, with the tax proceeds to go to public education. *Id.* at 158, 718.

64. In 1977, the Constitutional Convention revisited the education clause for the specific purpose of bringing it into accordance with the Supreme Court's prohibition on school segregation. In 1870, Tennessee had inserted a provision into its constitution prohibiting the creation or funding of schools that enrolled Black and White students together. TENN. CONST. of 1870, § 12.[2] In its initial draft and report, the education committee eliminated that defect. THE JOURNAL OF THE DEBATES OF THE LIMITED CONSTITUTIONAL CONVENTION OF 1977 at 381 (1977). The committee's draft also removed the poll tax, which had been declared unconstitutional on other grounds. *Id*. at 382. The committee's only addition to the education clause was to proclaim that: "The State of Tennessee recognizes the inherent value of education and encourages its support." *Id*. However, Delegate Helms explained that the new language was not intended to work a substantive change in the education clause. *Id*. at 382-85.

[2] Such provisions in southern state constitutions generally did not occur until well after the end of Reconstruction. Other southern states had explicit provisions in their 1868 and 1870 constitutions prohibiting discrimination in education and treated the term "open to all" as an anti-discrimination concept. Derek W. Black, *The Constitutional Compromise to Guarantee Education*, 70 STAN. L. REV. 735, 779-80, 785 (2018). Tennessee, however, reentered the Union prior to the Reconstruction Act of 1867 and the enactment of the Fourteenth Amendment. As a result, its constitution was not subject to congressional approval.

65. After Helms finished his remarks, convention delegates proposed several amendments to the committee's revised education clause. Those amendments from the floor included encouraging school prayer, electing local school boards, and one that could have affected the funding of private institutions of higher education. *Id*. at 382, 384-87, 389, 395-96, 412. The convention rejected all those amendments, accepted the committee's new draft of the education clause as submitted, and sent it to the drafting and style committee. *Id*. at 412. When the education clause returned to the full convention from the style committee, one amendment passed. It called for the deletion of the phrase "open to all persons in the State." *Id*. at 465. The amendment was not intended to change the nature of the public education system or the state's obligation to provide for a system of free education open to all but to avoid future misreadings of "all persons in the state" that might a) require every single public school in the state to be open to every student across the state (and thereby eviscerating current city and county residential requirements) or b) require the state to provide education to individuals who were only temporarily in the state. *Id*. at 465-70. In fact, the convention rejected amendments that would have undermined the state's obligation to fund public K-12 education for the state's children. *See, e.g.*, *id*. at 461-64.

**d. Conclusions Regarding the History of Public Education in Tennessee**

66. This history of public education in Tennessee leads to five conclusions. First, public education in Tennessee was radically distinct from private education. Public schools were funded differently—from *public* funds and *public* taxes, not privately paid tuition. Public schools served wealthy and poor students together, not just those who could or were willing to pay tuition. Public schools extended access to education on entirely different grounds and had entirely different constituencies—the general public, particularly the working class, as opposed to only slaveholders or wealthier individuals. Public schools were also managed differently—by state legislation and

public officials rather than individuals or private institutions. They were owned by the government, not private interests. And public schools served a distinct purpose—the perpetuation of republican government rather than individual advancement or ambition. It was the growth and systematic availability of public schools that created the conditions to finally compel school attendance in 1909.

67. Second, public education was an enormous political and practical undertaking that did not fully solidify in Tennessee, as in many states, until decades after they began the project. In Tennessee's infancy, the state faced resource and capacity limitations that stunted the growth of public education. While average voters consistently agitated for public education throughout the state's history and the recognition of public education as a state responsibility existed in 1834, raising the funds necessary to support public education was not easy. Like in all other states, from the North to the South, public education depended on the payment of taxes. While voters supported public education, they were not accustomed to paying taxes, and the slave-holding regions of the state, in particular, strongly opposed them. The politics of taxes slowed the development of public education but ultimately could not block the steady march toward the realization of the most aspirational parts of the constitutional commitment to public schooling.

68. Third, Tennessee has exerted significant control over its public schools, including during the nineteenth century when many other states left public education to organic growth and organization. This included the naming of state officials and local officials to oversee public education, the specification of their duties, and the granting of power to collect, receive, and manage tax dollars. PHELAN, *supra,* at 65. But it also included more detailed matters such as establishing a state curriculum and setting rules for the certification of teachers. *Id.* at 61.

