# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

- - - - - - - - - - - - - - - - x
THE WILBERFORCE ACADEMY OF :
KNOXVILLE, :
Plaintiff, :
v. : Case No.
KNOX COUNTY BOARD OF : 3:25-cv-584-CEA-DCP
EDUCATION, et al., :
Defendants, :
RICHARD COBLE, et al., :
Intervenor-Defendants, :
ADRIENNE CARROLL, et al., :
Intervenor-Defendants. :
- - - - - - - - - - - - - - - - X

Deposition of DEREK W. BLACK
Conducted Virtually
Monday, July 6, 2026
10:05 a.m. EDT

Job No.: 638081
Pages 1 - 270
Reported by: Debra A. Whitehead



Deposition of DEREK W. BLACK, conducted virtually.

Pursuant to notice, before Debra Ann Whitehead, E-Notary Public in and for the Commonwealth of Virginia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
RYAN PROCTOR, ESQUIRE
RACHAEL WYRICK, ESQUIRE
CONSOVOY McCARTHY, PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423

ON BEHALF OF DEFENDANTS:
JESSICA JERNIGAN-JOHNSON, ESQUIRE
DEPUTY LAW DIRECTOR
KNOX COUNTY, TENNESSEE
400 Main Street, Suite 612
Knoxville, Tennessee 37902
(865) 215-2327

ON BEHALF OF INTERVENOR-DEFENDANT RICHARD COBLE:
JESSICA LEVIN, ESQUIRE
PATRICK CREMIN, ESQUIRE
WENDY LECKER, ESQUIRE
EDUCATION LAW CENTER
60 Park Place, Suite 300
Newark, New Jersey 07102
(973) 624-1815



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF INTERVENOR-DEFENDANT RICHARD COBLE:
ALEX J. LUCHENITSER, ESQUIRE
LUKE ANDERSON, J.D., Litigation Fellow
AMERICANS UNITED FOR SEPARATION OF
CHURCH AND STATE
1301 L Street NW, Suite 200
Washington, DC 20005
(202) 466-2005
- and -
MITCHELL E. FELDMAN, ESQUIRE
MORRISON & FOERSTER LLP
John Hancock Tower
200 Clarendon Street, Floor 21
Boston, Massachusetts 02116
(617) 648-4759

ON BEHALF OF INTERVENOR-DEFENDANT ADRIENNE CARROLL:
THOMAS H. JARVIS, ESQUIRE
BAKER DONELSON
265 Brookville Centre Way, Suite 600
Knoxville, Tennessee 37919
(865) 549-7132

A P P E A R A N C E S   C O N T I N U E D

ALSO PRESENT:

DAVID MIELCAREK, A/V Technician



C O N T E N T S


| EXAMINATION OF DEREK W. BLACK | PAGE |
|---|---|
| By Mr. Proctor | 10 |
| By Ms. Levin | 261 |
| By Mr. Proctor | 267 |


E X H I B I T S

(Attached to the Transcript)


| BLACK DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of Derek W. Black | 19 |
| Exhibit 2 | Curriculum Vitae, Derek W. Black, Exhibit 2 | 34 |
| Exhibit 3 | Excerpt, Ending Zero Tolerance: The Crisis of Absolute School Discipline (Families, Law, and Society) | 55 |
| Exhibit 4 | Back of Book, Ending Zero Tolerance: The Crisis of Absolute School Discipline (Families, Law, and Society) | 60 |
| Exhibit 6 | Derek W. Black Website | 78 |
| Exhibit 7 | Article, Religion, Discrimination, and the Future of Public Education, by D. Black | 250 |




E X H I B I T S   C O N T I N U E D


| BLACK DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 9 | 37 Federal Reporter, 4th Series, Peltier | 190 |
| Exhibit 19 | Westlaw, Espinoza v Montana Department of Revenue, 591 U.S. 464 (2020) | 132 |
| Exhibit 20 | Excerpt, The State and the Non-Public School 1825-1925, by L. Jorgenson | 135 |
| Exhibit 21 | Expert Report of Steven K. Green, J.D., Ph.D. | 141 |
| Exhibit 22 | U.S.C.A. Northwest Ordinance, Ordinance of 1787: The Northwest Territorial Government | 167 |
| Exhibit 23 | OH Const. Section 3 | 172 |
| Exhibit 24 | OH Const. Article I, Section 7 | 174 |
| Exhibit 27 | 296 Federal Reporter, 3rd Series, Zachariah Logiodice v. Trustees of Maine Central Institute | 191 |
| Exhibit 28 | Marson v Makin, Brief of Amici Curiae, Education and Constitutional Law Scholars in Support of Respondent | 197 |




E X H I B I T S   C O N T I N U E D


| BLACK DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 39 | Excerpt, Dangerous Learning, by D. Black | 68 |

9

PROCEEDINGS

MR. PROCTOR: Ryan Proctor, on behalf of Plaintiff Wilberforce Academy of Knoxville.

MS. WYRICK: Rachael Wyrick, on behalf of Wilberforce Academy.

MS. LEVIN: Jessica Levin, from Education Law Center, on behalf of the Coble Intervenors.

MR. CREMIN: Patrick Cremin, from Education Law Center, on behalf of the Coble Intervenors.

MR. LUCHENITSER: Alex Luchenitser, Americans United for Separation of Church and State, on behalf of the Coble Intervenors. And I might be in and out of this deposition at some points.

MS. LECKER: Wendy Lecker, Education Law Center, on behalf of Coble Intervenors.

MR. ANDERSON: Luke Anderson, Americans United for Separation of Church and State, on behalf of Coble Intervenors.

MR. FELDMAN: Mitchell Feldman, Morrison Foerster, also on behalf of Coble Intervenors.

MR. JARVIS: And Tom Jarvis of Baker Donelson, on behalf of the Carroll Intervenors.

DEREK W. BLACK,

10

having been duly sworn, testified as follows:

MR. PROCTOR: Just before we get started, I would like to note for the record that nobody from the Knox County Board of Education is here.

David Sanders from their office sent us an email this morning saying that they will probably not have someone until noon, and that we're okay to start without them.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. PROCTOR:

Q Okay. Great. Professor Black, would you mind stating your full name, for the record.
**A Derek W. Black.**
Q And do you understand that you're under oath?
**A Yes, I do.**
Q And do you understand that the oath you just took carries the same force as an oath given in a courtroom?
**A Yes.**
Q Do you understand that the court reporter can only take down verbal answers, so you need to answer out loud with words. And if you answer with a nod or a gesture or an uh-huh or an unh-unh, that's going to be hard to capture on the

11

transcript?
**A Sure. I don't normally do that over Zoom, but if I do, feel free to remind me that I did not.**
Q Do you understand the court reporter can hear only one person talking at a time, so you'll need to let me finish each question before you begin your answer?
**A Yes.**
Q Okay. Do you agree that if a question is unclear, you will tell me so I can rephrase it for you?
**A Yes.**
Q And do you understand that if you answer a question, I will take it that you understand the question?
**A Yes.**
Q Okay. Do you understand that your testimony today can be used in court, including at trial?
**A Yes.**
Q Are you taking any medication or do you have any medical condition that could affect your ability to testify truthfully and completely today?

12

**A No.**
Q Is there anything preventing you from testifying truthfully and fully today?
**A No.**
Q Do you understand that you're to answer my questions without help from your attorneys?
**A Yes.**
Q Have you been deposed before?
**A Yes.**
Q How many times have you been deposed before?
**A Once.**
Q And what was the case?
**A That was in Federal District Court, Jindal versus United States Department of Education.**
Q And was that also as an expert witness?
**A Yes, it was.**
Q And what were you opining on in that case?
**A That case involved a dispute between the State of Louisiana and the U.S. Department of Education regarding No Child Left Behind waivers. I think they also had some claims regarding race at the top.**

21

page before or a page after, I could also just
flip open this hard copy.
Q Okay. Do you recognize the document on the screen?
A Yes, I do. Yes.
Q And what is the document on the screen?
A That's my expert report.
Q Okay. Great.
How many cases total have you testified as an expert witness?
A Well, it's one, two, three, four, five -- well, we should distinguish between testified versus having submitted reports.
But if you look at cases in which I've testified, I've testified in one, two, three -- I've only testified in three, but I submitted an expert document or an affidavit or report in one, two, three, four -- four additional cases. So three testimonies and -- and then four additional expert reports.
Q Okay. Let me see if I can make this easier for both of us.
Would you agree that Paragraphs 12 to 18 of your expert report lists all the cases in which you've participated in any capacity as an expert

22

witness?
A Yes. Yes.
Q Does this expert report contain all the opinions that you will express in this litigation?
A Yes.
Q Does this expert report contain the basis and reasons for your opinions?
A Well, let me back up.
If you were to ask me a question that was beyond the scope of this, I suppose I could potentially be required to answer it. But I don't have any intention to ask -- answer any questions or have opinions beyond what's in this report.
Q Great. So I appreciate the clarification.
And then, so, does this report contain the basis and reasons for your opinions?
A Yes, it does.
Q Did counsel for any party in this case provide you with any facts or data that you considered in forming your opinions?
A No, they did not.
Q Did counsel for any party in this case provide you with any assumptions that you relied on in forming your opinions?

23

A No, they did not.
Q How much time did you spend preparing your expert report?
A I think it was -- again because it was a flat rate, I can't sort of do the math off the top of my head. But I did keep track of my time. I want to say it was around 60 hours.
Q And how much time did you spend researching the national history of public education?
A I didn't spend any additional time researching the national history of public education in the country. I've written books about that.
You know, as I indicate in my report, I'm always adding depth to that knowledge. So whatever happens in Tennessee, you know, that's additional sort of nuances that can be added.
But I did not go and do any sort of new research regarding the history of public education. Other than refer to my own prior work.
Q Yeah. So would you look at Paragraph 21 with me for a minute.
A Yes.
Q And then could you read the second

24

sentence? After you've had a chance to look at the paragraph in full, could you read the second sentence -- or second and third sentences for me.
A "I have been researching and writing about the history of public education for most of my academic career. Thus, I did not conduct new research on the national history of public education, but rather drew on my existing knowledge while also consulting my prior scholarship on the subject."
Q And how much time did you spend consulting your prior scholarship on the subject?
A I mean, I didn't disaggregate. I mean, it's hard for me to disaggregate this now.
I mean, most of that I can, you know, have conversation off the top of my head on, to be quite frank, because I sort of am always doing it to some extent, sort of thinking about it, I guess.
I went back and looked at and looked over some of my seminal work on that. So anyway, I mean, I would guess, you know, probably less than five hours, I would think.
Q Less than three hours?
A I mean, I don't know. I mean, again, I

25

wasn't disaggregating it in my mind.
Q How much time did you spend researching the history of Tennessee public education?
A Yeah, I spent a lot of time on that. So that was, I mean, I would guess more than 20 hours on that, would be my guess.
Q More than 30 hours?
A Probably not. Just because I'm thinking about the fractions of, you know, how much time I would have had to spend on the other sections.
I mean, it's possible I got close to 30 hours, but I don't think so.
Q And how much time did you spend researching Tennessee charter schools?
A That's probably around ten, ten to 20. Again, as I give these ranges, you know, how they all perfectly add up to 60, I may be off a number or two. But I would think ten to 20 hours on that.
Q Did anyone assist you in preparing your expert report?
A No.
Q What expertise did you apply in forming your opinions?
A I applied my expertise of identifying and

26

finding historical documents, my expertise of terms of art that are often used in education history and discussions, expertise in sort of understanding the structure of how education was created and has evolved over time.
So I've used my expertise in those respects to interpret and understand and synthesize the material that I'm looking at.
Q Would historical expertise be a fair umbrella term for the kinds of expertise you just listed?
A Well, let me -- for what I just listed, I think historical -- that is -- that is part of it. But again, you can have historical expertise for terms of art, but not necessarily understand structure.
So there is sort of this structural component of public education that history alone wouldn't tell you. Certainly the structure is part of it.
I should also add, when you asked the question initially I was really sort of in my mind reflecting on the historical part of the report. When we move forward to the charter, that's a different type of expertise there because that's

27

sort of modern education policy.
So what I'm looking at there is sort of understanding how an education policy and education structure, what that actually does in terms of creating accountability and relationships between states, local districts, charter schools, federal government, et cetera.
So I have this policy expertise in education as well as this history expertise in education.
Q So then let's -- your report sort of breaks your analysis down into two questions presented.
Is that right?
A Yes.
Q Okay. And so then your first question presented is whether the provision of free education open to all is a traditional and an exclusive government function.
Is that right?
A If I can find that page.
Q Sure. Sure. Of course.
A That sounds correct, but I'm reluctant to just agree with you.
Q Of course. It's on Page 3, Paragraph 7

28

of your report. Or I guess it's not numbered, but it's Page 3.
A Yes, I think you -- if I recall, you reread the first question. I don't know whether you reread the second question or not.
But, yes, those on Page 3 and 4 were the questions that I was asked to look at.
Q So was the expertise that you applied on the first question presented primarily historical?
A Yes, that one, whether the provision of free education open to all is traditional, that is primarily a historical one. But there is also a functional policy component to that, as well. Because, you know, when you provide free education or create an education system, we do that through structure, which can vary across time.
So primarily historical, but also sort of a structural policy analysis as well.
Q And then what expertise would you say you -- how would you characterize the expertise that you applied specifically for the second question presented?
A Yeah, the second question is primarily -- well, the second question has got both history and policy in it, but it's more heavily weighted I


Case 3:25-cv-00584-CEA-DCP Document 111-2 Filed 08/04/26 Page 6 of 35 PageID #: 3361

33

**Public Charter Schools, but some national charter school organizations also.**

Q Sorry, were you finished with your answer, Professor?

