UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

THE WILBERFORCE ACADEMY OF KNOXVILLE,

*Plaintiff*,

v.

KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County Board of Education,

*Defendants*,

REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP,

*Intervenor-Defendants,*

ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER,

*Intervenor-Defendants.*

Case No. 3:25-cv-584 (CEA) (DCP)

**COBLE INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF PROFESSOR DEREK BLACK**

## TABLE OF CONTENTS

**Page**


Introduction .......... 1

Legal Standard .......... 2

Argument .......... 3

I. Professor Black's Testimony Is Plainly Relevant. .......... 3

A. Plaintiff's relevance argument improperly assumes the answer to a disputed merits question. .......... 3

B. The public-function cases require identification of the function actually performed, not plaintiff's "education generally" formulation. .......... 5

C. Professor Black's testimony is relevant to the analysis of state action. .......... 8

II. Professor Black's Testimony Does Not Impermissibly Substitute His Judgment for the Court's Legal Determinations. .......... 8

A. Sixth Circuit law distinguishes impermissible legal conclusions from specialized evidence that informs the court's legal analysis. .......... 9

B. Plaintiff's legislative-fact argument does not establish a categorical evidentiary bar .......... 11

III. Professor Black Possesses Ample Qualifications to Provide the Opinions Expressed in His Expert Report .......... 13

A. Professor Black is qualified to give expert testimony on historical matters .......... 14

B. Professor Black is qualified to offer education policy expertise .......... 18

IV. Professor Black's Methodology Meets the Criteria for Reliability and Plaintiff's Criticisms Bear Only on the Weight the Court Should Accord His Testimony .......... 19

Conclusion .......... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999)....................5

*Babb v. Maryville Anesthesiologists P.C.*,
942 F.3d 308 (6th Cir. 2019) ....................2, 3, 9

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) ....................9, 11, 13, 19

*Blum v. Yaretsky*,
457 U.S. 991 (1982)....................5

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*,
590 F.3d 806 (9th Cir. 2010) ....................6, 7

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....................2, 16, 17, 19

*Deal v. Hamilton Cnty. Bd. of Educ.*,
392 F.3d 840 (6th Cir. 2004), *cert. denied,* 546 U.S. 936 (2005)....................2

*Evans v. Newton*,
382 U.S. 296 (1966)....................6

*First Tenn. Bank Nat'l Ass'n v. Barreto*,
268 F.3d 319 (6th Cir. 2001) ....................2, 17, 20

*Howell v. Father Maloney's Boys' Haven, Inc.*,
976 F.3d 750 (6th Cir. 2020) ....................7

*Hyland v. HomeServices of Am., Inc.*,
771 F.3d 310 (6th Cir. 2014) ....................9

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974)....................7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................2, 19

*Kush Enters., LLC v. Mass. Bay Ins. Co.*,
2021 WL 3007263 (E.D. Tenn. July 15, 2021) ....................16

*Logiodice v. Trs. of Me. Cent. Inst.*,
296 F.3d 22 (1st Cir. 2002) .......... 6, 7, 21, 22

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) .......... 4, 5, 6, 8, 12

*Mannino v. Int'l Mfg. Co.*,
650 F.2d 846 (6th Cir. 1981) .......... 14, 15

*Marie v. Am. Red Cross*,
771 F.3d 344 (6th Cir. 2014) .......... 7

*McCown v. Norfolk S. Ry. Co.*,
2026 WL 1244797 (E.D. Tenn. Apr. 6, 2026) .......... 13

*Nathan v. Alamo Heights Independent School District*,
173 F.4th 576 (5th Cir. 2026) .......... 11

*Nugent v. Spectrum Juvenile Justice Servs.*,
72 F.4th 135 (6th Cir. 2023) .......... 8

*Peltier v. Charter Day Sch., Inc.*,
37 F.4th 104 (4th Cir. 2022) (en banc) .......... 6, 7

*Phillips v. Tangilag*,
14 F.4th 524 (6th Cir. 2021) .......... 7

*Reed v. Rhodes*,
1 F. Supp. 2d 705 (N.D. Ohio 1998), *aff'd*, 215 F.3d 1327 (6th Cir. 2000) .......... 18

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982) .......... 5, 6, 8

*Romanski v. Detroit Entm't, L.L.C.*,
428 F.3d 629 (6th Cir. 2005) .......... 11

*vonRosenberg v. Lawrence*,
413 F. Supp. 3d 437 (D.S.C. 2019) .......... 20

*Saginaw Chippewa Indian Tribe of Mich. v. Granholm*,
690 F. Supp. 2d 622 (E.D. Mich. 2010) .......... 12, 21

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) .......... 2, 21, 23

*Starr v. Hill*,
2012 WL 12868271 (W.D. Tenn. Mar. 1, 2012) .......... 15

*Terry v. Adams*,
345 U.S. 461 (1953)....................6

*Torres v. Cnty. of Oakland*,
758 F.2d 147 (6th Cir. 1985)....................12, 13

*U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*,
583 U.S. 387 (2018)....................11

*United States v. Kantengwa*,
781 F.3d 545 (1st Cir. 2015)....................20

*United States v. Lopez*,
514 U.S. 549 (1995)....................8

*United States v. Worthington*,
145 F.3d 1335, 1998 WL 279379 (6th Cir. 1998)....................3

*W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*,
300 F. Supp. 2d 600 (W.D. Tenn. 2004)....................13, 18

*William Penn Sch. Dist. v. Pa. Dep't of Educ.*,
294 A.3d 537 (Pa. Commw. Ct. 2023)....................10, 17, 18

*Wittstock v. Mark A. Van Sile, Inc.*,
330 F.3d 899 (6th Cir. 2003)....................12

*Zuzula v. ABB Power T & D Co.*,
267 F. Supp. 2d 703 (E.D. Mich. 2003)....................14

**Other Authorities**

Fed. R. Evid. 401(a)–(b)....................3

Fed. R. Evid. 402....................4

Fed. R. Evid. 702....................3, 4, 5, 8, 13, 16, 19, 21

Fed. R. Evid. 704(a)....................10

## Introduction

Professor Derek Black has spent his career studying and teaching about education, including education history and education policy, and is recognized for his scholarship on these topics. Coble Intervenors will use Professor Black's expert testimony to support their argument that Tennessee charter schools are state actors because they perform the traditional and exclusive public function of providing education that is free and open to all.[1] His testimony provides historical and policy context relevant to that inquiry without displacing the Court's responsibility to decide the ultimate legal question.[2] Admission of Professor Black's expert testimony is clearly proper under Federal Rule of Evidence 702.

Plaintiff's motion asks the Court to decide the disputed state-action issue prematurely and under Plaintiff's preferred characterization, treat the historical inquiry offered to inform the legal questions in this case as impermissible testimony on the legal conclusions themselves, require Professor Black to possess the formal credentials of a history department professor despite his specialized scholarship concerning public education and its history, and treat disagreements over historical sources and interpretation as methodological failures warranting wholesale exclusion. Rule 702 requires none of those things.

Professor Black's educational background, research, scholarship, teaching, and experience provide a more than sufficient foundation for the subject matter of his testimony, and Plaintiff's criticisms bear solely on the weight of his testimony, not its admissibility.

---

[1] The Court will need to engage in this public function analysis only if it does not agree with Coble Intervenors that Tennessee charter schools are themselves governmental entities and a separate state-actor analysis is therefore unnecessary.

[2] As Professor Black explained, education policy expertise is an important component of his analysis because it elucidates the "structural component" of public education. Feldman Decl. Ex. 1, Black Dep. Tr. 25:23–29:13.

## Legal Standard

The Rules of Evidence permit testimony by a witness "qualified as an expert by knowledge, skill, experience, training, or education" where the proponent shows that the expert's specialized knowledge will assist the trier of fact, the testimony rests on sufficient facts or data and reliable principles and methods, and the expert reliably applies those principles and methods. Fed. R. Evid. 702.

The district court serves as gatekeeper, but the inquiry is flexible and must account for the nature of the expertise involved. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–95 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42, 150–52 (1999). The traditional *Daubert* factors are neither exhaustive nor invariably useful, where, as here, the testimony rests on academic, professional, or experiential expertise rather than laboratory science. *See First Tennessee Bank National Ass'n v. Barreto*, 268 F.3d 319, 334-35 (6th Cir. 2001). And the district court's usual role as the "gatekeeper" of expert testimony "is largely irrelevant in the context of bench trial[s,]" because district judges are capable of independently determining "the amount of weight they must give to certain expert opinions." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004), *cert. denied,* 546 U.S. 936 (2005).

The Court's task is to determine whether an expert's testimony rests on a reliable foundation, not whether the expert's conclusions are correct. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-530 (6th Cir. 2008). In a bench trial, "[v]igorous cross-examination [and] presentation of contrary evidence" remain the "traditional and appropriate means of" vetting alleged weaknesses. *Daubert*, 509 U.S. at 596. And while an expert must not offer "ultimate legal conclusions," the Sixth Circuit has "generally excluded expert testimony for stating a 'legal conclusion' *only* when the witness explicitly testifies, in 'specialized' legal terminology, that a [party] *violated (or did not violate) the law*." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d

308, 317 (6th Cir. 2019) (emphasis added). If the Court determines that portions of an expert report are inadmissible, the proper course is to exclude only those portions rather than the entire report. *Id.* at 318.

## Argument

### I. Professor Black's Testimony Is Plainly Relevant.

Professor Black's testimony readily satisfies Rule 702(a)'s threshold relevance requirement because his specialized knowledge of education history and education policy will assist the Court in resolving issues material to Coble Intervenors' state-action theory. Rule 401 "sets a low threshold for relevancy." *United States v. Worthington*, 145 F.3d 1335, 1998 WL 279379, at *8 (6th Cir. 1998). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401(a)–(b). Among other things, Professor Black examines when and how states developed systems of tuition-free education open to all, the structure and operation of those systems, which institutions supplied education within and outside those systems, and the ways in which public education developed as a governmental responsibility distinct from private schooling. That historical and education policy expertise bears directly on whether the provision of education that is free and open to all is a function traditionally and exclusively performed by government. Professor Black's testimony therefore satisfies Rule 401's relevance standard and Rule 702(a)'s requirement that expert testimony help the trier of fact understand the evidence or determine a fact in issue.

#### A. Plaintiff's relevance argument improperly assumes the answer to a disputed merits question.

Coble Intervenors' primary position is that Tennessee charter schools are themselves governmental entities, such that no separate state-action analysis is necessary. If the Court

disagrees and treats Tennessee charter schools as private entities, however, Coble Intervenors will argue in the alternative that they are state actors under the state-action tests that apply to private entities, including the public-function doctrine. *See, e.g.*, *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802 (2019). Under that doctrine, courts ask whether a private entity performs a function "traditionally *and* exclusively performed" by the government. *Id.* at 809. If so, performance of that function is state action. *Id.* Coble Intervenors contend that charter schools perform the traditional and exclusive public function of providing education that is free and open to all.

Plaintiff argues that Professor Black's testimony is irrelevant because the public-function doctrine permits the Court to ask only whether "education generally" has traditionally and exclusively been performed by government. Pl.'s Black Mot. 2–6, ECF No. 111. But Plaintiff's broad framing is inconsistent with binding caselaw. The relevant inquiry is not whether government has historically exercised a monopoly over every form of activity that could be described at a high level as "education." Rather, the Court must identify the particular function at issue and determine whether that function has traditionally and exclusively been performed by government. Professor Black's testimony is relevant because it supplies historical and policy evidence bearing directly on that inquiry.

Plaintiff asks the Court to accept Wilberforce's mischaracterization of the relevant function, reject Coble Intervenors' competing characterization, and then declare Professor Black's testimony irrelevant because it addresses the theory Plaintiff wishes the Court to reject. But whether Plaintiff or Coble Intervenors have correctly identified the relevant function is a merits question under the public-function doctrine. Rules 402 and 702 do not provide a vehicle for resolving that disputed legal issue in Plaintiff's favor and then using that merits determination as

the basis for excluding otherwise relevant expert testimony. So long as Coble Intervenors' public-function theory remains before the Court, Professor Black's historical and education policy testimony bears directly on that theory and readily satisfies Rule 702's relevance requirement.

### B. The public-function cases require identification of the function actually performed, not plaintiff's "education generally" formulation.

Even assuming Plaintiff's merits arguments were properly raised here, they are wrong. The Supreme Court has made clear that the state-action inquiry "begins by identifying 'the *specific* conduct'" at issue. *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 51 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)) (emphasis added). The Supreme Court cases on which Wilberforce relies for its broad framing—*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), and *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802 (2019)—actually confirm the importance of specificity.

*Rendell-Baker* involved a private school that educated students with special needs such as substance abuse or behavioral issues that made it difficult to complete high school. 457 U.S. at 832–33. In determining whether the school's conduct constituted state action, the Supreme Court did not ask whether "education generally" was a traditional and exclusive public function. Instead, it identified the specific function at issue as "the education of maladjusted high school students." *Id.* at 842. Because the state had only recently begun to provide for the education of such students, the school did not perform a traditional and exclusive public function. *Id.* If the inquiry stopped at the broadest category of activity, as Wilberforce contends, *Rendell-Baker* could have simply asked whether "education" was traditionally exclusive to government and gone no further.

*Halleck* also supports specificity. There, the Court preferred a narrow approach over a broad one. It identified the relevant function as the "operation of public access channels on a cable system" and examined the history of that particular activity. 587 U.S. at 810–11. The Court did

not, as Plaintiff suggests (Pl.'s Black Mot. 5), limit its analysis to whether the provision of "some kind of forum for speech" was a traditional and exclusive public function. *Halleck*, 587 U.S. at 811–12. It only addressed that broad formulation to refute respondents' "more *general*[]" framing. *Id.* (emphasis added).

The Fourth Circuit recently held that North Carolina charter schools perform a traditional and exclusive public function and are thus state actors. *Peltier v. Charter Day School, Inc.*, 37 F.4th 104, 119 (4th Cir. 2022) (en banc). There, the court expressly rejected the charter school's effort to frame the function at issue as "'education' broadly," observing that in *Rendell-Baker* the Supreme Court narrowly defined the function at issue as "education of maladjusted high school students." *Id.* (quotation omitted). Applying a "narrower lens" than the charter school proposed, the *Peltier* court determined that North Carolina charter schools were statutorily created to perform the traditional and exclusive public function of providing "free, universal" education. *Id.*

*Peltier*'s rejection of the broad "education" framing is supported by additional Supreme Court cases. For example, although the government does not conduct elections for private offices, such as positions on corporate boards, the Court has held that running elections for *public* office is a traditionally exclusive government function. *See, e.g.*, *Terry v. Adams,* 345 U.S. 461, 468–69 (1953)*; Halleck,* 587 U.S. at 809–10 (collecting cases). Similarly, although both private and public parks exist, the Court has considered the private trustees of a public park to be state actors. *See Evans v. Newton*, 382 U.S. 296, 302 (1966).

*Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806 (9th Cir. 2010), and *Logiodice v. Trustees of Maine Central Institute*, 296 F.3d 22 (1st Cir. 2002), do not dictate the framing or the outcome of this case. *Caviness* began from the premise that "an entity may be a State actor for some purposes but not for others," and that the inquiry therefore "begins by

identifying the specific conduct of which the plaintiff complains." 590 F.3d. at 812–13. The challenged conduct concerned the school's treatment of a former employee, so "the relevant inquiry in [that] case [was] whether [the school's] *role as an employer* was state action." *Id.* at 813 (emphasis added). To the extent that dicta in *Caviness* extends its analysis of the relevant public function beyond the employment context, that dicta is not only nonbinding but also contrary to the Supreme Court's approach to determining the proper level of generality in the public-function analysis. *Logiodice*'s disapproving dicta about "tailoring by adjectives" (296 F.3d at 27) is also at odds with the Supreme Court's approach. Moreover, *Logiodice* analyzed unique factual issues that are not present in this case: It dealt with a private school that charged tuition and applied selective admissions practices, at least with respect to some of its students, within the context of Maine's unique educational history. *Id.* at 25–27; *see also infra* at 22–24.

*Peltier* rejected the notion that *Caviness* and *Logiodice* establish "bright-line rules applicable to every case," explaining that each evaluated "the specific conduct challenged by the plaintiffs in the context of the governing state law." *Peltier*, 37 F.4th at 121–22. That reasoning defeats Plaintiff's contention that Professor Black was given the "wrong assignment." Pl.'s Black Mot. 3. Coble Intervenors asked Professor Black to examine the history of the specific function they contend Tennessee charter schools perform: the provision of free education open to all.[3]

[3] Plaintiff's remaining authorities do not establish a contrary rule. *Phillips v. Tangilag,* 14 F.4th 524, 532 (6th Cir. 2021), and *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 354 & n.9 (1974), merely observed in passing that providing education does not *necessarily* turn a private entity into a state actor. In *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 753 (6th Cir. 2020), the Sixth Circuit identified the relevant function of a group as the provision of "housing, education, 'treatment[,] and crisis stabilization of at-risk youth[,]'" and then examined Kentucky's history to determine whether the state had traditionally and exclusively performed that function. *Id.* (internal quotations omitted). Finally, *Marie v. American Red Cross*, 771 F.3d 344, 362–63 (6th Cir. 2014), addressed disaster relief, not education. None of these cases resolves the questions presented here, including whether Tennessee charter schools perform the traditional and exclusive public function of providing education that is free and open to all.

### C. Professor Black's testimony is relevant to the analysis of state action.

The foregoing authorities establish that the public-function test[4] is concerned with the specific function at issue. Professor Black's testimony provides facts to which this Court can apply this focused analysis. He examines the historical development of a system of free public schools open to all, the institutions that historically supplied that education, and the place Tennessee charter schools occupy within that context. He analyzes the nationwide history of free education open to all, with particular emphases on Tennessee history and highly relevant time periods such as the common-school movement. *E.g.,* Black Rep. ¶ 91, ECF No. 111-1 (Ex. A).[5]

Professor Black's analysis is well calibrated to the particular function at issue in this case and easily clears Rule 702(a)'s relevance threshold. Plaintiff is free to argue that the history ultimately does not establish exclusivity. But that question is inappropriate on a motion to exclude.

## II. Professor Black's Testimony Does Not Impermissibly Substitute His Judgment for the Court's Legal Determinations.

Plaintiff next argues that Professor Black's testimony must be excluded because experts cannot decide questions of law. Pl.'s Black Mot. 6–9. Coble Intervenors do not dispute that basic

---

[4] Coble Intervenors respond specifically to Plaintiff's relevance arguments, which focus on the relevance of Professor Black's testimony to the public function test. Professor Black's testimony may also be relevant to other aspects of state action analysis.

[5] Insofar as Plaintiff suggests that only "[n]ational practice[s]" in "1791 and 1868" are relevant to the public-function inquiry (Pl.'s Black Mot. 8), Plaintiff is wrong. *Nugent v. Spectrum Juvenile Justice Services*, 72 F.4th 135, 141 & n.2 (6th Cir. 2023), does not prescribe the relevant geographic scope for all public-function analyses. To be sure, *Nugent* observed that national practices were relevant to analyzing the particular function in that case: "involuntary commitment." *Id*. But education is a quintessential state-level function. *E.g.*, *United States v. Lopez*, 514 U.S. 549, 564 (1995). It makes sense, then, that in *Rendell-Baker*, the Court focused on Massachusetts education practices. 457 U.S. at 842. The relevant time frame for the public-function analysis is also dependent on the particular function at issue. For instance, in *Halleck*, the Court analyzed the history of public-access cable channels dating back to the 1970s, with a focus on both national and local practices. 587 U.S. at 810–11.

rule. *See Hyland v. HomeServices of America, Inc.*, 771 F.3d 310, 322 (6th Cir. 2014); *Berry v. City of Detroit*, 25 F.3d 1342, 1353–54 (6th Cir. 1994). The Court—not Professor Black—will determine the contours of the state-action doctrine, identify the legally relevant function, and decide whether Tennessee charter schools satisfy the governing test. But that principle does not require exclusion of the analysis on education history and policy that Professor Black supplies.

### A. Sixth Circuit Law distinguishes impermissible legal conclusions from specialized evidence that informs the court's legal analysis.

Plaintiff relies on *Berry*, but *Berry* illustrates the distinction that supports admission of Professor Black's testimony. There the Sixth Circuit confirmed the basic principle that "expert testimony that expresses a legal conclusion" is inadmissible. 25 F.3d at 1354. Specifically, while an expert must not offer "ultimate legal conclusions," the Sixth Circuit has "generally excluded expert testimony for stating a 'legal conclusion' *only* when the witness explicitly testifies, in 'specialized' legal terminology, that a [party] violated (or did not violate) the law." *Babb*, 942 F.3d at 317.

Crucially, the Sixth Circuit makes clear the distinction between specialized information and the legal result in a case. In *Berry*, the expert could testify that discipline within the police department was lax and could explain the consequences of lax discipline, but he could not testify that those conditions legally constituted "deliberate indifference." 25 F.3d at 1353. The court illustrated the distinction with a straightforward comparison: a fingerprint expert may testify that the defendant's fingerprint was the only fingerprint on the murder weapon, but he may not make the legal conclusion that the defendant was guilty. *Id.* That analogy favors admission of the expert testimony at issue here. Professor Black may not tell the Court that Wilberforce is a state actor or that its operation satisfies the public-function test. But *Berry* does not bar him from supplying the historical evidence on which that legal determination may depend. He may testify, for example,

about when states developed systems of tuition-free education open to all, how those systems operated, which institutions supplied education within and outside them, and how private schooling historically differed from public education systems. Those subjects implicate both historical and education policy expertise: Professor Black does not merely identify historical events or statutory provisions, he also analyzes the structure, financing, supervision, and historical operation of public-education systems and the place of charter schools within those systems. This Court remains responsible for deciding whether that history satisfies the Supreme Court's public-function standard.

The fact that this case will be tried by the Court further reduces any concern that Professor Black's testimony will improperly dictate the legal result. Unlike a jury, the Court is fully capable of distinguishing proper expert testimony from an ultimate legal conclusion, applying the governing legal standard independently, and disregarding any formulation that crosses the line into an impermissible opinion on law. In fact, the Commonwealth Court in Pennsylvania articulated this point when qualifying Professor Black as a historical expert. The Court overruled an objection that Professor Black's testimony impermissibly provided a legal opinion, "finding his testimony was factual in nature," and simply noted that "[t]o the extent Professor Black proffered any legal opinion testimony on the interpretation of the Education Clause, the Court does not consider it." *William Penn Sch. Dist. v. Penn. Dep't of Educ.*, 294 A.3d 537, 549 (Pa. Commw. Ct. 2023).

Rule 704 reinforces the distinction between expert testimony offered to assist the court in deciding an issue and expert testimony offering a legal conclusion that tells the Court what result to reach. An opinion is not objectionable merely because it "embraces an ultimate issue." Fed. R. Evid. 704(a). That rule does not authorize experts to instruct the Court on law, but neither does it

convert specialized testimony into a legal opinion merely because it bears on the Court's eventual legal analysis.

**B. Plaintiff's legislative-fact argument does not establish a categorical evidentiary bar.**

Plaintiff attempts to avoid *Berry* by recasting Professor Black's historical testimony as inadmissible "legislative facts." Pl.'s Black Mot. 7–8. Coble Intervenors address that categorical argument more fully in their Opposition to Plaintiff's Motion to Exclude Expert Testimony of Steven Green. *See* Opp. to Mot. To Exclude Green 5. As explained there, legislative facts *are* admissible, and courts regularly rely on experts' opinions about legislative facts. Opp. to Mot. to Exclude Green 5.

Plaintiff's dependence on *Silvers*, *Moore*, and *Bruen* does not establish otherwise; those authorities address the distinction between legislative and adjudicative facts and the Court's ultimate decisional responsibility, not a categorical bar on expert testimony concerning legislative facts. *See id.* And *Nathan v. Alamo Heights Independent School District*, 173 F.4th 576 (5th Cir. 2026), *petition for cert. filed* (U.S. Aug. 17, 2026)—which Plaintiff relies on, Pl.'s Black Mot. 6—was wrongly decided and is at odds with the weight of authority. Opp. to Mot. to Exclude Green 4–5.

The public-function cases Plaintiff relies on also do not preclude the expert testimony here. Coble Intervenors do not dispute that the ultimate state-action determination is a question of law reviewed de novo, or that courts distinguish legal questions from case-specific adjudicative facts. *See Romanski v. Detroit Entertainment, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005); *U.S. Bank National Ass'n v. Village at Lakeridge, LLC*, 583 U.S. 387, 394 (2018). Those propositions address who decides the ultimate legal issue and the standard of appellate review; they do not answer what historical or specialized material a district court may consider in reaching that legal determination.

*Halleck* does not alter this conclusion. Plaintiff notes that the Supreme Court independently consulted historical sources when determining whether operation of public-access channels was a traditional public function. Pl.'s Black Mot. 7–8. That shows the Court must consider the pertinent history and decide what legal significance it carries. *Halleck* did not address the admissibility of expert historical testimony. And while *Wittstock v. Mark A. Van Sile, Inc.* confirms that "under the public function test, the court conducts a historical analysis," 330 F.3d 899, 902 (6th Cir. 2003), it says nothing about what historical material the Court may consider in doing so. The Court's responsibility to decide and the admissibility of evidence informing that decision are different questions.

Within this Circuit, courts have received expert material relevant to historically grounded legal questions while retaining responsibility for the legal determination. For example, in *Saginaw Chippewa Indian Tribe of Michigan v. Granholm*, the court admitted competing historical experts addressing the historical understanding of nineteenth-century treaties. 690 F. Supp. 2d 622 (E.D. Mich. 2010). The experts' historical disagreements required evaluation of their work, not categorical exclusion. That is the same process Coble Intervenors propose here. Professor Black supplies historical and education policy expertise. The Court independently determines the legal test and applies it to the facts it deems relevant to reach the ultimate legal conclusion.

Plaintiff separately argues that Professor Black's testimony is inadmissible because he uses the phrase "traditional and exclusive government function," terminology that also appears in the state-action cases. Pl.'s Black Mot. 8–9. Plaintiff relies on *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985), for the proposition that exclusion may be appropriate when an expert employs terms having a "separate, distinct and specialized meaning in the law different from that present in the vernacular."

At most, *Torres* and *Berry* support limiting an expert from using specialized legal terminology to tell the fact finder that the governing legal standard has been satisfied. Both *Torres* and *Berry* arose in jury trials, where the concern was that a witness using specialized legal terminology could effectively instruct the jury on the governing law or tell it what result to reach. See *Torres*, 758 F.2d at 150–51; *Berry,* 25 F.3d at 1353–54. That concern is substantially reduced here, where the Court—not a jury—will decide the state-action question. In any event, Coble Intervenors do not offer Professor Black to tell the Court that the legal standard for state action has been satisfied. His testimony concerns the historical development of public education, the role of charter schools, and the institutional considerations and responsibilities that bear on that inquiry. Notwithstanding, even if the Court concludes that Professor Black uses the terminology of the public function doctrine too closely, the appropriate remedy would be narrow. The Court can disregard anything it deems to be a legal conclusion while considering the historical and education policy analysis beneath it. Plaintiff therefore identifies, at most, a potential basis to limit Professor Black's use of the terminology of the public function doctrine—not to exclude his historical analysis.

## III. Professor Black Possesses Ample Qualifications to Provide the Opinions Expressed in His Expert Report.

Professor Black's qualifications are more than sufficient to satisfy this prong of the standards for admitting expert witness testimony. In the infrequent instances where a court excludes an expert's testimony, "it is rarely on qualification grounds." *W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*, 300 F. Supp. 2d 600, 604 (W.D. Tenn. 2004); *see also McCown v. Norfolk S. Ry. Co.*, 2026 WL 1244797, at *2 (E.D. Tenn. Apr. 6, 2026) (noting that Rule 702's qualification requirement "has always been treated liberally"). An expert may be qualified by "knowledge, skill, experience or training," and a specific formal degree is

"neither a necessary nor a sufficient condition" for qualification. *Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003). What matters is "the competence a particular proffered witness would bring to bear on the issues." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981).

By that governing standard, Professor Black is thoroughly qualified: he has devoted his career to the history, law, and policy of American public education, including book-length historical treatments, and his *curriculum vitae* as well as the range of work he described in his deposition reflect exactly the knowledge, skill, and experience Rule 702 demands. In fact, he has been qualified *as a historical expert* in prior litigation. Plaintiff's contentions that Professor Black is not qualified to opine on matters of history fail because they rely on labels this Circuit has long instructed courts to look past, while ignoring his pertinent training, knowledge, and skill, and his vast relevant experience. Moreover, Plaintiff does not dispute the education policy expertise that additionally makes Black qualified to render the opinions in his report. Plaintiff resorts to citing misleading snippets of Professor Black's deposition testimony without the context that makes clear he is thoroughly qualified in these areas.

**A. Professor Black is qualified to give expert testimony on historical matters.**

Professor Black has both relevant training and extensive experience in historical scholarship. Plaintiff cites no legal support for the contention that the lack of a degree in history disqualifies an expert from providing historical analysis. To the contrary, courts recognize that an expert witness may be qualified by education or by other experience, and no particular degree, title, or position is dispositive. *Zuzula*, 267 F. Supp. 2d at 713 ("[A]lthough a degree might be helpful in determining qualifications, since valid assumptions safely may be drawn from the general training one receives on the way to a diploma, it is neither a necessary nor a sufficient condition for qualification as an expert . . . , and qualification may be based on knowledge, skill,

experience or training as well."). Professor Black is qualified to render opinions with a historical component based on both his education and his vast relevant knowledge, skill, and experience.

Plaintiff erroneously contends that Professor Black has no relevant education or training simply because his degrees were not issued by university history departments.[6] Pl.'s Black Mot. 9. But when determining expert admissibility, a trial court "should not rely on labels." *Mannino*, 650 F.2d at 850. As Professor Black himself explained, "history itself is interdisciplinary, and so it lives within multiple different disciplines." Black Dep. Tr. 63:2–63:12. Professor Black has a degree in African and African American studies, which he noted was "primarily a historical . . . discipline," with most of the instructors being history professors, as well as a degree in Political Science, which also included a significant American history component. Black Dep. Tr. 36:14–36:22. The fact that Black's terminal degree is a J.D. rather than a Ph.D., and that he is not a member of an organization of professional historians, are irrelevant as long as he has other appropriate training or experience. *Starr v. Hill*, 2012 WL 12868271, at *3 (W.D. Tenn. Mar. 1, 2012) ("Absence of certificates, memberships, and accreditations does not in and of itself detract from the competency of the expert witness which otherwise exists.") In fact, Professor Black's legal training heightens his qualification to offer expertise in constitutional history specifically. If Plaintiff's position were correct—that only scholars officially labeled as "historians" or appointed in history departments are qualified to be experts on historical matters—it would exclude scholars in Political Science, African American Studies, Latin American Studies, Anthropology, or

[6] Plaintiff makes a similar argument based on the absence of words like "history" from Professor Black's website. Pl.'s Black Mot. 9-10. Professor Black explained that the website is for a specific purpose—promotion of book sales and media presence, Black Dep. Tr. 79-81, not an exhaustive description of the subjects on which he is qualified to opine in a court of law.

Education— whose work is deeply historical. Such an absurd result cannot flow from a proper interpretation of Rule 702.

In addition to relevant training, Professor Black also has extensive, relevant knowledge, skills, and experience in historical research and analysis, which alone is sufficient to make him qualified to offer the opinions in his report. *Kush Enters., LLC v. Massachusetts Bay Ins. Co.*, 2021 WL 3007263, at *6 (E.D. Tenn. July 15, 2021) ("The principle of *Daubert* is to make certain that an expert, whether basing testimony upon professional studies *or personal experience*, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.") (internal quotations omitted) (emphasis in original). As evidenced by his report and *curriculum vitae* and elucidated in his deposition, Professor Black has published numerous books, articles, and essays with significant historical components. Black Rep. ¶¶ 2-3; Black CV (ECF No. 111-3, Ex. C); Black Dep. Tr. 23:8–24:23, 52:23–68:10. His book *Schoolhouse Burning*, for example, is an extensive work on "the history of the right to public education in the United States." Black Dep. Tr. 64:5–64:25. Professor Black also incorporates history as a crucial element of the curriculum in several courses he teaches to law students, and he has the benefit of many years of teaching that historical material. *Id.* at 40:1–41:16.

Indeed, Professor Black has been widely recognized as a qualified historian. He has been asked to sit on Ph.D. committees for candidates receiving their degrees in disciplines including American history (*id.* at 37:13–37:21) and invited to testify before Congress on matters of education history (*id.* at 91:21–91:25). *Schoolhouse Burning* was published by the non-academic publishing company Hachette, but two prominent academic publishers also made offers to publish it—Oxford University Press and Yale University Press—and both of them subjected it to peer review in making that decision. *Id.* at 64:5–65:22. Professor Black's most recent book, *Dangerous*

*Learning*, was subject to "an extraordinary amount of historical scrutiny." *Id.* at 65:23–67:11. It was reviewed by historians both before and after publication, including "one of the nation's foremost historians, David Blight at Yale University." *Id.* at 66:17–67:11. The book was peer-reviewed and received "sign-off and approval … by those historians before it went to publication." *Id.*[7]

Plaintiff's motion makes much of an alleged lack of peer review of Professor Black's publications. Pl.'s Black Mot. 9. The Sixth Circuit has recognized that peer review is not a prerequisite to qualifying as an expert witness. *See First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334–35 (6th Cir. 2001) (declining to exclude expert testimony, even absent peer review, because the traditional *Daubert* factors "may be of limited utility in the context of non-scientific expert testimony"). In any case, much of Professor Black's key scholarship has indeed been subjected to peer review, including by historians, and with favorable results, i.e., publication in major journals or offers of publication by elite academic publishers. Professor Black's historical scholarship passes muster with top scholars and academic publishing houses.

Professor Black has even previously served as an expert witness on historical topics. In the case of *William Penn School District*, the trial court "qualified [Professor Black] as an expert in 'the history of education law with a specialty in the history of state constitutional education

[7] Plaintiff seizes on a line in the acknowledgements in *Dangerous Learning* in which Professor Black thanks two law librarians for introducing him to "genuine historical research." Pl.'s Black Mot. 9. From that, Plaintiff suggests that *Dangerous Learning* was Black's first legitimate work of historical scholarship, and that his reliance on earlier publications thus undermines his report. This is incorrect. Black explained that the acknowledgment referred to the librarians' ability to locate sources he had not expected to be readily accessible, not to his first exposure to historical research generally. Black Dep. Tr. 75:23-78:9. Second, his earlier works, including *Schoolhouse Burning*, likewise constitute substantial historical scholarship. Black Dep. Tr. 64:5–65:22. Finally, even assuming arguendo that Professor Black only became qualified to offer his historical expertise in the past two or three years, he still would have possessed that expertise when he developed the report at issue here. *Id.* at 23:2–21, 66:22–67:11.

clauses.'" 294 A.3d at 549 (quoting trial transcript at 918-19). In summarizing his relevant qualifications, the Pennsylvania court noted that Professor Black had "published more than 30 articles and a textbook about education law, policy, and history with a focus on the history of education clauses in state constitutions." *Id.* (quoting trial transcript at 905-12). Professor Black has also been offered as an expert witness in the pending cases of *Columbus City School District v. State of Ohio*, in which his expert report focuses on the history of public education in Ohio, and *Cruz Guzman v. State of Minnesota*, in which his expert report analyzes the history of the right to education in Minnesota. Black Dep. Tr. 91:6–91:25.

There is no legitimate doubt that Professor Black is qualified to offer historical expertise, especially in the specific areas related to K-12 education that are covered by his report. He has not only relevant training, but a vast store of knowledge, skill, and experience recognized by other top historical experts. This Court should deem him qualified as well.

**B. Professor Black is qualified to offer education policy expertise.**

In addition to his qualification to provide expert opinions on historical matters, Professor Black is qualified in another major area of expertise he offers the court: education policy. *See* Black Dep. Tr. 26:9–29:13 (witness explaining that his expertise in education includes both historical expertise and functional policy expertise). Courts in this circuit have recognized the value of such policy expertise. *See W. Tenn. Chapter of Associated Builders & Contractors, Inc.*, 300 F. Supp. 2d at 606 (denying motion to disqualify and accepting testimony of proffered expert because "[h]is expertise and knowledge in the realm of public policy analysis will be helpful to the fact finder"); *Reed v. Rhodes*, 1 F. Supp. 2d 705, 712 (N.D. Ohio 1998), *aff'd*, 215 F.3d 1327 (6th Cir. 2000) (relying on an "expert in the area of educational policy research methods, policy analysis, school desegregation plans and magnet schools"). Professor Black's policy expertise drove a significant portion of the analysis in his expert report. *See* Black Dep. Tr. 26:9–29:13.

Professor Black has ample training, knowledge, skill, and experience to be considered qualified to render expert opinions on education policy. The subjects in which Professor Black holds his degrees, including Political Science and law, are clearly and directly tied to public policy. Prior to entering academia, he engaged in education litigation and policy work at the Lawyers' Committee for Civil Rights Under Law. Black Rep. ¶ 5. Professor Black has taught courses on education law and policy at multiple universities. Black Dep. Tr. 40:1–40:20, 43:1–43:22. His scholarship, such as his book *Ending Zero Tolerance*, includes a significant policy component. *Id.* at 53:5–53:24. He has been called upon by policymaking bodies, including the U.S. Congress, to offer his expertise. And he has been accepted as an expert on education policy in previous litigation. Feldman Decl. Ex. 2, *Jindal v. U.S. Dep't of Educ.*, No. 3:14-cv-00534-SDD-RLB, Evidentiary Hearing Tr. 8:5–9:14 (M.D. La. May 29, 2015), ECF No. 71.

Plaintiff's motion does not include a single word questioning Professor Black's qualification as an education policy expert. Given his extensive credentials and experience in this area, the Court should deem Professor Black qualified to provide expertise on education policy as well as education history—the two areas of expertise he draws upon in his proffered report.

## IV. Professor Black's Methodology Meets the Criteria for Reliability and Plaintiff's Criticisms Bear Only on the Weight the Court Should Accord His Testimony.

Professor Black's methodology also satisfies the discipline-specific reliability inquiry required by Rule 702. The traditional *Daubert* factors do not operate as a rigid checklist for nonscientific expertise; the relevant question is whether the expert employed "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1349–50 (6th Cir. 1994). Consistent with that standard, the Sixth Circuit recognizes that the reliability

of nonscientific expert testimony may rest on disciplinary knowledge and practical experience. *Barreto*, 268 F.3d at 334–35.

Here, Professor Black applied the ordinary tools of social scientific inquiry: he examined and synthesized primary and secondary sources, situated those materials in their historical context, and drew on decades of relevant experience. *See* Black Rep. ¶¶ 8–11, 19–22. Such methodology is commonly accepted by courts receiving this type of expert testimony. *See, e.g., vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 451 (D.S.C. 2019) ("By reviewing historical documents and applying his experience, . . . [plaintiff's expert] used the common tools of a historian"); *United States v. Kantengwa*, 781 F.3d 545, 562 (1st Cir. 2015) (finding that acceptable historical methodology includes, for example, "gathering multiple sources . . . including original and secondary sources," to reach conclusions about historical facts).

Plaintiff's claim that Professor Black's expert opinions are "based on little to no research" (Pl.'s Black Mot. 10) is false. Professor Black did not conduct any *new* national-level research because he had researched and written about the history of public education for most of his career; instead he combined that existing scholarship with new Tennessee-specific research. *See* Black Rep. ¶ 21 (emphasis added). He likewise conducted a separate new analysis of Tennessee charter school statutes, their evolution, state and federal reports, and relevant policy materials. *Id.* His research and opinions thus rest on both extensive prior expertise and research tailored to the subject matter of this case.[8]

[8] Plaintiff also claims that Professor Black's reliance on his scholarship is insufficient because he could not point to prior writings on "whether the provision of free education open to all is a traditional and exclusive government function." Pl.'s Black Mot. 10. But that is unsurprising. Professor Black spent roughly 60 hours preparing his report. Black Dep. Tr. 23:2–23:7. He used his existing relevant research, and new research, to analyze a specific question he had not previously answered, or had not answered in depth, in the context of the subject matter of this case.

Plaintiff's argument that Professor Black's methodology is unreliable because there exists evidence contrary to his conclusions fails for two reasons. As an initial matter, Rule 702 asks whether those opinions rest on a reliable foundation, which they do, as explained above, not whether the movant agrees with the expert's interpretation of the evidence. See *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008). Any asserted disagreement with the expert's analysis therefore warrants careful evaluation and cross-examination, not wholesale exclusion. *See Saginaw Chippewa*, 690 F. Supp. 2d at 636–37, 643.

Furthermore, Plaintiff implies that caselaw contains numerous examples of "private schools that offered free education open to all from the time of Reconstruction to the present day" (Pl.'s Black Mot. 11) but cites only one case, *Logiodice*, and one specific example of such schooling that supposedly contradicts Professor Black's conclusions. Both *Logiodice* and the example cited by Plaintiff concern the same unusual, and highly localized, program – one existing in only three New England states and providing public funding to pay for private school tuition for students in districts that do not operate their own public schools. Pl.'s Black Mot. 11.

Moreover, this one example does not contradict Professor Black's conclusions. The private schools at issue in the New England example are not analogous to the charter schools that are the focus of this case and the proffered expert testimony. As opposed to Tennessee charter schools, which are legally prohibited from charging tuition, the Maine high school at issue in *Logiodice* charged tuition for every student, and it was either paid by individual families or for those in the tuition program, was paid by their school district. The Maine private school also exercised selective admissions practices over some students, which is again legally prohibited in Tennessee charter schools. And Maine has a unique history of school districts not operating public high

schools and therefore contracting with private schools instead, with no analogous history in Tennessee.

Indeed, Professor Black testified during his deposition that the situation in *Logiodice* was "far different" from the instant case. Black Dep. Tr. 201:21–202:2. Plaintiff asserts that when "confronted" with this example during his deposition, Professor Black offered no reason to doubt its veracity. Pl.'s Black Mot. 11. This is misleading in several ways. First, the transcript shows that when opposing counsel introduced the example of these New England tuition programs by "mak[ing] certain representation to [Professor Black] about what the [*Logiodice*] opinion says," it was unclear whether Professor Black should respond as to whether he had any reason to doubt that the judicial opinion had made the statements opposing counsel provided or whether he had any reason to doubt those statements were substantively true. *See* Black Dep. Tr. 193:18–196:22. Second, when this example was first introduced during the deposition, Professor Black questioned the assertion that the schools in the program were open to all. *Id.* at 194:9–194:14. Third, the witness was clearly focusing on whether he had reason to doubt opposing counsel's representations about the years the court said the three states began the program at issue, not the details of how the program was described. *See id.* at 195:1–197:9.

Finally, Plaintiff erroneously contends that Professor Black based his testimony on "outcome-oriented inconsistencies," claiming that he relied on two distinct definitions of "free and open to all." Pl.'s Black Mot. 12. In attempting to create an inconsistency where there is none, Plaintiff repeatedly mischaracterizes Professor Black's testimony, saying that on one hand he claims that individual public schools can be free and open to all, but on the other hand that private schools cannot be free and open to all because they have never provided a system of free schooling. That characterization is incorrect. Professor Black consistently emphasizes that public schools,

including charter schools, are part of a system of public schools that are free and open to all. Black Rep. ¶¶ 87, 91; Black Dep. Tr. 120:24–122:8, 230:2–232:19. Plaintiff claims that in his report, Professor Black opines, specifically at ¶87, that individual charter schools are free and open to all. However, Plaintiff conveniently omits a key statement made at the beginning of the paragraph: that "Tennessee's charter schools are public schools under state law and firmly entrenched within Tennessee's system of public education." Similarly, while Plaintiff claims that in his deposition, Professor Black "agreed that 'an individual school' could qualify as 'free and open to all'" (Black Dep. Tr. 119:25–122:8; Pl.'s. Black Mot. 12), Plaintiff conveniently omitted Professor Black's full response to that question. Professor Black testified that "public schools operate as a system. And that's a really important piece of the puzzle here." Black Dep. Tr. 120:24–122:8. In both his report and deposition, he made clear that his historical inquiry in this case focuses on the development and operation of public education systems, including the institutions, legal structures, and governmental responsibilities that define those systems. Black Rep. ¶¶ 23–25, 43, 66, 71, 87–91; Black Dep. Tr. 99:3–100:5, 130:15–131:20, 230:2–232:19.

The Sixth Circuit has emphasized that "[t]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529–30. Professor Black's conclusions are clearly supported by extensive facts and skilled analysis, meaning the determination before the Court is the weight they should be given, not their admissibility.

## Conclusion

For these reasons, the Coble Intervenors respectfully request that the Court deny Plaintiff's Motion to Exclude Expert Testimony of Derek Black.

Dated: August 18, 2026

Respectfully submitted,

MORRISON & FOERSTER LLP

By: */s/ Adam J. Hunt*


Adam J. Hunt*
Morrison Foerster LLP
250 West 55th Street
New York, NY 10019-9601
Telephone: 212.336.4341
Facsimile: 212.468.7900
Email: AdamHunt@mofo.com

Mitchell E. Feldman*
Morrison Foerster LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
Telephone: 617.648.4759
Facsimile: 617.830.0142
Email: MFeldman@mofo.com

Jon McNeal*
Morrison Foerster LLP
12531 High Bluff Drive, Suite 200
San Diego, CA 92130-3588
Telephone: 858.720.5100
Facsimile: 858.720.5125
Email: JMcNeal@mofo.com

Wanqian Zhang*
Morrison Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415.718.9737
Facsimile: 415.268.7522
Email: WZhang@mofo.com

Lucas Cameron-Vaughn (BPR# 036284)
American Civil Liberties Union Foundation
of Tennessee
P.O. Box 120160
Nashville, TN 37212
Telephone: 615.645.5067
Email: Lucas@aclu-tn.org

Daniel Mach*
Heather L. Weaver*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20008
Telephone: 202.675.2330
Facsimile: 202.546.0738
Email: dmach@aclu.org

Sophia Mire Hill (BPR# 040755)
Sam Boyd*
Neil Ranu*
Lauren Winkler*
Michael Tafelski*
Southern Poverty Law Center
150 E. Ponce de Leon, Suite 340
Decatur, GA 30030
Telephone: 504.457.1553
Email: sophia.mire@splcenter.org
Email: sam.boyd@splcenter.org
Email: neil.ranu@splcenter.org
Email: lauren.winkler@splcenter.org
Email: michael.tafelski@splcenter.org

Jessica Levin*
Wendy Lecker*
Patrick Cremin*
Katrina Reichert*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: 973.624.1815
Facsimile: 973.624.7339
Email: jlevin@edlawcenter.org
Email: wlecker@edlawcenter.org
Email: pcremin@edlawcenter.org
Email: kreichert@edlawcenter.org

Samuel T. Grover*

Alex J. Luchenitser*
Luke Anderson*
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: 202.466.3234
Facsimile: 202.217.3783
Email: luchenitser@au.org
Email: anderson@au.org

Kyle J. Steinberg*
Freedom From Religion Foundation, Inc.
10 N. Henry St.
Madison, WI 53703
Telephone: 608.256.8900
Email: sam@ffrf.org
Email: steinbergk@ffrf.org

* Admitted *pro hac vice*

*Attorneys for Coble Intervenor-Defendants Rev. Dr. Richard Coble, Amanda Collins, Kerry Dooley, Elizabeth Porter, and Rev. Dr. Katina Sharp*