# Exhibit 1

# Transcript of Derek W. Black

**Date:** July 6, 2026
**Case:** Wilberforce Academy of Knoxville -v- Knox County Board of Education

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)
- - - - - - - - - - - - - - - x
THE WILBERFORCE ACADEMY OF :
KNOXVILLE, :
Plaintiff, :
v. : Case No.
KNOX COUNTY BOARD OF : 3:25-cv-584-CEA-DCP
EDUCATION, et al., :
Defendants, :
RICHARD COBLE, et al., :
Intervenor-Defendants, :
ADRIENNE CARROLL, et al., :
Intervenor-Defendants. :
- - - - - - - - - - - - - - - X

Deposition of DEREK W. BLACK
Conducted Virtually
Monday, July 6, 2026
10:05 a.m. EDT

Job No.: 638081
Pages 1 - 270
Reported by: Debra A. Whitehead



Deposition of DEREK W. BLACK, conducted virtually.

Pursuant to notice, before Debra Ann Whitehead, E-Notary Public in and for the Commonwealth of Virginia.



A P P E A R A N C E S
ON BEHALF OF PLAINTIFF:
RYAN PROCTOR, ESQUIRE
RACHAEL WYRICK, ESQUIRE
CONSOVOY McCARTHY, PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423

ON BEHALF OF DEFENDANTS:
JESSICA JERNIGAN-JOHNSON, ESQUIRE
DEPUTY LAW DIRECTOR
KNOX COUNTY, TENNESSEE
400 Main Street, Suite 612
Knoxville, Tennessee 37902
(865) 215-2327

ON BEHALF OF INTERVENOR-DEFENDANT RICHARD COBLE:
JESSICA LEVIN, ESQUIRE
PATRICK CREMIN, ESQUIRE
WENDY LECKER, ESQUIRE
EDUCATION LAW CENTER
60 Park Place, Suite 300
Newark, New Jersey 07102
(973) 624-1815



A P P E A R A N C E S C O N T I N U E D
ON BEHALF OF INTERVENOR-DEFENDANT RICHARD COBLE:
ALEX J. LUCHENITSER, ESQUIRE
LUKE ANDERSON, J.D., Litigation Fellow
AMERICANS UNITED FOR SEPARATION OF
CHURCH AND STATE
1301 L Street NW, Suite 200
Washington, DC 20005
(202) 466-2005
- and -
MITCHELL E. FELDMAN, ESQUIRE
MORRISON & FOERSTER LLP
John Hancock Tower
200 Clarendon Street, Floor 21
Boston, Massachusetts 02116
(617) 648-4759

ON BEHALF OF INTERVENOR-DEFENDANT
ADRIENNE CARROLL:
THOMAS H. JARVIS, ESQUIRE
BAKER DONELSON
265 Brookville Centre Way, Suite 600
Knoxville, Tennessee 37919
(865) 549-7132

5

A P P E A R A N C E S   C O N T I N U E D

ALSO PRESENT:

DAVID MIELCAREK, A/V Technician

6

C O N T E N T S


| EXAMINATION OF DEREK W. BLACK | PAGE |
| --- | --- |
| By Mr. Proctor | 10 |
| By Ms. Levin | 261 |
| By Mr. Proctor | 267 |


E X H I B I T S

(Attached to the Transcript)


| BLACK DEPOSITION EXHIBIT | | PAGE |
| --- | --- | --- |
| Exhibit 1 | Expert Report of Derek W. Black | 19 |
| Exhibit 2 | Curriculum Vitae, Derek W. Black, Exhibit 2 | 34 |
| Exhibit 3 | Excerpt, Ending Zero Tolerance: The Crisis of Absolute School Discipline (Families, Law, and Society) | 55 |
| Exhibit 4 | Back of Book, Ending Zero Tolerance: The Crisis of Absolute School Discipline (Families, Law, and Society) | 60 |
| Exhibit 6 | Derek W. Black Website | 78 |
| Exhibit 7 | Article, Religion, Discrimination, and the Future of Public Education, by D. Black | 250 |


7

E X H I B I T S   C O N T I N U E D


| BLACK DEPOSITION EXHIBIT | | PAGE |
| --- | --- | --- |
| Exhibit 9 | 37 Federal Reporter, 4th Series, Peltier | 190 |
| Exhibit 19 | Westlaw, Espinoza v Montana Department of Revenue, 591 U.S. 464 (2020) | 132 |
| Exhibit 20 | Excerpt, The State and the Non-Public School 1825-1925, by L. Jorgenson | 135 |
| Exhibit 21 | Expert Report of Steven K. Green, J.D., Ph.D. | 141 |
| Exhibit 22 | U.S.C.A. Northwest Ordinance, Ordinance of 1787: The Northwest Territorial Government | 167 |
| Exhibit 23 | OH Const. Section 3 | 172 |
| Exhibit 24 | OH Const. Article I, Section 7 | 174 |
| Exhibit 27 | 296 Federal Reporter, 3rd Series, Zachariah Logiodice v. Trustees of Maine Central Institute | 191 |
| Exhibit 28 | Marson v Makin, Brief of Amici Curiae, Education and Constitutional Law Scholars in Support of Respondent | 197 |


8

E X H I B I T S   C O N T I N U E D


| BLACK DEPOSITION EXHIBIT | | PAGE |
| --- | --- | --- |
| Exhibit 39 | Excerpt, Dangerous Learning, by D. Black | 68 |

9

PROCEEDINGS
MR. PROCTOR: Ryan Proctor, on behalf of Plaintiff Wilberforce Academy of Knoxville.
MS. WYRICK: Rachael Wyrick, on behalf of Wilberforce Academy.
MS. LEVIN: Jessica Levin, from Education Law Center, on behalf of the Coble Intervenors.
MR. CREMIN: Patrick Cremin, from Education Law Center, on behalf of the Coble Intervenors.
MR. LUCHENITSER: Alex Luchenitser, Americans United for Separation of Church and State, on behalf of the Coble Intervenors. And I might be in and out of this deposition at some points.
MS. LECKER: Wendy Lecker, Education Law Center, on behalf of Coble Intervenors.
MR. ANDERSON: Luke Anderson, Americans United for Separation of Church and State, on behalf of Coble Intervenors.
MR. FELDMAN: Mitchell Feldman, Morrison Foerster, also on behalf of Coble Intervenors.
MR. JARVIS: And Tom Jarvis of Baker Donelson, on behalf of the Carroll Intervenors.
DEREK W. BLACK,

10

having been duly sworn, testified as follows:
MR. PROCTOR: Just before we get started, I would like to note for the record that nobody from the Knox County Board of Education is here.
David Sanders from their office sent us an email this morning saying that they will probably not have someone until noon, and that we're okay to start without them.
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. PROCTOR:
Q Okay. Great. Professor Black, would you mind stating your full name, for the record.
**A Derek W. Black.**
Q And do you understand that you're under oath?
**A Yes, I do.**
Q And do you understand that the oath you just took carries the same force as an oath given in a courtroom?
**A Yes.**
Q Do you understand that the court reporter can only take down verbal answers, so you need to answer out loud with words. And if you answer with a nod or a gesture or an uh-huh or an unh-unh, that's going to be hard to capture on the

11

transcript?
**A Sure. I don't normally do that over Zoom, but if I do, feel free to remind me that I did not.**
Q Do you understand the court reporter can hear only one person talking at a time, so you'll need to let me finish each question before you begin your answer?
**A Yes.**
Q Okay. Do you agree that if a question is unclear, you will tell me so I can rephrase it for you?
**A Yes.**
Q And do you understand that if you answer a question, I will take it that you understand the question?
**A Yes.**
Q Okay. Do you understand that your testimony today can be used in court, including at trial?
**A Yes.**
Q Are you taking any medication or do you have any medical condition that could affect your ability to testify truthfully and completely today?

12

**A No.**
Q Is there anything preventing you from testifying truthfully and fully today?
**A No.**
Q Do you understand that you're to answer my questions without help from your attorneys?
**A Yes.**
Q Have you been deposed before?
**A Yes.**
Q How many times have you been deposed before?
**A Once.**
Q And what was the case?
**A That was in Federal District Court, Jindal versus United States Department of Education.**
Q And was that also as an expert witness?
**A Yes, it was.**
Q And what were you opining on in that case?
**A That case involved a dispute between the State of Louisiana and the U.S. Department of Education regarding No Child Left Behind waivers. I think they also had some claims regarding race at the top.**

**I was opining as to the overall policy structure of how schools were held accountable under No Child Left Behind versus under the No Child Left Behind waiver system.**

Q Besides this Zoom window, do you have any applications open on your computer right now?

**A No.**

Q Are there any documents, books, or materials in front of you or next to you?

**A I have a blank legal pad here, and I have my report -- oops -- report here. It's -- I have clipped it into the different sections just in case you start moving me around. But this is just the report with some clips on it. And I have my to-do list up here, but that's it.**

Q Okay.

**A Not to-do list for this, but to-do list in life.**

Q So nothing related to the case or your testimony on the to-do list?

**A No.**

Q Do you have any written notes on your copy of the report?

**A I do not.**

Q Outside of preparing your expert report,



what did you do to prepare for this deposition?

**A I reread my report. I -- as well as two of my prior reports in another case. And I spoke with counsel about preparations for this.**

Q How many times did you speak with counsel?

**A We met twice -- well, I should say after the report I think we met twice. And then we met again this morning, which would be the third time.**

Q And how much time total did you spend preparing for your deposition with counsel?

**A With counsel?**

Q Uh-huh.

**A I think we met for around two hours and 15 minutes or so the first time. The second time we met for about four-and-a-half hours or so. And then this morning we met for about 30 minutes.**

Q Did you review any documents during those prep sessions?

**A No, I did not.**

Q Did you meet with anyone else to prepare for this deposition?

**A No.**

Q Was anybody present at your prep sessions other than you and counsel?



**A No.**

Q In your total preparation for this deposition, did you review -- not just your meetings with counsel, did you review any documents not already listed in your expert report or the CV attached to it?

**A No.**

Q How did you become involved in this litigation?

**A Counsel reached out to me I think in late March or sometime in April, that's my recollection, and wanted to chat. And then during the course of that conversation asked if I would be willing to serve as an expert in this case.**

Q Which counsel?

**A Jessica -- I cannot recall whether both of them were on the phone call or not. I think they were, but it would be Jessica Levin and Wendy Lecker, I believe it was.**

Q So counsel from the Education Law Center.
Is that right?

**A Correct.**

Q Do you have a preexisting relationship with the Education Law Center?

**A I don't have any formal relationship with**



**the Education Law Center, but I certainly have known Wendy and Jessica for quite a long time.**

**Well, I shouldn't say I don't have any formal. I also am an expert witness in a Minnesota case in which Wendy is counsel. I don't know whether Jessica is counsel in that case or not.**

Q Sorry, when you say "Wendy is counsel," do you mean in her capacity as an attorney for the Education Law Center?

**A Yes. It is my understanding, although I haven't checked the pleadings, that Wendy Lecker is one of the counsel of record in Cruz Guzman, I do not know whether Jessica Levin is counsel record of Cruz Guzman or not.**

Q Have you ever served or participated as an expert witness in any other cases in which the Education Law Center has been involved?

**A No.**

Q What about the American Civil Liberties Union; have you participated as an expert witness in any other cases where they have been involved?

**A I don't think so, but as you might -- I should say I have not participated and had a relationship with them as counsel. Some of these**

17

**cases have many parties and attorneys on them, and so I don't generally, you know, get involved with the whole team.**
**So it's possible, but I don't think so.**
Q What about the Americans United For Separation of Church and State?
**A I would give the same answer there. I don't think -- I'm pretty sure I have not with them. It's just ACLU has a pretty wide footprint.**
Q What about the Southern Poverty Law Center?
**A The Southern Poverty Law Center? I don't believe so.**
**Could you rephrase the question? I mean, not rephrase --**
Q Sure.
**A -- just make sure I'm not missing something.**
Q Have you participated as an expert witness in any other case where the Southern Poverty Law Center is also participating?
**A I do not believe that I have participated as a witness in any case the Southern Poverty Law Center is counsel in. I don't think -- I'm pretty sure it's not in this report. I had asked four or**

18

**five years ago whether I would serve as an expert in a racial harassment case. You know, they've never given me anything to do. I don't know if that case is still going on or not going on. And I don't know if the Southern Poverty Law Center was involved in that. I think that they were. But I've never done any work or received any compensation in that case.**
Q All right. And then last one of these, what about the Freedom From Religion Foundation?
**A Not -- not that I'm aware of, no.**
Q Are you being paid for your testimony today?
**A Yes, I am.**
Q How much are you being paid for your testimony today?
**A I have a separate sort of fee structure for the report versus the testimony. But, you know, you're only asking for the testimony. So as to today, $350 an hour.**
Q And how much are you being paid for the report?
**A The report had a cap of -- I think it was a flat rate of $12,500. And sometimes I offer that option. You know, people want to control**

19

**their budgets and not have me go over and do too many hours, whatever. So, you know, I agreed to that amount. Which I don't have the total number of hours that I spent on it, but I think that would probably have come out to 200 or 250 an hour, something like that.**
Q So, and then outside of the expert report, how many hours have you billed to date on your work in this case?
**A Outside of the expert? Well, I haven't billed any yet, but I've probably -- I think I have an Excel spreadsheet.**
**But I told you earlier the time that I spent with them, which was a two and a half hour, you know, four and a half hour, then half hour. And I would say I've probably got, you know, four, five hours of my own time, you know, outside of that.**
MR. PROCTOR: Dave, can we pull up Exhibit 1.
(Black Deposition Exhibit 1 marked for identification and is attached to the transcript.)
MR. PROCTOR: Sorry, Counsel, did you want -- do you want this PDF, or do you already have this one printed out?

20

MS. LEVIN: Yeah, we don't need this one. We've got this one.
MR. PROCTOR: Okay. Great.
So I'll represent that we received this document in discovery from the Coble intervenors.
Q Professor Black, do you recognize this document?
**A When you -- yeah, now I do, yes.**
Q Sorry. And if you need to scroll through it, you know, at any time, just please let us know, obviously. And I think we even have the ability to give you control, your screen control, if that would be helpful at any point.
MS. LEVIN: Well, let me just ask Professor Black if he wants the PDF to put on, you know, a monitor or -- would you like that?
THE WITNESS: I don't -- the question really is whether he has any objections rather than I. If this is the expert report that I sent, then I've got a hard copy here in front of me, which is page numbered the same, at least the first page is page numbered the same as what he's showing me.
**A I mean, I will look at what you're showing. But if I needed to read, you know, a**

21

**page before or a page after, I could also just**
**flip open this hard copy.**
Q Okay. Do you recognize the document on
the screen?
**A Yes, I do. Yes.**
Q And what is the document on the screen?
**A That's my expert report.**
Q Okay. Great.
How many cases total have you testified
as an expert witness?
**A Well, it's one, two, three, four, five --**
**well, we should distinguish between testified**
**versus having submitted reports.**
**But if you look at cases in which I've**
**testified, I've testified in one, two, three --**
**I've only testified in three, but I submitted an**
**expert document or an affidavit or report in one,**
**two, three, four -- four additional cases. So**
**three testimonies and -- and then four additional**
**expert reports.**
Q Okay. Let me see if I can make this
easier for both of us.
Would you agree that Paragraphs 12 to 18
of your expert report lists all the cases in which
you've participated in any capacity as an expert

22

witness?
**A Yes. Yes.**
Q Does this expert report contain all the
opinions that you will express in this litigation?
**A Yes.**
Q Does this expert report contain the basis
and reasons for your opinions?
**A Well, let me back up.**
**If you were to ask me a question that was**
**beyond the scope of this, I suppose I could**
**potentially be required to answer it. But I don't**
**have any intention to ask -- answer any questions**
**or have opinions beyond what's in this report.**
Q Great. So I appreciate the
clarification.
And then, so, does this report contain
the basis and reasons for your opinions?
**A Yes, it does.**
Q Did counsel for any party in this case
provide you with any facts or data that you
considered in forming your opinions?
**A No, they did not.**
Q Did counsel for any party in this case
provide you with any assumptions that you relied
on in forming your opinions?

23

**A No, they did not.**
Q How much time did you spend preparing
your expert report?
**A I think it was -- again because it was a**
**flat rate, I can't sort of do the math off the top**
**of my head. But I did keep track of my time. I**
**want to say it was around 60 hours.**
Q And how much time did you spend
researching the national history of public
education?
**A I didn't spend any additional time**
**researching the national history of public**
**education in the country. I've written books**
**about that.**
**You know, as I indicate in my report, I'm**
**always adding depth to that knowledge. So**
**whatever happens in Tennessee, you know, that's**
**additional sort of nuances that can be added.**
**But I did not go and do any sort of new**
**research regarding the history of public**
**education. Other than refer to my own prior work.**
Q Yeah. So would you look at Paragraph 21
with me for a minute.
**A Yes.**
Q And then could you read the second

24

sentence? After you've had a chance to look at
the paragraph in full, could you read the second
sentence -- or second and third sentences for me.
**A "I have been researching and writing**
**about the history of public education for most of**
**my academic career. Thus, I did not conduct new**
**research on the national history of public**
**education, but rather drew on my existing**
**knowledge while also consulting my prior**
**scholarship on the subject."**
Q And how much time did you spend
consulting your prior scholarship on the subject?
**A I mean, I didn't disaggregate. I mean,**
**it's hard for me to disaggregate this now.**
**I mean, most of that I can, you know,**
**have conversation off the top of my head on, to be**
**quite frank, because I sort of am always doing it**
**to some extent, sort of thinking about it, I**
**guess.**
**I went back and looked at and looked over**
**some of my seminal work on that. So anyway, I**
**mean, I would guess, you know, probably less than**
**five hours, I would think.**
Q Less than three hours?
**A I mean, I don't know. I mean, again, I**

25

**wasn't disaggregating it in my mind.**
Q How much time did you spend researching the history of Tennessee public education?
**A Yeah, I spent a lot of time on that. So that was, I mean, I would guess more than 20 hours on that, would be my guess.**
Q More than 30 hours?
**A Probably not. Just because I'm thinking about the fractions of, you know, how much time I would have had to spend on the other sections.**
**I mean, it's possible I got close to 30 hours, but I don't think so.**
Q And how much time did you spend researching Tennessee charter schools?
**A That's probably around ten, ten to 20. Again, as I give these ranges, you know, how they all perfectly add up to 60, I may be off a number or two. But I would think ten to 20 hours on that.**
Q Did anyone assist you in preparing your expert report?
**A No.**
Q What expertise did you apply in forming your opinions?
**A I applied my expertise of identifying and**

26

**finding historical documents, my expertise of terms of art that are often used in education history and discussions, expertise in sort of understanding the structure of how education was created and has evolved over time.**
**So I've used my expertise in those respects to interpret and understand and synthesize the material that I'm looking at.**
Q Would historical expertise be a fair umbrella term for the kinds of expertise you just listed?
**A Well, let me -- for what I just listed, I think historical -- that is -- that is part of it. But again, you can have historical expertise for terms of art, but not necessarily understand structure.**
**So there is sort of this structural component of public education that history alone wouldn't tell you. Certainly the structure is part of it.**
**I should also add, when you asked the question initially I was really sort of in my mind reflecting on the historical part of the report. When we move forward to the charter, that's a different type of expertise there because that's**

27

**sort of modern education policy.**
**So what I'm looking at there is sort of understanding how an education policy and education structure, what that actually does in terms of creating accountability and relationships between states, local districts, charter schools, federal government, et cetera.**
**So I have this policy expertise in education as well as this history expertise in education.**
Q So then let's -- your report sort of breaks your analysis down into two questions presented.
Is that right?
**A Yes.**
Q Okay. And so then your first question presented is whether the provision of free education open to all is a traditional and an exclusive government function.
Is that right?
**A If I can find that page.**
Q Sure. Sure. Of course.
**A That sounds correct, but I'm reluctant to just agree with you.**
Q Of course. It's on Page 3, Paragraph 7

28

of your report. Or I guess it's not numbered, but it's Page 3.
**A Yes, I think you -- if I recall, you reread the first question. I don't know whether you reread the second question or not.**
**But, yes, those on Page 3 and 4 were the questions that I was asked to look at.**
Q So was the expertise that you applied on the first question presented primarily historical?
**A Yes, that one, whether the provision of free education open to all is traditional, that is primarily a historical one. But there is also a functional policy component to that, as well. Because, you know, when you provide free education or create an education system, we do that through structure, which can vary across time.**
**So primarily historical, but also sort of a structural policy analysis as well.**
Q And then what expertise would you say you -- how would you characterize the expertise that you applied specifically for the second question presented?
**A Yeah, the second question is primarily -- well, the second question has got both history and policy in it, but it's more heavily weighted I**

29

suppose in terms of policy.
But there is certainly the -- the history of charter schools themselves, along with how they were structured originally, nationally. And then I sort of look at it more specifically in Tennessee. And Tennessee's charter school program also has a history to it, responding to specific, you know, sort of educational objectives in the State of Tennessee, et cetera. And then trying to create a framework to achieve those objectives.
So, but it is heavier on the policy and less on the history, but it does involve some history.
Q When you say "structure," how do you determine an education system's structure?
A Well, education is structurally complicated. Unfortunately for some folks you have -- at the very least you have three or four different public actors that are involved in the process.
So you might have state government, then you're going to have local school district, or a local charter school, which is also treated as an LEA in many respects.
And then you have the regulated entity or

30

sort of the local school itself, the principal there, the teachers.
So you have these sort of multiple levels of people who are executing sort of one policy. And then we have the federal government that's also involved in that.
And so you have shared responsibilities as to some things, you have exclusive responsibilities as to others. And so it is a -- you know, the kids receive it, the children, the students receive it as one sort of thing when they show up at school; but there are ultimately multiple different actors that are interacting with one another through this sort of shared responsibility.
And, you know, the amount of responsibility that, you know, each actor has is normally, you know -- can shift across -- can shift across time.
Q And how do you go about determining which actor has which responsibility?
A Well, you've -- normally you're going to have at least two things that are related to that. Well, I say "two," but it -- it's complicated.
You know, you can have a state

31

Constitutional text that could say, you know, X, you know, the state does this, the district does that; or the state raises money, the state does that. It could also assign things to the district.
Then you're going to have statutes, which is, you know, the legislature sort of creating another structure. And then you might have a State Department of Education creating an additional structure. And then you could have a local school board or charter school with their own set of policies creating another structure.
You could then have the labor union of the teachers creating another structure within that structure. And then you've got the principal, and then you've got the teachers.
So, you know, you really, depending on the question -- I mean, sometimes, you know, if we're not talking about, you know, a teacher strike, then some of that might be irrelevant. But then you've got the federal government sort of mandating, you know, antidiscrimination.
So, you know, ultimately I think you really have to look at what is the particular scenario being examined. And then each scenario

32

may implicate a different piece of that structure, depending on, you know, what the particular dispute is about or function is.
Q So in answering the second question presented, what sources and materials were you looking at to determine the relevant structure?
A Yeah, on -- on that, the -- looking only at Tennessee's -- now, I did -- you know, the part on the national history has some other sources. And you could see them, and they're cited in here.
For history, all of charter schools, so there are some other secondary sources that I consulted there.
As to Tennessee's charter schools themselves, I looked at the original charter school bill. I looked at some of the State Department of Education's documents and reports about their charter schools as well. And I looked at updates to the charter school law, so subsequent amendments to the charter school law.
That -- I mean, again, looking at the background overall context, as I indicated I had to look at some other secondary resources. So I do recall -- and I think I have some citations in here -- the national -- the National Alliance of

33

**Public Charter Schools, but some national charter school organizations also.**
Q Sorry, were you finished with your answer, Professor?
**A Yeah. I think she spoke as I was just saying, I was referencing that I looked at some other national charter school organization type materials as well, which are cited in the -- in the report.**
Q So you said that you looked at some documents and reports from the Tennessee Department of Education.
Are those the materials that you cited in the report?
**A Yes.**
Q Okay. Did you make policy judgments in answering the questions presented in your expert report?
MS. LEVIN: Objection. Vague and ambiguous as to "policy judgments."
**A Am I supposed to answer? I'm sorry.**
Q You're free to answer, if you'd like.
**A Okay. Sorry for the awkward pause there.**
**Yeah, I mean, I -- the word "judgment" would seem to me to imply that I am a policy maker**

34

**and I can do A or B, and which one do I think is better.**
**So in terms of me making a judgment of what's better or worse, I did not get into that type of policy judgment here regarding charter schools.**
MR. PROCTOR: David, could we pull up Exhibit 2, please.
(Black Deposition Exhibit 2 marked for identification and is attached to the transcript.)
MR. PROCTOR: And Jessica, if at any time you want to pause so you can print something out, just let me know. But for some of these, I'm going to assume you might already have them and ready.
MS. LEVIN: Let me ask the witness just to tell us if he needs a pause to print this out or wants the PDF link. But I don't need it.
MR. PROCTOR: Okay. Perfect.
David, could you scroll down a page?
Q So I'll represent that we received this document in discovery from the Coble intervenors.
Do you recognize this document?
**A It looks like my CV.**
Q And how do you know that?

35

**A Those are my publications there at the top, yeah.**
Q Great. And is the CV you submitted with your expert report up to date?
**A I don't have a more up-to-date version. You know, I'm always sort of, you know, speaking and this, that, or another. So it's possible -- well, I should say, and I -- you know, I don't list every engagement on there. But I do not recall having given any new lectures or published any -- publishing anything new since I submitted.**
Q So you received your bachelor of arts in the University of Tennessee.
Is that right?
**A That's correct.**
Q And you received your B.A. in 1999.
Is that right?
**A That's correct.**
Q And you triple majored.
Is that right?
**A That's correct.**
Q And you majored in African-American studies, philosophy, and political science.
Is that right?
**A That's correct.**

36

Q What did you study in philosophy?
**A Oh, you know, the Plato, Socrates, you know, existentialism. Also a fair amount of religion as well. I almost had a religious minor, I think, if I would have taken one more class. But anyway.**
Q I just asked, my wife is getting her Ph.D. in philosophy, so I always admire people who study philosophy.
Did you have any minors?
**A I did not have any minors, no.**
Q So you didn't major or minor in history.
Is that right?
**A I did not major or minor in history, no. No, I did not. Although I would add that, you know, African-American studies was primarily a historical sort of discipline. You know, most of those professors were history professors.**
**So, but no, I didn't major or minor in history. And the political science also had a good deal of American history in it as well. But I did not have a major or minor in history.**
Q After graduating did you go straight through to law school?
**A I did.**

37

Q And you received your J.D. from the University of North Carolina.
Is that right?
**A That's correct.**
Q And you received your J.D. in 2002.
Is that right?
**A That's correct.**
Q Do you have a master's degree of any kind?
**A I do not.**
Q Do you have a Ph.D.?
**A I do not.**
Q Do you have any other degrees?
**A I do not. Although I would add, even though it's not specifically your question, I am asked by Ph.D. committees in American history and other things, education policy as well, so I do sit on committees for people receiving their Ph.D.s, which is nice, I suppose.**
**But I did not have any advanced degrees beyond those you listed.**
Q After you graduated law school, you worked in the U.S. Postal Service Law Department.
Is that right?
**A That's correct.**

38

Q And what did you do there?
**A Employment litigation.**
Q Could you expand on that a little?
**A Oh, sorry. I just didn't think you would be that interested.**
**Well, at that point in time the United States Postal Service was the largest, if you can believe it, the largest employer in the United States, by a good margin.**
**So we had -- you know, I don't remember, it was 2.1 million employees or 1.2 million employees. But we had a -- we had a lot of employees. And so we had a lot of cases that went to the DC Circuit Court of Appeals. That was the then direct appeal from a variety of sort of lower -- both lower courts and -- and some administrative agencies.**
**So I did appellate employment law work, primarily dealing with, you know, Merit System Protection Board rules and regulations.**
Q And after the Postal Service, you worked at the Lawyers' Committee for Civil Rights Under Law.
Is that right?
**A That's correct.**

39

Q And what is the Lawyers' Committee for Civil Rights Under Law?
**A The Lawyers' Committee for Civil Rights Under Law was established in 1964 at the call of President Kennedy for the private bar to become more involved with dealing with racial segregation and discrimination in the United States. And so it was formed at that point.**
**Obviously I was -- well, you know, 40-some-odd years after that before I went -- well, about 40 years after that.**
**But, you know, we work with private law firms to -- sort of like the staff attorneys and other folks to be the expert in the subject-matter area, and then work with law firms on issues of racial discrimination, primarily.**
Q Would you characterize that as public-interest work?
**A Yeah, I would characterize that as public-interest work.**
Q After the Lawyers Committee, you worked at Howard University School of Law.
Is that right?
**A That's correct.**
Q And what did you do there?

40

**A I taught a number of classes, depending upon need. I could go through them, if you'd like. But I taught a number of classes there. And I found and directed the Education Rights Center.**
Q What kind of classes did you teach? You don't have to list every single one.
**A Yeah, I taught -- I mean, the first year I thought civil procedure to fill in. After that I taught torts every year, then I taught education law and policy every year. I taught social justice lawyering most years. I taught a civil rights class most years.**
**And then, also reflected on my CV, I also taught classes for the School of Education while I was there. So they had -- they requested me to teach a few different classes. And we started a program for students -- education leaders pursuing advanced degrees. And so I taught a few classes for them as well.**
Q Did you teach any history courses?
**A Not courses that were specifically named in history, but, of course, civil rights cases have sort of a history to them. And so certainly we cover that in classes. The social justice**

**lawyering course would as well, education law course has a history to it as well. But no course named history, no.**

Q So you would, you know, discuss history as relevant in your law school classes.

Is that right?

**A I mean, I -- not discover -- not discuss them -- not that you were suggesting that. But I didn't sort of just randomly discuss them. But I would teach, you know, history that's relevant to the subject matter.**

Q So you would teach history as relevant to the subject matter of your courses at the law school.

Is that right?

**A That's correct.**

Q While you were at Howard, you also spent a year as a visiting professor at the University of North Carolina.

Is that right?

**A That's correct.**

Q What did you do there?

**A I taught Constitutional law and torts.**

Q Did you teach --

**A And I -- what's that?**



Q Sorry. I interrupted you. I will let you finish.

**A And I also provided technical assistance to the UNC Center For Civil Rights.**

Q What's the UNC Center For Civil Rights?

**A That's a good question. It has -- it has undergone some changes across time, so I can't speak to what its current form and structure is.**

**But at least when I was working there, they did community work, they did sort of education and engagement. They did litigation. They did regulatory work. They did policy reports and things of that sort.**

Q And is that based out of the law school?

**A That is based out of the law school, yes.**

Q And I'm sorry, my memory failed me.

What two courses did you mention you taught there?

**A Torts and Constitutional law.**

Q Did you teach any other courses besides torts and Constitutional law?

**A I did not.**

Q After leaving Howard University, you now work at the University of South Carolina.

Is that right?



**A That's right.**

Q And you are a professor at the law school there.

Is that right?

**A That's correct.**

Q So what do you do as a professor at the law school at the University of South Carolina?

**A I teach my courses. I don't want to go through all the sort of details of the worst parts of committee work and that sorts of things.**

**But serve on committees, and meet with students, mentor students, direct the Constitutional Law Center, speak, lecture outside of the law school. Those sort -- those sorts of things.**

Q What kind of courses do you teach?

**A I teach Constitutional law, education law and policy. I teach evidence. I teach a voting rights course. I've taught civil rights for several years, but not in the last couple. And, yeah, I think that's -- I don't think I'm leaving off anything.**

Q Do you teach any history courses at the University of South Carolina?

**A I do not teach any courses that are**



**specifically titled history. But, of course, as we discussed with some of those classes at -- at the -- at Howard, there is a good deal of history.**

**You know, I still recall, for instance, my -- my third con law class here, we had a number of international students. And my Constitutional law class. And after about two weeks the student comes up with a dismayed look on his face. And he says, Professor Black, do I need to know American history to pass this course?**

**And I regretfully said, No, but it sure does help.**

**And, you know, which is really sort of testament to, you know, how much history is part of teaching that class and has really become more so over the years.**

**So again, Constitutional law is not titled history, but to understand -- to understand many of those cases you have to understand them in their historical context.**

**So I do a good deal of history in that class and bring in actually some historical primary documents into that class to give students a sense of things. And the same thing in educational law as well.**

45

Q And are all your courses listed at the law school?
**A You mean do I teach any courses that are listed in another department? Is that what you mean?**
Q Yes.
**A Yeah, I don't think there's anything cross-listed. Although I did have a Ph.D. student in history who wanted to take my education law class. Or maybe no, it was my civil rights class, actually. Several years ago. And we had authorized that.**
**I don't remember what the specific -- whether they gave a code number to the history department or whatever. But they are not generally co-listed in any other department.**
Q Are you a member of the American Historical Association?
**A No, I am not.**
Q Are you a member of the Organization of American Historians?
**A No, I am not.**
Q Are you a member of any professional organization for historians?
**A No, I am not.**

46

Q So I'm looking now at Page 1 of your CV.
Your CV listed Full Length Articles and Essays.
Is that right?
**A Yes.**
Q Okay.
MS. LEVIN: Do you want to scroll to the page that you're referencing?
MR. PROCTOR: Oh, yeah.
David, could you scroll to PDF Page 2, which is Page 1 of the CV.
A/V TECHNICIAN: Would it be easier if I give control to somebody?
MR. PROCTOR: Sure, you can give control to me.
A/V TECHNICIAN: All right. You should be able to have control after you click on the screen.
MR. PROCTOR: Great. Thank you.
Q I think I already asked this, but just to make sure I didn't lose my place. Your CV here listed your Full Length Articles and Essays.
Is that right?
**A That's correct.**
Q And they are listed on Pages 1 to 3 of

47

your CV.
Is that right?
**A That looks right, yes.**
Q All the full length articles and essays in your CV were published in law journals.
Is that right?
**A Yes, that's correct.**
Q And are all those law journals student-edited?
**A They are all student-edited. Although they should all have faculty advisors as well. And many -- several of them, I should say, to varying different degrees, seek peer reviews or outside input onto the -- whether to accept an article.**
Q Do you know which of those journals?
**A Well, we can go through them, if you'd like. Just go up to the top and we can -- I can -- I can't profess to know exactly what goes on behind closed doors on all of them.**
**But certainly the Yale Law Journal has peer review. I do not know whether Virginia Law Review does or not. I have some inkling that sometimes they do, sometimes they don't.**
**UC Irvine is -- I just know that it is --**

48

**it is blind review, so they don't know who the author is when they accept an article. Which is them trying to -- or is them mirroring some of the processes in other journals. I don't know whether they seek peer review.**
**I should also say the Yale Law Journal does -- does blind reviews as well.**
**Northwestern University I know does seek outside peer review from time to time because they've requested me to do peer review on articles. So whether they did or didn't on the two articles I published with them, I can't -- I can't say for sure.**
**NYU, I don't know. Notre Dame, I don't know. Cornell Law Review has gone to blind review. And again, that -- when you go to blind review you do sometimes ask others, but I can't speak beyond that.**
**Stanford Law Review does have peer review. The California Law Review, I know there was some peer review on that because I received that peer review feedback. We already talked about -- I don't think Washington University does. I already talked about Northwestern.**
**I don't think William & Mary does.**

49

**California we already spoke to. Vanderbilt I don't know. Wake Forest at least not on that particular article, but on another one that I did with them, had sought some peer review of that.**

**And that's probably it, although you could -- you could scroll down a bit if you wanted to.**

**Yeah, I think that's it.**

Q Okay. So for the journals you mentioned that either do peer review or may do peer review, what kind of scholars are performing the peer review?

**A You know, I can't -- I can't speak to that because it's blind review. So I don't know who they're -- who those folks are.**

Q Do you know if the reviewers are law professors?

**A I don't know who they are. I would be willing to say that I would expect that they are. But if you look at the pool of law professors, you know, I think three years ago like three-quarters of the people in the pool of law professors were J.D./Ph.D., or at least had some other advanced degrees.**

**So things are changing, so I guess it**

50

**would be hard -- it would be hard for me to speculate.**

**I wouldn't imagine there's anyone without a J.D. performing that peer review. But I think there is a high possibility or likelihood that folks with a J.D. and some additional advanced degree may have done peer review on some of them.**

Q So do you know if any of your full-length articles and essays were peer-reviewed by a professor in a history department?

MS. LEVIN: Objection. Calls for speculation. He said he doesn't know who they are.

Q You are free to answer.

**A I don't know. I don't know who they are, to be quite honest.**

**I should say, I mean, full honesty, I did -- they did ask a Supreme Court Justice, Goodwin Liu, if he would share his thoughts which he had supplied on my Stanford Law Review article. So that -- I know that he peer-reviewed the Stanford article.**

**I know that Michael Heise at Cornell Law reviewed my most recent Yale Law Journal. Because, again, you know, an author can ask to --**

51

**so they normally don't even, you know -- depending on the journal, they may not share the peer review. They may just sort of pass it on in their own words as to shield it.**

**But at least with the Yale one -- actually, Yale didn't share it. I actually learned that Michael Heise had peer-reviewed that because after they had accepted it for publication I reached out to him to ask if he could provide feedback. And he said he had already read the article because Yale had asked him to -- to look at it.**

**So sometimes, you know, you just kind of find out through -- through means like that accidentally.**

Q So we're turning now to -- sorry. Oh, I'm looking at the wrong document. Okay. Sorry.

MR. PROCTOR: David, could we pull up Exhibit 1 again.

Q So turning now to Section 4 of your report, starting on Page 4.

MR. PROCTOR: David, would you be able to scroll down to there, please.

A/V TECHNICIAN: Yes, you still have control.

52

MR. PROCTOR: Oh, I still have control? Thank you. My apologies.

David, to the extent you're able, if you're able to follow along and move to the pages, I'd appreciate that. But I understand if you can't.

A/V TECHNICIAN: No problem. I can do that.

MR. PROCTOR: Okay. Thank you.

Q So on Page 5 in Paragraph 9, you refer that -- you mention that you consulted your prior research.

Is that right?

**A That's correct.**

Q Okay. And you specifically consulted two of your -- two of the books you've authored.

Is that right?

**A Yes.**

Q And those books are Schoolhouse Burning and Education Law and Policy.

Is that right?

**A That's correct.**

Q Did you consult any of your other books?

**A No, I did not consult them. But, you know, I wrote -- wrote Dangerous Learning**

53

**relatively recently, so I have it pretty fresh in my mind. But it wasn't particularly -- I didn't -- I didn't go and consult it for this, for this report.**

Q And you authored the book Ending Zero Tolerance.

Is that right?

**A That's correct.**

Q What is the thesis of Ending Zero Tolerance?

**A The thesis of Ending Zero Tolerance is that certain aspects of school expulsion and discipline are inconsistent with Constitutional theory, I guess is the best way to put it.**

Q Would you say that -- or scratch that question.

Would it be fair to say that Ending Zero Tolerance is a book about education law and policy?

**A Yes, that would be fair to say.**

Q It's not a historical monograph, is it?

**A It's not a historical monograph, but it actually does have a history chapter in it as well.**

**So part of what I was -- you know, aside**

54

**from the sort of big-policy sort of big, sort of, legal theory things I was speaking of, you know, I said that you also have to understand school discipline as a matter of history and how schools' approaches to discipline have changed across time, particularly during desegregation.**

**So, you know, I could tell you more if you want to. But the short story is is that school discipline changed pretty radically during school desegregation in response to local white communities' concerns about their children going to school with black children. And so there were a lot of -- a lot of agitation, disruption, et cetera, in that history.**

**And then, you know, as a result of that, you know, schools took a harder approach to school discipline. I think relatively few people know that that's sort of part of the history.**

**So anyway, there is a -- there is a chapter on history in there as well.**

Q Do you know if Ending Zero Tolerance was peer-reviewed by historians?

**A I don't know if it was peer-reviewed by historians. I do know that it was peer-reviewed, though.**

55

MR. PROCTOR: David, could we pull up Exhibit 3, please.

(Black Deposition Exhibit 3 marked for identification and is attached to the transcript.)

MR. PROCTOR: And can we go to --

MS. LEVIN: We're going to need to print this out, if you could provide the PDF.

MR. PROCTOR: Sure.

A/V TECHNICIAN: Do you want me to drop the PDF to the chat?

MS. LEVIN: Yes, please.

A/V TECHNICIAN: Okay. This will take just a second. Give me just a moment, please.

MS. LEVIN: If you could give us time to print it, or if Professor Black needs to print it or otherwise some time to read through the document.

**A Looking at it, it looks fine to me. It looks like it's the front matter of the book. If I see something that I need to look at more closely, I can do so.**

MS. LEVIN: Okay. Please give us a moment to get it printed and look at it.

(A discussion was held off the record.)

MS. LEVIN: I need to object to

56

completeness of this document. I can't really -- yeah, I don't know if it's complete.

MR. PROCTOR: David, can you -- sorry, can you move to the second page of the -- the third page of the PDF, please. Okay.

Q Professor Black, do you recognize this title -- this page?

**A Yes.**

Q What is it?

**A It appears to be the sort of inside cover -- I mean, this is electronic. It says, Kindle, but the inside pages of my book Ending Zero Tolerance.**

Q And you mentioned this already, but do you see at the top how it says, Kindle?

**A Yes.**

Q Okay. So I'll represent to you that these are excerpts of your -- of your book Ending Zero Tolerance.

MR. PROCTOR: David, could you go back one page.

Perfect. All right.

Q So Ending Zero Tolerance was published by New York University Press.

Is that right?

57

**A Yes.**
Q And it was published as part of NYU Press's Families, Law, and Society Series.
Is that right?
**A Yes.**
Q It wasn't published as part of the American History and Culture Series.
Is that right?
**A No, it was not.**
MR. PROCTOR: Could you turn to PDF Page 7, David, please.
Q Do you recognize this page, Professor?
**A Yes.**
Q What is it?
**A That's my acknowledgments for the book.**
Q So according to your acknowledgments, Ending Zero Tolerance began as an idea for a law review article.
Is that right?
**A That's correct.**
MS. LEVIN: Sorry. I think is the text cut off at the bottom of this page? Because it doesn't -- the final sentence doesn't seem to flow to the next page.
MR. PROCTOR: I'm not sure.

58

MS. LEVIN: Okay. Well, then, I just object for completeness.
Q According to your acknowledgments, the -- sorry. Scratch that for a second. Okay.
According to your acknowledgments, Thomas Crocker and Josie Brown helped you develop the idea into that -- sorry. Scratch that.
According to your acknowledgments, Thomas Crocker and Josie Brown helped you develop the ideas that became Ending Zero Tolerance.
Is that right?
MS. LEVIN: Objection to completeness on this page.
Q You can answer.
**A Yeah, Tommy and Josie did assist me in the initial launching of that original idea, yes.**
Q Who are they?
**A Tommy Crocker is currently a professor of law at Boston College School of Law. Josie Brown is retired from the University of South Carolina School of Law.**
**At the time Tommy was a member of our faculty here at the University of South Carolina.**
Q And according to your acknowledgments, Ned Snow, Benjamin Means, and Colin Miller also

59

helped you refine the ideas for the book.
Is that right?
**A I mean --**
MS. LEVIN: I am going to object again for completeness.
I'm going to have the same objection to every question about this document and this page. So do you want to just stipulate to --
MR. PROCTOR: I'm happy to let you stipulate that, yeah.
MS. LEVIN: Okay.
**A I mean, I think -- and again, it's been a decade, more than a decade, well over a decade since I started this.**
**I mean, my recollection is that those first lines are referring to the law review article, rather than the book itself. But, you know, there's some ambiguity there. And I don't remember precisely who helped at what precise time.**
**I think the big thing was to acknowledge their most significant contributions. But certainly, yes, Tommy Crocker, Josie Brown, Ned Snow, Benjamin Means, and Colin Miller were all providing me insight and feedback into either the**

60

**article or the book, I just can't disaggregate in my mind. I think there is some ambiguity in my -- in my phrase there.**
Q And are those three individuals all law professors as well?
**A Yes, all those individuals are law professors. Tommy Crocker -- consistent with my earlier point about Ph.D.s, Tommy Crocker also has a Ph.D.**
Q And then at the bottom of the paragraph it says that the foundation for Chapters 6 and 7 of the book were provided by a law review article that you wrote.
Is that right?
**A That's correct.**
MR. PROCTOR: Can we pull up Exhibit 4 please, David.
(Black Deposition Exhibit 4 marked for identification and is attached to the transcript.)
Q Do you recognize this document?
MS. LEVIN: If you could give us a few minutes, we need to print this one as well.
Q Professor, do you recognize what's on the screen?
**A It appears to be the back cover of Ending**

61

**Zero Tolerance.**
Q Okay. And there are four -- sorry, let's zoom out a little.
MR. PROCTOR: David, can you zoom out? Thank you.
Q There are four reviews on the back, on this back cover.
Is that correct?
**A That's correct.**
Q Okay. And the first review is from James E. Ryan.
Is that right?
**A Yes.**
Q And he's listed as a professor at the Harvard Graduate School of Education.
Is that right?
**A Well, he was actually the dean of the school, Harvard Graduate School of Education. But as -- and I'm not really sure, to be quite honest, why that's not on there. Maybe he didn't want, you know, to suggest he was speaking on behalf of Harvard Graduate School of Education, or something like that.**
Q But he's not listed as a historian, is he?

62

**A No, he's not.**
Q And the second review is from Library Journal.
Is that right?
**A That's correct.**
Q And that's a trade publication for librarians. Correct?
**A I really don't know.**
Q Okay. To your knowledge, it's not a history journal, is it?
**A No, not to my knowledge.**
Q And the third review is from Kimberly Jenkins Robinson.
Is that right?
**A That's correct.**
Q And she's listed as a law professor.
Is that right?
**A That's correct.**
Q Not as a historian?
**A She is not listed as historian. Although, you know, I should just add for completeness sake, or just so that I can add, you know, schools of education, much like the work that I've done, do history work. There are people who are history of education policy, history of**

63

**education, et cetera, et cetera.**
**So there's history itself is interdisciplinary, and so it lives within multiple different disciplines. And so, you know, Jim Ryan has written a book which is -- well, at least one of his books was largely historical, published by Oxford University Press.**
**And I don't know whether Kimberly has authored any historical books or not, but she also has a -- she is currently at the University of Virginia, and she has a joint appointment in both the College of Education and the School of Law.**
Q And the fourth review is by Erwin Chemerinsky.
Is that right?
**A That's correct.**
Q And he is listed as the Dean of the University of California, Irvine School of Law.
Is that right?
**A That's correct. He's currently the dean at Berkeley School of Law.**
Q And --
**A Jim Ryan is not at Harvard Graduate School of Education, either; he's at the University of Virginia now.**

64

Q And Erwin Chemerinsky is not listed as a historian.
Is that correct?
**A That's correct.**
Q So you also authored the book Schoolhouse Burning: Public Education and the Assault on American Democracy.
Is that right?
**A That's correct.**
Q And what is Schoolhouse Burning about?
**A It is about the history of the right to public education in the United States.**
Q What history in particular does it discuss?
**A It traces the sort initiation both in idea and in practice of public education from the nation's founding through to today. Or at least through to whatever year it was. 2020, I guess.**
Q And Schoolhouse Burning was published by Public Affairs.
Is that correct?
**A That's correct.**
Q And is Public Affairs -- what relationship does Public Affairs have to Hachette?
**A It is a subsidiary of Hachette, yes.**

65

Q Okay.
**A Although now it's subsumed under some other subsidiary, the book industry.**
Q And Hachette is a trade publisher.
Is that correct?
**A That's correct.**
MS. LEVIN: Objection. Vague and ambiguous as to "trade publisher."
Q Hachette is not an academic publisher, is it?
**A Hachette is not an academic publisher. Well, I don't know whether they publish any academic books or not. But at least -- yeah, I don't know. But they're -- they are -- I think that will suffice. They may or may not have some, but they did purchase or make an offer on my book to publish it for a general audience.**
**Although I should add for completeness sake that Oxford University Press and Yale University Press both made offers on that book, and both of them subjected it to peer review in that process.**
Q And you've also authored the book Dangerous Learning: The South's Long War on Black Literacy.

66

Is that correct?
**A That's correct.**
Q And what is Dangerous Learning about?
**A Dangerous Learning is about the history of the repression of black people's ability to read and write during slavery, and then sort of how that connects to the repression of both public education and black people's access to it afterwards.**
**It's also a story of the history of black people's resistance against that repression both during slavery and after slavery.**
MS. LEVIN: We've been on the record for well over an hour. Would this be a good place to stop and take a break?
MR. PROCTOR: Sure.
**A Can I just add to that question, just so we don't forget it and maybe it's helpful. Well, I don't know if it's helpful or not to you, Ryan, but it may be helpful to me.**
**So speaking of sort of history review, the book Dangerous Learning was subjected to what I found to be an extraordinary amount of historical scrutiny, which made the book a much -- made it a long process.**

67

**It was reviewed by a group of historians prior to them accepting publication, and then a group of folks after publication. It also went through the board, one of the nation's foremost historians, David Blight at Yale University, he's on lots of TV now for the 250th anniversary of the United States, he was part of that team.**
**And so I received, we'll just say a lot of peer review and feedback and assistance, and the sign-off and approval of that book by -- by those historians before it went to publication.**
MR. PROCTOR: Jessica, do you want to say five minutes, or would you like a different amount of time?
MS. LEVIN: Five minutes is good.
MR. PROCTOR: Okay. Great. So 11:30, we'll see you then.
MS. LEVIN: Okay.
(A recess was taken.)
BY MR. PROCTOR:
Q All right. Great. I believe we were discussing your book, Dangerous Learning.
**A Yes.**
Q When did you begin writing Dangerous Learning?

68

**A Dangerous Learning? I probably started on it in some shape, form, or fashion in late 2020, sometime 2021, something like that. Probably 2021.**
Q And when was the book published?
**A 2025.**
Q And when did you start doing research for the book?
**A If my memory serves me correctly that I started in 2021, then the answer would be 2021.**
MR. PROCTOR: David, could you pull up exhibit -- hold on one second, actually.
Could you pull up Exhibit 39.
(Black Deposition Exhibit 39 marked for identification and is attached to the transcript.)
MS. LEVIN: Okay. We'll need to print this, and I'll appreciate your patience on that.
I'll note for the record that this is the method that was suggested by plaintiff's counsel for there to be paper copies of the exhibits when we discussed the need to have hard copies before the deposition. The discussion taking place before the deposition, not to read the copies before the deposition.
MR. PROCTOR: So I agree that --

69

MS. LEVIN: Another moment, Mr. Proctor. I'm sorry, did you want to speak to that? I was only asking you to hold your questioning until we can --
MR. PROCTOR: I'm responding to you. I agree we agreed that we would share the PDFs and you would have the option of printing them. I don't think that we agreed that, you know, we would be spending time on the record, you know, printing it out before we would start anything. And I think this is the fourth -- we didn't -- we certainly didn't agree to hold questions. And this is the fourth -- this is the fourth deposition we've had remotely in this case. And that's not how we proceeded in any of those prior ones.
So, you know, the fact that we agreed to that courtesy, you know, did not stop us from being able to ask questions and have Professor Black look remotely if he is able to see it, you know, like every other witness in a remote deposition in this case has proceeded.
MS. LEVIN: The other remote depositions were being taken by defendant intervenors' counsel, by our team, not by yours. Right?

70

But for --
MR. PROCTOR: That's not true. Because we took -- we took Holly Slater's deposition as well.
MS. LEVIN: Okay. Well, we had offered several ways to be able to have the copies already printed before the deposition, either for you to send them to us in a sealed package or to send us an electronic copy that we would print out beforehand. But this was the method proposed and chosen by plaintiffs' counsel.
So we have it now. We can proceed with the questions.
MR. PROCTOR: All right. It's not our practice to share exhibits in advance of depositions. And indeed, you know, in the interest of time, we're going to make very explicit that we never at any point agreed that we're going to hold all questions while printing happens.
You know, if it's very important, you're welcome to ask for a break to print. But we're not going to necessarily agree to use up record time on printing, which is not something that has happened at any point in this litigation.

71

MS. LEVIN: Please feel free to proceed with your questioning.
Q Okay.
MR. PROCTOR: Sorry, David, do you have Exhibit 39 up?
A/V TECHNICIAN: Yes. Are you not able to see it?
MR. PROCTOR: I'm not seeing it either.
A/V TECHNICIAN: It looks like something is going wrong with my screen share, so let me try and reshare. I apologize for that. I don't know why this would be happening.
It's not showing up on your end, is it?
MR. PROCTOR: No.
A/V TECHNICIAN: Well, that's some technical difficulty with Zoom, I think. Because the preview window is -- I'm sharing the screen, but the preview window is empty on my end. I am going to try again.
MR. PROCTOR: Okay. I know we just got back on the record, but, David, if it would be -- if you need a few minutes to figure it out, we can take a break if needed.
A/V TECHNICIAN: I may have to log out and log back in. I apologize. I don't know if

72

there is any other way to fix this. This is some Zoom glitch.
MR. PROCTOR: Okay. By "log out" do you mean like close the meeting or do you just need to --
A/V TECHNICIAN: I will give host to Debbie, I will log out, and log back in. I don't think there is any other way to fix this. I apologize.
MR. PROCTOR: Okay.
(A discussion was held off the record.)
COURT REPORTER: Do you want to go off the record?
MR. PROCTOR: Sure, yeah.
(A discussion was held off the record.)
BY MR. PROCTOR:
Q Professor Black, do you recognize this page?
**A That's the cover of my book.**
Q And do you see how at the top it says, Kindle?
**A Yes.**
Q So I'll represent these are excerpts of the Kindle version of dangerous -- your book Dangerous Learning.

73

MS. LEVIN: I'll object for completeness.
MR. PROCTOR: If you'd like to -- this will keep happening. Happy to stipulate that you preserve any objection to us introducing as an exhibit excerpts of a book rather than an entire book.
MS. LEVIN: Sure. And I'll object to this document specifically. We can just stipulate to that for all your questions about this document.
MR. PROCTOR: Okay. Great.
David, can we go to PDF Page 9.
Q Do you recognize this page, Professor?
**A Yes, I do.**
Q And what is it?
**A It is the Acknowledgments for my book Dangerous Learning.**
Q Okay. So you mentioned in the acknowledgements that your colleague, Bob Bockman, was your muse.
Is that correct?
**A Well, you know, I -- that is certainly what I wrote. I don't know how I would define "muse."**
**But, yes, Bob and I spoke on -- you know,**

74

**I would learn things or find little details. Or even I would find a thing that -- that wasn't new to me, but I wanted to see whether, you know, Bob found it interesting. Bob and I read a lot of the same books.**
**So certainly spent a lot of time, you know, talking with Bob and just sort of sharing the story of the book along the way.**
Q And is Bob Bockman a law professor?
**A Bob Bockman is -- he is retired. He was a -- he was a professor here at the law school. He's -- I think he actually is still nonetheless in today, I'm not sure what his specific relationship is with the law school at this moment.**
Q Was he, at the time you wrote Dangerous Learning, was he a historian?
**A He -- I guess it depends on how you -- what you mean by "historian."**
**I can tell you that Bob Bockman is extremely well read and knowledgeable, gives me books on a regular basis that he has read. But to my knowledge, he does not have a formal Ph.D. or master's in history.**
Q And then in the acknowledgements you also

75

say -- forgive me if I'm saying her name wrong -- Inge Lewis and Ashley Alvarado were the first and last readers of the full manuscript.
Is that correct?
**A That's correct. And what I mean by that, just to be clear, not for any sort of substantive quality check. But I always want to be accessible to readers. And so they are support staff here at the law school.**
**Although I think -- Inge a did work at the -- prior to coming to the law school, Inge did work at the South Carolina University Press, which is a peer-reviewed press. And Ashley has an advanced degree I think in literature.**
**So in any event, the point of sharing with them was simply to say does the nonacademic reader, so to speak, follow what I'm saying or find this to be an interesting story.**
Q And you relied on the law school librarians Michael Mounter and Candle Wester.
Is that correct?
**A That's correct.**
Q And you said they introduced you to genuine historical research.
Is that right?

76

**A I said that they introduced me to that. The word "genuine" is sort of a loaded term, so to speak. I could understand why you might focus on it.**
**Michael Mounter has a Ph.D. in history. He has assisted a number of faculty with writing history books and history materials. And so what I'm really referring to there is the ability to locate -- locate documents that you wouldn't -- I wouldn't have suspected would have been accessible or I would have suspected would have meant, you know, I'd have to travel to California to get them or Pennsylvania. And somehow or other Michael knows, you know, as a librarian, sort of knows how to get these things electronically.**
**And so just allowed me to go deeper into things like a letter between, you know, a guy living in Albemarle County whose name is lost to history, who had written a letter to his brother. And, it's -- you know, it's kind of interesting flavor to add. And so when you're trying to add that additional flavor, you kind of have to know where in the haystack to look.**
**And so, yeah, when you're trying to find that sort of -- that level of detailed narrative**

**flavor, Michael was -- was extremely helpful in locating those documents for me.**

MR. PROCTOR: David, could you turn to the next page.

Q I just want to make sure, Professor, that you have the chance to read --

**A Sure.**

Q -- the -- I mean, feel free to read all of it.

**A I read some actually while you and Jessica were discussing matters, so ...**

Q Okay. Great.

So Michael helped you find sources when you weren't able to find them through an internet search?

Is that right?

**A Yeah. Or in the library. You know, we have a number of materials here. And sometimes those materials actually are here.**

**I mean, you know, one of the things that's sort of interesting is how, you know, you look for a thing as being a primary source. And you look for the primary source and you say, Oh, the primary source is in Washington, DC.**

**But then Michael goes, Oh, but Derek, you**



**know, actually the Salmon Chase's papers are downstairs. And so as the recipient of that letter, actually you don't need Charles Sumner's papers; you can go to Chase's, and we have those downstairs.**

**So, yes, again, you know, he was very helpful in finding those things; but it wasn't just always internet. Sometimes we were looking at sort of libraries as well.**

MR. PROCTOR: David, could we pull up Exhibit 6.

(Black Deposition Exhibit 6 marked for identification and is attached to the transcript.)

Q And it's two pages.

MR. PROCTOR: David, could you scroll through both pages.

MS. LEVIN: And can you put it in the chat as well.

A/V TECHNICIAN: Hold on, please.

It should show up in the chat right now for everybody.

MS. LEVIN: Okay. Just give a --

Q Professor, do you recognize this web page?

**A It looks like -- counsel is trying to**



**catch up. But to me it looks like the front page or at least one of the pages from my personal website.**

Q So I'll represent to you that this is a screen shot of the front page of DerekWBlack.com that was taken yesterday, July 5th, 2026.

What's the purpose of your personal website?

**A Oh, you know, I hate to confess, but the purpose of this is to sell more books. That's the purpose of this website.**

Q Right. My wife is an adacemist, so I understand.

But so would it be fair to say that is part -- sorry, scratch that.

Is part of the purpose of the website to promote yourself as a scholar and expert?

**A No. I wouldn't say that. I mean, I hope that counsel aren't looking for experts on people's vain glory web pages. So no, I'm not -- I don't try -- I don't try to generate sort of expert work, so to speak. I've never -- I shouldn't say "never."**

**One time I did send a law review article in the Jindal case that first when I testified, I**



**sent a law review article to attorneys down there, hoping that they would use it or rely upon it at some point. And then they responded to me asking me to be an expert. But I don't generally try to get expert work, so to speak.**

**So, no. The purpose of this -- it's actually twofold, just for completeness sake. And one is so that when people are looking for your book, you know, you can create a landing page for the book, you know, as opposed to landing at -- you know, you could kind of get lost in Amazon or something like that, or Barnes & Noble. So one is that.**

**The other is actually really media presence. So one of the huge -- at least a potential factor in books from -- from both academic and trade press, to use that phrase, is to get a sense of, you know, just how good a person might be with the media. Because nowadays, you know, publishers put less and less work into selling your book.**

**So it is one to create a landing page so that they can kind of go and -- you know, you look at the first thing, Okay, he is a professor, he wrote some books and he knows some stuff about X.**

81

And then there are media links so they can see, well, how does he sound on TV or how does he sound on the radio. And probably not nearly as good sounding on depositions. But in any -- so those aren't up there.

But in any event, that's the purpose of it, is really the book industry.

Q Would you say that one of the -- so would you say that one of the goals, then, of your website, is to communicate what you know about?

A I mean, I have a list of my -- it is to list my publications.

So one of the things is if, you know, they want to go, Well, what's this person's background, or what else have they written about. So I certainly -- there's a page, you don't have it here, but there's a page that -- actually, it doesn't list all of my law review articles, you know, but it lists my prior books, it lists some of my writings and newspapers, because again that's sort of promotional. They want to see can you promote the book. So one of the ways you promote a book is you write an op-ed, you do this, that, and the other. So that's there. But it actually serves a narrow scope.

82

And I should add, you know, that this was -- a website seemed far more important to me, you know, five, six years ago. It's not up to date in any meaningful sense.

In fact, I get probably five to seven emails a week from the person who made this website saying, Hey, can I update it for you? The license keys are out of date. It's not going to work in all formats, et cetera, et cetera.

So, I mean, it's certainly there. It's mine. I pay the fees on it. But I will say I -- I don't spend much time updating it. And I've been ignoring requests from the -- from the webmaster that wants to do some more work on it.

Q Your book Dangerous Learning is on the front page of your website.

Is that right?

A That's correct, yes.

Q And that book was published in 2025.

Is that right?

A That's correct.

Q And one of the purposes of this website is to sell that book?

A That's right. And just to -- to finish out the prior answer.

83

I think, although you may find something else on there, I think that when I received copies of that book and put that picture that we're looking up there, that's probably the last update I made.

Author gets those copies of the book anywhere from three to six months before publication. So that book published in January of 2025. So I'm guessing that I received a box with my copies and it was all getting in, rushed down to the library, took some pictures, and then, you know, put them up on the internet.

So probably the last substantive update of this book was late summer, early fall 2024.

Q Is one of the ways you sell books by communicating that you're a knowledgeable author?

A Well, I mean, it might -- it might sound odd to you, but only indirectly.

I mean, so an interviewer -- so like a -- you know, a newspaper -- someone who wanted to interview you about your book or like a, you know, a podcaster or something, they -- because there are, you know, a variety of different books out there, they want to see some credentials, so they would look.

84

The book publisher would also look. I -- I mean, I don't know what the average buyer sort of looks at. But, yeah, I don't know where -- I wouldn't want to speculate. But I -- well, I guess I would -- I don't think that to the consumer paying 24 or 35 dollars a pop or whatever they're paying, I think what they want is the landing page for that book. So the landing page just sort of, you know, gives them a description of what the book is about. And they decide if they think it's interesting.

At least even book publishers, it is somewhat of a mystery. They don't really know how they sell books. You would think after all these years since the Gutenberg Press we would know, but it really is still a bit of a mystery. You just sort of throw a bunch of stuff out there and hope something hits.

Q When you put on your website, Professor, Author, Expert, the purpose of that is to -- sorry, scratch that question.

When you put on your website, Professor, Author, Expert, is the purpose of that at least in part to convey that you are a knowledgeable scholar?

85

MS. LEVIN: I am going to object to this document now that it's clear that what's in this two-page PDF is not the full website.

**A Ryan, I mean, it's somewhat -- I'm glad you're interested. I'm glad you look. It sort of gets embarrassing, the more and more embarrassing the further and further we go.**

**I mean, why does Professor, Author, Expert appear there? Well, when you put together a website, what you kind of do is you try to look at what someone else's look like. And so there was another professor who had those three headings there. I thought, Oh, that looks nice.**

**Because if you just put Professor, that seems like, Oh, that's all you are, is you're just a professor? If you just put Author, it's like, Oh, that's all you are is an author?**

**So anyway, you know, normally people -- four is too much, two is too little, three is about right. So I -- the decision, as I recall at this moment in time to put Professor, Author, and Expert, was me copying another website that I had seen.**

Q And your website says, "Expert in education, law, and policy, educational equality

86

and school funding for disadvantaged students."

Is that correct?

MS. LEVIN: Again, objection for the completeness of the -- incompleteness of the website in this document.

**A That is what that sentence says, yes.**

Q To your knowledge, does the front page of your website say that you are an expert in history anywhere?

**A It does not -- well, I'd have to pull it up. I don't think that that appears on there anywhere, but it does include books that are history books on it.**

**I guess I would add just for completeness -- and I certainly understand why -- why you'd want to focus on this.**

**That line in education, law, and policy, comma, education quality and school funding for disadvantaged students, is a line that has not been updated in any meaningful way probably in 20 years, close to 20 years.**

**So, you know, when -- when you're asked to speak at an event -- and I am often asked to -- have been often asked to speak at an event -- they ask for, you know, your bio. And, you know, you**

87

**don't want one that's too long. You want one that's relatively short, depending on the venue.**

**And so my recollection is that that line in education, law, and policy, comma, educational quality and school funding for disadvantaged students, is a line that I have been using without bothering to update since I was an assistant professor at Howard Law School and trying to give a line to people to have me speak at law schools.**

**Now when I speak at events, you know, generally, you know, there's a reference to, you know, my more recent work. And I'll talk about, you know, it may say -- depending on the venue, right, it depends on what they're having me speak about -- you know, I mean, emphasize if it was at a law school speaking about, you know, a legal issue, then maybe I would use that line and say nothing of my books.**

**If I was speaking to -- outside of the law school, I would -- may adapt that bio and put it somewhere else.**

**Anyway, that's a long way of saying I certainly -- the word "history" does not appear there. Part of that is an artifact of that line having a -- you know, a 15, 20 year old history.**

88

**You know, if I were thinking about it again, you know, maybe I'd update it. But again, I haven't updated it. Didn't seem that pertinent to me.**

Q So just to make sure we're clear on this point, on this web page it doesn't say that you're an expert in history, does it?

MS. LEVIN: Objection to the PDF of the website not being the complete website.

We can stipulate to that for the whole -- for every question about this exhibit.

MR. PROCTOR: Sure. Sure.

**A Yeah, I don't -- I don't -- I mean, I don't have the whole website here. But I think if you were to look at the -- so this -- that line that you just read does not contain the word "history." But I think if you looked at the entirety of the website, including -- maybe I'm -- maybe I'm misremembering it. But even on my Articles section, you know, I have sort of categories of things that I'm expert in or that I've written about. And I break them into relatively arbitrary -- arbitrary distinctions, again to try to make it easier for someone else to sort through.**

**But I know -- but it is my recollection,**

89

if we looked at it you would find something on, you know, the federal role in education, which is the history of the federal role in education. So I do believe that's there.

And certainly when the books themselves are talked about on their landing pages, I would be surprised, but maybe I'm misremembering, if they did not articulate them as being a history of the right to education or the history of education or the history of, you know, this, the South long war on black literacy.

So there on the front, the very front landing page, you know, the primary book being displayed is -- it doesn't say the word "history," but the long war is, you know, a more exciting version of the word "history." Instead of saying the history of black literacy in the south, it's the South's long war on history.

MR. PROCTOR: David, can we turn to Exhibit 1. And can we go to Paragraph 12.

Q So I think we discussed earlier that your expert report lists all the times you've participated as an expert witness in litigation before.

Is that right?

90

A That's correct.

Q Okay. In any -- scratch that.

Have you participated in a prior case as an expert on history?

A Yes.

Q Which cases?

A Well, William Penn School District was on the history of the education clause and the history of public education in Pennsylvania. So that would have -- again, I mean, I don't -- what was the phrase that they used in court that day, you know, I can't -- I can't tell you that off of my head. But I can tell you the substance of that, of that expert report was the history of the right to education and the history of education in Pennsylvania.

Adams versus McMasters -- Geez, I can't remember to what extent history came -- came up in that. You know, I didn't write a report in that case, so there is -- it was a preliminary injunction that happened very quickly. But that was primarily a matter of policy.

Jindal versus the United States Department of Education is not about sort of a long history, meaning a history sort of going back

91

to the nation's founding, but it was the history, maybe 21st century sort of history of education policy, and how that was interacting.

I can flip to the next page myself here. Columbus --

MR. PROCTOR: Just so I can follow on, David, can you flip to the next page as well?

A Yeah, Columbus City School District versus State of Ohio, that is again on the history of public education in Ohio. Cruz Guzman is also about the history of the right to education in Minnesota.

Falls versus DeSantis does not involve history, although it does involve looking at some history, maybe had some history standards in it. It was certainly about textbooks.

Smith versus Henderson didn't involve any history. And I would -- I would add just for completeness sake that these were formal court appearances.

I have also testified before Congress on the history of the federal role in education. There was also a commission set up by Congress in which I also testified on the history of the federal role in education as well.

92

Q So going back to William Penn School District V Pennsylvania. Did that case go to a jury?

A That case was before a judge.

Q Okay. Was that case decided on summary judgment?

A I don't know.

Q Was that --

A It was -- no, because we had a -- we had a trial, so it wouldn't have been on summary judgment.

Q Was there a motion to exclude your testimony in that case?

A Not that I recall. Maybe there was, but I don't recall it.

Q In Columbus City School District V Ohio, did that case go to a jury?

A It has come before the trial court judge and is now on appeal to the intermediate -- yeah, the intermediate courts in Ohio.

Q Was that case decided on summary judgment?

A I believe there -- I believe that was the procedural posture that led the case. I believe that was the procedural posture, but I don't know.

93

**It could have been a motion to dismiss or something. I don't think it was -- I think they already survived a motion to dismiss, if I recall correctly, prior to -- well, that would have been prior to the expert reports. So I just don't know whether it was summary judgment or not. My apologies, Ryan.**

Q Was there a motion to exclude your testimony in that case?

**A You know, I write the reports. I don't sort of, you know, get involved in the aftermath.**

**I don't have any recollection of said -- of any such motion. But, you know, one could have been filed and responded to without my knowledge. I would have thought that counsel would have alerted to me -- would alert me to that had it been the case. But I just don't recall that having happened.**

Q And then Cruz Guzman versus State of Minnesota, did that case go to a jury?

**A That case is still in -- I have a deposition coming up in that, in that case. So, no, it wouldn't be in a jury or summary judgment yet. But I don't know what the precise procedural posture of the case is at this particular moment.**

94

Q Okay. So you haven't yet been deposed. So I assume then that there has not yet been any motion to exclude your testimony.

Is that right?

**A I just don't -- I don't -- I wouldn't -- I wouldn't think so any more than you, but I don't know.**

Q Okay.

MR. PROCTOR: David, can we go to Page 3.

Q So I'd like to look at your questions presented now, Professor.

**A Sure.**

Q It straddles Pages 3 and 4.

**A Got it.**

MR. PROCTOR: David, could you scroll up just a little more?

Perfect. Okay.

Q So your report answers two questions presented.

Is that right?

**A Those are the two questions presented. And I answer them to the best of my ability, yes.**

Q Who drafted the questions presented?

**A I drafted them.**

Q They weren't given to you by counsel?

95

**A We --**

MS. LEVIN: Objection. It invades the work product privilege.

I'll instruct the witness not to answer.

MR. PROCTOR: Maybe I'll -- all right. Let me see if I can ask this a different way and see if it leads to the same objection.

Q So your first question presented, those are -- those are all your words.

Is that right?

MS. LEVIN: Objection. Invades the work product privilege.

I'll instruct the witness not to answer.

MR. PROCTOR: Sorry. Jessica, is your objection that I am not allowed to ask whether he drafted language in his expert report?

MS. LEVIN: My objection is that you're not allowed to ask about prior drafts or any potential communications.

MR. PROCTOR: I'm not -- I don't want any -- I don't want to know communications. I just want to know whether certain language in the actual report is something that the expert drafted. And your view is that that question is privileged?

96

MS. LEVIN: Yeah, why don't you go ahead and ask that question again, and I'll see if I still have the objection.

MR. PROCTOR: Okay.

Q Did you draft the first question presented?

**A If you mean by "draft" did I type it into the -- to the document, yes, I typed it into the document. Yes.**

Q Did you come up with -- sorry. Let me rephrase.

Were these questions that counsel tasked you with answering?

**A Yeah, those are -- those are the questions that they tasked me with answering, yes.**

Q So your first question presented uses the phrase "traditional and exclusive government function."

Is that right?

**A That -- yes, that's what it says. Yes.**

Q Is that a phrase that you had encountered before you wrote this expert report?

**A Yeah, I have encountered that phrase before I wrote this expert report.**

Q And how are you familiar with the phrase,

97

"traditional and exclusive government function"?
**A I'm familiar with it in teaching Constitutional law.**
Q Where does the phrase "traditional and exclusive government function" come up in Constitutional law?
**A It comes in the state action doctrine set of cases.**
Q What is the state action doctrine?
**A The state action doctrine is whether the activities of private -- well, actually, we could argue about when it comes up, because I have sort of written a little bit about this outside of the scope of this report.**
**But in any event, it traditionally, you know, came up in the most cases that are generated by -- it came up during the civil rights movement when the government was attempting to avoid desegregation.**
**So the court had already ordered -- this isn't the exclusive place, but it is a primary place. The court had ordered, you know, southern schools to desegregate. And lunch counters and things, and cemeteries and golf courses, et cetera, et cetera.**

98

**And so sometimes government had handed over activities to private industry to try to evade the state action doctrine. Sometimes we just had private actors that were in joint ventures or whatever, however you want to characterize it. And so the court is trying to determine in those cases, you know, whether the 14th Amendment should apply to the underlying dispute.**
Q So if an entity is a state actor, then it's subject to the 14th Amendment?
Is that right?
**A If it's a state actor, it is subject to the 14th Amendment.**
Q And if an entity is engaged in a traditional and exclusive government function, it's a state actor.
Is that right?
**A That is the question, that is the standard the court would apply to determine whether, yes, that private actor would be subject to the 14th Amendment. Or, rather, whether it's not really even the private actor at all, but it still is the state in some respect.**
Q Okay. And your answer to the first question presented is, yes.

99

Is that right?
**A Well, let me be clear about this.**
**So, you know, we've just had this discussion about legal doctrine. And what I was doing in my report was not in any way, to be quite honest, not in any way related to my knowledge of the state actor doctrine.**
**But, rather, what I was trying to do -- and, you know, those words appear in there, no doubt. But by traditional, which my question is, you know, has free public education as a matter of history been provided by the state, in the State of Tennessee, or nationally.**
**And then Number 2, you know, has anyone else also done that or done that in lieu of it. So certainly there's a -- there's a legal test that you and I have been talking about, but that legal test is really one for you as attorneys and the court to sort of deal with.**
**My inquiry here was, you know, just a matter of history, what has been the history of schools in public education. You know, has anyone else provided free education, open to all. You know, I provided that historic -- that history.**

100

**And, you know, it's up to the courts and you guys, if you sort of work it out some other way, to determine whether, you know, the facts that I'm supplying are up to this test or not up to this test.**
Q Have you in your scholarship written about whether charter schools qualify as state actors under the 14th Amendment?
**A Yes, I have.**
Q And you've concluded that they are.
Is that correct?
**A I, in examining the various policies out there in the way that -- the way that charter schools are structured, managed, et cetera, that generally speaking, yes, they are.**
**You know, actually, let me back up, Ryan. And that goes to what I was saying earlier. I actually personally object to this -- not to you asking the question. I object to the application of this legal doctrine to charter schools.**
**You know, my point in my scholarship, to be quite honest, is that -- or that I've at least made, is that this doctrine applies to private actors.**
**So if what we had were private schools**

101

that we were trying to subject to the 14th Amendment, then yes, this test would make a lot of sense.

I think the major point in my scholarship is that because the state is actually the one establishing, creating, authorizing, managing, et cetera, et cetera, there is -- there is state action that is subject to the 14th Amendment regardless of what type of private action or otherwise might be going on out there.

So my point, which, you know, probably no one cares about except for me, is probably a little bit distinct from -- I don't know, I haven't read your briefing. I haven't even read, you know, the briefing of counsel here today either. But I suspect maybe all of your points are somewhat distinct from mine.

Q So is your view that the state action doctrine is not the appropriate framework to think about whether the 14th Amendment applies to charter schools?

MS. LEVIN: Objection. It's outside of the scope of what he was asked to opine on here.

MR. PROCTOR: Are you instructing him to not answer?

102

MS. LEVIN: No.

Go ahead and answer.

A No. So, I mean, look, you have -- first of all, let's also make another distinction.

When one is writing legal scholarship, some people will analyze an individual state and sort of really drill down on it. And sometimes you lose the forest for the trees. Sometimes people look at the forest and they may miss a tree.

You know, my scholarship tends to be forest, not trees. So I'm looking at most charter schools. But -- charter school structures. But I'll confess to not having read all 42, I think it is, or maybe it's 46 now, but charter school statutes. And they've all got their own sort of little twists and turns in them.

So I can't say that it was my prior opinion that all charter schools' statutory systems necessarily involve a level of state -- a level of state control that means the state actor doctrine exceptions shouldn't apply.

You know, you're really sort of -- I mean, it's really a sort of broad question. So, yes, I had generally previously taken the position

103

that it didn't make a lot of sense for most charter schools statutes. But every charter school statute is different, and so, you know, we have to take them one at a time.

Q You're familiar with the Fourth Circuit's en banc decision in Peltier V Charter Day School. Correct?

A That's correct, yes.

Q And is it correct that in your scholarship you've -- strike that.

Is it correct that in your scholarship you agreed with the state actor analysis that applied to charter schools?

A Well, I agree with the final result in that case. I mean, as I recall it. And, I mean, I hate to say this on the record because he or she is a sitting judge. But, you know, there are a variety of opinions in that case. And one of them -- well, I guess I won't name him or her because I can't remember -- clearly didn't really understand what a charter school was or what an HVCU is or was in history.

And so I think one of the challenges -- and this is where I'm just not willing to say, yeah, I agree with it all. One of the challenges

104

is there's just a tremendous amount of factual confusion by jurors as to what a charter school actually is.

I mean, even -- and I will say it since he's not on the bench anymore, but even Souter seemed to have gotten confused at one point in oral argument. And I even remember the case, maybe it was Carson.

But, so in any event, I wouldn't sign onto the -- to the -- without looking at it, say, Oh, I think everything in the opinion that they wrote is necessarily correct. But I do -- or on the concurrences, et cetera, et cetera. But the final result of saying that the charter schools in North Carolina are subject to the 14th Amendment, yes, I agree with that. Which is -- yeah, I do agree with that.

Q And in that case the Fourth Circuit held that charter schools perform a traditional exclusive government function, didn't they?

A That's my -- yeah, that's my recollection. Yes.

Q Okay. Why is the function that you're examining the provision of free education open to all?

105

MS. LEVIN: Objection. Vague and ambiguous as to function you're examining.
**A Yeah, so, I mean, I guess what I would say is that -- can you repeat the question again, Ryan?**
Q So your question, first question presented, is about whether the provision of free education open to all is a traditional and exclusive government function. Right?
**A Uh-huh.**
Q So why is the function that you're examining the provision of free education open to all?
**A I'm not trying to be difficult, but I'm a little bit -- I'm not entirely confused, but I don't want to misspeak. I'm a little bit confused here.**
MS. LEVIN: Do you want to try rephrasing, Ryan?
MR. PROCTOR: Yes, I'm happy to rephrase. That's probably confusing because I asked a confusing question.
Q Why isn't your first question presented simply whether the provision of education is a traditional and exclusive government function?

106

**A Well, that was -- I mean, we previously indicated that I was asked to look at free education open to all. And so that's what I looked at.**
**I mean, obviously, I mean, I take from your implication there's -- you know, could have just looked at education in general. But that's not what I was asked to do. Although in the report I do examine or sort of talk about free education open to all in relationship to private education.**
Q So you just -- sorry. Let me rephrase.
That definition of the function is something that you just took as a given.
Is that right?
**A Well, let me --**
MS. LEVIN: Vague and ambiguous as to, "took as a given."
MR. PROCTOR: Let me -- I'll rephrase.
**A I mean, I know it's unusual, but I think I know what you're asking and I'm happy to share it. But I don't know if anybody has any objections to me -- to me articulating what I think you're asking and then answering it.**
MS. LEVIN: Why don't you either repeat

107

the question or rephrase the question, Ryan, just so it's clear what question the witness is answering.
MR. PROCTOR: Sure. Sure.
Q Just give me one moment.
Okay. Actually, I think I'm happy to move on for the moment.
Can you tell me what free education open to all is?
**A Yeah, so -- so there is a -- there is a -- yeah. Going to the sort of overall definition. There is a lot backed in that sentence, in that phrase.**
**So free education obviously means, one that is -- doesn't charge tuition to students, or students can go free of charge. Right? So that free means no charge.**
**Although, you know, to be clear, there's always some incidental costs. You know, costs of travel, maybe you have to buy your own books or, you know, study guides, whatever. I mean, you know, helmet for the football team. You know, public schools can struggle with some things. But not the books, but the equipment.**
**So, but generally speaking, to attend the**

108

**school, you don't have to pay to attend the school. And no one is directly paying on your behalf. Right? And you're not sort of looking for scholarships or whatever. You know, it's free.**
**Open to all means that -- I mean, that -- that's the real phrase. We can say no tuition, but this open to all is a key historical term of art. So obviously we have a history of excluding black people, excluding women, excluding immigrants, excluding a variety of folks from society at-large. And sometimes those things sort of have filtered into education.**
**But open to all would generally mean within whatever the larger societal constructs at the moment are, that everyone can go.**
**So like pre-Civil War, for instance, or sort of pre14th Amendment, you could have had, you know, a provision in a state that said, open to all, but all didn't mean black children. Right? It may not even have meant, you know, women or immigrants.**
**But the theory being that, you know, barring some sort of larger state or societal structure, everyone is entitled to go. And that**

109

**has always been, to be clear, sort of the aspiration -- and maybe that's where I should start -- the aspiration of public education since the beginning is that it would not just be free for some, but it would be free for all and free and open to all.**

**Now, because of discrimination, sometimes, you know, our schools haven't always lived up to that. So it's been a process of expansion, expansion, of expansion, sort of breaking down those laws of exclusion from free education.**

**The most obvious appearance of that phrase, "open to all," and the most consistent use of that phrase would have been during reconstruction, such that "all" is actually clearly, at least as I have written, a nondiscrimination phrase itself. So when the southern states put "all" in there, they meant black children too. That's what they meant.**

**So that is -- so what we're talking about is free education, open to everyone, but understanding that at various times in history we haven't always made it as open to all as maybe it should have been.**

110

Q Would you agree that a school's open to all if it has to admit all the school-aged children who live within a particular school district?

MS. LEVIN: Objection. Incomplete hypothetical.

**A So, I mean, you know, there's lots of different versions of -- could you repeat the question one more time?**

Q Sure. Would you agree that a school is open to all if it has to admit all school-aged children who live within a particular school district?

**A Well, I guess it kind of depends on what you mean by "admit." Which is -- sorry to be difficult.**

**But so like, you know, you could have a school that says, We will admit anyone regardless of race, religion, et cetera; but you've got to pay $40,000 a year to go. So that school is not really open to all in that particular hypothetical situation.**

**Or you could have a school on the other side of the county that, you know, is a 30-minute ride, and it -- and it's supposed to be open to**

111

**all. But, you know, you've got to get yourself there. You know, it might be difficult for some students to get there. So it's theoretically open to all but not actually open to all.**

**So, I mean, I guess the short story is there's a variety of hypothetical situations in which simply saying that we will admit anyone is not the same thing as being free and open to all.**

Q So would you agree if a school has to admit all school-aged children who live in a particular school district and is not allowed to charge them tuition, then at least on paper it's open to all?

**A I'm sorry, a few of your words blended together at the beginning, it might be my microphone --**

Q Sure. Would you agree that if a school has to admit all school-aged children within a school district and is not allowed to charge tuition, then it's at least formally open to all, even though there might be practical obstacles to it being open to all?

MS. LEVIN: Objection. Vague and ambiguous as to "formally" and "practically."

**A Yeah, I mean, so on -- the letter of the**

112

**law, as you described it, would say if you can get here, you have -- we would admit you and we're not going to charge you. And then the other version would be, Well, we will admit you, we're not going to charge you, but, you know, you've got to get here with no assistance.**

**So, I mean, I guess it's the distinction between -- I mean, almost as though you've got formally open to all and then you've got formally and practically open to all.**

**I mean, I'm sure there's some other sort of variation I could think of as well, but it's just not coming to me at the moment.**

Q So I guess in your own words what would you say a school needs to do to be both formally and practically open to all?

MS. LEVIN: Objection. Overly broad.

**A I'm sorry to keep doing this, it is catching me off guard sometimes. But could you read -- could you give me the question --**

Q Sure. I mean, when you're looking at a school, you have to have some way of determining whether that school is open to all. Right?

**A Yes.**

Q So what does a school have to do to be

113

genuinely open to all, in your opinion?
A Well, you know, I think maybe the reason why we're getting to a little bit of difficulty here is that, you know, oftentimes what we have is a situation in which you've got -- you've got overlaying laws. Right? And so, you know, a nondiscrimination -- like, discrimination could be happening, let's say, for instance. All right?
Discrimination could be happening in a school as a matter of practice. Right? And so that school is not really open to those students, because it's discriminating against them.
But the state might have a law that is prohibiting, right, that type of discrimination that occurs there.
And so I guess this sort of -- I hadn't thought about it precisely in the way that you're articulating it. But what we're getting to is that sometimes we had schools in which by the school's claim to be open to all, but there were other laws that formally prohibited -- or practices, you know, that prohibited those schools from being open to all.
But generally speaking, with that said, what I am looking for in this question is the

114

provision of free education that -- that serves all the students and that within the current -- you can even call it -- within the current norms of the time.
So as I said earlier, you know, a school -- I mean, some schools, let's just use it instead of hypotheticals, right, some schools, many schools in the South after Reconstruction professed to be open to all. Right?
But we know as a matter of -- and that would fit my definition. Right? That they were -- or fit my approach. They were, you know, supported by the state, run by the state, open to all students; but yet discrimination was still happening in those schools at that time. But that was still free education open to everyone except for the ones that the state happened to be discriminating against.
I mean, that's the difficulty of -- I think of the question, is that the level of discrimination occurring against -- against students or exclusion from schools has shrunk over time. So you had a lot of exclusion, you know, early on, both of women and black students. And then less and less exclusion later.

115

But taken -- but taking the idea of, Hey, it was a, you know, a racist or a sexist society that excluded black people from everything, the schools were open to all within that paradigm of otherwise racial exclusion.
So it's almost, when you start throwing in, you know, matters of race in particular, there's a little bit of a contradiction between what schools profess to do and what they were actually doing.
Q So if you have a school in 2026 that does not charge tuition, that is required to admit all students who live in the school district, that does not engage in discrimination, and that is practically accessible transportationwise for all students in the school district, is that school open to all?
MS. LEVIN: Objection. Incomplete hypothetical.
A Well, I would add to that, Ryan, which is, you know, what -- what happens in -- and maybe this is another difficulty. We were talking about what happens outside of school, or sort of the structure, and then what happens inside the school.

116

And so inside the school, you know, schools are teaching things. So, you know, if a school said, We are free and open to all -- in 2026, free and open to all, and we're going to watch, you know, Gone With the Wind, and we're going to have, you know, performances in blackface for the -- for the Christmas -- or whatever, the holidays, whatever, you know, plays, or we're going to do whatever, you know, here I struggle to say that that school is -- although it is free and it is formally open to all, something about its curriculum or education program is really very exclusionary. Right?
And so -- so there is that -- that piece of it. So I guess I would -- I would add to what you're saying, Well, if it's free, it's open to all, it has nondiscriminatory standards and it delivers a curriculum that is actually accessible and nonexclusionary, I think we then begin, you know, to get -- to get closer to a hypothetical that would work.
Q Well, would you say that a school with all of those -- sorry. Let me rephrase.
So if a school does not charge tuition, has to admit all students that live within the

117

school district, is accessible transportationwise for all students in the school district, does not engage in discrimination, does not have exclusionary -- does not have exclusionary practices, does it then qualify as free and open to all?

MS. LEVIN: Objection. That's an incomplete hypothetical.

**A Well, as the -- that last phrase, you said, Doesn't engage in discriminatory practices. I mean, that's, you know -- is, you know -- is reading Uncle Tom's Cabin, is asking students to watch Gone With the Wind, you know, Huck Finn and so on and so forth, is that -- is that nondiscrimination?**

**I mean, we really get into -- we get into sort of a legal question potentially. Right? Like, is the -- you know, is this a racially hostile environment, is this a sexually hostile environment, is there, you know, some other form of hostile environment.**

**And so, you know, a school could say and profess all of those things, and I would just say, you know, that that phrase, "discriminatory practices," you know, you and I may be using that**

118

**phrase differently than one another. No, I don't we are. We just could be.**

Q Do you think that a typical district public school in Tennessee in 2026 is free and open to all?

**A A typical --**

MS. LEVIN: Objection. Vague and ambiguous as to a typical Tennessee public school, district school.

**A Could you repeat it again, Ryan? Sorry.**

Q Do you think -- do you think that in 2026 Tennessee district public schools are free and open to all?

MS. LEVIN: Objection. You reworded it, but same type of objection. Vague and ambiguous.

MR. PROCTOR: Sorry, what's vague and ambiguous?

MS. LEVIN: Tennessee public schools.

MR. PROCTOR: District --

MS. LEVIN: District schools. Sorry. As a whole.

**A Did you say typical, Ryan? Sorry, in the last sentence --**

Q I will reask the question.

**A Reword it.**

119

Q Do you think that in 2026 Tennessee district public schools are free and open to all?

**A I would say that -- I would hope that most of them are. But I can't speak to the level of, to be quite honest, illegal activity that is occurring in some school districts.**

**You know, I -- I once worked for the Lawyers' Committee on Civil Rights, as you raised earlier, I had to investigate some schools in the western half of the state. And, you know, they were engaging in some pretty exclusionary activities, you know. You read things.**

**So, you know, I can't -- I'm not in a position to say that, Hey, there's not any bad behavior, so to speak, happening in any of the Tennessee's public schools.**

**I would -- I would -- as a proud graduate of the State of Tennessee's public schools, I would -- I would hope to think that those are the exceptions rather than the rule. So I would be cautiously willing to speculate that most of them are free and open to all. And hopefully all of them are. I just can't speak to what's happening in all of the districts there.**

Q You would -- would you agree that it is

120

possible for an individual school to be free and open to all?

**A It is -- it is possible for a school to be free and open to all.**

Q One way that an individual school -- sorry, let me rephrase.

An individual school wouldn't be free and open to all if it had selective admissions.

Right?

MS. LEVIN: Objection. Vague and ambiguous as to "selective admissions."

**A Well, I think, you know -- and sorry for being difficult here, Ryan. I just want to be careful and I don't want to misrepresent myself or --**

Q Would you like me to rephrase?

**A No. I'm fine with your phrasing of the question. Or generally fine with it.**

**So if a school is picking and choosing who gets to go there, then it seems to me it's very hard to say that it is free and open to all, if it's picking and choosing students based upon whether they want them or don't want them.**

**My -- my only hesitation -- well, I shouldn't say "only." One of my hesitations here**

**is that, you know, public schools operate as a system. And that's really a sort of important piece of the puzzle here. At least for me.**

**So for instance, magnet schools. You know, public schools have operated magnet schools by federal court order and otherwise. And those magnet schools do have some admissions criteria. You know, maybe you have to have a minimum -- you know, a minimum GPA or something to that effect.**

**And sometimes the magnet schools don't have any academic criteria at all.**

**But the point here being that, you know, School District A is free and open to all students. And it doesn't mean that every student is entitled to a particular school within that district.**

**So a district may have, because it operates as a system, it may have some -- some -- multiple different ways of serving individual students. So, you know, you might have, as we do in Richland too, have a magnet school for students with special needs. And so, you know, they have special services there.**

**So instead of giving those special services at every individual school, they've**



**got -- so in any event, the free and open to all can have, you know, some -- some minor admissions such as the, you know, magnet school. But it would -- there would be no requirement of the student to -- to go to one of those district schools, other than that they were of the, you know, appropriate age of 4 or 5 or whatever it is that begins in the school district.**

MR. PROCTOR: Would you guys like to break for lunch now?

MS. LEVIN: That sounds good.

MR. PROCTOR: Okay. How does -- is 1:30 okay?

MS. LEVIN: Is that all right for everyone?

MR. PROCTOR: Professor, are you okay with that?

THE WITNESS: Yeah, probably shouldn't be eating anyway. We'll see how quick Jimmy Johns can get there.

MS. LEVIN: How about we do 45 minutes?

MR. PROCTOR: Yeah. That's -- that's fine with me. I mean, is 1:45 enough time for you?

THE WITNESS: That should hopefully. If



not I'll get something out of the snack machine. We're good.

MR. PROCTOR: All right. So 1:45 then.

(A recess was taken.)

MR. PROCTOR: Can you pull up Exhibit 1, please.

BY MR. PROCTOR:

Q Professor, I want to take a look at Paragraph 43 of your expert report.

MR. PROCTOR: So that's PDF Page 20, David.

Could you scroll up just a little bit, David.

Perfect.

Q All right. So this paragraph, Paragraph 43, is in the section that you've titled Conclusions Regarding the National History of Free Public Education.

Is that correct?

**A Yes.**

Q All right. And could you read that first sentence in Paragraph 43 for me, please.

**A "Free public education open to all has been traditionally and exclusively delivered by government, more specifically states."**



Q If we deleted the word "public" from that sentence, would that change its meaning?

**A No, I don't -- I don't think so. I mean, it's -- you know, I don't think so. The word "public" happens to be there, but I don't think it would -- I don't think it would change its meaning.**

MR. PROCTOR: Can we go up to Paragraph 9, David, on PDF Page 5.

Q So in Paragraph 9 you mention -- you list your own prior research that you've consulted.

Is that right?

**A Yes.**

Q In any of the sources listed in Paragraph 9, did you ever discuss whether the provision of free education open to all is a traditional and exclusive government function?

**A I don't think I -- I don't think so. At least not as -- as framed as looking at public education through the lens of the legal standards, so to speak, that you -- if that's how you were meaning to use it.**

**But there certainly is the history of education, public education, education open to all, that is -- that is certainly a huge part of**

125

**the -- of many of those articles.**
Q Well --
**A The Amicus brief, I mean. The Amicus brief does -- does speak to that.**
Q Sorry. So just so I understand, are you saying that in your Oklahoma State -- excuse me.
Are you saying that in your Oklahoma Statewide Charter School Board V Drummond Amicus brief you did directly address whether the provision of free education open to all is a traditional and exclusive government function?
**A Well, now that you've rephrased it for me again, I would have to look at it. I hope it -- I mean, I certainly know that that was a legal issue in that case.**
**I think, you know, whether I use that specific phraseology in that brief, I cannot recall. Because it was really looking at the way that the charter schools operate as public schools.**
**Again, you know, if we wanted to look at it -- and I didn't actually read the whole thing again in preparation for this. I just looked at a few parts of it.**
**So I guess I should -- I should confess**

126

**that after just a year my memory fails me as to whether I actually used that specific phrase -- phraseology in there or not. Sorry. Happy to look at it if you've got it as an exhibit and peruse over it.**
MR. PROCTOR: David, could we go to PDF Page 10.
Q So I'm looking at Paragraph 26 of your report now, if you want to take a moment to review it again.
**A Yes.**
Q You can just let me know when you've had a chance to do that.
**A I mean, I'm not reading it word for word. If you have a specific question about a specific sentence or specific concept. But I'm familiar generally with what --**
Q Okay.
**A -- is there, yeah.**
Q I just wanted to make sure you had a chance to do that.
**A Thank you.**
Q So you note that the Massachusetts Constitution of 1780 calls for the provision of public schools.

127

Is that right?
**A Yes.**
Q In 1780, the term "public school" didn't necessarily refer to a government school.
Is that right?
MS. LEVIN: Objection. Vague and ambiguous as to meaning of "government school."
**A Yeah, I mean, the word "government school" is not -- you know, and I use it myself in this report -- is a -- is a relatively modern usage. Secretary of Education and a few -- and some others, but the Secretary of Education -- how many years ago was that, five or -- when she started -- close to a decade ago, she used that phraseology, "government schools." I'm not using it the same way she does.**
**But the word "government school" would not have been one that they used at that time. I mean, I'm not -- at least I don't recall any sort of use of that -- usage of that type of phraseology. So it's -- it is -- that phraseology itself is more of a modern vintage, I suppose.**
Q In 1780, a school could be -- scratch that. Let me rephrase. In 1780 a public school -- sorry. Let me try one more time.

128

In 1780, a school owned and operated by a private charity could be called a public school.
Is that right?
MS. LEVIN: Objection. Vague as to, school operated by a public charity -- or by a charity, sorry.
**A So could you just for clarity sake, Ryan, could you reread the question?**
Q Sure. Let me rephrase it for you.
In 1780, a school could be owned and operated by people who were not government officials and could still be called a public school. Correct?
**A Let me -- in answer to that question, Ryan -- and this goes to the phraseology difficulties that we sometimes have in sort of comparing our word "public" or -- or "government" back then.**
**I mean, there were a variety of different structures and a variety of different places. So you often -- often, I wouldn't say exclusively, but you often had townships that were delivering education, or at least raising the taxes and raising the funds for those schools, in 1780 and before.**

129

And so those townships -- I mean, I would -- and I haven't studied townships as a distinct concept at length. But I would -- I would tend to think of a township as being a government entity. But I'm just hesitating because I'm not sufficiently attuned to the relationship, the legal relationship between townships in 1780 and -- and, you know, the State of Massachusetts, and then also that being, you know -- some of that preceding their Constitutions.

And then, you know, you also had -- if you look at the -- when you get into the 1780 -- early 1780s and in the 1770s, you also have townships and communities operating under charter Constitutions because we were still subject to the Crown at that point in time.

And so, you know, there was this enormous -- I think enormous -- sort of uncertainty as to what law even governed localities in this sort of revolutionary, preconstitutional age.

So in South Carolina -- and then I'll just stop, I don't want to go on too long -- but, you know, there was this question as to whether or

130

not the colonial laws still applied.

And this comes up in my book Dangerous Learning, when Denmark Vesey was being prosecuted for a crime. He was a free person of color. And they really couldn't figure out which law applied. Was it the colonial law, was it some other criminal law in place.

And so in any event, you know, the short point here is that townships certainly were authorized to collect funds and taxes and, in fact, sometimes mandated to. But I can't speak to what a township precisely was and what law controlled it, because a lot of that actually was in flux at those particular moments in history.

Q In 1780, the phrase "public school" had a less precise definition than it has today.
Correct?
A Yeah, I think -- I think that it would have had a less precise definition. Or they would have used other terms which had, you know -- had their own definition.

So you have a township school. I imagine some people might have called it a township school. You know, you do see the word "common schools" sort of pop up in certain places prior to

131

Mann popularizing -- M-A-N-N, for the court reporter -- before Mann popularized that term in the common school movement in the early 1800s, so.

And then you might have schools for the public. So there are -- there are -- I mean, I can't speculate as to what, you know, any individual would have called or not called them. Again, you know, they -- they were -- there was probably more -- there was certainly more variance.

I talk about this in my report, how this has really been an idea of achieving this system of public schools, and it's been -- it was a work -- particularly a work in progress in those early years. And it varied by state. And locality, I should say.

The rural -- the rural locations were far different than, you know -- they wouldn't have even been said urban, but these were the towns back then.

Q Were township schools in 1780 also called parochial schools?
A I don't know the answer to that question. I don't know whether anyone called a township school a parochial school.

132

Q You're familiar with the Supreme Court's decision in Espinoza V Montana Department of Revenue. Right?
A Yes, I'm familiar with that.
Q You've discussed Espinoza at some length in your scholarship. Right?
A Yes.
Q Are you familiar with the book, The State and the Nonpublic School: 1825 to 1925, by Lloyd P. Jorgenson, published in 1987?
A I have not read that book, no.
Q Have you heard of it?
A I have -- I have heard of it, yes.
Q Okay.
MR. PROCTOR: David, could we pull up Exhibit 19.
(Black Deposition Exhibit 19 marked for identification and is attached to the transcript.)
Q Professor, can you recognize this document?
A I mean, not this precise one. But it looks like something you would have printed out from Westlaw of Espinoza versus Department of Revenue.
MS. LEVIN: Professor, do you -- have you

133

read this recently? Do you need a moment to look over it?
THE WITNESS: I mean, I haven't read it in the last couple of years. But I'd -- if I need a moment to look at something more, I could say so. But as long as it is what counsel purports for it to be, which is the opinion, you know, I'm comfortable with looking at it.
Q Obviously you're welcome to review the document at any time.
But, yes, I will represent to you this is a copy of the opinion Espinoza V Montana Department of Revenue, 591 U.S. 464 from the Westlaw database.
MR. PROCTOR: David, could you take us to PDF Page 8?
And then scroll down for me a little bit.
Actually, could I -- David, could I have control of the document for a second.
A/V TECHNICIAN: Sure. Just a moment, please. You should be able to control the screen.
MR. PROCTOR: Thank you.
Q All right. So we're looking now at what's Page 480 in the U.S. reports. And now I'm highlighting some text beginning with the phrase,

134

"But no comparable historic and substantial tradition."
Do you see that, Professor?
**A Yes.**
Q Okay. And then could you -- do you see how the opinion is quoting from Jorgenson's The State and the Non-Public School?
**A Yes.**
Q Okay. All right. And the quote is, "Far from prohibiting such support, the early Constitutions and statutes actively encourage this policy."
Is that right?
MS. LEVIN: Objection. He doesn't have the full Jorgenson.
MR. PROCTOR: I'm just asking what the document says.
**A I see that it says that in the document that you're showing me, yes.**
Q Okay. All right. And do you see how the citation there is to Page 4 of that book?
**A Uh-huh.**
Q Okay. Great.
MR. PROCTOR: All right. David, could we pull up Exhibit 20, please.

135

(Black Deposition Exhibit 20 marked for identification and is attached to the transcript.)
MR. PROCTOR: And it's three pages. So, David, could you just scroll through them for us. All right. Great. And could you take us back to the first page.
MS. LEVIN: I will object to any questions about this book. He said he hasn't read it. He would just be speculating. He doesn't have the context.
Q Do you -- what is this -- what does this document look like to you, Professor?
**A Well, it says that it is Lloyd Jorgenson's book, The State and the Non-Public** School (1825-1925).
Q And do you see the date at the bottom there?
MS. LEVIN: Again, I'm going to object. If you want to stipulate that I'll have the same objection to every question about this book, he already said he hasn't read it, and it calls for, therefore, speculation.
MR. PROCTOR: Sure. Let's stipulate.
**A It says it is published by the University of Missouri Press in 1987.**

136

Q Great. So I will represent to you that this is in fact excerpts from the book The State and the Non-Public School (1825 to 1925) by Lloyd P. Jorgenson.
MR. PROCTOR: David, can we go to the next PDF page? All right.
Q Do you see the page number on the top left, Professor?
**A Yes, I see Page 4.**
Q Okay. And you see that the section heading Early American School Terminology?
**A Yes.**
Q All right. And do you see the second sentence under that heading?
**A Yes.**
Q Could you read it.
**A That sentence says, "Far from prohibiting such support, the early state Constitutions and statutes actually encouraged this policy."**
Q And is that --
MS. LEVIN: Before we go further, can we get this uploaded to the chat, or the link in the chat, please.
MR. PROCTOR: Sure.
David, are you able to do that?

137

A/V TECHNICIAN: I'm sorry, it is in the chat. It just didn't finish uploading it because it's a large document. It should show up actually any moment now.

Q All right. And that's the same sentence that's quoted in Espinoza. Right?

**A I mean, I didn't commit it to memory, if -- I'm willing to say that you read it correctly. But I didn't -- I wasn't hanging on the words in Espinoza.**

Q Can you look at the next page, Page 5, please.

**A Yes.**

Q That's within the same -- that's still under the same heading, Early American School Terminology. Right?

**A Uh-huh.**

Q So it's from the same section that the Supreme Court quoted from. Right?

**A It's -- it's the page following the page that the court -- that the court cited to, yes.**

Q Okay. Could you read the first sentence of that first full paragraph on Page 5.

**A "A more striking reminder of the mingling of public and voluntary efforts in education is**

138

**the fact that the terminology of colonial and early national education made no provision for differentiating between schools that much later came to be classified separately as public or private."**

Q So would you agree that in the early national period there's -- there wasn't terminology to clearly classify public versus private schools?

**A No, I don't think I would agree with that. No, I don't think so.**

Q Were Massachusetts public schools free in the 18th century?

**A The -- well, the 18th century covers a very long period of time, and Massachusetts covers a lot of different townships. I mean, the important moments in time, obviously the state Constitution itself in 1780s, at which the state was to support those schools.**

**So there certainly were -- there were public schools that the state and local townships were supporting at that time. But the extent to which and the nature of any individual school I couldn't speak intelligently to.**

**I mean, as I said earlier, the public**

139

**educational project is one that has evolved and taken time to fully, you know, get off -- to get off the ground. So you have this sort of evolution, or sort of expansion over time.**

Q Right. So let's say from 1780 to 1800. As a general matter, do you think that Massachusetts public schools charged tuition?

**A Well, let's -- you know, even as that -- even as the word "public" -- and that's why I don't necessarily disagree -- don't necessarily agree with his phraseology.**

**What might have been labeled or called a public school -- and I've written this elsewhere -- doesn't resemble in some states, in instances doesn't resemble what we would call public today, you know, maybe for some of the reasons that he's mentioning here.**

**Because some of those schools -- some early schools did have some -- some financial requirements of students. So -- and I noted that in -- and that's noted in one of the books -- or I'm sorry, one of the articles, the Minnesota Law Review article about localism.**

**You know, states purported to be offering, quote/unquote, free public -- or public**

140

**education, but it wasn't public education in the way that we define it today. Because it wasn't always free, and it wasn't always open.**

**So what you really had were these sort of nominal -- sometimes what you had were nominally chartered schools. The state had some involvement in chartering them. And by "charter," it's not the charter that we talk about today; but rather gave them the -- the authority to operate. Right? And so or to confer a degree or whatever it may be.**

**So it's kind of like a corporation. The state would say, Okay, yeah, you can run this school. And then the state may have, depending on the state and locality or the township, provided some financial support to those schools, but they weren't fully public in the way that we would think about or use that phrase today. They really looked more like, you know, an entity that's authorized to open -- open and run a school, with some support from the state.**

Q Are you familiar with Professor Steven Green?

**A I am familiar with Professor Steven Green.**

Q You've cited him in your scholarship.
Is that right?
**A I have cited one of his articles in my scholarship. I don't know whether I've cited a second one or not.**
Q Are you aware that he has also been retained as an expert witness by the Coble intervenors in this case?
**A Yes, I'm aware of that.**
Q Have you reviewed his expert report?
**A No, I have not.**
Q Okay.
MR. PROCTOR: David, could we pull up Exhibit 21.
(Black Deposition Exhibit 21 marked for identification and is attached to the transcript.)
MR. PROCTOR: Could you zoom out? Sorry.
Q Professor, what does this document look like to you?
**A It says the Expert Report of Steven K. Green.**
Q And I will represent to you that we received this document from the Coble intervenors in this litigation.
MS. LEVIN: And I object to any questions



to the witness about this document. He has already said that he didn't read it. And so he won't have any context for questions about this document. They would call for speculation. And it's not fair to ask him about something that he hasn't had any review of.
Q You're welcome to review the document at any time.
MS. LEVIN: It's a long document. It would take him I think fairly at least a couple of hours to review. But that wouldn't include doing whatever he would want to do to digest it.
Do you want to give him several hours to do that?
MR. PROCTOR: I think you've made your objection. I'm happy to keep going. If the professor wants to take time to review it, he's welcome to do that.
David, could we go to Page --
MS. LEVIN: Sorry, Ryan, I just want to make sure this is clear for the record.
First of all, can we stipulate that I have the same objection to every question that you would ask about this document?
MR. PROCTOR: Sure. Sure.



MS. LEVIN: Okay. And secondly, without reviewing it, he will only be able to speculate. So --
MR. PROCTOR: Counsel, you made your objection known.
MS. LEVIN: I understand.
MR. PROCTOR: I appreciate --
MS. LEVIN: I'm trying to --
MR. PROCTOR: Speaking objections are not appropriate at this point. Your objection has been noted for the record. And I am going to ask the questions, as I am entitled to do.
MS. LEVIN: Ryan, sorry for interrupting you. I am trying to make sure we meet our mutual goal of a fair deposition of this witness and that you get to ask the questions that you want to ask and that he's able to answer them.
So are you saying that you would like to break for a few hours and have him read the report, or are you saying that you want to continue your questioning now without him having read the report?
MR. PROCTOR: I am going to ask him my questions. And he is free to take whatever -- he is free to examine the document to whatever extent



he feels is appropriate before he answers.
Okay. David, can we go to PDF Page 16 now.
A/V TECHNICIAN: You said 16. Right?
MR. PROCTOR: Yes.
Q All right. Paragraph -- could you take a second to read 26, and then let me know when you have.
**A Okay.**
Q So according to Professor Green, New England district schools charged parents a rate to send their children there.
Is that right?
**A That's what it says, yes.**
Q Do you agree or disagree with that?
**A Well, let me find the exact sentence again before I agree or disagree. Which sentence is that, Ryan?**
Q The New England --
**A I'm sorry, I meant the number. To pay a rate.**
**Well, yeah, now we're back to the mid 1600s. I didn't examine -- you know, when I talk about the schooling, I am talking about the United States of America, not the colonies. So, you**

145

**know, that would -- that doesn't sound wrong to me. But again, that's -- that's beyond the scope of what I normally look at and study.**

Q So would you say that by the founding New England district schools were no longer charging a rate?

Is that your view?

**A I would not say that none of them were. I would not be prepared to say that all of them were.**

**So I think that's -- I mean, I think what we're -- well, I will just stop and let you ask a followup question. I am happy to answer.**

Q At the time of founding, New England district schools were validly Christian. Right?

**A Sorry, can you repeat the question? The New England schools were validly Christian?**

**Is that what you said?**

Q Yes. At the time of the founding, New England district schools were validly Christian.

Right?

MS. LEVIN: Objection. Vague and Ambiguous as to "founding," the time of the founding.

Q You can answer.

146

**A Well, so if by founding you mean, you know, 1776, 1785, you know, 1787, you know, we could go through the -- whatever the founding era would cover sort of a period there.**

**There were certainly schools that were Christian at that time. I would not myself necessarily characterize those as being public schools or schools that were free and open to all. But, yes, there were certainly a number of those schools there.**

**And I think, you know, the -- some of this is sort of semantical, difference to be, you know, quite honest, I mean, you know, whether the glass is half full or half empty.**

**So at the founding, for tax reasons, for capacity reasons, for the fact that every state is actually in a different situation, New England, as this paragraph here alludes to, far ahead of the South. You know, I've said that public education doesn't begin in any meaningful sense in the South until after the Civil War.**

**So we really -- you know, we really have to talk at individual states, at individual times, rather than, you know, broad swaths, first of all.**

**But even when we get to sort of**

147

**individual ones, you know, and you see this in my report, that when Tennessee makes its commitment to public schools, it's not that it has public schools spreadsheet across the entirety of the state immediately; but rather it is the provision of free -- free and open schools for all that is really sort of the enormous task of government that begins in the founding era, and then continues to expand across time. Others would say, Well, we didn't really have many at that time. And I could say, Well, in some places that's true. The South did not have really any meaningful public education until later on.**

**And so it's really just a different story, a different time. But there are these commitments that extend back to the nation's founding regarding the provision of free education open to all. In fact, you know, James -- John Adams was articulating that. Thomas Jefferson was articulating that prior to what I would call the founding of the nation itself. And then it is their life's work and the life work of others to make that enormous task happen.**

Q I appreciate that, Professor. You know, in the interest of time I really would appreciate

148

it if you could try to limit your remarks to answering my questions directly.

MS. LEVIN: Sorry. Please don't tell the witness how to answer. If there's something that he -- if you feel he is not answering the question, then let's rephrase it and give him a chance to answer it. But he'll answer in full according to how he understands it.

MR. PROCTOR: I'm perfectly entitled to ask the witness to, you know, answer my questions directly and not digress. That's, you know, entirely appropriate and, it's important that witnesses not filibuster in depositions, as you and I both know.

MS. LEVIN: Next question please, Counsel.

Q So according to Paragraph 26 of Professor Green's report, local clergy -- many -- sorry, let me rephrase.

According to Paragraph 26 of Professor Green's report, local clergy tended to predominate in New England district schools.

Is that correct?

**A I mean, again, we're going to talk about which particular time period. I mean, he's**

149

**referencing the mid 1600s, which would be beyond the scope of -- of what -- of what I was looking at. So I don't have any reason to agree or disagree with what was going on in the 1600s. It is really beyond the scope of my expertise.**

Q Could you read the first sentence of Paragraph 26 for me?

**A Yeah. "At the time of our nation's founding, free, universal public schooling was nonexistent."**

Q So are you saying that after this Professor Green's discussion is limited to the mid 1600s?

**A No. And again, and my apologies, I wasn't trying to filibuster you earlier, Ryan, but I assumed we were going to move to this question. So I was kind of getting ahead of us. My apologies there.**

**So he is putting a modifier in front of the word "public schooling." So universal public schooling was nonexistent. That's certainly the case, that there was no universal public schooling.**

**And this goes back to my sort of phraseology about the sort of development of a**

150

**system. So that sort of as that word "universal." But then he does, you know, go back to, you know, the mid 1600s, which I assume he means -- he is sort of carrying that up to the nation's founding. But, you know, it does say the mid 1600s. And so, I just -- I don't have any knowledge of, you know, admittedly, not much knowledge at least, of what's happening before, you know, the 1780s or so.**

Q By the 1780s, is it -- excuse me.

Is it your view that by the 1780s local clergy were no longer dominant in the teaching in New England district schools?

**A Well, again, as to that, I can't tell you how many clergy were teaching or not teaching. I mean, and this is -- goes back to -- sorry for not having the definition of -- of, you know, half full, half empty.**

**You know, what my report sort of focuses on in the early founding era is the aspirations of those commitments to public education, not the failures to achieve it.**

**And so, I mean, I guess I would articulate what he's talking about is sort of the failure to achieve what I would call, you know, education open to all, if -- if clergy are running**

151

**it.**

**I mean, so I don't -- I could see why it would look like an inconsistency, but I think it's a -- he and I have a different point of focus. And his focus, you know, again admittedly goes beyond my expertise on some of those sort of points of focus.**

MR. PROCTOR: David, can we go back to Professor Black's report, Exhibit 1, please.

A/V TECHNICIAN: Any particular page of it?

MR. PROCTOR: Yes. Could we go to the next page, Page 11. Could you scroll down to the bottom of the paragraph, please. All right.

Q So you cite Jefferson's, A Bill for the More General Diffusion of Knowledge.

Is that right?

**A That's right, yes.**

Q That bill didn't actually pass, did it?

**A That's correct.**

Q And then, so I'm looking at Paragraphs 26 and 27, so Pages -- on Pages 11 and 12 of your report.

So you mention Massachusetts, New Hampshire, and Connecticut as early examples of

152

states with public schools at the end of the 18th century.

Is that right?

**A Yes. Well, Constitutional commitments to public schools, yes.**

Q Okay. Are there any other states that have Constitutional commitments to public schools at the end -- by the end of the 18th century?

**A I have to go back and look at a chart by date to know for sure on that.**

**You know, one of the -- there's a couple of sources that sort of chart them by year. I don't -- I don't know by specific year whether there were additional ones to them. I don't -- but I will say I don't think there's a huge number of -- of Constitutional commitments beyond them unless -- right, and there's always the "unless" -- you know, how we define it.**

**So you have sort of affirmative -- you have state Constitutions that make an affirmative obligation, sort of affirmatively requires a state to raise revenue or to support schools. And then you have others that actually place a limitation on using public school funds for something other than the public schools.**

153

**And when you do that, you're not actually mandating the creation of schools; you're just saying whatever money you have for them, don't spend on anything else. And sometimes states had statutes that preceded that.**

**So for instance, Connecticut didn't actually put education in its Constitution until the 1970s. But it had by statute I think actually maybe even earlier than that, then right after Massachusetts maybe.**

**But in any event, Connecticut had statutes there.**

**So when we say "Constitutional commitments," we have to disaggregate between affirmative and negative. And then we also shouldn't neglect statutes that may have been the forerunners to what later became a Constitutional provision.**

Q Did any other states have statutes that were the forerunners of a Constitutional commitment to providing public education by the end of the 18th century, to your knowledge?

**A I believe, as I just indicated, Connecticut -- I'd have to double-check the date, but I'm pretty sure that Connecticut did.**

154

**Pennsylvania is pretty old, but I'm not sure without looking back that it went into the 1700s. I really just have to think carefully about each -- each state.**

**But again, you know, we were talking about 13 colonies, so we've talked about three Constitutions and at least another statute or two. Whether there's a few more out there, I don't know. But in the South that certainly would have not -- not been as prevalent.**

**There weren't Constitutional mechanisms and the statutory mechanisms to the extent they might have existed were pretty rudimentary at best.**

Q Are you familiar with the New York Public School Society?

**A Not by that term. No. Not that specific society itself. Or at least it's not coming to mind at least immediately.**

MR. PROCTOR: Could we -- David, could we go back to Exhibit 21, please. This is Professor Green's report again. So Page 21, please.

Q Could you take a few minutes to review Paragraph 35 and let me know when you have.

MR. PROCTOR: David, could you scroll down. It crosses over to the -- to the next page too.

155

MS. LEVIN: Just to be clear for the record, same objection about any questions about this document just reading a paragraph out of context.

**A It's Paragraph 35?**

Q Yes. Yes.

**A I'm just going to open -- I have the PDF over here, so I am just looking over to the side for a moment.**

Q Okay. Yeah. By all means.

**A Sorry it's taking me a minute. I was reading the paragraph ahead of it.**

Q Read whatever you need to.

**A Okay.**

Q Does the discussion in Paragraph 35 of Professor Green's report refresh your recollection at all as to what the New York Public School Society is?

**A I don't think it's refreshing my recollection because I don't think I'm familiar with this particular -- you know, this particular incident. But I've read it now, and I've looked at it.**

156

Q Okay. So -- okay. So moving back to your own report then. Looking at Paragraph 28.

MR. PROCTOR: David, if you want to go back to Exhibit 1, PDF Page 12.

Sorry. Just give me one moment.

Q So you cite the Continental Congress's Public Land Ordinance of 1785.

Is that right?

**A Yes.**

Q All right. And that ordinance called for towns in the Northwest territory to set aside land for schools.

Is that right?

**A Correct.**

Q The schools established -- sorry. Let me rephrase.

The schools established in the Northwest territory charged tuition. Right?

**A I mean, I imagine some of them -- I mean, they could have. But the way that it was set up was that the -- or the way that the dictates of the Land Ordinance was that the center lot of each town would be reserved for the schools. And then the surrounding lots, nine of the surrounding lots would generate resources to -- for those schools.**

157

**And so the premise of Congress was that those schools would be supported by public resources.**

**Although due to mismanagement of those resources -- and some of this comes up in Tennessee's history -- those resources, some -- oftentimes were insufficient to fully run those schools. You know, the extent to which any of those schools may have required some resources from students is not something that I've, you know, focused on.**

**Because the point of the schools was for them to be self-supporting in that way, even though in practice they failed.**

Q Ministers frequently served as the teachers in the schools in the Northwest Territory.

Is that right?

**A You know, Ryan, I mean, I wish I knew the answer to that question. I have not gotten down to the level of -- of who were the teachers in schools.**

**In Ohio I have a little bit better sense not of the teachers, but of some of the fights and disagreements in those early schools. But I don't know who the teachers were or not.**

158

Q And the schools in the Northwest Territory were sometimes even held in churches.

Is that right?

**A That would have not been the intent, at least as I understood -- understand the intent.**

**Again, whether there were places that -- or churches that they learned in, I don't know.**

**Normally what you're dealing with in the territories is, at least that first school is on the frontier. I mean, literally, you know, you're -- a handful of people move west, they establish a town or they're populating a town. And, you know, there's nobody to sell land to other than the people who live there. So those people often pooled their funds to construct the buildings. But, you know, if they didn't have the resources, they would have them somewhere else.**

**Sometimes those buildings that they first constructed would double for other purposes. So it might be a town hall and a school. You know, whether somehow or other a church was involved in that is beyond my knowledge. I'm not aware of that being the case. It's not something I've studied, the actual facilities themselves.**

MR. PROCTOR: David, can we go back to

159

Exhibit 21. This is again Professor Green's expert report.

Q And, Professor, I will ask you to take a minute to read over Paragraph 28 and anything else you would like to related to it. Let me know when you have.

**A Paragraph 28?**

Q Yes.

MR. PROCTOR: So that's on Page 17, David, of the PDF.

A/V TECHNICIAN: I'm sorry, Counsel, what was the page number, please?

MR. PROCTOR: Seventeen.

A/V TECHNICIAN: Going to it right now.

**A Okay. I have read it, Ryan.**

Q Great. Thank you.

So according to Professor Green, the schools in the Northwest Territory were often supported by tuition payments.

Is that right?

**A Well, he says they were supported by taxes, lotteries, land sale revenues, and tuition payments. So he says they were supported by a multitude of things. And he does include tuition within that.**

160

Q And do you disagree with him on that point?

**A Well, let me read the preface again. "When and where schools were initially established" -- well, let me read the whole thing. Congress ...**

**Well, again he -- going back to the first sentence, he is talking about, you know, the expansion on the frontier. And so there is always -- you know, even in Pennsylvania which was not frontier in the mid 1800s by any respect. Right? It's an original colony, you still have these rural parts of Pennsylvania in which public education hasn't reached. And sometimes there is just no school at all. Maybe sometimes there's some religious group that's offering education, but it's not to everyone.**

**And so the challenge -- and I'm using Pennsylvania because it helps make the bigger point.**

**The challenge was to expand the system of public education. And so that really was a challenge, you know, even, you know, as late as the -- relatively late 1800s in Pennsylvania. But to acknowledge that challenge or to acknowledge**

**what may have been happening on the frontier does not negate the fact that they were providing -- going back to Pennsylvania -- they were providing, you know, public education free and open to all in those more developed parts of the state.**

**So part of it is sort of a scale-of-economy problem, to a certain extent. Part of it is a tax base. Part of it is the frontier.**

**So certainly when you show up in a location and there's not -- you know, there's not many facilities available, you know, other buildings, your own home, may be a place such as a church, may take precedent on that. But that doesn't change my conclusion, which is, yes, but the public education commitment had been established or the mandate had been established, but hadn't expanded all the way westward.**

**So if we go to Paragraph 28 again, which is what your question is about, there is this telling sentence here. "Land sale revenues." Right? So they had that land sale revenues.**

**So earlier when I was responding I was talking about the mismanagement of the system. So, you know, again, Congress's idea was, We'll**



**give you guys this ton of land. You can, if it's got natural resources you can manage it or you can sell it. And that revenue or those resources are going to support the school. And therefore you don't need, you know, lotteries or tuition payments, et cetera.**

**Unfortunately land speculators often took advantage in those early years. So they would buy the land at a very low, below-market rate. And so the public didn't really get the full value of the land that Congress had put there. Or, you know -- and this comes up in the Tennessee report -- people would squat on the land. And it made it impossible to sell. Or they'd say, We're going to pay but they never paid and they went bankrupt.**

**So part of this sort of, you know, variety of expenditures, particularly on the frontier, is that the land is not generating the financial value that it was expected to generate to support those schools. And so, of course, communities, you know, do what they need to do to provide education to their students.**

Q Professor, I appreciate the color. But I asked a precise question. I want to make sure I get your answer that's clear on it.



Do you agree or disagree with Professor Green that the schools on the Northwest Territory were funded in part by tuition payments?

MS. LEVIN: And I'll just object that the witness can't be limited to just agree or disagree if he needs to explain his answer.

**A But --**

Q All right. Go ahead.

**A My apologies. You know, I mean, I -- I want to give you a full answer because, you know, the -- you know, it's some schools. Right? If we say some schools, yes. All schools, no. And, you know, so that's the problem.**

**We can't -- we can't -- even though Professor Green does it, as we often as scholars do, we write a narrative. But, I mean, if we're really getting down to like a word that I am under oath to say is it all, is it some, you know, my answer, which is why I gave you the fuller one, is that it really varies.**

**But some schools, some schools, and he doesn't have the word "some" in there, some schools would have relied upon some form of tuition. And they might not have even called it tuition, per se. They may have called it fees,**



**fee schools. But in any event, some schools, yes. Not all.**

**And, you know, what's the percentage that did or didn't, I couldn't tell what you percentage did or did not.**

Q And do you agree with Professor Green that in the schools in the Northwest Territory classes were frequently taught by local clergy and sometimes held in church buildings?

**A I just don't know the -- I can't agree or disagree. I mean, I tend to -- yeah, I don't have personal knowledge of -- or personal research experience with who the teachers were in those schools.**

Q Okay. In your view, did the Continental Congress intend to facilitate access to religious education in the Northwest Territories?

**A Well, the Continental Congress in the Northwest Ordinances speaks about the encouragement of religion and education. It doesn't say religious education. So it speaks about two separate things there.**

**So the word "religion" does appear in the Northwest Ordinances, yes.**

Q So I understand your answer, did the --

165

when the Continental Congress promoted education in the Northwest Ordinance, was it trying to promote religion?
MS. LEVIN: Objection. It's beyond the scope of what this witness is being disclosed to -- for, and not calculated to lead to admissible evidence.
**A So, you know, Ryan, I think one of the challenges here, which is somewhat -- I don't know if it's unknowable, but at least I'm going to say it's very difficult to know the answer to, is that, you know, when we begin looking at dates, and Congress enacts, you know, the land ordinances of 1785 and 1787, the United States Constitution itself has not been enacted. So in 1787, literally just six weeks after -- or six or eight weeks after the land ordinances of 1785 or 1787, the First Amendment says Congress shall, you know, pass no law respecting the establishment of religion.**
**So, you know, you have a piece of legislation that is preconstitutional in some respects. And what we do see, though, with Congress in later periods of time, is that Congress itself does distinguish between**

166

**religious -- I should say between public education and other forms of education.**
**So in its enabling acts later on, it is requiring the states to reserve those schools exclusively for their public schools.**
**And so the tension is that you have Congress providing some level of potentially contradictory -- I'm not going to say they were contradictory because I don't fully know what Congress's intentions were. There is some ambiguity as to what they meant when they put religion in the land ordinances.**
**But there is no ambiguity in the First Amendment, which comes immediately after that. And there's no ambiguity in subsequent, you know, enabling acts when Congress itself begins to restrict the use of those funds for anything other than public schools. And then, you know -- well, I'll just stop there. I don't want to digress more. If you ask questions, we can go into it.**
MR. PROCTOR: David, can we --
MS. LEVIN: If you think it's a good place to stop for a break, we've been going about 70 minutes.
MR. PROCTOR: I -- sure. I have a -- I

167

have a brief line of questioning I think will take -- should take less than five minutes, and then we can break after that?
MS. LEVIN: That's good.
MR. PROCTOR: Okay.
David, can we pull up Exhibit 22, please.
(Black Deposition Exhibit 22 marked for identification and is attached to the transcript.)
Q Professor, can you tell what this document is?
**A It says it is the ordinance of 1787: The Northwest Territorial Government.**
Q And I will represent to you this is taken from Westlaw.
I mean, does this document look like what's commonly called the Northwest Ordinance?
**A I mean, I don't have any reason to think you've given me anything else. I will confess, I'm sure it's got -- well, it's only four pages here. Yeah, I haven't gone back and read the whole thing in a while.**
Q Okay.
MS. LEVIN: Are you able to testify under oath about it, Professor, or would you need to read it?

168

THE WITNESS: I think let's stick to specific provisions. If there is some provision I wouldn't feel comfortable with, I will say I wouldn't feel comfortable with that. So I'm comfortable moving forward under the condition that, you know, there may be some -- if it's outside of the scope of what I've normally looked at in the Northwest Territorial Government, then I may need some time to look at it.
Q Understood. And if at any point you feel you need to read more of the document to answer a question, of course I would never stop you from doing that.
MR. PROCTOR: David, can we go to Page 3, PDF Page 3.
Q So I'm looking at Section 14, Article III.
**A Yes.**
Q Feel free to read Article III. I imagine you've seen it before.
**A Yes.**
Q All right. Could you just read the first sentence of Article III for me, please.
**A "Religion, morality, and knowledge being necessary to good government and the happiness of**

169

**mankind, schools and the means of education shall forever be encouraged."**
Q So is it your testimony that it's unclear whether the Continental Congress meant to promote religious education in this provision?
**A That -- I would say it's unclear only because -- I mean, this is, you know, as -- as I assume probably many of us, you know, read enough Supreme Court and Court of Appeals decisions to know that you get these prefatory phrases. And the question is, you know, is it -- how does the prefatory phrase relate to -- relate to the operative phrase.**
**So the operative phrase is, you know, "schools and the means of education shall forever be encouraged." Certainly to the extent that one goes to public school, for instance, you know, that makes one able to read the Bible, for instance, if one, you know, learns to read there.**
**And so, you know, there is -- that's where the ambiguity is there. You know, because you said "religious schools." Right? And the word "religious schools" doesn't appear in this, in this Article III.**
Q Right.

170

MR. PROCTOR: Do you want to take a break until 3:05? Is that -- does that work for you, Professor?
THE WITNESS: Yeah. What time did you say?
MR. PROCTOR: 3:05. Five minutes?
THE WITNESS: Sure.
MR. PROCTOR: Okay. Great.
(A recess was taken.)
BY MR. PROCTOR:
Q So just before the break we were discussing Section 14 of Article III of the Northwest Ordinance.
Is that right?
**A Article III is what I -- I guess it's Article III of Section 14?**
Q It is a little confusing. Just let me -- I lost my place here for a second.
MS. LEVIN: Could we -- thanks. I was going to ask to put it on the screen.
**A I guess you're right, Ryan. They did the section before the articles.**
Q Yes, it is an oddly sectioned document.
So that first section, that first sentence, the religion, morality and knowledge

171

being necessary, et cetera, sentence, did state -- any states in the Northwest Territory incorporate that -- incorporate that provision into their own Constitutions?
**A I would have to go back and look at all of them to make sure. It's not -- no particular state is jumping out to me as having put religion in there. You know, the sort of necessary to good government is in some of them. But I -- I'm not sure that any of them have religion in there, but I could be wrong.**
Q So let's look back at your expert report, so Exhibit 1.
MR. PROCTOR: David, could we look at Exhibit 1, please. Paragraph 28.
Q All right. So you cite the Ohio Constitution of 1802.
Is that right?
**A Yes.**
Q And you cite Article VIII, Section 3 of the Ohio Constitution of 1802.
Is that right?
**A Yes.**
MR. PROCTOR: David, could you pull up Exhibit 23, please.

172

(Black Deposition Exhibit 23 marked for identification and is attached to the transcript.)
Q Okay. I'll give you a moment to review this document, and you can let me know when you have.
**A Yes, I have read it.**
Q Can you tell what this document is?
**A It says it's the Constitution of Ohio of 1802.**
Q Yes. Do you see how below that it says, Article VIII?
**A Yes.**
Q And then in the center it says, Section 3?
**A Yes.**
Q So is this -- this is the same provision that you cited in your expert report.
Is that right?
**A Yeah, that's right. And so that's why I was -- I was, you know, hesitating to say there wasn't any other one. Of course Ohio changes that prefatory phrase in the future. But, yes, so that word does appear there with the same, you know, ambiguity I would say that -- that's in Article III of the Northwest Ordinances that we just read.**

173

Q I apologize for having to ask you what might be a repetitive question, but it's the nature of depositions that we need to make a clear transcript.
That last sentence begins, "But religion, morality, and knowledge being essentially necessary to good government and the happiness of mankind, schools and the means of instruction shall forever be encouraged by legislative provision, not inconsistent with the rights of conscience."
That's what it says. Right?
**A Yes.**
Q Okay. And that language is drawn from the Northwest Ordinance?
Is that right?
**A Part of it is drawn from it. The overall clause is -- well, I don't know if the first part of that, that all men have a natural -- I don't know whether that's in the Northwest Ordinance in that particular phraseology. But certainly the word "religion, morality and knowledge," that little piece, yes, it looks -- it looks to mirror the Northwest Ordinance.**
Q But you said -- did I hear you correctly

174

you said that that language was removed in a later version of the Ohio Constitution?
**A Yeah. In 18 -- the 1842 Ohio Constitution makes an affirmative obligation. So this goes back to what I was saying earlier. You know, you have some Constitutional language like this which doesn't necessarily create an affirmative obligation to create public schools. And so in 1841 or '42, something like that, Ohio makes it an affirmative obligation of the legislature to create a system of public schools.**
**And at that point I don't think that religion is in there, because there ended up being a lot of fights amongst the religious denominations regarding that particular education clause.**
MR. PROCTOR: David, could you pull up Exhibit 24, please.
(Black Deposition Exhibit 24 marked for identification and is attached to the transcript.)
Q I'll give you a chance to review that, and you can let me know when you have.
**A Yes.**
Q Can you tell what this document is?
**A It says it's the Ohio Constitution of**

175

**1851.**
Q Yeah. So it says at the bottom, 1851 Constitutional Convention. Correct? Under credits?
**A Yes, that's what I was reading from.**
Q And then below that it says, "Current through Files 84 and 86 of the 136th General Assembly (2025-2026)."
Do you see that?
**A Yes.**
Q Okay. So I'll represent to you that this is Article I, Section 7 of the currently in force Constitution of Ohio.
**A Okay.**
Q And then could you read that last sentence for me of the operative text.
**A "Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the General Assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction."**
Q So would you agree that the language connecting religion and morality to education was

176

not cut out of the Ohio Constitution?
MS. LEVIN: Objection. Vague as to "connecting."
**A What I would say is -- and I would have to -- I don't have all the Constitution in front of me, I'm looking at individual sections. But a couple of -- if you indulge me for just here a moment. There are a couple of things going on here. This is not the education article. At least I don't believe this is the education article.**
**This is the religious freedom provision in the -- in the Ohio -- at least I believe it to be the religious freedom provision. And I think that's -- I don't know if that's true of the first one that you showed me a moment ago. But it certainly had religious freedom in it.**
**The Ohio Constitutional article -- education article today is -- speaks specifically to the obligation to operate common schools, and those schools are to be nonsectarian. There is limitation on the use of funds for private schools, whether they be religious or nonreligious.**
**And so I think, you know -- and again if**

177

you'll forgive me for just a moment, I mean that's sort of the tension that goes -- I think actually this clause and the one you showed earlier is teasing out even more so about the Article III from the Northwest Ordinances, which is Congress is warranting -- and these states, to protect religious freedom and religious conscience, at the same time that they are creating public schools which are separate from religion.
But, you know, they also want to make sure that within those schools there still is freedom of conscience. Because there was a lot of, you know, religious tension among denominations, et cetera.
So short story, yes, this language as you -- as you initially said would seem to mirror the -- the parts of the language from the Northwest ordinances. But I mistakenly thought what -- or maybe correctly that the one we were looking at earlier was actually the education article. Now that I see this, it makes me suspicious of where the other one was religious article. But I know that there is a religious article in the Ohio Constitution in addition to this. And it doesn't read like that.

178

Q Let's go back to your expert report again, so Paragraph 29.
MR. PROCTOR: David, can you take us to Exhibit 1. And this is on Page 12. Or Page 13, actually, but Paragraph 29.
Q Professor, whenever you're ready, feel free to review.
A I am ready.
Q So you referred to the Pennsylvania 1790 Constitution in Paragraph 29 of your expert report.
Is that right?
A Yes.
Q Okay. And you say that Pennsylvania 1790 Constitution required it to provide free education to poor children.
Is that right?
A Correct.
Q Do you know -- sorry, let me rephrase.
How did Pennsylvania fulfill this Constitutional obligation in the 1790s and early 1800s?
A To the poor children?
Q Yes.
A Yeah. Although I may have -- just to be

179

clear, I used the word "poor children." It was paupers, P-A-U-P-E-R-S, pauper schools. Which don't necessarily mean poor. Some of those were sort of abandoned and neglected children. And so I'm sure there were poor children who had, you know, two parents and then couldn't afford to go to school. And they would have went there.
But in any event, to your point, yeah, there were -- I don't know if all or some. But I know in Philadelphia at least -- I can't speak to everywhere -- that in Philadelphia a religious society was providing -- or a religious charity, some sort of religious society, was operating those pauper schools.
Q And were -- sorry. Was it -- you said a religious society. Was it a religious society, or was it a group of denominational schools?
A I really don't remember, Ryan. What I do remember was that when they were -- when they were updating the Constitution, that there were some religious organizations. I don't remember if it was the Catholic Sisters of Charity. I don't remember the specifics. But I remember them, you know, advocating on behalf of the continuation and operation of their schools because they were

180

concerned about the effect of the new Constitutional provisions on theirs.
But I just -- I don't remember whether it was several, some, or one.
Q Do you know if it was free for poor children to attend those religious schools?
A Well, again, I probably use an overbroad phrase of "poor." They were -- they were technically pauper schools, which is -- I mean, I don't want to use derogatory language. But, you know, I mean, part of the problem is you kind of had -- I don't want to call them a "problem." You had children that didn't seem adults were taking responsibility for them. So that may have been because their parents were wayward, overworked, or had abandoned them. So I just point I think paupers is narrower than what we would think of as poor children now. But those -- those children that fell out of the classification of pauper, it's my understanding, yes, they would have been going to those schools for free.
Q In your view, did any states in 1791 provide free education open to all?
A In 1791? Well, this -- this goes back to when we say the word, "did some states," or "did

181

**states." Do we mean do all states, did some states, did one state.**

**And when we say, "did the state," do we mean the state provided free public education open to all throughout.**

**So it was not the case that all states were providing school -- schooling to all students throughout their states in 1791. But there were -- there were schools that were providing schools or providing for education that would roughly be open to all, in some rough sense. But, of course, there could have been exclusion of -- of black students, for instance. And so there could have been exclusions.**

**But I -- again, at an individual level, you know, it's going to vary, the extent to which they're open to all, so to speak. And open to all doesn't mean the same thing in, you know, 1791 that it would mean in, you know, 18, you know, 68 or 1968, for that matter.**

Q Was there any state in 1791 that had a system in place that provided free education to all students of all races and social backgrounds?

**A I am not aware of statewide schools, universally across the state, open to all regardless of race, no.**

182

Q In 1791, did any state provide -- sorry. Let me rephrase.

In 1791, did any state have in place a system that provided free education to all white children of all social backgrounds?

**A Well, you know, again, Ryan, I appreciate the question. But there's a couple of different operative -- this goes back to that structure policy question we were engaged in much earlier.**

**You know, the state can say that all townships shall do X. Right? But that doesn't mean that all townships were doing it or doing it the way the state provided.**

**So those early statutory frameworks in some of the states did indicate that all of the states were supposed -- or all of the townships were supposed to, you know, enact a tax and make it open to their kids. That doesn't mean they actually did do it or that it actually was.**

**And again, you know, your smaller townships in the more rural areas probably did nothing. You know, whereas a Cambridge, Massachusetts, you know, probably did a lot more.**

Q Is your view that -- sorry, let me rephrase.

183

In 1791, were there any states that on paper called for providing free education to all at least white children of all social backgrounds to --

**A I --**

Q I think I lost my -- let me reask the question. I can't remember if I finished it properly.

In your view, in 1791 were there any states that on paper called for providing a free education to all at least white children of all social backgrounds? And I appreciate that they may not have lived up to it, but I'm just asking about on paper.

**A Yeah, I mean, Ryan, just because I'm under oath, I would want to read those statutes again to mirror the precise question that you're asking.**

**But speaking more generally, understanding that there's lack of precision, I mean, states did mandate that townships of a certain size -- I mean, that was the other thing I guess that was excluded, right, those early statutes only kicked in the duty when you had a certain number of people living there. And, you know, I can't even remember what that number is off the top of my head, how many people in a town, if it's 50 or 100 or what-have-you.**

184

**So, I mean, I would want to look at that to make sure I didn't mis -- misspeak. But I know that there were statutes that mandated, you know, that the public tax themselves to support those schools. Very early on. But again, I would want to look at specific dates and see what the specific language is in particular states.**

**So I would -- you know, I would start looking at a couple of states. I just didn't go back and look at those specific statutes in preparation for this deposition. Or the --**

Q Sitting here today with what you know right now, your testimony is you're not certain whether there were any states that, at least on paper, required the provision of free education to at least all white children of all social backgrounds?

**A Well, you can't --**

MS. LEVIN: Objection. First, vague as to on -- vague and ambiguous as to "on paper."

And then also object to mischaracterizing

185

the witness's testimony.
**A Right. It's really that word "all" that -- that's -- that I am getting hung up on there.**
**You know, sometimes there's ages that are wrapped around those. Sometimes there's not. So it -- I'm not trying to be evasive. I'm just trying to be careful in saying that, you know, you're using a definition and asking me whether any -- any state specifically had a statute and a specific year that would meet that. And it's my inclination that the answer to that -- you know, I'm -- it's my inclination that that would exist, but I wouldn't want to definitively say under oath that in that year at that time that it fit that specific definition without looking at those statutes. Because I just wasn't operating at that level of detail when I was -- when I was writing the report.**
Q Would you agree that -- scratch that.
Education in the early republic was overwhelmingly private.
Is that correct?
MS. LEVIN: Objection. Vague and ambiguous as to overwhelmingly:

186

**A I would say, as I did in my report, that the earliest schools in most places, or in many places, were -- were private schools intended to also be religious schools. And that is partly -- you know, that is a function of sort of tax base, frontier, and capacity.**
**And so those schools, you know, got a head start, so to speak. And this is noted in my discussion about Tennessee, for instance, that the first schools in Tennessee were religious schools.**
**So, you know, as I understand and specify your question, yes, I mean, the first schools in many locations were religious and continued in operation until the public system could get up in operation.**
**And then once it began operating it tended to quickly outpace those religious schools.**
Q Is education in general a traditional and exclusive government function?
MS. LEVIN: Objection. Vague and ambiguous as to "education in general."
**A Well, yeah, I mean, could you repeat the question again, Ryan?**
Q Let me rephrase it. Let me actually just repeat it.

187

Is education writ large a traditional and exclusive governmental function?
MS. LEVIN: Objection to "education writ large." Form objection. Vague and ambiguous.
**A I'm sorry, my mind just loses track when there is -- I'm sorry, Ryan, could you just ask me one more time? I just don't want to miss the way you phrased it the most recent.**
Q Is education, writ large, a traditional and exclusive governmental function?
**A I mean, I would -- I don't -- I don't really -- "writ large" may be a superfluous phrase, at least in my mind.**
**It is -- you know, have people other than government provided -- or other than states provided education throughout, you know, American history? The answer to that question is yes.**
Q From the founding through the early 19th century, federal, state, and local governments provided aid to private denominational religious schools.
Is that correct?
MS. LEVIN: Objection. Are you -- is that a quote, just to be clear? Are you reading from something?

188

Q You can answer my question.
**A Could you -- could you read it or ask it again, Ryan.**
Q Sure. From the founding through the 19th century, federal, state, and local governments provided aid to denominational religious schools.
Is that correct?
**A They have provided support. States have provided support to private and religious schools. That began to be sharply circumscribed as we move through the 19th century, and that's probably a different story in every -- in every state, as to the precise time and the precise, you know, sort of exceptions.**
**But, yes, state has provided some resources at times, you know. The size of that support would certainly -- would certainly vary. But they have provided support to schools.**
**And the other question, I should just say, which is embedded in that question, is, you know, was the state violating its own rules at the point that it did it. So again we sort of get into this sort of issue of, you know, are they using funds on schools that they should or shouldn't be using, you know, so -- and then what**

189

**is the nature of the support.**
**But, yes, there has been some support provided to private schools. But it was circumscribed, as I said, more and more so across time.**
Q So earlier we discussed the Fourth Circuit's en banc decision in Peltier V Charter Day School.
Do you remember that?
**A Yes.**
Q And you have discussed that opinion in your scholarship.
Is that right?
**A I have cited to it. I may have -- I think I discussed it for a paragraph or so somewhere, yeah.**
Q Did you -- sorry.
Have you read the separate writings in Peltier?
MS. LEVIN: Objection. Vague and ambiguous as to "separate writings."
**A Do you mean the concurrences, the dissents, what --**
Q Yes.
**A Yeah, I mean, I have not read the**

190

**concurrences. I don't know if there was any concurrences.**
**I recall at some point reading the dissents and maybe a concurrence. But I haven't read the dissent or the concurrence, or the majority for that matter, for probably over a year. But I generally recollect it, yes.**
Q Did you read the panel decision that the en banc court vacated in Peltier?
**A I -- I don't know. I don't know that I did. You know, I wasn't -- I don't think I began to pay much attention to that case until it went en banc, and then really sort of looked for the results.**
**I may have read it at some point, but it doesn't come to me immediately.**
Q Are you familiar with the First Circuit's decision in Logiodice v. Maine Central Institute?
**A Not by name I'm not.**
Q Okay.
MR. PROCTOR: David, can we pull up Exhibit 9, please.
(Black Deposition Exhibit 9 marked for identification and is attached to the transcript.)
MR. PROCTOR: Actually, sorry. I would

191

like to pull up a different exhibit. Can we pull up Exhibit 27.
(Black Deposition Exhibit 27 marked for identification and is attached to the transcript.)
Q Professor, I want to give you -- so I -- earlier I just mentioned if you were familiar with the decision Logiodice V Trustees of Maine Central Institute. I want to give you a chance to review this exhibit and let me know if -- you can let me know if it becomes familiar to you upon reviewing it.
**A I don't think I've ever read this case before. I mean, it's possible that I read a portion of it and cited to it in my scholarship for some small point. But I don't think I've -- I don't think I've ever read it from start to finish.**
Q Does it -- does it refresh your recollection at all if I tell you that this decision was cited in Peltier?
**A I'm sorry, Ryan, it doesn't. I mean, I haven't read -- you mean in the panel opinion or in the en banc opinion?**
Q Both.
**A Yeah, I mean, then I would have perused**

192

**across it. But I wouldn't have logged the name of it or went and read it then.**
MS. LEVIN: So just to be clear, Professor, to the best of your recollection you haven't read this document?
THE WITNESS: To the best of my recollection I have not read this document, no.
MS. LEVIN: So would you be able to answer questions under oath without reading it through?
THE WITNESS: I mean, I wouldn't be able to -- to speak intelligently about any nuance of it. Maybe there's some -- some question I might be able to speak to. But I would imagine there's probably more that I couldn't, depending on, you know, what the nature of the question was. I just -- I haven't -- I haven't read it before.
I am impressed that Ryan got it out of a hard copy, though.
MR. PROCTOR: I am a sucker for the old Federal Reporters.
THE WITNESS: I'm surprised your firm still purchases them.
MR. PROCTOR: Can we go back then to -- could we go back to Exhibit 9, then.

A/V TECHNICIAN: Please stand by. Let me bring it back up.
MR. PROCTOR: Actually, I'm sorry. I know it's a little early, but I could really use a glass of water.
Do you guys mind if we take a brief break now?
MS. LEVIN: No problem at all.
MR. PROCTOR: Okay. Great.
MS. LEVIN: Do you want to take a five-minute break or ten-minute break?
MR. PROCTOR: Why don't we say ten. Do you mind if we do 3:55?
MS. LEVIN: Sounds good.
MR. PROCTOR: Great. Thank you.
(A recess was taken.)
BY MR. PROCTOR:
Q So I appreciate that you haven't -- sorry. I understand that you haven't read Logiodice. I'm not going to ask you questions based on reading it.
What I am going to do, though, is I'm going to make certain representations to you about what the opinion says. And I'm going to ask you to answer certain questions based on that



assumption.
All right. So I'm going to represent to you that the Logiodice opinion says that Maine law, the law in the State of Maine, has allowed for localities to contract with private schools to offer free education open to all as early as 1873.
Do you have any reason to disagree with that?
**A I don't have any reason to disagree with that. I don't know that they actually were open to all. And that we've gone back and forth, you know, about the sort of reality versus -- but I don't have any -- any reason to disagree with that, that formal statement.**
Q I'm going to represent to you that Logiodice also says that New Hampshire law has provided for local school districts to contract with private schools to offer free education open to all as early as 1874.
Do you have any reason to disagree with that?
MS. LEVIN: Objection. I know you said that it's not based on the document, but you are representing what's in the document. So just calls for speculation. He didn't read it.



**A So New Hampshire law provided 1874. What year did you say for Maine?**
Q 1873.
**A 1873. Okay. Thank you.**
**I'm sorry. Is there still a question on the table?**
MS. LEVIN: Do you want to have it read back?
**A Sorry, Ryan.**
Q So I am going to represent to you that -- I'm going to represent to you that according to the Logiodice opinion, New Hampshire law provided for local school districts to contract with private schools to offer free education open to all as early as 1874.
**A Okay.**
Q Do you have any reason to disagree with that statement?
**A I don't have any reason --**
MS. LEVIN: Same objection. Same objection. We can stipulate to it.
MR. PROCTOR: Okay.
MS. LEVIN: To that for all questions involving, you know, what you're representing about the Logiodice decision.



MR. PROCTOR: Sure.
**A I mean, I haven't read it, but I don't have any reason to -- I forget the phraseology you were using, but I don't have any reason to disbelieve it, yeah. But I haven't read it.**
Q And in Vermont, local school districts have been allowed to -- sorry.
And in Vermont, local school districts have been able to contract with private schools to offer free education open to all since at least 1901.
Do you have any reason to disagree with that?
**A Well, surprisingly enough, I mean, I will say I thought that that general system, if I -- that you're describing, and if I am remembering correctly, actually goes back further than those dates. But maybe I'm just misremembering.**
**But generally speaking, you know, without having read it and looked at it again, I don't have any -- I don't have any firm reason to disbelieve it.**
Q And by 1873, did Maine, New Hampshire, and Vermont all have education clauses in their state Constitutions that required them to provide

197

public education?
**A I would -- I mean, I'm pretty sure. But again, I'd want to read them. But I'm pretty sure the answer to that question is yes. Yeah, based upon I think by 1873 the only state that didn't was Connecticut. So by math, I would -- I would say that's -- that sounds like a fair statement. Or maybe it was all states by 1879 except for one. So probably, yeah. Probably.**
Q Okay.
MR. PROCTOR: David, can you pull up Exhibit 28, please.
(Black Deposition Exhibit 28 marked for identification and is attached to the transcript.)
Q Do you recognize this document, Professor?
**A Yes.**
Q And what is it?
**A It is an Amicus brief in Carson versus Makin.**
Q And are you one of the authors of this brief?
**A I am one of the authors of this brief.**
Q And you co-wrote this brief in support of the respondent.

198

Is that right?
**A Respondent being -- yes.**
Q And you anticipated my question. And the respondent was the Maine Commissioner of Education.
Is that right?
**A Yes.**
Q At the time you wrote it, did you agree with the positions expressed in this brief?
**A Yes. At the time I wrote it I would have agreed with the opinions expressed.**
**I would only note that, you know, the final, final version that went out the door was sort of in Art Coleman's and Michael Brown's control. And that was quite a -- I don't want to -- I guess we were counsel on who were the -- I don't want to divulge any confidences there.**
**But all I would say is, you know, that my involvement in the -- in the last period was minimal. So to the extent that there's possibility of some -- some change or something, then that possibility is there. But I'm representing that I would imagine that 98, 99 percent of it I'm familiar with.**
**I didn't go back and read the final thing**

199

**that was submitted.**
Q Okay. Do you still agree with the positions expressed in this brief?
**A I mean, I would think. I'm just -- I'm just, you know, kind of waiting on a specific -- a specific question. That's a broad one.**
**I mean, generally I don't put my name on things I don't agree with. But to the extent there's -- there's some specific word that was added or changed that I might have at the time thought there should have been more nuance to, I don't know whether that's the case or not. I'm just being careful, given the broad question there. That's why I went with the 98, 99 percent.**
Q So let's look at Page 10 of the brief.
MR. PROCTOR: David, that's PDF Page 21. David, it's 21 in the -- in Adobe.
Q So do you see the last sentence of the top paragraph, "Indeed, all states, including Maine, provide for public education through their own Constitutions"?
**A Yes.**
Q Okay. So in this brief you acknowledge that Maine has a Constitutional duty to provide a free public education.

200

Is that right?
**A Yes.**
Q And you -- that's a position you still agree with today?
**A I mean, that's what the Constitution of the State of Maine says, to the best of my recollection. So I don't think that it's a position. That's what it -- that's what it says.**
Q Can we -- let's look at the next page. I'll give you a moment to just review that first full paragraph.
**A Yes.**
Q So one way that Maine provides its full Constitutional duty to provide a free public education is by contracting with private schools.
Is that right?
**A Well, let me just say one thing. I'm glad I was sort of being, you know, careful.**
**You know, that is me, except -- that last sentence there is me accepting the joint stipulated facts of the parties, rather than me investigating, you know, the matter in some sort of detail myself.**
**With that said, yes, I am aware that Maine creates an option whereby some of their**

201

**students in some districts can -- the local district pays for their tuition to go to high school. That's not for K through -- that is not for K through 8, I don't believe. I believe it's only for high school, but ...**
Q Then let's look at Page 4 of the brief.
MR. PROCTOR: So, David, for you that's Page 15 of the PDF.
Q Would you be able, Professor, to take a minute to review the first paragraph on the page.
**A Yes.**
Q So in this brief you say that private schools that Maine contracts with are assisting in the execution of a public function.
Is that right?
**A Private schools that may exist in the execution of a public function, yes. That's what -- that's what the brief says.**
Q And is that a conclusion you agree with still?
**A What I would say is that, you know, the overall -- so the overall nature of the discussion that's happening in this case is far different than the current one. I would add a couple of things. And again, you know, my task in working**

202

**on this brief is not to sort of litigate a separate case against Maine.**
**But I do think that it is -- I have to go back and look at Maine's Constitution, but I think it's plausible to say, to be quite honest, that -- that Maine may have, in fact, been violating its own state Constitution by failing to provide high schools to students, public high schools to students in all the communities in Maine.**
**Rather than doing that, Maine took it upon itself to -- and has long done so, for reasons that we could discuss if you want -- has taken it upon itself to try to provide some other maybe lesser option. And that's what they've done here.**
**So when I say that they may assist in the public function, that particular sentence, what I'm communicating is that Maine is taking the position, right, that they are going to allow these private schools to assist in carrying out their Constitutional duty. I'm not sure that Maine -- I don't know, I'd have to go and examine it, I don't know for sure that Maine is in compliance with its own state obligations when it does that. And in fact, that is a serious point**

203

**of contention.**
**But given the nature of, you know, the dispute in this case, which was really an establishment clause and free exercise, that -- that distinction wasn't really pertinent to the -- to the discussion there, so it doesn't show up.**
Q Let's go back to Exhibit 1, your expert report. Let's look at Paragraph 42 of Exhibit 1.
**A Paragraph 42, Ryan?**
Q Yes. So that's on Page 19 to 20.
**A Yes.**
Q I'll give you a minute to review it, if you'd like.
**A Yes.**
Q You're contrasting public education and private education in this paragraph.
Is that right?
**A That's right.**
Q Is there any particular time period that this comparison applies to?
**A Let's see. Well, if we go to first, right, I'm speaking of, you know, what we call the early -- early statehood, depending upon individual state. Right? So public schools first to open in many locations. Then I state they came**

204

**to function of private rather than government. So we've got a reference to something that was sort of early, we'll just call it early -- I will call it early in statehood and their initial -- now, there were certainly other private schools formed later in time.**
**Second, private schools were not free; they charged tuition. That is -- there are exceptions to -- to how much the -- you know, maybe -- well, that would be early period and now as well as a general -- as a general position.**
**The third one, as a result of their tuition and fee structure, they were not open to all.**
**These are all past tense. So I'm generally speaking about them -- yeah, I think this is generally speaking of early statehood type of periods where the -- you know, when you're looking at the early periods in states.**
Q What do you mean by "early statehood"?
**A Well, I use that phrase because every state, you know, enters the union at a different point. And that late entrance into the union is reflective of the fact that they were at least unsettled by -- by Europeans at that -- at that**

205

point in time.
And so, you know, those schools, the school system emerges at different points. Right? So Utah, you know, has both private and public schools at a later point in history than -- than would, you know, South Carolina, for instance. So I use statehood just to go each state's got its own sort of historical trajectory in terms of when it was first established.
Q So depending on the state in question, these points could be talking about as early as 1776 and as late as 1958?
A Just out of -- out of caution I would say I didn't think much about our most recently, you know -- I haven't actually sort of looked at Hawaii. I know that it has a statewide structure. There's only one school district in the whole state. So some of our more, you know, Alaska, I actually know a bit about Alaska. But I sort of haven't reviewed them in the context of these historical things.
So when I talk about this, I think it's safe to say I am thinking about, you know, the -- you know, the late 1700s through the late 1800s is probably a fair -- a fair characterization.

206

Q Would you agree that there's a long tradition of private charity schools in America that have provided free education to indigent children?
A I would agree that there have been charity schools. Sometimes those schools -- and again, you know, it's dangerous to speak of all of them. But the ones that are coming to mind, those schools actually weren't open -- necessarily open to children who didn't need charity.
So, you know, you might have, like, a society -- and we certainly had this in South Carolina -- a charity society, but it was -- it was a school only for poorer children. So if your -- or pauper children, to use that phrase earlier.
So it wouldn't be the case that just anyone would be going to that school. It's really sort of religious charity, which I think of as kind of a narrower -- a narrower subset of school.
Q In the I guess -- sorry. In the latter half of the 19th century, you know, what kinds of social classes would have attended Catholic parochial school?
A What social classes would have attended

207

Catholic parochial school. I have not studied Catholic parochial schools in the later half of the 19th century, so I can't speak in generality.
What I can speak to is -- or at least not off the top of my head I can't. But what I can speak to are the discussions that were happening in Ohio in the later 19th century regarding Catholic schools. And from those materials that I consulted, it was my -- would have been my impression that, you know, Catholics as a whole would have attended those schools, so the parishioners.
I don't know whether, you know, pauper children, for instance, would have been going to some separate class or something for those Catholic schools. But I think generally speaking, overall mass of Catholics would have attended those schools. But there still could have been limitations.
So, for instance -- in what year? In the mid 1800s, for instance, some Catholic societies ran schools for black children separate and apart from white children. So they would have been, you know, a racial distinction. And to give credit to those Catholic schools, they were providing

208

education to black children that sometimes, you know, no one else would, because of -- at all, for racial reasons.
So, you know, the short answer is, I am familiar with Ohio. And my take from that would have been that the general population of parishioners, it was my impression they would have attended those. I don't know that did or did not include pauper children or whether they had some sort of separate arrangement.
I know in South Carolina, though, for instance, black children did not attend school with white children, even though the Catholic Church seemed to have been providing some form of charity to some black children.
Q Do you have a sense of in the latter half of the 19th century how large a proportion of private schools in America Catholic parochial schools were?
A Just so I'm getting my math right. You mean what percentage of them in relationship to other religious schools, or what percentage of them in relationship to public schools? What, just so I understand?
Q I didn't do the best job there.

209

Of all private schools in the U.S., any sense of what proportion of them would have been Catholic parochial schools?

**A Well, again, you used the word "sense," which means I am speculating. I can only speculate with hard -- without any hard number. So I wouldn't speculate as a precise percentage.**

**What I -- what I could say is that -- that I would imagine the percentage probably increased in the latter half of the 19th century, but I couldn't tell you what the -- what the precise percentage was at any point in time.**

Q Okay.

**A Ryan, I actually misspoke much, much earlier. Do you mind if I make a clarification? Just a quick one.**

Q Sure.

**A When we were talking about religion earlier, or this Ohio Constitutional clause, I think I may have said -- you know, we were looking at the provisions that you had up there. And I said, but there were -- I think I may have said, but there's a separate religion clause. I meant to say but there is a separate education clause. So I think I may have inadvertently used the word**

210

**"separate religious clause." I meant separate education clause.**

Q Okay. Can you tell me in what sense charter schools in Tennessee are open to all?

**A Well, let me pull out my report here just so I -- I list like, you know -- I list several things in regard to charter schools here. Let me see. Charter school.**

MS. LEVIN: Ryan, could you read the question back?

Q Professor, did you get my question?

**A Well, I was looking to read from it. Rather than me maybe mischaracterizing your question, do you mind just stating it again? My apologies. I was just flipping to find it.**

Q Let me start with a basic question: Are Tennessee charter schools open to all?

**A They are open to all in the way that I define it. They're not open to -- well, actually, I have to go back. I don't think -- I don't think you're supposed to cross districts. So again, this is where all always operates within some context. So I -- maybe I'm misremembering that, but I think you're -- you know, I don't think you're supposed to cross boundaries for a charter**

211

**school outside the district, so. But other than that, yes, they would be -- they would be open to all. And I would treat that as being open to all because public schools have district boundaries as well.**

Q So a traditional public school is still open to all, even though it has district boundaries. Right?

**A That's what I meant. I just -- the only reason why -- again I try to be difficult, Ryan, the Tennessee Constitutional convention got all worked up at one point, which is in the report, because they were afraid that random people from some other state might show up and go to their schools or something like that.**

Q Do charter schools serve the community as a whole?

MS. LEVIN: Objection. Vague and ambiguous as to "community as a whole."

**A Well, it depends what you mean by "serve."**

**I mean, the charter schools located in a district would be free and open to all within that district. So they would be free and open to all to the students in that district. Unless I'm**

212

**misremembering and you can cross districts too. I'm just -- I'm forgetting at the end of the day, but I don't think you can.**

Q Is part of what makes public schools public the fact that they serve a cross-section of the community?

**A Well, there's a lot of factors that make a school public. One of those is serving all, which, you know, presumably would be a cross-section. But that's not -- that's not the exclusive factor that makes -- that makes the thing public.**

Q Would you agree that part of the idea of a public school is that it's a place for the entire political community to be educated and not just some subset of it?

**A That is a -- that is a key -- again, there's multiple factors. And that certainly is a -- is an important one.**

**You know, as I point out going back to that long history, I mean, John Adams very early on had articulated, you know, the idea that these schools needed to serve the highest and the lowest ranks of society and people from all different walks of life. So that is certainly one of the**

213

**factors, but that's not the only factor.**
Q Do you think that charter schools meet that factor?
**A I think that charters are designed to meet that factor. I have been -- I have been critical of some charter schools in the past for what would seem to me to be a failure to meet a cross-section of all students. So -- and I won't digress.**
**But, you know, I participated in an Amicus brief in New Jersey, for instance, where the laws articulated and the Constitution of New Jersey would have dictated, you know, that all of the charter schools needed to be serving a cross-section. But in practice it didn't seem that the education commissioner was enforcing that requirement, and the schools were -- seemed to be diverging from that.**
**So yes, as a matter of idea, principle, and law, yes. Are there instances where they diverge from that, they do. But that's inconsistent with law the same way when schools engage in racial segregation. You know, they're formally open to all but in practice are not really open to all, and so they're subject to 14th**

214

**Amendment challenges and things of that sort.**
Q Is there anywhere in Tennessee where charter schools are the default form of education?
MS. LEVIN: Objection. Vague and ambiguous as to "default."
**A So if by "default" you mean -- were to mean that they are the primary provider of public education, or if you meant that's where most or all of the students go, I'm not aware of any of the school districts doing that.**
**But -- it is a very significant but -- in Memphis, you know, Memphis did -- did substantially alter its public education structure. I -- you know, the particular year now is escaping me.**
**But they moved to what experts call, I don't know that Tennessee called it, but experts called it portfolio model. Because there was so much penetration of charter schools in -- in Memphis that if they weren't -- they may not have been the majority, but they were certainly becoming probably a very enormous slice in the Memphis School District itself, which doesn't actually exist anymore. Now it's been subsumed, and lots of things we need not go into there.**

215

**But it was -- it was a very large percentage of the schools. And so, you know, I wouldn't put "default" on that, because I don't know what that means. But it was a very, very major piece of the delivery of public education in Memphis.**
**And then Tennessee itself also created the Achievement School District, which also operated in Memphis. And that was a charter -- that was a -- in my recollection, and feel free to correct me or show me otherwise. But my recollection is that the state itself was exclusively running a system of charter schools there to try to turn around the overall system of public education.**
**I confess, I can't say exactly how it interacted with -- with the regular Memphis public school district, but that was the case.**
**Now, subsequent to that, due to racial and other demographic issues, Memphis dissolved itself, and therefore Shelby County had to take it over. And after that happened, a couple of communities in Shelby County said, We want to secede, we don't want to be part of Shelby County. So they broke off. Those were racially isolated.**

216

**All that to say the percentage of charter schools is probably lower when you look county-wide in Shelby County now. But if you looked, you know, within the city boundaries of Memphis, I would venture to speculate that it's still a very high portion of the delivery of public education in the City of Memphis.**
Q In Knox County, are charter schools approaching the numbers in terms of enrollment of traditional public schools?
**A I will first stipulate I am -- if that's such a thing for witnesses to stipulate, that I am speculating when I say no, I don't believe they are, but I have not consulted the numbers in Knox County.**
Q Okay.
**A Let me just for, because you asked the question and I want to be sure to give you a complete answer.**
**In Murfreesboro, just below Nashville, if you look at the charter schools there, although they, themselves, probably don't look like an enormous percentage in relation to the public school percentage all by themselves, if you looked at student growth or sort of new schools open, I**

believe that charter schools actually do have a very substantial portion of the schools there. And that's because Murphys -- are you from Tennessee, Ryan?

Q From Atlanta, so ...

A So Murfreesboro is just south of Davidson County, where Nashville sits. Enormous growth, you know, enormous, fast-growing.

So because the growth is happening so quickly and with construction costs for, you know -- you build a public school, you build it to last hopefully for a hundred years or something like that.

And so charter schools, you know, interestingly enough, have been able to help the Murfreesboro schools manage growth because they can open faster.

So in the absence of -- I should just say in the absence of charter schools in Murfreesboro, you know, the system physical capacity would be strained. But charter schools, you know, in conjunction with that system, is meeting -- you know, providing seats for all the public school students there in Murfreesboro.

Q Let's talk about the history of public



education in Tennessee.

The first common schools in Tennessee were poor schools.

Is that right?

A I'm sorry, they were poor schools?

Q Schools for paupers, if I might want to use some of the earlier terminology that we've been using?

A I don't remember discussing that in my report. You know, it may have come up along the way, and late in the day my mind is -- is failing me.

But I don't immediately recall. I mean, maybe there was -- maybe -- maybe we were referring to a particular individual school. But I don't remember -- I should just say they were not comparable to what was happening in Pennsylvania, which really was a systemic provision of education for pauper schools. That was not, at least in my recollection, that's not -- there wasn't some sort of really substantial longstanding system of pauper schools in Tennessee. But I'm sure, you know, if -- there may have been, you know, some here and there. But I don't think that was the system, necessarily.



Q So to the best of your knowledge, early -- early common schools in Tennessee were not, quote/unquote, poor schools?

A You know, forgive me. I guess the reason why I'm struggling here is I would not put the word "common" together with "pauper," because those are two different schools. So common schools would be common schools and pauper schools would be pauper schools. And I would have to read back through my report to get a precise year. But they didn't call their first -- I don't think they called their first schools in Tennessee common schools, but that's a sort of later period in time.

Q Did early common schools in Tennessee charge tuition?

MS. LEVIN: Objection. Vague and ambiguous as to "early."

A So again, the common -- let me -- let me just look just so we get -- I can be more precise myself, or at least try to.

What I can say is this: The first public schools in Tennessee, I don't think they called those common schools. If you're referring to public schools in Tennessee, again, we have to



sort of define what we -- what we mean by "public."

Do you mean public chartered them? As I said earlier, there were these -- there were these early schools that had been chartered by the state that did charge tuition, but those are not what I would call public schools; but rather, you know, schools that the state authorized to provide -- to grant degrees.

So forgive me for three different categories, but I just want to make sure that I understand which category you're asking me about.

Does that answer your question, or do you want to follow up with a specific --

Q Sure. Let's make sure we're on the same page.

When, in your view, did Tennessee first create a school fund?

MS. LEVIN: Objection. Vague and ambiguous as to "school fund."

A So the fund that I am thinking of here sort of deals with when Congress gave its land grant to Tennessee for schools. And so we have that land grant that was in 1806. And that didn't necessarily produce, you know, free public

221

**education open to all -- or open to some, for that matter, because of resource limitations, so.**
**But if by "fund" you mean those -- those land trust funds that were held in trust for schools, 1806 would have been when that -- that first sort of grant of trust lands, trust funds, went to the State of Tennessee.**
Q So looking at Paragraph 45 of your report.
**A Uh-huh.**
Q So you say, "In the late 1820s and 1830s the legislature passed significant pieces of legislation that established a rudimentary structure for creating a system of public education."
**A Uh-huh.**
Q "Those legislative efforts failed to produce an actual system."
In the 1820s and 1830s, did Tennessee have a permanent school fund paid for with tax dollars?
**A Well, when you say, "paid for with tax dollars," which tax dollars?**
**I mean, I would say at that point in time Tennessee had lands that it held in trust that the**

222

**federal government had given to it to finance those schools.**
**I don't have an accounting of how much funds that early trust fund actually generated. But it was not generating sufficient funds to -- to support the schools.**
Q So in your understanding, was there any fund paid for with state tax dollars for education in the 1820s and 1830s in Tennessee?
**A Was there any fund?**
Q Yes.
**A Statewide fund?**
Q Yes. Paid with state tax dollars.
**A Nothing is coming to mind.**
**But when I say that, there's a -- there's a -- there's an incompleteness in what I'm saying, which is that local communities may have -- again, I just sort of look -- look at specific years and dates. But it -- but in a statutory structure prior -- you know, prior to later Constitutional convention, Tennessee did pass -- my recollection passed legislation in the first half of the 19th century probably would have covered at least a portion of the '30s, in which local communities could tax themselves for schools. But those funds**

223

**would not have gone into the state -- a state fund, as you articulated, but they would have stayed local.**
**So I don't believe that there was any statewide form of taxation that was going into an education fund at that moment in time.**
MS. LEVIN: Just because it's getting later in the day, we have been going -- I'm going to just suggest that we take a little bit more frequent breaks, like every 45 minutes. But, Ryan, if that makes sense to you right now or if you have a couple more questions to finish up.
MR. PROCTOR: We can take a break now.
MS. LEVIN: Okay.
MR. PROCTOR: What do you want to say?
MS. LEVIN: Let's just -- why don't we say until 1:55 or 4:55 on your clock.
MR. PROCTOR: Okay.
(A recess was taken.)
BY MR. PROCTOR:
Q Let's look back at your expert report, Paragraph 70.
**A Yes.**
Q So you say that, It has been a constant principle that common school funds and taxes

224

should be used solely for public schools.
Is that right?
**A Yes.**
Q And that's with reference to Tennessee in particular. Right?
**A Yes.**
Q Are you familiar with Tennessee's Education Freedom Scholarship Program?
**A I didn't know --**
MS. LEVIN: Objection. It's outside the scope of what this witness has been disclosed for, and not calculated to lead to admissible evidence.
**A I did not go back -- first, I should say I haven't read the statute or the mechanics of that program. So I don't know a lot about it. I've read reporting. I don't know a lot about it as of now and sort of the details of how precisely it functions.**
**But I know that it was -- I know initial program was passed that was subject to litigation. I know that that went from trial court up to the Supreme Court, back to the trial court. And then I know Tennessee amended the program. I'm not sure exactly what the amendments were. I think that's subject to litigation as well.**

225

**So, but I do know that they're operating some form of a voucher system in the State of Tennessee.**

Q Are you familiar with Tennessee's system of per-pupil funding for public schools?

**A I am familiar with how it functions. I know that they adopted a new -- a new formula. They used to have the PPE, I guess it was, which I reference. And then they moved to a TESSA, I think they call it now. And I have read a report. Didn't read everything in it, but that's cited in -- you know, in the -- in the report. So I've read that, that discussion of that new program, of the new PPE system, yes.**

Q So how does -- in general terms, how does per pupil funding under TESSA work?

**A Well, actually, let me say that, lest I misspeak, I am going to speak in more generality than specifics.**

**Because, you know, there are lots of -- you know, there's lots of weights, you know, based upon individual students and local capacity. I mean, I should say generally speaking states have this sort of local capacity function and sort of -- and these things.**

226

**And so that level of nuance I can't really get into. But generally speaking, what we're talking -- what you're talking about was a statewide school funding formula, not Tennessee specifically, but a statewide school funding formula is that you have the generation of local taxes, state taxes, federal funds, and what the -- what the state is trying to do is determine -- what they're supposed to do, they don't always do -- actually that's the subject of litigation in the State of Tennessee as well. Tennessee's school funding format has been subject to litigation.**

**But anyway, what you're supposed to do in theory is determine what is the cost of delivering the Constitutional education in the State of Tennessee through your public schools. And that cost needs to, you know, account for student demographics, local costs, et cetera.**

**So the formula figures out how much money per pupil the state is going to contribute, how much the local district is going to contribute. The state formula doesn't do anything to the federal funds. The federal formulas dictate those.**

227

Q And so the types of formula generates a money amount per student.

Is that right?

MS. LEVIN: Objection. Outside the scope of what this expert was disclosed to speak to, and not calculated to lead to admissible evidence.

MR. PROCTOR: Jessica, you keep making relevance objections. But in a deposition you only -- only form objections are needed. And this is getting distracting and disruptive.

MS. LEVIN: Well, I'm trying to help you if you want to correct the question to something that would be permissible. If you only want me to say objection as to form, then I will limit it to objection as to form. But I -- you know, I want to put on the record that you don't want me to tell you what type of objection, and so you can't later say that I didn't specify what type of form objection.

MR. PROCTOR: "Objection, form," is great and appreciated.

**A Ryan, could you repeat the question?**

Q Sure. So the types of formula generates a certain monetary amount per student.

Is that right?

228

**A So first let me say that I didn't get to that, that level of looking at Tennessee's funding formula in the State of Tennessee; but rather verified that charter school funds flowed through it. So I don't really know how Tennessee comes up with what its specific, you know, state PPE is supposed to be. And that -- you know, without distracting all of us, I mean, that -- how they come up with that number ends up being the subject of education adequacy and equality litigation that normally involves, you know, an expert who's different than me.**

**But what I do know, or at least what I understand to be the case is that, you know, yes, the types of formula calculates what the state's contribution is going to be. The state contribution under normal circumstances would also be a function of -- of what the local entity could -- could or couldn't contribute. And then again you have these sort of, Well, how many poor students do you have, how many ELL students do you have, how many -- da, da, da.**

**But what the precise, you know, weights that they apply and how they say, Aha, each student needs, you know, $14,503, I don't really**

229

**know how Tennessee comes up with that. Which is probably why they've been sued. But I wasn't involved within that litigation.**
Q And when a Tennessee student attends a private school under the state's voucher program, the TESSA funding follows the student to that private school. Correct?
MS. LEVIN: Objection. Form.
**A I -- I saw, in reading the report, that there was reference to their ESA, or whatever they call their vouchers in Tennessee, that there was some reference to that being put into the -- to Tennessee formula, but I didn't look at it. So I don't really know whether it's a fraction, a full, you know, different weights. Whether it's, you know, based upon student -- I don't know at that level of detail. I just simply saw that it indicated that there were some funds that come out of TESSA. I have no idea how they are calculated or not calculated. I just know that that is subject to litigation now.**
Q Okay. Let's go back to your questions presented on Pages 3 to 4 of your report.
**A Yes.**
Q So that -- sorry, just for David's

230

benefit. Perfect.
So the second question presented is whether Tennessee's charter schools are part of the state's system of free education open to all.
Is that right?
**A Yes.**
Q Would the question mean something different if it said whether Tennessee's charter schools provide free education open to all?
**A Could you re -- I'm sorry, I'm just getting slower late in the day, Ryan. Could you read the entirety of what you would have it say, just read it out loud?**
Q Sure. Whether Tennessee's charter schools provide free education open to all?
**A Whether Tennessee's charter schools provide free education open to all.**
**Well, I mean, you know, that could -- you know, first let me say that, you know, the charter schools themselves are part of the system of free education open to all. And so, you know, you're -- you're, you know, proposing some other type of hypothetical situation different than the one that I was thinking about.**
**But you're -- with that said, you're**

231

**saying so whether charter schools are part of Tennessee's free education open to all?**
**Is that how you see it.**
Q I'm just trying to understand what the significance of part of the state's system is in this --
**A I see. Part of the state's system.**
**Well, you know, the system -- and this goes back to that universality open to all everywhere concept that, you know, I mean, to go back -- I hate to read someone else's report. But I was sort of, you know, talking about Steven Green had that word sort of "universality" in his definition. I later talk about the expansion of public education. I don't say "universality," but I talk about the expansion of it.**
**But, you know, the state's obligation is to all of its children everywhere, all the time. You know, 180 days a year, maybe more. And so you're not really discharging your duty if you said, Oh, we've got some really big high schools in Nashville, why don't y'all come up here and, you know, partake.**
**So when you think of public education, it really is a system, to be free and open to all, it**

232

**kind of -- it needs to be a system serving, you know, all the metes and bounds and communities of Tennessee.**
**So the word "part of that system" there in that sentence is speaking to Tennessee has determined, through its charter school law, that it is still going to provide free public education, a system of free public education, open to all. And it has included charter schools within that system, such that the students remain, public school students, they remain part of the system, they have the same sort of rights and obligations and access and outcome opportunities, et cetera.**
**So when I say "part of the state's system," what I'm saying is that the charter schools have been integrated into this statewide project or system of making sure that there's free education open to all in the State of Tennessee.**
Q So would you say that the question whether charter schools themselves provide free education open to all is a different question?
**A Well, the charter schools, open free education, open to all.**
**Well, it is a different question**

233

**necessarily by the fact that, you know, we've eliminated some words from it. So it is a different one. But I guess -- I just haven't thought about it the way that you're thinking about it, Ryan. It's a fair enough question, but I just haven't thought about it that way because that's not the way that the charter schools operate. They don't sort of operate completely independent of the public system.**

**And if what you had -- so the hypothetical that I think that you're posing, could a charter school provide free education open to all, not by itself. I actually, don't think it could by itself. Right? Because if it was -- it was sort of an isolated island, then, you know, it's not part of making sure that it's open to all. It's just sort of the same thing as me saying, Well what if we had a public school, one big huge public school that would house, you know, a million students in Nashville. And that really wouldn't be free education open to all.**

**So, you know, can a single charter school provide free education, and we could add some other, you know, adjectives to that, you know, sure. But, I mean, to make sure that all the**

234

**children are being served and have, you know, equitable and adequate, to use another phrase, access, you have to kind of look at the overall system rather than an individual one all by itself.**

**And Tennessee's charter school law itself includes that in it. If you look at -- I think I mentioned this in the report. In whether Tennessee -- whether a charter should be authorized in the State of Tennessee, one of the inquiries or one of the bases for denying a charter is its impact on the public school system.**

**So by that very provision -- and we could go deeper into that, if you wanted to. But by that very provision, Tennessee's charter schools are operating in relationship to or as part of the overall system of free education open to all in the State of Tennessee.**

Q Okay. So I'm now looking at Paragraph 87 of your report, Conclusions Regarding Tennessee's Charter Schools. So that's on PDF Page 40.

**A Yes.**

Q So one of your points is, "Charter schools can only come into existence and remain in operation by virtue of state authority, approval,

235

and oversight."

Is that correct?

**A Yes.**

Q Do you agree there are private entities that can only come into existence and remain in operation by virtue of state authority, approval, and oversight?

**A Well, as to the -- as to coming into existence by virtue of state statute, let's say, you know, you could only form an LLC, you know, in the liability company in Tennessee as an LLC if you sort of follow the Tennessee law. So by that measure, at least under that sort of first prong by virtue of some sort of state statute, which is different than state authority, the phrase I use there. But, you know, those other entities or at least the ones that are immediately coming to mind to me -- you could give me other examples if you want -- don't really involve approval and oversight.**

**So, for instance, I think the law may have changed. But, you know, if you're interested and you're entrepreneurial, Ryan, I think to start an LLC you just file the paper and it comes into existence at the moment of filing it in the State**

236

**of Tennessee. It doesn't actually require approval. I think Tennessee could maybe go back after the fact and disapprove it.**

**So again, you know, the other -- you know, the charter schools have additional -- you know, additional approval and oversight. With the charter school, you know, you can't start operating, you know, based upon submission of, you know -- of an application.**

Q If I were entrepreneurial, I wouldn't have gone to law school.

**A There's still hope. You can start your own practice.**

Q Do you -- can you start a hospital in Tennessee without getting state approval first?

MS. LEVIN: Objection. Form.

**A I mean, I know very little of health law, if that's even the right phrase, Ryan. But I would -- I would only be speculating.**

**But I would be concerned if you could start a hospital in the State of Tennessee without some governmental approval. At the same time, maybe the feds are reg -- I don't really know.**

Q Do you think you can start a restaurant in Tennessee without getting state approval first?

237

MS. LEVIN: Objection. Foundation.
A You know what? Interestingly enough, Ryan, I guess it depends on how one defines "restaurant."
I think -- and I'm emphasizing "think." But I'm pretty sure, you know, it depends upon the size and amount and all of this. You know, my friend, hopefully I'm not disclosing a violation on her part. But she's selling all manner of goods. And apparently she is more entrepreneurial than you and I, Ryan. She's only like 17, and she made $2,000 in the last week and a half selling baked goods and vegetables. So I think, you know, if it -- if it qualifies under a -- I think, and I am emphasizing -- farm, it's like on a farm, there's actually sort of a different set of rules for that. But if what you mean by "restaurant" is, you know, Outback Steakhouse, I think the Health Department and probably -- I don't know. I don't really know the processes. But I assume that there's a number of people you have to go through before you can start an Outback Restaurant in Oakridge, Tennessee.
Q I'm certainly not entrepreneurial enough to start a restaurant, that's for sure.

238

When a Tennessee School Board approves a charter school, it doesn't create the nonprofit that's the school sponsor, does it?
A Well, now that you raised that -- and again I am not a nonprofit lawyer -- I think the way that you phrased it is correct, that it doesn't start the nonprofit. But that nonprofit I would imagine has to seek state approval to become a state nonprofit. But I don't really know the -- I don't know all the details of that. But it's certainly different than the charter school process, yes.
Q Does Tennessee make any private schools administer standardized tests?
A I don't know the answer to that question, Ryan. I don't. You know, I don't know.
Q You don't. Do you know if private schools that participate in the voucher program administer standardized tests -- are required by state law to administer standardized tests?
MS. LEVIN: Objection. Foundation.
A I don't know, Ryan.
Q Are there antidiscrimination laws that private schools have to follow if they receive federal funds?

239

A Private -- we should distinguish, or at least I would distinguish, you don't need to. But I would distinguish when you say "private schools." Because private K through 12 schools generally speaking do not receive federal funds, and therefore they are not subject to those antidiscrimination norms. Whereas higher education private schools do receive federal funds, and therefore are subject to them. So, you know, that -- there's that distinction there.
Q Are there antidiscrimination laws private K through 12 schools have to follow even if they don't receive federal funds?
A So --
MS. LEVIN: Objection. Foundation.
A So Section 19 -- 42 U.S.C. Section 1981 requires that -- this was passed -- this was enacted in Civil Rights Act of 1866, '67, something like that.
The 42 U.S.C. 1981 says that black people shall have, you know, the same access to the right of contract and real estate, I think it says, as white persons. And that's -- actually, it may not say black people, it may say people of color. But black and white people are supposed to get, you

240

know, the same access.
So in the 1971, '72 there was a case that went up to the Supreme Court that held that 1981 was about exercise of Congress's 14th Amendment power -- 13th Amendment power, I'm sorry, which -- which is actually an important distinction. Because Congress has authority -- forgive me if I bore you here, but that was a question that you asked, this is the answer.
So the 13th Amendment and the 14th Amendment are different in terms of congressional power. So Congress can only regulate public state actors under the 14th Amendment. So -- and, you know, you guys are, you know, litigating all that, I'm sure. There is a different answer under the 13th Amendment. And the reason being that the 13th Amendment, in the course of how it was enacted, to eliminate the vestiges and badges of slavery, and so there are a handful of things that -- that the courts have said are vestiges of slavery, and real estate and contracting are two of those things.
So the contract is because black people could not contract for their labor even though they were, you know, technically free at the end

241

of the -- after the Civil War. They still were having problem contracting for their -- for their labor. And then real estate, they also needed a place to live, not just to work. And so there was problems there.

So the court upheld the ability of Congress to extend racial antidiscrimination to private entities pursuant to 42 U.S.C. 1981. And there may be 1980 as well, maybe the real estate. And so that provision, which is actually entirely distinct from all those other federal funding provisions that require federal receipt, that's the basis upon which admission to a private religious -- or a private, whether it be religious or not, school can be subject to racial antidiscrimination. But it's really only as to the contract itself. So this has actually been subsequent term of dispute. And this is actually one of the things I point out from time to time in this area. Is, at least as I understand it, all of that 1981 antidiscrimination provision protects is the right to enter the door. It doesn't protect treatment once inside the door. And so it doesn't require that the school, you know, change its sort of form or function or instruction. It

242

just says, You have to admit. You can continue with racist curriculum I suppose if you wanted to inside that school.

And so again, that's very different from the other antidiscrimination provision you were asking about earlier, which covers both admission and practice inside the building. So yes, short answer to your question, yes, there is a racial antidiscrimination provision that applies to private schools. But because it's only a contracting provision, it's only in relationship to the ability to enter the contract to enter the school. And unless something has changed that I'm unaware of, it doesn't actually protect treatment within the school itself. And I think Domino's Pizza sort of won a case on that distinction at some point this time, if I recall.

Q Private schools can be subject to -- scratch that. Let me rephrase.

Applying -- applying antidiscrimination law to a private school doesn't transform it into a public school, does it?

MS. LEVIN: Objection. Form.

A Applying -- that's an interesting question, Ryan, so I am -- forgive me, but if you

243

could repeat it, I think it's an interesting question.

Q Applying antidiscrimination law to a private school doesn't transform it into a public school, does it?

A By itself, applying antidiscrimination law to a private school, that alone would not transform it into a public school, no. Not just by itself, no.

Q Requiring private schools to administer standardized tests doesn't transform them into public schools, does it?

MS. LEVIN: Objection. Form.

A Yeah, again, it's -- you know, that single thing, the application all by itself, doesn't transform them into public schools. You know, making a school public as we discussed earlier, you know, involves a variety of factors. Those are two factors in that analysis, but there's certainly more factors that make something a public school.

I haven't actually thought about the transformation, though, of a private school into a public school. In the State of Tennessee, which is what I looked at, you know, Tennessee actually

244

prohibits a private school, regardless of religion or any other thing, like that's actually the one thing that can't become a charter school.

So a public -- traditional public school can become a charter school. A nonprofit can start a public school. But a private school can't then become, at least under Tennessee law, can't become a public school -- I mean a charter school, I should say.

Q Do you think that charter schools are less accountable for their performance than traditional public schools?

MS. LEVIN: Objection. Form.

A So, you know, there's -- I guess let me start with some context and then talk about -- you said do I think that they're less accountable.

So there's certainly a tremendous amount of criticism of charter schools for the ways in which they are not accountable. You know, or maybe another way of putting that is a way that they may at times not live up to the accountability that a state has created for them.

The other side of that, of that ledger, though, you know, the State of Tennessee and people who have created charter schools would say,

245

**Yeah, I mean, we may have some flexibility in terms of our instruction. But maybe, you know, maybe they're more accountable in certain ways than traditional public schools. Because if they don't live up to results -- I mean, this is actually, you know, what the charter school industry would say. You know, if we don't live up to results, we get closed. Whereas traditional public schools can continue to operate even when they don't live up to expectations.**

**I'm not -- I am not signing on to any of those narratives as being the right one. I'm simply saying there is some ways in which one could fairly say charter schools have higher accountability than traditional public schools. And then there are some other ways, which I have emphasized myself before, in which they seem to have less regulation than -- or sort of more flexibility in the delivery of their instructional method and those sorts of things.**

**So I think we'd have to look at the particular thing that they're being held accountable for, maybe that's a better way to think about it. Some things they are more accountable for and other things maybe they have a**

246

**little bit less oversight on them.**

Q So you would say that it's not appropriate to make a sort of general statement as to whether they're more or less accountable than traditional public schools?

MS. LEVIN: Objection. Form.

**A I would say, personally, that they -- I mean, I've never said it before, and that's why I'm sort of hesitating. But you formed the question and I am disaggregating it.**

**As a matter of law and capacity of the State of Tennessee, they may very well be more accountable for their test results than traditional public schools.**

**At the same time, they are less accountable in terms of the delivery -- or sort of less requirements than traditional public schools in terms of the textbook that they select, for instance, or, you know -- you know, the teachers that they hire. Right? So maybe there's some flexibility on that.**

**They may have some flexibility in terms of -- they often do have flexibility in terms of their service contracts, for instance. So a traditional public school -- and I didn't get --**

247

**to be clear, I didn't get down into this issue because it didn't sort of surface in Tennessee. So I'm just going to step back and speak nationally at this point.**

**But, you know, a -- normally speaking, you know, a public school with a Request for Proposal to get services, you know, for instance, or to have a playground built, they'd have to put that out for bid, and there would be a very specific process for that. And if they violated it there would be really huge problems if not criminal sanctions there. You know, private school doesn't have to go through that type of Request for Proposal, generally speaking, for services.**

**And so, you know, they do have some more flexibility. That's an example of them having more flexibility. And so some people would say, See, they're less accountable.**

**Also, you know, the -- you know, you have elected school boards, you know, that's a direct sort of pipeline between the vote and the result there. Whereas the accountability at charter schools is more diffuse. They're still accountable to state officials, but, you know,**

248

**there isn't this sort of direct line of local voters holding them accountable. So they have less local voter accountability than would a traditional public school.**

Q Do you think it's a close question whether charter schools count as public schools?

MS. LEVIN: Objection. Form.

**A Could you repeat the question, Ryan?**

Q Do you think it's a close question whether charter schools count as public schools?

**A Well, I don't know. I mean, I could guess what you mean by "a close question."**

**But, you know, I think that charter schools in the State of Tennessee, which is what I looked at, are clearly part of the state system of free public education if they're clearly public schools. Notwithstanding, you know, a variety of critiques that, you know, some public school educators might lob at them.**

Q In your view, does the establishment clause forbid Tennessee charter schools from being religious?

MS. LEVIN: Objection. Foundation.

**A Well, I mean, Ryan, I mean, that -- whether the establishment clause prohibits a thing**

249

or doesn't is a question for the court to decide. I mean, I am providing the facts as I -- as I have discovered them about charter schools here.

You know, the establishment clause is -- is, even amongst courts, to be quite honest, is a matter of ongoing dispute and circuit splits. So I think it would -- you know, the most one -- the most anyone could do, I suppose, is -- or at least the most -- I mean, I couldn't speculate as to what a court was going to do given, you know, the -- all of the cases that are floating around about the establishment clause.

And, you know, the court, as I'm sure you know, is, you know -- you know, said, We're not going to apply the lemon test anymore. And that -- you know, that had been, regardless of whether it was applied well or not applied well, that had been around for a long time. And that calls into question the endorsement test.

And so, I mean, it's just -- you know, my students and I, you know, struggle in class. They want to know, what's the test that's on the exam. And I have to go, Well, I don't know. Apply all four. And, you know, as long as you apply all four, give me an answer to all four, I'll treat

250

you as a job well done. We're not the Supreme Court justices here.

Q You've opined on whether charter schools are -- religious charter schools would be unconstitutional in your scholarship, haven't you?

A Yeah, I have opined -- I should also add, though, that there have been subsequent decisions to that. So I guess the question is, you know, the distinction between what would a court do, what do I think a court should do, what do I think a prior court would do. So what specific question are you asking, you know, amongst those -- at least those three options, Ryan.

MR. PROCTOR: Let's pull up Exhibit -- David, can you pull up Exhibit 7.

(Black Deposition Exhibit 7 marked for identification and is attached to the transcript.)

MR. PROCTOR: Can you scroll down a page.

Q Do you recognize this document?

A Yes.

Q What is it?

A It's an article that I published in the UC Irvine Law Review.

Q Okay. And the article is Religion Discrimination, and the Future of Public

251

Education.

Is that right?

A Yes. Although just looking at it, I had another article that overlapped to a certain extent. Is this the U.S. Irvine?

Q Yes.

A Yeah. Okay.

MR. PROCTOR: David, can you take us to PDF Page 36.

Q So it says Page 839 in the law review.

And could you read -- I will give you a minute to read the paragraph above Part E.

A The paragraph immediately before Part E?

Q Yeah. So starting, "The underlying rationale for religious charter schools."

A Yeah.

Q So at the very end, the last sentence you say, "Religious charter schools would breed a new set of Constitutional violations."

Is that correct?

A That's what I wrote, yes.

Q Would the reasoning you implied in this article apply to Tennessee charter schools?

MS. LEVIN: Objection. Foundation.

A Let me -- let me say two things.

252

I mean, there are sort of two different -- two different forms of analysis that I'm doing, you know.

So the -- this article is a survey of charter school laws. And based upon the court's precedent as it existed immediately following, of course.

You know, the Tennessee -- one of the -- one of the -- you know, one of the sort of issues in Drummond, for instance, a lot of people focused on was that, you know, here's -- here's Oklahoma's charter school statute, and it is not the same as this state's. And, you know, you asked about Peltier earlier.

So anyway, the point being this is sort of saying, Hey, generally speaking, all these charter schools have these, you know, attributes. The attributes when we look at them sort of as synthesized, add up under the law at that time to be -- to raise a new set of Constitutional violations.

So that's what I'm saying. As opposed to what I was doing in the current, is to actually not provide a survey, not providing an amalgamation they do this in this state and this

253

in this state and add them altogether.
So I am looking at a very specific state statute, and I have to determine based upon those facts, are these charter schools, you know, part of Tennessee's system or not.
And so, I mean, certainly, you know, you guys are looking at legal issues that overlap with this article a lot. But what I was doing in my particular report here is a different type of analysis that doesn't involve, you know, the legal analysis there. And, you know, this didn't involve a model charter school statute, nor specific charter school statute; whereas, you know, I'm looking at a specific one in the current case.
Q So in your article you were making Constitutional conclusions based off of amalgamations of what features charter schools generally have?
Is that right?
MS. LEVIN: Objection. Form.
A What I would say is, is that, you know, there's some indicia that -- you know, there is some indicia and factual aspects of how charter schools operate that are relevant to legal

254

questions. Right? Establishment clause questions, that would seem obvious. That's why we're, you know, here.
And so what I did not do in this particular article is to say, Let me look at an individual state, and really look at how public education is operating in this state, what's the specific charter school statute, what's the sort of in's and out's of it.
And so I am only saying that, Ryan, to say that, Look, there could be charter school statutes that are different or have different elements than what I am presupposing. But yes, if they have these elements, they are going to breed a Constitutional violation. But I wasn't looking at an individual statute, but rather, you know, the type of things that one often sees in charter school statutes.
Q So sitting here today, with your knowledge of Tennessee charter schools, are there any features of Tennessee charter schools that would make the Constitutional analysis of your article inapplicable?
MS. LEVIN: Objection. Foundation. It's outside the scope.

255

A Yeah, I mean, I didn't apply the establishment clause to Tennessee's charter school statute. You know, I -- you know, it seems to me that you're -- I think you're asking me, although maybe I'm misunderstanding, you're asking me to sit, you know -- sit as basically a judge, and judge whether I think -- or advocate, one or the other, and judge. And I just -- I just didn't sit as a judge or an advocate and look at it that way.
I mean, I should also add that, you know, I'm -- I don't spend -- establishment clause is not really my thing, to be quite honest, Ryan. There's people that are more expert in that than I.
And, you know, I'm familiar with, you know, these 10th Amendment -- ten commandment cases, you know, filtering through the states. And, you know, I look at them. But I -- it's not my -- establishment clause is not my area of focus. So, you know, was I comfortable with what I said there, yes because one is speaking in generalities, one is raising issues.
In this context, you know, under oath and understanding, you know, the context of what I was asked to do, I just didn't get into that.

256

I mean, if you wanted me to, you know, to speculate or just sort of opine separately as, you know, what I think a court would do, like I would do in a law school class, you know, I mean, I guess we could do that. But that's not what I did. That was beyond the scope of what I did for this report.
MS. LEVIN: May I ask for another break soon unless we are nearing the end. It's been another 50 minutes.
MR. PROCTOR: We are nearing the end. I think -- yeah, we're nearing the end.
MS. LEVIN: Okay.
Q Is it -- so sitting here today, with your knowledge of Tennessee charter schools, there's nothing about Tennessee charter schools that leads you to conclude that the analysis you reached -- sorry, let me rephrase.
Sitting here today, you're not able to identify anything about Tennessee charter schools that makes the conclusions you reached in your law review article inapplicable?
MS. LEVIN: Objection. Foundation.
A Sorry, you mean -- maybe I've lost -- I've lost the thread here a little bit.

257

So you're asking me, hypothetically speaking, if Tennessee allowed a religious charter to operate and teach religion as truth, and the religious chaplain all that sort of stuff, do I think that would raise establishment clause problems? Is that the question that you're asking, Ryan? Or are you just asking about charter schools in general? I'm sorry, I lost that.

Q I'm saying if Tennessee's charter system were exactly the way that it is now, except that it allows -- it allowed for religious instruction in charter schools, is there anything that you know about Tennessee charter schools that would make you say that it would not -- that allowing religious instruction would not breed a new set of Constitutional violations?

A Well, let me -- let me do this, which I'm willing to do. If you're -- if you're asking me to take off my -- my expert -- we'll just call it the expert for which I was engaged to testify hat and put on my law professor hat, which is not within the scope of this report, and I -- you know, I teach evidence.

I don't -- you know, I'm not familiar

258

with courts allowing all professors to opine on the meaning or sort of the requirement of the establishment clause, you know, as it existed.

If that's what you're -- is that what you're asking me to do, put my law professor hat on and take off my expert witness hat? Is that what you're asking, Ryan?

Q I'm not asking you to -- I'm not characterizing the capacity in which you're answering it. I would just like you to answer my question.

A Well, I -- so let me just say your -- your question is a hypothetical one. Not a hypothetical one. Your question is asking whether I have expertise that I did not apply to this set of facts. Right? My sort of expertise as a Constitutional law professor. To take that, which is something separate and not involved here, and then apply it to these facts. Right?

I would just point to one example. Right? Which is, you know, Lee versus Weisman speaks of coercion. Right? And so at least as I understand it -- and again, I am again emphasizing that I do not read all of the establishment clause law percolating through lower courts.

259

And I -- you know, I know there was a Louisiana decision and a Texas decision. And I think those are intention. One other on 10th Amendment. But I think the coercion rule, the coercion law, is still -- that's still is a case that I teach my students.

So let me make a hypothetical. I teach my students the coercion test, for instance. Right? That's Lee versus Weisman. And it seems to me that if a school, hypothetical, whether it be a traditional public school or a charter school, regardless of whether that charter school formally claimed to be religious -- if any public school, right, engaged in religious instruction, right, that is going to do one of two things.

It's either going to be, one, a religious practice -- it would seem to me it would likely be a religious practice -- that the courts have said, you know, it's not the business of state to engage in religious practice. Right? So if a public school was engaging in religious practice, that's a problem.

Also, if a public school invites a third party into the public school -- that was what happened in Weisman -- you know, a rabbi had been

260

invited to give the invocation at high school graduation -- the court said, you know, that has a coercive effect on students.

So if a school, any public school, engaged in religious practice or religious instruction, it seems to me that it would violate one of those two things. It would be engaging in religious activity or -- and/or engaging in coercive -- coercion of religion, at least as I -- as someone who is not a specialist in the establishment clause would see it.

MR. PROCTOR: Okay. No further questions from plaintiff.

MS. LEVIN: Okay. I may have a couple questions. I really need to run to the ladies' room. Can we take a five-minute break here?

MR. PROCTOR: Sure. 6 o'clock or 3 o'clock your time.

MS. LEVIN: Okay. Sounds good.

(A recess was taken.)

MS. LEVIN: So I understood you to have concluded your questions, Ryan. And I have a few questions for Professor Black. But I didn't know if any of the other parties had questions for him. I didn't want to cut that off.

261

MS. JERNIGAN-JOHNSON: Nothing from defendants.
MR. JARVIS: Nothing from Carroll Intervenors.
MS. LEVIN: Okay.
EXAMINATION BY COUNSEL FOR THE COBLE INTERVENORS
BY MS. LEVIN:
Q All right. So, Professor Black, I just have a few questions to clarify a couple of points. So this should not take very long. I know everybody's had a long day.
Professor, do you recall your testimony that all public schools in Tennessee are part of a system of public education?
**A Yes.**
Q Under the law, does each and every one of those public schools, traditional or charter, have to comply with the Constitution laws and regulations that apply to public schools?
**A That -- yes.**
Q And does that include antidiscrimination requirements? Does each and every one of those public schools in the system have to comply with all antidiscrimination requirements that apply to

262

public schools in Tennessee?
MR. PROCTOR: Objection. Leading.
**A It -- all -- so the way that they structured the system was that, yes, they did have to apply -- comply with that. You know, as well as the federal government's antidiscrimination provisions also apply to all of those schools because they are recipients of federal funds.**
Q And do state antidiscrimination requirements also apply to all those schools?
**A The -- the statute sort of lists, you know, these categories of statutes and regulations apply. So they use that phraseology. But I don't think it lists the specific statutes that would apply. They just categorically say that, yes, they remain subject to these antidiscrimination statutes and regulations and the Constitution.**
Q Do you recall your testimony that you co-authored in an Amicus brief in Oklahoma Statewide Charter School Board versus Drummond, and that was in the U.S. Supreme Court?
**A Yes.**
Q And am I correct that you testified that that Amicus brief addressed whether free education open to all is a traditional and exclusive

263

government function?
**A Well, I think I -- I think my recollection I said to Ryan was that, you know, I'd have to look and see if that specific phraseology is in there. But that was certainly an overall issue in the case. I just -- I didn't go back and review the sort of legal parts of that, that brief.**
Q Is it the case that any discussion of whether something is a traditional and exclusive government function is necessarily a legal discussion?
**A Is it true that -- could you repeat the question?**
Q Yes. Any time someone mentions whether the question of whether something is a traditional and exclusive government function, is that always calling for a legal conclusion?
**A Oh, no. I mean, you know, one could -- you know, the -- you know, that is a phrase I think that a -- actually a layman on the side of the street would sort of understand the question you're asking.**
**They wouldn't have the expertise to answer it. Nor would -- nor would many people.**

264

**But, you know, as I said earlier, traditional means historical. At least that's how I treated it. And -- and exclusive means no one else is doing it. So that is a factual question. But, of course, you know, courts look at those facts in answering a legal question, traditional and exclusive, which is a distinct legal questions. Or they apply their distinction precedent to the facts.**
Q Is your -- was your briefing in the Drummond matter in the Amicus brief separate from your expert report in this case?
**A Yes, it was separate. As I indicated, I haven't gone back and looked at it to add -- to look at sort of the national history. You know, there is that part at the beginning of my discussion of the national history of charter schools.**
**And so it was my recollection that I had some of that sort of generality about charter schools in that brief. And so that's why I went back and looked at it, was to see whether there was any sort of policy or factual stuff on the history.**
**My recollection is that the brief proved**

265

**to not be particularly helpful on that question if you look at, you know, the citations when I'm discussing the national history of charter schools. There were other sources that I was consulting for that.**

Q Did you reach any legal conclusions in your expert report in this matter?

**A No.**

Q Okay. Just a couple more questions.

So we've talked -- is it fair to say we talked a fair bit today, you've answered questions about whether the government has ever lent any support to religious -- private schools, including religious schools?

**A Yeah. I'm sorry. Have we talked about that today?**

Q Yes.

**A Yes, we have talked about that today.**

Q If we assume -- even if we assume that it's the case that the government has given support to religious schools at points in American history, is that mutually exclusive with your conclusion that the provision of free education open to all is a traditional and exclusive government function?

266

**A No. They don't -- they don't -- they don't have any direct bearing on one another. It seems to me it's two different systems, two different types of education.**

Q And if we were to assume or take as true that that provision of free education open to all may not have been perfect, it may not have been complete at various points in American history, is that mutually exclusive with your conclusion that the provision of free education open to all is a traditional and exclusive government function?

**A No, it's not. And, you know, I won't go on late in the day. But I'll just say that I think that I used that term "half full, half empty." I think that, you know, I think a lot of -- some people like to look at that public education, you know, for a long track towards being perfect and it's still not perfect yet. As I always say, it's never been perfect and I doubt it will be perfect in my lifetime. It's been a process. But it has been a process, with a starting point aiming towards a goal in the future. And it's consistently across that entire period made progress towards that call.**

Q Has any other entity provided free and open to all education, you know, in the United States besides the --

267

**A No. Because it is -- it is beyond -- I mean, I believe it to be beyond their capacity to do so, quite honestly.**

MS. LEVIN: I have no other questions.

MR. PROCTOR: I think I might have just one followup question, depending on what the answer is.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. PROCTOR:

Q But could you -- just to pick up on the very last question you received. Why is it that no one else besides the government has the capacity to provide free education open for all?

**A Yeah, I mean, when we speak of practicality here, sort of practical capacity. But free public education open to all depends upon enormous scope and scale. It requires taxation. Private entities lack the authority to tax, for instance. So there's a sort of -- the task is so Herculean, for lack of a better term, that it is beyond, it seems to me, practically speaking, that any private entity could deliver free and public education, a system, at least, of free public**

268

**education open to all. And as I said earlier, being open to all necessitates a system of some sort. So, you know, private school or private donors, you know, theoretically could, you know, fund some schools that were free. But I don't think that would be a system of free schools open to all. It would just be one school that happens to be free or reduced price or whatever it happens to be.**

MR. PROCTOR: No further questions from plaintiff.

(Off the record at 6:12 p.m.)

269

ACKNOWLEDGMENT OF DEPONENT

I, DEREK W. BLACK, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_______________________ ________________________
(DATE) (SIGNATURE)

270

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Debra Ann Whitehead, E-Notary Public in and for the Commonwealth of Virginia, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was not discussed; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 7th day of July, 2026.

My commission expires:
October 31, 2027

----------------------------
E-NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA