UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br><br>*Plaintiff*,<br><br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION,<br><br>*Defendant*,<br><br>REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP,<br><br>*Intervenor-Defendants,*<br><br>ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER,<br><br>*Intervenor-Defendants.* | Case No. 3:25-cv-584 (CEA) (DCP) |

**COBLE INTERVENOR-DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S POST-DISCOVERY MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page


PRELIMINARY STATEMENT ....... 1

STATEMENT OF FACTS ....... 2

I. The Tennessee Public Charter Schools Act. ....... 2

II. Public Education Developed as a Nonreligious System. ....... 3

III. Tennessee's Public Charter Schools Are Part of Its Public-School System. ....... 4

LEGAL STANDARD ....... 5

ARGUMENT ....... 5

I. Discovery Shows That Wilberforce Lacks Standing. ....... 5

- A. Wilberforce Suffered No Injury in Fact Because Applying Was Not Futile. ....... 6
  - 1. Wilberforce Faced No Discriminatory Barrier When It Filed Suit ....... 6
  - 2. Discovery Shows That Wilberforce Was Not "Able and Ready." ....... 8
- B. The Injury Is Not Traceable, Risk of Future Litigation Is Not Redressable, and Wilberforce Seeks an Advisory Opinion. ....... 10

II. The First Amendment Does Not Authorize Religious Public Charter Schools. ....... 11

- A. The Act Does Not Violate the Free Exercise Clause. ....... 12
- B. Public Charter Schools Are Governmental Entities and State Actors. ....... 13
  - 1. Public Charter Schools Are Governmental Entities ....... 14
  - 2. At Minimum, Public Charter Schools Are State Actors. ....... 17
- C. Public Charter Schools May Not Invoke the Free Exercise Clause Against the State's Nonsectarian Requirement. ....... 19
- D. The Establishment Clause Prohibits Religious Charter Schools. ....... 20
  - 1. The Establishment Clause Prohibits Creating Religious Governmental Institutions ....... 20
  - 2. The Establishment Clause Forbids Inculcating Religion in Students. ....... 21
  - 3. The Establishment Clause Forbids Direct State Aid for Religious Activities. ....... 22
- E. Even Assuming Strict Scrutiny Applied, the Act Satisfies It. ....... 23

III. Wilberforce Has Not Established Its Entitlement to Summary Judgment. ....... 25

CONCLUSION ....... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostini v. Felton*,
521 U.S. 203 (1997)....................22

*Ala. State Fed'n of Lab., Loc. Union No. 103, United Bhd. of Carpenters & Joiners of Am. v. McAdory*,
325 U.S. 450 (1945)....................11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................5, 25

*Bd. of Educ. v. Grumet*,
512 U.S. 687 (1994)....................20, 21

*Biden v. Nebraska*,
600 U.S. 477 (2023)....................14 n.12

*Blanco v. Success Acad. Charter Schs., Inc.*,
722 F. Supp. 3d 187 (S.D.N.Y. 2024)....................13 n.11

*Bowen v. Kendrick*,
487 U.S. 589 (1988)....................22

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
602 F.3d 1175 (10th Cir. 2010)....................13 n.11

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001)....................18, 19

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954)....................17

*Capitol Square Rev. & Advisory Bd. v. Pinette*,
515 U.S. 753 (1995)....................20

*Carney v. Adams*,
592 U.S. 53 (2020)....................6, 8

*Carson v. Makin*,
596 U.S. 767 (2022)....................12, 13, 24

*Caviness v. Horizon Community Learning Center, Inc.*,
590 F.3d 806 (9th Cir. 2010)....................16 n.13, 17 n.13

*Christian Healthcare Ctrs., Inc. v. Nessel*,
117 F.4th 826 (6th Cir. 2024) ........................................................................................9

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)........................................................................................................11

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
459 F.3d 676 (6th Cir. 2006) ..........................................................................................18

*Coleman v. Utah State Charter Sch. Bd.*,
673 F. App'x 822 (10th Cir. 2016) ...........................................................................13 n.11

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist*,
413 U.S. 756 (1973)........................................................................................................22

*Commodities Export Co. v. Detroit Int'l Bridge Co.*,
695 F.3d 518 (6th Cir. 2012) ....................................................................................14, 15

*Doe v. Claiborne County*,
103 F.3d 495 (6th Cir. 1996) ..........................................................................................17

*DOT v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015)..........................................................................................................14

*Edwards v. Aguillard*,
482 U.S. 578 (1987)........................................................................................................21

*Engel v. Vitale*,
370 U.S. 421 (1962)..........................................................................................20, 21, 22

*Epperson v. Arkansas*,
393 U.S. 97 (1968)..........................................................................................................21

*Espinoza v. Montana Department of Revenue*,
591 U.S. 464 (2020)..........................................................................................12, 13, 24

*Evans v. Newton*,
382 U.S. 296 (1966)........................................................................................................18

*Everson v. Bd. of Educ. of Ewing*,
330 U.S. 1 (1947)............................................................................................................20

*Fam. C.L. Union v. Dep't of Child. & Fams.*,
837 F. App'x 864 (3d Cir. 2020) ..............................................................................13 n.11

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)........................................................................................................19

*Gilbert v. City of Cambridge*,
932 F.2d 51 (1st Cir. 1991) ........................................................................................6

*Greater Heights Academy v. Zelman*,
522 F.3d 678 (6th Cir. 2008) .........................................................................12 n.11, 16

*Haaland v. Brackeen*,
599 U.S. 255 (2023).................................................................................................6 n.3

*Hughes v. Region VII Area Agency on Aging*,
542 F.3d 169 (6th Cir. 2008) .......................................................................................18

*Hunt v. McNair*,
413 U.S. 734 (1973)......................................................................................................22

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974)......................................................................................................17

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)...........................................................................................19 n.15, 20

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Board*, 172 F.3d 397 (6th Cir. 1999) ......................................................10 n.8

*Larkin v. Grendel's Den, Inc.*,
459 U.S. 116 (1982)......................................................................................................21

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995)......................................................................................................14

*Lee v. Weisman*,
505 U.S. 577 (1992)......................................................................................................20

*Leeper v. State*,
53 S.W. 962 (Tenn. 1899)....................................................................................18 n.14

*Lindke v. Freed*,
601 U.S. 187 (2024)......................................................................................................14

*Locke v. Davey*,
540 U.S. 712 (2004)......................................................................................................22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................................................................5

*Lynch v. Leis*,
382 F.3d 642 (6th Cir. 2004) ......................................................................................5, 9

*Mackey v. Rising*,
106 F.4th 552*,* 564 (6th Cir. 2024) ....................25

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019)....................17

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ....................11 n.8

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................11

*Nampa Classical Acad. v. Goesling*,
447 F. App'x 776 (9th Cir. 2011) ....................13 n.11

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
508 U.S. 656 (1993)....................7 n.6, 8 n.6

*Norwood v. Harrison*,
413 U.S. 455 (1973)....................24

*Nugent v. Spectrum Juvenile Justice Servs.*,
72 F.4th 135 (6th Cir. 2023) ....................18

*Drummond ex rel. Oklahoma v. Okla. Statewide Virtual Charter Sch. Bd.*,
558 P.3d 1 (Okla. 2024), *aff'd by an equally divided court*, 605 U.S. 165 (2025)....................13 n.11

*Ondo v. City of Cleveland*,
795 F.3d 597 (6th Cir. 2015) ....................8

*Peltier v. Charter Day Sch., Inc.*,
37 F.4th 104 (4th Cir. 2022) (en banc) ....................13, 13 n.11, 17

*Pierce v. Society of Sisters*
268 U.S. 510 (1925)....................18 n.14

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)....................19

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982)....................16 n.13

*Road-Con, Inc. v. City of Philadelphia*,
120 F.4th 346 (3d Cir. 2024) ....................11 n.9

*Roberts v. Progressive Preferred Ins. Co.*,
167 F.4th 955 (6th Cir. 2026) ....................10

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)....20, 24

*Roemer v. Bd. of Pub. Works*,
426 U.S. 736 (1976)....22

*Rust v. Sullivan*,
500 U.S. 173 (1991)....19

*S. Env't L. Ctr. v. Tenn. Valley Auth.*,
2025 WL 1791128 (E.D. Tenn. June 27, 2025)....6

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
411 U.S. 1 (1973) (Marshall, J., dissenting)....17

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000)....21

*Sch. Dist. of Abington Twp. v. Schempp*,
374 U.S. 203 (1963)....20, 21

*SFFA v. U.S. Naval Academy*,
2024 WL 4057002 (D. Md. Sept. 5, 2024)....9 n.7

*Sporhase v. Nebraska*,
458 U.S. 941 (1982)....6 n.4

*State ex rel. Weaver v. Ayers*,
756 S.W.2d 217 (Tenn. 1988)....18 n.14

*Surles v. Andison*,
678 F.3d 452 (6th Cir. 2012)....5

*Teen Ranch v. Udow*,
389 F. Supp. 2d 827 (W.D. Mich. 2005), *aff'd as supplemented sub nom. Teen Ranch, Inc. v. Udow*, 479 F.3d 403 (6th Cir. 2007)....22

*Tenn. Conf. of the NAACP v. Lee*,
139 F.4th 557 (6th Cir. 2025)....5, 6

*Tenn. Small Sch. Sys. v. McWherter*,
851 S.W.2d 139 (Tenn. 1993)....17, 18 n.14, 23

*Town of Greece v. Galloway*,
572 U.S. 565 (2014)....20, 21 n.16

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017)....7 n.5, 12, 13

*United States v. Ackerman*,
831 F.3d 1292 (10th Cir. 2016) (Gorsuch, J.)....................14 n.12, 16

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021)....................11 n.9

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021)....................9 n.7

*Wallace v. Jaffree*,
472 U.S. 38 (1985)....................21

*West v. Atkins*,
487 U.S. 42 (1988)....................17, 18

*Widmar v. Vincent*,
454 U.S. 263 (1981)....................20, 24

*Woolard v. Thurmond*,
170 F.4th 701 (9th Cir. 2026), *petition for cert. filed* (U.S. Aug. 20, 2026)....................13, 13 n.11

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009)....................19

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002)....................23, 24

*Zorach v. Clauson*,
343 U.S. 306 (1952)....................21

**Statutes**

20 U.S.C. § 1681(a)....................3

29 U.S.C. § 794....................3

42 U.S.C. § 1983....................17 n.13

42 U.S.C. § 2000d....................3

42 U.S.C. § 6102....................3

42 U.S.C. § 12132....................3

Tennessee Open Meetings Act, Tenn. Code Ann. §§ 8-44-101 et seq.....................15

Tennessee Public Records Act, Tenn. Code Ann. §§ 10-7-101 et seq.....................15

Tenn. Code Ann. § 49-1-302(a)(8)....................15

Tenn. Code Ann. § 49-3-105 .......... 16, 23

Tenn. Code Ann. § 49-5-108 .......... 15

Tenn. Code Ann. § 49-13-102 .......... 15

Tenn. Code Ann. §§ 49-13-104 .......... 2, 3, 15, 16, 17, 18

Tenn. Code Ann. §§ 49-13-106 .......... 2, 12, 15

Tenn. Code Ann. § 49-13-108 .......... 7

Tenn. Code Ann. §§ 49-13-110 .......... 2, 3

Tenn. Code Ann. §§ 49-13-111 .......... 3, 15, 24, 25

Tenn. Code Ann. § 49-13-112 .......... 16, 23

Tenn. Code Ann. § 49-13-120 .......... 3

Tenn. Code Ann. § 49-13-122 .......... 3

Tenn. Code Ann. § 49-13-127 .......... 3, 15

Tenn. Code Ann. § 49-13-101–145 .......... 2

2026 Tenn. Pub. Acts ch. 1128, §§ 1–2 .......... 3, 6, 24, 25

Fed. R. Civ. P. 56(a) .......... 5

Fed. R. Civ. P. 56(c)(4) .......... 8

**Other Authorities**

U.S. Const. art. III .......... 1, 6 n.3

U.S. Const. Amend. I .......... 11, 14, 19

Tenn. Const. art. XI, § 12 .......... 15, 17, 23

Tenn. Comp. R. & Regs. 0520-14-01-.03(2) .......... 23

Coble Intervenors respectfully submit this memorandum of law in opposition to Wilberforce's second motion for summary judgment ("Pl. 2d MSJ").[1]

## PRELIMINARY STATEMENT

With discovery now complete and a full factual record before the Court, Wilberforce's second attempt at summary judgment fails on multiple grounds. Without a trial, and on a record that contradicts its own theory, Wilberforce asks this Court to compel Tennessee to authorize religious instruction and worship through its own system of public charter schools—relief that is both extraordinary and unprecedented. Tennessee public charter schools are created by statute, funded ***as public schools*** directly through ***the state's public-school funding formula***, subject to governmental regulation, oversight, and charter revocation, and charged with fulfilling the State's constitutional obligation to provide public education. The Free Exercise Clause does not require what Wilberforce demands, and the Establishment Clause forbids it.

As a threshold matter, Wilberforce lacks Article III standing to bring this case. As set forth in the Coble Intervenors' Summary Judgment Motion ("CI MSJ"), discovery disproved Wilberforce's claim that it faced a "discriminatory barrier," confirmed that Wilberforce was never excluded from the application process, and revealed that Wilberforce was not "able and ready" to apply when it sued. As Wilberforce conceded: "the only reason the Knox County Board of Education did not consider [Wilberforce's] application is because Wilberforce did not submit one."

But even setting aside standing, the Free Exercise Clause does not require Tennessee to authorize religious charter schools. The Supreme Court cases on which Wilberforce relies each involved a benefit furnished to a private institution. None require a State to create a religious public

[1] Capitalized terms not otherwise defined shall carry the meaning set forth in Coble Intervenors' Motion for Summary Judgment (ECF No. 115). Citations to SJCIX shall refer to the exhibits attached to the Declaration (ECF No. 116) and Supplemental Declaration of Mitchell Feldman. Unless otherwise indicated, emphasis is added and citations and quotations are omitted.

school. Tennessee is not excluding a private institution from a public benefit; it is requiring that its own ***public schools*** operate consistent with state law and the Establishment Clause.

The reality is that Tennessee public charter schools are governmental entities and state actors. Appellate courts have consistently held as much, recognizing that the performance of charter schools' public educational functions constitutes state action. Neither a charter school nor its sponsor may invoke the Free Exercise Clause to compel the State to conduct religious instruction through its own public schools.

And the Establishment Clause independently bars what Wilberforce proposes. Government may not create religious public institutions, conduct religious instruction in public schools, or directly fund religious education. The 2026 amendment to the Tennessee Public Charter Schools Act confirms as much, removing the charter-school sponsorship restrictions—permitting religious organizations to sponsor a charter school—while leaving intact the requirement that the school itself "[o]perate as a public, nonsectarian, nonreligious public school." Tennessee does not exclude religious organizations from public education; it requires that public schools remain open to all without religious endorsement or promotion.

Wilberforce's motion should be denied.

## STATEMENT OF FACTS

### I. THE TENNESSEE PUBLIC CHARTER SCHOOLS ACT.

The Act defines a "public charter school" as "a public school" operating as "part of the state program of public education." Tenn. Code Ann. §§ 49-13-104(4), -(14), 49-13-106(a). The Act comprehensively governs public charter schools' creation and operation, including applications, approval, oversight, and ongoing mandates. *Id*. §§ 49-13-101–145. If approved, public charter schools are funded as public schools through state and local education funds and operate under binding charter agreements preapproved by local boards of education. *Id.* §§ 49-13-

110(a), -112(a). They must comply with "performance standards and requirements adopted . . . for public schools," serve "students with disabilities," and "[a]dminister state assessments." *Id.* §§ 49-13-111(a)(3), -(a)(5), -(a)(6). The statute states that public charter schools must "[o]perate as [] public, nonsectarian, nonreligious public school[s]" and comply with federal and state nondiscrimination requirements. *Id.* §§ 49-13-111(a)(2), (b); *see also* 42 U.S.C. § 2000d; 20 U.S.C. § 1681(a); 42 U.S.C. § 12132; 29 U.S.C. § 794; 42 U.S.C. § 6102. Public charter schools are subject to ongoing oversight, including annual performance reporting, financial audits, and charter revocation for material violations. Tenn. Code Ann. §§ 49-13-120(a), -120(b)(3), -122(b), -127; *see also* SJCIX22 ("Black Rep.") ¶¶ 87–90. The Act previously barred sponsors whose governing body "promote[d] the agenda of any religious denomination or religiously affiliated entity." Tenn. Code Ann. § 49-13-104(156)(B) (2024). But that prohibition was removed. 2026 Tenn. Pub. Acts ch. 1128, § 1 (effective May 22, 2026); Pl. 2d MSJ 3.[2]

## II. PUBLIC EDUCATION DEVELOPED AS A NONRELIGIOUS SYSTEM.

Free, universal public education did not exist at Founding; schooling was largely private and existed "to make Christians." SJCIX23 ("Green Rep.") ¶ 26. But beginning in the early nineteenth century, reformers sought public, secular education "under the control of public authorities," funded through taxes and focused on academics rather than religious inculcation. *Id.* ¶ 34. This "common-school" movement advocated "non-sectarian, publicly funded school[s]

[2] As further set forth in the CI MSJ, Wilberforce retained litigation counsel in August 2025, decided to file this lawsuit shortly thereafter, incorporated on November 21, submitted its LOI on November 25, and sued on November 30, before KCS had responded at all. CI MSJ 6–8, 21–22. The application Wilberforce later called "complete and submission ready" nevertheless failed on its face to satisfy numerous Tennessee authorizing requirements. CI MSJ 10–14, 22–23. And in the same application cycle, Union Academy—a self-described "Faith-based Christian College Preparatory" school—took the path Wilberforce declined: it left the same sponsor-eligibility box unchecked, qualified the nonsectarian assurance, submitted a completed application, and obtained authorizer approval. CI MSJ 14, 21.

where children of all classes and backgrounds would be educated together," and states increasingly became committed to "minimiz[ing] or abolish[ing] any religious component in the curriculum." Green Rep. ¶ 43; Black Rep. ¶ 29. That movement "included and necessitated discontinuing and prohibiting the public funding of private and religious schools." Green Rep. ¶ 43. States reserved public funds for those schools and declined to fund private religious education. *Id.* ¶¶ 36–43. In Professor Green's unrebutted expert report, he found "no evidence" that those decisions were understood as violating free-exercise rights; instead, funding religious schools was ***viewed as compelling citizens to support religion***. *Id.* ¶¶ 37, 44–46.

## III. TENNESSEE'S PUBLIC CHARTER SCHOOLS ARE PART OF ITS PUBLIC-SCHOOL SYSTEM.

Tennessee followed the same trajectory. In Professor Derek Black's unrebutted expert report, he explains that public education in Tennessee was "radically distinct from private education"—funded by taxes, serving the public, managed by public officials, and fulfilling "the perpetuation of republican government." Black Rep. ¶ 66. Since the nineteenth century, Tennessee exerted pervasive control through state and local officials, financing, curriculum requirements, and teacher qualifications. *Id*. ¶ 68. One principle remained "particularly constant": "common school funds and taxes should be used solely for public schools." *Id.* ¶¶ 68–70. When Tennessee enacted the Act in 2002, it placed charter schools squarely within that system, declaring that "[p]ublic charter schools shall be part of the state program of public education," using the word "public" ***97 times*** in the Act. *Id.* ¶¶ 74–76. Charter schools "were not to exist independently of the state" and could not "be created or operated without state approval and oversight," and they were "entirely integrated into" the public-school funding structure. *Id.* ¶¶ 77, 81.

In short, public charter schools are "firmly entrenched within Tennessee's system of public education," free and open to students, and "come into existence and remain in operation" only "by

virtue of state authority, approval, and oversight." *Id.* ¶¶ 87–88. They are funded "through the same statewide school-funding formula as all the other public schools," making charter and traditional public-school funding "inseparable." *Id.* ¶ 89. Though charter schools receive some instructional flexibility, they are governed by "a comprehensive framework of state and federal laws" covering academic standards, employment, financial transparency, and other public-school operations. *Id.* ¶ 90. As Professor Black concludes, Tennessee's charter schools are "part of its traditional and exclusive function of providing a system of free public education to all." *Id.* ¶ 91.

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986). Since Wilberforce bears the burden of proof on its claims, it must "affirmatively introduce evidence of such weight that no rational jury could disagree with it." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012).

## ARGUMENT

### I. DISCOVERY SHOWS THAT WILBERFORCE LACKS STANDING.

Standing requires (1) a concrete, particularized, and actual or imminent injury, (2) fairly traceable to the defendant's conduct, and (3) likely to be redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). As Wilberforce concedes, standing is "determined as of the time the complaint is filed." *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004); ECF No. 70 at 6. Wilberforce bears the burden of proving each element "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, at summary judgment, Wilberforce must introduce evidence setting forth "specific facts" and may not rely on "[c]onclusory allegations." *Tenn. Conf. of the NAACP v. Lee*, 139 F.4th 557,

566 (6th Cir. 2025); *see also* CI MSJ 14. As shown in the CI MSJ, Wilberforce lacks standing; nothing in its second summary judgment motion alters that conclusion. CI MSJ at 14–25.

### A. Wilberforce Suffered No Injury in Fact Because Applying Was Not Futile.

To establish injury in fact with no application, Wilberforce must demonstrate that (1) applying was "futile" due to a concrete barrier, and that (2) it was "able and ready" to compete when it sued. *Carney v. Adams*, 592 U.S. 53, 63–66 (2020). Wilberforce fails on both fronts.[3]

#### 1. Wilberforce Faced No Discriminatory Barrier When It Filed Suit.

An abstract objection to an allegedly unconstitutional restriction is not enough for futility. *Carney*, 592 U.S. at 59. A plaintiff invoking futility must show "inevitability" and certainty of denial: "[t]he mere possibility, or even the probability," of refusal is insufficient.[4] *Gilbert v. City of Cambridge*, 932 F.2d 51, 61 (1st Cir. 1991) ("the prospect of refusal must be certain (or nearly so)"); *see* CI MSJ 16–17 (collecting cases). Wilberforce's three futility arguments are unavailing.

***First***, Wilberforce relies heavily on the Court's motion to dismiss ruling on standing, citing it ***twenty-six*** times. Pl. 2d MSJ 8–14. But even if facts are "enough to 'plausibly assert standing' at the initial pleading stage," the standard "change[s] at summary judgment." *S. Env't L. Ctr. v. Tenn. Valley Auth.*, 2025 WL 1791128, at *2 (E.D. Tenn. June 27, 2025); *see also Tenn. Conf. of the NAACP*, 139 F.4th at 566, 569 (plaintiff must "plead and prove its standing in the same way that it must plead and prove the elements of its claims" by "affirmatively introduc[ing] evidence

[3] Wilberforce's reliance on *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023), for the proposition that an "[un]equal footing" allegation is itself a sufficient Article III injury, Pl. 2d MSJ 11, is misplaced for two reasons. ***First***, Haaland was not a futility case. ICWA's placement preferences were actually applied against the petitioners. Pet. for Cert. at 5–8, *Brackeen v. Haaland*, No. 21-380 (U.S. Sept. 3, 2021). ***Second***, even with realized injuries, the Court denied standing because the petitioners could not establish redressability. *Haaland*, 599 U.S. at 292–94.

[4] Wilberforce relies on *Sporhase v. Nebraska*, 458 U.S. 941 (1982), to argue that its failure to submit an application does not defeat standing. Pl. 2d MSJ 12. But *Sporhase* is inapposite because the challenged statute had been ***actually enforced*** against the plaintiffs: Nebraska sued to enjoin them from transferring groundwater across the state line. *Sporhase*, 458 U.S. at 944.

of such weight that no rational jury could disagree with it.”).

***Second***, the allegations that the Court credited at the motion to dismiss stage have been debunked through discovery. Wilberforce’s futility theory rests on five preliminary, nonbinding events—beyond them, there was not “anything else that the Knox County Board of Education told [Wilberforce] that led Wilberforce to believe that its application would be rejected[.]” SJCIX21 (“Wishart Dep.”) 117:18–118:1. These five events do not support Wilberforce:

- ***Triplett’s “passing comment.”*** The sole pre-filing event was a private remark by Knox County Board of Education (“KCBOE”) member Steve Triplett that Wilberforce concedes was merely a “passing comment” by one of nine Board members who later recused himself from Wilberforce-related decisions. *See* CI MSJ 17–18.
- ***The LOI.*** Wilberforce concedes it could have “agreed with all of the requirements of the check[]box” on the LOI. *See* CI MSJ 18–19. Knox County Schools (“KCS”) also twice invited Wilberforce to proceed with its application; yet Wilberforce never responded. *See* CI MSJ 19.
- ***The Nixon workshop.*** Ms. Nixon’s January 16 presentation occurred six weeks after Wilberforce filed suit, was purely advisory, and Wilberforce concedes that KCBOE likely had not reviewed “the specifics of Ms. Nixon’s presentation.” *See* CI MSJ 20.
- ***The Dupler resolution.*** The proposed resolution was drafted by the Deputy Law Director—“not a Knox County Board member”—was never requested by Wilberforce or KCBOE, and was never adopted. CI MSJ 20. Dupler himself confirmed “***an application could have been filed***,” and Chair Kristy stated the Board “had not denied anything” and had “no problem considering a charter school based on its application and merits.” App.1680–81. The proposal then failed 3–3–3—showing a divided Board, not a certain rejection. *See* App.1681.
- ***KCS policies and handbooks.*** Wilberforce claims that KCS policies and guidance concerning charter-school religious instruction create a concrete barrier. (Pl. 2d MSJ 5, 12–13.) But the cited materials do not reflect any KCBOE decision, and Wilberforce concedes that “[KCBOE] only speaks as a body.” App.469; *see also* Tenn. Code Ann. § 49-13-108(b)(2).[5] The approval of Union Academy’s application also forecloses this argument: Union Academy identified itself as a “Faith-based Christian College Preparatory” school, left the same box unchecked, submitted its application in the same cycle, and still was approved. SJCIX21, Wishart Dep. 118:16–120:14, 129:17–130:7; *see also* CI MSJ 14, 20–21.[6]

---

[5] Wilberforce conspicuously omits that the Commission policies cited in their 2d MSJ state that “The Commission recognizes the significant role that religious events, beliefs, and figures have played in world history” and “Religious themes shall be permitted in the curriculum.” App. 1857.

[6] Wilberforce relies on *Trinity Lutheran* and *Northeastern Florida Chapter of Associated General Contractors v. City of Jacksonville* for the proposition that an “inability to compete on an equal footing” constitutes injury in fact. Pl. 2d MSJ 9, 10. But both cases involved unambiguous barriers to competition that were actually applied against the plaintiffs. In *Trinity Lutheran*, the church

***Third***, the only new evidence Wilberforce offers in the Second MSJ are two declarations that amount to nothing more than predictions. Wishart asserts that KCBOE "would inevitably deny" Wilberforce's application. App.12. Wilberforce Board President Doug Harris claims that he "predicted correctly" that KCBOE would not approve the application, even though Wilberforce never submitted one. App.23. Such speculation falls short. Neither declarant has personal knowledge of how a nine-member Board would have voted on an application it never received. *See* Fed. R. Civ. P. 56(c)(4); *Ondo v. City of Cleveland*, 795 F.3d 597, 604–05 (6th Cir. 2015).

**2. Discovery Shows That Wilberforce Was Not "Able and Ready."**

Wilberforce also must prove that it was "able and ready" to apply. *Carney*, 592 U.S. at 63–66. That fact-specific inquiry turns on objective evidence, not a "few words of general intent." *Id.* at 63–64; *see also* CI MSJ 21–23. In place of evidence that it was "able and ready" to apply when it sued, Wilberforce relies on puffery. It touts its leaders as "remarkably qualified." Pl. 2d MSJ 4. But the people whose résumés Wilberforce invokes did not do the work it now cites as evidence of readiness: Wishart admitted that the LOI was "just [him] and the lawyers"; Board President Harris testified that the Board left Wishart alone to "do the application, do the LOI," and the Board was "just standing by." SJCIX21, Wishart Dep. 56:16–57:19; SJCIX20 ("Harris Dep.") 133:8–137:25. Board Member Laura Beaman only learned of the LOI "during carline when she was picking up her kids" and never saw it. SJCIX21, Wishart Dep. 71:19–78:14. Wishart himself had never prepared a charter application—he had only served on a "local advisory board" at Knoxville

applied for a grant, ranked fifth out of 44 applicants, and was *denied* solely because it was a church. 582 U.S. 449, 455–56, 463 (2017). And in *Jacksonville*, an operative set-aside ordinance was already in effect. 508 U.S. 656, 658–59 (1993). Indeed, *Jacksonville* distinguished cases where applicants could compete but merely predicted that the decisionmaker would ultimately deny them: "[t]he firms' complaint . . . was not that they could not compete equally; it was that they did not win." *Id.* at 667–68. Wilberforce identifies no comparable exclusion or decision that actually prevented it from entering the application process; its theory instead depends on predicting how KCBOE would have ruled on an application it never received.

Prep and worked with a South Carolina organization that also never submitted a charter application. SJCIX21, Wishart Dep. 21:14–24, 334:19–336:14.

Wilberforce also points to its "279-page application," the "$140,000" it spent on Arcadia, and the "1,200 man hours" devoted to the project ***after*** filing suit. Pl. 2d MSJ 5, 10; SJCIX04, Wishart Dep. 132:23–133:10, 146:23–147:5; SJCIX02, Denton Dep. 31:19–32:19. But since standing is "determined as of the time the complaint is filed," those later preparations cannot establish jurisdiction retroactively. *Lynch*, 382 F.3d at 647; *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 849 (6th Cir. 2024). Even still, the touted 1,200 hours were those of Arcadia, an out-of-state consultant that had never "served any charter schools in Tennessee" and whose managing consultant had never drafted a charter application. *See* CI MSJ 8, 21–23.

Tellingly, nowhere does Wilberforce argue that its draft application satisfies Tennessee's authorizing criteria, dismissing application deficiencies identified in discovery as "neither here nor there."[7] Pl. 2d MSJ 10. Instead, Wilberforce argues that it "compare[s] favorably" to KCBOE's two previously approved charter schools, Emerald Academy and Knoxville Prep. *Id.* at 11. But Emerald Academy met with more than 250 stakeholders (Wilberforce spoke with only "ten to twelve" families, fewer than half of whom said they would enroll), held 20 small-group meetings (Wilberforce held none), collected 290 petition signatures (Wilberforce submitted none), received 32 letters of support (Wilberforce received one), and identified two permanent facilities plus an

[7] Wilberforce relies on *SFFA v. U.S. Naval Academy* to argue that "[a]ny supposed deficiencies in Wilberforce's draft charter application" are irrelevant. Pl. 2d MSJ 10; 2024 WL 4057002 (D. Md. Sept. 5, 2024). But *Naval Academy* rested on applicants who had previously applied, and the court treated them as satisfying the Academy's basic eligibility requirements. *Naval Acad.*, 2024 WL 4057002, at *2–3, 5. Wilberforce never applied. Pl. 2d MSJ 10–11. Similarly, Wilberforce relies on *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021), to argue that the Court need not consider the obvious deficiencies in its application. *Vitolo* is inapposite: there, the plaintiff actually applied—indeed, "on the first day" the program opened. *Id.* at 357.

interim option (Wilberforce identified no viable facility). App.511–12; App.168–69; SJCIX21, Wishart Dep. 216:16–228:4, 242:1–243:10, 246:10–22. And Knoxville Prep, which had 16 support letters and twice as many interested families for a class one-third Wilberforce's size, closed after only two years. App.834, 960; Pl. 2d MSJ 4. More fundamentally, measured against Tennessee's requirements for "a demonstration of community support," "a solvent and sustainable budget," and the "capacity to execute its plan successfully," Wilberforce was plainly deficient. SJCIX17, Tenn. State Bd. of Educ. Policy 6.111, Standard 2(3)(a)(1), (3)(b); *see also* CI MSJ 10–14.

Wilberforce protests that the Coble Intervenors are arguing its application would have been denied. But Coble Intervenors have shown that Wilberforce ***could not*** have been accepted because it failed to submit an application and was objectively not ready and able at the time of filing.[8] Regardless, the application's deficiencies underscore that it was drafted in haste in connection with litigation that Wilberforce decided to pursue months before it even incorporated. CI MSJ 21–23.

### B. The Injury Is Not Traceable, Risk of Future Litigation Is Not Redressable, and Wilberforce Seeks an Advisory Opinion.

Wilberforce's one-sentence assertion that "the barrier causes" its equal-footing injury assumes the very barrier it failed to prove. Pl. 2d MSJ 9. As Wilberforce concedes, "the only reason the Knox County Board of Education did not consider [Wilberforce's] application is because Wilberforce did not submit one." SJCIX04, Wishart Dep. 123:6–14. That self-inflicted injury is "not traceable to anyone but [it]self." *Roberts v. Progressive Preferred Ins. Co.*, 167 F.4th 955, 963 (6th Cir. 2026) (cleaned up); CI MSJ 23–24.[9]

---

[8] Wilberforce's reliance on *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board* conflates whether an application had to be submitted with whether the plaintiff had to be ready to submit one. 172 F.3d 397, 404–06 (6th Cir. 1999). There, the plaintiff already operated a casino, had selected a Detroit site, and was "ready and able to submit a proposal." *Id.* Wilberforce's pre-filing record shows no comparable preparedness.

[9] Nothing that KCBOE did prevented Wilberforce from competing. Rather, Wilberforce prevented it from competing. Nominal damages can redress a completed violation; they cannot supply the

Wilberforce admits that "[e]ven if KCBOE approved Wilberforce's application, the futility problem would remain" because third parties might sue, and thus argues that it "needs judicial relief whether or not its application is approved." Pl. 2d MSJ 13. But it is a "bedrock principle" that courts cannot redress injuries resulting from "the independent action of some third party not before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). Because Wilberforce's "fears of hypothetical future harm" depend on future actions by others, relief against KCBOE cannot bind those actors, guarantee renewal, or immunize a future charter from legal challenge. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 416 (2013); CI MSJ 23–25.[10] Further, courts may not decide constitutional questions "in advance of the necessity for [their] decision," resolve "abstract, hypothetical or contingent questions," or issue rulings "broader than is required by the precise facts" before them. *Ala. State Fed'n of Lab., Loc. Union No. 103, United Bhd. of Carpenters & Joiners of Am. v. McAdory*, 325 U.S. 450, 461 (1945).

## II. THE FIRST AMENDMENT DOES NOT AUTHORIZE RELIGIOUS PUBLIC CHARTER SCHOOLS.

Wilberforce's merits arguments are equally unavailing. Wilberforce argues that "the

---

completed violation itself. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 292–93 (2021) (a request for nominal damages does not "guarantee[] entry to court" and redresses a "completed violation of a legal right"). Nor does *Road-Con, Inc. v. City of Philadelphia* support Wilberforce's position. 120 F.4th 346 (3d Cir. 2024); Pl. 2d MSJ 9. There, the challenged policy rendered the plaintiffs "ineligible" for identified public projects and "blocked" them from competing. *Id.* at 353–55. Here, Wilberforce identifies no comparable barrier that excluded it from competing; it chose not to submit an application. *Road-Con* is inapposite.

[10] Wilberforce contends that it ultimately withheld its supposedly complete application because it feared the public might "wrongly assume there is something wrong with the school." Pl. 2d MSJ 11–12. And it supports that position by invoking *Int'l. Bhd. of Teamsters v. United States*—an authority the Sixth Circuit has since held "ha[s] no bearing on whether [a plaintiff] has established standing." *Roberts*, 167 F.4th at 964 (6th Cir. 2026). Nor can Wilberforce rely on the out-of-circuit decision in *Mendoza v. Perez* to argue that the Court may not consider its refusal to submit an application. *Mendoza*, like other futility cases, excuses nonapplication only after futility has been objectively established; it does not permit nonapplication itself—or the applicant's prediction of the outcome—to establish futility. *Mendoza v. Perez*, 754 F.3d 1002, 1013–14, 14 n.6 (D.C. Cir. 2014). No comparable showing is possible here.

challenged policies discriminate against religion on their face" and that the Act improperly "bar[s] religious schools from public benefits solely because of [their] religious character." Pl. 2d MSJ 1, 15. That argument fails. ***First***, the Act does not violate the Free Exercise Clause because it regulates the State's own public schools rather than excluding private institutions from a generally available benefit. ***Second***, Tennessee charter schools are governmental entities and state actors that may not invoke the Free Exercise Clause to compel the State to authorize religious instruction through its own public schools. ***Third***, the Establishment Clause independently prohibits what Wilberforce proposes, and the nonsectarian requirement satisfies strict scrutiny.

**A. The Act Does Not Violate the Free Exercise Clause.**

Wilberforce argues that the Act triggers strict scrutiny under the Free Exercise Clause because it "expressly discriminates against religious schools." Pl. 2d MSJ 15. Citing *Carson*, *Espinoza*, and *Trinity Lutheran*, Wilberforce contends that the nonsectarian requirement "bar[s] religious schools from public benefits solely because of [their] religious character." *Id*. (quoting *Carson v. Makin*, 596 U.S. 767, 779 (2022)). But each of those cases involved a benefit furnished to a private institution: a playground-resurfacing grant to a private church (*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 453–55 (2017)); vouchers and tuition assistance that families can direct to private schools (*Espinoza v. Montana Department of Revenue*, 591 U.S. 464, 468–74 (2020); *Carson*, 596 U.S. at 773–78). None involved the government creating a public institution, authorizing it to operate in the public-school system, or subjecting it to public-school oversight, renewal, and revocation. The Act reinforces that distinction, prohibiting the conversion of "private" or "parochial" schools to charter status. Tenn. Code Ann. § 49-13-106(j)(7).

Tennessee public charter schools are fundamentally different from the private schools in *Carson*, and *Carson* recognized the distinction: Maine's participating schools were "not public schools"—they could impose admissions standards, charge tuition, use different curricula, avoid

state assessments, and employ uncertified teachers. 596 U.S. at 782–85. The Court still reaffirmed that a State may "provide a strictly secular education in its public schools" or expand its public-school system. *Id*. at 785. Unlike the private schools in *Trinity Lutheran*, *Espinoza*, and *Carson*, Tennessee charter schools are public schools, governmental entities, and state actors. *See infra* Part II.B; *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 118–21, 123 (4th Cir. 2022) (en banc); *Woolard v. Thurmond*, 170 F.4th 701, 705–10 (9th Cir. 2026), *petition for cert. filed* (U.S. Aug. 20, 2026). And the Free Exercise Clause has not historically been understood to prohibit states from refusing to directly fund religious schools. Green Rep. ¶¶ 44–46. Because Tennessee is regulating its own public schools, not excluding a private institution, strict scrutiny does not apply.

### B. Public Charter Schools Are Governmental Entities and State Actors.

To escape the reach of the Establishment Clause, and invoke the Free Exercise Clause, Wilberforce casts itself as a private entity, incorporated under Tennessee's general nonprofit statute, pursuing charitable purposes, and retaining private control over its board, curriculum, and operations. Pl. 2d MSJ 17–20. Wilberforce further contends that education is not exclusively governmental and the State does not "jointly" operate the school. *Id.* at 20–22. But these arguments run contrary to the weight of authority: appellate courts considering the status of charter schools in connection with their provision of public education have consistently concluded that the schools are governmental entities or other state actors.[11] And Wilberforce's framing ignores the

[11] *See Greater Heights Academy v. Zelman*, 522 F.3d 678, 680–82 (6th Cir. 2008); *Woolard*, 170 F.4th at 708–09 (holding that charter school independent-study programs were "public school programs" subject to state curricular standards and governmental supervision); *Peltier*, 37 F.4th at 120–21 (en banc); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010); *Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 830 (10th Cir. 2016); *Drummond ex rel. Oklahoma v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, 10–13 (Okla. 2024), *aff'd by an equally divided court*, 605 U.S. 165 (2025); *Fam. C.L. Union v. Dep't of Child. & Fams.*, 837 F. App'x 864, 869 (3d Cir. 2020); *Nampa Classical Acad. v. Goesling*, 447 F. App'x 776, 777–78 (9th Cir. 2011); *Blanco v. Success Acad. Charter Schs., Inc.*, 722 F. Supp. 3d 187, 227 (S.D.N.Y. 2024).

fundamental structure of the Act's statutory scheme, under which public charter schools are governmental entities operating within the state's public education system. Moreover, even if public charter schools were private entities (they are not), they plainly qualify as state actors.

### 1. Public Charter Schools Are Governmental Entities.

"Courts do not ordinarily pause to consider whether [the Constitution] applies to the actions of police officers, public schools, or prison officials." *Lindke v. Freed*, 601 U.S. 187, 195 (2024). The Supreme Court has held that a government-chartered corporation (there, Amtrak) is a governmental entity for First Amendment purposes when it "is part of the Government" in light of the statutory framework and degree of governmental control. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 381, 395–400 (1995). That conclusion was reaffirmed in *Department of Transportation v. Association of American Railroads*, emphasizing Amtrak's reporting obligations, congressionally mandated public objectives and daily operational requirements, and dependence on federal funding. 575 U.S. 43, 51–54 (2015).[12]

Wilberforce reads *Lebron* too narrowly, treating its corporate features as the exclusive test for identifying a governmental entity. But corporate structure is merely where the inquiry "begin[s]"—the analysis then examines governmental control, statutory objectives, operational requirements, and public support. *DOT v. Ass'n of Am. R.R.*, 575 U.S. at 51–55. And Wilberforce's own Sixth Circuit authority recognizes "there is no simple test" for what a governmental instrumentality is. *Commodities Export Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 528 (6th Cir.

---

[12] Courts have applied the same analysis to other entities: the Missouri Higher Education Loan Authority was governmental because it was created by the State to further a public purpose, governed by state officials, and subject to state dissolution, *Biden v. Nebraska*, 600 U.S. 477, 491, 493–94 (2023); and the National Center for Missing and Exploited Children was governmental based on the combination of its statutory creation and mandated functions, extensive governmental control and board presence, dependence on federal funding (approximately seventy-five percent of its budget), and the public law enforcement benefits it conferred, *United States v. Ackerman*, 831 F.3d 1292, 1296–1300 (10th Cir. 2016) (Gorsuch, J.).

2012). Tennessee public charter schools are governmental entities under the same analysis.

***First***, public charter schools exist only because the Legislature created them to operate as "public school[s]" within "the state program of public education." Tenn. Code Ann. §§ 49-13-104(15), 49-13-106(a). And they exist only upon the approval of a governmental authorizer. § 49-13-104(4). This express statutory designation makes this an easier case than the Amtrak, which was defined by statute as a for-profit corporation and not "an agency or establishment of the United States government." *Cf. Lebron*, 513 U.S. at 381, 391, 395, 400.

***Second***, public charter schools are subject to extensive governmental oversight and control. They must comply with state academic standards, § 49-1-302(a)(8); "[p]rovide education services for students with disabilities, English language learners, and other students with diverse needs," § 49-13-111(a)(5); adhere to nondiscrimination mandates, § 49-13-111(b); comply with open meetings and public records laws, §§ 8-44-101 *et seq*., 10-7-101 *et seq*.; ensure teacher licensure, § 49-5-108; and submit to financial accountability requirements, § 49-13-127. The authorizer exercises ongoing oversight through monitoring, auditing, and report review, §§ 49-13-111(d), -120, -127, and has the power to deny renewal or revoke a charter agreement, §§ 49-13-121–122. Wilberforce Board President Harris testified that charter-school oversight is "more rigorous" than for other public schools and charter schools would "definitely" be subject to public accountability in a way private schools are not. Harris Dep. 227:24–230:14, ECF No. 106-2; *see also* Slater Dep. 59:24–60:19, ECF No. 106-3 ("bound to the same requirements . . . because [it's] a public school").

***Third***, public charter schools are charged with advancing governmental objectives: "[i]mprov[ing] learning for all students and clos[ing] the achievement gap," and "[e]nsur[ing] [] the necessary outcomes of education." § 49-13-102(a), (b). They further the state's constitutional obligation to maintain free public schools that are open to all. Tenn. Const. art. XI, § 12; Tenn.

Code Ann. § 49-13-104(15). Professor Black concluded that Tennessee charter schools are "firmly entrenched within Tennessee's system of public education." Black Rep. ¶¶ 87–91.

***Fourth***, public charter schools are fully funded by the government, as public schools, through the State's public-school funding statute—they directly receive "state and local funds" allocated for public education, §§ 49-13-112(a), 49-3-105, through "the same statewide school-funding formula as all the other public schools in the state." Black Rep. ¶ 89.

Sixth Circuit precedent compels the conclusion that public charter schools are governmental entities. In *Greater Heights Academy*, the court held that Ohio charter schools were governmental political subdivisions, not only based on statutory designation, but also on the "substantive control" of the State. 522 F.3d at 680–81. The Sixth Circuit emphasized the "many institutional characteristics" making charter schools "part and parcel" of the State's public-education system and that Ohio had "not relinquished its power to create, govern or even destroy" them. *Id.* at 681. The Act is nearly identical: Tennessee's charter schools are statutorily designated public schools, only come into existence upon approval by other governmental entities, operate pursuant to charter agreements, receive public funds, comply with state academic and operational requirements, and remain subject to governmental oversight and termination. *Id.* Wilberforce conflates its private corporate status before authorization with the constitutional status of the public charter school it seeks to operate. *See* Pl. 2d MSJ 17–20. As then-Judge Gorsuch recognized, "an admittedly private entity can be made into a public one later." *Ackerman*, 831 F.3d at 1299.[13]

---

[13] Wilberforce's reliance on *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), and *Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806 (9th Cir. 2010), is similarly misplaced. Pl. 2d MSJ 20. *Rendell-Baker* involved an independently existing private school that charged tuition and served a limited population of students referred by public agencies—not a statutorily designated public school open to all and created as part of the State's public-school system. 457 U.S. at 832–35, 840–43. The Court also addressed state action in the context of the school's challenged employment decisions. *Id.* at 840–43. *Caviness* likewise does not resolve whether a charter school

### 2. At Minimum, Public Charter Schools Are State Actors.

At minimum, even if not governmental entities, Tennessee public charter schools are state actors. *See Doe v. Claiborne County*, 103 F.3d 495, 504, 511 (6th Cir. 1996) (holding that public school employees are state actors); *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 354 n.9 (1974) ("It is difficult to imagine a regulated activity more essential or more clothed with the public interest than the maintenance of schools."). Public charter schools qualify under at least two tests.

***Public function.*** A private entity's conduct "may be fairly treated as that of the State itself" when it "perform[s] a traditional, exclusive public function" or "the government has outsourced one of its constitutional obligations to" it. *Jackson*, 419 U.S. at 351; *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809, 810 n.1 (2019); *West v. Atkins*, 487 U.S. 42, 55–56 (1988). Providing education that is free and open to all is a function "traditionally and exclusively delivered" by the government. *Halleck*, 587 U.S. at 809; *see Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 111–12 (1973) (Marshall, J., dissenting); Black Rep. ¶ 43. Tennessee's Constitution even obligates the state to provide free public education open to all, Tenn. Const. art. XI, § 12, and it has delegated that obligation in part to public charter schools, Tenn. Code Ann. §§ 49-13-104(15), -106(a), -108, -110, -112, -120–22; *Halleck*, 587 U.S. at 810 n.1; *accord West*, 487 U.S. at 55–56; *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 140–41, 151 (Tenn. 1993); Black Rep. ¶ 88.

That private schools always existed misses the point. Pl. 2d MSJ 20–22. The *en banc* Fourth Circuit rejected that framing, explaining that the inquiry requires "a narrower lens" focused on the "'function within the state system.'" *Peltier*, 37 F.4th at 119–20 (quoting *West*, 487 U.S. at

---

is itself a governmental entity; it concerned only a private nonprofit operator of an Arizona charter school and its specific employment decisions challenged there under section 1983. 590 F.3d at 808, 812–14, 817–18. Thus, *Caviness* bears only on Wilberforce's alternative argument that, if treated as private, a charter-school operator would not satisfy the state-action tests.

55–56); *see Nugent v. Spectrum Juvenile Justice Servs.*, 72 F.4th 135, 139–42 (6th Cir. 2023). Just as operating a public park is a public function because it "traditionally serves the community," *Evans v. Newton*, 382 U.S. 296, 302 (1966), even though private parks exist, free schooling open to all is traditionally and exclusively performed by the government despite private school existence. *See also* Black Opp. 5–8, ECF No. 130.[14]

***Entwinement.*** "[A] nominally private entity [i]s a state actor . . . when it is entwined with governmental policies or when government is entwined in [its] management or control." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001); *accord Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 179 (6th Cir. 2008); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 692 (6th Cir. 2006). Charter schools are statutorily designated "public school[s]," authorized by the government, funded as public schools, and subject to extensive governmental control. Tenn. Code Ann. §§ 49-13-104(14), -106(a); Harris Dep. 227:24–230:14, ECF No. 106-2; Slater Dep. 59:24–60:19, ECF No. 106-3. As in *Brentwood*, public charter schools are "charged with a public character and judged by constitutional standards." 531 U.S. at 302. Even assuming charter-school employees were not considered

[14] Wilberforce's historical arguments similarly confuse the existence of private education with the distinct governmental function of maintaining Tennessee's system of free public schools. Wilberforce's citation to *Pierce v. Society of Sisters* for the proposition that it is unconstitutional to ban private schools is misguided, 268 U.S. 510, 534–35 (1925), because that case says nothing about whether operating a school within the State's public-school system is a governmental function. Professor Black draws precisely that distinction: private schools arose through private initiative and charged tuition, whereas Tennessee's public-school system was publicly financed, supervised by public officials, and designed to provide education to the public at large. Black Rep. ¶¶ 42–44, 66–69. He explains that public education in Tennessee was "radically distinct from private education" and conceived as "a state, not simply local, responsibility." *Id.* ¶¶ 66, 69. Tennessee law reflects this understanding: "[t]he public school is, in the highest sense, a public institution, whose operation involves a public use," *Leeper v. State*, 53 S.W. 962, 965 (Tenn. 1899); "[n]o doubt exists that providing education is a State function," *State ex rel. Weaver v. Ayers*, 756 S.W.2d 217, 221 (Tenn. 1988); and "the responsibility for designing and maintaining a free public school system" rests with the General Assembly, *McWherter*, 851 S.W.2d at 151.

government employees for all purposes, that state officials would not themselves "lead prayers or teach catechism lessons" (Pl. 2d MSJ 21) is irrelevant: *Brentwood* asks whether the entity is so entwined with governmental "management and control" that its conduct is attributable to the State—not whether state officials personally perform the challenged acts. 531 U.S. at 296–97, 302.

### C. Public Charter Schools May Not Invoke the Free Exercise Clause Against the State's Nonsectarian Requirement.

Because Tennessee public charter schools are governmental entities and state actors, they have no right under the Free Exercise Clause to present a religious curriculum for two reasons. ***First***, "subordinate unit[s] of government"—such as public charter schools authorized by the Board—"ha[ve] no privileges or immunities under the federal constitution which [they] may invoke in opposition to the will of [their] creator." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (citation modified). As governmental entities created by superior state entities, Tennessee public charter schools cannot assert free-exercise rights. *See id.*; Pl. 2d MSJ 22.

***Second***, an entity delivering government speech has no right under the First Amendment to present unlawful speech. *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("[G]overnment speech must comport with the Establishment Clause."); *Rust v. Sullivan*, 500 U.S. 173, 198–200 (1991) (holding that medical staff did not have free-speech right to provide abortion counseling and referral in violation of Title X rules when carrying out duties of government-funded program); *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes.").[15]

---

[15] Wilberforce's public-employee analogy is unavailing: equal eligibility does not entitle the employee to convert official duties into private religious ministry. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527–30 (2022) (distinguishing private speech from speech made pursuant to a public employee's official duties and concluding that Kennedy's prayers were "not delivered as an address to the team" but instead made "in his capacity as a private citizen"). Tennessee permits

### D. The Establishment Clause Prohibits Religious Charter Schools.

Wilberforce argues that the Establishment Clause does not justify banning religious charter schools because enrollment is voluntary, no denominational preference exists, and the government regularly employs chaplains. Pl. 2d MSJ 22–24. Not so. Adherence to the Establishment Clause is a compelling governmental interest. *See Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62, 783 (1995) (citing *Widmar v. Vincent*, 454 U.S. 263, 271 (1981); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394–95 (1993)); *Lee v. Weisman*, 505 U.S. 577, 587 (1992). A restriction that the Establishment Clause itself demands is necessarily narrowly tailored to that interest. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 624, 628–29 (1984). The Act's prohibition, in accord with "historical practices and understandings," is required for three reasons. *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).

#### 1. The Establishment Clause Prohibits Creating Religious Governmental Institutions.

State-established religious institutions were a source of religious oppression in Europe and the American colonies. *Engel v. Vitale*, 370 U.S. 421, 430–33 (1962); SJCIX23, Green Rep. ¶¶ 16–17. "[T]he 'establishment of religion' clause . . . means at least this: Neither a state nor the Federal Government can set up a church." *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947). The Clause prohibits "a fusion of governmental and religious functions or a concert or dependency of one upon the other." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 222 (1963). A state may not operate a "joint public-school religious-group program," *Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 205, 255–56 (1948), create a public school district under a single religious sect, *Bd. of Educ. v. Grumet*, 512 U.S. 687, 690 (1994), or delegate "important, discretionary

---

a religious organization to sponsor a school; it need not permit that organization to transform the school's official curriculum into religious exercise.

governmental powers . . . to . . . religious institutions," particularly when "employed for explicitly religious goals," *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 125–27 (1982). Religious charter schools would unite "civic and religious authority" in violation of "the core rationale underlying the Establishment Clause." *Grumet*, 512 U.S. at 697.

Wilberforce contends that no denominational preference exists if all religious groups can apply equally. Pl. 2d MSJ 23–24. But that contention is diametrically opposed to historical understandings of the Establishment Clause: the Founders "understood that the notion of non-preferential support of all religions was not only anathema to religious freedom but impossible to achieve." Green Rep. ¶ 20. That is, authorizers would inevitably consider religious affiliations in making application decisions. Even absent facial discrimination, allowing religious public charter schools would still create public institutions that conduct religious education in violation of the Establishment Clause. *See McCollum*, 333 U.S. at 209–12; *Grumet*, 512 U.S. at 696–97, 709–10.[16]

**2. The Establishment Clause Forbids Inculcating Religion in Students.**

Wilberforce's proposed religious curriculum is independently barred because "[g]overnment may not . . . undertake religious instruction []or blend secular and sectarian education." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310–13 (2000); *Weisman*, 505 U.S. at 598, 619; *Edwards v. Aguillard*, 482 U.S. 578, 596–97 (1987); *Wallace v. Jaffree*, 472 U.S. 38, 59–61 (1985); *Epperson v. Arkansas*, 393 U.S. 97, 106–07, 109 (1968); *Schempp*, 374 U.S. at 223, 225; *Engel*, 370 U.S. at 424–25;

[16] Wilberforce's reliance on *Galloway* is equally unavailing. *Galloway* rested on the "specific" and longstanding historical tradition of legislative prayer, where the audience was lawmakers, the prayer was ceremonial, and the government did not proselytize. 572 U.S. at 577, 583–85, 586–91. That narrow tradition does not extend to a public charter school whose official curriculum and mandatory activities teach and practice Christianity. *See id.* at 583–85; *see also* SJCIX15, Wilberforce Charter Application, at WILB-ACAD-0024–0032 (detailing Wilberforce's proposed religious program); SJCIX04, Wishart Dep. 281:20–282:11; Green Rep. ¶¶ 26–43 (discussing the history of the public education and disestablishment).

*McCollum*, 333 U.S. at 231 (Frankfurter, J., concurring) ("In no activity of the State is it more vital to keep out divisive forces" than in public education.).

That enrollment is voluntary is of no moment. Pl. 2d MSJ 23–24. Wilberforce's religious activities are ***not*** voluntary after enrollment: Every student must attend daily prayer, Scripture reading, creeds and confessions, and worship music. SJCIX19 at 10. Students must attend "in the same way that they would have to be present for math class." Wishart Dep. 281:20–282:11. Even if "observance on the part of the students is voluntary," that does not alter the constitutional prohibition on public-school inculcation of religion. *Engel*, 370 U.S. at 430; *see also McCollum*, 333 U.S. at 209–12. And the Founders believed that government involvement in religion created "religious 'animosities and jealousies,'" even absent mandating religion. Green Rep. ¶¶ 23–24 (quoting James Madison, Memorial and Remonstrance Against Religious Assessments (1785)).

### 3. The Establishment Clause Forbids Direct State Aid for Religious Activities.

In line with historical understanding (Green Rep. ¶ 25), the Establishment Clause also prohibits direct funding of religious education at a charter school. *See*, *e.g.*, *Teen Ranch v. Udow*, 389 F. Supp. 2d 827, 837 (W.D. Mich. 2005) ("State cannot fund placements at ['Christian faith-based organization'] without running afoul of the . . . Establishment Clause."), *aff'd as supplemented sub nom. Teen Ranch, Inc. v. Udow*, 479 F.3d 403 (6th Cir. 2007); *Locke v. Davey*, 540 U.S. 712, 725 (2004); *Agostini v. Felton*, 521 U.S. 203, 223, 252 (1997); *Bowen v. Kendrick*, 487 U.S. 589, 613, 621 (1988); *Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 747, 755 (1976) (plurality); *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 780 (1973); *Hunt v. McNair*, 413 U.S. 734, 743 (1973). Public funds may support religious education only when "a government aid program is neutral with respect to religion, and provides assistance directly *to a broad class of citizens* who, in turn, direct government aid to religious schools *wholly* as a result

of their own genuine and independent private choice." *See Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002). That exception does not apply here.

Public funds flow directly from the state to charter schools through the statewide public-school funding formula, not to a broad class of citizens through vouchers to pay for private institutions. Tenn. Code Ann. §§ 49-13-112(a), 49-3-105(d)(1)(B); Tenn. Comp. R. & Regs. 0520-14-01-.03(2); *see also* Black Rep. ¶¶ 88–90; Slater Dep. 171:17–172:9, ECF No. 106-3. Moreover, charter schools are eligible for federal start-up grants even before enrollment; Wilberforce's own application projects $250,000 in such funding. SJCIX15 at WILB-ACAD-0218–0219.

**E. Even Assuming Strict Scrutiny Applied, the Act Satisfies It.**

Wilberforce argues that the Act cannot satisfy strict scrutiny for three reasons: (1) there is no compelling interest because charter-school operators are "private nonprofits" that receive government funding through voluntary enrollment choices; (2) any interest in "separating church and state more fiercely than the Federal Constitution" cannot be compelling; and (3) even if there were a compelling interest, it is "fatally underinclusive" because Tennessee's voucher program subsidizes religious education and the 2026 amendment to the Act lets religious nonprofits sponsor charter schools. Pl. 2d MSJ 15–16. These arguments are unavailing.

***Compelling interest.*** As discussed, Tennessee charter schools are governmental entities or state actors. *See supra* Part II.B. Thus, as explained above, religious instruction at a charter school would violate the Establishment Clause, *supra* Part II.D., and "[t]here is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling." *Pinette*, 515 U.S. at 761–62, 783. That interest is reinforced by Tennessee's independent constitutional obligation to maintain and support a "system of free public schools," which means affording "substantially equal educational opportunities to all students." Tenn. Const. art. XI, § 12; *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 140–41, 151 (Tenn. 1993). Tennessee also has a compelling

interest in preventing discrimination in its public-school system. *See Roberts v. U.S. Jaycees*, 468 U.S. at 624 (eliminating discrimination "plainly serves compelling state interests of the highest order"); *Norwood v. Harrison*, 413 U.S. 455, 467 (1973) (a State's constitutional obligation requires it to "steer clear . . . of giving significant aid to institutions that practice . . . discrimination").

***Narrow tailoring.*** The nonsectarian requirement is narrowly tailored because it prohibits only religious instruction conducted through the State's own public-school system. *See Carson*, 596 U.S. at 785 (recognizing that a State "may provide a strictly secular education in its public schools"); *McCollum*, 333 U.S. at 209–12 (holding unconstitutional religious instruction conducted through the public-school system). The requirement does not prevent religious organizations from teaching religion, conducting worship, operating private religious schools, or—following the 2026 amendment—sponsoring nonsectarian charter schools. Tenn. Code Ann. § 49-13-111(a)(2); 2026 Tenn. Pub. Acts ch. 1128, §§ 1–2. Accordingly, the requirement does not achieve greater separation of church and state than the Establishment Clause requires. *See Widmar*, 454 U.S. at 276; *Espinoza*, 591 U.S. at 484–85.

***Underinclusiveness.*** Wilberforce contends that the nonsectarian requirement is "fatally underinclusive" because religious nonprofits can sponsor charter schools and the Education Freedom Scholarship ("EFS") Program allows eligible students to use state funds toward educational expenses at participating nonpublic schools. Pl. 2d MSJ 15–16. But private-choice programs, like EFS, may provide aid that reaches private religious schools without violating the Establishment Clause. *See Simmons-Harris*, 536 U.S. at 650–51; *Espinoza*, 591 U.S. at 487–89; *Carson*, 596 U.S. at 785. That is fundamentally different from religious instruction by the State's own public schools. *See Carson*, 596 U.S. at 785. As to religious sponsors, the 2026 amendment

only removed restrictions on who may ***sponsor*** a charter school while leaving intact the requirement that charter schools "[o]perate as a public, nonsectarian, nonreligious public school." Tenn. Code Ann. § 49-13-111(a)(2); 2026 Tenn. Pub. Acts ch. 1128, § 1.

## III. WILBERFORCE HAS NOT ESTABLISHED ITS ENTITLEMENT TO SUMMARY JUDGMENT.

. Even if the Court does not resolve the merits against Wilberforce as a matter of law, summary judgment must be denied because genuine disputes of material fact remain. *See Anderson*, 477 U.S. at 248, 255; *Mackey v. Rising*, 106 F.4th 552, 564 (6th Cir. 2024). ***First***, although charter schools are governmental entities or at least state actors as a matter of law, at a minimum the parties have submitted competing evidence on this issue. *See supra* Part II.B. ***Second***, Wilberforce's characterization of its religious program as voluntary is contradicted by the evidence that religious activities are mandatory once a student enrolls—with no opt-out. Wishart Dep. 281:20–282:11. ***Third***, the record does not establish that Wilberforce's religious affiliation prevented it from participating in the charter process. The 2026 amendment removed the religion-based sponsor restriction while § 49-13-111(a)(2) continues to regulate how the resulting public school operates. And in the same application cycle, Union Academy, a religious entity, proceeded with submitting a complete charter application. SJCIX21, Wishart Dep. 118:3–120:20.

Wilberforce itself acknowledges that any relief granted here will require affirmance by the Sixth Circuit and, "most likely, the U.S. Supreme Court." ECF No. 14 at 1. If summary judgment is not entered for the Coble Intervenors, a case of this consequence—poised to reshape the intersection of the Religion Clauses and public education nationwide—warrants a full record developed at trial, not disposition on a record that undercuts Wilberforce's own claims.

## CONCLUSION

Wilberforce's Second Motion for Summary Judgment should be denied.

Dated: August 24, 2026

Respectfully submitted,

MORRISON & FOERSTER LLP

By: */s/ Adam J. Hunt*

Adam J. Hunt*
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019-9601
Telephone: 212.336.4341
Facsimile: 212.468.7900
Email: AdamHunt@mofo.com

Mitchell E. Feldman*
Morrison & Foerster LLP
200 Clarendon Street, Floor 21
Boston, MA 02116
Telephone: 617.648.4759
Facsimile: 617.830.0142
Email: MFeldman@mofo.com

Jon McNeal*
Morrison & Foerster LLP
12531 High Bluff Drive, Suite 200
San Diego, CA 92130-3588
Telephone: 858.720.5100
Facsimile: 858.720.5125
Email: JMcNeal@mofo.com

Wanqian Zhang*
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415.718.9737
Facsimile: 415.268.7522
Email: WZhang@mofo.com

Lucas Cameron-Vaughn (BPR# 036284)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Telephone: 615.645.5067
Email: Lucas@aclu-tn.org

Alex J. Luchenitser*
Luke Anderson*

Americans United for Separation of
Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: 202.466.3234
Facsimile: 202.217.3783
Email: luchenitser@au.org
Email: anderson@au.org

Daniel Mach*
Heather L. Weaver*
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20008
Telephone: 202.675.2330
Facsimile: 202.546.0738
Email: dmach@aclu.org
Email: hweaver@aclu.org

Sophia Mire Hill (BPR# 040755)
Sam Boyd*
Neil Ranu*
Lauren Winkler*
Michael Tafelski*
Southern Poverty Law Center
150 E. Ponce de Leon, Suite 340
Decatur, GA 30030
Telephone: 504.457.1553
Email: sophia.mire@splcenter.org
Email: sam.boyd@splcenter.org
Email: neil.ranu@splcenter.org
Email: lauren.winkler@splcenter.org
Email: michael.tafelski@splcenter.org

Jessica Levin*
Wendy Lecker*
Patrick Cremin*
Katrina Reichert*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: 973.624.1815
Facsimile: 973.624.7339
Email: jlevin@edlawcenter.org
Email: wlecker@edlawcenter.org
Email: pcremin@edlawcenter.org

Email: kreichert@edlawcenter.org

Samuel T. Grover*
Kyle J. Steinberg*
Freedom From Religion Foundation, Inc.
10 N. Henry St.
Madison, WI 53703
Telephone: 608.256.8900
Email: sam@ffrf.org
Email: steinbergk@ffrf.org

* Admitted *pro hac vice*

*Attorneys for Intervenor-Defendants Rev. Dr. Richard Coble, Amanda Collins, Kerry Dooley, Elizabeth Porter, and Rev. Dr. Katina Sharp*