# SJCIX21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

Case No. 3:25-cv-584 (CEA)(DCP)

THE WILBERFORCE ACADEMY OF KNOXVILLE,

Plaintiff,

v.

KNOX COUNTY BOARD OF EDUCATION and JOHN BUTLER, ANNE TEMPLETON, PATRICIA FONTENOT-RIDLEY, KATHERINE BIKE, LAUREN MORGAN, BETSY HENDERSON, STEVE TRIPLETT, TRAVIS WRIGHT, and KRISTI KRISTY, all in their official capacities as members of the Knox County School Board of Education,

Defendants,

REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. KATINA SHARP,

Intervenor-Defendants,

ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER,

Intervenor-Defendants.

VIDEOGRAPHED DEPOSITION OF ZACHARY WISHART

JUNE 4, 2026

A. I was on the advisory board for Knoxville Preparatory School.
Q. Is that a religious school?
A. No.
Q. That's a charter school?
A. Yes.
Q. When did that school open?
A. Fall of '24, I believe. So August 2024.
Q. Okay.
Is it true that Knoxville Preparatory School is closing?
A. Yes.
Q. What was your specific role in opening that school?
A. I was on the local advisory board.
Q. What did that entail?
A. So I met with other community stakeholders on the advisory board, and we advised on community engagement and the launch of the school.
Q. Were you involved in any government licensing for the school?
A. No.
Q. Okay.

Let's talk about your proposed role at Wilberforce. Wilberforce was created in November of 2025, right?
A. Correct.
Q. And you have been involved since its inception?
A. Yes.
Q. You have been involved since before its inception?
A. Yes.
Q. When did you start your involvement in Wilberforce?
A. Over the summer. Last summer.
Q. Do you have a month in mind?
A. In Wilberforce, late -- mid to late August.
Q. Okay. We can return to that in a second. But I want to get a sense of your role at Wilberforce. Your role is school director, right?
A. Yes.
Q. And you don't currently receive a salary from Wilberforce, right?
A. Correct.
Q. And your current role is the same as the planned role in the school, also school director

if and when it may open.

MR. NORRIS: Objection. Form.

THE WITNESS: (Witness moves head up and down.)

BY MR. FELDMAN:

Q. And what's your anticipated salary?

A. There is a budget document in the application. I believe 115.

Q. And as school director, you would be responsible for the day-to-day operations of the school?

A. Correct.

Q. Direct interactions with students, right?

A. Yes.

Q. You would be responsible for ensuring that the school is compliant with the applicable laws and regulations, right?

A. Correct.

Q. You don't report to anyone except for the board, right?

A. At Wilberforce?

Q. Correct.

A. Correct.

Q. And all director and dean-level

positions report to you, right?
A. Correct.
Q. How many people would report to you?
A. So charter schools have a staffing model where they scale up, and so year one to five looks different. I don't recall what year one is, but probably around a dozen or so plus, year one.
Q. You can propose curriculum?
A. Yes.
Q. You can reject curriculum?
A. Yes.
Q. There are really no operational decisions that don't end with you, right?
MR. NORRIS: Objection. Vague as to scope of operational decisions.
THE WITNESS: Some things are already set in state law, but for the most part, yes.
BY MR. FELDMAN:
Q. When you say "state law," you mean the government has some say over operational decisions, right?
A. Yes. Just like they do in private schools.
Q. Any other responsibilities as school

Don't reveal the substance of any communications with lawyers, but you can answer whether lawyers were involved.

THE WITNESS: Yes, I sent it.

BY MR. FELDMAN:

Q. Okay. And was that Mr. Edwards?

A. I don't recall if I sent it to him as well.

Q. Okay.

So it was Consovoy McCarthy communicated with primarily on the letter of intent?

MR. NORRIS: Objection. That mischaracterizes his testimony.

THE WITNESS: Yes.

BY MR. FELDMAN:

Q. Were any of the directors involved with drafting the letter of intent?

A. No, I don't recall them being involved.

Q. Anyone else involved?

A. Not that I recall.

Q. Did you hire a consultant?

A. Not for -- no, not for that.

Q. To clarify, it was just you and the lawyers, right?

MR. NORRIS: Objection. Mischaracterizes the testimony, which is about the extent he worked with lawyers.
THE WITNESS: Yes.
BY MR. FELDMAN:
Q. You didn't hold a board meeting about the letter of intent?
A. No. The board members were aware that it was being sent.
Q. Did they authorize you in any way to send it?
MR. NORRIS: Objection. That calls for a legal conclusion.
THE WITNESS: They all knew and were supportive that it was being sent.
BY MR. FELDMAN:
Q. There was no -- but there was no formal board written consent, right?
A. Correct.
MR. NORRIS: Objection, calls for a legal conclusion. Objection, vague as to "formal."
BY MR. FELDMAN:
Q. Were there multiple drafts of the letter of intent before it was submitted?

a break? It's a good chance.

THE WITNESS: Sure. I'll use the restroom.

VIDEOGRAPHER: We're off the record at 9:57.

(Whereupon, a recess took place.)

VIDEOGRAPHER: We are back on the record at 10:10 a.m.

BY MR. FELDMAN:

Q. Got coffee, water? Get what you need? Good break?

A. Yes.

Q. Good.

Okay. We were just talking about the letter of intent. And a moment ago you said that the board of directors was made aware of the letter of intent application; is that right?

A. Yes.

Q. How were they made aware?

A. I don't recall how I let each individual board member know. Some of them I see in person frequently. Some I may have called.

Q. Well, let's break it down. David Colquitt. How did you make Mr. Colquitt aware of the letter of intent?

A. Probably a phone call.
Q. When was that phone call?
A. Probably before the days leading up -- a week or less leading up to the submission.
Q. Okay. So somewhere in the November 20th range?
A. Right. Likely somewhere around there.
Q. Okay.
And what did you talk about with Mr. Colquitt?
A. To be honest, I don't recall. If I'm guessing, it was probably, you know -- probably more that I had completed it and that it was going to be submitted.
Q. Did you read him the contents of the letter of intent?
A. I don't recall.
Q. Did you share the letter of intent with him?
A. I don't believe so.
Q. So Mr. Colquitt never saw the letter of intent before it was submitted?
MR. NORRIS: Objection. Calls for speculation.

THE WITNESS: I'm not certain. I don't believe so.
BY MR. FELDMAN:
Q. And what did Mr. Colquitt say about the letter of intent?
A. Yeah, I don't recall.
Q. Do you generally recall what he said?
A. Probably just, oh, that sounds great.
Q. Did he specifically say, "You have my approval," anything like that?
A. I don't recall. I don't recall.
Q. How about Mr. Harris? When did you first tell Mr. Harris about the letter of intent?
A. Probably around that same time frame.
Q. And what did you tell Mr. Harris about the letter of intent?
A. Probably more that it was just completed and going to be submitted.
Q. How did you tell Mr. Harris that?
A. It might have been in person, but I'm not -- but I'm not certain.
Q. Where would it have been in person?

A. I'm not -- I'm not for certain. Possibly at -- possibly at David Colquitt's office.
Q. And was David Colquitt present for that?
A. He would have been -- he would have been present. I'm thinking of a particular meeting that was not related to Wilberforce. I don't recall if it was -- that's when I informed him or not.
Q. What was that meeting about?
A. A campaign meeting.
Q. Whose campaign?
MR. NORRIS: Objection. Does this involve the 30(b)(6) category?
MR. FELDMAN: This is about the letter of intent. He's telling me that he spoke to individuals about the letter of intent at this meeting. I'm entitled to seek information about what this meeting was about.
MR. NORRIS: Go ahead.
THE WITNESS: Betsy Henderson's campaign, which I serve as a campaign manager for.
BY MR. FELDMAN:
Q. And what did you talk about in that campaign?

MR. NORRIS: I'm going to raise the same objection. This is an internal campaign meeting, there are First Amendment privilege issues as well. It's not about Wilberforce.

So I will instruct you not to answer except to the extent you're comfortable revealing what was talked about outside the context of Wilberforce.

THE WITNESS: I am not sure.

That particular meeting could have been about policy, fundraising. I don't recall.

BY MR. FELDMAN:

Q. And how did Wilberforce come up in that meeting?

A. I don't think that it was during the meeting. It would have probably been like, hey, Doug, by the way, excited we got this completed.

Q. Was anyone else there?

A. Likely, but I don't recall who.

Q. Do you remember anyone else who was there?

A. Not specifically.

Q. Was Ms. Henderson there?

A. No.

Q. And at this meeting, did you show Mr. Harris a copy of the letter of intent?
A. No.
Q. Did you read him any of the contents of the letter of intent?
A. No.
Q. Did he specifically provide approval to submit the letter of intent?
A. He may have said "sounds great."
Q. Okay.
How about -- is it Ms. Beaman?
A. Uh-huh.
Q. Beaman?
A. Yes.
Q. When did you tell Ms. Beaman about the letter of intent?
A. Probably around the same time frame.
Q. And how did you tell her?
A. I actually believe I told her during carline when she was picking up her kids.
Q. And what did you talk about during that conversation?
A. That the letter of intent was being submitted.
Q. How did she respond?

A. Positively.
Q. Did you show her a copy of the letter of intent?
A. I don't believe so.
Q. Did she specifically provide her approval to submit the letter of intent?
A. I would say through positivity and excitement, yes.
Q. And Mr. Bartholomew. How did you tell Mr. Bartholomew about the letter of intent?
A. That could have either been in person or on the phone. I'm not sure.
Q. Okay.
Where in person do you think you told Mr. Bartholomew about the letter of intent?
A. It would have been at River's Edge.
Q. At River's Edge?
A. Uh-huh.
Q. What is Mr. Bartholomew's role at River's Edge?
A. He is a parent and also voluntarily helps the school with all of our construction and maintenance projects.
Q. And do you recall showing Mr. Bartholomew the letter of intent?

A. No.
Q. Did you read any of the contents to Mr. Bartholomew?
A. I may have shared about the description but not read it to him.
Q. What did you share about the description?
A. Parker is an entrepreneur, and so I knew he was intrigued about the entrepreneurship element of the school.
Q. And did Mr. Bartholomew provide his approval to submit the letter of intent?
A. I would say it was implied by his excitement about it.
Q. And so again, you submitted the letter of intent on November 25, 2025. And then you filed this lawsuit on November 30, 2025, right?
A. Yes.
Q. Between submitting the letter of intent and filing the lawsuit, had anyone at the Knox County Board of Education told Wilberforce that they would reject Wilberforce's application?
MR. NORRIS: Objection. Vague as to "told."
THE WITNESS: I don't recall the

legal conclusion.

THE WITNESS: I'm not sure.

BY MR. FELDMAN:

Q. Okay.

And Wilberforce is seeking 13 waivers in its application, right? The draft application?

A. Yes.

Q. So, so far, we have talked about a few pieces of communications that you say the Knox County Board of Education told you that your application would be rejected. We talked about Mr. Dupler -- the email that Mr. Dupler was copied on about the check box. We talked about Steve Triplett's communication. We talked about the Teresa Nixon's workshop. And we talked about this resolution.

Is there anything else that the Knox County Board of Education told you that led Wilberforce to believe that its application would be rejected?

MR. NORRIS: Objection to form. Objection, calls for a legal conclusion. Objection as to vague in the word "tells" or "told."

THE WITNESS: No.
BY MR. FELDMAN:
Q. But you're aware that another public religious charter -- religious public charter school was approved in Tennessee, right?
A. Yes, but not at the time I wasn't aware that they were even applying.
Q. And you're familiar with that religious public charter school?
A. Yes.
MR. NORRIS: Objection. Vague.
BY MR. FELDMAN:
Q. That religious public charter school is Union Academy, right?
A. Yes.
Q. Have you reviewed Union Academy's letter of intent?
A. Not their -- actually, yes.
Q. You have.
What do you recall about Union Academy's letter of intent?
A. I recall that their -- they use the term "faith-based" and their director was like a dean at the university.
Q. And that is a religious school,

right?

A. Yes.

Q. Okay.

And you know that Union Academy didn't check the sponsor eligibility box, right?

A. I didn't know that. I recall the cover sheet, but I didn't recall that.

MR. FELDMAN: Wan, can you pass out Tab 18, please?

(Exhibit CID-8, Letter of Intent to Apply to Open a Tennessee Public Charter School, marked for identification.)

MR. FELDMAN: This is CID Exhibit 8.

BY MR. FELDMAN:

Q. Take your time. When you're ready.

What is this document?

A. This is the letter of intent of Union Academy.

Q. How do you know that?

A. It says it on the paper.

Q. And this is the letter of intent for charter school sponsors planning to submit a charter school application by February 1 of 2026, right?

A. Yes.

Q. That's the same deadline as Wilberforce's charter application, right?
A. Yes.
Q. And on page 3, under academic focus of the proposed school, it says faith-based Christian college preparatory school, right?
A. Yes.
Q. And then if you turn to page 4, there is the same check box that appeared in your letter of intent, right?
A. Yes.
Q. And Union Academy didn't check that box, right?
A. That's what it appears.
Q. That didn't disqualify Union's Academy approval, right?
MR. NORRIS: Objection. That calls for a legal conclusion. Objection. Calls for speculation.
THE WITNESS: It appears not.
MR. FELDMAN: Do you mind, we have been going another hour and a half, take a quick restroom?
MR. NORRIS: Do you want to take early lunch or do another session and then

Q. No.
The Knox County Board of Education?
A. Yeah, at times.
Q. Okay. And I'm asking you to think really hard whether you had a specific conversation with Steve Triplett about the decision not to submit a charter application.
A. I can't say with certainty. I know that we had conversations that -- about my concern with submitting it, and the board having to turn it down based on its religious status and affecting the long-term prospects of the school then. But I don't know that I told him conclusively that we were not submitting the application.
Q. So you're not sure either way?
A. Correct.
Q. You're not aware of any religious public charter application in Tennessee that has been denied solely because it is a religious organization, right?
MR. NORRIS: Objection. Form.
THE WITNESS: Well, the opportunity to apply has just not been there.
BY MR. FELDMAN:
Q. Well, a moment ago we just looked at

one, right? So you're aware of at least one that has been approved, right?

A. But I was not aware that that was even going through the application process at the same time we were.

Q. But you are aware now, right?

A. Yes.

Q. Okay.

And so now that you're aware that an application has been approved, is Wilberforce asking a court to assume what the Knox County Board of Education would have done with Wilberforce's application?

MR. NORRIS: Objection, vague. Objection, argumentative.

THE WITNESS: No.

BY MR. FELDMAN:

Q. You're not.

Is it not Wilberforce's legal position in this matter that the Knox County Board of Education would have denied Wilberforce's application?

MR. NORRIS: Objection, form. Objection, calls for a legal conclusion.

THE WITNESS: The -- can you repeat

A. Correct.
Q. The one that you intended to submit to the Knox County Board of Education, right?
A. Correct.
Q. Okay. And during the drafting process you identified a handful of proposed locations, right?
A. Yes.
MR. FELDMAN: Wan, can you hand up Tab 32, please?
(Exhibit CID-14, 1/7/2026 Email from Zachary Wishart to the Arcadia Team; WILB-ACAD-0795 - 0796, marked for identification.)
BY MR. FELDMAN:
Q. What is this document, Mr. Wishart?
A. This is an email to the Arcadia Consulting Group.
Q. And this is dated January 7, 2026, right?
A. Yes.
Q. And this email concerns potential locations for Wilberforce Academy, correct?
A. Yes.
Q. You identified a few locations in

this email; is that right?
A. Yes.
Q. And that's under Bullet 1.
Do you see that?
A. Yes.
Q. And for this location, you said it was a potential rentable space for the first couple of years, right?
A. Yes.
Q. How many square feet is that listing?
A. 30,000.
Q. That's about half the space that we talked about earlier in your emails with Mr. Bartholomew, right?
A. Yeah.
But it says it would probably need to be a minimum of 30,000 square feet to allow for full enrollment through year two. So we wouldn't be at capacity at that point. And so that would have been -- some of these things would have been -- yeah, so it's not like I was saying get a property of just 30,000.
Q. You were saying that let's get a property of 30,000; and then after year two, we'll

move to another property, right?
A. Well, that was -- in that scenario, that's what would be needed.
Q. Okay. And that would be additional expense to move to another property, right?
A. Correct.
Q. So that location wouldn't be viable for the first five years of operation, right?
A. Correct.
Q. And the first property that's 28,000 square feet, that's 2010 Castaic Lane, Knoxville, right?
A. Yes.
Q. And that property is for sale, right?
A. Yes.
Q. Do you recall how much that property -- what the listing price was for that property?
A. We looked at several. That one might have been...
I don't recall if that one was one of the ones that was 2.8 million or 4 million. That particular property was interesting because Parker and I looked at the map trying to figure out if there was buildable space on the property because

it's secluded and fenced in.

Q. Sorry, can you repeat that? The property doesn't have buildable space?

A. We were trying to determine if that -- it could be expanded where that if we were to buy that, is that something that we could, you know, build and expand on or not.

Q. But you saw that it was fenced in, right?

A. It is fenced in, but it is on kind of a larger piece of property. The challenge that we were facing there, a lot of it would be parking if you were to build on. And then there was like a funny kind of garage unit onto the side of it and kind of like a quasi warehouse space that would -- we just talked, okay, what could we do with this space? Could we close that in? What would that look like? So...

Q. But there were several challenges with that property, right?

A. Correct.

Q. Okay. The next property you identify is a shopping center, right?

A. Yes.

Q. And you say that this isn't ideal

because it would require big investment in renovations and still likely only be a temporary space, right?
A. Yes.
Q. You said you would have a hard time imagining how this would work, right?
A. Yes, with pickup and dismissal.
Q. Right.
Excuse me, right, you would have a hard time imagining how this would work with things like pickup and dismissal.
And then the next property is what you characterize as, quote, would be seen as a little outside of our service region, right?
A. Yes. I don't actually recall what that specific property was.
Q. Okay.
The last one is you call it a property where you say you would prefer to be on the other side of the interstate, right?
A. Correct.
Q. And that is a former American Freight, right?
A. Yes. I don't remember that property as well either.

Q. Do you know whether that property is currently occupied?
A. I don't know.
Q. You don't know whether that's currently an AutoZone?
A. Well, I don't believe that it was an AutoZone on January 7th.
Q. Okay. Have you driven past that property?
A. I don't believe so.
Q. Have you visited any of these properties?
A. Yes. The 28 -- I drove to the one at the top, the 28,000 square feet, but only on the outside. I haven't been on the inside.
Q. Okay. But none of the other properties you drove to?
A. Yes, and I've drove to the Seven Oaks location.
Q. The Seven Oaks location. The shopping center?
A. The shopping center, yes.
Q. That's the one you said they would have a big investment in renovation, right?
A. Correct.

Q. Do you know how much that would cost in renovations?
A. Parker and I discussed that the easiest buildings to renovate would be ones that had -- that were formally grocery stores, because those locations have some fire requirements that are more similar to educational occupancy requirements. And so he -- I don't recall how much, but I remember that he said that some of this would depend on, you know, the fire system as well because that is a substantial cost. So...
Q. Do you have an amount in mind?
A. Three or 4 million maybe.
Q. Okay.
So you visited the first two. You haven't seen the second two.
A. Correct.
Q. And if we could turn to Tab 2 again. Excuse me, Exhibit -- the charter application, 13, please. If you don't mind flipping over to page 190.
At the bottom of page 190 is a section for "Progress in Identifying and Securing a Facility." Do you see that?
A. Yes.

Q. And then at the top of 191, you identify three potential properties, right?
A. Yes.
Q. Okay. Three of those properties we just talked about in your January 7th email, right?
A. Yes.
Q. The first one that you visited, 210 Cadic Lane [sic], that was eliminated as an option, right?
A. Yes.
Q. Okay. And then you also listed the 9305 Kingston Place. It's a new retail place, I believe. We didn't see that in the last email.
MR. NORRIS: Objection. Form.
BY MR. FELDMAN:
Q. Excuse me. I'm sorry. That is the -- that's the former American Freight, is it not? Isn't that true?
A. Yes. So Castaic Lane is the one that's not listed.
And these two are probably that other -- I don't have the links, but I assume that these other two, Site 2 and 3, are the other two properties that I didn't visit.
Q. Okay.

The first one is the shopping center, right? That's the one where you said you had a hard time imagining how this would work with pickup and drop off, right?
A. Yes.
Q. And the second one is 11130 Kingston Pike. That's the one that you said would be outside of the service region, right?
A. Probably so, yes.
Q. Okay. And that's the large commercial space that would require a significant amount of renovation?
A. No, the -- the shopping center, 297 North Seven Oaks Drive is the one -- the first one is where I said that it would probably take a lot of renovation.
Q. Okay.
A. A big investment renovations.
Q. Okay. The second one is the one that would be outside of the service region.
A. Correct.
Q. Okay. And then the third one is the former American Freight space, right?
A. I believe so.
Q. Okay. And that's the one -- you

haven't seen that one?
A. Correct.
Q. And you don't know whether an AutoZone currently occupies that space?
A. No. I don't believe that it did when we did the initial search.
Q. Okay. Did you doublecheck before -- scratch that.
All three of these spaces share space with other commercial tenants, right?
A. Yes.
Q. Okay. And in your charter application, you state that you will hold 40 minutes of recess, right?
A. Yes.
Q. And state law actually requires you to hold 40 minutes of outdoor recess, right?
A. Correct.
MR. NORRIS: Objection. Calls for a legal conclusion.
BY MR. FELDMAN:
Q. Have you identified in these spaces where you plan to hold recess in the parking lots of the commercial spaces?
MR. NORRIS: Objection, form.

Objection, mischaracterizes his prior testimony.

THE WITNESS: No. And we haven't -- you know, these are potential places that would require substantial renovation. And so all of those things would be worked out with, you know, an architect in seeing what the facility usage was like.

We're very aware of the law about -- about recess. And it's something that we've even built into our sixth grade program to -- through sixth grade, to make sure that our students are able to enjoy recess and have fun with friends. You can learn a lot during that time of play.

BY MR. FELDMAN:

Q. But you haven't considered for any of these properties where you would hold recess, right?

MR. NORRIS: Objection. Form.

THE WITNESS: Well, the first property that we looked at, which is not listed in the application, there was some specific discussions around that. We -- we -- none of these were ideal. And so these were

just possible locations, and we didn't have a contractor at least with any of these locations.

BY MR. FELDMAN:

Q. Had you budgeted for the substantial renovations that you would need for any location?

A. We -- there was an initial draft of the budget that had some lower rates of the cost of even acquiring property that we had increased. So the budget was increased, but some of that would be done through philanthropy, which is the practice of I would say the majority of charter schools.

Q. Okay. So you would be relying entirely on philanthropy to renovate any of these schools?

MR. NORRIS: Objection. Mischaracterizes the testimony.

THE WITNESS: It is the general practice of charter schools that they have to rely on philanthropy in order to have permanent facility spaces. So we would be following the precedent set by, likely, the majority of charter schools.

BY MR. FELDMAN:

Q. Beyond the Colquitt Foundation, you

haven't identified any other specific funders who would fund the renovation of these properties, right?

A. No.

In the charter application, I will add that on Phase 2, there was a -- the proposal is that these were part of Phase 1. And that in Phase 2, that we would plan to purchase property to have a long-term facility with -- with fantastic recess and playground equipment and all of the things. So...

We didn't feel like that finding a temporary location -- we could retrofit some spaces for a temporary location for a couple of years, but the bigger desire is definitely to have a more permanent facility that meets all the needs of the growing school.

Q. I understand the ultimate vision as you put it, but you need a property, a school where you can teach the students, right, at least for the first couple of years?

MR. NORRIS: Objection. Form.

THE WITNESS: Sure.

BY MR. FELDMAN:

Q. And that would require a significant

Q. Okay.

In the next bullet, you identify relationship-based community engagement. You say that the school director and founding board members have engaged in direct conversations with families.

Do you see that?

A. Yes.

Q. How many families?

A. I'm not sure.

Q. Is it less than ten?

A. Maybe ten to twelve.

Q. Ten to twelve?

A. (Witness moves head up and down.)

Q. Okay. And those families -- all of those families stated that they will send their children to Wilberforce if it opens?

A. I think that -- yeah, some of it depends on, you know, the timing. If they are able to get their kindergartener started there, things like that.

Q. This is assuming the 2027 open, right?

A. Correct.

Q. So did those twelve families state that they would send their children to Wilberforce

for a 2027 open?
A. I wouldn't say conclusively that all of them would, but certainly some.
Q. Some. How many?
A. I'm not sure. At least probably -- I don't even want to guess because I'm really not sure.
Q. Is it less than half?
A. Perhaps around -- perhaps around that number.
Q. Are any of those families not Christian?
MR. NORRIS: Objection. Calls for speculation.
THE WITNESS: Not that I -- not that I know of.
BY MR. FELDMAN:
Q. And the bullet below that is "Prospective Family Interest Registry."
A. Yes.
Q. Is that the same 80 parents that we talked about earlier?
A. It is.
Q. Have you received -- besides the social media messages, have you received any

A. No.
Q. Does Mr. Wood know that there are -- under the minimum enrollment scenario, there are zero special education teachers planned to be hired at Wilberforce?
MR. NORRIS: Objection. That mischaracterizes the testimony.
THE WITNESS: No.
BY MR. FELDMAN:
Q. Has Wilberforce commissioned a survey of Knox County families asking whether they would enroll their students in a religious public charter school?
A. No.
Q. Has Wilberforce conducted any focus groups with families about whether they would enroll their students in a public religious charter school?
A. No.
Q. Has Wilberforce held any open meetings where families could express an interest in a religious public charter school?
A. No.
Q. Has Wilberforce done any analysis of how many families in the Cedar Bluff area would specifically seek out a Christian public charter

other ones that you've mentioned, you've never worked with Knox County Schools other than those things?
A. Yeah, not since 2019.
Q. Tell me about how you became a member of the advisory board for Knoxville Prep.
A. I was being considered -- or I was asked that I was interested in applying for the principal position, and I declined. I appreciated the mission of the school and what they were doing, and so I was just asked if I wanted to be on the advisory board.
Q. You mentioned earlier in your conversation with Mr. Feldman, I think you referenced the organization period for both Emerald and Knoxville Prep. Do you recall that line of conversation?
A. Yes.
Q. Had Knoxville Prep already been organized and established as a charter school when you became a member of the advisory board?
A. I don't believe so, no.
Q. What do you mean by that?
A. I -- I think I was on the advisory board once the application was complete but

before -- I think it was before that it was approved.

Q. Did you have a role in preparing Knoxville Prep's application?

A. No.

Q. So other than with Wilberforce that we've been talking about here today, have you ever been involved with an attempt to form or apply for a charter school in Tennessee?

A. Yes.

Q. Can you tell me about that?

A. I was contacted by someone from South Carolina, and they asked if that I would be interested in being a part of a new charter school here in town that submitted a letter of intent but never submitted an application.

Q. And what time period was that?

A. Hmm. Between -- I'm not trying to be vague. I truly don't remember.

It was after 2020 and before 2025.

Q. Okay.

A. Sorry.

Q. That's all right.

Did you have -- with the South Carolina charter school letter of intent, did

you have any role in the preparation of the letter of intent for that?

A. No, I did not.

Q. So just to make sure I'm clear. Other than the South Carolina entity that was interested or that submitted a letter of intent and Wilberforce, is it correct that you have not been involved with an attempt to form or apply for a charter school in Tennessee?

MR. NORRIS: Objection. That mischaracterizes the prior testimony.

BY MR. AYLIFFE:

Q. You can answer.

A. Yes.

Q. I wanted to ask you, turning back to Exhibit 19, Mr. Wishart, just about the certifications. I saw you have an all-level school principal certification. And I just wanted to ask, I think I know the answer, but do you have the Tennessee institutional leader license by chance?

A. Instructional leadership license?

Q. Yes.

A. No, I do not.

Q. Thank you.

Let me direct your attention to what