# SJCIX23

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION (KNOXVILLE)

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br><br>*Plaintiff*,<br><br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION,<br><br>*Defendant*,<br><br>REV. DR. RICHARD COBLE, AMANDA COLLINS, KERRY DOOLEY, ELIZABETH PORTER, and REV. DR. KATINA SHARP,<br><br>*Intervenor-Defendants*,<br><br>ADRIENNE CARROLL, CIARA CRUTCHER, TIFFANY NASH, EVELYN HENDERSON, SHAKEITHIA RICE, and HOLLY SLATER,<br><br>*Intervenor-Defendants*. | Case No. 3:25-cv-584 (CEA) (DCP) |

**<u>EXPERT REPORT OF STEVEN K. GREEN, J.D., PH.D.</u>**

## I. <u>Qualifications of Expert.</u>

1. I am the Fred H. Paulus Professor of Law and Affiliated Professor of Religious Studies and History at Willamette University in Salem, Oregon.[1] In the College of Law (my

[1] The expert opinions expressed below are my own and do not reflect the views of Willamette University or any other institution.

primary appointment), I teach courses in Constitutional Law, First Amendment Law, Education Law, Legal History, and Jurisprudence (legal philosophy). In the undergraduate Willamette College, I occasionally teach courses in Constitutional History and American Religious History. In addition to holding a J.D. from the University of Texas, I have an M.A. in American Religious History and a Ph.D. in American Constitutional History from the University of North Carolina. I also spent a year of graduate study at Duke Divinity School and Duke Law School. A copy of my curriculum vitae ("CV"), which includes a list of all publications I have authored in the last 10 years, is attached to this report as **Exhibit A**.

2. My scholarship pertains almost exclusively to the intersection of law, religion, and history. I am the author of eight books and more than 60 scholarly articles and book chapters on the subject area.[2] My chapters and articles have appeared in leading anthologies and law reviews, including the *Oxford Research Encyclopedia of American History*, *Oxford Handbook on Church and State in the United States*, *Yale Biographical Dictionary of American Law*, *Cornell Law Review*, *Notre Dame Law Review*, *Emory Law Journal*, *Boston College Law Review*, *Syracuse Law Review*, *William and Mary Bill of Rights Journal*, *Hastings Constitutional Law Quarterly*, *Journal of Church and State*, *Journal of Law and Religion*, *First Amendment Law Review*, and the *Oxford Journal of Law and Religion*. I am a member of the Constitutional Law Section of the Association of American Law Schools and a member of the Law, Religion, and Society and the Religion and Education sections of the American Academy of Religion. I serve on the editorial

[2] My published books include: *American Infidelity*: *The Gilded Age Battle Over Freethought, Free Love, and Feminism* (New York: Oxford Univ. Press, 2026); *The Grand Collaboration: Thomas Jefferson, James Madison, and the Invention of American Religious Freedom* (Charlottesville: Univ. of Va. Press, 2024); *Separating Church and State: A History* (Ithaca: Cornell Univ. Press, 2022); *The Third Disestablishment: Church, State, and American Culture, 1940-1975* (New York: Oxford Univ. Press, 2019); *Inventing a Christian America: The Myth of the Religious Founding* (New York: Oxford Univ. Press, 2015); *The Bible, the School, and the Constitution: The Clash that Shaped Modern Church-State Doctrine* (Oxford Univ. Press, 2012); *The Second Disestablishment: Church and State in Nineteenth-Century America* (New York: Oxford Univ. Press, 2010); and *Religious Freedom and the Supreme Court* (Waco: Baylor Univ. Press, 2008) (with Ronald Flowers and Melissa Rogers).

advisory board of the *Journal of Church and State* and the advisory board of the National Museum of American Religion.

3. I have closely examined the development of universal, free public education in the United States in three of my books: *The Second Disestablishment: Church and State in Nineteenth-Century America* (Oxford Univ. Press, 2010); *The Bible, the School, and the Constitution: The Clash that Shaped Modern Church-State Doctrine* (Oxford Univ. Press, 2012); and *Separating Church and State: A History* (Cornell Univ. Press, 2022).[3] My scholarship in this area has been well received and is regularly cited by other scholars.[4]

4. All of my books have been peer reviewed, meaning that the manuscripts were reviewed by other scholars for the rigor of my methodology, analysis, and conclusions. In addition, my articles published in the *Journal of Church and State*, the *Oxford Journal of Law and Religion*, the *American Journal of Legal History*, and the *Journal of Law and Religion* were also peer reviewed.

5. The peer-review process is rigorous and involves multiple steps. A potential publisher will distribute a proposed manuscript to two or more readers, who are scholars who have published on related topics and have knowledge of historical sources and the academic literature. The readers will then review the manuscript for the rigor of the author's methodology, analysis, and conclusions, opining on the strength of the manuscript and how it will relate to existing scholarship in the area. Many times, the reviewers offer suggestions to the author to improve the

[3] In a fourth book, *The Third Disestablishment*, *supra* n.2, I examined the controversies over rebuffed efforts to revive public school religious exercises and the public funding of religious schools during the mid-twentieth century. *Id*. at 133-146, 255-288.

[4] In endorsing my book, *The Grand Collaboration*, Pulitzer Prize winning Stanford University historian Jack Rakove wrote, "Green is one of the leading historians of the development of the ideas, doctrines, and practices of American religious freedom. I cannot think of another scholar who has contributed as much to the subject of American religious freedom." *The Grand Collaboration: Thomas Jefferson, James Madison, and the Invention of American Religious Freedom*, Univ. of Va. Press, Reviews, https://www.upress.virginia.edu/title/10018/ (last visited May 24, 2026).

manuscript, and publishers typically ask the author to respond in writing to any suggested changes and/or additions.

6. This often results in preparing additional drafts of the manuscript, with the revised manuscript sometimes being redistributed to the readers for additional review. Furthermore, the peer-review process always involves at least one level of "blind" review—where the identities of the reviewers are not disclosed to the author, so as to ensure candor on the part of the reviewers. In many instances, peer review involves a "double-blind" process, where the author's identity also remains undisclosed to the readers, again to ensure objectivity and candor of the review.

7. In the past four years, I have served as an expert in the following cases: *Roake v. Brumley*, Civ. No. 24-517-JWD-SDJ (M.D. La. 2024); *Stinson v. Fayetteville School District No. 1*, Civ. No. 5:25-cv-05127-TLB (W.D. Ark. 2025); *Nathan v. Alamo Heights Independent School District*, Civ. No. 25-cv-00756-FB (W.D. Tex. 2025); *Cribbs Ringer v. Comal Independent School District*, Civ. No. 25-cv-1181-OLG (W.D. Tex. 2025); and *Ashby v. Schertz-Cibolo-Universal City Independent School District*, Civ. No. 5:25-cv-01613-FB (W.D. Tex. 2025). I am receiving $200 per hour for expert work related to this case for preparing this report.

## II. <u>Methodology.</u>

8. In preparing this report, I relied on my graduate school training in history, which included extensive instruction in methodology.[5] Accordingly, I applied standard and well-accepted methodologies used by historians. This methodology can be described as involving several steps: research involving both primary and secondary sources, examining the relevant content and contextualizing it, integrating the relevant material into text and synthesizing it with other material, and then providing analysis of the material.

---

[5] This included a year-long course in methodology and historiography and a course in dissertation design. Additional training in methodology is otherwise integrated into most graduate courses.

9. Initially, I identified both primary and secondary sources for review. I identified these sources as relevant to the issues raised in this case. I was careful to identify a variety of potential primary and secondary sources so that my ultimate conclusions would not rely only on sources that may have reflected only one viewpoint or otherwise limited perspectives.

10. Next, I reviewed those sources closely and analyzed them to determine what role and weight, if any, they should be given in my overall study and analysis. Analysis of a primary source involves reviewing the source, determining how reliable the source is, and assessing how consistent it is with other evidence. First, I considered the conditions and context under which each source originated: where the source was produced, by whom it was produced, when it was produced, the intentions of the author, and other historical context and circumstances at the time it was produced (*i.e.*, its provenance). Second, I considered the extent to which each source is consistent with other sources, and the extent to which the sources complement each other. Third, I also considered how the plain language of the source would have been interpreted at the time of its writing, and I avoided applying modern interpretations to documents that were centuries old.[6]

11. As to secondary sources, I relied on books and articles about the relevant topics and considered their analyses of the primary sources. As someone who has studied, written, and taught in this area for more than three decades, I am familiar with the relevant academic literature. I

[6] For the accepted methodological standards for historians, *see* https://www.historians.org/resource/statement-on-standards-of-professional-conduct/. According to the American Historical Association, "the professional practice of history means respecting the integrity of primary and secondary sources while subjecting them to critical scrutiny and contributing in a fair-minded way to ongoing scholarly and public debates over what those sources tell us about the past and also what they fail to illuminate." Additionally, "the practice of history requires awareness of one's own biases and a readiness to follow sound method and analysis wherever they may lead. Historians should document their findings and be prepared to make available their sources, evidence, and data, including any documentation they develop through interviews. Historians should not misrepresent their sources. They should report their findings as accurately as possible and not omit evidence that runs counter to their own interpretation. They should not commit plagiarism. They should oppose false or erroneous use of evidence, along with any efforts to ignore or conceal such false or erroneous use." I have followed these rules of professional conduct in preparing this report and in all of my work as a historian.

considered the perspective of the authors, the information available to them, and any motivations they may have had to distort their interpretations in any way.

12. The penultimate step was to integrate the material into written text, synthesizing it with other material and providing analysis. In reliance on all sources, I sought to provide a basis for a reliable narrative about the past. Only after completing the above steps did I offer an expert opinion and conclusion.

13. In carrying out this methodology and reaching my conclusions in this report, I applied the same degree of rigor that I apply in preparing my books and scholarly articles for publication. Proper historical analysis is necessarily analytical. As a historian, I seek to provide context to historical writings and events. The methodology I have described above is consistent with the methodology ordinarily expected of historians.

## III. Summary of Conclusions.

14. At Intervenors' request, this report examines the history of the U.S. Constitution and First Amendment as it relates to the disestablishment of religion in the United States, including the abolition of government funding of religious enterprises. It examines the private elementary and secondary education landscape at the time of the Founding. It then examines the impulse behind the idea of universal, free public education, its development in the first half of the nineteenth century, and the movement toward devoting public funds solely to free, universal public education open to all students, including students of all faiths. I reach five key conclusions:

- The Religion Clauses of the First Amendment were rooted in the Founders' profound concerns for protecting the conscience of individuals and religious communities against all forms of coercion, including the compelled financial support of religion; avoiding the official promotion of religious doctrine; and preventing the religious divisiveness that flows from government funding of religion.
- Free, universal public education, as it exists today, was *nonexistent* at the time of the Founding; elementary and secondary schooling, to the extent it was available, occurred through private tutors, private academies, a handful of private denominational charity

schools, and then in town "district" schools in New England that were directed by local clergy. Most, if not all, schooling was highly religious in content and orientation. The later impulse toward *public* education represented a conscious break with this earlier practice.

- The history of the development of American public education reflects a strong commitment to universal, nonreligious schooling under the control of public authorities, and to prohibiting the public funding of religious schooling.

- At the time that state and local public officials declined to fund private religious schooling, the decision to fund only public education to the exclusion of private education was not viewed as a violation of free-exercise-of-religion principles.

- The government funding of Native American missions and missionary boarding schools and of Freedmen's Bureau schools during the nineteenth century reflected highly coercive religious practices that were inconsistent with the anti-coercion principles animating the Establishment Clause.

## IV. The Religion Clauses of the First Amendment Were Rooted in the Founders' Profound Concerns for Protecting the Conscience of Individuals and Religious Communities Against All Forms of Religious Coercion, Including the Compelled Financial Support of Religion; Avoiding the Official Promotion of Religious Doctrine; and Preventing the Religious Divisiveness That Flows From Government Funding of Religion.

15. On the cusp of the American Revolution, the British-American colonies represented the most religiously diverse place in the world. Congregationalists (formerly Puritans) dominated New England; Presbyterians, Quakers, Lutherans, and pietistic sects (Moravians, Mennonites) dominated the middle colonies; and Anglicans (Church of England) were entrenched in the southern colonies, where large swaths of evangelical New Light Presbyterian and Baptist groups also resided. Quakers, Mennonites, and Baptists constituted the majority in backcountry North Carolina, while Charleston and Savannah had large Jewish, Lutheran, and Huguenot communities. Many Catholics had settled in Maryland. And New York became home to myriad religious groups, including, among others, Dutch Reformed, Presbyterian, Anglican, Lutheran, and Jewish populations.[7]

[7] *See* Winthrop S. Hudson, *Religion in America*, 3rd ed. (New York: Charles Scribner's Sons, 1981), 23-58.

16. Despite this religious pluralism, nine of the 13 colonies maintained religious establishments in 1776, which meant an officially sanctioned Protestant denomination that was financially supported through forced tax assessments on all freeholders, regardless of whether that person adhered to that faith. Dissenting churches, if allowed to operate at all, did so at the whim of colonial officials.[8] The attendant enforcement of the means of establishment resulted in significant religious persecution and caused widespread religious discord. Following the Protestant revivals of the First Great Awakening of the 1730s and 1740s, evangelicals in New England and Virginia faced persecution as officials refused to grant licenses to their clergy, refused to allow the operation of their churches, and then taxed the dissenters to support the dominant religion (either Congregationalism or Anglicanism). Resistant dissenters faced fines or imprisonment.[9]

17. Members of the Founding generation, when they began assembling in 1774 to discuss resistance to Britain and the formation of a new nation, were painfully aware of this recent historical context, as well as the legacy of religious persecution in Europe.[10] They recognized the need to prevent such persecution in the new nation, defuse any inter-religious conflict, and avoid the corrosive effect on civil society caused by the fusion of government and religion.[11]

---

[8] Frank Lambert, *The Founding Fathers and the Place of Religion in America* (Princeton: Princeton Univ. Press, 2003), 46-124; Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* (New York: Oxford Univ. Press, 1986), 1-77.

[9] Hudson, *Religion in America*, *supra* n.7, at 23-58; Christopher Beneke, *Beyond Toleration: The Religious Origins of Religious Pluralism* (New York: Oxford Univ. Press, 2006), 17-40. By the mid-1700s, Congregationalist-controlled Massachusetts and Connecticut provided limited tax exemptions for "recognized" dissenting churches, although officials frequently denied dissenters' exemption requests.

[10] For example, the Thirty Years War of the early seventeenth century had pitted Protestants against Catholics, whereas the English Civil War (1643-1651) was between Presbyterians and Anglicans. *See* Geoffrey Parker, *The Thirty Years' War* (London: Routledge, 1997); Brian Manning, ed., *Politics, Religion, and the English Civil War* (New York: St. Martin's Press, 1974).

[11] Lambert, *The Founding Fathers and the Place of Religion in America*, *supra* n.8, at 137-158.

18. In May of 1776, the Second Continental Congress enacted a resolution recommending that the various colonies reorganize as states and write constitutions grounded on republican principles. The states needed little encouragement: that year, eight states enacted constitutions, with three more following suit in 1777—one being the new breakaway state of Vermont. One issue the new state assemblies had to address was what to do with their existing church-state arrangements.[12] The early constitutional provisions fit into three categories. The North Carolina (1776) and New York (1777) constitutions banned tax support for religion, joining those of Delaware, New Jersey, and Pennsylvania, which reaffirmed their colonial bans on religious establishments.[13] In the South, with its history of Anglican establishments, the initial constitutions of Georgia, Maryland, and South Carolina reflected some uncertainty. Georgia and Maryland authorized the possibility of non-exclusive tax support of Protestant churches, but their respective legislatures, reflecting public opposition, declined to institute any assessment. The South Carolina Constitution expressly declared that "the Christian Protestant religion . . . [was] the established religion of this State," but then specified that no person would be obligated to support any religion. Thus, religious assessments did not exist in those states.[14] The third category involved the New England states of Connecticut, New Hampshire, and Massachusetts, which retained their longstanding practice of extracting assessments for the support of a town's "standing minister"—inevitably a Congregational minister. Religious assessments were thus legal in those

---

[12] Resolution of May 10, 1776, in Bernard Schwartz, *The Bill of Rights: A Documentary History* (New York: Chelsea House, 1971), 1:229-230; John K. Wilson, "Religion Under the State Constitutions, 1776-1800," *J. of Church & State* 32 (1990), 753-773.

[13] Green, *Separating Church and State*, *supra* n.2, at 50-57; Curry, *The First Freedoms*, *supra* n.8, at 134-192; Carl H. Esbeck, "Dissent and Disestablishment: The Church-State Settlement in the Early American Republic," *BYU L. Rev.* (2004), 1385-1584. Rhode Island also had not maintained a religious assessment, but the state did not enact a constitution until 1842, relying instead on its colonial charter. *See* Francis Newton Thorpe, *Federal and State Constitutions, Colonial Charters, and Other Organic Laws* (Washington, DC: Gov't Printing Off., 1909), 6:3222.

[14] Green, *Separating Church and State*, *supra* n.2, at 52-54; Curry, *The First Freedoms*, *supra* n.8, at 148-157.

three states until 1818, 1819, and 1833, respectively, but they were highly contentious among Baptists and other minority religions.[15]

19. Finally, in Virginia, in 1784, the legislature considered a bill sponsored by Patrick Henry to authorize an assessment for "Establishing a Provision for Teachers of the Christian Religion." Importantly, Henry's bill provided that the assessment would pay not only for Christian ministers but could, alternatively, be used to support "seminaries of learning"—*i.e.*, *schools*—in which religious education took place. James Madison famously led the opposition to the measure, securing the tabling of Henry's bill and then convincing the legislature to enact Thomas Jefferson's "Act for Establishing Religious Freedom" in its stead, which banned all religious assessments.[16] To garner support for the ban, Madison wrote his incomparable *Memorial and Remonstrance Against Religious Assessments*. The *Memorial* raised 15 arguments against religious establishments, making three essential points. The first was jurisdictional—a term Madison actually used—affirming that religious and civil entities operated in separate spheres and exercised distinct authority. "[I]n matters of religion," Madison wrote, "no man's right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance." The second point was that religious establishments were coercive and violated rights of conscience. Madison did not distinguish between exclusive and multiple establishments; *all* forms of religious

---

[15] Green, *Separating Church and State*, *supra* n.2, at 51, 60-65; Curry, *The First Freedoms*, *supra* n.8, at 162-188. The Vermont Constitution of 1777 contained contradictory language regarding religious assessments, providing that "no man ought, or of right can be compelled to . . . support any place of worship, or maintain any minister, contrary to the dictates of his conscience," while also calling for the "support [of] some sort of religious worship," thereby allowing towns to extract taxes. The revised constitution of 1786, however, removed the language requiring the "support" of religious worship. Green, *Separating Church and State*, *supra* n.2, at 54-55.

[16] Drafted primarily by Thomas Jefferson, the Virginia statute disestablished the Church of England in Virginia and guaranteed religious equality for all sects. In the statute's preamble, Jefferson expressly condemned "the impious presumption of legislators and rulers, civil as well as ecclesiastical, who being themselves but fallible and uninspired men, have assumed dominion over the faith of others, setting up their own opinions and modes of thinking as the only true and infallible, and as such endeavouring to impose them on others." Virginia, Act for Establishing Religious Freedom, *The Founders' Constitution*, vol. 5, doc. 44, https://press-pubs.uchicago.edu/founders/documents/amendI_religions44.html.

assessments violated rights of conscience and constituted a religious establishment: "Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion to all other Sects?" Madison's third essential point was that religious establishments, rather than advancing Christian piety, harmed religion; they were "adverse to the diffusion of the light of Christianity."[17]

20. Approximately one-half of the state constitutional provisions disestablishing religion employed language that prohibited the establishment of "any one religious sect . . . in preference to another," which could be interpreted as indicating that members of the founding generation did not oppose non-preferential support of all churches or religious enterprises, but only the exclusive aid to one religion.[18] But the historical record does not support that conclusion.[19] All of the religious establishments that had existed in the colonies and into early statehood favored one religion, even in New England, which gave lip-service to providing non-exclusive support for religion (*i.e.*, for any Protestant church) but operated systems that invariably favored the Congregational Church. This was the experience for members of the founding generation, so it is not surprising that the early constitutions employed this non-preferential language even as these states sought, through these provisions, to prohibit government support for all religions.[20] This is demonstrated by Pennsylvania, Delaware, and New Jersey, which used non-preferential language

---

[17] *See* Memorial and Remonstrance, *The Founders' Constitution*, vol. 5, doc. 43, https://press-pubs.uchicago.edu/founders/documents/amendI_religions43.html; Act for Establishing Religious Freedom, in ibid., vol. 5, doc. 44, https://press-pubs.uchicago.edu/founders/documents/amendI_religions44.html. The religious assessment battle in Virginia is covered in detail in Green, *The Grand Collaboration*, *supra* n.2, at 92-109, and in John A. Ragosta, *Religious Freedom: Jefferson's Legacy, America's Creed* (Charlottesville: Univ. of Va. Press, 2013), 78-99. *See also* Jack N. Rakove, *Beyond Belief, Beyond Conscience: The Radical Significance of the Free Exercise of Religion* (New York: Oxford Univ. Press, 2020), 66-100.

[18] Article 29, Delaware Constitution of 1776, Thorpe, *Federal and State Constitutions*, *supra* n.13, at 568. Other state constitutions containing similar language included those of Georgia, New Jersey, New York, North Carolina, and Pennsylvania. *See* Green, *Separating Church and State*, *supra* n.2, at 55-57.

[19] *See* Douglas Laycock, "'Nonpreferential' Aid to Religion: A False Claim About Original Intent," *Wm. & Mary L. Rev.* 27 (1986), 875-923.

[20] Curry, *The First Freedoms*, *supra* n.8, at 105-133.

in their constitutions, but had never previously operated assessment systems, exclusive or otherwise. Viewed in the broader historical context, these provisions did not suddenly permit non-exclusive support for religion in states that had not permitted it before. Rather, the non-preferential text was understood to prohibit *both* exclusive and non-exclusive support for religion.[21] Indeed, James Madison, some two years after leading the successful fight to defeat Virginia's proposed non-exclusive assessment, remarked, "[f]ortunately for this commonwealth, a majority of the people are decidedly against any exclusive establishment—I believe it to be so in the other states." Thus, the founding generation, including Madison, understood that the notion of non-preferential support of all religions was not only anathema to religious freedom but impossible to achieve because all religious establishments favor one or more religions over others.[22]

21. All in all, between 1776 and 1786, the new nation went from having religious assessments in nine of 13 states to having active assessment systems in only three of 14 states, a remarkable turn of events in such a short period of time. As historian Thomas Curry sums up the shared understanding at the time: "The belief that government assistance to religion, especially in the form of taxes, violated religious liberty had a long history."[23]

22. Three years later, in 1789, as a member of the House of Representatives, Madison introduced several proposed amendments to the Constitution, including what would become the First Amendment of the Bill of Rights. Madison's Virginia experience and his strong opposition to both governmental support of religion and governmental interference with religious exercise

---

[21] Green, *Separating Church and State*, *supra* n.2, at 55-57.

[22] James Madison, June 12, 1788, in Jonathan Elliot, ed., *The Debates in the Several State Conventions, on the Adoption of the Federal Constitution* (New York: Burt Franklin, Pub. 1827, 1888), 3:330; Green, *Separating Church and State*, *supra* n.2, at 55-57.

[23] Curry, *The First Freedoms*, *supra* n.8, at 217.

were indubitably strong factors in his resolve to see the Religion Clauses enacted.[24] He ushered the amendment through the House debate, fending off proposals that would have lessened its scope and effect. He then served on the House-Senate conference committee, where he again defeated efforts to weaken its language.[25] Although Madison is not solely responsible for the First Amendment, no other person had a greater impact on its enactment,[26] a role that the members of the U.S. Supreme Court have recognized as far back as *Reynolds v. United States*,[27] through *Everson v. Board of Education*,[28] and beyond.

23. The founding generation's understanding of what non-establishment of religion prohibited was not limited to the "fine and imprisonment" that might accompany some forms of direct coercion, but also included indirectly coercive acts, such as those involving "some degree of proscription perhaps in public opinion." For example, Jefferson insisted that a government official's mere "recommendation" of prayer, even without the backing of legal force, was no "less a law of conduct for those to whom it is directed."[29] Madison, too, argued that, when governmental entities "recommend" religious fealty, this "naturally terminates in a conformity to the creed of the

---

[24] As I detail in my book, *The Grand Collaboration*, Jefferson and Madison had a long, collaborative relationship prior to the drafting of the Bill of Rights, and even though Jefferson was in France at that time, he and Madison engaged in an active correspondence between 1787 and 1789. In a December 1787 letter, Jefferson told Madison that the Constitution needed "a bill of rights providing clearly & without the aid of sophisms for freedom of religion [and] freedom of the press." Jefferson to Madison, Dec. 20, 1787, *Founders Online*, https://founders.archives.gov/. Between September 1787 and August 1789, the two men exchanged 13 letters that discussed aspects of constitutional amendments. Jefferson also advocated with other Founders regarding the need for a bill of rights. *See* Green, *The Grand Collaboration*, supra n.2, at 135-144.

[25] Thomas Curry notes that "[o]f the eleven states that ratified the First Amendment, nine (counting Maryland), adhered to the viewpoint that support of religion and churches should be voluntary, that any government financial assistance to religion constituted an establishment of religion and violated free exercise." Curry, *The First Freedoms*, *supra* n.8, at 220.

[26] Richard Labunski, *James Madison and the Struggle for the Bill of Rights* (New York; Oxford Univ. Press, 2006), 179-240; Green, *The Second Disestablishment*, *supra* n.2, at 64-72; Green, *The Grand Collaboration*, *supra* n.2, at 144-154.

[27] 98 U.S. 145, 163-64 (1878).

[28] 330 U.S. 1, 11-13, 33-41 (1947).

[29] *See* Thomas Jefferson to Rev. Samuel Miller, Jan. 23, 1808, *The Founders' Constitution*, vol. 5., doc. 60, https://press-pubs.uchicago.edu/founders/documents/amendI_religions60.html.

major⟨ity⟩." Additionally, "recommendations only," Madison wrote, "imply a religious agency, making no part of the trust delegated to political rulers." "The members of a Govt. as such can in no sense, be regarded as possessing an advisory trust from their Constituents in their religious capacities."[30] And Madison maintained the belief that the government's promotion of religion was detrimental to the latter. It was an "old error," he wrote, to insist "that without some sort of alliance or coalition between Government & Religion, neither can be duly supported." Rather, Madison warned that "such a Coalition" would have "corrupting influence on both the parties, [such] that the danger can not be too carefully guarded against. . . . Religion & Govt. will both exist in greater purity, the less they are mixed together."[31] Jefferson concurred with Madison that the government's promotion of religion harms religion: "I do not believe it is for the interest of religion to invite the civil magistrate to direct it's exercises, it's discipline, or it's doctrines."[32] Finally, both men believed that the government's promotion of religion, even when not done financially, would inevitably result in religious "animosities and jealousies, which may not soon be appeased."[33]

24. Jefferson and Madison were not alone in their opinions and concerns. The Baptist leader Rev. John Leland criticized the coercive nature of public financial support of religion, a reality that religious dissenters like Baptists had experienced firsthand. Writing about the putative non-preferential assessment system in Connecticut, Leland remarked that "it is not possible in the

---

[30] James Madison, Detached Memoranda on Monopolies. Perpetuities. Corporations. Ecclesiastical Endowments, *The Founders' Constitution*, vol. 5, doc. 64, https://press-pubs.uchicago.edu/founders/documents/amendI_religions64.html.

[31] James Madison to Edward Livingston, July 22, 1822, *The Founders' Constitution*, vol. 5, doc. 66, https://press-pubs.uchicago.edu/founders/documents/amendI_religions66.html.

[32] Jefferson to Rev. Samuel Miller, Jan. 23, 1808, *The Founders' Constitution*, vol. 5., doc. 60, https://press-pubs.uchicago.edu/founders/documents/amendI_religions60.html.

[33] Madison, Memorial and Remonstrance, *The Founders' Constitution*, https://press-pubs.uchicago.edu/founders/documents/amendI_religions43.html; *see also* Thomas Jefferson, *Notes on the State of Virginia*, ed. William Peden (Chapel Hill: Univ. of N.C. Press, 1982), 157-161.

nature of things to establish religion by human laws without perverting the design of civil laws and oppressing the people."[34] But he also went further to dispute that religious matters were in any way under the authority of civil officials. "Government has no more to do with religious opinions of men than it has with the principles of mathematics."[35] And St. George Tucker, editor of the first American edition to Blackstone's *Commentaries*, wrote expansively against the government's authority to promote religion, even short of coercion:

> Civil establishments of formularies of faith and worship, are inconsistent with the rights of private judgement. They engender strife . . . they turn religion into a trade . . . they shore up error . . . they produce hypocrisy and prevarication . . . they lay an undue bias on the human mind in its inquiries, and obstruct the progress of truth . . . genuine religion is a concern that lies entirely between God and our own souls.[36]

25. These historical events and writings evince that the fundamental concerns and principles animating the Religion Clauses include that:

- Government should not promote religious fealty or any religious belief.
- Government funding of religion has an inherently coercive quality and is beyond the authority of civil government.
- Government funding of religion results in religious preferences and causes religious divisiveness.
- Governmental involvement with religion corrupts religion and harms government.
- Support for religious worship and instruction must be truly voluntary, not coerced or provided by government.

---

[34] John Leland, "The Connecticut Dissenters Strong Box" (1802), in *American Political Writing During the Founding Era, 1760-1805*, eds. Charles Hyneman and Donald S. Lutz (Indianapolis: Liberty Fund, 1983): 2:1199.

[35] Ibid., 2:1195.

[36] St. George Tucker, *Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia*. 5 vols. Philadelphia (1803), in *The Founders' Constitution*, vol. 5, doc. 59, https://press-pubs.uchicago.edu/founders/documents/amendI_religions59.html.

## V. <u>Universal, Free Public Education Was Nonexistent at the Time of the Founding.</u>

26. At the time of our nation's founding, free, universal *public* schooling was nonexistent. Education in colonial America occurred chiefly in *private* academies or through tutors and was thus limited to the children of merchants and wealthy landowners. This schooling generally had a strong religious component due to the dominance of clergy as teachers.[37] In the New England colonies, town or "district" schools existed for children to attend—originating under mandates by the colonial assemblies in the mid-1600s—but these prototypes required parents to pay a "rate," and, again, the teachers were largely comprised of local clergy. Teachers relied extensively on religiously indoctrinating texts, such as the popular *New England Primer*, which used scripture to teach spelling or reading, and were designed chiefly to inculcate religious fealty.[38] According to one education historian, "[a]lmost everywhere and in every case, the avowed purpose of founding schools was religious: the schools were there to make Christians."[39] Outside of New England, however, education was largely unavailable to children of laboring and poorer families.

27. The end of the eighteenth century saw the rise of "charity" schools in cities along the eastern seaboard, including New York, Philadelphia, and Baltimore. These schools were created by various religious denominations to provide rudimentary education to indigent and poorer children, as well as religious instruction. Philadelphia had 10 such schools at the turn of

---

[37] Carl Kaestle, *Pillars of the Republic: Common Schools and American Society* (New York: Hill & Wang, 1983), 13-29.

[38] Lawrence A. Cremin, *American Education; The Colonial Experience, 1607-1783* (New York: Harper & Row, 1970); Edward P. Cubberley, *Readings in Public Education in the United States* (Boston: Hughton Mifflin Co., 1934), 18-19, 46-55; Richard L. Venezky, "A History of the Reading Textbook," 87 *Elementary Sch. J.* (1987), 246-265 ("Calvinism, with its stress on innate evil and the omnipotence of a wrathful God, had no room for readiness or multistage development. The child's interests were irrelevant to the need to inculcate the religious beliefs of the adult society.").

[39] Warren A. Nord, *Religion and American Education* (Chapel Hill: Univ. of N.C. Press, 1995), 64-65.

the nineteenth century, and New York City had six, operated by Presbyterian, Dutch Reformed, Episcopalian, Methodist, Quaker, and Lutheran groups. The denominational charity schools in New York City initially received small public grants from the state, administered through the city Common Council, based on a 1795 law that allocated $50,000 over a five-year period toward education. But this funding was eventually discontinued because city officials recognized that such financial support raised serious concerns about the intermingling of religion and government.[40]

28. Outside of the cities—in rural areas and on the expanding frontier—educational opportunities in the late eighteenth century were haphazard. As towns were established on the frontier, creating a school was frequently not a high priority. Congress's Land Ordinance of 1785 sought to facilitate the establishment of schools in the Northwest Territory by reserving one square mile within each township for a school but did little else to spur their development.[41] When and where schools were initially established, they often were based on the New England district school model, relying on a combination of property taxes, lotteries, land sale revenues, and tuition payments, with classes frequently taught by local clergy and sometimes being held in church buildings. In some places—particularly in rural areas—these locally run schools continued into the early decades of the nineteenth century, until they were displaced by free, universal public schools (see discussion *infra*, ¶¶ 29, 43).

29. Despite half of the early state constitutions extolling the virtues of education, few states provided any financial support for schooling, and none initially created mechanisms for

---

[40] Ellwood P. Cubberley, *Public Education in the United States* (Boston: Houghton Mifflin Co., 1919, 1934), 124-128; Cubberley, *Readings in Public Education, supra* n.38, at 113-121, 134-135; Carl F. Kaestle, *The Evolution of an Urban School System* (Cambridge: Harvard Univ. Press, 1973), 64-67.

[41] Lawrence A. Cremin, *The American Common School: An Historic Conception* (New York: Teachers Coll., Columbia Univ., 1951), 88-90.

expanding educational opportunities. While embracing the need for an educated citizenry, these state constitutions commonly left it to future legislatures to put that goal into place.[42] For example, the Tennessee Constitution of 1798 contained no provision regarding education, hortatory or otherwise.[43] An 1823 Tennessee law called for creating pauper-schools, followed by an 1830 law that established a district system of free schools. Finally, the new Tennessee Constitution of 1835 added a provision hailing the "encouragement of common schools throughout the state"; it then authorized the creation of a permanent "common-school fund," with a prohibition against it being "diverted to any other use than the support and encouragement of common schools," and further authorized the legislature to create a state board of commissioners to supervise the fund.[44] This piecemeal approach to creating and funding public schooling was common throughout many states in the early decades of the nineteenth century. As education historian Ellwood Cubberley observed, considering "the early state laws, we can hardly be said, as a people, to have developed an educational consciousness, outside of New England and New York, before about 1820."[45]

## VI. **The History of the Development of American Public Education Reflects a Strong Commitment to Free, Universal, Nonreligious Schooling Under the Control of Public Authorities.**

30. The widespread unavailability of educational opportunities, and the religious nature of most private schooling with its rote memorization, inspired a group of early education reformers to call for establishing a system of free, universal, *public* education, which would be under the

---

[42] Cubberley, *Public Education in the United States*, *supra* n.40, at 90-99; Cubberley, *Readings in Public Education*, *supra* n.38, 107-118; Cremin, *The American Common School*, *supra* n.41, at 86-88.

[43] *See* Thorpe, *Federal and State Constitutions*, *supra* n.13, at 6:3414-3425. Interestingly, the failed 1785 Constitution of Franklin contained a provision, Article 41, that provided: "That a school or schools shall be established by the legislature for the convenient instruction of youth, with such salaries to the masters, paid by the public, as may enable them to instruct at low prices." *See* Samuel Cole Williams, *History of the Lost State of Franklin* (New York: The Free Press of the Pioneers, 1933), 346. There is no explanation why this provision was not included in the Constitution of 1798.

[44] Thorpe, *Federal and State Constitutions*, *supra* n.13, at 6:3426-3444; Cubberley, *Public Education in the United States*, *supra* n.40, at 103.

[45] Cubberley, *Public Education in the United States*, *supra* n.40, at 94-105, 110.

control of public authorities, funded through taxes or other sources of public revenue (*i.e.*, lotteries, land sales), and offer a curriculum of academic studies that deemphasized religious content. These early reformers—Thomas Jefferson, Benjamin Rush, and Noah Webster, among others—tied the necessity of an educated citizenry to the survival of the new republic.[46]

31. Jefferson first proposed a system of public schooling for Virginia in 1779. His *Bill for the More General Diffusion of Knowledge* recommended three years of free public schooling for all children—both boys and girls—with additional education in a handful of advanced grammar schools for those boys who excelled academically. In contrast to the religiously based education common in private academies and through tutors, Jefferson proposed a curriculum based on academic subjects—reading, writing, "common arithmetick," history, and classical languages—hoping to facilitate free inquiry and reason, rather than relying on memorization and indoctrination.[47] Writing several years later in his *Notes on the State of Virginia*, Jefferson remarked: "Reason and persuasion are the only practicable instruments. To make way for these, free enquiry must be indulged." To further that goal, he recommended against "putting the Bible and Testament into the hands of the children, at an age when their judgments are not sufficiently matured for religious enquiries." Jefferson's vision of a secular public education system was pathbreaking for the time. James Madison introduced Jefferson's education bill in the Virginia Assembly in 1786, but the Assembly did not enact a version of it until 1796.[48]

---

[46] Lawrence A. Cremin, *American Education: The National Experience, 1783-1876* (New York: Harper & Row, 1980), 117-121, 261-267.

[47] Bill no. 79. A Bill for the More General Diffusion of Knowledge (June 18, 1779), in *Founders Online*, https://founders.archives.gov/documents/Jefferson/01-02-02-0132-0004-0079; Cremin, *The American Common School*, *supra* n.41, at 110-111; Gordon E. Mercer, "Thomas Jefferson: A Bold Vision for American Education," 68 *Int'l Soc. Sci. Rev.* 19-25 (1993).

[48] Jefferson, *Notes on the State of Virginia*, *supra* n.33, at 146-147, 160; Green, *The Grand Collaboration*, *supra* n.2, at 89.

32. On the heels of Jefferson's proposal, Dr. Benjamin Rush—surgeon and social reformer—announced in 1786 "A Plan for Establishing Public Schools in Pennsylvania." His plan proposed establishing free schools in every township to be financed through taxes. "Our schools of learning, by producing one general, and uniform system of education, will render the mass of the people more homogenous," Rush believed. Rush recommended retaining the use of the Bible as the best source of morality, but not teaching doctrine related to any sect or denomination: "it is improper to fill the minds of youth with religious prejudices of any kind, and . . . they should be left to choose their own [religious] principles."[49]

33. Noah Webster was arguably the leading educational innovator and reformer of the late eighteenth and early nineteenth centuries, producing his widely used and influential *Speller* and *Reader* (*Grammatical Institute*) and then his famous *Dictionary*.[50] Like Jefferson and Rush, Webster also recommended the creation of universal, free public education with a curriculum that emphasized secular academic subjects: spelling, reading, arithmetic, history, and geography, as well as "the general principles of law, commerce, money, and government." He wrote, "[i]n our American republics, where government is in the hands of the people, knowledge should be universally diffused by means of public schools." Like Rush, Webster did not object to using the Bible for teaching morals but opposed using it for indoctrination as had been common in colonial schooling. He criticized the "frequent repetition of [its] impressions" in private schooling. "Those parts of scripture, therefore, which are calculated to strike terror to the mind lose their influence by too frequently being brought into view."[51]

---

[49] Benjamin Rush, *Essays, Literary, Moral and Philosophical*, 2d ed. (Philadelphia: Thomas and William Bradford, 1806), 3-8.

[50] Cremin, *American Education: The National Experience, supra* n.46, at 261-267.

[51] Noah Webster, "On Education of Youth in America" (1790), in *Essays on Education in the Early Republic*, ed. Frederick Rudolph (Cambridge: Harvard Univ. Press, 1965), 50-51, 66.

34. Two other early educational reformers are worth noting, not only for sharing the prize offered by the American Philosophical Society in 1797 for the best essay on establishing a universal system of education, but also for their advocacy of a system that emphasized a secular curriculum and would be under the control of public authorities. Samuel Knox, a Presbyterian minister, urged that instruction "should be confined to a proper knowledge of the English language, writing, arithmetic, and practical mathematics, completed by some approved compend of history and geography." He also urged that it should "be an established principle . . . that no publicly endowed seminary in this state shall ever be characterized as the nursling or even distinguished by the appellation of any particular party of religious professors."[52] Co-awardee Samuel Harrison Smith echoed many of Knox's proposals for universal, nonsectarian education, but went a step further to consider the question, "Should education be public or private?" Only "the system of public education inspires a spirit of independent reflection and conduct," Smith insisted. "[E]very male child, without exception, [should] be educated" he remarked, and he advocated that "a fund [should] be raised from the citizens in ratio of their property" to maintain the schools. "This, then, appears to be the era, if ever, of public education."[53]

35. One of the earlier examples of the transition from private to nonsectarian public schooling arose in New York City. As noted above, by 1800, six denominational charity schools operated in the city, relying chiefly on donations but receiving small public grants from the state, administered through the city Common Council, based on the 1795 law.[54] By 1805, the number of unschooled children had increased, with many poor children being excluded from the charity

[52] Samuel Knox, "An Essay on the Best System of Liberal Education, Adapted to the Genius of the Government of the United States" (1799), in *Essays on Education in the Early Republic*, *supra* n.51, at 278-279, 327.

[53] Samuel Harrison Smith, "Remarks on Education" (1798), in ibid., 205-211.

[54] Kaestle, *The Evolution of an Urban School System*, *supra* n.40, at 75-84.

schools because of insufficient space and religious membership requirements. That year, Quaker philanthropists and civic leaders organized the Free School Society to provide schooling for all poor children, regardless of their religious background. In order to distinguish its charity schools from the denominational schools and make its schools accessible to children of all religious faiths, the Society stressed the nondenominational character of its curriculum, which, its announcement asserted, would teach the "common rudiments of learning" while instructing in only "the fundamental principles of the Christian religion, free from all sectarian bias, and also those general and special articles of the moral code, upon which the good order and welfare of society are based." Picking up on a theme advanced by Rush, Webster, Smith, and Knox, the Society asserted that its nonsectarian curriculum would allow children of all faiths to learn in an environment free of the stupefying effects of sectarianism.[55] Due to its nonsectarian curriculum and its open admissions, the number of Society schools grew quickly, such that in 1826 the Society received legislative approval to change its name to the New York Public School Society, which secured its position with the Common Council and the state legislature as the city's default public school and allowed it to serve all social classes.[56]

36. The transition away from limited public funding of private schooling opportunities is further evidenced in a controversy that predated the Free School Society's name change. In 1820, Bethel Baptist Church established a charity school in its church basement and began receiving appropriations from the New York common-school fund. Two years later the church secured a state grant from surplus school funds to construct a school building—with the goal of

---

[55] Ibid., 41-74; Kaestle, *Pillars of the Republic*, *supra* n.37, at 30-40; William Oland Bourne, *History of the Public School Society of the City of New York* (New York: William Wood & Co., 1870); John Webb Pratt, *Religion, Politics, and Diversity: The Church-State Theme in New York History* (Ithaca: Cornell Univ. Press, 1967), 158-203.

[56] Bourne, *Public School Society*, *supra* n.55, at 85-95, 93-102; Kaestle, *Evolution of an Urban School System*, *supra* n.40, at 85-88.

opening additional charity schools—a privilege that had heretofore been afforded only to the Free School Society.[57] The Society submitted a memorial to the state legislature opposing the appropriation on the ground that it would violate the separation between church and state. The memorial touted that the Society's program was available to children of *all* faiths and backgrounds—no "distinction of sect or name is known in admitting scholars"—in contrast to the denominational schools.[58] It also argued that funding of religious schools would cause competition and rivalry among faiths; that the grant "impose[d] a direct tax on our citizens for the support of religion" in violation of rights of conscience; and that the school fund was "purely of a civil character," not to be under the control of a religious institution. "[T]he proposition that such a fund should never go into the hands of an ecclesiastical body or religious society, is presumed to be incontrovertible upon any political principle approved or established in this country . . . that church and state shall not be united."[59] In 1824, the legislative Committee on Colleges, Academies and Common Schools recommended that the Assembly discontinue funding for religious charity schools, declaring that it would be "a violation of a fundamental principle . . . to allow the funds of the State, raised by a tax on the citizens, designed for civil purposes, to be subject to the control of any religious corporation."[60] The Assembly, opting for a more politically expedient course, voted to authorize the city Common Council to make all future allotments of the school fund in the city. The following year, the Common Council voted to end the funding of religious charity schools. After 1825, only those schools of the Society and the handful of non-denominational charity schools were eligible to receive public school funds.[61]

---

[57] Pratt, *Religion, Politics, and Diversity*, *supra* n.55, at 165-67; Bourne, *Public School Society*, *supra* n.55, at 49-50.

[58] Bourne, *Public School Society*, *supra* n.55, at 52-55, 67.

[59] Ibid., 52-55; Pratt, *Religion, Politics, and Diversity*, *supra* n.55, at 167.

[60] Bourne, *Public School Society*, *supra* n.55, at 70-72.

[61] Ibid., 85-91.

37. Six years later, the New York Common Council reaffirmed its decision not to fund private religious education. In 1831, the Common Council rejected a request for funding for a Methodist Charity School. In its report, the Council's law committee wrote: "A school, to be common, ought to be open to all. . . . If religion be taught in a school, it strips it of one of the characteristics of a common school. . . . Can we, without violating the Constitution, appropriate any of the public funds to the support of those schools or institutions in which children are taught the doctrines and tenets of religious sectarianism? . . . It would be a virtual violation of . . . the Constitution to appropriate a fund, purely civil in its character and object, to the support of religious schools, and would not be sanctioned by a people ardently and devotedly attached to the maintenance of civil and religious liberty."[62]

38. By 1842, the state funding of even non-denominational charity schools in New York ended. In 1843, the Assembly established local boards of education throughout the state to oversee state-funded common schools (the Public School Society continued to operate as a funded school until it was formally acquired by the city board of education in 1853).[63]

39. Greatly impacting the development of free, universal public education was a second generation of educational reformers during the 1820s–1840s, led by Horace Mann of Massachusetts, and including Henry Barnard of Connecticut, Calvin Stowe and Samuel Lewis of Ohio, and Caleb Mills of Indiana. Through forceful leadership, they helped to establish statewide public-school systems, with schools being funded by tax revenues and land sales and operated

---

[62] Ibid., 133-135, 139. Moreover, the committee declared that it "cannot, however, perceive any marked difference in principle, whether a fund be raised for the support of a church, or whether it be raised for the support of a school in which the doctrines of that church are taught as part of a system of education." Ibid., 139. Significantly, during these controversies, people used the word "sectarian" to refer to Protestant denominational schools. Ibid., 66, 126, 135.

[63] Ibid., 72-75, 90-94, 101; Pratt, *Religion, Politics, and Diversity*, *supra* n.55, at 167; Kaestle, *Evolution of an Urban School System*, *supra* n.40, at 160-161. The 1842 New York law expressly provided that "[n]o school . . . in which any religious sectarian doctrine or tenet shall be taught, inculcated, or practiced, shall receive any portion of the school moneys to be distributed by this act." Bourne, *Public School Society*, *supra* n.55, at 521-525.

under the control of public officials. In 1827, Massachusetts became the first state to enact a law with the goal of standardizing education statewide. Disparities in resources and educational quality among district town schools fueled the movement for greater state control. An important section of the 1827 Massachusetts law forbade teaching doctrines of particular sects or the use of sectarian textbooks in the state's common schools, including those located in otherwise religiously homogenous rural district schools. The law also created a state board of education, which appointed Horace Mann as its first Secretary in 1836. In his 12-year tenure as Secretary, Mann became the nation's most visible and forceful advocate for free, universal, common school education. Under his leadership, nonsectarian education evolved from its first phase—as represented by the early curriculum of the New York Free School Society with its use of religious catechisms—into its second. Mann set out to change both the assumptions and applications of nonsectarian education, to eradicate its remaining doctrinal character and any possible evangelizing goals, while ensuring that schooling was available to children of all faiths.[64] As Professor Cremin concluded: "Thus, by the 1830s, the conception of a common school entirely supported by public effort had firmly taken root in Massachusetts," setting the standard for other states. "By 1850 the principle of public control of the common school had fairly well taken root throughout the Union. It may well be said that the people by then largely controlled the schools which they had instituted with public funds."[65]

40. While standardization, accountability, and public financial control were leading factors in the trend toward the creation of universal, free public schools, so too were constitutional

[64] Cremin, *The American Common School*, *supra* n.41, at 49, 93-94; Cubberley, *Public Education in the United States*, *supra* n.40, at 221-234. According to Cubberley, "No one did more than [Mann] to establish in the minds of the American people the conception that education should be universal, non-sectarian, and free, and that its aims should be social efficiency, civic virtue, and character, rather than mere learning or the advancement of sectarian ends." Ibid., 226.

[65] Cremin, *The American Common School*, *supra* n.41, at 94, 175.

concerns about funding religious instruction, as discussed above.[66] Increasingly, educators and public officials were making firmer distinctions between public and private schools. In 1830, social and education reformer and congressman Robert Dale Owen authored six essays on "Public Education," where he argued for "universal" and "republican" education "open and free to all." He wrote: "The system of Public Education, then, which we consider capable, and only capable, of regenerating this nation, and of establishing partial virtue and republican equality among us, is one that provides for all children at all times."[67] Seven years later, reformer Theodore Edson delivered a lecture at the American Institute of Instruction (created in 1830), "On the Comparative Merits of Private and Public Schools": "Public schools are those by law established among us, the common free schools of New England. . . . Over these, the law provides for each town a superintending committee, having general charge of all the town schools, empowered to prescribe the books and direct the exercises, . . . and is entrusted with the duties of employing, paying, and, if need be, of removing the teachers. An obvious feature of distinction between public and private schools as I have now classed them, is that the former are under the supervision of selected men, responsible more or less directly to the community. The private schools have no supervision, or only that of the parents."[68]

41. Following the lead established by the 1827 Massachusetts school law, other states quickly adopted constitutional protections mandating free, universal, secular public schools. Michigan became the first state to enact an express provision in its constitution prohibiting the

---

[66] Lloyd P. Jorgenson, *The State and the Non-Public School* (Columbia, Mo.: Univ. of Mo. Press, 1987), 6-7; Kaestle, *Pillars of the Republic*, *supra* n.37, at 116-117; Green, *The Bible, the School, and the Constitution*, *supra* n.2, at 50-51, 69-71.

[67] *The Workingman's Advocate*, Apr. 17, 1830, 4, and ibid., Apr. 24, 1830, 4, reprinted in Cremin, *The American Common School*, *supra* n.41, at 37-44.

[68] *The Annals of the American Institute of Instruction, Being a Record of Its Doings for 54 Years, from 1830 to 1883*, ed. Charles Northend (New Britain, CT: 1884), 37.

appropriation of public money or property in support of any "religious sect or society, theological or religious seminary" (1835).[69] Other states followed suit, with no-funding of religion clauses appearing in the constitutions of Wisconsin (1848), Indiana (1851), Ohio (1851), Massachusetts (1855), Minnesota (1857), Oregon (1857), and Kansas (1858), all before the Civil War.[70] In addition, the constitutions of Florida (1837) and Kentucky (1850) provided that the state school funds were to be appropriated in aid of common schools, "but for no other purpose."[71] Finally, the New York and California legislatures enacted laws prohibiting the public funding of religious schools in 1843 and 1852, respectively.[72] Today, 38 state constitutions contain provisions that prohibit public monies being spent in aid of religious institutions or religious schools.[73]

42. Complementing those constitutional provisions that expressly prohibited the public funding of religious institutions and schools—and often predating those clauses—were state constitutional provisions regarding religious freedom that were subsequently interpreted to have a similar effect. Although the precise language often varied, these provisions fit into two categories. The most common type, originating with the Pennsylvania Constitution of 1776, provided that no person could "be compelled to attend, erect or support any place of worship, or to maintain any

[69] Mich. Const. art. I, § 5 (1835).

[70] Wis. Const. art. I, § 18; Ind. Const. art. I, § 6; Ohio Const. art. VI, § 2; Mass. Const. art. XVIII (1855); Minn. Const. art. I, § 16 (1857); Or. Const. art. I, § 5 (1859); Kan. Const. art. VI, § 8 (1859).

[71] The Florida Constitution of 1838 (art. X, sec. 1) and the Kentucky Constitution of 1850 (art. XI, sec. 1).

[72] N.Y. Laws, 1843, ch. 216 § 15; Cal. Stat., 1852, ch. 53. art. VI § 1.

[73] Ala. Const. art. XIV, § 263; Alaska Const. art. VII, § 1; Ariz. Const. art. II, § 12, art. IX, § 10; Cal. Const. art. IX, § 8, art. XVI, § 5; Colo. Const. art. IX, § 7; Del. Const. art. X, § 3; Fla. Const. art. I, § 3; Ga. Const. art. I, § 2, ¶ VII; Haw. Const. art. X, § 1; Idaho Const. art. IX, § 5; Ill. Const. art. X, § 3; Ind. Const. art. I, § 6; Kan. Const. art. VI, § 6c; Ky. Const. § 189; Mass. Const. art. XVIII; Mich. Const. art. I, § 4; Minn. Const. art. I, § 16; Miss. Const. art. 8, § 208; Mo. Const. art. I, § 7, art. IX, § 8; Mont. Const. art. X, § 6; Neb. Const. art. VII, § 11; Nev. Const. art. XI, § 10; N.H. Const. art. 83; N.M. Const. art. XII, §§ 3, 4; N.Y. Const. art. XI, § 3; N.D. Const. art. VIII, § 5; Ohio Const. art. VI, § 2; Okla. Const. art. I, § 5, art. XI, § 5; Ore. Const. art. I, § 5; Pa. Const. art. III, § 15, art. X, § 2; S.C. Const. art. XI, § 4; S.D. Const. art. VI, § 3, art. VIII, § 16; Tex. Const. art. I, § 7, art. VII, § 5; Utah Const. art. I, § 4, art. X, § 9; Va. Const. art. IV, § 16; Wash. Const. art. I, § 11; Wis. Const. art. I, § 18; Wyo. Const. art. I, § 19, art. III, § 36.

ministry against his consent." Pa. Const. art. I, § 3.[74] Pennsylvania's constitution served as the model for many states, including Tennessee's article XI, section 3 (now, article I, sec. 3).[75] 29 state constitutions contain such "no-compelled support" clauses.[76] Additionally, 27 state constitutions contain provisions restricting public appropriations or draws from state treasuries for "public purposes," for "public uses," or to remain under "public control."[77] Connecticut apparently adopted the first such clause in its 1818 constitution as a means to preserve its School Fund, which was created in 1795 after the sale of its land claims in the Western Reserve in Ohio. Article VIII, section 2 of that constitution provided in part that "the School Fund shall remain a perpetual fund, the interest of which shall be inviolably appropriated to the support and encouragement of the common or public schools throughout the State . . . and no law shall ever be made authorizing said fund to be diverted to any other use than the encouragement and support of public and common

---

[74] The initial phrasing of Article II of the Pennsylvania Declaration of Rights was that "no man ought or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent." Thorpe, *Federal and State Constitutions*, *supra* n.13, at 5:3082.

[75] Tenn. Const. of 1798, art. XI, § 3: "no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent." Thorpe, *Federal and State Constitutions*, *supra* n.13, at 6:3422. Any suggestions that this clause or similar constitutional clauses were rooted in anti-Catholic bias lacks historical support. In his essay on the drafting of the religion clauses of 1798 Tennessee Constitution, Edward R. Crowther makes no reference to any anti-Catholic bias motivating the adoption of those clauses. Edward R. Crowther, "Disestablishment in Tennessee," in *Disestablishment and Religious Dissent: Church-State Relations in the New American States, 1776-1833*, eds. Carl H. Esbeck and Jonathan J. Den Hartog (Columbia, Mo.: Univ. of Mo. Press, 2019), 215-224. And as noted, the no-compelled support language first arose in 1776, decades before the rise in significant Catholic immigration and subsequent nativist movement. Green, *The Bible, the School, and the Constitution*, *supra* n.2, at 87-91.

[76] Ala. Const. art. I, § 3; Ark. Const. art. II, § 24; Colo. Const. art. II, § 4; Conn. Const. art. VII; Del. Const. art. I, § 1; Idaho Const. art. I, § 4; Ill. Const. art. I, § 3; Ind. Const. art. I, § 4; Iowa Const. art. I, § 3; Kan. Const. § 7; Ky. Const. § 5; Md. Const. art. 36; Mich. Const. art. I, § 4; Minn. Const. art. I, § 16; Mo. Const. art. I, § 6; Neb. Const. art. I, § 4; N.H. Const. art. 6; N.J. Const., Art. I, Para. 3; N.M. Const. art. II, § 11; Ohio Const. art. I, § 7; Pa. Const. art. I, § 3; R.I. Const. art. I, § 3; S.D. Const. art. VI, § 3; Tenn. Const. art. I, § 3; Tex. Const. art. I, § 6; Vt. Const. ch. I, art. 3; Va. Const. art. I, § 16; W. Va. Const. art. III, § 15; Wis. Const. art. I, § 18.

[77] Ala. Const. art. IV, § 73; Alaska Const. art. IX, § 6; Ark. Const. art. XIV, § 2; Cal. Const. art. XVI, § 3; Colo. Const. art. IX, § 3; Conn. Const. art. VIII, § 4; Del. Const. art. X, § 4; Fla. Const. art. IX, § 6; Ga. Const. art. VII, § 6, ¶ 1(b); Haw. Const. art. VII, § 4; Idaho Const. art. IX, § 3; Ill. Const. art. VIII, § 1; Ky. Const. § 171; Md. Const. art. VIII, § 3; Mo. Const. art. IX, § 5; Mont. Const. art. V, § 11(5); Neb. Const. art. VII, § 11; N.J. Const. art. VIII, § IV, ¶ 2; N.M. Const. art. IV, § 31; N.C. Const. art. IX, § 6; Pa. Const. art. III, § 30; R.I. Const. art. XII, § 2; S.D. Const. art. VIII, § 3; Tex. Const. art. VII, § 5; Va. Const. art. VIII, § 10; Wash. Const. art. IX, § 2; Wyo. Const. art. III, § 36.

schools."[78] Similarly, the New York Constitution of 1821 provided that "the fund denominated the common-school fund, shall be and remain a perpetual fund, the interest of which shall be inviolably appropriated and applied to the support of common schools throughout the State."[79]

43. The aforementioned historical material leads to several conclusions. First, it is wrong to conflate the educational practices and opportunities of the colonial and early federal periods with those that arose after the 1820s. Public schooling after the 1820s had different aims and methods and was not seen as an extension of colonial schooling—educational reformers such as Thomas Jefferson, Noah Webster, and Horace Mann sought to make a break from the earlier purposes and practices of private, religious schooling. The goal was to institute free, universal education (*i.e.*, *common* schooling) under the control of public authorities and accountable to the public, one that emphasized academics instead of religious indoctrination. As Professor Cubberley described this transformation: "The new theory as to state control, and the erection of a citizenship purpose for education, made it both possible and desirable that the instruction in the school, and particularly in the vernacular school, should be recast, both in method and content, to bring the school in harmony with the new secular purpose." Because there was "[n]o real educational consciousness before 1820," it is historically erroneous to draw parallels between the colonial and later periods.[80] Second, as state governments began creating public schools and school systems in the early nineteenth century, there was a shared commitment to fund and operate *public* schools, under the control of public officials and accountable to public taxpayers. The clear impulse in these public schools was to minimize or abolish any religious component in the curriculum.[81]

---

[78] Conn. Const. art. VIII, § 2, in Thorpe, *Federal and State Constitutions*, *supra* n.13, at 1:545.

[79] N.Y. Const. art. VII, § 10, in Thorpe, *Federal and State Constitutions*, *supra* n.13, at 5:2649.

[80] *See* Ellwood P. Cubberley, *A Brief History of Education* (Boston: Houghton Mifflin Co., 1922), 291, 354.

[81] Green, *The Bible, the School, and the Constitution*, *supra* n.2, at 225-243.

Finally, this impulse included and necessitated discontinuing and prohibiting the public funding of private and religious schools.

## VII. Historical Evidence Does Not Suggest That the Non-Funding of Religious Schools During the First Half of the Nineteenth Century Was Considered a Violation of Free-Exercise Rights.

44. There is no evidence that public authorities' withdrawal of public funding from private religious schools (or their decision not to grant such funding in the first instance) during the initial decades of the nineteenth century was viewed as a violation of the right to free exercise of religion (whether guaranteed under either the federal or state constitutions). For example, neither the Baptist nor the Methodist charity schools discussed above, *supra* ¶¶ 36, 37, claimed that the New York Common Council's rejection of their funding requests violated free-exercise principles.[82] In fact, in rejecting the Methodist application, the Common Council's law committee found that the free-exercise concerns flowed in the opposite direction: "It is to tax the people for the support of religion, contrary to the Constitution, and a violation of their conscientious scruples."[83] In addition to those examples, between 1840 and 1842, a controversy erupted over Catholic requests for a share of public-school funds for Catholic parochial schools. At the conclusion of a series of debates before the New York Common Council and then the New York Senate over the matter, the Catholic funding requests were turned aside. Although Bishop John Hughes and other Catholic representatives asserted that exposing Catholic children to readings from the Protestant King James Bible and Protestant oriented schoolbooks violated the children's rights of conscience,[84] they did not make the corresponding argument that to deny Catholic schools a proportionate share of the school fund violated the church's free-exercise rights or its rights of

[82] *See* Bourne, *Public School Society*, *supra* n.55, at 58-62; Memorial of the Trustees of the Methodist Episcopal Church, Sept. 5, 1831, in ibid., 132-133.

[83] Ibid., 140.

[84] Ibid., 189, 436.

conscience.[85] In fact, Bishop Hughes expressly avoided making such a claim: "we ask not for the money on the ground that we are a religious corporation, but of public utility, for the purpose of giving an education to a large and destitute class which otherwise will not have the means to procure it."[86]

45. In their extensive examination of private schooling in the early nineteenth century, Professors Aaron Tang and Ethan Hutt similarly conclude that a denial of public funding of religious schooling was not viewed at the time as a free-exercise violation. In addition to the early episodes in New York, Tang and Hutt document denials of public funding requests for religious schooling in New Jersey, California, Pennsylvania, Indiana, Illinois, and Alabama—all of which produced no claims that the denials constituted a violation of federal or state free-exercise rights. They conclude that "government officials across antebellum America took action that had the intended and actual effect of denying religious schools access to public funds on equal terms with their peer educational institutions. . . . [however,] these funding denials did not lead to any free exercise rights talk or litigation in state courts."[87]

46. An additional example supports the conclusion that there was a wide understanding that a denial of public funding for religious education did not violate free-exercise rights or rights of conscience. Beginning in 1829 and continuing into the twentieth century, American Catholic bishops periodically issued Pastoral Letters to the Laity that pronounced ecclesiastical directives on various issues confronting the American Catholic Church. In several of the Letters, the bishops expressed their opposition to the Protestant character of public schooling and the need to establish

---

[85] *See* ibid., 189-195, 202-224, 277-312, 426-478.

[86] Ibid., 218. *See* Kaestle, *The Evolution of an Urban School System*, *supra* n.40, at 148-158; Green, *The Bible, the School, and the Constitution*, *supra* n.2, at 54-68.

[87] Aaron Tang and Ethan Hutt, "'Original History' and the Free Exercise Case for Religious Charter Schools," 103 *Wash. Univ. L. Rev.* 639-704 (2026), 663-676.

parochial schools.[88] Even though, as above, the bishops asserted that the use of the King James Bible and Protestant-oriented schoolbooks violated the conscience rights of Catholic schoolchildren and, again, urged the necessity of a Catholic education, they did not claim that the denial of a share of public-school funds violated free-exercise principles.[89]

## VIII. Public Funding of Indian Boarding Schools and Freedmen's Bureau Schools During the Nineteenth Century Reflected Highly Coercive Religious Practices That Were Inconsistent With the Anti-Coercion Principles Animating the Establishment Clause.

47. My conclusions are not changed by the government funding of Indian Boarding Schools during the nineteenth century and the Freedmen's Bureau sponsored schools immediately following the Civil War. These historical examples must be viewed in their full context.

48. First, with respect to Indian Boarding Schools, there is a long and tragic record of the federal government using religious missionaries and religious societies to pacify, "civilize" (*i.e.*, assimilate), and territorially dispossess America's indigenous peoples. In 1819, Congress established the "Civilization Fund" for the purpose of supporting benevolent associations and individuals in the education of Native Americans. Moravian, Catholic, Baptist, Methodist, and Presbyterian missionaries shortly established mission schools among various tribes and began receiving funding under the Civilization Fund. Conversion to Christianity was the primary goal of these agencies—a goal that was inseparable from education and the instruction in those habits and skills "so essential to civilized life." This forced acculturation process required the breaking down of Native customs and behaviors, including the eradication of Native religious beliefs. A policy of civilization thus meant a policy not only of cultural indoctrination but of coercive religious conversion demanding complete and total erasure of Native religious belief and practice.

---

[88] *See* the Pastoral Letters of 1833, 1840, 1843, 1852, 1866, and 1884, in Peter Guilady, *The National Pastorals of the American Hierarchy* (Washington, DC: Nat'l Catholic Welfare Council, 1923), 74, 132-135, 152-153, 189-191, 215-216, 243-247.

[89] Ibid.

By 1826, 36 religious mission schools were supported by the Fund, with a total appropriation of $13,550. The Fund continued until 1873 and served as the primary financial link between the government and its religious allies.[90]

49. Due to systemic corruption and mismanagement in the operation of the schools, in 1869 President Grant instituted what became known as the "Peace Policy" to reform the system. The new initiative relied heavily on religious groups and missionary societies to formulate and administer federal Indian policy, dividing reservations among various denominations.[91] This second phase greatly expanded the Indian Boarding School system and the unconscionable violations of the children's religious-freedom rights. Native children were forcibly removed from their families and sent to the schools, where they were systematically isolated from their languages, cultures, religion, and communities. Many suffered severe abuse—and death—at the hands of those charged with their "education."[92] In 2022, the Department of the Interior confirmed that the "Federal Indian boarding school system deployed systematic militarized and identity-alteration methodologies" to forcibly assimilate Native children, including by stripping them of their Native "languages, religions, and cultural practices."[93]

---

[90] Henry Warner Bowden, *American Indians and Christian Missions* (Chicago: Univ. of Chicago Press, 1981), 167-169; Louis Fisher, "Indian Religious Freedom: To Litigate or Legislate," 26 *Am. Indian L. Rev.* 1-3 (2001-2002); Francis Paul Prucha, *American Indian Policy in the Formative Years* (Cambridge: Harvard Univ. Press, 1962), 213-227; R. Pierce Beaver, *Church, State, and the American Indians* (St. Louis: Concordia Pub. House, 1966), 67-79; Robert F. Berkhofer, Jr., *Salvation and the Savage: An Analysis of Protestant Missions and American Indian Response, 1787-1862* (Lexington: Univ. Press of Ky., 1965), 2-4.

[91] "Report of the Indian Peace Commission," Jan. 7, 1868, "Report of the Board of Indian Commissioners," Nov. 23, 1869, "The President's Second Annual Message to Congress," Dec. 5, 1870, reprinted in Francis Paul Prucha, ed., *Documents of United States Indian Policy*, 2d ed. (Lincoln: Univ. of Neb. Press, 1990), 106-110, 131-134, 135; Robert H. Keller, Jr., *American Protestantism and United States Indian Policy, 1869-82* (Lincoln: Univ. of Neb. Press, 1983), 17-30; Beaver, *Church, State, and the American Indian*, *supra* n.90, at 124-130.

[92] Rebecca Tsosie, *Accountability for the Harms of Indigenous Boarding Schools: The Challenge of "Healing the Persisting Wounds" of "Historic Injustice,"* 52 *Sw. L. Rev.* 20, 20-21, 24-25 (2022).

[93] Bryan Newland, Bureau of Indian Affairs, U.S. Dep't of Interior, *Federal Indian Boarding School Initiative Investigative Report* 7 (May 2022), https://www.bia.gov/sites/default/files/dup/inline-files/bsi_investigative_report_may_2022_508.pdf.

50. The government's funding of and financial arrangements with Indian missions and boarding schools have been universally condemned. Indeed, the U.S. government has issued a formal apology for the schools.[94] The federal government's funding of these schools cannot be understood as anything other than an expedient means to deal with the "Indian Problem"[95] that was inconsistent with the anti-coercion principles animating the Establishment Clause. *See supra* ¶¶ 15-25.

51. The legacy of the Freedmen's Bureau schools is no better a historical comparator. Like the Indian Boarding Schools, the Freedmen's Bureau-funded schools were inconsistent with the anti-coercion principle at the heart of the Establishment Clause and reflect governmental expediency in utilizing available resources to address an urgent need.[96] Operating between 1865 and 1872 and charged with assisting formerly enslaved people in the aftermath of the Civil War, the Bureau supported a range of educational efforts in the South involving private benevolent societies, most staffed by Northern Protestant missionaries. As historians have documented, Bible reading and Protestant moral instruction were daily features of the classroom, embedded in a curriculum that treated religious conformity as a precondition for literacy and advancement, and as a tool of social and political control. Echoing the same assumptions that underlay Indian Boarding Schools, education in Bureau schools was shaped by a prevailing view of formerly enslaved people as uncivilized "barbarians" and the belief that Christianity offered the primary

---

[94] *See* U.S. Dep't Interior, "Deb Haaland: The Impact of President Biden's Apology to Indian Country" (Jan. 6, 2025), https://www.doi.gov/blog/deb-haaland-impact-president-bidens-apology-indian-country.

[95] *See* Eve L. Ewing, *Original Sins: The (Mis)education of Black and Native Children and the Construction of American Racism* (New York: One World, 2025).

[96] *See* Derek Black, "The Constitutional Compromise to Guarantee Education," 70 *Stan. L. Rev.* 735 (2018), 777-782.

means of their moral uplift. The teachers "were united by the same basic premise: the task of *civilization*" of black children.[97]

I declare under penalty of perjury that the foregoing accurately states my opinions and is true and correct to the best of my knowledge. Executed in the State of Oregon on May 25, 2026.

Steven K. Green, J.D., Ph.D.

---

[97] Ronald E. Butchart, *Northern Schools, Southern Blacks, and Reconstruction: Freedmen's Education, 1862-1875* (Westport, CT: Greenwood Press, 1980), 97-114; Henry Lee Swint, *The Northern Teacher in the South, 1862-1870* (New York: Octagon Books, Inc., 1967), 35-44, 56-62, 87, 138-39; Ewing, *Original Sins*, *supra* n.95, at 61, 93.