**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION (KNOXVILLE)**

| | |
|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE,<br>*Plaintiff*,<br>v.<br><br>KNOX COUNTY BOARD OF EDUCATION,<br>*Defendant*,<br><br>RICHARD COBLE, et al.,<br>*Intervenor-Defendants*,<br><br>ADRIENNE CARROLL, et al.,<br>*Intervenor-Defendants*. | Case No. 3:25-cv-584-CEA-DCP<br><br>District Judge Charles E. Atchley<br><br>Magistrate Judge Debra C. Poplin |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


Introduction .......... 1

Argument .......... 2

- I. The Court has jurisdiction over Wilberforce's remaining claim. .......... 2
  - A. Standing .......... 2
    - 1. Wilberforce has standing regardless of the odds its application is approved. .......... 5
    - 2. Wilberforce did not need to first submit a futile application. .......... 14
  - B. Finality and ripeness .......... 21
  - C. Mootness .......... 23
- II. Banning religious charter schools is unconstitutional. .......... 23
  - A. Banning religious charter schools violates the Free Exercise Clause. .......... 23
  - B. Wilberforce is a private entity entitled to full constitutional protection. .......... 25
    - 1. Wilberforce is a private entity under *Lebron*. .......... 26
    - 2. Wilberforce is not a state actor. .......... 35
    - 3. Wilberforce is not a government entity under the intervenors' made-up test that would apply only to schools. .......... 42
  - C. Even if charter schools were part of the government, the Free Exercise Clause would protect Wilberforce from discrimination. .......... 46
- III. This Court should award all appropriate relief. .......... 47

Conclusion .......... 50

## TABLE OF AUTHORITIES

**Cases**

*303 Creative v. Elenis*,
600 U.S. 570 (2023) .......... 18

*AAER v. Fearless Fund*,
103 F.4th 765 (11th Cir. 2024) .......... 47

*Aiken v. Hackett*,
281 F.3d 516 (6th Cir. 2002) .......... 49

*Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*,
75 F.3d 1401 (9th Cir. 1996) .......... 29, 30

*Arkansas v. Texas*,
346 U.S. 368 (1953) .......... 43

*Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado*,
84 F.3d 487 (1st Cir. 1996) .......... 30

*Biden v. Nebraska*,
600 U.S. 477, 491 (2023) .......... 26, 33, 43

*Blum v. Yaretsky*,
457 U.S. 991 (1982) .......... 32

*Brammer-Hoelter v. Twin Peaks Charter Acad.,*
602 F.3d 1175 (10th Cir. 2010) .......... 35

*Brentwood Acad. v. TSSAA*,
531 U.S. 288 (2001) .......... 39

*Brotherton v. Cleveland*,
173 F.3d 552 (6th Cir. 1999) .......... 50

*Brown v. Bd. of Ed.*,
347 U.S. 483 (1954) .......... 38, 44

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .......... 25

*Cady v. Arenac Cnty.*,
574 F.3d 334 (6th Cir. 2009) .......... 50

*Carey v. Piphus*,
435 U.S. 247 (1978) .......... 47

*Carson v. Makin*,
596 U.S. 767 (2022) .......... passim

*Carter v. Univ. of Toledo*,
349 F.3d 269 (6th Cir. 2003) .......... 17

*Cas. Reciprocal Exchange v. Mo. Emp'rs Mut. Ins. Co.*,
956 S.W.2d 249 (Mo. 1997) .......... 33

*Cath. Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025) ....................46

*Caviness v. Horizon Cmty. Learning Ctr.*,
590 F.3d 806 (9th Cir. 2010) .................... 35, 36, 37, 39

*Chelsey Nelson Photo. v. Louisville/Jefferson Cnty.*,
624 F. Supp. 3d 761 (W.D. Ky. 2022) ....................9

*Christian Healthcare Ctrs. v. Nessel*,
117 F.4th 826 (6th Cir. 2024)....................22

*Citizens United v. FEC*,
558 U.S. 310 (2010) ....................25

*Commodities Exp. Co. v. Detroit Int'l Bridge Co.*,
695 F.3d 518, 529 (6th Cir. 2012)....................26

*Dahl v. W. Mich. Univ.*,
15 F.4th 728 (6th Cir. 2021)....................24

*Dartmouth Coll. v. Woodward*,
17 U.S. 518 (1819) .................... 25, 32

*Dep't of Transp. v. AAR*,
575 U.S. 43, 53 (2015).................... 26, 34

*Drummond v. Okla. Statewide Virtual Charter Sch. Bd.*,
558 P.3d 1 (Okla. 2024) ....................36

*Engel v. Vitale*,
370 U.S. 421 (1962) ....................47

*Ernst v. Rising*,
427 F.3d 351, 367 (6th Cir. 2005) (en banc)....................23

*Espinoza v. Mont. Dep't of Rev.*,
591 U.S. 464 (2020) .................... 24, 25, 44, 46

*Evers v. Custer Cnty.*,
745 F.2d 1196 (9th Cir. 1984)....................48

*First Nat. Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) .................... 25, 27

*Fischer v. Thomas*,
52 F.4th 303 (6th Cir. 2022)....................15, 18, 49

*Fisher v. UT-Austin*,
758 F.3d 633 (5th Cir. 2014) ....................49

*Fulton v. Philadelphia*,
593 U.S. 522 (2021) ....................24

*Galette v. N.J. Transit Corp.*,
607 U.S. 509 (2026) ....................25

*Garner v. Memphis Police Dep't*,
8 F.3d 358 (6th Cir. 1993) ........ 48

*Gilbert v. City of Cambridge*,
932 F.2d 51 (1st Cir. 1991) ........ 15

*Grace Cmty. Church v. Lenox Twp.*,
544 F.3d 609 (6th Cir. 2008) ........ 21

*Graham v. Bd. of Educ.*,
8 F.4th 625, 629 (7th Cir. 2021) ........ 35

*Grand v. Univ. Heights*,
159 F.4th 507 (6th Cir. 2025) ........ 15, 21

*Gratz v. Bollinger*,
539 U.S. 244 (2003) ........ passim

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ........ 47

*Hack v. Yale Coll.*,
237 F.3d 81, 83-84 (2d Cir. 2000) ........ 26, 30, 31, 32

*Herron v. Fannie Mae*,
861 F.3d 160 (D.C. Cir. 2017) ........ 30, 31

*Holston United Methodist Home for Children v. Becerra*,
2022 WL 17084226 (E.D. Tenn. Nov. 18) ........ 14

*Howell v. Father Maloney's Boys' Haven, Inc.*,
976 F.3d 750 (6th Cir. 2020) ........ 36, 40

*Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*,
176 F.3d 921 (6th Cir. 1999) ........ 19

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974) ........ 36, 37, 39

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ........ 46

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*,
172 F.3d 397 (6th Cir. 1999) ........ 6, 16

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) ........ passim

*Lee v. Weisman*,
505 U.S. 577 (1992) ........ 47

*Lindke v. Freed*,
601 U.S. 187 (2024) ........ 34

*Logiodice v. Me. Cent. Inst.*,
296 F.3d 22 (1st Cir. 2002) ........ passim

*Lyng v. NICPA*,
485 U.S. 439 (1988) ........................................ 24

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) ........................................ passim

*Marie v. Am. Red Cross*,
771 F.3d 344 (6th Cir. 2014) ........................................ 36

*Martin v. Kelley*,
803 F.2d 236 (6th Cir. 1986) ........................................ 47

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
584 U.S. 617 (2018) ........................................ 4, 13

*Memphis Publ'g Co. v. Cherokee Child. & Fam. Servs.*,
87 S.W.3d 67 (Tenn. 2002) ........................................ 40

*Mik v. Fed. Home Loan Mortg. Corp.*, 743
743 F.3d 149 (6th Cir. 2014) ........................................ passim

*Mitchell v. Mid-Continent Spring Co. of Ky.*,
583 F.2d 275 (6th Cir. 1978) ........................................ 14

*Moore v. USDA*,
993 F.2d 1222 (5th Cir. 1993) ........................................ 6

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ........................................ 44

*Nampa Classical Acad. v. Goesling*,
447 F. App'x 776 (9th Cir. 2011) ........................................ 35

*Ne. Fla. Ch., AGCA v. Jacksonville*,
508 U.S. 656 (1993) ........................................ 5, 22, 48

*Northrip v. Fed. Nat. Mortg. Ass'n*,
527 F.2d 23 (6th Cir. 1975) ........................................ 29

*Nugent v. Spectrum Juv. Just. Servs.*,
72 F.4th 135, 141 n.2 (6th Cir. 2023) ........................................ 37

*Oakland v. FHFA*,
716 F.3d 935 (6th Cir. 2013) ........................................ 32

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) ........................................ 25

*Pakdel v. S.F.*,
594 U.S. 474 (2021) ........................................ 21

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001) ........................................ 21

*Parents Involved v. Seattle*,
551 U.S. 701 (2007) ........................................ 6

*Peltier v. Charter Day Sch.*,
37 F.4th 104 (4th Cir. 2022) (en banc) .............................. 36, 37

*Pembaur v. Cincinnati*,
475 U.S. 469 (1986) .............................. 48

*Phillips v. Tangilag*,
14 F.4th 524 (6th Cir. 2021) .............................. 36, 37

*Pierce v. Soc'y of Sisters*,
268 U.S. 510 (1925) .............................. 36

*Pro. Massage Training Ctr. v. Accreditation All. of Career Schs. & Colleges*,
781 F.3d 161 (4th Cir. 2015) .............................. 7

*Rd.-Con v. Philadelphia*,
120 F.4th 346 (3d Cir. 2024) .............................. 48

*Regional Rail Reorganization Act Cases*,
419 U.S. 102, 152 (1974) .............................. 26, 32

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982) .............................. passim

*Robert S. v. Stetson Sch.*,
256 F.3d 159 (3d Cir. 2001) .............................. 30, 35

*S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*,
483 U.S. 522, 543 (1987) .............................. passim

*SBA List v. Driehaus*,
573 U.S. 149 (2014) .............................. 14, 22

*SFFA v. Naval Acad.*,
2024 WL 4057002 (D. Md. Sept. 5) .............................. 5

*Shalala v. Ill. Council on Long Term Care*,
529 U.S. 1 (2000) .............................. 43

*Shea v. Kerry*,
796 F.3d 42 (D.C. Cir. 2015) .............................. 5

*Sherbert v. Verner*,
374 U.S. 398, 404 (1963) .............................. 24

*Sporhase v. Nebraska*,
458 U.S. 941 (1982) .............................. 14

*Sprauve v. W. Indian Co.*,
799 F.3d 226 (3d Cir. 2015) .............................. 31

*Tandon v. Newsom*,
593 U.S. 61 (2021) .............................. 24

*Teamsters v. United States*,
431 U.S. 324 (1977) .............................. 48

*Texas v. Lesage*,
528 U.S. 18 (1999) .......... 49

*Thomas v. Review Bd.*,
450 U.S. 707 (1981) .......... 25

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) .......... 47

*Trinity Lutheran Church v. Comer*,
582 U.S. 449 (2017) .......... passim

*USAID v. AOSI*,
591 U.S. 430 (2020) .......... 27

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) .......... 49

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021) .......... 5, 6

*Wieman v. Updegraff*,
344 U.S. 183 (1952) .......... 24, 46

*Wolford v. Lopez*,
146 S.Ct. 2032 (2026) .......... 38

*Wright v. Spaulding*,
939 F.3d 695 (6th Cir. 2019) .......... 35

**Statutes**

12 U.S.C. §1452(a)(2)(A) .......... 28

12 U.S.C. §1452(c) .......... 33, 34

12 U.S.C. §1452(f) .......... 34

20 U.S.C. §1232g(a)(2) .......... 42

Amateur Sports Act of 1978, 92 Stat. 3045 .......... 32, 34

Fed. R. Civ. P. 36(b) .......... 7

Fed. R. Evid. 801(d)(2)(C) .......... 19

Fed. R. Evid. 801(d)(2)(D) .......... 17, 19

Pub. Ch. 1128, §1, 114th Gen. Assembly .......... 23

Tenn. Code Ann. §29-20-102(3)(A) .......... 40

Tenn. Code Ann. §29-20-201(a) .......... 40

Tenn. Code Ann. §45-2-401(a)(4) .......... 29

Tenn. Code Ann. §45-4-201(a) .......... 29

Tenn. Code Ann. §48-52-102 .......... 26

Tenn. Code Ann. §48-53-102(a)(1) .......... 40

Tenn. Code Ann. §48-64-101 ..... 33
Tenn. Code Ann. §48-64-201 ..... 32
Tenn. Code Ann. §48-64-301 ..... 32
Tenn. Code Ann. §49-13-102(b) ..... 31
Tenn. Code Ann. §49-13-104 (2024) ..... 17
Tenn. Code Ann. §49-13-104(10) ..... 28, 39
Tenn. Code Ann. §49-13-106(i) ..... 28
Tenn. Code Ann. §49-13-107(a) ..... 18
Tenn. Code Ann. §49-13-107(a)-(b) (2013) ..... 8
Tenn. Code Ann. §49-13-107(b) ..... 6, 7, 27, 31
Tenn. Code Ann. §49-13-107(b)(18) ..... 6
Tenn. Code Ann. §49-13-108 ..... 24
Tenn. Code Ann. §49-13-108(b)(5) ..... 8
Tenn. Code Ann. §49-13-109(a)(1) ..... 27, 28
Tenn. Code Ann. §49-13-110(a) ..... 20, 27, 28
Tenn. Code Ann. §49-13-110(b)(1) ..... 12, 33
Tenn. Code Ann. §49-13-111(a)(1) ..... 28, 39
Tenn. Code Ann. §49-13-111(a)(2) ..... passim
Tenn. Code Ann. §49-13-111(p) ..... 21, 31, 41, 45
Tenn. Code Ann. §49-13-111(p)(1) ..... 19, 22
Tenn. Code Ann. §49-13-112 ..... 24
Tenn. Code Ann. §49-13-113(a) ..... 47
Tenn. Code Ann. §49-13-113(d)(3) ..... 45
Tenn. Code Ann. §49-13-114(a) ..... 11
Tenn. Code Ann. §49-13-121(j) ..... 33
Tenn. Code Ann. §49-13-122 ..... 24, 32, 33, 34
Tenn. Code Ann. §49-13-124(a) ..... 40
Tenn. Code Ann. §49-13-125 ..... 40
Tenn. Code Ann. §49-13-143(b) ..... 48
Tenn. Code Ann. §49-2-203(a)(2) ..... 30
Tee e nn. Code Ann. §49-50-801(a) ..... 41
Tenn. Code Ann. §49-50-801(d) ..... 41
Tenn. Code Ann. §49-6-3001(c) ..... 41

Tenn. Code Ann. §49-6-3507 ....................41
Tenn. Code Ann. §49-6-3508(c)....................13
Tenn. Code Ann. §49-6-8002(a)(3)....................22
Wash. Rev. Code §28A.195.010(3) ....................41

**Regulations**

2 C.F.R. §200.320....................41
34 C.F.R. §106.45....................42
603 Mass. Code Regs. §28, paras. 802.4, 1000.0-.6 (1979) ....................43
7 C.F.R. §210.15....................40
Tenn. Comp. R. & Regs. 0520-01-04-.01(1).................... 41, 50
Tenn. Comp. R. & Regs. 0520-07-02-.02(3)(d)....................41
Tenn. Comp. R. & Regs. 0520-07-02-.03(4)(c)8(v)(I)....................41
Tenn. Comp. R. & Regs. 0520-14-01-.01....................50
Tenn. Comp. R. & Regs. 0520-14-01-.01(1)....................22
Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(a) ....................3
Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(b)....................18
Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(c) ....................18
Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(f)....................50
Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(f)1 ....................6
Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(g) ....................6
Tenn. Comp. R. & Regs. 0520-14-02-.01(3)....................22

**Other Authorities**

Biskupic, *Two Moms, a Baby and a Legal First for U.S. Gay Marriage*, Reuters (Apr. 9, 2014), perma.cc/4CEZ-V2HE....................9
Chapman & McConnell, *Agreeing to Disagree* (2023)....................36
Fanning, *Baltimore, Plenary Councils of*, *in* 2 *The Catholic Encyclopedia* 235 (1907) ....................45
Gabel, *Public Funds for Church and Private Schools* (1937) .................... 38, 45
Garrett, *Annual Report of the State Superintendent of Public Instruction for Tennessee* (1892).................... 38, 45
Jorgenson, *The State and the Non-Public School, 1825-1925* (1987) ....................38, 44, 45
Kaestle, *Pillars of the Republic: Common Schools and American Society, 1780-1860* (1983)....................45
*Plessy v. Ferguson at 125*, Harvard Law Today (May 2021), perma.cc/M5GWAH8G ....................9
*Rev. Oliver L. Brown*, Nat'l Parks Serv., perma.cc/CAA7-VE9B (archived Mar. 5, 2026) ....................9

Tenn. Op. Att'y Gen. 2025-19 .......... 28, 33

## INTRODUCTION

Now that the Court has four sets of summary-judgment motions, the parties agree on one thing: This case should be resolved before trial, as a matter of law. Though Defendants had the benefit of this Court's ruling on the motion to dismiss and Wilberforce's two motions for summary judgment (the most recent one was filed two days early), Defendants did not read those documents carefully. Defendants spend a mind-numbing amount of space debating whether Wilberforce, after KCBOE said its letter of intent was "incomplete" in 2025, could have submitted a charter-school application anyway. What's it matter? As this Court found, Wilberforce's application *certainly* would have been denied because existing law bans religious charter schools. Defendants all defend that law; KCBOE promises to enforce that law; and if by some miracle Wilberforce had been approved despite defying that law, the Coble intervenors would sue it. So futility is not a hard call. The only remaining question on standing is whether Wilberforce, once this Court enters relief, subjectively intends to apply. Of course it does. Though it didn't need to prepare *anything* given the futility of applying as a religious school, Wilberforce got itself poised to file as soon as it wins judicial relief by forming a nonprofit, recruiting a who's who of Knoxville to serve on its board, getting approved by the IRS as a legitimate 501(c)(3), and spending 1,280 hours and $140,000 drafting a timely and comprehensive 279-page application. The only interesting question on standing is why Defendants continue resisting it.

That leaves the merits, which only the intervenors resist. Wilberforce will not pretend their position lacks force; the same free-exercise question split the Supreme Court 4-4 in 2025. But that 4-4 split does mean that, contra the Carroll intervenors, Wilberforce's position is not somehow foreclosed by the Court's decision in *Carson v. Makin* in 2022. The merits turn on pure questions of law. And the best answers to those questions are Wilberforce's. Banning religious charter schools means banning private nonprofits from accessing a state program because of their faith—a facially discriminatory policy that cannot survive strict scrutiny. This Court should promptly enter summary judgment for Wilberforce and deny the other summary-judgment motions.

## ARGUMENT

By moving for summary judgment, all now agree that this case should be resolved as a matter of law on the undisputed facts. And it should be resolved in Wilberforce's favor. This Court has jurisdiction. Banning religious charter schools violates Wilberforce's free-exercise rights. And this Court should grant all appropriate relief, including nominal damages.

### I. The Court has jurisdiction over Wilberforce's remaining claim.

In resolving KCBOE's factual challenge at the motion-to-dismiss stage, this Court had "little difficulty" finding standing. MTD-Op. (Doc.88) 13, 17. All three sets of defendants now move for summary judgment—apparently hoping to prove that this Court was not just wrong, but so wrong that no one can even genuinely dispute its wrongness. In reality, discovery did not improve a single fact for Defendants, and their standing arguments ignore basic legal principles from the inability-to-compete cases (including this Court's last opinion). Their ripeness and finality arguments fail for similar reasons. Wilberforce admits, though, that its claim about opening a secular school is moot and should be dismissed without prejudice.

#### A. Standing

The "inability to compete on an equal footing" because of a ban on religious charter schools is an "'injury in fact.'" MTD-Op.8 (quoting *Trinity Lutheran Church v. Comer*, 582 U.S. 449, 463 (2017)). Wilberforce suffers that injury if, absent the discriminatory barrier, it has "a concrete intent to apply to become a charter school in the reasonably foreseeable future." MTD-Op.11. The barrier causes that injury, and that injury is redressed by declaring the barrier unconstitutional or enjoining its enforcement. MTD-Op.15-17.

As this Court already found, Wilberforce has "a concrete intent to apply to become a charter school in the reasonably foreseeable future." MTD-Op.11. It "has undertaken extensive 'preparations' to apply on a clear 'anticipated timeframe.'" MTD-Op.11. When this lawsuit was filed, Wilberforce was already incorporated under Tennessee law and had "appl[ied] for 501(c)(3) status." MTD-Op.12 (crediting this fact as proof of Wilberforce's "concrete intent"). Wilberforce then "took the initial step

in the application process … by submitting a letter of intent" before the November 2025 deadline. MTD-Op.11. It stopped after KCBOE told Wilberforce that charter schools and sponsors cannot be religious, MTD-Op.12—both on the mandatory form for letters of intent, *see* App.11-12, 482 n.1, 484 & n.3, and in KCBOE's post-submission communications with Wilberforce, *see* App.11-12, 402-05, 1534. Even still, Wilberforce went on to "spen[d] considerable time and resources, including engaging an outside consulting group" and "completing a 279-page application that was ready to submit before the February [2026] deadline." MTD-Op.11. Wilberforce still has that application, and the IRS has now approved its 501(c)(3) status. App.112-397, 411. Per the undisputed testimony and evidence in the record, Wilberforce sincerely intends to submit its application as quickly as possible once the bans on religious charter schools are removed, including in the upcoming 2026-27 cycle. MTD-Op.18; *see* App.13-14, 23, 31-32, 72-73, 86-87, 446-47.

As this Court also found, it is "clear" that Wilberforce's application "would" be denied because charter schools in Tennessee cannot be religious. MTD-Op.13-14 (citing Tenn. Code Ann. §49-13-111(a)(2)). Under Tennessee law, charter schools "shall" operate as "nonsectarian" and "nonreligious." Tenn. Code Ann. §49-13-111(a)(2). Hence why, in its charter agreements with Emerald Academy and Knoxville Prep, KCBOE made both schools agree to operate as "nonreligious" schools "pursuant to T.C.A. §49-13-111(a)(2)." App.1447, 1465, 1491. The mandatory application form for charter schools also "requires a sponsor to 'affirm' that it will operate as a 'nonsectarian, non-religious school,'" which "Wilberforce cannot" do. MTD-Op.4; *see* Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(a); App.12, 492, 1534, 1567, 1697. KCBOE maintained in discovery that it follows all state laws, including the ban on religious charter schools. *E.g.*, App.460, 465, 475; *see also* Doc.57 at 16; Doc.98 at 5; App.12, 416, 469, 496, 1552 & n.2. KCBOE will not, absent an order from this Court, ignore that ban as unconstitutional. App.460, 465, 475; MTD-Op.18. KCBOE even maintains that religious

charter schools are forbidden under the Establishment Clause, a position that would bar Wilberforce's Christian charter school even if state law did not. App.475, 1600, 1641, 1668.

Defendants do not even discuss the evidence in the last paragraph. They do not question this Court's findings on futility or Wilberforce's intent. And they don't dispute that Wilberforce completed its 279-page application before the February 2 deadline. App.109-397; *see* Coble-MSJ (Doc.115) 10; Carroll-MSJ (Doc.110) 8; KCBOE-MSJ (Doc.123) 16-17, 21. Nor do they dispute that KCBOE has repeatedly affirmed that it complies with the bans on religious charter schools. *E.g.*, App.416, 460, 469, 496, 1552 & n.2, 1563, 1567, 1600, 1641, 1668; *see* Coble-MSJ.17 (ignoring these statements); Carroll-MSJ.8 (same). KCBOE's summary-judgment brief *reaffirms* that it has no "discretion to approve Plaintiff's application." KCBOE-MSJ.21; *accord* KCBOE-MSJ.10 ("KCBE lacks discretion"); KCBOE-MSJ.14 ("KCBE has no discretion to use alternate forms," to "modify or change those forms," or "to create or use different standards"); Nixon-Dec. (Doc.108-1) ¶12 (similar). KCBOE also "adopts and incorporates" the Coble intervenors' "standing" arguments, KCBOE-MSJ.24, including the argument that Wilberforce's Christian beliefs are "discriminatory," Coble-MSJ.12-14. If KCBOE would deny Wilberforce's application as "discriminatory" because Wilberforce has traditional Christian beliefs on sex, gender, and other biblical truths, *see* Coble-MSJ.12-14, then KCBOE is admitting both that Wilberforce's application is futile for another religious reason and that it plans to violate Wilberforce's free-exercise rights another way, *see Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 634-39 (2018); *but cf.* KCBOE-Opp. (Doc.137) 6 (appearing to walk back its incorporation of this argument by the Coble intervenors). So Defendants' "attacks" on Wilberforce's "standing" still "fail." MTD-Op.17.

Outside of a single token acknowledgment, *see* Carroll-MSJ.7, Defendants make no effort to address the legal analysis or factual findings from this Court's earlier opinion. They instead raise a host of objections that are legally irrelevant, factually unsupported, or both. The Coble intervenors try to

poke holes in Wilberforce's draft application, ignoring that the odds of its approval are irrelevant because the mere inability to compete is an injury. Defendants also push back on futility, zooming in on a few interactions with KCBOE while ignoring their *own position* that state and federal law bans Wilberforce from opening a religious charter school. Defendants' arguments on causation simply rehash their mistaken arguments on futility, Coble-MSJ.23-24, KCBOE-MSJ.23-24, and their arguments on redressability simply rehash their mistaken arguments on the quality of Wilberforce's application, Coble-MSJ.24-25. Because KCBOE's enforcement of the religious charter ban inflicts the "injury" of unequal treatment, "[i]t follows that" KCBOE's enforcement "is the 'cause' of [Wilberforce's] injury and that a judicial decree directing [KCBOE] to discontinue its [enforcement] would 'redress' the injury." *Ne. Fla. Ch., AGCA v. Jacksonville*, 508 U.S. 656, 666 n.5 (1993); *accord* MTD-Op.15-17.

**1. Wilberforce has standing regardless of the odds its application is approved.**

Unable to attack Wilberforce's intent to apply, the intervenors spill much ink attacking Wilberforce's draft application. Coble-MSJ.21-23; Carroll-MSJ.8. But critiques of the *quality* of Wilberforce's application have nothing to do with Wilberforce's ability and readiness "to apply." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). And the intervenors' armchair criticisms are lacking anyway.

Wilberforce's intent to apply cannot be undermined by predictions that its application would be denied on some non-religious ground. Because Wilberforce is injured by the mere inability to compete, it "need not demonstrate that it ultimately would have received charter approval." MTD-Op.10 (citing *Ne. Fla.*, 508 U.S. at 666; *Trinity Lutheran*, 582 U.S. at 463). The "relevant inquiry is not whether Wilberforce could prove it ultimately would have been approved, only whether it had a concrete intent to apply but was deterred from doing so by an allegedly unconstitutional barrier." MTD-Op.7. Any supposed deficiencies in Wilberforce's draft application are "neither here nor there." *SFFA v. Naval Acad.*, 2024 WL 4057002, at *5 (D. Md. Sept. 5); *accord Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021). In inability-to-compete cases, courts "do not inquire into the plaintiff's qualifications (or lack thereof) when assessing standing." *Shea v. Kerry*, 796 F.3d 42, 50 (D.C. Cir. 2015). Even if KCBOE

would *certainly* reject Wilberforce's application on non-religious grounds, Wilberforce still has standing to try—to get relief that lets it "compete" outside of "a system that uses [religion] as a deciding factor." *Parents Involved v. Seattle*, 551 U.S. 701, 719 (2007); *accord Vitolo*, 999 F.3d at 359. And because Wilberforce's application would be futile, it didn't need to prepare an application *at all*—meaning it would be especially strange for standing to turn on criticisms of the application it did prepare. *See Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999); *Moore v. USDA*, 993 F.2d 1222, 1223 (5th Cir. 1993).

Regardless, KCBOE certainly would reject Wilberforce's application on discriminatory grounds; the application wouldn't even get to the point where it could be denied for nondiscriminatory reasons. A sponsor must submit a charter application on the State's form, which includes as a required section a "Statement of Assurances" that the proposed school will be "nonsectarian" and "non-religious." App.1693, 1697; *see* Tenn. Code Ann. §49-13-107(b)(18); Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(f)1; Nixon-Dec. ¶10. An application without a signed statement will be deemed not "complete" and will not be "review[ed]." Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(f); *see* Tenn. Code Ann. §49-13-107(b). "The decisional process begins only when a sponsor completes and submits all of its application materials"; KCBOE will not score or vote on an application it deems incomplete. Nixon-Dec. ¶¶10-11, ¶13; *see* Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(g). Since Wilberforce can't sign the statement of assurances, App.12, KCBOE would reject its application as incomplete without ever considering how Wilberforce scores on the nonreligious criteria. Theresa Nixon's empty statement that Wilberforce's application "would have gone through the same review process … that every public charter school application receives" does not suggest otherwise. Nixon-Dec. ¶32. KCBOE would deem *every* charter-school application incomplete that could not sign the required assurances.

Even if KCBOE reviewed Wilberforce's application, any argument that it would be rejected on non-religious grounds is unsupported speculation. Wilberforce's lengthy application, extensive

fundraising, and impressive leadership compare favorably to the two other charter schools that opened in Knox County. *Compare* App.112-397, *with* App.499-1445. If the intervenors disagree, their opinion doesn't matter because they are (no offense) random parents with no experience or authority over charter applications in Knox County. KCBOE has that authority, but it notably declines to submit any evidence or testimony suggesting it would deny Wilberforce's application on non-religious grounds. (That its lawyers, who likewise have no authority or expertise on charter-school approvals, adopt arguments from the intervenors doesn't count.) KCBOE made a binding admission in discovery that "KCBOE has never reviewed" or "evaluated" Wilberforce's application, and so KCBOE "cannot … deny" that its application "would … be approved." App.466; *see* Fed. R. Civ. P. 36(b).

The Coble intervenors try to rely on the scoring rubric used by KCBOE's staff and then speculate reasons why Wilberforce might get a low score. But the Coble intervenors don't have a clue how that scoring rubric is applied; assessing the strength of a proposed charter school and predicting the odds it would be approved at least requires expert testimony, which the Coble intervenors never supply. *See* App.83; *Pro. Massage Training Ctr. v. Accreditation All. of Career Schs. & Colleges*, 781 F.3d 161, 172 (4th Cir. 2015). Even if the Coble intervenors knew how Wilberforce's application might be scored by KCBOE's staff, the board members themselves are not "bound" by the scoring rubric or the staff's recommendation. Nixon-Dec. ¶13; App.83. In other words, the elected members of KCBOE have complete discretion to approve a charter-school application, no matter how deficient anyone (including KCBOE's own staff) might think it is. And none of the critiques the intervenors make, even if sound, go to "ability" to apply because none would make Wilberforce *legally ineligible* for the program.

Even if the Coble intervenors had identified a fatal nonreligious defect in Wilberforce's draft application, even that evidence would not prevent Wilberforce from getting approval, much less defeat its standing. Any defect could be fixed either before applications are due in February 2027, Tenn. Code Ann. §49-13-107(b), or in post-application negotiations and amendments with KCBOE, *see*

App.14, 493-94, 1508-09, 1533, 1538; Nixon-Dec. ¶13, or before the next application cycle. Holly Slater's Ivy Academy, for example, was rejected several times before it was later approved. App.2297. And absent the unconstitutional bans on religious charter schools, the state charter commission could overrule any adverse decision that KCBOE might make. Tenn. Code Ann. §49-13-108(b)(5).

On top of being irrelevant, the intervenors' criticisms of Wilberforce's draft application miss the mark on their own terms. Wilberforce didn't wait until "late November" to begin working on the application. *Cf.* Coble-MSJ.21; Carroll-MSJ.8. As soon as Wishart conceived of forming Wilberforce in August 2025, App.5, he got to work preparing a charter application. *Cf.* Coble-MSJ.21-22; Carroll-MSJ.8. Wishart first made contact with Wilberforce's consultant, Arcadia, on August 27. App.2016. From then until Wilberforce submitted its letter of intent on November 25, App.10, Wishart communicated extensively with Arcadia. App.2018-40. By November 15, the parties had hammered out a detailed outline of the application and a schedule for completing it by the deadline. App.2042-49. And whatever the timeline, Defendants cannot dispute that Wilberforce expended "Hercule[an]" effort and a six-figure sum to ensure it could apply as soon as it has a religiously equal opportunity. App.451. As Wilberforce's consultant explained, "on even a longer timeline," the "1,200 hours" spent on this application was "on the high end" for a charter application. App.446.

The date of Wilberforce's formation is unremarkable. *Cf.* Coble-MSJ.21-22. It is common to form a new entity when submitting a charter application. Emerald Academy incorporated the same day its letter of intent was due. App.625; Tenn. Code Ann. §49-13-107(a)-(b) (2013). Wilberforce incorporated four days before submitting its letter of intent. Coble-MSJ.21. It is likewise perfectly sensible that Wishart and the board anticipated litigation before Wilberforce was formed. Coble-MSJ.22, 24; KCBOE-MSJ.21. Given KCBOE's clear (and never disavowed) policies banning religious charter schools, as well as the fate of the school in the Oklahoma case, it was obvious that Wilberforce would need judicial relief. App.11-13, 23, 30-31, 72, 89. Standing doctrine would be self-defeating if every

entity that needs judicial relief were labeled "insincere" simply because they sought that relief. That Wilberforce has filed this suit and, at every step, sought expedited relief letting it apply and open as soon as possible confirms its sincerity. *See Gratz*, 539 U.S. at 261 n.14. Calling something a "test case" doesn't make it true or, even when true, make the victim of discrimination any less a victim. *Chelsey Nelson Photo. v. Louisville/Jefferson Cnty.*, 624 F. Supp. 3d 761, 780 & n.5 (W.D. Ky. 2022) (collecting cases); *cf.* Coble-MSJ.3, 21. Just ask Homer Plessy,[1] Oliver Brown,[2] or countless others.[3]

Bolstering Wilberforce's ability and readiness to apply is its leadership. Wishart is well-qualified to be the executive director of a religious charter school in Knox County. *Cf.* Coble-MSJ.8, 10, 21-22. He is an experienced principal who has devoted his career to education in this area in both Christian and traditional public schools. App.3-4. Wilberforce's board—themselves well experienced in operating schools and nonprofits, App.5-6, 20-21, 28-29—trusted him to take the steps necessary to open a charter school, including preparing an application and suing. App.7, 22-23, 30-31. Wishart has kept the board informed of his efforts throughout the process, App.15; and the board has met three times, App.399-400, 435-39, despite needing to meet only once per year under its bylaws, App.383. The board approves of the job that Wishart has done. App.15, 22-23, 30-31, 87-88. And when intervenors called Wishart's authority into question, the board reaffirmed that he had the authority for all the actions he has taken on Wilberforce's behalf. App.23, 31, 438-42.

Arcadia is an experienced and qualified consultant. *Cf.* Coble-MSJ.22. The "team" that helped draft Wilberforce's application has "deep experience in operating charter schools," including preparing

---

[1] Plessy was an "activist" and a "member" of a "civil-rights organization" that "meticulously planned" his arrest so he could bring a "test case" in federal court. *Plessy v. Ferguson at 125*, Harvard Law Today (May 2021), perma.cc/M5GWAH8G.

[2] Brown was "recruited by the NAACP" to sue on behalf of his daughter, Linda. *Rev. Oliver L. Brown*, Nat'l Parks Serv., perma.cc/CAA7-VE9B (archived Mar. 5, 2026).

[3] The same-sex couple from Knoxville in *Obergefell v. Hodges* were "approached" by a gay-rights advocacy group, which talked them into suing. Biskupic, *Two Moms, a Baby and a Legal First for U.S. Gay Marriage*, Reuters (Apr. 9, 2014), perma.cc/4CEZ-V2HE.

"charter applications." App.446. The thoroughness of Arcadia's work with Wilberforce also speaks for itself through many documents in the record, almost none of which the Coble intervenors introduce or discuss. *E.g.*, App.10, 446, 451-56, 2016-167. And though it's good practice to use a consultant, nothing required Wilberforce to use one—meaning any criticisms of Arcadia cannot be grounds to deny standing. *E.g.*, Slater-Dep. (Doc.127-1) 84 (noting that her charter school's elementary school drafted its application without using a consultant).

Wilberforce is prepared to provide special education and English language instruction. *Cf.* Coble-MSJ.11, 22-23. Wilberforce's executive director is a licensed special-education interventionist and has worked in special education in Knox County public schools. App.3. He is currently completing a special-education certificate at the University of Tennessee. App.3. And Governor Lee recently appointed Wishart to serve on his Advisory Council for the Education of Students with Disabilities. App.2176, 2893. In its first year, Wilberforce will have a director of specialized services who will provide special-education instruction and a halftime English language instructor. App.393, 2182. In years two through five, it will hire additional special-education instructors, a fulltime English instructor, a counselor, and a nurse. App.393. Emerald had the same first-year staffing plan for special populations, and it was approved by KCBOE. App.540-41, 696. And the anticipated "caseload" of Wilberforce's special-education director in its first year is comparable to that of a special-education teacher in Knox County public schools. App.2181.

Intervenors' criticism that Wilberforce (like Emerald, App.540-41, 696) has not budgeted for any special-education students requiring full-time "one-on-one instruction" reveals only their ignorance of sound education policy. Coble-MSJ.11. Wishart testified without contradiction that, according to "special education advocates," "best practices" are for "students" to "primarily be educated in the traditional classroom environment," with "intervention services" provided as a supplement. App.2181; *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 845 (1982) (Marshall, J., dissenting) ("special

education programs must be provided in the least restrictive environment possible"). For instance, Skillern Elementary—the charter school where one Carroll intervenor sends her kids—has no "special education classroom that is separate from the classes attended by typically developing students." App.2786.

Wilberforce is well prepared financially. *Cf.* Coble-MSJ.2, 12. It has a complete budget and budget narrative. App.326-43, 392-97. That budget "is intentionally conservative" so "the school remains fully viable" even if it achieves only "75% enrollment." App.162. Wilberforce has a firm $2.2 million commitment from the Colquitt Foundation to cover any gaps in operating expenses in Wilberforce's planning year or in the first two years of operations, with more donations to come. App.29-30, 96. Wilberforce's first-year projected operating margin of 2.0% is unexceptional. App.394; *cf.* Coble-MSJ.12. Emerald and Knoxville Prep had projected margins of 1.8%. App.694, 976.

Wilberforce has a standard lunch plan. *Cf.* Coble-MSJ.11. Like Emerald, Skillern, Knoxville Charter Academy (a charter that KCBOE approved but that never opened, App.2276), and Knox County public schools, Wilberforce plans to charge for lunch, while relying on federal assistance to provide free or discounted lunches to disadvantaged students. App.314, 690, 2256, 2514-15, 2860-61. Wilberforce's budget expects that the lunch program will be "revenue neutral," Wishart-Dep. (Doc.116-4) 199; App.394, just like Emerald's, App.703.

Contra the intervenors' suggestion, Coble-MSJ.11, Wilberforce need not offer transportation, Tenn. Code Ann. §49-13-114(a); App.1709. Since Wilberforce's proposed location in Cedar Bluff lies "at the intersection of major regional transportation corridors," Wilberforce plans not to provide daily transportation to the general student population "during its initial years of operation." App.303. Knoxville Charter did the same. App.2507. Wilberforce will provide free daily transportation to disabled students, App.306, and has budgeted $54,000 for this service in its first year, App.394; *cf.* App.2513 (Knoxville Charter budgeting only $13,680).

Wilberforce meets all property-related requirements. *Cf.* Coble-MSJ.22. A sponsor does not need a definite school location at the time it applies. Such a requirement would make no sense because a charter school couldn't obtain a loan or lease before it's been approved. *See* App.2179, 2182-83. A charter application instead need only "[d]escribe the progress to date of identifying and securing a facility." App.1709. A charter school generally need not have a facility until December 1 of the year before it opens, long after the February 1 application deadline. App.1732. And if an approved charter school is unable to find a site by that deadline, it can delay its opening for up to a year. Tenn. Code Ann. §49-13-110(b)(1). Neither Emerald nor Knoxville Charter had secured definite locations at the time they submitted their applications. App.512, 2509; *see also* Slater-Dep. (Doc.127-1) 89-91 (noting that Skillern had no permanent facility when it opened and instead rented space in a church).

Wilberforce has made good progress toward securing a school site. Wishart and board member Parker Bartholomew (a real-estate developer "with extensive experience managing education-related construction projects," App.6, 302) have made significant efforts to locate an appropriate property for the school, including personally visiting sites. App.6, 10-11, 57, 2074, 2169-74. Wilberforce's application identifies three viable locations for the school. App.301-02. Wishart never conceded at his deposition that these sites "faced unrealistic funding and logistical hurdles," which are the intervenors' words, not his. Coble-MSJ.22. And in addition to the sites listed on the draft application, Wishart identified several "underutilized public school buildings" that Wilberforce could use. App.55.

Wilberforce has evidence of community support, including engagement with its website and social-media page and relationships with local nonprofits like Thrive (a nonprofit that tutors at-risk students), Street Hope Knoxville, the YMCA, Boys and Girls Clubs, the Knox County Church Network, and others. App.163, 166-70, 360-61; *cf.* Coble-MSJ.11. Though the intervenors fault Wilberforce for not conducting a "survey of Knox County families," "focus groups," or "open meetings," and for not identifying more hard commitments to attend, Coble-MSJ.11, there's no requirement to

establish community support by those specific types of evidence. And the kinds of evidence that the intervenors demand are impractical while it is still *illegal* for Wilberforce to open. *See* App.12-13, 72. Once Wilberforce is no longer banned, its community support and parental interest will only increase.

The Coble intervenors go even further afield by criticizing Wilberforce's religious beliefs—the Bible is true, Jesus is the savior of humanity, sex is for marriage, marriage is between a man and a woman, and gender doesn't change—as "discriminatory." Coble-MSJ.12-13, 24. Those beliefs are traditional tenets of Christianity. Many Tennessee schools with similar beliefs already receive state funding through the Education Freedom Scholarship program. *See* Tenn. Code Ann. §49-6-3508(c); App.1770, 2248-51. While the ACLU and the Freedom from Religion Foundation are free to condemn Christianity as discriminatory, KCBOE is not. *See Masterpiece*, 584 U.S. at 634-39. Wilberforce is ready to comply with all nondiscrimination laws that validly apply to it, and to adjust its policies should its understanding of those laws ever prove incorrect. App.9. Wilberforce will not require any student to affirm Christian doctrine or engage in Christian worship. App.9. And Wilberforce will not refuse to teach students any scientific views on religious grounds. App.2184.

The Coble intervenors' accusation of racial discrimination is a low-grade smear. Coble-MSJ.13. Wilberforce's 501(c)(3) application did not answer Schedule B's questions on racial discrimination because the form instructed Wilberforce, as a school to be operated "predominantly from government funds," *not* to "complete" those questions. Doc.116-7 at 26. In the same application, Wilberforce submitted its policy prohibiting all "discriminat[ion] on the basis of race." Doc.116-7 at 66-67; *see* App.9-10. This nonprofit and would-be school are named in honor of William Wilberforce, the famous slavery abolitionist. App.487. While the Coble intervenors are free to object to a Christian charter school or even Christianity itself, baselessly implying *racism* goes beyond even zealous advocacy. The Coble intervenors should apologize for this one.

### 2. Wilberforce did not need to first submit a futile application.

Defendants spend a lot of mental energy debating whether Wilberforce could have literally applied during the 2025-26 application cycle. Wilberforce *did* try to apply in 2025-26, but it quickly got stopped by KCBOE's discriminatory policies and forms. MTD-Op.12. But regardless, Defendants' focus on 2025-26 has no relevance to Wilberforce's standing to seek prospective relief. "If [Wilberforce] had submitted [an] application and been rejected, [it] would still need to allege an intent to apply again in order to seek prospective relief." *Gratz*, 539 U.S. at 261. The question, in other words, is whether Wilberforce has "the intent" to apply in a future cycle after "'defendants cease the use of [religion],'" *id.*, a fact that Defendants nowhere contest. "If [Defendants] mean that because [Wilberforce] did not apply [in the past], [it] must never *really* have intended to do so, that conclusion directly conflicts with the finding of fact entered" by this Court, *id.*, as well as the mountain of evidence confirming Wilberforce's sincerity, preparations, and readiness to apply, *see* Part I.A.

Especially because Wilberforce's application would be futile, it needs "no evidence that [it] had applied and been rejected" before anyway. *Gratz*, 539 U.S. at 261. Defendants seem focused on whether Wilberforce's application could have been *denied* on grounds other than religion. But the question is whether its application could have been *approved*, *Sporhase v. Nebraska*, 458 U.S. 941, 945 n.2 (1982)—something no defendant suggests, given the bans on religious charter schools that they're either defending (intervenors) or refusing to disavow (KCBOE). Nondiscrimination requires equal "opportunities, not merely that [any] applications … be processed." *Mitchell v. Mid-Continent Spring Co. of Ky.*, 583 F.2d 275, 281 (6th Cir. 1978).

The Coble intervenors misstate the standard for proving futility in other ways too. In a preenforcement challenge to a statute on First Amendment grounds, a plaintiff need only show "a credible threat of enforcement," *SBA List v. Driehaus*, 573 U.S. 149, 159 (2014); *Holston United Methodist Home for Children v. Becerra*, 2022 WL 17084226, at *6 (E.D. Tenn. Nov. 18)—not certain enforcement, *cf.* Coble-MSJ.16. The intervenors' purported "certainty" standard comes from a decades-old out-of-

circuit case addressing "the final decision requirement for takings claims," not Article III standing for First Amendment claims. *Gilbert v. City of Cambridge*, 932 F.2d 51, 60 (1st Cir. 1991); *see Grand v. Univ. Heights*, 159 F.4th 507, 511 (6th Cir. 2025) (the "'finality' requirement" is limited to "the land-use context"); MTD-Opp. (Doc.70) 12 (making the same point when KCBOE raised the same argument in its motion to dismiss). That said, the issue is academic. Given KCBOE's repeated affirmations that it follows state law prohibiting religious charter schools, futility is certain here.

The evidence of futility is not limited to the specific interactions that Wilberforce had with KCBOE after it submitted a letter of intent. *Cf.* Coble-MSJ.10 n.3, 17; Carroll-MSJ.8; KCBOE-MSJ.20-22. Futility stems foremost from state law, which requires charter schools to be "nonsectarian" and "nonreligious." Tenn. Code Ann. §49-13-111(a)(2). KCBOE's official policies—including Policy I-450, its charter-school handbook, and its charter-school performance framework—all affirm that charter schools cannot be religious and that sponsors must use the mandatory application form that requires sponsors to affirm that their school will be nonreligious. App.1552 & n.2, 1563, 1567, 1600, 1641, 1668. Public statements made by KCBOE's chair during this litigation also affirm that KCBOE enforces Tennessee's religious charter ban. App.416, 469, 496; App.1677 at 38:36-56 (video). And KCBOE's discovery responses and court filings in this case affirm that KCBOE enforces the ban. App.460, 465, 475; Doc.57 at 16; Doc.98 at 5; KCBOE-MSJ.10, 14, 21; Nixon-Dec. ¶12; *cf. Fischer v. Thomas*, 52 F.4th 303, 309 (6th Cir. 2022) (mere "refus[al] to disavow enforcement" in litigation establishes "credible threat"). This undisputed evidence alone is overwhelming proof of futility, yet no Defendants seem to want to talk about any of it.

*Intervenors* especially cannot argue that Wilberforce could apply and open its doors, since it's their position that Wilberforce's religious charter school would violate not only the charter-school statute but also the state and federal Establishment Clauses. *See* App.1995-98; Doc.22 at 13. So even if Wilberforce could be approved, the intervenors and related groups would sue Wilberforce, KCBOE,

the State, or all three. When a Catholic charter school was briefly approved in Oklahoma, the same groups backing these intervenors sued the school and the approving authority. App.422-24; Doc.10 ¶49; Doc.28 ¶49. And suing Wilberforce would be easy, according to the intervenors, because anyone who pays sales tax in Knox County has standing. Doc.22 at 13. Wilberforce could not meaningfully enroll families, hire staff, secure loans, erect facilities, or responsibly open a charter school with that threat of enterprise-ending litigation hanging over its head. App.13.

Wilberforce's executive director never testified that the five interactions the Coble intervenors discuss are the "full universe" of the evidence on futility. Coble-MSJ.10 n.3. The intervenors leave out that Wishart mainly testified that the application is futile because, "under Tennessee law," Wilberforce cannot "open a Christian charter school in Knox County." App.72. And they omit his testimony that, without judicial relief, Wilberforce would "get sued" if it "opened a religious charter school," and that "the threat of that lawsuit" would make it "hard to raise money for the school" and attract "families." App.72. In the testimony the intervenors cite, Wishart was asked what KCBOE had "told you," Wishart-Dep. (Doc.116-4) 117, not the full universe of futility evidence, which includes *the statute* banning religious charter schools, KCBOE's many policies, and several statements not directed to Wilberforce specifically, *see Lac Vieux*, 172 F.3d at 401-02, 406 (finding futility based on city ordinances and announcements to the public at large). And in any event, several of the statements by KCBOE that establish futility postdate Wishart's deposition. *See* App.35, 464, 472, 475, 1552 & n.2; Doc.98 at 5; KCBOE-MSJ.10, 14, 21; Nixon-Dec. ¶12.

Though Wilberforce doesn't need to rely on them, its specific interactions with KCBOE also prove futility. *Cf.* Coble-MSJ.17. All five pieces of evidence that the Coble intervenors dwell on bolster Wilberforce's intent to apply and the futility of applying now.

*First*, the direct statement from KCBOE board member Steve Triplett to Wishart that approval was "impossible" is an admissible opposing party statement, not hearsay. *Cf.* Coble-MSJ.17-18. As a

board member, Triplett is an "agent or employee" of KCBOE, and the board's policies on religious charter schools lie "within the scope of that relationship." Fed. R. Evid. 801(d)(2)(D). Even without "personal involvement" in votes on Wilberforce specifically, his general "oversight" of KCBOE's policies on religion makes his statements attributable to KCBOE and admissible. *Carter v. Univ. of Toledo*, 349 F.3d 269, 276 (6th Cir. 2003).

*Second*, the required letter-of-intent form communicated that Wilberforce could not sponsor a charter school. *Cf.* Coble-MSJ.18-19. The form stated that an entity qualifies as a "Sponsor" only if it "does not promote the agenda of any religious denomination or religiously affiliated entity." App.482 n.1 (citing Tenn. Code Ann. §49-13-104 (2024)). It asserted that "Tennessee law limits who may sponsor a charter school and prescribes the type of entity that may operate a charter school," citing "T.C.A. §§49-13-101 through 145," App.484 & n.3, a range that includes the ban on religious charter schools, §49-13-111(a)(2), and the then-existent ban on religious sponsors, §49-13-104 (2024). The mandatory form also required applicants to affirm they are an eligible "sponsor" that is not a "private, religious, or church school." App.484. To avoid affirming it was a "sponsor" within the form's discriminatory definition, Wilberforce left the eligibility box unchecked and specified that it met only Tennessee's nondiscriminatory criteria. App.484.

Contra intervenors, Wishart's testimony does not alter what the letter-of-intent form says or requires. *Cf.* Coble-MSJ.18-19. When intervenors asked Wishart whether "Wilberforce could have checked th[e] box," he testified, "I'm not an attorney. I'm not sure." Wishart-Dep. (Doc.116-4) 70. Even if Wishart's testimony mattered, this Court should sustain Wilberforce's objection to the question because the intervenors were asking Wishart how to comply with a state form and the meaning of the state statute that the form references—plainly a "legal conclusion." Wishart-Dep.69-70. Both the letter-of-intent form and Tennessee law speak for themselves.

*Third*, KCBOE's emails in response to Wilberforce's letter of intent reinforced the futility. *Cf.* Coble-MSJ.19. KCBOE's first email responded that Wilberforce's letter was "incomplete" and that KCBOE could "accept a completed letter until December 3." App.402. A sponsor must submit a "completed" letter of intent before it can submit an application. Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(b); *see* Tenn. Code Ann. §49-13-107(a). By deeming Wilberforce's letter "incomplete" and giving Wilberforce a deadline to "indicate eligibility as a sponsor," the email communicated that Wilberforce could not apply unless it completed the letter and thus affirmed that it complies with Tennessee's discriminatory standards (which it could not). App.402. The email also "declined to disavow" the religious sponsor ban after Wilberforce admitted that the school could not comply with it, giving rise to a "credible threat" of enforcement. *303 Creative v. Elenis*, 600 U.S. 570, 583 (2023); *accord Fischer*, 52 F.4th at 309.

KCBOE's second email is even worse. It states that Wilberforce refused "to correct th[e] error" in its letter of intent and thus never submitted "a completed" letter. App.404. While the email also said, "we recognize you are proceeding with the process … based on your original Letter of Intent," App.404, KCBOE never disavowed that it would reject Wilberforce's application for failure to submit a completed letter of intent, *see* Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(b)-(c). Even if KCBOE had communicated that it would credit the letter of intent, its second email affirmed that a "charter sponsor should comply with T.C.A. §49-13-104(16)," the very provision that then banned religious sponsors. App.404. The email thus expressly communicated that KCBOE would not approve a religious charter school. Defendants completely ignore this part of the email. *See* Coble-MSJ.19; KCBOE-MSJ.20-21.

*Fourth*, Nixon's statements at the technical assistance workshop, which postdate the email exchange above, themselves prove futility. Wishart was the only attendee at the workshop. App.47; *see* App.1513 (video). Nixon told Wishart directly that a charter school "can't be run by a church or other

religious organization" and that applicants must "use the State Board of Education application," App.1513 at 17:09-14, 23:34-40 (video); App.1534, which Wilberforce cannot do without disclaiming its school's religious character, App.12. Nixon was both "authorized to make [these] statement[s]" and speaking "within the scope" of her employment. Fed. R. Evid. 801(d)(2)(C)-(D). Nixon is KCBOE's Executive Director for Academic Supports. Nixon-Dec. ¶3. She "manage[s]" KCBOE's "Charter school program" and "chair[s]" KCBOE's "Charter School Application Review Committee." ¶3. She "has knowledge regarding the charter school application process" and "approval process." App.2261. And KCBOE has repeatedly relied on her alone to testify about its charter policies. App.476; Doc.19-1; Doc.57-1; Doc.92 at 1; Doc.108-1; Doc.108-3 at 3. At the workshop, she spoke on KCBOE's behalf. KCBOE's charter-school application protocol also states that the "workshop" is given "by KCS" itself. App.2266. Nixon later sent Wishart the workshop video and slides from the official "Chartering Authority" email account, not her individual account. App.2277.

Nixon doesn't need ultimate authority over KCBOE's charter-application policies to know what those policies are or to communicate them on KCBOE's behalf. *Cf.* KCBOE-MSJ.9; Coble-MSJ.20. The "critical" point is that Nixon "ha[d] the actual or implied authority to make such a statement on behalf of [her] employer." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999). If a store's official sign poster puts up a "white applicants only" sign, that's conclusive evidence of futility for nonwhite applicants, even if the sign poster doesn't decide what the policy is. The same goes for Nixon's official statements.

*Fifth*, KCBOE's meeting on February 2, 2026, further reinforces the futility. *Cf.* Coble-MSJ.20. At the meeting, KCBOE's chair reiterated that "we do follow" the "state law" prohibiting religious charter schools. App.1677 at 38:36-56 (video); App.469. KCBOE voted down a resolution that would have asked the State to consider granting Wilberforce a waiver. App.1681. And KCBOE's law director opined that the "civil rights" exception in Tenn. Code Ann. §49-13-111(p)(1) prohibits KCBOE from

granting Wilberforce a waiver. App.1677 at 31:17-31 (video). KCBOE never disavows that view in its summary-judgment motion. *See* KCBOE-MSJ.6.

The preliminary approval of Union Academy in Madison County says nothing about the futility of Wilberforce's application in Knox County. Doc.116-6 at 3; *cf.* Coble-MSJ.21. KCBOE is not bound by the decisions of Madison County, and Madison County's stance toward religious charter schools could not be more different from KCBOE's. The Madison County board chair "pitched th[e] idea" of opening a religious charter school to "the president of Union University" (a Baptist college), who was "very shocked" (in an "excited" way) by the idea. App.2220 at 58:12-45 (video); *see also id.* at 47:40-56 (Union was "handpicked" by the board chair and did not apply of its own "initiative"). KCBOE, in contrast, has repeatedly made clear that it follows the state law and its own policies banning religious charter schools, including in statements made after Union Academy was approved on April 28, 2026. App.2220 at 1:00 (video); *see* App.464, 475, 1552 & n.2; Doc.98 at 5; KCBOE-MSJ.10, 14, 21; Nixon-Dec. ¶12. In particular, Madison County approved Union Academy by waiving the statutory requirement that charter schools be nonsectarian and nonreligious, App.2293-94, but KCBOE has stated multiple times that it cannot grant Wilberforce a waiver, *infra* Part I.B. This Court has also ruled that Wilberforce has the right to seek relief outside the waiver process. MTD-Op.12.

Union Academy was approved, moreover, only after the February 2026 application deadline; Wishart did not know about its application or approval at that time, *see* App.2893. And as of today, there is still no signed charter agreement between Madison County and Union University. Without such an agreement, Union Academy has not yet been fully approved, and it is impossible to know whether and to what extent Madison County has agreed to let the school have a religious character. *See* Tenn. Code Ann. §49-13-110(a); Nixon-Dec. ¶18. It is also a certainty that, upon any approval, Union Academy, Madison County, the State of Tennessee, or all three, would be sued under the state and federal Establishment Clauses for operating, approving, or funding this religious charter school.

App.2293, 2894. Perhaps an established university whose charter school is backed by the county could operate under those conditions, but Wilberforce doesn't lack standing for not being similarly situated.

### B. Finality and ripeness

Wilberforce doesn't need to apply and be rejected to have standing. *Cf.* KCBOE-MSJ.22-23; Coble-MSJ.17-19. Wilberforce need only be "'able and ready' to apply" once it receives adequate judicial relief. *Gratz*, 539 U.S. at 262; *see Carson v. Makin*, 596 U.S. 767, 776 (2022). The "conceptually distinct" finality requirement that Defendants invoke, KCBOE-MSJ.22, applies only to "land use disputes," *Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 615 (6th Cir. 2008). It rests on the unique "discretion characteristically possessed by land-use boards." *Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001); *see* MTD-Opp.12-13 (addressing this argument when KCBOE raised it previously). And even though Sixth Circuit precedent already limits the finality requirement to the "land-use context," *Grand*, 159 F.4th at 511, the Supreme Court is now reviewing whether even that's too broad, 2026 WL 1871301 (U.S. June 30).

Even if it applied here, Wilberforce would meet the finality requirement. That "modest" requirement is met when "there is no question about how the regulations at issue apply to the particular land in question," even if the plaintiff has not "exhaust[ed] state remedies." *Pakdel v. S.F.*, 594 U.S. 474, 478-79 (2021) (cleaned up). And here there's no question that Wilberforce's proposed Christian charter school would be denied as "[s]ectarian" and "[r]eligious." Tenn. Code Ann. §49-13-111(a)(2).

It is no answer to say that Wilberforce could seek a "waiver" from the statutory ban on religious charter schools. *Cf.* Tenn. Code Ann. §49-13-111(p); KCBOE-MSJ.23; Coble-MSJ.24. As this Court ruled before, imposing an extra "waiver" requirement on religious entities because they are religious remains discriminatory. MTD-Op.12. And besides, a waiver would not stop KCBOE from denying Wilberforce's application (or the intervenors from suing Wilberforce) under the Establishment Clause. *See* App.475, 1600, 1995-98. KCBOE also admits it would deny any such waiver. App.465, 468-69; Doc.19 at 9; Doc.57 at 6, 16; *see also* App.1681 (rejecting resolution to request waiver

on Wilberforce's behalf). KCBOE would have no choice: Under the charter-school statute, no official can "waive regulatory or statutory requirements related to … [f]ederal and state civil rights," Tenn. Code Ann. §49-13-111(p)(1), including the ban on religious charter schools, *see* §49-6-8002(a)(3); App.1600, 1680; App.1677 at 31:17-31 (video). And no official can waive the "requirements in the charter school statute," Tenn. Comp. R. & Regs. 0520-14-02-.01(3), including the ban on religious charter schools, Tenn. Code Ann. §49-13-111(a)(2).

Wilberforce's claim is also ripe. *Cf.* Coble-MSJ.25. Where a plaintiff establishes standing in a preenforcement First Amendment challenge, no "additional ripeness analysis" is warranted. *Christian Healthcare Ctrs. v. Nessel*, 117 F.4th 826, 841 n.2 (6th Cir. 2024). But Wilberforce's claim would satisfy any ripeness inquiry: It presents a substantial controversy, it is "purely legal," and "denying prompt judicial review would impose a substantial hardship on" Wilberforce. *SBA List*, 573 U.S. at 167-68.

The possibility of appeal to the state charter commission has no effect on jurisdiction. *Cf.* Coble-MSJ.25; KCBOE-MSJ.23. Unequal treatment by KCBOE is a completed religious-discrimination injury, *Ne. Fla.*, 508 U.S. at 666; and forcing only a *religious* charter school to appeal proves that Wilberforce cannot compete equally now, MTD-Op.12. Regardless, Wilberforce cannot appeal to the commission. Appeal to the commission is available only after KCBOE reviews an application on the merits, KCBOE denies it, the sponsor submits an amended application, and KCBOE denies the amended application. *See* Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(f)-(m); Nixon-Dec. ¶¶13-16. But KCBOE would reject Wilberforce's application as incomplete for failing to affirm that it is nonreligious, and no appeal is available after an application is deemed incomplete. *See* Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(f); Nixon-Dec. ¶10. Even if Wilberforce could appeal, that appeal would be futile. The state commission is equally subject to the statute banning religious charter schools, Tenn. Code Ann. §49-13-111(a)(2), and the statute disallowing waivers of that ban, §49-13-111(p)(1). And that commission has its own policies banning religious charter schools. App.1857, 1896.

### C. Mootness

In May 2026, Tennessee repealed its ban on religious entities sponsoring a charter school. Pub. Ch. 1128, §1, 114th Gen. Assembly. If courts hold that Wilberforce cannot carry out its strong first preference of opening a Christian charter school, then no law appears to block Wilberforce from pursuing its second preference of sponsoring a secular charter school. *See* App.475. Though Wilberforce would still need judicial relief if it thought that secular school would get sued, the Coble intervenors conceded in discovery that the Establishment Clause does not bar a religious entity from opening a secular charter school. App.1999. The Carroll intervenors suggested they disagree, *see* App.2280-81, but their theory was never fleshed out; and they appear to have abandoned it, since they now agree that this part of the case is "moot," Carroll-MSJ.9. Their opinions are also irrelevant, since these parents are not Knox County taxpayers and thus would lack even municipal-taxpayer standing to sue Wilberforce under the Establishment Clause, App.1919. Wilberforce thus agrees that its challenge to the religious *sponsor* ban has been mooted by the Tennessee legislature. Moot claims are dismissed only "without prejudice." *Ernst v. Rising*, 427 F.3d 351, 367 (6th Cir. 2005) (en banc); *accord* Carroll-MSJ.8-9; KCBOE-MSJ.15-17.

No defendant argues that Wilberforce's main claim—its free-exercise right to open a religious charter school—is moot. Nor could they, since the Tennessee legislature just amended the charter-school statute but left the ban on religious charter schools in place.

## II. Banning religious charter schools is unconstitutional.

The Free Exercise Clause forbids excluding religious entities from the charter program. Wilberforce is a private religious entity. And even if charter schools were part of the government, Wilberforce would still have the right to be free from discrimination. The contrary arguments from the Carroll intervenors—the only defendants that moved for summary judgment on the merits—fail.

### A. Banning religious charter schools violates the Free Exercise Clause.

The bans on religious charter schools in Tennessee trigger strict scrutiny. Any government program that "bar[s] religious schools from public benefits solely because of [their] religious character"

is subject to "strict scrutiny." *Carson*, 596 U.S. at 779; *accord Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 487 (2020); *Trinity Lutheran*, 582 U.S. at 463. Tennessee's charter program expressly discriminates against religious schools. The program creates a benefit for qualifying nonprofits: charter agreements with the local school board, which come with guaranteed access to "public funds." *Carson*, 596 U.S. at 780; *see* Tenn. Code Ann. §49-13-112. Yet the program excludes "[r]eligious" and "[s]ectarian" schools. §49-13-111(a)(2). That facial discrimination against religion triggers strict scrutiny. *See Carson*, 596 U.S. at 775, 780 (applying strict scrutiny to prohibition on aid to "sectarian" schools).

The Carroll intervenors deny that participation in Tennessee's charter program is a public benefit, Carroll-MSJ.22-25, but their reading of the precedent is too narrow. In *Fulton v. Philadelphia*, the public benefit was a contract to help administer Philadelphia's foster-care program. 593 U.S. 522, 532-33 (2021). Putting Wilberforce to "the choice of for[g]oing a contract" or abandoning its religious exercise likewise triggers the Free Exercise Clause. *Dahl v. W. Mich. Univ.*, 15 F.4th 728, 731 (6th Cir. 2021). The Supreme Court long ago rejected the intervenors' premise that some "sovereign func-tion[s]" lie beyond the reach of the Free Exercise Clause. Carroll-MSJ.23; *see Sherbert v. Verner*, 374 U.S. 398, 404 (1963). The Clause broadly "protects against 'indirect coercion or penalties.'" *Carson*, 596 U.S. at 778. So denying *any* "rights, benefits, [or] privileges" on religious grounds triggers strict scru-tiny. *Lyng v. NICPA*, 485 U.S. 439, 449 (1988). Otherwise States could prevent Jewish organizations, and only Jewish organizations, from sponsoring charter schools without even implicating the Free Exercise Clause. *Contra Wieman v. Updegraff*, 344 U.S. 183, 191-92 (1952). Tennessee law agrees that participating in the charter program is a desirable benefit by giving private sponsors procedural pro-tections and appeal rights. Tenn. Code Ann. §§49-13-108(b), -122(e)-(h).

Banning religious charter schools cannot survive strict scrutiny. By not briefing the merits at all, KCBOE makes no effort to satisfy the government's "burden" under strict scrutiny, which alone dooms the ban. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Even if the parent intervenors can carry that

burden for the government, they make no effort to carry it either. *See* Carroll-MSJ.9, 22-23. Nor could they. To survive, the ban must be "the least restrictive means of achieving some compelling state interest." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981). No compelling interest supports the ban, as the ban is not necessary to comply with the Establishment Clause and the ban also is not narrowly tailored to any antiestablishment interest the intervenors might assert. Pltf.-MSJ.16. And given the long history of government support for religious schools, the ban cannot be squared with the original meaning of the First and Fourteenth Amendments. Pltf.-MSJ.16-17; *see Espinoza*, 591 U.S. at 481.

**B. Wilberforce is a private entity entitled to full constitutional protection.**

The Carroll intervenors claim that Wilberforce cannot invoke the Free Exercise Clause because, if approved to operate a charter school, this nonprofit will *become* part of the government. Carroll-MSJ.9-22. But Wilberforce is a private nonprofit and will remain so if approved to operate a charter school. It is entitled to the protections of the Free Exercise Clause.

As a private nonprofit corporation, Wilberforce has rights under the First and Fourteenth Amendments. "First Amendment protection extends to corporations," *Citizens United v. FEC*, 558 U.S. 310, 342 (2010), including the protection of the Free Exercise Clause, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705-06 (2014). Corporations are also "persons within the meaning of the Fourteenth Amendment," entitling them to First Amendment protection against the States. *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 780 & n.15 (1978). Indeed, the First Amendment extends special protection to the rights of "religious institutions," including "schools." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746, 755-56 (2020). Wilberforce thus has the right to apply for government benefits without religious discrimination, just like Trinity Lutheran Church did, which was also a nonprofit corporation. *Trinity Lutheran*, 582 U.S. at 449, 467.

Wilberforce is not part of the government. A corporation is presumptively "a separate legal person from the State." *Galette v. N.J. Transit Corp.*, 607 U.S. 509, 520 (2026); *see Dartmouth Coll. v. Woodward*, 17 U.S. 518, 636-37 (1819) (corporations are not "part of the civil government"). To

overcome this presumption, the Carroll intervenors contend that Wilberforce is a government entity under *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995); that operating a charter school qualifies as state action; and that Wilberforce is a government entity under an *ad hoc*, school-specific test that the intervenors made up. Each argument misses the mark.

### 1. Wilberforce is a private entity under *Lebron*.

For "purposes of the First Amendment," a "corporation is part of the Government" when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors." *Id.* at 400; *see also Biden v. Nebraska*, 600 U.S. 477, 491 (2023); *Dep't of Transp. v. AAR*, 575 U.S. 43, 53 (2015). If any one of these features is absent, the corporation is private. *See S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 543 (1987); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 152 (1974); *Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 168 (6th Cir. 2014); *Commodities Exp. Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 529 (6th Cir. 2012); *Hack v. Yale Coll.*, 237 F.3d 81, 83-84 (2d Cir. 2000). All three are absent here. The relevant entity is Wilberforce, which is indisputably private. Even if charter schools were the relevant entity, they do not satisfy any of the *Lebron* elements, much less all three. Intervenors' other arguments, like the government's limited power to revoke a charter agreement and the statutory designation of charter schools as "public," are irrelevant.

***Wilberforce is a private nonprofit.*** Wilberforce is as far from a government entity as a corporation can get. The Tennessee legislature did not incorporate Wilberforce "by a special statute." *Lebron*, 513 U.S. at 397. Wilberforce incorporated under Tennessee's general incorporation statute for nonprofits, App.373 (citing Tenn. Code Ann. §48-52-102), no different from the ACLU of Tennessee, App.1911. Wilberforce was formed to pursue "charitable," including "religious," purposes, App.373, not to pursue "governmental objectives," *Lebron*, 513 U.S. at 400. And the State has no authority to appoint its directors. Wilberforce's private incorporator selected its initial board, and the board is

responsible for selecting members going forward, App.373-74, including the future fifth board member (a parent of a child who chooses to attend Wilberforce), Tenn. Code Ann. §49-13-109(a)(1).

None of these features will change if Wilberforce becomes the operator of a charter school. When a state or county board approves a charter application, it does not issue new articles of incorporation, amend the articles to have different purposes, or assert the power to name the sponsor's board. It simply enters a contract with the sponsor authorizing the establishment of a charter school. §49-13-110(a). Far from altering a sponsor's corporate structure, a charter agreement *enshrines* its existing form. Sponsors must include their "Articles of Incorporation" in their application. App.1693; *see also* Tenn. Code Ann. §49-13-107(b)(7). Charter agreements must incorporate those materials. §49-13-110(a). And so the sponsor's existing corporate structure becomes part of the charter agreement. *See, e.g.*, App.622-24, 627-28, 1455; App.896-98, 1314-15, 1319, 1500.

The intervenors don't contest that Wilberforce the nonprofit is a private entity. They instead claim that a *charter school* is a state entity even if its *sponsor* is not. Carroll-MSJ.15-16. But when determining whether an entity has First Amendment rights, the corporation is the proper "legal uni[t]" of analysis. *See USAID v. AOSI*, 591 U.S. 430, 435 (2020) (foreign affiliates of U.S. nonprofits are "distinct" from the U.S. entities for First Amendment purposes because they are "separately incorporated"). Since corporations are legal "persons" under the Constitution, their rights either attach or do not attach to the corporation as a whole. *Bellotti*, 435 U.S. at 780 n.15. Courts cannot gerrymander their legal status as they see fit to strip away constitutional rights. *AOSI*, 591 U.S. at 435. Courts instead ask whether "the *corporation*" at issue "is part of the Government for purposes of the First Amendment." *Lebron*, 513 U.S. at 400 (emphasis added); *see Mik*, 743 F.3d at 168 ("*Lebron* … established a framework for determining when a government-sponsored corporation is a government actor").

Here, intervenors make no attempt to argue that charter schools are distinct, separately incorporated entities from their sponsors. *See* Carroll-MSJ.15-16. Nor could they. In Tennessee, a charter

"school has no existence apart from the sponsor." Tenn. Op. Att'y Gen. 2025-19 at 10; *see* Pltf.-MSJ.18-19. For purposes of the First Amendment, the relevant entity is Wilberforce, not the school it intends to form. And Wilberforce is plainly, purely private.

***Charter schools are private.*** Even if the charter school were the relevant entity, it still would be private. *See* Tenn. Op. Att'y Gen. 2025-19 at 10-12. The Carroll intervenors still could not show that Tennessee charter schools satisfy *any* element of the *Lebron* test, much less all three.

*First*, the government does not unilaterally "creat[e]" charter schools. *Lebron*, 513 U.S. at 400; *cf.* Carroll-MSJ.16. A charter school is authorized only when the private "sponsor" and a government body *together* sign a "charter agreement." Tenn. Code Ann. §49-13-110(a). After the authorization, the private "sponsor," not the government, "establish[es]" the school, Tenn. Code Ann. §49-13-106(i), and is responsible for taking the concrete steps necessary to get the school up and running, including obtaining a facility, establishing an admissions procedure, and hiring staff, App.1730; *see* App.1732-53.

*Second*, the government does not have "permanent authority to appoint a majority of the directors." *Lebron*, 513 U.S. at 400; *cf.* Carroll-MSJ.16-19. The private sponsor serves as the charter school's "[g]overning body," which "operate[s]" the school "by deciding matters" like "budgeting, curriculum and other operating procedures for the public charter school" and "by overseeing management and administration of" the "charter school." Tenn. Code Ann. §49-13-104(10); *see also* §49-13-111(a)(1). And the sponsor continues to select its own board members after entering into a charter agreement. *See, e.g.*, App.628, 1455 (Emerald Academy); App.1319, 1500 (Knoxville Prep).

The requirement that the board include a "parent representative whose child is currently enrolled" at the school doesn't change this reality. Tenn. Code Ann. §49-13-109(a)(1); *cf.* Carroll-MSJ.19. The parent representative is still "appointed by the governing body," not the government. Tenn. Code Ann. §49-13-109(a)(1). Federal or state law can impose qualifications for privately selected board members without transforming them into the government. *See, e.g.*, 12 U.S.C. §1452(a)(2)(A) (requiring

Freddie Mac to have at least one board member from "the homebuilding industry," "the mortgage lending industry," and "the real estate industry"); Tenn. Code Ann. §45-4-201(a) (requiring directors of a credit union to be "members of the credit union"); §45-2-401(a)(4) (requiring directors of a state-charted bank to live in state or within 100 miles of a bank branch). And regardless, a single representative on a board of five, *see* App.5, is not a "majority of the directors." *Lebron*, 513 U.S. at 400; *see, e.g.*, *id.* at 390-91, 397 (3 of 15 directors insufficient); *Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 75 F.3d 1401, 1407 (9th Cir. 1996) (5 of 18 directors insufficient); *Mik*, 743 F.3d at 168 (same); *Northrip v. Fed. Nat. Mortg. Ass'n*, 527 F.2d 23, 30, 32 (6th Cir. 1975) (5 of 15 directors insufficient).

Unable to establish government appointment authority, the Carroll intervenors instead invoke a host of irrelevant legal requirements that Tennessee law imposes on charter schools and the consequences for violating them. Carroll-MSJ.16-19. But even "extensive regulation by the government does not transform the actions of the regulated entity into those of the government." *S.F. Arts*, 483 U.S. at 544. "Control" under *Lebron* means "voting control." 513 U.S. at 391; *see also S.F. Arts*, 483 U.S. at 545 n.27 (defining "control" for government-entity purposes as the power to make a corporation's governing board "vote a certain way"). *Lebron*'s control element is met only when the government "retains for itself permanent authority to appoint a majority of the directors." 513 U.S. at 400. Only when an entity is "run by [governmental] appointees" can it be said to be "no different from … regulatory agencies such as the [FCC] or the [SEC]." *Id.* at 398.

Consider examples from the caselaw. The U.S. Olympic Committee was incorporated by a special statute and subject to "extensive regulation." *S.F. Arts*, 483 U.S. at 543-45. But the government did not have voting control of the Committee, *id.* at 545 n.27, so it was a "private" entity, *id.* at 544. Freddie Mac also "is not a government actor" "[u]nder the *Lebron* framework," even though it is incorporated by a special statute and heavily regulated. *Mik*, 743 F.3d at 168 & n.13. The key was that "the government does not control the operation of Freddie Mac through its appointees" to the board.

*Id.* at 168. In short, "*Lebron* means what it says" when it requires the government "to appoint a majority of … board members." *Hack*, 237 F.3d at 84; *accord Herron v. Fannie Mae*, 861 F.3d 160, 168 (D.C. Cir. 2017); *see also, e.g.*, *Robert S. v. Stetson Sch.*, 256 F.3d 159, 162 (3d Cir. 2001) (Alito, J.) (deeming school a "private … institution" because its "board" was privately appointed); *Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado*, 84 F.3d 487, 492 (1st Cir. 1996) (determining control under *Lebron* in terms of voting control); *Am. Bankers*, 75 F.3d at 1407-09 (same).

The voting-control requirement is not a technicality. When the government has voting control over an entity's governing board, the entity has no will separate from the government's. The entity can be called a mere "instrumentality" of the government whose every action is government action. *Lebron*, 513 U.S. at 394; *cf. id.* at 378 (noting, by contrast, that under the state-action doctrine, an entity's acts are "sometimes" governmental and sometimes private). When the government lacks voting control, it cannot directly force a corporation to do anything. *S.F. Arts*, 483 U.S. at 545 n.27. Official KCBOE policy recognizes as much, stating:

> Each charter school's governing board shall operate independently of the Board and maintain full authority over instructional programming, financial management, personnel decisions, school culture, and scheduling. The Board's role is not to manage the success or failure of individual schools, but to hold schools accountable for performance and compliance with applicable laws and regulations.

App.1552. This relationship with the Board stands in marked contrast to traditional public schools, which KCBOE directly "[m]anage[s]" and "control[s]." Tenn. Code Ann. §49-2-203(a)(2). And although the government can impose consequences on charter schools that defy legal requirements, such externally imposed consequences—including the loss of a "license" to operate, a "contract," or all an entity's funding—are not enough to make charter schools an arm of the state. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 814 (2019); *see also infra* Part II.B.2 (explaining that the specific regulations the intervenors cite are all consistent with charter schools' private status). Because charter schools have a will of their own, they are not a mere instrument in the hands of the government.

*Third*, charter schools have a private purpose. *See Lebron*, 513 U.S. at 400; *cf.* Carroll-MSJ.15-16. The private sponsor, and not the government, defines the school's "mission and goals," including its "academic focus" and "instruction methods." Tenn. Code Ann. §49-13-107(b)(1), (2). Through the waiver process, most legal requirements can yield when they conflict with a charter school's privately defined "mission" or "goals." §49-13-111(p). Such waivers are "commonly" granted for curriculum and personnel matters, giving charter schools the autonomy to instantiate their own educational vision. App.1699; *see* App.1610-15. Even the provision the intervenors invoke for charter schools' supposedly governmental purpose, *see* Carroll-MSJ.16, states that charter schools must be "allowed maximum flexibility to achieve *their* goals," Tenn. Code Ann. §49-13-102(b) (emphasis added).

No surprise, Tennessee charter schools vary widely in their focus and goals, based on the differing visions of their private sponsors. To give just a few examples, Nashville Classical emphasizes great books and the liberal arts. App.2189-90. Libertas School of Memphis follows the Montessori method. App.2194-96. Skillern has an environmental focus. App.2708-09. The Memphis School of Excellence's curriculum is centered on STEM. App.2199. The Soulsville Charter School provides intensive music education. App.2205. The Tennessee Career Academy emphasizes technical education to prepare students for skilled trades. App.2210-11. ChattAcademy is a Spanish immersion school. App.2218. And Knoxville Prep was an all-boys school (and Chattanooga Prep still is). App.796, 1190.

At any rate, a governmental purpose alone cannot satisfy *Lebron*. *Cf.* Carroll-MSJ.15. A "private group" does not lose its private character merely because it "serv[es] a 'public function.'" *Rendell-Baker*, 457 U.S. at 842. Even when the government creates a corporation to serve governmental objectives, "permanent government control" remains "'a necessary condition precedent' to consider [the] corporation part of the government." *Herron*, 861 F.3d at 168; *accord Sprauve v. W. Indian Co.*, 799 F.3d 226, 233 n.8 (3d Cir. 2015); *Hack*, 237 F.3d at 84. For instance, both the U.S. Olympic Committee, *S.F. Arts*, 483 U.S. at 537-38 & n.17, and Freddie Mac, *Mik*, 743 F.3d at 168 n.13; *Oakland v. FHFA*, 716

F.3d 935, 937 (6th Cir. 2013), have specific, congressionally defined purposes. Yet both are private. *S.F. Arts*, 483 U.S. at 544; *Mik*, 743 F.3d at 168. Even an entity as obviously private as Yale was created "by special law" for "a governmental objective"; only the private control of Yale's board prevents it from being deemed a government entity. *Hack*, 237 F.3d at 84.

The Carroll intervenors misunderstand *Lebron*'s purpose element. It is *another* requirement that an entity must meet to qualify as part of the government, not a way to make an entity governmental absent government creation and control. Even if the government has voting control, if the corporation's purpose is to generate "a profit for the benefit of its shareholders" rather than to further "public interest 'goals,'" the corporation is still private. *Lebron*, 513 U.S. at 399 (citing *Regional Rail*, 419 U.S. at 152). The intervenors cannot sidestep *Lebron*'s creation and control elements, which doom any effort to label Wilberforce a government entity.

***Intervenors' remaining arguments fail.*** County school boards' limited authority to revoke charter agreements does not make Wilberforce a government entity either. *Cf.* Carroll-MSJ.19. A county board has no authority to dissolve the nonprofit corporation that operates a charter school. Tenn. Code Ann. §49-13-122. And revoking a private entity's contract, license to operate, or funding does not make it a public entity, even if doing so will have the effect of shutting down all the entity's operations. *See Halleck*, 587 U.S. at 814; *Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982). Even if the relevant entity were the school and not the sponsor, there is no rule that an entity is governmental if the government can dissolve it. Every corporation is a "creature of law," *Dartmouth*, 17 U.S. at 636, and so can be dissolved by the government—including the indisputably private nonprofits formed under Tennessee's general incorporation statute. *See* Tenn. Code Ann. §§48-64-201, -301.

Even plenary discretion to dissolve an entity does not make it public. Both the U.S. Olympic Committee and Freddie Mac are private. *S.F. Arts*, 483 U.S. at 544; *Mik*, 743 F.3d at 168. Yet Congress can dissolve both entities at will. *See* Amateur Sports Act of 1978, 92 Stat. 3045, 3049 (reserving "[t]he

right to alter, amend, or repeal this Act [incorporating the U.S. Olympic Committee] at any time"); 12 U.S.C. §1452(c) (conferring the power of "succession" on Freddie Mac only "until dissolved by Act of Congress"). Congress reserved the same discretion to alter or revoke Amtrak's charter. *See Lebron*, 513 U.S. at 398; Carroll-MSJ.19. But *Lebron* did not identify this discretion as an independent basis for deeming Amtrak governmental; the Court cited this discretion only to note that Congress could eliminate the for-cause removal restrictions on Amtrak's directors if it wished. 513 U.S. at 398. *Lebron* could not have been clearer that its holding rested on the three elements it articulated and discussed at length throughout its opinion. *See id.* at 400.

*Biden* is even further afield. *Cf.* Carroll-MSJ.15. After establishing that Missouri created MOHELA by special statute for government purposes and appointed its board, 600 U.S. at 489-90, the Court noted as a cumulative point that "*only* the State can abolish [MOHELA] and set the terms of its dissolution," *id.* at 491 (emphasis added; cleaned up; quoting *Cas. Reciprocal Exchange v. Mo. Emp'rs Mut. Ins. Co.*, 956 S.W.2d 249, 254-55 (Mo. 1997)). The Court's point was not that MOHELA was governmental because it could be dissolved. It was that MOHELA has no will apart from the State in part because it "cannot elect to go out of business"; only "the general assembly and the governor" can make those decisions. *Cas. Reciprocal*, 956 S.W.2d at 254-55. Wilberforce, in contrast, can dissolve itself at any time. Tenn. Code Ann. §48-64-101. And charter schools can initiate their early closure, §49-13-121(j), or simply allow their charter agreements to expire, §§49-13-110(b)(1), -121(a).

In any event, a county school board's authority to revoke a charter agreement is much more circumscribed than the government's authority to dissolve the U.S. Olympic Committee, Freddie Mac, or Amtrak. A local school board can revoke a charter agreement only "for a limited number of statutorily specified reasons," Tenn. Op. Att'y Gen. 2025-19 at 11, namely, if the school fails to meet performance standards, violates the terms of the charter agreement, or does not adhere to "generally accepted standards of fiscal management," Tenn. Code Ann. §49-13-122(a)-(b). The board can do so

only pursuant to a "progressive intervention policy" that gives the school an opportunity to take "corrective action," and with a written explanation of "the reasons for the revocation." §49-13-122(c)-(g). The charter school can then appeal the revocation to the state charter commission or obtain review from the state department of education. §49-13-122(a)(4), (h)(1). These substantive and procedural limits on charter revocation guarantee charter schools' right to remain in operation for the term of their charter agreements, so long as they comply with their agreements and performance standards. And all along the way, KCBOE admits the charter school gets substantial "autonomy" in deciding how to comply. App.464. Their right to lawful operation stands in stark contrast to the plenary authority that Congress enjoys to dissolve Amtrak (public) and the U.S. Olympic Committee and Freddie Mac (private). *See Lebron*, 513 U.S. at 398; 92 Stat. 3049; 12 U.S.C. §1452(c).

Nor does it matter that charter schools are designated "public" by statute. *Cf.* Carroll-MSJ.16. As noted, the relevant entity is the operator, not the school, and no statute provides that the 501(c)(3)'s that operate charter schools are somehow "public." In all events, legislative "pronouncements … are not dispositive of [an entity]'s status as a governmental entity … under the Constitution." *AAR*, 575 U.S. at 51. Courts must instead perform "an independent inquiry into" that "status." *Id.*; *accord Lebron*, 513 U.S. at 392. Hence why Freddie Mac is a private entity "for constitutional purposes," *Mik*, 743 F.3d at 168, even though by statute it is a federal "agency" for other purposes, 12 U.S.C. §1452(f). The First Amendment constrains statutes, not the other way around.

The intervenors' appeals to federalism are similarly misplaced. *Cf.* Carroll-MSJ.11-12. The *Lebron* test and the state-action doctrine "enforc[e] th[e] constitutional boundary between the governmental and the private," not between state and federal authority. *Halleck*, 587 U.S. at 808. And the Fourteenth Amendment (which incorporates the Free Exercise Clause) is designed to limit States. To avoid "endanger[ing] individual liberty and private enterprise," *id.* at 816, courts should not defer to state-law "labels" of entities as public any more than federal ones, *Lindke v. Freed*, 601 U.S. 187, 197 (2024).

At least on this point, the Tennessee Charter Center's proposed amicus brief agrees, stressing that charter schools can remain "public" under various state laws even if this Court deems their sponsors "private" under the Constitution. Doc.103 at 11; *see also* O.A.-Tr.81-82, *Okla. Charter*, 605 U.S. 165 (No. 24-394) (federal government adopting the same position).

The intervenors also cannot find any foothold in precedent. *Cf.* Carroll-MSJ.20. *Graham v. Board of Education* held that charter schools are "governmental under ERISA," not the Constitution. 8 F.4th 625, 629 (7th Cir. 2021). And if the court had held otherwise, the *entire* pension plan for Chicago public schools could have become subject to ERISA. *See id.* at 627-28. The unpublished decision *Nampa Classical Acad. v. Goesling* is of no persuasive value because it doesn't even cite, let alone apply, *Lebron* or any related decision. 447 F. App'x 776, 777-78 (9th Cir. 2011). *Brammer-Hoelter v. Twin Peaks Charter Academy* simply assumed without analysis that charter schools are government entities. 602 F.3d 1175, 1188 (10th Cir. 2010); *see Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019) ("questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents"). And the state-court decisions the intervenors cite found charter schools to be government entities for certain state-law purposes, not for purposes of the Federal Constitution. *Cf.* Carroll-MSJ.20.

In contrast, *Caviness v. Horizon Community Learning Center* persuasively held that charter-school operators are private. 590 F.3d 806, 808 (9th Cir. 2010). And courts have repeatedly resisted efforts to deem publicly supported schools governmental based on loose applications of government-entity or state-action precedents. *E.g.*, *Rendell-Baker*, 457 U.S. at 839-43; *Robert S.*, 256 F.3d at 164-69; *Logiodice v. Me. Cent. Inst.*, 296 F.3d 22, 26-31 (1st Cir. 2002). This Court should too.

**2. Wilberforce is not a state actor.**

Operating a charter school is not one of the "few limited circumstances" where a "private entity can qualify as a state actor." *Halleck*, 587 U.S. at 809. A "private school," even when funded "primarily from public sources" and "regulated by public authorities," is not a state actor. *Rendell-*

*Baker*, 457 U.S. at 831. So "a private non-profit corporation that runs a charter school" is not "a state actor." *Caviness*, 590 F.3d at 808. The Carroll intervenors claim that charter-school operators are state actors because they perform a public function and because they are intertwined with state officials. Carroll-MSJ.20-22. They also rely heavily on the fact that the State regulates charter schools. Carroll-MSJ.22. These arguments all, again, fail.

***Public function.*** A private entity qualifies as a state actor when it performs a "function" that "the government" has "traditionally *and* exclusively performed." *Halleck*, 587 U.S. at 809. "Obviously, education is not and never has been" such a "function." *Logiodice*, 296 F.3d at 26. "There were no public schools … at the founding." Chapman & McConnell, *Agreeing to Disagree* 146 (2023). "Public schools in anything remotely resembling the current system first came into being in the early 1830s." *Id.* And private schools have always existed alongside public ones. It's *unconstitutional* to ban private schools. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925). So courts agree that "the maintenance of schools" is not a traditional and exclusive government function. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 354 n.9 (1974); *accord Phillips v. Tangilag*, 14 F.4th 524, 532 (6th Cir. 2021); *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 753 (6th Cir. 2020); *Marie v. Am. Red Cross*, 771 F.3d 344, 362–63 (6th Cir. 2014); *Caviness*, 590 F.3d at 816; *see also Rendell-Baker*, 457 U.S. at 842.

The Carroll intervenors attempt to escape this history and precedent by giving an improperly narrow definition of the "function" at issue—"providing free public education within the Tennessee public school system and using per-pupil funding dollars to do it." Carroll-MSJ.21; *see also Peltier v. Charter Day Sch.*, 37 F.4th 104, 122 (4th Cir. 2022) (en banc) (finding state action based on a similar error); *Drummond v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, 11-12 (Okla. 2024) (same). The state-action doctrine requires analyzing the "*relevant* function," not manipulating its scope to circumvent the doctrine's stringent requirements. *Halleck*, 587 U.S. at 811 (emphasis added). Precedent has consistently defined the relevant function based on the nature of the action itself, not on where the

action was performed or whether the action was performed for pay or for the general public. For example, "running elections and operating a company town" qualify as public functions, whereas "sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity" do not. *Id.* at 809-10 (collecting cases). In none of these examples can "adjectives" like "publicly funded" or "available to all," or state-specific qualifications, get smuggled into the definition of the function. *Logiodice*, 296 F.3d at 27. Controlling precedent has repeatedly recognized that, in the context of schools, the relevant "functio[n]" is "the provision of … education," without qualification. *Phillips*, 14 F.4th at 532; *see also Jackson*, 419 U.S. at 354 n.9 ("maintenance of schools").

The intervenors' gerrymandered definition is also "foreclosed by *Rendell-Baker*." *Caviness*, 590 F.3d at 815; Black-*Daubert*-Mot. (Doc.111) 5. The school there received public funding to provide a free education to all special-needs students in two cities. *Rendell-Baker*, 457 U.S. at 832-33. Yet the "relevant" function was "the education of maladjusted high school students," *id.* at 842, not the provision of "a free education to all children," *id.* at 849 (Marshall, J., dissenting). Likewise, it is not "relevant" whether the education in question could be deemed "public." *Id.* at 842 (majority op.). As *Halleck* explains, the relevant function is the provision of "some kind of" education, not a "public" education specifically; otherwise the court is "ignor[ing] the threshold state-action question" instead of answering it. 587 U.S. at 811; *accord Peltier*, 37 F.4th at 147 (Quattlebaum, J., dissenting in part) (observing it's "circular" to ask "whether 'free, public education' is traditionally an exclusive state function"); *see* Black-*Daubert*-Mot.6; Pltf.-MSJ.21-22.

In addition, "the inquiry into traditionally exclusive public functions" is not "state-specific." *Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135 (6th Cir. 2023); *see Halleck*, 587 U.S. at 811-12 (identifying various functions as traditionally exclusive or not on a national basis); *cf.* Carroll-MSJ.21 n.4. The state-action doctrine is derived from the "text and original meaning" of the First and Fourteenth

Amendments. *Halleck*, 587 U.S. at 808. These provisions "ha[ve] the same meaning in all parts of the United States." *Wolford v. Lopez*, 146 S.Ct. 2032, 2050 (2026). But even if the "Volunteer Spirit" were controlling, *cf. id.*, that Tennessee focus would only hurt the intervenors, as explained below.

Even under the Carroll intervenors' rigged framing, charter schools do not engage in state action. From colonial times to at least the 1870s, American governments deemed schools "under complete private control" to be "'public' schools" entitled to public support. Gabel, *Public Funds for Church and Private Schools* 8-13 (1937) (App.2310-15); *accord* Jorgenson, *The State and the Non-Public School, 1825-1925*, at 5-7 (1987) (App.2329-30). Even in the modern era of compulsory public school, "publicly funded education of last resort" has not been "provided exclusively by government." *Logiodice*, 296 F.3d at 27; *see also Carson*, 596 U.S. at 773; Black-*Daubert*-Mot.12. And the school in *Rendell-Baker* was not a state actor even though it was free to attend and performed a "public function." 457 U.S. at 841-42.

In Tennessee specifically, before 1827, education was entirely private, and a "real" "state system" of public schools did not come into existence until 1873. Gabel 254, 421-22; *see also Brown v. Bd. of Ed.*, 347 U.S. 483, 489-90 (1954) (noting that "the movement toward free common schools, supported by general taxation, had not yet taken hold" "[i]n the South" in 1868). Private schools regularly received funding from the State's "Common School Fund" from its establishment in 1823 until 1870. Gabel 421-22, 647. Even after 1870, private schools continued to receive public funding by other means. *See id.* at 647. Tennessee laws from 1873 and 1926 allowed local governments to contract with private schools to serve as the "free" "public schools" for the community. *Id.* at 647-48. As of 1891, "many private schools" performed this function. *Id.* at 647-48; Garrett, *Annual Report of the State Superintendent of Public Instruction for Tennessee* 39 (1892) (App.2336). Today, Tennessee's Education Freedom Scholarship program similarly allows private schools to educate students using per-pupil funding from the State, App.1776, often for free, *see* App.2892 (most students at River's Edge attend for free because

of education freedom scholarships). Whether in Tennessee or nationwide, no historically honest definition of "education" can turn it into an exclusive government function.

Nor does it matter if Tennessee has a state constitutional duty to provide public education. *Cf.* Carroll-MSJ.21-22. In *Rendell-Baker*, Massachusetts had a legal duty to provide for "the education of maladjusted high school students." 457 U.S. at 842. But that duty did not make the education state action. The "relevant question is not simply whether a private group is serving a 'public function,'" but "whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Id.* Likewise, in rural school districts, Maine fulfills its constitutional duty to provide a public education by paying for students to attend private school. *Carson*, 596 U.S. at 773-74. But participating schools still retain their "private" character. *Id.* at 785. State law cannot transform private action into state action under the federal Constitution. *See Jackson*, 419 U.S. at 353-54.

***Entwinement.*** A private entity can qualify as a state actor when the State is "entwined in its management or control." *Brentwood Acad. v. TSSAA*, 531 U.S. 288, 297 (2001) (cleaned up). That was the case in *Brentwood*, where 84% of an interschool athletic association's voting members were government schools, and government officials acting in their official capacities controlled the association's governing board. *Id.* at 298-99. Charter schools, in contrast, are operated by private nonprofits that select their own boards. *See* Tenn. Code Ann. §§49-13-104(10), -111(a)(1); App.383, 628, 1455, 1319, 1500. And the private sponsors "operate independently" of the local school board. App.1552. Local school boards act merely as external regulators, which does not establish state action. *Halleck*, 587 U.S. at 815-16. The State is not entwined in the management of Tennessee charter schools. *Caviness*, 590 F.3d at 816 n.6; *Logiodice*, 296 F.3d at 28; *cf.* Carroll-MSJ.22.

***Regulation.*** Although the Carroll intervenors repeatedly invoke state-law requirements imposed on Tennessee charter schools, even "extensive regulation" of a private entity has no bearing on

state action. *Halleck*, 587 U.S. at 815; *Rendell-Baker*, 457 U.S. at 841; *cf.* Carroll-MSJ.16-19, 22. But even if regulations were relevant, all the regulations they invoke confirm Wilberforce's private status.

Immunity. A variety of private nonprofits that contract with or are funded by the government receive tort immunity under Tennessee law, such as a "nonprofit corporation that administers the Head Start or Community Service Block Grant programs." Tenn. Code Ann. §§29-20-102(3)(A), -201(a); *cf.* Carroll-MSJ.16. If charter schools were an "instrumentality of government," Tenn. Code Ann. §29-20-102(3)(A), the charter-school statute wouldn't have needed a separate provision conferring immunity, *see* §49-13-125.

Ability to be sued. A charter school *cannot* sue or be sued, *cf.* Carroll-MSJ.16, which helps explain why charter schools have no legal personality apart from their private governing bodies, *see* Pltf.-MSJ.19. Only the private "governing body" can "sue and be sued." Tenn. Code Ann. §49-13-124(a). And though the charter statute clarifies this point, the governing body does not need to rely on the charter statute to sue or be sued. Even before a sponsor signs the charter agreement, it already has the power to sue and be sued under the general incorporation statute, §48-53-102(a)(1), which is why no one seriously questions Wilberforce's ability to bring this lawsuit.

Public Records and Open Meetings Acts. Tennessee requires a variety of private contractors that are not state actors to comply with the Public Records Act. *Cf.* Carroll-MSJ.16-17; *compare, e.g.*, *Memphis Publ'g Co. v. Cherokee Child. & Fam. Servs.*, 87 S.W.3d 67, 79 (Tenn. 2002) (private foster-care agency subject to Public Records Act), *with Howell*, 976 F.3d at 753-55 (private foster-care agency not state actor). Same for the Open Meetings Act. Tenn. Code Ann. §8-44-102(b)(1)(B)-(E).

Financial reporting and procurement. Private entities often must submit financial reports when they receive public funds. *Cf.* Carroll-MSJ.17. Federal law imposes detailed reporting and recordkeeping requirements on private schools participating in the national school lunch program. 7 C.F.R. §210.15. The school in *Rendell-Baker* also had to "submit periodic reports to the city." 457 U.S. at 847

(Marshall, J., dissenting). Likewise, to prevent waste, it is common for the government to impose rules on how private funding recipients procure supplies and contracts. *E.g.*, 2 C.F.R. §200.320 (imposing detailed requirements on federal funding recipients generally).

Curriculum. States often regulate the curricula of private schools, especially as a condition of funding, and charter schools have greater freedom to define their curricula than traditional public schools. *Cf.* Carroll-MSJ.17. The school in *Rendell-Baker* had "to carry out the individualized plan" that the government "developed for each student." 457 U.S. at 833. Tennessee private schools must meet the curricular requirements of the State or a state-approved accrediting agency. Tenn. Code Ann. §49-6-3001(c)(3)(A)(i), (iii); §49-50-801(a). Schools receiving education freedom scholarships must administer state-approved standardized tests. §49-6-3507. Charter schools, on the other hand, "commonly" receive waivers exempting them from curriculum requirements that interfere with their privately defined academic focus. App.1699; *see* App.1610-15, 3139, 3143. The only unwaivable curricular requirement is that charter schools must have "equivalent time of instruction as required in regular public schools," Tenn. Code Ann. §49-13-111(p)(12), which state law also requires of private schools, §49-50-801(d); Tenn. Comp. R. & Regs. 0520-07-02-.03(4)(c)8(v)(I).

Building safety. Tennessee law generally imposes the same building safety standards on public and private schools. Tenn. Comp. R. & Regs. 0520-01-04-.01(1).

Staffing and payroll. States often regulate personnel matters at private schools, and charter schools have greater freedom on staffing than traditional public schools. Tennessee requires teachers at Category I private schools to have state-issued licenses and imposes evaluation and seniority requirements. Tenn. Comp. R. & Regs. 0520-07-02-.02(3)(d). Some States require private-school teachers to have a license from the State. *E.g.*, Wash. Rev. Code §28A.195.010(3). Yet charter schools "commonly" receive waivers from staffing regulations. App.1699; *see* App.1610-15, 3137-42.

Due-process protections for students. Due-process protections are often a condition of public funding. *Cf.* Carroll-MSJ.17. Federal Title IX regulations, for instance, impose detailed due-process requirements for resolving allegations of sex discrimination in private K-12 schools that receive federal funding. 34 C.F.R. §106.45. Private schools receiving federal funding must also extend due-process protections to families contesting the accuracy of their academic records. 20 U.S.C. §1232g(a)(2).

### 3. Wilberforce is not a government entity under the intervenors' made-up test that would apply only to schools.

Since Wilberforce is private under both *Lebron* and the state-action doctrine, it enjoys the full protection of the First Amendment. There is no third test that makes "public schools" government entities even when a comparable non-school entity would be private. *Cf.* Carroll-MSJ.12-14. Precedent and history foreclose deeming charter schools governmental because they are "public."

Precedent establishes only two ways for an entity like Wilberforce to be considered part of the government. Either the entity is the "Government itself" under *Lebron*, or it is a "private entit[y]" whose "actions" must "be regarded as governmental action" under the state-action doctrine. *Lebron*, 513 U.S. at 378. *Lebron* defines when an entity is "part of the Government for purposes of the First Amendment." *Id.* at 400. And the state-action doctrine defines when "a private entity can qualify as a state actor." *Halleck*, 587 U.S. at 809. When an organization meets neither standard, it is a private entity engaged in private action with constitutional rights. *Id.* at 808.

There is no bespoke exception to this two-part framework for schools. In *Rendell-Baker*, the Court had no doubt that the New Perspective School, which was "operated by" a privately selected "board of directors," was a "private" entity. 457 U.S. at 832, 837. It then applied ordinary state-action principles to determine that the Fourteenth Amendment did not apply to its conduct. *Id.* at 839-43. Rather than rely on an ad hoc rule for schools, the Court held that *Blum*, a case about "nursing homes," controlled its analysis. *Id.* at 839-40.

The Carroll intervenors have no answer to *Rendell-Baker*. On their view, the Court could not have demonstrated that the school had a genuinely private character without first considering whether it was a "public school." After all, the petitioners had argued that they "occup[ied] the same positions as any other public school teachers or counselors" and were responsible for educating "public school children." Pet'rs-Br.11, 38, 457 U.S. 830 (No. 80-2102); *see also Rendell-Baker*, 457 U.S. at 848 & n.2 (Marshall, J., dissenting) (arguing that "the unique role that education plays in American society" calls for a distinct state-action analysis for "public education"). The New Perspective School, moreover, plausibly possessed all four of the "characteristics" of public schools that the intervenors stress. *See* Carroll-MSJ.13-14. The school was contractually obliged to accept all students referred to it by the city, charged no tuition, had "to carry out the individualized plan developed for each student" by the city, and had to obtain state certification for its teachers. 457 U.S. at 832-33; *see* 603 Mass. Code Regs. §28, paras. 802.4, 1000.0-.6 (1979) (available in App. to Reply Br., *Rendell-Baker*, 457 U.S. 830). The school even met the IRS's definition of a "public school" because it was operated "predominantly from government funds." *See* Doc.116-7 at 26. Yet the Court rejected the argument that performing the "public function" of "education" called for a departure from ordinary state-action principles. 457 U.S. at 842. That holding excludes intervenors' school-specific test. *Accord, e.g.*, *Arkansas v. Texas*, 346 U.S. 368, 370 (1953) (relying on generally applicable government-entity principles, and not the school's status as a public school, to deem the University of Arkansas a government entity); *Biden*, 600 U.S. at 491-92 (applying *Arkansas*'s reasoning to a loan-servicing company).

Far from silently overruling *Rendell-Baker*, *cf. Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 18 (2000), *Carson* supports applying generally applicable government-entity and state-action principles to schools. *Cf.* Carroll-MSJ.12. *Carson* affirmed that "Maine may provide a strictly secular education in its public schools." 596 U.S. at 785. But this principle did not justify Maine's school-funding regime because "Maine has decided *not* to operate schools of its own." *Id.* In other words, consistent with

*Lebron* and *Rendell-Baker*, the Court recognized that a public school in the constitutional sense is one the government directly operates. *See also id.* (listing Maine's "options" for providing education without "fund[ing] religious education," all of which involved the government directly providing services).

The Carroll intervenors conclude otherwise by misreading language in an earlier part of *Carson*. *Cf.* Carroll-MSJ.12-14. To defend its refusal to fund religious private schools, Maine argued that the private schools it funded had to provide the "rough equivalent of a Maine public school education." *Carson*, 596 U.S. at 782 (cleaned up). The Court rejected this argument as a matter of *state statutory law*, concluding that the relevant Maine "statute does not say anything like that." *Id.* The Court then "confirmed" its "reading of the statute" by noting the differences between the participant schools and "Maine public schools." *Id.* at 783-84. Contra the Carroll intervenors, the Court wasn't even discussing federal constitutional law, much less implicitly overruling *Rendell-Baker* by announcing a new test for when a school is considered part of the government.

History also rules out the intervenors' position. The constitutional line between governmental and private conduct is based on the "original meaning" of the First and Fourteenth Amendments. *Halleck*, 587 U.S. at 808. A school-specific test could be legitimate only if, at the time of ratification, there was an established principle that "public schools" were necessarily part of the government. But there was not. "There were no public schools as we understand them at the founding." Chapman & McConnell 146. And the "terminology" of the early republic "made no provision for differentiating between the schools that much later came to be classified as 'public' or 'private.'" Jorgenson 5. That history rules out a school-specific test, since the scope of the "First Amendment" against both "the Federal Government and States is pegged to the public understanding … in 1791." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 37 (2022); *accord Espinoza*, 591 U.S. at 482. Even if relevant, the public understanding in 1868 likewise does not support a school-specific government-entity test. Modern public schooling at that time was still in its infancy, *Brown*, 347 U.S. at 489-90, and privately operated

schools continued to be deemed "public schools" entitled to state support. Gabel 8-13; Jorgenson 5-7; Garrett 39-40. Local governments also contracted with privately operated schools to perform what is today seen as the core function of government schools—serving as the free school of last resort open to all students in the local school district. *Logiodice*, 296 F.3d at 27; Gabel 647-48; Garrett 39.

Regardless, charter schools are not public schools even under the intervenors' invented test. Unlike a traditional public school—or even a private school that contracts with a local government to be the local school of last resort—charter schools "do not have to accept all students." *Carson*, 596 U.S. at 783; *cf.* Carroll-MSJ.13. A charter school can reject applicants if the number exceeds its capacity. Tenn. Code Ann. §49-13-113(d)(3). Charter schools' "curriculum" can vary considerably from public schools'. *Carson*, 596 U.S. at 783; *cf.* Carroll-MSJ.13. Charter schools define their own "mission," "goals," and "academic focus," allowing them to adopt a variety of curricula—from classical to STEM to Montessori to Spanish immersion. *See* App.2186-218. When state curricular requirements interfere with a charter school's privately defined mission, those requirements can be waived, Tenn. Code Ann. §49-13-111(p), and curricular waivers are "commonly" granted, App.1699; *see* App.1610-15, 3139, 3143. The same is true of requirements concerning teacher hiring and retention. App.1699; *see* App.1610-15, 3139, 3143; *cf.* Carroll-MSJ.13-14. Nor can charter schools be deemed public solely because they are free. *Cf.* Carroll-MSJ.13. There is "a longstanding … American tradition" of free private education, from "charity schools" in the early Republic, Kaestle, *Pillars of the Republic: Common Schools and American Society, 1780-1860*, at 32 (1983); to Catholic parochial schools, which the Catholic Church in the late 19th century strove to make "free," Fanning, *Baltimore, Plenary Councils of*, *in* 2 *The Catholic Encyclopedia* 235, 239 (1907) (App.2344); to modern schools like River's Edge, which charges less in tuition than the scholarships available from the State, App.2892. So even under the intervenors' misreading of *Carson*, charter schools are not part of the government.

### C. Even if charter schools were part of the government, the Free Exercise Clause would protect Wilberforce from discrimination.

The Carroll intervenors wrongly assume that, if charter schools are part of the government for constitutional purposes, then Wilberforce has no free-exercise rights at all. Carroll-MSJ.9. In reality, Wilberforce still would have the right not to be discriminated against in that scenario.

Wilberforce does not operate a charter school yet, so *right now* it is a private entity with First Amendment rights. Even supposing that charter schools are government schools, Tennessee's charter program holds out a valuable "privilege" and "public benefit"—the opportunity to design, create, and run a government school. *Carson*, 596 U.S. at 778, 785. The government may not "den[y]" Wilberforce that "benefit based on [its] religious exercise." *Id.* at 785. A traditional public-school teacher, for example, is an agent of the State while at work and so might be unable to exercise her Jewish faith in the classroom with the same freedom that she can outside of school. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). But a law prohibiting Jews from *being* public-school teachers would violate the Free Exercise Clause. *Wieman*, 344 U.S. at 191-92. In the same way, KCBOE cannot deny Wilberforce the opportunity to work within the public-school system simply because it is religious.

Charter schools being government entities could alter the constitutional analysis only if the Establishment Clause *forbids* respecting Wilberforce's free-exercise rights. *Carson*, 596 U.S. at 781. But the Carroll intervenors do not even argue that the Establishment Clause bars religious charter schools. *See* Carroll-MSJ.9. Rightly so. The Establishment Clause prohibits religious compulsion, *Kennedy*, 597 U.S. at 537, and official government preference of "one religious denomination over another," *Cath. Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025). So long as the government respects those limits, there is no free-floating rule under the Establishment Clause against government support for religious education. *See Espinoza*, 591 U.S. at 480-81; Pltf.-MSJ.23.

A religious charter school can exist comfortably within the Establishment Clause's limits. *See* Pltf.-MSJ.23-24. Religious charter schools involve no discrimination so long as all religious groups can

apply on equal terms; if so, a State or county that approves a charter associated with a particular religious tradition does not create any denominational preference. *Cf. Town of Greece v. Galloway*, 572 U.S. 565, 579 (2014). And religious charter schools do not involve coercion because attendance is purely voluntary. Tenn. Code Ann. §49-13-113(a). That feature distinguishes charter schools from traditional public schools, where compulsory attendance can make officially sanctioned religious practice "coercive." *Lee v. Weisman*, 505 U.S. 577, 592 (1992); *Engel v. Vitale*, 370 U.S. 421, 431 (1962). A Christian charter school with *voluntary* enrollment no more mandates Christianity as the State's official religion than a Spanish immersion charter school mandates Spanish as the State's official language.

**III. This Court should award all appropriate relief.**

Wilberforce is entitled to a permanent injunction, declaratory judgment, and nominal damages. Pltf.-MSJ.24-25. Only KCBOE contests the propriety of only one form of relief: nominal damages. KCBOE-MSJ.10-15. KCBOE's arguments are mistaken. (And even if they were right, these arguments would only be a reason to deny Wilberforce nominal "damages," not forward-looking relief. KCBOE-Opp.10.)

A "plaintiff" is "entitled to at least nominal damages for violation of his constitutional rights," even in the absence of "actual damages." *Martin v. Kelley*, 803 F.2d 236, 238 n.3 (6th Cir. 1986); *see Carey v. Piphus*, 435 U.S. 247, 266-67 (1978). Here, KCBOE violated Wilberforce's First Amendment rights when it denied Wilberforce an equal opportunity to apply for charter status in the 2025-26 cycle, despite Wilberforce being able and ready to apply by the February 2 deadline. The mere "imposition of the barrier" caused a "denial of equal treatment" based on religion, *Gratz*, 539 U.S. at 262; and "discrimination" that violates the Constitution "counts as an Article III injury," *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023). So does "each lost opportunity" to compete, as Wilberforce can never again compete for the 2025-26 cycle after it opened and closed with the religious barrier intact. *AAER v. Fearless Fund*, 103 F.4th 765, 780 (11th Cir. 2024). KCBOE owes Wilberforce a dollar for that past completed injury.

KCBOE's policies denied Wilberforce an equal opportunity to apply in the 2025-26 cycle. *Cf.* KCBOE-MSJ.10-12. As they do today, KCBOE's Policy I-450, charter-school handbook, and performance framework forbade religious charter schools and required charter applicants to use the State's application form, which religious applicants cannot complete. App.1552 & n.2, 1563, 1567, 1600, 1641, 1668. If KCBOE was enforcing state law, *see* KCBOE-MSJ.13, it was still making "a deliberate choice to follow" an unconstitutional state law rather than the higher law of the Constitution. *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986). KCBOE's adherence to "state law" might establish the "good faith" of the individual board members, but "good faith does not relieve the County from liability." *Evers v. Custer Cnty.*, 745 F.2d 1196, 1203 (9th Cir. 1984). Regardless, KCBOE is liable because its policies do not stem solely from state law. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). KCBOE's performance framework adopts the position that the Establishment Clause prohibits religious instruction in charter schools. App.1600, 1641, 1668; *see also* App.475. No state law required KCBOE to include that position in its charter-school framework, *see* Tenn. Code Ann. §49-13-143(b), so KCBOE's own choices violated Wilberforce's rights.

Wilberforce's refusal to submit a futile application is irrelevant. *Cf.* KCBOE-MSJ.11-12. It did try to apply, but KCBOE's religious barrier stopped it early in the process. MTD-Op.12. Regardless, even "a nonapplicant can be a victim of unlawful discrimination entitled to [retrospective] relief when an application would have been a useless act." *Teamsters v. United States*, 431 U.S. 324, 367 (1977). KCBOE's "imposition of" a discriminatory "barrier" denied Wilberforce the "[a]bility to compete on an equal footing" for a past cycle, even if Wilberforce never formally applied. *Ne. Fla.*, 508 U.S. at 666; *accord Trinity Lutheran*, 582 U.S. at 463. Because Wilberforce was "able and ready" to apply by the 2026 deadline, it has "standing" to seek "damages." *Rd.-Con v. Philadelphia*, 120 F.4th 346, 358 (3d Cir. 2024).

Nor does Wilberforce have to show that, absent KCBOE's discrimination, its application would have been approved. *Cf.* KCBOE-MSJ.12-13. Wilberforce's "legal injury" of unequal treatment

entitles it to "nominal damages absent evidence of other damages." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 286 (2021). *Aiken v. Hackett* does not hold otherwise. That case addresses standing to seek compensatory damages where the harm is the denial of a benefit, not standing to seek nominal damages where the harm is the inability to compete. *Aiken* says plaintiffs who "allege that a racial preference *cost them some benefit*" lack standing for damages if they would not "have received the benefit" anyway. 281 F.3d 516, 519 (6th Cir. 2002) (emphasis added; citing *Texas v. Lesage*, 528 U.S. 18, 20 (1999)). Wilberforce doesn't seek compensation for denial of a charter agreement; it seeks a dollar to vindicate its denied right to equally compete in a completed cycle—"a right that the law protects." *Id.* A similar claim for nominal damages based on the past inability to compete is what gave Abigail Fisher standing to sue the University of Texas: The Supreme Court never questioned her standing or demanded proof that, even without UT's use of race, she would have been admitted. *See Fisher v. UT-Austin*, 758 F.3d 633, 663 (5th Cir. 2014) (Garza, J., dissenting), *aff'd*, 579 U.S. 365 (2016).

Even if *Aiken* applied to nominal-damages claims, KCBOE misstates the burden of proof. Once the plaintiff proves unlawful discrimination, *the government* bears the burden of "proving that it would have made the same decision without the impermissible motive." *Lesage*, 528 U.S. at 21; *see Aiken*, 281 F.3d at 519 (plaintiffs lacked standing where it was "beyond debate" they "still would not have been promoted"). Here, KCBOE made a binding admission that it "cannot … deny that Wilberforce's proposed charter school plan would … be approved." App.466. KCBOE also concedes that, however weak its staff might deem Wilberforce's application (a question it hasn't asked them yet), either the Board or the state commission would be free to overrule them. Nixon-Dec. ¶13, ¶16, ¶31. Since Wilberforce *could have* been approved in a fair process, it has standing to seek nominal damages. *Fisher*, 758 F.3d at 662-63 (Garza, J., dissenting) (distinguishing *Lesage*, 528 U.S. at 21).

It is certain that KCBOE would *not* "have made the same decision without the impermissible motive." *Lesage*, 528 U.S. at 21. If Wilberforce had applied in 2026 without signing the assurance that

its school will not be religious, KCBOE would not have "review[ed]" the application at all, leaving Wilberforce with no recourse. Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(f); Nixon-Dec. ¶10; *supra* Part I.B. But absent that discriminatory requirement, KCBOE would have had to "review" and "rule" on the application. Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(f)-(g); Nixon-Dec. ¶13. If KCBOE then denied Wilberforce's application, Wilberforce would have the right to appeal to the state charter commission. Tenn. Comp. R. & Regs. 0520-14-01-.01(1)(m)1; Nixon-Dec. ¶16.

KCBOE has no sovereign immunity. *Cf.* KCBOE-MSJ.13-15. "Units of local government are not entitled to sovereign immunity under the Eleventh Amendment." *Cady v. Arenac Cnty.*, 574 F.3d 334, 345 (6th Cir. 2009). Local "*officials*" can receive immunity "for complying with state mandates that afford no discretion." *Brotherton v. Cleveland*, 173 F.3d 552, 566 (6th Cir. 1999) (emphasis added). In such cases, they act "as an agent" of "the State" rather than "the County." *Id.* at 565-66. But Wilberforce's claim is against the local government itself, not its officials. And "*entities*" like "county governments" have no sovereign immunity whether or not their actions were compelled by state law. *Id.* at 563; *see Cady*, 574 F.3d at 345 (extending sovereign immunity to county prosecutor who enforced state law but not county itself). In any event, KCBOE has its own bans on religious charter schools, and it chose to take the position that charter schools can't be religious regardless of state law. *See* App.475, 1552 & n.2, 1563, 1600, 1641, 1668. So KCBOE is not "simply … complying with state mandates." *Brotherton*, 173 F.3d at 566. It's enforcing its own policies and views of constitutionality.

## CONCLUSION

This Court should grant summary judgment to Wilberforce and deny it to Defendants.

Dated: August 25, 2026

Respectfully submitted,

*/s/ Cameron T. Norris*
Cameron T. Norris (TN Bar No. 33467)
Ryan M. Proctor*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

**admitted pro hac vice*

*Counsel for Wilberforce Academy*