# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | | |
|---|---|---|
| THE WILBERFORCE ACADEMY OF KNOXVILLE, | ) | |
| | ) | Case No. 3:25-cv-584 |
| *Plaintiff*, | ) | |
| | ) | Judge Atchley |
| v. | ) | |
| | ) | Magistrate Judge Poplin |
| KNOX COUNTY BOARD OF EDUCATION, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION AND ORDER

Tennessee may, of course, "provide a strictly secular education in its public schools." *Carson v. Makin*, 596 U.S. 767, 785 (2022). But this case does not concern Tennessee's traditional public schools. It concerns a different choice Tennessee has made: to permit private organizations to contract with it to provide an alternative form of education through the State's charter school system. Once the State opens that program to private participants, however, it may not prohibit them from receiving a public benefit solely because of their intended religious use. *Id.* at 787. The First Amendment does not permit the State to require an organization to abandon its religious beliefs or practices as the price of participating in a public benefit program.

Each party in this action has moved for summary judgment. Before the Court are the following dispositive motions: Plaintiff's Post-Discovery Motion for Summary Judgment [Doc. 99], Defendant Carroll Intervenors'[1] Motion to Dismiss the Amended Complaint for Lack of Subject Matter Jurisdiction or For Summary Judgment on Plaintiff's Free Exercise Claims [Doc.

[1] The Carroll Intervenors are comprised of Adrienne Carroll, Ciara Crutcher, Tiffany Nash, Evelyn Henderson, Shakeithia Rice, and Holly Slater.

106], Defendant Coble Intervenors'[2] Motion for Summary Judgment [Doc. 114], and Defendant Knox County Board of Education's ("KCBE") Amended[3] Motion for Summary Judgment [Doc. 123]. Also before the Court are Plaintiff's Motions to Exclude the Expert Testimony of Holy Slater, Derek Black, and Steven Green [Docs. 104, 111, 113] and a Motion for Leave to File Brief of Amicus Curiae by the Tennessee Charter School Center [Doc. 102].

For the reasons explained below, Plaintiff's Post-Discovery Motion for Summary Judgment [Doc. 99] will be **GRANTED IN PART** and **DENIED IN PART**, KCBE's Amended Motion for Summary Judgment [Doc. 123] will be **GRANTED IN PART** and **DENIED PART**, Carroll Intervenor's Motion to Dismiss the Amended Complaint for Lack of Subject Matter Jurisdiction or For Summary Judgment on Plaintiff's Free Exercise Claims [Doc. 106] will be **DENIED**, and the Coble Intervenor's Motion for Summary Judgment [Doc. 114] will be **DENIED**. In addition, Plaintiff's Motions to Exclude [Docs. 104, 111, 113] and the Motion for Leave to File of Amicus Curiae [Doc. 102] will all be **DENIED**.

## I. BACKGROUND

Plaintiff, the Wilberforce Academy of Knoxville ("Wilberforce"), is a religious nonprofit organization seeking to establish a religious charter school in Knox County, Tennessee. [Doc. 10]. Wilberforce's mission is unmistakable: to provide "Christian educational services" by operating a "Christian charter school." [*Id.* at ¶ 31]. But Tennessee law currently provides that charter schools are required to operate as "nonsectarian" and "nonreligious." Tenn. Code Ann. § 49-13-111(a)(2).

---

[2] The Coble Intervenors are comprised of Rev. Dr. Richard Coble, Amanda Collins, Kerry Dooley, Elizabeth Porter, and Rev. Dr. Katina Sharp.

[3] After filing its initial Motion for Summary Judgment [Doc. 109], counsel for KCBE and counsel for Plaintiff clarified the scope of damages and filed a stipulation with the Court [Doc. 120]. KCBE thereafter filed its Amended Motion [Doc. 123] reflecting that change. Because KCBE's initial Motion [Doc. 109] is still pending in the record, it is hereby **DENIED AS MOOT**, and the Court will only consider KCBE's Amended Motion [Doc. 123].

For this reason, Wilberforce contends that KCBE, which is responsible for approving or denying charter school applications, will ultimately deny Wilberforce's application solely because it intends to operate a Christian charter school. [Doc. 10 at ¶¶ 25–26].

*A. Tennessee's Charter School Framework*

The Tennessee Public Charter Schools Act of 2002 (the "Act") establishes a framework for the creation and operation of charter schools in Tennessee. *See* Tenn. Code. Ann. § 49-13-101. The Tennessee General Assembly designed the Act to provide an "alternative means" of education that would "improve learning for all students" by "encourag[ing] the use of different and innovative teaching methods." *Id.* § 49-13-102(a)–(b). The Act also seeks to create "new professional opportunities for teachers" and provide parents with "substantial meaningful opportunities to participate in the education of their children." *Id.* § 49-13-102(a). To achieve these objectives, the Act affords charter schools "maximum flexibility" by "provid[ing] greater decision making authority to schools and teachers in exchange for greater responsibility for student performance." *Id.* § 49-13-102(a)–(b).

The Act defines a "public charter school" as a "public school in [Tennessee] that is established and operating under the terms of a charter agreement and in accordance with [the Act]." *Id.* § 49-13-14(15). Although charter schools are nominally referred to as "public" schools under Tennessee law, they are operated by private, nonprofit corporations rather than local public school boards. *Id.* §§ 49-13-104(17), 49-13-106. These private organizations, referred to as "sponsors," are the "governing bod[ies]" of charter schools and are responsible for "deciding matters" such as "budgeting, curriculum, and other operating procedures." *Id.* § 49-13-104(11), (17). It is the nonprofit's board of directors—not the local school board or state education officials—that ultimately "oversee[] management and administration" of a charter school under the Act. *Id.*

To establish a charter school, the Act invites eligible sponsors to apply to an appropriate "authorizer," which is defined as "the local board of education or the Tennessee public charter school commission that makes decisions regarding the approval, renewal, or revocation of a public charter school application or agreement." *Id.* §§ 49-13-104(5), 49-13-107. When Wilberforce filed its original Complaint [Doc. 1], the definition of "sponsor" under the Act said the school's governing body could "not promote the agenda of any religious denomination or religiously affiliated entity." *Id.* § 49-13-104(16)(B) (2025). The General Assembly amended that definition in 2026 to delete the quoted language. Pub. Ch. 1128, § 1, 114th Gen. Assembly; Tenn. Code Ann. § 49-13-104(17) (2026). Although religious nonprofit organizations may now apply to operate charter schools, the schools themselves must still "[o]perate as public, nonsectarian, [and] nonreligious" schools (the "Nonsectarian Requirement"). *Id.* § 49-13-111(a)(2).

To initiate the application process, a sponsor must first submit a letter of intent to both the Tennessee Public Charter School Commission (the "Commission") and the relevant authorizer sixty days before the application process begins. *Id.* § 49-13-107(a). The sponsor must then complete and submit a detailed application using a template developed by the State Board of Education "[o]n or before February 1 of the year preceding the year in which the proposed public charter school plans to begin operation." *Id.* § 49-13-107(b). The application requires extensive information regarding the proposed charter school's academic plan, student-performance measures, operating budget, transportation, and compliance with applicable health and safety laws, among other things. *Id.*

Once submitted, the authorizer reviews the application using standards and scoring criteria adopted by the State Board of Education. *Id.* § 49-13-108. The local board must vote to approve or deny the application within ninety days. *Id.* If the application is denied, the sponsor may amend

the application to address any deficiencies within 30 days, after which the local board conducts another review. *Id.* If the application is again denied, the sponsor may appeal to the Commission, which conducts a de novo review of the board's decision and may approve the charter school notwithstanding the local board's denial. *Id.*

In addition, pursuant to Tenn. Code. Ann. § 49-13-108(b)–(f), the State Board of Education has adopted application requirements that all authorizers must follow. The State Board of Education must periodically evaluate authorizer quality, including "determin[ing] authorizer compliance with the requirements of this chapter and the rules and regulations of the state board of education." *Id.* § 49-13-145. An authorizer who fails to comply, such as by allowing a religious charter school, is subject to a loss of funding as determined by the State Board of Education. *Id.*

If an application is ultimately approved, the sponsor and authorizer enter into a written contractual agreement, referred to as a "charter agreement." *Id.* §§ 49-13-104(6), 49-13-110. The charter agreement is binding upon the governing body of the charter school, and the authorizer must "enforce compliance" with it and the Act's requirements. *Id.* §§ 49-13-110, 49-13-111. An authorizer has the power to revoke a charter agreement if it determines that a sponsor has violated its charter or the school has been designated as a low-performing priority school. *Id.* § 49-13-122. A governing body may appeal most revocation decisions to the Commission, unless the Commission is the authorizer. *Id.* Charter schools are funded by state and local education dollars rather than tuition. *Id.* §§ 49-13-106(e), 49-13-112. Specifically, charter schools receive taxpayer-provided per-pupil funding from the State of Tennessee under the Tennessee Investment in Student Achievement Act funding formula. *Id.* § 49-13-112.

Approved charter schools remain subject to government oversight and regulation. They must comply with state academic standards, federal and state anti-discrimination laws, and other

statutory and regulatory requirements governing public schools. *See id.* § 49-13-111. Charter schools are also subject to public oversight, as its records are "open for personal inspection and duplication" by any state citizen "to the same extent" as those of traditional public schools. *Id.* § 49-13-111(g). And the meetings of the governing body of a charter school are "deemed public business" subject to the Tennessee Open Meetings Act. *Id.* § 49-13-111(h). Furthermore, public charter school teachers must hold a valid Tennessee educator license, and although employees of a charter school are employed by the private entity operating the charter school, they are treated as employees of the local school board for retirement purposes. *Id.* §§ 49-13-111(j), 8-35-242.

While charter schools operate within a framework of government oversight, they retain a degree of autonomy that distinguishes them from traditional public schools. They may establish their own "mission and goals," exercise control over instruction, and develop their own curricula, subject, of course, to the Nonsectarian Requirement, which only permits nonsectarian and nonreligious schools. *Id.* §§ 49-13-107(b)(1), 49-13-111(a)(2). The Act also gives charter schools some discretion over student enrollment. They may use a lottery when applications exceed available seats and may grant enrollment preferences to economically disadvantaged students and children of the school's employees or governing body members. *Id.* § 49-13-113(d). Enrollment is completely voluntary: Participation must be based on parental choice, and any student residing within the jurisdiction of the local education agency in which the charter school is located may apply. *Id.* § 49-13-113(a)–(b). Finally, the Act provides that a charter school's governing body may sue or be sued in its own name, unlike a traditional public school, which operates under the local school district. *Id.* § 49-13-124.

Charter schools must also apply to renew their charter agreement every 10 years to ensure compliance with regulatory and statutory requirements. *Id.* §§ 49-13-108(a), 49-13-110. If a

charter school cannot meet the requirements of a State Board of Education rule or statute, the sponsor may apply for a "waiver." *Id.* § 49-13-111(p). But waivers may not be granted for regulatory or statutory requirements related to "federal and state civil rights." *Id.* The only person with authority to waive the State Board of Education rules for a charter school under Tennessee law is the Commissioner of Education. *Id.* § 49-1-203.

### *B. Wilberforce and Its Proposed Religious Charter School*

Enter Wilberforce. On November 25, 2025, Wilberforce submitted a letter of intent (the "LOI") to KCBE indicating its intent to open a faith-based Christian charter school in the 2027–28 school year. [Doc. 10-2]. Importantly, the LOI form, created by the Tennessee State Board of Education, included a "Sponsor Eligibility" section advising that "Tennessee law limits who may sponsor a charter school and prescribes the type of entity that may operate a charter school." [Doc. 10-2 at 5[4]]. The form then provided a footnote citing the entirety of the Act for more information relating to eligible sponsors. [*Id.*]. In that same "Sponsor Eligibility" section, the form required any would-be sponsor to check various boxes to "confirm eligibility to apply." [*Id.*]. One of those boxes (the "Eligibility Box") corresponded with the following statement:

> The sponsor of this charter school is not: "a for-profit corporation;" "a non-public school, as defined in Tenn. Code Ann. § 49-6-3001(c)(3)(A), or other private religious, or church school;" and the proposed charter school is not cyber based.

[*Id.*]. Wilberforce explains that it left the Eligibility Box unchecked given them form's emphasis on sponsor eligibility, its citation to the Act as a whole, and the Act's then-existing prohibition on religious sponsors. [Doc. 99-2 at App. 0011, Ex. 1 at ¶ 36]. It instead provided the following

[4] For consistency and ease of reference, record citations are to the internal pagination of any filed document, not to the CM/ECF-stamped document and page number. Where possible, further citation is made to more specific subdivisions within a document, such as the paragraph number of an affidavit or complaint.

statement next to the Eligibility Box:

> Note: Sponsor is not a "for-profit entity," "nonpublic school," "other private, religious, or church school," or "postsecondary institution"; but Sponsor does "promote the agenda of any religious denomination or religiously affiliated entity." T.C.A. § 49-13-104(15).

[Doc. 10-2 at 5]. Wilberforce did affirm, however, that it is a not-for-profit organization and has applied for 501(c)(3) status.[5] [*Id.*]. Before KCBE took any action with respect to Wilberforce's LOI, Wilberforce filed the instant suit on November 30, 2025. [Doc. 1].

On December 2, 2025, KCBE responded to Wilberforce by email indicating that its LOI was "considered incomplete" based on Wilberforce's failure to check the Eligibility Box. [Doc. 10-4]. The email also indicated that Wilberforce could submit an updated "Letter of Intent to indicate eligibility as a sponsor" by December 3, 2025. [*Id.*]. Wilberforce did not submit an amended form and left the Eligibility Box unchecked. KCBE sent another email to Wilberforce on December 5, 2025, informing Wilberforce that it did not receive a "completed Letter of Intent indicating [its] eligibility as a sponsor" and that it considered Wilberforce as proceeding with the application "process in accordance with T.C.A. § 49-13-107 based upon [its] original Letter of Intent." [Doc. 99-2 at App. 0404, Ex. 12]. On January 16, 2026, Wilberforce's executive director, Zachary Wishart, attended KCBE's Charter Application Technical Assistance Workshop for sponsors applying to open in the 2027–28 school year. [Doc. 99-2 at App. 0011, Ex. 1 at ¶ 36]. The workshop was led by Theresa Nixon, KCBE's Executive Director for Academic Supports, who serves "as the main point of contact for [KCBE]" and answers "questions for the organizations attempting to sponsor or establish a Charter school." [Doc. 19-1 at ¶¶ 4, 10]. During the workshop,

[5] Wilberforce submitted an application to the IRS to register as a § 501(c)(3) non-profit organization on November 24, 2025. [Doc. 99-2 at App. 0006, Ex. 1 at ¶ 17]. The IRS approved Wilberforce's application on April 1, 2026, and it recognized Wilberforce's effective date of exemption as November 21, 2025. [*Id.* at App. 0411, Ex. 14].

Ms. Nixon informed Mr. Wishart—the only attendee—that a charter school "can't be run by a church or other religious organization." [Doc. 99-3 at App. 1513, Ex. 38 at 17:09–14].

Although the Act prohibited religious organizations like Wilberforce from sponsoring or operating a religious charter school, Wilberforce invested substantial resources in preparing a 279-page application that was ready for submission to KCBE on January 29, 2026. [Doc. 99-2 at App. 0109, Ex. 7; App. 0111–0390, Ex. 8]. Wilberforce retained an outside consulting group experienced in preparing successful charter school applications. [*Id.* at App. 0010, Ex. 1 at ¶¶ 32–35]. Alongside the eighty hours Mr. Wishart spent on the application, the group devoted approximately 1,200 hours to the effort, which ultimately cost Wilberforce $140,000. [*Id.*]. Yet the charter school application required the sponsor to affirm that the proposed school would operate as a "nonsectarian, non-religious public school." [*Id.* at App. 0116, Ex. 8 at ¶ 2]. Because Wilberforce could not truthfully make such an affirmation, it did not submit the application before the February 1, 2026, deadline. [*Id.* at App. 0011, Ex. 1 at ¶ 36].

Notwithstanding its failure to submit an application, Wilberforce claims that it is "able and ready" to apply for charter status and will do so once a court orders KCBE to stop discriminating against religious sponsors. [*Id.*]. Until that time, it believes any submitted application would be "futile" based on the Act's prohibition of religious charter schools. [*Id.*]; *see also* Tenn. Code Ann. § 49-13-111(a)(2).

### *C. The Instant Litigation*

Wilberforce initiated this action against KCBE on November 30, 2025, and filed its Amended Complaint on December 12, 2025, challenging the then-existing ban on religious sponsors and the current Nonsectarian Requirement of the Act, which it believes unlawfully discriminates against religious organizations in violation of the Free Exercise Clause of the First

Amendment. [Doc. 1]. Wilberforce seeks a declaration that the Nonsectarian Requirement—preventing it from opening an explicitly Christian charter school—is unconstitutional and further seeks a permanent injunction against KCBE with respect to future application cycles. [Doc. 99 at 8]. It also seeks nominal damages against KCBE with respect to the 2025-26 application cycle.[6] [*Id.*].

From the outset of this litigation, Wilberforce has sought an expedited resolution. It explains that preparing and opening a charter school takes considerable time, and applications are accepted only once a year. Thus, it maintains that each passing February delays its ability to pursue its mission by another year. [Doc. 1 at ¶ 65; Doc. 99 at 8]. Consequently, on January 23, 2026, before discovery had begun and before KCBE had an opportunity to respond to the Complaint, Wilberforce moved for accelerated summary judgment. [Doc. 14]. Given the significant constitutional questions presented and the lack of a developed record, the Court denied the motion to allow the parties to engage in discovery. [Doc. 64]. But recognizing Wilberforce's concerns and the likelihood that the case would involve very few factual disputes, the Court fashioned an expedited schedule designed to balance efficiency with fairness to both parties. [*Id.* at 5; Doc. 62]. Discovery has now concluded, and the parties have fully developed the record before the Court.

KCBE indicated early in this action that it would not take an official position on the constitutionality of the Act's Nonsectarian Requirement and instead would assert various procedural defenses. [Doc. 19 at 7]. Consistent with that position, KCBE moved to dismiss Wilberforce's claims, arguing, among other things, that Plaintiff lacked Article III standing

---

[6] Wilberforce has indicated that it no longer seeks compensatory damages, nor does it seek relief with respect to its backup preference that, if it cannot pursue a Christian charter school, it would pursue a secular charter school. [Doc. 99 at 8]. It now only seeks relief with respect to "all laws and policies that continue to block" its preference of opening an "explicitly Christian charter school." [*Id.*].

because it had not submitted a charter school application. [Doc. 57 at 7–17]. KCBE raised both a facial and factual challenge to the existence of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. [*Id.*]. The Court rejected both challenges, concluding that the allegations in the Amended Complaint and the evidence before it supported a finding that Wilberforce was ready and able to apply but for the barriers imposed by the Act. [Doc. 88 at 6–17]. Now, following discovery, KCBE, as well as the Intervenors, again contend that Wilberforce lacks Article III standing based on all the evidence in the record.

In large part because KCBE declined to take a position on the merits and the State of Tennessee declined to intervene, the Court permitted two separate groups to intervene in this action. [Docs. 41, 58, 80]. First, the Coble Intervenors joined this action in opposition to Wilberforce and to defend their interests in the way public-education tax funds are used in Tennessee. [Doc. 41]. This group consists of Knox County taxpayers who each have children who attend or have attended a Knox County non-charter public school. [Doc. 41 at 2]. They assert that their tax dollars will improperly fund religious instruction and be diverted from traditional public schools. [*Id.*]. The second group, the Carroll Intervenors, also opposes Wilberforce and have joined to defend the public nature of Tennessee charter schools. [Doc. 80 at 2]. This group consists of parents of children who attend public charter schools in Memphis, Nashville, and Chattanooga, Tennessee. [Doc. 80 at 2]. Many of these children have disabilities and receive accommodations under federal law, while others attend charter schools that receive federal funding to support students from low-income families. [*Id.*]. Unlike the Coble Intervenors, this group maintains that classifying Tennessee charter schools as private institutions would risk jeopardizing the public funding and statutory protections upon which their children rely. [*Id.* at 2–3].

Now, all four sets of parties have moved for summary judgment in their favor. [Docs. 99,

106, 114, 123]. The Court has received extensive briefing on the issues before it. All parties have timely filed their responses, replies, and even supplemental briefs pursuant to Local Rule 7.1(d). Based on the record before the Court, these matters are now ripe for the Court's review.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material fact must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*,

578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III. *DAUBERT* MOTIONS

As a preliminary matter, Wilberforce has moved to exclude the testimony of three separate experts under Rule 702 of the Federal Rules of Evidence. [Docs. 104, 111, 113]. First, Plaintiff challenges the Carroll Intervenors' expert, Holly Slater. She is offered to testify about the degree of control the State exercises over charter schools based on her experience in traditional public schools and as a charter school administrator in Tennessee. [Doc. 104]. Second, Plaintiff seeks to exclude the Coble Intervenor's expert, Derek Black, a law professor who is offered to testify about the history and policies surrounding public education in the United States as they relate to the Court's state-actor analysis below. [Doc. 111]. Finally, Plaintiff challenges the Coble Intervenor's expert, Steven Green, a law professor and legal historian offered to testify about the historical context concerning the Religion Clauses in support of their argument that religious charter schools violate the Establishment Clause. [Doc. 113].

Wilberforce raises several grounds for excluding these experts under Rule 702, including that they are not qualified and offer unreliable testimony based upon improper methodologies. The

most significant, however, is that, according to Wilberforce, all three of the experts' anticipated testimony are primarily legal opinions reserved for the Court to make.

As the Court has already explained in its prior Order [Doc. 95], *Daubert* motions ask courts to act as "gatekeepers," protecting juries from misleading or unreliable expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–92, 597 (1993). The Sixth Circuit has indicated that this "gatekeeper" role is "largely irrelevant in the context of a bench trial." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004). This is because the Court is "less prone to persuasion by misleading expert testimony than a jury." *United States v. Stepp*, 680 F.3d 651, 669 (6th Cir. 2012) (citing *Deal*, 392 F.3d at 852)). Even when conducting a bench trial, however, the Court may only consider admissible and reliable expert testimony. *See Thomas v. United States*, No. 2:03-CV-02416, 2015 WL 5076969, at *182 (W.D. Tenn. Aug. 27, 2015).

For purposes of the pending summary judgment motions, the Court need not wholesale exclude the challenged testimony. Much of it impermissibly offers legal conclusions, while the remainder is either irrelevant based on the Court's framing of the issues or insufficient to create a genuine dispute of material fact.[7] *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th

---

[7] For instance, Ms. Slater is offered to testify about the ways in which the "State of Tennessee exercises significant operational and organizational control over public charter schools." [Doc. 104-1]. That information, however, is meticulously laid out in the Act. *See* T.C.A. § 49-13-101, *et seq.* Indeed, Ms. Slater confirmed this in her deposition when she agreed that, to prove or disprove her opinions, "you could research or consult state law or federal law or what's asked for at the district." [Doc. 104-2 at 221:4–19]. Although the Court is mindful that some aspects of her testimony clarify the practical realities of the State's regulation of charter schools, such testimony ultimately does not create a genuine dispute of material fact. *See infra* Part VI at pp. 41, 50, 58–59; *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 (1974) (holding that an "extensive and detailed" regulatory scheme does not automatically transform an entity into a state actor).

Mr. Black's and Mr. Green's testimony is largely irrelevant in light of the Court's findings. As explained more thoroughly below, the Intervenors have improperly defined the state function and entity at issue in this case for the state actor analysis. Mr. Black's entire expert report is premised on two central questions: (1) "Whether the provision of free education open to all is a traditional

Cir. 2014) ("Nonetheless, a witness may not testify to a legal conclusion." (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)); *Hailes v. Sec'y of Dep't of Veterans Affairs*, No. 1:24-cv-293, 2026 U.S. Dist. LEXIS 95014, at *1–2 (N.D. Ohio Apr. 30, 2026) ("To be admissible, an expert's testimony must be helpful to the trier of fact. And proffered testimony is not helpful if it's not relevant." (cleaned up)). The Court is the factfinder in this case, and there is little risk that expert testimony will mislead or confuse the Court. The Court will therefore permit the testimony for purposes of resolving the pending motions without crediting opinions that impermissibly address questions of law or do not assist in resolving the issues presented.

Ultimately, however, the parties agree that this case can be resolved on summary judgment. Indeed, all four sets of parties have filed motions for summary judgment. [Docs. 99, 106, 114, 123]. And the outcome of this case turns largely on how the Court defines the public function and entity at issue for the state actor analysis—questions of law for the Court, not the experts. *See Berry*, 25 F.3d at 1343–54 (finding that an expert could not define "deliberate indifference" since it was a legal term reserved for the court); *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629 (6th 2005) (affirming the district court's decision at the summary judgment stage that an officer was a "state actor as a matter of law"); *Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 607–08 (5th Cir. 2026) ("What the founding generation understood as an establishment of religion is a

---

and an exclusive government function," and (2) "Whether Tennessee's charter schools are part of the state's system of free education open to all." [Doc. 111-1 at 3–4]. Similarly, Mr. Green's expert report discusses the history of "[f]ree, universal public education" and its development throughout America's history. [Doc. 113-1 at 6–7]. A look into the history and policies surrounding *free, universal education*, however, is not the proper inquiry, and even if it was, does not create a genuine dispute of material fact. *See infra* Part VI at pp. 47–56. Thus, while some of Mr. Black's and Mr. Green's findings may provide helpful context in understanding traditional public schools and private schools, their findings do not generate any dispute of material fact in this case.

legal question to be decided by a court, not a 'fact' question to be decided by experts, no matter how credentialed.").

As explained more thoroughly below, the Intervenors' experts largely analyze something different than the public function or entity at issue in this case. *See infra* Part VI at pp. 47–56. Their opinions therefore do not create a genuine dispute of material fact under the proper framework, even where those opinions might otherwise provide useful historical or practical context. Therefore, the Court will **DENY** Wilberforce's *Daubert* Motions [Doc. 104, 111, 113], as the testimony these experts does not change the Court's findings and fails to create any genuine dispute of material fact.

## IV. AMICUS BRIEF MOTION

Another matter that must be resolved before the Court can delve into the merits of this case is a Motion for Leave to File Amicus Curiae [Doc. 102] filed by the Tennessee Charter School Center ("TCSC"). TCSC is a nonprofit organization "engaged in policy, advocacy, and school-support work to ensure that Tennessee's charter schools have a fair playing field and the resources needed to provide high-quality public education to all students." [Doc. 103 at 1]. It requests to appear in this case not to ask the Court to decide the First Amendment questions in favor of either party, but to "assist the Court by explaining the structure, importance, and value of charter schools in Tennessee." [*Id.* at 2].

Courts in this Circuit have recognized that requests for leave to file an amicus curiae brief are governed by Federal Rule of Appellate Procedure 29. *Sweigert v. Cable News Network, Inc.*, No. 20-cv-12933, 2022 WL 842322, at *5, n.2 (E.D. Mich. Mar. 21, 2022) (collecting cases); *Triad Intern. Maint. Corp. v. S. Air Transp., Inc.*, No. 2:04-CV-2005, 2005 WL 1917512, at *1 (S.D. Ohio Aug. 10, 2005). Under Rule 29(a), a private amicus may file a brief "only by leave of court or if the brief states that all parties have consented to its filing." Fed. R. App. P. 29(a). When leave

of court is sought, Rule 29(b) provides that the motion for leave to file "must be accompanied by the proposed brief" and must state: (1) the movant's interest; and (2) the reason why the amicus brief is desirable and why the matters asserted are relevant to the disposition of the case. Fed. R. App. P. 29(b).

Here, Wilberforce has filed a brief in opposition to TCSC's request. [Doc. 125]. It argues that TCSC's "claimed neutrality is false" and that it actually "recruited the Carroll Intervenors to join this case and to oppose Wilberforce on the merits." [Doc. 125]. Although Wilberforce acknowledges that amicus briefs are "no longer expected to be independent of the merits," it argues that TCSC's privity with the Carroll Intervenors should foreclose its ability to file in this case.

"[P]articipation as an amicus to brief and argue as a friend of the court was, and continues to be, a privilege within the sound discretion of the courts, depending upon a finding that the proffered information of amicus is timely, useful, or otherwise necessary to the administration of justice." *United States v. Michigan*, 940 F.3d 143, 165 (6th Cir. 1991). "An amicus brief should normally be allowed when a party is not represented competently or is not represented at all, when the amicus has an interest in some other case that may be affected by the decision in the present case (though not enough affected to entitle the amicus to intervene and become a party in the present case), or when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Protect our Land and Rts. Def. Fund v. Enbridge Energy, Ltd. P'ship*, No. 12-14161, 2012 WL 5288135, at *1 (E.D. Mich. Oct. 25, 2012) (internal citations omitted). "Otherwise, leave to file an amicus curiae brief should be denied." *Id.*

TCSC does not contend that any of the foregoing considerations apply. Upon reviewing the proposed brief, the Court finds no basis to permit its filing, regardless of TCSC's underlying motivations or potential connections with the Carroll Intervenors. The proposed amicus curiae

brief does not offer a "unique" perspective or identify any material information otherwise absent from the record. Two separate groups have already been permitted to intervene in this matter, each represented by highly competent counsel, and the parties have submitted extensive briefing on the propriety of summary judgment. *See Nat'l Air Traffic Controllers Ass'n v. Mineta*, No. 99CV1152, 2005 U.S. Dist. LEXIS 54190, at *4–5 (N.D. Ohio June 23, 2005) (denying leave to file amicus briefs by interested parties because they failed to offer a "unique" perspective that was not already briefed in the record). TCSC offers its brief to assist the Court in understanding the structure of Tennessee charter schools and what mechanisms make "those schools part of the public-education system." [Doc. 103 at 2]. Those matters, however, are argued at length in the Intervenors' briefing already before the Court. [*See generally* Docs. 110, 115, 138, 139, 146, 147]. Under these circumstances, there is little reason to believe that TCSC's proposed brief would do more than reiterate or potentially repackage arguments already presented.

Accordingly, the Court will exercise its discretion and **DENY** TCSC's Motion [Doc. 102].

## V. POSITIONS OF THE PARTIES

All four sets of parties have filed cross-motions for summary judgment. [Docs. 99, 106, 114, 123]. At a high level, the motions present two central questions: (1) whether Wilberforce has Article III standing to bring its claims against KCBE; and (2) if so, whether the Act's Nonsectarian Requirement is constitutional as applied to Wilberforce. The second question, in turn, raises a threshold issue that shapes much of the parties' briefing: whether a charter school operating under the Act would be a state actor. Wilberforce, as a private, non-profit organization, plainly possesses Free Exercise rights. But the Intervenors contend that Wilberforce would not retain those rights if it operated as a charter school because it would then be a government entity or state actor. Along those same lines, Intervenors also argue that the Establishment Clause bars religious charter schools. The parties have briefed these issues extensively, often advancing overlapping arguments

on the same legal and factual questions. The Court therefore begins by briefly summarizing each party's position.

### A. Wilberforce

As to standing, Wilberforce argues that the issue is straightforward: When Wilberforce sought to apply, the Act categorically barred religious sponsors, and the law continues to prohibit religious charter schools. [Doc. 99 at 9–14]. Submitting an application, Wilberforce contends, would therefore have been futile. [Doc. 141 at 14–21]. Because the injury is the "inability to compete on an equal footing" with secular organizations, all Wilberforce needs to show is that it had a concrete intent to apply and was ready and able to do so. [Doc. 99 at 4, 8–14]. To support its futility argument and its contention that it was ready and able to apply, Wilberforce points to its completed application, its submission of the LOI to KCBE, and KCBE's statements and policies surrounding religions charter schools. [*Id.*; Doc. 141 at 18–22].

On the merits, Wilberforce contends that the Act's Nonsectarian Requirement violates the Free Exercise Clause of the First Amendment by excluding it from a generally available public benefit because of its intended religious use. [Doc. 99 at 15–17]. Wilberforce maintains that neither it nor its proposed charter school would qualify as a government entity under *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374 (1995), or as a state actor under the public-function or entwinement tests. [Doc. 99 at 17–22]. It emphasizes that the Act does not establish a charter school as a legal entity separate from its sponsor, so a would-be sponsor does not automatically shed its private status once it enters a contractual agreement with an authorizer to operate a charter school. [*Id.* at 18–20; Doc. 141 at 26–32]. Under the public-function test, Wilberforce argues that education is not a function traditionally reserved exclusively to the state. [Doc. 99 at 20–22; Doc. 144 at 16–17]. It contends that the Intervenors define the relevant function improperly by framing

it as the provision of "free public schools," rather than providing some kind of education generally. [Doc. 99 at 21–22]. It also maintains that the State is not entwined in the management or control of charter schools because they are operated by private nonprofits who select their own board members. [Doc. 144 at 17]. Finally, Wilberforce argues that even if the Establishment Clause applied, it does not overcome its Free Exercise rights. [Doc. 99 at 22–24; Doc. 144 at 18–23].

**B. KCBE**

KCBE only takes a position on standing. The Board argues that Wilberforce lacks standing because it never submitted a completed charter school application and was never denied approval.[8] [Doc. 123 at 10–12]. It believes that Wilberforce's injury was "self-inflicted" rather than the result of any action of KCBE. [Doc. 123 at 23–24]. KCBE emphasizes that it acknowledged Wilberforce's LOI, invited it to correct the omission, and even permitted Wilberforce to proceed with the application process. [*Id.* at 8; Doc. 115 at 19]. In KCBE's view, those steps left the application process open to Wilberforce, who voluntarily decided not to move forward. Due to Wilberforce's failure to submit an application, KCBE maintains that Wilberforce suffered no injury in fact because there is no final decision for the Court to review. [*Id.* at 20–23]. Nor can Wilberforce show that its proposed charter school would have been approved. [*Id.* at 12–13]. In addition, KCBE asserts that Plaintiff's Free Exercise claim is now moot based on the subsequent change in Tennessee law that now permits religious sponsors to operate a secular charter school. [*Id.* at 15–17]. In response, Wilberforce concedes that its challenge to the religious sponsor ban is now moot, but its main claim—its purported free-exercise right to open a religious charter

[8] KCBE also adopts and incorporates by reference the Intervenors' arguments regarding Wilberforce's standing to bring this action and mootness. [Doc. 123 at 24].

school—is still alive based on the Act's Nonsectarian Requirement that remains in place. [Doc. 141 at 23].

KCBE separately seeks summary judgment on Wilberforce's claim for nominal damages under 42 U.S.C. § 1983 because it argues that it neither coerced Wilberforce to violate its religious beliefs nor took any action against it. [Doc. 123 at 10–13]. In the alternative, KCBE maintains that it is entitled to sovereign immunity as to nominal damages because it was merely implementing state law over which it had no discretion. [*Id.* at 13–15].

### C. Coble Intervenors

The Coble Intervenors challenge only Wilberforce's standing in their motion for summary judgment. [Docs. 114, 115]. They argue that Wilberforce was neither excluded from the application nor ready and able to apply when it filed suit. [Doc. 115 at 16–23]. They contend that Wilberforce never genuinely intended to submit a charter school application and instead manufactured this litigation by filing suit before it received any response from KCBE. [*Id.* at 1–2, 21]. They point to Wilberforce's incorporation just days before it submitted its LOI, its reliance on an outside consulting firm to prepare the application, deficiencies in its draft application, and what they characterize as inadequate leadership to operate the proposed school. [Doc. 147 at 11–16]. They also argue that the Court cannot consider much of the evidence Wilberforce invokes to establish its intent and ability to apply—including its completed application, payments to the consulting firm, and KCBE's emails or statements—because those events occurred after this litigation began and thus cannot be used to generate standing. [Doc. 139 at 9].

The Coble Intervenors also contend that Wilberforce's failure to check the Eligibility Box in its LOI proves fatal to its claims because Wilberforce conceded during discovery that it could have technically checked the box and proceeded with its application. [Doc. 115 at 2]. As an

example, they point to Union Academy, another openly religious applicant in Tennessee that left the same box unchecked, submitted its application in the same cycle, and was approved by a separate school board in Tennessee. [*Id.* at 1–2, 14, 21]. The Coble Intervenors believe this evidence demonstrates that submitting an application was not futile because KCBE may have approved the application notwithstanding the Act's Nonsectarian Requirement.

The Coble Intervenors further dispute causation, redressability, and ripeness. They argue that Wilberforce's own failure to apply caused its alleged injury and its draft application contained independent deficiencies that could have led to denial regardless of the religious restriction under the Act. [*Id.* at 10–14]. Without a submitted application and an agency decision, they contend the Court would have to speculate about how KCBE would have evaluated the proposal, which risks issuing an advisory opinion on the issues. [*Id.* at 25].

Finally, in opposing Wilberforce's motion for summary judgment, the Coble Intervenors contest the merits of the constitutional claims at issue. They argue that Tennessee charter schools are government entities under *Lebron*'s framework because the State created them as part of its public-education system, funds their operations, exercises substantial control over their governance and educational requirements, and utilizes them to promote a government purpose. [Doc. 139 at 11–16]. At minimum, they assert that charter schools are state actors because providing "free, public education to all" has been a function "traditionally and exclusively delivered" by the government. [*Id.* at 17–18]. The Coble Intervenors alternatively argue that charter schools are state actors under the entwinement theory due to the level of "management and control" the state has over them. [*Id.* at 18–19]. They further contend that the charter school program differs from the generally available public-benefit programs in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), *Espinoza v. Montana Department of Revenue*,

591 U.S. 464 (2020), and *Carson v. Makin*, 596 U.S. 767 (2022). [*Id.* at 12–13]. Even if Wilberforce does have a valid Free Exercise claim, they maintain that the Establishment Clause prohibits inculcating religion in students and directing state aid for religious activities. [*Id.* at 20–23]. Lastly, the Coble Intervenors argue that the Nonsectarian Requirement satisfies strict scrutiny because the state has a compelling interest in preventing an Establishment Clause violation. [*Id.* at 23–25].

### D. Carroll Intervenors

Unlike the Coble Intervenors, the Carroll Intervenors directly move for summary judgment on both standing and the merits. On standing, they also argue that Wilberforce was not ready and able to apply when it filed suit: It had not hired its eventual application consultant, had not prepared its draft application, and never submitted an application despite being invited to do so by KCBE. [Doc. 110 at 7–9]. The Carroll Intervenors maintain that, although Wilberforce might have produced enough evidence to survive the motion to dismiss stage, it has failed to meet its "significantly higher" standing burden at the summary judgment stage. [*Id.*].

On the merits, the Carroll Intervenors advance similar arguments to the Coble Intervenors. They too argue that Wilberforce—as a charter school—is a distinct private entity under *Lebron*. [*Id.* at 14–20]. They also maintain that the Court should look at the four characteristics of "public schools" identified in *Carson* to determine whether Tennessee's charter schools are indeed public schools. [*Id.* at 12–14]. They emphasize that charter schools under the Act are designated by statute as public schools, operate within the State's public-education system, provide tuition-free education, follow state curriculum and assessment requirements, receive public funding, and remain subject to extensive state oversight. [*Id.* at 17–18]. In any event, the Carroll Intervenors assert the Court should follow the direction of the Fourth Circuit in *Peltier v. Charter Day School,*

*Inc.*, 37 F.4th 104 (4th Cir. 2022), and the Oklahoma Supreme Court in *Drummond ex rel. State of Oklahoma v. Oklahoma Statewide Virtual Charter School Board*, 2024 OK 53 (Okla. 2024), and find that Tennessee charter schools are public schools. [*Id.* at 9–12]. They argue that providing free public education is a traditional sovereign function of Tennessee, and, in their view, federalism principles should counsel the Court to respect Tennessee's decision to structure its charter schools as public schools. [*Id.*].

If the Court believes that charter schools are not government entities under Tennessee law, the Carroll Intervenors posit that they are state actors under the public function test and the entwinement test. [*Id.* at 20]. Like the Coble Intervenors, the Carroll Intervenors believe that the relevant function would be "providing free public education within the Tennessee public schools system," which is inherently the exclusive function of the state. [*Id.* at 20–22]. And, if their public function argument fails, then charter schools are state actors under the entwinement test. [*Id.* at 22]. The Carroll Intervenors also reject Wilberforce's characterization of the charter school program as a generally available public benefit from which religious organizations have been discriminatorily excluded. [*Id.* at 22–25]. They argue that Tennessee is providing education through its own public school system, rather than subsidizing private religious schools, and may require the schools to remain secular. [*Id.*]. On that view, they assert that there is no Free Exercise interest that collides with the Establishment Clause. [Doc. 138 at 24–25].

Both the Carroll Intervenors and Coble Intervenors agree that, even if their summary judgment motions are denied, Wilberforce's arguments present factual questions that preclude summary judgment. [*Id.* at 17–22; Doc. 139 at 25]. As to standing, both Intervenors believe that they have submitted evidence disputing whether Wilberforce was truly able and ready to submit a charter school application. [Doc. 110 at 4–8; Doc. 139 at 25]. Moving to the merits, they both

contend that there is some dispute in the record about the level of control the State of Tennessee has over charter schools. [Doc. 110 at 18; Doc. 139 at 25]. But make no mistake, they each alternatively argue that this case can be resolved at the summary judgment stage based on the evidence in the record.

## VI. ANALYSIS

The Court must first determine whether Wilberforce has standing to assert its claims against KCBE. If it does not, the analysis ends there. But if it does, the Court may then proceed to analyzing the constitutionality of the Act's Nonsectarian Requirement.[9]

### A. Standing

Article III of the Constitution limits the jurisdiction of federal courts to actual cases and controversies. U.S. Const. art. III, § 2. Courts have long understood Article III, Section 2 to require that a "case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (citation omitted). To ensure that a live controversy exists between the parties, "constitutional standing has three elements that serve as its irreducible minimum in all cases." *Miller v. City of Wickliffe*, 852 F.3d 497, 502 (6th Cir. 2017) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual and imminent, not conjectural or hypothetical." *Id.* (internal citation and quotations omitted). The second element requires the plaintiff to prove causation—"i.e., that her injury is 'fairly traceable to the challenged action of the defendant, and

[9] Both groups of Intervenors in this matter have requested oral argument as it relates to the pending motions for summary judgment. [Docs. 106, 114]. The Court has reviewed the record in this case, the applicable legal authorities, and the parties' arguments. Given the extensive briefing in this case, the Court finds oral argument is not necessary for it to resolve the motions for summary judgment.

not the result of independent action of some third party not before the court." *Id.* (citation and quotations omitted). For the third and final element, the plaintiff must "prove that it is likely, rather than merely speculative, that a favorable decision could redress the injury." *Id.* (citation omitted).

i. Wilberforce has standing because it was "able and ready" to apply for charter status.

The Court has addressed Wilberforce's standing once before when it denied KCBE's Motion to Dismiss. [Doc. 88]. Although Wilberforce faced a less demanding evidentiary burden at that stage, the Court rejected KCBE's facial and factual challenges, concluding that the evidence then before it was sufficient to establish standing. [*Id.* at 6–14]. In that Memorandum Opinion and Order, the Court discussed the relevant governing law at length. [*See* Doc. 88 at 7–10]. In doing so, the Court surveyed the Supreme Court's "able and ready" precedents and distilled two principles that govern the standing inquiry here. [*Id.*].

First, Wilberforce need not show that its charter school application ultimately would have been approved; it must show that it would have applied but for a discriminatory barrier that prevented it from competing on equal footing with secular organizations. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jack.*, 508 U.S. 656, 666 (1993) ("[T]he 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract."); *Trinity Lutheran*, 582 U.S. at 463 ("The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant."). Second, that intent to apply must be concrete, supported by sufficient evidence to establish that Wilberforce was likely to apply in the reasonably foreseeable future rather than merely expressing a hypothetical interest in doing so. *See Carney v. Adams*, 592 U.S. 53, 60 (2020) ("Adams must at least show that he is likely to apply to become a judge in the reasonably foreseeable future if Delaware did not bar him because

of political affiliation. And our cases make clear that he can show this only if he is 'able and ready' to apply.").

The Court sees no need to repeat its earlier discussion of these authorities. The question now is whether, in light of the fully developed record, Wilberforce has satisfied those requirements. The Court finds that it has.

Once again, the Court finds it particularly helpful to compare the facts of this case to those in *Carney*. In *Carney*, the respondent, Adams, filed suit against Delaware's Governor, claiming that Delaware's political balance requirements violated his First Amendment right to freedom of association by making him ineligible to become a judge unless he rejoined a major political party. 592 U.S. at 56. The Court, after carefully reviewing all the evidence in the summary judgment record, found that Adams was not "able and ready" to apply for a judicial position. *Id.* at 61. Although Adams testified in his deposition that he would apply for any judicial position that he thought he was qualified for, his "few words of general intent" did not demonstrate that he was going to apply in the imminent future. *Id.* at 66. Adams did not reference any anticipated timeframe, prior judgeship applications, prior relevant conversations, or any other preparation or investigations into potential judicial positions. *Id.* at 63–64. Based on the evidence in the record, the Court concluded that Adams's claim suggested an "abstract, generalized grievance, not an actual desire to become a judge." *Id.*

The record, by contrast, shows that Wilberforce has met its burden to show that it had a concrete intent to apply to open a charter school in the 2027–28 school year. To begin, Wilberforce's Executive Director confirmed in his deposition that Wilberforce's plan was to create a charter school "from the outset." [Doc. 99-2, App. 0043, Ex. 4 at 34:3–6]. Wilberforce then took tangible steps to turn that plan into reality. Before filing suit, it formally incorporated under Tennessee law on November 21, 2025, and was retroactively granted § 501(c)(3) status as of the

same date. [Doc. 99-2, App. 0043, Ex. 4 at 35:19–24; Doc. 99-2, App. 0411, Ex. 14]. Next, Wilberforce took the initial step in the application process to open a charter school by submitting its LOI on November 25, 2025, which expressly indicated its "projected opening school year" date as 2027. [Doc. 10-2]. Already, Wilberforce stands in a materially different position than the plaintiff in *Carney*. These actions show that Wilberforce had undertaken "preparations" to apply on a clear "anticipated timeframe" by organizing a legal entity, establishing its tax-exempt status, and beginning the application process by submitting the LOI. *Carney*, 592 U.S. at 63. Even before filing suit, Wilberforce's actions demonstrate much more than the "few words of general intent" in *Carney*. *Id.* at 66.

After viewing the evidence in the light most favorable to the nonmoving parties, Wilberforce has "affirmatively introduce[d] evidence of such weight that no rational jury could disagree" with the conclusion that it was able and ready to apply in the imminent future. *Tenn. Conf. of the NAACP v. Lee*, 139 F.4th 557, 569 (6th Cir. 2025) (internal citation and quotations omitted); *see also Carney*, 592 U.S. at 66. Wilberforce was formed for the particular purpose of operating a Tennessee charter school. [*See* Doc. 99-2, App. 0006, Ex. 1 at ¶ 15]. It identified the school district in which it intended to operate, established a target opening year, and completed the initial step of the application process. Alongside beginning the application process, Wilberforce's leadership and board of directors included individuals with experience working in education, including experience operating a Tennessee charter school. [Doc. 99-2, App. 0004–06, Ex. 1 at ¶¶ 6–7, 11]; *see Bridges v. Prince George's Cnty.*, No. 21-1319-BAH, 2024 U.S. Dist. LEXIS 18368 (D. Md. Feb. 1, 2024) (finding standing at summary judgment stage where plaintiff had requested an application and possessed experience in the position he sought). At the time Wilberforce filed suit, the Act categorically excluded it from not only applying but from also operating a religious charter school. Beyond submitting a formal application, there was not much

else Wilberforce could do before filing suit if it wanted to participate—without any discriminatory barriers—in the next application cycle. The futility doctrine exists to avoid such an exercise.

Contrary to KCBE and the Intervenors' position, post-filing events can also be relevant to the standing inquiry. "While a plaintiff's standing is ordinarily assessed as of the time a lawsuit is brought, immediate post-filing events may be taken into account where, as here, the relief requested is directed at preventing a future action (i.e. denial of plaintiff's future reapplications)." *Hakim v. Chertoff*, 447 F. Supp. 2d 325, 328 (S.D.N.Y. 2006) (cleaned up). Indeed, the events that have unfolded since Wilberforce filed suit merely "confirm" what was already true at the time of filing: Wilberforce had a concrete intent to apply and that its "fear of future harm [was] reasonable." *Baur v. Veneman*, 352 F.3d 625, 637 n.11 (2d Cir. 2003); *see also Welty v. Dunaway*, 749 F. Supp. 3d 882, 903 n.8 (M.D. Tenn. 2024) (analyzing facts in the standing context as "backwards-looking evidence" to confirm what was true at the time of filing). Here, Wilberforce attended KCBE's charter school workshop, paid a consultant $140,000 to help develop its application, and completed a 279-page application before the submission deadline. [*See* Doc. 99-2, App. 0010, Ex. 1 at ¶ 33; App. 111, Ex. 8; App. 1512, Ex. 38]. These were not mere expressions of interest or steps taken to retroactively bolster this litigation. They were concrete, costly efforts to bring Wilberforce's proposed charter school to fruition. And while each occurred after the Complaint was filed, each supports the same conclusion: Wilberforce's intention to open a charter school for the 2027–28 school year at the time of filing was genuine, not "conjectural or hypothetical."[10] *Carney*, 592 U.S. at 58 (cleaned up).

[10] To be sure, the short interval between Wilberforce's incorporation and the filing of suit and its reliance on a consultant to prepare its application may suggest that Wilberforce sought only to "vindicate [its] view of the law." *Carney*, 592 U.S. at 62. But those factors are not dispositive. Considered alongside the rest of the record, they do not outweigh the substantial evidence that Wilberforce had a concrete intent to apply and operate a charter school, rather than merely air a general grievance with the law.

It is also clear from the record that submitting a charter school application to KCBE would have been futile. *See Doster v. Kendall*, 54 F.4th 398, 417 (6th Cir. 2022) ("Just as someone may challenge a racially discriminatory policy for awarding contracts without receiving a formal denial . . . so too the Plaintiffs likely can challenge a religiously discriminatory policy without receiving a formal denial."). At the time Wilberforce filed suit, the Act categorically prohibited religious sponsors from applying. Tenn. Code Ann. § 49-13-104(16)(B) (2025). And the Act still prohibits sponsors from operating a religious charter school. *Id.* § 49-13-111(a)(2). Moreover, KCBE's official policies—including its Policy I-450, its charter school handbook, and its charter school performance framework—all affirm that charter schools cannot be religious. [Doc. 99-4, App. 1552, Ex. 41 at 2 n.2; App. 1563, Ex. 42 at 9; App. 1600, Ex. 43 at 19]. Beyond its official policies, KCBE's actions and statements also demonstrate that Wilberforce need not have submitted an actual application.

Perhaps most convincing is how KCBE treated Wilberforce's LOI. KCBE deemed the submission "incomplete" because Wilberforce left the Eligibility Box unchecked. [Doc. 10-4]. KCBE and Intervenors argue that Wilberforce's injury is self-inflicted because Mr. Wishart concedes that Wilberforce could have *technically* checked the box and proceeded with its application. [Doc. 115 at 2, 18–19; Doc. 123 at 8, 24; Doc. 138 at 8]. Wilberforce asserts that the surrounding information on the LOI form, alongside KCBE's response, led it to reasonably believe it could not certify its eligibility as a sponsor without misrepresenting its legal status. [Doc. 99-2, App. 0011, Ex. 1 at ¶ 36(a)]. The record does not support KCBE and the Intervenors' position. The Eligibility Box appeared under the section titled "Sponsor Eligibility," and the form expressly advised applicants that Tennessee law limits who may sponsor a charter school. [Doc. 10-2 at 5]. It even directed prospective sponsors to the Act itself for them to presumably determine whether they qualified. [*Id.*]. The Court finds that the form's emphasis on sponsor eligibility, its citation to

the Act, and direct warning that Tennessee law prescribes the type of entity that may operate a charter school reasonably led Wilberforce to believe that it could not certify its eligibility. To be sure, the Eligibility Box did not expressly include every statutory qualification. Oddly, it recited the first part of the definition of "sponsor" as defined in Tennessee law at that time, but omitted the second, which prohibited sponsors that "promote the agenda of any religious denomination or religiously affiliated entity." Tenn. Code Ann. § 49-13-104(16) (2025). Whatever the reason for that omission, the Court will not fault Wilberforce for declining to make a representation of eligibility that it reasonably believed was false—and that, if false, could expose it to legal consequences.

KCBE's response to the LOI only reinforced that understanding. In its email response to Wilberforce's submission of the LOI, KCBE again identified the relevant section as "Sponsor Eligibility," cited Tenn. Code Ann. § 49-13-104(16), and instructed Wilberforce that it could submit a completed LOI by updating the form to "indicate sponsor eligibility." [Doc. 10-4]. The statutory provision KCBE cited contained the very restriction that prevented Wilberforce from serving as a sponsor under the law then in effect. In other words, KCBE treated the unchecked box not as a minor paperwork omission, but as a failure to establish sponsor eligibility, and advised Wilberforce that it had an opportunity to certify the very eligibility that state law denied it. Against the record, the argument that Wilberforce simply chose not to apply by failing to check the Eligibility Box, and thus inflicted its own injury, rings hollow.

KCBE and Intervenors' argument that Wilberforce could have just simply submitted its application holds no water. As explained above, KCBE deemed Wilberforce's LOI "incomplete" because it did not affirm sponsor eligibility. Although KCBE indicated to Wilberforce that it could proceed with an incomplete LOI, the charter school application itself required Wilberforce to also affirm that it would "[o]perate as a public, nonsectarian, non-religious public school." [Doc. 99-2,

App. 0116, Ex. 8 at 5; Doc. 99-4, App. 1697, Ex. 47 at 14]. KCBE therefore presented Wilberforce with only two options: either falsely disclaim its religious status or continue submitting materials that KCBE had already indicated would be deemed incomplete. And any doubt about KCBE's position was dispelled at its Charter Application Technical Assistance Workship, held before the February 1 application deadline, when Ms. Nixon told Mr. Wishart—the workshop's only attendee—that a charter school "can't be run by a church or other religious organization."[11] [Doc. 99-3 at App. 1513, Ex. 38 at 17:09–14]. She also said that applicants must "use the State Board of Education application," which Wilberforce could not do without disclaiming its religious character. [*Id.* at 23:34–40]. Under these circumstances, KCBE cannot persuasively fault Wilberforce for failing to pursue an application that required an affirmation it could not truthfully make and that KCBE had already signaled would be unacceptable.

Nor does the fact that another Tennessee authorizer approved Union Academy, an openly religious charter school, change the analysis. The suggestion that Wilberforce should have applied to KCBE simply because another Tennessee authorizer apparently disregarded the Act's Nonsectarian Requirement is entirely unpersuasive. Just because one authorizer may have violated Tennessee law does not mean Wilberforce could reasonably expect KCBE to do the same—particularly when KCBE's own guidance and communications gave Wilberforce little reason to believe it would.

---

[11] KCBE and Intervenors attempt to downplay Ms. Nixon's comments by arguing that she never expressly told Wilberforce not to apply and that she had no authority to speak on KCBE's behalf. Ms. Nixon, however, is in charge of managing the Charter School program for KCBE, which includes answering "questions for the organizations attempting to sponsor or establish a Charter School." [Doc. 57-1 at ¶¶ 3–4]. In addition, KCBE's charter school application protocol states that the workshop is given "by KCS" itself. [Doc. 141-1, App. 2266, Ex. 128 at 3]. While it is true that she never expressly said the words, "Wilberforce cannot apply," she did not need to. Her actions and statements tend to show that KCBE would not have accepted Wilberforce's application based on its religious status and mission.

Unlike the plaintiffs in *Miller v. City of Wickliffe*, Wilberforce made a "strong showing" that KCBE would not have permitted it to operate a religious charter school. 852 F.3d 497, 504–05 (6th Cir. 2017). In *Miller*, the city "never indicated that it would not permit [the] plaintiffs to open their nightclub," and in fact expressly invited the plaintiffs to submit a conditional use permit that fixed any application deficiencies. 852 F.3d at 505. However, the plaintiffs never did so. *Id.* The court also noted that it was "far from clear that the nightclub ordinance would have necessarily prohibited plaintiffs form opening a nightclub" and that the city had indicated that it "did not have a legal justification to [deny the plaintiffs a permit]." *Id.* at 505–06. For those reasons, the plaintiffs' futility argument was not a legitimate basis for standing. *See id.* The same cannot be said here. It is abundantly clear that the Nonsectarian Requirement prohibits Wilberforce from opening a religious charter school. Unlike the city in *Miller*, KCBE did not invite Wilberforce to pursue an avenue of action that accommodated Wilberforce's religious character. In fact, beyond KCBE's stated policies on non-religious charter schools, Ms. Nixon made clear to Mr. Wishart that a religious institution could not become a charter school operator. [Doc. 99-3 at App. 1513, Ex. 38 at 17:09–14]. Moreover, under the Act, KCBE had full authority to deny any application Wilberforce submitted based on the Nonsectarian Requirement. *See* Tenn. Code Ann. §§ 49-13-108; 49-13-111(a)(2). Therefore, Wilberforce has demonstrated that it would have been futile for it to apply.[12]

[12] And to the extent that KCBE and Intervenors rely on *Roberts v. Progressive Preferred Ins. Co.*, 167 F.4th 955 (6th Cir. 2026), the Court has already explained in its prior Order why the facts in that case are distinguishable. [*See* Doc. 88 at 14]. First, this case does not involve separate sequential application stages at which discrimination arose only later in the process. *Roberts*, 167 F.4th at 11–12. At the time Wilberforce filed suit, the Act did not permit religious sponsors to apply in general. *See* Tenn. Code Ann. § 49-13-104(16) (2025). And even if the LOI can be characterized as an initial contractual stage, Wilberforce actually submitted it unlike the plaintiff in *Roberts*. [Doc. 10-2].

Although the Coble Intervenors go to great lengths to point out the apparent deficiencies in Wilberforce's application, Wilberforce need not demonstrate that it ultimately would have received charter approval but for the Nonsectarian Requirement. [*See* Doc. 88 at 7–11]; *see also Shea v. Kerry*, 796 F.3d 42, 50 (D.C. Cir. 2015) (finding that in inability-to-compete cases, courts "do not inquire into the plaintiff's qualifications (or lack thereof) when addressing standing"); *Nat'l Ben Gamla Jewish Charter Sch. Found., Inc. v. Shellem*, No. CIV-26-582-R, 2026 U.S. Dist. LEXIS 221142, at *12 (W.D. Okla. Sept. 24, 2026) (recognizing that a religious charter school sponsor need not actually show their application would be denied to have standing). After all, the Supreme Court has emphasized that when applying would be futile, an "aggrieved party need not allege that he would have obtained the benefit but for the [unlawful] barrier in order to establish standing." *Carney*, 592 U.S. at 66 (citation modified). It makes little sense, therefore, to speculate how KCBE would have handled such deficiencies when Wilberforce did not need to translate its desire to operate a charter school "into a formal application."[13] *Id.* But even so, KCBE and Intervenors "have not identified any noncurable conditions or nondiscriminatory eligibility criteria that entirely disqualify [Wilberforce] from receiving a charter contract." *Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *13.

Based on the summary judgment record before the Court, Wilberforce has shown that it had a concrete intent to apply for charter status in the imminent future but that submitting an

[13] KCBE and the Coble Intervenors' argument regarding the purported deficiencies in Wilberforce's draft application is also internally inconsistent. On the one hand, they argue that because Wilberforce never submitted its application, the Court would risk issuing an advisory opinion by having it "predict how [KCBE] would treat [the] submission." [Doc. 115 at 25]. On the other hand, they ask the Court to do precisely that: scrutinize the draft application and predict that KCBE would have rejected it for any of those reasons. [*See id.* at 10–14]. This is particularly salient when KCBE is not even "bound" by the State Board of Education's scoring rubric that the Coble Intervenors rely on to support the apparent deficiencies. [Doc. 108-1 at ¶ 13]. If predicting how KCBE would have treated the application would require the Court to issue an advisory opinion, then that concern applies no less to their own argument.

application would have been a "futile gesture" in light of KCBE's policies and actions. Wilberforce, therefore, has made the required showing that it was "able and ready" to apply for standing purposes.

ii. Wilberforce's claim regarding the Act's Nonsectarian Requirement is not moot and is ripe for adjudication.

As the Court explained above, the parties agree that Wilberforce's claim regarding the Act's prohibition of religious sponsors has been mooted by the subsequent change in Tennessee law. *See* Pub. Ch. 1128, § 1, 114th Gen. Assembly; Tenn. Code Ann. § 49-13-104(17) (2026). That amendment, however, left the Act's Nonsectarian Requirement in place. *See* Tenn. Code. Ann. § 49-13-111(a)(2) (2016). Thus, Wilberforce's claim that the Act's Nonsectarian Requirement violates its free exercise right to open a religious charter school is still in dispute. Again, the Nonsectarian Requirement provides that a "public charter school, at a minimum," must "[o]perate as a public, nonsectarian, nonreligious public school . . .." Tenn. Code Ann. § 49-13-111(a)(2).

KCBE and the Intervenors argue that Wilberforce's claim regarding the Act's Nonsectarian Requirement is both moot and unripe for many of the same reasons argued above. For instance, they argue that because no application was submitted, there is no final decision for the Court to review. [*See* Doc. 115 at 3, 25]. The Court has already explained above that Wilberforce did not need to submit a formal application to have standing. And although it is true that it may not be able to open a charter school during the 2027–28 school year, Wilberforce has shown that it is "able and ready" to apply to for charter school status "for the earliest school year it could open." [*See* Doc. 10 at ¶ 48]. Moreover, no post-filing developments have indicated that KCBE plans to consider Wilberforce's application as if it were submitted by a secular organization.

Therefore, the imposition of the alleged discriminatory barrier—the Act's ban on religious charter schools—and Wilberforce's concrete intent to apply in the imminent future make this claim ripe for adjudication.

* * *

For the reasons explained above, Wilberforce has carried its burden to establish standing and ripeness. Although KCBE and the Intervenors argue there are disputed issues of fact, they really only dispute the legal implications arising from those facts. *See Yarberry v. Gregg Appliances, Inc.*, No. 1:12-cv-611-HJW, 2014 U.S. Dist. LEXIS 129422 (S.D. Ohio Sept. 16, 2014) (citing *Beard v. Banks*, 548 U.S. 521, 529–30 (2006)). Accordingly, Wilberforce is entitled to judgment on the issue of standing.

**B. Merits**

Turning to the merits, Wilberforce argues that the Act's Nonsectarian Requirement violates its rights under the Free Exercise Clause of the First Amendment because it excludes religious organizations from a generally available public benefit. Intervenors contend, however, that Wilberforce would have no such protection if permitted to operate a charter school because it would then transform into a governmental entity or state actor. And even if Wilberforce possessed Free Exercise rights, Intervenors assert that the Establishment Clause does not permit religious charter schools.

The Court therefore begins by examining the nature of Wilberforce's status as a private organization and the protections afforded to it under the Free Exercise Clause. The Court then considers whether Tennessee law transforms charter school operators into governmental entities or state actors. Concluding that it does not, the Court finally addresses whether any of the asserted anti-establishment interests permit Tennessee to exclude Wilberforce from the program under strict scrutiny. The Court finds that it does not.

i. <u>Wilberforce, as it presently exists, is a private organization entitled to Free Exercise Protection.</u>

Regardless of whether Wilberforce would be considered part of the government as a charter school, all parties agree that it is a private organization in its current form. And as a private nonprofit corporation, Wilberforce is undoubtedly entitled to First Amendment protections. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705–06 (2014); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746, 755–56 (2020). As an initial matter, the Court must, therefore, analyze whether Wilberforce has a valid Free Exercise claim.

The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940), provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. "The Free Exercise Clause protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." *Trinity Lutheran*, 582 U.S. at 458 (citation modified). And if the Supreme Court's Free Exercise precedent tells us anything, it is that "a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. This principle applies no less to state programs that fund or otherwise support education. *See id.* at 778–80 (tuition assistance program that prohibited funds from reaching "nonsectarian" schools violated the Free Exercise Clause); *Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *15–16 (collecting cases).

Here, Tennessee has created a generally available benefit: "the opportunity to apply for and contract with [an authorizer] to establish a charter school." *Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *17. The Act's Nonsectarian Requirement, however, "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Carson*, 596 U.S. at 789. Although religious organizations may now apply to operate charter schools under the Act, they

must do so on the condition that their schools remain secular. The Supreme Court made clear in *Carson* that discrimination based on religious use is no less constitutionally suspect than discrimination based on religious status. *Id.* at 787. Religious organizations like Wilberforce are therefore still "single[d] out . . . for disfavored treatment" because the Nonsectarian Requirement "inevitably deter[s] [and] discourage[s] the exercise of First Amendment rights." *Id.* at 463 (citation modified); *see Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.").

The Carroll Intervenors disagree, arguing that participating in Tennessee's charter program is not a public benefit. [Doc. 110 at 22–25]. They contend that a "public benefit" is limited to some kind of financial assistance, such as scholarships, unemployment benefits, or other affirmative assistance to its citizens. [*Id.*]. The Carrol Intervenors are mistaken.

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) provides a helpful illustration. In *Fulton*, the defendant, the City of Philadelphia, contracted with private agencies to place children with foster families. 593 U.S. at 529. One of those private organizations the city contracted with was Catholic Social Services ("CSS"). *Id.* Upon discovering that CSS would not certify same-sex couples to be foster parents due to its religious beliefs, the city gave CSS an ultimatum: either certify same-sex couples or lose the ability to renew its contract with the city. *Id.* at 531. The Supreme Court held that, by putting this choice to CSS, the city impaired CSS's Free Exercise rights. *Id.* at 532–35. The ability to contract with the city was, therefore, a public benefit that could not be conditioned on an applicant surrendering its religious beliefs. Indeed, the Sixth Circuit relies on *Fulton* to help identify what is considered a "generally available government benefit." *Dahl v. Bd. of Trs. of Western Mich. Univ.*, 15 F.4th 728, 731–32 (6th Cir. 2021) (per curiam) (holding

that playing intercollegiate sports was a "generally available benefit" in the context of college athletes refusing the COVID-19 vaccine on religious grounds). So too here, the opportunity to contract with authorizers to operate a charter school is a public benefit that Tennessee cannot deny Wilberforce solely because of its religious use.

The Carroll Intervenors also argue that operating a charter school is not a "right or privilege held in common by all citizens" because the Act also prohibits private schools, for-profit corporations, and individual citizens from operating a charter school. [Doc. 110 at 24–25]. The Sixth Circuit, however, flatly rejected this type of argument in *Dahl*. In *Dahl*, a group of collegiate athletes challenged the defendant university's policy that required athletes to be vaccinated against COVID-19 or risk losing their eligibility to play college sports. 15 F.4th at 730. Defendant asserted that playing college sports was not a "generally available benefit." *Id.* at 732. The Sixth Circuit disagreed, explaining that "generally available" in the free exercise context refers to "the baseline against which burdens on religion are measured." *Id.* (quoting *Locke v. Davey*, 540 U.S. 712, 726 (2004) (Scalia, J., dissenting)). Thus, the court found that "all plaintiffs must show is that they are 'otherwise eligible' to play intercollegiate sports—that is, eligible apart from the regulation that burdens their religious exercise." *Id.* Similarly, although the Act limits the available pool of entities that may operate a charter school, all Wilberforce must show is that it is "otherwise eligible" to operate a charter school apart from the Nonsectarian Requirement.

At its core, the Free Exercise Clause "protects against 'indirect coercion or penalties on the free exercise of religion.'" *Id.* at 732 (quoting *Trinty Lutheran*, 582 U.S. at 450–51); *see also Carson*, 596 U.S. at 780 (finding that a tuition assistance program that conditioned eligibility on religious status "effectively penalizes the free exercise" of religion). The Act's Nonsectarian Requirement does just that. It penalizes Wilberforce—an otherwise qualified organization—by

withholding the benefit of operating a charter school should it refuse to give up its religious exercise. *Id.* at 732–33. The State will contract with and pay a private nonprofit organization to operate a charter school—"so long as the schools are not religious." *Carson*, 596 U.S. at 781. "That is discrimination against religion." *Id.*

Accordingly, Wilberforce—as a private nonprofit corporation seeking to establish a charter school—is clothed with the full protections afforded by the Free Exercise Clause.

ii. <u>Tennessee's charter school framework does not transform Wilberforce into a government entity or state actor.</u>

Before considering whether the Nonsectarian Requirement survives strict scrutiny, the Court must address the Intervenors' threshold argument that Wilberforce, as it currently exists, is not the proper entity to focus on when determining whether free exercise protections apply. They contend that Wilberforce actually seeks to establish a "distinct type of entity created by Tennessee as part of its public school system." [Doc. 110 at 1; *see also* Doc. 115 at 13–14]. From that premise, they argue that the proposed charter school would have no Free Exercise rights because it would be both a government entity and state actor. They further maintain that, even if charter schools are private entities, they still qualify as state actors. The Court disagrees.[14]

At its heart, Tennessee's charter school program is an invitation for private participants to contract with the State to provide an alternative form of education. As explained below, charter schools under the Act are not separate government entities apart from their sponsor. Nor does the State's authorization and regulation of charter schools transform them into state actors for all purposes under either the public-function or entwinement test. Importantly, the Court's analysis is

[14] A determination of whether Wilberforce—as a charter school operator—would be a state actor is also necessary to resolve the Intervenors' argument that the State's antiestablishment interest is strong enough to withstanding strict scrutiny. As their argument goes, if Tennessee charter schools are government entities and state actors, then the State has a compelling interest not to fund a government institution that promotes religion—an institution like Wilberforce.

limited to whether Wilberforce, in its capacity as a charter school operator, would qualify as a government entity or state actor under federal law. The Court does not address whether charter schools in Tennessee may be considered public schools for purposes of state law.

*1. Tennessee charter schools are not government entities.*

At the outset, it is important to recognize three basic principles that the Supreme Court has established when it comes to identifying private versus state action. First, the "distinction between private conduct and state action turns on substance, not labels." *Lindke v. Freed*, 601 U.S. 187, 197 (2024). Otherwise, states could "manipulate[]" labels to avoid First Amendment scrutiny. *Carson*, 596 U.S. at 784. Second, the "'mere existence' of a 'regulatory scheme'—even if 'extensive and detailed'"—does not automatically make one a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 815–16 (2019). Third, "[t]he government may subsidize private entities without assuming constitutional responsibility for their actions." *S.F. Arts & Ath., Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 544 (1987). With those baseline considerations in mind, it is clear that Tennessee charter schools are not government entities under any of the Supreme Court's established tests.

In the Supreme Court's seminal government-entity cases, two defining characteristics have emerged that are not present in Tennessee charter schools: government creation and government control. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 394–95 (1995); *Biden v. Nebraska*, 600 U.S. 477, 492–94 (2023). Consider *Lebron*. There, the Supreme Court considered whether the National Railroad Passenger Corporation ("Amtrak") was a government entity subject to the First Amendment. *Lebron*, 513 U.S. at 376. Amtrak was created by federal statute, its board members were appointed by the President, and it was subject to reporting requirements imposed by Congress. *Id.* at 383–86. Based on these features, the Court held that Amtrak was a government entity since it was "established and organized under federal law for the very purpose of pursuing

federal government objectives" all while "under the direction and control of federal government appointees." *Id.* at 398. The Court applied a similar reasoning in *Biden*, concluding that the Missouri Higher Education Loan Authority was a government entity because "[i]t was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State." 600 U.S. at 491. Once again, government creation and control guided the Court's analysis. *Compare Lebron*, 513 U.S. at 399, *and Biden*, 600 U.S. at 491, w*ith Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 152 (1974) (state-incorporated corporation was not a government entity despite federal appointees on the board of directors because federal appointees were there merely to protect the United States' interest as a creditor rather than to exercise control as a policymaker).

Together, these cases demonstrate that Tennessee charter schools are "worlds apart" from the government-created and government-controlled entities that the Supreme Court has deemed instrumentalities of the State. *Lebron*, 513 U.S. at 399; *see also Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *18–23 (finding that Oklahoma charter schools are not government entities). As an initial matter, Wilberforce itself is undoubtedly a private entity. It was not created "by a special statute." *Id.* at 397. And the State lacks any authority to appoint its directors. This conclusion does not change if Wilberforce becomes the operator of a charter school.

As to creation, the Act places the initiative to establish a charter school in the hands of private sponsors, not the State. A sponsor that "seeks to establish a new public charter school" must submit an application to the appropriate authorizer. Tenn. Code Ann. § 49-13-106(i). The sponsor develops, among other things, the proposed school's "mission and goals," "academic plan," "operating budget," "code of behavior and discipline," and "proposed rules and policies for governance and operation of the school." *Id.* § 49-13-107(b). The school then comes into existence once the authorizer approves the sponsor's application and the parties enter into a "charter



Case 3:25-cv-00584-CEA-DCP Document 156 Filed 11/06/26 Page 42 of 66
PageID #: 6282

agreement." *Id.* § 49-13-110. Even then, the Act does not require the creation or incorporation of a distinct legal entity. Indeed, the authorizer does not issue new articles of incorporation, amend the sponsor's existing articles to have different purposes, or change in any way the corporate structure of the sponsor. In fact, the sponsor's existing articles of incorporation are included in the application and typically incorporated into the charter agreement. [Doc. 99-4, App. 1693, Ex. 47 at 10]. *Id.* § 49-13-107(b)(7)]; *see also* Tenn. Code Ann. § 49-13-110(a).

This framework bears little resemblance to the entities in *Lebron* and *Biden*, where the government itself created the entities and its mission through specific legislation. *Lebron*, 513 U.S. at 384 ("Later sections of the statute authorize Amtrak's incorporation, [] set forth its structure and powers, [] and outline [its] procedures . . .."); *Biden*, 600 U.S. at 489 ("Missouri created MOHELA as a nonprofit government corporation . . .."). The Tennessee legislature has instead established a process through which private sponsors may seek authorization to operate schools under a contractual charter agreement. *See Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *19 (noting that "a charter school only comes into existence because a private actor (or other applicant) initiates the process"). Although authorizers approve applications under the Act, "an otherwise private actor is not transformed into a government entity merely because it has been awarded a government contract, received a license, or granted some specific authority by state law." *Id.* (collecting cases).

An even stronger sign that Tennessee charter schools are not government entities is the lack of government control over them. Unlike the entities in *Lebron* and *Biden*, charter schools under the Act are governed by the private sponsor, which has the power to choose its own directors and governing body. Tenn. Code Ann. § 49-13-104(11), (17). Other than the requirement that the governing body of a charter school must include at least "one parent representative whose child is currently enrolled in a charter school operated by the governing body," the State has no control over the sponsor's board of directors. The lack of government control through appointees dictates

that Wilberforce, as either a private entity or charter school, is not a government entity. *See Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149 (6th Cir. 2014) (finding that the defendant was not a government entity since the government has no appointment power over it). Moreover, while it is true that the State heavily regulates charter schools under the Act, it does not exercise "day-to-day supervision" or statutory control over the school's operations. *See Forsham v. Harris*, 445 U.S. 169, 180 (1980). Although charter schools under the Act are "accountable to the authorizer for the purpose of ensuring compliance with the charter agreement and [the Act]," it is ultimately the charter schools themselves that develop the "rules and policies for governance and operation of the school." Tenn. Code Ann. §§ 49-13-107(b)(7), 49-13-111(d); *see also id.* § 49-13-102(b) (one of the purposes of the Act is to allow charter schools to operate with "maximum flexibility to achieve their goals").

The *Lebron* inquiry leads this Court to one conclusion: Tennessee charter schools are not government entities. The Intervenors point to the public purpose charter schools serve, their reliance on public funds, and the Act's designation of them as public schools. But, as we know, none of these features make Tennessee charter schools government entities in the absence of government creation and control. *See Lindke*, 601 U.S. at 197; *Halleck*, 587 U.S. at 815–16; *United States Olympic Comm.*, 483 U.S. at 544. While they are certainly relevant, the Court cannot say that Tennessee charter schools are anything like the government entities the Supreme Court has recognized.

Seeking to sidestep *Lebron* and its governing considerations, the Carroll Intervenors invoke federalism, urging the Court to defer to the State's "traditional sovereignty over public education" and to apply the factors discussed in *Carson* to determine whether Tennessee charter schools are government entities. [Doc. 110 at 9–14]. To be sure, the Court respects the principles of federalism and the State's authority to structure its public education system. But that authority does not permit

Tennessee to circumvent First Amendment scrutiny simply by labeling an entity a public school. *Carson*, 596 U.S. at 784. Ultimately, the government entity and state action doctrines exist to "enforce[e] th[e] constitutional boundary between the government and the private." *Halleck*, 587 U.S. at 808. Whether or not Tennessee is performing a traditional sovereign function, the Court remains obligated to perform "an independent inquiry" to determine an organization's "status as a government entity" under the Constitution. *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 51 (2015).

Nor did *Carson* establish a standalone test for determining whether a school is public or private. There, Maine created a tuition-assistance program for families whose school districts neither operated their own secondary schools nor contracted with another district to provide one. *Carson*, 596 U.S. at 773. Maine conditioned that assistance on a private school's being "a nonsectarian school." *Id.* at 774. The Supreme Court struck down the restriction as a violation of the Free Exercise Clause, holding that the "State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available benefit." *Id.* at 781. When Maine argued that its program merely provided the "rough equivalent of [a] public school education," the Court examined the relevant state statute and how the participating private schools differed from traditional public schools. *Id.* at 782–84. That discussion exposed the flaw in Maine's reasoning: States cannot evade First Amendment scrutiny by "manipulat[ing]" the definition or label of a particular program. *Id.* at 784. The common characteristics of traditional public schools discussed by the Court were utilized to demonstrate that the substance of the challenged provision mattered more than the labels the State used to describe the program. "In no way did *Carson* announce a new test for state action by private parties," *Woolard v. Thurmond*, 170 F.4th 701, 714–16 (9th Cir. 2026) (Bumatay, J., dissenting), by simply rejecting the State's argument as a matter of state statutory law.

Once again, as to determining whether an organization is a governmental entity, *Lebron* provides the proper test. Under that test, Wilberforce would not transform into a government entity simply by contracting with the State to operate a charter school.

Finally, the Coble Intervenors rely on *Greater Heights Academy v. Zelman*, 522 F.3d 678 (6th Cir. 2008), for the proposition that Tennessee charter schools are government entities. [Doc. 139 at 16–17]. In *Greater Heights*, the Sixth Circuit found that Ohio's community schools were "political subdivisions of the state" for purposes of sovereign immunity. 522 F.3d at 680. That holding is distinguishable from this case for two reasons.

First, *Greater Heights* addressed the discrete issue of sovereign immunity, not whether charter schools qualify as government entities under *Lebron* and its progeny. *Id.* at 679–81. In reaching its decision, the Sixth Circuit relied in part on Ohio's statutory classification of community schools as political subdivisions. *Id.* at 680. That approach makes sense in the sovereign-immunity context, where a State's treatment of an entity and its consent to suit are relevant considerations. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011) ("Sovereign immunity is the privilege of the sovereign not to be sued without its consent."). But to resolve the question in this matter—whether Tennessee charter schools are governmental entities for the purposes of the First Amendment—the Court cannot rely on statutory labels alone. *Lindke*, 601 U.S. at 197.

Second, even if *Greater Heights*'s analysis were applicable, the Sixth Circuit expressly grounded its decision in Ohio statutory law, which is "quite different from Tennessee law" on charter schools. *Project Reflect, Inc. v. Metro. Nash. Bd. of Pub. Educ.*, 947 F. Supp. 2d 868, 874 (M.D. Tenn. 2013). Most notably, Tennessee law does not define political subdivisions to include charter schools. *Id.* And unlike Ohio law, Tennessee permits the governing body of a charter school to sue or be sued directly. Tenn. Code Ann. § 49-13-124(a). Moreover, under Ohio law, once a

"proposing person" is approved to operate a community school, they may enter into a "preliminary agreement" with a local school board to "establish a governing authority," which is a new, distinct "corporation." Ohio Rev. Code §§ 3314.02(C)(1–2), 3314.03(A)(1). It is this new "governing authority" that later enters into the contract with the local school board if ultimately approved. *Id.* § 3314.02(D). In contrast, when an authorizer approves a charter school application under Tennessee law, the parties enter into a "written charter agreement signed by the sponsor and the authorizer." Tenn. Code Ann. § 49-13-110(a). The Court expresses no view on the status of Ohio's community schools. The point is simply that *Greater Heights*'s reasoning, grounded in sovereign immunity considerations and Ohio's statutory framework, does not control the analysis here. *See Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 814 (9th Cir. 2010) (finding that *Greater Heights*'s reasoning was inapplicable when it came to analyzing charter schools under Arizona law).

Wilberforce—the proposed charter school—would not be a government entity because it is neither created by the State nor controlled by the State through government appointees. Intervenors' reliance on *Greater Heights* and *Carson* does not alter that conclusion.

*2. Tennessee charter schools do not perform a traditional and exclusive public function.*

Intervenors next argue that, under the traditional state-action doctrine,[15] Tennessee charter schools are state actors because they perform a traditional and exclusive public function. To be a state actor under the "public function" test, a private entity must exercise "'powers traditionally

[15] Although the Supreme Court has recognized a "variety of approaches" for determining whether private action can be attributed to the State, *see Caviness*, 590 F.3d at 812, the Intervenors focus their briefing primarily on two of those tests: the public function and entwinement tests. [*See* Doc. 110 at 20, 22; Doc. 138 at 19, 22; Doc. 139 at 17 ("Public charter schools qualify under at least two tests.")]. The Court, therefore, limits its discussion to those two tests, along with the other various approaches the Intervenors adopt. [*See* Doc. 110 at Doc. 138 at 22 (arguing the "delegation" test applies)].

exclusively reserved to the State.'" *Halleck*, 587 U.S. at 809 (citing *Jackson*, 419 U.S. at 352). Merely because a function "serves the public good or the public interest in some way" is not enough. *Id.* "Rather, to qualify as a traditional, exclusive public function within the meaning of [the Supreme Court's] state-action precedents, the government must have traditionally *and* exclusively performed the function." *Id.* (emphasis in original).

Before analyzing the function in this case, it is important to recognize that the public function test is exceedingly narrow. The Supreme Court has cautioned that "very few functions fall into that category." *Id.* (internal quotations and citation omitted). Indeed, the Supreme Court had found more functions to fall outside the public-function category than within it. Only functions such as running elections and operating a company town have historically qualified; whereas, a variety of functions have not, including: "running sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, [ ] supplying electricity, [and operating a public access channel on a cable system]." *Halleck*, 587 U.S. at 809–10 (cleaned up) (collecting cases).

Much of the parties' briefing turns on how the Court should define the relevant function at issue. However, that question presents somewhat of a tricky issue based on the posture of this case. Generally, the state-actor inquiry focuses on the particular conduct that gives rise to the plaintiff's claim rather than asking whether a private entity is a state actor for all purposes. *See generally Rendell-Baker v. Kohn*, 457 U.S. 830, 844 (1982) (considering whether a private school was a state actor in making employment decisions); *Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22 (1st Cir. 2002) (examining whether a private school's disciplinary procedures in the context of a due process claim); *Caviness*, 590 F.3d at 813 (examining a charter school is a state actor in the context of certain employment-related actions); *Peltier*, 37 F.4th at 113–14 (considering whether a charter school's enforcement of a dress code constituted state action). Here, however, there is no challenge

to a discrete act taken by a potential state actor. Rather, Wilberforce challenges a statutory requirement that would govern its operation of a charter school from the outset. To determine whether Wilberforce would be a state actor as the operator of a charter school, the Court must therefore consider the function a charter school operator performs generally.

To begin, "education is not and never has been a function reserved to the state." *Logiodice*, 296 F.3d at 26 (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)). Indeed, governments have provided financial support to private schools, including denominational ones, from the founding era. *Espinoza*, 591 U.S. at 481. The framing of the particular function at issue, however, is not so simple.

The parties heavily dispute the function an operator of a charter school performs. On the one hand, Wilberforce believes the framing should be broad, arguing that the Court should define the function as education generally. [Doc. 99 at 20–21]. On the other hand, the Intervenors adopt a narrower definition, maintaining that providing a "free" and "public" (i.e., open to all) education is the relevant function. [Doc. 110 at 21–22; Doc. 139 at 17–18]. The Court finds that neither approach accords with the way the Supreme Court has defined the function at issue in other cases. As explained below, the more appropriate framing of the function is that Tennessee charter schools provide an alternative form of primary education. *See Peltier*, 37 F.4th at 143 (Quattlebaum, J., dissenting); Tenn. Code Ann. § 49-13-102(b).

The Supreme Court's decision in *Rendell-Baker* is exceptionally instructive. There, the court considered whether a private school—which shared many characteristics with Tennessee charter schools—was a state actor. *Rendell-Baker*, 457 U.S. at 831–34. The school was a private organization and did not have any government appointees on its board of directors. *Id.* at 832. The school functioned almost exclusively as a government contractor, whereby the state would refer students with special needs, drug addictions, or other behavioral problems that the school was

required to educate. *Id.* at 833. Altogether, state and federal funds accounted for somewhere between 90–99% of the school's operating budget. *Id.* The school also operated under detailed regulatory requirements, "many of which are common to all schools." *Id.* These regulations included rules governing recordkeeping, student-teacher ratios, personnel practices, and curriculum requirements for certain students. *Id.*

Despite substantial public funding, extensive regulation, and its contractual relationship with the state to provide education, the Supreme Court held the school was not a state actor. *Id.* at 843. The Court rejected the notion that the amount of funding and level of regulation transformed the school into a state actor.[16] *Id.* at 839–42. It also noted that private entities do not become state actors "by reason of their significant or even total engagement in performing public contracts." *Id.* at 841. Rather, the operation of the school was no different from "many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government." *Id.* at 840–41. The Court separately considered whether the school performed a function traditionally and exclusively reserved to the State. *Id.* at 842–43. The Court noted that although "the education of maladjusted high school students is a public function," it was a "legislative policy choice [that] in no way [made those] services the exclusive province of the State." *Id.* at 842.

The reasoning in *Rendell-Baker* is helpful in two respects. First, the school in *Rendell-Baker* shared several features with Tennessee charter schools: both rely heavily on public funding, operate under extensive state regulation, and provide educational services through a contractual relationship with the State. Those similarities weigh against treating Tennessee charter schools as

---

[16] This is precisely why Slater's expert opinion regarding the level of regulation Tennessee charter schools are subjected to does not create a genuine dispute of material fact. Not only does the Act provide that information, but the extensiveness of the regulation is not dispositive. Instead, courts look to other factors, such as those under the *Lebron* inquiry or the traditional state-action tests the Court examines here.

state actors. Consistent with *Rendell-Baker*, several courts of appeals—including the First, Third, and Ninth Circuits—have likewise concluded that similar private and charter schools are not state actors because providing publicly-funded education is not a traditional and exclusive government function. *See Logiodice*, 296 F.3d at 27–29 (rejecting a claim that a privately operated school, which contracted with the state to be the exclusive provider of public education in the district, was a state actor when disciplining a student); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 164–66 (3d Cir. 2001) (Alito, J.) (finding that a private school, which contracted with state and local governments to educate juvenile offenders, did not perform an exclusive and traditional public function); *Caviness*, 590 F.3d at 814–16 (holding that a private organization that operated an Arizona charter school was not a state actor under the public function test). As multiple courts of appeals, and now a federal district court, have acknowledged, *Rendell-Baker* "foreclosed" the argument that "public educational services" are "traditionally and exclusively the province of the state." *Peltier*, 37 F.4th at 142 (Quattlebaum, J., dissenting); *see also Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *27 ("But the operation of a school, even one that provides a free education, is not a function that has been 'traditionally the exclusive prerogative of the State.'" (quoting *Jackson*, 419 U.S. at 353)).

Second, *Rendell-Baker* provides guidance on how to define the relevant function. Rather than asking whether education generally is a public function, the Supreme Court examined the more specific function of educating "maladjusted high school students." *Rendell-Baker*, 457 U.S. at 842. That framing suggests that the inquiry requires at least some level of specificity into the function the school provides. *See Peltier*, 37 F.4th at 143 (Quattlebaum, J., dissenting). Indeed, the Supreme Court has since characterized *Rendell-Baker* as standing for the proposition that "providing special education" is not a function traditionally and exclusively reserved to the State.

*Halleck*, 587 U.S. at 810. Wilberforce's proposed definition, therefore, is too broad in light of *Rendell-Baker* and *Halleck*.

But the need for a sufficiently specific definition does not justify the Intervenors' approach. *Halleck* and *Carson* make clear that the relevant function cannot be defined by labels that assume the very conclusion the state-action inquiry is meant to resolve. Asking whether "free" and "public education" is traditionally an exclusive state function "ignores the threshold state-action question." *Halleck*, 587 U.S. at 811; *see also Peltier*, 37 F.4th at 147–48 (Quattlebaum, J., dissenting) (explaining that whether "free, public education" is "traditionally an exclusive state function" is a "circular" question). In *Halleck*, film producers sued a private nonprofit corporation that New York City had designated to operate a public-access television channel. 587 U.S. at 805–08. Similar to the Intervenors here, the producers in *Halleck* argued that the relevant function was the "operation of a public forum for speech" rather than the "operation of public access channels on a cable system." *Id.* at 811. The Supreme Court rejected that framing, explaining that the inquiry must focus on the function the private entity actually performs. *Id.* at 811–13. Otherwise, states could "manipulate[]" the "definition of a particular program" by using outcome-determinative adjectives to sidestep the proper relevant function inquiry. *Carson*, 596 U.S. at 784; *see also Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *24–28 (reasoning that it is improper to define the relevant function as "the provision of free public education" for charter schools).

For these same reasons, the Intervenors' reliance on *Peltier* and *Drummond* is unpersuasive. The Court disagrees with both courts' framing of the function at issue.

First, both courts defined the relevant function as the provision of free, public education. *Drummond,* 2024 OK at 30; *Peltier*, 37 F.4th at 118. That framing is problematic for the reasons already discussed. The Supreme Court has made clear that providing taxpayer-funded, public education though private entities, though undoubtedly a public function, is not one traditionally

and exclusively reserved to the State. *Rendell-Baker*, 457 U.S. at 842. More fundamentally, defining the relevant function as providing "free" and "public" education "mistakenly ignores the threshold state-action question." *Halleck*, 587 U.S. at 811–13. In *Halleck*, the Supreme Court explained that changing the relevant function to hosting a public forum did not transform a private entity into a state actor simply because the government is constrained when it opens a public forum. *Id.* The same underlying principle applies here. That charter schools provide "public" and "free" education, which the State also offers in its traditional public schools, does not establish that providing education through the charter school model is a function traditionally and exclusively reserved to the State. As *Halleck* cautions, the inquiry cannot be resolved by defining the function in terms that presuppose the entity's government status.

Second, both courts placed substantial weight on their respective States' statutory frameworks and constitutional obligations to provide free public education. *Drummond,* 2024 OK at 14–26; *Peltier*, 37 F.4th at 118. But neither consideration answers the federal constitutional question before this Court. As explained above, a State cannot transform a private entity into a government actor simply by labeling it a public institution or incorporating it into a statutory scheme. *See Carson*, 596 U.S. at 784 ("But the definition of a particular program can always be manipulated to subsume the challenged condition, and to allow States to recast a condition on funding in this manner would be to see the First Amendment . . . reduced to a simple semantic exercise." (internal quotations and citation omitted)). Nor does a State's constitutional duty to provide education establish that every private entity that assists in fulfilling that duty becomes a state actor. *See Rendell-Baker*, 457 U.S. at 842 (finding that assisting the state in educating "maladjusted high school students" did not transform the private school into a state actor); *Logiodice*, 296 F.3d at 28–31 (holding that a private school funded by the state and which provided the only education in a particular district was not a state actor); *Caviness*, 590 F.3d at 814–16

(determining that an Arizona charter school was not a state actor). The First Circuit rejected the same argument in *Logiodice*. Although Maine had a constitutional duty to provide secondary education to all children, the court declined to treat a private school as a state actor even when it was the only secondary school in the district. *Logiodice*, 296 F.3d at 29. Doing so, the First Circuit explained, would require the creation of a "new ad hoc exception" to the state-action doctrine—a step it wisely left to the Supreme Court. *Id.* This Court likewise declines to create such an exception considering *Rendell-Baker*.

To be sure, the Supreme Court has, under certain circumstances, found a private entity to be a state actor when the government "has outsourced one of its constitutional obligations." *Halleck*, 587 U.S. at 810 n.1 (citing *West v. Atkins*, 487 U.S. 42 (1988)). But that is not the case here. In *West*, the Supreme Court held that a private physician who contracted with the State acted under the color of state law because the State had a constitutional duty under the Eighth Amendment to provide inmates with medical care and had delegated that responsibility to the physician. 487 U.S. at 42–45, 54–56. The physician was not merely supplementing a service the State continued to provide; he was fulfilling an obligation the State owed to individuals who had no alternative means of obtaining the necessary care due to their incarceration. *Id.* at 55 ("It is only those physicians authorized by the State to whom the inmate may turn. Under state law, the only medical care West could receive for his injury was that provided by the State."). The State had assumed responsibility for the inmate's care and left him no choice but to rely on the physician it provided. *Id.*

The Sixth Circuit applied similar reasoning in *Brent v. Wayne County Department of Human Services*, 901 F.3d 656, 676–77 (2018), finding that a private foster-care agency was a state actor when caring for children removed from their homes. The court explained that "Michigan assumed [ ] constitutional obligations when it removed the Brent children from their home, and

Michigan subsequently contracted with [private foster-care agencies] to fulfill its duties." *Id.* Like the inmates in *West*, the children were wards of the State, dependent on the State and its chosen providers for care. In both cases, the State had assumed direct responsibility for vulnerable individuals who had no independent choice over who would provide the services they needed.

Tennessee's relationship with charter schools is fundamentally different. The State has not transferred its obligation to provide public education to private charter school operators. It continues to operate traditional public schools, and students remain free to attend them rather than a charter school. Charter schools instead offer families an additional option within the State's broader educational system. Unlike the inmate in *West* or the children in *Brent*, students attending charter schools are not dependent on a particular private operator because the State has placed them in its care or completely outsourced its responsibility to provide education.[17] Tennessee's authorization and regulation of charter schools therefore do not amount to outsourcing its constitutional obligation to provide public education.

Accordingly, to the extent *Peltier* and *Drummond* treat the provision of free public education, or the State's legal obligations to provide it, as sufficient to establish state action, this Court finds their reasoning and Intervenors' similar arguments unpersuasive.

In sum, Tennessee charter schools provide an "alternative" means of educating students, expanding parental choice and permitting educational approaches that may differ from those of traditional public schools. Tenn. Code Ann. § 49-13-102. Their defining feature is not simply that they educate children, or that they do so for free with taxpayer dollars, but that they do so through

[17] Even under this reasoning, there is an argument that Tennessee charter schools would still not qualify as state actors under the outsource doctrine. Again, consider *Rendell-Baker*. There, troubled high school students were referred to the schools at issue by public school officials or by a state drug rehabilitation agency. *Rendell-Baker*, 457 U.S. at 832. Thus, even though students were, in a sense, obligated to attend a private school of the State's choosing, the Supreme Court did not consider the school to be a state actor. *See Logiodice*, 296 F.3d at 29 (finding that a private school of last resort in the district was not a state actor).

a distinct model of school governance and educational design that offers "maximum flexibility to achieve their goals." *Id.* § 49-13-102(b). This is achieved by permitting charter school operators to develop a school's mission, curriculum, instructional approach, and distinct "academic focus" within the framework established by state law. *Id.* § 49-13-107(b). That model allows schools to pursue different educational priorities and methods rather than requiring every school to follow a uniform approach. Providing education through alternative models, however, has never been the traditional and exclusive prerogative of the state. *Cf. Pierce*, 268 U.S. at 534 (recognizing that the operation of private schools has long been "useful and meritorious"); *Espinoza*, 591 U.S. at 480 ("In the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones. 'Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy.'" (quoting L. Jorgenson, *The State and the Non-Public School, 1825–1925*, p. 4 (1987)). And even if the relevant function were defined more broadly as educating children in general—a formulation some courts have adopted—the result would be the same. *See Caviness*, 590 F.3d at 814–15; *Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *24–28.

Like the schools in *Rendell-Baker*, *Logiodice*, *Robert S.*, *Caviness*, and *Ben Gamala*, Tennessee charter schools are operated by private actors that contract with State. While it is certainly commendable that Tennessee wants to "[e]ncourage the use of different and innovative teaching methods," it cannot do so by opening the door to private participants just to discriminate against them on the basis of religion. As explained above, the Court finds that, in the context of operating a charter school, providing an alternative form of education is not the traditional and exclusive prerogative of the State.

### 3. *Tennessee charter schools are not state actors under the entwinement test.*

The second state-action test that the Intervenors rely on is the entwinement doctrine. A private entity can qualify as a state actor when the State is "entwined in its management or control." *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 297 (2001) (cleaned up). A close look at Tennessee charter schools shows that they are not "overborne by the pervasive entwinement of public institutions and public officials in [their] composition and workings." *Id.* at 298.

The Supreme Court's decision in *Brentwood* illustrates the degree of government involvement necessary to establish state action under the entwinement test. There, the Court was tasked with determining whether a nominally private athletic association was a state actor. *Brentwood*, 531 U.S. at 291. True to form, the Court began its analysis by emphasizing that the association's public or private characterization in statutory law was not dispositive. *Id.* at 296. The Court then considered the association's composition and operations. *Id.* at 298–99. Its membership consisted overwhelmingly of public schools, its governing structure was dominated by public school officials, and those officials selected the representatives who established and enforced its rules. *Id.* at 299–300. Indeed, public officials did not merely oversee the association; they performed nearly all the functions necessary for it to operate. *Id.* at 300 ("There would be no recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms."). The association's connection to the State extended even further: members of the State Board of Education served on the board of control and legislative council. *Id.* These overlapping personnel and governance structures demonstrated that the state was so thoroughly integrated into its composition and operations that its private character was effectively overcome. *Id.* at 298–300.

Nothing comparable exists under Tennessee's charter school framework. A charter school's governing body—a private nonprofit entity—is responsible for its policies and operation, which is not composed of any state officials or otherwise controlled by them. Tenn Code Ann. §§ 49-13-104(11), (17), 49-13-106. That the government has neither a presence on the school's governing body nor control over its management strongly counsels against finding government entwinement. *See Caviness*, 590 F.3d at 816 n. 6 (recognizing that charter schools in Arizona are not state actors under the entwinement test because the complaint did not include any allegations that state actors were in involved in its governing board); *Logiodice*, 296 F.3d at 27–28 ("But unlike the association in *Brentwood*, MCI is run by private trustees and not public officials; two officials of the school district (a school principal and a teacher) are trustees but serve as private citizens."); *Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *29–31 ("Unlike the athletic association in *Brentwood*, a governing board, selected by and composed of private individuals, is responsible for a charter school's policies and operational decisions.").

Although the State authorizes charter schools, subjects them to regulations, and retains oversight through the authorizing process, those forms of supervision do not establish the pervasive entwinement found in *Brentwood*. *See Rendell-Baker*, 457 U.S. at 833 (private school was subject to "detailed regulations"); *Jackson*, 419 U.S. at 357 (public utility subject to "extensive and detailed" regulations and approval procedures); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) (State's oversight of a private insurance-review scheme, including its establishment, regulation, and requirement that insurers obtain agency approval, did not constitute state action). Although no single factor is dispositive under the *Brentwood* inquiry, the fact that authorizers under the Act behave as external regulators of charter schools instead of serving as officials of the schools themselves is particularly weighty. [*See* Doc. 99-4, App. 1552, Ex. 41 at 1 ("Each charter school's governing board shall *operate independently* of the Board and maintain full authority over

instructional programming, financial management, personnel decisions, school culture, and scheduling. The Board's role is not to manage the success or failure of individual schools, but to hold schools accountable for performance and compliance with applicable laws and regulations." (emphasis added))]. Were regulatory oversight, public funding, or the requirement to obtain government approval sufficient to establish state action, countless private contractors and entities would become state actors—a result the Supreme Court has explicitly cautioned against. *See Halleck*, 587 U.S. at 816; *see also Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *31.

In short, the Court finds that the State is not pervasively entwined with the "management or control" of charter schools under the Act. *Brentwood*, 531 U.S. at 296.

iii. The Act's Nonsectarian Requirement fails under strict scrutiny.

Having found that Wilberforce—as merely an applicant or would-be sponsor of a charter school—has Free Exercise rights, the Court must now determine whether the Act's Nonsectarian Requirement survives constitutional scrutiny. Because the Nonsectarian Requirement works to "disqualify some private schools from funding solely because [of their] religious [use]," it must be subjected to "the strictest scrutiny." *Carson*, 596 U.S. at 780 (cleaned up).

"To satisfy strict scrutiny, the government action must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id.* at 780–81 (cleaned up). Importantly, "[a] law that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in *rare* cases." *Id.* (emphasis added) (cleaned up). Like the state programs in *Espinoza*, *Trinity Lutheran*, and *Carson*, this is not one of those rare cases.

Again, KCBE did not defend the constitutionality of the Nonsectarian Requirement and the State of Tennessee did not intervene in this matter, so the government has failed to brief whether the provision survives strict scrutiny. And "the government has the burden to establish that the challenged law satisfied strict scrutiny." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Because the

Carroll Intervenors argued that strict scrutiny did not apply in the first place, only the Coble Intervenors have briefed the issue. [Doc. 139 at 20–25]. Although it is unclear whether the Coble Intervenors can carry the burden's government for it, their asserted antiestablishment interests on behalf of the State are not sufficient to save the Nonsectarian Requirement.

To justify the Nonsectarian Requirement, the Coble Intervenors assert various antiestablishment interests. [*Id.*]. Primarily, they contend that the Establishment Clause prohibits the establishment of a religious government entity and the funding of religious education. [*Id.*]. To start, the Court has already found that Wilberforce is not a government entity or state actor. Nor would it be if permitted to operate a charter school. As explained above, charter schools under the Act are primarily created through private initiative. Although the State may ultimately approve a charter school application, it certainly does not establish a church or other religious institution. *See Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947). It merely contracts with the private institution to operate a charter school. The Coble Intervenors' argument that State-established religious institutions are unconstitutional, therefore, does not apply.

As to the antiestablishment interest in preventing the funding of religious education, it too fails. There does not exist any "historic and substantial" tradition to support Tennessee's "decision to disqualify religious schools from government aid." *Espinoza*, 591 U.S. at 480. And if the Supreme Court's Free Exercise precedent tell us anything, it is this: Neutrally administering a state education program in which funds reach religious schools does not offend the Establishment Clause because it neither favors nor disfavors religion. *See Carson*, 596 U.S. at 781 ("A State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise."); *Espinoza*, 591 U.S. at 484–85 (finding that a State's attempt to prohibit religious institutions from participating in a scholarship program was unconstitutional); *Mitchell v. Helms*,

530 U.S. 793, 829 (2000) (plurality op.) ("In short, nothing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of this Court bar it."); *see also Ben Gamla*, 2026 U.S. Dist. LEXIS 221142, at *36–37. This is because a State's interest "in achieving greater separation of church and State than is already ensured under the Establishment Clause . . . is limited by the Free Exercise Clause." *Espinoza*, 591 U.S. at 484.

As the Court has already explained, states have a long history of supporting religious education through public funding. *See Espinoza*, 591 U.S. at 480. Tennessee's charter school funding mechanism is consistent with that tradition. Like the programs at issue in *Espinoza* and *Carson*, Tennessee distributes funding on a per-pupil basis, meaning that public funds follow students to the schools their families choose. *See* Tenn. Code. Ann. § 49-13-112. Families are free to select a charter school or pursue other educational options, and the State's role is to provide funding to the school in which a student enrolls. *Mitchell*, 530 U.S. at 816 ("If aid to schools, even 'direct aid,' is neutrally available and, before reaching or benefiting any religious school, first passes through the hands (literally or *figuratively*) of numerous private citizens who are free to direct the aid elsewhere, the government has not provided any 'support of religion.'" (emphasis added) (cleaned up)). That the funds ultimately reach a religious institution—approved to operate a charter school—does not transform the State's support for a generally available educational benefit into an establishment of religion.

Nor is the antiestablishment interest in *Locke v. Davey*, 540 U.S. 712 (2004), present here. There, the Supreme Court upheld a scholarship program that prohibited students from using public funds to pursue a degree in devotional theology. *Locke*, 540 U.S. at 716. But the Supreme Court has since emphasized that Locke rested on the State's "historic and substantial interest" in preventing taxpayer funds from being used to train members of the clergy. *Carson*, 596 U.S. at

770 (quoting *Locke*, 540 U.S. 725). The Supreme Court cautioned that *Locke* "cannot be read to generally authorize the State to exclude religious persons from the enjoyment of public benefits on the basis of their anticipated religious use of the benefits." *Id.* Thus, *Locke*'s narrow exception does not apply here. Although Wilberforce intends to provide a Christian education, that mission does not mean its students will be trained as members of the clergy. Indeed, even in *Locke*, the scholarship program permitted students to attend explicitly religious institutions if they did not pursue a degree in the ministry. *Locke*, 540 U.S. at 717. The limited interest in *Locke*, therefore, does not salvage the Act's Nonsectarian Requirement.

Accordingly, no compelling interest has been offered that supports the Nonsectarian Requirement, nor is it necessary to comply with the Establishment Clause. Based on the long history of government support for religious schools, the Court finds that the Nonsectarian Requirement cannot be squared with the original meaning of the First and Fourteenth Amendments. By planning to enforce the Nonsectarian Requirement, KCBE violated Wilberforce's Free Exercise rights under the First Amendment.

### C. Permanent Injunction

Because the Court has found the Nonsectarian Requirement unconstitutional, the Court must now address Wilberforce's claim for a permanent injunction.

A party requesting a permanent injunction must show: (1) that it has suffered irreparable harm; (2) that legal remedies fail to compensate for the injury; (3) that a balance of the equities supports injunctive relief; and (4) that the public interest favors a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Here, each factor weighs in favor of enjoining KCBE from enforcing the Nonsectarian Requirement against Wilberforce.

Regarding the first factor, constitutional violations establish irreparable injury. *ACLU v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003) ("[I]f it is found that a constitutional right is

being threatened or impaired, a finding of irreparable injury is mandated."). "The loss of First Amendment freedoms, for even minimal period of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Looking to the second factor, "[t]here are no available remedies at law that are adequate to compensate for a loss of First Amendment rights." *Brinkman v. Budish*, 692 F. Supp. 2d 855, 866 (S.D. Ohio 2010) (internal quotations and citation omitted). As it stands, Wilberforce cannot attempt to pursue its purpose—to open a charter school—unless KCBE is enjoined from enforcing the Nonsectarian Requirement. As for the third factor, the balance of equities leans in favor of enjoining KCBE because it has no interest in unconstitutionally applying the Nonsectarian Requirement and is therefore not harmed by its enjoinment. *See Deja Vu of Nash., Inc. v. Metro. Gov't of Nash. & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]f the plaintiff shows . . . that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment."). Similarly, "[i]t is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). Therefore, the fourth factor also weighs in favor of an injunction. *See id.*

Based on these considerations, the Court finds that a permanent injunction against KCBE is warranted. KCBE will be enjoined from enforcing the Nonsectarian Requirement, Tenn. Code. Ann. § 49-13-111(a)(2), against Wilberforce. *See infra* Part VII at ¶ 9. This, of course, does not mean that KCBE will ultimately approve Wilberforce's application. KCBE may find other nondiscriminatory reasons to deny Wilberforce from operating a charter school; however, it cannot do so because of the Act's Nonsectarian Requirement.

**D. Nominal Damages**

Finally, the Court must address Wilberforce's claim for nominal damages. Wilberforce

argues that it is entitled to nominal damages based on KCBE's action with respect to the 2025–26 application cycle. [Doc. 99 at 25]. In response, KCBE asserts that it is entitled to sovereign immunity because it was merely following state laws, policies, and mandates. [Doc. 137 at 9–10]. The Court agrees with KCBE.

Ordinarily, a plaintiff is "entitled to at least nominal damages for violation of his constitutional rights." *Martin v. Kelley*, 803 F.2d 236, 239 n.3 (6th Cir. 1986). But a plaintiff may not "use § 1983 to sue the State for damages, even nominal ones, and get around the Eleventh Amendment." *Saint Michael Acad., Inc v. Hertel*, No. 22-1054, 2022 U.S. App. LEXIS 30011, at *7 (6th Cir. 2022). Although sovereign immunity does not always extend to school boards, "[w]hen a local body or its official [is] sued for complying with state mandates that afford no discretion, they act as an arm of the state, and enjoy the state's immunity." *L.E. v. Lee*, 728 F. Supp. 3d 806, 828 (M.D. Tenn. 2024) (citing *Brotherton v. Cleveland*, 173 F.3d 552, 556–67 (6th Cir. 1999)).

Here, state law categorically prohibits religious charter schools. Tenn. Code Ann. § 49-13-111(a)(2). The Act mandates KCBE, as the relevant authorizer, to "enforce compliance with the requirements of [the Act]." *Id.* § 49-13-111(d). KCBE, therefore, was merely complying with a state mandate that afforded no discretion. Although a sponsor may apply for waiver, they may not be granted for regulatory or statutory requirements related to "federal and state civil rights." *Id.* § 49-13-111(p). And the only person with authority to waive the State Board of Education rules for a charter school under Tennessee law is the Commissioner of Education. *Id.* § 49-1-203. Thus, KCBE had no discretion to waive the Nonsectarian Requirement as to Wilberforce.

Accordingly, because KCBE has been sued for complying with a state mandate that affords no discretion, the Court finds that it can enjoy the state's sovereign immunity. Wilberforce's claim

for nominal damages is **DENIED**.

## VII. CONCLUSION

The First Amendment does not permit Tennessee to open its charter school program to private participants and then exclude them because they seek to exercise their religion. "That is discrimination against religion." *Carson*, 596 U.S. at 781. To be sure, Tennessee retains broad authority to structure its public-education system—and it need not create a charter school program at all. But having chosen to make that opportunity generally available to private participants, the State cannot condition participation on the surrender of a constitutionally protected right, no matter how the program is described. Accordingly, Tennessee's Nonsectarian Requirement for its otherwise generally available charter school program violates the Free Exercise Clause of the First Amendment.

For the foregoing reasons, the Court hereby **ORDERS** the following:

1. Wilberforce's Post-Discovery Motion for Summary Judgment [Doc. 99] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Wilberforce's request for nominal damages against KCBE is **DENIED**. The Motion is **GRANTED** in all other respects.

2. KCBE's Amended Motion for Summary Judgment [Doc. 123] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, it is **GRANTED** to the extent that Wilberforce's claim for nominal damages is denied. It is **DENIED** in all other respects.

3. KCBE's original Motion for Summary Judgment [Doc. 109] is **DENIED AS MOOT**.

4. The Carroll Intervenors' Motion to Dismiss the Amended Complaint for Lack of Subject Matter Jurisdiction or For Summary Judgment on Plaintiff's Free Exercise Claims [Doc. 106] is **DENIED**.

5. The Coble Intervenor's Motion for Summary Judgment [Doc. 114] is **DENIED**.

6. Wilberforce's various Motions to Exclude [Docs. 104, 111, 113] are **DENIED**.

7. The Tennessee Charter School Center's Motion for Leave to File of Amicus Curiae [Doc. 102] is **DENIED**.

8. The Court **DECLARES** that Tenn. Code Ann. § 49-13-111(a)(2) (2026)—as it relates to the enforcement of the provision that charter schools must operate as "nonsectarian" and "nonreligious"—as applied to Wilberforce is unconstitutional in violation of the First Amendment of the United States Constiution.

9. Defendant Knox County Board of Education is **PERMANENTLY ENJOINED** from enforcing Tenn. Code Ann. § 49-13-111(a)(2)—as described in the preceding paragraph 8—against The Wilberforce Academy of Knoxville in all future application cycles.

**A SEPARATE JUDGMENT WILL ENTER.**

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**