69. Fourth, public education in Tennessee was conceived as a state, not simply local, responsibility to be discharged as a collective, rather than an isolated, enterprise that would be systematically available to all. The public demanded free universal education and was willing to tax itself to achieve that end. In doing so, the citizens of Tennessee created a system that could only come into being by virtue of the state government. In fact, during those periods when the state government and resources faltered, so too did the public school system.

70. Finally, whatever challenges and evolution public education encountered, one principle remained particularly constant—that common school funds and taxes should be used solely for public schools. Both the scarcity of resources and the fact that the public was being taxed for public education demanded as much.

### B. TENNESSEE CHARTER SCHOOLS WERE ESTABLISHED AS AND REMAIN A PART OF THE STATE'S SYSTEM OF PUBLIC EDUCATION THAT IS FREE AND OPEN TO ALL

#### a. History, Structure, and Growth of Charter Schools

71. A charter school is a public school that is free and open to all, operates under state control, and relies on public school revenues, but charter schools differ from other public schools in that states grant them flexibility regarding operations and instructional methods. Sandra Vergari, *The Politics of Charter Schools*, 21 EDUC. POL'Y 15 (2007). A charter school comes into existence when a school board, school district, state agency, or some other entity specifically empowered by state law approves an application, typically from a third party, to operate a charter school. *Id*. While private entities may operate a charter school, they remain under the control of the state, which reserves the authority, for instance, to terminate them. *See, e.g.*, IND. CODE ANN. § 20-24-3-7. In short, a charter school may operate with more flexibility than a traditional public school, but it remains a public school that is entirely dependent on the state for its creation, funding, continuation, and authority to deliver instruction.

72. The first charter school opened in Minnesota in 1992. U.S. DEP'T. OF EDUC., EVALUATION OF THE PUBLIC CHARTER SCHOOL PROGRAM: YEAR ONE EVALUATION REPORT 3-4 (2000). By 1996, a majority of states had passed charter school laws, with the number of charter schools in operation growing from 2 in 1992 to 432 in 1996 and 1,692 in 1999. *Id.* at iii. Today, forty-five states have enacted charter school statutes and authorized more than 8,000 charter schools, serving nearly four million public school students. National Alliance for Public Charter Schools, *Charter Schools 101 Fact Sheet*, last visited May 21, 2026, https://publiccharters.org/wp-content/uploads/2026/01/2025-09-10-Charter-101.pdf. Charter schools tend to be clustered in urban locations. Thus, while charters enroll less than 10% of the public-school population nationwide, they are a primary provider of public education in some locations. National Alliance of Charter Schools, *Details from the Dashboard: Charter Schools by Geographic Region*, https://files.eric.ed.gov/fulltext/ED535207.pdf. In New Orleans, for instance, the entire public-school population attended charter schools for the better part of two decades, although a single traditional public school has since reopened. Aubri Juhasz, *20 Years After Katrina, New Orleans Schools Are Still "A Work in Progress,"* NPR, August 25, 2025.

73. As noted in Part I of this report, states have long been constitutionally obligated to provide free public schools open to all. Charter schools, though distinct from traditional public schools, are one of the ways that states have chosen to discharge that duty and they remain part of the overall system of free public education open to all. Consistent with these practices and states' treatment of charter schools as public schools, states directly fund charter schools with public-education tax dollars. The precise method varies by state, but charter schools receive funding through the same or similar mechanisms as traditional public schools. In several states, charter schools are entitled to the same per-pupil aid as traditional public schools, *see, e.g.*, Colo. Rev.

Stat. § 22-30.5-112; Ga. Code Ann., § 20-2-2068.1; N.Y. Educ. Law § 2856; Tex. Educ. Code § 12.106; Ala. Code § 16-6F-10(b)(b); Ark. Code Ann § 6-23-501(a)(1); Fla. Stat. Ann. § 1002.33(17). States also frequently route charter-school funds through local public-school districts and make the districts responsible for apportioning charter schools their appropriate share. S*ee, e.g.*, N.J. Stat. Ann. § 18A:36A-12; N.Y. Educ. Law § 2856; 24 Pa. Const. Stat. Ann. § 17-1725-A. In North Carolina, charters are even entitled to a portion of the unused or rainy-day funds that a local district may reserve. *See Thomas Jefferson Classical Academy Charter Sch. v. Cleveland Cnty. Bd. of Educ.*, 243 N.C. App. 797, 817 (2015). And while states afford charter schools flexibility in meeting some of the requirements that states impose on public schools, states have retained control over charters to ensure they are delivering education consistent with the state's responsibilities. States, although to varying degrees, control charter school curriculum, instruction, testing, and teacher credentials, as well as retain authority to monitor and terminate them when appropriate. *See e.g.*, WAC 108-20-070(2)(d) (requiring alignment with state curriculum); W. VA. CODE ST. R. § 126-79-5.4.b.1.A.5 (requiring minimum instructional time); C.G.S.A. § 10-66dd (granting Commissioner of Education authority regarding charter school teachers); O.R.S. § 338.095(2) (requiring charters to report to the state department of education); FLA. STAT. ANN. § 1002.33 (power to terminate charters).

**b. Tennessee's Charter Schools**

(i) *Original Statutory Structure*

74. Tennessee enacted its first charter school law, more than two decades ago: The Public Charter Schools Act of 2002, H.B. 1131/S.B. 887 (2002). The statute defined a public charter school as "a public school in the state of Tennessee that is established and operating under the terms of a charter agreement and in accordance with this act." *Id.* at § 4 (6). The Act's stated purpose in creating public charter schools was to close achievement gaps, improve achievement,

and provide families with additional educational options "within the public school system" and "within a school district structure." *Id.* at § 2 (b). Public charter schools were to "provide both the state department of education and local school districts with options" to comply with the federal Elementary and Secondary Education Act (ESEA) and other laws. *Id.* at § 2 (c). Tennessee also saw public charter schools as a way to meet the state's "adequate yearly progress" (AYP) requirements under the ESEA, which helps fund states' public education systems in exchange for states' agreement to meet federal achievement and accountability benchmarks.

75. Under the Charter Schools Act, charter agreements were to be formed between the "sponsor" of the public charter school and the local school board, which served as the "chartering authority." *Id.* at § 4 (1). To make clear that charter schools were public, not private as some charged, the Act excluded all types of sponsors that might be associated with private schools, indicating that a sponsor "cannot be a for-profit entity, a private school, a religious or church school, or promote the agenda of any religious denomination or religiously affiliated entity." *Id.* at § 4 (7). Once formed, the "Public charter schools shall be part of the state program of public education." *Id.* at § 5 (a). As with other public schools, student enrollment and attendance at charter schools was required to be free under the statute, which prohibited charters from charging tuition. *Id.* at § 11 (k).

76. Beyond the two sections on the statute's title and effective date, the Act included 27 substantive sections. All 27, to varying degrees, included provisions that either specifically treat charter schools as public schools of the state or substantively distinguish them from private schools and entities. On a pure definitional level, the statute referred to charter schools as "public" 97 times. That terminology was consistent with the provisions addressing charter school oversight,

legal structure, legal responsibility, financing, free cost to students, public transparency, employee relations, and ownership of charter schools.

77. Under the 2002 Act, charter schools were not to exist independently of the state, nor could they be created or operated without state approval and oversight. Local school boards were given the authority to approve or deny them and exercise ongoing supervision of them. *Id.* at § 8. The state board was to hear appeals of denials or negative actions by the local board. *Id.* at § 6. The state comptroller was given the authority to audit charter schools regularly, just as it would other state entities. *Id.* at § 11, 28. All of these relationships are governed by state statute. Thus, the relationships were not to be governed by the private market or private negotiations, but dictated by law, including a limit on the number of charters to be issued. *Id.* at § 9. And just as a charter school can only come into existence by virtue of the state, the local school board was given power to unilaterally terminate them, for failures such as non-compliance with the adequate yearly progress requirements that the ESEA imposes on the state of Tennessee and its schools. *Id.* at § 23.

78. The Charter Act of 2002 also specifically limited who and what can authorize, operate, and become a charter school. While anyone could start non-public educational services and schools, the statute provided that a charter school cannot be operated by "a for-profit entity, a private school, a religious or church school, or promote the agenda of any religious denomination or religiously affiliated entity." *Id.* at § 4 (7). Similarly, an existing "private, parochial, cyber-based, or home based school" could not convert into a charter school. *Id.* at § 6 (c). Nor could any individual or organization hold "any ownership interest" in a public charter school. *Id.* at § 6 (d). Consistent with the Act's indication that charter schools are public schools, traditional or regular public schools can, however, convert into charter schools. *Id.* at § 6 (b).

79. The statute also limited the number and location of charter schools that could operate in the state so that charter schools could not exceed the number of traditional public schools failing to make AYP statewide. *Id.* at § 6 (b) 1. And in a district with "more than thirty (30) schools failing to make adequate yearly progress, the number of newly created public charter schools shall be limited to one-third per year the number of schools failing to make adequate yearly progress, but not more than ten (10) schools in any [district] in the initial year of implementation." *Id.*

80. The Act also indicated that charter schools, like other public schools, were to be subject to various state and federal statutes, including prohibitions against discrimination, special education laws, and procedural due process laws. *Id.* at § 5 (b), 11 (b). It further indicated that charter schools could not take action that would subvert state or federal court orders that are in place regarding local school districts. *Id.* at § 11 (b). This placed charter schools in an entirely different position from private schools. Similarly, the Act provides that the meetings of a charter school's governing board are "public business" and subject to the state's general statutory rules of open meetings, which cannot be waived. *Id*. at § 5 (b), 11 (h). The Act also granted charter schools the same immunity from other civil liabilities that traditional public schools hold. *Id.* at § 26. All these impositions—and immunity—placed charters schools in an entirely different position from private schools.

81. Under the 2002 Act, charter school funding flowed to charters from the state of Tennessee and its local school boards pursuant to the general funding structure created for all public schools in the state. *Id.* at § 13 (3). Tennessee funds its public schools through a mixture of state, local, and federal dollars. *Id*. Those funds are allocated through a formula that accounts for student demographics and local revenues, among other factors. TENNESSEE COMPTROLLER OF

THE TREASURY, THE EDUCATION IMPROVEMENT ACT: A PROGRESS REPORT (2004). That formula produces a unique funding amount for each district. *Id*. Thus, charter school funding was not to stand outside the state's public-school funding formula but rather was to be entirely integrated into it. Their revenues were to be calculated in the exact same way as those of the local districts in which they reside. The statute required the local district to pass on 100% of the state and local per-pupil revenues that the district would have received for the charter school's students. Charter School Act of 2002 at § 12 (a). Once received, those funds were to remain subject to public transparency through audits and public postings, as well as other state rules regarding ethical conflicts and bids for contracted services. *Id.* at §§ 11 (e), 11 (g), 11 (j), 11 (m), 28. Should a charter school close, any unencumbered charter school funds were to revert back to the state. *Id.* at § 10 (c) 1.

82. Finally, the statute treated public charter school teachers as public school teachers in all important respects. *Id.* at § 17 (c). Their teaching in charter schools was to count toward years of teaching service in state and local systems. They were to participate in state insurance systems. *Id.* at § 19. They were to have the same collective bargain rights as other public school teachers. *Id.* at § 18. For retirement purposes, the Act treated them as employees of the local board of education and allowed them to participate in the retirement system under the same terms as others. *Id.* at § 20 (a).

(ii) *Revisions*

83. Since 2002, the general structure of the Act has largely remained in place, but the state has made notable revisions. In 2011, the state lifted the cap on the number of charters that could operate. 2011 Tennessee Laws Pub. Ch. 466 sec. 6 (H.B. 1989). At the same time, it specified the grounds on which a local school board could reject a charter school applicant,

including the financial impact the charter school would have on the district. *Id.* at § 11. In fact, from 2002 to 2014, it was far more likely that a charter application would be rejected than approved, with only 78 of 222 applications being approved. TENN. DEPT. OF EDUC., CHARTER SCHOOLS 2015 ANNUAL REPORT 5 (March 2015).

84. In 2011, "enrollment eligibility was . . . extended to all students . . . , whereas preference had originally been given to those students in failing schools or qualifying for free or reduced price lunch." *Id.* at 2. Though to be clear, charter schools had never been free to pick and choose students and, when applications exceeded seats, they were to admit students through a lottery. Charter School Act of 2002 § 13 (b)(2).

85. Under the 2002 Act, local districts were the only chartering authority, but in 2014, the legislature amended the Act to permit the State Board of Education to approve charters that had been rejected at the local level by a school board. 2014 Tennessee Laws Pub. Ch. 850 § 6 (H.B. 702). In 2019, the state created the Tennessee Public Charter School Commission, effectively replacing the state board of education in hearing charter school appeals and acting as a secondary authorizer (although the commission is to rely on the state board's standards). T. C. A. § 49-13-105. The governor appoints all nine members of the Commission, who must also receive confirmation by a joint resolution of the state house and senate. *Id.*

86. In 2022, the state updated its overall school-funding formula. As in the past, the formula included a base per-pupil amount, demographic weights, and local capacity adjustments, which would pass through to charters as before. But the formula added two additional components that layer on top of the formula: student achievement and direct funding for special educational programs. TENNESSEE DEPARTMENT OF EDUCATION, TENNESSEE INVESTMENT IN STUDENT ACHIEVEMENT GUIDE 2024-25 SCHOOL YEAR at 29, 49 (2025). Under the new formula, Tennessee

also added direct funding for charters, approximately $500 per student. TENNESSEE DEPARTMENT OF EDUCATION, TENNESSEE INVESTMENT IN STUDENT ACHIEVEMENT FUNDING QUICK GUIDE: CHARTER SCHOOLS 6 (2025).

**c. Conclusions Regarding Tennessee's Charter Schools**

87. Tennessee's charter schools are public schools under state law and firmly entrenched within Tennessee's system of public education. First, charter schools are free and open to all. Charter schools are prohibited from picking and choosing their students and must accept all students who seek to enroll, or enroll students by lottery when they reach capacity. Second, a charter school can only come into existence and remain in operation by virtue of state authority, approval, and oversight. No one can operate a charter school outside the process and authorization standards established by the state.

88. Third, charter schools are part of the state's discharge of its constitutional duty in education. They provide students with a free education subject to rules and regulations set by the state and are subject to continued state monitoring and regulation. Fourth, Tennessee created charter schools precisely for the purpose of discharging its duty to public school students. Tennessee's public schools are subject to state and federal testing and achievement metrics. State and federal consequences accompany the failure to meet those metrics. Tennessee passed its 2002 Charter School Act with the specific intent that charter schools would help the state's overall system of education meet federal public school achievement metrics and has continued to require charter schools to submit achievement data for that reason, among others. Fifth, charter schools operate on public-school funds derived from taxpayers and appropriated for public education.

89. Sixth, not only does Tennessee fund charter schools with public education dollars, it funds them through the same statewide school-funding formula as all the other public schools in

the state. In this respect, the funding of charter schools and traditional public schools is inseparable. Moreover, Tennessee's school-funding formula is a function of the state constitution's education clause. Tennessee adopted its Basic Education Program (BEP) funding formula in response to a series of decisions ordering it to equalize the way it funds schools. S*ee, e.g.*, *Tenn. Small Sch. Sys. v. McWherter,* 851 S.W.2d 139 (1993). Tennessee's charter schools were funded as public schools under the BEP for two decades and are now funded as public schools under the BEP's successor, TISA.

90. Seventh, while charter schools enjoy substantial flexibility in instructional approaches, they remain subject to a comprehensive framework of state and federal laws governing the treatment of students, academic standards, employment and other aspects of their operation. For instance, Tennessee's charter laws make clear that charter schools must respect students' federal and state anti-discrimination rights. Tennessee similarly extends charter school teachers the same major employment benefits it extends to teachers in traditional public schools. Likewise, it treats charters' business operations as public operations, subjecting them to the state's financial transparency and ethics rules.

91. In conclusion, Tennessee's charter schools are part of its traditional and exclusive function of providing a system of free public education to all.

* * *

I declare under penalty of perjury that the foregoing accurately states my opinions and is true and correct to the best of my knowledge. Executed in the State of South Carolina on May 26 2026.

____________________________
Derek W. Black