**A Yeah. I think she spoke as I was just saying, I was referencing that I looked at some other national charter school organization type materials as well, which are cited in the -- in the report.**

Q So you said that you looked at some documents and reports from the Tennessee Department of Education.

Are those the materials that you cited in the report?

**A Yes.**

Q Okay. Did you make policy judgments in answering the questions presented in your expert report?

MS. LEVIN: Objection. Vague and ambiguous as to "policy judgments."

**A Am I supposed to answer? I'm sorry.**

Q You're free to answer, if you'd like.

**A Okay. Sorry for the awkward pause there.**

**Yeah, I mean, I -- the word "judgment" would seem to me to imply that I am a policy maker**

34

**and I can do A or B, and which one do I think is better.**

**So in terms of me making a judgment of what's better or worse, I did not get into that type of policy judgment here regarding charter schools.**

MR. PROCTOR: David, could we pull up Exhibit 2, please.

(Black Deposition Exhibit 2 marked for identification and is attached to the transcript.)

MR. PROCTOR: And Jessica, if at any time you want to pause so you can print something out, just let me know. But for some of these, I'm going to assume you might already have them and ready.

MS. LEVIN: Let me ask the witness just to tell us if he needs a pause to print this out or wants the PDF link. But I don't need it.

MR. PROCTOR: Okay. Perfect.

David, could you scroll down a page?

Q So I'll represent that we received this document in discovery from the Coble intervenors.

Do you recognize this document?

**A It looks like my CV.**

Q And how do you know that?

35

**A Those are my publications there at the top, yeah.**

Q Great. And is the CV you submitted with your expert report up to date?

**A I don't have a more up-to-date version. You know, I'm always sort of, you know, speaking and this, that, or another. So it's possible -- well, I should say, and I -- you know, I don't list every engagement on there. But I do not recall having given any new lectures or published any -- publishing anything new since I submitted.**

Q So you received your bachelor of arts in the University of Tennessee.

Is that right?

**A That's correct.**

Q And you received your B.A. in 1999.

Is that right?

**A That's correct.**

Q And you triple majored.

Is that right?

**A That's correct.**

Q And you majored in African-American studies, philosophy, and political science.

Is that right?

**A That's correct.**

36

Q What did you study in philosophy?

**A Oh, you know, the Plato, Socrates, you know, existentialism. Also a fair amount of religion as well. I almost had a religious minor, I think, if I would have taken one more class. But anyway.**

Q I just asked, my wife is getting her Ph.D. in philosophy, so I always admire people who study philosophy.

Did you have any minors?

**A I did not have any minors, no.**

Q So you didn't major or minor in history.

Is that right?

**A I did not major or minor in history, no. No, I did not. Although I would add that, you know, African-American studies was primarily a historical sort of discipline. You know, most of those professors were history professors.**

**So, but no, I didn't major or minor in history. And the political science also had a good deal of American history in it as well. But I did not have a major or minor in history.**

Q After graduating did you go straight through to law school?

**A I did.**

37

Q And you received your J.D. from the University of North Carolina.
Is that right?
**A That's correct.**
Q And you received your J.D. in 2002.
Is that right?
**A That's correct.**
Q Do you have a master's degree of any kind?
**A I do not.**
Q Do you have a Ph.D.?
**A I do not.**
Q Do you have any other degrees?
**A I do not. Although I would add, even though it's not specifically your question, I am asked by Ph.D. committees in American history and other things, education policy as well, so I do sit on committees for people receiving their Ph.D.s, which is nice, I suppose.**
**But I did not have any advanced degrees beyond those you listed.**
Q After you graduated law school, you worked in the U.S. Postal Service Law Department.
Is that right?
**A That's correct.**

38

Q And what did you do there?
**A Employment litigation.**
Q Could you expand on that a little?
**A Oh, sorry. I just didn't think you would be that interested.**
**Well, at that point in time the United States Postal Service was the largest, if you can believe it, the largest employer in the United States, by a good margin.**
**So we had -- you know, I don't remember, it was 2.1 million employees or 1.2 million employees. But we had a -- we had a lot of employees. And so we had a lot of cases that went to the DC Circuit Court of Appeals. That was the then direct appeal from a variety of sort of lower -- both lower courts and -- and some administrative agencies.**
**So I did appellate employment law work, primarily dealing with, you know, Merit System Protection Board rules and regulations.**
Q And after the Postal Service, you worked at the Lawyers' Committee for Civil Rights Under Law.
Is that right?
**A That's correct.**

39

Q And what is the Lawyers' Committee for Civil Rights Under Law?
**A The Lawyers' Committee for Civil Rights Under Law was established in 1964 at the call of President Kennedy for the private bar to become more involved with dealing with racial segregation and discrimination in the United States. And so it was formed at that point.**
**Obviously I was -- well, you know, 40-some-odd years after that before I went -- well, about 40 years after that.**
**But, you know, we work with private law firms to -- sort of like the staff attorneys and other folks to be the expert in the subject-matter area, and then work with law firms on issues of racial discrimination, primarily.**
Q Would you characterize that as public-interest work?
**A Yeah, I would characterize that as public-interest work.**
Q After the Lawyers Committee, you worked at Howard University School of Law.
Is that right?
**A That's correct.**
Q And what did you do there?

40

**A I taught a number of classes, depending upon need. I could go through them, if you'd like. But I taught a number of classes there. And I found and directed the Education Rights Center.**
Q What kind of classes did you teach? You don't have to list every single one.
**A Yeah, I taught -- I mean, the first year I thought civil procedure to fill in. After that I taught torts every year, then I taught education law and policy every year. I taught social justice lawyering most years. I taught a civil rights class most years.**
**And then, also reflected on my CV, I also taught classes for the School of Education while I was there. So they had -- they requested me to teach a few different classes. And we started a program for students -- education leaders pursuing advanced degrees. And so I taught a few classes for them as well.**
Q Did you teach any history courses?
**A Not courses that were specifically named in history, but, of course, civil rights cases have sort of a history to them. And so certainly we cover that in classes. The social justice**

41

**lawyering course would as well, education law course has a history to it as well. But no course named history, no.**
Q So you would, you know, discuss history as relevant in your law school classes.
Is that right?
**A I mean, I -- not discover -- not discuss them -- not that you were suggesting that. But I didn't sort of just randomly discuss them. But I would teach, you know, history that's relevant to the subject matter.**
Q So you would teach history as relevant to the subject matter of your courses at the law school.
Is that right?
**A That's correct.**
Q While you were at Howard, you also spent a year as a visiting professor at the University of North Carolina.
Is that right?
**A That's correct.**
Q What did you do there?
**A I taught Constitutional law and torts.**
Q Did you teach --
**A And I -- what's that?**

42

Q Sorry. I interrupted you. I will let you finish.
**A And I also provided technical assistance to the UNC Center For Civil Rights.**
Q What's the UNC Center For Civil Rights?
**A That's a good question. It has -- it has undergone some changes across time, so I can't speak to what its current form and structure is.**
**But at least when I was working there, they did community work, they did sort of education and engagement. They did litigation. They did regulatory work. They did policy reports and things of that sort.**
Q And is that based out of the law school?
**A That is based out of the law school, yes.**
Q And I'm sorry, my memory failed me.
What two courses did you mention you taught there?
**A Torts and Constitutional law.**
Q Did you teach any other courses besides torts and Constitutional law?
**A I did not.**
Q After leaving Howard University, you now work at the University of South Carolina.
Is that right?

43

**A That's right.**
Q And you are a professor at the law school there.
Is that right?
**A That's correct.**
Q So what do you do as a professor at the law school at the University of South Carolina?
**A I teach my courses. I don't want to go through all the sort of details of the worst parts of committee work and that sorts of things.**
**But serve on committees, and meet with students, mentor students, direct the Constitutional Law Center, speak, lecture outside of the law school. Those sort -- those sorts of things.**
Q What kind of courses do you teach?
**A I teach Constitutional law, education law and policy. I teach evidence. I teach a voting rights course. I've taught civil rights for several years, but not in the last couple. And, yeah, I think that's -- I don't think I'm leaving off anything.**
Q Do you teach any history courses at the University of South Carolina?
**A I do not teach any courses that are**

44

**specifically titled history. But, of course, as we discussed with some of those classes at -- at the -- at Howard, there is a good deal of history.**
**You know, I still recall, for instance, my -- my third con law class here, we had a number of international students. And my Constitutional law class. And after about two weeks the student comes up with a dismayed look on his face. And he says, Professor Black, do I need to know American history to pass this course?**
**And I regretfully said, No, but it sure does help.**
**And, you know, which is really sort of testament to, you know, how much history is part of teaching that class and has really become more so over the years.**
**So again, Constitutional law is not titled history, but to understand -- to understand many of those cases you have to understand them in their historical context.**
**So I do a good deal of history in that class and bring in actually some historical primary documents into that class to give students a sense of things. And the same thing in educational law as well.**

45

Q And are all your courses listed at the law school?
**A You mean do I teach any courses that are listed in another department? Is that what you mean?**
Q Yes.
**A Yeah, I don't think there's anything cross-listed. Although I did have a Ph.D. student in history who wanted to take my education law class. Or maybe no, it was my civil rights class, actually. Several years ago. And we had authorized that.**
**I don't remember what the specific -- whether they gave a code number to the history department or whatever. But they are not generally co-listed in any other department.**
Q Are you a member of the American Historical Association?
**A No, I am not.**
Q Are you a member of the Organization of American Historians?
**A No, I am not.**
Q Are you a member of any professional organization for historians?
**A No, I am not.**

46

Q So I'm looking now at Page 1 of your CV.
Your CV listed Full Length Articles and Essays.
Is that right?
**A Yes.**
Q Okay.
MS. LEVIN: Do you want to scroll to the page that you're referencing?
MR. PROCTOR: Oh, yeah.
David, could you scroll to PDF Page 2, which is Page 1 of the CV.
A/V TECHNICIAN: Would it be easier if I give control to somebody?
MR. PROCTOR: Sure, you can give control to me.
A/V TECHNICIAN: All right. You should be able to have control after you click on the screen.
MR. PROCTOR: Great. Thank you.
Q I think I already asked this, but just to make sure I didn't lose my place. Your CV here listed your Full Length Articles and Essays.
Is that right?
**A That's correct.**
Q And they are listed on Pages 1 to 3 of your CV.
Is that right?
**A That looks right, yes.**
Q All the full length articles and essays in your CV were published in law journals.
Is that right?
**A Yes, that's correct.**
Q And are all those law journals student-edited?
**A They are all student-edited. Although they should all have faculty advisors as well. And many -- several of them, I should say, to varying different degrees, seek peer reviews or outside input onto the -- whether to accept an article.**
Q Do you know which of those journals?
**A Well, we can go through them, if you'd like. Just go up to the top and we can -- I can -- I can't profess to know exactly what goes on behind closed doors on all of them.**
**But certainly the Yale Law Journal has peer review. I do not know whether Virginia Law Review does or not. I have some inkling that sometimes they do, sometimes they don't.**
**UC Irvine is -- I just know that it is --**

48

**it is blind review, so they don't know who the author is when they accept an article. Which is them trying to -- or is them mirroring some of the processes in other journals. I don't know whether they seek peer review.**
**I should also say the Yale Law Journal does -- does blind reviews as well.**
**Northwestern University I know does seek outside peer review from time to time because they've requested me to do peer review on articles. So whether they did or didn't on the two articles I published with them, I can't -- I can't say for sure.**
**NYU, I don't know. Notre Dame, I don't know. Cornell Law Review has gone to blind review. And again, that -- when you go to blind review you do sometimes ask others, but I can't speak beyond that.**
**Stanford Law Review does have peer review. The California Law Review, I know there was some peer review on that because I received that peer review feedback. We already talked about -- I don't think Washington University does. I already talked about Northwestern.**
**I don't think William & Mary does.**

49

**California we already spoke to. Vanderbilt I don't know. Wake Forest at least not on that particular article, but on another one that I did with them, had sought some peer review of that.**
**And that's probably it, although you could -- you could scroll down a bit if you wanted to.**
**Yeah, I think that's it.**
Q Okay. So for the journals you mentioned that either do peer review or may do peer review, what kind of scholars are performing the peer review?
**A You know, I can't -- I can't speak to that because it's blind review. So I don't know who they're -- who those folks are.**
Q Do you know if the reviewers are law professors?
**A I don't know who they are. I would be willing to say that I would expect that they are. But if you look at the pool of law professors, you know, I think three years ago like three-quarters of the people in the pool of law professors were J.D./Ph.D., or at least had some other advanced degrees.**
**So things are changing, so I guess it**

50

**would be hard -- it would be hard for me to speculate.**
**I wouldn't imagine there's anyone without a J.D. performing that peer review. But I think there is a high possibility or likelihood that folks with a J.D. and some additional advanced degree may have done peer review on some of them.**
Q So do you know if any of your full-length articles and essays were peer-reviewed by a professor in a history department?
MS. LEVIN: Objection. Calls for speculation. He said he doesn't know who they are.
Q You are free to answer.
**A I don't know. I don't know who they are, to be quite honest.**
**I should say, I mean, full honesty, I did -- they did ask a Supreme Court Justice, Goodwin Liu, if he would share his thoughts which he had supplied on my Stanford Law Review article. So that -- I know that he peer-reviewed the Stanford article.**
**I know that Michael Heise at Cornell Law reviewed my most recent Yale Law Journal. Because, again, you know, an author can ask to --**

51

**so they normally don't even, you know -- depending on the journal, they may not share the peer review. They may just sort of pass it on in their own words as to shield it.**
**But at least with the Yale one -- actually, Yale didn't share it. I actually learned that Michael Heise had peer-reviewed that because after they had accepted it for publication I reached out to him to ask if he could provide feedback. And he said he had already read the article because Yale had asked him to -- to look at it.**
**So sometimes, you know, you just kind of find out through -- through means like that accidentally.**
Q So we're turning now to -- sorry. Oh, I'm looking at the wrong document. Okay. Sorry.
MR. PROCTOR: David, could we pull up Exhibit 1 again.
Q So turning now to Section 4 of your report, starting on Page 4.
MR. PROCTOR: David, would you be able to scroll down to there, please.
A/V TECHNICIAN: Yes, you still have control.

52

MR. PROCTOR: Oh, I still have control? Thank you. My apologies.
David, to the extent you're able, if you're able to follow along and move to the pages, I'd appreciate that. But I understand if you can't.
A/V TECHNICIAN: No problem. I can do that.
MR. PROCTOR: Okay. Thank you.
Q So on Page 5 in Paragraph 9, you refer that -- you mention that you consulted your prior research.
Is that right?
**A That's correct.**
Q Okay. And you specifically consulted two of your -- two of the books you've authored.
Is that right?
**A Yes.**
Q And those books are Schoolhouse Burning and Education Law and Policy.
Is that right?
**A That's correct.**
Q Did you consult any of your other books?
**A No, I did not consult them. But, you know, I wrote -- wrote Dangerous Learning**


Case 3:25-cv-00584-CEA-DCP Document 111-2 Filed 08/04/26 Page 11 of 35 PageID #: 3366

61

**Zero Tolerance.**
Q Okay. And there are four -- sorry, let's zoom out a little.
MR. PROCTOR: David, can you zoom out? Thank you.
Q There are four reviews on the back, on this back cover.
Is that correct?
**A That's correct.**
Q Okay. And the first review is from James E. Ryan.
Is that right?
**A Yes.**
Q And he's listed as a professor at the Harvard Graduate School of Education.
Is that right?
**A Well, he was actually the dean of the school, Harvard Graduate School of Education. But as -- and I'm not really sure, to be quite honest, why that's not on there. Maybe he didn't want, you know, to suggest he was speaking on behalf of Harvard Graduate School of Education, or something like that.**
Q But he's not listed as a historian, is he?

62

**A No, he's not.**
Q And the second review is from Library Journal.
Is that right?
**A That's correct.**
Q And that's a trade publication for librarians. Correct?
**A I really don't know.**
Q Okay. To your knowledge, it's not a history journal, is it?
**A No, not to my knowledge.**
Q And the third review is from Kimberly Jenkins Robinson.
Is that right?
**A That's correct.**
Q And she's listed as a law professor.
Is that right?
**A That's correct.**
Q Not as a historian?
**A She is not listed as historian. Although, you know, I should just add for completeness sake, or just so that I can add, you know, schools of education, much like the work that I've done, do history work. There are people who are history of education policy, history of**

63

**education, et cetera, et cetera.**
**So there's history itself is interdisciplinary, and so it lives within multiple different disciplines. And so, you know, Jim Ryan has written a book which is -- well, at least one of his books was largely historical, published by Oxford University Press.**
**And I don't know whether Kimberly has authored any historical books or not, but she also has a -- she is currently at the University of Virginia, and she has a joint appointment in both the College of Education and the School of Law.**
Q And the fourth review is by Erwin Chemerinsky.
Is that right?
**A That's correct.**
Q And he is listed as the Dean of the University of California, Irvine School of Law.
Is that right?
**A That's correct. He's currently the dean at Berkeley School of Law.**
Q And --
**A Jim Ryan is not at Harvard Graduate School of Education, either; he's at the University of Virginia now.**

64

Q And Erwin Chemerinsky is not listed as a historian.
Is that correct?
**A That's correct.**
Q So you also authored the book Schoolhouse Burning: Public Education and the Assault on American Democracy.
Is that right?
**A That's correct.**
Q And what is Schoolhouse Burning about?
**A It is about the history of the right to public education in the United States.**
Q What history in particular does it discuss?
**A It traces the sort initiation both in idea and in practice of public education from the nation's founding through to today. Or at least through to whatever year it was. 2020, I guess.**
Q And Schoolhouse Burning was published by Public Affairs.
Is that correct?
**A That's correct.**
Q And is Public Affairs -- what relationship does Public Affairs have to Hachette?
**A It is a subsidiary of Hachette, yes.**

65

Q Okay.
**A Although now it's subsumed under some other subsidiary, the book industry.**
Q And Hachette is a trade publisher.
Is that correct?
**A That's correct.**
MS. LEVIN: Objection. Vague and ambiguous as to "trade publisher."
Q Hachette is not an academic publisher, is it?
**A Hachette is not an academic publisher. Well, I don't know whether they publish any academic books or not. But at least -- yeah, I don't know. But they're -- they are -- I think that will suffice. They may or may not have some, but they did purchase or make an offer on my book to publish it for a general audience.**
**Although I should add for completeness sake that Oxford University Press and Yale University Press both made offers on that book, and both of them subjected it to peer review in that process.**
Q And you've also authored the book Dangerous Learning: The South's Long War on Black Literacy.

66

Is that correct?
**A That's correct.**
Q And what is Dangerous Learning about?
**A Dangerous Learning is about the history of the repression of black people's ability to read and write during slavery, and then sort of how that connects to the repression of both public education and black people's access to it afterwards.**
**It's also a story of the history of black people's resistance against that repression both during slavery and after slavery.**
MS. LEVIN: We've been on the record for well over an hour. Would this be a good place to stop and take a break?
MR. PROCTOR: Sure.
**A Can I just add to that question, just so we don't forget it and maybe it's helpful. Well, I don't know if it's helpful or not to you, Ryan, but it may be helpful to me.**
**So speaking of sort of history review, the book Dangerous Learning was subjected to what I found to be an extraordinary amount of historical scrutiny, which made the book a much -- made it a long process.**

67

**It was reviewed by a group of historians prior to them accepting publication, and then a group of folks after publication. It also went through the board, one of the nation's foremost historians, David Blight at Yale University, he's on lots of TV now for the 250th anniversary of the United States, he was part of that team.**
**And so I received, we'll just say a lot of peer review and feedback and assistance, and the sign-off and approval of that book by -- by those historians before it went to publication.**
MR. PROCTOR: Jessica, do you want to say five minutes, or would you like a different amount of time?
MS. LEVIN: Five minutes is good.
MR. PROCTOR: Okay. Great. So 11:30, we'll see you then.
MS. LEVIN: Okay.
(A recess was taken.)
BY MR. PROCTOR:
Q All right. Great. I believe we were discussing your book, Dangerous Learning.
**A Yes.**
Q When did you begin writing Dangerous Learning?

68

**A Dangerous Learning? I probably started on it in some shape, form, or fashion in late 2020, sometime 2021, something like that. Probably 2021.**
Q And when was the book published?
**A 2025.**
Q And when did you start doing research for the book?
**A If my memory serves me correctly that I started in 2021, then the answer would be 2021.**
MR. PROCTOR: David, could you pull up exhibit -- hold on one second, actually.
Could you pull up Exhibit 39.
(Black Deposition Exhibit 39 marked for identification and is attached to the transcript.)
MS. LEVIN: Okay. We'll need to print this, and I'll appreciate your patience on that.
I'll note for the record that this is the method that was suggested by plaintiff's counsel for there to be paper copies of the exhibits when we discussed the need to have hard copies before the deposition. The discussion taking place before the deposition, not to read the copies before the deposition.
MR. PROCTOR: So I agree that --

MS. LEVIN: I'll object for completeness.
MR. PROCTOR: If you'd like to -- this will keep happening. Happy to stipulate that you preserve any objection to us introducing as an exhibit excerpts of a book rather than an entire book.
MS. LEVIN: Sure. And I'll object to this document specifically. We can just stipulate to that for all your questions about this document.
MR. PROCTOR: Okay. Great.
David, can we go to PDF Page 9.
Q Do you recognize this page, Professor?
**A Yes, I do.**
Q And what is it?
**A It is the Acknowledgments for my book Dangerous Learning.**
Q Okay. So you mentioned in the acknowledgements that your colleague, Bob Bockman, was your muse.
Is that correct?
**A Well, you know, I -- that is certainly what I wrote. I don't know how I would define "muse."**
**But, yes, Bob and I spoke on -- you know,**



**I would learn things or find little details. Or even I would find a thing that -- that wasn't new to me, but I wanted to see whether, you know, Bob found it interesting. Bob and I read a lot of the same books.**
**So certainly spent a lot of time, you know, talking with Bob and just sort of sharing the story of the book along the way.**
Q And is Bob Bockman a law professor?
**A Bob Bockman is -- he is retired. He was a -- he was a professor here at the law school. He's -- I think he actually is still nonetheless in today, I'm not sure what his specific relationship is with the law school at this moment.**
Q Was he, at the time you wrote Dangerous Learning, was he a historian?
**A He -- I guess it depends on how you -- what you mean by "historian."**
**I can tell you that Bob Bockman is extremely well read and knowledgeable, gives me books on a regular basis that he has read. But to my knowledge, he does not have a formal Ph.D. or master's in history.**
Q And then in the acknowledgements you also



say -- forgive me if I'm saying her name wrong -- Inge Lewis and Ashley Alvarado were the first and last readers of the full manuscript.
Is that correct?
**A That's correct. And what I mean by that, just to be clear, not for any sort of substantive quality check. But I always want to be accessible to readers. And so they are support staff here at the law school.**
**Although I think -- Inge a did work at the -- prior to coming to the law school, Inge did work at the South Carolina University Press, which is a peer-reviewed press. And Ashley has an advanced degree I think in literature.**
**So in any event, the point of sharing with them was simply to say does the nonacademic reader, so to speak, follow what I'm saying or find this to be an interesting story.**
Q And you relied on the law school librarians Michael Mounter and Candle Wester.
Is that correct?
**A That's correct.**
Q And you said they introduced you to genuine historical research.
Is that right?



**A I said that they introduced me to that. The word "genuine" is sort of a loaded term, so to speak. I could understand why you might focus on it.**
**Michael Mounter has a Ph.D. in history. He has assisted a number of faculty with writing history books and history materials. And so what I'm really referring to there is the ability to locate -- locate documents that you wouldn't -- I wouldn't have suspected would have been accessible or I would have suspected would have meant, you know, I'd have to travel to California to get them or Pennsylvania. And somehow or other Michael knows, you know, as a librarian, sort of knows how to get these things electronically.**
**And so just allowed me to go deeper into things like a letter between, you know, a guy living in Albemarle County whose name is lost to history, who had written a letter to his brother. And, it's -- you know, it's kind of interesting flavor to add. And so when you're trying to add that additional flavor, you kind of have to know where in the haystack to look.**
**And so, yeah, when you're trying to find that sort of -- that level of detailed narrative**

77

**flavor, Michael was -- was extremely helpful in locating those documents for me.**

MR. PROCTOR: David, could you turn to the next page.

Q I just want to make sure, Professor, that you have the chance to read --

**A Sure.**

Q -- the -- I mean, feel free to read all of it.

**A I read some actually while you and Jessica were discussing matters, so ...**

Q Okay. Great.

So Michael helped you find sources when you weren't able to find them through an internet search?

Is that right?

**A Yeah. Or in the library. You know, we have a number of materials here. And sometimes those materials actually are here.**

**I mean, you know, one of the things that's sort of interesting is how, you know, you look for a thing as being a primary source. And you look for the primary source and you say, Oh, the primary source is in Washington, DC.**

**But then Michael goes, Oh, but Derek, you**

78

**know, actually the Salmon Chase's papers are downstairs. And so as the recipient of that letter, actually you don't need Charles Sumner's papers; you can go to Chase's, and we have those downstairs.**

**So, yes, again, you know, he was very helpful in finding those things; but it wasn't just always internet. Sometimes we were looking at sort of libraries as well.**

MR. PROCTOR: David, could we pull up Exhibit 6.

(Black Deposition Exhibit 6 marked for identification and is attached to the transcript.)

Q And it's two pages.

MR. PROCTOR: David, could you scroll through both pages.

MS. LEVIN: And can you put it in the chat as well.

A/V TECHNICIAN: Hold on, please.

It should show up in the chat right now for everybody.

MS. LEVIN: Okay. Just give a --

Q Professor, do you recognize this web page?

**A It looks like -- counsel is trying to**

79

**catch up. But to me it looks like the front page or at least one of the pages from my personal website.**

Q So I'll represent to you that this is a screen shot of the front page of DerekWBlack.com that was taken yesterday, July 5th, 2026.

What's the purpose of your personal website?

**A Oh, you know, I hate to confess, but the purpose of this is to sell more books. That's the purpose of this website.**

Q Right. My wife is an adacemist, so I understand.

But so would it be fair to say that is part -- sorry, scratch that.

Is part of the purpose of the website to promote yourself as a scholar and expert?

**A No. I wouldn't say that. I mean, I hope that counsel aren't looking for experts on people's vain glory web pages. So no, I'm not -- I don't try -- I don't try to generate sort of expert work, so to speak. I've never -- I shouldn't say "never."**

**One time I did send a law review article in the Jindal case that first when I testified, I**

80

**sent a law review article to attorneys down there, hoping that they would use it or rely upon it at some point. And then they responded to me asking me to be an expert. But I don't generally try to get expert work, so to speak.**

**So, no. The purpose of this -- it's actually twofold, just for completeness sake. And one is so that when people are looking for your book, you know, you can create a landing page for the book, you know, as opposed to landing at -- you know, you could kind of get lost in Amazon or something like that, or Barnes & Noble. So one is that.**

**The other is actually really media presence. So one of the huge -- at least a potential factor in books from -- from both academic and trade press, to use that phrase, is to get a sense of, you know, just how good a person might be with the media. Because nowadays, you know, publishers put less and less work into selling your book.**

**So it is one to create a landing page so that they can kind of go and -- you know, you look at the first thing, Okay, he is a professor, he wrote some books and he knows some stuff about X.**


Case 3:25-cv-00584-CEA-DCP Document 111-2 Filed 08/04/26 Page 15 of 35 PageID #: 3370

93

**It could have been a motion to dismiss or something. I don't think it was -- I think they already survived a motion to dismiss, if I recall correctly, prior to -- well, that would have been prior to the expert reports. So I just don't know whether it was summary judgment or not. My apologies, Ryan.**

Q Was there a motion to exclude your testimony in that case?

**A You know, I write the reports. I don't sort of, you know, get involved in the aftermath.**

**I don't have any recollection of said -- of any such motion. But, you know, one could have been filed and responded to without my knowledge. I would have thought that counsel would have alerted to me -- would alert me to that had it been the case. But I just don't recall that having happened.**

Q And then Cruz Guzman versus State of Minnesota, did that case go to a jury?

**A That case is still in -- I have a deposition coming up in that, in that case. So, no, it wouldn't be in a jury or summary judgment yet. But I don't know what the precise procedural posture of the case is at this particular moment.**

94

Q Okay. So you haven't yet been deposed. So I assume then that there has not yet been any motion to exclude your testimony.

Is that right?

**A I just don't -- I don't -- I wouldn't -- I wouldn't think so any more than you, but I don't know.**

Q Okay.

MR. PROCTOR: David, can we go to Page 3.

Q So I'd like to look at your questions presented now, Professor.

**A Sure.**

Q It straddles Pages 3 and 4.

**A Got it.**

MR. PROCTOR: David, could you scroll up just a little more?

Perfect. Okay.

Q So your report answers two questions presented.

Is that right?

**A Those are the two questions presented. And I answer them to the best of my ability, yes.**

Q Who drafted the questions presented?

**A I drafted them.**

Q They weren't given to you by counsel?

95

**A We --**

MS. LEVIN: Objection. It invades the work product privilege.

I'll instruct the witness not to answer.

MR. PROCTOR: Maybe I'll -- all right. Let me see if I can ask this a different way and see if it leads to the same objection.

Q So your first question presented, those are -- those are all your words.

Is that right?

MS. LEVIN: Objection. Invades the work product privilege.

I'll instruct the witness not to answer.

MR. PROCTOR: Sorry. Jessica, is your objection that I am not allowed to ask whether he drafted language in his expert report?

MS. LEVIN: My objection is that you're not allowed to ask about prior drafts or any potential communications.

MR. PROCTOR: I'm not -- I don't want any -- I don't want to know communications. I just want to know whether certain language in the actual report is something that the expert drafted. And your view is that that question is privileged?

96

MS. LEVIN: Yeah, why don't you go ahead and ask that question again, and I'll see if I still have the objection.

MR. PROCTOR: Okay.

Q Did you draft the first question presented?

**A If you mean by "draft" did I type it into the -- to the document, yes, I typed it into the document. Yes.**

Q Did you come up with -- sorry. Let me rephrase.

Were these questions that counsel tasked you with answering?

**A Yeah, those are -- those are the questions that they tasked me with answering, yes.**

Q So your first question presented uses the phrase "traditional and exclusive government function."

Is that right?

**A That -- yes, that's what it says. Yes.**

Q Is that a phrase that you had encountered before you wrote this expert report?

**A Yeah, I have encountered that phrase before I wrote this expert report.**

Q And how are you familiar with the phrase,

97

"traditional and exclusive government function"?
**A I'm familiar with it in teaching Constitutional law.**
Q Where does the phrase "traditional and exclusive government function" come up in Constitutional law?
**A It comes in the state action doctrine set of cases.**
Q What is the state action doctrine?
**A The state action doctrine is whether the activities of private -- well, actually, we could argue about when it comes up, because I have sort of written a little bit about this outside of the scope of this report.**
**But in any event, it traditionally, you know, came up in the most cases that are generated by -- it came up during the civil rights movement when the government was attempting to avoid desegregation.**
**So the court had already ordered -- this isn't the exclusive place, but it is a primary place. The court had ordered, you know, southern schools to desegregate. And lunch counters and things, and cemeteries and golf courses, et cetera, et cetera.**

98

**And so sometimes government had handed over activities to private industry to try to evade the state action doctrine. Sometimes we just had private actors that were in joint ventures or whatever, however you want to characterize it. And so the court is trying to determine in those cases, you know, whether the 14th Amendment should apply to the underlying dispute.**
Q So if an entity is a state actor, then it's subject to the 14th Amendment?
Is that right?
**A If it's a state actor, it is subject to the 14th Amendment.**
Q And if an entity is engaged in a traditional and exclusive government function, it's a state actor.
Is that right?
**A That is the question, that is the standard the court would apply to determine whether, yes, that private actor would be subject to the 14th Amendment. Or, rather, whether it's not really even the private actor at all, but it still is the state in some respect.**
Q Okay. And your answer to the first

99

question presented is, yes.
Is that right?
**A Well, let me be clear about this.**
**So, you know, we've just had this discussion about legal doctrine. And what I was doing in my report was not in any way, to be quite honest, not in any way related to my knowledge of the state actor doctrine.**
**But, rather, what I was trying to do -- and, you know, those words appear in there, no doubt. But by traditional, which my question is, you know, has free public education as a matter of history been provided by the state, in the State of Tennessee, or nationally.**
**And then Number 2, you know, has anyone else also done that or done that in lieu of it. So certainly there's a -- there's a legal test that you and I have been talking about, but that legal test is really one for you as attorneys and the court to sort of deal with.**
**My inquiry here was, you know, just a matter of history, what has been the history of schools in public education. You know, has anyone else provided free education, open to all. You know, I provided that historic -- that history.**

100

**And, you know, it's up to the courts and you guys, if you sort of work it out some other way, to determine whether, you know, the facts that I'm supplying are up to this test or not up to this test.**
Q Have you in your scholarship written about whether charter schools qualify as state actors under the 14th Amendment?
**A Yes, I have.**
Q And you've concluded that they are.
Is that correct?
**A I, in examining the various policies out there in the way that -- the way that charter schools are structured, managed, et cetera, that generally speaking, yes, they are.**
**You know, actually, let me back up, Ryan. And that goes to what I was saying earlier. I actually personally object to this -- not to you asking the question. I object to the application of this legal doctrine to charter schools.**
**You know, my point in my scholarship, to be quite honest, is that -- or that I've at least made, is that this doctrine applies to private actors.**
**So if what we had were private schools**

101

**that we were trying to subject to the 14th Amendment, then yes, this test would make a lot of sense.**

**I think the major point in my scholarship is that because the state is actually the one establishing, creating, authorizing, managing, et cetera, et cetera, there is -- there is state action that is subject to the 14th Amendment regardless of what type of private action or otherwise might be going on out there.**

**So my point, which, you know, probably no one cares about except for me, is probably a little bit distinct from -- I don't know, I haven't read your briefing. I haven't even read, you know, the briefing of counsel here today either. But I suspect maybe all of your points are somewhat distinct from mine.**

Q So is your view that the state action doctrine is not the appropriate framework to think about whether the 14th Amendment applies to charter schools?

MS. LEVIN: Objection. It's outside of the scope of what he was asked to opine on here.

MR. PROCTOR: Are you instructing him to not answer?

102

MS. LEVIN: No.

Go ahead and answer.

**A No. So, I mean, look, you have -- first of all, let's also make another distinction.**

**When one is writing legal scholarship, some people will analyze an individual state and sort of really drill down on it. And sometimes you lose the forest for the trees. Sometimes people look at the forest and they may miss a tree.**

**You know, my scholarship tends to be forest, not trees. So I'm looking at most charter schools. But -- charter school structures. But I'll confess to not having read all 42, I think it is, or maybe it's 46 now, but charter school statutes. And they've all got their own sort of little twists and turns in them.**

**So I can't say that it was my prior opinion that all charter schools' statutory systems necessarily involve a level of state -- a level of state control that means the state actor doctrine exceptions shouldn't apply.**

**You know, you're really sort of -- I mean, it's really a sort of broad question. So, yes, I had generally previously taken the position**

103

**that it didn't make a lot of sense for most charter schools statutes. But every charter school statute is different, and so, you know, we have to take them one at a time.**

Q You're familiar with the Fourth Circuit's en banc decision in Peltier V Charter Day School. Correct?

**A That's correct, yes.**

Q And is it correct that in your scholarship you've -- strike that.

Is it correct that in your scholarship you agreed with the state actor analysis that applied to charter schools?

**A Well, I agree with the final result in that case. I mean, as I recall it. And, I mean, I hate to say this on the record because he or she is a sitting judge. But, you know, there are a variety of opinions in that case. And one of them -- well, I guess I won't name him or her because I can't remember -- clearly didn't really understand what a charter school was or what an HVCU is or was in history.**

**And so I think one of the challenges -- and this is where I'm just not willing to say, yeah, I agree with it all. One of the challenges**

104

**is there's just a tremendous amount of factual confusion by jurors as to what a charter school actually is.**

**I mean, even -- and I will say it since he's not on the bench anymore, but even Souter seemed to have gotten confused at one point in oral argument. And I even remember the case, maybe it was Carson.**

**But, so in any event, I wouldn't sign onto the -- to the -- without looking at it, say, Oh, I think everything in the opinion that they wrote is necessarily correct. But I do -- or on the concurrences, et cetera, et cetera. But the final result of saying that the charter schools in North Carolina are subject to the 14th Amendment, yes, I agree with that. Which is -- yeah, I do agree with that.**

Q And in that case the Fourth Circuit held that charter schools perform a traditional exclusive government function, didn't they?

**A That's my -- yeah, that's my recollection. Yes.**

Q Okay. Why is the function that you're examining the provision of free education open to all?

105

MS. LEVIN: Objection. Vague and ambiguous as to function you're examining.
**A Yeah, so, I mean, I guess what I would say is that -- can you repeat the question again, Ryan?**
Q So your question, first question presented, is about whether the provision of free education open to all is a traditional and exclusive government function. Right?
**A Uh-huh.**
Q So why is the function that you're examining the provision of free education open to all?
**A I'm not trying to be difficult, but I'm a little bit -- I'm not entirely confused, but I don't want to misspeak. I'm a little bit confused here.**
MS. LEVIN: Do you want to try rephrasing, Ryan?
MR. PROCTOR: Yes, I'm happy to rephrase. That's probably confusing because I asked a confusing question.
Q Why isn't your first question presented simply whether the provision of education is a traditional and exclusive government function?

106

**A Well, that was -- I mean, we previously indicated that I was asked to look at free education open to all. And so that's what I looked at.**
**I mean, obviously, I mean, I take from your implication there's -- you know, could have just looked at education in general. But that's not what I was asked to do. Although in the report I do examine or sort of talk about free education open to all in relationship to private education.**
Q So you just -- sorry. Let me rephrase.
That definition of the function is something that you just took as a given.
Is that right?
**A Well, let me --**
MS. LEVIN: Vague and ambiguous as to, "took as a given."
MR. PROCTOR: Let me -- I'll rephrase.
**A I mean, I know it's unusual, but I think I know what you're asking and I'm happy to share it. But I don't know if anybody has any objections to me -- to me articulating what I think you're asking and then answering it.**
MS. LEVIN: Why don't you either repeat the question or rephrase the question, Ryan, just so it's clear what question the witness is answering.

107

MR. PROCTOR: Sure. Sure.
Q Just give me one moment.
Okay. Actually, I think I'm happy to move on for the moment.
Can you tell me what free education open to all is?
**A Yeah, so -- so there is a -- there is a -- yeah. Going to the sort of overall definition. There is a lot backed in that sentence, in that phrase.**
**So free education obviously means, one that is -- doesn't charge tuition to students, or students can go free of charge. Right? So that free means no charge.**
**Although, you know, to be clear, there's always some incidental costs. You know, costs of travel, maybe you have to buy your own books or, you know, study guides, whatever. I mean, you know, helmet for the football team. You know, public schools can struggle with some things. But not the books, but the equipment.**
**So, but generally speaking, to attend the school, you don't have to pay to attend the school. And no one is directly paying on your behalf. Right? And you're not sort of looking for scholarships or whatever. You know, it's free.**

108

**Open to all means that -- I mean, that -- that's the real phrase. We can say no tuition, but this open to all is a key historical term of art. So obviously we have a history of excluding black people, excluding women, excluding immigrants, excluding a variety of folks from society at-large. And sometimes those things sort of have filtered into education.**
**But open to all would generally mean within whatever the larger societal constructs at the moment are, that everyone can go.**
**So like pre-Civil War, for instance, or sort of pre14th Amendment, you could have had, you know, a provision in a state that said, open to all, but all didn't mean black children. Right? It may not even have meant, you know, women or immigrants.**
**But the theory being that, you know, barring some sort of larger state or societal structure, everyone is entitled to go. And that**

121

**is that, you know, public schools operate as a system. And that's really a sort of important piece of the puzzle here. At least for me.**

**So for instance, magnet schools. You know, public schools have operated magnet schools by federal court order and otherwise. And those magnet schools do have some admissions criteria. You know, maybe you have to have a minimum -- you know, a minimum GPA or something to that effect.**

**And sometimes the magnet schools don't have any academic criteria at all.**

**But the point here being that, you know, School District A is free and open to all students. And it doesn't mean that every student is entitled to a particular school within that district.**

**So a district may have, because it operates as a system, it may have some -- some -- multiple different ways of serving individual students. So, you know, you might have, as we do in Richland too, have a magnet school for students with special needs. And so, you know, they have special services there.**

**So instead of giving those special services at every individual school, they've**

122

**got -- so in any event, the free and open to all can have, you know, some -- some minor admissions such as the, you know, magnet school. But it would -- there would be no requirement of the student to -- to go to one of those district schools, other than that they were of the, you know, appropriate age of 4 or 5 or whatever it is that begins in the school district.**

MR. PROCTOR: Would you guys like to break for lunch now?

MS. LEVIN: That sounds good.

MR. PROCTOR: Okay. How does -- is 1:30 okay?

MS. LEVIN: Is that all right for everyone?

MR. PROCTOR: Professor, are you okay with that?

THE WITNESS: Yeah, probably shouldn't be eating anyway. We'll see how quick Jimmy Johns can get there.

MS. LEVIN: How about we do 45 minutes?

MR. PROCTOR: Yeah. That's -- that's fine with me. I mean, is 1:45 enough time for you?

THE WITNESS: That should hopefully. If

123

not I'll get something out of the snack machine. We're good.

MR. PROCTOR: All right. So 1:45 then.

(A recess was taken.)

MR. PROCTOR: Can you pull up Exhibit 1, please.

BY MR. PROCTOR:

Q Professor, I want to take a look at Paragraph 43 of your expert report.

MR. PROCTOR: So that's PDF Page 20, David.

Could you scroll up just a little bit, David.

Perfect.

Q All right. So this paragraph, Paragraph 43, is in the section that you've titled Conclusions Regarding the National History of Free Public Education.

Is that correct?

**A Yes.**

Q All right. And could you read that first sentence in Paragraph 43 for me, please.

**A "Free public education open to all has been traditionally and exclusively delivered by government, more specifically states."**

124

Q If we deleted the word "public" from that sentence, would that change its meaning?

**A No, I don't -- I don't think so. I mean, it's -- you know, I don't think so. The word "public" happens to be there, but I don't think it would -- I don't think it would change its meaning.**

MR. PROCTOR: Can we go up to Paragraph 9, David, on PDF Page 5.

Q So in Paragraph 9 you mention -- you list your own prior research that you've consulted.

Is that right?

**A Yes.**

Q In any of the sources listed in Paragraph 9, did you ever discuss whether the provision of free education open to all is a traditional and exclusive government function?

**A I don't think I -- I don't think so. At least not as -- as framed as looking at public education through the lens of the legal standards, so to speak, that you -- if that's how you were meaning to use it.**

**But there certainly is the history of education, public education, education open to all, that is -- that is certainly a huge part of**

125

**the -- of many of those articles.**
Q Well --
**A The Amicus brief, I mean. The Amicus brief does -- does speak to that.**
Q Sorry. So just so I understand, are you saying that in your Oklahoma State -- excuse me.
Are you saying that in your Oklahoma Statewide Charter School Board V Drummond Amicus brief you did directly address whether the provision of free education open to all is a traditional and exclusive government function?
**A Well, now that you've rephrased it for me again, I would have to look at it. I hope it -- I mean, I certainly know that that was a legal issue in that case.**
**I think, you know, whether I use that specific phraseology in that brief, I cannot recall. Because it was really looking at the way that the charter schools operate as public schools.**
**Again, you know, if we wanted to look at it -- and I didn't actually read the whole thing again in preparation for this. I just looked at a few parts of it.**
**So I guess I should -- I should confess**

126

**that after just a year my memory fails me as to whether I actually used that specific phrase -- phraseology in there or not. Sorry. Happy to look at it if you've got it as an exhibit and peruse over it.**
MR. PROCTOR: David, could we go to PDF Page 10.
Q So I'm looking at Paragraph 26 of your report now, if you want to take a moment to review it again.
**A Yes.**
Q You can just let me know when you've had a chance to do that.
**A I mean, I'm not reading it word for word. If you have a specific question about a specific sentence or specific concept. But I'm familiar generally with what --**
Q Okay.
**A -- is there, yeah.**
Q I just wanted to make sure you had a chance to do that.
**A Thank you.**
Q So you note that the Massachusetts Constitution of 1780 calls for the provision of public schools.

127

Is that right?
**A Yes.**
Q In 1780, the term "public school" didn't necessarily refer to a government school.
Is that right?
MS. LEVIN: Objection. Vague and ambiguous as to meaning of "government school."
**A Yeah, I mean, the word "government school" is not -- you know, and I use it myself in this report -- is a -- is a relatively modern usage. Secretary of Education and a few -- and some others, but the Secretary of Education -- how many years ago was that, five or -- when she started -- close to a decade ago, she used that phraseology, "government schools." I'm not using it the same way she does.**
**But the word "government school" would not have been one that they used at that time. I mean, I'm not -- at least I don't recall any sort of use of that -- usage of that type of phraseology. So it's -- it is -- that phraseology itself is more of a modern vintage, I suppose.**
Q In 1780, a school could be -- scratch that. Let me rephrase. In 1780 a public school -- sorry. Let me try one more time.

128

In 1780, a school owned and operated by a private charity could be called a public school.
Is that right?
MS. LEVIN: Objection. Vague as to, school operated by a public charity -- or by a charity, sorry.
**A So could you just for clarity sake, Ryan, could you reread the question?**
Q Sure. Let me rephrase it for you.
In 1780, a school could be owned and operated by people who were not government officials and could still be called a public school. Correct?
**A Let me -- in answer to that question, Ryan -- and this goes to the phraseology difficulties that we sometimes have in sort of comparing our word "public" or -- or "government" back then.**
**I mean, there were a variety of different structures and a variety of different places. So you often -- often, I wouldn't say exclusively, but you often had townships that were delivering education, or at least raising the taxes and raising the funds for those schools, in 1780 and before.**

129

And so those townships -- I mean, I would -- and I haven't studied townships as a distinct concept at length. But I would -- I would tend to think of a township as being a government entity. But I'm just hesitating because I'm not sufficiently attuned to the relationship, the legal relationship between townships in 1780 and -- and, you know, the State of Massachusetts, and then also that being, you know -- some of that preceding their Constitutions.

And then, you know, you also had -- if you look at the -- when you get into the 1780 -- early 1780s and in the 1770s, you also have townships and communities operating under charter Constitutions because we were still subject to the Crown at that point in time.

And so, you know, there was this enormous -- I think enormous -- sort of uncertainty as to what law even governed localities in this sort of revolutionary, preconstitutional age.

So in South Carolina -- and then I'll just stop, I don't want to go on too long -- but, you know, there was this question as to whether or

130

not the colonial laws still applied.

And this comes up in my book Dangerous Learning, when Denmark Vesey was being prosecuted for a crime. He was a free person of color. And they really couldn't figure out which law applied. Was it the colonial law, was it some other criminal law in place.

And so in any event, you know, the short point here is that townships certainly were authorized to collect funds and taxes and, in fact, sometimes mandated to. But I can't speak to what a township precisely was and what law controlled it, because a lot of that actually was in flux at those particular moments in history.

Q In 1780, the phrase "public school" had a less precise definition than it has today.

Correct?

A Yeah, I think -- I think that it would have had a less precise definition. Or they would have used other terms which had, you know -- had their own definition.

So you have a township school. I imagine some people might have called it a township school. You know, you do see the word "common schools" sort of pop up in certain places prior to

131

Mann popularizing -- M-A-N-N, for the court reporter -- before Mann popularized that term in the common school movement in the early 1800s, so.

And then you might have schools for the public. So there are -- there are -- I mean, I can't speculate as to what, you know, any individual would have called or not called them. Again, you know, they -- they were -- there was probably more -- there was certainly more variance.

I talk about this in my report, how this has really been an idea of achieving this system of public schools, and it's been -- it was a work -- particularly a work in progress in those early years. And it varied by state. And locality, I should say.

The rural -- the rural locations were far different than, you know -- they wouldn't have even been said urban, but these were the towns back then.

Q Were township schools in 1780 also called parochial schools?

A I don't know the answer to that question. I don't know whether anyone called a township school a parochial school.

132

Q You're familiar with the Supreme Court's decision in Espinoza V Montana Department of Revenue. Right?

A Yes, I'm familiar with that.

Q You've discussed Espinoza at some length in your scholarship. Right?

A Yes.

Q Are you familiar with the book, The State and the Nonpublic School: 1825 to 1925, by Lloyd P. Jorgenson, published in 1987?

A I have not read that book, no.

Q Have you heard of it?

A I have -- I have heard of it, yes.

Q Okay.

MR. PROCTOR: David, could we pull up Exhibit 19.

(Black Deposition Exhibit 19 marked for identification and is attached to the transcript.)

Q Professor, can you recognize this document?

A I mean, not this precise one. But it looks like something you would have printed out from Westlaw of Espinoza versus Department of Revenue.

MS. LEVIN: Professor, do you -- have you

181

states." Do we mean do all states, did some states, did one state.

And when we say, "did the state," do we mean the state provided free public education open to all throughout.

So it was not the case that all states were providing school -- schooling to all students throughout their states in 1791. But there were -- there were schools that were providing schools or providing for education that would roughly be open to all, in some rough sense. But, of course, there could have been exclusion of -- of black students, for instance. And so there could have been exclusions.

But I -- again, at an individual level, you know, it's going to vary, the extent to which they're open to all, so to speak. And open to all doesn't mean the same thing in, you know, 1791 that it would mean in, you know, 18, you know, 68 or 1968, for that matter.

Q Was there any state in 1791 that had a system in place that provided free education to all students of all races and social backgrounds?

A I am not aware of statewide schools, universally across the state, open to all

182

regardless of race, no.

Q In 1791, did any state provide -- sorry. Let me rephrase.

In 1791, did any state have in place a system that provided free education to all white children of all social backgrounds?

A Well, you know, again, Ryan, I appreciate the question. But there's a couple of different operative -- this goes back to that structure policy question we were engaged in much earlier.

You know, the state can say that all townships shall do X. Right? But that doesn't mean that all townships were doing it or doing it the way the state provided.

So those early statutory frameworks in some of the states did indicate that all of the states were supposed -- or all of the townships were supposed to, you know, enact a tax and make it open to their kids. That doesn't mean they actually did do it or that it actually was.

And again, you know, your smaller townships in the more rural areas probably did nothing. You know, whereas a Cambridge, Massachusetts, you know, probably did a lot more.

Q Is your view that -- sorry, let me

183

rephrase.

In 1791, were there any states that on paper called for providing free education to all at least white children of all social backgrounds to --

A I --

Q I think I lost my -- let me reask the question. I can't remember if I finished it properly.

In your view, in 1791 were there any states that on paper called for providing a free education to all at least white children of all social backgrounds? And I appreciate that they may not have lived up to it, but I'm just asking about on paper.

A Yeah, I mean, Ryan, just because I'm under oath, I would want to read those statutes again to mirror the precise question that you're asking.

But speaking more generally, understanding that there's lack of precision, I mean, states did mandate that townships of a certain size -- I mean, that was the other thing I guess that was excluded, right, those early statutes only kicked in the duty when you had a

184

certain number of people living there. And, you know, I can't even remember what that number is off the top of my head, how many people in a town, if it's 50 or 100 or what-have-you.

So, I mean, I would want to look at that to make sure I didn't mis -- misspeak. But I know that there were statutes that mandated, you know, that the public tax themselves to support those schools. Very early on. But again, I would want to look at specific dates and see what the specific language is in particular states.

So I would -- you know, I would start looking at a couple of states. I just didn't go back and look at those specific statutes in preparation for this deposition. Or the --

Q Sitting here today with what you know right now, your testimony is you're not certain whether there were any states that, at least on paper, required the provision of free education to at least all white children of all social backgrounds?

A Well, you can't --

MS. LEVIN: Objection. First, vague as to on -- vague and ambiguous as to "on paper." And then also object to mischaracterizing

185

the witness's testimony.
**A Right. It's really that word "all" that -- that's -- that I am getting hung up on there.**
**You know, sometimes there's ages that are wrapped around those. Sometimes there's not. So it -- I'm not trying to be evasive. I'm just trying to be careful in saying that, you know, you're using a definition and asking me whether any -- any state specifically had a statute and a specific year that would meet that. And it's my inclination that the answer to that -- you know, I'm -- it's my inclination that that would exist, but I wouldn't want to definitively say under oath that in that year at that time that it fit that specific definition without looking at those statutes. Because I just wasn't operating at that level of detail when I was -- when I was writing the report.**
Q Would you agree that -- scratch that.
Education in the early republic was overwhelmingly private.
Is that correct?
MS. LEVIN: Objection. Vague and ambiguous as to overwhelmingly:

186

**A I would say, as I did in my report, that the earliest schools in most places, or in many places, were -- were private schools intended to also be religious schools. And that is partly -- you know, that is a function of sort of tax base, frontier, and capacity.**
**And so those schools, you know, got a head start, so to speak. And this is noted in my discussion about Tennessee, for instance, that the first schools in Tennessee were religious schools.**
**So, you know, as I understand and specify your question, yes, I mean, the first schools in many locations were religious and continued in operation until the public system could get up in operation.**
**And then once it began operating it tended to quickly outpace those religious schools.**
Q Is education in general a traditional and exclusive government function?
MS. LEVIN: Objection. Vague and ambiguous as to "education in general."
**A Well, yeah, I mean, could you repeat the question again, Ryan?**
Q Let me rephrase it. Let me actually just repeat it.

187

Is education writ large a traditional and exclusive governmental function?
MS. LEVIN: Objection to "education writ large." Form objection. Vague and ambiguous.
**A I'm sorry, my mind just loses track when there is -- I'm sorry, Ryan, could you just ask me one more time? I just don't want to miss the way you phrased it the most recent.**
Q Is education, writ large, a traditional and exclusive governmental function?
**A I mean, I would -- I don't -- I don't really -- "writ large" may be a superfluous phrase, at least in my mind.**
**It is -- you know, have people other than government provided -- or other than states provided education throughout, you know, American history? The answer to that question is yes.**
Q From the founding through the early 19th century, federal, state, and local governments provided aid to private denominational religious schools.
Is that correct?
MS. LEVIN: Objection. Are you -- is that a quote, just to be clear? Are you reading from something?

188

Q You can answer my question.
**A Could you -- could you read it or ask it again, Ryan.**
Q Sure. From the founding through the 19th century, federal, state, and local governments provided aid to denominational religious schools.
Is that correct?
**A They have provided support. States have provided support to private and religious schools. That began to be sharply circumscribed as we move through the 19th century, and that's probably a different story in every -- in every state, as to the precise time and the precise, you know, sort of exceptions.**
**But, yes, state has provided some resources at times, you know. The size of that support would certainly -- would certainly vary. But they have provided support to schools.**
**And the other question, I should just say, which is embedded in that question, is, you know, was the state violating its own rules at the point that it did it. So again we sort of get into this sort of issue of, you know, are they using funds on schools that they should or shouldn't be using, you know, so -- and then what**

189

**is the nature of the support.**
**But, yes, there has been some support provided to private schools. But it was circumscribed, as I said, more and more so across time.**
Q So earlier we discussed the Fourth Circuit's en banc decision in Peltier V Charter Day School.
Do you remember that?
**A Yes.**
Q And you have discussed that opinion in your scholarship.
Is that right?
**A I have cited to it. I may have -- I think I discussed it for a paragraph or so somewhere, yeah.**
Q Did you -- sorry.
Have you read the separate writings in Peltier?
MS. LEVIN: Objection. Vague and ambiguous as to "separate writings."
**A Do you mean the concurrences, the dissents, what --**
Q Yes.
**A Yeah, I mean, I have not read the**

190

**concurrences. I don't know if there was any concurrences.**
**I recall at some point reading the dissents and maybe a concurrence. But I haven't read the dissent or the concurrence, or the majority for that matter, for probably over a year. But I generally recollect it, yes.**
Q Did you read the panel decision that the en banc court vacated in Peltier?
**A I -- I don't know. I don't know that I did. You know, I wasn't -- I don't think I began to pay much attention to that case until it went en banc, and then really sort of looked for the results.**
**I may have read it at some point, but it doesn't come to me immediately.**
Q Are you familiar with the First Circuit's decision in Logiodice v. Maine Central Institute?
**A Not by name I'm not.**
Q Okay.
MR. PROCTOR: David, can we pull up Exhibit 9, please.
(Black Deposition Exhibit 9 marked for identification and is attached to the transcript.)
MR. PROCTOR: Actually, sorry. I would

191

like to pull up a different exhibit. Can we pull up Exhibit 27.
(Black Deposition Exhibit 27 marked for identification and is attached to the transcript.)
Q Professor, I want to give you -- so I -- earlier I just mentioned if you were familiar with the decision Logiodice V Trustees of Maine Central Institute. I want to give you a chance to review this exhibit and let me know if -- you can let me know if it becomes familiar to you upon reviewing it.
**A I don't think I've ever read this case before. I mean, it's possible that I read a portion of it and cited to it in my scholarship for some small point. But I don't think I've -- I don't think I've ever read it from start to finish.**
Q Does it -- does it refresh your recollection at all if I tell you that this decision was cited in Peltier?
**A I'm sorry, Ryan, it doesn't. I mean, I haven't read -- you mean in the panel opinion or in the en banc opinion?**
Q Both.
**A Yeah, I mean, then I would have perused**

192

**across it. But I wouldn't have logged the name of it or went and read it then.**
MS. LEVIN: So just to be clear, Professor, to the best of your recollection you haven't read this document?
THE WITNESS: To the best of my recollection I have not read this document, no.
MS. LEVIN: So would you be able to answer questions under oath without reading it through?
THE WITNESS: I mean, I wouldn't be able to -- to speak intelligently about any nuance of it. Maybe there's some -- some question I might be able to speak to. But I would imagine there's probably more that I couldn't, depending on, you know, what the nature of the question was. I just -- I haven't -- I haven't read it before.
I am impressed that Ryan got it out of a hard copy, though.
MR. PROCTOR: I am a sucker for the old Federal Reporters.
THE WITNESS: I'm surprised your firm still purchases them.
MR. PROCTOR: Can we go back then to -- could we go back to Exhibit 9, then.

193

A/V TECHNICIAN: Please stand by. Let me bring it back up.

MR. PROCTOR: Actually, I'm sorry. I know it's a little early, but I could really use a glass of water.

Do you guys mind if we take a brief break now?

MS. LEVIN: No problem at all.

MR. PROCTOR: Okay. Great.

MS. LEVIN: Do you want to take a five-minute break or ten-minute break?

MR. PROCTOR: Why don't we say ten. Do you mind if we do 3:55?

MS. LEVIN: Sounds good.

MR. PROCTOR: Great. Thank you.

(A recess was taken.)

BY MR. PROCTOR:

Q So I appreciate that you haven't -- sorry. I understand that you haven't read Logiodice. I'm not going to ask you questions based on reading it.

What I am going to do, though, is I'm going to make certain representations to you about what the opinion says. And I'm going to ask you to answer certain questions based on that

194

assumption.

All right. So I'm going to represent to you that the Logiodice opinion says that Maine law, the law in the State of Maine, has allowed for localities to contract with private schools to offer free education open to all as early as 1873.

Do you have any reason to disagree with that?

**A I don't have any reason to disagree with that. I don't know that they actually were open to all. And that we've gone back and forth, you know, about the sort of reality versus -- but I don't have any -- any reason to disagree with that, that formal statement.**

Q I'm going to represent to you that Logiodice also says that New Hampshire law has provided for local school districts to contract with private schools to offer free education open to all as early as 1874.

Do you have any reason to disagree with that?

MS. LEVIN: Objection. I know you said that it's not based on the document, but you are representing what's in the document. So just calls for speculation. He didn't read it.

195

**A So New Hampshire law provided 1874. What year did you say for Maine?**

Q 1873.

**A 1873. Okay. Thank you.**

**I'm sorry. Is there still a question on the table?**

MS. LEVIN: Do you want to have it read back?

**A Sorry, Ryan.**

Q So I am going to represent to you that -- I'm going to represent to you that according to the Logiodice opinion, New Hampshire law provided for local school districts to contract with private schools to offer free education open to all as early as 1874.

**A Okay.**

Q Do you have any reason to disagree with that statement?

**A I don't have any reason --**

MS. LEVIN: Same objection. Same objection. We can stipulate to it.

MR. PROCTOR: Okay.

MS. LEVIN: To that for all questions involving, you know, what you're representing about the Logiodice decision.

196

MR. PROCTOR: Sure.

**A I mean, I haven't read it, but I don't have any reason to -- I forget the phraseology you were using, but I don't have any reason to disbelieve it, yeah. But I haven't read it.**

Q And in Vermont, local school districts have been allowed to -- sorry.

And in Vermont, local school districts have been able to contract with private schools to offer free education open to all since at least 1901.

Do you have any reason to disagree with that?

**A Well, surprisingly enough, I mean, I will say I thought that that general system, if I -- that you're describing, and if I am remembering correctly, actually goes back further than those dates. But maybe I'm just misremembering.**

**But generally speaking, you know, without having read it and looked at it again, I don't have any -- I don't have any firm reason to disbelieve it.**

Q And by 1873, did Maine, New Hampshire, and Vermont all have education clauses in their state Constitutions that required them to provide

197

public education?
A I would -- I mean, I'm pretty sure. But again, I'd want to read them. But I'm pretty sure the answer to that question is yes. Yeah, based upon I think by 1873 the only state that didn't was Connecticut. So by math, I would -- I would say that's -- that sounds like a fair statement. Or maybe it was all states by 1879 except for one. So probably, yeah. Probably.
Q Okay.
MR. PROCTOR: David, can you pull up Exhibit 28, please.
(Black Deposition Exhibit 28 marked for identification and is attached to the transcript.)
Q Do you recognize this document, Professor?
A Yes.
Q And what is it?
A It is an Amicus brief in Carson versus Makin.
Q And are you one of the authors of this brief?
A I am one of the authors of this brief.
Q And you co-wrote this brief in support of the respondent.

198

Is that right?
A Respondent being -- yes.
Q And you anticipated my question. And the respondent was the Maine Commissioner of Education.
Is that right?
A Yes.
Q At the time you wrote it, did you agree with the positions expressed in this brief?
A Yes. At the time I wrote it I would have agreed with the opinions expressed.
I would only note that, you know, the final, final version that went out the door was sort of in Art Coleman's and Michael Brown's control. And that was quite a -- I don't want to -- I guess we were counsel on who were the -- I don't want to divulge any confidences there.
But all I would say is, you know, that my involvement in the -- in the last period was minimal. So to the extent that there's possibility of some -- some change or something, then that possibility is there. But I'm representing that I would imagine that 98, 99 percent of it I'm familiar with.
I didn't go back and read the final thing

199

that was submitted.
Q Okay. Do you still agree with the positions expressed in this brief?
A I mean, I would think. I'm just -- I'm just, you know, kind of waiting on a specific -- a specific question. That's a broad one.
I mean, generally I don't put my name on things I don't agree with. But to the extent there's -- there's some specific word that was added or changed that I might have at the time thought there should have been more nuance to, I don't know whether that's the case or not. I'm just being careful, given the broad question there. That's why I went with the 98, 99 percent.
Q So let's look at Page 10 of the brief.
MR. PROCTOR: David, that's PDF Page 21. David, it's 21 in the -- in Adobe.
Q So do you see the last sentence of the top paragraph, "Indeed, all states, including Maine, provide for public education through their own Constitutions"?
A Yes.
Q Okay. So in this brief you acknowledge that Maine has a Constitutional duty to provide a free public education.

200

Is that right?
A Yes.
Q And you -- that's a position you still agree with today?
A I mean, that's what the Constitution of the State of Maine says, to the best of my recollection. So I don't think that it's a position. That's what it -- that's what it says.
Q Can we -- let's look at the next page. I'll give you a moment to just review that first full paragraph.
A Yes.
Q So one way that Maine provides its full Constitutional duty to provide a free public education is by contracting with private schools.
Is that right?
A Well, let me just say one thing. I'm glad I was sort of being, you know, careful.
You know, that is me, except -- that last sentence there is me accepting the joint stipulated facts of the parties, rather than me investigating, you know, the matter in some sort of detail myself.
With that said, yes, I am aware that Maine creates an option whereby some of their

201

**students in some districts can -- the local district pays for their tuition to go to high school. That's not for K through -- that is not for K through 8, I don't believe. I believe it's only for high school, but ...**

Q Then let's look at Page 4 of the brief.

MR. PROCTOR: So, David, for you that's Page 15 of the PDF.

Q Would you be able, Professor, to take a minute to review the first paragraph on the page.

**A Yes.**

Q So in this brief you say that private schools that Maine contracts with are assisting in the execution of a public function.

Is that right?

**A Private schools that may exist in the execution of a public function, yes. That's what -- that's what the brief says.**

Q And is that a conclusion you agree with still?

**A What I would say is that, you know, the overall -- so the overall nature of the discussion that's happening in this case is far different than the current one. I would add a couple of things. And again, you know, my task in working**

202

**on this brief is not to sort of litigate a separate case against Maine.**

**But I do think that it is -- I have to go back and look at Maine's Constitution, but I think it's plausible to say, to be quite honest, that -- that Maine may have, in fact, been violating its own state Constitution by failing to provide high schools to students, public high schools to students in all the communities in Maine.**

**Rather than doing that, Maine took it upon itself to -- and has long done so, for reasons that we could discuss if you want -- has taken it upon itself to try to provide some other maybe lesser option. And that's what they've done here.**

**So when I say that they may assist in the public function, that particular sentence, what I'm communicating is that Maine is taking the position, right, that they are going to allow these private schools to assist in carrying out their Constitutional duty. I'm not sure that Maine -- I don't know, I'd have to go and examine it, I don't know for sure that Maine is in compliance with its own state obligations when it does that. And in fact, that is a serious point**

203

**of contention.**

**But given the nature of, you know, the dispute in this case, which was really an establishment clause and free exercise, that -- that distinction wasn't really pertinent to the -- to the discussion there, so it doesn't show up.**

Q Let's go back to Exhibit 1, your expert report. Let's look at Paragraph 42 of Exhibit 1.

**A Paragraph 42, Ryan?**

Q Yes. So that's on Page 19 to 20.

**A Yes.**

Q I'll give you a minute to review it, if you'd like.

**A Yes.**

Q You're contrasting public education and private education in this paragraph.

Is that right?

**A That's right.**

Q Is there any particular time period that this comparison applies to?

**A Let's see. Well, if we go to first, right, I'm speaking of, you know, what we call the early -- early statehood, depending upon individual state. Right? So public schools first to open in many locations. Then I state they came**

204

**to function of private rather than government. So we've got a reference to something that was sort of early, we'll just call it early -- I will call it early in statehood and their initial -- now, there were certainly other private schools formed later in time.**

**Second, private schools were not free; they charged tuition. That is -- there are exceptions to -- to how much the -- you know, maybe -- well, that would be early period and now as well as a general -- as a general position.**

**The third one, as a result of their tuition and fee structure, they were not open to all.**

**These are all past tense. So I'm generally speaking about them -- yeah, I think this is generally speaking of early statehood type of periods where the -- you know, when you're looking at the early periods in states.**

Q What do you mean by "early statehood"?

**A Well, I use that phrase because every state, you know, enters the union at a different point. And that late entrance into the union is reflective of the fact that they were at least unsettled by -- by Europeans at that -- at that**

205

point in time.

And so, you know, those schools, the school system emerges at different points. Right? So Utah, you know, has both private and public schools at a later point in history than -- than would, you know, South Carolina, for instance. So I use statehood just to go each state's got its own sort of historical trajectory in terms of when it was first established.

Q So depending on the state in question, these points could be talking about as early as 1776 and as late as 1958?

A Just out of -- out of caution I would say I didn't think much about our most recently, you know -- I haven't actually sort of looked at Hawaii. I know that it has a statewide structure. There's only one school district in the whole state. So some of our more, you know, Alaska, I actually know a bit about Alaska. But I sort of haven't reviewed them in the context of these historical things.

So when I talk about this, I think it's safe to say I am thinking about, you know, the -- you know, the late 1700s through the late 1800s is probably a fair -- a fair characterization.

206

Q Would you agree that there's a long tradition of private charity schools in America that have provided free education to indigent children?

A I would agree that there have been charity schools. Sometimes those schools -- and again, you know, it's dangerous to speak of all of them. But the ones that are coming to mind, those schools actually weren't open -- necessarily open to children who didn't need charity.

So, you know, you might have, like, a society -- and we certainly had this in South Carolina -- a charity society, but it was -- it was a school only for poorer children. So if your -- or pauper children, to use that phrase earlier.

So it wouldn't be the case that just anyone would be going to that school. It's really sort of religious charity, which I think of as kind of a narrower -- a narrower subset of school.

Q In the I guess -- sorry. In the latter half of the 19th century, you know, what kinds of social classes would have attended Catholic parochial school?

A What social classes would have attended

207

Catholic parochial school. I have not studied Catholic parochial schools in the later half of the 19th century, so I can't speak in generality.

What I can speak to is -- or at least not off the top of my head I can't. But what I can speak to are the discussions that were happening in Ohio in the later 19th century regarding Catholic schools. And from those materials that I consulted, it was my -- would have been my impression that, you know, Catholics as a whole would have attended those schools, so the parishioners.

I don't know whether, you know, pauper children, for instance, would have been going to some separate class or something for those Catholic schools. But I think generally speaking, overall mass of Catholics would have attended those schools. But there still could have been limitations.

So, for instance -- in what year? In the mid 1800s, for instance, some Catholic societies ran schools for black children separate and apart from white children. So they would have been, you know, a racial distinction. And to give credit to those Catholic schools, they were providing

208

education to black children that sometimes, you know, no one else would, because of -- at all, for racial reasons.

So, you know, the short answer is, I am familiar with Ohio. And my take from that would have been that the general population of parishioners, it was my impression they would have attended those. I don't know that did or did not include pauper children or whether they had some sort of separate arrangement.

I know in South Carolina, though, for instance, black children did not attend school with white children, even though the Catholic Church seemed to have been providing some form of charity to some black children.

Q Do you have a sense of in the latter half of the 19th century how large a proportion of private schools in America Catholic parochial schools were?

A Just so I'm getting my math right. You mean what percentage of them in relationship to other religious schools, or what percentage of them in relationship to public schools? What, just so I understand?

Q I didn't do the best job there.

209

Q Of all private schools in the U.S., any sense of what proportion of them would have been Catholic parochial schools?
**A Well, again, you used the word "sense," which means I am speculating. I can only speculate with hard -- without any hard number. So I wouldn't speculate as a precise percentage.**
**What I -- what I could say is that -- that I would imagine the percentage probably increased in the latter half of the 19th century, but I couldn't tell you what the -- what the precise percentage was at any point in time.**
Q Okay.
**A Ryan, I actually misspoke much, much earlier. Do you mind if I make a clarification? Just a quick one.**
Q Sure.
**A When we were talking about religion earlier, or this Ohio Constitutional clause, I think I may have said -- you know, we were looking at the provisions that you had up there. And I said, but there were -- I think I may have said, but there's a separate religion clause. I meant to say but there is a separate education clause. So I think I may have inadvertently used the word**

210

**"separate religious clause." I meant separate education clause.**
Q Okay. Can you tell me in what sense charter schools in Tennessee are open to all?
**A Well, let me pull out my report here just so I -- I list like, you know -- I list several things in regard to charter schools here. Let me see. Charter school.**
MS. LEVIN: Ryan, could you read the question back?
Q Professor, did you get my question?
**A Well, I was looking to read from it. Rather than me maybe mischaracterizing your question, do you mind just stating it again? My apologies. I was just flipping to find it.**
Q Let me start with a basic question: Are Tennessee charter schools open to all?
**A They are open to all in the way that I define it. They're not open to -- well, actually, I have to go back. I don't think -- I don't think you're supposed to cross districts. So again, this is where all always operates within some context. So I -- maybe I'm misremembering that, but I think you're -- you know, I don't think you're supposed to cross boundaries for a charter**

211

**school outside the district, so. But other than that, yes, they would be -- they would be open to all. And I would treat that as being open to all because public schools have district boundaries as well.**
Q So a traditional public school is still open to all, even though it has district boundaries. Right?
**A That's what I meant. I just -- the only reason why -- again I try to be difficult, Ryan, the Tennessee Constitutional convention got all worked up at one point, which is in the report, because they were afraid that random people from some other state might show up and go to their schools or something like that.**
Q Do charter schools serve the community as a whole?
MS. LEVIN: Objection. Vague and ambiguous as to "community as a whole."
**A Well, it depends what you mean by "serve."**
**I mean, the charter schools located in a district would be free and open to all within that district. So they would be free and open to all to the students in that district. Unless I'm**

212

**misremembering and you can cross districts too. I'm just -- I'm forgetting at the end of the day, but I don't think you can.**
Q Is part of what makes public schools public the fact that they serve a cross-section of the community?
**A Well, there's a lot of factors that make a school public. One of those is serving all, which, you know, presumably would be a cross-section. But that's not -- that's not the exclusive factor that makes -- that makes the thing public.**
Q Would you agree that part of the idea of a public school is that it's a place for the entire political community to be educated and not just some subset of it?
**A That is a -- that is a key -- again, there's multiple factors. And that certainly is a -- is an important one.**
**You know, as I point out going back to that long history, I mean, John Adams very early on had articulated, you know, the idea that these schools needed to serve the highest and the lowest ranks of society and people from all different walks of life. So that is certainly one of the**

213

factors, but that's not the only factor.
Q Do you think that charter schools meet that factor?
A I think that charters are designed to meet that factor. I have been -- I have been critical of some charter schools in the past for what would seem to me to be a failure to meet a cross-section of all students. So -- and I won't digress.
But, you know, I participated in an Amicus brief in New Jersey, for instance, where the laws articulated and the Constitution of New Jersey would have dictated, you know, that all of the charter schools needed to be serving a cross-section. But in practice it didn't seem that the education commissioner was enforcing that requirement, and the schools were -- seemed to be diverging from that.
So yes, as a matter of idea, principle, and law, yes. Are there instances where they diverge from that, they do. But that's inconsistent with law the same way when schools engage in racial segregation. You know, they're formally open to all but in practice are not really open to all, and so they're subject to 14th

214

Amendment challenges and things of that sort.
Q Is there anywhere in Tennessee where charter schools are the default form of education?
MS. LEVIN: Objection. Vague and ambiguous as to "default."
A So if by "default" you mean -- were to mean that they are the primary provider of public education, or if you meant that's where most or all of the students go, I'm not aware of any of the school districts doing that.
But -- it is a very significant but -- in Memphis, you know, Memphis did -- did substantially alter its public education structure. I -- you know, the particular year now is escaping me.
But they moved to what experts call, I don't know that Tennessee called it, but experts called it portfolio model. Because there was so much penetration of charter schools in -- in Memphis that if they weren't -- they may not have been the majority, but they were certainly becoming probably a very enormous slice in the Memphis School District itself, which doesn't actually exist anymore. Now it's been subsumed, and lots of things we need not go into there.

215

But it was -- it was a very large percentage of the schools. And so, you know, I wouldn't put "default" on that, because I don't know what that means. But it was a very, very major piece of the delivery of public education in Memphis.
And then Tennessee itself also created the Achievement School District, which also operated in Memphis. And that was a charter -- that was a -- in my recollection, and feel free to correct me or show me otherwise. But my recollection is that the state itself was exclusively running a system of charter schools there to try to turn around the overall system of public education.
I confess, I can't say exactly how it interacted with -- with the regular Memphis public school district, but that was the case.
Now, subsequent to that, due to racial and other demographic issues, Memphis dissolved itself, and therefore Shelby County had to take it over. And after that happened, a couple of communities in Shelby County said, We want to secede, we don't want to be part of Shelby County. So they broke off. Those were racially isolated.

216

All that to say the percentage of charter schools is probably lower when you look county-wide in Shelby County now. But if you looked, you know, within the city boundaries of Memphis, I would venture to speculate that it's still a very high portion of the delivery of public education in the City of Memphis.
Q In Knox County, are charter schools approaching the numbers in terms of enrollment of traditional public schools?
A I will first stipulate I am -- if that's such a thing for witnesses to stipulate, that I am speculating when I say no, I don't believe they are, but I have not consulted the numbers in Knox County.
Q Okay.
A Let me just for, because you asked the question and I want to be sure to give you a complete answer.
In Murfreesboro, just below Nashville, if you look at the charter schools there, although they, themselves, probably don't look like an enormous percentage in relation to the public school percentage all by themselves, if you looked at student growth or sort of new schools open, I

257

So you're asking me, hypothetically speaking, if Tennessee allowed a religious charter to operate and teach religion as truth, and the religious chaplain all that sort of stuff, do I think that would raise establishment clause problems? Is that the question that you're asking, Ryan? Or are you just asking about charter schools in general? I'm sorry, I lost that.

Q I'm saying if Tennessee's charter system were exactly the way that it is now, except that it allows -- it allowed for religious instruction in charter schools, is there anything that you know about Tennessee charter schools that would make you say that it would not -- that allowing religious instruction would not breed a new set of Constitutional violations?

A Well, let me -- let me do this, which I'm willing to do. If you're -- if you're asking me to take off my -- my expert -- we'll just call it the expert for which I was engaged to testify hat and put on my law professor hat, which is not within the scope of this report, and I -- you know, I teach evidence.

I don't -- you know, I'm not familiar

258

with courts allowing all professors to opine on the meaning or sort of the requirement of the establishment clause, you know, as it existed.

If that's what you're -- is that what you're asking me to do, put my law professor hat on and take off my expert witness hat? Is that what you're asking, Ryan?

Q I'm not asking you to -- I'm not characterizing the capacity in which you're answering it. I would just like you to answer my question.

A Well, I -- so let me just say your -- your question is a hypothetical one. Not a hypothetical one. Your question is asking whether I have expertise that I did not apply to this set of facts. Right? My sort of expertise as a Constitutional law professor. To take that, which is something separate and not involved here, and then apply it to these facts. Right?

I would just point to one example. Right? Which is, you know, Lee versus Weisman speaks of coercion. Right? And so at least as I understand it -- and again, I am again emphasizing that I do not read all of the establishment clause law percolating through lower courts.

259

And I -- you know, I know there was a Louisiana decision and a Texas decision. And I think those are intention. One other on 10th Amendment. But I think the coercion rule, the coercion law, is still -- that's still is a case that I teach my students.

So let me make a hypothetical. I teach my students the coercion test, for instance. Right? That's Lee versus Weisman. And it seems to me that if a school, hypothetical, whether it be a traditional public school or a charter school, regardless of whether that charter school formally claimed to be religious -- if any public school, right, engaged in religious instruction, right, that is going to do one of two things.

It's either going to be, one, a religious practice -- it would seem to me it would likely be a religious practice -- that the courts have said, you know, it's not the business of state to engage in religious practice. Right? So if a public school was engaging in religious practice, that's a problem.

Also, if a public school invites a third party into the public school -- that was what happened in Weisman -- you know, a rabbi had been

260

invited to give the invocation at high school graduation -- the court said, you know, that has a coercive effect on students.

So if a school, any public school, engaged in religious practice or religious instruction, it seems to me that it would violate one of those two things. It would be engaging in religious activity or -- and/or engaging in coercive -- coercion of religion, at least as I -- as someone who is not a specialist in the establishment clause would see it.

MR. PROCTOR: Okay. No further questions from plaintiff.

MS. LEVIN: Okay. I may have a couple questions. I really need to run to the ladies' room. Can we take a five-minute break here?

MR. PROCTOR: Sure. 6 o'clock or 3 o'clock your time.

MS. LEVIN: Okay. Sounds good.

(A recess was taken.)

MS. LEVIN: So I understood you to have concluded your questions, Ryan. And I have a few questions for Professor Black. But I didn't know if any of the other parties had questions for him. I didn't want to cut that off.

MS. JERNIGAN-JOHNSON: Nothing from defendants.
MR. JARVIS: Nothing from Carroll Intervenors.
MS. LEVIN: Okay.
EXAMINATION BY COUNSEL FOR THE COBLE INTERVENORS
BY MS. LEVIN:
Q All right. So, Professor Black, I just have a few questions to clarify a couple of points. So this should not take very long. I know everybody's had a long day.
Professor, do you recall your testimony that all public schools in Tennessee are part of a system of public education?
**A Yes.**
Q Under the law, does each and every one of those public schools, traditional or charter, have to comply with the Constitution laws and regulations that apply to public schools?
**A That -- yes.**
Q And does that include antidiscrimination requirements? Does each and every one of those public schools in the system have to comply with all antidiscrimination requirements that apply to



public schools in Tennessee?
MR. PROCTOR: Objection. Leading.
**A It -- all -- so the way that they structured the system was that, yes, they did have to apply -- comply with that. You know, as well as the federal government's antidiscrimination provisions also apply to all of those schools because they are recipients of federal funds.**
Q And do state antidiscrimination requirements also apply to all those schools?
**A The -- the statute sort of lists, you know, these categories of statutes and regulations apply. So they use that phraseology. But I don't think it lists the specific statutes that would apply. They just categorically say that, yes, they remain subject to these antidiscrimination statutes and regulations and the Constitution.**
Q Do you recall your testimony that you co-authored in an Amicus brief in Oklahoma Statewide Charter School Board versus Drummond, and that was in the U.S. Supreme Court?
**A Yes.**
Q And am I correct that you testified that that Amicus brief addressed whether free education open to all is a traditional and exclusive



government function?
**A Well, I think I -- I think my recollection I said to Ryan was that, you know, I'd have to look and see if that specific phraseology is in there. But that was certainly an overall issue in the case. I just -- I didn't go back and review the sort of legal parts of that, that brief.**
Q Is it the case that any discussion of whether something is a traditional and exclusive government function is necessarily a legal discussion?
**A Is it true that -- could you repeat the question?**
Q Yes. Any time someone mentions whether the question of whether something is a traditional and exclusive government function, is that always calling for a legal conclusion?
**A Oh, no. I mean, you know, one could -- you know, the -- you know, that is a phrase I think that a -- actually a layman on the side of the street would sort of understand the question you're asking.**
**They wouldn't have the expertise to answer it. Nor would -- nor would many people.**



**But, you know, as I said earlier, traditional means historical. At least that's how I treated it. And -- and exclusive means no one else is doing it. So that is a factual question. But, of course, you know, courts look at those facts in answering a legal question, traditional and exclusive, which is a distinct legal questions. Or they apply their distinction precedent to the facts.**
Q Is your -- was your briefing in the Drummond matter in the Amicus brief separate from your expert report in this case?
**A Yes, it was separate. As I indicated, I haven't gone back and looked at it to add -- to look at sort of the national history. You know, there is that part at the beginning of my discussion of the national history of charter schools.**
**And so it was my recollection that I had some of that sort of generality about charter schools in that brief. And so that's why I went back and looked at it, was to see whether there was any sort of policy or factual stuff on the history.**
**My recollection is that the brief proved**

265

**to not be particularly helpful on that question if you look at, you know, the citations when I'm discussing the national history of charter schools. There were other sources that I was consulting for that.**
Q Did you reach any legal conclusions in your expert report in this matter?
**A No.**
Q Okay. Just a couple more questions.
So we've talked -- is it fair to say we talked a fair bit today, you've answered questions about whether the government has ever lent any support to religious -- private schools, including religious schools?
**A Yeah. I'm sorry. Have we talked about that today?**
Q Yes.
**A Yes, we have talked about that today.**
Q If we assume -- even if we assume that it's the case that the government has given support to religious schools at points in American history, is that mutually exclusive with your conclusion that the provision of free education open to all is a traditional and exclusive government function?

266

**A No. They don't -- they don't -- they don't have any direct bearing on one another. It seems to me it's two different systems, two different types of education.**
Q And if we were to assume or take as true that that provision of free education open to all may not have been perfect, it may not have been complete at various points in American history, is that mutually exclusive with your conclusion that the provision of free education open to all is a traditional and exclusive government function?
**A No, it's not. And, you know, I won't go on late in the day. But I'll just say that I think that I used that term "half full, half empty." I think that, you know, I think a lot of -- some people like to look at that public education, you know, for a long track towards being perfect and it's still not perfect yet. As I always say, it's never been perfect and I doubt it will be perfect in my lifetime. It's been a process. But it has been a process, with a starting point aiming towards a goal in the future. And it's consistently across that entire period made progress towards that call.**
Q Has any other entity provided free and

267

open to all education, you know, in the United States besides the --
**A No. Because it is -- it is beyond -- I mean, I believe it to be beyond their capacity to do so, quite honestly.**
MS. LEVIN: I have no other questions.
MR. PROCTOR: I think I might have just one followup question, depending on what the answer is.
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. PROCTOR:
Q But could you -- just to pick up on the very last question you received. Why is it that no one else besides the government has the capacity to provide free education open for all?
**A Yeah, I mean, when we speak of practicality here, sort of practical capacity. But free public education open to all depends upon enormous scope and scale. It requires taxation. Private entities lack the authority to tax, for instance. So there's a sort of -- the task is so Herculean, for lack of a better term, that it is beyond, it seems to me, practically speaking, that any private entity could deliver free and public education, a system, at least, of free public**

268

**education open to all. And as I said earlier, being open to all necessitates a system of some sort. So, you know, private school or private donors, you know, theoretically could, you know, fund some schools that were free. But I don't think that would be a system of free schools open to all. It would just be one school that happens to be free or reduced price or whatever it happens to be.**
MR. PROCTOR: No further questions from plaintiff.
(Off the record at 6:12 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, DEREK W. BLACK, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_______________________ ________________________

(DATE) (SIGNATURE)



CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Debra Ann Whitehead, E-Notary Public in and for the Commonwealth of Virginia, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was not discussed; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 7th day of July, 2026.

My commission expires:
October 31, 2027

----------------------------
E-NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA